BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       .

                     .  Case Number 21-cr-552

       Plaintiff,      .

                     .

   vs.               .

                     .  Washington, D.C.

KENNETH JOSEPH OWEN THOMAS,   .  May 17, 2023

                     .  9:08 a.m.

       Defendant.      .
- - - - - - - - - - - - - - - - -


TRANSCRIPT OF JURY TRIAL, VOLUME 3
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the United States:     SAMANTHA MILLER, AUSA
                       SEAN MCCAULEY, AUSA
                       United States Attorney's Office
                       601 D Street Northwest
                       Washington, D.C. 20579

For the Defendant:        JOHN PIERCE, ESQ.
                       ROGER ROOTS, ESQ.
                       John Pierce Law P.C.
                       21550 Oxnard Street
                       Third Floor, OMB #172
                       Woodland Hills, California 91367


Official Court Reporter:   SARA A. WICK, RPR, CRR
                       333 Constitution Avenue Northwest
                       Room 4704-B
                       Washington, D.C. 20001
                       202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

TESTIMONY

JESSICA BABOULIS        Direct Examination............... 22
                        Cross-Examination................ 64
                        Redirect Examination............. 105
                        Recross-Examination.............. 111

ANTHONY CAMPANALE       Direct Examination............... 114
                        Cross-Examination................ 125
                        Redirect Examination............. 137
                        Recross-Examination.............. 138

RODNEY ANDERSON         Direct Examination............... 142
                        Cross-Examination................ 157
                        Redirect Examination............. 162

SCOTT AINSWORTH         Direct Examination............... 164
                        Cross-Examination................ 200
                        Redirect Examination............. 216
                        Recross-Examination.............. 219

EXHIBITS RECEIVED

Government 119.......................................... 26
Government 105.......................................... 35
Government 106.......................................... 38
Government 107.......................................... 40
Government 120 and 204.................................. 46
Government 201.......................................... 50
Government 202.......................................... 51
Government 103.......................................... 54
Defense 301.2.......................................... 93
Government 309......................................... 121
Government 504......................................... 124
Defense 236............................................ 133
Government 304......................................... 153
Government 307.1....................................... 155
Government 707......................................... 155
Government 303X........................................ 213

P R O C E E D I N G S

(Jury not present.)

THE CLERK:  Matter before the Court, Criminal Case Number 21-552, United States of America versus Kenneth Thomas.

Counsel, please come forward and state your names for the record, starting with the government.

MS. MILLER:  Good morning, Your Honor.  Samantha Miller on behalf of the United States.  Sean McCauley is here.  He just stepped out into the hall for one moment.

THE COURT:  Good morning.

MS. MILLER:  And also, our paralegal Brianna Rummens is here, and Special Agent Alexis Brown is also here.

THE COURT:  Okay.  Great.

MR. PIERCE:  Good morning, Your Honor.  John Pierce on behalf of defendant, Kenneth Joseph Thomas.  Also, co-counsel Roger Roots is here, our paralegal Emily Lambert, and Mr. Thomas is present.

THE COURT:  Good morning, everyone.  Before we bring the jury out, I just wanted to run through a couple of questions I had on the government's exhibits.

So the text messages referencing Bowser's curfew, am I correct that those are covered by the declaration of the custodian in Exhibit 114?  Is that --

MS. MILLER:  I'm 99 percent sure that's right, but I will double-check.

THE COURT:  All right.  And then on the Bowser curfew, I had a question for the defense on this.  So you've objected as to completeness.  That's my understanding.  This is the redacted curfew on -- I don't know if this is a curfew, but it's the declaration of a second public emergency.

Is the government introducing this?  This is Exhibit 121.

MS. MILLER:  Our exhibit list, Your Honor?

THE COURT:  I think so.

MS. MILLER:  Then yes, we are introducing it.

THE COURT:  As I understand it, the defense objected to this exhibit on completeness grounds.  This is 121.  Is the point -- what's the purpose of introducing this?  Remind me what the government's trying to show here.

MS. MILLER:  Yes, Your Honor.

In one of the defendant's own videos, you hear an emergency alert that you get -- sometimes you get them for hurricane warnings and stuff.  And you can hear it on his own videos.  So we are introducing that as evidence of what that sound was with his video, which was the -- around the same time that that alert went out.

THE COURT:  We're talking about Exhibit 121, the administrative issuance system?

MS. MILLER:  I'm sorry.  That's the mayor's order declaring a curfew.

THE COURT:  Right, declaring a curfew.

MS. MILLER:  They're all interrelated --

THE COURT:  Sorry.  It's January 6.  I was looking at the January 8 at the top.

So this is the curfew.  The defense objected on completeness grounds.  The government said security information is redacted?

MS. MILLER:  So I think that they are objecting to multiple different exhibits for redactions.  One of them is for just personal information of the folks who sent the e-mails that are a part of that text alert.

If we are referring to 121, which is the mayor's order, there's portions of that redacted, and I've done some investigating.  The order is publicly available online.  I think the parts that are redacted is because they are inflammatory for the defense.

THE COURT:  And I wonder, there are other parts not redacted, to me -- I'm not trying to try their case, but I just wonder whether the defense would just stipulate there's this order.  Paragraph 5 talks about how the protests were transformed from peaceful to violent, barricades were stormed, persons entered the Capitol.

You all want this thing coming in as this?

MS. MILLER:  It's already redacted, which takes out even more information.

THE COURT:  I know.  I guess I'm just -- if you all

don't want to stipulate, don't stipulate.  But I was just surprised that --

MR. ROOTS:  Your Honor, we honestly have not seen the full, the complete one.  So we don't know what is redacted.

THE COURT:  But my point is, there's stuff that's not redacted that you might want redacted.

You say this is available online right now?

MS. MILLER:  Yes, Your Honor.

THE COURT:  You all ought to be able to look at this.  The full is publicly available online.

Anyway, is this coming in with one of the first couple witnesses?

MS. MILLER:  Yes, Your Honor, the first -- no, Your Honor, not one of the first couple witnesses.

THE COURT:  So we can address this later.

Is the government also introducing the Secret Service records?

MS. MILLER:  Yes, Your Honor, through the first witness.

THE COURT:  And this witness lays, what, a business record foundation?

MS. MILLER:  She has personal knowledge.

THE COURT:  Of these records?

MS. MILLER:  Yes.

THE COURT:  Okay.  And then am I right that the 302

and search warrants are just for refreshing recollection?

MS. MILLER:  Just in case, yes, Your Honor.

THE COURT:  So that's all for the exhibits.  Let me just run through a couple of other issues to clarify.

I assume you all have reviewed the Court's pretrial order on do's and don'ts in trial.  If you haven't, please do so.

Highlighting a couple issues, no speaking objections.  If necessary, we will get on the headsets to discuss objections.

I've seen some facial expressions from counsel's table.  None of that in front of the jury.  That's not appropriate.

I've reviewed on the sequestration issue the government's notice of authority.  Nothing the government has presented has persuaded me to change the positions I adopted yesterday, which is as to Ms. Lambert, I find she does fall under the exception for a person whose presence the party shows to be essential to presenting the party's claim or defense.  That's Federal Rule of Evidence 615(c).  She is such a witness.

And another judge of this court has said this exception covers not only counsel of record but also their legal assistants.  That's *Minebea Company v. Papsti*, P-a-p-s-t-i, at 374 F.Supp.2d at 234.

As I understand, Ms. Lambert will not be making argument in any way as a legal advocate.  I see little risk that her testimony will be shaped by that of other witnesses or improper collusion.  As I understand it, she's simply an overview

witness.  Correct?

MR. ROOTS:  (Nodded head.)

THE COURT:  All right.  And I don't expect her to testify that she personally observed any disputed facts. Therefore, I will allow her to remain at the counsel table and in the courtroom.

As to the government's two case agents, as I've said, I'm unpersuaded that Rule 615(b) extends to more than one representative for a nonnatural party, and Rule 615(c) at least as of now does not seem to apply to the second case agent. Again, in *Minebea Company*, this court ruled that 615(b) would permit a single designated representative of one plaintiff and a single designated representative of the other plaintiff because the plaintiffs are not natural persons.  That's 374 F.Supp.2d at 234.

Judge Cooper also encountered a similar situation in *U.S. v. Khatallah*, Abu Khatallah.  That's 2017 WL 11494061 at 2. And he permitted the government to designate one case agent as a representative to be present during trial.

All right.  As to the evidence relating to effect on commerce, the defense has represented that it may call a witness from the mayor's office to testify about any effects of January 6 on commerce within D.C.

I just want to note, I'm sure everybody's aware, but under 231(a)(3), the government can prove a violation in multiple

ways.  Right?  You all know it can prove it by an effect on commerce or a movement of any article or commodity in commerce or the conduct or performance of any federal protected function.

I'll address the issue, but I just want to make sure we're all on the same page there about the jury instructions.

The defense understands there's three ways?

MR. ROOTS:  (Nodded head.)

THE COURT:  All right.  I read the statutory language, which states that the adverse effect can be caused in any way or degree as requiring only that the government show some effect on commerce, not a net adverse effect.  So the defense can't simply rebut the government's case that one sector of commerce, i.e. Safeway, was adversely affected by showing that in some other sector of D.C. commerce there was a positive effect.

But the defense can rebut the government's case by showing that there was no adverse effect on commerce at all or that any adverse effect was not caused by January 6.  So I will permit the defense to put on evidence and elicit testimony relating to the commerce prong.

It can put on evidence, for example, that contradicts the government's evidence that January 6 negatively impacted Safeway in particular.  They can also introduce effects on other commerce in D.C., but I note that such evidence would only be relevant in order to show whether Safeway really was adversely affected or whether January 6 really caused any adverse effect

to Safeway.

What I will not permit is defense counsel asking witnesses to further opine on whether the effects on other sectors of commerce and any effect the government presents weigh each other out. Whether there was a net adverse effect on commerce is not relevant, in the Court's view, as to whether there's a violation of Section 231(a)(3), and I think it would be confusing to the jury in terms of the elements of the statute to allow such questioning.

Is the defense clear about where I am on that? If you want to brief this issue on whether it's the net effect or any effect --

MR. ROOTS: Actually, we're working on a brief, and it is fairly complicated. We believe that this particular statute is different than, for example, the firearm statutes.

THE COURT: No, I agree. But even looking at this statute and the plain language, you're working on a brief on that?

I will take a look at whatever you have. I just think that you can present evidence that suggests that what the government is showing with respect to Safeway isn't true. And perhaps if other businesses are doing well and Safeway is not, then maybe you can question the credibility of that evidence. I don't know.

But the sort of net weighing of hoteling and restaurants

versus grocery stores and which -- how it all shakes out, did D.C. make more money or less money, I don't think that's appropriate and irrelevant, and I think it's confusing to the jury. But I look forward to reading your brief.

MS. MILLER: Your Honor, if I could just note for the record, we do think that this is briefing that should have been filed in pretrial.

THE COURT: I understand.

I will address later the defendant's motions in limine with respect to criminal history and illegal substances. Remind me to bring that up. I don't want to keep the jury waiting. But I also want to just clarify what the Court's ruled on, particularly with respect to the First Amendment.

The parties cannot elicit legal opinions from the witnesses. For example, they cannot ask the witnesses to comment on whether certain conduct was protected by the First Amendment or whether the Capitol grounds were considered restricted for purposes of a particular statute or whether certain action constitutes self-defense as a legal matter. So these are all legal issues.

But as I've said before, the defense may elicit facts that would support self-defense or defense of others. And later, after I've heard all the evidence, I'll determine whether to give the judge a self-defense or in-defense-of-others instruction based on that evidence.

The defense has represented it's not going to argue entrapment by estoppel or that law enforcement's failure to act to protect the Capitol as a whole made Mr. Thomas's entry lawful.  The defense may only introduce evidence of any inaction by law enforcement if Mr. Thomas observed or was aware of such conduct.  Other evidence wouldn't be relevant to the charges.

And as a matter of law, the Court has found that the jury need not find that Mr. Thomas was the direct but-for cause for the delay in the certification of the Electoral College vote.  So evidence that the certification was already delayed before Mr. Thomas arrived, including by pipe bombs, is irrelevant.

But as the defense did in its opening statement, it may argue and put on evidence that Mr. Thomas was not a cause of the delay at all; he was no cause.

The defense may not elicit facts to support jury nullification, of course, or civil disobedience defense.  These are not defenses recognized by the law.

The defense has represented that it would not pursue a necessity defense that is different than self-defense or defense of others.

As I've said, neither the defense nor the government is entitled to put on any evidence about any death connected to January 6.  That's police, rioters, anyone else.  That evidence is irrelevant based on the proffers that I've received.  And even if it were relevant, at this point, I think it would be

more prejudicial than probative.

And back to the First Amendment issue, I did review the defense's trial brief.  I will grant the government's motion to preclude any argument that Mr. Thomas's alleged conduct was protected by the First Amendment.  The conduct that he's charged with in the second superseding indictment is plainly not protected by the First Amendment.  He allegedly assaulted five federal officers on restricted grounds.

And as I've said, the government can introduce evidence of his statements to show corrupt intent.  But at the pretrial, I want to be clear, I did not preclude the defense from eliciting facts or testimony about issues like whether Mr. Thomas knew the grounds he was on were restricted or whether Mr. Thomas saw signs telling him that the grounds were restricted and whether, as a factual matter, the Capitol grounds were restricted on January 6 for purposes of Section 1752.  Both parties may put on evidence that's relevant to these factual disputes.

The defense may also elicit facts to support a theory that on January 6 he did not violate any criminal statutes but simply engaged in protected speech, that the conduct alleged to have violated -- the conduct alleged to have violated a criminal statute was itself merely protected speech.

As I've said, I find those theories unlikely, given the nature of the allegations in the indictment.  But theoretically, Mr. Thomas could elicit testimony that he never entered

restricted grounds or committed a violent act.

But again, at this point, whether the conduct is protected by the First Amendment is a legal conclusion. He cannot ask witnesses to give their opinions on whether a particular act was protected by the First Amendment. He can only ask them to comment on what he did or did not do.

As to the other issues raised in the defense trial brief, they appear to be challenges that would be more appropriately raised in any motions for acquittal or for a new trial, arguing that the evidence presented was insufficient to support a conviction. Later, I can evaluate whether the evidence produced supports the legal conclusion that the Capitol grounds were restricted on January 6.

All right.

MS. MILLER: Your Honor, I believe Your Honor set a deadline of 10:00 a.m. for us to respond to that trial brief. Because it sounds like the defense is now going to file additional briefing on some of those same issues, could we just extend that deadline out, and we will file --

THE COURT: That's fine. These are tentative rulings, and I'm not going to continue to revisit these every day. But I think there has been some confusion in the discussions over the course of time.

So of course, the government can respond. The defense can file -- remind me what it is filing a brief on.

MR. ROOTS:  The commerce.

THE COURT:  The commerce issues.  But we're not going to have daily trial briefs coming in.  If there are other issues the defense is contemplating now in terms of legal briefs, can you let me know now so we can set a schedule for those?

MS. MILLER:  Thank you, Your Honor.

THE COURT:  Mr. Pierce or Mr. Roots?

MR. ROOTS:  Actually, the ruling Your Honor just gave, I'm taking notes, and we're processing that.

THE COURT:  So you understand, generally, you can get into the facts all you want.  It's just refraining from asking witnesses to make legal conclusions.

MR. ROOTS:  What about questions of -- I can think of questions of law enforcement officers about their knowledge of the history of protests, things like that.

THE COURT:  Why is that relevant here?

MR. ROOTS:  I think it goes to what is acceptable, what is not acceptable.  There is a Metro PD -- not a Capitol Police PD but Metro policy manual on First Amendment that has a lot of great stuff.  And it says that they are instructed to allow protestors to get as close as possible to the object of their protest.  And that is a little bit of a defense in terms of that is the policy.  In terms of Metro, again, this is not the Capitol PD manual, it's Metro, and I believe that manual actually says such that the protestors can be heard by the

object.  In other words, if they're protesting the mayor's office, city hall, whatever, I believe that manual even says that the police are instructed to allow protestors to get close enough that their voice may be heard.

So this is sort of a --

THE COURT:  I've held before, these policy manuals, I don't see the relevancy here.  If you're telling me -- if Mr. Thomas himself, you know, was aware of those manuals and read them and thought what he was doing was legal, that's one thing.  But whether or not the police violated some manual, I don't see how that goes to disproving the elements of the offense.

MR. ROOTS:  Okay.  There's so many tangled dimensions to this.  I'm sure Your Honor's aware that Hollywood actors are commonly arrested for civil disobedience.  Martin Sheen has been arrested over 100 times, I believe at the Capitol a lot, arrested for just standing in the same place, sitting in a place, civil disobedience.

And I think that is maybe an aspect of our defense here where he says "hold the line."  It's almost a stereotypical thing that protestors do.

THE COURT:  That comes from Mr. Evans about, what, hold the line, or Mr. Thomas, if he's going to testify.  I don't see how questioning the police about whether they've conformed to a manual that's not even their manual, I think it's -- even

if it's at all relevant, it's highly prejudicial and confusing to the jury.

The Capitol Police aren't on trial about whether they followed the law.  The question is whether Mr. Thomas had the requisite intent to violate the law.  And to the extent he thought what he was doing is legal, then you can get that in, but not through police officers.

It's his intent that matters.  And the jury can assess the reasonableness of the officers' use of force and all of that independently of any policy manual.

MR. ROOTS:  Another aspect of our defense is that even the mayor's curfew order discussed how it went from peaceful to violent.  That sort of is our defense, that Mr. Thomas was there peacefully.  The crowd was mostly peaceful.  And there came a time when things sort of got violent.  So I think that is part of our defense, that it started peaceful, intent was peaceful.

THE COURT:  And that's legitimate, and now I see why you want that order in there as it is.  That's testimony you can elicit.  You can ask the police officers, Wasn't the crowd initially peaceful?  But I don't think what happened to Martin Sheen or what happens in the -- even Mr. Thomas is smiling on that one, Mr. Roots.

MR. ROOTS:  I think this case is wrapped up in these issues, these issues of a protest that is -- it started out being not untypical of hundreds of other protests.

THE COURT:  Agreed.  And I think you can go into that with the officers, weren't the protestors initially quiet and not combative.  They may say no.  I don't know what they're going to say.  But that's fair game.  You can call your own officer who is going to testify they were at the line, they weren't trespassing, they were just asking, Can we please come in and talk to members of Congress.

That's -- I mean, that kind of information to go to Mr. Thomas's state of mind, I think, is relevant, but it needs to be tied to him, and I don't see how the policy manuals do that.  So I'm not going to allow that cross.

Again, even if it's marginally relevant, it's highly prejudicial because it's very confusing to the jury, because that doesn't go to any of the elements of the crime.

MR. ROOTS:  There's another aspect of the story which involves the permits.  There were permits, and there were even, among Mr. Thomas and many others that I spoke to, there were rumors of permits and rumors of permits that may or may not have existed.  So this is almost a defense.

THE COURT:  Isn't the government introducing somebody who is going to talk about some permits, or no?  I feel like I read that somewhere.

MR. MCCAULEY:  No, Your Honor, we are not going to be introducing evidence about the permits, because it would be distracting, frankly.  Any permits that were issued in relation

to this event -- without getting needlessly into the details here, any permits that were issued for this event were on the east side of the Capitol, outside the secured perimeter.

Mr. Thomas was on the west side.  So insofar as they have no relation to him because he was on the complete opposite side and --

THE COURT:  If he personally was confused and thought that there was a permit that allowed this, he can certainly testify to that.

MR. MCCAULEY:  Of course.  That would be permissible.

THE COURT:  And Mr. Evans as well?  If the theory is he was hearing rumors -- I'm flagging this as a potential issue that's going to come up.

MR. MCCAULEY:  I suppose Mr. Evans could testify to that, but he would have, in my view, difficulty asserting his knowledge of the permits and his compliance with the permits, considering that he has accepted a plea to trespassing on the Capitol.

That is an issue, it seems, for another day.

THE COURT:  In terms of his intent, if he wrongfully thought that this was all permitted, that's something he can elicit himself if he takes the stand.

MR. MCCAULEY:  Correct.  That is, in my view, permissible.

MS. MILLER:  Again, I think we're going to have some

hearsay problems.  If they're going to reference documents like permits, I don't know how they're going to get them into evidence.

THE COURT:  I haven't heard him reference exhibits.  Are those exhibits that he's flagged for you all?

MS. MILLER:  No.

THE COURT:  I think he can ask hypothetically if Mr. Thomas were to take the stand.

MS. MILLER:  If he had knowledge of them, but not what they say.

THE COURT:  Right.  Or but his understanding was that there were permits that covered this, his understanding, but not this permit, you know, here's the five permits.  But it sounds like from what the government's saying, that that would actually help the government, because the permits are on the east side and they're for 50 people.

So I don't know.  You all have to try your case the way you want to try your case, but I think it's fair game if Mr. Thomas thought this was legal according to a permit.  That, you can elicit if he testifies.

MR. ROOTS:  I have a fear they're going to put on law enforcement witnesses, and the law enforcement witnesses are going to say things like oh, this was a restricted area, there were clear signs, it was totally restricted, everyone knew it, and then we won't be able to pick that apart and say, well, wait

a minute, isn't it true that it's common -- these bicycle racks are not permanent fixtures.

THE COURT:  All fair cross.  Yes, of course, they're going to say there were signs everywhere.  You've heard this testimony before.  They're going to say there were signs all around the perimeter of the Capitol, and there were signs up on the west platform.  And you're going to get up and say, Isn't it true that they were all on the ground, and isn't it true that bike racks are used for many purposes?

All of that is fair game, but they have strong evidence that it was restricted.

MR. ROOTS:  Okay.  They said Mr. Thomas has to take the stand --

THE COURT:  No one is saying Mr. Thomas has to take the stand.  If you want to get into his mental state, that's one way to do it.  He does not have to take the stand.

MR. ROOTS:  Can't we ask a law enforcement witness, Isn't it true that there were permits issued that day?

MS. MILLER:  Yeah.

MR. MCCAULEY:  That's fine with the government.

MR. ROOTS:  Okay.

THE COURT:  Are we good to bring the jury in?

MR. ROOTS:  I think Mr. Pierce has an issue today.

MR. PIERCE:  I have one sort of scheduling housekeeping issue relating to the afternoon.  I don't think

this will wind up being an issue, because if Your Honor is okay with it, we can proceed with Mr. Roots.

There's a federal court action in Montana that I realized yesterday, although I should have realized it earlier, there's a pretrial conference in this afternoon at 3:30.

THE COURT:  Mr. Pierce, you're an extremely busy man.

MR. PIERCE:  Believe it or not, I'm in high demand in certain ways.  I don't think it will take too long, but Mr. Roots can certainly --

THE COURT:  That's fine.  I'm just not adjourning.

MR. PIERCE:  Understood.

(Jury entered courtroom.)

THE COURT:  Good morning, ladies and gentlemen, and welcome back.  I hope you had a good night's sleep.  We're going to start with the government's case-in-chief.

Will it be Ms. Miller or Mr. McCauley?

MR. MCCAULEY:  It will be me, Your Honor.

THE COURT:  All right.  When you're ready to proceed.

MR. MCCAULEY:  We are, Your Honor.

Your Honor, the government now calls Captain Jessica Baboulis.

JESSICA BABOULIS, WITNESS FOR THE GOVERNMENT, SWORN

THE COURT:  Good morning, Officer.

THE WITNESS:  Good morning.

THE COURT:  You may proceed.

MR. MCCAULEY:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MCCAULEY:

Q.    Good morning, Captain.

Good morning, Jurors.

What is your name?

A.    My name is Jessica Baboulis.

Q.    Can you please spell your last name.

A.    Yes.  The last name is B-a-b-o-u-l-i-s.

Q.    Are you currently employed?

A.    Yes, I am.

Q.    How long have you been employed?

A.    I'm currently employed with the United States Capitol Police for nearly 25 years.

Q.    And as a United States Capitol Police captain, where do you fall within the rank structure of the Capitol Police?

A.    Sure.  So with the rank structure of the United States Capitol Police, you come in as an officer, and you can move up to technician, detective, et cetera, then to the rank of sergeant, lieutenant, captain.

So I fall above the front-line officers, and above myself would be the rank of inspector, deputy chief, assistant chief, and then chief of police.  So I'm in that middle portion there.

Q.    What are your general day-to-day responsibilities?

A.    So on a daily basis, currently and for the last few years,

I have been assigned as a captain for the Uniformed Services Bureau, which means at any given time I am the second or first in command over several hundred officers who are in uniform and working in and around the Capitol complex.

Q.   What is the mission of the United States Capitol Police?

A.   So, the mission of the United States Capitol Police is to ensure that the legislative branch of government, the Congress specifically, can carry out their requirements and responsibilities day to day in an open, safe, and secure environment.

Q.   And does that include the safety of both the lawmakers and their staff?

A.   It does.  It includes not only the lawmakers, but their staff and visitors to the Capitol complex.

Q.   In your nearly 25 years with the Capitol Police, have you become familiar with the Capitol itself?

A.   Yes, I have.

Q.   How familiar?

A.   I'm extremely familiar with the Capitol grounds.  I have spent 25 years working in and around the grounds, both in a vehicle, on foot, and on a bicycle.  So I'm pretty engaged with all aspects of the grounds.

Q.   And just to be clear, that includes both inside the building and the surrounding grounds; correct?

A.   Correct.

Q.   Captain -- Ms. Rummens, I'm going to ask you to show to the witness Government Exhibit 119.  Ms. Rummens, I will ask you to, only for the witness, move through the pages in that exhibit.

THE COURT:  Just a moment, Mr. McCauley.

Can all the jurors see on the computers?  All your computers are on?

MR. MCCAULEY:  I have not --

THE COURT:  I know.  I wanted to make sure that their computers were working.

MR. MCCAULEY:  Understood, Your Honor.

BY MR. MCCAULEY:

Q.   Captain, do you recognize this?

A.   I do.

Q.   What is it?

A.   This is a depiction of the United States Capitol building, particularly shown on this photo from the west side as to what it would have looked like during the inaugural season, to include January 6, 2021.

Q.   Have you reviewed these models before coming to court today?

A.   Yes, I have.

Q.   And are you familiar with the area depicted in these images?

A.   Yes, I am.

Q.   And that's all of the pages in this exhibit; correct?

A.    Yes.

Q.    Based on your experience working with the United States Capitol Police, do these images fairly and accurately depict certain areas within the Capitol complex as they appeared on January 6, 2021?

A.    Yes, they do.

MR. MCCAULEY:  Your Honor, the government would move to admit 119.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  All right.  The exhibit is admitted.

(Government Exhibit 119 received into evidence.)

THE COURT:  Any time I admit, you can go ahead and publish to the jury.

MR. MCCAULEY:  I would ask that this be published to the jury.  I ask Ms. Rummens to go to page 1.

BY MR. MCCAULEY:

Q.    Captain, what does this image show, page 1?

A.    So, this is an aerial depiction looking at the U.S. Capitol grounds from the west side.

Q.    Just so the jurors may have a point of reference, with this image, what would be behind the person viewing this image?

A.    So on the bottom of the picture, you were looking -- if the picture extended on the bottom portion, you would see the National Mall.

Q.   Including the Washington Monument?

A.   To include the Washington Monument and all of the Smithsonian museums.

Q.   And now turning to page 2, what is this area?

A.   So this area is honed in on what we refer to as the Capitol Square, and that is bound by First Street in the east, First Street in the west, and Constitution and Independence Avenues.  So it's the actual square that the Capitol building itself is positioned upon.

Q.   And specifically with regards to the building itself in this image, what is that area referred to as?

A.   This is looking at the west front of the Capitol.

Q.   I ask Ms. Rummens to go to page 3.

On this image, where is the area commonly referred to as the Northwest Courtyard?  And I remind you this is a touch screen.

A.   Okay.  If you're referring to the Upper West Terrace, the Northwest Courtyard is in that vicinity.

Q.   Thank you, Captain.  Now to page 5, again marking on your screen, where is the area that's commonly referred to as the Northwest Terrace?

A.   So up here, we refer to the Northwest Terrace as -- and I'm kind of enclosing it here.  This entire side would be referred to as the Upper Northwest Terrace.

Q.   And now moving through pages 6 through 10, Captain, without

going into all the details of the specific monuments, is this generally how the area around the Northwest Terrace appeared on January 6, 2021?

A.    Yes.

Q.    On January 6, 2021, was there anything different from the appearance of the Northwest Terrace relative to how it normally appears?

A.    Yes.

Q.    What was that?

A.    So from roughly October through January, every four years when there's a pending inauguration of the President of the United States, the U.S. Capitol building and grounds, they -- they begin constructing a stage that consumes a large portion of the west front.  So it looks very different on a given day than it would in those months leading up to an inauguration.

In this situation, off to the right side of the photo, I can see the back side of that stage, which is very different than what it would normally look like.

Q.    And I just ask Ms. Rummens to go back to page 2.

Captain, again using the screen in front of you, can you indicate what the construction that you've referred to was on the west front.

A.    Yes.  So the photo in the previous picture was taken at an angle over in this direction, and it was demonstrating the back of what we call press risers and VIP seating.  So this entire

stage area, this entire portion is a build-out for what I was referring to for the stage for the pending inauguration.

Q.    And did this construction include grandstands?

A.    Yes.

Q.    Can you again indicate on this screen where the grandstands were?

A.    Yes.  So all of this area that you can see with lines through it are different stands that were being built out for seating.

Q.    And did those stands extend all the way to the west front, to the actual building itself on the west front?

A.    Yes.  Much of it is on that Upper West Terrace, the back side of it.

Q.    You've touched on this briefly, but what were those grandstands specifically for?

A.    So the stands are -- so there's a stage that is built out, a podium, which is in this center portion here, where the President of the United States can look over the National Mall and address the nation.  And behind him are all of the dignitaries and VIPs that are invited to attend that event who are seated up in all of those press risers there.

       And I'm sorry.  The seating areas, I refer to them as press risers.  That's simply often what we refer to them as.

Q.    On and prior to January 6, 2021, was this area of the west front open to the public?

A.    It was not.

Q.    When did this area close?

A.    Again, roughly in October when they began building the stage.  So every four years, that area is secure.  That perimeter is enhanced to protect that area to ensure that nobody is coming anywhere on or near the grounds.

That's for multiple reasons:  For the security of that stage, in addition to the safety of people due to the open construction site that it is.

In addition to that, there were additional closures that were in place for demonstrations that were occurring.

Q.    Was the stage and scaffolding specifically open to the public?

A.    It was not.  It was not even something that we would authorize our officers to traverse unless absolutely necessary.

Q.    Who is in charge of security around the United States Capitol?

A.    The chief of police of the United States Capitol Police.

Q.    On January 6, had the U.S. Capitol Police ordered this area closed?

A.    Yes.

Q.    Moving on from the stage and scaffolding to the Upper West Terrace, on January 6, was this area open to the public?

A.    No.  And as a matter of fact, that area, in my 24 years, has not been open to the general public.

So there are different locations that are a little bit difficult to see in this picture. But as noted before, and if I may, there's a line here that you can see that goes around this perimeter, and it distinguishes between two layers on the Upper West Terrace. That layer closest to the building, in my 24-year, 25-year career, has never been open to the public. And the terrace surrounding that has been closed for, I would like to say, at least the last 15 years. So the terrace in itself is not accessible to the general public.

Q. To enter these areas that you just described, what would a member of the general public have to do to enter them?

A. They wouldn't be authorized. If, perhaps, they were with a member of Congress entering into those areas, we would be advised, and we would notify all individuals, officers working in that vicinity that somebody would be coming around. So we would make sure that they had clear communication for those that were working up there that it wasn't actually somebody breaching the perimeter but, in fact, somebody that was authorized.

Q. Captain, when the building is open to the public, do people coming into the Capitol have to go through any process?

A. Yes.

Q. What is that process?

A. So there's a multilayered process. There are some prescreening indicators that one would be reviewed upon. And once entering into the building, any individual entering into

the building would have to undergo a screening of their persons and their belongings.  So similar as to you would in an airport, they have to walk through and proceed through a magnetometer to make sure if there was anything on their persons that would be prohibited and dangerous, and they would have their belongings searched through an X-ray machine where officers there would be checking for items there.

There's, in addition, some enhanced screening that takes place in different areas as well.

Q.   So January 6, 2021, was the building open to the public?

A.   It was not.

Q.   Why not?

A.   For multiple reasons.  Again, the building itself had been closed since March of 2020, since the start of COVID.  So it had been closed to the public for that purpose.

Due to the constitutionally-required January 6 event, the building was limited access to those who had -- were participating in that event, so meaning the House and Senate members, staff that had a need or immediate access to the building, in other words they had an office inside the building that they had to attend to, or they had to be present for the event.

So the attendance inside the U.S. Capitol building itself that day was very limited, for multiple reasons.

Q.   And when there is a joint session, as you've just

described, did the U.S. -- and particularly for the constitutionally-mandated process you just described, did the U.S. Capitol expect to receive any particular visitor that day?

A.   Yes.

Q.   Who?

A.   The Vice President of the United States.

Q.   And prior to the vice president's visit on January 6, did the United States Capitol Police take any measures to secure the grounds?

A.   Yes.

Q.   Can you please describe those measures.

A.   Yes.  And this is any time we have what's referred to as a Joint Session of Congress.  What that means to us is that the House and Senate will be operating together in one room, so the House of Representatives and the United States Senate, in addition to an outside person, whether that be a foreign dignitary or head of state or the Vice President of the United States.

On this particular day, the Vice President of the United States was the presiding officer over that day.  So we'd have constant communications about his presence there.  In that instance, we will enhance our security measures and extend out those perimeters.  So again, with our mission being that open, safe, but secure environment, one of our challenges is that openness.  So we physically install perimeters that would

enclose that Capitol Square that we had established.

Q.   Have you worked prior joint sessions of Congress, prior to January 6, 2021?

A.   Yes, I have.

Q.   And were you involved in setting the perimeter for at least some of those joint sessions?

A.   Yes.

Q.   I ask Ms. Rummens to display only for the witness Exhibit 105.

Captain, do you recognize this?

A.   I do.

Q.   What is it?

A.   This is what we refer to as a bike rack perimeter plan.  So it is a perimeter plan that was established for this respective event.

Q.   And how is that perimeter marked in this exhibit?

A.   With a red line.

Q.   And does this fairly and accurately show the security perimeter around the United States Capitol on January 6, 2021?

A.   It does.

        MR. MCCAULEY:  I move to admit Government's 105.

        MR. ROOTS:  Your Honor, we object to that characterization that it fairly depicts the restricted perimeter.

        THE COURT:  Mr. Roots, no speaking objections.

(Bench conference.)

THE COURT:  Mr. Roots, you just give your ground.  All right?

What's the objection?

MR. ROOTS:  The red line is not the -- he asked a question of the witness if this accurately depicts the bicycle rack perimeter, and that's not what this depicts.  This is an illustration.  The red line is conceptual.

THE COURT:  It says, "Does this fairly and accurately show the security perimeter around the United States Capitol on January 6, 2021?"

What's wrong with that?

MR. ROOTS:  Well, it's not the security perimeter.  It is a red line depicting where they think or what conceptually they think the perimeter is.

THE COURT:  She said clearly this was the perimeter.  So I would overrule the objection.

(End of bench conference.)

THE COURT:  All right.  The objection is overruled, and the exhibit is admitted.

(Government Exhibit 105 received into evidence.)

MR. MCCAULEY:  Thank you, Your Honor.  And I would ask that it be shown to the jurors now.

BY MR. MCCAULEY:

Q.   Captain, just for reference, which direction is this image

oriented?

A.    Sure.  So to the top -- and would you like me to draw on the map?

Q.    Please.

A.    So this would be the north side, which is the Senate side. This is the east.  This is the south.  And this is the west.

Q.    Very briefly turning your attention back to Government's 119, the images, which side did those images show?

A.    The images were referencing the west front of the Capitol here.

Q.    Thank you.  In the context of January 6 and the United States Capitol Police, what does "secure perimeter" mean?

A.    When we reference a secure perimeter, it means that there are no access to that point.  So in other words, because the United States Capitol does not have, similar as the White House does, a 10-foot fence, we have to erect one.  So that means that we are installing in place a perimeter that is not accessible to people to come through.

Q.    And is that perimeter marked?

A.    Yes.

Q.    How?

A.    So strategically, roughly every 6 feet or so, there are signs that are posted that say "area closed by order of the Capitol Police Board."  And they are on a thick almost foam cardboard piece that are placed on top of those bike racks,

roughly again every 6 feet or so.

Q.   Are there any physical barriers?

A.   There are.

Q.   What are those?

A.   So often, we utilize the bicycle racks.  So it looks like a bike rack you would see at a concert or anywhere that you would see bike racks.  They are connected in place to form a secure perimeter.

     At this time, we also utilized what was referred to as snow fencing.  So snow fencing, it kind of looks like a mesh line of hard plastic fencing, and that would have been coupled with permanent walls which are referred to as the Olmstead Walls.  So there are some walls on the grounds that that would have been layered with in the event somebody tried to climb them.

Q.   I would ask Ms. Rummens to show Exhibit 106 only to the witness.

     Captain, what is this?

A.   This is a photo taken from First Street in the west that depicts what the west front -- what I was just referring to with the west front.

Q.   And is this a fair and accurate depiction of how the west front of the Capitol appeared earlier in the day on January 6, 2021?

A.   Yes.

          MR. MCCAULEY:  Your Honor, the government would move

to admit 106.

THE COURT:  Any objection?

MR. ROOTS:  Objection; foundation with regard to the precise time of day.

THE COURT:  Go ahead.

BY MR. MCCAULEY:

Q.  Captain, based on your knowledge of the events of January 6 and what you are able to see in 106, did the -- was this how the Capitol appeared throughout the day on January 6?

A.  Yes.  This was, in fact, the perimeter in place on the morning of January 6.

Q.  Did there come any time when, if one were to take this picture later in the day, this image changed?

A.  Yes, once the rioters breached the building.

Q.  And was this -- when did that approximately happen?

A.  At roughly 1:00 in the afternoon.

Q.  So is it fair to say that this image was taken prior to 1:00 in the afternoon?

A.  Yes, it is.

MR. MCCAULEY:  The government would now move to admit.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 106 received into evidence.)

MR. MCCAULEY:  And I ask that it be shown to the jury.

BY MR. MCCAULEY:

Q.   Captain, again using the touch screen in front of you, what barriers do you see in this image?

A.   So this here is taken again from the First Street in the west in the center portion of the Capitol grounds.  The first thing I see is the snow fencing that I was referring to.  So this would have been behind a permanent wall, the Olmstead Walls.

This is looking at the stage.  So the stage that was being constructed is all in that area, the stage.

And then further, the snow fencing here along the center portion of that, which was another layer, and you can see -- you can't read them, but you can see what I was referring to as every 6 feet there were white signs that noted the area was closed by order of the Capitol Police Board.

Q.   And did those signs clearly say that the area was closed?

A.   Yes.

Q.   Now I would ask Ms. Rummens to display Government's 107, only for the witness.

Captain, what is this image?

A.   So this is demonstrating what I was explaining.  So this is the wall.  You can see the individual is resting their arms upon the wall.  So you can see the height of the wall and the snow fencing lined behind it.

The sign posted there was that thick foam cardboard, it's

durable for rain, that states "area closed by order of the United States Capitol Police Board."

Behind that, you can see a layer of officers, and then again behind that, you can see the layer that was in the distance in the last picture that is also lined with the signs that say the area is closed.

Q. And do you know specifically what time this photo was taken?

A. I do not, but I can tell you, with the individuals in the area, that it was probably in the later morning but prior to that 1:00 breach.

Q. And does the image of the sign that you indicated in this photo fairly and accurately depict the "area closed" signs that you just described?

A. That is accurate.

MR. MCCAULEY: Your Honor, the government would now move to admit 107.

THE COURT: Any objection?

MR. ROOTS: No objection.

THE COURT: It's admitted.

(Government Exhibit 107 received into evidence.)

BY MR. MCCAULEY:

Q. Captain, do you know how many signs were placed around the perimeter on January 6?

A. Hundreds, if not thousands.

Q.    Were these signs around the entire perimeter?

A.    They were.

Q.    Captain, is the U.S. Capitol complex covered by surveillance cameras?

A.    Yes.

        MR. MCCAULEY:  And I would now ask Ms. Rummens to, only for the captain, show her Exhibits 120 and 204. Ms. Rummens, if you can just play the first 15 or so seconds of this video.

        (Video played.)

        MR. MCCAULEY:  And now the first 15 seconds of 204.

        (Video played.)

        BY MR. MCCAULEY:

Q.    Captain, do you recognize these two exhibits?

A.    I do.

Q.    What are they?

A.    The first exhibit was of the Upper West Terrace north, where the initial breach of the U.S. Capitol building occurred, and the second exhibit is that of the Vice President of the United States being evacuated from the U.S. Senate.

Q.    And where do these videos come from?

A.    They are both U.S. Capitol Police CCTV videos.

Q.    And how does the United States Capitol Police refer to this -- excuse me.  Withdrawn.

        Are you familiar with this CCTV system?

A.   Yes, I am.

Q.   How?

A.   Multiple reasons, because it's utilized every day on the inner and outer portions of the U.S. Capitol grounds, for points of reference, for security.  So I've had to have multiple interactions with footage.

Q.   Where is the security system run from?

A.   So this security system is controlled in our command center.

Q.   Have you ever been in the United States Capitol Police Command Center?

A.   Yes.

Q.   Were you in the command center on January 6?

A.   I was not.

Q.   And are you generally familiar with the locations -- based on your prior instances of being in the command center, are you generally familiar with the locations of the cameras in that system?

A.   Yes.

Q.   And are there cameras in the building and throughout the grounds?

A.   Yes.

Q.   And do these include audio and video?

A.   No.

Q.   What do they include?

A.    They are just video.  There is no audio included in the videos.

Q.    Is it a part of the U.S. Capitol Police's regular course of business to record and maintain these videos?

A.    Yes.

Q.    And were the videos from January 6, 2021, recorded and maintained?

A.    Yes.

Q.    Prior to coming to court today, did you review footage captured by the United States Capitol Police CCTV system?

A.    Yes.

Q.    Based on your presence at or near the Capitol on January 6, 2021, and your review of these two exhibits, do these fairly and accurately depict the events that took place at the Capitol on January 6, 2021?

A.    Yes.

        MR. MCCAULEY:  Government would move to admit both exhibits.

        MR. ROOTS:  With regard to the first one, lack of foundation with regard to the precise time of day.

        THE COURT:  Okay.

    (Bench conference.)

        THE COURT:  All right.  Mr. McCauley?

        MR. MCCAULEY:  Your Honor, the time stamp is right on these videos.

THE COURT:  Can you pull out testimony from her about what the time stamp -- the significance of it means?

MR. MCCAULEY:  I certainly can, Your Honor.

THE COURT:  Mr. Roots, is there another objection for the second one?

MR. ROOTS:  We really don't object to it.

THE COURT:  Okay.  So it's just the timing on the first.

MR. ROOTS:  You know, I take that back.  We would object on relevance and foundation.  Mr. Thomas obviously did not see this interior footage.

THE COURT:  The government has to prove -- because you haven't stipulated, the government has to prove that the proceedings were adjourned.  So I find it relevant.

And what's the other objection?

MR. ROOTS:  Just the -- well, that's the only objection we have to the interior one, is the relevance, and then there's the --

THE COURT:  On the first, which he's going to establish through the time stamps.

MR. ROOTS:  Correct.

THE COURT:  All right.

(End of bench conference.)

MR. MCCAULEY:  Ms. Rummens, can you please go back to Exhibit 120, only for the witness.

BY MR. MCCAULEY:

Q.   Captain, is United States Capitol Police CCTV footage time-stamped?

A.   Yes.

Q.   Is the footage in Exhibit 120 time-stamped?

A.   Yes.

Q.   What is the beginning of that time stamp?

A.   4:20:32 p.m.

Q.   And based on your review of the lower right-hand portion of the screen, the length of the video, going back to 120, how long is this video?

A.   Nine minutes and 25 seconds.

Q.   Is it fair to say this depicts the period from approximately 4:20 p.m. to approximately 4:30 p.m. on January 6, 2021?

A.   Yes.

Q.   And now Government's 204.  Is this video time-stamped?

A.   Yes, it is.

Q.   What is the beginning time stamp in the upper left-hand corner of this video?

A.   2:25:48 p.m.

Q.   And how long is this video?

A.   33 seconds.

Q.   So does this fairly and accurately depict the period from 2:25 p.m. to approximately 2:26 p.m.?

A.    Yes.

MR. MCCAULEY:    The government would now move to admit.

THE COURT:    Any objection?

MR. ROOTS:    No objection.

THE COURT:    Both exhibits are admitted.

(Government Exhibits 120 and 204 received into evidence.)

BY MR. MCCAULEY:

Q.    Captain, I want to turn your attention to your own experience on January 6, 2021.

Were you working at the Capitol that day?

A.    Yes.

Q.    And what time did you arrive at the Capitol grounds?

A.    I got in to work between 7:00 and 7:30 in the morning.

Q.    What time did you leave?

A.    I left on January 7th at 4:00 a.m.

Q.    And where generally were you located during the day?

A.    I was on the south side of the Capitol grounds for the majority of the day.

Q.    Was there anything special scheduled to take place on January 6, 2021?

A.    Yes.

Q.    What?

A.    The Joint Session of Congress, which would have been to review and validate the Electoral College and the votes.

Q.    And can you go into some details -- based on your knowledge

in your 25 years with the Capitol Police, what is the purpose of that joint session?

A.    So it's to vote on and identify any discrepancies or challenges by the U.S. Congress and to validate the election and move forward with the securing of the President of the United States.

Q.    That person being the President-elect?

A.    Correct.

Q.    Is January 6 a date that the United States Capitol Police chooses?

A.    No, it is not.

Q.    Who or what sets that date?

A.    In the Twelfth Amendment of the Constitution, it's very clear not only to what will happen on that day, but the times, of how it will happen, how it will be seated, how they'll move throughout the building.  So it's very much outlined in that Twelfth Amendment.

Q.    And is any person mandated to be a part of those proceedings who is not normally at the Capitol?

A.    Yes.

Q.    Who?

A.    The Vice President of the United States is mandated to be the presiding officer over those hearings.

Q.    That person being the sitting vice president?

A.    Correct.

Q.    Who was the vice president on January 6, 2021?

A.    Vice President Pence.

Q.    Who provides security detail for the Vice President of the United States?

A.    The United States Secret Service.

Q.    And if the vice president were to visit the Capitol, is there a coordination between your agency and the Secret Service?

A.    Yes, there is.

Q.    Can you describe what that coordination entails?

A.    Yes.  We work very closely with the United States Secret Service.  Any time there is a visit to the U.S. Capitol by one of their principals, this particular instance with the vice president, they will provide us with any and all information pertaining to his visit, and we will supplement that escort while on Capitol grounds to ensure his or her safety.

Q.    How is the -- how are the Capitol Police alerted to an impending visit by a head of state?

A.    There are permanently placed liaisons of the United States Secret Service, active members of the Secret Service who are actually assigned to Capitol Hill.  They will provide again all information and notification to our command.  That will, in turn, be processed out to the entire agency in the form of a special events notification.

Q.    And is there any particular notification that comes in when the vice president visits?

A.   Yes.

Q.   What is that notification called?

A.   Again, it's a dignitary VIP notification.

Q.   I would ask Ms. Rummens to show you Government's Exhibit 201, if you could briefly move through this.

Captain, do you recognize this?

A.   I do.

Q.   What is it?

A.   This is a form called a "Head of State Worksheet."  That is what I was referring to from the liaisons.  You can see on there it says "Secret Service Liaison Division."  So this is a form where they would note pertinent information that the Capitol Police would need to know regarding the visit of -- again, I said their principals, but anyone they're protecting.  So this would come standardized.

Q.   And one of these sheets is completed whenever the vice president visits the Capitol?

A.   That's correct.

Q.   In your time with the Capitol Police, how many of these head of state worksheets have you received?

A.   Hundreds.

Q.   How many have you received in the past month?

A.   Hundreds.

Q.   How many have you received --

A.   Or maybe thousands, yes.

Q.    Captain, does this fairly and accurately depict how the head of state worksheet would have looked for Vice President Mike Pence for his visit to the Capitol on January 6, 2021?

A.    Yes.

MR. MCCAULEY:  The government would move to admit.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 201 received into evidence.)

MR. MCCAULEY:  I would ask that it just be briefly shown to the jury.

BY MR. MCCAULEY:

Q.    Captain, how would this notice that comes through the head of state worksheet be shared with the officers of the United States Capitol Police?

A.    Sure.  So this form would go to our Special Events Section, who would review and ensure that we had all of the appropriate assets in place, and then they would push that out to the agency.  So most members of the department would receive that.

Q.    And what is the specific means by which it would be distributed?

A.    Via e-mail.

Q.    And I would ask Ms. Rummens to show Government Exhibit 202. This will only be for the witness.

Captain, do you recognize this?

A.    I do.

Q.    What is it?

A.    This is again coming from the Secret Service.  This is an e-mail that they would push out saying hey, heads-up, this is what's coming your way.

Q.    And this would be accompanying with the head of state worksheet that we just --

A.    That's correct.

Q.    Does this fairly and accurately depict the e-mail as it would have been for the vice president's visit to the United States Capitol on January 6, 2021?

A.    Yes.

          MR. MCCAULEY:  Government would move to admit 202.

          MR. ROOTS:  No objection.

          THE COURT:  It's admitted.

     (Government Exhibit 202 received into evidence.)

          BY MR. MCCAULEY:

Q.    Captain, did the vice president actually visit the Capitol on January 6, 2021?

A.    Yes, he did.

Q.    And do you know that directly?

A.    I do.

Q.    How?

A.    From numerous movements across the grounds, along with different members of the Capitol Police, just different

notifications, from command-level notifications of his arrival to radio communications for the day.  So there's multiple ways that everybody would be familiar of the presence.

Q.   And from the CCTV footage as well?

A.   Correct.

Q.   Captain, in your nearly 25 years with the Capitol Police, how many Electoral College certifications have you been present for?

A.   Five or six.

Q.   And are you familiar with what goes on during a joint session to certify the Electoral College vote?

A.   Yes.

Q.   Could you please describe it for the jury.

A.   Yes.  So ultimately, it's required that the Vice President of the United States be in the House side of the Capitol, in the House Chamber with the joint House and Senate Congress to discuss it, to discuss what is happening.

     If there's any discrepancies at that time, the Senate then moves to the Senate Wing of the Capitol where they discuss with the U.S. Senate any issues that they may have.  The House remains in the House and discusses those matters.  They ultimately come back together and then finalize that vote.

Q.   I would ask that Government's 103 be shown to the witness.

     Captain, do you recognize Government's 103?

A.   I do.

Q.    What is it?

A.    It's showing a photograph of the U.S. Capitol building, which demonstrates what I was referring to as far as moving throughout portions of it, and it appears, from having previously viewed this, it would be kind of a timeline capture.

MR. MCCAULEY:  I would ask Ms. Rummens to just play the first 30 seconds or so of this video.

(Video played.)

BY MR. MCCAULEY:

Q.    Captain, having now reviewed the first 15 seconds of this video --

A.    Yes.

Q.    -- what does this video depict?

A.    This shows the U.S. House of Representatives Floor.  It shows they were meeting and all began arriving on the floor at noon and called to order by the Speaker Pro Tempore.

Q.    I was going to stop you there briefly.  Have you reviewed the entirety of this video prior to coming to court today?

A.    Yes.

Q.    And does it fairly and accurately depict the details of the process that you outlined about what was to take place on January 6, 2021?

A.    Yes.

MR. MCCAULEY:  Your Honor, the government would move to admit Government's 103.

THE COURT:  Any objection?

MR. ROOTS:  Irrelevant.

THE COURT:  Overruled.  It's admitted.

(Government Exhibit 103 received into evidence.)

MR. MCCAULEY:  Ms. Rummens, if you can go back to the beginning of this video and play just the first two minutes and 10 seconds.  Sound on, please.

(Video played.)

BY MR. MCCAULEY:

Q.   Captain, in this video at 2 minutes and 10 seconds, we saw a procession of people.  Who are those people?

A.   The United States Senate and the Vice President of the United States.

Q.   And currently on the screen, we see a collection of people wearing -- or carrying boxes.  What is in those boxes?

A.   So those are the votes and the ballots that they would be reviewing.

MR. MCCAULEY:  Ms. Rummens, if you can continue playing for the next 10 seconds.

(Video played.)

BY MR. MCCAULEY:

Q.   Captain, what does this video at 2 minutes and 20 seconds depict?

A.   This here is, you can see in the front, led by the Vice President of the United States and followed by the U.S. Senate,

they are coming into the House of Representatives onto the floor, where they are required to meet at 1:00 p.m.

Q.    Ms. Rummens, if you can go to time stamp 2:46.

Can you please read the text that appears on the screen right now?

A.    It says, "The joint session was called to order by the vice president."

Q.    And in this context, what does "joint session" mean?

A.    It means that with the House of Representatives and the United States present -- I'm sorry, Senate present, along with the vice president, that they are called to order and that the work begins.  That session has begun.

MR. MCCAULEY:  Ms. Rummens, please play until 3:19.

(Video played.)

BY MR. MCCAULEY:

Q.    Captain, was Vice President Pence just describing the process that you previously outlined?

A.    Yes.

Q.    Based on your knowledge of these proceedings, if there is an objection to one of the electors, what happens?

A.    They will again go into their separate chambers and review those and discuss them further without going back to the floor. They will take a break to do that.

Q.    Ms. Rummens, can you please go to time stamp 4:12.

Captain, looking at this frame, where is this video from?

A.    This frame is in the United States Senate, on their floor, the Senate Floor.

Q.    And who do we see sitting at the top of the United States Senate at this moment?

A.    Vice President Pence.

Q.    Ms. Rummens, please play until 5:10.

(Video played.)

BY MR. MCCAULEY:

Q.    Captain, who is this person that appears in the middle of the screen right now?

A.    That would be a United States senator.

Q.    Ms. Rummens, can you please play the next 20 seconds of the video.

(Video played.)

BY MR. MCCAULEY:

Q.    Captain, in this video, in this particular portion, we just heard someone say something to that person whom you identified as a United States senator.

Based on your review of this video, what did that person say?

A.    They alluded to that there were demonstrators in the building -- or I'm sorry, had breached the building or breached the grounds.  I'm sorry.  Without specifically listening to it again, he speaks to him directly about the fact that there are demonstrators in the area.

MR. MCCAULEY:  Ms. Rummens, can we go back to time stamp 5:20 and play that 10-second clip again.

(Video played.)

BY MR. MCCAULEY:

Q.   Ms. Rummens, now go to time stamp 5:47.

Captain, what area is now depicted in this video?

A.   This is the U.S. House of Representatives House Floor.

Q.   Who do we see sitting in the highest chair in this video?

A.   That is the former Speaker of the House, Nancy Pelosi.

MR. MCCAULEY:  Ms. Rummens, please play until 7:08.

(Video played.)

BY MR. MCCAULEY:

Q.   Captain, what caused the Senate and the House and their respective sessions to recess on January 6, 2021?

MR. ROOTS:  Objection; speculation.

THE COURT:  Can you answer the question?

THE WITNESS:  Yes.

THE COURT:  All right.  Overruled.

THE WITNESS:  The House was called into recess due to the rioters that had breached the ground and were breaching the building.

BY MR. MCCAULEY:

Q.   And the Senate as well?

A.   That's correct.

Q.   Captain, can you please describe what happened during that

breach?

A.   Generally, so thousands of rioters had not only breached the grounds, but they had then made their way to the facade of the building and through the construction site that was present.

Once they got in that area and began breaching into the building and grounds and we were unable to maintain that security, we had to revert back to our most important mission, which was the protection of those members.  So it was critical for us to have them evacuated from these respective areas and into a safe place.

Q.   Without going into all the specifics, where did these breaches occur?

A.   The initial breach of the actual building -- the breach of the grounds first began at the Peace Circle, which is on First Street in the west.  They moved their way up on the north side of the grounds of the Capitol, up the steps of the grounds, and onto the north side of that Upper West Terrace area that was shown.  That area was the initial breach.  Following were multiple.

Q.   And you just stated that these breaches were considered a security threat?

A.   Correct.

Q.   Why?

A.   Because at the point that what we in advance of January 6 determined would be the necessary area to secure who was present

in those buildings and what was happening, once that was breached and there was not a full gain of control of what was occurring, immediately, it had to be determined that there was no way to secure the proceedings of what were taking place.

Q.    And just to develop what you just said a little bit more, was the breach of the grounds a security threat?

A.    Yes.

Q.    And how about the building itself?

A.    Significant.  As I mentioned earlier, anybody coming onto the grounds or into the building goes through multiple layers of security screening.  In this instance, not only did they breach multiple layers of perimeters that were set in place to keep people out, but they had then, through multiple ways, broken windows, doors, et cetera, to get into the building.

Once in the building, there was no physical way to determine what was in their possession, whether it be weapons, whether it be explosives, whether it be just the mere threat of their person.  There were multiple reasons why that would have been deemed very unsecure.  And again, as our primary mission being the protection of that process, getting them out of there became critical.

Q.    And you described why the presence of persons inside the building was a security threat.  Why was the presence of unauthorized persons immediately outside the building a security threat?

A.    Because there's no way to --

MR. ROOTS:  Object to the leading question.

THE COURT:  Overruled.

THE WITNESS:  There's no way to determine, once someone showed that willingness to breach through barricades, to come onto grounds where it was occurring, we didn't know what they were capable of doing, what was in their possession, which we now know was multiple items that could have harmed somebody, there was no way that we can determine and control the safety of what was going on in there just on the grounds.

The deliberate intention of setting those multiple layered barricades was for the purpose of what we knew was a safe zone to keep people from in the event a threat happened or something broke out.  Without being able to secure that and maintain that perimeter that was deliberating established, that caused a threat just in itself to that proceeding and the dignitaries and members that were in there, to include the Vice President of the United States and the entire Congress.

Q.    Again, without going into all the details, what processes did the Capitol Police have to take to secure the building at this time?

A.    To resecure or to secure?

Q.    To resecure the building, yes.

A.    Okay.  Just getting the rioters out of the building would have never been enough.  There was a complete destruction of the

building.  So making sure that the destruction itself -- and when I say that, doors that were torn off hinges, windows that had been kicked through or pushed through with different weaponry, all of that had to be in place.

The grounds to our initial perimeter needed to be resecured.  So again, not just the people, the presence of rioters, but to go in and ensure that what they may or may not have left behind, that that was cleared out as well.  So it was a multi-layered task to get that area secured once again.

Q.   Is Congress able to safely reconvene if there are unauthorized persons engaging in violence on the Capitol grounds?

A.   No.

Q.   Why not?

A.   Because we cannot ensure their safety.  We've already identified it as a threat, and to not remove that threat would be to have acknowledged that they can't perform that job.

Q.   And you testified earlier that the United States Capitol Police Department's mission is to protect the members and the process.

What happened to the members and lawmakers inside of the building when these events occurred on January 6, 2021?

A.   What happened in general is that --

Q.   In general.

A.   -- they were unable to do their job and that they had to be

rallied up and relocated into safe locations to ensure their safety and welfare.

Q.   Were members able to reconvene for the joint session while rioters were still in the building?

A.   They were not.

Q.   And how about while the rioters were still immediately outside the building?

A.   They were not.

MR. ROOTS:   Objection; leading.

THE COURT:   Overruled.

BY MR. MCCAULEY:

Q.   When were -- to your knowledge, when were the lawmakers able to resume their duties?

A.   At roughly 9:00 that evening, when we were able to ensure that again we had not only removed rioters, but that we as the Capitol Police received assistance from outside agencies that can maintain that perimeter that had been breached multiple times, that no one was in there, nothing was left behind, and that they can do their job in the fashion we set out for them to do.

Q.   You mentioned outside agencies.  Who were those outside agencies?

A.   There were numerous outside agencies.  We received assistance from the Metropolitan Police Department, Virginia State Police.  New Jersey State Police came down to assist.  And

ultimately, later in the evening, we received support from the National Guard.

Q.   And did that assistance include support that came from police departments in the surrounding counties to Washington, D.C.?

A.   Yes.  There were multiple agencies that I couldn't even begin to state them all without missing one that came in to assist us so that we were numbered with the amount of rioters that were there.

Q.   When, if ever, was the Electoral College vote certified?

A.   Just before 4:00 a.m. on January 7th.

Q.   How did the presence of rioters on the buildings and ground affect your mission -- affect the mission of the U.S. Capitol Police?

A.   It was a complete impact, because again our mission is to protect the Congress, to make sure they can carry out their business.  That's inclusive of the staff and visitors and the buildings themselves.

So in every aspect, there was -- the breaches in itself and the riots and the destruction caused an impact to every bit of our ability to do that.

Q.   Are you able to generalize about which side of the building -- based on your knowledge of the events of January 6, are you able to generalize about which side of the building had the most violence?

A.    Yes.

Q.    Which side?

A.    The Senate.  I'm sorry.  The north side.

Q.    And west front versus east front?

A.    West front primarily.

Q.    And a related question, if one rioter continued engaging in violence in either of those two locations, could Congress safely reconvene?

A.    No.

MR. MCCAULEY:  Nothing further, Your Honor.

THE COURT:  All right.  Any cross-examination?

CROSS-EXAMINATION

BY MR. ROOTS:

Q.    Thank you, Captain Baboulis.

You talked about the U.S. Capitol.  You've had 25 years there.  You've had all kinds of experiences there --

A.    Yes.

Q.    -- over the years?

Normally, people walk around the grounds of the Capitol relatively unrestricted; correct?

A.    Yes, relatively.

Q.    And people who have visited the Capitol many times would be generally used to walking around the grass and grounds, the sidewalks unrestricted?

A.    Depending on the day and the type of event ongoing.

Q.   So people who visit the Capitol often would be surprised that it was under the level of restriction that you described?

MR. MCCAULEY:  Objection.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MR. ROOTS:

Q.   They wouldn't be surprised?

A.   I can't speak to every individual.  What I can tell you is that routinely different areas of the grounds are closed down for different restrictive reasons, which is why we post those "area closed" signs every few feet.

Q.   You post those signs.  Is there any public announcements regarding this?

A.   Depending on the event.

Q.   Press releases?

A.   Certainly, I'm sure, that there are restrictions posted.

Q.   What about -- was this clearly available on the official websites?

A.   Was this?  When you say "this," do you mean January 6?

Q.   These restrictions.

A.   I can't answer that.  I don't have that answer.

Q.   If someone was to visit the official websites on that day, they would not have seen this posted, would they?

A.   I have not looked at the website to see what was posted for that day.

Q.   What about visitors from out of state who have never been there?  Would they be informed that it's always restricted in that way?

A.   I think if they've never been there, that would be the purpose of making sure officers were letting them know the area was closed.

Q.   Safe to say that most people from out of state are familiar with state capitols that are much more open?

A.   I can't say that.  I'm not certain that they've attended state capitols.

Q.   People coming from out of state wouldn't think that it's restricted to them, generally speaking?

A.   I'm sorry, sir.  I don't understand your question.

Q.   Someone coming from, let's say, Ohio, for example, who was used to his own state capitol being relatively unrestricted, upon coming to the U.S. Capitol on January 6, he would not be informed that there were all these restrictions, would he?

A.   I can't draw that connection.  Again, there were perimeters set on Capitol grounds that day with officers.  And ultimately, by the time the riots occurred, there were also notifications by chemical spray, radios, et cetera.

Q.   You testified that even Capitol Police officers cannot traverse what you called restricted areas unless absolutely necessary; is that your testimony?

A.   I didn't say cannot.  I said they do not.  There's not a

necessary purpose for them to be floating into the construction site themselves unless necessary.

Q.    So these construction sites building the stage are almost the exclusive domain of the construction workers?

A.    I would say that's accurate.

Q.    Police officers never wade into that area?

A.    Again, the only reason police officers would have to be in an active working site is if they were called to something or they needed to check on something.

Q.    Is this policy written down anywhere?

A.    I would say that if you refer to OSHA, that you would likely find something that they shouldn't be in an open and active construction site with hazards there.

Q.    Okay.  You talk about the primary need -- the primary mission of the Capitol Police is to protect Congress.

Do Congresspeople ever participate in these events, protest events?

A.    They do.

Q.    They go out among the crowd?

A.    Sometimes.

Q.    In fact, that's fairly common, isn't it?

A.    I've seen it on a few occasions in my 25 years.

Q.    You don't regard that as some extreme danger to these Congresspeople?

A.    I think the level is dependent upon.  So often, they may go

speak at events, and we will provide security at said events to ensure that if those events get out of control, we again remove them for their safety.  This particular instance, in a riot, that would be one of those.

Q.  You said "riot."  Did you declare it to be a riot?

A.  I have no authority -- I'm telling you it was a riot.  I would say yes, it's a riot.

Q.  Was it officially proclaimed to be a riot?

A.  I can tell you that it was proclaimed to be a riot.  Under what capacity, I can't answer that.  It was a riot.

Q.  You talked about magnetometers, these metal detectors --

A.  Yes.

Q.  -- inside the Capitol.  To be clear, there are no such metal detectors outside?

A.  No, there are not today, or on January 6, there were not.

Q.  Have there ever been magnetometers set up on the grounds?

A.  Yes.

Q.  There have been?

A.  Routinely.

Q.  Can you give me an example?

A.  Yesterday --

Q.  Okay.

A.  -- for the -- I'm sorry, on Monday for the Law Enforcement Officers Memorial that was held on the grounds, people went through screening --

Q.   Okay.

A.   -- because the grounds was actually -- they were open.  So in order to make those grounds that needed to be secure open, people traversed through magnetometers and had their belongings checked.

Q.   Are these magnetometers placed down at the street level?

A.   They are.

Q.   The Vice President of the United States is the President of the Senate; correct?

A.   Correct.

Q.   So he presides over the Senate?

A.   He is the tie-breaking vote over the Senate, and yes.

Q.   He or she?

A.   He or she.

Q.   So when members of the Senate are heard on the Congressional Record saying Mr. President or Ms. President, they're talking about the Vice President of the United States?

A.   I'm not sure what you're referring to.  There is a President Pro Tem of the Senate who differs from the Vice President of the United States who oversees the Senate.

Q.   And as you said, the vice president, the President of the Senate, breaks all ties?

A.   Correct.

Q.   And the vice president is always there at joint sessions?

A.   Not always.

Q.   Okay.  Would you say that that's the vice president's job, to preside over the Senate, one of his official duties in the U.S. Constitution?

A.   On January 6, the Vice President of the United States's job is to come at 1:00 in the afternoon and preside over the hearings for the Electoral College.

Q.   Okay.  But the Constitution says that one of the duties of the vice president is to preside over the U.S. Senate?

A.   In what instance?  I mean, are you -- yes, yes.

Q.   So when he's there -- does the vice president have an office inside the Capitol?

A.   Yes.

Q.   So you wouldn't describe the vice president going to his office as, quote, visiting?

A.   Yes, I would.

Q.   He would be visiting his own office?

A.   That's correct.

Q.   Okay.  You talk about the bike rack perimeter plan.

     Can we bring up Exhibit 105?

     Do you see the image on the screen?

A.   I do.

Q.   To be clear, that red line is conceptual; right?

A.   That red line is a perimeter plan that is in place for everyone to be aware of where that perimeter will be established.

Q.    Now, you called that the bike rack perimeter plan.  There are not bike racks everywhere through that -- along that red line, is there?

A.    No.  As I stated earlier, there are areas where there's actually permanent walls.  In one of the previous exhibits, you can see the individual at arm's level on that wall and a reference that in those instances -- not anymore, but that that used to be layered with snow fencing for a double perimeter in the instances of where there was a wall.

So most of it is consumed with bike racks.  Some of it had snow fencing and actual physical permanent structures.

Q.    At one point in your direct testimony, you talked about the idea of a secured perimeter, and you said something like it's not like the White House fence.

Do you recall that?

A.    I do.

Q.    The White House fence is something like 10 feet tall; would you agree?

A.    The White House fence is permanent, is what I was referring to.  That fence is not removed and re-erected for necessary events.  The White House has the authority to have that 100 percent of the time around there, the use of.

Q.    It's much taller than a bike rack; would you agree?

A.    Yes.

Q.    Someone can't just jump over the White House fence?

A.    They've had them before.

Q.    They climb over the White House fence?

A.    I can't speak to how they get over, but they've attempted.

Q.    But a person could -- at least an athletic person could jump over the bike rack, couldn't they, at the Capitol?

A.    I would say that, yes, an athletic person could jump over one.

Q.    And the White House fence is permanent?  It's clear to anybody that goes to the White House that it's restricted beyond that fence?

A.    Yes.

Q.    In fact, some of the people who climb the fence and jump on to the grounds of the White House are attempting suicide by cop?

        MR. MCCAULEY:  Objection.

        THE COURT:  Sustained.

        BY MR. ROOTS:

Q.    It's likely that they would know it's restricted, just from the height of the fence; correct?

A.    It's likely that they would be arrested if they went over it, yes.

Q.    And that's not necessarily true of bike racks around the Capitol?

A.    I'm sorry?

Q.    That's not necessarily true of bike racks around the Capitol?

A.    So if you're asking -- and I think one of the things I'm envisioning is, if I'm at a concert or something of that nature, an interlocking bike racks indicates that I'm not permitted beyond that area.

So I've never referenced somebody just because they're athletic jumping them.

Q.    Do people occasionally move bike racks?

A.    No, they absolutely should not.

Q.    What about cops?  Do they move the bike racks at times?

A.    If they need to get through, yes.

Q.    Your testimony is that the public never moves the bike racks?

A.    If the public were to move bike racks that were established for a secure perimeter, we would immediately direct our attention to that individual, remove them from the perimeter, resecure, and ensure that they left nothing behind.

Q.    I would like to bring up Defense Exhibit -- this would be the radio call, which would be --

THE COURT:  Mr. Roots, sorry to interrupt.  Let me just ask you, how much more cross-examination do you have roughly?

MR. ROOTS:  I would say at least 20 minutes, maybe 30.

THE COURT:  Okay.  I think it might be a good time for the jury to take a break.  So we will take a 10- or 15-minute break.  We will come back at 11:10.

(Jury exited courtroom.)

THE COURT:  Mr. Roots, sorry to interrupt, but as you will recall, that juror had the alarm go off.  This is the woman who is diabetic.  So I wanted to give her a chance to take a break.  We've been going now for an hour and a half.  So we'll take a 10-minute break, and we will be back with the cross.

(Recess taken from to 11:01 a.m. to 11:20 a.m.)

(Jury entered courtroom.)

THE COURT:  Ladies and gentlemen, tomorrow, we will have breakfast to you, and we will take care of the water issue over the lunch break.  Sorry about that.

We're also going to check to see if the jury room next door is being used, because if not, then there will be an extra bathroom in there.  One bathroom for 14 is difficult on short breaks.

Ladies and gentlemen, I think we're going to need to take a lunch break now.  The juror has a problem with her blood sugar.  It's low.  It is a little early, but the advantage to this is there will be an empty cafeteria, but I would ask that you come back by 12:30, and we will resume with the cross-examination then.  Sorry for the delay.

(Jury exited courtroom.)

THE COURT:  So we will come back at 12:30.  Does that work for everyone?  Sorry about this.  We'll make sure that that juror has what she needs in the future.

And, Captain, we're going to delay your testimony a little bit. I remind you not to talk about your testimony during the break, and when you return, you will be under oath still.

THE WITNESS: Yes, Your Honor.

THE COURT: Any questions before we adjourn until 12:30?

Thank you.

(Recess taken from 11:22 a.m. to 12:31 p.m.)

(Jury not present.)

THE COURT: We're still waiting for one juror?

COURTROOM DEPUTY: One juror, yes, Your Honor.

(Pause.)

(Jury entered courtroom.)

THE COURT: All right. Welcome back, ladies and gentlemen. We will resume with the captain from the Capitol Police.

Is she in the courtroom?

MR. MCCAULEY: She's right outside.

JESSICA BABOULIS, WITNESS FOR THE GOVERNMENT, RESUMED STAND

THE COURT: Captain, I remind you you are still under oath.

THE WITNESS: Yes, ma'am.

THE COURT: You may resume, Mr. Roots.

CROSS-EXAMINATION (Continued)

BY MR. ROOTS:

Q.    Good afternoon, Captain.

A.    Good afternoon.

Q.    I guess we will get right back where we were.  We were talking about these bike rack perimeters.  You indicated that the bike rack perimeter is temporary as opposed to the -- for example, the fencing at the White House?

A.    Correct.

Q.    The sections of these bike racks are designed to be movable; correct?

A.    Correct.

Q.    How long are those sections?  6 feet?  8 feet?

A.    Probably roughly 8 feet, and they link in at the end so that they cannot be removed when placed.

Q.    Now, did you indicate that they were chained together also?

A.    That was what I just stated.  So they link in together, and they are heavy metal that link and connect to one another.

Q.    So if someone was going to disconnect them, what would they need to do?

A.    It would require significant effort for them to want to go in and physically remove them.

Q.    Significant effort?  They could just lift one panel up and disconnect them?

A.    Well, again, when they're connected with thousands of them, it would then cause a fall of the numerous barricades behind it.

Q.    And your testimony is that that's very difficult to do?

A.    I wouldn't say that it's difficult.  It would be intentful.  So you would need to go in and physically stand there.  It's not something you can just push open.

Q.    I'd like to bring up Defense Exhibit 442, which is some radio traffic.  Go ahead and play it, if we can bring it up.

We'll just play a smidgen on of it, and then I will ask you if you recognize anything about it.

MR. MCCAULEY:  Your Honor, can we go to the phones briefly?

THE COURT:  Yes.

(Bench conference.)

THE COURT:  Is there an objection?

MS. MILLER:  Your Honor, a couple of things.

One, I believe Mr. Roots before the break and after the break introduced the exhibit by saying what he thinks it is, a radio run.  He shouldn't be stating that in front of the witness.  He's going to ask the witness about what it is, first of all.

And second of all, I think he's about to play it with volume, which the jury is about to hear.

THE COURT:  Mr. Roots, is this her radio run?

MR. ROOTS:  Yes, this is the official Capitol Police radio run that this witness would have been used to and, I believe, has at other trials testified that she was listening to it all day long.

THE COURT:  Is there only one single radio run?

MS. MILLER:  It looks to be 12 hours long, this exhibit.

THE COURT:  Mr. Roots, can you start off by asking her if she -- if there's a single radio run and would she would have been listening to it that day?

And does the government object to -- if she answers those questions yes, to him playing it a little bit, for her to determine whether she heard that?

MR. MCCAULEY:  Your Honor, what we would object to is the totality of this.  It is 12 hours long.  So absent any --

THE COURT:  I didn't understand it was actually 12 hours long.

Is there just a set portion that you're going to play, Mr. Roots?

MR. ROOTS:  Yes.  Just, I believe, two minutes, where there's discussion on the radio of cops saying that the public has moved to disconnecting some of the bicycle racks.

MR. MCCAULEY:  What would need to happen at that point is a proper foundation to be laid for approximately what time that occurred.  Was she listening to the radio at that time?

This is a lengthy radio run.  To say that she knows all of it is a stretch.

THE COURT:  Mr. Roots, I really don't want to excuse the jury to deal with this outside the presence of the jury.

But I'm concerned that you can't just play this without knowing whether she can recognize it.

As an alternative, can you ask her about movement -- the movement of people and whether she heard anything about that on the radio?

MR. ROOTS:  It's ironic.  I've asked her, this same witness, in another trial if joggers ever moved the barricades, and she said no.  We found this.  We knew we had it somewhere, but it took us a while after that trial to find this, which shows, in fact, the Capitol Police said joggers were moving --

THE COURT:  I don't think she said no one could remove it.  I think she said it would be intentional.  When you asked her whether or not it would be difficult, she said no, it would be intentional.

I don't see any direct impeachment there.  But if you have a transcript from a prior trial and you think she's testified inconsistently with that, then you can impeach her.

MR. ROOTS:  Well, it's maybe not just impeaching calling her a liar.  It's more of just impeaching the idea that this fencing is so immovable and it takes great effort to do so.

THE COURT:  I don't think that's her testimony, Mr. Roots.  I think she clarified, she was saying it was intentional.  If you want to ask her another question or two about that and see if she doubles down on it being difficult, then I will allow that.

If you want to ask her if she heard, you know -- you can ask her about the barricades being breached and the police officers being moved back, ask if she knew about that. You can ask if she heard that over the radio. And then you can proceed with this.

But otherwise, I think you need to lay more of a foundation than you've done to let this in right now.

MR. ROOTS: Okay. I will just ask if she's familiar with the radio and this communication system that --

THE COURT: No, it's more than that. It's asking her about the movement and whether she heard that on the radio.

MR. ROOTS: Okay.

(End of bench conference.)

BY MR. ROOTS:

Q. Okay. Sorry about that. A little bit of some follow-up questions.

Are you familiar with the radio frequency that the Capitol Police use on the job?

A. Yes.

Q. You would have a -- while you are working, you would have a radio on your person?

A. That is correct.

Q. And you would be listening to and communicating to fellow officers that way?

A. Yes.

Q.    I forget when you arrived that day at the U.S. Capitol.

A.    Between 7:00 and 7:30 a.m.

Q.    So were you listening to the radio beginning at that time?

A.    I would say I was in meetings in the early morning.  So to be clear, on radio communications, yes, later in the morning, yes.

Q.    Are you familiar with indications that joggers had moved the bike rack barricades and they needed to be put back in place?

A.    No, I'm not.

Q.    I would like to bring up that Exhibit 442 from minute mark 1:00 to minute mark 2:30.

      Is there any way we can just play this for the witness?

            THE COURT:  Is there an objection?  I can't tell.

            MR. MCCAULEY:  Objection, Your Honor.

            THE COURT:  I will sustain that.

            BY MR. ROOTS:

Q.    Your testimony is that joggers never move the barricades, the -- the bicycle racks?

A.    My testimony is that I am not familiar with any joggers moving barricades that morning, nor do I have any recollection of joggers moving barricades today.

Q.    So if fellow Capitol officers heard that, what would your response be?

A.    My response would be to have an official respond out there

to see what's going on.

Q.   With that, I would like to play this exhibit, 442, from minute 1 to 2:30.

(Bench conference.)

THE COURT:   Mr. Roots, have you established that she heard this on the radio?

MR. ROOTS:   She indicated she had not, but she indicated she was there on the clock.

THE COURT:   Does the government know whether this is at the time that she said she had the radio on and was listening to it?

MR. MCCAULEY:   Your Honor, the government has no information about, as I sit here, when any incident like this would have happened.  At a minimum, the witness's testimony is that she is not aware of it, whenever it might have happened.

THE COURT:   So Mr. Roots, I don't think you've laid sufficient foundation.

MR. ROOTS:   Okay.

(End of bench conference.)

BY MR. ROOTS:

Q.   Next, let's discuss these "area closed" signs.  I'd like to bring up Exhibit 107, which was shown earlier.  Thank you, by the way.

Do you recognize this image?

A.   I don't see an image on the screen.

MR. ROOTS:  I would like to publish it.

THE WITNESS:  I do.

BY MR. ROOTS:

Q.   There's a sign there that says "area closed."

Do you see that?

A.   Yes.

Q.   To be clear, that is not at the entry gate area where most foot traffic goes through; correct?

A.   This sign that you're referencing in this photo?

Q.   Yes.

A.   This is not near an entrance, no.

Q.   This would be how many feet, 50 feet away from the walkway area?

A.   Again, this sign you can see or the ones in the background?

Q.   This one in the foreground.

A.   The one in the foreground is probably 50 feet from an entrance.

Q.   And how many feet from the Capitol building itself would you say this is?

A.   Perhaps the length of a football field.

Q.   That would be about 100 yards?

A.   Perhaps; perhaps.

Q.   How many feet between this sign in the foreground and I guess what you called signs, if those are signs, way back in the background?

A.    How many feet dividing those two?

Q.    Yeah.

A.    Probably half the distance of a football field.

Q.    And in fact, no one from this perspective can read those -- if they are signs, no one can read that they're signs that say anything; correct?  Would you agree?

A.    I'm not certain.

Q.    Can you read anything that's said on those?

A.    In this photograph?  I cannot.  I would draw the conclusion that the size and the shape and being strategically everywhere, that they all said the same thing.  But again, that's just my conclusion.

Q.    But you can't actually see any lettering or writing?

A.    In this photo, I cannot.

Q.    Now, you see three officers also -- or three people there on the grass?

A.    Yes; as you said, yes, three officers.

Q.    Would you say that is also -- officer staffing is also a part of this idea of whether an area is restricted?

A.    Yes.  I believe there -- so those officers are there to enforce it, to look for any one individual that may attempt to violate or has questions.  They're there for multiple reasons.

Q.    So if someone came at a time when there were not officers like that, that might be an indication that it is not as restricted?

A.    No, I wouldn't say that.

Q.    Okay.

A.    Again, I would look at the reference, and if we're referencing just this picture, the signs everywhere that state "area closed," along with the fencing, along with the officers, along with the signs with prohibited items and who can and can't be in, so I think a multitude, from my perspective, you can see that the area is very clearly closed.

Q.    When you say it's "very clearly closed," you would agree that sign in the foreground that says "area closed" is a temporary sign?  That's not a permanent sign, is it?

A.    It's not a permanent sign.  It is -- as I mentioned earlier, it is a thick, durable, so -- so it endures the rain, weather, et cetera.  It's positioned every 6 feet when similarly the barricades are placed strategically.

Q.    Now, you say every 6 feet.  Would you not agree that it is greater than 6 feet to the right of that sign, and we don't see another sign?

A.    I cannot determine that from that angle.

Q.    How far would you -- in Exhibit 107, from the edge of that sign to the edge of the screen on the right, how far would you say that distance is?

A.    The distance of two people.

Q.    You're saying --

A.    Because that's what we see in the photo.  Two people is the

extent of what I can see there.

Q.   Your testimony is that that distance is less than 6 feet?

A.   My testimony is that I can't tell from the angle of the photo.  What I can tell is that there's two individuals pictured in there.  So the width of two people would be what I can see in that photo.

Q.   Okay.  All right.  With regard to permanent signs there in that area, is there any permanent signs that say this area is subject to closure?

A.   I'm not sure.  There's prohibited items that tell you that you have entered into Capitol grounds, which is different from the District of Columbia, and that there are different restrictions in place, and those are placed in multiple locations across the ground.

Q.   Any signs indicating a phone number to call if someone is interested in this question of whether or not it's closed or not?

A.   I don't know.

Q.   Again, I think you said that you didn't know if the official website of the Capitol indicated anything about these closures?

A.   Typically, the website would make notification of closures. I don't want to speak to what was produced that day, because I don't know.

And if I may add, there's multiple websites, which is why I

don't want to speak to it.  There are multiple factors at the U.S. Capitol, to include the United States Senate releases, the House of Representatives releases, the Architect of the Capitol's releases, and the U.S. Capitol Police's releases.  So there's multiple, and I couldn't tell you what was released on that morning.

Q.    In the event bicycle racks are moved from their position, is there any written plan that tells people where to move them back or anything like that?

A.    So, the perimeter plan that you referenced, that's the bicycle map plan.  That would be the plan.

Q.    Is there any written policy about who can move these barricades?

A.    Which part of a policy would you be referencing?  Because there's multiple policies.  As far as if there's a breach, how you respond to a security breach?

Q.    Sure.

A.    Yes.

Q.    There's something in writing?

A.    If -- there are policies on our agency, yes, in writing on how to handle a breach and what that definition is.

Q.    This would inform an officer, for example, exactly where to precisely place the barrier --

A.    No.  Again, what I was asking was what specifically.  So I referenced the bicycle perimeter map.  That would tell you that

that's the perimeter in place.  And a separate policy would tell you if, in fact, somebody breached your perimeter, how to handle that.

Q.   Okay.  With regard to the Secret Service and the vice president, these perimeter communications, are they communicated to the Secret Service?

A.   Yes.

Q.   So Pence was informed of this?

A.   So, no, we would actually never involve the Vice President of the United States in that planning.  We would work with the Secret Service, who are tasked with his protection.

Q.   How about Trump?  Would Trump have been informed of this?

A.   I don't know if he was informed of it or why he would need to know that.  There was no plan for him to come to Capitol grounds that day.

Again, the protective responsibility of the president, former president, vice president, former vice president would have been under the purview of the United States Secret Service.

Q.   Are you aware that President Trump gave a speech a distance away --

MR. MCCAULEY:  Objection.

THE COURT:  If you can answer it.

THE WITNESS:  I am aware that he gave a speech a distance away, yes.

BY MR. ROOTS:

Q.    Are you aware he gave a speech suggesting that listeners should go to the Capitol?

A.    Yes.

Q.    Would he have had any knowledge of these closures or restrictions?

A.    I can't --

        MR. MCCAULEY:  Objection.

        THE COURT:  Sustained.

        BY MR. ROOTS:

Q.    I'd like to bring up Exhibit 120, which was shown, and I'd like to publish this for the jury.

        You recall this scene?

A.    I do.

Q.    And you indicated that this was around 4:20 in the afternoon on January 6?

A.    That's what's noted on the CCTV, yes, 4:20:38.

Q.    And also, there was a video shown right after that of Mr. Pence being moved inside the Capitol.

        Do you recall that?

A.    I do.  The timing of the videos was not after, but when you were showing and presenting those, it was after.

Q.    So Pence was moved around 2:20 or something like that?

A.    Correct.

Q.    So the scene here, this video on the outside, was some two hours later?

A.   It appears to be, yes.

Q.   So obviously, this scene, whatever is happening here, could not have contributed to anything with regard to that scene of Mr. Pence being moved?

MR. MCCAULEY:  Objection.

THE COURT:  Overruled.

THE WITNESS:  At 4:20 of what is being shown here in this moment would have contributed to the inability to resecure the United States Capitol, to multiple breaches that were occurring and still occurring.  That would have contributed to that.

As far as the movement of --

Q.   Can I stop you --

A.   -- Vice President Pence into a different location, that would have been a different time frame.

Q.   So again, you answered a different question, which I want to ask those questions.

But isn't it true that this scene here could not have contributed to the movement of the vice president two hours earlier?

A.   The movement shown in the previous video --

Q.   Please answer the question.  Yes.

A.   I'm sorry, sir.  I want to answer your question.  The question you asked is, could it have contributed to the movement of Vice President Pence?

Q.    Yes.

A.    And my answer is, to the video clip that you showed and that respective movement, no.

Q.    Okay.  Thank you.  Were there any plans by the Capitol Police in preparation of January 6?

A.    Yes.

Q.    I'd like to bring up Exhibit 10, Defense Exhibit 10.

Do you recognize this as the plan by the Capitol Police for --

MR. MCCAULEY:  Objection.

THE COURT:  Go to the phone, please.

(Bench conference.)

MR. MCCAULEY:  Your Honor, we would like to point out that Mr. Roots keeps saying what the exhibit is before he proceeds to ask the witness any questions about it.

THE COURT:  Fair enough.

Mr. Roots, just refer to the exhibit number.  You don't need to explain it in front of the jury until it's actually published to the jury.

Do you also have an objection to this document being shown to this witness?

MR. MCCAULEY:  Insofar as this witness has knowledge of this?  No.

THE COURT:  Okay.  So we don't know yet.  You're just objecting the way he's identifying exhibits before they're

published to the jury?

MR. MCCAULEY:  Correct.  We might have a foundational objection --

THE COURT:  Understood.

Mr. Roots, no longer refer to the content of the exhibit.

(End of bench conference.)

BY MR. ROOTS:

Q.  Do you recognize this exhibit?

A.  No.

Q.  You do not?

A.  No.  This is the Civil Disturbance Unit plan.  I was not a part of the Civil Disturbance Unit on January 6.

Q.  You never read the plan for --

A.  I've never seen this plan that you're presenting right now.

Q.  You were just told that there were plans for January 6?

A.  There were multiple different communications of what would transpire that day.  It was not in my duties that day to be assigned to the Civil Disturbance Unit.  I was responsible for the southeast sector of D.C., to include the Library of Congress buildings and the grounds surrounding the southeast sector.

Q.  So you never read this document?

A.  I did not.

Q.  Are you familiar with some of the event permits of January 6?

A.  Yes.

Q.    I would like to pull up 301.2.

Do you see this document?

A.    I do.

Q.    Do you recognize it?

A.    I have not had an opportunity to view it.

Q.    Go ahead, if you want, to look at it and review it.

Scroll down a little bit.

A.    Sorry.  Do I have access to scroll, or is that you scrolling?

Q.    Ms. Lambert here is scrolling for me.

A.    Okay.

Q.    Is this anything you recognize?

A.    This is a typical notification that would go out for an event that has an authorized permit.

Q.    And this -- do you recognize this specific permit for January 6?

A.    I do not.

Q.    But you said it's typical of the kind of permits that are issued?

A.    Correct.

MR. ROOTS:  I would like to offer this into evidence.

THE COURT:  Any objection?

MR. MCCAULEY:  No objection.

THE COURT:  All right.  It's admitted.

(Defense Exhibit 301.2 received into evidence.)

MR. ROOTS:  And I would like to publish this for the jury to see.  We can start at the top and just look at this.

BY MR. ROOTS:

Q.   Ma'am, this is a permit by an organization called "Women for a Great America."

Do you see that at the very top?

A.   Yes.

Q.   And this is a permit issued on January 6; would you agree?

A.   Let me see.  Yes.

Q.   How many permits were issued on the Capitol grounds for events on January 6?

A.   I don't recall completely.  I remember areas 8 and 9.

Q.   Areas 8 and 9.  So if someone heard this organization was putting on an event, they would come to the Capitol grounds; correct?

A.   If someone heard?

Q.   Yeah, if they wanted to attend that.

MR. MCCAULEY:  Objection, Your Honor.

THE COURT:  Grounds?

MR. MCCAULEY:  Speculation.

THE COURT:  Sustained.

BY MR. ROOTS:

Q.   Let's scroll down.  I would like to go to page 14, actually.

Do you see where it says the "event summary" there?

A.   I do.

Q.   It says it will consist of multiple speakers with music interludes.

Do you see that?

A.   I see where it says approximately 50 persons.  So where are you looking?

Q.   Where she's highlighted there.  Do you see that there?

A.   Yes.

Q.   Below that, it says, "No civil disobedience is planned."

Do you see that?

A.   I do.

Q.   Now, what does that mean?

A.   It means that the group is known to be peaceful, and from every bit of information that they have gathered, the group has told them that they intend to be peaceful and have no more than additional -- I'm sorry, no more than 50 participants.

Q.   And in fact, when people apply to put on an event on Capitol grounds, they have to fill out a lot of information; correct?

A.   They do.

Q.   And one of the boxes they check is whether or not they intend to have civil disobedience?

A.   I don't know if it's a box.  It's a part of the obligation of units that are required to look into these permits.

Q.   And civil disobedience is sometimes approved; would you

agree?

A.    I would not say it's approved.  I would say it's recognized that the participants intend to do so.

Q.    And in the big sense, if it's approved civil disobedience, it's not true civil disobedience, is it?

A.    Again, I wouldn't call it approved.  I would say that the leader of the organization would have passed on information to say that typically, this occurs, and so we are prepared to engage with them.

Q.    I'd like to direct your attention to that highlighted area at the very bottom there that indicates "the specs person suspects nonmembers who support the mission of Women for a Great America may decide to attend this event and the various events occurring on Capitol grounds."

Do you see that?

A.    I do.

Q.    So, if someone, not knowing there are any restrictions, were to read anything about or to hear events are going on on Capitol grounds, you would agree there's nothing here, at least, that indicates that there are any of these restrictions you talked about?

A.    If I understand the question correctly, what you're asking is, would the average person who attended this event or wanted to participate with the group of 50, would they find a reason that they weren't able to participate?

Is that what you're asking?

Q.    Both the answer and the question were a little bit long.

So you said a group of 50.  First of all, this is a permit for 50-people event?

A.    Uh-huh.

Q.    But isn't it true that -- well, the plain language there says "nonmembers may come."

A.    So I will also say this:  When applying for a permit, if the group were to expect a significant number of people in excess of 50, they would not have been authorized.

And again, I don't want to get into the specific number, but the determination of where that group would be positioned would be assessed.  So if there was a belief that in the area that they anticipated 50 people were going to be 30,000, they would be removed from that location, and the permit would not be granted, if that was what their request was.

I think that's what you're asking, but --

Q.    Okay.

A.    So that would not be a granted permit for 30,000 people. This group requested 50 people, and typically, when they say there's others who may attempt to attend that they're unaware of, they will communicate that with the Capitol Police, because that's also a part of the discussions of the permit, and those people would be asked to leave the area or removed if it's in excess.

If the group is unwilling to assist with that, then we may have to consider relocating that permit.

Q.   Okay.

A.   So these are all the guidelines of the permit of what the requester and the Capitol Police have discussed.

Q.   Okay.  Thank you.  As events occur on the ground, do the organizers always know if person number 51 or 52 is going to show up?

A.   I can't answer that.

Q.   So if someone is planning to have an event with 50, they may not -- they may not know that larger numbers may show up?

MR. MCCAULEY:  Objection.

THE COURT:  Sustained.

BY MR. ROOTS:

Q.   It says "various events occurring on Capitol grounds."

Do you see that?

A.   I do.

Q.   So someone hearing of these various events on Capitol grounds, would it be reasonable for them to assume they could go onto Capitol grounds?

A.   I'm sorry, but that question is so broad.  You're saying that if people understood an event was going on Capitol grounds, could they just arbitrarily go wherever they felt like going?

Q.   From the perspective of someone who hears that there are permitted events on Capitol grounds, you would agree that that

would lead them to believe they could go onto Capitol grounds?

MR. MCCAULEY:  Objection.

THE COURT:  Sustained.

BY MR. ROOTS:

Q.   Is there any barriers -- back to the bicycle racks or anything else, fences, cages between this event area that's permitted here and the rest of the world?

A.   Yes.

Q.   And what might those be?

A.   Again, the -- there's the Olmstead Walls that we referred to that cordon off.  There's also what we call bollards, so there's large green concrete in the ground to prevent vehicles.

So this is where the Capitol Police and the requesting organizer would have discussions on what area is bounded and what its bounded by.

Q.   But there's not necessarily a fence that separates?

A.   Not necessarily.

Q.   Not necessarily any signs that separate?

A.   It would depend on the area.

Q.   You would agree that this organization calling itself Women for a Great America seems to be a pro-Trump organization?

MR. MCCAULEY:  Objection.

THE COURT:  Sustained.

BY MR. ROOTS:

Q.   Let me ask it this way:  If someone was to come to this

event, it would be an innocent intention to attend this event; do you agree?

MR. MCCAULEY:  Objection.

THE COURT:  Sustained.

BY MR. ROOTS:

Q.   Somebody coming to an event that is a bunch of speeches for Women for a Great America isn't necessarily seeking to attack the Capitol?

MR. MCCAULEY:  Objection.

THE COURT:  Sustained.

Mr. Roots, you can't continue to ask her about other people's intentions.

BY MR. ROOTS:

Q.   Is it your experience that the public is to play no role on January 6?

A.   I'm sorry?

Q.   Is it your understanding that the public is not to participate in the proceedings of January 6?

A.   In the proceedings inside the Capitol building?

Q.   (Nodded head.)

A.   Yes, that's correct.

Q.   The public is not to participate in any way?

A.   In the proceedings in the House of Representatives and inside the United States Capitol building?  That's correct. They are not a part of that process.

Q.   It's your testimony that the public is not to shout, yell, advocate for anything going on inside the building?

A.   The public is not permitted during the January 6th event into the area that the proceedings are held.  And in all of the permits I'm sure you've seen, it also talks about them directing sound away from the Capitol.

     And there are in the permits clarified guidelines of what can and can't take place to allow the legislative process to continue but to balance the rights.

Q.   So they're not to yell in the direction of the Capitol?

A.   I never said that.  I said they're not a part of the proceedings.

Q.   I'd like to pull up Exhibit 201, and I'd like to publish to the jury Government's 201.  I think this is already in evidence. I would like to show this to the jury, if it's not already.

     This is the head of state worksheet that you described.

A.   Yes.

Q.   And top line there in the graph, it says that at 12:30 p.m., Vice President Pence is to be at a particular place. Looking over at the right column, it says 12:45 p.m.

     Do you see that?

A.   I do.

Q.   And then below that, every other box says "TBD."

     What does "TBD" mean?

A.   To be determined.

Q.    To be determined.  So it sets an agenda for the Secret Service and Vice President Pence to begin at 12:45; correct?

A.    Uh-huh.

Q.    But there is no end time that is designated?

A.    That's correct.

Q.    Nowhere in that agenda did it say that Pence would go out on the West Terrace, did it?

A.    No, it does not.

Q.    And in fact, Pence never visited the West Terrace at any time on January 6?

A.    No, he did not.  That area is closed.

Q.    Pence never went out on the west grounds of the Capitol that day?

A.    He did not.

Q.    Now, this notion that you've testified to, that protestors on the grounds needed to be completely cleared out from the Capitol grounds, 100 percent cleared out, do you recall that you testified to that --

A.    I do.

Q.    -- before Congress could get back into session?

A.    I do.

Q.    Every last protestor had to be removed from Capitol grounds?

A.    From within the perimeter to the perimeter that we can secure and we feel comfortable that it is secure.

Q.   Has that -- first of all, is that written down anywhere, any writings that you can think of, that policy?

A.   What policy?

Q.   This idea that every last protestor must be removed from the entire Capitol grounds in order for Congress to function.

A.   I'm sure if you consolidate a multitude of policies and our command experience as to what would require a safe and secure environment, you can formulate.

But is there a specific policy that directs if 30,000 rioters enter onto the grounds, what you need to do?  No.

Q.   Okay.  And in fact, many times, there have been loud protests on the grounds --

MR. MCCAULEY:  Objection.

BY MR. ROOTS:

Q.   -- and Congress functioned?

THE COURT:  Overruled.

THE WITNESS:  Have there been loud demonstrations on the grounds?  Yes, in fact, there have been.

BY MR. ROOTS:

Q.   So in the six hours that Congress was in recess -- first of all, is that unusual?

A.   Six hours?

Q.   A six-hour recess?

A.   For us to resecure the grounds due to a riot, no, that is not normal at all.

Q.   Please, let me just stop and ask the question again.  Is it unusual for a six-hour recess of Congress?

A.   Congress has the recess capabilities when they need to, but I can't speak to how they would recess --

Q.   It's a yes-or-no question.  I'm sorry.

A.   I can't speak to any six-and-a-half-hour recesses personally.

Q.   So for my clarity, yes or no, is it unusual for Congress to have a six-hour recess?

A.   Yes.

Q.   It's unusual?

A.   Yes.  They have -- they go into recess often.  Six hours is not something I've often experienced or that I can think of off the top of my head.

Q.   Okay.

A.   But it would not be unreasonable for them to go into recess for work that they need to perform.

Q.   And again, there's no writing, no rule that you know of that's written down that says this, that every protestor must be removed from the Capitol grounds in order for Congress to function?

A.   No.

          MR. MCCAULEY:  Objection.

          THE COURT:  Overruled.

          BY MR. ROOTS:

Q.    I believe she said no.

Are you aware of this policy ever being imposed at any other time that you've been there, this idea?

A.    Which policy?

Q.    The policy of removing every last protestor from the entirety of the grounds before Congress can go back into session.

A.    Congress will not go into session if we do not have the grounds secure.  If at any time we're to tell the Congress that it is not safe for you to be doing that, that's in our mission and our rules and responsibility.

Q.    Okay.  Last question.  I'd like to have Mr. Thomas stand up, if you could.

Do you recognize this individual?

A.    I do not.

Q.    Did you have any interaction, as far as you know, with this individual on January 6?

A.    I did not.

MR. ROOTS:  No further questions.  Thank you so much.

THE COURT:  Any redirect?

MR. MCCAULEY:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. MCCAULEY:

Q.    Captain, on cross, you testified that -- and on direct, you testified that Capitol Police officers were not entering the

construction on the west front --

A.    Correct.

Q.    -- but for a necessary purpose?

A.    Correct.

Q.    Would a necessary purpose be dispensing with rioters on the construction?

A.    Absolutely necessary.

Q.    You also testified on cross-examination that in the event of a breach of that secured perimeter, it is the duty of the officers to attempt to resecure the perimeter; correct?

A.    That's correct.

Q.    And that's typically when it happens; correct?

A.    Correct.

Q.    In an event such as January 6, were the officers able to resecure the perimeter as the breach happened?

A.    They were not.

Q.    Mr. Roots asked you some questions about joggers.  Setting aside any knowledge that you might or might not have about joggers on January 6, if joggers were to have breached the secured perimeter on January 6, was that permitted?

A.    It was not.

Q.    Would the Capitol Police have been responsible for removing them from --

A.    Absolutely.

Q.    And does removing joggers differ from removing a mob?

A.    100 percent.

Q.    You also spoke about -- Mr. Roots asked you some questions about the surveillance footage that was shown earlier, the CCTV?

A.    Yes.

Q.    One of which showed Vice President Pence being evacuated from the Senate Chamber; correct?

A.    Correct.

Q.    And another which showed the events happening on the Upper West Terrace around 4:20 p.m.?

A.    Correct.

Q.    Was the event -- as you have seen them in that surveillance, insofar as you have, were the events that were occurring on the Upper West Terrace a part of a continuing pattern of events throughout the day?

A.    Yes, it was.  It also contributed to -- and if I may clarify, when that question was asked, he asked if that specific movement contributed -- the two hours later.

And as I stated, that specific movement at that exact time, perhaps not.  However, there were multiple movements that needed to transpire to secure the Vice President of the United States well through the time of the 4:30, 4:26 that was displayed in the other video.

Q.    Would it be fair to say that the vice president was moved, as we've seen in that video, as a part of a continuing course of events that day?

A.    That is correct.

Q.    We also spent quite a deal of time talking about permits, and you said that those permits were in sectors 8 and 9.

A.    Correct.

Q.    Can you briefly explain for the jury what this sectoring system is around the Capitol grounds.

A.    Yes, I can.  So at the U.S. Capitol, because we are aware that people want to come and express their First Amendment rights, we designate areas that they can come and work with us to say, hey, I would like to file for a permit for my group. Based on what their intentions are, the number of people they have, and how they wish to carry that out, we very much work with them so they can do that.

So when I referenced areas 8 and 9, those are the east side of the Capitol, so closest to the U.S. Supreme Court.  There are what we refer to as eggs.  So there are areas that are cordoned off by landscaping, permanent walls, fixtures, et cetera. They're more or less zones that they can go into and demonstrate based on the information that they've provided us.  So we often work with people to do that.

So areas 8 and 9 are on the east side of the Capitol on the northeast corner.

Q.    And if I can have Ms. Rummens call up Government Exhibit 119, page 1.

Captain, using your screen, would you please just indicate

approximately where zones 8 and 9 are.

A.    Yes.  So 8 would be --

MR. MCCAULEY:  Can I request that this be shown to the jury?  Excuse me.

THE WITNESS:  Okay.  So area 8 would be in this semirectangular area, and area 9 would be in this 8 right here.

BY MR. ROOTS:

Q.    So 8 refers to the shape of the --

A.    I'm sorry.  We refer to it as the Senate egg, and it's just due to the shape that's naturally laid out by the walls and the landscape.

Q.    And just one more time.  Also on this image, can you indicate where the Northwest Terrace would be?

A.    Yes.

Q.    And if someone were to make an approach from the Peace Circle, what avenue would they take to get to the Northwest Terrace?

A.    They arrived through this and this area.  No demonstrations were allowed in those areas.

MR. ROOTS:  Objection as to speculation.  The question was, would someone traveling -- the question seems speculative.

THE COURT:  Can you rephrase the question?

MR. MCCAULEY:  Yes, Your Honor.

BY MR. MCCAULEY:

Q.    Captain, for someone traveling from the Peace Circle to the

area on the Northwest Terrace, is there a path there?

A.    Yes.

Q.    Would you please mark that path?

A.    Yes.  It's where the arrow is here and the arrow here.

Q.    And was any of this area permitted for demonstration that day?

A.    None of it was.

        MR. MCCAULEY:  Nothing further, Your Honor.

        THE COURT:  All right.  Thank you.  May this witness be excused?

        MR. MCCAULEY:  Yes, Your Honor.

        THE COURT:  Mr. Roots?

        MR. ROOTS:  Do we get recross?  Okay.  There's one point I wouldn't mind bringing up.

    (Bench conference.)

        THE COURT:  Is this based on something new that came out?

        MR. ROOTS:  Yes.  The permit is for area 10, not area 8, actually.

        THE COURT:  Mr. McCauley?  It seems fair redirect.

        MR. MCCAULEY:  Your Honor, I can ask the question as well, if that's easier.

        THE COURT:  You've passed the witness.  So I will allow him to ask about --

        MR. MCCAULEY:  As long as -- sorry, Your Honor.

THE COURT:  Go ahead.

MR. MCCAULEY:  As long as it's limited to that question, that is fine.

THE COURT:  That question, and if there's any clarification on that issue and only that issue.

All right, Mr. Roots?

MR. MCCAULEY:  Understood, Your Honor.

(End of bench conference.)

RECROSS-EXAMINATION

BY MR. ROOTS:

Q.   Can we bring up that three-dimensional map-like thing of the Capitol.

THE COURT:  Which exhibit number is that?

MR. ROOTS:  The one that was just shown.

THE COURT:  Could we erase the writing?

MR. ROOTS:  We can keep it on, just to make a point.

BY MR. ROOTS:

Q.   The Women for a Great America was not in area 8, was it?

A.   I don't recall.  I'd have to see that.

Q.   Okay.  Where is area 10, first, on this map?

Okay.  Let's bring it up, just very briefly.

Area 10 is closer to the Capitol than area 9; would you agree?

A.   It is not.

Q.   It is not?

A.    They are equally --

Q.    I'm sorry.  I meant area 8.  Is area 10 or area 8 closer?

A.    Probably 10.

Q.    And area 8 is actually separated by a street?

A.    No.

Q.    A pathway?

A.    Yes.

Q.    And the Women for a Great America -- let's bring up that permit one more time very quickly.  That's our Exhibit Number 301.2.  And if we could just go up to the top -- right there.

      Do you see where it says "area 10" highlighted there?

A.    Yes.

Q.    One last question.  Is there any separation between that permitted area in terms of barriers and the other areas -- and the Capitol?

A.    Yes.

Q.    There is?

A.    Yes.

Q.    Well, let's go back -- if we could go back to 201.  I'm sorry.

      Could you point out area 10.

A.    (Complied.)

Q.    You say there is a barrier between area 10 and the Capitol?

A.    Yes.

Q.    Is that a bike rack?

A.    There's two.  There's a permanent wall that contains that area, and then about 5 feet beyond that is a bike rack.

Q.    I don't even know the answer, but is there any permanent fencing around the entire area of 10 otherwise?

A.    There's walls.  So when you see the shape of the egg, there's an actual -- again, it's Olmstead Wall.  So there are actual walls, permanent walls.

Q.    And back to your recollection about other permitted events. Those were -- if you could point out those that were on January 6.

A.    I don't recall details, but I do recall something being set in 8 and 9.

          MR. ROOTS:  Thank you so much.

          THE COURT:  All right.  May this witness be excused? Yes?  All right.

     Thank you, Captain.

          THE WITNESS:  Thank you.

          THE COURT:  Next witness for the government?

          MS. MILLER:  Your Honor, we want to clarify that last exhibit is 119.  I think Mr. Roots said 201.

          MR. MCCAULEY:  Your Honor, the government now calls Officer Anthony Campanale.

     ANTHONY CAMPANALE, WITNESS FOR THE GOVERNMENT, SWORN

          THE COURT:  Good afternoon, sir.

THE WITNESS:  Good afternoon, ma'am.

DIRECT EXAMINATION

BY MR. MCCAULEY:

Q.    Good afternoon.  Can you please state your name for the jury?

A.    Officer Anthony Campanale.

Q.    And just spell your last name for the court reporter.

A.    C-a-m-p-a-n-a-l-e.

Q.    Where do you work?

A.    Metropolitan Police Department.

Q.    How long have you been a Metropolitan Police Department officer?

A.    19 years.

Q.    When you first joined MPD, where were you assigned?

A.    I was originally assigned to the Sixth District, Patrol Unit.

Q.    And after that?

A.    After that, I became assigned to the Vice Unit, and then after that, I was promoted to detective, and then finally made it to the Emergency Response Team, where I'm currently assigned.

Q.    And what is the Emergency Response Team?

A.    The D.C. SWAT team.

Q.    Were you working on January 6, 2021?

A.    Yes.

Q.    What was your duty that day?

A.    I was assigned to an Active Shooter Response Team.

Q.    And what is an Active Shooter Response Team?

A.    For major events, the Metropolitan Police Department will assign a Emergency Response Team in different units as an Active Shooter Response Team in the event something like that was to occur.

Q.    What was your shift that day?

A.    We started that morning at 6:30 in the morning.

Q.    And when you started your shift, where did you begin --

A.    We --

Q.    -- physically?

A.    We physically began at the Special Operations Division building, which is located on New York Avenue Northeast.

Q.    And after the Special Operations Division building, where did you report to?

A.    We proceeded downtown, in the downtown area.

Q.    And where did you stage that day?

A.    Myself and my partner were south of the Capitol that day. That was our assignment area.

Q.    And was there a time that you were called to the area around the Capitol?

A.    Yes.

Q.    And can you say with more specificity where that area around the Capitol was?

A.    Yes.  Originally, we received a suspicious package call or

a bomb threat at the DNC, the Democratic National Committee building on South Capitol Street.

Q.    Is that also near the Library of Congress?

A.    Yes.

Q.    What time did you respond there, approximately?

A.    Approximately maybe around 9:00 a.m., not 100 percent sure, but definitely early morning.

Q.    When you arrived in the vicinity of the DNC headquarters and the Library of Congress, what did you observe?

A.    We observed multiple agencies and bomb techs dealing with a suspicious package.  So we just provided outside security for all that.

Q.    Approximately how long did you remain there, in that location?

A.    A little over an hour maybe.

Q.    And what caused you to leave?

A.    We started receiving radio transmissions across our radio for officers calling 1033, which is MPD police jargon for officer in need of assistance.

Q.    Officer, are you familiar in your long career with the MPD about officer calls for assistance over the radio?

A.    Yes.

Q.    Where does a 1033 rate in terms of that level of assistance needed?

A.    It's the number 1 priority call when it relates to officers

needing of assistance.

Q. When you hear -- generally, when you hear a 1033 over the radio, what are you supposed to do?

A. Respond directly to that unit that needs help.

Q. And upon hearing these 1033s on January 6, what did you do?

A. We were eventually able to respond to the Capitol and assist.

Q. How long did that response take?

A. It took a little longer than I wanted to. There was talk from the upper management about whether to deploy the Emergency Response Team in that manner just due to other threats that had the potential of happening.

Q. And when you were originally responding to the DNC area and the Library of Congress area, what was your attire or outfit that day?

A. I was in a uniform. We had our outside vests on and just shirt and uniform pants.

Q. And were you armed?

A. Armed with my sidearm, yes.

Q. Prior to going to the Capitol in response to these 1033s, did you undergo an equipment change?

A. Yes.

Q. What was that change?

A. So we donned our helmets. My particular helmet was equipped with a mandible and eye cover shield that came down.

And I also grabbed certain -- like my 40-millimeter impact weapon and some OC spray, pepper spray.

Q.    And just for the members of the jury who aren't familiar with helmet terms, does a mandible refer to the portion that covers the jaw?

A.    Yeah, it protects the face.  It's a hard nylon cover that goes over our helmets on the bottom.

Q.    So in common parlance, it wouldn't look dissimilar from, say, a motorcycle helmet?

A.    Correct.

Q.    Upon responding to the Capitol, what, if any, orders did you receive with respect to your responsibilities?

A.    Once we made it to the Capitol and we proceeded to walk up towards the Capitol, we were met by Commander Glover at the time, and we were given instructions on how to proceed with -- there was a set of bleachers that they wanted cleared out that had been taken over at that time.

Q.    And who is Commander Glover to you?

A.    Commander Glover at the time was our direct commander of Special Operations Division.

Q.    Generally speaking, which side of the Capitol were you on?

A.    I believe we approached initially from the west side of the Capitol off of Pennsylvania Avenue.

Q.    Did you eventually come to learn the name of the area that you were posted at?

A.   Yes.   We just refer to it as the West Side Terrace.

Q.   And I would ask Ms. Rummens to call up Government Exhibit 119 and go to page 2.

Officer, the screen in front of you is a touch screen. Would you please draw approximately the route that you took to get to the Capitol that day.

A.   (Witness complied.)

Q.   And now, Ms. Rummens, if you could go to page 3.

Officer, where did you approximately post that day?

A.   After we came down the terrace on the west side, we proceeded right in this area approximately, and that's where we were met by Commander Glover at the time.

Q.   And did there come a time when you continued moving across the terrace?

A.   Yes.

Q.   And would you please just continue tracing your route to the point -- until the point you were posted at approximately 3:00 p.m.

A.   So we proceeded up the stairs and helped clear these bleachers out with all the people that were up there, and then we proceeded down the back side of the stairs where we eventually came to a stopping point.

Q.   Ms. Rummens, could you go to page 5.

Officer, can you please indicate on this screen approximately where you were at 3:10 p.m.?

A.    Approximately in this area here.

Q.    And Ms. Rummens, page 6.

      Officer, are you familiar with this view?

A.    Yes.

Q.    Could you just briefly describe for the members of the jury what it is?

A.    So this is the view from the back side of the bleachers. When we came down those stairs, at the bottom of these stairs, the back side is where we were facing.

Q.    So this page, can you indicate as best you can where you were standing at 3:10 p.m.?

A.    (Witness complied.)

Q.    Officer, in this area at approximately 3:10 p.m., do you recall any interactions you had with persons who were at the Capitol?

A.    Yes.

Q.    What were you doing at the time that you saw this person?

A.    We saw multiple people trying to take down the mesh or nylon type of tarp that was hanging down the back side of the bleachers from underneath.

Q.    Can you please give a general description of what the person who you had this interaction with looked like?

A.    It was a white male.  He was wearing brownish-colored clothes, I believe some camouflage.  That's all I recall.

Q.    And I would ask now that Government Exhibit 309 be shown,

only to the witness.

Officer, do you recognize what's on the screen in front of you?

A.   Yes.

Q.   What is it?

A.   It's a view of my body-worn camera footage.

Q.   And what is the time stamp at the top?

A.   15:12, which would be 3:12 p.m.

Q.   And have you had the opportunity to review this body-worn camera footage before coming to court today?

A.   Yes.

Q.   And does it fairly and accurately depict what occurred in this location at approximately 3:10 p.m. on January 6, 2021?

A.   Yes.

MR. MCCAULEY:  The government would move to admit.

THE COURT:  Any objection?

MR. ROOTS:  No objections.

THE COURT:  It's admitted.

(Government Exhibit 309 received into evidence.)

MR. MCCAULEY:  Your Honor, I would ask that it be played.

(Video played.)

BY MR. MCCAULEY:

Q.   Officer, at any point during this interaction, did you use force with this person who you had the conversation with?

A.    No.

Q.    Why not?

A.    There was no need.  I attempted to de-escalate the situation with just talking, and that seemed to work.

Q.    Did you place him under arrest?

A.    No.

Q.    Could you have?

A.    Yes.

Q.    Why?

A.    At that time, I could have arrested him for destruction of property for cutting away at the nylon cover.

Q.    And why didn't you arrest him at this time?

A.    In those type of situations where it's that large of a crowd and a volatile situation, it's just not safe to do so for our safety and other people's safety there.

Q.    And I would now ask Ms. Rummens to go to Government Exhibit 504 and jump to time stamp 22:29.

       Officer, looking at what's been marked as Government Exhibit 504, do you recognize this video?

A.    Yes.

Q.    Do you appear in this video?

A.    Yes.

Q.    Does it -- based upon your review of your body-worn camera, does this depict the same interaction that you had with the individual underneath these grandstands or bleachers at

approximately 3:12 p.m.?

A.    Yes.

Q.    Is there any portion missing from this video?

A.    Yes.

Q.    What portion?

A.    At one point during the video, it stops when I'm telling the individual to put away the knife and to back up.

Q.    Just to be clear, you reviewed this portion of this video prior to coming to court today; correct?

A.    Yes.

Q.    And based upon your review of that video, why is that portion missing?

A.    It seems to be that someone was trying to conceal that portion of the video of me telling him to put the knife away.

Q.    Did you see him make any indications with his phone that led you to that conclusion?

A.    Yes.

Q.    What was that?

A.    I could see the individual take the phone and turn it and conceal it, and it looks to be that they stopped recording at that point.

Q.    And other than that missing portion, does it fairly and accurately reflect your interaction with the individual underneath the grandstands at 3:12 p.m.?

A.    Yes.

MR. MCCAULEY:  Government would move to admit.

THE COURT:  Any objection?

MR. ROOTS:  No objections.

THE COURT:  It's admitted.

(Government Exhibit 504 received into evidence.)

MR. MCCAULEY:  I would ask Ms. Rummens to play it until 25:10.

(Video played.)

MR. MCCAULEY:  Ms. Rummens, can you please go to Government Exhibit 504.1.

Excuse me, Your Honor.  That is Government Exhibit 309.1.

THE COURT:  All right.  Thank you.

MS. MILLER:  Ms. Gumiel, we've been marking -- on the exhibit list, it's X, but for the purposes of the file names, it's 0.1.  Sorry about that.

BY MR. MCCAULEY:

Q.   Officer, do you recognize what's been marked as Government's 309.1?

A.   Yes.

Q.   What is it?

A.   It's a side-by-side comparison of my video from the body-worn camera footage and the video from the recording.

Q.   And does this video include closed captioning?

A.   Yes.

Q.   Based upon your review of these two videos, is that closed

captioning accurate?

A.    Yes.

Q.    Does it fairly and accurately depict the interaction --
does this video fairly and accurately depict the interaction
that you had with this individual around 3:12 p.m.?

A.    Yes.

MR. MCCAULEY:  Your Honor, I would move to enter into
evidence 309.1.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 309.1 received into evidence.)

MR. MCCAULEY:  And I ask that it be played.

(Video played.)

MR. MCCAULEY:  Pass the witness.

THE COURT:  All right.  Cross-examination?

CROSS-EXAMINATION

BY MR. ROOTS:

Q.    Thank you for coming here today, Officer Campanale.  My
name is Roger Roots.  I represent Mr. Joseph Thomas over here,
along with fellow attorney John Pierce.

Okay.  I would like to bring up -- well, let's go to that
same exhibit that was just played, the two-window, if you could.
I think that was 309.1, perhaps.  Two windows, two screens.

MR. MCCAULEY:  309.1.

MR. ROOTS:  If we could play that just a little bit.

(Video played.)

BY MR. ROOTS:

Q.  You can stop right there.

Now, you testified that you had this exchange with the man, I guess for lack of a better word I will use protestor, the protestor the farthest to the right in the image there.

Would you circle him, if you could.

A.  (Witness complied.)

Q.  Would you agree that appears to be the defendant, Mr. Thomas?

A.  Yes.

Q.  Would you stand up?

Does that look like the man that you had that interaction with?

A.  Yes, sir.

Q.  If you would look in this image of the torn tarp, look up high at the top where the cut line is.

You would agree that's beyond the reach of that gentleman there in the center?

MR. MCCAULEY:  Objection.

THE COURT:  Overruled.

BY MR. ROOTS:

Q.  Would you agree that's beyond his reach?

A.  No, sir.

Q.    He could reach up there and cut that?

A.    It appears so, yes, sir.

Q.    Or Mr. Thomas could reach up there and cut that high?

A.    Yes, sir.

Q.    You said you had this interaction and you could have arrested Mr. Thomas, and you said for property damage.

      Do you recall that?

A.    Yes, sir.

Q.    Did you actually see him damage any property?

A.    Not initially, no, sir.

Q.    And nothing in this video shows him damaging property, does it?

A.    That's correct, sir.

Q.    In this video, he's not shown cutting the tarp?

A.    That's correct, sir.

Q.    But you say you could have arrested him.  Would you have had probable cause to make that arrest?

            MR. MCCAULEY:  Objection.

            THE COURT:  Overruled.

            THE WITNESS:  In videos prior, sir, there are videos of individuals cutting away at the tarp area, not necessarily my video, but as we were approaching that area, that was what drew our attention to come down there to begin with.

            BY MR. ROOTS:

Q.    But you had -- you didn't see Mr. Thomas cut the tarp, did

you?

A.    Not particularly, not him directly, sir.

Q.    You did show an image, it looked like he had a knife in his hand.

Do you recall that?

A.    There was an image shown, yes, sir.

Q.    Did you see that someone else handed him that knife?

A.    There was some interaction between him and a gentleman behind him, but I didn't see exactly what was going on.

Q.    Did you see that he handed that knife back to that individual?

A.    No, sir.

Q.    But you say you could have made an arrest for property destruction.  Does that mean with the evidence we have here in front of us?

A.    No; with just that video, no, sir.

Q.    You would need probable cause to make an arrest, wouldn't you?

A.    Yes, sir.

Q.    And you just testified you didn't see Mr. Thomas cut the tarp?

A.    In this video, no, sir.

Q.    But again, you did see it yourself?

A.    I just saw people cutting away at the tarp at the beginning, yes, sir.

Q.   Now, you mentioned that you thought there was missing video or something and that someone -- it looked like someone was trying to conceal.

Do you recall that?

A.   Yes, sir.

Q.   With the suggestion that maybe Mr. Thomas was trying to conceal something?

A.   It appears the video cut off when I approached him about the knife.

Q.   I would like to pull up Defense Exhibit 236, and I would like to play it from the beginning.  Actually, just to get it authenticated, we will play it for a second or two if you want to look at this.

Do you recognize this as the same tarp area?

A.   A portion of it, sir, yes.

Q.   Do you recognize these fellow officers in this image?

A.   No, sir.  Just Commander Glover, I believe, is to the left of the video.  I don't recognize the other officers.

Q.   But this is a fair and accurate depiction of the scene at that time --

A.   I would say so.

Q.   -- around that time.

I would like to move for the admission of this.

THE COURT:  Any objection?

MR. MCCAULEY:  Your Honor, this video -- can we --

(Bench conference.)

THE COURT:  Mr. McCauley?

MR. MCCAULEY:  This video appears to be 2 hours and 30 minutes long.

THE COURT:  Mr. Roots?

MR. ROOTS:  We're only playing two minutes of it.

THE COURT:  You just moved to admit the entire exhibit.

MR. ROOTS:  We'll move just to admit the first two and a half minutes.

THE COURT:  Is that only the period of time that involves this officer?

MR. ROOTS:  It's the period of time most relevant to his testimony.

MR. MCCAULEY:  Does this witness appear in this video, Mr. Roots?

MR. ROOTS:  Yes, he does.

THE COURT:  In the two minutes?

MR. ROOTS:  Yes, in the first two minutes.

THE COURT:  Mr. McCauley, any objection to playing the first two minutes?

And Mr. Roots, you're going to have to find a way to shorten this exhibit before it goes to the jury.

MR. MCCAULEY:  Your Honor, I would ask, in terms of foundation, this witness at least be shown himself prior to

testifying as to its authenticity.

THE COURT:  I think he just said this fairly and accurately represented what he saw that day.

MR. MCCAULEY:  He said -- my recollection is that he said that it depicted the scene around him.  Insofar as this officer is going to move -- this is not his body-worn camera.

THE COURT:  Let's clarify, Mr. Roots.

The problem, of course, is he probably needs to see the video to answer the question you want him to answer.  So do we need to excuse the jury briefly?

We need a break probably anyway now.  So why don't we take a ten-minute break right now.

MR. ROOTS:  I would actually like to make this point.  He's right in this --

THE COURT:  Mr. Roots, the government doesn't appear to know that.

MS. MILLER:  If we could fast forward to where we see him and that's within the first two and a half minutes --

THE COURT:  And not publish it to the jury?  All right.  Let's do that.

And then assuming he's in the scene, then you have no objection to him admitting the video; correct?

MS. MILLER:  (Nodded head.)

THE COURT:  Okay.

(End of bench conference.)

BY MR. ROOTS:

Q.   Officer Campanale, do you see yourself in this?

A.   No, sir, I don't.

Q.   If we could roll just a little bit more of this.

THE COURT:   This is not being published to the jury now; correct?

COURTROOM DEPUTY:   No, Your Honor.

THE COURT:   All right.

(Video played.)

BY MR. ROOTS:

Q.   Do you see yourself anywhere in this video?

A.   No, sir.

Q.   This accurately depicts the area that we're talking about?

MR. MCCAULEY:   Objection.

THE COURT:   Overruled, but that's not going to be sufficient.

BY MR. ROOTS:

Q.   Do you see that officer there in the center of the screen right there?

A.   Yes.   That's me, sir.

Q.   That is you?

A.   Yes, sir.

Q.   Okay.   Does this accurately depict, then, what you were doing at that time?

A.   Yes, sir.

MR. ROOTS:  I'd like to move for the introduction of this video.

THE COURT:  Any objection?

MR. MCCAULEY:  No objection.

THE COURT:  The video is admitted.

(Defense Exhibit 236 received into evidence.)

MR. ROOTS:  And I would like to publish this for the jury, and I'd like to play it from the beginning, just two minutes of it.

(Video played.)

BY MR. ROOTS:

Q.   You saw that cutout area in that tarp area just now?

Back up just a little bit.

Do you see that where the tarp appears to have been cut?

A.   Yes, sir.

Q.   That's not the area we're talking about, is it?

A.   No, sir.

Q.   Okay.  Let's keep rolling.

(Video played.)

BY MR. ROOTS:

Q.   Okay.  Do you see that officer there in the center of the screen?

A.   Yes, sir.

Q.   Does it look like he's cutting the tarp?

A.   Yes.

Q.    Let's keep rolling.

(Video played.)

BY MR. ROOTS:

Q.    Let me stop here.  Would you have probable cause to arrest that officer for property destruction?

A.    No, sir.

Q.    No?

A.    No.

Q.    And why not?

A.    One, that's me.  And two, I wasn't doing it for the destruction of property purposes.

Q.    You agree you're destroying property?

A.    Yes.

Q.    Let's keep rolling.

(Video playing.)

BY MR. ROOTS:

Q.    You agree you're pointing a weapon into an enclosed area there?

A.    Yes.

Q.    And is that you cutting that tarp?

A.    Yes, sir.

Q.    You testified that Mr. Thomas cut the tarp?

A.    No, sir.  I said initially there were people cutting the tarp when we came down the stairs, which is what drew our attention down there.  If you saw at the beginning of the video,

there had been people who had already cut away at the tarp.

Q.   But you don't see Mr. Thomas cutting away at the tarp?

A.   As I stated before, no, sir.

Q.   And in fact, the tarp is being cut, and it folds back in towards the officers; is that correct?

A.   It folds outwards.

Q.   If people had been cutting it from the inside, wouldn't it be more likely to fall inside?

A.   I don't know, sir.

        MR. MCCAULEY:  Objection.

        BY MR. ROOTS:

Q.   And you agree that it's being cut at a cut line that is above the protestors but at about chest level of the officers?

A.   Not above the --

        THE COURT:  I'm sorry.  I couldn't hear that answer.

        THE WITNESS:  Sorry.  Could you repeat the question again?

        BY MR. ROOTS:

Q.   You agree that it's being cut at a cut line that would be above where the protestors were but at about chest level of the officers?

A.   Underneath there, there were people higher and lower.  So I'm not sure where the chest level of each protestor would be at.

Q.   And does it look like there are even that many protestors

in there at this time?

A.    The tarp is blocking the view.  There were a good amount of people underneath of there.

Q.    Protestors came up to peer out after officers cut the tarp; correct?

A.    There were protestors prior to our arrival down below there, which is what drew our attention down there and what also we were directed towards that area.

Q.    So you and other officers cut that tarp, inviting protestors on the inside to come farther up and look?

A.    Correct, sir.

Q.    And you aimed, it looked like, a weapon.  Was that a less-than-lethal weapon?

A.    That's the 40-millimeter impact weapon I referred to earlier.  Less-lethal weapon, yes, sir.

Q.    And is your training to shoot such a weapon in closed areas?

A.    Yes, sir.

Q.    It is?

A.    Yes, sir.

Q.    You agree that you're cutting tarp in this video but Mr. Thomas is not?

A.    This video shows me cutting a portion of the tarp, yes, sir.

            MR. ROOTS:  Court's indulgence.

No further questions.  Thank you, Officer.

MR. MCCAULEY:  Your Honor, I only have three questions.

THE COURT:  Go ahead.  And we will take a break after this, ladies and gentlemen.

REDIRECT EXAMINATION

MR. MCCAULEY:  If I could have the previous defense exhibit back up on the screen at approximately the 15-second mark or 30-second mark.  Play it a little bit.

(Video played.)

MR. MCCAULEY:  And pause, please.

BY MR. MCCAULEY:

Q.   Officer, this is you; correct?

A.   Yes.

Q.   And would you agree with me that this is a different area from where you had the 3:12 interaction?

A.   Yes.

Q.   And you didn't cut that tarp?

A.   Correct.

Q.   Officer, why are you cutting the tarp?

A.   So we could see underneath the bleachers for the crowd of people that was under there.

Q.   In an environment such as this, does a crowd of people being obscured by a tarp present a safety threat?

A.   Yes.

Q.   And that's to you?

A.   Yes.

Q.   Fellow officers?

A.   Yes.

Q.   And the public?

A.   Correct.

Q.   And just very quickly, it's somewhat difficult to see at this angle, but can you mark where the 3:12 interaction was approximately?

A.   Further down this way.

MR. MCCAULEY:  Nothing further.

THE COURT:  All right.  May this witness be excused?

MR. MCCAULEY:  He may, Your Honor.

MR. ROOTS:  I'd like to ask one follow-up, one recross.

THE COURT:  All right.  One.

RECROSS-EXAMINATION

BY MR. ROOTS:

Q.   You agree that in this scene the tarp is almost completely intact except for cops cutting the tarp?  Would you agree?

A.   No, sir.

Q.   You would not agree?

A.   No, sir.

Q.   Pointing to that area where you said the reaction, the 3:12 reaction or whatever, that's fully intact over there, isn't it?

A.    I can't tell from this angle, sir.  It's not in view of the camera.

Q.    But the --

THE COURT:  Mr. Roots, this is more than one.

MR. ROOTS:  All right.  One last question.

BY MR. ROOTS:

Q.    The cut over there at the 3:12 mark is consistent with the type of cutting you're doing right here at this location; correct?

A.    It's a cut, sir.  I'm not sure if it's similar to my cut or -- I don't have any way of determining that.

Q.    Is it your training to accuse people of doing the things that you and other officers --

MR. MCCAULEY:  Objection.

THE COURT:  Sustained.

This witness, can he be excused now, Mr. Roots?

MR. ROOTS:  Yes.

THE COURT:  All right.  Thank you, Officer.

THE WITNESS:  Thank you, ma'am.

THE COURT:  All right, ladies and gentlemen.  We will take a brief recess and come back at 2:30 sharp.

(Jury exited courtroom.)

THE COURT:  All right.  Who is the government's next witness?

MR. MCCAULEY:  Detective Rodney Anderson.

THE COURT:  And approximately how long -- I know it's difficult to anticipate exactly how long he will testify.  Do you think we'll get through two more witnesses today for the government?

MR. MCCAULEY:  We will certainly get through Detective Anderson today.

THE COURT:  And who is the next?

MR. MCCAULEY:  After that would be Corporal Scott Ainsworth of the Prince George's County Police Department.  His will be longer.

THE COURT:  Let's try to get us on to his as much as we can today.

MR. MCCAULEY:  I suspect, cross depending, that Detective Anderson's testimony will be the approximate length of Officer Campanale's testimony.

THE COURT:  All right.  Mr. Roots, to the extent that there are exhibits like these videos that you are going to use to cross the government officers, it would be helpful if you all would talk ahead of time so that we're in agreement ahead of time how long we're going to play the video, whether there's really an issue about the officer being able to authenticate the video, laying the proper foundation for the video.

That was perfectly fine.  It just could have gone more smoothly if you all had some discussions.  So to the extent you know you're going to cross-examine some of these officers with

video, it would be helpful to share that now so that we're able to move efficiently.

MR. MCCAULEY:  And I want to state this for the Court: Insofar as we see these videos in advance and they can be authenticated for what they are, we're happy to --

THE COURT:  You're not going to object.  It's slowing things down unnecessarily.  So if you know, it would be helpful. I don't think that there are any surprises if you're showing officers videos that they're actually in.  I don't think you're revealing any defense strategy that they haven't considered if the officer is actually in the video.  So I would encourage that.

All right.  We will be back here -- at 2:30, we will start.

(Recess taken from 2:16 p.m. to 2:31 p.m.)

(Jury not present.)

THE COURT:  Mr. Roots, I'm not routinely going to give redirect, and when you say one more question and you ask five or six, it doesn't make me want to give you redirect in the future. So if you have something new to raise, very well, but not retreading over things that have already been covered.

MR. ROOTS:  Understood.

THE COURT:  All right.  Are you ready?  Does the government want to go ahead bring in its witness or wait for the jury?

MR. MCCAULEY:  Whichever the Court prefers.

THE COURT:  It doesn't matter.

MR. MCCAULEY:  Yes.  The government now calls Detective Rodney Anderson.

THE COURT:  All right.

(Jury entered courtroom.)

RODNEY ANDERSON, WITNESS FOR THE GOVERNMENT, SWORN

MR. MCCAULEY:  May I proceed, Your Honor?

THE COURT:  Yes, you may.

DIRECT EXAMINATION

BY MR. MCCAULEY:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Could you state your name for the members of the jury.

A.  My name is Detective Rodney Anderson.

Q.  Just spell Anderson for the jury.

A.  Anderson is A-n-d-e-r-s-o-n.

Q.  And how are you employed right now?

A.  I'm employed by the Metropolitan Police Department in Washington, D.C.

Q.  How long have you been employed by MPD?

A.  I've been a police officer in D.C. for 19 years.

Q.  What's your rank?

A.  I'm a detective?

Q.  How long have you been a detective?

A.  I've been a detective for about a year and a half.

Q.   What is your current assignment?

A.   I'm assigned to Homicide.

Q.   How long have you been with Homicide?

A.   I was just recently transferred to Homicide about a week ago.

Q.   Prior to joining the Homicide Branch, where were you assigned?

A.   I was assigned to the Seventh District.

Q.   And what were your responsibilities with the Seventh District?

A.   Investigating criminal cases in the District of Columbia.

Q.   Turning your attention to January of 2021, what was your rank then?

A.   I was an officer, assigned to the Warrant Squad at the time.

Q.   And what were your duties with the Warrant Squad?

A.   To execute D.C. and extraditable warrants from other jurisdictions.

Q.   Could you just briefly explain what that means to the jury.

A.   So extraditable warrants are warrants that are from another jurisdiction that can -- that are arrestable in D.C., and the other jurisdiction will come back to D.C. and pick them up and take them to where they are to face the charges in that jurisdiction.

Q.   And turning your attention to January 6, 2021, were you

working that day?

A.    I was.

Q.    What was your assignment?

A.    We were assigned to prisoner transport for the protest that was supposed to happen that day.

Q.    Why was a member of the Warrant Squad involved with these First Amendment activities?

A.    So in those First Amendment -- generally, when we have First Amendment assemblies, the NSID, the unit that I was assigned to at the time, we would be assigned to mass processing.  So we would be divided up in different jobs that were related to the mass processing of any mass arrests that take place during these protests.

Q.    And you use these terms, mass arrests, mass processing.
      Briefly, what does that mean?

A.    Just any large-scale or a number of arrests during protests.

Q.    What time of day did your shift begin?

A.    It was in the morning.  Our usual day started about 4:00 a.m., but this day, I'm not sure.  It could have been different because of the -- because of the scheduling of the -- because that's a little bit different than our normal activities.  So it could have been different, but it was definitely in the morning.

Q.    But you're sure it began -- withdrawn.
      What was your uniform that day?

A.    Full duty uniform, just uniform pants, uniform shirt, vest, and that's pretty much it.

Q.    Were you wearing any additional protective gear beyond what you've described?

A.    During the day, we put on helmet and masks later on in the day, once we responded over to the Capitol.  But prior to that, it was just regular basic uniform.

Q.    Let's back up.  Where were you in the morning?

A.    So in the morning, we staged at the convention center initially, where we normally stage and wait.  We basically wait for any type of arrest, and then we respond and do the transports from wherever the arrest location is to the mass processing center.

Q.    Where is the convention center?

A.    The convention center is located at Mount Vernon and, what is that, Seventh Street, between Seventh and Ninth on Mount Vernon.

Q.    Which quadrant?

A.    I'm sorry?

Q.    Which quadrant of the district?

A.    Northwest.

Q.    Thank you, sir.  And at the convention center, what were you doing?

A.    Just waiting.

Q.    And did there come a time when you did receive a call to

act?

A.    Right.   So someone -- one of our officials received a call to respond over to near the Capitol for what was going on at the Capitol.

Q.    And within the area around the Capitol, where did you go?

A.    We responded to Independence Avenue, somewhere like right along the side, right around South Capitol Street on Independence.

Q.    And did there come a time when you responded to the Capitol building itself?

A.    Yes.

Q.    As you were moving toward the Capitol building from Independence Avenue, what did you observe?

A.    I remember seeing just smoke going up in the air.  I remember seeing some officials coming back.  They were obviously feeling the effects of the OC spray or the CS gas that was being released at the time, and I assumed that what was being -- what I was seeing in the air was the CS gas.

Q.    And what do you remember about the crowd?  Not the law enforcement officers, the larger crowd that had gathered around the Capitol.

A.    They were obviously protesting.  They were angry.  That's mainly what I remember about what was going on.

Q.    Do you remember them saying anything to you --

A.    No.

Q.    -- at this time?

A.    Not at this time, no.

Q.    Officer, I'm going to show you what's in evidence as Government Exhibit 119.  Officer, this is a map of the Capitol building or the Capitol grounds.

Would you please trace the route you took from Independence Avenue to the Capitol.

A.    Okay.  So we started somewhere on this side here.  That's Independence Avenue, and I believe that's about South Capitol Street.  We made our way across the lawn here and up onto the terrace and around the front of the building all the way over to here.

Q.    And Ms. Rummens, if you could please go to page 3.

Officer, you've previously indicated where you responded to the Capitol building.  Can you please mark that again on page 3 of this exhibit?

I apologize.  I don't believe I said this.  Just so the record is clear, he first marked page 1 of Government's Exhibit 119.

Officer, this location that you've indicated with an X, can you -- approximately what time were you there?

A.    I can't really recall exactly what time it was right now, because the day was kind of -- it was kind of an odd day.  Probably about 1:00, if I'm not mistaken.

Q.    Officer, I want to turn your -- excuse me.

Ms. Rummens, can you go to page 6, please.

Officer, can you indicate approximately where you were at about 3:30 p.m.?

A.    (Indicating).

Q.    And would you describe for the members of the jury what this area looks like?

A.    This was a part of the terrace.  There's a set of stairs right -- that lead to the next landing down there.  We were standing at the top of those stairs right there just kind of -- we made a line to prevent people from getting from the lower landing onto this terrace and into the building.

Q.    Officer, at 3:30 p.m., who were you in this location with?

A.    Other MPD officers.

Q.    Did you know them?

A.    Some of them, yes.

Q.    Was anyone from your unit there?

A.    Yeah, pretty much the whole unit was there.  I just don't know where everybody was.  The only person that I can say for sure that I know was in my vicinity was Sergeant Nickerson.  And he's also -- he was a sergeant in the Warrant Squad at the same time.

Q.    And did you know Sergeant Nickerson prior to this day?

A.    Yes.

Q.    How?

A.    He was one of the supervisors in the Warrant Squad.

Q.   And at 3:30 p.m., where was Sergeant Nickerson relative to you?

A.   He was on the landing, somewhere next to me.

Q.   But it would be fair to say close by?

A.   Yes.

Q.   And you've described how you were in the police line here. What was in front of you?

A.   A crowd of people.

Q.   What was that crowd doing?

A.   They were -- initially as we walked up, they initially tried to push through to try to get to the Capitol.  We kind of pushed them back, stopped them from getting through.  Then they were just kind of standing there.  Some people were saying things, waving flags, and that's pretty much it initially.  Some people came up and tried to talk, stuff like that.

Q.   And at this time, can you describe any interactions that you remember having with the crowd or what they were saying to you?

A.   Well, people would come up and ask, you know, why are you stopping us from getting to the Capitol, whose side are you on, you're on the wrong side, stuff like that.

Q.   Did there come a time when the crowd tried to get past the police line?

A.   Yes.

Q.   Can you describe how many times?

A.    It was at least twice.  Yeah, it was at least twice, maybe three times.

Q.    How were they trying to do that?

A.    Just trying to push past the line.  At some point, a person started to count down, and they all -- as that person tried to push through, then more people followed suit and tried to push through the crowd -- I mean push through the line of officers as well.

Q.    On January 6, were you wearing a body-worn camera?

A.    I was.

Q.    And was that camera working?

A.    It was.

Q.    Does everyone in the Warrant Squad wear a body-worn camera?

A.    Yes.

Q.    And for members of the jury who might not know, can you please briefly describe how a body-worn camera works.

A.    So the body-worn camera, before you activate it to record, it's already recording.  So as long as it's on, it'll be recording.  And the way that MPD has it set, it will record two minutes -- it will keep two minutes prior to you pressing the button to actually activate the recording, but there will be no sound for that first two minutes.

      Now, if your body-worn camera wasn't on for two minutes before you activated it, it will only have the 30 seconds, 20 seconds, 10 seconds, whatever it was that you had it on in the

standby mode before you actually activated it to record, if that makes sense.

Once you hit the record, then the audio is recording and the video, but up until the point that you activate it, it's only video.

Q.   How does one activate a body-worn camera?

A.   You just double tap it.

Q.   To your knowledge, was Sergeant Nickerson also wearing a body-worn camera?

A.   Yes.

Q.   And was his body-worn camera working, to your knowledge?

A.   It was.

Q.   Detective, I'm showing you now what's been marked as Government's Exhibit 307.

Do you recognize this?

A.   I do.

Q.   What is it?

A.   It's a body-worn footage from that terrace on January 6.

Q.   Have you reviewed this footage before coming to court today?

A.   I have.

Q.   And does it fairly and accurately depict what happened on January 6, 2021, at approximately 3:30 p.m.?

A.   It does.

MR. MCCAULEY:  Your Honor, the government would move

to admit.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Plaintiff Exhibit 307 received into evidence.)

(Video played.)

BY MR. MCCAULEY:

Q.   Detective, as seen in Government's Exhibit 307, did anybody make contact with your body?

A.   Yes.

Q.   How do you know that?

A.   Just watching the body camera, I can see them coming up trying to push through the line.

Q.   And were you able to see anyone approach your body specifically?

A.   Yes.

Q.   Can you describe generally what that person was wearing?

A.   There were several people.  The two guys with the cane specifically, I remember them, and then the guy with the brown jacket.

Q.   Detective, I am now showing you what's been marked in evidence as Government's Exhibit 304.

Do you recognize this?

A.   I do.

Q.   What is it?

A.    It's a body-worn camera footage from January 6.

Q.    Do you appear in this video?

A.    Yes.

Q.    Just to be clear, you have reviewed this video prior to coming to court today; correct?

A.    Correct.

Q.    Does it fairly and accurately reflect what happened on January 6, 2021, at approximately 3:30 p.m.?

A.    Correct.

        MR. MCCAULEY:  Your Honor, I would move to admit Government's Exhibit 304.

        MR. ROOTS:  No objection.

        THE COURT:  It's admitted.

    (Government Exhibit 304 received into evidence.)

        MR. MCCAULEY:  If we can publish.

    (Video played.)

        BY MR. MCCAULEY:

Q.    Pause, please.

      Detective, why aren't we hearing any sound now?

A.    It's that standby mode that I was talking about probably.

Q.    Please continue, Ms. Rummens.

    (Video played.)

        MR. MCCAULEY:  And I would ask Ms. Rummens to please rewind the video to 20 seconds and at two-thirds speed.

    (Video played.)

BY MR. MCCAULEY:

Q.   Detective, just to be clear, you've now seen Government's 304 and Government's 307.

Are these the same body-worn camera?

A.   No.

Q.   Whose body-worn cameras are they, based on your review?

A.   One of them is mine, and one is Sergeant Nickerson.

Q.   And based upon your review of these body-worn cameras, did this person come into contact with your and Sergeant Nickerson's body?

A.   Yes.

Q.   Ms. Rummens, please call up 307.1.

Detective, do you recognize Government's 307.1?

A.   I do.

Q.   What is it?

A.   It's a side-by-side of my body-worn camera and Sergeant Nickerson's body-worn camera.

Q.   Have you had an opportunity to review this before coming to court today?

A.   I have.

Q.   Does it fairly and accurately reflect what happened on January 6, 2021, at approximately 3:30 p.m.?

A.   It does.

MR. MCCAULEY:  Your Honor, I would move to admit Government's 307.1.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 307.1 received into evidence.)

MR. MCCAULEY:  Please play.

(Video played.)

BY MR. MCCAULEY:

Q.   Ms. Rummens, can you please pull up Government's 707.

Detective, do you recognize Government's Exhibit 707?

A.   I do.

Q.   Have you had an opportunity to review it before coming to court today?

A.   I have.

Q.   Do you appear in this video?

A.   Yes.

Q.   And does Sergeant Nickerson appear in this video?

A.   Yes.

Q.   Does it fairly and accurately reflect what happened on January 6, 2021, at approximately 3:30 p.m.?

A.   Yes, it does.

MR. MCCAULEY:  Your Honor, we would move to admit 707.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 707 received into evidence.)

MR. MCCAULEY:  Ms. Rummens, please play until 37 seconds.

(Video played.)

BY MR. MCCAULEY:

Q.   Ms. Rummens, can you please go to time stamp 0:15.

Detective, I know it is difficult with the flag in this frame, but do you see yourself in this frame?

A.   No, I can't pick myself out of this frame.

Q.   Ms. Rummens, please play.

A.   I can --

(Video playing.)

THE WITNESS:  I can see myself now.

BY MR. MCCAULEY:

Q.   The screen in front of you is a touch screen.  Would you draw an arrow where you are?

A.   (Witness complied.)

Q.   Just to be clear, this individual?

A.   Yes.

Q.   And do you see Sergeant Nickerson?

A.   Yes.

Q.   Can you please draw an arrow to him?

A.   (Witness complied.)

Q.   Just to be clear, this individual?

A.   Yes.

MR. MCCAULEY:  I pass the witness.

THE COURT:  All right.  Mr. Roots?

CROSS-EXAMINATION

BY MR. ROOTS:

Q.    Good afternoon, Detective Anderson.

A.    Yes.  Good morning -- or good afternoon.

Q.    I really just have a couple questions.

      First of all, you're obviously a big, strong guy.  How tall are you?

A.    6 foot 4.

Q.    6 foot 4?

A.    Yes.

Q.    Approximately what's your weight?

A.    Right now, I'm probably about 300 pounds.

Q.    Safe to say, you don't lose too many fights?

A.    No, I don't.

Q.    Now, you have had some previous accusations of excessive force; correct?

A.    You can explain it to me, but --

Q.    Have you been accused of injuring people as an officer?

A.    Accused of injuring people?

Q.    Using excessive force.

A.    Not to my knowledge, no.

Q.    Have you put people in the hospital?

      MR. MCCAULEY:  Objection.

      THE COURT:  Let's get on the --

(Bench conference.)

THE COURT:  Mr. Roots, where are you going with this?

MR. ROOTS:  We do have *Giglio* provided that shows he has five accusations of excessive force, some of which have been verified.

THE COURT:  What's the government's response to that?

MR. MCCAULEY:  Your Honor, if we could have one moment to review.  I think I know what's happening here, but if we could have 15 seconds.

THE COURT:  Okay.

(Pause.)

THE COURT:  Mr. McCauley?

MR. MCCAULEY:  Your Honor, looking at these forms, he did -- there's only one that mentions excessive force, and it was dismissed, which means that for our purposes here it doesn't exist.

MR. ROOTS:  Reviewing this, it does look like he's been accused five times, none of which have been held against him.  He has been accused of turning off his body cam twice during excessive force, and those have been sustained.

THE COURT:  Mr. McCauley, I asked if the government had concerns with *Giglio* and did you want to move to exclude anything.

What's the argument he can't at least ask if he has a good-faith basis for this?

MR. MCCAULEY:  Your Honor, the problem is that the way that Mr. Roots has framed this, he says excessive force, but there's only one allegation in this entire thing that says excessive force.  This is Mr. Roots reading into an interpretation.  If they wanted to know more about this, we could have provided more, but as we all sit here now, the only information that we have is --

THE COURT:  So you don't dispute that he can ask about one?

MR. MCCAULEY:  No, we do not dispute that.

THE COURT:  Mr. Roots, where are you getting five?

MR. ROOTS:  Well, I guess maybe I'm -- he's accused of force and causing injury, but maybe not excessive force, but I believe it is -- these are incidents where he's accused of using too much force.

THE COURT:  Okay.  Folks, I don't know the facts.  I don't have the paperwork.  This was worthy of a motion to admit or exclude.  I can't, without more information, rule on this.

So do you want to move on now, Mr. Roots, and we will take a break shortly and I will address this?

MR. ROOTS:  Okay.  I would like to ask about the body cam, the turn off the body cam episodes.  He's been convicted or at least sustained disciplinary twice for that.

THE COURT:  Mr. McCauley?

MR. MCCAULEY:  He's been accused, but in one, he was

exonerated.  There was an incident where it was sustained.  So he can ask about the one incident.

THE COURT:  You can ask about the one incident now on the body-cam footage, Mr. Roots, and we will come back -- how much more cross-examination do you have?

MR. ROOTS:  Not very much at all, actually.  I actually don't view this as a huge area.  The video speaks for itself largely.  My point is he's a big strong guy and he's capable of --

THE COURT:  You can cross -- right now, I don't see the basis based on the representations that are being made to me that there are five incidents.  I hear there's one on the body-cam footage, and the government's conceding there's one on the use of force but it was dismissed, and the government can certainly get up and redirect on that.

MR. MCCAULEY:  Yes, Your Honor.

THE COURT:  All right.  So you can ask about those two.  Anything more?  I need a better understanding of what the discovery shows.  I don't have any of it.

MR. ROOTS:  Well, we can go over that during the break, but I don't think this is a huge one.  I think turning off the body cam -- by the way, there is another officer here that Mr. Thomas is accused of assaulting who mysteriously had body cam that went missing.

MR. MCCAULEY:  Your Honor, I would point out that

although there may have been accusations in the past, their body-worn cameras were running in full throughout January 6.

THE COURT:  Of course, and you can make that argument, and it's clear to the jury.

Mr. Roots, what do you want to ask?  I'm okay with you asking about one body-cam incident and one use-of-force incident.  And of course, the government's going to stand up and be able to clear some of this up.  So you decide what to do.

Anything more than that, we're going to have to take a break, and I'm going to have to hear more about it.

MR. ROOTS:  Okay.  I don't have a lot of cross.  I might ask if it appeared Mr. Thomas was -- could have injured him or if it looked like Mr. Thomas was trying to injure him.

THE COURT:  That's fine.

So you're abandoning this cross on the *Giglio*?

MR. ROOTS:  I would like to ask about the body cam.

THE COURT:  You can ask about that.

(End of bench conference.)

BY MR. ROOTS:

Q.   Detective Anderson, people occasionally make complaints about law enforcement officers.

Has anyone ever made a complaint about you?

A.   Maybe once that I know of.

Q.   How about turning off your body cam during episodes of force?  Have you been accused of that twice?

A.    No.  I think you're -- you're saying it wrong.  Maybe I didn't turn my body camera on soon enough, and the incident -- the incident you're talking about is a lady who was banging her head -- started banging her head against a window, and then I turned my body cam on once she started banging her head and I had to restrain her from banging her head.

I was reprimanded because I didn't turn it on immediately upon contacting her.  So for that, yes.  But the only force that was used in that case was to restrain her from banging her head.

Q.    If I could have Mr. Thomas stand up.

Do you recall Mr. Thomas that day?  Does he look like the same guy?

A.    No, I don't recall him.

Q.    Were you injured by Mr. Thomas?

A.    No.

Q.    Do you recall any indication that he looked like he was trying to harm you, injure you?

A.    No, not that I know of, no.  I mean, not that I can remember, no.

MR. ROOTS:  I have no further questions.  Thank you so much.

THE COURT:  All right.  Redirect?

MR. MCCAULEY:  Very briefly.

REDIRECT EXAMINATION

BY MR. MCCAULEY:

Q.   Detective, was your body-worn camera running throughout January 6, 2021?

A.   Not throughout, but yes, it was on in parts of that day, yes.

Q.   And certainly, the incident we just described, it was on?

A.   Yes.

Q.   And when you went to that police line above these steps on the Northwest Terrace, what was your objective?

A.   To prevent people from getting to the Capitol.

Q.   And based on what you have seen in this video, what were these people trying to do?

A.   They were trying to get past us and get to the Capitol.

Q.   And when that happened, what did you do?

A.   We had to push people back and try to stop them.

          MR. MCCAULEY:  Nothing further.

          THE COURT:  All right.  May this witness be excused?

          MR. ROOTS:  Yes.

          THE COURT:  All right.  Thank you, sir.

          THE WITNESS:  Thank you.

          THE COURT:  All right.  Next witness?

          MR. MCCAULEY:  If we can have one minute to assess who is outside.

          THE COURT:  All right.

          MR. MCCAULEY:  Your Honor, I can tell you the government will be calling Corporal Scott Ainsworth.

MS. MILLER:  Your Honor, the government calls Corporal Scott Ainsworth.

SCOTT AINSWORTH, WITNESS FOR THE GOVERNMENT, SWORN

THE COURT:  Good afternoon, sir.

THE WITNESS:  Good afternoon, Your Honor.

DIRECT EXAMINATION

BY MS. MILLER:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Good afternoon, members of the jury.

Could you please state and spell your name for the record, sir.

A.   Corporal Scott Ainsworth, A-i-n-s-w-o-r-t-h.

Q.   Where do you work, Corporal Ainsworth?

A.   I'm employed by the Prince George's County Police Department.

Q.   How long have you been in law enforcement?

A.   For 35 years.

Q.   Can you please just describe briefly for the jury what that career looked like for the last 30 years?

A.   Yes.  So in July 1988, I entered the United States Army and graduated from its military police school.  From there, I was sent to what was then called West Germany, and I served in West Germany, eventually being deployed into Desert Storm with the Third Armored Division, came back.

The military police have a combat and a law enforcement role.  Eventually, I was sent to Fort Meade.  From Fort Meade, I went to Korea.  From Korea, I went back to Fort Meade, and I left the Army in September 1996.

Q.   And in September 1996, where did you then work?

A.   After that, I was employed by Johns Hopkins University, doing security.

Q.   For about how long?

A.   For five months.

Q.   Okay.  And then where did you go?

A.   Then I went -- in February 1997, I entered the Prince George's County Police Academy.

Q.   Doing mental math, 1997 to 2023, you've been working there for nearly --

A.   26 years.

Q.   -- 26 years.  Thank you.

What is your current rank with -- and let's take a step back.

Prince George's County, can we refer to it as P.G. County?  Is that common parlance?

A.   Yes.

Q.   How long have you been with P.G. County police?

I'm sorry.  You just said that.  What is your current rank with P.G. County Police?

A.   Corporal.

Q.   Can you quickly describe for the jury what the ranks look like below corporal?

A.   So, corporal's the highest nonsupervisory rank, although I am an assistant supervisor simply because of my longevity with the department.  Below that would be patrol officer first class, and then the entry rank is patrol officer.

Q.   And what's your current assignment with P.G. County?

A.   Currently, I'm with the Special Operations Division, Traffic Enforcement Section, Collision Analysis and Reconstruction Unit.

Q.   Can you just describe for the jury what your day-to-day responsibilities are in that unit?

A.   My day-to-day responsibility is to investigate any fatal or near-fatal car crashes that occur within the jurisdiction of the Prince George's County Police.

Q.   Corporal Ainsworth, what, if any, experience do you have in riot control?

A.   So starting back when I was in the Army, MP school is a one-week -- then it was called riot training.  This is where you start to learn the formations, the commands, how we maneuver as a force, and we can start to redirect crowds.  You start to use the gear, things like that.

     Then from my entry into Prince George's County Police, again, to be a Maryland certified police officer, you have to do a one-week -- we call it CDU, Civilian Disturbance Unit-type

training.  This again is just the basic school.

When I did that in '97, I continued with my training, and I've been with the CDU Unit of the department since I joined the Prince George's County Police, so 26 years.

Q.   Can you please describe for the jury the difference between your responsibilities or sort of schedule when you work for the CDU versus your normal day to day?

A.   Yeah.  So members of the CDU Unit, we're on call pretty much all the time, because currently there's only 50 of us.  So we have one platoon that is fully active and ready to go.  We're responsible for anywhere in the D.C. region.  We have mutual aid agreements with virtually every jurisdiction in the D.C. region.

Q.   Does that include within the District of Columbia itself?

A.   Yes, it does.

Q.   Turning your attention to January 6, 2021, were you working with the CDU that day for Prince George's County?

A.   Yes.

Q.   Could you tell the jury a little bit about your assignment that day?

A.   So January 6 was actually day 2 of a three-day assignment.  On January 5, we were in the District.  We were at the D.C. convention center.  We were staging for potential unrest in D.C. neighborhoods.  At the time, we were not committed to the Capitol at all.  That was going to be a separate force.

So we had done our first day.  There were no events.  It

went off without incident.

Day 2, January 6, we met at our Special Operations Division headquarters, which was then in Riverdale, Maryland, and began to get ready for the day.

Q.   Do you remember about what time your shift began that day?

A.   I pulled my timecards, and it said I started at 2:00.  I actually arrived a little bit earlier.

Q.   Did you ever make it to the convention center within D.C. that day?

A.   No, we did not.

Q.   Why not?

A.   So around 2:00, I had walked inside our headquarters building.  As a member of the Traffic Unit, we would -- you typically escort the buses and all the necessary vehicles to an incident by using our vehicles to go and block intersections, to leapfrog along so we could smoothly get from A to B.

I wanted to know what the route was that our commanders wanted us to take.  So -- I'm sorry.

THE COURT:  Sorry to interrupt.  I think it might be a good time to take a break.  I'm sorry to interrupt right in the middle of testimony.

MS. MILLER:  No problem, Your Honor.

THE COURT:  Ladies and gentlemen, let's take a 15-minute break, and we will come back at 3:30.

(Jury exited courtroom.)

THE COURT:  Ms. Miller, I'm sorry to do that, and I'm sorry, Corporal.  But the juror who has the alarm was really looking like she was having a hard time focusing right now.  So I think we all needed a break.

MS. MILLER:  Sure.

THE COURT:  So we will come back at 3:15 -- I mean 3:30.

(Recess taken from 3:15 p.m. to 3:31 p.m.)

(Jury entered courtroom.)

THE COURT:  Sir, I want to remind you you're still under oath.

THE WITNESS:  Yes, Your Honor.

MS. MILLER:  May I proceed, Your Honor?

THE COURT:  You may.  Repeat the question and resume.

BY MS. MILLER:

Q.   I don't remember what my question was, but I realized over the break that I should take a step back just in case and ask, where is Prince George's County?

A.   Prince George's County borders Washington, D.C., just to the east of D.C., in the State of Maryland.

Q.   Maryland, thank you.  So it's across the river?

A.   Yes.

Q.   So I think I last asked something about whether you ever made it to the convention center, and I believe you were starting to answer no.

Could you just tell the jury why you never made it to the convention center on January 6, 2021.

A.   So on January 6 at 2:00, we arrive at our Special Operations Division headquarters in Riverdale.

Q.   Sorry.  Where is Riverdale?

A.   I'm sorry?

Q.   Where is Riverdale?

A.   In Riverdale, Maryland.

Q.   Thank you.

A.   I had arrived early.  Like I said, I was going to try and figure out what the route we were going to take is.  So I entered the building, went to my commander's office.  And in Prince George's County, we call them white shirts.  Lieutenant, captain, a major, or a chief wears a white shirt.  Whereas, I wear a green one.

So as I enter the commander's office, all the white shirts are standing there staring at a big screen TV.  There is absolutely no laughing.  There's no joking.  There's nobody -- nobody's talking to anybody.  They're all just staring at it.

And I enter the room.  I look at the commander.  And about that time, the commander takes his telephone -- his cell phone out.  He's getting a phone call.  He looks at it.  He looks at all the other commanders in the room.  They're looking at him. He takes the call.

After he gets done with the call, he turns around, and he

finally sees me standing in the room.  He points to me and says, "Run outside.  Get everybody on the buses.  Do it right now. We're going to dress on the bus."

So I then ran outside, yelled out in the parking lot. There's about 40 or 50 officers starting to assemble in the parking lot.  I yell, "Hey, we got to go, get on the buses, bring your gear, and let's go."

Q.  What was it the commanders in the white shirts were watching on the TV?

A.  It was live video from the Capitol building.

Q.  And in terms of buses, can you just tell the jury why you were getting on buses or assembling in buses?

A.  We take a standard school bus, and we convert it for police use, put lights and sirens on it, remove some of the seats so we get more room to be able to maneuver in it.

Q.  Now, you said that your commander ordered you to get everyone else, to get your gear ready, and hop on the buses.

First, can you tell the jury what your normal gear was when you arrived at the CDU that day?

A.  So we would wear a standard blue tactical-type uniform: Shirt, pants, and our gun belt with boots.  Then we would have our riot gear, CDU gear, loaded in the bags.

Q.  And what does CDU riot gear look like?

A.  So starting with the head, you would have a helmet.  You would have a face mask that you have in a carrier, a padded

gloves, forearm, elbow, shoulder, shoulder pads, a chest protector that's also padded, and then starting at the knees, knee, shin, and ankle protectors.

Q.    And just to get specific, did you put on all that gear before you got on the buses?

A.    No.

Q.    Okay.  So once you were summoned by the white shirts to get in the buses, can you please tell the jury what happened after that.

A.    So we all quickly, within about five minutes, we grab our gear, throw it on the bus.  Everybody's now on the bus, and we're putting that gear I just described, trying to put it on as the bus is moving down the road.

Q.    And where were you going?

A.    To the Capitol.

Q.    Can you describe your understanding at that time of what was going on at the Capitol?

A.    Up to that point, we -- I hadn't heard anything, and nobody had texted me, nobody had called me hey, you know, what's going on.  Obviously, at this particular moment now, we've all got our phones out once we've got our gear on, and we're trying to figure out our situation.  And we start to get the image of or the impression of what is going on.

Q.    And what was that image or impression?

A.    That the -- well, the news feeds that we were receiving was

the U.S. Capitol had been overtaken and that the U.S. Capitol Police had lost control of the Capitol.

Q.   Do you recall around what time you, meaning you and your fellow officers on the buses, arrived at or around Capitol grounds?

A.   The exact time?  I cannot tell you.  I know it was after 3:00.  It's getting later in the day.  We're getting a little bit of a fading sun.

Q.   Can you describe the scene as you sort of arrive near the Capitol?

A.   So we -- our route there, we took 295.  We got on Pennsylvania Avenue.  We took Pennsylvania Avenue to Independence.  And once on Independence Avenue, that brings you to the south side of the Capitol building.  We were due south of the Capitol.  We could see the south side of the Capitol.  We stopped both our buses.  We had brought several other vehicles with us, command vehicles.  We brought a tactical team in a BearCat, which was an up-armored vehicle.  We had brought them along with us.

As we stop, the entire roadway is a flurry of activity.  Every conceivable emergency vehicle has arrived.  You've got ambulances and fire trucks, bomb squads, K-9 units.  Imagine the biggest police vehicle you have ever seen all the way down to a Kia that I saw was there, which I actually thought was funny.

Q.   Did you observe a crowd outside of law enforcement when you

arrived around the Capitol?

A.    You said a crowd outside of law enforcement?

Q.    Aside from law enforcement, were there any other individuals around?

A.    Yes.

Q.    What did those individuals look like to you?

A.    So there was, from my viewpoint, hundreds.  If I had taken another viewpoint, it would have been thousands of individuals in regular street clothes about the entire Capitol grounds. They were next to the Capitol.  They were on the Capitol greens. They were on the inaugural stage.  They were all over the place.

Q.    So you just described the inaugural stage.  Is it fair to assume, then, you went from wherever you parked your buses up to the Capitol grounds and eventually onto the inaugural stage?

A.    We did not make it to the actual inaugural stage.  We didn't go on it.  We went past it at one point, yes.

Q.    And do you remember whether the crowd was saying anything as you were making your way from where you parked up onto the Capitol grounds and towards the Capitol building?

A.    I do.

Q.    What were they saying?

A.    They were calling me a traitor, that I had to remember my oath, some expletives that I won't repeat.  But you get the impression.

Q.    I'd like to show you Exhibit 119, which is already in

evidence, if we could please publish.

Do you remember reviewing these 3-D renderings of the Capitol before your testimony today?

A.    Yes.

Q.    Okay.  Turning to page 2, please, can you -- you have a touch screen in front of you.  Are you seeing the pallet where you can choose a pen?  Top right, I think.  If you tap the screen, a pallet of things --

A.    I don't see a pen.  Yep.

Q.    Got it?

A.    Got it.

Q.    Thank you.  So it looks like you have a yellow pencil or pen there.  Could you please mark -- are we on page 2, Ms. Rummens?  Thank you.

Could you please mark for the jury sort of your general path from where you parked in the buses up towards the Capitol grounds and sort of where you went based on this view of the Capitol?

A.    Yes.  So we parked in this general location, and after disembarking the buses and assembling into our formation, we began walking towards this ramp.

Q.    And about how many of you were assembled together?

A.    Approximately -- so we -- just to kind of briefly describe a formation, you have what's called shield officers or line officers.  There were 40 shield officers, and behind us would be

a SWAT team of about six to eight and then supervisors and some other elements.  So approximately 50 of us.

Q.   So you were a shield officer?

A.   Yes.

Q.   Why were the shield officers in the front of the formation?

A.   So shield officers, line officers have a about 2-1/2 wide by about 4 foot long plastic shield, impact shield.  And we assemble together to form a line in an effort to either protect a certain location or to use the shields to move crowds in the direction we want.

MS. MILLER:  Now, let the record reflect the witness has marked the very middle of this page 2 of Exhibit 119 at the far right and has drawn a line directly to the left.

THE COURT:  The record will so reflect.

MS. MILLER:  Thank you.

BY MS. MILLER:

Q.   Can you please mark again on this 3-D rendering where you went from here?

A.   Where I was what?

Q.   Where you went after -- you've marked sort of a piece of your journey.  Could you mark the rest of your journey up onto the Capitol grounds?

A.   Yes.

Q.   Thank you.

A.   So once we received our instructions, we took this path to

approximately this corner.

Q.    And you said "once we received our instructions."

What were your instructions?

A.    The initial -- when we were on the buses, our commanders told us we were going to be attempting to get between the crowd and the inaugural stage.

When we arrived, that assignment changed.

Q.    Now, before you continue drawing your path on this 3-D rendering, could you just circle for the jury what your understanding of the inaugural stage -- where that's located on this 3-D rendering?

A.    So this structure right here is the inaugural stage, a temporary structure.  Obviously, it's put up for the presidential inauguration.

MS. MILLER:  Let the record reflect the witness has drawn an upside down U shape in the bottom middle of the exhibit.

THE COURT:  The record will so reflect.

MS. MILLER:  Thank you.

BY MS. MILLER:

Q.    Now can you draw the rest of your path, if there was any rest of your path, from where you left off at the bottom right corner of what we're looking at on Capitol grounds -- or near the Capitol building.

A.    So this particular moment, we are in a single-file

formation.  So we're one right behind the other as we're coming up this walkway.  When we round this corner, we then encounter a crowd of individuals, and it's at this particular moment that the commanders decide we need to form -- get into a formation, a line formation.

So we then go from the Capitol building, the physical building itself, to this wall, forming just a wall of shields all the way across.

Q.    Now, up to this point, were you wearing any sort of gas mask?

A.    We had donned the gas mask right after we got off the bus.

Q.    Why did you don a gas mask?

A.    They had already -- someone had already deployed a chemical irritant into the area.  So there was CS/OC spray in the area, and the potential for deploying more was there.  So we elected to go ahead and just don the masks, put them on ahead of time.

Q.    In your 30 years of law enforcement experience, have you ever yourself experienced any reaction to chemical irritants in the air?

A.    Yes, several.

Q.    Can you please describe for the jury what that's like.

A.    So if it's OC spray that comes out as a -- it looks like a fog, and that fog is actually -- it's smoke.  CS and CN gas isn't really a gas.  It's a pulverized kind of dust, and what it does is it gets into your nose.  It causes respiration issues,

gets into your eyes, causes them to tear up.  As a matter of fact, it causes them to burn, along with your nose.  It gets on your skin, and the more you sweat, the more your pores open up, it imbeds itself and irritates, and it just stings.

Q.   At the time that you arrived in and around the Capitol, did you observe any irritants in the air yourself with your own eyes?

A.   Yes.

Q.   What did that look like?

A.   So in the approximate area of the Capitol or the inaugural stage, somebody had deployed -- and CS/CN gas has a grayish kind of smoke to it.  Whereas, like regular smoke is a white smoke.  So we can kind of tell the difference.  So somebody had deployed it in and around the inaugural stage.

Q.   Corporal Ainsworth, you keep saying "somebody."  Is there a reason why you're not specifying who the somebody was?

A.   Given what I observed later on, I cannot tell you who deployed what.

Q.   What do you mean by that?  Can you explain that a little bit more?

A.   So we had officers that were coated in bear spray, which is basically -- OC spray is divided into like a percentage.  The OC spray I carry, which if I spray somebody with it it's going to clamp their eyes shut and it's going to shut them down.  It's only a 5 percent OC spray.

Bear spray is like 20 percent.  So it's like four times as potent.  We had officers coated in it that were coated by individuals that refused to leave the Capitol.

Q.    Meaning not by law enforcement?

A.    Correct.

Q.    Okay.  So we stopped here, sort of -- if we're talking geographically, at the southwest corner of the Capitol.

Can you tell the jury a little bit about what happened at this moment?

A.    So at this moment, the order is given to form a line formation, and there's a wall right here.  So once that order is given, we're able to quickly in a smooth motion transition from one behind the other to a line formation out to our left, locking shields together.

I say in a smooth and efficient manner because part of -- in a deterrent -- to not have to use force in a situation like this, the more effective you look, the more professional you look, the less likely you're going to have to use force.  You're basically conveying to the other side we know what we're doing, maybe it would be a good idea for you to leave now.

So once we did that, we actually experienced a little bit of that desired effect.  The individuals that were in front of us moved back 10 yards, because now they're looking at who are these guys.  So we got what we wanted.  We got a five- to ten-yard separation.

We then paused. We intentionally pause, give them a moment to set in that this isn't something they want to get involved with, so now they have an opportunity to leave.

So while all this is going on, we're giving commands over loudspeakers. We're yelling it to the crowd move back, leave.

Q. If I may mark the screen for you, and I'm going to try to mark it in a different color, red. I'm going to draw an arrow to the left of where you left off on the screen, which is the southwest corner of the Capitol building itself or the grounds right around the Capitol.

If I draw an arrow this direction, from where you were standing, your line left on this exhibit, could you see along -- did you have a clear line of sight down that way, northward?

A. Yes.

Q. Could you estimate about how many non-law enforcement individuals you saw facing that direction?

A. Hundreds.

Q. Did you then at any point start moving in that direction?

A. Yes.

Q. Okay. So I'm going to clear the screen, please. It's getting a little cluttered.

Could you tell the jury and mark on the screen where, if anywhere, your line of officers, the shield officers, ended up?

A. So the individuals that initially were in this yellow marked area, they pushed back and went to this location, this

big area right here.  We were relatively easily able to maneuver down this way.  Then about in here is where we came to a stop.

Q.    And at that moment in time, what was your understanding of your mission?

A.    So the reason we stopped is -- and I will draw a circle around it.  I believe this is the location.  There's a door right there that leads into the Capitol.  There were still individuals in the Capitol building that needed to be exited from the building.  The Capitol Police, MPDC Police were still trying to push individuals and get them out of the Capitol building.

       So in an effort not to have these individuals be pushed out of the Capitol building and now be behind us, we had to stop and wait for them to be pushed out of the building and get the doors closed.

Q.    Did that line of officers that you drew on the southwest portion of Capitol grounds ever move further northward?

A.    Yes.

Q.    Could you please draw an arrow in the direction that that line moved?

A.    That our line?

Q.    Yes, your shield officer line and the folks behind you.

A.    So we were generally going in that direction.

Q.    And by around 4:30 p.m. on January 6, do you have a relative understanding of where on this map that line was?

A.    Yes.

Q.    Could you please draw that for the jury?

A.    So we had -- in the circled area, that door -- once that door was closed, most of the crowd had been pushed along this wall.  So we moved our formation just slightly up and left just enough room so that individuals could be pushed this way and eventually out this way.

Q.    And I'm going to go ahead and -- let the record reflect that the witness has now drawn an arrow along the west side of the Upper West Terrace of the Capitol northward.

      I'm going to clear the screen.

            THE COURT:  The record will so reflect.

            MS. MILLER:  Thank you, Your Honor.

            BY MS. MILLER:

Q.    Corporal Ainsworth, on this rendering, do you have an understanding, based on how you described your ultimate mission, of where you were hoping to force the rioters to exit the premises from?

A.    I'm sorry?

Q.    Do you know where you were hopefully trying to get the rioters to exit this area towards?

A.    So our understanding was we were to push them northward up to -- I'm sorry.

Q.    It looks like you somehow got an arrow and not a pencil.  I think you can reselect it up top there.  That might have been

me.  Sorry.

A.    So we were supposed to go to this corner and then eventually to this corner.

MS. MILLER:  Let the record reflect that the witness has just circled the Northwest-most corner of the terrace, and the second marking is the Northeast-most corner of the terrace.

THE COURT:  The record will so reflect.

MS. MILLER:  Thank you.

BY MS. MILLER:

Q.    Corporal Ainsworth, do you have any specific memories of interacting with rioters around the area I'm about to mark, around this area of the Upper West Terrace?

A.    Yes.

Q.    Can you please describe for the jury very briefly what your memory is of that interaction with rioters?

A.    So after getting all the individuals out of the building, again, we gave it a little time.  Hopefully, they would get the idea that it was now time to leave the area.  Commands were being given.  They were now able to hear these commands.

Once a sufficient time had elapsed, the commanders ordered -- gave the order to go ahead and move forward, and we started to push.

Initially, most stayed 10 yards away from us.  They were withdrawing.  The crowd was getting thinner.  Things were actually looking somewhat like it was going to be a relatively

easy push.

However, in about that area, more people started showing up. More individuals were joining the crowd rather than leaving it, and these individuals were not moving backwards. They started actually closing that 10-yard gap that we had between the rioters and our shields.

Q. And just to be clear for the jury, when you say "push," the term "push" in terms of your mission, do you mean physically push or figuratively move in a direction and push forward?

MR. ROOTS: Objection; leading.

THE COURT: It was an "or." I will overrule the objection.

THE WITNESS: Either one. If they can do it of their own power and leave the area, fantastic. If they don't, then we would physically have to remove them from the area.

BY MS. MILLER:

Q. Thank you. I'm showing you Exhibit 120, which is already in evidence, please.

Corporal Ainsworth, do you recall reviewing this in anticipation of your testimony?

A. Yes.

Q. Does it fairly and accurately reflect what you remember about the scene around 4:20 p.m. on January 6, 2021?

A. I do.

Q. Do you see there's actually a time stamp that says

4:20 p.m.?

A.    I do.

Q.    And do you remember whether this video has sound?

A.    I'm sorry?

Q.    Do you remember whether this video has sound?

A.    I don't believe it does, no.

Q.    Can we please play this video from the beginning until 38 seconds.

        (Video played.)

            BY MS. MILLER:

Q.    Corporal Ainsworth, do you see yourself in this freeze frame?

A.    Yes.

Q.    Could you please circle yourself for the jury and describe what you're doing here?

A.    Am I able to circle it?

Q.    Yes, you should, with the same pencil.

A.    There we go.  All right.

        So that would be me.  I know it's me because my visor is up.  In the melee, somehow I accidentally knocked my visor up, my protective visor.  And this is my arm.  I had been trying to motion for the crowd to move away.

Q.    And Corporal Ainsworth, did you see -- prior to the 38-second mark, did you see how there was a lot of individuals that sort of seemed to be running to the left of the screen --

A.   Yes, I did.

Q.   -- before you were arriving?

A.   Yes.

Q.   Could you describe for the jury what your memory is of that sort of crowd movement and why you believe they were moving?

A.   So up to that point, what you don't see is off-screen to the right, we were in that line formation, and we went from one behind the other to one next to each other and made that line.

     Once we did that, we started to push forward a little bit, and that's the crowd reacting to us getting lined up and into position.

Q.   You say you were gesturing for the crowd to move, but were you or anyone else verbally directing the rioters to move back?

A.   Again, not visible in this frame.  There is individuals behind us with bullhorns, PA speakers, loudspeakers, giving commands to the crowd to move away from the area.

Q.   And were those individuals law enforcement officers?

A.   Yes.

          MS. MILLER:  Now, let's let the record reflect that the witness has circled himself in the bottom right corner of the video at 38 seconds.

          THE COURT:  The record will so reflect.

          MS. MILLER:  Thank you, Your Honor.  I'm going to clear the screen, hopefully.

     May we continue playing this video until 47 seconds.

(Video played.)

BY MS. MILLER:

Q.    We've done a freeze frame at 47 seconds.

Can you describe for the jury what we saw between the 37-second mark and the 47-second mark?

A.    At this particular moment, if you look in the background, you will see the doorway.  There's three archways.  Right in the center is where the door is.  Capitol officers and MPDC officers are still in the effort of getting individuals out and getting that door closed, and then they're pushing the -- I'll even draw the door for you.  It's right here.  They're pushing the individuals now along this wall, down this wall to where this yellow flag is.

MS. MILLER:  Let the record reflect that the witness has just circled the middle archway of the three in sort of the bottom quadrant of the screen and drawn an arrow to the left of that circle.

THE COURT:  The record will so reflect, and the line is drawn to the yellow flag.

MS. MILLER:  Almost to the edge of the yellow flag.  Thank you.

BY MS. MILLER:

Q.    What was your understanding of why they were forcing -- you and MPDC, Metropolitan Police, were forcing rioters in that direction?

A.    So our intention was, once we had swept this area, this little cove area, if you will, removed all the rioters from it, we would now have them in this location, and once they were in that location, we would then begin again pushing northward.

Q.    And thinking back to the 3-D renderings we went over just a couple of minutes ago, are you now in this video on sort of the left side of those 3-D renderings, the north side, or the south side or some other side?

A.    We're on the west side of the Capitol, approximately where the center of the Capitol is.  We're right next to the inaugural stage now.

Q.    So looking -- if you were looking at the 3-D rendering, would you be moving left or right?

A.    Left.

Q.    Thank you.  Okay.  I'm going to clear the screen.

Let the record reflect that the witness has also circled again all three arches now and drawn a line from that to another circle in the bottom left corner of the screen that circles most of the individuals in the bottom corner of the screen.

THE COURT:  The record will so reflect.

MS. MILLER:  I'm going to clear the screen.

Could we please play this video from here until 1:46, please.

(Video played.)

BY MS. MILLER:

Q.   Corporal Ainsworth, do you see the gentleman in the bottom left corner of the screen in a tan jacket and baseball hat?

A.   I do.

Q.   Do you remember the specific individual -- did you remember this specific individual before reviewing the surveillance video?

A.   I do.

Q.   Why did you remember him?

A.   During -- in the video a few moments later, he ends up hitting my plastic shield, and this knocks me down.

Q.   Do you see this individual in the courtroom today?

A.   I do.

Q.   Could you please identify him for the jury, including a description of what he's wearing?

A.   It would be the defendant seated at the defendant's table wearing eyeglasses, the gray jacket, and a gray tie.

Q.   And before we go on, could you please just circle him in the video for the jury?

THE COURT:  Let the record reflect that the witness has identified the defendant in the courtroom.

MS. MILLER:  Thank you, Your Honor.

Please let the record reflect also that the witness has circled on the video in the bottom left corner where he sees the defendant in the tan jacket.

THE COURT:  The record so reflects.

MS. MILLER:  Thank you.  I'm going to clear the screen.

Could we play this exhibit for another five seconds, if possible, to 1:51, please.

(Video played.)

BY MS. MILLER:

Q.    Corporal Ainsworth, based on your memory of what we've seen in the last five seconds, could you please describe for the jury what just happened with respect to you and the defendant?

THE WITNESS:  In approximately this area right here, you will see several officers are now bent over.  They're looking down at something.  What they're looking down at is actually me.  I am on my back, and I am actually on top of another officer that I ended up falling back onto, and we're both looking skyward and trying to get ourselves back up.  Because of all the gear and all the people, we can't get ourselves up.  So these officers are now having to lift me up.

Q.    And I know we couldn't see it because it was very quick in this video, but in those five seconds, can you please give a little more detail about what you remember about your interaction with the defendant?

A.    So the individual right here, if you look back five seconds, what happens is he comes in this direction.  You lose sight of him.  I fall back.  He then all of a sudden ricochets back to where he was right now.  The reason he's ricochetting

back is he had ran at me, and with full body weight and full force, he hit me.

Unfortunately, I had my feet crossed at the time.  So I wasn't able to brace for the impact that I was going to receive. I took the hit, fell back, and he bounced back to the position he's in right now.

Q.    Corporal Ainsworth, how did you feel during this particular episode?

A.    How did I feel?

Q.    Yes.

A.    Oh, I was frightened.  I was scared.

Q.    Why?

A.    I've been through quite a few things in my 35 years.  One of the things I know is, if you're on the ground and there's that many people around, there's a good chance you could get stomped.  And even though I'm wearing a helmet, I could get stomped on the head.  I could get stomped on an arm, a leg. Something could get broke, and this is not the place to be on the ground.  So it was not a fun feeling.

MS. MILLER:  And let the record reflect that the witness again circled the defendant in the bottom left corner and drew an arrow from him to the right of this screen and towards a larger circle, maybe in the middle eighth of the left bottom corner of the screen.

THE COURT:  The record will so reflect.

MS. MILLER:  I'm going to clear the screen.

BY MS. MILLER:

Q.   Before we continue playing the video, Corporal Ainsworth, do you have any memory whether this is the only interaction with this individual or whether he kept going?

A.   I believe he had -- I cannot recall if he came back in and hit me again.  I can't recall.

Q.   Okay.  Let's keep playing the video from here until 2 minutes 19 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Corporal Ainsworth, if you have any specific memory of that short portion of the video we just watched, could you please describe that for the jury.  And if you don't, that's okay.

A.   Yes.

Q.   You do have a memory?

A.   Yes.

Q.   Please describe.

A.   So up to this point, it's been relatively -- I wouldn't say easy, but it's been relatively not violent on either part. They've really not perpetrated any violence on us.  We have not had to use any force against them.

But after I get knocked down by the defendant, now suddenly, the crowd becomes more emboldened, and now we are having to fight it out.  We are having to actually hit people

with sticks.  We are having to use chemical munitions.  We're having to actually push with our shields.  So it became much, much worse.

Q.   Based on your training and experience in your 30 years in law enforcement, why did you have to use force?

A.   Because the crowd is now becoming more violent.  They're simply not protesting.  They're now coming up, and they're actively trying to reach over our shields and grab our helmets.  They're grabbing our face masks, trying to tear our face masks off.  They're striking us with objects that they had in their hands at the time.

Q.   Do you have any specific memories of the type of objects they had in their hands?

A.   Yeah.  So there was a woman -- and it was actually somewhere about in this location is where I encountered her.  She was actually slightly to my right ahead of me, and she had an object in her hand.  It looked like a wooden object, piece of wood.  I then -- when an opportunity presented itself, I opened my shield up ever so slightly, reached out, grabbed it, snatched it out of her hands before she had a chance to react.

And I can't keep it because I've got things to do.  So I have to hand it back.  As I look back to hand it back, I look on the piece of wood.  It's a wooden plank, and it says "Ways and Means."

Q.   What's the significance of that to you?

A.    It's the Ways and Means Committee.

Q.    So where do you think it came from?

A.    From inside the Capitol building.

MS. MILLER:  Let the record reflect that the witness has circled where he believed this woman with the wood to be in the middle of the screen, just left of center.

THE COURT:  The record will so reflect.

MS. MILLER:  Clearing the screen.

Can we please play until 2 minutes 20 seconds of the video.

(Video played.)

BY MS. MILLER:

Q.    Now, in your opinion, what do you see the camera doing over the last sort of 30 seconds of this video?

A.    What do I see the camera do?

Q.    Right.

A.    So it's caded itself more to the left.  So it's now trying to transition to the north.

Q.    In your opinion, why do you think it's doing that?

A.    Because it's following us.  It's staying centered on us, our interaction with the crowd.

Q.    Okay.  Can we please skip ahead in this video to 5 minutes 45 seconds and play from there until 6 minutes 33 seconds.

Corporal Ainsworth, I'm going to focus your attention on an area in and around where you see a vertical pole right in the middle of the video's foreground.

(Video played.)

MS. MILLER:   This particular video file is challenging.  We're going to have to reopen it.  Just give us one second, Your Honor.

We're going to change the plan a little.  Let's play from 5 minutes 9 seconds and play from there to 6 minutes 33 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Corporal Ainsworth, focusing to the left of the pole in the foreground, do you see the defendant in this freeze frame?

A.   Yes.

Q.   Could you please circle him for the jury?

A.   Yes.

MS. MILLER:   And let's let the record reflect, please, Your Honor, that the witness has just circled a man in a tan jacket just to the left in the middle of the screen, of the pole.

THE COURT:   The record will so reflect.

MS. MILLER:   I'm going to clear the screen.

BY MS. MILLER:

Q.   Corporal Ainsworth, could you describe for the jury what they saw, based on your memory, over the last sort of 45 seconds or so of the video?

A.   Okay.  I'm sorry?

Q.   Could you please describe for the jury what we saw over the last 45 seconds or so of this video, based on your memory?

A.   So starting out with the video, we were initially gathered up right here.  Commands are being given for the individuals to leave.  Every so often, you want to give them a breather, basically an opportunity to move away.  You have to give them an opportunity to move away.  I give them time, and you actually have to give them an exit spot to go to.  We were providing both.

After a while, it becomes you have to do something.  You have to remove these individuals from the area.

So as we begin to push forward, the crowd, with the defendant also up in the front, began to resist.  They come up on us, and it turns literally into a rugby match, if you will, where you're just pushing for the ball.  It's two bodies or two masses trying to push against each other.

MS. MILLER:  Let the record reflect the witness made a circle to the right of the pole in the middle and the officers to the right of the pole.

THE COURT:  The record will so reflect.

MS. MILLER:  Thank you.  I'm going to clear the screen.

Please continue this video for another 30 seconds, until 7 minutes 21 seconds approximately.

(Video played.)

BY MS. MILLER:

Q.    I know it's getting further away, so it's smaller and smaller, but do you see the defendant in this freeze frame?

A.    I believe he's right here.

MS. MILLER:    Let the record reflect the witness has just circled a man in a tan jacket in the middle of the screen just left of center.

THE COURT:    The record will so reflect.

MS. MILLER:    Thank you.

BY MS. MILLER:

Q.    Turning back to the overall mission of clearing the rioters northward, was your police line ever successful in moving the rioters northward?

A.    Yes.

Q.    Corporal Ainsworth, could you please tell the jury a little bit about how this compares to your previous work in riot control?

MR. ROOTS:    Objection; irrelevant.

(Bench conference.)

THE COURT:    Ms. Miller?

MS. MILLER:    What's the objection?    Irrelevant?

THE COURT:    Haven't you covered -- hasn't he testified already about how extreme this was compared to what he had experienced before?

MS. MILLER:    So it's cumulative is the objection?

THE COURT:  Yeah, from my perspective.

MS. MILLER:  Okay.  I will move on.

(End of bench conference.)

BY MS. MILLER:

Q.   Corporal Ainsworth, about how long did it take for you to move rioters from as far east as you remember on the Upper West Terrace to this point?

A.   45 minutes.

Q.   I know you described previously how you felt when you were knocked over.  Can you take a step back and more generally describe how you felt at the end, after you got the rioters off the Upper West Terrace?

A.   I was exhausted.

Q.   Why?

A.   So when you're doing this, it's 45 straight minutes of pushing and being pushed, and you're getting hit from the left and the right.  So every muscle you have, you're utilizing it. You're trying to hold the shield up.  You have the stick in your hand.  You're using the stick.

I guess the best way to describe it is, put your hands against a brick wall and try to push that wall for 45 straight minutes with every muscle you have, without water, without rest.

MS. MILLER:  Court's indulgence, please.

BY MS. MILLER:

Q.   One last question, Corporal Ainsworth.  Were you wearing a

body-worn camera on January 6, 2021?

A.    I was.

Q.    Were we able to review that video?

A.    No.

Q.    Why not?

A.    My camera got knocked off.  Shortly after we got into our line formation, somehow it got knocked off my uniform.  One of my supervisors found it laying on the ground and picked it up, put it in their pocket.

MS. MILLER:  No further questions, Your Honor.

THE COURT:  All right.  Mr. Roots?

CROSS-EXAMINATION

BY MR. ROOTS:

Q.    Good afternoon --

A.    Good afternoon, sir.

Q.    -- Corporal Ainsworth.

So you've been 26 years with Prince George's County, Maryland.  Is that the sheriff or the police department?

A.    County police.

Q.    You've only advanced twice; is that the case?

A.    Yes, by my choosing.

Q.    By your choosing?

A.    Yes.

Q.    Is that unusual?

A.    No.  I'm a crash investigator.  If I make sergeant, if I

test for sergeant and make sergeant, which I could do, I have no doubts, I would then lose my position as a crash investigator. And the department and myself spent a lot of money getting me to the point that I am.

So it just made more sense to stay as a corporal and continue being a supervisor -- or a crash investigator.

Q.    Are you the longest-serving corporal in the department?

A.    No.  I think I'm like maybe the 40th one.  I'm the oldest in my unit.

Q.    You could have gone to a higher rank but chose not to?

A.    Correct.

Q.    Wouldn't that be more pay?

A.    It would be in the short term, but being a crash reconstructionist on the outside, once I retire, I assure you it will pay a lot more.

Q.    With regard to the Upper West Terrace, January 6, you talked about the crowd saying things like "remember your oath."

Do you recall that?

A.    I do.

Q.    What were they meaning by that?

MS. MILLER:  Objection; speculation.

THE COURT:  Sustained.

MR. ROOTS:  I will refrain -- I will rephrase.

BY MR. ROOTS:

Q.    That would be trying to persuade you to do something;

right?

MS. MILLER:  Objection; speculation.

THE COURT:  Sustained.

BY MR. ROOTS:

Q.   At the time you arrived up there on the Upper West Terrace, what time was that again?

A.   It was -- I don't know the exact time.  It was after 3:00. It was getting later in the day.

Q.   Suffice to say the Capitol building had been breached before you ever got there?

A.   Correct.

Q.   And there were efforts to push the people inside the building out at that time?

A.   Yes.

Q.   Did you happen to see any signs or bike racks that offered barriers, provided barriers to the crowd?

A.   No.

Q.   Now, you mentioned this CS gas or tear gas.  Does that have an effect on people at times, creating confusion?

A.   It can, yes.

Q.   Can it create panic in people?

A.   It can, yes.

Q.   Can it affect people's judgment?

A.   I would imagine it could, yes.

Q.   There's no evidence -- you don't have any information that

Mr. Thomas ever sprayed anything, do you?

A.    No.

Q.    You talked about announcements being played.  How many announcements did you hear when you were up there?

A.    Probably hundreds.

Q.    Hundreds?

A.    Hundreds.

Q.    At one point, your testimony said they were now able to hear, and I understood that to mean they weren't able to hear prior to that for some reason.

A.    No.  All I know is when we arrived, we had bullhorns, PA systems, and we started making announcements.  The MPDC police had a commander there who was in their formal dress uniform with a gas mask on and wearing their formal hat.  And he had his PA out, and he was utilizing his PA when we arrived, because he was the overall commander of the incident.

Q.    I'd like to bring up Government's 120 again, which has already been played, the video, and we can play it just after when the officers come in.

        (Video playing.)

            BY MR. ROOTS:

Q.    First of all, let me ask you, in this scene, this setting that you're looking at here, do you see any violence?

A.    No.

Q.    Would you call this a riot right here?

A.    At this particular moment, no.

Q.    Now you see people running.  Some of them are running very quickly.

Do you see that?

A.    Yes.

Q.    And you testified they are running from this moving skirmish line; correct?

A.    Correct.

Q.    Would you say they're in fear?

A.    I wouldn't say -- well, I can't say if they were afraid or --

Q.    We can stop right here.

A.    -- they were simply adjusting themselves to the situation.

Q.    Would you say there's over 100 officers moving rapidly toward them?

A.    Correct.

Q.    Who would you describe as the aggressors in this scene that we just saw?

A.    Nobody, not us or them.

Q.    The officers were not aggressors here?

A.    No.

Q.    Why would you say that?  They're moving forward at rapid speed.

A.    We've used no force at this particular moment.  They have left on their own power.  And we are attempting to achieve a

lawful purpose.

Q.    You're saying -- would everyone have understood that in the crowd?

MS. MILLER:  Objection.

THE COURT:  Sustained.

MR. ROOTS:  Let's roll the film a little bit more, if I could.

(Video playing.)

BY MR. ROOTS:

Q.    You see there are a few baton strikes, officers appear to be hitting people with batons?

MS. MILLER:  Objection; misstates the evidence.

BY MR. ROOTS:

Q.    Okay.  Do you see that?

A.    Where was it again?  It was in the foreground or where the Texas flag is?

THE COURT:  Mr. Roots, why don't you point out what you're seeing and ask him if that's an officer using a baton.

MR. ROOTS:  Can we back up a little bit?  Okay.  Let's play it forward here a little bit.

(Video played.)

BY MR. ROOTS:

Q.    Right there.

Did you see anything there, a baton?

A.    Right here?

Q.   More over in this area.

A.   Yes.

Q.   Did it look like it was a baton being swung down upon someone's head, perhaps?

A.   Yes.

Q.   Let's roll it a little bit more.  Let's remove these circles, if I could.  Let's see if I could clear this, or maybe you can.

A.   I don't know if I can clear it.  Can I?  I'm afraid to touch anything.

Q.   Oh, there we go.  If we could roll some more here.

     (Video played.)

        BY MR. ROOTS:

Q.   Okay.  Did you see some more baton strikes?

A.   Yes.

Q.   In this area here, perhaps?

A.   It appeared that the law enforcement were swinging batons at protestors there.

Q.   Yes.  In your training, is it possible to hit people in the head with a baton?

A.   No, no.  You never want to target the head, although it does happen.

Q.   And that's actually potentially deadly force; correct?

A.   It could be.

Q.   And you could only do that if deadly force was being

offered against you?

A.    Yes.

Q.    Did it look like the crowd was offering deadly force against the officers there?

MS. MILLER:  Objection; speculation.

THE COURT:  Overruled.

THE WITNESS:  No.  There was -- it doesn't appear so.

BY MR. ROOTS:

Q.    Now, you testified that there was a bullhorn in amongst the law enforcement, but it can't be seen in this video.

Do you recall that?

A.    No, I -- well, I haven't been looking.  I've been looking in this general area, because this is where I was told to put my attention.

Q.    I think you indicated it was behind you, somewhere off the screen.

A.    Correct.

Q.    And it also can't be heard in this video; correct?

A.    No.

Q.    There's no audio in this?

A.    No, there's no audio.

Q.    You said someone hit -- I believe you indicated that the defendant hit your plastic shield.

Did you say that?

A.    Yes.

Q.   Now, in your experience, is that -- isn't that what plastic riot shields is for, is to push against the crowd, causing the crowd to have contact and occasionally hit the riot shield?

A.   The purpose of the shield is to protect me and protect what's behind me.  It's not so that somebody can hit me.

Q.   Right.  If someone wanted to hit you, though -- if someone wanted to hit the shield, that wouldn't be regarded as a severe assault, would it?

A.   No.

Q.   Now, there was discussion of the phrase ricochetting back. Now, I believe you said the line of officers came in fast, and then there was sort of a ricochet backward.

Is that what happened?

A.   Correct.

MS. MILLER:  Objection; misstates the evidence.  He didn't say -- can we get on the phones for a second, Your Honor.

THE COURT:  Why can't the witness answer the question?

Did you say that?

THE WITNESS:  I can't recall if I said rebound or ricochet.  But there was a quick motion where -- in the video where he moves back quickly from where I was at.

BY MR. ROOTS:

Q.   So the officers came in fast, made contact with the crowd, and there was a burst of resistance at that moment, and it was a ricochetting back, I think is what you indicated.

Would you say that's sort of what happened?

A.   With regards to the crowd, yes.  The defendant at one point comes back in again and hits me.

Q.   Okay.  Let's go into that a little bit later here.

You just testified that you were knocked to the ground by the defendant.

A.   Yes.

Q.   Do you recall making a prior statement to the FBI about -- do you recall writing a report or giving a report to the FBI about the incident?

A.   Yes, I spoke with the FBI.

MS. MILLER:  Objection; improper impeachment.

THE COURT:  Mr. Roots.

(Bench conference.)

MR. ROOTS:  I don't know how this would be improper impeachment.

THE COURT:  What did he say that was inconsistent?

I don't know what he said to the FBI, Ms. Miller.

MS. MILLER:  Nothing that I know of.

THE COURT:  What did he say that's inconsistent with his testimony now?

MR. ROOTS:  Well, that is my point.  He made a statement to the FBI, a 302, which does not mention being pushed to the ground by the defendant.

MS. MILLER:  But that's not inconsistent.

THE COURT:  Fair enough.

He didn't -- that's fair cross, that he didn't mention that at the time.  I will allow the question.  The objection is overruled.

(End of bench conference.)

BY MR. ROOTS:

Q.  Do you recall giving a report about the incident to the FBI?

A.  Yes, we spoke.  Yeah.

Q.  And you did not mention being pushed to the ground in that report?

A.  I can't recall if I mentioned it to them or not, no.  I do not recall if I -- like I said, we -- it was a telephone conversation, and I didn't make a formal report.  If I made a formal report for every use of force and every assault that was committed on me that day, I would still be doing reports today.

Q.  Let me stop you there.  Aren't you required by your job to report every use of force?

A.  And we did.  The command staff initiated a use of force review.  The -- given the breadth of everything that occurred that day, as I said, every single action could not be categorized or evaluated.  So it was -- they would take video and try to do the best they could.

Q.  Okay.  But you are required to report every use of force?

A.  Yes.

Q.    And you did not report being pushed to the ground by Mr. Thomas?

A.    I did to my supervisors afterwards, yes.

Q.    You did not mention that to the FBI?

A.    Well, when I was speaking with the FBI initially, I didn't know which assault we were talking about.  So like I said, there was several that day.

Q.    It would be fairly important -- it would be an important fact that you were pushed to the ground by someone, wouldn't it?

A.    Correct.

Q.    But you did not mention that in your report to the FBI?

A.    No, I didn't mention it to them, no.

Q.    In that report, didn't you mention that a woman officer was pushed down by the crowd?

A.    Yes.

Q.    And do you happen to remember the name or the identity of that officer?

A.    Yes.  Corporal Wood.

Q.    And Corporal Wood has no body-cam footage of the incident either, does she?

            MS. MILLER:  Objection; speculation.

      (Bench conference.)

            THE COURT:  Mr. Roots, this time, you better have a good-faith basis for asking that.

            MR. ROOTS:  We've asked for Ms. Wood's -- Officer

Wood's body cam, and we're told by the prosecution it does not exist.

THE COURT:  Ms. Miller?

MS. MILLER:  As far as we know, there isn't any.

THE COURT:  Okay.  But he can ask the question.

MS. MILLER:  How would he know whether she had it or not?

THE COURT:  Because he asked for it, and you didn't give it to him.  He would be entitled to it, wouldn't he, in discovery, if the body-cam footage showed the defendant?

MS. MILLER:  Right.  But we're saying that it doesn't exist.  So asking about the nonexistence of body-worn camera is not appropriate.

THE COURT:  Why?  Officers, if they're supposed to wear body cameras on them and they don't have them on, then why is that not fair cross?

MS. MILLER:  How would he know whether she had body-worn camera or not?

THE COURT:  Because you didn't produce it.  That's a fair inference to draw.  If he asked for body-cam footage and you didn't produce it, then a fair inference is that you would have produced it if you had it, and you would have it if it existed.

MS. MILLER:  I will withdraw the objection.

(End of bench conference.)

THE COURT:  The objection is overruled.

BY MR. ROOTS:

Q.  So far as you know, Officer Wood never produced any body-cam footage of that?

A.  No.

Q.  And you say you suddenly fell, but you didn't tell this to the FBI, and your body cam of that is also missing?

A.  Correct.

Q.  I would like to play Defense 303X -- I'm sorry.  It's Government's 303X.  This may not be in evidence, or is it?

We can just play the first snippet, and I will ask you if you recognize.

(Video played.)

BY MR. ROOTS:

Q.  Do you recognize that image as images of January 6 and that general vicinity?

A.  Yes.

MR. ROOTS:  I move to admit Government's Exhibit 303X.

MS. MILLER:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 303X received into evidence.)

MR. ROOTS:  And I would like to show it to the jury.

(Video played.)

MR. ROOTS:  I would like to just play it from the beginning.

(Video played.)

BY MR. ROOTS:

Q.   Did you recognize the defendant, Mr. Thomas, in that video?

A.   Yes.

Q.   And do you recognize yourself anywhere in this set of images?

A.   Could we play it back?  I think I was looking in the wrong spot.  I see the images down here below now.

(Video played.)

MR. ROOTS:  Why don't we just go ahead and play it forward.

(Video played.)

BY MR. ROOTS:

Q.   Now, you see Mr. Thomas in the image on the upper right? Do you see that?

A.   Yes.

Q.   Actually, now that I look at it, look down at the image on the left.  On the left, there's a bunch of officers.  It looks like there is an officer who is down on the ground.

Is that you there?

A.   Yes.

Q.   That is you?  Okay.

Let's keep rolling.

(Video played.)

BY MR. ROOTS:

Q.    If I could go back to maybe 15 seconds and have you focus on the screen on the left, and we could play that forward.  I want to really focus on who initiates the aggression, if you would.

(Video played.)

        MR. ROOTS:  If we could play it some more.

(Video played.)

        BY MR. ROOTS:

Q.    Okay.  If it's not -- what did you see there in terms of -- especially on the left side of the screen there?

A.    So you see officers engaging with the crowd.

Q.    Okay.  Let's look at the one up top -- up high here where I believe there's an augmented image of Mr. Thomas.

      Do you see him standing there?

A.    Yes.

Q.    And he's holding what in his right hand, does it look like?

A.    That's his cell phone -- a cell phone.

Q.    Does it look like he's trying to film or video?

A.    I believe -- well, if you look at him, he's got his left arm up, and his feet are bladed out.  It appears he's bent at the knees.  So he's in a fighting stance.

Q.    This is a fighting stance?

A.    Yeah, that's a fighting stance.

Q.    Okay.  Let's play it forward a little bit.

(Video played.)

BY MR. ROOTS:

Q.   Do you hear Mr. Thomas saying "let him up, let him up, let him up"?

A.   Let him up, yes.

Q.   To your knowledge, he's referring to an older protestor that's down on the ground there?

A.   I don't know if that's what he's referring to.  I'm assuming that's what he's referring to.

Q.   Let's keep playing.

(Video played.)

BY MR. ROOTS:

Q.   Did it look like Mr. Thomas was looking out for an older protestor that was down on the ground?

A.   That is possible, yes.

Q.   He was trying to maybe open some space so that that individual could get up?

A.   That's possible, yes.

MR. ROOTS:  I have no further questions.  Thank you so much.

THE COURT:  Redirect?

MS. MILLER:  Yes, Your Honor.

REDIRECT EXAMINATION

MS. MILLER:  Could we go back to the beginning of this video and play it all the way through in full, please.

(Video played.)

BY MS. MILLER:

Q.   Corporal Ainsworth, you just heard him say at the end "we're on your side"; right?

A.   Yes.

Q.   Based on your interactions with the defendant, did you feel like he was on your side?

A.   No.

Q.   Why not?

A.   He was engaging in unlawful behavior.  He was not following instructions.  He was committing acts of violence against myself and my fellow officers.  So I do not consider that with me, no.

Q.   Mr. Roots asked you on cross whether you felt like pushing up against your shield is a severe assault.

     Would you agree that if it knocks you to the ground and you hit your head, it could turn severe?

A.   No, I wouldn't agree -- well, I would agree, yes, it would be a severe injury, yes.

          MR. ROOTS:  Objection; speculation.

          THE COURT:  Overruled.

          MS. MILLER:  The Court's indulgence.

          BY MS. MILLER:

Q.   And Corporal Ainsworth, Mr. Roots asked you on cross if you remembered your interview with the FBI.

A.   Yes.

Q.   Do you remember when that was?

A.    It was a telephone call.  I believe it was Agent Brown.

She had called to ask me some questions about that day.

Q.    Do you have an approximation of when in time in terms of

dates that was?

A.    I believe it was over a year ago.

Q.    Did Ms. -- or Special Agent Brown, did she provide you with

any video before you had your telephone call with her?

A.    No, I did not recall any videos.

Q.    But you did review video before your testimony here today;

right?

A.    Yes.

Q.    And you testified that there were lots of different

assaults, it was hard to keep track of them; right?

A.    Correct.

Q.    So does watching video sometimes help you remember more

specific events, or does it make no difference?

A.    It does help remember specific events, yes.

Q.    And did watching -- first of all, actually, the video that

we just watched, Exhibit 303.1, had you watched that before your

testimony here today?

A.    I don't believe I did, no.

Q.    You did watch the CCTV surveillance video that we went over

with no sound; is that right?

A.    Yes, I did.

Q.    Did that help you remember events more specifically from

January 6?

A.    Yes.

        MS. MILLER:  No further questions.

        THE COURT:  All right.  Mr. Roots?

                    RECROSS-EXAMINATION

        BY MR. ROOTS:

Q.    Your statement with the FBI, would January 20 of this year be a more accurate date?

A.    Possibly.  I do not remember the date.  I'm sorry.  I know it's a considerable amount of time from January 6, 2021.

Q.    One last question.  How sure are you that it was Mr. Thomas that knocked you down?

A.    Positive.

Q.    Would you say 100 percent positive?

A.    I'm sorry?

Q.    100 percent positive?

A.    100 percent positive.

        MR. ROOTS:  Okay.  Thank you very much.

        THE COURT:  May this witness be excused?

        MS. MILLER:  Yes, Your Honor.

        THE COURT:  Mr. Roots?

        MR. ROOTS:  Yes.

        THE COURT:  All right.  Thank you, sir.

        MR. ROOTS:  Actually, we may recall him in our case.

        THE COURT:  All right.  Corporal, I would ask that you

not discuss your testimony with anyone.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, it's late in the day.  I know you're tired.  I'm inclined to let you go now, we're at a good breaking point, and bring you back at 9:00 a.m. tomorrow morning.

This time, I promise we will have breakfast.  If you show up at 8:30, you will have a nice breakfast.

COURTROOM DEPUTY:  Yes, Your Honor.

THE COURT:  Okay.  Any questions?  All right.  Thank you.  Have a nice evening.

(Jury exited courtroom.)

THE COURT:  All right, Counsel.  So the government will start tomorrow with Officer Leano?

MS. MILLER:  Yes, Your Honor.

THE COURT:  I'm not going to hold you to it specifically, but so I have some sense, can you give me an idea of how long it will take you to get through the next four?  We did four today.

Were those some of your longest witnesses?

MS. MILLER:  Yes.  Aside from Special Agent Brown, who is going to be lengthy, I would say the next two officers hopefully on direct won't be longer than 45 minutes each.

THE COURT:  So Mr. Roots, the defense should be ready to start its case if things go efficiently tomorrow.

And then Mr. Roots, as far as cross-examining law enforcement officers, I want to know, what was your good faith basis for asking the detective if he had five use of force charges against him.

MR. ROOTS:  Ms. Lambert was literally showing me the screen of the *Giglio* materials we've been provided.

THE COURT:  All right.  It's hard for the Court to believe, because I asked specifically about *Giglio*, and the government's reaction was there's nothing we're worried about. So I don't know what documents you all are looking at, but I was under the impression there was little, if any -- there was some *Giglio*, but nothing the government was concerned about.

And so if you're going to do that again, in the event there's some confusion on the defense side about what the documents show -- and I'm not alleging anything, but it confounds me the government's reaction to what your cross was and the way you moved on.  So I don't think you were interpreting the documents correctly.

So if you intend to cross-examine an agent and ask questions like that of that nature, we need to take it up before the witness takes the stand, outside the presence of the jury. I don't want to go through that again, where I'm having to make decisions based on discovery I haven't seen.

So just a warning.  I don't understand why there's such two vastly perspectives on what discovery was provided.  I'm not

going to waste the Court's time on drilling down on this, but I'm just saying, it appears to the Court that there was a misunderstanding.  If you think otherwise, I don't understand why you moved on from your questioning.

MR. ROOTS:  If I could just say, what we saw was a table.  I didn't need to move on.  I honestly figured, you know, this is not -- his credibility is not really -- honestly, the video speaks for itself.

THE COURT:  Use of force is a big issue in this case with your self-defense and defense of others.

MR. ROOTS:  I will say, I didn't need to move on.  I could have delved into that, but I thought --

THE COURT:  Let me hear from the government.  What are the facts with regard to that detective?

MR. MCCAULEY:  Your Honor, my colleague is calling them up as we speak right now, but as the detective testified, he has 19 years on the force.  Of course, he is going to have interactions with the public that are reported.  It's extremely rare for any officer to make it that far without having numerous reports.  The difference is that some of them -- they have different degrees of findings.

THE COURT:  Different degrees of what?

MR. MCCAULEY:  Findings by the police department.  In some instances, they're going to be found to have used force; others will not.  Mr. Roots and Ms. Lambert were looking at the

document and looking at the allegations, not necessarily the findings.

THE COURT:  The detective didn't even seem to be aware of it.

MR. MCCAULEY:  And this is where -- unfortunately, we are diving into the bureaucracy of the police department here. My understanding of this process is there will be an initial investigation, and then if there is no -- if, say, it's on camera or very clear or the person who has made the allegation does not follow up or doesn't pursue it, they will terminate the case, which is why what matters -- I apologize.

THE COURT:  No, go ahead.

MR. MCCAULEY:  Which is why what matters for purposes of our *Giglio* disclosures is what the finding is.

THE COURT:  Understood.

MR. MCCAULEY:  So the officer may never even learn that there was an investigation into him.  It is only if the Office of Police Complaints or the Internal Affairs Division here in Washington, D.C., determines that there is something that does require investigating.

THE COURT:  In light of what happened there, I suggest that if the government is concerned about this happening again, that you move to exclude what you have turned over if you don't think it warrants cross-examination, or else he's going to ask the question.

I don't think you should, Mr. Roots.  If the officer doesn't even know about it and it's been dismissed -- we have in this court complaints filed against us all the time.

MR. ROOTS:  As do lawyers.

THE COURT:  I would ask that you all confer about your understanding of what the *Giglio* shows before you ask questions like that, because it leaves the jury with an impression that doesn't conform to the factual record.

MR. MCCAULEY:  Just to be clear, Your Honor, the government is happy -- we only have two MPD officers left who would even have anything potentially to exclude.  So we're happy to walk through this.

THE COURT:  You all talk.  I really -- that was a frustrating position to be in, because I don't have the discovery.

And so what I'm saying, Mr. Roots, is if you're going to do this, you need to at a minimum have a conversation with the government and be on the same page.  If not, I need something filed ahead of time so I can address this to avoid what happened there.

MR. MCCAULEY:  Understood, Your Honor.

MR. ROOTS:  If I could just add, I was surprised at the officer's answer that he did not think he did have those complaints, because I had just been sitting here looking at two pages of complaints against him.  And so --

THE COURT:  But as you know from dealing with police departments, they never are made aware of many that are considered, perhaps, frivolous.

MS. MILLER:  I mean, Your Honor, there's a column on the spreadsheet he's referring to that says "disposition," and it seems as though Mr. Roots has completely ignored what the disposition is.

THE COURT:  Don't ignore disposition, and if you want to talk about and impeach them with something that doesn't show a disposition, then you need to flag it for me first before you do that.

Understood?

MR. ROOTS:  Understood.

As it I sit here right now, I honestly think he answered inaccurately, but I was not confident enough -- I had not absorbed the information enough -- he literally said he didn't have complaints, and I don't believe that's accurate.

THE COURT:  I'm not saying it's intentional.  There was a misunderstanding, and this can be avoided with communication between the two sides.  It's not appropriate, when you're not confident you understand the information, to lob that kind of question and perhaps leave the jury with the impression that there's something there when there's no finding at all.

I would ask for you all to confer.

MS. MILLER:  Your Honor, we may request a curative

instruction to that effect.  We will file something if we need to.

MR. ROOTS:  By the way, Ms. Lambert has just told me that there was at least one finding of excessive force against that officer.

THE COURT:  Okay.  But you didn't ask it.

MR. ROOTS:  I absorbed that information so quickly, and I was so surprised that he said no, I don't know anything about that.  As I stood there at the lectern, I was like, what do I do now?

THE COURT:  This might be beneficial to both sides, because you won't be doing this on the fly and you will be able to follow up where you have a good faith basis for following up, if you address this outside the presence of the jury first so that any lack of communication can be cleared up, and I can look at the documents if necessary, and I can make a ruling.

But again, I can't do that on the fly, and it sounds like, Mr. Roots, you didn't have a full grasp of the information.  So I think it's beneficial to both sides to discuss this outside the Court and make sure you're on the same page.  And if there's an issue and the defense thinks that it's appropriate cross, then file something, or the government file something to exclude.

Also, did the defense share exhibits as I directed yesterday?  And if so, do we the Court have the new exhibits?

MR. ROOTS:  I'm told they're all on USAfx in that folder.

THE COURT:  Okay.  The Court, I don't think -- I need a list or something.  Are you supplementing -- if you've provided these exhibits to the Court already, that's fine, but if these are new exhibits, which I understood you to suggest you were --

MR. ROOTS:  Oh, I know what you're talking about.  I think you're talking about some tourism board document about effect on commerce.  We don't have many.  I think we had three things.  By the way, those are publicly filed on the docket with our Moseley proffer.

THE COURT:  I was just checking.  I was under the impression yesterday that you were supplementing your exhibits, and I was just asking that you provide them to the Court and the government if you hadn't.  But if you're not supplementing the exhibits, that's fine.

Motion in limine, this is Docket 114 -- and I can't recall, what is that motion in limine?  Oh, the criminal history.  So we are waiting for a response -- oh, you want me to address the -- I'm not going to rule on that right now, but that motion's fully briefed; correct?  Does the defense want to file any reply there?

MR. ROOTS:  I think the issues are pretty --

THE COURT:  All right.  So I will address that

tomorrow.

The deadlines for the commerce issue and the government response, when can the government get that?  Some time tomorrow?

MS. MILLER:  Your Honor, in the end, we decided to just file our response to the trial brief.  So we have filed something that discusses the 231 issue and the commerce issue already.  I don't know if Mr. Roots is going to file something in addition to the trial brief.

THE COURT:  Is that issue fully briefed so the Court can address it tomorrow?

MR. ROOTS:  The commerce issue, I would say, is not fully briefed.  We started something.  We haven't finished it. Hope to get it done tonight.

THE COURT:  Okay.  Great.  If I can have that at the latest by noon tomorrow, does that give adequate time?

MR. ROOTS:  (Nodded head.)

THE COURT:  What other open issues are there that we should address?

MS. MILLER:  Sorry, Your Honor.  Could we set a deadline for our response to that, then?  If it's noon tomorrow for Mr. Roots, could we have until Friday morning, perhaps, to respond?

THE COURT:  What day is tomorrow?

MS. MILLER:  I just did the same thing.  Thursday.

THE COURT:  I'm just concerned about the defense case

could start tomorrow.

Yeah, I suppose.  This effectively is a reply; right?

MS. MILLER:  Right.

THE COURT:  So by 8:00 a.m. on Friday morning.  All right?

Tomorrow, we'll have the jury start with the officer, hearing the testimony at 9:00.  If you all can show up at 8:45 to discuss any preliminary issues.

Anything else we need to cover?

MS. MILLER:  Does Your Honor want me to go through what I have on my list of things we should cover, or we'll just start tomorrow morning?

THE COURT:  I didn't realize there were issues.  Of course, I want to deal with as much as we can today rather than tomorrow.

MS. MILLER:  Right.  I just wanted to alert Your Honor, I know we've had a busy day today, but we did file a response to the defense witness list, which has sort of --

THE COURT:  Oh, right.  I did take a quick look at that.

And so Mr. Roots, are you going to respond to that?  No?

MR. ROOTS:  Very quickly, I know Your Honor has asked us to have one overview witness.

THE COURT:  Well, no, I don't want to limit you to one overview witness.  I need to understand what the witness is

testifying to.  All right?  It's confusing to me, based on what you've told me so far, what the various witnesses are expected to testify about.

MR. ROOTS:  I believe Stephen Hill is flying in tonight from Boise, Idaho.

THE COURT:  And what will he do that Ms. Lambert isn't doing?  He's not testifying as an expert?

MR. ROOTS:  No, he won't testify as an expert, other than he has great expertise on the videos.

THE COURT:  What do you mean by that, expertise on the videos?

MR. ROOTS:  He's reviewed a lot of this, especially the violence allegations.

THE COURT:  Again, remember, I'm not allowing you to get into other incidents that Mr. Thomas was not aware of.

MR. ROOTS:  Correct; understood.

THE COURT:  Does he have some particular expertise with respect to the videos that are relevant in this case?

MR. ROOTS:  Yes, he does.

THE COURT:  In the sense that he's very familiar with them -- not a true expert but just that he's knowledgeable about them in a way that Ms. Lambert is not?

MR. ROOTS:  I would say yes.

Now, here's the thing.  Ms. Lambert is more steeped in all the stuff.  For example, that officer that was on the stand

today, Baboulis, we could not get in the radio traffic that said there are joggers moving the barriers, can you go move the barriers back.  We would like to get that evidence in somehow.

THE COURT:  How do you get that in through either Hill or Lambert?

MR. ROOTS:  Well, I guess that's -- is an overview witness sort of like -- this is something Ms. Lambert could testify about as someone who has knowledge about the discovery of this case.

THE COURT:  It seems to me someone who is familiar with the radio run from that day needs to get that in.

MR. ROOTS:  Baboulis would have been the best, and she denied listening to it, which puzzles me.  But I don't know what to do.

THE COURT:  Does the government have a position on this?

MS. MILLER:  Yes, Your Honor.  Of course, we don't intend -- we're not trying to limit them from calling the witnesses they wish to call.  But I'm not sure it makes sense to have two overview witnesses with -- neither of who are prescient witnesses who were actually at January 6.

That's number 1.  I mean, we have two people who just reviewed videos, and they're going to sit on the stand and talk about them?

THE COURT:  But you have two case agents who weren't

there, potentially; right?  You say you could call a case agent in rebuttal, who were not there either.

MS. MILLER:  Well, and there's been no proffer about what the differences are in their testimony.

THE COURT:  That's what I'm asking him about now.

MS. MILLER:  And in terms of the radio runs, yeah, I'm not sure how they can get those in.

THE COURT:  Without someone who can --

MS. MILLER:  Authenticate them.

MR. ROOTS:  Those radio runs are played by the government in every J6 trial, and they are hearsay.  I've objected to hearsay grounds, and they come in in every single instance as business records and its effect on the listener.

THE COURT:  Effect on the listener, yes.

Are you trying to get it in for the truth?

MR. ROOTS:  Well, I guess it's an aspect of the truth, which is that these barriers and bike racks are moved easily, and joggers were moving them on the morning of January 6, contrary to the witness's statements.

THE COURT:  I think I let it in in another trial, but for the effect that it had on the officers who ran from one part of the Capitol to another, but I don't know that I've let it in for the truth as a business record.

MR. ROOTS:  As to how to get it in, I will just say that without being able to get it in, the government leaves a

wrong impression in the mind of the jury.

MS. MILLER:  He raised the issue of the radio runs.  I don't know how we're leaving the wrong impression when we didn't raise the radio runs at all.

THE COURT:  Can't you subpoena a witness to come testify?

MR. ROOTS:  We're going to have to think about this. I don't know what witness would take the stand and say they heard it.  We'd have to figure that out.

THE COURT:  Does the government agree that these could come in with the appropriate witness as business records or government records?

MS. MILLER:  I haven't done any legal research into this issue.

THE COURT:  911 calls, for example, some of those come in as, you know, present sense impressions and for the effect.

But do they not come in for the truth?

MS. MILLER:  On the listener.  So if it's someone who is testifying as the listener --

THE COURT:  No, understood.  But I mean, their hands are a little tied.  They need a witness who can admit them.

Has the government admitted them for the truth in any case, and if so, can you share the name of that witness with them? You don't deny this evidence is valid and authentic, do you? It's just a matter of them figuring out the right witness.

MS. MILLER:  I'm trying to think of who -- for example, I watched some of the Alberts trial that this defense team did a couple of weeks ago, and there was a Capitol Police officer who testified extensively in that case.  I'm pretty sure I heard her testify about the radio runs.

THE COURT:  But would the government object to the radio runs coming in for the truth of the matter if the appropriate witness were testifying?  That's my question.

MS. MILLER:  No.

THE COURT:  For the truth?

MS. MILLER:  No, of course.  If it's through the right witness, I don't think we'd object.  And I'm just suggesting that they have observed and cross-examined a witness that they could have subpoenaed.

MR. ROOTS:  We think it was Baboulis, and she -- we're not going to call her a liar, but we both -- I'm quite puzzled that Baboulis twice has said, I don't know anything about this.  I'm quite puzzled.

THE COURT:  Is that the witness you got the radio run in through?

MR. ROOTS:  Let me just say, it was during the Alberts trial that I knew that I had heard that stuff in the discovery, and she testified, like here, Oh, these bike racks are solid, no one ever moves them, everyone knows they can't move them, it's an arrestable offense.

THE COURT:  I think that misstates her testimony a little bit.  She said it would be difficult.  Then she said it could be done but you would have to do it intentionally.

So I think you're overstating the degree to which she said they can't being broken apart.

MR. ROOTS:  I'm exaggerating, but --

THE COURT:  But you want that fact to come in, that on the radio runs, they say what?  What does the radio run say? Joggers are breaking these down?

MR. ROOTS:  They say joggers moved the bike racks, can someone go down and move them back.

THE COURT:  Where were the bike racks moved by joggers?  Do you know on what part of the Capitol they were moved?

MR. ROOTS:  I think it might be the very area that the vast majority went through.

THE COURT:  If it's on the east side, it really doesn't have any relevance here.

MR. ROOTS:  Northwest.

MS. MILLER:  I believe that the radio runs were offered by the government in Alberts, by their Capitol Police witness, who testified about her calls on her own radio.

THE COURT:  Was it Baboulis?

MS. MILLER:  I'm not sure it was Baboulis.  I'm forgetting her name.

THE COURT:  Can you help them figure out who the witness is?

MR. ROOTS:  We think it is Baboulis.  It triggered my mind when she said no, nobody ever moves those.

After the trial, we found it.  That's how we got where we are.

MS. MILLER:  They could have impeached her with that if they had wanted to.

MR. ROOTS:  We tried.  She said she hadn't heard it.

MS. MILLER:  If she testified that she did, you could have introduced the transcript.

MR. ROOTS:  Her credibility is -- by the time she's done in all these trials, I can't imagine the government will keep putting her on, because she keeps making false statements in these trials.

THE COURT:  I'm informed it was Baboulis.  But the answer there was to impeach her with the transcript.  So you can't call her just to impeach her.  I can't imagine that there's not another Capitol Police officer who can get in the radio run.

MR. ROOTS:  It's so funny, because I think the jury heard the discussion, and maybe that's enough.  I don't view this as a huge thing.

THE COURT:  I definitely don't think it's a huge impeachment of her, but if you think it's important, it's going

to be relevant if someone can say those joggers were around where Mr. Thomas came through and if Mr. Thomas can say he saw joggers moving or Mr. Evans or someone else.  But if it's just joggers are moving bike racks around the Capitol, I don't -- it's a large circumference.  I don't know how --

MS. MILLER:  Particularly when we don't have a time stamp for when that happened, when in the time of day they think this radio run went out with the jogger discussion.  I don't think we have a time stamp on that.  So it could have been at 9:00 a.m.

THE COURT:  I would just ask the government to consider -- this seems like a pretty innocuous piece of evidence -- whether the government couldn't agree that a radio run at X time said this, and you can argue there's no time, there's no place.  I'm not going to force it, but it would be a nice solution to a fact we all know, at least I'm told, exists.

If there's no question the radio run says this, it just seems like pretty weak evidence, honestly, but if the defense wants to get it in.

I guess the other option is, I ask you help them figure out, of all the thousands of officers who were there, who listened to it, and they can call and subpoena them and have them brought in here.

It seems like a lot of effort for something that's not super-critical, and the government can explain away.  But he

wants it in.

MS. MILLER:  Yes, Your Honor.  They had a 12-hour radio run file.  We had no idea --

THE COURT:  Clearly, the whole thing's not coming in unless you can explain --

MR. ROOTS:  We believe it was one of the first things noticed by the Capitol Police that morning, was the bike racks had been moved by -- I believe they said, joggers, can anyone go and move them back.

MS. MILLER:  Exactly.  Then it's not relevant because they fixed it.

THE COURT:  They can also elicit from somebody that somebody moved them back.  It's hard to believe if this happened in the morning, that something didn't happen between then and 12:00 or 1:00, but maybe not.

I'm not saying you can't do it.  Let's think this through. If there's a way to reach a stipulation on this, I think that would be great.  If not, if you could identify a witness who could get the portion of the radio run in he wants in, let's do it.

This is just -- this seems to be a minor issue that we should be able to resolve without much impact to either side, honestly.

MS. MILLER:  Yes, Your Honor.

MR. ROOTS:  I don't even think it's contested that the

bike racks were not in place at the time Mr. Thomas came through, which was hours later.

MS. MILLER:  So then why is this relevant?

MR. ROOTS:  Only to attack the point that she made, that it takes a Herculean effort of strength --

THE COURT:  Mr. Roots, go look at her transcript.  I don't think in the end that's the bottom line of what you elicited from her.  Again, you can put whatever you want in, but I'm trying to show some common sense here and speed things along.

I am more concerned about the Evans and the -- well, the Evans for sure.  I skimmed the government's brief.  They suggested, and I don't recall this -- I was the sentencing judge.  I did handle his case.  They suggested in the brief that I might have made a finding that he wasn't truthful and that they would cross him on that.  Now, that's potentially very sticky.

Is the defense proceeding with Mr. Evans?  I haven't looked at the transcript to see if what they say is accurate or whether I simply made a comment that he was slow to show remorse.  I don't know how strong my -- I don't know whether it's a finding.

MS. MILLER:  Right.  I don't think it was a finding, technically, but I think Your Honor --

THE COURT:  So how would you cross him on that?

MS. MILLER:  It depends on what he says on the stand about his sentencing and the fact that he pled guilty and all that.

THE COURT:  This gets kind of tangential.  If you have him -- if you have proof that he lied in some way and you want to ask him about that, he can deny it or accept it, and then I still don't think -- do you get to prove it up?

MS. MILLER:  I think the circumstance would be if -- and I have not had a chance to carefully review the sentencing transcript.  But if we ask him about things that he said at his sentencing, whether he expressed remorse, this, that, or the other and he says something different, then I think we can impeach him with the sentencing transcript, that portion of it, and say don't you remember, you know, the judge --

THE COURT:  Are you going to go through the transcript line by line and ask him questions about everything?  It seems a little like a fishing expedition.  If there's something critical to his propensity to tell the truth, fine, but if you don't have a reason to think he's going to lie, just going through the whole transcript and say the judge said this, the judge said that, that would be highly inappropriate, particularly given that I'm the judge.

MS. MILLER:  Agreed, Your Honor.  We don't plan to go line by line at all.

The challenge is that the proffer for Mr. Evans is so

bare-bones, it's hard to know what they're going to elicit from him.  I can't say right now what we would cross him on, because we don't know what he's going to be testifying to.

THE COURT:  My understanding, based upon what Mr. Roots said, is that he came through the same area that Mr. Thomas came through, and he came through earlier in the day, and at the time he came through that area, all the signs were down, and presumably, he's going to say he didn't notice the signs.

Now, that may be -- I don't remember.  I've handled 50-plus of these.  I may have said that I found that not credible.  I don't know.

Mr. Roots, this is something you need to take a look at.  He could open the door, and this is something that I don't want sprung on me, that some comment I made in a sentencing hearing is coming out in the trial and all of a sudden I'm a witness in this trial.

MR. ROOTS:  I will add that Mr. Treniss, although he came 20 minutes or 30 minutes before Mr. Thomas, when he came out, it was very close to the same -- almost the same time.  I don't believe they ever interacted at all.

THE COURT:  But essentially, you're calling him to talk about the lack of barriers and signs?  That's the reason you're calling him?

MR. ROOTS:  Yes, I would say that's the main point.

THE COURT:  And I guess the point I'm making is, if I found that not credible based on his plea colloquy, based on videos the government showed me, something you all need to think through and I need to think through as well, once I know the facts.

I don't know the facts right now of the sentencing.  I don't recall.

MR. ROOTS:  I know only a little bit about all that.

Also, Treniss is just a great witness about all things January 6, the atmosphere, the intention of most of the people there.

THE COURT:  I will allow a few questions about what the -- you talked about the weather.  What was that link that you drew in a brief recently, about the weather mattered because they blew the signs down.

MR. ROOTS:  It's also relevant to what people can hear.  There are claims that people can hear announcements.

THE COURT:  And the flash bangs.  I don't think it's the weather that's --

MR. ROOTS:  And I'm reminded about the direction of the tear gas and the pepper spray.

THE COURT:  So Treniss is going to know the wind direction that day?

MR. ROOTS:  It was a factor in some -- we have another case where it's a huge factor.  The tunnel, it was a factor.

THE COURT:  All right.  Again, I would suggest that you all talk a little bit about what's coming so that we are -- the appropriate arguments can be made on both sides.

MS. MILLER:  Your Honor, I would make one additional request.  It's a little challenging to prepare for a moving target on who the defense witnesses are, let alone the fact that there's 150 exhibits, some of which are 12 hours long, on the defense witness list.

If there's some way to get a list before they begin their case of the exhibits they're going to use, maybe not broken down by person but just the exhibits they're going to introduce, so we can focus on reviewing those exhibits in advance of them presenting their case, rather than a list of 150 exhibits --

THE COURT:  They've just said there's nothing new.  Right?  They've said there's no new exhibits, just their list.

And the issue is that these are super-long videos.  Can you all give some time stamps so the Court can look at them as well?

MR. ROOTS:  We're working on so many things at one time.  We go to sleep, and there's even more work to do.

THE COURT:  That would be helpful to me as well to review them.  But in terms of witnesses now, you don't know about the mayor's office, because you're still looking at this issue?

MR. ROOTS:  We are, and we are of the opinion that the law on this statute does require proof that there was negative

impact of the --

THE COURT:  I disagree, and you're going to file something to try to convince me I'm wrong.

MR. ROOTS:  Okay, yeah.

THE COURT:  Your other witnesses are --

MR. ROOTS:  I wanted to mention Mr. Moseley.  Last night, the government sent us an e-mail, witness intimidation again, saying Mr. Moseley, we would hate to see him get in trouble.

THE COURT:  To be fair, Mr. Roots, if these folks have exposure, it's their duty to flag this and make sure someone's testifying -- are you all threatening to charge him if he testifies, or are you just saying he has exposure if he was present?

MS. MILLER:  Right, and he may want to consider invoking his Fifth Amendment right.  It's up to him.  He can waive it if he wants.  We just are notifying him that there's evidence, you know, incriminating evidence.

MR. ROOTS:  Mr. Moseley committed no crimes.  It's only in the most outlandish interpretation of the law that the government could make these threats.

MS. MILLER:  It's not a threat.

THE COURT:  Let's just walk through -- you started to tell me, Mr. Roots, with respect to Mr. Hill, he's going to testify to videos that related to Mr. Thomas.

MR. ROOTS:  Yes.

THE COURT:  And what else?  I get a little worried when you say he has this broad expertise, because he's not allowed to testify as an expert.

So what beyond relevant videos will he offer?

MR. ROOTS:  One thing is about the announcements.  So it is said that Mr. Thomas could hear all kinds of announcements.  Mr. Hill has reviewed lots and lots and lots of these videos.  There are videos of this -- there are bullhorns that law enforcement are using, but Mr. Hill can testify that it was difficult to hear for many of the people there.

THE COURT:  But --

MS. MILLER:  He wasn't there.

THE COURT:  I got it, Ms. Miller.

This is someone who has just reviewed videos, was not there with Mr. Thomas that day.

MR. ROOTS:  Correct.

THE COURT:  I don't know how, based solely on a hodgepodge of videos, he can testify that Mr. Thomas could not hear.

MR. ROOTS:  There's so many hundreds of hours of body cams.  Mr. Hill has reviewed hundreds of those, hundreds of hours.  From that perspective, he does have that knowledge about what can be heard and what cannot be heard at that time.

THE COURT:  You have a whole host of witnesses who

were there.  You have the officers who were engaged with Mr. Thomas.  You can ask them about it, as I think you have.  If he decides to take the stand, you have Mr. Thomas.

You're saying you don't have anyone around because they have Fifth Amendment issues?

MR. ROOTS:  Other than Mr. Evans.

THE COURT:  Who was not around Mr. Thomas that day.

MR. ROOTS:  They never interacted, but there was a time on the Upper West Terrace -- as Mr. Evans was leaving, that was about the time Mr. Thomas got up there in that same general area.  They never interacted.

THE COURT:  You've going to ask Hill, you've watched 500 videos, a hundred of them that relate to this area on the northwest side of the Capitol?

MR. ROOTS:  There is video of an LRAD.  I think that's some kind of an announcement, bullhorn thing that was used, but I don't think it was -- I think that Mr. Hill could testify that Mr. Thomas was not in good position where he was to hear it.

And of course, Mr. Thomas can also testify to that, but he would have to take the stand, obviously.

By the way, for the record, he may well take the stand.  But his credibility and his bias is obvious, or his bias certainly is obvious.  So it would help for another witness to be able to go into that evidence.

THE COURT:  I guess I'm going to need to hear more

specifically about what Mr. Hill can say about Mr. Thomas, where he was standing, and how he can possibly opine on what he could or couldn't hear.  That just -- it's hard for me to understand.  General information about it was loud that day, I guess, but it sounds like you want some pretty precise testimony about Mr. Thomas, and that's hard for me to see how he has the foundation to do that.

MR. ROOTS:  One thing Mr. Hill has great knowledge of is the body-cam locations, which officer was -- which group of officers were at which locations at which times.  And also of the other available, you know, especially the large reporters, the reporters that were there video'ing a lot, he's gone over a lot of that footage.

THE COURT:  And so he's going to be able to say that he's looked at all the footage from the relevant time period and --

MR. ROOTS:  Ms. Lambert just said we can actually brief this pretty well.  We can provide maybe a brief of -- with regard to the announcements that Mr. Hill could talk about.

THE COURT:  That would be helpful, just to crystallize what it is exactly you're trying to get in.

All right.  That's Hill.  Moseley is going to do what again?

MR. ROOTS:  Moseley, again, if we can -- this issue of the commerce.  He was a D.C. resident and an activist.

Mr. Moseley is a wonderful guy.  He active in all conservative Christian patriot circles, and he was there that day.  He was on the east, mostly, of the Capitol.  He went to The Ellipse.  And he actually was filming.  He has legitimate journalist credentials, working for a thing called National File.  He was actually recording that day as a journalist to some extent.

And he heard and read the announcements in D.C. about the mayor telling the people to shut down their businesses, not allow toilets and Port-A-Johns for the visitors, and he can testify that that is what caused the impact on commerce.  It was that announcement.

THE COURT:  Understood.  But that announcement was caused by the riot.

MR. ROOTS:  Well, it was preannounced.  It was preplanned.  The mayor's office urged people --

THE COURT:  Who is going to testify to that?

MR. ROOTS:  Moseley; effect on the listener for Mr. Moseley.

THE COURT:  No, no.  Who is going to testify that the mayor's curfew was for some reason other than the January 6 events?  Who do you have who has firsthand knowledge of that?

MR. ROOTS:  Is that required?

THE COURT:  You're telling me that the mayor -- the document I've seen talks about the riots and says as a result we're invoking a curfew -- the mayor is invoking a curfew.  I

think that's what it says.

So if you have evidence that that's not the real reason the curfew was put into effect, who is going to provide that?

It seems to me it has to be someone, not the mayor herself, someone in the mayor's office who knows the real reason behind the curfew.

MR. ROOTS:  Let me -- obviously, Congress created that statute to address riots.  Riots are cities are burning, stores are being looted.  Those affect commerce.  Congress intended that statute to apply to riots that harm commerce, looting, burning, et cetera.

It was the mayor's curfew in this case.  It was the government that artificially caused all the economic harms, to the extent there were any.  Mr. Moseley could testify there weren't any.

THE COURT:  But you're not answering my question.  Correct me if I'm wrong, but I think that the mayor's curfew, the public document that's coming into evidence in redacted form that you like because it shows how the riot escalated, does it or does it not say that the curfew is going into effect because of what happened on January 6?

MS. MILLER:  Your Honor --

MR. ROOTS:  It does say that.

THE COURT:  It does say that?

MR. ROOTS:  It does say that.

THE COURT:  And you're suggesting that's not the real reason --

MS. MILLER:  He's talking about a different document.

MR. ROOTS:  Can the mayor just declare a curfew right now and then --

THE COURT:  That's not an issue for the jury.

MR. ROOTS:  -- blame someone else?

MS. MILLER:  Your Honor, I think it may help clarify to look more closely at what we filed in response to the proffer for Moseley and Evans, because we specifically -- they attached some documents to the Moseley -- those are the documents he's referring to.  So you might want to just take a look at those.

THE COURT:  I will take a look at that.

MS. MILLER:  It might be a better use of time to talk about them tomorrow morning.

THE COURT:  Hill, Moseley.  Who else, Mr. Roots?

MR. ROOTS:  We still have Mr. David Sumrall.  He is a fact witness who was there -- he was there before Mr. Thomas was there on the Capitol grounds at that same area where everyone -- I would say 90 percent entered at the street, and his perception is that the breach, whatever happened in front of him, was some kind of negotiated situation.

THE COURT:  Why is that relevant to what happened some time later with Mr. Thomas?

MR. ROOTS:  Well, it's a little bit like in my opening

statement, the people that rush up on the soccer field at the end.  The first 20 guys can be blamed, but the hundreds that come after are within their rights to believe that they had some freedom to be there.

THE COURT:  And how is he going to testify that they're within their rights?

MR. ROOTS:  Mr. Thomas just pointed out, in the law of trespassing, it creates an easement for the moment.

THE COURT:  I don't find that argument in your brief compelling.

MR. MCCAULEY:  If I may make one point about -- I guess it's two masquerading at one.

Insofar as I recall the testimony of David Sumrall in the Christopher Alberts trial, he testified that he arrived at the Peace Circle in the late morning, after the Circle had been breached.

So insofar as he has personal knowledge -- excuse me, insofar as he has knowledge of what happened at the Peace Circle, which is one of the first breach points within the secured perimeter --

THE COURT:  And this is the place where Mr. Thomas and Mr. Evans went through?

MR. MCCAULEY:  Yes, very near to.  I won't say precisely, but very near to.

Insofar as he has knowledge of it, he was behind the line

of where that initial interaction between people who have since been charged --

THE COURT:  Did he testify about the negotiations?

MR. MCCAULEY:  In Alberts, the government strenuously objected.  He touched upon it to an extent.  But it was -- what I am saying, Your Honor, is that he, based on what I have reviewed in this transcript, does not have personal knowledge of what happened at the Peace Circle for that initial breach.

MS. MILLER:  And we attached that transcript for Your Honor.

THE COURT:  That's what I was going to ask for.  Okay.

MR. MCCAULEY:  Similarly, insofar as he was -- as a second point, he was there in the very late morning, very early afternoon as the crowd is amassing on the west front of the Capitol.

THE COURT:  Okay.  So I clearly need to read the briefs.

Mr. Roots, are these all teed up?  I have everything I need in front of me to resolve this?

MR. ROOTS:  I believe so, but we can supplement with more stuff.  I was just reminded that on one of Mr. Sumrall's videos are people who are voicing the perception that the staging -- which we all know in this room was set up for the inauguration, we know that, but nonetheless, there are voices that are heard saying that they thought the staging had been set

up for them, for these permitted Trump protests and those kinds of events.

THE COURT:  I don't see what that has to do with Mr. Thomas.  If Mr. Thomas believed that, he can testify to that, and he can also testify that his understanding was this was all allowed and there had been negotiations, that was my understanding.

Based on what you've told me so far, I don't see how Sumrall can do that for him.

MR. ROOTS:  It goes to the crowd's innocence, frankly. The crowd is innocent, and Mr. Thomas is in that crowd.  Their perception is that it's not a restricted area.

THE COURT:  Okay.  One other issue, the Evans ethics issue with Mr. Pierce, you agree there should be some inquiry on both sides about is Mr. Thomas comfortable with that and Mr. Evans comfortable with that.  And you all didn't address that.  So I would like to know.  Only you know the answers to that, and I would like there to be some colloquy outside the presence of the jury that they're both comfortable if Mr. Evans is testifying.

MR. ROOTS:  Okay.

THE COURT:  All right.  So I know we still have a lot unresolved.  I've got to review the briefs before I can decide any of this.

Mr. Roots, if there's anything you want to supplement on

the two issues that you said were ready for me to rule on, I need them, you know, by 8:00 tomorrow so that I can rule.

MR. ROOTS:  That was the commerce issue, and what was the other one?

THE COURT:  Witnesses.

MS. MILLER:  That's fine.  I thought we had said he could do the 231 briefing by noon tomorrow.  If you're referring to the witnesses, I agree, we should resolve this before they're about to present their case.  So I think the witnesses stuff, we should try to do tomorrow morning.

THE COURT:  That's what I'm saying.  He said earlier he didn't need to file a reply.  But I at a minimum need a response on this Evans conflict issue.  So I do need that by 8:00 tomorrow.

MR. ROOTS:  All right.

THE COURT:  Okay.  Am I clear, because I'm not with myself right now?

MR. ROOTS:  We will have that.  We will work on that.

THE COURT:  Anything else, Ms. Miller or Mr. McCauley?

MS. MILLER:  No, Your Honor.

THE COURT:  Mr. Roots?

MR. ROOTS:  Nothing more that I can think of.

THE COURT:  Mr. Thomas, you're good?

THE DEFENDANT:  I appreciate you letting me speak, Your Honor.

It just seems like every day, my defense is bogged down with more and more briefs handed to us by the government, and we --

THE COURT:  Well, no, I'm asking for some of this, because I can't decide these issues without your side answering some questions.

So I'm not trying to bog you down.  I had tried to flush some of this out before trial, and that didn't happen.  So now we are where we are.  I've got to rule because we're moving, and your case is going to start on Friday.

THE DEFENDANT:  I certainly understand that, Your Honor, and I wasn't speaking negatively about the process of the Court.  It's just --

The COURT:  No, I understand, but I think even they --

THE DEFENDANT:  -- the resources are vastly different between one side and the other.

THE COURT:  I'm sorry?

THE DEFENDANT:  The resources are vastly different from one side to the other.

THE COURT:  Well, it depends.  I've been on the other side sometimes when I wish I had more resources than I had.  I don't know what they have.

THE DEFENDANT:  We certainly appreciate your leniency, Your Honor.

THE COURT:  All right.  We're all good.

We will see you tomorrow.  Let's say 8:30, since it sounds like we have a good bit to cover.

(Proceedings adjourned at 5:43 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


CERTIFICATE OF OFFICIAL COURT REPORTER


I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Sara A. Wick_____          August 2, 2023_____

SIGNATURE OF COURT REPORTER          DATE

| # |
|---|

**#172** [1] - 1:18

| ' |
|---|

**'97** [1] - 167:2

| / |
|---|

**/s** [1] - 256:14

| 0 |
|---|

**0.1** [1] - 124:15
**0:15** [1] - 156:5

| 1 |
|---|

**1** [7] - 26:16, 26:18, 82:3, 108:24, 116:25, 147:18, 231:22
**10** [20] - 27:25, 54:7, 54:10, 54:19, 71:17, 73:24, 91:7, 110:18, 111:20, 111:22, 112:2, 112:3, 112:12, 112:22, 112:24, 113:5, 150:25, 180:23, 184:23
**10-foot** [1] - 36:16
**10-minute** [1] - 74:6
**10-second** [1] - 57:2
**10-yard** [1] - 185:5
**100** [10] - 16:16, 71:22, 83:21, 102:17, 107:1, 116:6, 204:14, 219:14, 219:16, 219:17
**103** [4] - 52:23, 52:24, 53:25, 54:4
**103.............................**
............ [1] - 2:18
**1033** [3] - 116:18, 116:23, 117:2
**1033s** [2] - 117:5, 117:20
**105** [5] - 2:5, 34:9, 34:21, 35:21, 70:19
**105.............................**
............ [1] - 2:15
**106** [4] - 37:15, 38:1, 38:8, 38:24
**106.............................**
............ [1] - 2:16
**107** [5] - 39:18, 40:17, 40:21, 82:22, 85:20
**107.............................**

............ [1] - 2:16
**10:00** [1] - 14:16
**111** [1] - 2:5
**114** [3] - 2:6, 3:23, 227:18
**11494061** [1] - 8:17
**119** [11] - 25:2, 26:8, 26:12, 36:8, 108:24, 113:21, 119:3, 147:4, 147:19, 174:25, 176:12
**119.............................**
............ [1] - 2:15
**11:01** [1] - 74:7
**11:10** [1] - 73:25
**11:20** [1] - 74:7
**11:22** [1] - 75:8
**12** [4] - 78:2, 78:11, 78:12, 243:7
**12-hour** [1] - 238:2
**120** [9] - 2:17, 41:7, 44:25, 45:5, 45:10, 46:6, 89:10, 185:17, 203:17
**121** [5] - 2:19, 4:6, 4:11, 4:21, 5:11
**124** [1] - 2:20
**125** [1] - 2:7
**12:00** [1] - 238:15
**12:30** [4] - 74:20, 74:23, 75:6, 101:19
**12:31** [1] - 75:8
**12:45** [2] - 101:20, 102:2
**133** [1] - 2:20
**137** [1] - 2:7
**138** [1] - 2:8
**14** [2] - 74:14, 94:23
**142** [1] - 2:9
**15** [6] - 31:8, 41:8, 41:11, 53:10, 158:9, 215:1
**15-minute** [2] - 73:24, 168:24
**15-second** [1] - 137:8
**150** [2] - 243:7, 243:13
**153** [1] - 2:21
**155** [2] - 2:21, 2:22
**157** [1] - 2:9
**15:12** [1] - 121:8
**162** [1] - 2:10
**164** [1] - 2:11
**17** [1] - 1:6
**1752** [1] - 13:16
**19** [4] - 114:13, 142:21, 193:9, 222:17
**1988** [1] - 164:21
**1996** [2] - 165:4, 165:5

**1997** [2] - 165:11, 165:13
**1:00** [8] - 38:16, 38:18, 40:11, 55:2, 70:5, 81:12, 147:24, 238:15
**1:46** [1] - 189:22
**1:51** [1] - 191:4

| 2 |
|---|

**2** [15] - 8:17, 27:4, 28:19, 54:10, 54:22, 119:3, 130:3, 167:20, 168:2, 175:5, 175:13, 176:12, 193:8, 195:9, 256:14
**2-1/2** [1] - 176:6
**20** [10] - 54:22, 56:12, 73:22, 150:24, 153:24, 180:1, 195:9, 219:7, 241:19, 251:2
**200** [1] - 2:11
**20001** [1] - 1:22
**201** [6] - 49:5, 50:9, 101:13, 101:14, 112:20, 113:21
**201.............................**
............ [1] - 2:17
**2017** [1] - 8:17
**202** [3] - 50:23, 51:13, 51:16
**202-354-3284** [1] - 1:23
**202.............................**
............ [1] - 2:18
**2020** [1] - 32:14
**2021** [37] - 25:18, 26:5, 28:3, 28:5, 29:24, 32:10, 34:3, 34:19, 35:11, 37:23, 43:6, 43:13, 43:15, 45:15, 46:9, 46:20, 48:1, 50:3, 51:11, 51:19, 53:22, 57:14, 61:22, 114:23, 121:13, 143:12, 143:25, 151:23, 153:8, 154:22, 155:19, 163:2, 167:15, 170:2, 185:23, 200:1, 219:10
**2023** [3] - 1:6, 165:13, 256:14
**204** [4] - 41:7, 41:11, 45:17, 46:6
**204.............................**
.... [1] - 2:17

**20579** [1] - 1:15
**21** [1] - 197:24
**21-552** [1] - 3:4
**21-cr-552** [1] - 1:3
**213** [1] - 2:22
**21550** [1] - 1:17
**216** [1] - 2:12
**219** [1] - 2:12
**22** [1] - 2:4
**22:29** [1] - 122:17
**231** [2] - 228:6, 254:7
**231(a)(3** [2] - 8:25, 10:7
**234** [2] - 7:21, 8:15
**236** [2] - 129:10, 133:6
**236.............................**
............... [1] - 2:20
**24** [1] - 30:24
**24-year** [1] - 31:6
**25** [8] - 23:14, 24:15, 24:20, 45:12, 47:1, 52:6, 64:15, 67:22
**25-year** [1] - 31:6
**25:10** [1] - 124:7
**26** [5] - 2:15, 165:15, 165:16, 167:4, 200:17
**295** [1] - 173:11
**2:00** [3] - 168:6, 168:12, 170:3
**2:16** [1] - 141:14
**2:20** [1] - 89:22
**2:25** [1] - 45:25
**2:25:48** [1] - 45:21
**2:26** [1] - 45:25
**2:30** [4] - 81:12, 82:3, 139:21, 141:13
**2:31** [1] - 141:14
**2:46** [1] - 55:3

| 3 |
|---|

**3** [5] - 1:9, 27:13, 119:8, 147:13, 147:15
**3-D** [7] - 175:2, 176:17, 177:8, 177:11, 189:5, 189:7, 189:12
**30** [10] - 53:7, 73:22, 130:3, 150:24, 164:20, 178:17, 194:4, 195:13, 197:23, 241:19
**30,000** [3] - 97:14, 97:19, 103:9
**30-second** [1] - 137:9
**300** [1] - 157:13
**301.2** [3] - 93:1, 93:25, 112:10

**301.2.........................**
................ [1] - 2:19
**302** [2] - 6:25, 209:23
**303.1** [1] - 218:19
**303X** [4] - 213:9, 213:10, 213:18, 213:21
**303X.........................**
............... [1] - 2:22
**304** [4] - 152:22, 153:11, 153:14, 154:3
**304.............................**
............ [1] - 2:21
**307** [4] - 151:14, 152:5, 152:8, 154:3
**307.1** [4] - 154:12, 154:13, 154:25, 155:4
**307.1.........................**
............. [1] - 2:21
**309** [2] - 120:25, 121:19
**309.............................**
............ [1] - 2:19
**309.1** [6] - 124:11, 124:18, 125:8, 125:12, 125:24, 125:25
**33** [3] - 45:23, 195:22, 196:6
**333** [1] - 1:21
**35** [3] - 2:15, 164:18, 192:13
**37** [1] - 156:1
**37-second** [1] - 188:5
**374** [2] - 7:21, 8:14
**38** [3] - 2:16, 186:7, 187:21
**38-second** [1] - 186:24
**3:00** [3] - 119:18, 173:7, 202:7
**3:10** [4] - 119:25, 120:11, 120:13, 121:13
**3:12** [8] - 121:8, 123:1, 123:24, 125:5, 137:16, 138:8, 138:24, 139:7
**3:15** [2] - 169:6, 169:8
**3:19** [1] - 55:13
**3:30** [10] - 22:5, 148:3, 148:12, 149:1, 151:23, 153:8, 154:22, 155:19, 168:24, 169:7
**3:31** [1] - 169:8

## 4

**4** [3] - 157:9, 157:10, 176:7
**40** [3] - 2:16, 171:5, 175:25
**40-millimeter** [2] - 118:1, 136:14
**40th** [1] - 201:8
**442** [3] - 77:4, 81:11, 82:2
**45** [7] - 195:22, 196:23, 197:2, 199:8, 199:15, 199:21, 220:23
**46** [1] - 2:17
**47** [2] - 187:25, 188:3
**47-second** [1] - 188:5
**4704-B** [1] - 1:22
**4:00** [3] - 46:15, 63:11, 144:19
**4:12** [1] - 55:24
**4:20** [6] - 45:14, 89:14, 90:7, 107:9, 185:23, 186:1
**4:20:32** [1] - 45:8
**4:20:38** [1] - 89:16
**4:26** [1] - 107:21
**4:30** [3] - 45:14, 107:21, 182:24

## 5

**5** [8] - 5:19, 27:19, 113:3, 119:23, 167:21, 179:25, 195:21, 196:5
**50** [15] - 2:17, 20:16, 83:12, 83:16, 95:5, 95:16, 96:24, 97:3, 97:10, 97:14, 97:20, 98:10, 167:9, 171:5, 176:2
**50-people** [1] - 97:4
**50-plus** [1] - 241:10
**500** [1] - 246:13
**504** [3] - 122:17, 122:19, 124:5
**504.............................
............** [1] - 2:20
**504.1** [1] - 124:10
**51** [2] - 2:18, 98:7
**52** [1] - 98:7
**54** [1] - 2:18
**5:10** [1] - 56:6
**5:20** [1] - 57:2
**5:43** [1] - 256:3
**5:47** [1] - 57:5

## 6

**6** [110] - 5:2, 8:23, 9:17, 9:21, 9:25, 12:23, 13:16, 13:19, 14:13, 25:18, 26:5, 27:25, 28:3, 28:5, 29:24, 30:19, 30:23, 32:10, 32:16, 33:7, 34:3, 34:19, 35:11, 36:11, 36:22, 37:1, 37:22, 38:7, 38:9, 38:11, 39:14, 40:24, 42:13, 43:6, 43:12, 43:15, 45:14, 46:9, 46:20, 47:9, 48:1, 50:3, 51:11, 51:19, 53:22, 57:14, 58:24, 61:22, 63:23, 65:19, 66:16, 68:15, 70:4, 76:11, 85:14, 85:16, 85:17, 86:2, 89:15, 91:5, 92:12, 92:15, 92:24, 93:16, 94:8, 94:11, 100:15, 100:18, 102:10, 105:17, 106:14, 106:19, 106:20, 113:11, 114:23, 117:5, 120:2, 121:13, 143:25, 148:1, 150:9, 151:18, 151:23, 153:1, 153:8, 154:22, 155:19, 157:9, 157:10, 161:2, 163:2, 167:15, 167:20, 168:2, 170:2, 170:3, 182:24, 185:23, 195:22, 196:6, 200:1, 201:16, 213:15, 219:1, 219:10, 231:21, 232:18, 242:10, 248:20, 249:21
**601** [1] - 1:14
**615(b** [2] - 8:8, 8:11
**615(c** [1] - 8:9
**615(c)** [1] - 7:17
**64** [1] - 2:4
**6:30** [1] - 115:8
**6th** [1] - 101:3

## 7

**7** [1] - 197:24
**707** [4] - 155:8, 155:9, 155:21, 155:25
**707.............................**

**............** [1] - 2:22
**7:00** [2] - 46:13, 81:2
**7:08** [1] - 57:10
**7:30** [2] - 46:13, 81:2
**7th** [2] - 46:15, 63:11

## 8

**8** [19] - 5:3, 76:11, 76:12, 94:12, 94:13, 108:3, 108:14, 108:21, 109:1, 109:2, 109:5, 109:6, 109:8, 110:19, 111:18, 112:2, 112:4, 113:13
**8:00** [3] - 229:4, 254:2, 254:14
**8:30** [2] - 220:8, 256:1
**8:45** [1] - 229:7

## 9

**9** [10] - 94:12, 94:13, 108:3, 108:14, 108:21, 109:1, 109:6, 111:22, 113:13, 196:6
**90** [1] - 250:20
**911** [1] - 233:15
**91367** [1] - 1:18
**93** [1] - 2:19
**99** [1] - 3:24
**9:00** [5] - 62:14, 116:6, 220:6, 229:7, 237:10
**9:08** [1] - 1:6

## A

**A-i-n-s-w-o-r-t-h** [1] - 164:13
**A-n-d-e-r-s-o-n** [1] - 142:16
**a.m** [13] - 1:6, 14:16, 46:15, 63:11, 74:7, 75:8, 81:2, 116:6, 144:20, 220:6, 229:4, 237:10
**abandoning** [1] - 161:15
**ability** [1] - 63:21
**able** [31] - 6:9, 20:25, 38:8, 60:14, 61:10, 62:3, 62:13, 62:14, 63:22, 63:24, 96:25, 106:14, 117:6, 140:21, 141:1, 152:14, 161:8, 171:15, 180:12, 182:1, 184:19,

186:16, 192:4, 200:3, 203:8, 203:9, 226:12, 232:25, 238:22, 246:24, 247:14
**above-entitled** [1] - 256:11
**absent** [1] - 78:11
**absolutely** [6] - 30:15, 66:23, 73:8, 106:7, 106:24, 170:18
**absorbed** [2] - 225:16, 226:7
**Abu** [1] - 8:17
**Academy** [1] - 165:12
**accept** [1] - 240:6
**acceptable** [2] - 15:17, 15:18
**accepted** [1] - 19:17
**access** [4] - 32:17, 32:19, 36:14, 93:8
**accessible** [2] - 31:9, 36:17
**accidentally** [1] - 186:20
**accompanying** [1] - 51:6
**according** [1] - 20:19
**accurate** [8] - 37:21, 40:15, 67:5, 125:1, 129:19, 219:8, 225:17, 239:19
**accurately** [22] - 26:3, 34:18, 35:6, 35:9, 40:13, 43:14, 45:24, 50:1, 51:9, 53:20, 121:12, 123:23, 125:3, 125:4, 131:3, 132:13, 132:23, 151:22, 153:7, 154:21, 155:18, 185:22
**accusations** [3] - 157:16, 158:4, 161:1
**accuse** [1] - 139:12
**accused** [9] - 157:19, 157:20, 158:18, 158:19, 159:12, 159:14, 159:25, 160:23, 161:25
**achieve** [1] - 204:25
**acknowledged** [1] - 61:17
**acquittal** [1] - 14:9
**act** [4] - 12:2, 14:1, 14:4, 146:1
**action** [3] - 11:19, 22:3, 210:21
**activate** [4] - 150:17, 150:21, 151:4, 151:6

**activated** [2] - 150:24, 151:1
**active** [5] - 48:19, 67:8, 67:13, 167:10, 248:1
**Active** [3] - 115:1, 115:2, 115:4
**actively** [1] - 194:8
**activist** [1] - 247:25
**activities** [2] - 144:7, 144:22
**activity** [1] - 173:20
**actors** [1] - 16:14
**acts** [1] - 217:10
**actual** [7] - 27:8, 29:11, 58:13, 71:11, 113:7, 113:8, 174:15
**add** [3] - 86:25, 224:22, 241:18
**addition** [5] - 30:8, 30:10, 32:8, 33:16, 228:8
**additional** [5] - 14:18, 30:10, 95:16, 145:3, 243:4
**address** [13] - 6:15, 9:4, 11:9, 29:19, 159:20, 224:19, 226:14, 227:20, 227:25, 228:10, 228:18, 249:8, 253:16
**adequate** [1] - 228:15
**adjourn** [1] - 75:5
**adjourned** [2] - 44:14, 256:3
**adjourning** [1] - 22:10
**adjusting** [1] - 204:13
**administrative** [1] - 4:22
**admission** [1] - 129:23
**admit** [22] - 26:8, 26:13, 34:21, 38:1, 38:20, 40:17, 43:17, 46:2, 50:5, 51:13, 53:25, 121:15, 124:1, 130:7, 130:9, 152:1, 153:10, 154:24, 155:21, 159:17, 213:18, 233:21
**admitted** [19] - 26:11, 35:20, 38:23, 40:20, 46:5, 50:8, 51:15, 54:3, 93:24, 121:18, 124:4, 125:11, 133:5, 152:4, 153:13, 155:3, 155:24, 213:20,

233:22
**admitting** [1] - 131:22
**adopted** [1] - 7:13
**advance** [3] - 58:24,
141:4, 243:12
**advanced** [1] - 200:20
**advantage** [1] - 74:18
**adverse** [6] - 9:9, 9:11,
9:16, 9:17, 9:25,
10:5
**adversely** [2] - 9:13,
9:24
**advised** [1] - 31:14
**advocate** [2] - 7:23,
101:2
**aerial** [1] - 26:19
**Affairs** [1] - 223:18
**affect** [4] - 63:13,
202:23, 249:9
**affected** [2] - 9:13,
9:25
**afraid** [2] - 204:10,
206:9
**afternoon** [23] - 21:25,
22:5, 38:16, 38:18,
70:5, 76:1, 76:2,
89:15, 113:25,
114:1, 114:4,
142:11, 142:12,
157:4, 157:5, 164:4,
164:5, 164:8, 164:9,
164:10, 200:14,
200:15, 252:14
**afterwards** [1] - 211:3
**agencies** [6] - 62:16,
62:21, 62:22, 62:23,
63:6, 116:10
**agency** [4] - 48:7,
48:22, 50:19, 87:20
**agenda** [2] - 102:1,
102:6
**Agent** [4] - 3:12,
218:1, 218:6, 220:21
**agent** [4] - 8:10, 8:18,
221:19, 232:1
**agents** [2] - 8:7,
231:25
**aggression** [1] - 215:3
**aggressors** [2] -
204:17, 204:20
**ago** [4] - 143:5, 189:6,
218:5, 234:3
**agree** [32] - 10:16,
71:18, 71:23, 84:6,
85:9, 85:16, 94:8,
96:1, 96:19, 98:25,
99:20, 100:2,
111:23, 126:10,
126:19, 126:24,
134:12, 134:17,

135:12, 135:19,
136:21, 137:15,
138:19, 138:20,
138:22, 217:14,
217:16, 233:10,
237:13, 253:14,
254:8
**agreed** [2] - 18:1,
240:23
**agreement** [1] -
140:19
**agreements** [1] -
167:12
**ahead** [18] - 26:13,
38:5, 77:5, 93:6,
111:1, 137:4,
140:19, 141:23,
178:16, 183:8,
184:21, 194:16,
195:21, 214:10,
223:12, 224:19
**aid** [1] - 167:11
**aided** [1] - 1:25
**aimed** [1] - 136:12
**Ainsworth** [26] -
140:9, 163:25,
164:2, 164:13,
164:14, 166:16,
179:15, 183:15,
184:10, 185:19,
186:11, 186:23,
190:1, 191:7, 192:7,
193:3, 193:12,
195:23, 196:10,
196:22, 198:15,
199:5, 199:25,
200:16, 217:2,
217:22
**AINSWORTH** [2] -
2:11, 164:3
**air** [4] - 146:14,
146:18, 178:19,
179:6
**airport** [1] - 32:2
**alarm** [2] - 74:3, 169:2
**Alberts** [5] - 234:2,
234:21, 235:21,
251:14, 252:4
**alert** [4] - 4:16, 4:19,
5:10, 229:16
**alerted** [1] - 48:16
**Alexis** [1] - 3:12
**allegation** [2] - 159:3,
223:9
**allegations** [3] -
13:24, 223:1, 230:13
**alleged** [3] - 13:4,
13:20, 13:21
**allegedly** [1] - 13:7
**alleging** [1] - 221:15

**allow** [11] - 8:5, 10:8,
15:21, 16:3, 18:11,
79:25, 101:8,
110:24, 210:3,
242:12, 248:9
**allowed** [4] - 19:8,
109:19, 245:4, 253:6
**allowing** [1] - 230:14
**alluded** [1] - 56:21
**almost** [7] - 16:20,
18:19, 36:24, 67:3,
138:19, 188:20,
241:20
**alone** [1] - 243:6
**alternative** [1] - 79:3
**amassing** [1] - 252:14
**ambulances** [1] -
173:22
**Amendment** [16] -
11:13, 11:17, 13:2,
13:5, 13:7, 14:3,
14:5, 15:19, 47:13,
47:17, 108:8, 144:7,
144:8, 144:9,
244:16, 246:5
**America** [7] - 3:4,
94:5, 96:13, 99:21,
100:7, 111:18, 112:8
**AMERICA** [1] - 1:3
**amount** [3] - 63:8,
136:2, 219:10
**Analysis** [1] - 166:9
**ANDERSON** [2] - 2:9,
142:6
**Anderson** [8] -
139:25, 140:6,
142:3, 142:14,
142:15, 142:16,
157:4, 161:20
**Anderson's** [1] -
140:14
**angle** [5] - 28:24,
85:19, 86:3, 138:8,
139:1
**angry** [1] - 146:22
**ankle** [1] - 172:3
**announcement** [3] -
246:16, 248:11,
248:12
**announcements** [9] -
65:12, 203:3, 203:4,
203:12, 242:17,
245:6, 245:8,
247:19, 248:7
**answer** [18] - 57:16,
65:21, 68:10, 88:22,
90:22, 90:23, 91:2,
97:2, 98:9, 113:4,
131:9, 135:15,
169:25, 208:17,

224:23, 236:17
**answered** [2] - 90:16,
225:14
**answering** [2] -
249:16, 255:5
**answers** [2] - 78:7,
253:17
**Anthony** [2] - 113:23,
114:6
**ANTHONY** [2] - 2:6,
113:24
**anticipate** [1] - 140:2
**anticipated** [1] - 97:14
**anticipation** [1] -
185:20
**anyway** [2] - 6:11,
131:11
**apart** [2] - 20:25,
235:5
**apologize** [2] -
147:17, 223:11
**appear** [9] - 14:8,
122:21, 130:15,
131:15, 153:2,
155:14, 155:16,
205:10, 207:7
**appearance** [1] - 28:6
**APPEARANCES** [1] -
1:12
**appeared** [6] - 26:4,
28:2, 37:22, 38:9,
161:12, 206:17
**apply** [3] - 8:10, 95:17,
249:10
**applying** [1] - 97:8
**appreciate** [2] -
254:24, 255:23
**approach** [2] - 109:15,
152:14
**approached** [2] -
118:22, 129:8
**approaching** [1] -
127:22
**appropriate** [9] - 7:10,
11:3, 50:17, 212:13,
225:20, 226:21,
233:11, 234:8, 243:3
**appropriately** [1] -
14:8
**approved** [4] - 95:25,
96:2, 96:4, 96:6
**approximate** [2] -
140:14, 179:10
**approximation** [1] -
218:3
**arbitrarily** [1] - 98:23
**arches** [1] - 189:17
**Architect** [1] - 87:3
**archway** [1] - 188:15
**archways** [1] - 188:7

**area** [129] - 20:23,
25:22, 27:4, 27:5,
27:11, 27:14, 27:20,
28:2, 29:1, 29:7,
29:24, 30:2, 30:4,
30:5, 30:19, 30:23,
30:24, 36:23, 39:10,
39:14, 39:16, 40:1,
40:6, 40:10, 40:13,
56:25, 57:6, 58:5,
58:17, 58:18, 58:25,
61:9, 65:11, 66:5,
67:6, 73:4, 82:21,
83:4, 83:7, 83:13,
84:19, 85:5, 85:8,
85:10, 86:8, 96:10,
97:13, 97:24, 99:6,
99:14, 99:19, 101:4,
102:11, 109:5,
109:6, 109:18,
110:1, 110:5,
110:18, 110:19,
111:18, 111:20,
111:22, 112:2,
112:4, 112:12,
112:15, 112:22,
112:24, 113:3,
113:5, 115:16,
115:19, 115:20,
115:23, 117:13,
117:14, 118:24,
119:11, 120:1,
120:13, 127:21,
127:22, 129:14,
132:13, 133:12,
133:16, 134:17,
136:8, 137:15,
138:24, 146:5,
148:6, 160:7,
178:14, 179:10,
181:25, 182:1,
183:3, 183:21,
184:11, 184:12,
184:18, 185:2,
185:14, 185:15,
187:16, 189:1,
189:2, 191:10,
195:24, 197:11,
206:1, 206:16,
207:13, 235:15,
241:5, 241:7,
246:11, 246:13,
250:19, 253:12
**areas** [18] - 26:4,
29:22, 31:10, 31:13,
32:9, 58:9, 65:9,
66:23, 71:4, 94:12,
94:13, 108:9,
108:14, 108:16,
108:21, 109:19,
112:15, 136:17

**argue** [3] - 12:1, 12:13, 237:14
**arguing** [1] - 14:9
**argument** [5] - 7:22, 13:4, 158:24, 161:3, 251:9
**arguments** [1] - 243:3
**arm** [3] - 186:21, 192:17, 215:20
**arm's** [1] - 71:6
**armed** [2] - 117:18, 117:19
**Armored** [1] - 164:25
**armored** [1] - 173:18
**arms** [1] - 39:22
**Army** [3] - 164:21, 165:4, 166:18
**arrest** [8] - 122:5, 122:12, 127:17, 128:13, 128:17, 134:4, 145:11, 145:12
**arrestable** [2] - 143:21, 234:25
**arrested** [7] - 16:15, 16:16, 16:17, 72:19, 122:10, 127:6, 127:16
**arrests** [3] - 144:12, 144:14, 144:16
**arrival** [2] - 52:1, 136:6
**arrive** [3] - 46:12, 170:3, 173:9
**arrived** [16] - 12:11, 81:1, 109:18, 116:8, 168:7, 170:10, 171:19, 173:4, 173:21, 174:1, 177:7, 179:5, 202:5, 203:11, 203:15, 251:14
**arriving** [2] - 53:15, 187:2
**arrow** [11] - 110:4, 156:15, 156:21, 181:7, 181:11, 182:19, 183:9, 183:24, 188:16, 192:22
**article** [1] - 9:2
**artificially** [1] - 249:13
**aside** [3] - 106:18, 174:3, 220:21
**aspect** [5] - 16:19, 17:11, 18:15, 63:19, 232:16
**aspects** [1] - 24:22
**assault** [4] - 208:8, 210:15, 211:6,

217:13
**assaulted** [1] - 13:7
**assaulting** [1] - 160:23
**assaults** [1] - 218:13
**assemble** [2] - 171:5, 176:8
**assembled** [1] - 175:22
**assemblies** [1] - 144:9
**assembling** [2] - 171:12, 175:20
**asserting** [1] - 19:15
**assess** [2] - 17:8, 163:21
**assessed** [1] - 97:13
**assets** [1] - 50:18
**assign** [1] - 115:4
**assigned** [15] - 24:1, 48:20, 92:18, 114:14, 114:15, 114:18, 114:20, 115:1, 143:2, 143:7, 143:8, 143:14, 144:4, 144:10
**assignment** [7] - 115:19, 143:1, 144:3, 166:7, 167:18, 167:20, 177:7
**assist** [4] - 62:25, 63:8, 98:1, 117:7
**assistance** [7] - 62:16, 62:24, 63:3, 116:19, 116:21, 116:23, 117:1
**assistant** [2] - 23:22, 166:4
**assistants** [1] - 7:20
**assume** [3] - 7:5, 98:19, 174:13
**assumed** [1] - 146:17
**assuming** [2] - 131:21, 216:8
**assure** [1] - 201:14
**athletic** [3] - 72:4, 72:6, 73:6
**atmosphere** [1] - 242:10
**attached** [2] - 250:10, 252:9
**attack** [2] - 100:7, 239:4
**attempt** [3] - 84:21, 97:21, 106:10
**attempted** [2] - 72:3, 122:3
**attempting** [3] - 72:13, 177:5, 204:25
**attend** [6] - 29:20,

32:21, 94:17, 96:13, 97:21, 100:1
**attendance** [1] - 32:23
**attended** [2] - 66:9, 96:23
**attention** [12] - 36:7, 46:8, 73:15, 96:10, 127:23, 134:25, 136:7, 143:12, 143:25, 167:15, 195:23, 207:14
**attire** [1] - 117:14
**attorney** [1] - 125:21
**Attorney's** [1] - 1:14
**audio** [5] - 42:23, 43:1, 151:3, 207:20, 207:21
**augmented** [1] - 215:13
**August** [1] - 256:14
**AUSA** [2] - 1:13, 1:13
**authentic** [1] - 233:24
**authenticate** [2] - 140:21, 232:9
**authenticated** [2] - 129:12, 141:5
**authenticity** [1] - 131:1
**authority** [3] - 7:12, 68:6, 71:21
**authorize** [1] - 30:15
**authorized** [4] - 31:12, 31:18, 93:14, 97:10
**available** [5] - 5:13, 6:7, 6:10, 65:17, 247:11
**avenue** [1] - 109:16
**Avenue** [10] - 1:21, 115:13, 118:23, 146:6, 146:13, 147:7, 147:9, 173:12, 173:13
**Avenues** [1] - 27:8
**average** [1] - 96:23
**avoid** [1] - 224:19
**avoided** [1] - 225:19
**aware** [14] - 8:24, 12:5, 16:8, 16:14, 70:24, 82:15, 88:19, 88:23, 89:1, 105:2, 108:7, 223:3, 225:2, 230:15

## B

**B-a-b-o-u-l-i-s** [1] - 23:9
**BABOULIS** [3] - 2:4, 22:22, 75:19
**Baboulis** [11] - 22:21,

23:7, 64:14, 231:1, 231:12, 234:15, 234:17, 235:23, 235:24, 236:3, 236:16
**background** [3] - 83:14, 83:25, 188:6
**backward** [1] - 208:12
**backwards** [1] - 185:4
**bags** [1] - 171:22
**balance** [1] - 101:9
**ball** [1] - 197:15
**ballots** [1] - 54:16
**banging** [5] - 162:3, 162:4, 162:5, 162:6, 162:9
**bangs** [1] - 242:18
**bare** [1] - 241:1
**bare-bones** [1] - 241:1
**barricades** [12] - 5:20, 60:5, 60:12, 76:24, 79:7, 80:2, 81:8, 81:18, 81:21, 81:22, 85:15, 87:13
**barrier** [2] - 87:23, 112:24
**barriers** [10] - 37:2, 39:3, 99:5, 112:15, 202:16, 231:2, 231:3, 232:17, 241:23
**baseball** [1] - 190:2
**based** [36] - 11:25, 12:24, 26:2, 38:7, 42:15, 43:12, 45:9, 46:25, 55:19, 56:19, 63:23, 108:11, 108:19, 110:16, 122:23, 123:11, 124:25, 154:6, 154:8, 160:11, 163:10, 175:17, 183:16, 191:7, 194:4, 196:23, 197:2, 217:5, 221:23, 230:1, 241:4, 242:2, 245:18, 252:6, 253:8
**basic** [2] - 145:7, 167:1
**basis** [6] - 23:25, 158:25, 160:11, 211:24, 221:3, 226:13
**bathroom** [2] - 74:14
**baton** [6] - 205:10, 205:18, 205:24, 206:3, 206:14, 206:20
**batons** [2] - 205:11,

206:17
**bear** [2] - 179:21, 180:1
**BearCat** [1] - 173:18
**became** [3] - 59:21, 114:18, 194:2
**become** [1] - 24:16
**becomes** [2] - 193:24, 197:10
**becoming** [1] - 194:6
**BEFORE** [2] - 1:1, 1:9
**began** [10] - 30:3, 53:15, 58:5, 58:14, 115:12, 144:24, 168:3, 168:5, 175:21, 197:13
**begin** [9] - 28:13, 63:7, 102:2, 115:9, 127:23, 144:18, 189:4, 197:12, 243:9
**beginning** [11] - 45:7, 45:19, 54:6, 81:3, 128:25, 129:11, 133:8, 134:25, 186:7, 213:25, 216:23
**begins** [1] - 55:12
**begun** [1] - 55:12
**behalf** [2] - 3:8, 3:15
**behavior** [1] - 217:9
**behind** [22] - 26:22, 29:19, 39:7, 39:24, 40:3, 40:4, 61:8, 62:18, 73:16, 76:24, 128:9, 175:25, 178:1, 180:13, 182:13, 182:22, 187:8, 187:15, 207:15, 208:5, 249:5, 251:25
**belief** [1] - 97:13
**belongings** [3] - 32:2, 32:5, 69:4
**below** [6] - 95:9, 101:23, 136:6, 166:2, 166:5, 214:8
**belt** [1] - 171:21
**Bench** [11] - 35:1, 43:22, 77:11, 82:4, 91:12, 110:15, 130:1, 158:1, 198:19, 209:14, 211:22
**bench** [11] - 35:18, 44:23, 80:13, 82:19, 92:6, 111:8, 131:25, 161:18, 199:3, 210:5, 212:25
**beneficial** [2] - 226:11, 226:19

**bent** [2] - 191:11, 215:20
**best** [4] - 120:10, 199:20, 210:23, 231:12
**better** [4] - 126:6, 160:18, 211:23, 250:14
**between** [18] - 31:4, 46:13, 48:7, 81:2, 83:23, 99:6, 112:14, 112:24, 128:8, 145:16, 167:5, 177:5, 185:5, 188:4, 225:20, 238:14, 252:1, 255:16
**beyond** [7] - 72:9, 73:4, 113:3, 126:19, 126:24, 145:3, 245:5
**bias** [2] - 246:22
**bicycle** [10] - 21:1, 24:21, 35:6, 37:5, 78:18, 81:19, 87:7, 87:11, 87:25, 99:5
**big** [6] - 96:4, 157:7, 160:8, 170:17, 182:1, 222:9
**biggest** [1] - 173:23
**bike** [32] - 21:9, 34:13, 36:25, 37:6, 37:7, 70:18, 71:1, 71:2, 71:10, 71:23, 72:5, 72:21, 72:24, 73:3, 73:7, 73:9, 73:11, 73:13, 76:4, 76:5, 76:8, 81:8, 113:1, 113:3, 202:15, 232:17, 234:23, 235:10, 235:12, 237:4, 238:7, 239:1
**bit** [34] - 15:22, 31:1, 59:5, 63:20, 75:2, 78:8, 80:15, 93:7, 95:14, 97:2, 126:1, 132:4, 133:13, 137:9, 144:22, 167:18, 168:7, 173:8, 179:20, 180:8, 180:21, 187:9, 198:16, 205:6, 205:19, 205:20, 206:6, 209:4, 215:24, 235:2, 242:8, 243:2, 250:25, 256:2
**bladed** [1] - 215:20
**blame** [1] - 250:7
**blamed** [1] - 251:2
**bleachers** [6] - 118:16, 119:20,

120:7, 120:20, 122:25, 137:21
**blew** [1] - 242:15
**block** [1] - 168:15
**blocking** [1] - 136:2
**blood** [1] - 74:17
**blue** [1] - 171:20
**Board** [3] - 36:24, 39:15, 40:2
**board** [1] - 227:9
**bodies** [1] - 197:15
**body** [51] - 121:6, 121:9, 122:23, 124:22, 131:6, 150:9, 150:13, 150:16, 150:17, 150:23, 151:6, 151:9, 151:11, 151:18, 152:9, 152:12, 152:14, 153:1, 154:4, 154:6, 154:8, 154:10, 154:16, 154:17, 158:19, 159:21, 159:22, 160:4, 160:13, 160:22, 160:24, 161:2, 161:6, 161:16, 161:24, 162:2, 162:5, 163:1, 192:1, 200:1, 211:19, 212:1, 212:10, 212:12, 212:15, 212:18, 212:20, 213:4, 213:7, 245:21, 247:9
**body-cam** [8] - 160:4, 160:13, 161:6, 211:19, 212:10, 212:20, 213:4, 247:9
**body-worn** [25] - 121:6, 121:9, 122:23, 124:22, 131:6, 150:9, 150:13, 150:16, 150:17, 150:23, 151:6, 151:9, 151:11, 151:18, 153:1, 154:4, 154:6, 154:8, 154:16, 154:17, 161:2, 163:1, 200:1, 212:12, 212:18
**bog** [1] - 255:7
**bogged** [1] - 255:1
**Boise** [1] - 230:5
**bollards** [1] - 99:11
**bomb** [3] - 116:1, 116:10, 173:22
**bombs** [1] - 12:11

**bones** [1] - 241:1
**boots** [1] - 171:21
**borders** [1] - 169:19
**bottom** [16] - 26:23, 26:24, 96:11, 118:7, 120:8, 177:16, 177:22, 187:20, 188:16, 189:18, 189:19, 190:1, 190:23, 192:21, 192:24, 239:7
**bounced** [1] - 192:5
**bound** [1] - 27:6
**bounded** [2] - 99:14, 99:15
**Bowser** [1] - 4:1
**Bowser's** [1] - 3:21
**box** [2] - 95:23, 101:23
**boxes** [3] - 54:15, 95:21
**brace** [1] - 192:4
**branch** [1] - 24:7
**Branch** [1] - 143:6
**breach** [17] - 40:11, 41:18, 58:1, 58:13, 58:18, 59:6, 59:11, 60:5, 87:15, 87:16, 87:21, 106:9, 106:15, 250:21, 251:19, 252:8
**breached** [12] - 38:14, 56:22, 57:20, 58:2, 59:2, 62:17, 80:2, 88:2, 106:19, 202:9, 251:16
**breaches** [4] - 58:12, 58:20, 63:19, 90:9
**breaching** [3] - 31:17, 57:20, 58:5
**breadth** [1] - 210:20
**break** [20] - 55:23, 73:24, 73:25, 74:5, 74:6, 74:11, 74:17, 75:3, 77:14, 77:15, 131:11, 131:12, 137:4, 159:20, 160:21, 161:10, 168:20, 168:24, 169:4, 169:17
**breakfast** [3] - 74:10, 220:7, 220:8
**breaking** [3] - 69:12, 220:5, 235:9
**breaks** [2] - 69:22, 74:15
**breather** [1] - 197:5
**Brianna** [1] - 3:11
**brick** [1] - 199:21
**brief** [17] - 10:11, 10:13, 10:17, 11:4,

13:3, 14:7, 14:16, 14:25, 139:21, 228:5, 228:8, 239:12, 239:14, 242:14, 247:18, 251:9
**briefed** [3] - 227:22, 228:9, 228:12
**briefing** [3] - 11:6, 14:18, 254:7
**briefly** [17] - 29:14, 36:7, 49:5, 50:10, 53:17, 77:9, 108:5, 111:21, 120:5, 131:10, 143:19, 144:15, 150:16, 162:23, 164:19, 175:23, 184:14
**briefs** [5] - 15:3, 15:4, 252:17, 253:23, 255:2
**bring** [19] - 3:18, 11:11, 21:22, 70:19, 73:17, 77:4, 77:5, 81:11, 82:22, 89:10, 91:7, 111:11, 111:21, 112:8, 125:22, 141:23, 171:7, 203:17, 220:5
**bringing** [1] - 110:14
**brings** [1] - 173:13
**broad** [2] - 98:21, 245:3
**broke** [2] - 60:14, 192:18
**broken** [3] - 59:13, 235:5, 243:10
**brought** [4] - 173:16, 173:17, 173:18, 237:23
**brown** [1] - 152:19
**Brown** [4] - 3:12, 218:1, 218:6, 220:21
**brownish** [1] - 120:23
**brownish-colored** [1] - 120:23
**build** [1] - 29:1
**build-out** [1] - 29:1
**building** [75] - 24:24, 25:15, 27:8, 27:10, 28:12, 29:11, 30:3, 31:5, 31:19, 31:25, 32:1, 32:10, 32:13, 32:17, 32:20, 32:23, 38:14, 41:18, 42:20, 47:16, 53:2, 56:22, 57:21, 58:4, 58:6, 58:13, 59:8, 59:10, 59:14, 59:15, 59:23, 59:24, 60:20, 60:23,

60:24, 61:1, 61:22, 62:4, 62:7, 63:23, 63:24, 67:3, 83:18, 100:19, 100:24, 101:2, 115:13, 115:14, 116:2, 146:10, 146:12, 147:5, 147:11, 147:15, 148:11, 168:13, 170:12, 171:10, 173:14, 174:19, 177:24, 178:6, 178:7, 181:9, 182:8, 182:9, 182:11, 182:13, 182:14, 184:16, 195:3, 202:9, 202:13
**buildings** [4] - 59:1, 63:12, 63:18, 92:20
**built** [2] - 29:8, 29:16
**bullhorn** [2] - 207:9, 246:16
**bullhorns** [3] - 187:15, 203:11, 245:9
**bunch** [2] - 100:6, 214:18
**Bureau** [1] - 24:2
**bureaucracy** [1] - 223:6
**burn** [1] - 179:2
**burning** [2] - 249:8, 249:11
**burst** [1] - 208:24
**bus** [6] - 171:3, 171:13, 172:11, 172:13, 178:11
**buses** [15] - 168:14, 171:2, 171:6, 171:11, 171:12, 171:17, 172:5, 172:8, 173:4, 173:16, 174:13, 175:16, 175:20, 177:4
**business** [6] - 6:20, 43:4, 63:17, 232:13, 232:23, 233:11
**businesses** [2] - 10:22, 248:8
**busy** [2] - 22:6, 229:17
**but-for** [1] - 12:8
**button** [1] - 150:21
**BY** [113] - 23:3, 25:11, 26:17, 35:24, 38:6, 39:1, 40:22, 41:13, 45:1, 46:7, 50:12, 51:17, 53:9, 54:9, 54:21, 55:15, 56:8, 56:15, 57:4, 57:12, 57:22, 62:11, 64:13,

65:6, 72:16, 75:25, 80:14, 81:17, 82:20, 83:3, 88:25, 89:9, 92:7, 94:3, 94:22, 98:14, 99:4, 99:24, 100:5, 100:13, 103:14, 103:19, 104:25, 105:23, 109:7, 109:24, 111:10, 111:17, 114:3, 121:23, 124:16, 125:18, 126:3, 126:23, 127:24, 132:1, 132:10, 132:17, 133:11, 133:20, 134:3, 134:16, 135:11, 135:18, 137:12, 138:18, 139:6, 142:10, 152:7, 153:17, 154:1, 155:7, 156:4, 156:13, 157:3, 161:19, 162:25, 169:15, 176:16, 183:14, 184:9, 185:16, 186:10, 188:2, 188:22, 189:25, 193:11, 195:11, 196:9, 196:21, 199:4, 200:13, 201:24, 202:4, 203:21, 205:9, 205:13, 205:22, 206:13, 207:8, 208:22, 210:6, 213:2, 213:14, 214:2, 214:13, 214:25, 215:8, 216:1, 216:11, 217:1, 217:21, 219:6

**C**

**C-a-m-p-a-n-a-l-e** [1] - 114:8
**caded** [1] - 195:16
**cafeteria** [1] - 74:19
**cages** [1] - 99:6
**California** [1] - 1:18
**cam** [18] - 158:19, 159:22, 160:4, 160:13, 160:22, 160:24, 161:6, 161:16, 161:24, 162:5, 211:19, 212:1, 212:10, 212:20, 213:4, 213:7, 247:9
**camera** [29] - 121:6,

121:10, 122:23, 124:22, 131:6, 139:2, 150:9, 150:11, 150:13, 150:16, 150:17, 150:23, 151:6, 151:9, 151:11, 152:12, 153:1, 154:4, 154:16, 154:17, 162:2, 163:1, 195:12, 195:14, 200:1, 200:6, 212:12, 212:18, 223:9
**cameras** [7] - 41:4, 42:17, 42:20, 154:6, 154:8, 161:2, 212:15
**camouflage** [1] - 120:24
**Campanale** [4] - 113:23, 114:6, 125:19, 132:2
**CAMPANALE** [2] - 2:6, 113:24
**Campanale's** [1] - 140:15
**cams** [1] - 245:22
**cane** [1] - 152:18
**cannot** [14] - 11:14, 11:15, 14:3, 61:15, 66:22, 66:25, 76:13, 84:9, 84:14, 85:19, 173:6, 179:17, 193:6, 245:24
**capabilities** [1] - 104:3
**capable** [2] - 60:7, 160:9
**capacity** [1] - 68:10
**Capitol** [239] - 5:21, 11:17, 12:3, 13:15, 14:12, 15:18, 15:24, 16:16, 17:3, 19:3, 19:18, 21:6, 23:13, 23:15, 23:16, 23:18, 24:4, 24:5, 24:6, 24:14, 24:15, 24:16, 24:19, 25:15, 26:3, 26:4, 26:19, 27:5, 27:8, 27:12, 28:12, 30:17, 30:18, 30:19, 31:20, 32:23, 33:3, 33:8, 34:1, 34:19, 35:10, 36:9, 36:12, 36:15, 36:24, 37:22, 38:9, 39:5, 39:15, 40:2, 41:3, 41:18, 41:22, 41:23, 42:4, 42:10, 43:3, 43:10, 43:12, 43:14, 45:2,

46:10, 46:12, 46:17, 47:1, 47:9, 47:19, 48:6, 48:11, 48:15, 48:16, 48:20, 49:12, 49:17, 49:19, 50:3, 50:15, 51:11, 51:18, 51:25, 52:6, 52:15, 52:19, 53:2, 58:16, 60:20, 61:11, 61:18, 62:16, 63:13, 64:15, 64:19, 64:22, 65:1, 66:16, 66:19, 66:22, 67:15, 68:13, 70:11, 72:5, 72:22, 72:25, 75:15, 77:22, 79:10, 80:17, 81:1, 81:23, 83:18, 86:11, 86:20, 87:2, 87:4, 88:14, 89:2, 89:18, 90:9, 91:4, 91:8, 94:10, 94:14, 95:18, 96:14, 96:19, 97:22, 98:5, 98:15, 98:18, 98:20, 98:22, 98:25, 99:1, 99:13, 100:8, 100:19, 100:24, 101:6, 101:10, 102:12, 102:17, 102:22, 103:5, 104:20, 105:25, 106:22, 108:6, 108:7, 108:15, 108:21, 111:12, 111:22, 112:16, 112:24, 115:18, 115:21, 115:24, 116:2, 117:6, 117:20, 118:11, 118:13, 118:14, 118:21, 118:23, 119:6, 120:15, 145:6, 146:3, 146:4, 146:5, 146:7, 146:9, 146:12, 146:21, 147:4, 147:5, 147:7, 147:9, 147:15, 149:11, 149:20, 163:9, 163:12, 167:24, 171:10, 172:15, 172:17, 173:1, 173:2, 173:4, 173:10, 173:14, 173:15, 174:1, 174:9, 174:10, 174:14, 174:19, 175:3, 175:16, 175:18, 176:22, 177:23, 177:24, 178:6, 179:5, 179:10, 180:3, 180:7, 181:9,

181:10, 182:7, 182:8, 182:9, 182:10, 182:13, 182:17, 183:10, 188:8, 189:9, 189:10, 195:3, 202:9, 232:22, 234:3, 235:13, 235:21, 236:19, 237:4, 238:7, 246:14, 248:3, 250:19, 252:15
**capitol** [1] - 66:15
**Capitol's** [1] - 87:4
**capitols** [2] - 66:8, 66:10
**Captain** [8] - 22:20, 23:4, 27:19, 27:25, 64:14, 75:1, 76:1, 113:17
**captain** [43] - 23:15, 23:20, 24:1, 25:1, 25:12, 26:18, 28:20, 31:19, 34:10, 35:25, 37:17, 38:7, 39:2, 39:20, 40:23, 41:3, 41:7, 41:14, 45:2, 46:8, 49:6, 50:1, 50:13, 50:25, 51:18, 52:6, 52:24, 53:10, 54:10, 54:22, 55:16, 55:25, 56:9, 56:16, 57:6, 57:13, 57:25, 75:15, 75:20, 105:24, 108:25, 109:25, 170:14
**captioning** [2] - 124:23, 125:1
**capture** [1] - 53:5
**captured** [1] - 43:10
**car** [1] - 166:14
**cardboard** [2] - 36:25, 39:25
**care** [1] - 74:10
**career** [3] - 31:6, 116:20, 164:20
**carefully** [1] - 240:9
**carrier** [1] - 171:25
**carry** [4] - 24:8, 63:16, 108:12, 179:23
**carrying** [1] - 54:15
**case** [32] - 5:17, 7:2, 8:7, 8:10, 8:18, 9:12, 9:15, 17:23, 20:17, 20:18, 22:15, 162:9, 169:17, 200:20, 219:24, 220:25, 222:9, 223:11, 228:25, 230:18, 231:9, 231:25,

232:1, 233:22, 234:4, 239:14, 242:25, 243:10, 243:13, 249:12, 254:9, 255:10
**Case** [2] - 1:3, 3:3
**case-in-chief** [1] - 22:15
**cases** [1] - 143:11
**categorized** [1] - 210:22
**caused** [10] - 9:9, 9:17, 9:25, 57:13, 60:15, 63:20, 116:16, 248:10, 248:13, 249:13
**causes** [3] - 178:25, 179:1, 179:2
**causing** [2] - 159:13, 208:2
**CCTV** [8] - 41:22, 41:25, 43:10, 45:2, 52:4, 89:16, 107:3, 218:22
**CDU** [8] - 166:25, 167:3, 167:7, 167:8, 167:16, 171:19, 171:22, 171:23
**cell** [3] - 170:21, 215:17
**center** [22] - 29:17, 39:5, 39:11, 42:9, 42:13, 42:16, 126:20, 132:18, 133:21, 145:9, 145:13, 145:14, 145:15, 145:22, 167:22, 168:8, 169:24, 170:2, 188:8, 189:10, 195:6, 198:7
**Center** [1] - 42:11
**centered** [1] - 195:19
**certain** [8] - 11:16, 11:19, 22:8, 26:4, 66:9, 84:7, 118:1, 176:9
**certainly** [10] - 19:8, 22:9, 44:3, 65:16, 140:5, 160:15, 163:5, 246:23, 255:11, 255:23
**CERTIFICATE** [1] - 256:7
**certification** [2] - 12:9, 12:10
**certifications** [1] - 52:7
**certified** [2] - 63:10, 166:24

**certify** [2] - 52:11, 256:9
**cetera** [6] - 23:19, 59:14, 66:21, 85:14, 108:17, 249:11
**chained** [1] - 76:14
**chair** [1] - 57:8
**challenge** [1] - 240:25
**challenges** [3] - 14:8, 33:24, 47:4
**challenging** [2] - 196:3, 243:5
**Chamber** [2] - 52:16, 107:6
**chambers** [1] - 55:21
**chance** [4] - 74:4, 192:15, 194:20, 240:9
**change** [4] - 7:13, 117:21, 117:23, 196:5
**changed** [2] - 38:13, 177:7
**characterization** [1] - 34:23
**charge** [2] - 30:16, 244:12
**charged** [2] - 13:5, 252:2
**charges** [3] - 12:6, 143:23, 221:4
**check** [4] - 3:25, 67:9, 74:12, 95:21
**checked** [1] - 69:5
**checking** [2] - 32:7, 227:13
**chemical** [4] - 66:21, 178:13, 178:18, 194:1
**chest** [4] - 135:13, 135:20, 135:23, 172:1
**chief** [6] - 22:15, 23:22, 23:23, 30:18, 170:14
**choose** [1] - 175:7
**chooses** [1] - 47:10
**choosing** [2] - 200:21, 200:22
**chose** [1] - 201:10
**Christian** [1] - 248:2
**Christopher** [1] - 251:14
**Circle** [7] - 58:14, 109:16, 109:25, 251:15, 251:19, 252:8
**circle** [11] - 126:8, 177:9, 182:5, 186:14, 186:16,

188:17, 189:18, 190:17, 192:23, 196:13, 197:18
**circled** [10] - 183:3, 184:5, 187:20, 188:15, 189:16, 190:23, 192:21, 195:5, 196:16, 198:6
**circles** [3] - 189:18, 206:7, 248:2
**circumference** [1] - 237:5
**circumstance** [1] - 240:8
**cities** [1] - 249:8
**city** [1] - 16:2
**civil** [8] - 12:16, 16:15, 16:18, 95:9, 95:22, 95:25, 96:4, 96:5
**Civil** [3] - 92:11, 92:12, 92:18
**Civilian** [1] - 166:25
**claim** [1] - 7:16
**claims** [1] - 242:17
**clamp** [1] - 179:24
**clarification** [1] - 111:5
**clarified** [2] - 79:22, 101:7
**clarify** [6] - 7:4, 11:12, 107:16, 113:20, 131:7, 250:8
**clarity** [1] - 104:8
**class** [1] - 166:5
**clear** [36] - 10:10, 13:11, 20:24, 24:23, 31:16, 47:14, 68:13, 70:22, 72:8, 81:5, 83:7, 119:19, 123:8, 147:18, 153:4, 154:2, 156:17, 156:23, 161:4, 161:8, 181:13, 181:20, 183:11, 185:7, 187:24, 189:15, 189:21, 191:1, 193:1, 196:20, 197:21, 206:7, 206:9, 223:9, 224:9, 254:16
**cleared** [5] - 61:8, 102:16, 102:17, 118:16, 226:15
**clearing** [2] - 195:8, 198:11
**clearly** [7] - 35:16, 39:16, 65:17, 85:8, 85:9, 238:4, 252:16
**CLERK** [1] - 3:3
**climb** [3] - 37:14, 72:2,

72:12
**clip** [2] - 57:2, 91:2
**clock** [1] - 82:8
**close** [5] - 15:21, 16:3, 30:2, 149:4, 241:20
**closed** [27] - 30:20, 31:7, 32:14, 32:15, 36:23, 39:15, 39:16, 40:1, 40:6, 40:13, 65:9, 65:11, 66:6, 82:21, 83:4, 85:5, 85:8, 85:9, 85:10, 86:16, 102:11, 124:23, 124:25, 136:16, 182:15, 183:4, 188:10
**closely** [2] - 48:10, 250:9
**closer** [2] - 111:22, 112:2
**closest** [2] - 31:5, 108:15
**closing** [1] - 185:5
**closure** [1] - 86:9
**closures** [4] - 30:10, 86:21, 86:22, 89:4
**clothes** [2] - 120:24, 174:9
**cluttered** [1] - 181:21
**CN** [1] - 178:23
**co** [1] - 3:15
**co-counsel** [1] - 3:15
**coated** [3] - 179:21, 180:2
**colleague** [1] - 222:15
**collection** [1] - 54:14
**College** [6] - 12:9, 46:24, 52:7, 52:11, 63:10, 70:6
**Collision** [1] - 166:9
**colloquy** [2] - 242:2, 253:18
**collusion** [1] - 7:25
**color** [1] - 181:7
**colored** [1] - 120:23
**Columbia** [3] - 86:12, 143:11, 167:13
**COLUMBIA** [1] - 1:1
**column** [2] - 101:20, 225:4
**combat** [1] - 165:1
**combative** [1] - 18:3
**comfortable** [4] - 102:25, 253:15, 253:16, 253:19
**coming** [33] - 5:22, 6:11, 15:3, 25:19, 30:6, 31:15, 31:20, 43:9, 51:3, 51:5, 53:18, 55:1, 59:9,

66:11, 66:14, 66:16, 100:6, 121:10, 123:9, 125:19, 146:15, 151:19, 152:12, 153:5, 154:18, 155:11, 178:1, 194:7, 234:7, 238:4, 241:16, 243:2, 249:18
**command** [9] - 24:3, 42:8, 42:13, 42:16, 48:21, 52:1, 103:7, 173:17, 210:19
**Command** [1] - 42:11
**command-level** [1] - 52:1
**Commander** [5] - 118:14, 118:18, 118:19, 119:12, 129:17
**commander** [6] - 118:19, 170:20, 170:21, 171:16, 203:13, 203:16
**commander's** [2] - 170:12, 170:16
**commanders** [6] - 168:17, 170:23, 171:8, 177:4, 178:4, 184:20
**commands** [6] - 166:20, 181:4, 184:18, 184:19, 187:16, 197:4
**comment** [4] - 11:16, 14:6, 239:20, 241:15
**commerce** [23] - 8:21, 8:23, 9:2, 9:11, 9:12, 9:14, 9:16, 9:19, 9:23, 10:4, 10:5, 15:1, 15:2, 227:10, 228:2, 228:6, 228:11, 247:25, 248:10, 249:9, 249:10, 254:3
**committed** [4] - 14:1, 167:23, 210:16, 244:19
**Committee** [2] - 116:1, 195:1
**committing** [1] - 217:10
**commodity** [1] - 9:2
**common** [5] - 21:1, 67:21, 118:8, 165:20, 239:9
**commonly** [3] - 16:15, 27:14, 27:20
**communicate** [1] - 97:22

**communicated** [1] - 88:5
**communicating** [1] - 80:23
**communication** [4] - 31:16, 80:9, 225:20, 226:15
**communications** [5] - 33:21, 52:2, 81:5, 88:5, 92:16
**Company** [2] - 7:20, 8:11
**compared** [1] - 198:23
**compares** [1] - 198:16
**comparison** [1] - 124:21
**compelling** [1] - 251:10
**complaint** [1] - 161:22
**Complaints** [1] - 223:18
**complaints** [5] - 161:20, 224:3, 224:24, 224:25, 225:17
**complete** [4] - 6:4, 19:5, 60:25, 63:15
**completed** [1] - 49:16
**completely** [4] - 94:12, 102:16, 138:19, 225:6
**completeness** [3] - 4:3, 4:11, 5:5
**complex** [4] - 24:4, 24:14, 26:4, 41:3
**compliance** [1] - 19:16
**complicated** [1] - 10:14
**complied** [6] - 112:23, 119:7, 120:12, 126:9, 156:16, 156:22
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**computers** [3] - 25:5, 25:6, 25:9
**conceal** [4] - 123:13, 123:20, 129:3, 129:7
**conceding** [1] - 160:13
**conceivable** [1] - 173:21
**conceptual** [2] - 35:8, 70:22
**conceptually** [1] - 35:14
**concerned** [5] - 79:1, 221:12, 223:22,

228:25, 239:11
**concerns** [1] - 158:22
**concert** [2] - 37:6, 73:2
**conclusion** [5] - 14:3, 14:12, 84:9, 84:12, 123:16
**conclusions** [1] - 15:12
**concrete** [1] - 99:12
**conduct** [8] - 9:3, 11:16, 12:6, 13:4, 13:5, 13:20, 13:21, 14:2
**confer** [2] - 224:5, 225:24
**conference** [23] - 22:5, 35:1, 35:18, 43:22, 44:23, 77:11, 80:13, 82:4, 82:19, 91:12, 92:6, 110:15, 111:8, 130:1, 131:25, 158:1, 161:18, 198:19, 199:3, 209:14, 210:5, 211:22, 212:25
**confident** [2] - 225:15, 225:21
**conflict** [1] - 254:13
**conform** [1] - 224:8
**conformed** [1] - 16:24
**confounds** [1] - 221:16
**confused** [1] - 19:7
**confusing** [5] - 10:7, 11:3, 17:1, 18:13, 230:1
**confusion** [3] - 14:22, 202:19, 221:14
**Congress** [30] - 18:7, 24:7, 31:13, 33:13, 34:2, 46:23, 47:4, 52:16, 60:18, 61:10, 63:16, 64:7, 67:15, 92:19, 102:20, 103:5, 103:15, 103:20, 104:2, 104:3, 104:8, 104:20, 105:6, 105:8, 105:9, 116:3, 116:9, 117:14, 249:7, 249:9
**Congressional** [1] - 69:16
**Congresspeople** [2] - 67:16, 67:24
**connect** [1] - 76:16
**connected** [3] - 12:22, 37:7, 76:23

**connection** [1] - 66:18
**conservative** [1] - 248:1
**consider** [4] - 98:2, 217:11, 237:12, 244:15
**considerable** [1] - 219:10
**considered** [4] - 11:17, 58:20, 141:10, 225:3
**considering** [1] - 19:17
**consist** [1] - 95:2
**consistent** [1] - 139:7
**consolidate** [1] - 103:6
**constant** [1] - 33:21
**constitutes** [1] - 11:19
**Constitution** [5] - 1:21, 27:7, 47:13, 70:3, 70:7
**constitutionally** [2] - 32:16, 33:2
**constitutionally-mandated** [1] - 33:2
**constitutionally-required** [1] - 32:16
**constructed** [1] - 39:10
**constructing** [1] - 28:13
**construction** [10] - 28:21, 29:3, 30:9, 58:4, 67:1, 67:3, 67:4, 67:13, 106:1, 106:6
**consumed** [1] - 71:10
**consumes** [1] - 28:13
**contact** [4] - 152:9, 154:9, 208:3, 208:23
**contacting** [1] - 162:8
**contains** [1] - 113:2
**contemplating** [1] - 15:4
**content** [1] - 92:5
**contested** [1] - 238:25
**context** [2] - 36:11, 55:8
**continue** [11] - 14:21, 54:18, 100:11, 101:9, 119:16, 153:21, 177:8, 187:25, 193:3, 197:23, 201:6
**Continued** [1] - 75:24
**continued** [3] - 64:6, 119:13, 167:2
**continuing** [2] - 107:13, 107:24

**contradicts** [1] - 9:20
**contrary** [1] - 232:19
**contributed** [7] - 90:3, 90:8, 90:10, 90:19, 90:24, 107:15, 107:17
**control** [6] - 59:2, 60:9, 68:2, 166:17, 173:2, 198:17
**controlled** [1] - 42:8
**convention** [8] - 145:9, 145:14, 145:15, 145:22, 167:22, 168:8, 169:24, 170:2
**conversation** [3] - 121:25, 210:14, 224:17
**convert** [1] - 171:13
**conveying** [1] - 180:19
**convicted** [1] - 159:22
**conviction** [1] - 14:11
**convince** [1] - 244:3
**Cooper** [1] - 8:16
**coordination** [2] - 48:7, 48:9
**cop** [1] - 72:13
**cops** [3] - 73:9, 78:17, 138:20
**cordon** [1] - 99:11
**cordoned** [1] - 108:16
**corner** [18] - 45:20, 108:22, 177:1, 177:23, 178:2, 180:7, 181:9, 184:2, 184:3, 184:5, 184:6, 187:20, 189:18, 189:19, 190:2, 190:23, 192:21, 192:24
**corporal** [6] - 165:25, 166:2, 169:2, 201:5, 201:7, 219:25
**Corporal** [28] - 140:8, 163:25, 164:1, 164:13, 164:14, 166:16, 179:15, 183:15, 184:10, 185:19, 186:11, 186:23, 190:1, 191:7, 192:7, 193:3, 193:12, 195:23, 196:10, 196:22, 198:15, 199:5, 199:25, 200:16, 211:18, 211:19, 217:2, 217:22
**corporal's** [1] - 166:3
**correct** [81] - 3:22,

8:1, 19:23, 24:24, 24:25, 25:25, 44:21, 47:8, 47:25, 49:18, 51:8, 52:5, 57:24, 58:22, 64:20, 69:9, 69:10, 69:23, 70:17, 72:18, 76:7, 76:9, 76:10, 80:22, 83:8, 84:6, 89:23, 92:2, 93:20, 94:15, 95:19, 100:21, 100:24, 102:2, 102:5, 106:2, 106:4, 106:10, 106:11, 106:12, 106:13, 107:6, 107:7, 107:10, 108:1, 108:4, 118:10, 123:9, 127:13, 127:15, 131:22, 132:6, 135:5, 136:5, 136:11, 137:13, 137:19, 138:6, 139:9, 153:5, 153:6, 153:9, 157:17, 180:5, 201:11, 202:11, 204:7, 204:8, 204:16, 206:23, 207:17, 207:18, 208:14, 211:10, 213:8, 218:14, 227:22, 230:16, 245:17, 249:17, 256:10
**correctly** [2] - 96:22, 221:18
**corrupt** [1] - 13:10
**Counsel** [1] - 220:13
**counsel** [5] - 3:5, 3:15, 7:19, 8:5, 10:2
**counsel's** [1] - 7:9
**count** [1] - 150:5
**counties** [1] - 63:4
**county** [1] - 200:19
**County** [16] - 140:9, 164:15, 165:12, 165:19, 165:22, 165:24, 166:7, 166:15, 166:23, 167:4, 167:16, 169:18, 169:19, 170:13, 200:17
**couple** [9] - 3:19, 6:11, 6:14, 7:4, 7:7, 77:13, 157:6, 189:6, 234:3
**coupled** [1] - 37:11
**course** [15] - 12:16, 14:23, 14:24, 19:10, 21:3, 43:3, 107:24,

131:8, 161:3, 161:7, 222:17, 229:14, 231:17, 234:11, 246:19
**COURT** [392] - 1:1, 3:10, 3:13, 3:18, 4:1, 4:8, 4:10, 4:21, 4:25, 5:2, 5:16, 5:25, 6:5, 6:9, 6:15, 6:20, 6:23, 6:25, 7:3, 8:3, 9:8, 10:16, 11:8, 14:20, 15:2, 15:7, 15:10, 15:16, 16:6, 16:22, 17:17, 18:1, 18:20, 19:7, 19:11, 19:20, 20:4, 20:7, 20:11, 21:3, 21:14, 21:22, 22:6, 22:10, 22:13, 22:18, 22:23, 22:25, 25:4, 25:8, 26:9, 26:11, 26:13, 34:25, 35:2, 35:9, 35:16, 35:19, 38:2, 38:5, 38:21, 38:23, 40:18, 40:20, 43:21, 43:23, 44:1, 44:4, 44:7, 44:12, 44:19, 44:22, 46:3, 46:5, 50:6, 50:8, 51:15, 54:1, 54:3, 57:16, 57:18, 60:3, 62:10, 64:11, 65:4, 72:15, 73:19, 73:23, 74:2, 74:9, 74:23, 75:5, 75:10, 75:14, 75:20, 75:23, 77:10, 77:12, 77:21, 78:1, 78:4, 78:12, 78:24, 79:11, 79:21, 80:10, 81:14, 81:16, 82:5, 82:9, 82:16, 88:22, 89:8, 90:6, 91:11, 91:16, 91:24, 92:4, 93:22, 93:24, 94:19, 94:21, 98:13, 99:3, 99:23, 100:4, 100:10, 103:16, 104:24, 105:20, 109:22, 110:9, 110:12, 110:16, 110:20, 110:23, 111:1, 111:4, 111:13, 111:15, 113:15, 113:19, 113:25, 121:16, 121:18, 124:2, 124:4, 124:12, 125:9, 125:11, 125:16, 126:22, 127:19, 129:24, 130:2, 130:5, 130:7, 130:11, 130:18,

130:20, 131:2, 131:7, 131:15, 131:19, 131:24, 132:5, 132:8, 132:15, 133:3, 133:5, 135:15, 137:4, 138:12, 138:16, 139:4, 139:15, 139:18, 139:20, 139:23, 140:1, 140:7, 140:11, 140:16, 141:6, 141:16, 141:22, 142:1, 142:4, 142:8, 152:2, 152:4, 153:13, 155:1, 155:3, 155:22, 155:24, 157:1, 157:25, 158:2, 158:6, 158:10, 158:12, 158:21, 159:8, 159:11, 159:16, 159:24, 160:3, 160:10, 160:17, 161:3, 161:14, 161:17, 162:22, 163:16, 163:18, 163:20, 163:23, 164:4, 168:19, 168:23, 169:1, 169:6, 169:10, 169:14, 176:14, 177:18, 183:12, 184:7, 185:11, 187:22, 188:18, 189:20, 190:19, 190:25, 192:25, 195:7, 196:19, 197:20, 198:8, 198:20, 198:22, 199:1, 200:11, 201:22, 202:3, 205:5, 205:17, 207:6, 208:17, 209:13, 209:17, 209:20, 210:1, 211:23, 212:3, 212:5, 212:8, 212:14, 212:19, 213:1, 213:20, 216:20, 217:19, 219:4, 219:19, 219:21, 219:23, 219:25, 220:3, 220:10, 220:13, 220:16, 220:24, 221:7, 222:9, 222:13, 222:22, 223:3, 223:12, 223:15, 223:21,

224:5, 224:13, 225:1, 225:8, 225:18, 226:6, 226:11, 227:3, 227:13, 227:25, 228:9, 228:14, 228:17, 228:23, 228:25, 229:4, 229:13, 229:19, 229:24, 230:6, 230:10, 230:14, 230:17, 230:20, 231:4, 231:10, 231:15, 231:25, 232:5, 232:8, 232:14, 232:20, 233:5, 233:10, 233:15, 233:20, 234:6, 234:10, 234:19, 235:1, 235:7, 235:12, 235:17, 235:23, 236:1, 236:16, 236:24, 237:11, 238:4, 238:12, 239:6, 239:25, 240:4, 240:15, 241:4, 241:22, 242:1, 242:12, 242:18, 242:22, 243:1, 243:14, 243:20, 244:2, 244:5, 244:10, 244:23, 245:2, 245:12, 245:14, 245:18, 245:25, 246:7, 246:12, 246:25, 247:14, 247:20, 248:12, 248:16, 248:19, 248:23, 249:16, 249:24, 250:1, 250:6, 250:13, 250:16, 250:23, 251:5, 251:9, 251:21, 252:3, 252:11, 252:16, 253:3, 253:13, 253:22, 254:5, 254:11, 254:16, 254:19, 254:21, 254:23, 255:4, 255:14, 255:17, 255:20, 255:25, 256:7, 256:15
**court** [14] - 7:18, 8:11, 22:3, 25:19, 43:9, 53:18, 114:7, 121:10, 123:9, 151:19, 153:5, 154:19, 155:12,

224:3
**Court** [16] - 1:21, 3:3, 12:7, 108:15, 141:3, 141:25, 221:7, 222:2, 226:20, 226:25, 227:3, 227:5, 227:15, 228:9, 243:17, 255:13
**Court's** [7] - 7:5, 10:6, 11:12, 136:25, 199:23, 217:20, 222:1
**COURTROOM** [3] - 75:11, 132:7, 220:9
**courtroom** [14] - 8:6, 22:12, 74:1, 74:8, 74:22, 75:13, 75:17, 139:22, 142:5, 168:25, 169:9, 190:11, 190:20, 220:12
**Courtyard** [2] - 27:15, 27:18
**cove** [1] - 189:2
**cover** [6] - 117:25, 118:6, 122:11, 229:9, 229:11, 256:2
**covered** [5] - 3:22, 20:12, 41:3, 141:20, 198:22
**covers** [2] - 7:19, 118:5
**COVID** [1] - 32:14
**crash** [4] - 200:25, 201:2, 201:6, 201:13
**crashes** [1] - 166:14
**create** [1] - 202:21
**created** [1] - 249:7
**creates** [1] - 251:8
**creating** [1] - 202:19
**credentials** [1] - 248:5
**credibility** [4] - 10:23, 222:7, 236:12, 246:22
**credible** [2] - 241:11, 242:2
**crime** [1] - 18:14
**crimes** [1] - 244:19
**Criminal** [1] - 3:3
**criminal** [5] - 11:10, 13:19, 13:21, 143:11, 227:19
**critical** [4] - 58:8, 59:21, 237:25, 240:17
**cross** [29] - 18:11, 21:3, 64:11, 73:20, 74:6, 74:20, 105:24, 106:8, 125:16,

140:13, 140:18, 140:25, 160:5, 160:10, 161:11, 161:15, 210:2, 212:16, 217:12, 217:22, 221:1, 221:16, 221:19, 223:24, 226:21, 234:13, 239:16, 239:25, 241:2
**Cross** [4] - 2:4, 2:7, 2:9, 2:11
**CROSS** [5] - 64:12, 75:24, 125:17, 157:2, 200:12
**cross-examination** [7] - 64:11, 73:20, 74:20, 106:8, 125:16, 160:5, 223:24
**CROSS-EXAMINATION** [5] - 64:12, 75:24, 125:17, 157:2, 200:12
**Cross-Examination.. ............** [4] - 2:4, 2:7, 2:9, 2:11
**cross-examine** [2] - 140:25, 221:19
**cross-examined** [1] - 234:13
**cross-examining** [1] - 221:1
**crossed** [1] - 192:3
**crowd** [44] - 17:14, 17:19, 67:19, 122:14, 137:21, 137:23, 146:19, 146:20, 149:8, 149:9, 149:17, 149:22, 150:7, 173:25, 174:2, 174:17, 177:5, 178:3, 181:5, 183:4, 184:24, 185:3, 186:22, 187:5, 187:10, 187:12, 187:16, 193:24, 194:6, 195:20, 197:12, 201:17, 202:16, 205:3, 207:3, 208:2, 208:3, 208:23, 209:2, 211:14, 215:11, 252:14, 253:11
**crowd's** [1] - 253:10
**crowds** [2] - 166:21, 176:9
**CRR** [1] - 1:21

**crystallize** [1] - 247:20
**CS** [4] - 146:16, 146:18, 178:23, 202:18
**CS/CN** [1] - 179:11
**CS/OC** [1] - 178:14
**cumulative** [1] - 198:25
**curative** [1] - 225:25
**curfew** [17] - 3:21, 4:1, 4:4, 4:24, 4:25, 5:4, 17:12, 248:20, 248:25, 249:3, 249:6, 249:12, 249:17, 249:20, 250:4
**current** [4] - 143:1, 165:17, 165:23, 166:7
**custodian** [1] - 3:23
**cut** [20] - 126:18, 127:1, 127:3, 127:25, 128:20, 129:8, 133:14, 134:22, 135:1, 135:4, 135:12, 135:19, 136:4, 136:9, 137:18, 139:7, 139:10
**cutout** [1] - 133:12
**cutting** [14] - 122:11, 127:14, 127:21, 128:24, 133:24, 134:20, 134:23, 135:2, 135:7, 136:21, 136:23, 137:20, 138:20, 139:8

**D**

**D.C** [25] - 1:5, 1:15, 1:22, 8:23, 9:14, 9:23, 11:2, 63:5, 92:19, 114:22, 142:19, 142:21, 143:17, 143:21, 143:22, 167:11, 167:12, 167:21, 167:22, 168:8, 169:19, 169:20, 223:19, 247:25, 248:7
**DABNEY** [1] - 1:9
**daily** [2] - 15:3, 23:25
**damage** [2] - 127:6, 127:9
**damaging** [1] - 127:11
**danger** [1] - 67:23
**dangerous** [1] - 32:5

**date** [4] - 47:9, 47:12, 219:8, 219:9
**DATE** [1] - 256:15
**dates** [1] - 218:4
**David** [2] - 250:17, 251:13
**day-to-day** [3] - 23:24, 166:11, 166:13
**de** [1] - 122:3
**de-escalate** [1] - 122:3
**deadline** [3] - 14:16, 14:19, 228:20
**deadlines** [1] - 228:2
**deadly** [3] - 206:23, 206:25, 207:3
**deal** [3] - 78:25, 108:2, 229:14
**dealing** [2] - 116:10, 225:1
**death** [1] - 12:22
**decide** [5] - 96:13, 161:8, 178:4, 253:23, 255:5
**decided** [1] - 228:4
**decides** [1] - 246:3
**decisions** [1] - 221:23
**declaration** [2] - 3:22, 4:5
**declare** [2] - 68:5, 250:4
**declaring** [2] - 4:24, 4:25
**deemed** [1] - 59:19
**Defendant** [2] - 1:7, 1:16
**DEFENDANT** [5] - 254:24, 255:11, 255:15, 255:18, 255:23
**defendant** [19] - 3:15, 126:10, 190:15, 190:20, 190:24, 191:9, 191:21, 192:21, 193:23, 196:11, 197:13, 198:3, 207:23, 209:2, 209:6, 209:24, 212:10, 214:3, 217:5
**defendant's** [3] - 4:15, 11:9, 190:15
**Defense** [9] - 2:19, 2:20, 73:17, 77:4, 91:7, 93:25, 129:10, 133:6, 213:9
**defense** [58] - 4:2, 4:10, 5:4, 5:15, 5:18, 7:16, 8:21, 9:6, 9:11, 9:15, 9:18, 10:2, 10:10, 11:19, 11:21,

11:22, 11:24, 12:1, 12:4, 12:12, 12:15, 12:16, 12:18, 12:19, 12:21, 13:11, 13:18, 14:7, 14:17, 14:24, 15:4, 15:22, 16:19, 17:11, 17:13, 17:16, 18:19, 137:7, 141:10, 220:24, 221:14, 222:10, 226:21, 226:24, 227:22, 228:25, 229:18, 234:2, 237:18, 239:18, 243:6, 243:8, 255:1
**defense's** [1] - 13:3
**defenses** [1] - 12:17
**definitely** [3] - 116:7, 144:23, 236:24
**definition** [1] - 87:21
**degree** [2] - 9:10, 235:4
**degrees** [2] - 222:21, 222:22
**delay** [4] - 12:9, 12:14, 74:21, 75:1
**delayed** [1] - 12:10
**deliberate** [1] - 60:11
**deliberating** [1] - 60:15
**delved** [1] - 222:12
**demand** [1] - 22:7
**Democratic** [1] - 116:1
**demonstrate** [1] - 108:18
**demonstrates** [1] - 53:3
**demonstrating** [2] - 28:24, 39:21
**demonstration** [1] - 110:5
**demonstrations** [3] - 30:11, 103:17, 109:18
**demonstrators** [2] - 56:21, 56:25
**denied** [1] - 231:13
**deny** [2] - 233:24, 240:6
**Department** [7] - 62:24, 114:10, 114:11, 115:3, 140:9, 142:18, 164:16
**department** [8] - 50:19, 166:5, 167:3, 200:18, 201:3, 201:7, 222:23, 223:6
**Department's** [1] - 61:19

**departments** [2] - 63:4, 225:2
**dependent** [1] - 67:25
**depict** [15] - 26:3, 40:13, 43:14, 45:24, 50:1, 51:9, 53:13, 53:20, 54:23, 121:12, 122:24, 125:3, 125:4, 132:23, 151:22
**depicted** [3] - 25:22, 57:6, 131:5
**depicting** [1] - 35:14
**depiction** [4] - 25:15, 26:19, 37:21, 129:19
**depicts** [6] - 34:23, 35:6, 35:7, 37:19, 45:13, 132:13
**deploy** [1] - 117:10
**deployed** [5] - 164:24, 178:13, 179:11, 179:13, 179:18
**deploying** [1] - 178:15
**DEPUTY** [3] - 75:11, 132:7, 220:9
**deputy** [1] - 23:22
**describe** [31] - 33:11, 48:9, 52:13, 57:25, 70:13, 120:5, 148:5, 149:16, 149:25, 150:16, 152:17, 164:19, 166:1, 166:11, 167:5, 172:16, 173:9, 175:23, 178:21, 184:14, 186:14, 187:4, 188:4, 191:8, 193:14, 193:18, 196:22, 197:1, 199:11, 199:20, 204:17
**described** [14] - 31:10, 33:1, 33:2, 40:14, 59:22, 65:2, 101:16, 145:4, 149:6, 163:5, 172:12, 174:12, 183:16, 199:9
**describing** [1] - 55:16
**description** [2] - 120:21, 190:14
**Desert** [1] - 164:24
**designate** [2] - 8:18, 108:9
**designated** [3] - 8:12, 8:13, 102:4
**designed** [1] - 76:8
**desired** [1] - 180:22
**destroying** [1] - 134:12
**destruction** [7] -

60:25, 61:1, 63:20, 122:10, 128:14, 134:5, 134:11
**detail** [2] - 48:3, 191:20
**details** [6] - 19:1, 28:1, 46:25, 53:20, 60:19, 113:12
**Detective** [6] - 140:5, 140:14, 142:3, 142:14, 157:4, 161:20
**detective** [19] - 23:19, 114:19, 139:25, 142:23, 142:24, 142:25, 151:13, 152:8, 152:21, 153:19, 154:2, 154:13, 155:9, 156:6, 163:1, 221:3, 222:14, 222:16, 223:3
**detectors** [2] - 68:11, 68:14
**determination** [1] - 97:12
**determine** [6] - 11:23, 59:16, 60:4, 60:9, 78:9, 85:19
**determined** [4] - 58:25, 59:3, 101:25, 102:1
**determines** [1] - 223:19
**determining** [1] - 139:11
**deterrent** [1] - 180:16
**develop** [1] - 59:5
**diabetic** [1] - 74:4
**differ** [1] - 106:25
**difference** [4] - 167:5, 179:13, 218:16, 222:20
**differences** [1] - 232:4
**different** [34] - 5:8, 10:15, 12:19, 28:5, 28:14, 28:17, 29:8, 31:1, 32:9, 51:25, 61:3, 65:9, 65:10, 86:11, 86:12, 90:14, 90:15, 90:16, 92:16, 115:4, 137:15, 144:11, 144:20, 144:22, 144:23, 181:7, 218:12, 222:21, 222:22, 240:12, 250:3, 255:15, 255:18
**differs** [1] - 69:19
**difficult** [11] - 31:2,

74:14, 76:25, 77:1, 79:13, 79:24, 138:7, 140:2, 156:6, 235:2, 245:11
**difficulty** [1] - 19:15
**dignitaries** [2] - 29:20, 60:16
**dignitary** [2] - 33:17, 49:3
**dimensional** [1] - 111:11
**dimensions** [1] - 16:13
**DIRECT** [4] - 23:2, 114:2, 142:9, 164:6
**direct** [8] - 12:8, 71:12, 73:14, 79:15, 96:10, 105:24, 118:19, 220:23
**Direct** [4] - 2:4, 2:6, 2:9, 2:11
**directed** [2] - 136:8, 226:24
**directing** [2] - 101:5, 187:13
**direction** [14] - 28:24, 35:25, 101:10, 176:10, 181:11, 181:16, 181:18, 182:19, 182:23, 185:9, 188:25, 191:23, 242:20, 242:23
**directly** [5] - 51:21, 56:24, 117:4, 128:2, 176:13
**directs** [1] - 103:9
**disagree** [1] - 244:2
**disciplinary** [1] - 159:23
**disclosures** [1] - 223:14
**disconnect** [2] - 76:17, 76:22
**disconnecting** [1] - 78:18
**discovery** [7] - 160:19, 212:10, 221:23, 221:25, 224:15, 231:8, 234:22
**discrepancies** [2] - 47:3, 52:18
**discuss** [9] - 7:8, 52:17, 52:19, 55:22, 82:21, 220:1, 226:19, 229:8
**discussed** [2] - 17:12, 98:5
**discusses** [2] - 52:21,

228:6

**discussion** [4] - 78:17, 208:10, 236:22, 237:8

**discussions** [4] - 14:22, 97:23, 99:14, 140:24

**disembarking** [1] - 175:20

**dismissed** [3] - 158:15, 160:14, 224:2

**disobedience** [8] - 12:16, 16:15, 16:18, 95:9, 95:22, 95:25, 96:4, 96:5

**dispensing** [1] - 106:5

**display** [2] - 34:8, 39:18

**displayed** [1] - 107:21

**disposition** [4] - 225:5, 225:7, 225:8, 225:10

**disproving** [1] - 16:11

**dispute** [2] - 159:8, 159:10

**disputed** [1] - 8:4

**disputes** [1] - 13:17

**dissimilar** [1] - 118:8

**distance** [7] - 40:5, 84:3, 85:22, 85:23, 86:2, 88:19, 88:24

**distinguishes** [1] - 31:4

**distracting** [1] - 18:25

**distributed** [1] - 50:21

**district** [1] - 145:20

**District** [7] - 86:12, 114:15, 143:8, 143:10, 143:11, 167:13, 167:21

**DISTRICT** [3] - 1:1, 1:1, 1:10

**Disturbance** [4] - 92:11, 92:12, 92:18, 166:25

**divided** [2] - 144:11, 179:22

**dividing** [1] - 84:1

**diving** [1] - 223:6

**Division** [9] - 49:11, 115:12, 115:14, 118:20, 164:25, 166:8, 168:2, 170:4, 223:18

**DNC** [3] - 116:1, 116:8, 117:13

**do's** [1] - 7:6

**docket** [1] - 227:11

**Docket** [1] - 227:18

**document** [8] - 91:20, 92:21, 93:2, 223:1, 227:9, 248:24, 249:18, 250:3

**documents** [7] - 20:1, 221:10, 221:15, 221:18, 226:16, 250:11

**domain** [1] - 67:4

**don** [2] - 178:12, 178:16

**don'ts** [1] - 7:6

**done** [9] - 5:12, 80:7, 167:25, 170:25, 188:3, 228:13, 233:13, 235:3, 236:13

**donned** [2] - 117:24, 178:11

**door** [8] - 74:12, 182:6, 183:3, 183:4, 188:8, 188:10, 188:11, 241:14

**doors** [3] - 59:14, 61:2, 182:14

**doorway** [1] - 188:7

**double** [3] - 3:25, 71:8, 151:7

**double-check** [1] - 3:25

**doubles** [1] - 79:24

**doubts** [1] - 201:2

**down** [52] - 62:25, 65:9, 67:10, 69:6, 79:24, 93:7, 94:23, 103:1, 104:19, 117:25, 119:10, 119:21, 120:8, 120:18, 120:19, 127:23, 134:24, 134:25, 136:6, 136:7, 138:10, 141:7, 148:8, 150:5, 172:13, 173:23, 177:16, 179:24, 181:13, 182:2, 188:12, 190:10, 191:12, 193:23, 206:3, 211:14, 214:8, 214:17, 214:19, 216:6, 216:13, 219:12, 222:1, 235:9, 235:11, 241:8, 242:15, 243:10, 248:8, 255:1, 255:7

**downtown** [2] - 115:16

**draw** [14] - 36:2, 66:18, 84:9, 119:5,

156:15, 156:21, 177:21, 181:7, 181:11, 182:5, 182:19, 183:2, 188:10, 212:20

**drawing** [1] - 177:8

**drawn** [6] - 176:13, 177:16, 183:9, 188:16, 188:19, 189:17

**dress** [2] - 171:3, 203:13

**drew** [6] - 127:22, 134:24, 136:7, 182:16, 192:22, 242:14

**drilling** [1] - 222:1

**due** [7] - 30:8, 32:16, 57:19, 103:24, 109:10, 117:11, 173:14

**durable** [2] - 40:1, 85:13

**during** [18] - 8:19, 25:17, 46:16, 52:10, 57:25, 75:2, 101:3, 121:24, 123:6, 144:13, 144:16, 145:5, 158:20, 160:20, 161:24, 190:9, 192:7, 234:21

**dust** [1] - 178:24

**duties** [5] - 62:13, 70:2, 70:7, 92:17, 143:16

**duty** [4] - 106:9, 114:25, 145:1, 244:11

**E**

**e-mail** [4] - 50:22, 51:4, 51:9, 244:7

**e-mails** [1] - 5:9

**early** [5] - 74:18, 81:4, 116:7, 170:10, 252:13

**easement** [1] - 251:8

**easier** [1] - 110:22

**easily** [2] - 182:1, 232:17

**east** [11] - 19:3, 20:15, 27:6, 36:6, 64:4, 108:14, 108:21, 169:20, 199:6, 235:17, 248:3

**easy** [2] - 185:1, 193:20

**economic** [1] - 249:13

**edge** [3] - 85:20,

85:21, 188:20

**effect** [24] - 8:20, 9:1, 9:9, 9:10, 9:11, 9:14, 9:16, 9:17, 9:25, 10:4, 10:5, 10:11, 10:12, 180:22, 202:19, 226:1, 227:10, 232:13, 232:14, 232:21, 233:16, 248:17, 249:3, 249:20

**effective** [1] - 180:17

**effectively** [1] - 229:2

**effects** [4] - 8:22, 9:22, 10:3, 146:16

**efficient** [1] - 180:15

**efficiently** [2] - 141:2, 220:25

**effort** [8] - 76:19, 76:21, 79:20, 176:8, 182:12, 188:9, 237:24, 239:5

**efforts** [1] - 202:12

**egg** [2] - 109:9, 113:6

**eggs** [1] - 108:16

**eight** [1] - 176:1

**eighth** [1] - 192:23

**either** [8] - 64:7, 176:8, 185:13, 193:20, 211:20, 231:4, 232:2, 238:22

**elapsed** [1] - 184:20

**elbow** [1] - 172:1

**elect** [1] - 47:7

**elected** [1] - 178:15

**election** [1] - 47:4

**Electoral** [6] - 12:9, 46:24, 52:7, 52:11, 63:10, 70:6

**electors** [1] - 55:20

**elements** [4] - 10:8, 16:11, 18:14, 176:2

**elicit** [11] - 9:18, 11:14, 11:21, 12:15, 13:18, 13:25, 17:19, 19:22, 20:20, 238:12, 241:1

**elicited** [1] - 239:8

**eliciting** [1] - 13:11

**Ellipse** [1] - 248:3

**emboldened** [1] - 193:24

**Emergency** [4] - 114:20, 114:21, 115:4, 117:10

**emergency** [3] - 4:5, 4:15, 173:21

**Emily** [1] - 3:16

**employed** [8] - 23:10, 23:12, 23:13,

142:17, 142:18, 142:20, 164:15, 165:6

**empty** [1] - 74:19

**enclose** [1] - 34:1

**enclosed** [1] - 134:17

**enclosing** [1] - 27:23

**encounter** [1] - 178:2

**encountered** [2] - 8:16, 194:15

**encourage** [1] - 141:11

**end** [7] - 76:12, 102:4, 199:11, 217:3, 228:4, 239:7, 251:2

**End** [11] - 35:18, 44:23, 80:13, 82:19, 92:6, 111:8, 131:25, 161:18, 199:3, 210:5, 212:25

**ended** [2] - 181:23, 191:14

**ends** [1] - 190:9

**endures** [1] - 85:13

**enforce** [1] - 84:21

**Enforcement** [2] - 68:23, 166:9

**enforcement** [21] - 12:5, 15:14, 20:22, 21:17, 146:20, 161:21, 164:17, 165:1, 173:25, 174:2, 174:3, 178:17, 180:4, 181:15, 187:17, 194:5, 206:17, 207:10, 221:2, 245:10

**enforcement's** [1] - 12:2

**engage** [1] - 96:9

**engaged** [3] - 13:20, 24:21, 246:1

**engaging** [4] - 61:11, 64:6, 215:11, 217:9

**enhance** [1] - 33:22

**enhanced** [2] - 30:5, 32:8

**ensure** [10] - 24:7, 30:5, 48:15, 50:17, 61:7, 61:15, 62:1, 62:14, 68:2, 73:16

**entails** [1] - 48:9

**enter** [6] - 31:10, 31:11, 103:10, 125:7, 170:16, 170:20

**entered** [12] - 5:21, 13:25, 22:12, 74:8, 75:13, 86:11, 142:5,

164:21, 165:11, 169:9, 170:12, 250:20

**entering** [4] - 31:13, 31:25, 105:25

**entire** [12] - 27:23, 28:25, 29:1, 41:1, 48:22, 60:18, 103:5, 113:5, 130:7, 159:3, 173:20, 174:9

**entirety** [2] - 53:18, 105:6

**entitled** [3] - 12:22, 212:9, 256:11

**entrance** [2] - 83:11, 83:17

**entrapment** [1] - 12:2

**entry** [4] - 12:3, 83:7, 166:6, 166:23

**environment** [4] - 24:10, 33:24, 103:8, 137:23

**envisioning** [1] - 73:2

**episode** [1] - 192:8

**episodes** [2] - 159:22, 161:24

**equally** [1] - 112:1

**equipment** [1] - 117:21

**equipped** [1] - 117:25

**erase** [1] - 111:15

**erect** [1] - 36:16

**erected** [1] - 71:20

**escalate** [1] - 122:3

**escalated** [1] - 249:19

**escort** [2] - 48:14, 168:14

**especially** [3] - 215:10, 230:12, 247:11

**ESQ** [2] - 1:16, 1:16

**essential** [1] - 7:15

**essentially** [1] - 241:22

**establish** [1] - 44:20

**established** [6] - 34:1, 34:14, 60:15, 70:25, 73:13, 82:5

**estimate** [1] - 181:15

**estoppel** [1] - 12:2

**et** [6] - 23:19, 59:14, 66:21, 85:14, 108:17, 249:11

**ethics** [1] - 253:13

**evacuated** [3] - 41:20, 58:9, 107:5

**evaluate** [1] - 14:11

**evaluated** [1] - 210:22

**Evans** [16] - 16:22, 19:11, 19:14, 237:3,

239:11, 239:12, 239:18, 240:25, 246:6, 246:9, 250:10, 251:22, 253:13, 253:16, 253:19, 254:13

**evening** [3] - 62:14, 63:1, 220:11

**event** [32] - 19:1, 19:2, 29:20, 32:16, 32:18, 32:22, 34:15, 37:14, 60:13, 64:25, 65:14, 87:7, 92:23, 93:14, 94:14, 94:25, 95:17, 96:13, 96:23, 97:4, 98:10, 98:22, 99:6, 100:1, 100:6, 101:3, 106:8, 106:14, 107:11, 115:5, 221:13

**events** [30] - 38:7, 43:14, 48:23, 61:22, 63:23, 67:16, 67:17, 68:1, 68:2, 71:21, 94:11, 96:13, 96:18, 98:6, 98:15, 98:18, 98:25, 107:8, 107:12, 107:14, 107:25, 113:9, 115:3, 167:25, 218:16, 218:17, 218:25, 248:21, 253:2

**Events** [1] - 50:16

**eventually** [8] - 117:6, 118:24, 119:22, 164:24, 165:2, 174:14, 183:7, 184:3

**everywhere** [4] - 21:4, 71:2, 84:10, 85:4

**evidence** [62] - 4:18, 8:20, 9:18, 9:20, 9:21, 9:23, 10:20, 10:23, 11:23, 11:25, 12:4, 12:6, 12:10, 12:13, 12:22, 12:23, 13:9, 13:17, 14:10, 14:11, 18:24, 20:3, 21:10, 26:12, 35:21, 38:24, 40:21, 46:6, 50:9, 51:16, 54:4, 93:21, 93:25, 101:14, 121:19, 124:5, 125:8, 125:12, 128:14, 133:6, 147:3, 152:5, 152:22, 153:14, 155:4, 155:25, 175:1, 185:18, 202:25, 205:12,

208:15, 213:10, 213:21, 231:3, 233:24, 237:13, 237:18, 244:18, 246:24, 249:2, 249:18

**Evidence** [1] - 7:17

**exact** [3] - 107:18, 173:6, 202:7

**exactly** [6] - 87:22, 128:9, 140:2, 147:22, 238:10, 247:21

**exaggerating** [1] - 235:6

**EXAMINATION** [16] - 23:2, 64:12, 75:24, 105:22, 111:9, 114:2, 125:17, 137:6, 138:17, 142:9, 157:2, 162:24, 164:6, 200:12, 216:22, 219:5

**examination** [7] - 64:11, 73:20, 74:20, 106:8, 125:16, 160:5, 223:24

**Examination............** [4] - 2:5, 2:7, 2:10, 2:12

**Examination.............** [3] - 2:5, 2:8, 2:12

**Examination.............** . [4] - 2:4, 2:6, 2:9, 2:11

**Examination.............** .. [4] - 2:4, 2:7, 2:9, 2:11

**examine** [2] - 140:25, 221:19

**examined** [1] - 234:13

**examining** [1] - 221:1

**example** [10] - 9:20, 10:15, 11:15, 66:14, 68:20, 76:6, 87:22, 230:25, 233:15, 234:2

**except** [1] - 138:20

**exception** [2] - 7:14, 7:18

**excess** [2] - 97:10, 97:25

**excessive** [9] - 157:16, 157:21, 158:4, 158:14, 158:20, 159:2, 159:4, 159:13, 226:4

**exchange** [1] - 126:5

**exclude** [5] - 158:22,

159:18, 223:23, 224:11, 226:23

**exclusive** [1] - 67:4

**excuse** [7] - 41:24, 78:24, 109:4, 124:11, 131:10, 147:25, 251:17

**excused** [6] - 110:10, 113:15, 138:12, 139:16, 163:16, 219:19

**execute** [1] - 143:17

**exhausted** [1] - 199:13

**Exhibit** [58] - 3:23, 4:6, 4:21, 25:2, 26:12, 34:9, 35:21, 37:15, 38:24, 40:21, 44:25, 45:5, 49:5, 50:9, 50:23, 51:16, 54:4, 70:19, 73:17, 77:4, 81:11, 82:22, 85:20, 89:10, 91:7, 93:25, 101:13, 108:24, 112:9, 119:3, 120:25, 121:19, 122:17, 122:19, 124:5, 124:10, 124:11, 125:12, 129:10, 133:6, 147:4, 147:18, 151:14, 152:5, 152:8, 152:22, 153:11, 153:14, 155:4, 155:9, 155:25, 174:25, 176:12, 185:17, 213:18, 213:21, 218:19

**exhibit** [27] - 4:7, 4:11, 25:3, 25:25, 26:11, 34:16, 35:20, 41:17, 41:19, 77:15, 78:3, 82:2, 91:14, 91:17, 92:5, 92:8, 111:13, 113:21, 124:14, 125:23, 130:8, 130:23, 137:8, 147:16, 177:17, 181:12, 191:3

**EXHIBITS** [1] - 2:14

**exhibits** [24] - 3:20, 5:8, 7:3, 20:4, 20:5, 41:14, 43:13, 43:18, 46:5, 71:5, 91:25, 140:17, 226:24, 226:25, 227:5, 227:6, 227:14, 227:17, 243:7, 243:10, 243:11,

243:12, 243:13, 243:15

**Exhibits** [2] - 41:7, 46:6

**exist** [3] - 158:16, 212:2, 212:12

**existed** [2] - 18:19, 212:23

**exists** [1] - 237:16

**exit** [3] - 183:17, 183:21, 197:8

**exited** [6] - 74:1, 74:22, 139:22, 168:25, 182:8, 220:12

**exonerated** [1] - 160:1

**expect** [3] - 8:3, 33:3, 97:9

**expected** [1] - 230:2

**expedition** [1] - 240:17

**experience** [8] - 26:2, 46:9, 100:14, 103:7, 166:16, 178:17, 194:4, 208:1

**experienced** [4] - 104:13, 178:18, 180:21, 198:24

**experiences** [1] - 64:16

**expert** [4] - 230:7, 230:8, 230:21, 245:4

**expertise** [4] - 230:9, 230:10, 230:17, 245:3

**explain** [7] - 91:18, 108:5, 143:19, 157:18, 179:19, 237:25, 238:5

**explaining** [1] - 39:21

**expletives** [1] - 174:23

**explosives** [1] - 59:17

**exposure** [2] - 244:11, 244:13

**express** [1] - 108:8

**expressed** [1] - 240:11

**expressions** [1] - 7:9

**extend** [3] - 14:19, 29:10, 33:22

**extended** [1] - 26:24

**extends** [1] - 8:8

**extensively** [1] - 234:4

**extent** [7] - 17:5, 86:1, 140:16, 140:24, 248:6, 249:14, 252:5

**extra** [1] - 74:13

**extraditable** [2] - 143:17, 143:20

**extreme** [2] - 67:23,

198:23
**extremely** [3] - 22:6, 24:19, 222:18
**eye** [1] - 117:25
**eyeglasses** [1] - 190:16
**eyes** [3] - 179:1, 179:7, 179:24

**F**

**F.Supp.2d** [2] - 7:21, 8:14
**facade** [1] - 58:3
**face** [5] - 118:6, 143:23, 171:25, 194:9
**facial** [1] - 7:9
**facing** [2] - 120:9, 181:16
**fact** [21] - 30:24, 31:18, 38:10, 56:24, 67:21, 72:12, 79:10, 84:4, 88:2, 95:17, 102:9, 103:11, 103:18, 135:4, 179:2, 211:9, 235:7, 237:16, 240:2, 243:6, 250:18
**factor** [3] - 242:24, 242:25
**factors** [1] - 87:1
**facts** [10] - 8:4, 11:21, 12:15, 13:12, 13:18, 15:11, 159:16, 222:14, 242:5, 242:6
**factual** [3] - 13:15, 13:17, 224:8
**fading** [1] - 173:8
**failure** [1] - 12:2
**fair** [19] - 18:4, 20:18, 21:3, 21:10, 37:21, 38:17, 45:13, 91:16, 107:23, 110:20, 129:19, 149:4, 174:12, 210:1, 210:2, 212:16, 212:20, 212:21, 244:10
**fairly** [23] - 10:14, 26:3, 34:18, 34:23, 35:9, 40:13, 43:13, 45:24, 50:1, 51:9, 53:20, 67:21, 121:12, 123:22, 125:3, 125:4, 131:2, 151:22, 153:7, 154:21, 155:18, 185:22, 211:8
**faith** [4] - 158:25,

211:24, 221:2, 226:13
**fall** [6] - 7:14, 23:16, 23:21, 76:24, 135:8, 191:24
**falling** [1] - 191:14
**false** [1] - 236:14
**familiar** [20] - 24:16, 24:18, 24:19, 25:22, 41:25, 42:15, 42:17, 52:3, 52:10, 66:7, 80:8, 80:17, 81:7, 81:20, 92:23, 116:20, 118:3, 120:3, 230:20, 231:10
**fantastic** [1] - 185:14
**far** [14] - 53:3, 85:20, 85:21, 87:15, 90:12, 105:16, 176:13, 199:6, 212:4, 213:3, 221:1, 222:19, 230:2, 253:8
**farthest** [1] - 126:7
**fashion** [1] - 62:19
**fast** [3] - 131:17, 208:11, 208:23
**fatal** [2] - 166:13, 166:14
**FBI** [12] - 209:8, 209:9, 209:11, 209:18, 209:23, 210:8, 211:4, 211:5, 211:11, 213:7, 217:23, 219:7
**fear** [2] - 20:21, 204:9
**February** [1] - 165:11
**federal** [3] - 9:3, 13:8, 22:3
**Federal** [1] - 7:16
**feeds** [1] - 172:25
**feet** [21] - 36:22, 37:1, 39:14, 65:11, 71:17, 76:11, 76:12, 83:12, 83:16, 83:18, 83:23, 84:1, 85:14, 85:16, 85:17, 86:2, 113:3, 192:3, 215:20
**fell** [2] - 192:5, 213:6
**fellow** [7] - 80:23, 81:23, 125:21, 129:16, 138:3, 173:4, 217:11
**felt** [4] - 98:23, 199:9, 199:11, 217:12
**fence** [12] - 36:16, 71:14, 71:17, 71:19, 71:20, 71:25, 72:2, 72:8, 72:10, 72:12, 72:18, 99:16

**fences** [1] - 99:6
**fencing** [12] - 37:10, 37:11, 39:6, 39:11, 39:24, 71:8, 71:11, 76:6, 79:20, 85:5, 113:5
**few** [7] - 23:25, 65:11, 67:22, 190:9, 192:13, 205:10, 242:12
**field** [3] - 83:20, 84:3, 251:1
**Fifth** [2] - 244:16, 246:5
**fight** [1] - 193:25
**fighting** [3] - 215:21, 215:22, 215:23
**fights** [1] - 157:14
**figuratively** [1] - 185:9
**figure** [5] - 170:11, 172:22, 233:9, 236:1, 237:20
**figured** [1] - 222:6
**figuring** [1] - 233:25
**File** [1] - 248:5
**file** [17] - 14:17, 14:19, 14:25, 108:10, 124:14, 177:25, 196:2, 226:1, 226:22, 227:22, 228:5, 228:7, 229:17, 238:3, 244:2, 254:12
**filed** [6] - 11:7, 224:3, 224:19, 227:11, 228:5, 250:9
**filing** [1] - 14:25
**fill** [1] - 95:18
**film** [2] - 205:6, 215:18
**filming** [1] - 248:4
**finalize** [1] - 52:22
**finally** [2] - 114:19, 171:1
**findings** [3] - 222:21, 222:23, 223:2
**fine** [10] - 14:20, 21:20, 22:10, 111:3, 140:23, 161:14, 227:5, 227:17, 240:18, 254:6
**finished** [1] - 228:12
**fire** [1] - 173:22
**firearm** [1] - 10:15
**first** [40] - 6:11, 6:13, 6:14, 6:18, 24:2, 39:5, 41:8, 41:11, 41:17, 43:19, 44:8, 44:19, 53:7, 53:10, 54:6, 58:14, 77:17, 97:3, 103:1, 103:20,

111:20, 114:14, 130:9, 130:19, 130:21, 131:18, 147:18, 150:22, 157:7, 166:5, 167:25, 171:18, 203:22, 213:11, 218:18, 225:10, 226:14, 238:6, 251:2, 251:19
**First** [17] - 11:13, 11:16, 13:2, 13:5, 13:7, 14:3, 14:5, 15:19, 27:6, 27:7, 37:18, 39:4, 58:15, 108:8, 144:7, 144:8, 144:9
**firsthand** [1] - 248:21
**fishing** [1] - 240:17
**five** [16] - 13:7, 20:13, 52:9, 141:17, 158:4, 158:18, 159:11, 160:12, 165:9, 172:10, 180:24, 191:3, 191:8, 191:19, 191:22, 221:3
**fixed** [1] - 238:11
**fixtures** [2] - 21:2, 108:17
**flag** [7] - 156:6, 188:13, 188:19, 188:20, 205:16, 225:10, 244:11
**flagged** [1] - 20:5
**flagging** [1] - 19:12
**flags** [1] - 149:14
**flash** [1] - 242:18
**floating** [1] - 67:1
**floor** [4] - 53:15, 55:2, 55:22, 56:1
**Floor** [4] - 1:18, 53:14, 56:2, 57:7
**flurry** [1] - 173:20
**flush** [1] - 255:7
**fly** [2] - 226:12, 226:17
**flying** [1] - 230:4
**foam** [2] - 36:24, 39:25
**focus** [4] - 195:23, 215:1, 215:3, 243:12
**focusing** [2] - 169:3, 196:10
**fog** [2] - 178:23
**folder** [1] - 227:2
**folds** [2] - 135:4, 135:6
**folks** [4] - 5:9, 159:16, 182:22, 244:10
**follow** [4] - 80:15,

138:14, 223:10, 226:13
**follow-up** [2] - 80:15, 138:14
**followed** [3] - 17:4, 54:25, 150:6
**following** [4] - 58:18, 195:19, 217:9, 226:13
**foot** [5] - 24:21, 83:8, 157:9, 157:10, 176:7
**footage** [21] - 42:6, 43:9, 44:11, 45:2, 45:5, 52:4, 107:3, 121:6, 121:10, 124:22, 151:18, 151:19, 153:1, 160:4, 160:13, 211:19, 212:10, 212:20, 213:4, 247:13, 247:15
**football** [2] - 83:20, 84:3
**FOR** [6] - 1:1, 22:22, 75:19, 113:24, 142:6, 164:3
**force** [38] - 17:9, 121:25, 157:17, 157:21, 158:4, 158:14, 158:20, 159:2, 159:4, 159:13, 159:15, 160:14, 161:6, 161:25, 162:8, 166:21, 167:24, 180:16, 180:18, 183:17, 192:2, 193:22, 194:5, 204:24, 206:23, 206:25, 207:3, 210:15, 210:18, 210:19, 210:24, 221:3, 222:9, 222:17, 222:24, 226:4, 237:15
**forcing** [2] - 188:23, 188:24
**forearm** [1] - 172:1
**foregoing** [1] - 256:9
**foreground** [7] - 83:15, 83:16, 83:23, 85:10, 195:25, 196:11, 205:15
**foreign** [1] - 33:16
**forget** [1] - 81:1
**forgetting** [1] - 235:25
**form** [9] - 37:7, 48:22, 49:9, 49:11, 50:16, 176:8, 178:4, 180:10, 249:18

**formal** [4] - 203:13, 203:14, 210:14, 210:15
**formation** [11] - 175:20, 175:24, 176:5, 178:1, 178:4, 178:5, 180:11, 180:13, 183:5, 187:7, 200:7
**formations** [1] - 166:20
**former** [3] - 57:9, 88:17
**forming** [1] - 178:7
**forms** [1] - 158:13
**formulate** [1] - 103:8
**Fort** [3] - 165:2, 165:3
**forward** [13] - 3:5, 11:4, 47:5, 131:17, 184:21, 185:9, 187:9, 197:12, 204:22, 205:20, 214:11, 215:2, 215:24
**foundation** [10] - 6:21, 38:3, 43:20, 44:10, 78:20, 80:6, 82:17, 130:25, 140:22, 247:7
**foundational** [1] - 92:2
**four** [5] - 28:10, 30:4, 180:1, 220:18, 220:19
**frame** [11] - 55:25, 56:1, 90:15, 156:7, 156:8, 186:12, 187:14, 188:3, 196:11, 198:3
**framed** [1] - 159:2
**frankly** [2] - 18:25, 253:10
**freedom** [1] - 251:4
**freeze** [4] - 186:11, 188:3, 196:11, 198:3
**frequency** [1] - 80:17
**Friday** [3] - 228:21, 229:4, 255:10
**FRIEDRICH** [1] - 1:9
**frightened** [1] - 192:11
**frivolous** [1] - 225:3
**front** [34] - 7:10, 23:21, 27:12, 28:14, 28:20, 28:22, 29:10, 29:11, 29:25, 36:9, 37:19, 37:20, 37:22, 39:2, 54:24, 64:4, 64:5, 77:16, 91:18, 106:1, 119:4, 121:2,

128:15, 147:11, 149:7, 156:14, 175:6, 176:5, 180:22, 197:13, 250:21, 252:14, 252:19
**front-line** [1] - 23:21
**frustrating** [1] - 224:14
**full** [9] - 6:4, 6:10, 59:2, 145:1, 161:2, 192:1, 216:24, 226:18
**fully** [5] - 138:25, 167:10, 227:21, 228:9, 228:12
**fun** [1] - 192:19
**function** [3] - 9:3, 103:5, 104:21
**functioned** [1] - 103:15
**funny** [2] - 173:24, 236:21
**future** [2] - 74:25, 141:18

## G

**gain** [1] - 59:2
**game** [3] - 18:4, 20:18, 21:10
**gap** [1] - 185:5
**gas** [12] - 146:16, 146:18, 178:9, 178:11, 178:12, 178:23, 178:24, 179:11, 202:18, 203:14, 242:21
**gate** [1] - 83:7
**gathered** [3] - 95:14, 146:20, 197:3
**gear** [13] - 145:3, 166:22, 171:7, 171:17, 171:18, 171:22, 171:23, 172:4, 172:11, 172:12, 172:21, 191:16
**general** [13] - 23:24, 30:25, 31:9, 31:11, 61:23, 61:24, 120:21, 175:15, 175:19, 207:13, 213:16, 246:10, 247:4
**generalize** [2] - 63:22, 63:24
**generally** [14] - 15:10, 28:2, 42:15, 42:17, 46:16, 58:2, 64:23,

66:12, 117:2, 118:21, 144:8, 152:17, 182:23, 199:10
**gentleman** [3] - 126:19, 128:8, 190:1
**gentlemen** [8] - 22:13, 74:9, 74:16, 75:15, 137:5, 139:20, 168:23, 220:3
**geographically** [1] - 180:7
**George's** [12] - 140:9, 164:15, 165:12, 165:19, 166:15, 166:23, 167:4, 167:16, 169:18, 169:19, 170:13, 200:17
**Germany** [2] - 164:23, 164:24
**gesturing** [1] - 187:12
**Giglio** [8] - 158:3, 158:22, 161:15, 221:6, 221:8, 221:12, 223:14, 224:6
**given** [11] - 13:23, 24:2, 28:14, 118:15, 179:17, 180:10, 180:12, 184:19, 197:4, 210:20, 240:21
**Glover** [5] - 118:14, 118:18, 118:19, 119:12, 129:17
**gloves** [1] - 172:1
**good-faith** [2] - 158:25, 211:24
**Government** [39] - 2:15, 2:15, 2:16, 2:16, 2:17, 2:17, 2:18, 2:18, 2:19, 2:20, 2:21, 2:21, 2:22, 2:22, 25:2, 26:12, 35:21, 38:24, 40:21, 46:6, 50:9, 50:23, 51:16, 54:4, 108:23, 119:2, 120:25, 121:19, 122:16, 122:18, 124:5, 124:10, 124:11, 125:12, 147:4, 153:14, 155:4, 155:25, 213:21
**GOVERNMENT** [5] - 22:22, 75:19, 113:24, 142:6, 164:3
**government** [74] - 3:6,

4:6, 5:5, 6:16, 7:12, 8:18, 8:25, 9:10, 10:4, 10:20, 12:21, 13:9, 14:24, 18:20, 20:15, 21:20, 22:20, 24:7, 26:7, 37:25, 38:20, 40:16, 43:17, 44:12, 44:13, 46:2, 50:5, 51:13, 53:24, 78:7, 82:9, 82:12, 113:19, 113:22, 121:15, 124:1, 131:15, 140:4, 140:18, 141:23, 142:2, 151:25, 158:21, 160:14, 163:25, 164:1, 220:13, 221:12, 222:13, 223:22, 224:10, 224:18, 226:22, 227:16, 228:2, 228:3, 231:15, 232:11, 232:25, 233:10, 233:12, 233:22, 234:6, 235:21, 236:13, 237:11, 237:13, 237:25, 242:3, 244:7, 244:21, 249:13, 252:4, 255:2
**government's** [18] - 3:20, 4:13, 7:11, 8:7, 9:12, 9:15, 9:21, 13:3, 20:14, 22:15, 139:23, 158:6, 160:13, 161:7, 213:10, 221:9, 221:16, 239:12
**Government's** [23] - 34:21, 36:8, 39:18, 45:17, 49:4, 52:23, 52:24, 53:25, 101:14, 124:18, 147:18, 151:14, 152:8, 152:22, 153:11, 154:2, 154:3, 154:13, 154:25, 155:8, 155:9, 203:17, 213:18
**grab** [2] - 172:10, 194:8
**grabbed** [2] - 118:1, 194:19
**grabbing** [1] - 194:9
**graduated** [1] - 164:22
**grandstands** [5] - 29:3, 29:5, 29:15, 122:25, 123:24

**grant** [1] - 13:3
**granted** [2] - 97:16, 97:19
**graph** [1] - 101:18
**grasp** [1] - 226:18
**grass** [2] - 64:23, 84:16
**gray** [2] - 190:16
**grayish** [1] - 179:11
**Great** [6] - 94:5, 96:12, 99:21, 100:7, 111:18, 112:8
**great** [8] - 3:13, 15:20, 79:20, 228:14, 230:9, 238:18, 242:9, 247:8
**greater** [1] - 85:17
**green** [2] - 99:12, 170:15
**greens** [1] - 174:10
**grocery** [1] - 11:1
**ground** [19] - 21:8, 35:2, 57:20, 63:12, 86:14, 98:6, 99:12, 192:14, 192:19, 200:8, 209:5, 209:24, 210:10, 211:1, 211:9, 214:19, 216:6, 216:13, 217:14
**grounds** [86] - 4:11, 5:5, 11:17, 13:8, 13:13, 13:14, 13:15, 14:1, 14:12, 24:19, 24:20, 24:22, 24:24, 26:20, 28:12, 30:6, 33:9, 37:13, 39:5, 42:4, 42:21, 46:12, 46:17, 48:15, 51:24, 56:23, 58:3, 58:6, 58:14, 58:16, 59:6, 59:10, 60:6, 60:10, 61:5, 61:12, 64:19, 64:23, 65:9, 66:19, 68:16, 68:24, 69:2, 69:3, 72:13, 86:11, 88:15, 92:20, 94:10, 94:14, 94:19, 95:18, 96:14, 96:19, 98:15, 98:19, 98:20, 98:22, 98:25, 99:1, 102:12, 102:16, 102:17, 102:23, 103:5, 103:10, 103:12, 103:18, 103:24, 104:20, 105:6, 105:9, 108:6, 147:5, 173:5, 174:9, 174:14, 174:19, 175:17, 176:22,

177:23, 181:9, 182:17, 232:12, 250:19
**group** [10] - 95:13, 95:14, 96:24, 97:3, 97:9, 97:12, 97:20, 98:1, 108:10, 247:9
**Guard** [1] - 63:2
**guess** [13] - 5:25, 76:3, 83:24, 126:6, 159:12, 199:20, 231:6, 232:16, 237:20, 242:1, 246:25, 247:4, 251:12
**guidelines** [2] - 98:4, 101:7
**guilty** [1] - 240:2
**Gumiel** [1] - 124:13
**gun** [1] - 171:21
**guy** [5] - 152:19, 157:7, 160:8, 162:12, 248:1
**guys** [3] - 152:18, 180:24, 251:2

**H**

**half** [6] - 74:5, 84:3, 104:6, 130:10, 131:18, 142:25
**hall** [2] - 3:9, 16:2
**hand** [8] - 45:9, 45:19, 128:4, 194:17, 194:22, 199:19, 215:16
**handed** [3] - 128:7, 128:10, 255:2
**handle** [3] - 87:21, 88:2, 239:14
**handled** [1] - 241:10
**hands** [5] - 194:11, 194:13, 194:20, 199:20, 233:20
**hanging** [1] - 120:19
**happy** [3] - 141:5, 224:10, 224:11
**hard** [9] - 37:11, 118:6, 169:3, 218:13, 221:7, 238:13, 241:1, 247:3, 247:6
**harm** [2] - 162:17, 249:10
**harmed** [1] - 60:8
**harms** [1] - 249:13
**hat** [2] - 190:2, 203:14
**hate** [1] - 244:8
**hazards** [1] - 67:13
**head** [24] - 8:2, 9:7,

33:17, 48:17, 49:20, 50:2, 50:13, 51:6, 100:20, 101:16, 104:14, 131:23, 162:4, 162:5, 162:6, 162:9, 171:24, 192:17, 206:4, 206:20, 206:21, 217:15, 228:16
**Head** [1] - 49:9
**headquarters** [4] - 116:8, 168:3, 168:12, 170:4
**heads** [1] - 51:4
**heads-up** [1] - 51:4
**headsets** [1] - 7:8
**hear** [23] - 4:15, 4:17, 77:20, 96:18, 117:2, 135:15, 160:12, 161:10, 184:19, 203:4, 203:9, 216:2, 222:13, 242:17, 245:7, 245:11, 245:20, 246:18, 246:25, 247:3
**heard** [28] - 11:23, 15:25, 16:4, 20:4, 21:4, 56:17, 69:15, 78:9, 79:4, 80:1, 80:4, 80:11, 81:23, 82:6, 94:13, 94:16, 172:18, 207:18, 217:2, 233:9, 234:5, 234:22, 236:9, 236:22, 245:24, 248:7, 252:25
**hearing** [6] - 19:12, 98:18, 117:5, 153:19, 229:7, 241:15
**hearings** [2] - 47:23, 70:6
**hears** [1] - 98:24
**hearsay** [3] - 20:1, 232:11, 232:12
**heavy** [1] - 76:16
**height** [2] - 39:23, 72:18
**held** [4] - 16:6, 68:24, 101:4, 158:18
**helmet** [6] - 117:24, 118:4, 118:9, 145:5, 171:24, 192:16
**helmets** [3] - 117:24, 118:7, 194:8
**help** [9] - 20:15, 117:4, 218:15, 218:17, 218:25, 236:1, 237:20, 246:23, 250:8

**helped** [1] - 119:19
**helpful** [5] - 140:18, 141:1, 141:7, 243:20, 247:20
**Herculean** [1] - 239:5
**herself** [1] - 249:4
**high** [4] - 22:7, 126:18, 127:3, 215:12
**higher** [2] - 135:22, 201:10
**highest** [2] - 57:8, 166:3
**highlighted** [3] - 95:7, 96:10, 112:12
**highlighting** [1] - 7:7
**highly** [3] - 17:1, 18:12, 240:21
**Hill** [13] - 48:20, 230:4, 244:24, 245:8, 245:10, 245:22, 246:12, 246:17, 247:1, 247:8, 247:19, 247:22, 250:16
**hill** [1] - 231:4
**Hills** [1] - 1:18
**himself** [4] - 16:8, 19:22, 130:25, 187:20
**hinges** [1] - 61:2
**history** [3] - 11:10, 15:15, 227:19
**hit** [14] - 151:3, 192:2, 192:5, 193:7, 193:25, 199:16, 206:19, 207:22, 207:23, 208:3, 208:5, 208:6, 208:7, 217:15
**hits** [1] - 209:3
**hitting** [2] - 190:10, 205:11
**hodgepodge** [1] - 245:19
**hold** [4] - 16:20, 16:23, 199:18, 220:16
**holding** [1] - 215:16
**Hollywood** [1] - 16:14
**Homicide** [4] - 143:2, 143:3, 143:4, 143:6
**honed** [1] - 27:5
**honestly** [6] - 6:3, 222:6, 222:7, 225:14, 237:18, 238:23
**Honor** [109] - 3:7, 3:14, 4:7, 4:14, 6:3, 6:8, 6:13, 6:14, 6:18,

7:2, 11:5, 14:15, 15:6, 15:8, 18:23, 22:1, 22:17, 22:19, 22:20, 23:1, 25:10, 26:7, 34:22, 35:22, 37:25, 40:16, 43:24, 44:3, 53:24, 64:10, 75:4, 75:11, 77:8, 77:13, 78:10, 81:15, 82:12, 91:13, 94:18, 105:21, 109:23, 110:8, 110:11, 110:21, 110:25, 111:7, 113:20, 113:22, 121:20, 124:11, 125:7, 129:25, 130:24, 132:7, 137:2, 138:13, 142:7, 151:25, 153:10, 154:24, 155:21, 158:7, 158:13, 159:1, 160:16, 160:25, 163:24, 164:1, 164:5, 168:22, 169:12, 169:13, 183:13, 187:23, 190:21, 196:4, 196:16, 200:10, 208:16, 216:21, 219:20, 220:2, 220:9, 220:15, 222:15, 224:9, 224:21, 225:4, 225:25, 228:4, 228:19, 229:10, 229:17, 229:22, 231:17, 238:2, 238:24, 239:24, 240:23, 243:4, 249:22, 250:8, 252:6, 252:10, 254:20, 254:25, 255:12, 255:24
**Honor's** [1] - 16:14
**HONORABLE** [1] - 1:9
**hop** [1] - 171:17
**hope** [2] - 22:14, 228:13
**hopefully** [4] - 183:20, 184:17, 187:24, 220:23
**hoping** [1] - 183:17
**Hopkins** [1] - 165:6
**hospital** [1] - 157:23
**host** [1] - 245:25
**hoteling** [1] - 10:25
**hour** [6] - 74:5, 103:23, 104:2,

104:6, 104:9, 116:15
**hours** [14] - 78:2, 78:11, 78:13, 89:25, 90:19, 103:20, 103:22, 104:12, 107:17, 130:3, 239:2, 243:7, 245:21, 245:23
**House** [29] - 32:18, 33:14, 33:15, 36:15, 52:15, 52:16, 52:20, 52:21, 53:14, 55:1, 55:9, 57:7, 57:9, 57:13, 57:19, 71:14, 71:17, 71:19, 71:21, 71:25, 72:2, 72:8, 72:9, 72:13, 76:6, 87:3, 100:23
**housekeeping** [1] - 21:25
**huge** [5] - 160:7, 160:21, 236:23, 236:24, 242:25
**hundred** [2] - 24:3, 246:13
**hundreds** [13] - 17:25, 40:25, 49:21, 49:23, 174:7, 181:17, 203:5, 203:6, 203:7, 245:21, 245:22, 251:2
**hurricane** [1] - 4:16
**hypothetically** [1] - 20:7

**I**

**i.e** [1] - 9:12
**Idaho** [1] - 230:5
**idea** [9] - 71:13, 79:19, 84:19, 103:4, 105:3, 180:20, 184:18, 220:17, 238:3
**identified** [3] - 56:17, 61:16, 190:20
**identify** [3] - 47:3, 190:13, 238:18
**identifying** [1] - 91:25
**identity** [1] - 211:16
**ignore** [1] - 225:8
**ignored** [1] - 225:6
**illegal** [1] - 11:10
**illustration** [1] - 35:8
**image** [26] - 26:18, 26:22, 27:11, 27:14, 35:25, 38:13, 38:17, 39:3, 39:20, 40:12, 70:20, 82:24, 82:25, 109:12, 126:7, 126:17, 128:3,

128:6, 129:16, 172:22, 172:24, 213:15, 214:14, 214:17, 215:13
**images** [8] - 25:23, 26:3, 36:8, 36:9, 213:15, 214:6, 214:8
**imagine** [4] - 173:22, 202:24, 236:13, 236:18
**imbeds** [1] - 179:4
**immediate** [1] - 32:19
**immediately** [5] - 59:3, 59:24, 62:6, 73:14, 162:7
**immovable** [1] - 79:20
**impact** [9] - 63:15, 63:20, 118:1, 136:14, 176:7, 192:4, 238:22, 244:1, 248:10
**impacted** [1] - 9:21
**impeach** [5] - 79:17, 225:9, 236:17, 236:18, 240:13
**impeached** [1] - 236:7
**impeaching** [2] - 79:18, 79:19
**impeachment** [4] - 79:15, 209:12, 209:16, 236:25
**impending** [1] - 48:17
**important** [4] - 58:7, 211:8, 236:25
**imposed** [1] - 105:2
**impression** [9] - 172:23, 172:24, 174:24, 221:11, 224:7, 225:22, 227:14, 233:1, 233:3
**impressions** [1] - 233:16
**improper** [3] - 7:24, 209:12, 209:15
**in-defense-of-others** [1] - 11:24
**inability** [1] - 90:8
**inaccurately** [1] - 225:15
**inaction** [1] - 12:4
**inappropriate** [1] - 240:21
**inaugural** [11] - 25:17, 174:11, 174:12, 174:14, 174:15, 177:6, 177:10, 177:12, 179:10, 179:14, 189:10
**inauguration** [5] - 28:11, 28:15, 29:2,

177:14, 252:24
**incident** [15] - 82:13, 160:1, 160:2, 160:3, 161:6, 161:7, 162:2, 162:3, 163:5, 168:1, 168:15, 203:16, 209:10, 210:7, 211:19
**incidents** [3] - 159:14, 160:12, 230:15
**inclined** [1] - 220:4
**include** [12] - 24:11, 25:18, 27:2, 29:3, 42:23, 42:25, 60:17, 63:3, 87:2, 92:19, 124:23, 167:13
**included** [1] - 43:1
**includes** [2] - 24:13, 24:23
**including** [3] - 12:11, 27:1, 190:13
**inclusive** [1] - 63:17
**inconsistent** [3] - 209:17, 209:20, 209:25
**inconsistently** [1] - 79:17
**incriminating** [1] - 244:18
**Independence** [8] - 27:7, 146:6, 146:8, 146:13, 147:6, 147:9, 173:13
**independently** [1] - 17:10
**indicate** [8] - 28:21, 29:5, 76:14, 108:25, 109:13, 119:24, 120:10, 148:2
**indicated** [11] - 40:12, 76:4, 82:7, 82:8, 86:20, 89:14, 147:14, 147:20, 207:15, 207:22, 208:25
**indicates** [3] - 73:3, 96:11, 96:20
**indicating** [1] - 86:15
**indicating)** [1] - 148:4
**indication** [2] - 84:24, 162:16
**indications** [2] - 81:7, 123:15
**indicators** [1] - 31:24
**indictment** [2] - 13:6, 13:24
**individual** [22] - 31:25, 39:22, 65:8, 71:6, 73:15, 84:21, 105:14, 105:17,

122:25, 123:7, 123:19, 123:23, 125:5, 128:11, 156:17, 156:23, 190:4, 190:5, 190:11, 191:22, 193:5, 216:16
**individuals** [27] - 31:14, 40:9, 86:4, 127:21, 174:4, 174:6, 174:8, 178:3, 180:3, 180:22, 181:16, 181:24, 182:8, 182:10, 182:12, 183:6, 184:16, 185:3, 185:4, 186:24, 187:14, 187:17, 188:9, 188:12, 189:19, 197:4, 197:11
**indulgence** [3] - 136:25, 199:23, 217:20
**inference** [2] - 212:20, 212:21
**inflammatory** [1] - 5:14
**inform** [1] - 87:22
**information** [20] - 5:5, 5:9, 5:24, 18:8, 48:13, 48:21, 49:12, 82:13, 95:14, 95:18, 96:7, 108:19, 159:7, 159:18, 202:25, 225:16, 225:21, 226:7, 226:18, 247:4
**informed** [6] - 66:2, 66:17, 88:8, 88:12, 88:13, 236:16
**initial** [8] - 41:18, 58:13, 58:18, 61:5, 177:4, 223:7, 252:1, 252:8
**initiated** [1] - 210:19
**initiates** [1] - 215:3
**injure** [2] - 161:13, 162:17
**injured** [2] - 161:12, 162:14
**injuring** [2] - 157:19, 157:20
**injury** [2] - 159:13, 217:17
**inner** [1] - 42:4
**innocence** [1] - 253:10
**innocent** [2] - 100:1, 253:11
**innocuous** [1] -

237:12
**inquiry** [1] - 253:14
**inside** [17] - 24:23, 32:20, 32:23, 59:22, 61:21, 68:13, 70:11, 89:18, 100:19, 100:24, 101:2, 135:7, 135:8, 136:10, 168:12, 195:3, 202:12
**insofar** [10] - 19:4, 91:22, 107:12, 131:5, 141:4, 251:13, 251:17, 251:18, 251:25, 252:12
**inspector** [1] - 23:22
**install** [1] - 33:25
**installing** [1] - 36:17
**instance** [6] - 33:22, 48:12, 59:11, 68:3, 70:9, 232:13
**instances** [4] - 42:16, 71:7, 71:9, 222:24
**instructed** [2] - 15:20, 16:3
**instruction** [2] - 11:25, 226:1
**instructions** [6] - 9:5, 118:15, 176:25, 177:2, 177:3, 217:10
**insufficient** [1] - 14:10
**intact** [2] - 138:20, 138:25
**intend** [5] - 95:15, 95:22, 96:3, 221:19, 231:18
**intended** [1] - 249:9
**intent** [5] - 13:10, 17:5, 17:8, 17:16, 19:20
**intentful** [1] - 77:1
**intention** [4] - 60:11, 100:1, 189:1, 242:10
**intentional** [4] - 79:12, 79:14, 79:23, 225:18
**intentionally** [2] - 181:1, 235:3
**intentions** [2] - 100:12, 108:11
**interacted** [3] - 241:21, 246:8, 246:11
**interacting** [1] - 184:11
**interaction** [17] - 105:16, 120:22, 121:24, 122:24, 123:23, 125:3, 125:4, 126:14,

127:5, 128:8, 137:16, 138:8, 184:15, 191:21, 193:4, 195:20, 252:1
**interactions** [5] - 42:6, 120:14, 149:16, 217:5, 222:18
**interested** [1] - 86:16
**interior** [2] - 44:11, 44:17
**interlocking** [1] - 73:3
**interludes** [1] - 95:3
**Internal** [1] - 223:18
**interpretation** [2] - 159:5, 244:20
**interpreting** [1] - 221:18
**interrelated** [1] - 5:1
**interrupt** [4] - 73:19, 74:2, 168:19, 168:20
**intersections** [1] - 168:15
**interview** [1] - 217:23
**intimidation** [1] - 244:7
**introduce** [4] - 9:22, 12:4, 13:9, 243:11
**introduced** [2] - 77:15, 236:11
**introducing** [7] - 4:6, 4:9, 4:12, 4:18, 6:16, 18:20, 18:24
**introduction** [1] - 133:1
**investigate** [1] - 166:13
**investigating** [3] - 5:13, 143:11, 223:20
**investigation** [2] - 223:8, 223:17
**investigator** [3] - 200:25, 201:2, 201:6
**invited** [1] - 29:20
**inviting** [1] - 136:9
**invoking** [3] - 244:16, 248:25
**involve** [1] - 88:9
**involved** [3] - 34:5, 144:6, 181:2
**involves** [2] - 18:16, 130:12
**ironic** [1] - 79:6
**irrelevant** [6] - 11:3, 12:11, 12:24, 54:2, 198:18, 198:21
**irritant** [1] - 178:14
**irritants** [2] - 178:18, 179:6
**irritates** [1] - 179:4
**issuance** [1] - 4:22

**issue** [31] - 7:11, 9:4, 10:11, 13:2, 19:12, 19:19, 21:23, 21:25, 22:1, 74:10, 111:5, 140:21, 222:9, 226:21, 228:2, 228:6, 228:9, 228:11, 233:2, 233:14, 238:21, 243:16, 243:23, 247:24, 250:6, 253:13, 253:14, 254:3, 254:13
**issued** [6] - 18:25, 19:2, 21:18, 93:19, 94:8, 94:10
**issues** [19] - 7:4, 7:7, 11:20, 13:12, 14:7, 14:18, 15:2, 15:3, 17:24, 52:20, 178:25, 227:24, 228:17, 229:8, 229:13, 246:5, 254:1, 255:5
**it'll** [1] - 150:18
**items** [4] - 32:7, 60:8, 85:6, 86:10
**itself** [23] - 13:22, 24:16, 27:9, 27:10, 29:11, 31:8, 32:13, 32:23, 59:8, 60:16, 61:1, 63:19, 83:18, 99:20, 146:10, 160:8, 167:13, 178:7, 179:4, 181:9, 194:18, 195:16, 222:8

## J

**J6** [1] - 232:11
**jacket** [6] - 152:20, 190:2, 190:16, 190:24, 196:17, 198:6
**January** [103] - 5:2, 5:3, 8:23, 9:17, 9:21, 9:25, 12:23, 13:16, 13:19, 14:13, 25:18, 26:5, 28:3, 28:5, 28:10, 29:24, 30:19, 30:23, 32:10, 32:16, 33:7, 34:3, 34:19, 35:11, 36:11, 37:22, 38:7, 38:9, 38:11, 40:24, 42:13, 43:6, 43:12, 43:15, 45:14, 46:9, 46:15, 46:20, 47:9, 48:1, 50:3, 51:11, 51:19, 53:22,

57:14, 58:24, 61:22, 63:11, 63:23, 65:19, 66:16, 68:15, 70:4, 89:15, 91:5, 92:12, 92:15, 92:24, 93:16, 94:8, 94:11, 100:15, 100:18, 101:3, 102:10, 105:17, 106:14, 106:19, 106:20, 113:11, 114:23, 117:5, 121:13, 143:12, 143:25, 150:9, 151:18, 151:23, 153:1, 153:8, 154:22, 155:19, 161:2, 163:2, 167:15, 167:20, 167:21, 168:2, 170:2, 170:3, 182:24, 185:23, 200:1, 201:16, 213:15, 219:1, 219:7, 219:10, 231:21, 232:18, 242:10, 248:20, 249:21
**jargon** [1] - 116:18
**jaw** [1] - 118:5
**Jersey** [1] - 62:25
**JESSICA** [3] - 2:4, 22:22, 75:19
**Jessica** [2] - 22:20, 23:7
**job** [7] - 61:17, 61:25, 62:19, 70:1, 70:4, 80:18, 210:17
**jobs** [1] - 144:11
**jogger** [1] - 237:8
**joggers** [19] - 79:7, 79:10, 81:7, 81:18, 81:20, 81:22, 106:17, 106:19, 106:25, 231:2, 232:18, 235:9, 235:10, 235:13, 237:1, 237:3, 237:4, 238:8
**JOHN** [1] - 1:16
**John** [3] - 1:17, 3:14, 125:21
**Johns** [2] - 165:6, 248:9
**joined** [2] - 114:14, 167:3
**joining** [2] - 143:6, 185:3
**joint** [10] - 32:25, 34:2, 34:6, 47:2, 52:10, 52:16, 55:6, 55:8,

62:3, 69:24
**Joint** [2] - 33:13, 46:23
**joking** [1] - 170:18
**Joseph** [2] - 3:15, 125:20
**JOSEPH** [1] - 1:6
**journalist** [2] - 248:4, 248:6
**journey** [2] - 176:21
**judge** [7] - 7:18, 11:24, 239:14, 240:14, 240:20, 240:22
**Judge** [1] - 8:16
**JUDGE** [1] - 1:10
**judgment** [1] - 202:23
**July** [1] - 164:21
**jump** [5] - 71:25, 72:5, 72:6, 72:12, 122:17
**jumping** [1] - 73:6
**jurisdiction** [5] - 143:21, 143:22, 143:24, 166:14, 167:12
**jurisdictions** [1] - 143:18
**juror** [6] - 74:3, 74:17, 74:25, 75:10, 75:11, 169:2
**jurors** [3] - 25:5, 26:21, 35:23
**Jurors** [1] - 23:5
**JURY** [1] - 1:9
**Jury** [12] - 22:12, 74:1, 74:8, 74:22, 75:9, 75:13, 139:22, 141:15, 142:5, 168:25, 169:9, 220:12
**jury** [86] - 3:2, 3:19, 7:10, 9:5, 10:8, 11:4, 11:11, 12:7, 12:15, 17:2, 17:8, 18:13, 21:22, 26:14, 26:16, 38:25, 50:11, 52:13, 73:24, 74:12, 77:20, 78:25, 89:11, 91:18, 91:19, 92:1, 94:2, 101:14, 101:15, 108:5, 109:4, 114:5, 118:3, 120:5, 130:23, 131:10, 131:19, 132:5, 133:8, 141:24, 142:13, 142:15, 143:19, 148:5, 150:15, 161:4, 164:10, 164:19, 166:1, 166:11,

167:5, 167:18, 170:1, 171:11, 171:18, 172:8, 175:15, 177:9, 178:21, 180:8, 181:22, 183:2, 184:14, 185:7, 186:14, 187:4, 188:4, 190:13, 190:18, 191:8, 193:14, 196:13, 196:22, 197:1, 198:15, 213:22, 221:21, 224:7, 225:22, 226:14, 229:6, 233:1, 236:21, 250:6, 253:19

## K

**K-9** [1] - 173:22
**keep** [15] - 11:11, 59:12, 60:13, 111:16, 133:18, 134:1, 134:14, 150:20, 179:15, 193:8, 194:21, 214:23, 216:9, 218:13, 236:14
**keeps** [2] - 91:14, 236:14
**KENNETH** [1] - 1:6
**Kenneth** [2] - 3:4, 3:15
**kept** [1] - 193:5
**Khatallah** [2] - 8:17
**Kia** [1] - 173:24
**kicked** [1] - 61:3
**kind** [18] - 18:8, 27:23, 37:10, 53:5, 93:18, 147:23, 148:9, 149:11, 149:13, 175:23, 178:24, 179:11, 179:13, 225:22, 240:4, 246:16, 250:22
**kinds** [3] - 64:16, 245:7, 253:1
**knee** [1] - 172:3
**knees** [2] - 172:2, 215:21
**knife** [6] - 123:7, 123:14, 128:3, 128:7, 128:10, 129:9
**knocked** [7] - 186:20, 193:23, 199:10, 200:6, 200:7, 209:5, 219:12
**knocks** [2] - 190:10, 217:14

**knowing** [2] - 79:1, 96:17
**knowledge** [24] - 6:22, 15:14, 19:16, 20:9, 38:7, 46:25, 55:19, 62:12, 63:23, 89:4, 91:22, 106:18, 151:8, 151:11, 157:22, 216:5, 231:8, 245:23, 247:8, 248:21, 251:17, 251:18, 251:25, 252:7
**knowledgeable** [1] - 230:21
**known** [1] - 95:13
**knows** [3] - 78:22, 234:24, 249:5
**Korea** [2] - 165:3

## L

**lack** [4] - 43:19, 126:6, 226:15, 241:23
**ladies** [8] - 22:13, 74:9, 74:16, 75:14, 137:5, 139:20, 168:23, 220:3
**lady** [1] - 162:3
**laid** [3] - 78:20, 82:16, 109:10
**Lambert** [13] - 3:16, 7:14, 7:22, 93:10, 221:5, 222:25, 226:3, 230:6, 230:22, 230:24, 231:5, 231:7, 247:17
**landing** [3] - 148:8, 148:11, 149:3
**landscape** [1] - 109:11
**landscaping** [1] - 108:17
**language** [3] - 9:8, 10:17, 97:6
**large** [6] - 28:13, 99:12, 122:13, 144:16, 237:5, 247:11
**large-scale** [1] - 144:16
**largely** [1] - 160:8
**larger** [3] - 98:11, 146:20, 192:23
**last** [22] - 23:8, 23:9, 23:25, 31:8, 40:5, 102:22, 103:4, 105:5, 105:12, 112:14, 113:20, 114:7, 139:5,

164:20, 169:23, 191:8, 195:13, 196:23, 197:2, 199:25, 219:11, 244:6
**late** [3] - 220:4, 251:15, 252:13
**latest** [1] - 228:15
**laughing** [1] - 170:18
**law** [29] - 12:2, 12:5, 12:7, 12:17, 15:14, 17:4, 17:5, 20:21, 20:22, 21:17, 146:19, 161:21, 164:17, 165:1, 173:25, 174:2, 174:3, 178:17, 180:4, 181:15, 187:17, 194:5, 206:17, 207:10, 221:1, 243:25, 244:20, 245:10, 251:7
**Law** [2] - 1:17, 68:23
**lawful** [2] - 12:4, 205:1
**lawmakers** [4] - 24:11, 24:13, 61:21, 62:12
**lawn** [1] - 147:10
**lawyers** [1] - 224:4
**lay** [1] - 80:6
**layer** [4] - 31:5, 39:12, 40:3, 40:4
**layered** [4] - 37:14, 60:11, 61:9, 71:8
**layers** [3] - 31:4, 59:10, 59:12
**laying** [2] - 140:22, 200:8
**lays** [1] - 6:20
**lead** [2] - 99:1, 148:8
**leader** [1] - 96:7
**leading** [4] - 28:15, 60:2, 62:9, 185:10
**leads** [1] - 182:7
**Leano** [1] - 220:14
**leapfrog** [1] - 168:16
**learn** [3] - 118:24, 166:20, 223:16
**least** [13] - 8:9, 31:8, 34:5, 72:4, 73:22, 96:19, 130:25, 150:1, 158:24, 159:23, 226:4, 237:16
**leave** [11] - 46:14, 97:24, 116:16, 180:3, 180:20, 181:3, 181:5, 184:18, 185:14, 197:5, 225:22

**leaves** [2] - 224:7, 232:25
**leaving** [3] - 185:3, 233:3, 246:9
**lectern** [1] - 226:9
**led** [2] - 54:24, 123:16
**left** [37] - 45:19, 46:15, 61:8, 62:18, 73:16, 129:17, 165:4, 176:13, 177:22, 180:13, 181:8, 181:12, 183:5, 186:25, 188:16, 189:7, 189:13, 189:14, 189:18, 190:2, 190:23, 192:21, 192:23, 195:6, 195:16, 196:10, 196:17, 198:7, 199:16, 204:25, 214:18, 215:2, 215:10, 215:19, 224:10
**left-hand** [1] - 45:19
**leg** [1] - 192:17
**legal** [13] - 7:19, 7:23, 11:14, 11:19, 11:20, 14:3, 14:12, 15:4, 15:12, 16:9, 17:6, 20:19, 233:13
**legislative** [2] - 24:7, 101:8
**legitimate** [2] - 17:17, 248:4
**length** [3] - 45:10, 83:20, 140:14
**lengthy** [2] - 78:22, 220:22
**leniency** [1] - 255:23
**less** [6] - 11:2, 86:2, 108:18, 136:13, 136:15, 180:18
**less-lethal** [1] - 136:15
**less-than-lethal** [1] - 136:13
**lethal** [2] - 136:13, 136:15
**lettering** [1] - 84:13
**letting** [2] - 66:5, 254:24
**level** [9] - 52:1, 65:2, 67:25, 69:6, 71:6, 116:23, 135:13, 135:20, 135:23
**Liaison** [1] - 49:11
**liaisons** [2] - 48:18, 49:10
**liar** [2] - 79:19, 234:16
**Library** [4] - 92:19,

116:3, 116:9, 117:14
**lie** [1] - 240:19
**lied** [1] - 240:5
**lieutenant** [2] - 23:20, 170:13
**lift** [2] - 76:21, 191:17
**light** [1] - 223:21
**lights** [1] - 171:14
**likely** [5] - 67:12, 72:17, 72:19, 135:8, 180:18
**limine** [3] - 11:9, 227:18, 227:19
**limit** [2] - 229:24, 231:18
**limited** [3] - 32:17, 32:24, 111:2
**line** [53] - 16:20, 16:23, 18:5, 23:21, 31:3, 34:17, 35:5, 35:8, 35:14, 37:10, 70:22, 70:23, 71:3, 101:18, 126:18, 135:12, 135:19, 148:10, 149:6, 149:23, 150:4, 150:7, 152:13, 163:7, 175:24, 176:6, 176:8, 176:13, 178:5, 180:10, 180:13, 181:12, 181:13, 181:23, 182:16, 182:20, 182:21, 182:22, 182:25, 187:7, 187:8, 188:18, 189:17, 198:12, 200:7, 204:7, 208:11, 239:7, 240:16, 240:24, 251:25
**lined** [3] - 39:24, 40:5, 187:10
**lines** [1] - 29:7
**link** [4] - 76:12, 76:15, 76:16, 242:13
**list** [9] - 4:7, 124:14, 227:4, 229:11, 229:18, 243:8, 243:9, 243:13, 243:15
**listened** [1] - 237:22
**listener** [5] - 232:13, 232:14, 233:18, 233:19, 248:17
**listeners** [1] - 89:1
**listening** [8] - 56:23, 77:24, 78:6, 78:21, 80:23, 81:3, 82:10, 231:13

**literally** [3] - 197:14, 221:5, 225:16
**live** [1] - 171:10
**loaded** [1] - 171:22
**lob** [1] - 225:21
**located** [4] - 46:16, 115:13, 145:15, 177:10
**location** [15] - 90:14, 97:15, 116:14, 121:13, 139:8, 145:12, 147:20, 148:12, 175:19, 176:9, 181:25, 182:6, 189:3, 189:4, 194:15
**locations** [8] - 31:1, 42:15, 42:17, 62:1, 64:7, 86:14, 247:9, 247:10
**locking** [1] - 180:14
**longest** [2] - 201:7, 220:20
**longest-serving** [1] - 201:7
**longevity** [1] - 166:4
**look** [48] - 6:9, 10:19, 11:4, 28:18, 29:18, 84:21, 85:3, 93:6, 94:2, 95:24, 118:8, 126:14, 126:17, 129:13, 133:24, 135:25, 136:10, 158:17, 162:11, 166:1, 170:20, 171:23, 174:6, 179:9, 180:17, 180:18, 188:6, 191:22, 194:22, 206:3, 207:3, 214:17, 215:12, 215:16, 215:18, 215:19, 216:12, 226:15, 229:19, 239:6, 241:13, 243:17, 250:9, 250:12, 250:13
**looked** [13] - 25:17, 50:2, 65:24, 120:22, 128:3, 129:2, 136:12, 161:13, 162:16, 164:20, 194:17, 239:18, 247:15
**looking** [31] - 5:2, 10:16, 26:19, 26:23, 27:12, 39:9, 55:25, 95:6, 101:20, 122:18, 158:13, 169:3, 170:23,

177:23, 180:23, 184:25, 189:12, 191:12, 191:15, 203:23, 207:12, 214:7, 216:12, 221:10, 222:25, 223:1, 224:24, 243:22
**looks** [12] - 28:14, 37:5, 37:10, 78:2, 123:20, 148:6, 170:22, 175:12, 178:22, 183:24, 214:18
**looted** [1] - 249:9
**looting** [1] - 249:10
**lose** [3] - 157:14, 191:23, 201:2
**lost** [1] - 173:2
**loud** [3] - 103:11, 103:17, 247:4
**loudspeakers** [2] - 181:5, 187:15
**low** [1] - 74:18
**lower** [3] - 45:9, 135:22, 148:10
**LRAD** [1] - 246:15
**lunch** [2] - 74:11, 74:17

## M

**ma'am** [4] - 75:22, 94:4, 114:1, 139:19
**machine** [1] - 32:6
**magnetometer** [1] - 32:3
**magnetometers** [4] - 68:11, 68:16, 69:4, 69:6
**mail** [4] - 50:22, 51:4, 51:9, 244:7
**mails** [1] - 5:9
**main** [1] - 241:25
**maintain** [4] - 43:4, 58:6, 60:14, 62:17
**maintained** [1] - 43:7
**major** [2] - 115:3, 170:14
**majority** [2] - 46:18, 235:16
**male** [1] - 120:23
**Mall** [2] - 26:25, 29:18
**man** [5] - 22:6, 126:5, 126:14, 196:16, 198:6
**management** [1] - 117:10
**mandated** [3] - 33:2, 47:18, 47:22

**mandible** [2] - 117:25, 118:4
**maneuver** [3] - 166:20, 171:15, 182:1
**manner** [2] - 117:11, 180:15
**manual** [8] - 15:19, 15:24, 16:2, 16:10, 16:25, 17:10
**manuals** [3] - 16:6, 16:8, 18:10
**map** [7] - 36:3, 87:11, 87:25, 111:11, 111:20, 147:4, 182:25
**map-like** [1] - 111:11
**March** [1] - 32:14
**marginally** [1] - 18:12
**mark** [19] - 81:11, 81:12, 110:3, 137:9, 138:8, 139:7, 147:15, 175:13, 175:15, 176:17, 176:21, 181:6, 181:7, 181:22, 184:11, 186:24, 188:5
**marked** [10] - 34:16, 36:19, 122:18, 124:17, 147:18, 151:13, 152:21, 176:12, 176:20, 181:25
**marking** [3] - 27:19, 124:13, 184:6
**Martin** [2] - 16:15, 17:20
**Maryland** [6] - 166:24, 168:3, 169:20, 169:21, 170:8, 200:18
**mask** [5] - 171:25, 178:10, 178:11, 178:12, 203:14
**masks** [4] - 145:5, 178:16, 194:9
**masquerading** [1] - 251:12
**mass** [6] - 144:10, 144:12, 144:14, 145:12
**masses** [1] - 197:16
**match** [1] - 197:14
**materials** [1] - 221:6
**math** [1] - 165:13
**matter** [10] - 3:3, 11:19, 12:7, 13:15, 30:24, 142:1, 179:1, 233:25, 234:7,

256:11
**mattered** [1] - 242:14
**matters** [4] - 17:8, 52:21, 223:11, 223:13
**mayor** [5] - 248:8, 248:23, 248:25, 249:4, 250:4
**mayor's** [11] - 4:23, 5:11, 8:22, 16:1, 17:12, 243:22, 248:15, 248:20, 249:5, 249:12, 249:17
**McCauley** [11] - 3:8, 22:16, 25:4, 43:23, 110:20, 130:2, 130:20, 158:12, 158:21, 159:24, 254:19
**MCCAULEY** [173] - 1:13, 18:23, 19:10, 19:14, 19:23, 21:20, 22:17, 22:19, 23:1, 23:3, 25:7, 25:10, 25:11, 26:7, 26:15, 26:17, 34:21, 35:22, 35:24, 37:25, 38:6, 38:20, 38:25, 39:1, 40:16, 40:22, 41:6, 41:11, 41:13, 43:17, 43:24, 44:3, 44:24, 45:1, 46:2, 46:7, 50:5, 50:10, 50:12, 51:13, 51:17, 53:6, 53:9, 53:24, 54:5, 54:9, 54:18, 54:21, 55:13, 55:15, 56:8, 56:15, 57:1, 57:4, 57:10, 57:12, 57:22, 62:11, 64:10, 65:3, 72:14, 75:18, 77:8, 78:10, 78:19, 81:15, 82:12, 88:21, 89:7, 90:5, 91:10, 91:13, 91:22, 92:2, 93:23, 94:18, 94:20, 98:12, 99:2, 99:22, 100:3, 100:9, 103:13, 104:23, 105:21, 105:23, 109:3, 109:23, 109:24, 110:8, 110:11, 110:21, 110:25, 111:2, 111:7, 113:22, 114:3, 121:15, 121:20, 121:23, 124:1, 124:6, 124:9, 124:16, 125:7,

125:13, 125:15, 125:25, 126:21, 127:18, 129:25, 130:3, 130:15, 130:24, 131:4, 132:14, 133:4, 135:10, 137:2, 137:7, 137:11, 137:12, 138:11, 138:13, 139:14, 139:25, 140:5, 140:8, 140:13, 141:3, 141:25, 142:2, 142:7, 142:10, 151:25, 152:7, 153:10, 153:15, 153:17, 153:23, 154:1, 154:24, 155:5, 155:7, 155:21, 156:1, 156:4, 156:13, 156:25, 157:24, 158:7, 158:13, 159:1, 159:10, 159:25, 160:16, 160:25, 162:23, 162:25, 163:15, 163:21, 163:24, 222:15, 222:23, 223:5, 223:13, 223:16, 224:9, 224:21, 251:11, 251:23, 252:4, 252:12
**Meade** [3] - 165:2, 165:3
**mean** [19] - 18:8, 36:12, 55:8, 65:19, 70:9, 95:12, 101:24, 128:14, 144:15, 150:7, 162:18, 169:6, 179:19, 185:8, 203:9, 225:4, 230:10, 231:22, 233:20
**meaning** [4] - 32:18, 173:3, 180:4, 201:20
**means** [10] - 24:2, 33:13, 36:13, 36:16, 44:2, 50:20, 55:9, 95:13, 143:19, 158:15
**Means** [2] - 194:24, 195:1
**meant** [1] - 112:2
**measures** [3] - 33:8, 33:11, 33:22
**meet** [1] - 55:2
**meeting** [1] - 53:15
**meetings** [1] - 81:4

**melee** [1] - 186:20
**member** [4] - 31:11, 31:13, 144:6, 168:13
**members** [18] - 18:7, 32:19, 48:19, 50:19, 51:25, 58:8, 60:17, 61:19, 61:21, 62:3, 69:15, 118:3, 120:5, 142:13, 148:5, 150:15, 164:10, 167:8
**Memorial** [1] - 68:24
**memories** [2] - 184:10, 194:12
**memory** [8] - 184:15, 187:4, 191:7, 193:4, 193:12, 193:16, 196:23, 197:2
**mental** [2] - 21:15, 165:13
**mention** [8] - 209:23, 210:2, 210:10, 211:4, 211:11, 211:12, 211:13, 244:6
**mentioned** [6] - 59:9, 62:21, 85:12, 129:1, 202:18, 210:12
**mentions** [1] - 158:14
**mere** [1] - 59:17
**merely** [1] - 13:22
**mesh** [2] - 37:10, 120:18
**messages** [1] - 3:21
**met** [3] - 118:14, 119:12, 168:2
**metal** [3] - 68:11, 68:14, 76:16
**Metro** [4] - 15:18, 15:19, 15:23, 15:24
**Metropolitan** [6] - 62:24, 114:10, 114:11, 115:3, 142:18, 188:24
**middle** [12] - 23:23, 56:9, 168:21, 176:12, 177:16, 188:15, 192:23, 195:6, 195:25, 196:17, 197:18, 198:6
**might** [17] - 6:6, 73:23, 82:15, 84:24, 92:2, 99:9, 106:18, 150:15, 161:12, 168:19, 183:25, 226:11, 235:15, 239:15, 250:12, 250:14
**Mike** [1] - 50:3

**military** [2] - 164:22, 165:1
**MILLER** [152] - 1:13, 3:7, 3:11, 3:24, 4:7, 4:9, 4:14, 4:23, 5:1, 5:7, 5:23, 6:8, 6:13, 6:18, 6:22, 6:24, 7:2, 11:5, 14:15, 15:6, 19:25, 20:6, 20:9, 21:19, 77:13, 78:2, 113:20, 124:13, 131:17, 131:23, 164:1, 164:7, 168:22, 169:5, 169:13, 169:15, 176:11, 176:15, 176:16, 177:15, 177:19, 177:20, 183:13, 183:14, 184:4, 184:8, 184:9, 185:16, 186:10, 187:19, 187:23, 188:2, 188:14, 188:20, 188:22, 189:21, 189:25, 190:21, 191:1, 191:6, 192:20, 193:1, 193:2, 193:11, 195:4, 195:8, 195:11, 196:2, 196:9, 196:15, 196:20, 196:21, 197:17, 197:21, 198:1, 198:5, 198:9, 198:10, 198:21, 198:25, 199:2, 199:4, 199:23, 199:24, 200:10, 201:21, 202:2, 205:4, 205:12, 207:5, 208:15, 209:12, 209:19, 209:25, 211:21, 212:4, 212:6, 212:11, 212:17, 212:24, 213:19, 216:21, 216:23, 217:1, 217:20, 217:21, 219:3, 219:20, 220:15, 220:21, 225:4, 225:25, 228:4, 228:19, 228:24, 229:3, 229:10, 229:16, 231:17, 232:3, 232:6, 232:9, 233:2, 233:13, 233:18, 234:1, 234:9, 234:11, 235:20, 235:24,

236:7, 236:10, 237:6, 238:2, 238:10, 238:24, 239:3, 239:23, 240:1, 240:8, 240:23, 243:4, 244:15, 244:22, 245:13, 249:22, 250:3, 250:8, 250:14, 252:9, 254:6, 254:20
**Miller** [8] - 3:8, 22:16, 169:1, 198:20, 209:18, 212:3, 245:14, 254:19
**mind** [4] - 18:9, 110:14, 233:1, 236:4
**mine** [1] - 154:7
**Minebea** [2] - 7:20, 8:11
**minimum** [3] - 82:14, 224:17, 254:12
**minor** [1] - 238:21
**minute** [6] - 21:1, 81:11, 81:12, 82:3, 131:12, 163:21
**minutes** [33] - 45:12, 54:6, 54:10, 54:22, 73:22, 78:16, 130:4, 130:6, 130:10, 130:18, 130:19, 130:21, 131:18, 133:9, 150:20, 150:22, 150:23, 172:10, 189:6, 193:9, 195:9, 195:21, 195:22, 196:6, 197:24, 199:8, 199:15, 199:22, 220:23, 241:19
**missing** [7] - 63:7, 123:3, 123:12, 123:22, 129:1, 160:24, 213:7
**mission** [16] - 24:5, 24:6, 33:23, 58:7, 59:19, 61:19, 63:13, 63:15, 67:15, 96:12, 105:10, 182:4, 183:16, 185:8, 198:11
**misstates** [3] - 205:12, 208:15, 235:1
**mistaken** [1] - 147:24
**misunderstanding** [2] - 222:3, 225:19
**mob** [1] - 106:25
**mode** [2] - 151:1, 153:20

**models** [1] - 25:19
**moment** [17] - 3:9, 25:4, 56:4, 90:8, 158:7, 172:20, 177:25, 178:3, 180:9, 180:10, 181:1, 182:3, 188:6, 204:1, 204:24, 208:24, 251:8
**moments** [1] - 190:9
**Monday** [1] - 68:23
**money** [3] - 11:2, 201:3
**Montana** [1] - 22:3
**month** [1] - 49:22
**months** [2] - 28:15, 165:9
**Monument** [2] - 27:1, 27:2
**monuments** [1] - 28:1
**morning** [35] - 3:7, 3:10, 3:14, 3:18, 22:13, 22:23, 22:24, 23:4, 23:5, 38:11, 40:10, 46:13, 81:4, 81:5, 81:21, 87:6, 115:8, 116:7, 144:19, 144:23, 145:8, 145:9, 157:5, 220:6, 228:21, 229:4, 229:12, 232:18, 238:7, 238:14, 250:15, 251:15, 252:13, 254:10
**Moseley** [13] - 227:12, 244:6, 244:8, 244:19, 247:22, 247:24, 248:1, 248:17, 248:18, 249:14, 250:10, 250:11, 250:16
**most** [14] - 50:19, 58:7, 63:25, 66:7, 71:10, 83:7, 130:13, 183:4, 184:5, 184:6, 184:23, 189:18, 242:10, 244:20
**mostly** [2] - 17:14, 248:3
**motion** [7] - 13:3, 159:17, 180:12, 186:22, 208:20, 227:18, 227:19
**motion's** [1] - 227:21
**motions** [2] - 11:9, 14:9
**motorcycle** [1] - 118:9
**Mount** [2] - 145:15, 145:16

**movable** [1] - 76:9
**move** [56] - 23:18, 25:3, 26:7, 34:21, 37:25, 38:20, 40:17, 43:17, 46:2, 47:5, 47:15, 49:5, 50:5, 51:13, 53:24, 73:7, 73:9, 73:13, 81:18, 87:8, 87:12, 121:15, 124:1, 125:7, 129:23, 130:9, 131:6, 133:1, 141:2, 151:25, 153:10, 154:24, 155:21, 158:22, 159:19, 176:9, 181:5, 182:17, 184:21, 185:9, 186:22, 187:12, 187:13, 187:16, 197:6, 197:7, 199:2, 199:6, 213:18, 222:6, 222:11, 223:23, 231:2, 234:24, 235:11, 238:9
**moved** [22] - 58:15, 78:18, 79:7, 80:3, 81:7, 87:7, 89:18, 89:22, 90:4, 107:23, 130:7, 180:23, 182:20, 183:5, 221:17, 222:4, 232:17, 235:10, 235:12, 235:14, 238:8, 238:13
**movement** [12] - 9:2, 79:3, 79:4, 80:11, 90:12, 90:19, 90:21, 90:24, 91:3, 107:17, 107:18, 187:5
**movements** [2] - 51:24, 107:19
**moves** [5] - 52:19, 73:11, 208:21, 234:24, 236:4
**moving** [23] - 27:25, 30:22, 53:3, 79:10, 81:21, 81:22, 119:13, 146:12, 172:13, 181:18, 185:4, 187:5, 189:13, 198:12, 204:6, 204:14, 204:22, 231:2, 232:18, 237:3, 237:4, 243:5, 255:9
**MP** [1] - 166:18
**MPD** [7] - 114:14, 116:18, 116:20, 142:20, 148:13,

150:19, 224:10
**MPDC** [4] - 182:9, 188:8, 188:24, 203:12
**MR** [419] - 3:14, 6:3, 8:2, 9:7, 10:13, 15:1, 15:8, 15:13, 15:17, 16:13, 17:11, 17:23, 18:15, 18:23, 19:10, 19:14, 19:23, 20:21, 21:12, 21:17, 21:20, 21:21, 21:23, 21:24, 22:7, 22:11, 22:17, 22:19, 23:1, 23:3, 25:7, 25:10, 25:11, 26:7, 26:10, 26:15, 26:17, 34:21, 34:22, 35:5, 35:13, 35:22, 35:24, 37:25, 38:3, 38:6, 38:20, 38:22, 38:25, 39:1, 40:16, 40:19, 40:22, 41:6, 41:11, 41:13, 43:17, 43:19, 43:24, 44:3, 44:6, 44:9, 44:16, 44:21, 44:24, 45:1, 46:2, 46:4, 46:7, 50:5, 50:7, 50:10, 50:12, 51:13, 51:14, 51:17, 53:6, 53:9, 53:24, 54:2, 54:5, 54:9, 54:18, 54:21, 55:13, 55:15, 56:8, 56:15, 57:1, 57:4, 57:10, 57:12, 57:15, 57:22, 60:2, 62:9, 62:11, 64:10, 64:13, 65:3, 65:6, 72:14, 72:16, 73:22, 75:18, 75:25, 77:8, 77:22, 78:10, 78:16, 78:19, 79:6, 79:18, 80:8, 80:12, 80:14, 81:15, 81:17, 82:7, 82:12, 82:18, 82:20, 83:1, 83:3, 88:21, 88:25, 89:7, 89:9, 90:5, 91:10, 91:13, 91:22, 92:2, 92:7, 93:21, 93:23, 94:1, 94:3, 94:18, 94:20, 94:22, 98:12, 98:14, 99:2, 99:4, 99:22, 99:24, 100:3, 100:5, 100:9, 100:13, 103:13, 103:14, 103:19, 104:23, 104:25, 105:19, 105:21, 105:23, 109:3, 109:7, 109:20, 109:23, 109:24,

110:8, 110:11, 110:13, 110:18, 110:21, 110:25, 111:2, 111:7, 111:10, 111:14, 111:16, 111:17, 113:14, 113:22, 114:3, 121:15, 121:17, 121:20, 121:23, 124:1, 124:3, 124:6, 124:9, 124:16, 125:7, 125:10, 125:13, 125:15, 125:18, 125:25, 126:1, 126:3, 126:21, 126:23, 127:18, 127:24, 129:25, 130:3, 130:6, 130:9, 130:13, 130:15, 130:17, 130:19, 130:24, 131:4, 131:13, 132:1, 132:10, 132:14, 132:17, 133:1, 133:4, 133:7, 133:11, 133:20, 134:3, 134:16, 135:10, 135:11, 135:18, 136:25, 137:2, 137:7, 137:11, 137:12, 138:11, 138:13, 138:14, 138:18, 139:5, 139:6, 139:14, 139:17, 139:25, 140:5, 140:8, 140:13, 141:3, 141:21, 141:25, 142:2, 142:7, 142:10, 151:25, 152:3, 152:7, 153:10, 153:12, 153:15, 153:17, 153:23, 154:1, 154:24, 155:2, 155:5, 155:7, 155:21, 155:23, 156:1, 156:4, 156:13, 156:25, 157:3, 157:24, 158:3, 158:7, 158:13, 158:17, 159:1, 159:10, 159:12, 159:21, 159:25, 160:6, 160:16, 160:20, 160:25, 161:11, 161:16, 161:19, 162:20, 162:23, 162:25, 163:15,

163:17, 163:21, 163:24, 185:10, 198:18, 200:13, 201:23, 201:24, 202:4, 203:21, 205:6, 205:9, 205:13, 205:19, 205:22, 206:13, 207:8, 208:22, 209:15, 209:22, 210:6, 211:25, 213:2, 213:14, 213:18, 213:22, 213:24, 214:2, 214:10, 214:13, 214:25, 215:6, 215:8, 216:1, 216:11, 216:18, 217:18, 219:6, 219:18, 219:22, 219:24, 221:5, 222:5, 222:11, 222:15, 222:23, 223:5, 223:13, 223:16, 224:4, 224:9, 224:21, 224:22, 225:13, 226:3, 226:7, 227:1, 227:8, 227:24, 228:11, 228:16, 229:22, 230:4, 230:8, 230:12, 230:16, 230:19, 230:23, 231:6, 231:12, 232:10, 232:16, 232:24, 233:7, 234:15, 234:21, 235:6, 235:10, 235:15, 235:19, 236:3, 236:9, 236:12, 236:21, 238:6, 238:25, 239:4, 241:18, 241:25, 242:8, 242:16, 242:20, 242:24, 243:18, 243:24, 244:4, 244:6, 244:19, 245:1, 245:6, 245:17, 245:21, 246:6, 246:8, 246:15, 247:8, 247:17, 247:24, 248:14, 248:17, 248:22, 249:7, 249:23, 249:25, 250:4, 250:7, 250:17, 250:25, 251:7, 251:11, 251:23, 252:4, 252:12,

252:20, 253:10, 253:21, 254:3, 254:15, 254:18, 254:22
**MS** [151] - 3:7, 3:11, 3:24, 4:7, 4:9, 4:14, 4:23, 5:1, 5:7, 5:23, 6:8, 6:13, 6:18, 6:22, 6:24, 7:2, 11:5, 14:15, 15:6, 19:25, 20:6, 20:9, 21:19, 77:13, 78:2, 113:20, 124:13, 131:17, 131:23, 164:1, 164:7, 168:22, 169:5, 169:13, 169:15, 176:11, 176:15, 176:16, 177:15, 177:19, 177:20, 183:13, 183:14, 184:4, 184:8, 184:9, 185:16, 186:10, 187:19, 187:23, 188:2, 188:14, 188:20, 188:22, 189:21, 189:25, 190:21, 191:1, 191:6, 192:20, 193:1, 193:2, 193:11, 195:4, 195:8, 195:11, 196:2, 196:9, 196:15, 196:20, 196:21, 197:17, 197:21, 198:1, 198:5, 198:9, 198:10, 198:21, 198:25, 199:2, 199:4, 199:23, 199:24, 200:10, 201:21, 202:2, 205:4, 205:12, 207:5, 208:15, 209:12, 209:19, 209:25, 211:21, 212:4, 212:6, 212:11, 212:17, 212:24, 213:19, 216:21, 216:23, 217:1, 217:20, 217:21, 219:3, 219:20, 220:15, 220:21, 225:4, 225:25, 228:4, 228:19, 228:24, 229:3, 229:10, 229:16, 231:17, 232:3, 232:6, 232:9, 233:2, 233:13, 233:18, 234:1,

234:9, 234:11, 235:20, 235:24, 236:7, 236:10, 237:6, 238:2, 238:10, 238:24, 239:3, 239:23, 240:1, 240:8, 240:23, 243:4, 244:15, 244:22, 245:13, 249:22, 250:3, 250:8, 250:14, 252:9, 254:6, 254:20
**multi** [1] - 61:9
**multi-layered** [1] - 61:9
**multilayered** [1] - 31:23
**multiple** [29] - 5:8, 8:25, 30:7, 32:13, 32:24, 42:3, 42:5, 52:2, 58:19, 59:10, 59:12, 59:13, 59:18, 60:8, 60:11, 62:17, 63:6, 84:22, 86:13, 86:25, 87:1, 87:5, 87:15, 90:9, 92:16, 95:2, 107:19, 116:10, 120:18
**multitude** [2] - 85:7, 103:6
**munitions** [1] - 194:1
**muscle** [2] - 199:17, 199:22
**museums** [1] - 27:3
**music** [1] - 95:2
**must** [2] - 103:4, 104:19
**mutual** [1] - 167:11
**mysteriously** [1] - 160:23

## N

**name** [14] - 23:6, 23:7, 23:8, 23:9, 114:4, 114:7, 118:24, 125:20, 142:13, 142:14, 164:11, 211:16, 233:23, 235:25
**names** [2] - 3:5, 124:14
**Nancy** [1] - 57:9
**nation** [1] - 29:19
**National** [5] - 26:25, 29:18, 63:2, 116:1, 248:5
**natural** [1] - 8:14
**naturally** [1] - 109:10

**nature** [3] - 13:24, 73:2, 221:20
**near** [10] - 30:6, 43:12, 83:11, 116:3, 146:3, 166:14, 173:9, 177:23, 251:23, 251:24
**near-fatal** [1] - 166:14
**nearly** [4] - 23:14, 24:15, 52:6, 165:14
**necessarily** [8] - 72:21, 72:24, 99:16, 99:17, 99:18, 100:7, 127:21, 223:1
**necessary** [12] - 7:8, 30:15, 58:25, 66:24, 67:1, 67:2, 71:20, 106:3, 106:5, 106:7, 168:14, 226:16
**necessity** [1] - 12:19
**need** [43] - 12:8, 32:19, 49:13, 67:14, 73:10, 74:16, 76:18, 77:2, 78:19, 80:6, 88:13, 91:18, 103:10, 104:3, 104:17, 116:19, 122:3, 128:17, 131:10, 131:11, 160:18, 178:4, 221:20, 222:6, 222:11, 224:17, 224:18, 225:10, 226:1, 227:3, 229:9, 229:25, 233:21, 241:13, 242:3, 242:4, 246:25, 252:16, 252:18, 254:2, 254:12, 254:13
**needed** [9] - 61:5, 67:9, 69:3, 81:8, 102:16, 107:19, 116:24, 169:4, 182:8
**needing** [1] - 117:1
**needlessly** [1] - 19:1
**needs** [5] - 18:9, 74:25, 117:4, 131:8, 231:11
**negative** [1] - 243:25
**negatively** [2] - 9:21, 255:12
**negotiated** [1] - 250:22
**negotiations** [2] - 252:3, 253:6
**neighborhoods** [1] - 167:23
**net** [4] - 9:11, 10:5, 10:11, 10:25

**never** [23] - 13:25, 31:6, 60:25, 66:1, 66:4, 67:6, 73:5, 73:11, 81:18, 88:9, 92:13, 92:14, 92:21, 101:11, 102:9, 102:12, 170:1, 206:21, 213:3, 223:16, 225:2, 246:8, 246:11
**New** [2] - 62:25, 115:13
**new** [7] - 14:9, 110:16, 141:19, 226:25, 227:6, 243:14, 243:15
**news** [1] - 172:25
**next** [15] - 54:19, 56:12, 74:12, 82:21, 113:19, 139:23, 140:7, 148:8, 149:3, 163:20, 174:10, 187:8, 189:10, 220:18, 220:22
**nice** [3] - 220:8, 220:11, 237:16
**Nickerson** [7] - 148:19, 148:22, 149:1, 151:8, 154:7, 155:16, 156:19
**Nickerson's** [2] - 154:9, 154:17
**night** [1] - 244:7
**night's** [1] - 22:14
**nine** [1] - 45:12
**Ninth** [1] - 145:16
**nobody** [6] - 30:5, 170:18, 172:18, 172:19, 204:19, 236:4
**nobody's** [1] - 170:19
**non** [1] - 181:15
**non-law** [1] - 181:15
**none** [3] - 7:10, 110:7, 158:18
**nonetheless** [1] - 252:24
**nonexistence** [1] - 212:12
**nonmembers** [2] - 96:12, 97:7
**nonnatural** [1] - 8:9
**nonsupervisory** [1] - 166:3
**noon** [4] - 53:16, 228:15, 228:20, 254:7
**normal** [4] - 103:25, 144:22, 167:7, 171:18

**normally** [5] - 28:6, 28:18, 47:19, 64:19, 145:10
**north** [7] - 36:5, 41:17, 58:15, 58:17, 64:3, 189:7, 195:17
**northeast** [1] - 108:22
**Northeast** [2] - 115:13, 184:6
**Northeast-most** [1] - 184:6
**northward** [7] - 181:13, 182:17, 183:10, 183:22, 189:4, 198:12, 198:13
**northwest** [1] - 246:14
**Northwest** [16] - 1:14, 1:21, 27:15, 27:18, 27:21, 27:22, 27:24, 28:2, 28:6, 109:13, 109:16, 110:1, 145:21, 163:8, 184:5, 235:19
**Northwest-most** [1] - 184:5
**nose** [2] - 178:25, 179:2
**note** [4] - 8:24, 9:23, 11:5, 49:12
**noted** [3] - 31:2, 39:14, 89:16
**notes** [1] - 15:9
**nothing** [14] - 7:12, 62:18, 64:10, 73:16, 96:19, 110:8, 127:11, 138:11, 163:15, 209:19, 221:9, 221:12, 243:14, 254:22
**notice** [3] - 7:12, 50:13, 241:8
**noticed** [1] - 238:7
**notification** [7] - 48:21, 48:23, 48:24, 49:2, 49:3, 86:22, 93:13
**notifications** [3] - 52:1, 66:20
**notify** [1] - 31:14
**notifying** [1] - 244:17
**notion** [1] - 102:15
**nowhere** [1] - 102:6
**NSID** [1] - 144:9
**nullification** [1] - 12:16
**number** [10] - 86:15, 91:17, 97:9, 97:11, 98:7, 108:11, 111:13, 116:25,

144:16, 231:22
**Number** [3] - 1:3, 3:4, 112:10
**numbered** [1] - 63:8
**numbers** [1] - 98:11
**numerous** [4] - 51:24, 62:23, 76:24, 222:19
**nylon** [3] - 118:6, 120:19, 122:11

## O

**oath** [5] - 75:3, 75:21, 169:11, 174:23, 201:17
**object** [13] - 15:21, 16:1, 34:22, 44:6, 44:10, 60:2, 78:7, 78:10, 141:6, 194:17, 234:6, 234:12
**objected** [5] - 4:2, 4:10, 5:4, 232:12, 252:5
**objecting** [2] - 5:7, 91:25
**objection** [85] - 26:9, 26:10, 35:4, 35:17, 35:19, 38:2, 38:3, 38:21, 38:22, 40:18, 40:19, 44:4, 44:15, 44:17, 46:3, 46:4, 50:6, 50:7, 51:14, 54:1, 55:20, 57:15, 62:9, 65:3, 72:14, 77:12, 81:14, 81:15, 88:21, 89:7, 90:5, 91:10, 91:20, 92:3, 93:22, 93:23, 94:18, 98:12, 99:2, 99:22, 100:3, 100:9, 103:13, 104:23, 109:20, 121:16, 124:2, 125:9, 125:10, 126:21, 127:18, 129:24, 130:20, 131:22, 132:14, 133:3, 133:4, 135:10, 139:14, 152:2, 152:3, 153:12, 155:1, 155:2, 155:22, 155:23, 157:24, 185:10, 185:12, 198:18, 198:21, 198:25, 201:21, 202:2, 205:4, 205:12, 207:5, 208:15, 209:12, 210:3,

211:21, 212:24, 213:1, 213:19, 217:18
**objections** [5] - 7:7, 7:8, 34:25, 121:17, 124:3
**objective** [1] - 163:8
**objects** [2] - 194:10, 194:12
**obligation** [1] - 95:23
**obscured** [1] - 137:24
**observe** [4] - 116:9, 146:13, 173:25, 179:6
**observed** [5] - 8:4, 12:5, 116:10, 179:17, 234:13
**obvious** [2] - 246:22, 246:23
**obviously** [9] - 44:10, 90:2, 146:15, 146:22, 157:7, 172:20, 177:13, 246:20, 249:7
**OC** [6] - 118:2, 146:16, 178:22, 179:22, 179:25
**occasionally** [3] - 73:7, 161:20, 208:3
**occasions** [1] - 67:22
**occur** [4] - 58:12, 98:6, 115:6, 166:14
**occurred** [6] - 41:18, 61:22, 66:20, 78:21, 121:12, 210:20
**occurring** [8] - 30:11, 59:3, 60:6, 90:10, 96:14, 98:15, 107:13
**occurs** [1] - 96:8
**October** [2] - 28:10, 30:3
**odd** [1] - 147:23
**OF** [5] - 1:1, 1:3, 1:9, 256:7, 256:15
**off-screen** [1] - 187:6
**offense** [2] - 16:12, 234:25
**offer** [2] - 93:21, 245:5
**offered** [3] - 202:15, 207:1, 235:21
**offering** [1] - 207:3
**office** [11] - 8:22, 16:2, 32:20, 70:11, 70:14, 70:16, 170:12, 170:16, 243:22, 248:15, 249:5
**Office** [2] - 1:14, 223:18
**Officer** [10] - 22:23, 113:23, 125:19,

132:2, 137:1, 139:18, 140:15, 211:25, 213:3, 220:14
**officer** [59] - 18:5, 23:18, 33:20, 47:23, 84:18, 87:22, 114:6, 114:12, 116:19, 116:20, 116:21, 119:4, 119:9, 119:24, 120:3, 120:13, 121:2, 121:24, 122:18, 124:17, 130:12, 131:6, 132:18, 133:21, 134:5, 137:13, 137:20, 140:21, 141:11, 142:21, 143:14, 147:3, 147:4, 147:14, 147:20, 147:25, 148:2, 148:12, 157:19, 160:22, 166:5, 166:6, 166:24, 176:3, 182:22, 191:14, 205:18, 211:13, 211:17, 214:19, 222:19, 223:16, 224:1, 226:5, 229:6, 230:25, 234:4, 236:19, 247:9
**officer's** [1] - 224:23
**officers** [83] - 13:8, 15:14, 17:7, 17:19, 18:2, 23:21, 24:3, 30:15, 31:14, 32:6, 40:3, 50:14, 66:5, 66:19, 66:22, 67:6, 67:7, 80:3, 80:24, 81:23, 84:15, 84:17, 84:20, 84:23, 85:6, 105:25, 106:10, 106:14, 116:18, 116:25, 129:16, 129:18, 135:5, 135:13, 135:21, 136:4, 136:9, 138:3, 139:13, 140:18, 140:25, 141:9, 146:20, 148:13, 150:7, 161:21, 171:5, 173:4, 175:24, 175:25, 176:5, 176:6, 179:21, 180:2, 181:23, 182:16, 187:17, 188:8, 191:11, 191:17, 197:18, 203:19,

204:14, 204:20, 205:10, 207:4, 208:11, 208:23, 212:14, 214:18, 215:11, 217:11, 220:22, 221:2, 224:10, 232:21, 237:21, 246:1, 247:10
**Officers** [1] - 68:24
**officers'** [1] - 17:9
**Official** [1] - 1:21
**OFFICIAL** [1] - 256:7
**official** [6] - 65:17, 65:22, 70:2, 77:22, 81:25, 86:20
**officially** [1] - 68:8
**officials** [2] - 146:2, 146:15
**often** [8] - 29:23, 37:5, 65:1, 67:25, 104:12, 104:13, 108:19, 197:5
**Ohio** [1] - 66:14
**older** [2] - 216:5, 216:12
**oldest** [1] - 201:8
**Olmstead** [4] - 37:12, 39:7, 99:10, 113:7
**OMB** [1] - 1:18
**once** [26] - 31:25, 38:14, 58:5, 59:1, 59:15, 60:4, 61:9, 118:13, 145:6, 151:3, 161:23, 162:5, 172:7, 172:21, 173:13, 176:25, 177:2, 180:11, 180:21, 183:3, 184:20, 187:9, 189:1, 189:3, 201:14, 242:4
**one** [119] - 3:9, 4:15, 5:8, 6:4, 6:11, 6:14, 8:8, 8:12, 8:18, 9:12, 16:9, 17:22, 21:14, 21:15, 21:24, 31:24, 33:14, 33:24, 36:16, 38:12, 43:19, 44:5, 44:17, 48:11, 49:16, 55:20, 62:18, 63:7, 64:6, 68:4, 70:2, 70:7, 71:5, 71:12, 72:7, 73:1, 74:14, 75:10, 75:11, 76:16, 76:21, 77:14, 78:1, 79:11, 83:15, 83:16, 84:4, 84:5, 84:21, 95:21, 107:5, 109:12, 110:13,

111:14, 112:9,
112:14, 123:6,
134:10, 138:14,
138:16, 139:4,
139:5, 141:17,
146:2, 148:25,
151:6, 154:7, 158:7,
158:14, 159:3,
159:9, 159:25,
160:2, 160:3,
160:12, 160:13,
160:21, 161:6,
163:21, 166:19,
166:25, 167:10,
170:15, 174:16,
178:1, 180:13,
185:13, 187:7,
187:8, 192:13,
196:4, 199:25,
200:7, 201:8, 203:8,
209:2, 215:12,
219:11, 226:4,
229:23, 229:24,
232:21, 234:24,
238:6, 243:4,
243:18, 245:6,
247:8, 251:11,
251:12, 251:19,
252:21, 253:13,
254:4, 255:16,
255:19
**one-week** [2] - 166:19,
166:25
**ones** [1] - 83:14
**ongoing** [1] - 64:25
**online** [3] - 5:13, 6:7,
6:10
**open** [19] - 24:9,
29:25, 30:8, 30:12,
30:23, 30:25, 31:6,
31:19, 32:10, 33:23,
66:8, 67:12, 69:2,
69:3, 77:3, 179:3,
216:15, 228:17,
241:14
**opened** [1] - 194:18
**opening** [2] - 12:12,
250:25
**openness** [1] - 33:25
**operating** [1] - 33:14
**Operations** [6] -
115:12, 115:14,
118:20, 166:8,
168:2, 170:4
**opine** [2] - 10:3, 247:2
**opinion** [3] - 195:12,
195:18, 243:24
**opinions** [2] - 11:14,
14:4
**opportunity** [8] - 93:5,

121:9, 154:18,
155:11, 181:3,
194:18, 197:6, 197:7
**opposed** [1] - 76:5
**opposite** [1] - 19:5
**option** [1] - 237:20
**order** [20] - 4:23, 5:11,
5:13, 5:19, 7:5, 9:24,
17:12, 17:18, 36:23,
39:15, 40:1, 53:16,
55:6, 55:11, 69:3,
103:5, 104:20,
180:10, 180:11,
184:21
**ordered** [3] - 30:19,
171:16, 184:21
**orders** [1] - 118:11
**organization** [5] -
94:4, 94:13, 96:7,
99:20, 99:21
**organizer** [1] - 99:14
**organizers** [1] - 98:7
**oriented** [1] - 36:1
**originally** [3] - 114:15,
115:25, 117:13
**OSHA** [1] - 67:11
**otherwise** [3] - 80:6,
113:5, 222:3
**ought** [1] - 6:9
**ourselves** [2] -
191:15, 191:17
**outer** [1] - 42:4
**outfit** [1] - 117:14
**outlandish** [1] -
244:20
**outlined** [3] - 47:16,
53:21, 55:17
**outside** [24] - 19:3,
33:16, 59:24, 62:7,
62:16, 62:21, 62:23,
68:14, 75:18, 78:25,
89:24, 116:11,
117:16, 163:22,
171:2, 171:4,
173:25, 174:2,
201:14, 221:21,
226:14, 226:19,
253:18
**outwards** [1] - 135:6
**overall** [2] - 198:11,
203:16
**overrule** [2] - 35:17,
185:11
**overruled** [16] - 35:19,
54:3, 57:18, 60:3,
62:10, 65:4, 90:6,
103:16, 104:24,
126:22, 127:19,
132:15, 207:6,
210:4, 213:1, 217:19

**oversees** [1] - 69:20
**overstating** [1] - 235:4
**overtaken** [1] - 173:1
**overview** [5] - 7:25,
229:23, 229:25,
231:6, 231:20
**OWEN** [1] - 1:6
**own** [10] - 4:15, 4:17,
18:4, 46:8, 66:15,
70:16, 179:6,
185:14, 204:25,
235:22
**Oxnard** [1] - 1:17

## P

**P.C** [1] - 1:17
**P.G** [4] - 165:19,
165:22, 165:24,
166:7
**p.m** [35] - 45:8, 45:14,
45:21, 45:25, 55:2,
75:8, 101:19,
101:20, 107:9,
119:18, 119:25,
120:11, 120:13,
121:8, 121:13,
123:1, 123:24,
125:5, 141:14,
148:3, 148:12,
149:1, 151:23,
153:8, 154:22,
155:19, 169:8,
182:24, 185:23,
186:1, 256:3
**PA** [4] - 187:15,
203:11, 203:14,
203:15
**package** [2] - 115:25,
116:11
**padded** [2] - 171:25,
172:2
**pads** [1] - 172:1
**page** [23] - 9:5, 26:16,
26:18, 27:4, 27:13,
27:19, 28:19, 94:23,
108:24, 119:3,
119:8, 119:23,
120:2, 120:10,
147:13, 147:15,
147:18, 148:1,
175:5, 175:13,
176:12, 224:18,
226:20
**pages** [4] - 25:3,
25:25, 27:25, 224:25
**pallet** [2] - 175:6,
175:8
**panel** [1] - 76:21
**panic** [1] - 202:21

**pants** [3] - 117:17,
145:1, 171:21
**paperwork** [1] -
159:17
**Papsti** [1] - 7:20
**PAPSTI** [1] - 7:20
**paragraph** [1] - 5:19
**paralegal** [2] - 3:11,
3:16
**parked** [4] - 174:13,
174:18, 175:16,
175:19
**parking** [2] - 171:4,
171:6
**parlance** [2] - 118:8,
165:20
**part** [18] - 5:10, 17:15,
43:3, 47:18, 84:19,
87:14, 92:12, 95:23,
97:23, 100:25,
101:11, 107:13,
107:24, 148:7,
180:15, 193:20,
232:21, 235:13
**participants** [2] -
95:16, 96:3
**participate** [5] - 67:16,
96:24, 96:25,
100:18, 100:22
**participating** [1] -
32:18
**particular** [21] - 9:22,
10:14, 11:18, 14:4,
33:3, 33:19, 48:12,
48:24, 56:16, 68:3,
101:19, 117:24,
172:20, 177:25,
178:3, 188:6, 192:7,
196:2, 204:1,
204:24, 230:17
**particularly** [6] -
11:13, 25:16, 33:1,
128:2, 237:6, 240:21
**parties** [2] - 11:14,
13:16
**partner** [1] - 115:18
**parts** [3] - 5:14, 5:16,
163:3
**party** [2] - 7:15, 8:9
**party's** [1] - 7:16
**pass** [2] - 125:15,
156:25
**passed** [2] - 96:7,
110:23
**past** [6] - 49:22,
149:22, 150:4,
161:1, 163:12,
174:16
**path** [7] - 110:1,
110:3, 175:16,

176:25, 177:8,
177:21, 177:22
**pathway** [1] - 112:6
**patriot** [1] - 248:2
**patrol** [2] - 166:5,
166:6
**Patrol** [1] - 114:15
**pattern** [1] - 107:14
**pause** [3] - 137:11,
153:18, 181:1
**Pause** [2] - 75:12,
158:11
**paused** [1] - 181:1
**pay** [2] - 201:12,
201:15
**PD** [3] - 15:18, 15:19,
15:24
**Peace** [6] - 58:14,
109:15, 109:25,
251:15, 251:18,
252:8
**peaceful** [8] - 5:20,
17:12, 17:14, 17:16,
17:20, 95:13, 95:15
**peacefully** [1] - 17:14
**peer** [1] - 136:4
**Pelosi** [1] - 57:9
**pen** [3] - 175:7, 175:9,
175:13
**Pence** [16] - 48:2,
50:3, 55:16, 56:5,
88:8, 89:18, 89:22,
90:4, 90:14, 90:25,
101:19, 102:2,
102:6, 102:9,
102:12, 107:5
**pencil** [3] - 175:12,
183:24, 186:17
**pending** [2] - 28:11,
29:2
**Pennsylvania** [3] -
118:23, 173:12
**people** [80] - 20:16,
30:8, 31:19, 36:18,
54:11, 54:14, 59:13,
60:13, 61:6, 64:19,
64:22, 65:1, 66:7,
66:11, 68:24, 69:4,
72:12, 73:7, 79:4,
84:15, 85:23, 85:25,
86:5, 87:8, 95:17,
97:9, 97:14, 97:19,
97:20, 97:24, 98:22,
108:8, 108:11,
108:20, 119:20,
120:18, 128:24,
134:23, 135:1,
135:7, 135:22,
136:3, 137:22,
137:23, 139:12,

148:10, 149:8, 149:13, 149:15, 149:19, 150:6, 152:18, 157:19, 157:20, 157:23, 161:20, 163:9, 163:11, 163:14, 185:2, 191:16, 192:15, 193:25, 202:12, 202:19, 202:21, 204:2, 205:11, 206:19, 231:22, 242:10, 242:16, 242:17, 245:11, 248:8, 248:15, 251:1, 252:1, 252:22

**people's** [3] - 100:12, 122:15, 202:23

**pepper** [2] - 118:2, 242:21

**percent** [11] - 3:24, 71:22, 102:17, 107:1, 116:6, 179:25, 180:1, 219:14, 219:16, 219:17, 250:20

**percentage** [1] - 179:22

**perception** [3] - 250:20, 252:22, 253:12

**perfectly** [1] - 140:23

**perform** [2] - 61:17, 104:17

**performance** [1] - 9:3

**perhaps** [12] - 10:21, 31:12, 83:20, 83:22, 107:19, 125:24, 206:4, 206:16, 225:3, 225:22, 228:21

**perimeter** [48] - 19:3, 21:6, 30:5, 31:4, 31:18, 34:5, 34:13, 34:14, 34:16, 34:19, 34:24, 35:7, 35:10, 35:13, 35:15, 35:16, 36:12, 36:13, 36:17, 36:19, 37:8, 38:10, 40:24, 41:1, 60:15, 61:5, 62:17, 70:18, 70:23, 70:24, 71:1, 71:8, 71:13, 73:14, 73:15, 76:5, 87:10, 87:25, 88:1, 88:2, 88:5, 102:24, 106:9, 106:10, 106:15, 106:20, 251:20

**perimeters** [5] - 33:23,

33:25, 59:12, 66:18, 76:4

**period** [5] - 45:13, 45:24, 130:11, 130:13, 247:15

**permanent** [15] - 21:2, 37:12, 39:7, 71:5, 71:11, 71:19, 72:8, 85:11, 85:12, 86:7, 86:8, 108:17, 113:2, 113:4, 113:8

**permanently** [1] - 48:18

**permissible** [2] - 19:10, 19:24

**permit** [20] - 8:12, 9:17, 10:2, 19:8, 20:13, 20:19, 93:14, 93:15, 94:4, 94:8, 97:3, 97:8, 97:15, 97:19, 97:23, 98:2, 98:4, 108:10, 110:18, 112:9

**permits** [23] - 18:16, 18:18, 18:21, 18:24, 18:25, 19:2, 19:16, 20:2, 20:12, 20:13, 20:15, 21:18, 92:23, 93:18, 94:10, 95:24, 101:5, 101:7, 108:2, 108:3

**permitted** [11] - 8:18, 19:21, 73:3, 98:25, 99:7, 101:3, 106:20, 110:5, 112:15, 113:9, 253:1

**perpetrated** [1] - 193:21

**person** [27] - 7:15, 26:22, 33:16, 47:7, 47:18, 47:24, 56:9, 56:17, 56:19, 59:18, 72:4, 72:6, 80:21, 96:11, 96:23, 98:7, 120:17, 120:22, 121:25, 148:18, 150:4, 150:5, 152:17, 154:9, 223:9, 243:11

**personal** [4] - 5:9, 6:22, 251:17, 252:7

**personally** [3] - 8:4, 19:7, 104:7

**persons** [9] - 5:21, 8:14, 32:1, 32:4, 59:22, 59:24, 61:11, 95:5, 120:14

**perspective** [5] - 84:4, 85:7, 98:24, 199:1, 245:23

**perspectives** [1] - 221:25

**persuade** [1] - 201:25

**persuaded** [1] - 7:13

**pertaining** [1] - 48:14

**pertinent** [1] - 49:12

**phone** [8] - 86:15, 91:11, 123:15, 123:19, 170:21, 170:22, 215:17

**phones** [3] - 77:8, 172:21, 208:16

**photo** [11] - 25:16, 28:16, 28:23, 37:18, 40:7, 40:13, 83:9, 84:14, 85:25, 86:4, 86:6

**photograph** [2] - 53:2, 84:9

**phrase** [1] - 208:10

**physical** [4] - 37:2, 59:15, 71:11, 178:6

**physically** [7] - 33:25, 76:20, 77:2, 115:11, 115:12, 185:8, 185:15

**pick** [3] - 20:25, 143:22, 156:8

**picked** [1] - 200:8

**picture** [7] - 26:23, 26:24, 28:23, 31:2, 38:13, 40:5, 85:4

**pictured** [1] - 86:4

**piece** [5] - 36:25, 176:20, 194:17, 194:23, 237:12

**PIERCE** [5] - 1:16, 3:14, 21:24, 22:7, 22:11

**Pierce** [7] - 1:17, 3:14, 15:7, 21:23, 22:6, 125:21, 253:14

**pipe** [1] - 12:11

**place** [29] - 16:17, 16:18, 30:11, 32:9, 36:17, 37:7, 38:10, 43:14, 46:19, 50:18, 53:21, 58:10, 59:4, 59:12, 61:4, 70:23, 81:9, 86:13, 87:23, 88:1, 101:8, 101:19, 122:5, 144:13, 174:11, 192:18, 237:15, 239:1, 251:21

**placed** [7] - 36:25, 40:23, 48:18, 69:6, 76:13, 85:15, 86:13

**plain** [2] - 10:17, 97:6

**plainly** [1] - 13:6

**plaintiff** [2] - 8:12, 8:13

**Plaintiff** [2] - 1:4, 152:5

**plaintiffs** [1] - 8:14

**plan** [16] - 34:13, 34:14, 70:18, 70:23, 71:1, 87:8, 87:10, 87:11, 88:14, 91:8, 92:11, 92:13, 92:14, 196:5, 240:23

**plank** [1] - 194:23

**planned** [1] - 95:9

**planning** [2] - 88:10, 98:10

**plans** [2] - 91:4, 92:15

**plastic** [5] - 37:11, 176:7, 190:10, 207:23, 208:1

**platform** [1] - 21:7

**platoon** [1] - 167:10

**play** [44] - 41:8, 53:6, 54:6, 55:13, 56:6, 56:12, 57:2, 57:10, 77:5, 77:6, 77:19, 78:14, 79:1, 81:13, 82:2, 100:14, 124:6, 126:1, 129:11, 129:12, 133:8, 137:9, 140:20, 155:5, 156:1, 156:9, 186:7, 189:22, 191:3, 195:9, 195:22, 196:5, 196:6, 203:18, 205:20, 213:9, 213:11, 213:24, 214:7, 214:10, 215:2, 215:6, 215:24, 216:24

**played** [53] - 41:10, 41:12, 53:8, 54:8, 54:20, 55:14, 56:7, 56:14, 57:3, 57:11, 121:21, 121:22, 124:8, 125:13, 125:14, 125:23, 126:2, 132:9, 133:10, 133:19, 134:2, 137:10, 152:6, 153:16, 153:22, 153:25, 155:6, 156:3, 186:9, 188:1, 189:24, 191:5, 193:10, 195:10, 196:1, 196:8, 197:25, 203:3, 203:18, 205:21, 206:12, 213:13, 213:23,

214:1, 214:9, 214:12, 214:24, 215:5, 215:7, 215:25, 216:10, 216:25, 232:10

**playing** [12] - 54:19, 78:8, 130:6, 130:20, 134:15, 156:11, 187:25, 193:3, 193:8, 203:20, 205:8, 216:9

**plea** [2] - 19:17, 242:2

**pled** [1] - 240:2

**pocket** [1] - 200:9

**podium** [1] - 29:17

**point** [43] - 4:12, 6:5, 12:25, 14:2, 26:21, 36:14, 58:24, 71:12, 78:19, 91:13, 110:14, 111:16, 112:22, 113:10, 119:17, 119:22, 121:24, 123:6, 123:21, 131:13, 150:4, 151:4, 160:8, 160:25, 172:18, 174:16, 178:9, 181:18, 187:6, 193:19, 199:7, 201:4, 203:8, 205:17, 209:2, 209:22, 220:5, 239:4, 241:25, 242:1, 251:11, 252:13

**pointed** [1] - 251:7

**pointing** [2] - 134:17, 138:24

**points** [3] - 42:4, 171:1, 251:19

**pole** [5] - 195:24, 196:10, 196:18, 197:18, 197:19

**police** [30] - 12:23, 16:3, 16:10, 16:24, 17:7, 17:19, 23:23, 30:18, 63:4, 67:6, 67:7, 80:2, 116:18, 142:21, 149:6, 149:23, 163:7, 164:22, 165:1, 165:22, 166:24, 171:13, 173:23, 198:12, 200:18, 200:19, 203:12, 222:23, 223:6, 225:1

**Police** [70] - 15:19, 17:3, 23:14, 23:15, 23:16, 23:18, 24:5, 24:6, 24:15, 26:3,

30:18, 30:19, 33:8, 36:12, 36:24, 39:15, 40:2, 41:22, 41:23, 42:10, 43:10, 45:2, 47:1, 47:9, 48:16, 49:13, 49:19, 50:15, 51:25, 52:6, 60:20, 61:19, 62:16, 62:24, 62:25, 63:14, 66:22, 67:15, 75:16, 77:22, 79:10, 80:18, 91:5, 91:8, 97:22, 98:5, 99:13, 105:25, 106:22, 114:10, 114:11, 115:3, 140:9, 142:18, 164:15, 165:12, 165:24, 166:15, 166:23, 167:4, 173:2, 182:9, 188:24, 223:18, 234:3, 235:21, 236:19, 238:7
**Police's** [2] - 43:3, 87:4
**policies** [3] - 87:15, 87:20, 103:6
**policy** [15] - 15:19, 15:23, 16:6, 17:10, 18:10, 67:10, 87:12, 87:14, 88:1, 103:2, 103:3, 103:9, 105:2, 105:4, 105:5
**pores** [1] - 179:3
**Port** [1] - 248:9
**Port-A-Johns** [1] - 248:9
**portion** [23] - 23:23, 26:24, 28:13, 29:1, 29:17, 39:5, 39:12, 45:9, 56:16, 78:14, 118:4, 123:3, 123:5, 123:8, 123:12, 123:14, 123:22, 129:15, 136:23, 182:17, 193:13, 238:19, 240:13
**portions** [3] - 5:12, 42:4, 53:4
**position** [7] - 87:7, 187:11, 192:5, 201:2, 224:14, 231:15, 246:18
**positioned** [3] - 27:9, 85:14, 97:12
**positions** [1] - 7:13
**positive** [5] - 9:14, 219:13, 219:14, 219:16, 219:17
**possession** [2] -

59:16, 60:7
**possible** [5] - 15:21, 191:4, 206:19, 216:14, 216:17
**possibly** [2] - 219:9, 247:2
**post** [3] - 65:10, 65:12, 119:9
**posted** [7] - 36:23, 39:25, 65:16, 65:23, 65:24, 118:25, 119:17
**potent** [1] - 180:2
**potential** [4] - 19:12, 117:12, 167:22, 178:15
**potentially** [4] - 206:23, 224:11, 232:1, 239:16
**pounds** [1] - 157:13
**power** [2] - 185:14, 204:25
**preannounced** [1] - 248:14
**precise** [3] - 38:4, 43:20, 247:5
**precisely** [2] - 87:23, 251:24
**preclude** [2] - 13:4, 13:11
**prefers** [1] - 141:25
**prejudicial** [3] - 13:1, 17:1, 18:13
**preliminary** [1] - 229:8
**premises** [1] - 183:18
**preparation** [1] - 91:5
**prepare** [1] - 243:5
**prepared** [1] - 96:8
**preplanned** [1] - 248:15
**prescient** [1] - 231:20
**prescreening** [1] - 31:24
**presence** [12] - 7:15, 33:21, 43:12, 52:3, 59:22, 59:23, 61:6, 63:12, 78:25, 221:21, 226:14, 253:19
**present** [16] - 3:2, 3:17, 8:19, 10:20, 32:21, 52:7, 55:10, 58:4, 58:25, 75:9, 137:24, 141:15, 233:16, 244:14, 254:9
**presented** [3] - 7:12, 14:10, 194:18
**presenting** [4] - 7:16, 89:21, 92:14, 243:13

**presents** [1] - 10:4
**preside** [3] - 70:2, 70:5, 70:8
**president** [23] - 47:24, 48:1, 48:6, 48:13, 48:25, 49:17, 51:18, 55:7, 55:11, 69:16, 69:21, 69:24, 70:8, 70:10, 70:13, 88:5, 88:16, 88:17, 90:19, 107:23
**President** [33] - 28:11, 29:18, 33:6, 33:17, 33:19, 41:19, 47:5, 47:7, 47:22, 48:2, 48:3, 50:2, 52:14, 54:12, 54:25, 55:16, 56:5, 60:17, 69:8, 69:17, 69:19, 69:20, 69:21, 70:4, 88:9, 88:19, 90:14, 90:25, 101:19, 102:2, 107:5, 107:20
**president's** [3] - 33:7, 51:10, 70:1
**President-elect** [1] - 47:7
**presidential** [1] - 177:14
**presides** [1] - 69:11
**presiding** [2] - 33:20, 47:23
**press** [4] - 28:25, 29:21, 29:22, 65:15
**pressing** [1] - 150:20
**presumably** [1] - 241:8
**pretrial** [4] - 7:5, 11:7, 13:10, 22:5
**pretty** [11] - 24:21, 145:2, 148:17, 149:14, 167:8, 227:24, 234:4, 237:12, 237:18, 247:5, 247:18
**prevent** [3] - 99:12, 148:10, 163:9
**previous** [6] - 28:23, 71:5, 90:21, 137:7, 157:16, 198:16
**previously** [4] - 53:5, 55:17, 147:14, 199:9
**primarily** [1] - 64:5
**primary** [3] - 59:19, 67:14
**Prince** [12] - 140:9, 164:15, 165:11, 165:19, 166:15, 166:23, 167:4, 167:16, 169:18,

169:19, 170:13, 200:17
**principals** [2] - 48:12, 49:14
**priority** [1] - 116:25
**prisoner** [1] - 144:4
**pro** [1] - 99:21
**Pro** [2] - 53:16, 69:19
**pro-Trump** [1] - 99:21
**probable** [3] - 127:17, 128:17, 134:4
**probative** [1] - 13:1
**problem** [4] - 74:17, 131:8, 159:1, 168:22
**problems** [1] - 20:1
**proceed** [8] - 22:2, 22:18, 22:25, 32:3, 80:4, 118:15, 142:7, 169:13
**proceeded** [5] - 115:16, 118:13, 119:11, 119:19, 119:21
**proceeding** [2] - 60:16, 239:18
**Proceedings** [2] - 1:24, 256:3
**proceedings** [10] - 44:14, 47:19, 55:19, 59:4, 100:18, 100:19, 100:23, 101:4, 101:12, 256:10
**proceeds** [1] - 91:15
**process** [12] - 31:20, 31:22, 31:23, 33:2, 53:21, 55:17, 59:20, 61:20, 100:25, 101:8, 223:7, 255:12
**processed** [1] - 48:22
**processes** [1] - 60:19
**processing** [5] - 15:9, 144:11, 144:12, 144:14, 145:13
**procession** [1] - 54:11
**proclaimed** [2] - 68:8, 68:9
**produce** [2] - 212:19, 212:21
**produced** [5] - 1:25, 14:11, 86:23, 212:22, 213:3
**professional** [1] - 180:17
**proffer** [4] - 227:12, 232:3, 240:25, 250:9
**proffers** [1] - 12:24
**prohibited** [3] - 32:5, 85:6, 86:10
**promise** [1] - 220:7

**promoted** [1] - 114:19
**prong** [1] - 9:19
**proof** [2] - 240:5, 243:25
**propensity** [1] - 240:18
**proper** [2] - 78:20, 140:22
**property** [8] - 122:11, 127:6, 127:9, 127:11, 128:13, 134:5, 134:11, 134:12
**prosecution** [1] - 212:1
**protect** [8] - 12:3, 30:5, 61:19, 63:16, 67:15, 176:8, 208:4
**protected** [8] - 9:3, 11:16, 13:5, 13:7, 13:20, 13:22, 14:2, 14:5
**protecting** [1] - 49:14
**protection** [3] - 58:8, 59:20, 88:11
**protective** [3] - 88:16, 145:3, 186:21
**protector** [1] - 172:2
**protectors** [1] - 172:3
**protects** [1] - 118:6
**protest** [4] - 15:22, 17:24, 67:16, 144:4
**protesting** [3] - 16:1, 146:22, 194:7
**protestor** [9] - 102:22, 103:4, 104:19, 105:5, 126:6, 126:7, 135:23, 216:5, 216:13
**protestors** [13] - 15:21, 15:25, 16:3, 16:21, 18:2, 102:15, 135:13, 135:20, 135:25, 136:4, 136:6, 136:10, 206:18
**protests** [7] - 5:19, 15:15, 17:25, 103:12, 144:13, 144:17, 253:1
**prove** [5] - 8:25, 9:1, 44:12, 44:13, 240:7
**provide** [7] - 48:13, 48:20, 68:1, 218:6, 227:15, 247:18, 249:3
**provided** [8] - 108:19, 116:11, 158:3, 159:6, 202:16, 221:6, 221:25, 227:5

**provides** [1] - 48:3
**providing** [1] - 197:8
**public** [23] - 4:5, 29:25, 30:13, 30:23, 30:25, 31:6, 31:9, 31:11, 31:19, 32:10, 32:15, 65:12, 73:11, 73:13, 78:17, 100:14, 100:17, 100:22, 101:1, 101:3, 138:5, 222:18, 249:18
**publicly** [3] - 5:13, 6:10, 227:11
**publish** [9] - 26:14, 83:1, 89:11, 94:1, 101:13, 131:19, 133:7, 153:15, 175:1
**published** [4] - 26:15, 91:19, 92:1, 132:5
**pull** [5] - 44:1, 93:1, 101:13, 129:10, 155:8
**pulled** [1] - 168:6
**pulverized** [1] - 178:24
**purpose** [10] - 4:12, 32:15, 47:1, 60:12, 66:5, 67:1, 106:3, 106:5, 205:1, 208:4
**purposes** [7] - 11:18, 13:16, 21:9, 124:14, 134:11, 158:15, 223:13
**pursue** [2] - 12:18, 223:10
**purview** [1] - 88:18
**push** [25] - 50:18, 51:4, 77:3, 149:11, 150:4, 150:6, 150:7, 152:13, 163:14, 182:10, 183:22, 184:22, 185:1, 185:7, 185:8, 185:9, 187:9, 194:2, 197:12, 197:16, 199:21, 202:12, 208:2
**pushed** [13] - 61:3, 149:12, 181:25, 182:12, 182:14, 183:4, 183:6, 199:16, 209:23, 210:10, 211:1, 211:9, 211:14
**pushing** [6] - 188:10, 188:11, 189:4, 197:15, 199:16, 217:12
**put** [22] - 9:18, 9:20,

12:13, 12:22, 13:16, 20:21, 81:8, 95:17, 123:7, 123:14, 145:5, 157:23, 171:14, 172:4, 172:12, 177:13, 178:16, 199:20, 200:9, 207:13, 239:8, 249:3
**putting** [3] - 94:14, 172:12, 236:14
**puzzled** [2] - 234:16, 234:18
**puzzles** [1] - 231:13

## Q

**quadrant** [3] - 145:18, 145:20, 188:16
**questioning** [3] - 10:9, 16:24, 222:4
**questions** [26] - 3:19, 15:13, 15:14, 75:5, 78:8, 80:16, 84:22, 90:17, 91:15, 105:19, 106:17, 107:2, 137:1, 137:3, 157:6, 162:20, 200:10, 216:18, 218:2, 219:3, 220:10, 221:20, 224:6, 240:16, 242:12, 255:6
**quick** [3] - 191:18, 208:20, 229:19
**quickly** [9] - 112:9, 138:7, 166:1, 172:10, 180:12, 204:3, 208:21, 226:7, 229:22
**quiet** [1] - 18:2
**quite** [4] - 108:2, 192:13, 234:16, 234:18
**quote** [1] - 70:14

## R

**rack** [12] - 34:13, 35:7, 37:6, 70:18, 71:1, 71:23, 72:5, 76:4, 76:5, 81:8, 113:1, 113:3
**racks** [27] - 21:1, 21:9, 36:25, 37:5, 37:7, 71:2, 71:10, 72:21, 72:24, 73:3, 73:7, 73:9, 73:12, 73:13, 76:8, 78:18, 81:19, 87:7, 99:5, 202:15,

232:17, 234:23, 235:10, 235:12, 237:4, 238:7, 239:1
**radio** [44] - 52:2, 73:18, 77:5, 77:16, 77:21, 77:23, 78:1, 78:5, 78:17, 78:21, 78:22, 79:5, 80:4, 80:9, 80:11, 80:17, 80:21, 81:3, 81:5, 82:6, 82:10, 116:17, 116:21, 117:3, 231:1, 231:11, 232:6, 232:10, 233:2, 233:4, 234:5, 234:7, 234:19, 235:8, 235:20, 235:22, 236:20, 237:8, 237:13, 237:17, 238:3, 238:19
**radios** [1] - 66:21
**rain** [2] - 40:1, 85:13
**raise** [2] - 141:19, 233:4
**raised** [3] - 14:7, 14:9, 233:2
**rallied** [1] - 62:1
**ramp** [1] - 175:21
**ran** [3] - 171:4, 192:1, 232:21
**rank** [11] - 23:16, 23:17, 23:19, 23:22, 142:22, 143:13, 165:17, 165:23, 166:3, 166:6, 201:10
**ranks** [1] - 166:1
**rapid** [1] - 204:22
**rapidly** [1] - 204:14
**rare** [1] - 222:19
**rate** [1] - 116:23
**rather** [3] - 185:3, 229:14, 243:13
**ray** [1] - 32:6
**re** [1] - 71:20
**re-erected** [1] - 71:20
**reach** [6] - 126:19, 126:24, 127:1, 127:3, 194:8, 238:17
**reached** [1] - 194:19
**react** [1] - 194:20
**reacting** [1] - 187:10
**reaction** [5] - 138:24, 138:25, 178:18, 221:9, 221:16
**read** [13] - 9:8, 16:9, 18:22, 39:13, 55:4, 84:4, 84:5, 84:8, 92:13, 92:21, 96:18, 248:7, 252:16

**reading** [2] - 11:4, 159:4
**ready** [7] - 22:18, 141:22, 167:10, 168:4, 171:17, 220:24, 254:1
**real** [3] - 249:2, 249:5, 250:1
**realize** [1] - 229:13
**realized** [3] - 22:3, 22:4, 169:16
**really** [14] - 9:24, 9:25, 44:6, 78:24, 140:21, 147:22, 157:6, 169:2, 178:24, 193:21, 215:3, 222:7, 224:13, 235:17
**reason** [12] - 67:7, 96:24, 179:16, 182:5, 191:25, 203:10, 240:19, 241:23, 248:20, 249:2, 249:5, 250:2
**reasonable** [1] - 98:19
**reasonableness** [1] - 17:9
**reasons** [7] - 30:7, 32:13, 32:24, 42:3, 59:18, 65:10, 84:22
**rebound** [1] - 208:19
**rebut** [2] - 9:12, 9:15
**rebuttal** [1] - 232:2
**receive** [5] - 33:3, 50:19, 118:12, 145:25, 192:4
**RECEIVED** [1] - 2:14
**received** [29] - 12:24, 26:12, 35:21, 38:24, 40:21, 46:6, 49:20, 49:22, 49:24, 50:9, 51:16, 54:4, 62:16, 62:23, 63:1, 93:25, 115:25, 121:19, 124:5, 125:12, 133:6, 146:2, 152:5, 153:14, 155:4, 155:25, 176:25, 177:2, 213:21
**receiving** [2] - 116:17, 172:25
**recently** [2] - 143:4, 242:14
**recess** [11] - 57:14, 57:19, 103:20, 103:23, 104:2, 104:3, 104:4, 104:9, 104:12, 104:16, 139:21
**Recess** [4] - 74:7,

75:8, 141:14, 169:8
**recesses** [1] - 104:6
**recognize** [29] - 25:12, 34:10, 41:14, 49:6, 50:25, 52:24, 77:7, 79:2, 82:24, 91:8, 92:8, 93:4, 93:12, 93:15, 105:14, 121:2, 122:19, 124:17, 129:14, 129:16, 129:18, 151:15, 152:23, 154:13, 155:9, 213:12, 213:15, 214:3, 214:5
**recognized** [2] - 12:17, 96:2
**recollection** [4] - 7:1, 81:21, 113:9, 131:4
**Reconstruction** [1] - 166:10
**reconstructionist** [1] - 201:14
**reconvene** [3] - 61:10, 62:3, 64:8
**record** [42] - 3:6, 6:21, 7:19, 11:6, 43:4, 147:18, 150:17, 150:19, 151:1, 151:3, 164:11, 176:11, 176:14, 177:15, 177:18, 183:8, 183:12, 184:4, 184:7, 187:19, 187:22, 188:14, 188:18, 189:16, 189:20, 190:19, 190:22, 190:25, 192:20, 192:25, 195:4, 195:7, 196:15, 196:19, 197:17, 197:20, 198:5, 198:8, 224:8, 232:23, 246:21, 256:10
**Record** [1] - 69:16
**recorded** [2] - 1:24, 43:6
**recording** [7] - 123:20, 124:22, 150:18, 150:19, 150:21, 151:3, 248:6
**records** [5] - 6:17, 6:23, 232:13, 233:11, 233:12
**recross** [2] - 110:13, 138:15
**Recross** [3] - 2:5, 2:8, 2:12

**RECROSS** [3] - 111:9, 138:17, 219:5
**RECROSS-EXAMINATION** [3] - 111:9, 138:17, 219:5
**Recross-Examination........... ..** [3] - 2:5, 2:8, 2:12
**red** [8] - 34:17, 35:5, 35:8, 35:14, 70:22, 70:23, 71:2, 181:7
**redacted** [10] - 4:3, 5:6, 5:12, 5:14, 5:17, 5:23, 6:4, 6:6, 249:18
**redactions** [1] - 5:8
**redirect** [8] - 105:20, 110:20, 141:17, 141:18, 160:15, 162:22, 166:21, 216:20
**Redirect** [4] - 2:5, 2:7, 2:10, 2:12
**REDIRECT** [4] - 105:22, 137:6, 162:24, 216:22
**refer** [14] - 27:5, 27:22, 29:22, 29:23, 34:13, 41:23, 67:11, 91:17, 92:5, 108:16, 109:9, 118:4, 119:1, 165:19
**reference** [8] - 20:1, 20:4, 26:21, 35:25, 36:13, 42:5, 71:7, 85:3
**referenced** [4] - 73:5, 87:10, 87:25, 108:14
**referencing** [5] - 3:21, 36:9, 83:9, 85:4, 87:14
**referred** [10] - 27:11, 27:14, 27:20, 27:23, 28:21, 33:12, 37:9, 37:12, 99:10, 136:14
**referring** [16] - 5:11, 27:17, 29:2, 37:19, 39:6, 39:13, 49:10, 53:3, 69:18, 71:19, 216:5, 216:7, 216:8, 225:5, 250:12, 254:7
**refers** [1] - 109:8
**reflect** [31] - 123:23, 153:7, 154:21, 155:18, 176:11, 176:14, 177:15, 177:18, 183:8, 183:12, 184:4, 184:7, 185:22, 187:19, 187:22, 188:14, 188:18,

189:16, 189:20, 190:19, 190:22, 192:20, 192:25, 195:4, 195:7, 196:15, 196:19, 197:17, 197:20, 198:5, 198:8
**reflects** [1] - 190:25
**refrain** [1] - 201:23
**refraining** [1] - 15:11
**refreshing** [1] - 7:1
**refused** [1] - 180:3
**regard** [10] - 38:3, 43:19, 43:20, 67:23, 86:7, 88:4, 90:3, 201:16, 222:14, 247:19
**regarded** [1] - 208:7
**regarding** [2] - 49:13, 65:13
**regards** [2] - 27:10, 209:2
**region** [2] - 167:11, 167:12
**regular** [4] - 43:3, 145:7, 174:9, 179:12
**relate** [1] - 246:13
**related** [3] - 64:6, 144:12, 244:25
**relates** [1] - 116:25
**relating** [3] - 8:20, 9:18, 21:25
**relation** [2] - 18:25, 19:5
**relative** [3] - 28:6, 149:1, 182:25
**relatively** [7] - 64:20, 64:21, 66:15, 182:1, 184:25, 193:19, 193:20
**released** [2] - 87:5, 146:17
**releases** [5] - 65:15, 87:2, 87:3, 87:4
**relevance** [3] - 44:10, 44:17, 235:18
**relevancy** [1] - 16:7
**relevant** [19] - 9:24, 10:6, 12:6, 12:25, 13:17, 15:16, 17:1, 18:9, 18:12, 44:14, 130:13, 230:18, 237:1, 238:10, 239:3, 242:16, 245:5, 247:15, 250:23
**relocated** [1] - 62:1
**relocating** [1] - 98:2
**remain** [2] - 8:5, 116:13

**remains** [1] - 52:21
**remember** [32] - 94:12, 146:14, 146:15, 146:19, 146:23, 146:24, 149:17, 152:19, 162:19, 168:5, 169:16, 174:17, 174:22, 175:2, 185:22, 186:3, 186:5, 190:4, 190:8, 191:20, 199:6, 201:17, 211:16, 217:25, 218:15, 218:17, 218:25, 219:9, 230:14, 240:14, 241:10
**remembered** [1] - 217:23
**remind** [7] - 4:12, 11:10, 14:25, 27:15, 75:2, 75:20, 169:10
**reminded** [2] - 242:20, 252:21
**remorse** [2] - 239:21, 240:11
**remove** [9] - 61:16, 68:2, 73:15, 76:20, 79:11, 171:14, 185:15, 197:11, 206:6
**removed** [9] - 62:15, 71:20, 76:13, 97:15, 97:24, 102:22, 103:4, 104:20, 189:2
**removing** [4] - 105:5, 106:22, 106:25
**rendering** [5] - 176:17, 177:9, 177:11, 183:15, 189:12
**renderings** [3] - 175:2, 189:5, 189:7
**reopen** [1] - 196:3
**repeat** [3] - 135:16, 169:14, 174:23
**rephrase** [2] - 109:22, 201:23
**reply** [3] - 227:22, 229:2, 254:12
**report** [12] - 115:15, 209:9, 210:7, 210:11, 210:14, 210:15, 210:18, 210:24, 211:1, 211:11, 211:13
**reported** [1] - 222:18
**REPORTER** [2] - 256:7, 256:15
**reporter** [1] - 114:7

**Reporter** [1] - 1:21
**reporters** [2] - 247:11, 247:12
**reports** [2] - 210:16, 222:20
**represent** [1] - 125:20
**representations** [1] - 160:11
**representative** [4] - 8:9, 8:12, 8:13, 8:19
**Representatives** [7] - 33:15, 53:14, 55:1, 55:9, 57:7, 87:3, 100:23
**represented** [4] - 8:21, 12:1, 12:18, 131:3
**reprimanded** [1] - 162:7
**request** [4] - 97:16, 109:3, 225:25, 243:5
**requested** [1] - 97:20
**requester** [1] - 98:5
**requesting** [1] - 99:13
**require** [4] - 76:19, 103:7, 223:20, 243:25
**required** [7] - 32:16, 52:14, 55:2, 95:24, 210:17, 210:24, 248:22
**requirements** [1] - 24:8
**requiring** [1] - 9:10
**requisite** [1] - 17:5
**research** [1] - 233:13
**resecure** [7] - 60:22, 60:23, 73:16, 90:8, 103:24, 106:10, 106:15
**resecured** [1] - 61:6
**reselect** [1] - 183:25
**resident** [1] - 247:25
**resist** [1] - 197:13
**resistance** [1] - 208:24
**resolve** [3] - 238:22, 252:19, 254:8
**resources** [3] - 255:15, 255:18, 255:21
**respect** [7] - 10:21, 11:10, 11:13, 118:12, 191:9, 230:18, 244:24
**respective** [4] - 34:14, 57:14, 58:9, 91:3
**respiration** [1] - 178:25
**respond** [11] - 14:16, 14:24, 81:25, 87:16,

116:5, 117:4, 117:6, 145:11, 146:3, 228:22, 229:21
**responded** [4] - 145:6, 146:6, 146:9, 147:14
**responding** [2] - 117:13, 118:11
**response** [12] - 81:24, 81:25, 117:8, 117:20, 158:6, 227:20, 228:3, 228:5, 228:20, 229:18, 250:9, 254:13
**Response** [7] - 114:20, 114:21, 115:1, 115:2, 115:4, 115:5, 117:11
**responsibilities** [6] - 23:24, 24:9, 118:12, 143:9, 166:12, 167:6
**responsibility** [3] - 88:16, 105:11, 166:13
**responsible** [3] - 92:18, 106:22, 167:11
**rest** [5] - 99:7, 176:21, 177:21, 177:22, 199:22
**restaurants** [1] - 10:25
**resting** [1] - 39:22
**restrain** [2] - 162:6, 162:9
**restricted** [19] - 11:18, 13:8, 13:13, 13:14, 13:15, 14:1, 14:13, 20:23, 20:24, 21:11, 34:23, 66:2, 66:12, 66:23, 72:9, 72:17, 84:19, 84:25, 253:12
**restriction** [1] - 65:2
**restrictions** [7] - 65:16, 65:20, 66:17, 86:13, 89:5, 96:17, 96:20
**restrictive** [1] - 65:10
**result** [1] - 248:24
**resume** [5] - 62:13, 74:20, 75:15, 75:23, 169:14
**RESUMED** [1] - 75:19
**retire** [1] - 201:14
**retreading** [1] - 141:20
**return** [1] - 75:3
**revealing** [1] - 141:10
**revert** [1] - 58:7
**review** [24] - 13:2, 43:9, 43:13, 45:9, 46:24, 50:17, 55:21,

56:19, 93:6, 121:9, 122:23, 123:11, 124:25, 154:6, 154:8, 154:18, 155:11, 158:8, 200:3, 210:20, 218:9, 240:9, 243:21, 253:23
**reviewed** [15] - 7:5, 7:11, 25:19, 31:24, 53:10, 53:17, 123:8, 151:19, 153:4, 230:12, 231:23, 245:8, 245:15, 245:22, 252:7
**reviewing** [6] - 54:17, 158:17, 175:2, 185:19, 190:5, 243:12
**revisit** [1] - 14:21
**rewind** [1] - 153:24
**ricochet** [2] - 208:12, 208:20
**ricochets** [1] - 191:24
**ricochetting** [3] - 191:25, 208:10, 208:25
**right-hand** [1] - 45:9
**rights** [4] - 101:9, 108:9, 251:3, 251:6
**riot** [19] - 68:3, 68:5, 68:6, 68:7, 68:8, 68:9, 68:10, 103:24, 166:17, 166:19, 171:22, 171:23, 198:16, 203:25, 208:2, 208:3, 248:13, 249:19
**rioter** [1] - 64:6
**rioters** [25] - 12:23, 38:14, 57:20, 58:2, 60:24, 61:7, 62:4, 62:6, 62:15, 63:8, 63:12, 103:10, 106:5, 183:17, 183:21, 184:11, 184:15, 185:6, 187:13, 188:24, 189:2, 198:11, 198:13, 199:6, 199:11
**riots** [6] - 63:20, 66:20, 248:24, 249:8, 249:10
**risers** [3] - 28:25, 29:21, 29:23
**risk** [1] - 7:23
**river** [1] - 169:21
**Riverdale** [5] - 168:3, 170:4, 170:5, 170:7,

170:8
**road** [1] - 172:13
**roadway** [1] - 173:20
**RODNEY** [2] - 2:9, 142:6
**Rodney** [3] - 139:25, 142:3, 142:14
**Roger** [2] - 3:16, 125:20
**ROGER** [1] - 1:16
**role** [2] - 100:14, 165:2
**roll** [4] - 132:4, 205:6, 206:6, 206:11
**rolling** [4] - 133:18, 134:1, 134:14, 214:23
**room** [8] - 33:14, 74:12, 170:20, 170:23, 171:1, 171:15, 183:6, 252:23
**Room** [1] - 1:22
**Roots** [73] - 3:16, 15:7, 17:22, 22:2, 22:9, 34:25, 35:2, 44:4, 73:19, 74:2, 75:23, 77:14, 77:21, 78:4, 78:15, 78:24, 79:22, 82:5, 82:16, 91:14, 91:17, 92:5, 100:11, 106:17, 107:2, 110:12, 111:6, 113:21, 125:20, 130:5, 130:16, 130:22, 131:7, 131:15, 139:4, 139:16, 140:16, 141:16, 157:1, 158:2, 159:2, 159:4, 159:11, 159:19, 160:4, 161:5, 200:11, 205:17, 209:13, 211:23, 217:12, 217:22, 219:4, 219:21, 220:24, 221:1, 222:25, 224:1, 224:16, 225:6, 226:18, 228:7, 228:21, 229:21, 239:6, 241:5, 241:13, 244:10, 244:24, 250:16, 252:18, 253:25, 254:21
**ROOTS** [244] - 1:16, 6:3, 8:2, 9:7, 10:13, 15:1, 15:8, 15:13, 15:17, 16:13, 17:11,

17:23, 18:15, 20:21, 21:12, 21:17, 21:21, 21:23, 26:10, 34:22, 35:5, 35:13, 38:3, 38:22, 40:19, 43:19, 44:6, 44:9, 44:16, 44:21, 46:4, 50:7, 51:14, 54:2, 57:15, 60:2, 62:9, 64:13, 65:6, 72:16, 73:22, 75:25, 77:22, 78:16, 79:6, 79:18, 80:8, 80:12, 80:14, 81:17, 82:7, 82:18, 82:20, 83:1, 83:3, 88:25, 89:9, 92:7, 93:21, 94:1, 94:3, 94:22, 98:14, 99:4, 99:24, 100:5, 100:13, 103:14, 103:19, 104:25, 105:19, 109:7, 109:20, 110:13, 110:18, 111:10, 111:14, 111:16, 111:17, 113:14, 121:17, 124:3, 125:10, 125:18, 126:1, 126:3, 126:23, 127:24, 130:6, 130:9, 130:13, 130:17, 130:19, 131:13, 132:1, 132:10, 132:17, 133:1, 133:7, 133:11, 133:20, 134:3, 134:16, 135:11, 135:18, 136:25, 138:14, 138:18, 139:5, 139:6, 139:17, 141:21, 152:3, 153:12, 155:2, 155:23, 157:3, 158:3, 158:17, 159:12, 159:21, 160:6, 160:20, 161:11, 161:16, 161:19, 162:20, 163:17, 185:10, 198:18, 200:13, 201:23, 201:24, 202:4, 203:21, 205:6, 205:9, 205:13, 205:19, 205:22, 206:13, 207:8, 208:22, 209:15, 209:22, 210:6, 211:25, 213:2, 213:14, 213:18, 213:22,

213:24, 214:2, 214:10, 214:13, 214:25, 215:6, 215:8, 216:1, 216:11, 216:18, 217:18, 219:6, 219:18, 219:22, 219:24, 221:5, 222:5, 222:11, 224:4, 224:22, 225:13, 226:3, 226:7, 227:1, 227:8, 227:24, 228:11, 228:16, 229:22, 230:4, 230:8, 230:12, 230:16, 230:19, 230:23, 231:6, 231:12, 232:10, 232:16, 232:24, 233:7, 234:15, 234:21, 235:6, 235:10, 235:15, 235:19, 236:3, 236:9, 236:12, 236:21, 238:6, 238:25, 239:4, 241:18, 241:25, 242:8, 242:16, 242:20, 242:24, 243:18, 243:24, 244:4, 244:6, 244:19, 245:1, 245:6, 245:17, 245:21, 246:6, 246:8, 246:15, 247:8, 247:17, 247:24, 248:14, 248:17, 248:22, 249:7, 249:23, 249:25, 250:4, 250:7, 250:17, 250:25, 251:7, 252:20, 253:10, 253:21, 254:3, 254:15, 254:18, 254:22
**roughly** [8] - 28:10, 30:3, 36:22, 37:1, 38:16, 62:14, 73:21, 76:12
**round** [1] - 178:2
**route** [6] - 119:5, 119:16, 147:6, 168:17, 170:11, 173:11
**routinely** [3] - 65:9, 68:19, 141:16
**RPR** [1] - 1:21
**rugby** [1] - 197:14
**rule** [6] - 104:18,

159:18, 227:21, 254:1, 254:2, 255:9
**Rule** [3] - 7:16, 8:8, 8:9
**ruled** [2] - 8:11, 11:12
**rules** [1] - 105:11
**ruling** [2] - 15:8, 226:16
**rulings** [1] - 14:20
**Rummens** [43] - 3:11, 25:1, 25:2, 26:16, 27:13, 28:19, 34:8, 37:15, 39:18, 41:6, 41:8, 44:24, 49:4, 50:23, 53:6, 54:5, 54:18, 55:3, 55:13, 55:24, 56:6, 56:12, 57:1, 57:5, 57:10, 108:23, 119:2, 119:8, 119:23, 120:2, 122:16, 124:6, 124:9, 147:13, 148:1, 153:21, 153:23, 154:12, 155:8, 156:1, 156:5, 156:9, 175:14
**rumors** [3] - 18:18, 19:12
**run** [19] - 3:19, 7:4, 42:7, 77:16, 77:21, 77:23, 78:1, 78:5, 78:22, 171:2, 231:11, 234:19, 235:8, 236:20, 237:8, 237:14, 237:17, 238:3, 238:19
**running** [6] - 161:2, 163:1, 186:25, 204:2, 204:6
**runs** [8] - 232:6, 232:10, 233:2, 233:4, 234:5, 234:7, 235:8, 235:20
**rush** [1] - 251:1

**S**

**safe** [10] - 24:9, 33:24, 58:10, 60:12, 62:1, 66:7, 103:7, 105:10, 122:14, 157:14
**safely** [2] - 61:10, 64:7
**safety** [10] - 24:11, 30:8, 48:15, 60:9, 61:15, 62:2, 68:3, 122:15, 137:24
**Safeway** [6] - 9:13, 9:21, 9:24, 10:1,

10:21, 10:22
**SAMANTHA**[1] - 1:13
**Samantha** [1] - 3:7
**Sara** [2] - 256:9, 256:14
**SARA** [1] - 1:21
**saw** [16] - 13:13, 54:10, 120:17, 120:18, 128:24, 131:3, 133:12, 134:25, 173:24, 181:16, 188:4, 196:23, 197:1, 204:18, 222:5, 237:2
**scaffolding** [2] - 30:12, 30:22
**scale** [1] - 144:16
**scared** [1] - 192:11
**scene** [13] - 89:12, 89:24, 90:2, 90:3, 90:18, 129:19, 131:5, 131:21, 138:19, 173:9, 185:23, 203:22, 204:17
**schedule** [2] - 15:5, 167:6
**scheduled** [1] - 46:19
**scheduling** [2] - 21:24, 144:21
**school** [4] - 164:22, 166:18, 167:1, 171:13
**Scott** [4] - 140:8, 163:25, 164:2, 164:13
**SCOTT** [2] - 2:11, 164:3
**screen** [53] - 27:16, 27:20, 28:20, 29:5, 39:2, 45:10, 54:14, 55:4, 56:10, 70:20, 82:25, 85:21, 108:25, 119:4, 119:24, 121:2, 132:18, 133:22, 137:8, 156:14, 170:17, 175:6, 175:8, 181:6, 181:8, 181:20, 181:22, 183:11, 186:25, 187:6, 187:24, 188:16, 189:15, 189:18, 189:19, 189:21, 190:2, 191:2, 192:22, 192:24, 193:1, 195:6, 195:8, 196:17, 196:20, 197:22, 198:6,

207:16, 215:2, 215:10, 221:6
**screening** [4] - 32:1, 32:8, 59:11, 68:25
**screens** [1] - 125:24
**scroll** [3] - 93:7, 93:8, 94:23
**scrolling** [2] - 93:9, 93:10
**Sean** [1] - 3:8
**SEAN** [1] - 1:13
**search** [1] - 7:1
**searched** [1] - 32:6
**season** [1] - 25:17
**seated** [3] - 29:21, 47:15, 190:15
**seating** [3] - 28:25, 29:9, 29:22
**seats** [1] - 171:14
**second** [12] - 4:5, 8:10, 13:6, 24:2, 41:19, 44:5, 77:19, 129:12, 184:6, 196:4, 208:16, 252:13
**seconds** [37] - 41:8, 41:11, 45:12, 45:23, 53:7, 53:10, 54:7, 54:10, 54:19, 54:22, 56:12, 150:24, 150:25, 153:24, 156:2, 158:9, 186:8, 187:21, 187:25, 188:3, 191:3, 191:8, 191:19, 191:23, 193:9, 195:9, 195:13, 195:22, 196:6, 196:23, 197:2, 197:23, 197:24, 215:1
**Secret** [13] - 6:16, 48:5, 48:7, 48:10, 48:19, 49:11, 51:3, 88:4, 88:6, 88:11, 88:18, 102:1
**Section** [4] - 10:7, 13:16, 50:16, 166:9
**sections** [2] - 76:8, 76:11
**sector** [4] - 9:12, 9:14, 92:19, 92:20
**sectoring** [1] - 108:5
**sectors** [2] - 10:3, 108:3
**secure** [19] - 24:9, 30:4, 33:8, 33:24, 36:12, 36:13, 37:7, 58:25, 59:4, 60:14, 60:20, 60:22, 69:3, 73:14, 102:25,

103:7, 105:9, 107:20
**secured** [6] - 19:3, 61:9, 71:13, 106:9, 106:20, 251:20
**securing** [1] - 47:5
**security** [21] - 5:5, 30:7, 30:16, 33:22, 34:18, 35:10, 35:13, 42:5, 42:7, 42:8, 48:3, 58:7, 58:21, 59:6, 59:11, 59:23, 59:24, 68:1, 87:16, 116:11, 165:7
**see** [126] - 7:23, 16:7, 16:11, 16:24, 17:17, 18:10, 25:5, 26:24, 28:17, 29:7, 31:2, 31:3, 37:6, 37:7, 38:8, 39:3, 39:6, 39:12, 39:13, 39:22, 39:23, 40:3, 40:4, 44:11, 49:10, 54:14, 54:24, 56:3, 57:8, 65:24, 70:20, 71:6, 74:12, 79:15, 79:24, 82:1, 82:25, 83:5, 83:14, 84:13, 84:15, 85:8, 85:17, 85:25, 86:1, 86:5, 93:2, 94:2, 94:6, 94:9, 94:25, 95:4, 95:5, 95:7, 95:10, 96:15, 98:16, 101:21, 111:19, 112:12, 113:6, 123:15, 123:19, 127:9, 127:25, 128:7, 128:9, 128:10, 128:20, 128:23, 131:8, 131:17, 132:2, 132:11, 132:18, 133:14, 133:21, 135:2, 137:21, 138:7, 141:4, 152:12, 152:14, 156:7, 156:12, 156:19, 160:10, 173:15, 175:9, 181:12, 185:25, 186:11, 186:23, 186:24, 187:6, 188:7, 190:1, 190:11, 191:11, 191:18, 195:12, 195:14, 195:24, 196:11, 198:3, 202:15, 203:23, 204:2, 204:4, 205:10, 205:14, 205:24, 206:7, 206:14, 214:8,

214:14, 214:15, 215:9, 215:11, 215:14, 239:19, 244:8, 247:6, 253:3, 253:8, 256:1
**seeing** [5] - 146:14, 146:15, 146:18, 175:6, 205:18
**seeking** [1] - 100:7
**seem** [2] - 8:10, 223:3
**sees** [2] - 171:1, 190:23
**self** [5] - 11:19, 11:22, 11:24, 12:19, 222:10
**self-defense** [5] - 11:19, 11:22, 11:24, 12:19, 222:10
**semirectangular** [1] - 109:6
**Senate** [30] - 32:18, 33:14, 33:15, 36:5, 41:20, 52:16, 52:18, 52:19, 52:20, 54:12, 54:25, 55:10, 56:1, 56:2, 56:4, 57:13, 57:23, 64:3, 69:9, 69:11, 69:12, 69:15, 69:19, 69:20, 69:22, 70:2, 70:8, 87:2, 107:6, 109:9
**senator** [2] - 56:11, 56:18
**sense** [8] - 96:4, 151:2, 201:5, 220:17, 230:20, 231:19, 233:16, 239:9
**sent** [4] - 5:9, 164:23, 165:2, 244:7
**sentencing** [7] - 239:13, 240:2, 240:9, 240:11, 240:13, 241:15, 242:6
**separate** [4] - 55:21, 88:1, 99:18, 167:24
**separated** [1] - 112:4
**separates** [1] - 99:16
**separation** [2] - 112:14, 180:25
**September** [2] - 165:4, 165:5
**sequestration** [1] - 7:11
**sergeant** [5] - 23:20, 148:20, 200:25, 201:1
**Sergeant** [9] - 148:19, 148:22, 149:1, 151:8, 154:7, 154:9,

154:16, 155:16, 156:19
**served** [1] - 164:23
**Service** [13] - 6:16, 48:5, 48:7, 48:11, 48:19, 49:11, 51:3, 88:4, 88:6, 88:11, 88:18, 102:2
**Services** [1] - 24:1
**serving** [1] - 201:7
**session** [10] - 32:25, 47:2, 52:11, 55:6, 55:8, 55:12, 62:3, 102:20, 105:7, 105:8
**Session** [2] - 33:13, 46:23
**sessions** [4] - 34:2, 34:6, 57:14, 69:24
**set** [16] - 14:15, 15:5, 59:12, 62:19, 66:19, 68:16, 78:14, 113:12, 118:16, 148:7, 150:19, 181:2, 214:5, 228:19, 252:23, 252:25
**sets** [2] - 47:12, 102:1
**setting** [4] - 34:5, 60:11, 106:17, 203:22
**Seventh** [4] - 143:8, 143:9, 145:16
**several** [6] - 24:3, 152:18, 173:16, 178:20, 191:11, 211:7
**severe** [4] - 208:7, 217:13, 217:15, 217:17
**shakes** [1] - 11:1
**shape** [5] - 84:10, 109:8, 109:10, 113:6, 177:16
**shaped** [1] - 7:24
**share** [3] - 141:1, 226:24, 233:23
**shared** [1] - 50:14
**sharp** [1] - 139:21
**Sheen** [2] - 16:15, 17:21
**sheets** [1] - 49:16
**sheriff** [1] - 200:18
**shield** [18] - 117:25, 175:24, 175:25, 176:3, 176:5, 176:6, 176:7, 181:23, 182:22, 190:10, 194:19, 199:18, 207:23, 208:3, 208:4, 208:7, 217:13

**shields** [7] - 176:9, 178:7, 180:14, 185:6, 194:2, 194:8, 208:2
**shift** [4] - 115:7, 115:9, 144:18, 168:5
**shin** [1] - 172:3
**shirt** [4] - 117:17, 145:1, 170:14, 171:21
**shirts** [4] - 170:13, 170:16, 171:8, 172:7
**shoot** [1] - 136:16
**Shooter** [3] - 115:1, 115:2, 115:5
**short** [3] - 74:14, 193:13, 201:13
**shorten** [1] - 130:23
**shorthand** [1] - 1:24
**shortly** [2] - 159:20, 200:6
**shoulder** [2] - 172:1
**shout** [1] - 101:1
**show** [26] - 4:13, 9:10, 9:24, 13:10, 25:1, 26:18, 34:18, 35:10, 36:8, 37:15, 41:7, 49:4, 50:23, 98:8, 98:11, 101:15, 128:3, 147:3, 174:25, 213:22, 220:7, 221:15, 225:9, 229:7, 239:9, 239:20
**showed** [6] - 60:5, 91:2, 107:5, 107:8, 212:10, 242:3
**showing** [11] - 9:13, 9:15, 10:21, 53:2, 89:21, 141:8, 151:13, 152:21, 185:2, 185:17, 221:5
**shown** [19] - 25:16, 35:23, 38:25, 50:11, 52:23, 58:18, 82:22, 89:10, 89:17, 90:7, 90:21, 91:20, 107:3, 109:3, 111:14, 120:25, 127:14, 128:6, 130:25
**shows** [10] - 7:15, 53:14, 53:15, 79:10, 127:11, 136:23, 158:3, 160:19, 224:6, 249:19
**shut** [3] - 179:24, 248:8
**side** [58] - 19:3, 19:4, 19:5, 20:15, 25:16, 26:20, 27:23, 28:16,

28:17, 29:13, 36:5, 36:8, 46:17, 52:15, 58:16, 58:17, 63:22, 63:24, 64:2, 64:3, 108:14, 108:21, 118:21, 118:22, 119:10, 119:21, 120:7, 120:9, 120:19, 124:21, 146:7, 147:8, 149:20, 149:21, 154:16, 173:14, 173:15, 180:19, 183:9, 189:7, 189:8, 189:9, 215:10, 217:3, 217:6, 221:14, 235:17, 238:22, 246:14, 255:5, 255:16, 255:19, 255:21
**Side** [1] - 119:1
**side-by-side** [2] - 124:21, 154:16
**sidearm** [1] - 117:19
**sides** [5] - 225:20, 226:11, 226:19, 243:3, 253:15
**sidewalks** [1] - 64:24
**sight** [2] - 181:13, 191:24
**sign** [13] - 39:25, 40:12, 83:4, 83:9, 83:14, 83:23, 85:10, 85:11, 85:12, 85:17, 85:18, 85:21
**SIGNATURE** [1] - 256:15
**significance** [2] - 44:2, 194:25
**significant** [4] - 59:9, 76:19, 76:21, 97:9
**signs** [30] - 13:14, 20:24, 21:4, 21:5, 21:6, 36:23, 39:14, 39:16, 40:5, 40:13, 40:23, 41:1, 65:11, 65:12, 82:21, 83:24, 84:5, 85:4, 85:6, 86:7, 86:8, 86:15, 99:18, 202:15, 241:7, 241:9, 241:23, 242:15
**similar** [4] - 8:16, 32:2, 36:15, 139:10
**similarly** [2] - 85:14, 252:12
**simply** [8] - 7:25, 9:11, 13:19, 29:23, 166:4, 194:7, 204:13, 239:20

**single** [7] - 8:12, 8:13, 78:1, 78:5, 177:25, 210:21, 232:12
**single-file** [1] - 177:25
**sirens** [1] - 171:14
**sit** [4] - 82:13, 159:6, 225:14, 231:23
**site** [5] - 30:9, 58:4, 67:2, 67:8, 67:13
**sites** [1] - 67:3
**sitting** [5] - 16:17, 47:24, 56:3, 57:8, 224:24
**situation** [8] - 8:16, 28:16, 122:4, 122:14, 172:22, 180:16, 204:13, 250:22
**situations** [1] - 122:13
**six** [10] - 52:9, 103:20, 103:22, 103:23, 104:2, 104:6, 104:9, 104:12, 141:18, 176:1
**six-and-a-half-hour** [1] - 104:6
**six-hour** [3] - 103:23, 104:2, 104:9
**Sixth** [1] - 114:15
**size** [1] - 84:10
**skimmed** [1] - 239:12
**skin** [1] - 179:3
**skip** [1] - 195:21
**skirmish** [1] - 204:7
**skyward** [1] - 191:15
**sleep** [2] - 22:14, 243:19
**slightly** [3] - 183:5, 194:16, 194:19
**slow** [1] - 239:20
**slowing** [1] - 141:6
**smaller** [2] - 198:2, 198:3
**smidgen** [1] - 77:6
**smiling** [1] - 17:21
**Smithsonian** [1] - 27:3
**smoke** [5] - 146:14, 178:23, 179:12
**smooth** [2] - 180:12, 180:15
**smoothly** [2] - 140:24, 168:16
**snatched** [1] - 194:19
**snippet** [1] - 213:11
**snow** [7] - 37:9, 37:10, 39:6, 39:11, 39:23, 71:8, 71:11
**soccer** [1] - 251:1
**solely** [1] - 245:18

**solid** [1] - 234:23
**solution** [1] - 237:16
**someone** [39] - 56:17, 60:5, 65:22, 66:14, 71:25, 76:17, 84:23, 86:15, 94:13, 94:16, 96:17, 98:10, 98:18, 98:24, 99:25, 109:15, 109:21, 109:25, 123:13, 128:7, 129:2, 146:2, 178:13, 207:22, 208:6, 211:9, 231:8, 231:10, 232:8, 233:18, 235:11, 237:1, 237:3, 245:15, 249:4, 249:5, 250:7
**sometimes** [5] - 4:16, 67:20, 95:25, 218:15, 255:21
**somewhat** [2] - 138:7, 184:25
**somewhere** [7] - 18:22, 79:8, 146:6, 147:8, 149:3, 194:15, 207:15
**soon** [1] - 162:2
**sorry** [48] - 4:23, 5:2, 29:22, 55:10, 56:22, 56:23, 64:3, 66:13, 68:23, 72:23, 73:19, 74:2, 74:11, 74:21, 74:24, 80:15, 90:23, 93:8, 95:16, 98:21, 100:16, 104:5, 109:9, 110:25, 112:2, 112:21, 124:15, 135:15, 135:16, 145:19, 165:23, 168:18, 168:19, 168:20, 169:1, 169:2, 170:5, 170:6, 183:19, 183:23, 184:1, 186:4, 196:25, 213:9, 219:9, 219:15, 228:19, 255:17
**sort** [22] - 10:25, 16:5, 17:13, 17:15, 21:24, 167:6, 173:9, 175:15, 175:17, 176:20, 178:9, 180:6, 186:25, 187:5, 188:15, 189:6, 195:13, 196:23, 208:12, 209:1, 229:18, 231:7
**sound** [8] - 4:18, 54:7,

101:6, 150:22, 153:19, 186:3, 186:5, 218:23
**sounds** [5] - 14:17, 20:13, 226:17, 247:5, 256:1
**south** [7] - 36:6, 46:17, 115:18, 173:14, 173:15, 189:7
**South** [3] - 116:2, 146:7, 147:9
**southeast** [2] - 92:19, 92:20
**southwest** [3] - 180:7, 181:9, 182:16
**space** [1] - 216:15
**Speaker** [2] - 53:16, 57:9
**speakers** [2] - 95:2, 187:15
**speaking** [6] - 7:7, 34:25, 66:12, 118:21, 211:5, 255:12
**speaks** [3] - 56:24, 160:7, 222:8
**Special** [10] - 3:12, 50:16, 115:12, 115:14, 118:20, 166:8, 168:2, 170:3, 218:6, 220:21
**special** [2] - 46:19, 48:23
**specific** [15] - 28:1, 50:20, 93:15, 97:11, 103:9, 107:16, 107:18, 172:4, 184:10, 190:4, 190:5, 193:12, 194:12, 218:16, 218:17
**specifically** [14] - 24:8, 27:10, 29:15, 30:12, 40:7, 56:23, 87:24, 152:15, 152:19, 218:25, 220:17, 221:8, 247:1, 250:10
**specificity** [1] - 115:23
**specifics** [1] - 58:11
**specifying** [1] - 179:16
**specs** [1] - 96:11
**speculation** [8] - 57:15, 94:20, 109:20, 201:21, 202:2, 207:5, 211:21, 217:18
**speculative** [1] -

109:21

**speech** [5] - 13:20, 13:22, 88:19, 88:23, 89:1

**speeches** [1] - 100:6

**speed** [3] - 153:24, 204:23, 239:9

**spell** [4] - 23:8, 114:7, 142:15, 164:11

**spent** [3] - 24:20, 108:2, 201:3

**spot** [2] - 197:8, 214:8

**spray** [13] - 66:21, 118:2, 146:16, 178:14, 178:22, 179:21, 179:22, 179:23, 179:25, 180:1, 242:21

**sprayed** [1] - 203:1

**spreadsheet** [1] - 225:5

**sprung** [1] - 241:15

**Squad** [6] - 143:14, 143:16, 144:6, 148:20, 148:25, 150:13

**squads** [1] - 173:22

**Square** [2] - 27:6, 34:1

**square** [1] - 27:8

**staff** [5] - 24:12, 24:14, 32:19, 63:17, 210:19

**staffing** [1] - 84:18

**stage** [25] - 28:13, 28:17, 29:1, 29:2, 29:16, 30:4, 30:8, 30:12, 30:22, 39:9, 39:10, 67:3, 115:17, 145:10, 174:11, 174:12, 174:14, 174:15, 177:6, 177:10, 177:12, 179:11, 179:14, 189:11

**staged** [1] - 145:9

**staging** [3] - 167:22, 252:23, 252:25

**stairs** [7] - 119:19, 119:21, 120:8, 134:24, 148:7, 148:9

**stamp** [14] - 43:24, 44:2, 45:7, 45:19, 55:3, 55:24, 57:2, 57:5, 121:7, 122:17, 156:5, 185:25, 237:7, 237:9

**stamped** [3] - 45:3, 45:5, 45:17

**stamps** [2] - 44:20, 243:17

**stance** [3] - 215:21, 215:22, 215:23

**STAND** [1] - 75:19

**stand** [18] - 19:22, 20:8, 21:13, 21:15, 21:16, 77:2, 105:12, 126:13, 161:7, 162:10, 221:21, 230:25, 231:23, 233:8, 240:1, 246:3, 246:20, 246:21

**standard** [2] - 171:13, 171:20

**standardized** [1] - 49:15

**standby** [2] - 151:1, 153:20

**standing** [9] - 16:17, 120:11, 148:9, 149:13, 170:17, 171:1, 181:12, 215:14, 247:2

**stands** [3] - 29:8, 29:10, 29:16

**staring** [2] - 170:17, 170:19

**start** [16] - 22:15, 32:14, 78:4, 94:2, 141:13, 166:20, 166:21, 172:22, 181:18, 220:14, 220:25, 229:1, 229:6, 229:12, 255:10

**started** [18] - 17:16, 17:24, 115:8, 115:9, 116:17, 144:19, 147:8, 150:5, 162:4, 162:5, 168:6, 184:22, 185:2, 185:5, 187:9, 203:12, 228:12, 244:23

**starting** [7] - 3:6, 166:18, 169:25, 171:5, 171:24, 172:2, 197:3

**State** [4] - 49:9, 62:25, 169:20

**state** [22] - 3:5, 18:9, 21:15, 33:17, 48:17, 49:20, 50:2, 50:14, 51:6, 63:7, 66:1, 66:7, 66:8, 66:10, 66:11, 66:15, 85:5, 101:16, 114:4, 141:3, 142:13, 164:11

**statement** [5] - 12:12, 209:8, 209:23,

219:7, 251:1

**statements** [3] - 13:10, 232:19, 236:14

**STATES** [3] - 1:1, 1:3, 1:10

**states** [2] - 9:9, 40:1

**States** [60] - 1:13, 1:14, 3:4, 3:8, 23:13, 23:15, 23:17, 24:5, 24:6, 25:15, 26:2, 28:12, 29:18, 30:16, 30:18, 33:6, 33:8, 33:15, 33:18, 33:20, 34:19, 35:10, 36:12, 36:15, 40:2, 41:20, 41:23, 42:10, 43:10, 45:2, 47:6, 47:9, 47:22, 48:4, 48:5, 48:10, 48:18, 50:15, 51:11, 52:15, 54:12, 54:13, 54:25, 55:10, 56:1, 56:3, 56:11, 56:18, 60:18, 61:18, 69:8, 69:17, 69:20, 87:2, 88:10, 88:18, 90:9, 100:24, 107:20, 164:21

**States's** [1] - 70:4

**stating** [1] - 77:16

**statute** [8] - 10:8, 10:14, 10:17, 11:18, 13:22, 243:25, 249:8, 249:10

**statutes** [2] - 10:15, 13:19

**statutory** [1] - 9:8

**stay** [1] - 201:5

**stayed** [1] - 184:23

**staying** [1] - 195:19

**steeped** [1] - 230:24

**stenotype** [1] - 1:24

**step** [3] - 165:17, 169:17, 199:10

**Stephen** [1] - 230:4

**stepped** [1] - 3:9

**steps** [2] - 58:16, 163:7

**stereotypical** [1] - 16:20

**stick** [2] - 199:18, 199:19

**sticks** [1] - 194:1

**sticky** [1] - 239:17

**still** [15] - 62:4, 62:6, 75:3, 75:10, 75:20, 90:10, 169:10, 182:7, 182:9, 188:9, 210:16, 240:7, 243:22, 250:17,

253:22

**stings** [1] - 179:4

**stipulate** [3] - 5:18, 6:1

**stipulated** [1] - 44:13

**stipulation** [1] - 238:17

**stomped** [3] - 192:16, 192:17

**stood** [1] - 226:9

**stop** [11] - 53:17, 90:13, 104:1, 126:4, 134:4, 163:14, 173:20, 182:2, 182:13, 204:12, 210:17

**stopped** [5] - 123:20, 149:12, 173:16, 180:6, 182:5

**stopping** [2] - 119:22, 149:20

**stops** [1] - 123:6

**stores** [2] - 11:1, 249:8

**Storm** [1] - 164:24

**stormed** [1] - 5:20

**story** [1] - 18:15

**straight** [2] - 199:15, 199:21

**strategically** [3] - 36:22, 84:10, 85:15

**strategy** [1] - 141:10

**street** [4] - 69:6, 112:4, 174:9, 250:20

**Street** [11] - 1:14, 1:17, 27:6, 27:7, 37:18, 39:4, 58:15, 116:2, 145:16, 146:7, 147:10

**strength** [1] - 239:5

**strenuously** [1] - 252:4

**stretch** [1] - 78:23

**strikes** [2] - 205:10, 206:14

**striking** [1] - 194:10

**strong** [4] - 21:10, 157:7, 160:8, 239:21

**structure** [4] - 23:16, 23:17, 177:12, 177:13

**structures** [1] - 71:11

**stuff** [9] - 4:17, 6:5, 15:20, 149:15, 149:21, 230:25, 234:22, 252:21, 254:9

**subject** [1] - 86:9

**subpoena** [2] - 233:5, 237:22

**subpoenaed** [1] - 234:14

**substances** [1] - 11:10

**successful** [1] - 198:12

**sudden** [2] - 191:24, 241:16

**suddenly** [2] - 193:24, 213:6

**suffice** [1] - 202:9

**sufficient** [3] - 82:17, 132:16, 184:20

**sugar** [1] - 74:17

**suggest** [3] - 223:21, 227:6, 243:1

**suggested** [2] - 239:13, 239:14

**suggesting** [3] - 89:1, 234:12, 250:1

**suggestion** [1] - 129:6

**suggests** [1] - 10:20

**suicide** [1] - 72:13

**suit** [1] - 150:6

**summary** [1] - 94:25

**summoned** [1] - 172:7

**Sumrall** [3] - 250:17, 251:13, 253:9

**Sumrall's** [1] - 252:21

**sun** [1] - 173:8

**super** [2] - 237:25, 243:16

**super-critical** [1] - 237:25

**super-long** [1] - 243:16

**superseding** [1] - 13:6

**supervisor** [2] - 166:4, 201:6

**supervisors** [4] - 148:25, 176:1, 200:8, 211:3

**supplement** [3] - 48:14, 252:20, 253:25

**supplementing** [3] - 227:4, 227:14, 227:16

**support** [7] - 11:22, 12:15, 13:18, 14:10, 63:1, 63:3, 96:12

**supports** [1] - 14:12

**suppose** [2] - 19:14, 229:2

**supposed** [4] - 117:3, 144:5, 184:2, 212:14

**Supreme** [1] - 108:15

**surprised** [5] - 6:2, 65:1, 65:7, 224:22, 226:8

**surprises** [1] - 141:8
**surrounding** [4] -
24:24, 31:7, 63:4,
92:20
**surveillance** [5] -
41:4, 107:3, 107:12,
190:5, 218:22
**suspect** [1] - 140:13
**suspects** [1] - 96:12
**suspicious** [2] -
115:25, 116:11
**sustain** [1] - 81:16
**sustained** [15] - 72:15,
89:8, 94:21, 98:13,
99:3, 99:23, 100:4,
100:10, 139:15,
158:20, 159:23,
160:1, 201:22,
202:3, 205:5
**SWAT** [2] - 114:22,
176:1
**sweat** [1] - 179:3
**swept** [1] - 189:1
**swinging** [1] - 206:17
**SWORN** [4] - 22:22,
113:24, 142:6, 164:3
**swung** [1] - 206:3
**system** [8] - 4:22,
41:25, 42:7, 42:8,
42:18, 43:10, 80:9,
108:6
**systems** [1] - 203:12

**T**

**table** [4] - 7:9, 8:5,
190:15, 222:6
**tactical** [2] - 171:20,
173:17
**tactical-type** [1] -
171:20
**talks** [3] - 5:19, 101:5,
248:24
**tall** [2] - 71:17, 157:7
**taller** [1] - 71:23
**tan** [4] - 190:2, 190:24,
196:16, 198:6
**tangential** [1] - 240:4
**tangled** [1] - 16:13
**tap** [2] - 151:7, 175:7
**target** [2] - 206:21,
243:6
**tarp** [27] - 120:19,
126:17, 127:14,
127:21, 127:25,
128:21, 128:24,
129:14, 133:12,
133:14, 133:24,
134:20, 134:22,
134:24, 135:1,

135:2, 135:4, 136:2,
136:4, 136:9,
136:21, 136:23,
137:18, 137:20,
137:24, 138:19,
138:20
**task** [1] - 61:9
**tasked** [1] - 88:11
**TBD** [2] - 101:23,
101:24
**Team** [7] - 114:20,
114:21, 115:1,
115:2, 115:4, 115:5,
117:11
**team** [4] - 114:22,
173:17, 176:1, 234:3
**tear** [4] - 179:1, 194:9,
202:18, 242:21
**technically** [1] -
239:24
**technician** [1] - 23:19
**techs** [1] - 116:10
**teed** [1] - 252:18
**telephone** [4] -
170:21, 210:13,
218:1, 218:7
**Tem** [1] - 69:19
**temporary** [3] - 76:5,
85:11, 177:13
**Tempore** [1] - 53:16
**ten** [2] - 131:12,
180:25
**ten-minute** [1] -
131:12
**ten-yard** [1] - 180:25
**tentative** [1] - 14:20
**term** [2] - 185:8,
201:13
**terminate** [1] - 223:10
**terms** [16] - 10:8, 15:4,
15:22, 15:23, 19:20,
112:15, 116:23,
118:4, 130:24,
144:14, 171:11,
185:8, 215:9, 218:3,
232:6, 243:21
**Terrace** [27] - 27:17,
27:21, 27:22, 27:24,
28:2, 28:6, 29:12,
30:23, 31:5, 41:17,
58:17, 102:7, 102:9,
107:9, 107:13,
109:13, 109:17,
110:1, 119:1, 163:8,
183:10, 184:12,
199:7, 199:12,
201:16, 202:5, 246:9
**terrace** [10] - 31:7,
31:8, 119:10,
119:14, 147:11,

148:7, 148:11,
151:18, 184:5, 184:6
**test** [1] - 201:1
**testified** [23] - 61:18,
66:22, 77:24, 79:16,
102:15, 102:18,
105:24, 105:25,
106:8, 126:5,
128:20, 134:22,
198:22, 204:6,
207:9, 209:5,
218:12, 222:16,
234:4, 234:23,
235:22, 236:10,
251:14
**testifies** [2] - 20:20,
244:13
**testify** [26] - 8:4, 8:22,
16:23, 18:5, 19:9,
19:14, 140:2, 230:3,
230:8, 231:8, 233:6,
234:5, 244:25,
245:4, 245:10,
245:19, 246:17,
246:19, 248:10,
248:16, 248:19,
249:14, 251:5,
252:3, 253:4, 253:5
**testifying** [8] - 131:1,
230:1, 230:7,
233:19, 234:8,
241:3, 244:12,
253:20
**TESTIMONY** [1] - 2:3
**testimony** [36] - 7:24,
9:18, 13:12, 13:25,
17:18, 21:5, 44:1,
66:24, 71:12, 73:11,
75:1, 75:2, 76:25,
79:21, 81:18, 81:20,
82:14, 86:2, 86:3,
101:1, 130:14,
140:14, 140:15,
168:21, 175:3,
185:20, 203:8,
209:21, 218:9,
218:20, 220:1,
229:7, 232:4, 235:1,
247:5, 251:13
**Texas** [1] - 205:16
**text** [3] - 3:21, 5:10,
55:4
**texted** [1] - 172:19
**THE** [428] - 1:1, 1:1,
1:9, 3:3, 3:10, 3:13,
3:18, 4:1, 4:8, 4:10,
4:21, 4:25, 5:2, 5:16,
5:25, 6:5, 6:9, 6:15,
6:20, 6:23, 6:25, 7:3,
8:3, 9:8, 10:16, 11:8,

14:20, 15:2, 15:7,
15:10, 15:16, 16:6,
16:22, 17:17, 18:1,
18:20, 19:7, 19:11,
19:20, 20:4, 20:7,
20:11, 21:3, 21:14,
21:22, 22:6, 22:10,
22:13, 22:18, 22:22,
22:23, 22:24, 22:25,
25:4, 25:8, 26:9,
26:11, 26:13, 34:25,
35:2, 35:9, 35:16,
35:19, 38:2, 38:5,
38:21, 38:23, 40:18,
40:20, 43:21, 43:23,
44:1, 44:4, 44:7,
44:12, 44:19, 44:22,
46:3, 46:5, 50:6,
50:8, 51:15, 54:1,
54:3, 57:16, 57:17,
57:18, 57:19, 60:3,
60:4, 62:10, 64:11,
65:4, 65:5, 72:15,
73:19, 73:23, 74:2,
74:9, 74:23, 75:4,
75:5, 75:10, 75:14,
75:19, 75:20, 75:22,
75:23, 77:10, 77:12,
77:21, 78:1, 78:4,
78:12, 78:24, 79:11,
79:21, 80:10, 81:14,
81:16, 82:5, 82:9,
82:16, 83:2, 88:22,
88:23, 89:8, 90:6,
90:7, 91:11, 91:16,
91:24, 92:4, 93:22,
93:24, 94:19, 94:21,
98:13, 99:3, 99:23,
100:4, 100:10,
103:16, 103:17,
104:24, 105:20,
109:5, 109:22,
110:9, 110:12,
110:16, 110:20,
110:23, 111:1,
111:4, 111:13,
111:15, 113:15,
113:18, 113:19,
113:24, 113:25,
114:1, 121:16,
121:18, 124:2,
124:4, 124:12,
125:9, 125:11,
125:16, 126:22,
127:19, 127:20,
129:24, 130:2,
130:5, 130:7,
130:11, 130:18,
130:20, 131:2,
131:7, 131:15,
131:19, 131:24,

132:5, 132:8,
132:15, 133:3,
133:5, 135:15,
135:16, 137:4,
138:12, 138:16,
139:4, 139:15,
139:18, 139:19,
139:20, 139:23,
140:1, 140:7,
140:11, 140:16,
141:6, 141:16,
141:22, 142:1,
142:4, 142:6, 142:8,
152:2, 152:4,
153:13, 155:1,
155:3, 155:22,
155:24, 156:12,
157:1, 157:25,
158:2, 158:6,
158:10, 158:12,
158:21, 159:8,
159:11, 159:16,
159:24, 160:3,
160:10, 160:17,
161:3, 161:14,
161:17, 162:22,
163:16, 163:18,
163:19, 163:20,
163:23, 164:3,
164:4, 164:5,
168:19, 168:23,
169:1, 169:6,
169:10, 169:12,
169:14, 176:14,
177:18, 183:12,
184:7, 185:11,
185:13, 187:22,
188:18, 189:20,
190:19, 190:25,
191:10, 192:25,
195:7, 196:19,
197:20, 198:8,
198:20, 198:22,
199:1, 200:11,
201:22, 202:3,
205:5, 205:17,
207:6, 207:7,
208:17, 208:19,
209:13, 209:17,
209:20, 210:1,
211:23, 212:3,
212:5, 212:8,
212:14, 212:19,
213:1, 213:20,
216:20, 217:19,
219:4, 219:19,
219:21, 219:23,
219:25, 220:2,
220:3, 220:10,
220:13, 220:16,
220:24, 221:7,

222:9, 222:13, 222:22, 223:3, 223:12, 223:15, 223:21, 224:5, 224:13, 225:1, 225:8, 225:18, 226:6, 226:11, 227:3, 227:13, 227:25, 228:9, 228:14, 228:17, 228:23, 228:25, 229:4, 229:13, 229:19, 229:24, 230:6, 230:10, 230:14, 230:17, 230:20, 231:4, 231:10, 231:15, 231:25, 232:5, 232:8, 232:14, 232:20, 233:5, 233:10, 233:15, 233:20, 234:6, 234:10, 234:19, 235:1, 235:7, 235:12, 235:17, 235:23, 236:1, 236:16, 236:24, 237:11, 238:4, 238:12, 239:6, 239:25, 240:4, 240:15, 241:4, 241:22, 242:1, 242:12, 242:18, 242:22, 243:1, 243:14, 243:20, 244:2, 244:5, 244:10, 244:23, 245:2, 245:12, 245:14, 245:18, 245:25, 246:7, 246:12, 246:25, 247:14, 247:20, 248:12, 248:16, 248:19, 248:23, 249:16, 249:24, 250:1, 250:6, 250:13, 250:16, 250:23, 251:5, 251:9, 251:21, 252:3, 252:11, 252:16, 253:3, 253:13, 253:22, 254:5, 254:11, 254:16, 254:19, 254:21, 254:23, 254:24, 255:4, 255:11, 255:15, 255:17, 255:18, 255:20, 255:23, 255:25
**themselves** [3] -

63:18, 67:2, 204:13
**theoretically** [1] - 13:24
**theories** [1] - 13:23
**theory** [2] - 13:18, 19:11
**therefore** [1] - 8:5
**they've** [9] - 16:24, 66:4, 66:9, 72:1, 72:3, 108:19, 193:21, 243:14, 243:15
**thick** [3] - 36:24, 39:25, 85:13
**thing's** [1] - 238:4
**thinking** [1] - 189:5
**thinks** [2] - 77:15, 226:21
**thinner** [1] - 184:24
**Third** [2] - 1:18, 164:25
**thirds** [1] - 153:24
**Thomas** [74] - 3:4, 3:15, 3:16, 12:5, 12:8, 12:11, 12:13, 13:12, 13:13, 13:25, 16:8, 16:23, 17:4, 17:13, 17:21, 18:17, 19:4, 20:8, 20:18, 21:12, 21:14, 44:10, 105:12, 125:20, 126:11, 127:3, 127:6, 127:25, 128:20, 129:6, 134:22, 135:2, 136:22, 160:23, 161:12, 161:13, 162:10, 162:11, 162:14, 203:1, 211:2, 214:3, 214:14, 215:13, 216:2, 216:12, 219:11, 230:15, 237:2, 239:1, 241:6, 241:19, 244:25, 245:7, 245:16, 245:19, 246:2, 246:3, 246:7, 246:10, 246:18, 246:19, 247:1, 247:6, 250:18, 250:24, 251:7, 251:21, 253:4, 253:11, 253:15, 254:23
**THOMAS** [1] - 1:6
**Thomas's** [3] - 12:3, 13:4, 18:9
**thousands** [6] - 40:25, 49:25, 58:2, 76:23,

174:8, 237:21
**threat** [12] - 58:21, 59:6, 59:17, 59:23, 59:25, 60:13, 60:16, 61:16, 116:1, 137:24, 244:22
**threatening** [1] - 244:12
**threats** [2] - 117:11, 244:21
**three** [12] - 9:6, 84:15, 84:17, 111:11, 137:2, 150:2, 167:20, 188:7, 188:15, 189:17, 227:10
**three-day** [1] - 167:20
**three-dimensional** [1] - 111:11
**throughout** [8] - 38:9, 42:20, 47:16, 53:4, 107:14, 161:2, 163:1, 163:3
**throw** [1] - 172:11
**Thursday** [1] - 228:24
**tie** [2] - 69:12, 190:16
**tie-breaking** [1] - 69:12
**tied** [2] - 18:10, 233:21
**ties** [1] - 69:22
**time-stamped** [3] - 45:3, 45:5, 45:17
**timecards** [1] - 168:6
**timeline** [1] - 53:5
**timing** [2] - 44:7, 89:20
**tired** [1] - 220:4
**today** [25] - 21:23, 25:20, 43:9, 53:18, 68:15, 81:22, 121:10, 123:9, 125:19, 140:3, 140:6, 140:12, 151:20, 153:5, 154:19, 155:12, 175:3, 190:11, 210:16, 218:9, 218:20, 220:19, 229:14, 229:17, 231:1
**together** [7] - 33:14, 52:22, 76:14, 76:15, 175:22, 176:8, 180:14
**toilets** [1] - 248:9
**tomorrow** [20] - 74:9, 220:6, 220:14, 220:25, 228:1, 228:3, 228:10, 228:15, 228:20,

228:23, 229:1, 229:6, 229:12, 229:15, 250:15, 254:2, 254:7, 254:10, 254:14, 256:1
**tonight** [2] - 228:13, 230:5
**took** [9] - 43:14, 79:9, 117:9, 119:5, 147:6, 173:11, 173:12, 176:25, 192:5
**top** [16] - 5:3, 36:2, 36:25, 56:3, 94:2, 94:6, 101:18, 104:14, 112:10, 121:7, 126:18, 148:9, 175:7, 183:25, 191:13, 215:12
**torn** [2] - 61:2, 126:17
**totality** [1] - 78:11
**totally** [1] - 20:24
**touch** [6] - 27:15, 39:2, 119:4, 156:14, 175:6, 206:10
**touched** [2] - 29:14, 252:5
**tourism** [1] - 227:9
**toward** [2] - 146:12, 204:15
**towards** [8] - 118:14, 135:5, 136:8, 174:19, 175:16, 175:21, 183:21, 192:23
**trace** [1] - 147:6
**tracing** [1] - 119:16
**track** [1] - 218:13
**traffic** [3] - 77:5, 83:8, 231:1
**Traffic** [2] - 166:9, 168:13
**training** [7] - 136:16, 139:12, 166:19, 167:1, 167:2, 194:4, 206:19
**traitor** [1] - 174:22
**TRANSCRIPT** [1] - 1:9
**transcript** [12] - 79:16, 236:11, 236:17, 239:6, 239:19, 240:10, 240:13, 240:15, 240:20, 252:7, 252:9, 256:10
**Transcript** [1] - 1:25
**transcription** [1] - 1:25
**transferred** [1] - 143:4
**transformed** [1] - 5:20

**transition** [2] - 180:12, 195:17
**transmissions** [1] - 116:17
**transpire** [2] - 92:17, 107:20
**transport** [1] - 144:4
**transports** [1] - 145:12
**traveling** [2] - 109:21, 109:25
**traverse** [2] - 30:15, 66:23
**traversed** [1] - 69:4
**Treniss** [3] - 241:18, 242:9, 242:22
**trespassing** [3] - 18:6, 19:17, 251:8
**trial** [22] - 7:6, 8:19, 13:3, 14:7, 14:9, 14:16, 15:3, 17:3, 79:7, 79:9, 79:16, 228:5, 228:8, 232:11, 232:20, 234:2, 234:22, 236:5, 241:16, 241:17, 251:14, 255:8
**TRIAL** [1] - 1:9
**trials** [3] - 77:24, 236:13, 236:15
**tried** [8] - 37:14, 149:11, 149:15, 149:22, 150:5, 150:6, 236:9, 255:7
**triggered** [1] - 236:3
**trouble** [1] - 244:9
**trucks** [1] - 173:22
**true** [11] - 10:21, 21:1, 21:8, 21:18, 72:21, 72:24, 90:18, 96:5, 97:6, 230:21
**Trump** [5] - 88:12, 88:19, 99:21, 253:1
**truth** [8] - 232:15, 232:16, 232:23, 233:17, 233:22, 234:7, 234:10, 240:18
**truthful** [1] - 239:15
**try** [12] - 5:17, 20:17, 20:18, 140:11, 149:11, 163:14, 170:10, 181:6, 199:21, 210:23, 244:3, 254:10
**trying** [33] - 4:13, 5:17, 120:18, 123:13, 129:3, 129:6, 150:3, 150:4, 152:13,

161:13, 162:17,
163:11, 163:12,
172:12, 172:21,
182:10, 183:20,
186:21, 191:15,
194:8, 194:9,
195:16, 197:16,
199:18, 201:25,
215:18, 216:15,
231:18, 232:15,
234:1, 239:9,
247:21, 255:7
**tunnel** [1] - 242:25
**turn** [8] - 46:8, 48:22,
123:19, 147:25,
159:22, 162:2,
162:7, 217:15
**turned** [2] - 162:5,
223:23
**turning** [10] - 27:4,
36:7, 143:12,
143:25, 158:19,
160:21, 161:24,
167:15, 175:5,
198:11
**turns** [2] - 170:25,
197:14
**TV** [2] - 170:17, 171:9
**Twelfth** [2] - 47:13,
47:17
**twice** [7] - 150:1,
158:19, 159:23,
161:25, 200:20,
234:17
**two** [50] - 8:7, 31:4,
41:14, 43:13, 54:6,
64:7, 78:16, 79:23,
84:1, 85:23, 85:25,
86:4, 86:5, 89:24,
90:19, 107:17,
113:2, 124:25,
125:23, 125:24,
129:12, 130:6,
130:9, 130:18,
130:19, 130:21,
131:18, 133:8,
134:10, 140:3,
150:19, 150:20,
150:22, 150:23,
152:18, 153:24,
160:18, 197:15,
220:22, 221:24,
224:10, 224:24,
225:20, 231:20,
231:22, 231:25,
251:12, 254:1
**two-thirds** [1] - 153:24
**two-window** [1] -
125:23
**type** [8] - 64:25,

120:19, 122:13,
139:8, 145:11,
166:25, 171:20,
194:12
**typical** [2] - 93:13,
93:18
**typically** [5] - 86:22,
96:8, 97:20, 106:12,
168:14

**U**

**U.S** [32] - 8:17, 26:19,
28:12, 30:19, 32:23,
33:1, 33:3, 41:3,
41:18, 41:20, 41:22,
42:4, 43:3, 47:4,
48:11, 52:20, 53:2,
53:14, 54:25, 57:7,
63:13, 64:15, 66:16,
70:3, 70:8, 81:1,
87:2, 87:4, 108:7,
108:15, 173:1
**ultimate** [1] - 183:16
**ultimately** [4] - 52:14,
52:22, 63:1, 66:19
**unable** [2] - 58:6,
61:25
**unauthorized** [2] -
59:24, 61:11
**unaware** [1] - 97:21
**under** [12] - 7:14, 8:24,
65:2, 68:9, 75:3,
75:20, 88:18, 122:5,
137:22, 169:11,
221:11, 227:13
**undergo** [2] - 32:1,
117:21
**underneath** [6] -
120:20, 122:25,
123:24, 135:22,
136:3, 137:21
**understood** [16] -
22:11, 25:10, 92:4,
98:22, 111:7,
141:21, 203:9,
205:2, 223:15,
224:21, 225:12,
225:13, 227:6,
230:16, 233:20,
248:12
**unfortunately** [2] -
192:3, 223:5
**uniform** [11] - 24:3,
117:16, 117:17,
144:25, 145:1,
145:7, 171:20,
200:7, 203:13
**Uniformed** [1] - 24:1
**unit** [6] - 117:4, 144:9,

148:16, 148:17,
166:12, 201:9
**Unit** [10] - 92:11,
92:12, 92:18,
114:16, 114:18,
166:10, 166:25,
167:3, 167:8, 168:13
**Unit-type** [1] - 166:25
**UNITED** [3] - 1:1, 1:3,
1:10
**United** [61] - 1:13,
1:14, 3:4, 3:8, 23:13,
23:15, 23:17, 24:5,
24:6, 25:15, 26:2,
28:12, 29:18, 30:16,
30:18, 33:6, 33:8,
33:15, 33:17, 33:19,
34:19, 35:10, 36:11,
36:15, 40:2, 41:20,
41:23, 42:10, 43:10,
45:2, 47:5, 47:9,
47:22, 48:4, 48:5,
48:10, 48:18, 50:14,
51:10, 52:15, 54:12,
54:13, 54:25, 55:10,
56:1, 56:3, 56:11,
56:18, 60:18, 61:18,
69:8, 69:17, 69:20,
70:4, 87:2, 88:10,
88:18, 90:9, 100:24,
107:20, 164:21
**units** [3] - 95:24,
115:4, 173:22
**University** [1] - 165:6
**unlawful** [1] - 217:9
**unless** [4] - 30:15,
66:23, 67:2, 238:5
**unlikely** [1] - 13:23
**unnecessarily** [1] -
141:7
**unpersuaded** [1] - 8:8
**unreasonable** [1] -
104:16
**unresolved** [1] -
253:23
**unrest** [1] - 167:22
**unrestricted** [3] -
64:20, 64:24, 66:15
**unsecure** [1] - 59:19
**untypical** [1] - 17:25
**unusual** [5] - 103:21,
104:2, 104:8,
104:11, 200:24
**unwilling** [1] - 98:1
**up** [130] - 11:11, 17:23,
19:13, 21:6, 21:7,
22:1, 23:18, 27:22,
28:15, 29:21, 31:17,
51:4, 58:15, 58:16,
62:1, 68:16, 70:19,

73:17, 76:21, 77:4,
77:5, 80:15, 81:11,
82:22, 89:10, 91:7,
93:1, 98:8, 98:11,
101:13, 105:13,
108:23, 110:14,
111:11, 111:21,
112:8, 112:10,
118:13, 119:2,
119:19, 119:20,
123:7, 125:22,
126:13, 126:17,
127:1, 127:3,
129:10, 133:13,
136:4, 136:10,
137:8, 138:14,
143:22, 144:11,
145:8, 146:14,
147:10, 149:10,
149:15, 149:19,
151:4, 152:12,
154:12, 155:8,
160:15, 161:7,
161:8, 162:10,
172:18, 173:18,
174:13, 174:18,
175:16, 176:21,
177:13, 178:2,
178:9, 179:1, 179:3,
181:23, 183:5,
183:22, 183:25,
185:3, 186:20,
187:6, 187:10,
190:9, 191:14,
191:15, 191:17,
193:19, 194:7,
194:19, 197:4,
197:13, 199:18,
200:8, 202:5, 203:4,
203:17, 205:19,
215:12, 215:20,
216:2, 216:3, 216:4,
216:16, 217:13,
220:8, 221:20,
222:16, 223:10,
226:13, 226:15,
229:7, 240:7,
244:16, 246:10,
251:1, 252:18,
252:23, 253:1
**up-armored** [1] -
173:18
**upper** [3] - 45:19,
117:10, 214:14
**Upper** [16] - 27:17,
27:24, 29:12, 30:22,
31:4, 41:17, 58:17,
107:8, 107:13,
183:10, 184:12,
199:6, 199:12,
201:16, 202:5, 246:9

**upside** [1] - 177:16
**urged** [1] - 248:15
**USAfx** [1] - 227:1
**use-of-force** [1] -
161:6
**usual** [1] - 144:19
**utilize** [1] - 37:5
**utilized** [2] - 37:9, 42:3
**utilizing** [2] - 199:17,
203:15

**V**

**valid** [1] - 233:24
**validate** [2] - 46:24,
47:4
**various** [4] - 96:13,
98:15, 98:18, 230:2
**vast** [1] - 235:16
**vastly** [3] - 221:25,
255:15, 255:18
**vehicle** [4] - 24:21,
173:18, 173:21,
173:23
**vehicles** [5] - 99:12,
168:14, 168:15,
173:16, 173:17
**verbally** [1] - 187:13
**verified** [1] - 158:5
**Vernon** [2] - 145:15,
145:17
**versus** [4] - 3:4, 11:1,
64:4, 167:7
**vertical** [1] - 195:24
**vest** [1] - 145:1
**vests** [1] - 117:16
**via** [1] - 50:22
**Vice** [26] - 33:6, 33:17,
33:19, 41:19, 47:22,
48:2, 48:3, 50:2,
52:14, 54:12, 54:24,
55:16, 56:5, 60:17,
69:8, 69:17, 69:19,
70:4, 88:9, 90:14,
90:25, 101:19,
102:2, 107:5,
107:20, 114:18
**vice** [22] - 33:7, 47:24,
48:1, 48:6, 48:12,
48:25, 49:16, 51:10,
51:18, 55:6, 55:11,
69:21, 69:24, 70:1,
70:8, 70:10, 70:13,
88:4, 88:17, 90:19,
107:23
**vicinity** [5] - 27:18,
31:15, 116:8,
148:19, 213:16
**Video** [50] - 41:10,
41:12, 53:8, 54:8,

54:20, 55:14, 56:7, 56:14, 57:3, 57:11, 121:22, 124:8, 125:14, 126:2, 132:9, 133:10, 133:19, 134:2, 134:15, 137:10, 152:6, 153:16, 153:22, 153:25, 155:6, 156:3, 156:11, 186:9, 188:1, 189:24, 191:5, 193:10, 195:10, 196:8, 197:25, 203:20, 205:8, 205:21, 206:12, 213:13, 213:23, 214:1, 214:9, 214:12, 214:24, 215:5, 215:7, 215:25, 216:10, 216:25

**video** [113] - 4:19, 41:9, 42:23, 43:1, 45:10, 45:11, 45:17, 45:20, 45:22, 53:7, 53:11, 53:13, 53:18, 54:6, 54:10, 54:22, 55:25, 56:13, 56:16, 56:19, 57:6, 57:8, 89:17, 89:24, 90:21, 91:2, 107:22, 107:24, 122:19, 122:21, 123:3, 123:6, 123:8, 123:11, 123:14, 124:21, 124:22, 124:23, 125:4, 127:11, 127:14, 127:22, 128:16, 128:22, 129:1, 129:8, 129:18, 129:25, 130:3, 130:15, 131:9, 131:22, 132:11, 133:2, 133:5, 134:25, 136:21, 136:23, 140:20, 140:22, 141:1, 141:11, 151:4, 151:5, 153:2, 153:4, 153:24, 155:14, 155:16, 160:7, 163:10, 171:10, 186:3, 186:5, 186:7, 187:21, 187:25, 189:6, 189:22, 190:6, 190:9, 190:18, 190:23, 191:19, 193:3, 193:8, 193:13,

195:9, 195:13, 195:21, 196:1, 196:2, 196:24, 197:2, 197:3, 197:23, 200:3, 203:18, 207:10, 207:18, 208:20, 210:22, 214:3, 215:18, 216:24, 218:7, 218:9, 218:15, 218:18, 218:22, 222:8, 246:15

**video'ing** [1] - 247:12
**video's** [1] - 195:25
**videos** [30] - 4:15, 4:17, 41:21, 41:22, 43:2, 43:4, 43:6, 43:25, 89:20, 124:25, 127:20, 140:17, 141:4, 141:9, 218:8, 230:9, 230:11, 230:18, 231:23, 242:3, 243:16, 244:25, 245:5, 245:9, 245:15, 245:19, 246:13, 252:22
**view** [12] - 10:6, 19:15, 19:23, 93:5, 120:3, 120:7, 121:6, 136:2, 139:1, 160:7, 175:17, 236:22
**viewed** [1] - 53:5
**viewing** [1] - 26:22
**viewpoint** [2] - 174:7, 174:8
**violate** [3] - 13:19, 17:5, 84:22
**violated** [3] - 13:21, 16:10
**violation** [2] - 8:25, 10:6
**violence** [7] - 61:11, 63:25, 64:7, 193:21, 203:23, 217:10, 230:13
**violent** [6] - 5:20, 14:1, 17:13, 17:15, 193:20, 194:6
**VIP** [2] - 28:25, 49:3
**VIPs** [1] - 29:20
**Virginia** [1] - 62:24
**virtually** [1] - 167:12
**visible** [1] - 187:14
**visit** [11] - 33:7, 48:6, 48:11, 48:14, 48:17, 49:13, 50:3, 51:10, 51:18, 65:1, 65:22
**visited** [2] - 64:22,

102:9
**visiting** [2] - 70:14, 70:16
**visitor** [1] - 33:3
**visitors** [4] - 24:14, 63:17, 66:1, 248:9
**visits** [2] - 48:25, 49:17
**visor** [3] - 186:19, 186:20, 186:21
**voice** [1] - 16:4
**voices** [1] - 252:24
**voicing** [1] - 252:22
**volatile** [1] - 122:14
**volume** [1] - 77:20
**VOLUME** [1] - 1:9
**vote** [6] - 12:9, 47:3, 52:11, 52:22, 63:10, 69:12
**votes** [2] - 46:24, 54:16
**vs** [1] - 1:5

## W

**wade** [1] - 67:6
**wait** [5] - 20:25, 141:23, 145:10, 182:14
**waiting** [4] - 11:11, 75:10, 145:24, 227:20
**waive** [1] - 244:17
**walk** [5] - 32:3, 64:19, 118:13, 224:12, 244:23
**walked** [2] - 149:10, 168:12
**walking** [2] - 64:23, 175:21
**walkway** [2] - 83:12, 178:2
**wall** [15] - 39:7, 39:22, 39:23, 71:6, 71:9, 113:2, 178:7, 180:11, 183:5, 188:12, 199:21
**Wall** [1] - 113:7
**walls** [8] - 37:12, 37:13, 71:5, 108:17, 109:10, 113:6, 113:8
**Walls** [3] - 37:12, 39:8, 99:10
**wants** [4] - 237:19, 238:1, 238:19, 244:17
**warning** [1] - 221:24
**warnings** [1] - 4:17
**Warrant** [6] - 143:14, 143:16, 144:6,

148:20, 148:25, 150:13
**warrants** [5] - 7:1, 143:17, 143:20, 223:24
**Washington** [9] - 1:5, 1:15, 1:22, 27:1, 27:2, 63:4, 142:19, 169:19, 223:19
**waste** [1] - 222:1
**watch** [1] - 218:22
**watched** [5] - 193:13, 218:19, 234:2, 246:12
**watching** [4] - 152:12, 171:9, 218:15, 218:18
**water** [2] - 74:10, 199:22
**waving** [1] - 149:14
**ways** [5] - 9:1, 9:6, 22:8, 52:2, 59:13
**Ways** [2] - 194:23, 195:1
**weak** [1] - 237:18
**weapon** [7] - 118:2, 134:17, 136:12, 136:13, 136:14, 136:15, 136:16
**weaponry** [1] - 61:4
**weapons** [1] - 59:16
**wear** [4] - 150:13, 170:15, 171:20, 212:15
**wearing** [12] - 54:15, 120:23, 145:3, 150:9, 151:8, 152:17, 178:9, 190:14, 190:16, 192:16, 199:25, 203:14
**wears** [1] - 170:14
**weather** [4] - 85:14, 242:13, 242:14, 242:19
**website** [3] - 65:24, 86:20, 86:22
**websites** [3] - 65:18, 65:22, 86:25
**week** [3] - 143:4, 166:19, 166:25
**weeks** [1] - 234:3
**weigh** [1] - 10:4
**weighing** [1] - 10:25
**weight** [2] - 157:12, 192:1
**welcome** [2] - 22:14, 75:14
**welfare** [1] - 62:2
**West** [20] - 27:17,

29:12, 30:22, 31:5, 41:17, 58:17, 102:7, 102:9, 107:9, 107:13, 119:1, 164:23, 183:10, 184:12, 199:6, 199:12, 201:16, 202:5, 246:9
**west** [28] - 19:4, 21:7, 25:16, 26:20, 27:7, 27:12, 28:14, 28:22, 29:10, 29:11, 29:24, 36:6, 36:9, 37:18, 37:19, 37:20, 37:21, 39:5, 58:15, 64:4, 64:5, 102:12, 106:1, 118:22, 119:10, 183:9, 189:9, 252:14
**whereas** [2] - 170:14, 179:12
**whichever** [1] - 141:25
**white** [8] - 39:14, 120:23, 170:13, 170:14, 170:16, 171:8, 172:7, 179:12
**White** [11] - 36:15, 71:14, 71:17, 71:19, 71:21, 71:25, 72:2, 72:8, 72:9, 72:13, 76:6
**whole** [5] - 12:3, 148:17, 238:4, 240:20, 245:25
**Wick** [2] - 256:9, 256:14
**WICK** [1] - 1:21
**wide** [1] - 176:6
**width** [1] - 86:5
**willingness** [1] - 60:5
**wind** [2] - 22:1, 242:22
**window** [2] - 125:23, 162:4
**windows** [3] - 59:14, 61:2, 125:24
**Wing** [1] - 52:19
**wish** [3] - 108:12, 231:19, 255:21
**withdraw** [1] - 212:24
**withdrawing** [1] - 184:24
**withdrawn** [2] - 41:24, 144:24
**Witness** [5] - 119:7, 120:12, 126:9, 156:16, 156:22
**witness** [79] - 6:19, 6:20, 7:17, 8:1, 8:21, 21:17, 25:2, 25:3, 34:8, 35:6, 37:16, 39:19, 44:25, 50:24,

52:23, 77:17, 77:23, 79:7, 81:13, 91:15, 91:21, 91:22, 110:9, 110:23, 113:15, 113:19, 121:1, 125:15, 130:15, 130:25, 138:12, 139:16, 139:24, 141:23, 156:25, 163:16, 163:20, 176:11, 177:15, 183:9, 184:4, 187:20, 188:14, 189:16, 190:19, 190:22, 192:21, 195:4, 196:16, 197:17, 198:5, 208:17, 219:19, 221:21, 229:18, 229:23, 229:25, 231:7, 233:5, 233:8, 233:11, 233:21, 233:23, 233:25, 234:8, 234:12, 234:13, 234:19, 235:22, 236:2, 238:18, 241:16, 242:9, 243:8, 244:7, 246:23, 250:18

**WITNESS** [31] - 22:22, 22:24, 57:17, 57:19, 60:4, 65:5, 75:4, 75:19, 75:22, 83:2, 88:23, 90:7, 103:17, 109:5, 113:18, 113:24, 114:1, 127:20, 135:16, 139:19, 142:6, 156:12, 163:19, 164:3, 164:5, 169:12, 185:13, 191:10, 207:7, 208:19, 220:2

**witness's** [2] - 82:14, 232:19

**witnesses** [23] - 6:12, 6:14, 7:24, 10:2, 11:15, 14:4, 15:12, 20:22, 140:3, 220:20, 230:2, 231:19, 231:20, 231:21, 243:6, 243:21, 244:5, 245:25, 254:5, 254:8, 254:9

**WL** [1] - 8:17

**woman** [4] - 74:3, 194:14, 195:5, 211:13

**Women** [6] - 94:4,

96:12, 99:20, 100:7, 111:18, 112:8

**wonder** [2] - 5:16, 5:18

**wonderful** [1] - 248:1

**Wood** [3] - 211:18, 211:19, 213:3

**wood** [3] - 194:18, 194:23, 195:5

**wood's** [1] - 211:25

**Wood's** [1] - 212:1

**wooden** [2] - 194:17, 194:23

**Woodland** [1] - 1:18

**word** [1] - 126:6

**words** [3] - 16:1, 32:20, 36:14

**workers** [1] - 67:4

**works** [1] - 150:16

**Worksheet** [1] - 49:9

**worksheet** [4] - 50:2, 50:14, 51:7, 101:16

**worksheets** [1] - 49:20

**world** [1] - 99:7

**worn** [25] - 121:6, 121:9, 122:23, 124:22, 131:6, 150:9, 150:13, 150:16, 150:17, 150:23, 151:6, 151:9, 151:11, 151:18, 153:1, 154:4, 154:6, 154:8, 154:16, 154:17, 161:2, 163:1, 200:1, 212:12, 212:18

**worried** [2] - 221:9, 245:2

**worse** [1] - 194:3

**worthy** [1] - 159:17

**wrapped** [1] - 17:23

**writing** [6] - 84:13, 87:19, 87:20, 104:18, 111:15, 209:9

**writings** [1] - 103:2

**written** [5] - 67:10, 87:8, 87:12, 103:1, 104:19

**wrongfully** [1] - 19:20

### X

**X-ray** [1] - 32:6

### Y

**yard** [1] - 180:25

**yards** [3] - 83:21,

180:23, 184:23

**year** [3] - 142:25, 218:5, 219:7

**years** [25] - 23:14, 23:25, 24:15, 24:20, 28:10, 30:4, 30:24, 31:8, 47:1, 52:6, 64:15, 64:18, 67:22, 114:13, 142:21, 164:18, 164:20, 165:15, 165:16, 167:4, 178:17, 192:13, 194:4, 200:17, 222:17

**yell** [3] - 101:1, 101:10, 171:6

**yelled** [1] - 171:4

**yelling** [1] - 181:5

**yellow** [5] - 175:12, 181:24, 188:13, 188:19, 188:20

**yes-or-no** [1] - 104:5

**yesterday** [5] - 7:13, 22:4, 68:21, 226:25, 227:14

**York** [1] - 115:13

**yourself** [9] - 128:23, 132:2, 132:11, 156:7, 178:18, 179:6, 186:11, 186:14, 214:5

### Z

**zone** [1] - 60:12

**zones** [2] - 108:18, 109:1