BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .  Case Number 21-cr-552
          Plaintiff,               .
                                   .
     vs.                           .
                                   .  Washington, D.C.
KENNETH JOSEPH OWEN THOMAS,        .  May 18, 2023
                                   .  8:45 a.m.
          Defendant.               .
- - - - - - - - - - - - - - - - - -


              TRANSCRIPT OF JURY TRIAL, VOLUME 4
          BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the United States:        SAMANTHA MILLER, AUSA
                              SEAN MCCAULEY, AUSA
                              United States Attorney's Office
                              601 D Street Northwest
                              Washington, D.C. 20579

For the Defendant:            JOHN PIERCE, ESQ.
                              ROGER ROOTS, ESQ.
                              John Pierce Law P.C.
                              21550 Oxnard Street
                              Third Floor, OMB #172
                              Woodland Hills, California 91367



Official Court Reporter:      SARA A. WICK, RPR, CRR
                              333 Constitution Avenue Northwest
                              Room 4704-B
                              Washington, D.C. 20001
                              202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

TESTIMONY

| | | |
|---|---|---|
| DAN LEANO | Direct Examination................ | 34 |
| | Cross-Examination................. | 61 |
| | Redirect Examination.............. | 82 |
| | Recross-Examination............... | 84 |
| | | |
| ROBERT NIEWENHOUS | Direct Examination................ | 85 |
| | Cross-Examination................. | 105 |
| | Redirect Examination.............. | 111 |
| | Recross-Examination............... | 114 |
| | | |
| ALEXIS BROWN | Direct Examination................ | 129 |

EXHIBITS RECEIVED

| | |
|---|---|
| Government 303........................................ | 46 |
| Government 305........................................ | 50 |
| Government 711........................................ | 54 |
| Government 305.1...................................... | 56 |
| Defense 183........................................... | 67 |
| Government 712........................................ | 77 |
| Government 306........................................ | 101 |
| Government 308 and 308.1.............................. | 103 |
| Defense 446........................................... | 108 |
| Defense 447........................................... | 109 |
| Defense 448........................................... | 109 |
| Government 401........................................ | 140 |
| Government 402.11337.................................. | 144 |
| Government 512........................................ | 146 |
| Government 513, 514, 515, and 516..................... | 150 |
| Government 517........................................ | 153 |
| Government 507........................................ | 154 |
| Government 518........................................ | 156 |
| Government 510........................................ | 158 |
| Government 511........................................ | 163 |
| Government 111, 112, 113, 114, and 121................ | 189 |
| Government 505........................................ | 205 |
| Government 402.14877, 402.15773, 402.15465, 402.8825, 402.15013 through 15016, 402.3788, 402.3733, 402.16941, 402.16942, 402.16943, 402.5522, 402.1008, 402.5522, 402.9901, and 402.3717............................. | 210 |

P R O C E E D I N G S

(Jury not present.)

COURTROOM DEPUTY:  Your Honor, we are in Criminal Action 21-552, United States of America versus Kenneth Thomas.

If I can have counsel please approach the podium and state your names for the record, starting with the United States.

MS. MILLER:  Good morning, Your Honor.  Samantha Miller on behalf of the United States.

THE COURT:  Good morning.

MS. MILLER:  I have Mr. McCauley and Ms. Rummens.

THE COURT:  Good morning.

MR. PIERCE:  Good morning, Your Honor.  John Pierce on behalf of defendant Kenneth Thomas, Kenneth Joseph Thomas, and we have co-counsel Roger Roots and Ms. Lambert as well.

THE COURT:  We missed you yesterday afternoon.  Welcome back.

MR. PIERCE:  Thank you.

THE COURT:  So I've reviewed the recent filings, and let me ask, is it fair to say that the defendant's motion in limine to preclude any reference or evidence of Mr. Thomas's criminal history or any illicit substances in his possession at the time of his arrest is essentially mooted out if they're not calling any character witnesses, unless he opens the door?

MS. MILLER:  Yes, Your Honor, unless he himself opens the door.

THE COURT:  Defense isn't calling any character witnesses; correct?

MR. ROOTS:  That's correct.

THE COURT:  All right.  So the motion in limine is granted, except to the extent Mr. Thomas opens the door by saying something like he's never violated the law, something along those lines, which I don't anticipate, if he takes the stand.

So are you good with that, Mr. Roots?

MR. ROOTS:  Yeah.

THE COURT:  Defense's proposed witnesses -- as I've said, I'm inclined to allow Ms. Lambert to testify as a summary witness.  Both sides, and that includes the case agents for the government, need to elicit just summary testimony, no improper expert testimony, no hearsay testimony.

If either side does that, we will just -- I'll sustain the objections, and if it continues, I will cut the witnesses' testimony short.

I think Ms. Lambert can testify as a summary witness.  I also think that Mr. Evans can testify.  I think his testimony could be relevant if, as the defense proffers, he followed the same path as Mr. Thomas, and if he's going to testify to that, he could testify to the signs he did or didn't see.

With regard to the conflict of interest concerns, I would need to have a colloquy with both Mr. Evans and Mr. Thomas to

confirm that they understand the potential conflict and they waive the conflict, and Mr. Evans should be represented by a different lawyer who can assure the Court that Mr. Evans has been advised of the conflict.

But from what I can tell, their interests are not materially adverse, and the risk, of course, is diminished, given that Mr. Evans has been sentenced.

With regard to any cross about what was stated at the sentencing, I've reviewed the transcript.  He said he did not know of any violence.  I found it inconceivable that he did not know of at least -- I think I said some members of the crowd were violent, it was a boisterous crowd, and they presented a safety risk to individuals and the property in and around the Capitol.  I didn't make any specific finding.

I think he can be impeached in the same way that I suggested, by asking him questions.  I see no need for the government to get into what a judge implied.  I didn't make a specific finding, and that seems fair impeachment on cross, that if the government wants to show him videos of himself and the crowd all around him, I think you can impeach him that way, but not by relying on the transcript from the sentencing hearing or even questioning about what I might have said.  I think that's improper.

And if the government is going to get into that, you need to do so outside the presence of the jury.

MS. MILLER:  Your Honor, I want to make sure we're understanding.  I understood about not using Your Honor's commentary.

THE COURT:  Yes.

MS. MILLER:  For example, if we ask him did you see any violence and he says yes, then we could impeach him with his testimony at sentencing, saying that he didn't see any violence.  Don't you agree?

THE COURT:  He didn't testify at sentencing.

MS. MILLER:  I understood that he was --

THE COURT:  He had a colloquy.

Look, you could say you didn't say that at your sentencing, I guess.  The government needs to be very careful that it doesn't put the Court in a position of having to be a witness in this trial.

MS. MILLER:  Yes, Your Honor.

THE COURT:  And strategically, if he said he saw violence all around him, the government presumably thinks that's true.

I don't know.  It just seems like the cross-examination you can have about the fact that he has a bias, because I think it's fair to say even though it's not a felony -- let me ask the defense.

It seems fair for bias purposes for them to impeach him on the fact that he was prosecuted in connection with January 6.

That goes to bias.

I guess, Ms. Miller, I'm wondering, once you say that, once you bring that out -- I don't know.  Let me think about what you can say about sentencing.  I think it's pretty marginal impeachment.

MS. MILLER:  And we may not do it.  It would be to show that he's a liar.  If he said one thing and we know he said on the record something else --

THE COURT:  So I was looking more at what I said as opposed to what he said there in looking at this.  So I will take another look at it.

MS. MILLER:  Thanks.

MR. MCCAULEY:  Your Honor, if I could ask one further question rather than relaying it through Ms. Miller.

THE COURT:  Sure.

MR. MCCAULEY:  If he stands up there and he says -- or if he takes the stand and he says, I saw no violence, or represents himself in such a way that is inconsistent with what has been put forward, can we solicit testimony about what he has done since his sentencing in public statements that he has made?

THE COURT:  Of course, yeah.

MR. MCCAULEY:  Thank you.

MR. ROOTS:  And I would just add, Your Honor, I don't believe we -- either he or we would say he's not biased.  He is an activist or he's a spokesperson for this January 6 --

THE COURT: And that's fair cross for them to get into, what he's doing in that capacity. So I think that's appropriate.

And given all of that, Mr. McCauley, at some point, it becomes kind of overkill anyway.

MR. MCCAULEY: Of course. It would be --

THE COURT: I mean overkill --

MR. MCCAULEY: -- not every statement that he has made since then. It would be more of an abstract question about the role that he has come --

THE COURT: He's clearly very pro-January 6, okay.

So yes to Lambert; yes to Evans.

As I understand Mr. Sumrall, the defense's proffer is that he, like Mr. Evans, followed the same path as Mr. Thomas on the Capitol grounds, and he too will testify there were no signs or police officers obstructing the crowd when he arrived.

Now, he's before Mr. Thomas; is that correct?

MR. ROOTS: Quite a bit before. I would say half an hour.

THE COURT: Okay. But he's going to say, I followed the same path and there were no signs and essentially what Mr. Evans is going to say?

MR. ROOTS: (Nodded head.)

THE COURT: All right. I will allow him to testify, and the fact that, you know -- the fact that he didn't hear

announcements telling the crowd the area was restricted, that can come in, but it's of marginal relevance for Mr. Thomas's case.

But I don't think there's really a 403 issue here such that I should preclude it, because the government can point out how much earlier he was than Mr. Thomas. And I think the government's put on a lot of witnesses to kind of lay the scene of January 6, and so I think it's only fair to let the defense lay the scene.

If these people say they couldn't hear any announcements, you can certainly argue they're not there.

MS. MILLER: Just to avoid wasting time if and when he actually is called, I want to anticipate what exhibits they might try to introduce with him. I anticipate they might be trying to get in exhibits of those announcements to show that he didn't hear them, and I don't think that's appropriate.

He can testify, I didn't hear any, but we can't introduce exhibits of the announcements that he didn't hear.

THE COURT: Yeah, I don't see the relevance of that, Mr. Roots.

Do you agree?

MR. ROOTS: I would agree. There were times when the officers were using this huge audio device, I think it's called an LRAD, long-range audio device or something.

Now, Mr. Hill actually has some -- he has studied a lot of

video --

THE COURT:  Let's stay on Sumrall right now.

MR. ROOTS:  I would say Sumrall is a very good witness of the people around him as he came through and their perspective that it was not a restricted area at that time, and that was before Mr. Thomas got there.

THE COURT:  Is this someone who also has been prosecuted?

MR. ROOTS:  No.

MS. MILLER:  Your Honor, I think he's again referring to this video that he wants to introduce of Sumrall's where other rioters around him are talking about how they think the staging area was for Trump supporters.  I think that's what he's referring to.  He's going to try to get in one of Mr. Sumrall's videos that he took where other rioters around him are discussing what they think the staging is for.

I don't think that's appropriate.  It's not relevant to Mr. Thomas whatsoever.

MR. ROOTS:  I think that's quite relevant, and the reason is it shows effect on the listener.  It shows effect on all the -- Sumrall had the same opinion.

MS. MILLER:  He can testify he thought that, but his video of other people talking is irrelevant.

MR. ROOTS:  He was surrounded by people who were under the impression of all these things and that the stage -- these

are people who had not been to the Capitol.  They didn't know it was set up for the inauguration.  So they come through.  They do see there's -- it was a confusing situation.  But the people around Mr. Sumrall and Mr. Sumrall himself -- actually, Mr. Sumrall had slightly better knowledge than those around him, because he had been there a little bit early and had been working with some permittees there.

But the perception of all the crowd is relevant to Mr. Thomas.

MS. MILLER:  They weren't there at the same time.

MR. ROOTS:  And they were speaking directly with Mr. Thomas, and he was speaking with them -- I'm sorry, Mr. Sumrall.  Their perceptions are --

THE COURT:  Have you given us this video?  Is that something that I can watch?

MR. ROOTS:  Yes.

THE COURT:  Okay.  What number is that?  I will take a look at the video, but for now -- regardless, Sumrall can testify.  I will address the issue of the video.

MR. MCCAULEY:  One other thing that I want to highlight with Mr. Sumrall's potential testimony, in the Alberts trial, he also seems to have testified about his perception of other videos that someone who now works for him who was also there on January 6 --

THE COURT:  Yeah, I don't see how that's appropriate.

MR. MCCAULEY:  I just wanted to alert the Court to that, that that should also be limited or be precluded from his testimony.

THE COURT:  I tend to agree, Mr. Roots.  Were you intending to do that?

MR. ROOTS:  We were not intending to do that.

THE COURT:  Okay.

MR. ROOTS:  Mr. Sumrall is another like Treniss Evans --

THE COURT:  Another what?

MR. ROOTS:  Another like Treniss Evans, he could be a great overview witness because he has such vast knowledge of all this stuff.  But in our case, he will just be a fact witness for what he saw.

THE COURT:  To be clear, I see Evans and Sumrall as fact witnesses about the signs and about the path that Mr. Thomas took.  I'm not saying you can't elicit anything about the overall scene, but I'm going to be reluctant to let their testimony stray too far from what their views were -- or what they experienced on January 6.

All right?

MR. ROOTS:  Understood.

THE COURT:  Any other concerns, Mr. McCauley?

MR. MCCAULEY:  About Mr. Sumrall, Your Honor?

THE COURT:  Or either of those.  You all can let me

know.

MS. MILLER:  Plenty of concerns, but we've shared them.

MR. ROOTS:  I've just been told it's Exhibit 292.

THE COURT:  Thank you.  All right.

Now, with respect to Mr. Hill, I've already precluded him from testifying as an expert.  The defense represents that he will testify as a summary witness regarding videos he has reviewed of Mr. Thomas.  I don't see why Mr. Hill's testimony in that regard is not cumulative of what you're going to use Ms. Lambert to do.

What is different about the summary nature of his testimony?

MR. ROOTS:  Specifically, Mr. Hill has reviewed all of the violent -- the videos involving Mr. Thomas's alleged violence.  That's very specifically --

THE COURT:  But what -- these videos are before the Court.  Are there additional videos you're going to put into evidence showing Mr. Thomas?

MR. ROOTS:  Let me ask.  We may have some that are defense exhibits, but I believe they're on the defense exhibit list.

THE COURT:  Why don't the videos speak for themselves? Why do we need Mr. Hill to commentate the video when he wasn't there?

I see a difference when you have an agent or an officer talking about what was going on.  But for Mr. Hill to interpret the video that the jury can watch just like he did, I don't see the need for that, particularly when you have Ms. Lambert able to do the same sort of summary overview of the testimony.  They're different than the officers who are talking about these videos, because the officers were there.

MR. ROOTS:  Now, the last witness last night was this Prince George's County corporal.  The last question I asked him was, are you 100 percent sure that Mr. Thomas pushed you over?

Mr. Hill, we spoke to him last night, will -- that's one thing he's zeroing in on, and he states categorically that's not the case, and his review of the videos will show that's not the case.

THE COURT:  He's not an expert.  He wasn't there.

Why can't the jury watch the video?  Why does Mr. Hill have any special expertise?  Why can't Ms. Lambert say this video appears to show someone else falling down?  What is Mr. Hill's role here?

MR. ROOTS:  Mr. Hill has examined all of those videos from every angle, or more angles.  Ms. Lambert has great knowledge -- she has knowledge of the videos as well, but the social media stuff, which I believe the government's going to put on today, trying to build this case about the 1512 obstruction count, I guess, that would be something she would be

more able to address with regard to that evidence.

MR. MCCAULEY:  This is a description of expert testimony without the word "expert."

MS. MILLER:  Exactly.

THE COURT:  I don't think Mr. Hill -- I don't see the purpose of having him give some conclusion as to what all the videos show.  I think the videos speak for themselves, and if you can't get a video in -- he's not even the person who can say this fairly and accurately represents that day.  So some witness needs to get all of this in.

MR. ROOTS:  Mr. Hill is the one witness with the most knowledge of the videos.

THE COURT:  Understood.  But he's -- not from his own knowledge, his own -- he's not a percipient witness of the events of that day.

MR. ROOTS:  I will say -- if our case opens today, he would be available immediately.

Now, we would need to --

THE COURT:  So is Ms. Lambert.  She's available today.

I'm not -- I don't think having him interpret the videos is something --

MR. ROOTS:  He wouldn't be interpreting the videos.

THE COURT:  You're saying that he's going to say that he's studied all the videos and he does not believe that Mr. Thomas knocked down the corporal.

MR. ROOTS:  He's the one person that we have that could instantly know what exhibit number, what second, what minute mark, that kind of thing.

THE COURT:  I don't understand why this isn't something Ms. Lambert can do.

MR. ROOTS:  She could do it.  I don't think she's quite as well steeped in this stuff as Mr. Hill is, and Mr. Hill has worked on several defense teams, not just our defense team, looking at so much of this crowd chaos.

THE COURT:  He can --

MS. MILLER:  Share his notes.

THE COURT:  Ms. Miller, I'm not talking to you right now.

MS. MILLER:  Sorry.

THE COURT:  He can certainly advise you which exhibits to get through Ms. Lambert, but I don't see the point in having two summary witnesses for the defense.

Would you rather have him than Ms. Lambert?

MR. ROOTS:  I hate to say it, but Mr. Hill is more prepared on this topic today, on these topics if we had to open our case today.

THE COURT:  You don't have any other witness here today?

MR. ROOTS:  Other than Mr. Thomas?  Let me think.

THE COURT:  And Ms. Lambert.

MR. ROOTS:  We have Ms. Lambert, but again, she's been doing other things.  She does about eight things for us.  And the others would be arriving tonight or they're not here yet.

THE COURT:  Let me add this:  I think it's inappropriate to have Mr. Hill testify about whether Mr. Thomas would have heard alarms or warnings instructing him to leave the Capitol grounds.  I don't see how he can opine on what the videos show better than Ms. Lambert would.  He's not a percipient witness.

The videos can have poor audio quality.  I don't think you can elicit that kind of testimony from Mr. Hill that Mr. Thomas couldn't have heard the alarms.

MR. ROOTS:  If I could add one other thing.  Poor Mr. Hill; I just want to say poor Mr. Hill.  We have flown him out at a cost to us, which ultimately is a cost to the client, thousand of dollar plane tickets, in two trials.  We tried -- he was ready for the Alberts trial.  Thousands of dollar plane tickets.

THE COURT:  He didn't get to testify at the Alberts trial?

MR. ROOTS:  No.  He was --

THE COURT:  Well, why did you do this again?  I excluded his expert testimony just like Judge Cooper did.  Why do you keep flying him in?

MR. ROOTS:  We're not proffering him at this time --

we recognize you have not allowed him as an expert witness. However, he is a witness in -- and a great witness on these videos. Perhaps no one -- I don't know of a better witness with regard to knowing the videos of the crowd violence and the police reaction and those kinds of things.

THE COURT: You're concerning me about what he's going to say about these videos. He wasn't there.

MR. ROOTS: He was not there, but he is -- let's put it this way: I don't even want to say that we would give up Ms. Lambert, because she is important for other things. But I would say that if our case opens today, he -- I would just say that Mr. Hill is far better at the crowd chaos and the violent video action and just knowing which minute mark starts where, which officer is involved, which body cam --

THE COURT: You clearly have to know what question to ask him. So he shared with you which videos to introduce. So he's not going to stand up and give a narrative in this courtroom. So you know what video to direct him to, and you know what time stamp to direct him to.

I'm really concerned, Mr. Roots, you're trying to get in a whole bunch of narrative with him that's not appropriate, given that he wasn't there, and he's just -- and he's just giving an overview to explain what the video is.

MR. ROOTS: Mr. Pierce reminded me, he did testify in the Proud Boys trial as a video overview witness of the shooting

of the rubber bullets, where they landed, where each officer was, whether each rubber bullet landed, where each baton strike landed, those kinds of things.

Those are the kinds of things that Mr. Hill knows better than anyone.

THE COURT:  And what in this case is similar to what you've just described?

MR. ROOTS:  The specific question last night, which this case could turn on -- remember, that officer said 100 percent that Mr. Thomas pushed him over.  I believe Mr. Hill has a presentation, and -- he's already viewed the videos previously, but he's going over that inch by inch, and I think it would greatly help the Court and the jury to understand that situation.

THE COURT:  So you propose having him testify flat-out that Mr. Thomas did not push the corporal over?

MR. ROOTS:  The evidence does not show that Mr. Thomas pushed the corporal over.

THE COURT:  Ms. Miller?

MS. MILLER:  Sorry to beat a dead horse here, but I think that's expert opinion, number 1.

Number 2, I wanted to clarify for the record that he testified in the Proud Boys trial by agreement by the parties. He was precluded from testifying as an expert, and then the parties reached an agreement as to the testimony.

MR. ROOTS:  And I was there, and I can tell you why that agreement was reached.  We were threatening to call the case agent in the Proud Boys trial to the stand.  And the government, for whatever -- the government in that case did not want the case agent on the stand because we would be asking all kinds of questions about CHSs, undercover agents.

And so they stipulated okay, we'll allow Mr. Hill on the stand in replacement of the case agent.  I can speak to that because I was there.

THE COURT:  You can also call the case agent here.

MR. ROOTS:  We could, but we don't have the same issues.  And frankly, I don't think this is a case that involves CHSs and that kind of thing that the government wants to keep hidden.

THE COURT:  But all the more reason why you could call the case agent.

MR. ROOTS:  We could, but it's not -- the threat to call the case agent here is not as powerful.

THE COURT:  I don't understand.

MR. ROOTS:  I don't know much about this case agent, but in this case -- let's put it this way:  The idea that we need to -- that the government needs to approve, that is some kind of a poker game in which we have to have a trump card --

THE COURT:  I'm not inclined to exclude it for that reason.  I guess I just don't see the need for two summary

witnesses in a case when you're going to introduce a number of videos that will speak for themselves that the jury can watch themselves.

MR. ROOTS:  It puts us in a little awkward situation. Mr. Hill would not -- he's the closest thing we have to a neutral.  He's not an activist like, let's admit -- let's say, we're all activists.  Maybe even Ms. Lambert is biased towards our side.  Mr. Hill is more of a law enforcement career, you know, law enforcement person, but he's not a hostile witness for us.  It puts us in a pinch where we would have to put Mr. Thomas on to get the same videos in.

THE COURT:  I'm concerned about how you're going to use Mr. Hill in a quasi-expert way, you know, his law enforcement background, you have expertise, you've reviewed all these videos.  And that sounds like expert testimony to me.

MR. ROOTS:  We could just put him on and say, You have a career in law enforcement?  Yes.  And have you viewed hundreds of hours of videos?  And go directly into the videos.

MR. MCCAULEY:  Again, Your Honor, that is expert testimony without the use of the word "expert."  He's reviewing videos, offering his interpretation of those videos, of what caused the strike, who implemented the force in this case, was the force authorized.  He is testifying to that based upon his experience of however many years, I think he said 30, in law enforcement.  That is expert testimony, and he has been excluded

as an expert three times now by this Court, Judge Kelly, and Judge Cooper, and was only permitted to testify in the Proud Boys trial as a summary witness, which they already have in Ms. Lambert, who is present in court today and can testify.

THE COURT:  All right.  I'm inclined to agree.  I'm not going to permit the testimony of Mr. Hill.  I think it's unduly cumulative.  I don't think he's got any firsthand witness of what the videos show.  And I'm concerned that what the defense is going to do is use him in an expert-type role.  So I'm excluding that.

With respect to Mr. Moseley, the same issue with him.  He was not anywhere near Mr. Thomas on January 6.  As I understand, he was on the east side principally.  He wouldn't be able to offer any firsthand knowledge.

The effect on commerce, as I explained yesterday, I'm waiting for the defense's brief, but I don't read Section 231 to require any net adverse effect on commerce, but I'm open to what you say in your briefs coming in.

But still, I did permit the defense to put forth evidence on commerce, but you're going to have to argue that that somehow undermines the Safeway evidence.

And I don't see that Mr. Moseley has any personal knowledge of what went on in the mayor's office, what the real reason was that the defense suggests was behind the mayor's order closing businesses.

I think if the defense has a witness from the mayor's office who can address that, that person would be allowed to testify.

But I don't think that Mr. Moseley is that person.  So I will exclude his testimony as well.

MR. ROOTS:  Your Honor, we have an additional thing about Mr. Moseley.  Yesterday, the government put on a witness named Baboulis, and she testified, as she does in many trials, that the grounds were almost a prison-like security setting, that it was absolutely just barriers and bike racks and fencing.

And at the end of her testimony, we talked about those permitted areas on the east side.  And Ms. Baboulis testified under oath that even those areas -- Olmstead Wall, stone wall, even those areas are known to be a restricted area.

So Mr. Moseley, who was on the east side, can impeach that witness's false testimony.

THE COURT:  He's going to say there are no little walls around those egg circles?

MR. ROOTS:  He would testify, my understanding is, there's almost nothing that separates the Capitol building, no fencing, certainly, no walls that separate the building from those permitted areas.

THE COURT:  Mr. McCauley?

MR. MCCAULEY:  Two points on that.  One, it's irrelevant, because Mr. Thomas was on the west side, not the

east side.

Point 2 --

THE COURT:  What about for impeaching --

MR. MCCAULEY:  Precisely.  That's the next point, Your Honor.

We will stipulate to a video of the east side coming through through Ms. Lambert that shows -- areas 8, 9, and 10 I believe were the portions of her testimony -- that show whatever it shows.

THE COURT:  All right.

MS. MILLER:  And three, if they wanted to impeach Captain Baboulis, they could have done so on the stand.

MR. ROOTS:  I had no idea she would tell again false statements about how these huge walls are immovable, restricted.

THE COURT:  Mr. Roots, you can get in a video.  There has to be videos that show all this.  The government's stipulating to their admission.  So you can get in the video, and the jury can see for itself, and you can argue that very point.  I don't think we need to call Mr. Moseley for that.

MR. ROOTS:  The matter of the mayor's pre-January 6 attempt to tamp down commerce in the city, that is a new issue even for me, and I've dealt with these January 6 cases.  It was Mr. Moseley who pointed that out from his recollection and his knowledge of that.

And I would almost say, it's a *Brady* violation by the

government, not providing that in all these January 6 cases. They've been putting on evidence that, you know, the riot caused the downward profits in Safeway when, in fact, they've been sitting on *Brady* evidence all along that they did not provide us, that the mayor issued decrees in advance of January 6.

This is before our riot even began by any definition. In advance of January 6, the mayor asked and begged businesses to shut their doors and tamp down commerce.

That's a *Brady* violation on the part of the government. We had to get that information from Mr. Moseley, who told us about that. I didn't know about that.

THE COURT: Mr. McCauley?

MR. MCCAULEY: It's not a *Brady* violation because it was not in the government's possession. It is a public statement.

THE COURT: I'm not worried about the *Brady* point, but the larger point.

MR. MCCAULEY: The larger point is, as Your Honor has honed in on repeatedly, this is not what the statute says.

18 U.S.C. 231 says affects commerce in any way. That is not a quote, but it is very clear it is affects commerce in any way. At no point in that statute does it imply any net analysis.

THE COURT: No, understood on that. But what about the point -- and I find it hard to follow, but his point that

the curfew imposed by the mayor didn't relate to January 6 at all, and therefore, any effect on commerce wasn't caused by January 6?  That's what I think he's arguing now.

I think you need someone from the mayor's office to say that.  I don't know that anything that I've read suggests that it was preordained that at -- on January 6 at whatever hour that was that the curfew was imposed, that that had been decided long ago before the events of January 6.

I think there's certainly evidence that it had been considered and encouraged, but the shutdown, I think you need someone from the mayor's office to say the shutdown wasn't because of January 6.

MR. ROOTS:  If I can just say, we're aware of the effect the curfew had.  That's no secret.  In fact, we've argued that the Safeway profit/loss on January 6 was due to the mayor's curfew order.

But now with Mr. Moseley's revelations, we're aware that three days before January 6, the mayor was begging and asking all businesses to close their doors to Trump supporters, don't open your doors to Trump supporters.

THE COURT:  What does that have to do with what she did on the 6th?

MR. ROOTS:  It has to do with the commerce that was impacted.  It wasn't impacted by the rioters on January 6.  It was impacted by government in advance.

THE COURT:  By the mayor shutting down businesses.  She might have encouraged before, but she actually shut down businesses on the 6th.

MR. ROOTS:  Yes.  And Mr. Moseley was walking around at that time and was hearing this on the radios, local news, local radio, was denied a bathroom.  He was looking for a bathroom.  Businesses were shut, and they weren't shut because of the riot.  The riot hadn't even begun.

THE COURT:  So you're telling me that Moseley will testify that businesses were shut down to the public?

MR. ROOTS:  Yes, in response to the mayor.  The mayor did more damage to the economy of this city than the riot.

THE COURT:  I want to hear -- we're keeping the jury waiting.  So we're going to bring them back in.  But you haven't convinced me, but I do want to know how many businesses in the District he's going to say shut down before January 6.

MR. ROOTS:  I don't know that we have that.

THE COURT:  That's the kind of testimony he would need to provide.  If he's telling me all the Safeway stores shut three days earlier, something like that --

MS. MILLER:  Your Honor, the Safeway exhibits themselves tell a different story.  In certain stores, on Tuesday the 5th --

THE COURT:  Obviously, the Safeway stores didn't shut down.

MS. MILLER:  Their sales were up that day.

THE COURT:  You have to give me a more extensive proffer about what exactly he's going to say about businesses closing.  I'm still not seeing the link.  The fact that some businesses were turning away Trump supporters, which sounds like you might have been saying that, I don't see the relevance to commerce being affected for the entire District on January 6 as a result of the riot.

MR. ROOTS:  By the way, these are decrees ordering streets closed, parking -- the mayor ordered parking to be limited.

THE COURT:  Again, I think you need someone from the mayor's office to get into this, or you need a more extensive proffer about what Mr. Moseley knows exactly.  But based on what I've heard so far, I'm excluding.

But we need to bring the jury in.

MS. MILLER:  Your Honor, I had one other thing to raise before the jury comes in.

We realized last night we made an error.  We've already told defense about it, and we shared the materials with them. But there were some 302s that were done in the last two weeks for witness prep that we realized we hadn't provided to the defense.  We realized that error last night when we were prepping with our special agent.  We've now turned them over.

We apologize.  It was an honest mistake, and we just wanted

to let the Court know.

THE COURT:  Are these *Jencks* for anyone who has testified?

MS. MILLER:  Yes, there are 302s for some of the witnesses that testified yesterday.

THE COURT:  Here's a point that I didn't focus on yesterday.  302s for a police officer are not *Jencks* for that officer.  They're not that officer's statements.

MS. MILLER:  They're FBI statements.

THE COURT:  So the objection you made on the police officer being impeached with the 302 should have been this is not his report, not the fact that he left something out of the report is not impeachment, because that is clearly impeachment, if it had been a police report.

But Mr. Roots, you can't use a 302 to impeach an officer who didn't write the report.  That's not *Jencks* for them.

So I don't think that's *Jencks*.  But if there's something in there that concerns the defense, I want to hear what you would have crossed them on.

MR. ROOTS:  Actually, we're still analyzing.  We believe that this new -- there are *Jencks* and *Brady* violations.

THE COURT:  How are there *Jencks* on 302s on police officers?

MR. ROOTS:  Okay.  With regard to the police officers, I would grant that point.

But these --

THE COURT:  No agent has testified.  These are all 302s.

MR. ROOTS:  Okay.  We grant that point.

The 302s that were provided last night are consistent with the officer's testimony yesterday.  So it appears to me that the prosecution has generated and the FBI has generated these new 302s to shape and sort of -- I won't say coach, but yeah, shape and coach the testimony --

THE COURT:  How can you say that?

MR. ROOTS:  -- and slightly move the testimony closer to what they want rather than what the officer originally --

THE COURT:  You can call the officer who wrote the 302 maybe, but I don't know.

MR. MCCAULEY:  They can cross her.

THE COURT:  If this is the agent who wrote the 302s, you can ask her about that.  That's her *Jencks*.  If she wrote all these 302s, it's her *Jencks*.  You can cross-examine her on that.

MR. ROOTS:  I think everyone recognizes some of the most startling evidence came from that officer who falsely testified under oath that Mr. Thomas cut the tarp when, in fact, he cut the tarp.

So that to me smacks that this prosecution team may be coaching witnesses to falsify and state falsely and testify

falsely.

THE COURT:  I don't know, Mr. Roots, that I drew the conclusion from the officer's testimony that he cut that tarp. I think you were talking about two different areas of the tarp. I think it's uncertain now who cut the tarp, and you crossed him on him not seeing Mr. Thomas cutting the tarp.  And so we don't know who cut the tarp.

But I don't think you've established that the police officer cut that tarp.  You've established he cut a tarp, but you haven't established yet that it was the same tarp.  So I don't think that at this point you can say he testified falsely. Maybe he has, but I don't recall the evidence in the way you're suggesting.

MR. ROOTS:  That tarp line -- the cut line was exactly precisely consistent with the cut line that the officer was making at another location.

THE COURT:  We're keeping the jury waiting.  We're going to take this up more at lunch.  Anything else?

But again, no cross-examination of officers on 302s.  It's not their statement.

MR. MCCAULEY:  Understood, Your Honor.

THE COURT:  All right.  Is the government prepared to call its next witness?

MS. MILLER:  Yes, Your Honor.

THE COURT:  All right.  Let's go.  Let's go ahead and

get the witness in.

Let me just say to both sides, to the extent the defense wants to admit videos that they can't get in that are government videos that are relevant to this case, like, you know, Mr. McCauley, you said the video on the east side that shows the scene around 8 and 9, you all need to work together, but I would hope that you can agree to have these videos admitted without him having an agent.

MR. MCCAULEY:  Certainly, any body-worn camera that shows the east side --

THE COURT:  But you just represented that there's likely video of the east side that he can introduce and you would stipulate to to show --

MR. MCCAULEY:  Yes; yes.

THE COURT:  -- the lack of barriers between the Capitol and the two areas where permits were allowed.

I don't know that that's what they show, but to the extent that video exists --

MR. MCCAULEY:  To the extent that that video exists and that we know about it beforehand.  The problem becomes when we find out about it in realtime.  When we know about it beforehand, we can stipulate to it.

THE COURT:  All right.  Mr. Roots, if there are videos that you want to get in, talk to them, and let's get some stipulations so we don't have delays during the defense case.  I

don't want a delay to get some government witness here who can --

MR. MCCAULEY:  Fully understood, Your Honor.  We are happy to work --

THE COURT:  All right.

MR. MCCAULEY:  If we know about the video in advance, if we can review it before having to sit here with someone being crossed or during closing, we're happy to stipulate to it.

THE COURT:  Thank you.

And what was the issue yesterday about them not being able to get a witness?  What was --

MR. ROOTS:  Okay.  There was a radio call early in the morning of January 6 --

MS. MILLER:  We have a proposal that we're --

THE COURT:  Oh, great.

MR. MCCAULEY:  We're going to take that up later.

MS. MILLER:  Maybe at lunch.

THE COURT:  All right.

(Jury entered courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  Welcome back.  Sorry for the delay this morning.  We had to deal with a few legal matters.  But we're now ready with the next witness for the government.

Ms. Miller?

MS. MILLER:  Yes, Your Honor.

DAN LEANO, WITNESS FOR THE GOVERNMENT, SWORN

MS. MILLER:  For the record, I don't know if I actually stated on the record, but we're calling Officer Dan Patrick Leano from the Metropolitan Police Department.

THE COURT:  Good morning, Officer.

THE WITNESS:  Good morning, Your Honor.

DIRECT EXAMINATION

BY MS. MILLER:

Q.   Good morning, Officer Leano.

A.   Good morning.

Q.   Good morning, members of the jury.

Officer Leano, can you please state and spell your last name for the Court?

A.   Leano, L-e-a-n-o.

Q.   Officer Leano, sorry I was mispronouncing it.

Where do you work?

A.   Metropolitan Police Department, Sixth District.

Q.   And if we refer to the Metropolitan Police Department as "MPD," is that a common acronym?

A.   Yes.

Q.   What is your rank with MPD?

A.   Officer.

Q.   How long have you worked with the MPD?

A.   Six years.

Q.   And what is your current assignment today?

A.   My current assignment today, I just got off patrol.

Q.   When you say you "just got off patrol," what does that mean?

A.   I'm a patrol officer with the Sixth District in PSA 607.

Q.   Do you work night or day shifts?

A.   Night.

Q.   So when you say you just got off work, you mean literally last night you worked?

A.   Yes.

Q.   What are your typical duties as an officer working the night shift?

A.   Operate a police cruiser and patrol around the District.  I answer radio assignments and address any issues citizens may have, whether they call them in or they approach me.

Q.   Now, Officer Leano, turning your attention to January 2021, what was your rank then?

A.   Officer.

Q.   Where were you assigned at that time?

A.   At that time, I was assigned to a CDU platoon, CDU Platoon 61.

Q.   Could you please just explain for the jury what "CDU" stands for?

A.   Civil Disturbance Unit.

Q.   What does a Civil Disturbance Unit do for MPD?

A.   Essentially, crowd control.  If there's a riot, you respond

there, stuff like that.

Q.   Are you still a part of the CDU?

A.   Yes.

Q.   So it's not your full-time job to be a part of the CDU? When do you work on the CDU?

A.   I work on the CDU when they assign me.  There is a roster, a preset roster.  When they call CDU 61, I respond.

Q.   Turning your attention to January 6, 2021, were you working that day?

A.   Yes.

Q.   What was your assignment?

A.   I was with CDU 61 that day.

Q.   Do you remember about what time of day your shift began on that day?

A.   I began some time in the morning.

Q.   And I know it's been a while, but do you remember what uniform you were wearing when you reported to work?

A.   I was wearing my regular patrol uniform.  So something like this, but also in addition with a ballistic vest, and then I had my CDU gear in the back of the truck.

Q.   When you say your "CDU gear," how is that different from the regular gear that you showed up in?

A.   It's an additional ballistic helmet, a riot baton, some other personal protective equipment that they issue us.

Q.   Sorry.  What was the type of baton?

A.   Could you repeat that?

Q.   You said a certain type of baton.  I just didn't catch it.

A.   Riot baton.

Q.   Riot baton.  Thank you.

On January 6, did you hear any radio calls over your police radio?

A.   I did.

Q.   Can you please tell the jury what kind of calls you heard?

A.   I'm sorry.  Do you have a mint or something?

So I've heard calls for help before.  I've heard officers calling for assistance in a more panicked manner.  But this day just felt different.  It was a lot -- I don't really know how to put my finger on it, but there was panic.  There was desperation that I heard.  They were saying something like they've breached the Capitol, need everyone, something along those lines.

It was -- yeah.

Q.   So fair to say you were hearing emergency calls for help?

A.   Yes.

Q.   Calls for backup?

A.   Yes.

MR. ROOTS:  Objection; hearsay.

THE COURT:  Overruled.

BY MS. MILLER:

Q.   Do you remember about what time you started hearing those calls?

A.    Some time in the afternoon.

Q.    And once you started hearing those calls, what did you do next?

A.    So we gathered the rest of the people in the van together, and then we headed towards the Capitol.  At some point, the crowd was so thick that we had to get out of the van and redirect traffic around it.  So we were kind of splitting the crowd and splitting traffic in order to get through to the actual Capitol.  We did that for a few blocks, and then we staged a couple blocks away from the Capitol.

Q.    What do you mean by the word "staged"?

A.    We chose a position to prepare the rest of our equipment and don our protective equipment and gather in a formation.

Q.    And you said you were in a van.  Do you know about how many people were in the van with you?

A.    It's usually about six to seven.  I don't know that day, but that's the usual amount that's in the van.

Q.    And Officer Leano, I just got a note that I think we may be having a little trouble hearing you.  So if you wouldn't mind speaking up a little bit and just into the mic.

A.    Of course.

Q.    So you got into formation with the other officers from your van; is that right?

A.    Yes.

Q.    Can you tell the members of the jury what you did once you

were in formation?

A.    So once we were in formation and we had all of our protective equipment donned, then we started proceeding towards the Capitol, down the street.  And all along that route there were people yelling out don't hurt them, calling us traitors, just generally yelling at us.

Once we started walking, we picked up the pace a little bit, and the entire squad started running toward the Capitol.  And then we actually were able to find a location to gather after we ran to the Capitol.

Q.    And before we talk about where that location was when you arrived sort of closer to the Capitol, I think you used the term donned gear.

Just in case the jury doesn't understand, can you explain what "donned" means?

A.    Donned means to put on, which is the term they use.

Q.    And what was your understanding at the time of why you donned additional gear at that time?

A.    From my understanding, there was assaultive behavior going on.  When someone says they've breached the Capitol, it's better to prepare.

Q.    What additional gear did you don at that time?

A.    I donned my ballistic helmet, my gas mask, and my riot baton.

Q.    Taking a step back, does -- just generally speaking, does

donning a gas mask make it hard to be heard, like your commands to be heard?

A.   It makes it a little difficult to be heard, and also, it's a little difficult to breathe at that time, too.

Q.   So let's pull up Exhibit 119, please, which is already in evidence and published to the jury.

Officer Leano, just so you know, this is a touch screen. Let me see if I can -- do you see little a palette where you can select on the top right corner of your screen?

A.   Yes.

Q.   Okay.  Great.  Thank you.  So I may ask you to mark some things once we get a little further.

Do you remember reviewing these 3-D renderings of the Capitol building in preparation for your testimony?

A.   I do.

Q.   Could we turn to page 3, please, of 119.

Do you remember where, looking at this visual, you -- once you made your way and ran up to the Capitol, sort of where you landed?

A.   I was around this area here.  I remember there being risers to my left and seeing a mass of people like above me.

Q.   When you say "a mass of people," was that law enforcement or someone else?

A.   It was someone else.  It was not law enforcement.

Q.   Can you describe what those people sort of generally

appeared to be?

A.   It appeared to be people who had gathered in support of a presidential candidate.  There was a -- I remember seeing a lot of -- not memorabilia, not advertisements, but signs.

Q.   Flags and things?

A.   Flags, signs in support for like Trump and everything.

Q.   Can you describe what you remember about the noise when you arrived sort of in this area you marked on the 3-D rendering?

A.   It was extremely loud.  It was almost so loud I couldn't really focus.  I had to really like hone in on the radio transmissions.  But even then, it was hard to hear.

Q.   What made it so loud?

A.   All the people were yelling.  They were yelling abusive language and just yelling at us.

Q.   And "us" is law enforcement?

A.   Law enforcement, yes.

Q.   Before we keep talking about your movement along Capitol grounds, can you describe for the jury how, if at all, the tone of the crowd changed throughout the time you were at the Capitol?

A.   It seemed to get more and more aggressive as the -- and agitated as the day went on.  The longer we were there, the more tensions rose, the more anxieties rose, and it just didn't feel good.

            MS. MILLER:  Let's go ahead and let the record reflect

the witness marked a little diagonal line at the sort of -- just right of middle of the screen.

THE COURT:  The record will so reflect.

MS. MILLER:  Thank you.

BY MS. MILLER:

Q.   What was your understanding when you were in that area of sort of what your mission was going to be going forward?

A.   My understanding at that point was to establish a police line with the assistance of the rest of my coworkers.  Usually, that means don't let anyone through who isn't MPD, yeah.

Q.   Did you form an understanding of why you were forming a line in that area in particular?

A.   No, I didn't.  I just received orders to go there, and I helped to reinforce the line I was told to.

Q.   So on this image, if we were to draw a line left on the screen from where you've marked, could you see in that direction based on where you were standing?

A.   Yes.

Q.   What did you see in that direction?

A.   I saw a mass of people right before me as far as really I could see.

Q.   And you said before that you saw people above you.  Just so the jury understands, can you describe what you mean in front of you as far as the eye could see versus above you?

A.   Above me, I mean the risers that were set up to the left of

me.

Q.   You can go ahead and circle it on the screen.

A.   So I saw all sorts of people to the risers there, and then the risers, from behind, you could look through.  So I could see that there were also people like throughout the rest of the steps as well.  You saw the risers as full, essentially.

MS. MILLER:  And also, could we let the record reflect the witness circled as what he was describing as the risers, just left and lower than the line on the screen previously.

THE COURT:  The record will so reflect.

MS. MILLER:  Thank you.  I'm going to clear the screen.

BY MS. MILLER:

Q.   So once you formed the line you previously marked, where, if anywhere, did you go from there?

A.   So from there, we pushed the line this way.

Q.   Do you have an approximate -- did you stop at any point, or did you move the entire time?

A.   We took maybe little breaks, little pauses, but we were moving pretty consistently.

Q.   What is your understanding of why you were moving consistently like that?

A.   My understanding was to clear the Capitol grounds of the people that weren't supposed to be there.

Q.   On this 3-D rendering, do you have a sense of where you

were hoping to clear them to?

A.   No.   I was thinking that we had to clear them off the general Capitol grounds.

MS. MILLER:  Please let the record reflect that the witness has marked an arrow diagonally down facing upward towards the left of the screen and in front of the center area of the west side of the Capitol.

THE COURT:  The record will so reflect.

MS. MILLER:  Thank you.

BY MS. MILLER:

Q.   Officer Leano, at the tip of where you've marked your arrow, do you have any specific memories of interactions with rioters in and around that area?

A.   Yes.

Q.   Can you describe for the jury any specific memories?

A.   Again, there was a lot of yelling.  I remember I was yelling at people to get back, get back.  People were pushing against us.  When we were trying to push, I remember just being pressed so hard it felt like my lungs caving in.  It felt like they couldn't expand.  I couldn't breathe.

And I also remember someone with a brown jacket.  I don't know why I remember him.  But then I also remember someone trying to steal my baton when I was telling them to get back.  I pushed forward, and then he grabbed the middle of it, and then we had to wrestle to the ground, and I had to fight to get it

back and retain it.  And some officers behind me helped get me up, and then we re-established that line.

Q.   Were you and your fellow officers giving any commands other than verbal commands to move back?

A.   Sorry.  Could you repeat that?

Q.   Were you doing any sort of gesturing to the crowd to move back in addition to verbal commands?

A.   Yes, in conjunction with giving the verbal commands of get back, I had my baton kind of like diagonally across my body like this and saying "get back" in conjunction with pushing as well.

Q.   Is that something you're trained to do for riot control?

A.   Yes.

Q.   Why?

A.   It's a -- from my understanding, it's a clear message. It's concise directions in conjunction with a visual cue, if not a physical cue, to get back.  I believe it's a simple command to give and follow.

Q.   Officer Leano, have you had an opportunity to review your body-worn camera in advance of your testimony?

A.   I have.

Q.   Well, were you wearing a body-worn camera on January 6?

A.   Yes.

        MS. MILLER:  Court's indulgence for one moment, please.

        Could we pull up Exhibit 303.  It is not yet in evidence.

Case 1:21-cr-00552-DLF    Document 209    Filed 10/20/23    Page 46 of 269

46

Let me clear the screen, too.

Could we please play the first 48 seconds of this on silent, for the witness only.

(Video played.)

BY MS. MILLER:

Q. Officer Leano, do you recognize this exhibit?

A. Yes.

Q. What is it?

A. It's my body-worn camera from that day.

Q. Does it fairly and accurately reflect what happened on January 6, 2021, at approximately 4:22 p.m.?

A. Yes.

MS. MILLER: At this time, Your Honor, I would like to move this into evidence.

THE COURT: Any objection?

MR. ROOTS: No objection.

THE COURT: It's admitted.

(Government Exhibit 303 received into evidence.)

MS. MILLER: Can we publish to the jury and play this with sound for 1 minute and 19 seconds.

(Video played.)

BY MS. MILLER:

Q. Officer Leano, can you describe in your own words what your memory is of what we saw in that video?

A. We just saw in that video, we were trying to reestablish

the line after we got pushed down.  We were trying to get people back.

When I directed people to get back, one of the people in the crowd took hold of my baton and tried to take it for himself.  We ended up on the ground, and I was able to take it away -- take it back from him and retain control of it.

Q.   And Officer Leano, do you see that -- the individual in the brown jacket in the middle of this freeze frame?

A.   Yes.

Q.   Do you have any specific memories of this person from January 6, 2021?

A.   I have bits and pieces.  I do remember distinctly a brown jacket, yeah.

Q.   Can you describe any memories you have of the tone or tenor of this individual towards law enforcement?

A.   It was not good.  He generally had an aggressive demeanor toward us.  I remember something like about pushing back when -- against directions.  He was struggling with us.

Q.   Let's continue, please, playing this video to 3 minutes and 22 seconds.

(Video played.)

MS. MILLER:  Court's indulgence, please.

I apologize.  Could we keep playing another 15 seconds, to -- let's say 3:40.

(Video played.)

BY MS. MILLER:

Q.   Officer Leano, can you describe to the jury what it felt like to be at the front of what appeared to be your officer line and having these individuals speaking to you in that way?

A.   I was kind of having mixed emotions.  It was just really confusing.  At that time, I didn't really know exactly why they were there, why they were acting like this, and why they kind of chose us to take their frustrations out on, if they were frustrated.  You get an apology one second, and then it's followed up by an F you, fuck you.

And I just -- also, it was kind of a surreal experience.  I saw it happening, but I didn't really believe that it was happening.  It didn't really register in my mind, I guess.

Q.   Had you ever experienced anything like this before January 6, 2021?

MR. ROOTS:  Objection; irrelevant.

THE COURT:  Sustained.

MS. MILLER:  Can you please keep playing the video until 5 minutes 7 seconds.

(Video played.)

BY MS. MILLER:

Q.   Officer Leano, could you please describe in your own words what we just saw in that portion of the video?

A.   In that portion of the video, we were trying to get the crowd to get back.  You heard me saying "get back, get back"

multiple times, while also signaling with my baton to get back.

The crowd linked arms and physically forced themselves against us in the opposite direction we were trying to push them back to.

Q. And just for the record, what is the time at the end of that sort of altercation with that group? What's the time stamp?

A. 16:26:53, which is 4:26 p.m.

Q. Thank you. Now I would like to show you Exhibit 305, please, which has not been admitted.

Could you please identify the time stamp in the top right-hand corner?

A. Time stamp in the top right corner is 16:25:59, which is 4:25 p.m.

Q. Have you had an opportunity to review this exhibit before your testimony today?

A. I have.

Q. What is it?

A. It's another officer's body camera.

Q. Does it fairly and accurately represent what happened in this general area on January 6, 2021, at approximately 4:25, 4:26 p.m.?

A. Yes.

MS. MILLER: Your Honor, at this time, I move Exhibit 305 into evidence.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 305 received into evidence.)

MS. MILLER:  Can we please publish to the jury and go back to the beginning.

(Video played.)

BY MS. MILLER:

Q.   Officer Leano, do you have a sense where that officer was standing in relation to you at that same time frame?

A.   He was standing to my right.

Q.   Was he very close to you or far from you?

A.   He was pretty close to me.

MS. MILLER:  I would now like to pull up Exhibit 504, which I believe has been admitted into evidence.  Could we please scroll ahead in this video to 34 minutes, 35 seconds -- I'm sorry, 34 minutes.

I'm sorry.  I think I have that wrong.  Could we go ahead to 35 minutes 13 seconds.  That's my mistake.

The Court's indulgence.  I'm sorry.

So could we go to 45 minutes, 13 seconds, please.  Could we publish to the jury, please.  Thank you.

Okay.  So this is Exhibit 504 at 45 minutes and 12 seconds.  Could we please play this exhibit from here until 45 minutes 50 seconds.

(Video played.)

BY MS. MILLER:

Q.    Officer Leano, do you see yourself in this video?

A.    I did.  If we could rewind maybe a couple seconds.

Q.    Sure.  Let's go back 30 seconds, please, so 45 minutes.
Let's play it from 45:20 to 45:50, please.

(Video played.)

THE WITNESS:  Could you go back?

(Video played.)

THE WITNESS:  Right there.

BY MS. MILLER:

Q.    Straight ahead there?

A.    Yeah.  I believe I'm the -- on the left, if we could maybe
go a little further.  Yeah, go back maybe one or two frames.

Q.    We can go forward frame by frame.  I'm not sure we can go
back frame by frame.

What is it about that video that makes you think it's you?

A.    So a couple things.  One, I saw my old tech kit, which is a
tactical emergency and like trama care kit.  It's basically
rendering first aid.  Like, a lot of the stuff that I would need
to do that I stored on my vest in a pouch that I bought for
myself.  So it wasn't department-issued.  So it's unique to me.

And then I see like a glimmer of one of the spare handcuff
keys that I always keep in that position at that time, in like
the bottom of the frame in the middle.

And next to it, I think, is the white part of a tourniquet that I at that time kept at that location on my vest.

Q.   Thank you.  Could we please now play to 46 minutes 14 seconds.

(Video played.)

THE WITNESS:  If you go back a little bit, you can see it a little more clearly, all the equipment that I kind of described.

BY MS. MILLER:

Q.   Sure.  Let's -- we can go back 10 seconds if you want to describe that further for the jury.

We've gone back to 45:46, and Officer Leano, please feel free to say stop when you see yourself more clearly.

(Video played.)

THE WITNESS:  Stop.  It was like one second.

BY MS. MILLER:

Q.   It's okay.  We can keep going.

So let's play until 46 minutes 14 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Officer Leano, can you make out the name tag of the officer featured here -- sorry.

Can you make out the name on the name tag?  And you can also base this on your prior review of this same footage.

A.   It kind of looks like K. Veizaj.

Q.   So a first name K, period, and then a name starting with V?

A.   Yes.

Q.   Do you recognize his uniform?

A.   Yes.

Q.   Where is that uniform from?

A.   It's from MPD.

MS. MILLER:  Now, let's play until 49 minutes 15 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Did you just catch -- I know there's a lot of noise going on.  Did you catch what was just said on the video?

A.   Something about a sleeping giant.

Q.   Thank you.  Please keep playing until 49 minutes 15 seconds.

(Video played.)

MS. MILLER:  Could we please now pull up Exhibit 711. Can we play that on silent just for the witness, because it's not been admitted, for the first 40 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Officer Leano, do you recognize this video?

A.   Yes.

Q.   Do you remember reviewing this video in preparation for your testimony today?

A.    Yes.

Q.    What is it?

A.    It's video footage of January 6.

Q.    Is it from around the same time as the other videos we've been reviewing?

A.    Yes.

Q.    Does it fairly and accurately reflect what happened on January 6 around this time frame?

A.    Yes.

         MS. MILLER:  At this time, Your Honor, I would move in 711.

         THE COURT:  Any objection?

         MR. ROOTS:  No objection.

         THE COURT:  It's admitted.

     (Government Exhibit 711 received into evidence.)

         MS. MILLER:  Could we play the full video with sound.

     (Video played.)

         BY MS. MILLER:

Q.    Officer Leano, do you recall reviewing in advance of your testimony a video that matched up multiple different videos that we've already reviewed timing wise?

A.    Yes.

Q.    Let me rephrase that.

     That matched up timing wise with videos that we've just been reviewing?

A.    Yes.

Q.    I would like to show you Exhibit 303.1 or 303.X, which has already been admitted, and could we skip to the 20-second mark, please.

Before we play this for the jury, could you please just describe what you're seeing in terms of the three different videos.

A.    So the top right video is my body camera footage, and then the other two seem to be cell phone footage taken from that day.

Q.    And on the left side in the cell phone footage, do you see an officer with a piece of blue tape on his helmet?

A.    Yes.

Q.    Do you recall if that's the same officer as the one you identified with "K.V." in his name tag?

A.    Yes.

        Ms. MILLER:  Now let's go back to the beginning, and please play this video in full.

        (Video played.)

        BY MS. MILLER:

Q.    Officer Leano, do you remember reviewing one additional sort of mashup-type exhibit with us in preparation for your testimony?

A.    Yes.

Q.    I'm going to show you 305.1 or 305.X.  it has not been admitted yet.

THE COURT:  Ms. Miller, how much longer do you have on direct?

MS. MILLER:  Five minutes.

THE COURT:  Okay.

BY MS. MILLER:

Q.   Officer Leano, do you recognize this?

A.   Yes.

Q.   What is different about this version than the last sort of mash-up that we had?

A.   So this version in the bottom right has the other officer's body-worn camera footage that we identified.

Q.   Does this mash-up fairly and accurately reflect what happened on January 6, 2021, at approximately 4:25 p.m.?

A.   Yes.

MS. MILLER:  At this time, Your Honor, I would move Exhibit 305.1 into evidence.

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 305.1 received into evidence.)

MS. MILLER:  Could we please play the full video with sound for the jury.

(Video played.)

MS. MILLER:  Thank you, Officer Leano.  No further questions.  I pass the witness.

THE COURT:  All right.  Mr. Roots, before you start,

let's just take a ten-minute break.

(Jury exited courtroom.)

(Recess taken from 10:24 a.m. to 10:39 a.m.)

(Jury not present.)

THE COURT:  One quick issue before we bring the jury in.  The mayor documents before January 6, one of those comes off the official website, I think.

So any reason why that can't come in as a public record if it's on the government website?

MR. MCCAULEY:  Your Honor, we actually just had a conversation amongst ourselves about this.  We are fine stipulating to the admission of that tweet, I think a January 3rd tweet and January 5 tweet.

THE COURT:  That, too, is fine, but there's also something that was on the official website, at least it appears that way.  It was a screenshot of the website, it looks like, for D.C. government.

MS. MILLER:  I think we would be willing to stipulate if it avoided calling an additional witness.

THE COURT:  Even as to the tweets, maybe he can't get those in.  Wait.  These were tweets that Moseley received?

MR. ROOTS:  That, I'm not 100 percent sure.  We can talk to him again.

THE COURT:  Well, look, I think the official document, if I'm right that it's on a website, that can come in.  And if

you want to ask him, Did he and his like ten friends not come into the city because of that, I think that's a fair question, but nothing more that you've convinced me is relevant.  I think that's --

MR. ROOTS:  I will just say Mr. Moseley did indicate at the time they were hearing lots of radio news on AM radio and whatnot and that he was angry.  So the effect on the listener, he was mad that the mayor was politically sort of not inviting the Trump --

THE COURT:  Why does that matter, that Mr. Moseley is mad?

MR. ROOTS:  Well, it's a hearsay exception.

THE COURT:  But why?  Why is it relevant here that he's angry?

MR. ROOTS:  He remembered taking note of it in his own mind.

THE COURT:  Why does the fact that he's angry matter at all to this trial?

MR. ROOTS:  It proves up the point that it wasn't the rioters that caused the harm to the economy.

THE COURT:  I don't understand that.  The fact that he didn't come into D.C. and visit businesses he otherwise would have is, I guess, marginally relevant.

I don't understand why both sides are making such a big deal out of this commerce issue when the government can prove it

by interference with a federal function.  This is like a little mini trial on an element that has three ways for the government to prove.  We're putting a lot of time and energy on something that seems to the Court to be overkill.

But if the defense wants to get in the official document, it can do that.  If the government wants to stipulate to the tweets, fine.  Or if Mr. Moseley received the tweets, and he can say I received this, you know, and didn't come to the District, fine.

But that's going to be it, Mr. Roots.  It's not going to be a major overview witness.  I don't remember what you wanted to get through him, but we're not going to have cumulative testimony.  We're not going to talk about his anger about the mayor.  That's irrelevant to Mr. Thomas's guilt or innocence.

MS. MILLER:  We'll have a conversation with the defense, hopefully over lunch, about stipulating to the tweets.

THE COURT:  All right.  But again, if he wants to call him to say I didn't come in as a result of this, I think it's --

MR. ROOTS:  Well, he was a D.C. resident.

THE COURT:  Well, I didn't go to businesses downtown because of this, okay.

But again, I just wonder why the defense is spending so much time on this piece that is not even required for the government to prove.  But I'm not going to say you can't do it.  You can do it.  It's just confusing to the Court on why there's

such a big debate on this.  I'm not trying to second-guess your strategy.

MR. ROOTS:  The government hangs its hat on this Safeway -- one company, a single corporation, and the harm that was done to that, and then we're put in a position of not being able to challenge.

THE COURT:  I'm not putting you in a position of not being able to challenge.  I've said you can put in evidence to rebut the Safeway evidence.  I've not said that at all.

But I think what the government is hanging its hat on is the mayor's curfew closing everything and using Safeway as an example of a business that actually did that and experienced some loss.

But I'm not going to tie your hands.  I just don't know how effective it is.

All right.  You're ready to cross-examine this officer?

MR. ROOTS:  Yeah.

THE COURT:  Okay.  Officer, I hope you get some sleep after this.

So the government is ready to call the next witness after this?

MS. MILLER:  Yes, Your Honor.

THE COURT:  So I think we will go until 12:30 or some breaking point that's natural around then.

MS. MILLER:  That would make sense.

THE COURT:  It would be ideal if we could finish the next witness, too.

(Jury entered courtroom.)

THE COURT:  All right.  Mr. Roots?

CROSS-EXAMINATION

BY MR. ROOTS:

Q.  Good morning.

A.  Good morning, sir.

Q.  Officer --

A.  Leano.

Q.  Leano.  That's right.  Thank you for coming.

I would like to once more go over the same exhibit that was just played, and that would be Government's Exhibit 711.

(Video played.)

BY MR. ROOTS:

Q.  If I could just ask you, if you recall January 6, that day, you worked for the Metro PD -- Police Department?

A.  MPD, yes.

Q.  MPD.  Do you know an officer named Ainsworth, Corporal Ainsworth, from the Prince George's, Maryland, Police?

A.  No.

Q.  Do you recall an officer who was there with you with his visor sort of up instead of down?

A.  There were a lot of officers that day.

Q.  Okay.  And you recall this scene which we just showed,

which was shown on direct?

A.    Yes.

Q.    Now, you recall this man here, this man with a lot of hair, is he wearing a brown jacket?

A.    It appears so.

(Video played.)

BY MR. ROOTS:

Q.    Do you see an officer with his visor up on the right side of the screen there?

A.    I see a visor up on the right side of the screen.

Q.    If I could just circle there, that's the officer I'm speaking of.

And you were -- you were supported there -- the Metro PD was supported by other agencies at the time?

A.    I believe so.

Q.    Including Prince George's, Maryland?

A.    I do remember seeing P.G. County there.

Q.    Okay.  Let me zero out this mark I just made.  Let's see if we can clear the screen.

Okay.  I would like you to pay attention to that officer there with his visor up.

(Video played.)

BY MR. ROOTS:

Q.    You see lots of pushing and shoving there?

A.    I do.

(Video played.)

BY MR. ROOTS:

Q.   Let me stop right there.  First of all, I will have Mr. Thomas stand up, if I could.

Do you recognize this man?

A.   Yes.

Q.   Was he there that day?

A.   Yes.

Q.   And you recall him specifically?

A.   I recall him from my body-worn camera footage.

Q.   Okay.  You agree that he's not in this particular screen that we're looking at?

A.   This screen that I'm looking at right now?

Q.   Yes.

A.   I don't see him really.

Q.   You'd say with 100 percent certainty he's not in this screen?

MS. MILLER:  Objection; asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I would say I am fairly certain that I do not see him in this frame.

BY MR. ROOTS:

Q.   Okay.  I would like to pay attention to the individual in blue there.  Keep going there.

(Video played.)

BY MR. ROOTS:

Q.   Did you see that there?

A.   Could you rewind, please.

Q.   Can we rewind and show that again.

Do you see the individual in blue, the blue T-shirt?

A.   I do see an individual in a blue T-shirt.

MS. ROOTS:  I'd like to just roll this segment.

(Video played.)

BY MR. ROOTS:

Q.   Now, if I could stop.  Did you see an officer either fall to the ground or pushed to the ground, went to the ground there?

A.   I saw an officer kind of get off balance a little bit.

Q.   And his hands touched the ground; he went to the ground.

And you would agree Mr. Thomas is not involved in that?

A.   I didn't see him in that portion of the video.

(Video played.)

MR. ROOTS:  Okay.  Let's just -- I'd like to go to another -- I'd like to bring up another video, and that is 183. Is that Defense 183?  Defense 183, and we want to go to a particular minute mark.

THE COURT:  This isn't being published to the jury?

COURTROOM DEPUTY:  It is not, Your Honor.

BY MR. ROOTS:

Q.   We will start here and have you authenticate real quick.

MS. MILLER:  Your Honor, may we go to the phones for

one second, please?

(Bench conference.)

MS. MILLER:  Ms. Lambert just five minutes ago said she might use this on cross.  It's not the same file that I have as 183.  I haven't had an opportunity to look at it, because they just let us know, and I don't have the file labeled at 183.

THE COURT:  Let's give the government a chance to review this.

Is this something that you provided in discovery?

MS. MILLER:  It appears to be body-worn camera.  So it was probably in the global discovery, yes.

THE COURT:  Mr. Roots, can you proffer what's coming out on this?

MR. ROOTS:  This is another angle of that same sort of scene, which shows that the man in the blue shirt is actually the officer that either pushed or the officer fell with the man in blue involved and not Mr. Thomas.

THE COURT:  Okay.  So this is the same scene?  Because at the beginning, I saw cars being parked.  This is cutting away to the Northwest Plaza of the Capitol?

MR. ROOTS:  Yeah, this is a longer video, but we're going to go to, I believe, to about the 1 hour and 50 minute mark, somewhere in there.

THE COURT:  This is just another perspective of the assault?

MR. ROOTS:  Correct.

MS. MILLER:  How much of this video are you planning to play?

MR. ROOTS:  Just enough to show basically the same segment in time.

THE COURT:  If that's true, Mr. Roots, and you're just showing another perspective of the assault we've been watching, then I don't see, Ms. Miller --

MS. MILLER:  I don't either, as long as they cut it down to just the portion that they're going to show.

THE COURT:  Ms. Lambert, who is very capable to do that, and if it goes too far, you can object, and we'll stop again.

MS. MILLER:  And Your Honor -- sorry, before we go, can we just make sure that we collectively take down the exact time stamps of what they're showing so that we know what actually goes back to the jury?

THE COURT:  Yes.

MS. MILLER:  Thank you.

THE COURT:  Let's state that clearly on the record, Mr. Roots.

MR. ROOTS:  Okay.

(End of bench conference.)

MR. ROOTS:  Okay.  Now, this is just for the witness right now, Defense 183, beginning at 1:50:50, and if we could

play enough for you to recognize it.

(Video played.)

BY MR. ROOTS:

Q.   Do you recognize this as about the same time period and at about the same location?

A.   I recognize the time stamp at the top right.  I recognize that it's a body-worn camera footage of an officer surrounded by officers.

Q.   And does this look like it's from January 6 on the Upper West Terrace there where you were?

A.   It does seem familiar, yes.

MR. ROOTS:  Your Honor, I move at this time for admission of this exhibit.  This is Defense 183, beginning at 1:50:50.

THE COURT:  Any objection?

MS. MILLER:  No, Your Honor.

THE COURT:  All right.  It's admitted.

(Defense Exhibit 183 received into evidence.)

MR. ROOTS:  I would like to show this to the jury and go ahead and play it.

(Video played.)

BY MR. ROOTS:

Q.   Okay.  Now, in this scene, do you see an officer, it looks like he's either tripping or being pushed down?  Do you see that?

A.    I see an officer on the ground.

Q.    And if we could go ahead and play that back a second or two.  If you could look at the man in the blue T-shirt there.

(Video played.)

BY MR. ROOTS:

Q.    Okay.  Let's stop right there.  Do you see that arm that -- I'll just circle it here.  There's an arm here.  Do you see that, someone's hand there, an arm?

A.    Yes.

Q.    Does it look like that is the protestor, demonstrator or, slash, rioter that is the most likely to have been the person who either pushed or had hands on as this officer went down?

MS. MILLER:  Objection; speculation.

THE COURT:  Overruled.  The officer can answer it if he's able to.

THE WITNESS:  I can't really match up the hand specifically to a person.

MR. ROOTS:  Okay.  This is minute mark -- for the record, this is 1:50:58 for the record.  And I would like to clear this and play it just a little bit more.

(Video played.)

BY MR. ROOTS:

Q.    You see the officer went down there?

A.    I see an officer on the ground.

Q.    Okay.  Let's keep rolling.

(Video played.)

MR. ROOTS:  I want to find where the individual in blue sort of is caught by Mr. Thomas.

(Video played.)

BY MR. ROOTS:

Q.   Okay.  Let me just stop right there.  Maybe if we could go back one second.

(Video played.)

BY MR. ROOTS:

Q.   Maybe we can see it here.  In this area that I'm circling, do you see some protestors there, some individuals in that area I've circled?

A.   Yes.

Q.   Do you see a man wearing a blue T-shirt?

A.   I do.

Q.   Does it look like he's wearing maybe a blue flannel shirt, a long-sleeved shirt under the blue T-shirt?

A.   I can't really tell what color the flannel is, but it is a flannel -- it looks to be a flannel shirt underneath the blue T-shirt.

Q.   Would you say that's consistent with the flannel long sleeve that appeared to be either pushing or making contact with that Prince George's -- I'm sorry, that officer that went down earlier?

A.   If I'm going to be honest, the video itself at that time

was a little grainy; the color -- the video at that time showing the hand with the officer, it did look a little grainy.  I'd be guessing if I said yes or no.

Q.   Okay.  Also, I would like you to look at this area here. You see where I'm drawing this line?  Do you see that concrete, I guess, step up there?

A.   Yes.

Q.   It looks like it could be a curb of some kind, curbing?

A.   Yes.

Q.   And it looks like maybe in the interior here there is some kind -- it's a planter or something?  It looks like dirt or soil there.  Do you see that?

A.   Yes.

MR. ROOTS:  Let the record show I'm pointing to an area at minute mark 1:51:00, and it's showing sort of a concrete step up there that seems to be around a large planter area.

BY MR. ROOTS:

Q.   Would you agree?

A.   I don't know the purpose of it, but it looks to be a curb with some dirt.

Q.   Okay.  Let me just ask you, does that look like it might be a tripping hazard for either side, for anyone?

A.   Yeah.

Q.   Do you see the officers -- actually, a variety of people appear to be tripping, falling down; would you agree with me?

A.   Yes.

Q.   It's a close crowd.  It's a scrum.  People are in a chaotic crowd.

A.   Yes.

Q.   And that's true on both the law enforcement side and the demonstrators' side; you would agree?

A.   I don't know about the demonstrators' side, but the law enforcement side, it was -- I mean, it was there.

Q.   You saw people either falling down or pushed down, going to the ground at times?

A.   Yes.

Q.   And that was on both sides, both law enforcement and the demonstrators?

A.   I'll be honest, at that time, I was more focused on helping officers that were down.  I wasn't really paying attention to the demonstrator side at that moment.  I remember falling down myself and trying to help another officer up.

Q.   Okay.  Now, do you see that this man in blue has sort of been caught by -- going backward by an individual in a brown jacket?  Do you see that?

A.   I see an individual in blue, and I see an individual with his arm kind of near him, yeah.

Q.   Okay.  Maybe we can just roll some more of that.  I will try to clear this out a little bit.  Okay.

       (Video played.)

BY MR. ROOTS:

Q.   Okay.  And you see that people are in sort of a scramble?
Would you call that a chaotic moment?

A.   Yes.

MR. ROOTS:  Court's indulgence, just to figure out
where I am at the moment.

BY MR. ROOTS:

Q.   Okay.  Just some background questions here.

You have experience with crowd control?

A.   Yes.

Q.   And that's a part of your duties at Metro?

A.   It's a part of my duties at MPD.

Q.   And you talked about some of the gear you wear, ballistic
vest?

A.   Yes.

Q.   And when you go to riot situations like this one was --
correct?

A.   Yes.

Q.   This was a riot situation, so you were wearing specialized
riot gear, would you say?

A.   I was wearing my Kevlar helmet, my gas mask, and my riot
baton, in addition with my usual gear.

Q.   And that's not what you would normally wear on patrol, is
it?

A.   No.

Q.   So this was specialized protective gear that you were wearing?

A.   Yes.

Q.   Would you say it has extra padding, more than normal?

A.   For my head, yes.

Q.   We'll just look at the scene.  Can the jury see this?

You see an officer -- that's the Prince George's guy there, I believe, wearing protective gear as well, would you say?

A.   It may be another officer.  It doesn't look like any protective gear that MPD issues.

Q.   Okay.  But in general, riot -- the officers here in this scrimmage line that were moving to push the demonstrators out were wearing protective gear; correct?

A.   Yes.

Q.   Helmets, as you said?

A.   Yes.

Q.   Padding, as you said?

A.   Yes.

Q.   And that includes elbow pads, arm pads?

A.   I don't know specifically what they're issued.  I just know what I'm issued.

Q.   And a protective vest there?

A.   Yes.

Q.   What about knee pads, protection for the legs?

A.   Again, I don't know what they're issued.  I just know what

I'm issued.

Q.   Were you wearing knee pads or any leg protection?

A.   I don't remember on that day, but I was never issued any.

Q.   And of course, the shields, the shields are not what you would normally use on patrol; correct?

A.   We do have some -- nothing similar to these shields.  We do have a -- maybe one or two that we don't carry usually but we may keep in a patrol car.

Q.   Okay.  Now, when you're on these special crowd control, I think you called it CDU units -- what does "CDU" stand for, first of all?

A.   Civil Disturbance Unit.

Q.   When you were using the Civil Disturbance Unit gear, is it the expectation that you will have contact with people?

A.   The expectation is that we may need to protect ourselves.

Q.   So this was about -- this would not be consistent with your normal patrol clothing?

A.   No.

Q.   In your normal patrol clothing on patrol, you're not normally expecting to have physical contact with people?

A.   Could you --

Q.   For example, what you're wearing there, what you're wearing on the stand there, would you say that's what you might typically wear on a typical day?

A.   No.  This is administrative gear.  So I'm just -- I have my

uniform shirt on and uniform pants.  Usually on the street, I would also additionally have a duty belt, as well as my ballistic vest.

Q.   Okay.  But on a normal day on patrol, you would not have elbow pads?

A.   I personally wouldn't, no.

Q.   And you would not have a Kevlar helmet?

A.   We are encouraged to carry those on patrol in case of an active shooter.

Q.   In case of an active shooter?  Okay.  But you would agree with me that when you transform into this CDU crowd control duty, that you don this protective gear with the expectation you might have contact with the public, physical contact?

A.   Again, it's issued to me for my own personal protection.  Whether or not the intent is to have contact with the public or not, I don't really give the orders.

Q.   Okay.  And you've had experience with other either riots or protests?

A.   I have.

Q.   Would you say that everyone who makes contact with a police shield that you're holding is committing an assault on you?

A.   I usually don't hold the shield.  I'm usually not really issued the shield when I'm on CDU.  I have my riot baton as a main tool.

Q.   Okay.  You did testify that with your gear on and in that

situation, it was hard to hear.

Do you recall that?

A.   It was not because of the gear.  I had practiced with the gear.  It was hard to hear because of all the yelling.  With the gas mask, it doesn't obstruct my ears at all, and with the Kevlar helmet, there's a decent amount of space between the helmet and actual ears so I can still hear things coming in.

Q.   And you testified that the crowd was very loud that day?

A.   Yes.

Q.   What about announcements, official announcements?  Could you hear those real well?

MS. MILLER:  Objection; beyond the scope.

THE WITNESS:  Overruled.

THE COURT:  What do you mean by "announcements"?

BY MR. ROOTS:

Q.   You said it was hard to hear.  You agree it was hard to hear any statements?

A.   I wouldn't say "any statements."  I heard specific things being said in a crowd.  There's certain things that stand out to me.  "Traitor" was one of them.

Q.   Let me just ask you about that.  Did that hurt your feelings at all?

MS. MILLER:  Objection; relevance.

THE COURT:  Sustained.

BY MR. ROOTS:

Q.    Is it common to have the public yell things at you --

A.    Yes.

Q.    -- as a cop?  It's common.

I'd like to bring up Government's 712.  I don't know if that's in evidence or not.

MS. MILLER:  It's not in evidence.  But we have no objection.

THE COURT:  To clarify, Ms. Miller, there's no need for this witness to identify it first?  We can publish it to the jury?

MS. MILLER:  Yeah.

THE COURT:  Okay.  It's admitted.

(Government Exhibit 712 received into evidence.)

MR. ROOTS:  Okay.  I would like to show this to the jury and play the --

(Video played.)

BY MR. ROOTS:

Q.    If I could just stop there, do you recognize yourself in that segment anywhere?

A.    No.

Q.    You recognize that moment in time when the MPD and the other officers were seeking to start pushing the crowd along that area?

A.    Yes.

Q.    And did you hear those voices asking or saying they didn't

know what was going on?

A.    No, I did not hear those voices.

Q.    Did it seem like the crowd was confused?

A.    I don't know what was going through their head.

Q.    You indicated that you were confused?

A.    Yes, I was confused.

Q.    You literally testified you were confused.

(Video played.)

MS. MILLER:    I object and move to strike Mr. Root's comment.

MR. ROOTS:    Grounds?

THE COURT:    Mr. Roots, you don't testify.    Ask the witness the questions.

BY MR. ROOTS:

Q.    Okay.    You indicated you were yourself confused?

MS. MILLER:    Objection; asked and answered.

THE COURT:    Overruled.

BY MR. ROOTS:

Q.    You indicated you were confused; correct?

A.    I indicated that it was a confusing situation, yeah.

Q.    And you would agree that it indicates that the crowd was confused?

MS. MILLER:    Objection; asked and answered.

MR. ROOTS:    I don't believe it's been answered.    I could be wrong.

THE COURT:  To the extent you can answer the question, you may answer it.

Overruled.

THE WITNESS:  Again, I don't really know what was going on through their heads.  I'm not psychic.

BY MR. ROOTS:

Q.   If I could just say, you don't always have to look to the prosecution table when you're answering.

MS. MILLER:  Objection; move to strike.

THE COURT:  Yeah, I move to strike that, Mr. Roots.

MR. ROOTS:  Okay.

THE COURT:  Ladies and gentlemen, you are to disregard that.

BY MR. ROOTS:

Q.   How many people had brown jackets up there that day?

A.   Hard to guess.  I think multiple is a safe answer.

Q.   Okay.  Now, in all the footage you've seen, have you seen any bullhorns among the officers?

A.   Could you clarify what you mean by bullhorn?

Q.   A bullhorn or a megaphone.  Did you see any megaphones held by officers at all?

A.   I don't remember seeing any that day.

Q.   With regard to the messages of the crowd, you heard many people chant things; correct?

A.   Yes.

Q.   And you heard at times Mr. Thomas was yelling different things?

A.   Yes.

Q.   Some of those things were against police but some were for police; would you agree?

A.   You'd have to give me the specific statements.

Q.   Well, we're on your side -- did Mr. Thomas shout "we're on your side"?

A.   I don't remember if it was him specifically, but I do remember hearing that.

Q.   "We want freedom.  We want peace."

Do you recall that?

A.   Yes.

Q.   Now, at the time you saw Mr. Thomas up there, did he have one of his hands -- an object in one of his hands?

A.   Yes.

Q.   And what was he holding?

A.   It appeared to be a cell phone.

Q.   And in your experience, is that consistent with someone who is wanting to fight?

        MS. MILLER:  Objection; speculation.

        THE COURT:  Overruled.

        BY MR. ROOTS:

Q.   In your experience, do people launch into fights while holding a cell phone in their hand?

A.    Sometimes when they're holding a cell phone, it does seem they can get aggressive.  Obviously, when a fight happens, it kind of -- it kind of springs up on you.

Q.    Okay.  Did it look like he might be actually filming at the time?

A.    I did see the camera portion, like the lens portion of the phone sometimes, if I remember correctly, from my body-worn camera.

          MR. ROOTS:  Court's indulgence.

          BY MR. ROOTS:

Q.    Okay.  Just a couple more questions.  I would like to bring up Exhibit 504, which was shown.  Sorry.  We have the wrong video.

     Let me just ask, was there a moment when during that fracas, during that chaos up there, did it seem that Mr. Thomas here was using his back to hold a space so that another protestor could get to his feet?  Do you recall that?

A.    I couldn't see what was beyond him.

     (Bench conference.)

          THE COURT:  Mr. Roots, I just want to tell you to be careful.  I think a video popped up, and the jury might have seen it, that had a note maybe from Mr. Hill on the side.  Maybe it wasn't published to the jury.  But Ms. Lambert needs to be careful pulling up these videos, and let's not change videos without first just showing it to the witness.

MR. ROOTS:  We're actually just -- we're going to make our points through another witness.

THE COURT:  Okay.

(End of bench conference.)

MR. ROOTS:  Officer, sorry for the delay.  We're going to make the points through another witness.  Thank you so much for coming today.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MS. MILLER:  Very briefly, Your Honor.  We always say that.  Somewhat briefly, hopefully.

May I proceed, Your Honor?

THE COURT:  Of course.

REDIRECT EXAMINATION

BY MS. MILLER:

Q.   Officer Leano, how many times have you testified in court?

A.   A handful.  If I had to guess, I could count it on my hand.

Q.   Have you ever testified in federal court?

A.   No.

Q.   Is this your first time testifying in federal court?

A.   Yes.

Q.   When Mr. Roots was asking you about confusion, do you remember testifying on direct about your confusion?

A.   Yes.

Q.   Do you remember my asking you what was confusing about what

the rioters were saying to you?

A.    Yes.

Q.    Can you remind the jury what you said about that?

A.    So it was confusing because it was a mixture of statements. On the one hand, I would get like "we support you," and then on the other hand, I would get, "Go fuck yourself, you're a traitor.  You don't deserve to wear the badge."  So it was just -- it just seemed kind of diametrically opposed.

Q.    And what was your interpretation of when the defendant yelled "hold the line" about 20 times?  What did you think that meant?

A.    So I thought that it meant -- when he was saying that, a bunch of other individuals I saw link arms to try and halt our advance, MPD's advance.

Q.    Mr. Roots asked you a number of times if you agreed it was a chaotic scene.

      Would you also agree it was an evolving scene?

A.    Yes.

Q.    Do you know what caused each and every officer to fall over during that ten-minute time frame?

A.    I couldn't keep track of it all.

Q.    Mr. Roots also asked you about a scrum.  Can you tell the jury what you understand the word "scrum" to mean?

A.    I don't.  I have no idea what a scrum is.  Could you use it in a sentence?  I'm sorry.

THE COURT:  It's all right.

BY MS. MILLER:

Q.   It's okay.  That's why I asked.

In terms of the defendant filming the day and generally Mr. Roots asked you, do you remember, on cross about whether folks who are filming riots is typical, do you remember that?

A.   Yes.

Q.   In this day and age, with Defund the Police, do you see people filming more or less their interactions with law enforcement than six years ago?

MR. ROOTS:  Objection; leading.

THE COURT:  Overruled.

THE WITNESS:  More.

MS. MILLER:  No further questions.

THE COURT:  All right.  May this witness be excused?

MR. ROOTS:  I just have a couple questions.

THE COURT:  Okay.  Go ahead.

RECROSS-EXAMINATION

BY MR. ROOTS:

Q.   So when you said confusion, that you were confused, it was just about the messaging?  That was the whole point of what you meant?

A.   Yes.

Q.   You weren't confused by anything else, just the messaging?

A.   I was mainly focused on the messaging.  That was -- I

remember that's what was going through my mind.

Q.   Very quickly, you testified that someone tried to take your baton.

Do you recall that?

MS. MILLER:  Objection; beyond the scope.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. ROOTS:

Q.   For the record, you're not suggesting that was Mr. Thomas?

A.   I am not.

MR. ROOTS:  Okay.  No further questions.  Thank you.

THE COURT:  So this witness may be excused?

MS. MILLER:  Yes, Your Honor.

THE COURT:  All right.  Thank you, Officer.

THE WITNESS:  Thank you, Your Honor.

MS. MILLER:  Would you like us to proceed, Your Honor?

THE COURT:  Yes, please.

MS. MILLER:  The government now calls Robert Niewenhous from MPD.

ROBERT NIEWENHOUS, WITNESS FOR THE GOVERNMENT, SWORN

THE COURT:  Good morning, sir.

THE WITNESS:  Good morning.  How are you?

THE COURT:  Doing well.  And you?

THE WITNESS:  Trying to fit in this chair.

DIRECT EXAMINATION

BY MS. MILLER:

Q.    Good morning, Officer Niewenhous.  Can you please state and spell your name for the record.

A.    Officer Robert Niewenhous, R-o-b-e-r-t N-i-e-w-e-n-h-o-u-s.

Q.    Officer Niewenhous, where do you work?

A.    MPD, 6D, Metropolitan Police Department.

Q.    How long have you been working in law enforcement?

A.    I'm currently in my sixth year.

Q.    What's your current assignment in terms of -- I know you said where you work, but your day to day?

A.    Patrol in southeast D.C.

Q.    What, if any, experience do you have in riot control?

A.    I've been a part of the Civil Disturbance Unit 62 since I got to 6D about four and a half, five years ago, which is the 2 unit, which is head to toe what we call the turtle gear.  It's the hard platoon, all pads, coveralls.  Easiest way to describe it, you're the padded unit.

Q.    Just so the jury understands, taking a step back, can you describe sort of -- it sounds like there was different levels of CDU, I guess, in terms of gear.

      Can you tell them a little bit about that?

A.    Yes.  You have regular CDU platoons like the 1, 3, 5.  So your district is the first number.  We're 6D.  So I'm 6D2.  Those units show up to -- in regular uniform like I'm dressed now, with also CDU gloves, which is more padded than your

typical glove that we'd wear on the street, a batten, which is an expandable larger baton, and a helmet with gas mask.

The four platoons are -- for us would be 64. It's a bike platoon, dressed like I am now, again also have the bike helmet, and then they also have the hard helmet, if they need it, with a face shield and gas mask and batten.

The 2 platoons are the head-to-toe essentially hockey gear, hardened plastic that go -- I wear them, shin guards, thigh guards, shoulder pads that go underneath, attached to our vest. Then you have the arm guards, so you're protected all the way down to your wrist. We also have the gloves, helmet, gas mask, batten, as well as a fire retardant coverall that goes over all of that.

Q. And that final tier was what you called the turtle gear?

A. That is the turtle suit, in a nutshell.

Q. The turtle suit, thank you.

Turning your attention to January 6, 2021, were you working on the CDU that day?

A. I was scheduled to be on CDU 62, with a roll call of 4:00 or 4:30 that afternoon.

Q. What time of day, if you recall, did you show up for your shift?

A. I typically came in early to get the vans ready, but that day, I was about three hours early. So I got there anywhere from between 1:00 to 1:45.

Q.    And I think I heard you say "to get the vans ready."

Can you describe what you mean to the jury?

A.    So when we're on CDU deployments and it's full activation, where we know we're going to be working possible First Amendment activities, we have rental vans that we put our gear in and we sit in and wait until we're needed.

The 2 platoons typically don't leave the vans unless absolutely needed.  Sometimes we don't even dress until they say gear up, which means put the whole turtle suit on.

So typically, I would get there early and make sure the vans were where they needed to be, gassed up if we need to get gas.  I'd have somebody go get them gassed up so we can move when we're done with roll call, which is when we all come together, check in, and then go out on the street.

So get the vans, I come in and make sure the keys are where they need to be, because we all know that people misplace keys.  And that happens even at work.  So just making sure everything was ready that day.

Q.    So is it fair to say that the tier that you work in, the turtle suit tier of the CDU, is sort of on call for emergencies?

A.    Yeah, we are the emergency.  If you see us come out, we're the last resort.

Q.    Turning your attention to January 6, 2021, were you called to duty that day?

A.    Yeah.  I was early enough that -- my lieutenant was already

there.  I went to check on the keys, and he told me to gear up and get ready, because two other officers from the 2 platoon that day were there early as well, and the four of us got into a car and came down early.

Q.   What was your understanding -- sorry.

When you say "came down," what do you mean?

A.   Came down to the Capitol from 6D, which is up on northeast part of D.C.

Q.   What was your understanding of why you were deploying to the Capitol?

A.   At that point, I hadn't paid attention to the news or anything.  So I didn't really know what was going on.  And he said that it had gotten worse that day and we needed to get down there as soon as possible.  And I turned the radio on, and all I heard was chaos.  I couldn't really make out what was being said.  So I knew something was wrong.

Q.   When you say "chaos," can you describe that a little bit more?

A.   Yelling on the radio.

Q.   Is that normal, to hear yelling on the radio?

A.   No.

Q.   To be clear, we're talking about your police radio?

A.   Yes.

Q.   Do you remember anything specific about what was being yelled on the radio?

A.    I didn't hear it specifically, but I was told that a 1033 was called, and when an officer puts out a 1033 call, that is officer in distress, send anybody and everybody who is available to assist.

Q.    Do you have any memory of any specific feelings you had at the time when you heard a 1033 and yelling on the -- or were told that there was yelling on the radio?

A.    That day, when you hear 1033, and we knew the situation, you get nervous, excited, because you don't know what you're going into.  Like any other 1033, your adrenaline goes through the roof.  You don't know what you're going into.

So yeah, you're excited and adrenaline is going, but at the same time, you're scared because you don't know what you're going into.

Q.    When you say you knew about the situation, do you mean that you knew there were rallies planned around D.C. that day?

A.    Yes.

Q.    So do you know approximately what time you arrived on Capitol grounds?

A.    Maybe an hour later, because it takes a little bit to get all that gear on.  So anywhere from 2:30, 3:15, somewhere around there.

Q.    Can you describe for the jury what you remember about the scene as you arrived at the Capitol building?

A.    People everywhere, police cars everywhere, buses

everywhere, cars parked in the middle of the road, people running all around, smoke in the air.

I know when we pulled up on scene, we parked in the middle of Independence Avenue, got out of the car.  The senses start going off, because you know -- the smoke's in the air, but to describe it to you the best is it was spicy because the CS and the OC that was already in the air.

So once we got up on the grounds, we immediately put our masks on.

Q.   I'd like to show you Exhibit 119, which is already in evidence.  Do you remember reviewing 3-D renderings of the Capitol in advance of your testimony?

A.   Yes.

Q.   Turning to page 2, please, can you briefly just draw on the screen -- at the top right corner of the screen, there's a palette that you can select to draw.  Can you just draw your general memory of your path onto Capitol grounds on January 6, please.

A.   That's where I entered.

MS. MILLER:  Let the record reflect the witness has marked from the upper right-hand corner, in a diagonal sort of line towards Capitol grounds.

BY MS. MILLER:

Q.   Then can you please continue drawing where you went once you got up -- did you arrive on that terrace area?

A.   We came up on the top area here.  I remember there was a path.  I just can't see it here.  But we came across, down around the corner, came up on the top.  And at this point, this is about where we started to pull our gas masks out and figure out where we needed to go.

Q.   Do you remember whether there were a lot or a little in terms of numbers of people in the area where you just landed here?

A.   So where we came across where I have the little arrowhead, we came through protestors and demonstrators through that area.

Once we hit the corner, it was strictly law enforcement, and at that point, that's where we found a safe spot to put the gas masks on.

MS. MILLER:  And let the record reflect that the witness has drawn a second line, which is corner angle around the southwest corner of the Capitol building.

THE COURT:  The record will reflect both lines.

MS. MILLER:  Thank you, Your Honor.

I'm going to go ahead and clear the screen.

BY MS. MILLER:

Q.   Turning to page 4 of this exhibit, please, Officer Niewenhous, did there come a point where you ended up in this area in the northwest corner on the terrace at the Capitol?

A.   Yes.

Q.   Could you please mark for the jury approximately where you

remember ending up?

A.    So do you want me to draw like the line?

Q.    Yes.

A.    Okay.  Came across the top back behind the grandstands.  At this point, we already have our gas mask on, and I ended up at the top of a ramp at the top of this staircase over here.

Q.    Now, at the time you put your gas mask on, it sounds like you have a pretty vivid memory of doing that; is that right?

A.    Yes.

        MR. ROOTS:  Objection; leading.

        THE COURT:  Rephrase the question.

        MS. MILLER:  Sure.

        BY MS. MILLER:

Q.    What, if any, memory do you have of putting your gas mask on?

A.    I do know that there was CS gas in the air and OC spray, and we knew that there were other irritants in the air.  So at that point, to protect your breathing, your eyes, you put your gas mask on.

Q.    As you made this approach from the south to the north of the Capitol grounds, do you have any memories of what was the scene around you?

A.    Yes.  Over near the grandstands, I knew there were white shirts standing there looking out over the grounds on the west side.  White shirts are for us at MPD lieutenants and above.

Saw them standing there looking out, but directly in front of me, there was a line formed for officers to -- it's more or less a police line.  Like in any other crime scene you work, it doesn't matter if it's tape or a line of officers to create a restricted area.  There was a line forming there.  I joined that line with my lieutenant and the other two officers I went with that day.  And there was a crowd on the northern side of that line in this area.

MS. MILLER:  Please let the record reflect the witness has drawn a line in the middle of the screen towards the top left and then has circled an area just left of center in the top of the screen.

THE COURT:  The record will so reflect.

BY MS. MILLER:

Q.   What was your understanding of your mission when you joined the line of officers?

A.   It was to prevent protestors from moving south from the north side, to keep them from gaining entry into the Capitol.

Q.   Did the line of officers begin moving, or was it stationary?

A.   At the start, it was stationary, and then we were given the order to move forward, at which point we moved forward, and that means northbound.

Q.   Thank you.  I'm going to go ahead and clear the screen. And can we please move to page 5 of this exhibit.  Now, a couple

of moments ago, you were describing a ramp.

Could you please mark for the jury where that ramp existed on January 6, 2021?

A.   The ramp was right along this wall going up the staircase here.

Q.   And what type of ramp was it, in your opinion?

A.   Wheelchair access ramp.  I believe it was there for the inauguration.

MS. MILLER:  Let the record reflect that the witness has marked in just above middle center a line up a staircase.

THE COURT:  The record will so reflect.

MS. MILLER:  I'm going to clear the screen.  And could we go to page 9, please, of this exhibit.

BY MS. MILLER:

Q.   Now, Officer Niewenhous, could you just describe for the jury what we're seeing in terms of the angle and sort of circumstance with this 3-D rendering?

A.   Yeah.  This is the west side, on the northern side of the police line facing toward where the police line would have been formed across that staircase going up to the entrance of the Capitol inside of that -- I guess we can call it nook area over here.  The police line went directly across, straight across the entire area right there.

Q.   Could you go ahead and draw a line where the police line was, please.

A.   (Witness complied.)

MS. MILLER:  Let the record reflect the witness has drawn an X just left of center on the screen and has drawn a line from the X towards the right of the screen.

THE COURT:  The record will so reflect.

MS. MILLER:  Thank you.

BY MS. MILLER:

Q.   Can you mark from this vantage point the ramp you were describing?

A.   (Witness complied.)

MS. MILLER:  And please let the record reflect that the witness has drawn a line towards the bottom of the screen in the middle of the horizontal line he previously drew.

THE COURT:  The record will so reflect.

BY MS. MILLER:

Q.   Okay.  I would like to show you Exhibit 712, please.

If possible, could you play just the first second of this video.

(Video played.)

BY MS. MILLER:

Q.   Officer Niewenhous, do you see yourself in this freeze frame?

A.   If you go back a second, yeah.

(Video played.)

THE WITNESS:  Right before she says "why."  Even if

you pause it where it was at the beginning.  Yeah, right there.

BY MS. MILLER:

Q.   I know it's a little blurry, but could you circle yourself for the jury, please.

A.   (Witness complied.)

MS. MILLER:  Let the record reflect the witness has circled himself in the video smack dab in the middle of the screen.

THE COURT:  At what time stamp?

MS. MILLER:  This is an open-source video, so there's no time stamp.  Oh, of the video?  It's between the zero-second mark and the one-second mark.

THE COURT:  All right.

MS. MILLER:  Thank you.  I'm going to clear the screen.

Now please play until 8 seconds.

(Video played.)

BY MS. MILLER:

Q.   Do you see yourself in this freeze frame?

A.   Right here (indicating).

Q.   Thank you.

MS. MILLER:  Let the record reflect the witness has now circled himself at eight seconds in the left bottom portion of the screen.

THE COURT:  The record will so reflect.

MS. MILLER:  Your Honor, do we need to take a moment?

THE COURT:  Yes.  Let's take a brief ten-minute break.

(Jury exited courtroom.)

(Recess taken from 11:46 a.m. to 12:00 p.m.)

(Jury entered courtroom.)

MS. MILLER:  May I proceed, Your Honor?

THE COURT:  Yes.

MS. MILLER:  Let's go back to the beginning and play this video until 21 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Officer Niewenhous, did you catch what that officer said to the person asking questions?

A.   "Moving down the steps" I heard, I think.

Q.   And up until that point, did you hear the officers chanting anything?

A.   No.

Q.   Did you hear them speaking to the rioters?

A.   That might have been an officer.  I'm not sure.

MS. MILLER:  Let's play until 1 minute 5 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Officer Niewenhous, can you please describe what you just saw happen in the bottom left corner of the video?

A.   A gentleman in a brown coat with camouflage underneath it climbing the wall at the bottom of the ramp.

Q.   And in that last portion, did you hear the officers speaking to the rioters?

A.   Not that I could tell.

MS. MILLER:  Okay.  Let's keep playing until the end of the video.

(Video played.)

BY MS. MILLER:

Q.   Officer Niewenhous, going back to what you sort of described as your understanding of your mission, can you compare what your mission was to what we saw in that video, please?

A.   Mission is to push them to the north side, but what we were dealing with was a group of violent individuals mixed in with people that were there just to be there and people that did not like law enforcement that day.  They thought we were against their mission, which I still will never fully understand, but we were there to protect the Capitol, the Capitol grounds, and all those people that were inside.  And once we formed that line, they became violent toward us.

Q.   Officer Niewenhous, did you review any body-worn camera in advance of your testimony today?

A.   Yes.

Q.   Did you review both body-worn camera that you wore and body-worn camera that other officers near you wore?

A.    Yes.

Q.    I'd like to show you Exhibit 306, please, and if you could slide forward so the witness can see until about one minute or so.    Thank you.

(Video played.)

BY MS. MILLER:

Q.    That's good.    Thank you.

Do you recognize this exhibit?

A.    Yes.

Q.    What is it?

A.    This is the terrace above the ramp that I eventually go down.

Q.    What does this exhibit contain?

A.    A mixture of law enforcement agencies on the line moving forward.

Q.    Sorry.    In the top right corner, what are we seeing up there?

A.    This is where the -- in the previous -- when we saw the brown jacket/camouflage climb the wall in front of the ramp toward where that scuffle began to happen between the protestors and law enforcement.

Q.    Is this body-worn camera or open-source video?

A.    BWC.

Q.    Does BWC --

A.    Body-worn camera.

Q.   Thank you.  Does it fairly and accurately represent the scene as you were walking down that ramp around 4:21 p.m. on January 6?

A.   Yes.

MS. MILLER:  At this time, I move Exhibit 306 into evidence, please.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 306 received into evidence.)

MS. MILLER:  So if we could go back to the beginning and play with sound the first minute and 26 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Officer Niewenhous, did you review another version of this video that's called a treated version?

A.   Yes.

Q.   How is that different?

A.   It's going to have an outline.

Q.   Would it be helpful to the jury to see the treated version?

A.   Yes.

MS. MILLER:  At this time, Your Honor, I would like to move into evidence Exhibit 306.1.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 306.1 received into evidence.)

MS. MILLER:  Thank you.  Please publish and play for the jury.

(Video played.)

BY MS. MILLER:

Q.   Now, were you wearing body-worn camera on January 6?

A.   Yes.

Q.   Did you review that body-worn camera before your testimony today?

A.   Yes.

MS. MILLER:  Can we please show the witness 308, and if there's no objection, we can just publish to the jury.

MR. ROOTS:  If it's body cam of the incident, no objection.

MS. MILLER:  Can we move in and publish?

THE COURT:  Is this body cam of the incident?

MS. MILLER:  Yes.

THE COURT:  All right.  Yes, you may.

(Video played.)

BY MS. MILLER:

Q.   And now can we -- did you also review a different version, a treated version of this exhibit?

A.   Yes.

Q.   Would it be helpful to the jury to show -- to see the

treated version?

A.    Yes.

MS. MILLER:  Your Honor, I'd like to also move in Exhibit 308.1 or 308.X.

MR. ROOTS:  No objection.

THE COURT:  Both 308 and 308.1 are admitted.

(Government Exhibits 308 and 308.1 received into evidence.)

MS. MILLER:  Thank you.

(Video played.)

BY MS. MILLER:

Q.    In the freeze frame at the end there, did you catch what the time stamp was?

A.    No, I didn't see it.

Q.    Can we go back to the last frame, please.

A.    It appears to be 16:28.

Q.    That's fine.  So around 6 -- 4:28 p.m.?

A.    Yes.

Q.    In that clip, did you hear anyone saying "move back, move, move"?

A.    Yes.

Q.    Were you one of those individuals?

A.    Yes.

Q.    Can you please describe for the jury how, if at all, the events on January 6 have impacted you and those events in particular that we just watched?

A.    I had a lot of situations, never got diagnosed with PTSD, but I knew the first time that I truly was affected.  The HBO special came out, and I was sitting in my parents' living room.

MR. ROOTS:  Your Honor, we object on relevance to some of this.

(Bench conference.)

THE COURT:  Ms. Miller, I don't see the point of going on.  He can answer how has this impacted him, but there's not really a question pending.  So direct him.

MS. MILLER:  Sure.

(End of bench conference.)

BY MS. MILLER:

Q.    Officer Niewenhous, a little more specifically, can you tell the jury how you felt during this period around 4:28, I think we said, p.m.?

A.    At that time, you've got people in front of you screaming and yelling at you, which in law enforcement you get used to, but as in one of the videos, you hear somebody yelling "kill them, kill them."  Fight -- even the girl that was holding the camera saying that she was recording, somebody was yelling "stop recording and get in the fight."  So you had people that just want to bring violence to you.

MR. ROOTS:  Your Honor, there was some hearsay in some of that.

THE COURT:  All right.  Well, I'll overrule it.

Ladies and gentlemen, the statement he made about what someone else said is not being offered for the truth of the matter but, rather, for how it impacted him.

So if you can ask the question again, and Officer, if you can try to listen to the question and answer just the question.

THE WITNESS:  Okay.

BY MS. MILLER:

Q.   Officer Niewenhous, can you describe for the jury how you were felling at that time?

A.   In fear.

MS. MILLER:  No further questions.

THE COURT:  Mr. Roots?

CROSS-EXAMINATION

BY MR. ROOTS:

Q.   Good morning, Officer.

A.   Morning.

Q.   One of the things that you said that sort of intrigued me was the mission of these people there, the demonstrators/protestors there.  You said you still don't understand the mission.

Would it be safe to say many of them had different missions?

A.   I'd be assuming if I said that.

Q.   Safe to say they may not have all been on the same page?

A.   Possibly.

Q.   From what you could tell at that time -- which was what time again?

A.   The last video ended at 16:28, I believe.

Q.   That would be 4:28 p.m.?

A.   Yes.

Q.   And as far as you know, the Capitol building had already been entered by demonstrators previously?

A.   I didn't know anything at that time.

Q.   Now, you paused during January 6 to post some selfies on Facebook; correct?

A.   What was that?

Q.   Did you post some selfies of yourself on Facebook?

A.   Yes.

Q.   I'd like to pull those up.

        MR. MCCAULEY:  Your Honor, can we go to the phones very quickly?

        (Bench conference.)

        MR. MCCAULEY:  Your Honor, just to be clear --

        THE COURT:  This is her witness; right?

        MR. MCCAULEY:  Yes, Your Honor.

        THE COURT:  What's the objection?

        MS. MILLER:  We just want to make sure that they're only going to be shown to the witness, because they're not on any exhibit list.

        THE COURT:  Okay.  I'm informed that you all received

e-mails about a half hour ago or so from the defense showing you these exhibits.  These exhibits are selfies the officer took of him smiling with the Capitol in the background in the evening.

I think, given the comment about the PTSD, I think it's fair cross for them to introduce that.  Otherwise, I wouldn't have, because I think it's not close in time, but he did talk about having PTSD, and I think it's fair for them to introduce those.

MS. MILLER:  Then let's make sure that the question asked is not during the daytime, it's during the evening time.

THE COURT:  The pictures are obvious it's dark.

MS. MILLER:  Thank you, Your Honor.

(End of bench conference.)

THE COURT:  You may proceed, Mr. Roots.

BY MR. ROOTS:

Q.   Okay.  We would like to bring up Defense Exhibit -- we will mark it as 446.

Can you see this on the screen?

A.   Yes.

Q.   Does this look like -- are you familiar with this?

A.   Yes.

Q.   Did you post this yourself?

A.   Yes.

MR. ROOTS:  I'd like to move for admission.

THE COURT:  Any objection?

MS. MILLER:  No objection.

THE COURT:  All right.  The exhibit's admitted.

(Defense Exhibit 446 received into evidence.)

MR. ROOTS:  I'd like to show this to the jury.

BY MR. ROOTS:

Q.  Do you see you said, "Only action pic found of me, crazy day"?

A.  Yes.

Q.  And then -- and the second picture lower down, is that you circled?

A.  Yes.

Q.  And were you sort of making fun of claims that it was a violent day there?

A.  No.

Q.  You were saying this is the only action pic you found of yourself?

A.  Yeah, in other words, of a picture of me working that day.

Q.  You weren't commenting about how it was being overblown or anything?

A.  No.

Q.  Okay.  I would like to bring up Defense Exhibit 447.

Do you recognize this?

A.  Yes.

Q.  This is a post you posted on Facebook?

A.  Yes.

MR. ROOTS:  We would like to move for admission.

MS. MILLER:  No objection.

THE COURT:  It's admitted.

(Defendant Exhibit 447 received into evidence.)

BY MR. ROOTS:

Q.   We would like to show this to the jury.

Here, you're posting a selfie -- selfies of yourself on January 6?

A.   Yes.

Q.   Now, you just said you were almost in a PTSD type state of trauma that day?

A.   Yes.

Q.   But you were posting selfies on Facebook?

A.   Okay.

Q.   Let's bring up the next one.  That would be Defense 448.

MS. MILLER:  No objection.

THE COURT:  It's admitted.

(Defense Exhibit 448 received into evidence.)

MR. ROOTS:  And we would like to show this to the jury.

BY MR. ROOTS:

Q.   Is that you in the lower left there?

A.   Yes.

Q.   And you're posting a selfie of yourself?

A.   Yes.

Q.   Did you post anything that day that said you were in a state of trauma, PTSD?

A.   No, because that's post-traumatic stress disorder.

Q.   Okay.  You didn't recognize that trauma at that time?

A.   That day, I wasn't thinking about it.

Q.   Okay.  Now, you talked about -- you can take that off the screen.  Thank you.

You talked about hearing these demonstrators say things like "hold the line."

Have you ever heard that phrase before?

A.   Yes.

Q.   And that's a phrase that's commonly said when there are different lines between groups, would you say?

A.   Yes.

Q.   And generally, what does that mean?

A.   It means hold the line you're on.

Q.   It means hold the line to try and stay in one place; would you agree?

A.   Yes.

Q.   So these protestors -- by the way, is this something that law enforcement say to each other at times?

A.   We say "hold."  It means don't move forward.

Q.   So when these demonstrators said "hold the line," would you say they're trying to just urge people to stand in one place?

A.   For them to say "hold the line," to me, it meant something

different.  It more meant you're not going to obey what we give as orders, which was to move back.

Q.   But it stands for the proposition that the person is wanting not to retreat, to stay in one place?

A.   Like I said, it's them saying they're not going to follow our orders to move back.

Q.   In your experience with protests and demonstrations, is that common?

A.   To hear "hold the line"?  No.

Q.   For protestors to try to stay in a state of civil disobedience and be positioned at one place.

A.   We had not faced anything like this up to that point.

MR. ROOTS:  No further questions.  Thank you.

THE COURT:  Any redirect?

MS. MILLER:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. MILLER:

Q.   Officer Niewenhous, what time of day did those Facebook pictures appear to be in?

A.   That was nighttime.  It was either closer to midnight or the next morning, being that I was there until 9:00 the next morning.

Q.   So what was your total shift from beginning to end, approximately?

A.   I came in approximately -- anywhere between 1:00 and 2:00

and didn't go home until between 8:30, 9:00 the next morning.

Q.   Were you exhausted at that point or still had a lot more energy to go?

A.   I was beyond exhausted.

Q.   Mr. Roots asked you about your comment that you felt like you had PTSD.  Did you realize you felt like you had PTSD in the wee hours of January 7, 2021, or some time later?

A.   Way later.  Not days, not hours.  It was way later.  And I didn't realize I had it until I had a certain situation while I was at my parents' house.

MS. MILLER:  Your Honor, can he describe that situation for the jury?  They opened the door.

THE COURT:  Any objection?

MR. ROOTS:  We do have an objection.

THE COURT:  All right.  I'll sustain the objection.

BY MS. MILLER:

Q.   Why did you make those Facebook posts?

A.   Finally had a break, hours later, pure exhaustion, and it's just a -- you finally had a breather to act normal, and you realize that you were involved in something that some day would be looked at in history books.  You're just marking something you worked on.

It's not uncommon for -- everybody looks at us like robots.  But we are human, and it is something that we -- it doesn't matter what we're on.  Occasionally, we try to act normal, and

in that moment, it was wow, that just happened, that was insane. And it was a capture the moment type situation with the people that I worked long hours with for many months going up to then, and then after something like that happens, you don't realize how big it was until later, and it was just a capture the moment while we had a break and before we continued working the rest of the night.

And at that point, I believe that one selfie where I was sitting down in the bottom corner facing the camera, that was prior to us pushing even further out.  We only got that break because I think at that time the National Guard had finally showed up.  And then at that point, it had been, I believe, five or six hours straight going, no bathroom breaks, nothing, and it was one of those I get a breather, I get to act normal for a minute.  And then we went back at it for a while trying to clear the area.

And then the later selfies, when I was up on the terrace where you have the Capitol behind me, that was my first bathroom break the entire day that I had been on shift so far, and that was anywhere from 9:00 to midnight, and that's when I finally took that selfie.  And the only reason I was able to do that was that we finally had a secured area where we could use a bathroom break, and there were no more protestors, demonstrators in that area, and it was secured by law enforcement.

Q.    Officer Niewenhous, had you ever been that close to the

United States Capitol before?

A.    The only time I had been that close was when we got permission from Capitol Police while I was in the academy and we were doing our Capitol run, which was essentially a five-mile run around the monuments, Capitol, up and down the steps.  I think we did it ten times, and it was grueling.

But that's the only time I had ever been that close outside of taking a picture at graduation, where I was standing down on Third Street.

Q.    When you reflect on your experience at the Capitol on January 6, is it positive or negative?

A.    It's a negative one.  It's something nobody going into this profession can even dream of in their wildest dreams.  It's something that you can't prepare for.  I work in a section of the city that is -- it's a very tough area, and this supersedes that in the amount of stuff that I saw that was violent that day.

MS. MILLER:  Thank you, Officer Niewenhous.  No further questions.

THE COURT:  Anything else?

RECROSS-EXAMINATION

BY MR. ROOTS:

Q.    You talked about whether it was a positive or negative experience for you.  You got commendations for that, didn't you, for January 6?

A.    Yes.

Q.    Are you wearing medals on your chest right now from it?

A.    No.

Q.    But you were awarded medals or commendations?

A.    Yes.

Q.    And you received other benefits; correct?

A.    I don't know what that means.

Q.    Your pay has increased?

A.    That has nothing to do with January 6.

Q.    You weren't given any kind of pay boost?

A.    That was a contract with the city.  It had nothing to do with January 6.

Q.    When you claim PTSD, you receive benefits, don't you?

A.    I didn't claim PTSD.  I stated I realized that something was wrong.  I was never treated for PTSD, but I realize I am affected by it by things that have happened to me since then.

Q.    How many awards have you been given for January 6?

A.    A pin.

Q.    One pin?

A.    I got a pin, and we got a Congressional medal, a replica of the medal that was given to the department.

Q.    Back to the Facebook posts, you explained the lack of bathroom breaks and exhausted.

You didn't say any of that on your Facebook post, did you?

A.    No.

Q.    Specifically, do you recall -- January 6, do you recall Mr. Thomas here?

Mr. Thomas, would you stand up?

Do you recall him?

A.    Yes.

Q.    You specifically recall him from that day in your memory?

A.    From reviewing camera footage, yes.

Q.    From reviewing camera footage.  But do you have a recollection of him from that day?

A.    I can't say if I do or not.  It's two years ago.

Q.    While you were waiting in the hallway yesterday, did you tell people that you had no recollection of Mr. Thomas?

A.    No.

MR. ROOTS:  Okay.  Thank you.  Nothing further.

THE COURT:  All right.  May this witness be excused?

MS. MILLER:  Yes, Your Honor.

THE COURT:  Mr. Roots?

MR. ROOTS:  Yes.

THE COURT:  All right.  Thank you, sir.

MR. ROOTS:  We might want to keep him for our defense case, to recall him potentially.

THE COURT:  All right.  We'll take that up at the break.

Ladies and gentlemen, I think it's a good time for a lunch break.  So we will see you back at 1:45.  Just a reminder,

again, no conversation, no research.  I know I've told you that a number of times, but just a reminder.

(Jury exited courtroom.)

THE COURT:  All right.  Mr. Roots, can you -- this is news, first news of this officer being a part of your case.

What's the purpose of calling him?

MR. ROOTS:  This particular officer?

THE COURT:  Yes.

MR. ROOTS:  Just because we do have a witness, actually Mr. Thomas's wife, who was in the hallway yesterday and heard him saying to others that he had no recollection of Mr. Thomas.

THE COURT:  But you don't get to prove that up with extrinsic evidence.

MR. ROOTS:  We also -- I've just been reminded, on this officer's body-worn camera footage at other times, he was joking around.  But we were a little bit surprised by all this talk about PTSD.  So we would like to review his body-worn camera, and we believe he was joking around most of the day.

THE COURT:  You had an opportunity to prepare for his testimony.  You knew he was going to be a witness for weeks now. You could have cross-examined him with that.  I don't think anything about the fact that he referred to PTSD was such a surprise that it justifies calling him back to ask him questions you could have asked him during your cross.  So I'm not going to

keep the officer here for that purpose.

Is there anything else?

MR. ROOTS:  We think he gave some slightly inaccurate testimony just now.

THE COURT:  You had an opportunity to cross-examine him.

MR. ROOTS:  Understood.

THE COURT:  All right.

MS. MILLER:  Your Honor, if we could just ask Mr. Roots to not make statements like that in front of the jury. I don't think it's necessary.

THE COURT:  Remind me what he said.

MS. MILLER:  He's now continually said "we may recall him" over and over again about every officer who testifies.

THE COURT:  I asked can he be excused.  So I think he was trying to respond to my question.  I don't think he was trying to be difficult.  And perhaps I should have waited until the jury was excused.  But honestly, based on everything else, I expected him to say no.  So I don't think this was a attempt by Mr. Roots to be difficult for the jury.

All right.  So when we come back after lunch, we will have the case agent, and then the government intends to rest?

MS. MILLER:  Yes, Your Honor.

THE COURT:  And the defense will have Ms. Lambert ready to go once the government rests or another witness?

MR. ROOTS:  I believe -- I believe it will be Ms. Lambert, yes.

THE COURT:  All right, then.  We will see you back here at 1:45.

(Recess taken from 12:36 p.m. to 1:47 p.m.)

(Jury not present.)

THE COURT:  Counsel, are we ready to go?

MR. MCCAULEY:  One preliminary matter before we begin.

THE COURT:  Is this your witness?

MR. MCCAULEY:  This is not my witness.  This is a totally separate --

THE COURT:  I'm not complaining.  I was just curious who was going to do this one.

MR. MCCAULEY:  This is Ms. Miller's.  I did not mean to do that with the trial --

THE COURT:  No, it's fine.

MR. MCCAULEY:  Your Honor, I just wanted to put a finer point on the issue raised with the Court this morning about the materials disclosed yesterday.  Although we understand that generally speaking 302s are the *Jencks* only of the FBI agent who writ them -- who wrote them, excuse me, in this instance, the materials that we disclosed yesterday which were written in the past two weeks did include quotations, so -- of the witnesses who were being interviewed.

THE COURT:  But it's still her recording of their

quotes.  They didn't adopt them, did they?  The witnesses didn't look at the reports and say yes, this is an accurate quote by me, or this is a --

MR. MCCAULEY:  No, they did not do that.  But to be -- in an abundance of caution, the government is informing the defense team --

THE COURT:  They have the 302s; right?

MR. MCCAULEY:  They have the 302s.  In the event there is something about those quotations they want to cross-examine one of the witnesses on who are the subject of those 302s --

THE COURT:  Who have already testified?  We're going to bring them back?

MR. MCCAULEY:  We're saying we would make them available for recross, in the event that they want to proceed with that.  If they don't, then it's not an issue.

THE COURT:  But help me understand, why is that their *Jencks*?  Is there authority that says when an agent puts something in quotes, that becomes *Jencks* for a witness?

Agents often write reports that are verbatim, and simply because they use quote marks, does that make them somehow adopted by the witness?

They can still be inaccurate quotations by the agent.

MR. MCCAULEY:  Certainly true, Your Honor, and insofar as -- I am unfortunately -- do not know the case law on that particular aspect.

THE COURT:  I think if they were adopted by the witnesses, the witness saw the report and said yes, this is accurate, then we've got a problem.  But absent that, I don't think you do.

But I'll hear from Mr. Roots, but that's my position on that.

Secondly, Mr. Roots, if you could also address whether there's even a need for you to go there if I were to change my mind.  Is there anything that's impeaching in those 302s?

MR. ROOTS:  Well, what is impeaching is that the new 302s are almost identical to the recent testimony, which is very odd.

THE COURT:  And fair point for you to ask this agent about and ask her about the quotes she put in about what sergeant so and so would say or corporate so and so and, in fact, he did testify X, Y, and Z.  That's fair cross of her.

I don't think it's fair cross of him.  He never saw her report.

MR. ROOTS:  Well, I'm thinking of Ainsworth, whose story -- his initial FBI report that he made didn't make a big deal about falling down or being pushed.

Yet on the stand --

THE COURT:  That's an initial 302 by the same agent?

MS. MILLER:  Yes.

MR. ROOTS:  It's an FBI 302.

THE COURT: By the same agent?

MR. MCCAULEY: It's an FBI 302 by the same agent that was disclosed long ago.

THE COURT: Again, Mr. Roots, I think you can address all of this by asking this agent, Your first report didn't say that, your second report said this, and the witness, in fact, testified to exactly what you put in quotes.

MR. ROOTS: Like I said, it seems to me these new 302s, if we had had them, we would have had a better -- we would have crossed the agent differently.

THE COURT: Crossed? The agent hasn't testified yet.

MR. ROOTS: Crossed the corporal differently.

THE COURT: Let's go forward with the agent's testimony. At the conclusion of the testimony -- I'm guessing the government will have these witnesses not available today but tomorrow. We will address this at the end of the day today if there's a need. I'm just not sure that any of those witnesses -- I guess you had these 302s today but not yesterday?

MR. ROOTS: We got them last night.

THE COURT: All right. So I think it would be fair, since you didn't have them yesterday, to question any of the witnesses from yesterday, if it plays out like you think it will, that the agent told them what to say.

MR. ROOTS: It's actually, I think, worse than this. We've looked carefully -- okay. So this corporal, his initial

report to the FBI was, you know, he talked about the whole experience, didn't mention falling down or being pushed down.

Here, he took the stand and said this was a huge deal, and he said -- as you'll recall, his last answer was 100 percent certainty it was Mr. Thomas.

THE COURT:  I may be remembering incorrectly, but I think he also testified that he had not had an opportunity to review the video at the time of the first interview.  So that might explain why he gave more fulsome answers for the second video.

Let's take this up at the end of the day.  Given that you didn't have these 302s yesterday, I think it's fair to call them back, I think.

Can you just call a witness to impeach?  I guess the government is saying he could have crossed him yesterday, and since he didn't have the chance to cross -- it's effectively the government's witness that he's crossing.

MR. MCCAULEY:  Your Honor is very aware of the potential sanctions under *Jencks* and the ability of Your Honor to craft a sanction.  So insofar as this is a remedy for the lack of the information -- the lack of information that the defense had when they began their cross-examination, we think that would be an appropriate remedy if, as Your Honor has indicated, it bears out today that this agent is not the one who is the better witness --

THE COURT:  So it's fair for him to take the stand and impeach -- his ability to impeach continues, because effectively, this is a continuation of his cross from yesterday?

MR. MCCAULEY:  Correct.

THE COURT:  All right.  Okay.  I think that makes sense for yesterday's witnesses.  I don't think it makes sense for today's witnesses.

MR. ROOTS:  Okay.  We actually want to raise another thing.  Actually, we will set this up.

We believe that this is a Rule 29 motion with regard to one of the five assault counts, because our time stamps show -- there's that video of Mr. Thomas down on a lower position where he sort of scrambles up.  That was around maybe 4:22:10.  The moment where Corporal Ainsworth goes down is 4:22:15.

So it could not have happened.  Mr. Thomas could not have assaulted and pushed Mister -- Corporal Ainsworth down.  So one of the five counts is absolutely false, and it's demonstratively false.

THE COURT:  Mr. McCauley?

MR. MCCAULEY:  That's a question of fact for our jurors who can sit there and --

THE COURT:  I have to say, no reasonable juror could reach the conclusion the government is arguing.  I'm going to reserve on that until -- likely until after the jury verdict.

MR. ROOTS:  Okay.  We have another thing which we've

been scrambling -- one problem we have, frankly, is I believe, Your Honor -- with all this discussion of putting on an overview witness, we've had names of Stephen Hill and Ms. Lambert.

We have great difficulty -- Ms. Lambert is necessary to be here showing the videos and the exhibits, and none of us are very technical.  So we're not able to put her on very easily, at least not without some work and training and preparation, to put her on and then have someone manage the computer, the showing of the videos.

THE COURT:  So you're saying you want to have a different summary witness?

MR. ROOTS:  Well, we're proposing Stephen Hill, who is here, potentially, or we could put Mr. Thomas on today, maybe late, if it comes to that.

THE COURT:  Okay.  So you're saying instead of having Ms. Lambert as your summary witness, you would propose Mr. Hill, and you would like him to testify today?

MR. ROOTS:  That's our thinking.  The real problem is, Ms. Lambert is absolutely needed over here, and it's hard to --

THE COURT:  No, I understand.

We can address this at the end of the government's case, but has Mr. Hill been in the courtroom?

MR. ROOTS:  No.

THE COURT:  Okay.  Does the government have any objection?  I will keep the line firm on expert testimony.

MS. MILLER:  I don't think we have an objection, but I'm not sure we're following.

Does that mean Ms. Lambert is not going to testify at all?

THE COURT:  She's not going to testify; right?

MR. ROOTS:  We would substitute Stephen Hill for her, and the reason is, again, she's needed here.

THE COURT:  All right.  Let's get the jury in here, because they're waiting, and we can finalize this after the government rests.

Are you going to rest after this, Ms. Miller, this witness?

MS. MILLER:  Yes --

MR. MCCAULEY:  Presuming that our -- that we settle the recross, the *Jencks* cross issue.

THE COURT:  But this you would view as a part of your case, or you wouldn't just let him call him in his case?

MR. MCCAULEY:  Well, the Jencks Act triggers at the conclusion of the government's case.

So to avoid any potential issue --

THE COURT:  Can you get this corporal back here today?

MR. MCCAULEY:  Let me see if I can make contact with him today.  I don't know if that will necessarily be possible, but I will try.

THE COURT:  And if the defense isn't going to object because this is just a procedural issue, is it a problem if the defense calls him, so long as the defense isn't objecting, that

it's not happening in your case?

MS. MILLER:  I think we need to sort of discuss internally before we commit to one way or the other.

THE COURT:  You all should be doing that now, somebody who doesn't have the witness, because I want to continue after this witness.  If you don't have a witness to put back on, I would like to go to the defense case.

MS. MILLER:  Yes, Your Honor.

The only thing I don't understand about the recross of Corporal Ainsworth is, I'm not sure what Mr. Roots has said he's identified in the new 302 he wants to cross him on.

THE COURT:  Well, he says that the new 302 has information in it that wasn't in the first 302.

That's inappropriate cross, though, Mr. Roots.  Mr. Roots, you can't cross with the 302.  Are you just going to say, Is it true that you were coached?

MR. ROOTS:  Let's put it this way:  The videos that we showed through that first witness today we did not have booted up.  We had not focused on them.  We were shocked that he said 100 percent certain that it was Mr. Thomas, because Mr. Thomas assured me right here at the table that that's absolutely not true.

THE COURT:  You can certainly argue that based on the evidence.

What is it that you're going to impeach him on in the --

you can't impeach him from the 302.  So what is in the 302 that you didn't know that, had you known, you would have asked him another question?

MR. ROOTS:  It's not the 302.  It's the meeting with the prosecution team.

THE COURT:  But you always know a witness meets before testimony.

MR. ROOTS:  We would start by showing the same videos -- maybe we've got more now -- that shows that in fact there's a guy in blue -- we believe the guy might have been tripped.  But to the extent he was pushed, it was by a guy with a blue T-shirt.

THE COURT:  That's not based on what's in the 302. That's your theory that you can argue to the jury and you can prove up other ways.  But you had that video yesterday.

MR. ROOTS:  I would like to probe as to why he changed from his first FBI report saying nothing about it to his second saying oh, this was huge, and it was Mr. Thomas with 100 percent certainty.

THE COURT:  That's cross-examining him on the 302s, which again I don't view that as his statement.

MR. MCCAULEY:  And I think that we're now expanding beyond the scope of what the quotation -- what we are talking about is the quotation within these 302s.

THE COURT:  Why don't you all give me a copy of the

302, and go ahead and call your agent, and let's get moving, and I will look at this while this agent is testifying, and we will take it up at the conclusion of this witness's testimony.

MS. MILLER:  Could we just e-mail it to Your Honor?  Is that okay?

THE COURT:  Sure.

(Jury entered courtroom.)

THE COURT:  All right.  Good afternoon, ladies and gentlemen.  We will now proceed with the government's next witness.

MS. MILLER:  Your Honor, the government calls Special Agent Alexis Brown.

ALEXIS BROWN, WITNESS FOR THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MS. MILLER:

Q.   Good afternoon, Agent Brown.

A.   Good afternoon.  Good afternoon.

Q.   Could you please state and spell your last name for the record.

A.   Brown, B-r-o-w-n.

Q.   And could you please make sure you're speaking loud enough so that we all can hear you.

A.   Yes.

Q.   Where do you work?

A.   I work at the FBI, in its Washington Field Office, which is

a couple of blocks from here.

Q.   And what is your title with the FBI?

A.   I'm a special agent with the FBI.

Q.   What does being a special agent look like?

A.   Being a special agent empowers you to investigate federal crimes of all sorts.

Q.   How long have you been a special agent?

A.   Almost nine years.

Q.   So when was that?  When did you start?

A.   2014.

Q.   Could you just tell the jury a little bit about your duties as a special agent.

A.   I investigate federal crimes, mostly involving white collar, but in this instance, the FBI was focused on the events that happened at the Capitol on January 6.

Q.   Could you tell the jury a little bit about any special training you've had to be a special agent?

A.   So I began the academy down at Quantico in 2014.  A lot of our training was focused on investigative methodology, with special focuses also in interviewing, defensive tactics, firearms, defensive driving, and some specialty topics like counterterrorism, cyber crime, or white collar crime.

     After that, I received other trainings as well, most recently as a certified crisis negotiator on our team.

Q.   Where geographically were you working on January 6, 2021?

A.    I was in Virginia.

Q.    Where in Virginia?

A.    Manassas, Virginia.

Q.    Did you have any personal involvement with the events on January 6, 2021?

A.    I did.

Q.    What was that?

A.    We received notice of the events happening at the Capitol later in the afternoon.  We were told that it was an all-hands call to deploy down to D.C., where I met up with probably most of the other special agents of the FBI from the Washington Field Office.  We met, and we were told that we were to -- at least my group was told that we were going to be providing perimeter security around the Capitol building.

      I was stationed myself with my squad right outside of the Northwest Terrace on the Senate side on the lawns.

Q.    Do you remember approximately what time that was that you were deployed there?

A.    It was fully dark.  I'd estimate around 9:00 p.m.

Q.    Now, taking a step back, more generally following January 6, what was your role in the overall January 6 investigation?

A.    After the events, it was determined that Washington Field Office and its agents would be handling a lot of the cases.  So as you might imagine, when the FBI put out calls for assistance

from the public essentially asking folks from the public to talk about anything they might know about the events that happened on the 6th, we were inundated with thousands upon thousands of tips, people who wanted to make complaints, identify individuals who were there, and it quickly became obvious that it's going to take a lot of manpower to sort through all of that.

Practically, what that meant is that each agent, myself included, would receive leads from a number of these tips to sort of batches pulled out from random.  And my job was to take that tip, any given tip that I got, evaluate it for truthfulness, and apply investigative rigor to see what value there was in the tip.

Q.    Did there come a time when you received a tip for what we now know to be the defendant in this case?

A.    Yes.

Q.    What did you do with that tip?

A.    I treated it like any of the other tips I received.  This was in another batch I received in mid-January 2021.  I looked at the tip, which was just a couple of media files from somebody reporting in, and in reviewing those media files, I saw what appeared to be multiple assaults committed by the individual that became identified as AFO 214.

Q.    What does "AFO" mean?

A.    Assault on a federal officer.  That is how we differentiated other actors at the Capitol from folks who

committed assaults on federal officers.  If they were AFOs and they had some number after them, it means they were suspected of committing federal assaults or assaults on federal officers.

Q.   What was your next set of investigative steps once you reviewed that initial -- those initial media files for AFO 214?

A.   Next, I was faced with the immediate problem that I did not know who this individual was just upon looking at these media files.

So after receiving concurrence from management to open a AFO, assault on a federal officer, file, I was able to submit a BOLO on this individual depicted.

Q.   Could you please tell the jury what "BOLO" stands for?

A.   Surely.  It stands for be on the lookout for.

Q.   And when you say issue a BOLO, what does that mean?

A.   It means the FBI published these BOLO alerts, being on the lookout for certain individuals on social media pages and other publicly-facing websites.

Q.   When you reviewed the initial files you received from the lead, you said you couldn't tell or couldn't identify who the potential defendant was, but could you tell who the officers were that he was potentially assaulting?

A.   No, not immediately.

Q.   Could you tell the jury a little bit about how you went about trying to figure out who those officers were?

A.   Sure.  So once again, we're talking about needles in a

haystack. There were thousands of hours of media footage, thousands of pictures that were being submitted.

After we received production from MPD for their body-worn camera footage, it was produced to us in a fairly raw state. There wasn't a lot of sectioning it off by time or by officers. It was essentially just a big data dump of video files that were sometimes hours long.

So my job for several months basically going forward was to review body-cam footage from anybody that I could identify being in the area where the assault's depicted and the lead took place. This included a lot of play/pause, going through the videos and clicking play/pause, play/pause for hours on end.

Eventually, I would be able to identify those officers, either by the name plates they would wear or sometimes by their helmets which had their officer number designated on the front and on the back.

And at that point, if I was able to positively make an identification using those identifiers, I would write MPD and specifically request, via our official channels, I would like the body-worn camera footage for this officer, this number.

Q. Did there come a time where you were able to identify one of the assault victims as Corporal Ainsworth from Prince George's County?

A. I was, from body-worn camera footage provided by MPD.

Q. Explain a little more. Why was it MPD body-worn camera

footage that you were able to identify them through?

A.   Because Prince George's County did not have the body-worn camera footage available to us.  It was really only MPD and U.S. Capitol Police CCTV footage that we had the most fulsome materials for.

Q.   So what was it about Corporal Ainsworth that you observed in the MPD body-worn camera that made you able to identify him?

A.   He also had his number written on his helmet or somewhere on his person.  So I was able to identify his number, as well as a couple of his other colleagues.  I had called Prince George's County to ask about those numbers, and I was placed in touch specifically for that number with Corporal Ainsworth.

        MS. MILLER:  I would like to pull up Exhibit 711, which is already in evidence, please.  And if we could -- you're the expert here.  I know this file is a little wonky, but if we go to 20 seconds, please, and start playing from there in a slower speed or perhaps going frame by frame, please, with volume.

    (Video played.)

        BY MS. MILLER:

Q.   If you could stop there, please, at 26 seconds.

    Based on your investigation, Special Agent Brown, who in this freeze frame at 26 seconds is Corporal Ainsworth?

A.   His numbers aren't visible here, but based on previous review of body-cam footage that I've seen, he would be the one

with the visor that is raised.

Q.    And you were here for his prior testimony in this trial; right?

A.    That's right.

Q.    Did he testify that he had had his visor raised --

A.    Yes.

Q.    -- at this time?

A.    That's right.

MS. MILLER:  Okay.  And can we continue on with the freeze frames, please -- I'm sorry, not freeze frames, frame by frame.

(Video played.)

BY MS. MILLER:

Q.    And please pause there for one second.

Who do we see in the bottom left corner here at 27 seconds in the video?

A.    We see Mr. Thomas right down here at the bottom left-hand corner.

Q.    Thank you.  And please continue doing the frame by frame.

(Video played.)

BY MS. MILLER:

Q.    And we can stop there.

Special Agent Brown, did what we see in this video inform -- does it replicate what you observed when you identified the person who you learned later was Corporal

Ainsworth?

A.    It does from a different angle.  I did not have the luxury of this angle when I was going through my initial review.

Q.    And what was it about this interaction between who you identified to be Corporal Ainsworth and the defendant that made you identify it as a potential assault on a federal officer?

A.    Well, the video shows that Mr. Thomas's hand is pressed up against Corporal Ainsworth's shield in the previous frames.

Q.    And who do we see now after that moment in the bottom left of this?  Can you describe the person and what they're wearing in the bottom left corner of the screen?

A.    It's an unidentified individual with a checked-looking shirt.

Q.    Can you see the top of his shirt at the very bottom of the screen, what color that is?

A.    That's a blue shirt.

Q.    Thank you.  You can take that down.

Now, you said you issued a BOLO, be on the lookout, for the person you now know is the defendant.

Did you ever receive any responses to that BOLO?

A.    Yes, many.

Q.    Did you review those responses?

A.    I did.

Q.    Was anyone able to positively identify the individual depicted in the BOLO as the defendant?

A.    Yes.

Q.    How?

A.    The person who reported it said that they knew Mr. Thomas. They knew Mr. Thomas had gone to the Capitol on the 6th, and they provided me links to Mr. Thomas's Facebook page, which when I reviewed that Facebook page showed the defendant wearing the exact same camera -- I'm sorry, the exact same clothing and in the vicinity of the Capitol on the 6th.

Q.    When you went to that Facebook page, was it a public-facing Facebook page?

A.    Yes.

Q.    So was there content on the page that you were able to access without being friends, quote unquote, with Mr. Thomas on Facebook?

A.    That's right.

Q.    Was there anything other than photos on that page when you went to it when it was public?

A.    There were some media links.

Q.    Do you remember if any of the photos had any hashtags with their posts on his page?

A.    Yes.

Q.    Do you remember -- just from memory, do you remember what any of those hashtags were?

A.    The early hashtags were #capitol, #capitolbuilding.

Q.    And do you have a general memory of when it appeared that

those photos and those hashtags had been posted, in terms of date?

A.   Very close to the 6th.

Q.   Did there come a time when you issued a search warrant to Facebook to see whether you could obtain materials beyond what was publicly available when you went to that Facebook page?

A.   I did.

Q.   Could you also just tell the jury what a search warrant is, please.

A.   Sure.  A search warrant is an investigative tool available to us.  We are able to say that we would like the entire content of a user's account, Facebook, YouTube, anything like that, if we are able to show probable cause that a federal crime has been committed.

Q.   And who issues a search warrant?

A.   A court of law.  In this case, it was this court, the District of Columbia.

Q.   I'd like to show you Exhibit 401, please, and that has not been entered into evidence yet.

     Do you recognize this?

A.   I do.

Q.   What is it?

A.   This is what we call a "Certificate of Authenticity of Records" from a custodian of records.

Q.   From whom?

A.    From Facebook.

Q.    Is it a true and correct copy of the letter of certification or authenticity that you received from Facebook?

A.    Yes.

MS. MILLER:  Your Honor, at this time, we move into evidence Exhibit 401.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 401 received into evidence.)

MS. MILLER:  May we please publish to the jury, and if we could go to page 2 of this document.

Ms. Rummens, feel free to zoom in as necessary to make it easier to see.

BY MS. MILLER:

Q.    Agent Brown, what is listed after the word "account" at the top?

A.    This is the first page of the production from Facebook.

Q.    Sorry.  What is the name listed after "account" at the top?

A.    Oh, it is "Black Lion Jester."  Excuse me.

Q.    That's okay.

If we could zoom back out, please.  Sorry.

In the middle of the page there or bottom half, please --actually, we don't need to zoom in.  That's fine.

What is listed next to "name" in the sort of direct middle

of this page?

A.   We have a first name of Joe, a last name of Thomas.

Q.   And what e-mail addresses are listed a little bit below there?

A.   A couple of them.  There's blacklion_jester@yahoo.com and blacklionjester@gmail.com.  The one that's registered is the Yahoo! account.

Q.   Before we look at any specific posts or anything from Facebook, can you describe to the jury the format of what you received back from the Facebook search warrant, sort of what it looks like when you get it?

A.   First of all, it was over 30,000 pages of .pdfs, not particularly well searchable either.  I wouldn't recommend it.  But it's just going to be essentially a raw compilation of all the data belonging to this user.  So there's no real order of it in the way that we would view it.  It's certainly not organized by date or organized by times or subject matter.  It's just the raw compilation of everything.

So every .pdf, every page in the over 30,000-page production is just going to be either the media image, posting, and then a time stamp on it somewhere, up top or below.

Q.   Now, if the individual or the account has media files like videos, how do you receive those?

A.   We receive those in a separate zip file.  They obviously can't put the media files in a .pdf file.  So they just attached

a zip file that I could download and get the media files attached to those.

MS. MILLER:  At this time, Your Honor, for ease of -- or time efficiency, I would like to see if we could move in all of Exhibit 402 and the specific pages listed on our exhibit list within 402.

THE COURT:  Any objection?

MR. ROOTS:  That sounds like a --

THE COURT:  No speaking objection.

(Bench conference.)

THE COURT:  Isn't this all part of the same return?

MS. MILLER:  Yes.

THE COURT:  What's the problem with that?

MR. ROOTS:  It sounds like a trap.  So it sounds like if I say no objection, then they'll believe that every single thing in all of Mr. Thomas's entire Facebook history then can come in.

MS. MILLER:  Would you like me to respond, Your Honor?

THE COURT:  Wait.  I'm not following you, Mr. Roots. It's unfortunate that she said that without clearing it first. But is that your worry, is that if you say "I object," they're going to think that you're hiding something?  I don't understand what you're saying.

MR. ROOTS:  No, I'm saying if we have no objection -- it sounds like hey, we'd like to bring in everything that

follows, which is a typical, you know --

THE COURT:  No, no.  She can clarify that referring to the exhibits that were a part of this return from Facebook -- I can ask if there's any objection if she makes clear that this isn't his entire Facebook account.

MR. ROOTS:  She just indicated how vast his Facebook history was.  So obviously, there's going to be some unreasonably prejudicial things which outweigh probative value and misleading things.

THE COURT:  Let me make sure I understand.  You're going to make us, each time she pulls up a different social media post, she's going to have to ask to get that one admitted?  Is that what you want?

MS. MILLER:  Your Honor, I could ask a few more clarifying questions about what's within 402.

THE COURT:  I want to know, is that really what you want, Mr. Roots?  You want 15 times for her to ask to get it admitted when it's all a part of the same return?

MR. ROOTS:  Frankly, I'm a little blind-sided by this.  If I could just have the judge inquire, how many exhibits are we talking about?

THE COURT:  These are the government's exhibits that they've given to you and to the Court, Facebook exhibits that they've said they're going to introduce at trial.

MS. MILLER:  The 400 series, Mr. Roots, on our exhibit

list.

MR. ROOTS:  Okay.  We will just object because I think we have to.  I don't know what's coming.

THE COURT:  I don't know how you don't know, when they filed their exhibits last week.

But go ahead.  We'll speed through this.

(End of bench conference.)

BY MS. MILLER:

Q.   I'd like to show you what's been marked as Exhibit 402, page 11337.

Do you recognize this, Special Agent?

A.   I do.

Q.   What is it?

A.   This is a copy of the BOLO that was issued for AFO 214.

Q.   How did you get this copy of the BOLO?

A.   This was from the Facebook production.

Q.   Is it a true and correct copy of what you received from Facebook in the Facebook search warrant return?

A.   That's right.

MS. MILLER:  At this time, I move 402.11337 into evidence.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 402.11337 received into evidence.)

BY MS. MILLER:

Q.   Now, Special Agent Brown, you said that the Facebook return can be upwards of thousands and thousands of pages.  Did you, for the purpose of this investigation, take out certain pages that were most relevant?

A.   I did.

Q.   So what did you determine to be relevant about this particular Facebook post?

A.   From what I can see, you see the green banner that is at the top of the exhibit?  It appears to be a screenshot taken from somebody's phone, and somebody has taken this, at which point it was uploaded to Mr. Thomas's account, and it seemed to be in recognition of AFO 214, meaning that somebody indicated that this may be him.

Q.   Now, we're not seeing all the text of the BOLO within this screenshot, but can you just give the jury a general sense of what else appears, since you worked on the BOLO?

A.   Yes.  It's basically the same form language we had for most of the BOLOs.  It just says afterwards refer to the AFO number when submitting your tip and here are the places you can submit your tip.  We had a tip line -- an e-mail address and also a tip line for telephone if people wanted to call in.

Q.   I'm going to take a step back from the Facebook return and talk a little bit more about the additional steps you took following your initial review of Mr. Thomas's public Facebook

profile.

Did you do any other open-source research, meaning on the Internet, to see whether the same individual might have other open social media accounts?

A.   Yes.

Q.   What did you discover?

A.   We saw there was also a YouTube page, a YouTube channel belonging to Mr. Thomas as well.

Q.   Do you recall what the account name was for that YouTube page?

A.   It was also Black Lion Jester.

Q.   I'd like to show you Exhibit 512, please.

Do you recognize this?

A.   I do.

Q.   What is it?

A.   This is the YouTube channel belonging to, as you see up top, YouTube.com user Black Lion Jester.

Q.   What is listed as the accountholder name?

A.   It is Joseph Thomas.

Q.   Is it a fair and accurate depiction of what you saw when you went to this YouTube page as a part of your investigation?

A.   Yes, it is.

MS. MILLER:  At this time, Your Honor, I would move Exhibit 512 into evidence.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 512 received into evidence.)

THE COURT:  Ms. Miller, if you could step to the headset briefly.

(Bench conference.)

THE COURT:  All right.  What I'm going to suggest here, if we're anticipating that you're going to go through the 400 series and the 500 series, is it possible for you to just go through these one after another and let her page through these all at once and then you ask if these were tied to the search warrant and just get them all in at once, and that way, Mr. Roots sees them all and we're not doing this seriatim?

MS. MILLER:  For Facebook absolutely, but for YouTube, these were just screenshots she took initially in her investigation.

THE COURT:  If we've got -- Mr. Roots was objecting to the 400 series because he doesn't know what's coming because he hasn't reviewed the exhibits.  But there's no reason, when you get back to the Facebook, you can't do all 20 or whatever you're going to introduce and ask her at the conclusion whether they're all a part of the search warrant return.

MS. MILLER:  Sure, we can do that.

(End of bench conference.)

MS. MILLER:  Mr. Hopkins, is this published?

COURTROOM DEPUTY:  It is.

BY MS. MILLER:

Q.   Now that the jury can see the exhibit, can you point them to where you're seeing Black Lion Jester on this screenshot?

A.   At the very top of the page, you will see the scroll bar where you would see a URL.  You will see youtube.com\user\blacklionjester for the YouTube account up there.

Q.   You can go ahead and mark on your screen, actually, if you want to use your pencil to circle it, please.

A.   I'm just underlining it.

MS. MILLER:  Let the record reflect the witness is underlying the URL in the top left corner of the screenshot.

THE COURT:  The record will so reflect.

MS. MILLER:  Thank you.

BY MS. MILLER:

Q.   And next to the circular profile picture-looking image, what's the name we see there?

A.   We see Joseph Thomas.

Q.   And if we look a little bit further down, if we actually could zoom in on all the stuff that falls under the word "description," please.

Looking at this screenshot, can you tell the members of the jury what's listed under the word "Gab "?

A.   It's a URL for a particular Gab account user.  In this

case, the user is identified as PiAnon.

Q.    Could you spell that for the jury, please?

A.    P-i-A-n-o-n.

Q.    Based on your work on this investigation, do you know what Gab is?

A.    It's a social media site that's popular with certain folks.

Q.    And under Telegram?

A.    We see another link to Telegram, and that is PI_Anon.

Q.    What is Telegram?

A.    Telegram is another social media networking site.

Q.    Can you tell the members of the jury what's listed under iPatriot?

A.    It's a link to another member belonging to the iPatriot site, also known as PiAnon.

Q.    If we could zoom back out, please, what does this screenshot show in terms of the number of subscribers to this YouTube page?

A.    36.

Q.    And now I'd like to show the witness only, please, Exhibits 513, 514, 515, and 516, and I'll clear the screen.

Special Agent Brown, do you recognize those four exhibits we just showed you?

A.    I recognize those screenshots, yes.

Q.    So they're screenshots.  Are they -- how did you -- how do you recognize them?

A.   I found them on the page belonging to Joseph Thomas when it was public or when it was up.

Q.   Are they true and correct copies of what you screenshotted when you were doing your investigation and came to this open YouTube page?

A.   That's correct.

MS. MILLER:  At this time, Your Honor, I move into evidence Exhibits 513 through 516.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  They're all admitted.

(Government Exhibits 513, 514, 515, and 516 received into evidence.)

MS. MILLER:  Thank you.  Permission to publish.

THE COURT:  Yes.

MS. MILLER:  Thank you, Your Honor.

If we could go to 513, please.

BY MS. MILLER:

Q.   What do we see in this screenshot here, Special Agent Brown?

A.   We see in the foreground some officers being engaged in front of what appears to be the Capitol building.

Q.   Is this a screenshot of a video?

A.   It is.

Q.   How long does the video appear to be in length -- how long

is the video?  Sorry.

A.    Over 50 minutes.

Q.    And have you frozen in time and taken a screenshot of one particular moment in this video?

A.    I'm sorry.  Can you repeat that?

Q.    Sure.  Because this is a screenshot, can you tell the jury at what time in the video you took this screenshot?

A.    At 36 minutes 22 seconds.

Q.    Can you please tell the jury what the title given to the video is?

A.    It is titled "March for Trump (at the Capitol)."

Q.    What date does the video appear to have been posted on YouTube?

A.    The date appears -- well, the date on which it appears to have been posted was January 8th, 2021, but the caption of the video below you can see was January 6th, 2021.

Q.    If we could go to 514, please.

How is this screenshot different from the last one?

A.    It's a couple of minutes later.  So it depicts a different scene, still of law enforcement officers.

Q.    And if we could go to the next one, 515, please.

And how does this one differ?

A.    Also about a minute later.

Q.    Are we seeing law enforcement featured at this moment in time in the video?

A.   Not in this one.

Q.   When you went to this YouTube account, did you review this video in full?

A.   I did.

Q.   What kind of device did this video appear to have been captured by?

A.   With your camera function on your phone.

Q.   And if we could go to Exhibit 516.

In terms of the form of the video, how does this look different from the prior screenshots we just had?

A.   This is either turned physically or turned using the turn function on your phone to face the person, to face the defendant.

Q.   And just for the record, who -- can you please describe who we see in this screenshot, in terms of the attire?

A.   Yes.  We see a white male in a camouflage hat, apparently camouflage-looking sweatshirt, over which is a brown jacket.

Q.   Is he wearing glasses?

A.   Yes.

Q.   And based on your review of the full video, once he -- once the camera was flipped facing this video, was he speaking in the video?

A.   He did.

Q.   I would like to show you Exhibit 517 now, please.

Do you recognize this exhibit?

A.    I do.

Q.    What is it?

A.    This is a screenshot of another of the videos posted to the defendant's YouTube account.

Q.    Is it a fair and accurate depiction of what you saw when you went and reviewed this video on the public YouTube page?

A.    It is.

MS. MILLER:    At this time, I would like to move Exhibit 517 into evidence.

THE COURT:    Any objection?

MR. ROOTS:    No objection.

THE COURT:    It's admitted.

(Government Exhibit 517 received into evidence.)

BY MS. MILLER:

Q.    Special Agent Brown, what do you see in this moment in time of this video?

A.    I see a lot of individuals in the foreground, and in the background, we see the Capitol.

Q.    And what is the name given to this video on YouTube?

A.    It is "March for Trump D.C. Rally (before Capitol).

Q.    Who appeared to have posted it?

A.    It was posted by Joseph Thomas.

Q.    And the date it was posted, please?

A.    It was posted on January 8th, 2021, but the caption underneath the subscriber's name is January 6th, 2021.

Q.    We can take that down.  Thank you.

Special Agent Brown, did there come a time when you observed video on the public YouTube page that included a news reel?

A.    There is.

Q.    I would like to show you Exhibit 507, please.

Do you recognize this video?

A.    I do.

Q.    What is it?

A.    This is a screenshot of a video that appeared on Mr. Thomas's YouTube page.

Q.    Actually, if you look at the bottom, is it a screenshot, or is it an actual video?

A.    It is the actual video.  Right now, it's just frozen on the first frame.

Q.    How did you obtain a copy of this video?

A.    I went to the YouTube page and downloaded it.

Q.    Is it a fair and accurate depiction of the video you found on that public YouTube page?

A.    It is.

MS. MILLER:  At this time, Your Honor, I would like to move in Exhibit 507.

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 507 received into evidence.)

MS. MILLER:  Can we please play the video from the beginning until 1 minute 50 seconds with sound.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, did you, the FBI or you yourself, cut this video in any way?  We see it jumping a little bit.  Did you make those modifications?

A.   No, I just had it in full.

Q.   Sorry.  What was that?

A.   I just got it in full.  Whatever you see depicted was not my work, any of the cuts.

Q.   What do we hear the person on the video saying at the end there?

A.   "Midnight Riders all mounted up."

MS. MILLER:  Can you play through to 4 minutes 7 seconds.

(Video played.)

BY MS. MILLER:

Q.   Agent Brown, what did we see there in terms of the format of the video?

A.   The angle of the video switched toward the person in the car.

Q.   And who is now shown in the left corner of the video?

A.   The defendant.

MS. MILLER:  Please keep playing from here until

4 minutes 46 seconds, please.

(Video played.)

MS. MILLER:  Let's just play it through the end.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, this video, including this news reel portion, this was published to the public Facebook account for Joseph Thomas?

A.   YouTube, yes.

Q.   YouTube.  Thank you.

Now I'd like to show you Exhibit 518, please.

Do you recognize this?

A.   Yes, I do.

Q.   What is it?

A.   This is the certificate of authenticity from Google, which is the parent company of YouTube.

Q.   Who is it addressed to?

A.   It's addressed to me.

Q.   Is it a true and correct copy of the letter certification you received from Google in response to the search warrant issued?

A.   It is.

MS. MILLER:  I would like to move in Exhibit 518, Your Honor, please.

THE COURT:  Any objection?

157

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 518 received into evidence.)

MS. MILLER:  If we could publish, please.

BY MS. MILLER:

Q.  What is the date of this letter, Special Agent Brown?

A.  July 7th, 2021.

Q.  If we could please turn to page 3, what does it say at the top of this page?

A.  It says "Certificate of Authenticity."

Q.  Is this again something you received in response to every search warrant?

A.  Yes, that's right.

Q.  If we could zoom in on paragraphs 4, 5, and 6, please.

Could you please tell the jury what YouTube account the search warrant was issued for?

A.  It was the account belonging to the user associated with blacklionjester@gmail.com, identified with YouTube identifiers, and there's a pretty long series of letters and numbers there in the user line.

Q.  And the last sentence of paragraph 4 references an attachment A.  Could we please zoom back out and scroll down to attachment A in this exhibit, please.  You can stop there; that's fine.

Could you just describe for the jury what we see in

attachment A, which continues in many more pages?

A.    It does.    Attachment A, you will see at the top its title is "Attachment A:   Hash values for production files."

This is in response to my request for Google's content.  As you know, Google just has videos up there.  Now, to distinguish one video from any other video on YouTube, Google -- really any site will assign it a hash value.  This can be expressed in either MD5 that you see here, let's just take the first entry, MD5, or the 512 hash value, which is memorialized by SHA512.

So each video is assigned a unique hash number, so that way, you can see this video is the video that I know it to be, and here's its unique identifier.

Q.    Now I'd like to show you Exhibit 510, please.

Do you recognize this?

A.    I do.

Q.    What is it?

A.    This was a video posted to that channel's YouTube page.

Q.    Is it a true and correct copy of the video file you received from the YouTube search warrant return?

A.    That's right.

MS. MILLER:  At this time, I would like to move in Exhibit 510, Your Honor, please.

THE COURT:  Any objection?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 510 received into evidence.)

MS. MILLER:  Once it's published, can we please play from the beginning to the 50-second mark with volume.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, approximately how many times do you think you've reviewed this video?

A.   Dozens.

Q.   Because it's a little difficult to hear with the bell ringing and all the noise, can you please tell the jury who the speaker was referring to when he said "they"?

A.   It sounded like he was referring to the members of Congress, both the House and the Senate.

Q.   And did you catch where he said "they should march on"?

A.   "They should march on the Capitol today."

Q.   And if we could please skip ahead to -- actually, before we do that, like the last video we reviewed, does this video cut from one place to another sort of abruptly?

A.   It does.

Q.   And did you make those cuts?

A.   No.

Q.   Is that the form that the video was in when you received it from YouTube?

A.   That's correct.

MS. MILLER:  Okay.  Can we skip to 1 minute 26

seconds, please, and then play from here until 3 minutes 28 seconds.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, based on your work on the January 6 cases, did you come to have an understanding of what the phrase "stop the steal" means?

A.   Yes.

Q.   What does it mean?

A.   It is a theory circulated that but for electoral fraud perpetrated in the 2020 election, Donald Trump would be president.

MS. MILLER:   Now let's skip to 4 minutes 10 seconds and play from there until 5 minutes 21 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, based on your work investigating January 6 cases, did you come to have an understanding of what the speaker was referring to when the speaker said "they may be voting on these things in the coming hours," what he meant by "they"?

A.   The only folks who would be voting on anything appreciable on January 6 would be the Senate and the House of Representatives with respect to certifying the Electoral College count.

MS. MILLER:  If we could frame by frame ahead, please.

(Video played.)

BY MS. MILLER:

Q.   We've frozen us here at 5:21.

Can you read for the members of the jury what's on the white sign there, please?

A.   It says "honor our vote."

MS. MILLER:  Now, please continue playing from here until 5 minutes 27 seconds.

(Video played.)

BY MS. MILLER:

Q.   We actually went to 5 minutes 31 seconds there, but did you catch what the speaker just said about fighting?

A.   I'd have to listen to it one more time.

Q.   That's okay.  We can move on.

So, similar to how some of these videos cut abruptly, do some of these videos also repeat portions multiple times within the same long video?

A.   They do.

Q.   Again, that wasn't you that did that, that's the form that you received them in?

A.   That's right.

Q.   So let's skip to 10 minutes 40 seconds of the video, please.

Before we play it, Special Agent Brown, how if at all is

this portion of the video different from the portion we were just reviewing?

A.    This has switched to a different scene.  As you can see, the people there are now under a flag.

MS. MILLER:  Can we play from here until 11 minutes 14 seconds, please.

(Video played.)

BY MS. MILLER:

Q.    Special Agent Brown, did you come to have an understanding in this investigation who Carolyn was?

A.    I did.

Q.    Who is it?

A.    That is the defendant's wife.  That is the name of the defendant's wife.

Q.    Thank you.  And did you hear the defendant say into the camera "where's your mom"?

A.    I did.

Q.    Based on your review of many, many hours of this footage, do you believe that voice to have been the defendant sitting behind me?

A.    I do.

Q.    How did you come to learn that the defendant was with his wife and someone he referred to as "mom" -- or -- for the purposes of "mom" on January 6?

A.    I did through my review of these videos posted on YouTube

and through the Facebook return.

Q.   Did you ever come to have an understanding of why the defendant explained that -- well, actually, strike that.

Do you know whether the defendant's wife and child remained with him throughout the entire day on January 6?

A.   I don't believe they did.

Q.   Did you come to understand why that might have been based on what the defendant said about the day?

A.   There were allusions to it.

MR. ROOTS:   Speculation; asking the witness to speculate.

THE COURT:   Sustained.

BY MS. MILLER:

Q.   I'd like to show you Exhibit 511, please.

Do you recognize this exhibit?

A.   I do.

Q.   What is it?

A.   It's another video from the YouTube return.

Q.   Is it a fair and accurate copy of the video file you received in response to that return?

A.   It is.

MS. MILLER:   At this time, I would move Exhibit 511 into evidence.

THE COURT:   Any objection?

MR. ROOTS:   No objection.

THE COURT:  It's admitted.

(Government Exhibit 511 received into evidence.)

MS. MILLER:  Once it's published, can we please play this video with sound from the beginning until the 11-second mark.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, what do we see here in the foreground of this video?

A.   Seeing a lot of fencing.

Q.   The silver fencing, do you know what those are called?

A.   I believe they're known as bike racks.

Q.   And then can you make out on the top left there -- it's a little blurry; we could potentially go a little more forward if it clears up -- but what the sign says, the red and white sign in the left corner of the screen?

A.   The red and white sign says "Restricted Area."

Q.   Can you make out what it says in the bottom half?

A.   "Do Not Enter."

MS. MILLER:  Now, if we could slide forward in this video and play from the 2 minute mark until 2 minutes and 11 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   So in terms of where we were in the beginning of this video

versus now, could you tell the jury whether those are the same places, based on what we are seeing in the video?

A.   No.   The scene we saw just before the one that's currently depicted appeared to be on the National Mall.   Whereas, this seems to be on Pennsylvania Avenue, in a different area.

Q.   And did you catch what was just said --

A.   I'm sorry.   Constitution Avenue.

Q.   Thank you.   And did you catch what was just said on the video?

A.   "Marching to the Capitol."

Q.   Whose voice was that?

A.   That appeared to be the defendant's.

Q.   And geographically, do you know what direction he was marching?

A.   The camera is currently pointing east.   So he's heading east.

MS. MILLER:   Now, could we please skip forward to 2 minutes 58 seconds and play from there until 3 minutes 30 seconds.

(Video played.)

MS. MILLER:   I'm sorry.   Could we go back five seconds and play until 3 minutes 31 seconds, so 3:25 to 3:31.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, did you catch what was said there in

the video?

A.   Yes.  An unidentified person said, "Wait until we reach the Capitol, because then there's going to be some drama."

MS. MILLER:  And please keep playing this video until 3 minutes 45 seconds.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, did you catch anything about debating there?  Did you hear what was said?

A.   Can we back up one more time?

Q.   Sure.

Can we go back to 3 minutes 35 seconds and play from there until 3 minutes 45 seconds, please.

(Video played.)

THE WITNESS:  They're saying, "They're debating right now."

BY MS. MILLER:

Q.   In your opinion, who is the "they" they're referring to?

MR. ROOTS:  Objection; speculation.

MS. MILLER:  Rule 701, Your Honor, lay opinion testimony.

MR. ROOTS:  This is an overview witness --

THE COURT:  Stop, stop.  Pick up the phone.

(Bench conference.)

THE COURT:  Ms. Miller, what's the basis for her

knowing the answer to this question?

MS. MILLER:  Just that it's lay opinion under Rule 701, rationally based on her perception.  It's helpful to clarify the witness's understanding and not based on scientific, technical, or specialized knowledge.

THE COURT:  Okay.  But what is she relying on to know the answer to this?

MS. MILLER:  Her extensive review of this video over and over again.

THE COURT:  Okay.  Mr. Roots?

MS. MILLER:  As well as the context of what was happening on January 6.

MR. ROOTS:  Nothing shows that Mr. Thomas even heard that.

THE COURT:  Do you know what she's going to say, Ms. Miller?

MS. MILLER:  That they're referring to the Congressional debate of the Electoral College vote.

THE COURT:  I'll allow it.  It seems pretty obvious.  They're saying, "They're debating right now."  I'll allow the question.

(End of bench conference.)

THE COURT:  Overruled.

BY MS. MILLER:

Q.   Do you remember the question?

A.   Who is the "they" they are referring to?

Q.   Yes.

A.   These individuals are marching toward the direction of the Capitol.  There's been mention of the Capitol.  From my understanding of the scene, it seemed like they were discussing the senators and representatives that were meeting at the Capitol that day.

MS. MILLER:  And let's skip ahead to 4 minutes 45 seconds and play from there until 5 minutes 9 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   What did we just hear the defendant say on that video?

A.   "Do you hear that, Congress"?

Q.   It terms of the format, did we see a switch from one format to another?

A.   Yes, it was cut.

Q.   Let's skip ahead to 7 minutes and 16 seconds, please.

Special Agent Brown, what do we see at this freeze frame at 7 minutes 16 seconds?

A.   We see a number of individuals, and in the background, there's the Capitol on the left side.

Q.   Based on your investigation, do you have a general sense of where we are geographically here?

A.   It appears that the camera is pointed as if someone was approaching from the left side of the Capitol, that is, the

Senate side, and moving up the paths there.

Q.   From west to east or east to west, if you know?

A.   They would be moving from west to east.

Q.   Thank you.  Let's play from here until 7 minutes 25 seconds, please.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, did you just hear a male voice there that was not the defendant's?

A.   That's correct.

Q.   Did you hear what they said?

A.   "I'm just telling you, they're storming the Capitol."

MS. MILLER:  Let's skip ahead to 7 minutes 38 seconds, please, and play from there until 7 minutes 44 seconds.

(Video played.)

BY MS. MILLER:

Q.   Who did we just see there?

A.   We saw the defendant.

Q.   In terms of the format or where the video was pointing, what changed?

A.   It was pointing toward himself.

Q.   And actually, could we go back and play that quick one more time, 7 minutes 38 seconds to 7 minutes 44 seconds?

And pay careful attention to what is said.

(Video played.)

BY MS. MILLER:

Q.   What was the list of Patriots going to do?

A.   Going to storm the Capitol.

Q.   Now let's pull up Exhibit 504, which is already in evidence, please.

Special Agent Brown, do you know where this video came from?

A.   This came from the defendant's Rumble site.

Q.   Can you tell the jury what Rumble is, please?

A.   It's another video-sharing site akin to YouTube.

Q.   Based on your investigation, is the defendant's Rumble account also public?

A.   That's right.

Q.   What are some of the user names for his accounts?

A.   For the Rumble accounts?

Q.   Yes.

A.   They include PiAnon.

Q.   Are there more than one account for this -- associated with the defendant, if you remember?

A.   I don't right now.

Q.   Okay.  To your knowledge as you sit here today, is this -- the account from which this video came still publicly available?

A.   The last time I checked about a week ago, it was.

Q.   And because you've been sitting here through trial, does the January 6 footage and this current video depict events we've

also seen in some of the body-worn camera throughout this trial?

A.    From different angles, yes.

Q.    Was some or all of the footage contained in this video, Exhibit 504, also posted to any of the defendant's other social media accounts?

A.    Yes.

Q.    Do you remember which, off the top of your head, those were?

A.    The YouTube account that we initially spoke about.

Q.    Anything to Facebook?

A.    Some to Facebook as well.

Q.    How long does this video appear to be in total?

A.    Almost an hour.

Q.    Okay.  To avoid playing an hour-long video, let's skip ahead to 10 minutes 21 seconds, please.

      Actually, I'm sorry.  Before we do that, who do we see in the beginning of this video?

A.    We see the defendant.

Q.    And could you just tell the jury -- we're not going to play it for them -- what happens for the first couple of minutes of this video?

A.    It appears to be him speaking into the camera for some time before starting other footage.

Q.    Okay.  Now let's skip to 10 minutes 21 seconds, please.

      We're having trouble getting to 10:21.  So we're going to

go to 10:19.

What do we see here?

A.    I see a screenshot that it appears we observed earlier.

Q.    Right.  So would you agree that this video contains some of the video we've already seen that was in another exhibit already?

A.    That's right.

Q.    And now let's skip ahead to 14 minutes 5 seconds.  Can you freeze frame to 14 minutes 5 seconds, please -- not freeze frame, frame by frame.  That's good.  Thank you.

So we're frozen here at 14 minutes 4 seconds of the video. Special Agent Brown, do you have an understanding of what we're seeing here?

A.    We are seeing knives in the hand of an individual.

Q.    And based on your review of this entire video, including the intro portion, do you have an understanding of what the defendant says about these knives in this video?

A.    He said that the defendant found these knives and returned them to law enforcement personnel.

Q.    Based on your review of Officer Campanale's body-worn camera and based on your participation here at trial and seeing his testimony, do these knives appear to be the same knife that Officer Campanale saw in the defendant's hand within his body-worn camera?

A.    They do not.

Q.    How do they look different, if you remember?

A.    The knife depicted in the video that Campanale had appeared to be yellowish.  These are gray metal.

Q.    Now, skipping ahead to 14 minutes 40 seconds.  That's probably fine.  So we're at 14 minutes 36 seconds.

Does this appear to be similar to video we've already seen?

A.    Yes.

Q.    Because there's a flag above and people below?

A.    Right.

MS. MILLER:  And now play from here, please, until 16 minutes 17 seconds.

(Video played.)

BY MS. MILLER:

Q.    It's a little hard to hear there, Special Agent Brown, but did you catch what another male voice said at the end of that portion of the video?

A.    I did not.  I would have to listen to it again.

Q.    That's okay.  Did you see and can you describe what we saw in terms of a woman being carried out through the crowd?

A.    As you saw throughout the video, when you could see the left side of the screen, there were a line of people exiting away from the premises.  They were moving west instead of east. Among that crowd were approximately four individuals supporting a woman that did not appear to be able to walk of her own volition.

MS. MILLER:  Now, please skip ahead to 16 minutes 48 seconds, and play from here to about 17 minutes 54 seconds.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, first, can you orient the jury as to where the defendant was at this moment with respect to restricted Capitol grounds as a whole?

A.   Sure.  The restricted Capitol grounds began well before this scene that we see.  As Captain Baboulis testified, it included both the grounds and the actual Capitol building itself.

Right now, in the scene we just saw, we see the defendant being on what we would -- what has been referred to as the temporary stage, going up the risers there on what appears to be the left-side risers.

Q.   And in the sort of top half of the screen along the banister, railing, what do we see above the railing there?

A.   We see a number of law enforcement officers.

Q.   How do you know they're law enforcement?

A.   They're wearing the green jacket that MPD dons on a regular basis.

MS. MILLER:  Your Honor, could we perhaps do a restroom break now?  We've been going for about an hour and a half.  Would that be possible?

THE COURT:  All right.  Ladies and gentlemen, what do

you think?  Would you like a break now?

All right.  We'll take a 15-minute break.  If we can come back at 3:30.

(Jury exited courtroom.)

MS. MILLER:  I'm sorry, Your Honor.  I didn't want to step on your toes, but I did notice --

THE COURT:  No, I'm glad you raised it.  I wanted to make sure that they were --

MS. MILLER:  Ready?

THE COURT:  -- ready, yes.

Let me say just quickly, I looked at the 302.  I still stick with my view that this is not *Jencks*.  So there is not a *Jencks* violation.  I've looked at the case law, and I think that even 302s that have quotes, so long as they aren't verbatim, fulsome quotes of the interview, the whole interview, that it's not *Jencks*.

And you're telling me that the witness did not adopt it, did not review it, and if that's true, I don't think it's *Jencks*.

That doesn't mean, however, that the defense, if there's something in the 302 -- not something you could have and should have asked in cross, but if there's something in the 302 that had you known you would have asked a question about, then I think there's no need for this to be a part of the government's case, because I haven't found a *Jencks* violation, and he could

recall the witness that had been excused for that purpose because he didn't have it yesterday.

Just to be clear for the record, there's no other law enforcement witness whose testimony could be impacted by this late disclosure of 302s?  It's just Corporal Ainsworth, is that right, from yesterday?

MR. MCCAULEY:  And --

MS. MILLER:  There was a whole batch of all of the witnesses we prepped in the last two weeks, unfortunately.

THE COURT:  No, I understand.  But who testified yesterday?  All of them have 302s similar to Ainsworth 302s?

MS. MILLER:  Yes, Your Honor.

THE COURT:  Again, I don't think there's *Jencks* violations for any of those, but I will certainly entertain the defense calling, if there's something that you would have crossed from the 302, not videos that you've had for a long time that you wish you would have asked him about, but something relating to the 302s that you didn't know about, that's the standard you're going to have to show.

I think for purposes of the record for appeal, the government should file -- you can do it redacted or to the extent there's anything sensitive, I think there should be a record on what -- the comparison between what they had before and what they have now, just for appellate purposes.

MS. MILLER:  Sure.

MR. MCCAULEY:  Yes, Your Honor.

THE COURT:  Again, I'm not asking you to disclose anything sensitive, but you could certainly redact the 302s.

But as I think about it, you probably need to also provide what they had with respect to each witness.  That may be a lot.  I'm just concerned about the record on appeal.  Think about that, but I do think something needs to be filed on the record, because if there's ever an appeal and there's an issue raised, the Court of Appeals needs to be clear about what the defense did have and what the defense didn't have.

All right?

MS. MILLER:  Yes, Your Honor.

THE COURT:  So I'm not going to make Mr. Roots tell me now.  This can happen tomorrow.  I understand your point, Mr. McCauley, about any violation of *Jencks* needs to be remedied in the government's case-in-chief.  But if the Court's found there's no *Jencks* violation, then you've done your duty.  It's not your fault.

MR. MCCAULEY:  We understand.

THE COURT:  So typically, I would not let the defense just call a witness to impeach them, but in these circumstances, I think it's fair, if there's something you can point out in the new 302s that you would have asked them about had you known, had you been in possession of the 302s.

Does that make sense to everyone?  You understand my

ruling?

Oh, and just for the record, let me cite some cases that I did review for this.

So *U.S. v. Donato*, this a D.C. Circuit case, 93 F.3d at 433; *U.S. v. Moore*, 651 F.3d 30 at 75; and one or both of those cases cited *Palermo v. United States*, 360 U.S. 343, 352 through 353.

And again, I think the line is, is the 302 substantially a verbatim recital of the interview.  And I've reviewed the 302 of Ainsworth, and I don't think it's substantially verbatim, although there are some select quotes throughout the 302.

Now, if any of the other 302s are verbatim, I need to see those as well, but I'm assuming they were all similarly drafted.

MR. MCCAULEY:  That's correct, Your Honor.

THE COURT:  And I'm assuming that none of the witnesses saw the 302s, nor did the agent read the statement, the quote, or any other part of the 302 to the witness and ask for confirmation, and they confirmed.

MR. MCCAULEY:  Your Honor is correct.

THE COURT:  All right.  So I don't think that's *Jencks* for those witnesses.

MR. MCCAULEY:  Just to be clear, Corporal Ainsworth should be here in 15 minutes.

THE COURT:  If the defense wants -- I'm sorry.  I didn't want to interrupt your testimony.  It took a little while

to research that.  But I'm confident it's not *Jencks* in this circuit or Supreme Court case law.  So I think the government's not violated *Jencks*.

All right.  Mr. Pierce, were you just getting up to leave? All right.

(Recess taken from 3:24 p.m. to 3:36 p.m.)

(Jury not present.)

THE COURT:  Mr. Pierce, you're in the hot seat. Before we get the jury, I do want to raise a question about Mr. Hill.  Are you going to be able to answer this?  Obviously, the Court is concerned about the line between lay and expert testimony.

I get the sense from Mr. Roots that the defense is calling Mr. Hill in part to say he's reviewed hundreds of January 6 videos, some of which have been provided by the government in discovery, some of which are open source, and he's looked at all of them, and there's hundreds relating to this assault, for example, or the signage, and he will -- he can tell you that none of those videos show Ainsworth knocking him down, nor do they show any signs up.

And if that's the -- after 11:00 a.m. that day, just hypothetically.

And if that's the sort of lay testimony you're going to seek to elicit from him, has the government had any notice on what he's relying on, what videos he's reviewed?  And if it's

literally hundreds and you haven't alerted them by now to that, then I would preclude that kind of testimony, because they can't possibly review that before tomorrow.

So Mr. Roots, just before I bring the jury in, I just want to discuss this briefly.  Mr. Hill, if he's going to be the summary witness, obviously, I'm concerned about the line between lay and expert testimony, and you know that he can't testify about in his law enforcement experience this is excessive use of force, et cetera.

However, I think he could testify as a lay witness to what he's seen on videos that he's reviewed and what he has not seen on videos he's reviewed.

But my concern is, as you suggested, he may have reviewed hundreds or thousands of videos, and if you're going to try to elicit that kind of testimony from him, for example, to the effect that I've reviewed hundreds or thousands of videos and no signs were posted after 11:30 a.m. on the 6th, something like that, and you haven't already notified the government what those videos are so they have a chance to review it and effectively cross him, then I'm going to preclude that.

If he's going to testify, I've looked at these, you know, subset of 20 or 30 videos, and they know before tomorrow what they are or before today, whenever we start his testimony, that's a different issue.

So can you help me -- can you reassure me that he's not

going to be basing his testimony on exhibits that the government doesn't have notice of and adequate opportunity to review?

MR. ROOTS:  Yes, I believe the government has everything that we would intend to use.

THE COURT:  Well, of course.  They've turned over 100,000 videos.  That doesn't mean that they're on notice that they need to review all those.

MR. ROOTS:  Mostly, we're using the government's own exhibits that they've put into this case.

THE COURT:  Okay.

MR. ROOTS:  I won't say it's 100 percent, but --

THE COURT:  You can give them to them tonight so they can review it before they have to finish their cross?

MR. ROOTS:  Yes.  By tomorrow, we certainly could.

THE COURT:  Well, we'll see.  I don't know.  This is taking a while.  There's that.  And of course, I want to remind you that Hill cannot get into every other assault and every other incident involving January 6 rioters or protestors who Mr. Thomas didn't see or wasn't aware of.

Understood?  It's not kind of a look at all these aggressive tactics by the police all over the Capitol that day.  That would be irrelevant and excluded.

MR. ROOTS:  I'm 100 percent sure that Mr. Hill's testimony about these -- the alleged assault episodes will be entirely -- only videos of those episodes and not anything that

Mr. Thomas could not have seen.

THE COURT:  With Mr. Thomas and those that Mr. Thomas will either -- from the videos, we can tell he saw them, or he'll testify that he saw them?  You're going to tie all this up?

MR. ROOTS:  Yes; yes.

THE COURT:  Does the government want to add anything to the concerns I've expressed?  I'm just trying to avoid a need for a continuance.

MR. MCCAULEY:  Understood, Your Honor.  And the only issue that we -- and I think at the risk of beating a dead horse here, we don't want to place this -- ourselves or the defendant, for that matter, into a position where he has put up a witness who is now offering what appears to be improper expert testimony by another name and we have to object to every question.

THE COURT:  But do you agree that if he says I reviewed 30 videos and I'm telling you in those 30 videos I did or did not see X, that's proper lay witness testimony?

There's no specialized -- yes, he's reviewed a lot of videos, but there's no expert opinion being offered.  He's just testifying as to what he saw in the same way, you know, Ms. Miller asked the agent here, What did you think that meant based on what you've reviewed.

It's the same sort of testimony that's acceptable, lay witness --

MR. MCCAULEY:  Understood, Your Honor.  I think where the distinction comes in there is what is the universe of videos that we're talking about.

THE COURT:  Yes, and I'm making clear --

MR. MCCAULEY:  If it's purely the government's exhibits that we have offered into evidence plus X number that the defense wants to offer into evidence and he is going to review them and say this is what I see in this video or provide a summary of that video, that's -- I think that would be permissible lay testimony.

But if, on the other hand, he says -- this is by way of example -- this is unauthorized use of force by --

THE COURT:  No, that's expert testimony.  Nothing about expert opinion from his law enforcement experience, none of that is appropriate, but what he saw in the videos he reviewed, so long as the government's not caught off guard on what those videos are.  What's the universe of videos he's reviewed, you need to know that so you can effectively cross-examine him if one of those videos is contrary to what he's testifying to.

MR. MCCAULEY:  Yes.  And I think that this would be acceptable if we know what the universe of videos is, which we've just discussed, and also, the questions that are asked are not asked in such a way as to encourage any sort of expert testimony based on your training and experience.

THE COURT:  I think I've been clear about that, and if anything slips out -- you should warn Mr. Hill the limits of his testimony, and I would expect nothing to come out, but if anything did, I would strike it as impermissible testimony.

MS. MILLER:  We also have not received any reverse *Jencks*.

THE COURT:  Is there any *Jencks* on Mr. Hill?

MR. ROOTS:  He doesn't have much.

THE COURT:  The rule is before cross, but you all need to get his statements to them.

MR. ROOTS:  He has his transcript in the Proud Boys trial.

MS. MILLER:  Social media?

MR. ROOTS:  This guy does not do social media.  He's law enforcement -- well, most of them don't do that.

MR. MCCAULEY:  Insofar as there are any reports he has generated about the videos that will be the subject of his testimony, that would also fall within.

THE COURT:  Agreed.

MS. MILLER:  E-mails about the subject of his testimony, all communications?

THE COURT:  You all check that.  They're representing none, but obviously, that's *Jencks* that would need to be turned over.

MS. MILLER:  I want to note for the record, Your

Honor, I believe you noted -- I wasn't paying attention because I was dealing with other things -- that there was some sort of note by Stephen Hill on something that they were looking at while the jury saw it earlier.

THE COURT:  I only saw -- I didn't see the content of it.  It may be when you're going to testify.  I don't know.  Obviously, if there's stuff substantively related to exhibits that he's opined on or stated something about, you need to turn that over.

MR. MCCAULEY:  I think that --

THE COURT:  We're all on the same page?

MR. MCCAULEY:  To close the loop here, I think that would be acceptable for the government at this point.

THE COURT:  All right.

MR. ROOTS:  Through this witness, we were going to have a chitchat about possible stipulations with regard to maybe the radio call and maybe the commerce document.

THE COURT:  How much more do you have on direct, roughly?

MS. MILLER:  I would love to tell you not a lot, but it's kind of a lot.

THE COURT:  We're going to finish her up today.  You don't have to rest today.  So maybe the stipulations could be -- I mean, if they're joint stipulations, too, it doesn't matter whether the government rests or not, does it?  You want to

introduce it?

Let's get the jury back in.  Let's try to get through this witness today so that we can start the defense case tomorrow.

MS. MILLER:  But yes, we can talk about that later.  Sorry.  The day got away from us.

MR. ROOTS:  There's a lot going on.  This is why nobody goes to trial.  Trial is so exhausting.

THE COURT:  I feel your pain.

MS. MILLER:  I feel great.  It's my Diet Mountain Dew, I guess.

THE COURT:  What's the defense doing about cutting the exhibits down?

(Jury entered courtroom.)

MS. MILLER:  May I proceed, Your Honor?

THE COURT:  Of course.

MS. MILLER:  Thank you.

BY MS. MILLER:

Q.   So Special Agent Brown, we were reviewing Exhibit 50.  You had just told the jury that the defendant is now somewhere near or on the inauguration stage area, what we've been referring to as that.  We're frozen here at 17 minutes 54 seconds, and you were talking about the line of police officers at the top.

So let's play from here until 18 minutes and 44 seconds, please.

(Video played.)

BY MS. MILLER:

Q.    We're frozen here at 18 minutes 44 seconds.

You just heard someone initiate a chant "police stand down."

Who initiated that chant?

A.    That was the defendant's voice.

Q.    And what is the camera focused on now in this freeze frame?

A.    It shows the Capitol in the background, some fencing in the middle of the frame, and right in the foreground, a number of individuals.

Q.    And who is in the black uniform on top of what looks like grandstands?

A.    Those appear to be law enforcement officers.

Q.    Do you know whether those grandstands are the same ones that we saw the defendant underneath in the body-worn camera of Officer Campanale?

A.    It ought to be.

Q.    Now, we also just heard in this portion of the video a loud sort of alert noise playing through the defendant's phone.

Do you know what that was?

A.    I subpoenaed D.C. Emergency Management Agency.  They refer to themselves as HSEMA, Homeland Security Emergency Management, but for D.C.

Some time in the 2:00 p.m. hour, they issued an alert going out to all cell phones pinging in the D.C. area that there was

going to be a curfew beginning at 6 p.m. on the 6th and lasting until 7 a.m. on the 7th.

Q.   I would like to show you Government Exhibits 111, 112, 113, 114, 121.

Do you recognize those exhibits I just showed you?

A.   I do.

Q.   Generally speaking, what do those exhibits consist of?

A.   There's a couple of different classes here that you're showing me.  The first four exhibits which you published to me and I presume only I can see them --

Q.   Yes.

A.   -- those involved the -- I misspoke.  I said subpoena.  I actually just requested, but we used a same declaration of custodian form for D.C. HSEMA to authenticate the records, and those were the productions from there.  They consisted of the times that the two alerts were issued, one was at the 7 p.m. hour, and also contained the text of the alert.

This one that I'm looking at right now is the mayor's order that was issued on January 6, 2021, a declaration of a public emergency.

Q.   Are all of these exhibits true and correct copies of the ones you received either from HSEMA, that were publicly available through Twitter, or from publicly available public documents from the mayor?

A.   That's right.

MS. MILLER:  At this time, Your Honor, I would move into evidence Exhibits 111, 112, 113, 114, and 121, please.

MR. ROOTS:  There is a foundation problem.

(Bench conference.)

THE COURT:  Mr. Roots?

MR. ROOTS:  Yes.  Mr. Thomas's phone may have received these, but he's filming.  He's holding the phone and videoing, obviously, at this time.  So even if these came through, there's no -- it's likely, it's almost certain he didn't see them or read them at the time.

THE COURT:  That doesn't mean they didn't come on his phone.  You can cross-examine her about that.

MR. ROOTS:  Okay.  With regard to 121, we previously -- we sought a 106 objection to that.  We've reviewed the rest of that, and we no longer object to 121 on 106 completeness grounds.

THE COURT:  All right.  Thank you.

(End of bench conference.)

THE COURT:  The objection is overruled.

(Government Exhibits 111, 112, 113, 114, and 121 received into evidence.)

BY MS. MILLER:

Q.   Can we please show the witness and publish to the jury Exhibit 114.

Special Agent Brown, what is this?

A.   This is the certificate of authenticity.  I know it says "Declaration of Custodian of Records," but it serves the same purpose, from the D.C. HSEMA agency that I mentioned.

Q.   And if we could look at 111, please, and if we could just zoom in on the bottom half of the page.

Special Agent Brown, could you please circle and read the time stamp of when this alert went out?

A.   It says it was sent on January 6, 2021, 14:48:18, which would be about 2:48 in the afternoon.

MS. MILLER:  Let the record reflect the witness just circled the top left corner of the zoomed-in portion of this exhibit.

THE COURT:  So reflected.

MS. MILLER:  And I'm going to clear the screen.

BY MS. MILLER:

Q.   Could you read the headline for the jury, please?

A.   The headline reads "Citywide Curfew."

Q.   And the area?

A.   The area would be the District of Columbia.

Q.   You already said the sender is D.C. HSEMA.

Could you read the content of the alert that went out, which begins with the section "WEA."

A.   "Mayor Bowser issues a citywide curfew for D.C. for Wednesday, January 6, starting at 6:00 p.m. until Thursday, January 7, at 6:00 a.m.  Essential workers, including health

care personnel and media, are exempt."

Q.    Thank you.  If we could zoom back out for the full exhibit, please.

Now, you said there was a second alert that went out later in the day.  How do you know -- or what is the basis for your opinion that it was this alert around 3:00 that the defendant received on his phone?

A.    At 7:00 p.m. in January, it would be completely dark outside.  It was not dark in the video.

Q.    If we could please go to Exhibit 113.

Special Agent Brown, could you read the name of this Twitter account, please.

A.    It's @DC_HSEMA.

Q.    And would you agree that the bottom half of this alert contains the same content as what you just read from the last exhibit?

A.    I would.

Q.    Does this appear to be a screenshot of what it would have looked like on someone's actual telephone when they received it?

A.    It appears to be that, yes.

Q.    And could we go to Exhibit 121, please.  If we could just zoom in on the top half of the page, including the title.  Thank you.  All the way down under the text.  Thank you.

Could you please read the date of this document?

A.    January 6, 2021.

Q.   And the subject line?

A.   "Declaration of a second public emergency, citywide curfew."

Q.   And the originating agency?

A.   Office of the Mayor.

Q.   And if we could zoom back out and go to the second page of this document, please.  And if we could again zoom in just on the text of the paragraphs.

Could you please read paragraph 5, beginning with the second sentence.

A.   "Barricades at the Capitol were stormed, and persons have entered the Capitol with the intent of disrupting proceedings."

Q.   I'm sorry.  I think that's actually the third sentence. Starting with "on" on the first line there.

A.   "On January 6, 2021, protests transformed from peaceful to violence" -- "violent."

Q.   You can continue, please.

A.   Continue?

Q.   Please continue, yes.

A.   "Barricades at the Capitol were stormed, and persons have entered the Capitol with the intent of disrupting proceedings. Protestors brought their own stink bombs and deployed them, sprayed pepper spray, and threw bricks, bottles, and bicycle racks at persons, including law enforcement officers.  Both Capitol Police and Metropolitan Police Department officers have

been injured.  Bomb threats have been called in, and shots have been fired at the Capitol."

Q.   And then if we could go to the third page, please, and zoom back out.  Thank you.  If we could zoom in on the text at the bottom there, please.

Special Agent Brown, could you read paragraphs 11, 12, and paragraph 1 of Section 2 here.

A.   "I now must exercise my authority to impose a curfew in order to protect the safety of persons and property in the District.  By this order, a second public emergency is declared in the District of Columbia, and a curfew is ordered for Wednesday night, January 6, 2021, continuing until the morning of January 7, 2020."  I presume that is a typo.

"A curfew is hereby ordered commencing at 6:00 p.m. on Wednesday, January 6, 2021, and ending at 6:00 a.m. on Thursday, January 7, 2021."

Q.   You can stop there.  Thank you.

If we could please turn to the fourth page, whose signature do we see on the right side at the bottom of this page?

A.   We see the signature of Muriel Bowser, the mayor of D.C.

Q.   In practical terms, could you tell the jury what the effect was of this declaration?

A.   The effect that this had was that all people on the streets essentially were told to clear out.  There shouldn't be anybody on the streets in public spaces in all of the District of

Columbia.

MR. ROOTS:  Your Honor, we object to this witness talking about the practical impact of this.

THE COURT:  No speaking objections.

I'll overrule the objection.

BY MS. MILLER:

Q.   Let's go back to Exhibit 504, the video we had been reviewing, please.  And we paused this video at 18 minutes 43 seconds.  If we could go back there, please.  That's fine.  18 minutes 41 seconds.

So we just heard the "police stand down" chant, and we're facing the grandstands at the top there.  Could we please now scroll ahead to 21 minutes and 21 seconds.

Special Agent Brown, has the defendant moved now in this video to another different place on Capitol grounds?

A.   The location we see here is appreciably closer to the law enforcement officers.

Q.   And what's behind the law enforcement officers in terms of buildings?

A.   The Capitol building.

MS. MILLER:  Could we please play from here until 22 minutes 40 seconds.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, what did we just see in terms of the

cutting of the video there?

A.   It was just a cut that shifted the scene from one to another, indicating that there was forward movement of this camera angle.  Now we're where it appears to be under the grandstands, under that riser section described in Officer Campanale's testimony.

Q.   Do we appear now to be closer or further from the Capitol than we were in the last portion of the video?

A.   This shot is closer.

MS. MILLER:  Now, please go to 28 minutes and 37 seconds of this video and play from there until 29 minutes 43 seconds.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, what did we hear the defendant saying in that portion of the video with respect to "our house"?

A.   He said, "This is our house."

Q.   Anything about letting us into the house?

A.   Yes.

Q.   Skipping ahead to 34 minutes 34 seconds, please.

So we're at 34 minutes 33 seconds here.  Before we play the video, can you make out what we see in the foreground of this, in terms of what appears to be in his hand?

A.   It appears to be the end of a cigarette that goes in your mouth.

MS. MILLER:  Play from here to 34 minutes 49 seconds.

(Video played.)

BY MS. MILLER:

Q.   What is your translation of what you just heard the defendant say?

MR. ROOTS:  Translation?

THE COURT:  Ms. Miller, let's pick up the phone.

(Bench conference.)

THE COURT:  All right.  I will sustain the objection.

Ms. Miller, are we going to go through this whole video again, or is there some new testimony?

MS. MILLER:  I don't think we've gone through this part of the video yet, Your Honor.  This is earlier in the day than what we've seen previously.

THE COURT:  But it's a scene we've seen.  What are you bringing out that Campanale didn't get into here?

MS. MILLER:  This is after his interaction with Campanale.

THE COURT:  This is not the Campanale scene?

MS. MILLER:  No, Your Honor.

THE COURT:  Okay.

(End of bench conference.)

BY MS. MILLER:

Q.   Special Agent Brown, you've been watching this whole trial; correct?

A.    Yes.

Q.    Do you remember when else we've seen a cigarette featured with respect to the defendant in this trial?

A.    I do.

Q.    When is that?

A.    It was around the time of the assaults occurring at 15:30.

MR. ROOTS:  Objection; legal conclusion.

THE COURT:  Can you lay a foundation for why she knows that?

BY MS. MILLER:

Q.    As a part of your investigation, did you review extensive body-worn camera from January 6 relating to this defendant?

A.    I did.

Q.    Was it you as the principal case agent that determined what you believed to be assault on federal law enforcement officers?

A.    Can you rephrase that?

Q.    Sure.  Who -- what agency identified assaults on law enforcement officers that created the need for this investigation?

A.    The FBI.

Q.    And have you reviewed the body-worn camera of what you just referred to as the 3:30 assaults?

A.    Yes, I have, and the body-worn camera from the officers that were present at around 3:30.  We see in the body-worn camera footage that the defendant approaches those officers with

a cigarette in his mouth.

THE COURT:  All right.  To be clear, I think I misunderstood the objection.  The objection is that she's testifying to a legal conclusion?

MR. ROOTS:  Yes, that it was an assault.

THE COURT:  All right.  She doesn't mean assault in a legal sense of the word, does she, necessarily?

MS. MILLER:  No.  Based on her work investigating crimes, she identifies what an assault is, her opinion, and brings it to the lawyers to then try and prove their case.

THE COURT:  Ladies and gentlemen, you should not interpret the witness's reference to an assault as a legal conclusion that an assault occurred in this case.

She's referring to --

MS. MILLER:  Assaultive conduct.

THE COURT:  Ask her to describe what she views as assault.

MS. MILLER:  Sure.

BY MS. MILLER:

Q.  What do you view as an assault in terms of conduct?

A.  That would be a forcible touching.

Q.  Okay.  Let's skip ahead to 36 minutes.

MR. ROOTS:  Legal conclusion; objection.

THE COURT:  I will sustain the objection.

Ladies and gentlemen, the legal standard, I will give you

the instructions at the end on what defines an assault, and you should follow those.

MS. MILLER:  Let's skip to 36 minutes 36 seconds, please.  Thank you.  And please play from here to 36 minutes 50 seconds.

(Video played.)

BY MS. MILLER:

Q.   Special Agent Brown, does this line of officers appear to be the same or different from the one that Officer Anderson and Nickerson were in?

A.   This appears to be different.  There are more shields on the line now.

MS. MILLER:  And skipping to 37 minutes 57 seconds, please, and can we play from here until 38 minutes.

(Video played.)

BY MS. MILLER:

Q.   What do we see in terms of the format of this video at this time?

A.   The camera is now facing the defendant.

Q.   Okay.  Please skip ahead to 41 minutes 9 seconds, please.  Special Agent Brown, what do we see here on the ground?

A.   We see a red and white sign.

Q.   Based on your review of hours and hours of footage of January 6, do you know what that sign says?

A.   It would say "area restricted" or "area closed."

MS. MILLER:  And please play from here until 41 minutes 27 seconds.

(Video played.)

BY MS. MILLER:

Q.   We are frozen here at 41 minutes 27 seconds.

Do you see a reflection in this shield?

A.   I do.

Q.   Who does the reflection appear to be?

A.   It appears to be the defendant.

Q.   Did you see in the last portion of the video we just played him gesturing in any way?

A.   He did.  He touched his chest at the line "we before you" or "me before you."  It's a little difficult to hear.

MS. MILLER:  Skipping ahead to 42 minutes 25 seconds.  Thank you.  Can we please play from here to 42 minutes 40 seconds.

(Video played.)

BY MS. MILLER:

Q.   What do we see in the background here, Special Agent Brown?

A.   We see a number of police officers.

Q.   And what's behind the police officers?

A.   The Capitol building.

Q.   Okay.  Skipping ahead to 44 minutes 15 seconds, please.

Before we play this, can you please situate the jury as to where we are on Capitol grounds at this point?

A.    We're here moving further north.  As described in Officer Niewenhous's testimony, you see the ramp pretty much in the foreground there that he was describing.

Q.    What do we see in the background of this freeze frame?

A.    We see officers and the Capitol building.

MS. MILLER:  Please play from here until 45 minutes 45 seconds.

(Video played.)

BY MS. MILLER:

Q.    We paused at 45 minutes 11 seconds.

Special Agent Brown, where did we see the defendant move in that portion of the video?

A.    He moved up the divider between the lower part of that terrace and the upper part and is now on the upper part.

Q.    Has the jury seen a lot of the video that comes after this point in the video?

A.    I believe so.

MS. MILLER:  I'd like to pause here for a moment and go to previously admitted Exhibit 305.1, please.  Can you skip to about 8 seconds, please.

COURTROOM DEPUTY:  Ms. Miller, that has been admitted?

MS. MILLER:  I think we got this in with Officer Leano.

So we could scroll ahead to 8 seconds, please.

BY MS. MILLER:

Q.    Special Agent Brown, you heard Officer Leano testify earlier today; right?

A.    I did.

Q.    And you heard him testify that the body-worn camera in the top right corner of this compilation video was his body-worn camera; right?

A.    Yes.

Q.    Can you please read for the jury the unique identifier number for that body-worn camera in the top right?

A.    That is 6039B9WG.

Q.    And in your investigation of the defendant, were you able to determine whose body-worn camera was in the bottom right corner of this exhibit?

A.    I was.

Q.    Whose was that?

A.    This belonged to, I guess, Officer Kevin Veizaj.

Q.    Could you please read that body-worn camera unique identifier number?

A.    That is 6039BCMP.

Q.    Okay.  Can we please go back to Exhibit 504.  We've paused here at 45 minutes 45 seconds.  So if you could please go back there.

      Without playing the remainder of this video for the jury, based on your review of this evidence, Special Agent Brown, do you know whether this video captures the final altercation

between the defendant and Officer Niewenhous, who testified as our last officer witness today?

A.    Yes.

MS. MILLER:  Let's skip ahead to 53 minutes and 13 seconds, and please play from here to -- that's fine, 53 minutes 12 seconds, and play from there until 54 minutes, please.

(Video played.)

BY MS. MILLER:

Q.    Special Agent Brown, do you know where we are situated now on Capitol grounds, if we've moved from the last portion of the video?

A.    We appear to have rounded the corner to the north side, and now we're fully on the north side of the Senate building.

MS. MILLER:  And finally, for this exhibit, please skip to 57 minutes and play from there until the end.

(Video played.)

BY MS. MILLER:

Q.    Special Agent Brown, we just heard the defendant discuss law enforcement's treatment of, quote unquote, unarmed civilians.

But could you please remind the jury of what we saw with respect to whether the defendant was armed in his interaction with Officer Campanale?

A.    He had a knife in his hand at one point in his interaction with Officer Campanale.

MR. ROOTS:  Objection as to the word "armed."

THE COURT:  Overruled.

BY MS. MILLER:

Q.   Let's look at Exhibit 505, please, which I don't believe has been admitted yet.

Special Agent Brown, I'm showing you Exhibit 505.  Do you recognize it?

A.   I do.

Q.   What is it?

A.   This is another video posted to the defendant's Rumble account.

Q.   Have you watched the video in full?

A.   I have.

Q.   Is it a fair and accurate copy of the video the FBI downloaded from Rumble?

A.   Yes.

Q.   In general terms only, outside of the beginning portion, what does it show?

A.   It shows the defendant talking into the camera.

Q.   And what about later in the video?

A.   Same thing.

Q.   Is there any footage from January 6 in this video?

A.   There is.

Q.   Has the jury seen any portions of this video before in video we've already covered in this trial?

A.    They should, yes.

MS. MILLER:  At this time, I would move to admit Exhibit 505.

THE COURT:  Any objection?

MR. ROOTS:  This is a subset of stuff that's already admitted?

MS. MILLER:  Do you want to get on the phones?

MR. ROOTS:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 505 received into evidence.)

BY MS. MILLER:

Q.    Now, like we've seen in other of these videos, do you know whether this video repeats portions multiple times within the same lengthy video?

A.    Yes.

Q.    And that's how it was in the form that you downloaded it; right?

A.    That's right.

MS. MILLER:  Let's please play from 2 minutes 42 seconds to 5 minutes 15 seconds, please.

(Video played.)

BY MS. MILLER:

Q.    Based on the countless hours that you've watched the defendant's videos, did you recognize any common refrains in this portion of the video that we just watched?

A.    Yes, the language of honoring one's oath directed at police officers.

Q.    And did you see anything different in this interaction with officers than what we've seen previously?

A.    At this point, the defendant also makes reference to 3 percent of people standing up to -- 3 percent of people supported the American Revolution, essentially, harkening back to that idea.

Q.    Let's skip forward to 13 minutes 54 seconds, please.

What do we see here, Agent Brown?

A.    We see a male in a tricorn hat.

MR. ROOTS:  Objection; relevance.

(Bench conference.)

THE COURT:  Are you going into the 3 Percent group?

MS. MILLER:  Not any more than identifying what he's superimposed on this image.

THE COURT:  Right.  And this is relevant because it relates to the 3 percent of individuals who fought for the Revolution?

MS. MILLER:  That, as well as the fact that he has superimposed the sign of pi, which is his theme and moniker all throughout the social media, that his name is Pi.

THE COURT:  Why is this not relevant?

MR. ROOTS:  I can't think of a reason it is relevant.

THE COURT:  He posted this where?

MS. MILLER:  His Rumble account.  I think it's still there now.

THE COURT:  Is anything attached to it, or it's just the picture?

MS. MILLER:  I mean, he included this at the end of his compilation video that he had created and posted on the internet.

THE COURT:  If it's at the end of the video, make that clear.

MS. MILLER:  Yes, Your Honor.

(End of bench conference.)

THE COURT:  The objection is overruled.

BY MS. MILLER:

Q.   Can you tell us where we are in this video, based on what we're seeing sort of timing wise?

A.   We're at the very end.

Q.   And again, you haven't modified this video in any way, have you?

A.   No.

Q.   So presumably, this is included in the video that is potentially on Rumble now; right?

A.   I did not change it in any way.

Q.   Now, do you see the circular marking on the hat?

A.   Yes, I do.

Q.   Do you have any understanding of what that means?

A.    Through the --

MR. ROOTS:  Objection; foundation.

THE COURT:  Overruled.  Tie it up.

BY MS. MILLER:

Q.    Based on your investigation of January 6 cases, have you come to understand what that symbolizes?

A.    Yes, through my investigation here and in the FBI's wider investigation, I've come to understand that that symbol stands for the group known as the Three Percenters, with the -- you can see behind the -- behind the pi symbol, three lines surrounded by 13 little points there.

Q.    Did you come to have an understanding of what the 13 points represents?

A.    The 13 original colonies.

Q.    And then what do we see superimposed in this particular version of this image?

A.    We see what appears to be a pi symbol.

MS. MILLER:  And let's please play the rest of the video until the end.

(Video played.)

BY MS. MILLER:

Q.    Special Agent Brown, those images at the Capitol sort of at night, did you see those images posted to any of the defendant's other social media accounts?

A.    Yes, on the Facebook return.

Q.    With respect to this Facebook return, did you request through the court process materials that predated January 6?

A.    Yes.

Q.    Why?

A.    If I requested only the material that occurred on January 6, I would have no knowledge related to any of the intent or planning that may have happened prior.

Q.    I'd like to show you Exhibit 402, page 14- -- page 14877. I'm going to do this hopefully pretty quickly and show you a bunch of different pages within this exhibit and have you identify them all at once.  So that's 14877.

Then, could we please pull up page 23508 from Exhibit 402 and page -- so I'll just say the full exhibit name:  402.15773, please; 402.15465, please; 402.8825, please; 402.15013 through 15016, and I think you can just show her the first of those; 402.3788; 402.3733; 402.16941; 402.16942; 402.16943; 402.5522; 402.1008; 402.5522; 402.9901; 402.3717.  That's it.

So actually, the Court's indulgence for one moment, please.

THE COURT:  All right.

BY MS. MILLER:

Q.    Special Agent Brown, what are those exhibits that I just showed you?

A.    All of them are business records from Facebook, meaning from the Facebook search warrant return.

Q.    Are they fair and accurate copies of the records you

received pursuant to the Facebook warrant?

A.   Yes.

MS. MILLER:  At this time, Your Honor, I move to admit all of those exhibits.

THE COURT:  Any objection?

MR. ROOTS:  Same objection we've previously lodged with regard to those.

THE COURT:  In terms of the --

MR. ROOTS:  Hearsay, irrelevant, misleading, foundation.

THE COURT:  Okay.  I've overruled all of those. They're admitted.

(Government Exhibits 402.14877, 402.15773, 402.15465, 402.8825, 402.15013 through 15016, 402.3788, 402.3733, 402.16941, 402.16942, 402.16943, 402.5522, 402.1008, 402.5522, 402.9901, and 402.3717 received into evidence.)

MS. MILLER:  Thank you, Your Honor.  If we could publish 402.14877, please.

BY MS. MILLER:

Q.   Special Agent Brown, I know we took a couple minutes getting to these exhibits, but does that image on that page look familiar to you?

A.   Yes.

Q.   From what?

A.   From the last video we just played.

Q.   Now, if we could zoom in on just the top half of this exhibit, please.

So under the -- I'd like to walk the jury through what the information typically looks like in a Facebook return.  Under photo ID, please don't read the number, but explain what it is.

A.   Same thing like I described with the YouTube search warrant return, same thing with Facebook.  They will assign unique identifiers to the media that gets posted there, so that way, you can be sure this is the media item you're talking about, not anything else.

Q.   And what is, for this example, next to "posted"?

A.   That is the date and time stamp in Universal Time Code.

Q.   For those unfamiliar like me with UTC, can you translate what that translates into for Eastern Standard Time for the purposes of January 6, 2021?

A.   I wasn't familiar with it either until I looked.

Basically, what it means is you take away five hours and you get Eastern Standard Time in January.  It changes during the summer months, I think.

Q.   And what would, just for this example, be the Eastern Standard Time for this post?

A.   19 minus 5 would be 14:50.  So that would be approximately 2:50 on January 7th, 2021.

Q.   And then at the bottom, where it says "mobile true," what does that mean?

A.    Mobile and true would indicate it was uploaded from a mobile phone, didn't come from a desktop computer, came from a mobile unit.

Q.    Please read this post from the beginning until the word "destruction."

A.    "This is video from the Capitol yesterday.  Graphic language.  Disturbing footage.  Viewer discretion is advised.  I do not condone violence or destruction."

Q.    Now please read from "it is the people's" to the word "restrained," about halfway through the paragraph.

A.    "It is the people's.  Most people were just trying to stand their ground despite the assault by the police, defending the innocent/vulnerable from being trampled, aiding those injured and peacefully assembled.  Sorry for the language.  After tear gas and multiple shots of irritants, I became a little less restrained.  Judge all you want, but those that were there with the truest of intentions are heroes to our republic."

Q.    You can stop there.  Thank you.

      Can you read the hashtags at the bottom of this.

A.    The hashtags are "wake up America," "Capitol building," "wild protest," "stop the steal," "march for Trump," "Washington, D.C.," "Capitol."

Q.    And zooming back out, please, from the zoom-in we have here, this post mentions videos.  Based on your review of this evidence, what are the videos referenced?

A.    That would be a little later in the return.

Q.    But what's the content of the videos referred to?

A.    The videos were those taken by the defendant at the Capitol.

Q.    Are they substantially similar to the ones we've gone through from Rumble, for example?

A.    That's right.

Q.    Please go to 402.23508.

      What do we see in this photo?

A.    I see a picture of the Capitol on January 6.

Q.    And the video IDs listed below, could you just describe for the jury what that is?

A.    Again, those refer to the unique identifiers Facebook gave to all of the videos that were uploaded here.

      COURTROOM DEPUTY:  What was the number for this one again?

      MS. MILLER:  402.23508.

      BY MS. MILLER:

Q.    Without going through them, can you please tell the jury generally what those videos contained?

A.    Generally, those videos contained the footage from the Capitol, most of which you've already seen.

Q.    Do you see the status at the bottom of this page?

A.    Yes.

Q.    Could we zoom in on it, please.

What's the date posted?

A.   It was posted January 6, 16:34 Universal Time.

Q.   That's fine.  Can you please read what the status is?

A.   "We the people have had enough.  We march and speak with one thunderous voice.  These are the times that try men's souls.  We are not summer patriots.  #marchfortrump, #midnightride," and then a link to the Twitter account.

Q.   What's the user name?

A.   Belonging to Black Lion Jester, with the "S" being a "5."

Q.   Thank you.  Special Agent Brown, when else in your testimony have we discussed something called the "Midnight Ride"?

A.   We discussed it in that video that was spliced together with the news report.

Q.   I know that feels like ages ago.  Do you remember what night that news report was from?

A.   That was from the early morning in January 6.

Q.   Thank you.  I would like to take a look at some other evidence that predated January 6.  Let's look at 402.15773, please.

Focusing on the image here, what does the image appear to be of?

A.   It appears to be a man in colonial-looking clothing.

Q.   And what is the text on the image?

A.   It says "midnight riders" and then "mount up."  The "O"

appears to look like a "Q."

Q.   What's the date of this post, if you can read it?  We can zoom in if you need it.

A.   If you could zoom in, that would be helpful.

Q.   Sure.

A.   It was posted October 9, 2020.

Q.   Could we now go to 402.15465.  Minus the superimposed frog face, what does this image appear to be?

A.   I'm getting hung up because I know this is a fairly famous painting, but I can't put my finger on it.  It also depicts an individual on a horse in fairly old-fashioned clothing.

Q.   Okay.  What's the text on this image?

A.   "Hold the line."

Q.   And if we could zoom in on the bottom text for the date, please.

A.   It was posted on November 3rd, 2020.

Q.   And if we could go to Exhibit 402.8825, could you please describe what we're seeing in this image?

A.   We are seeing an image of the Capitol building with lightning appearing over the Senate side.

Q.   What is the text of the image?

A.   "Justice is coming.  Get ready.  Stay steady."

Q.   And focusing on the text -- the first set of text below this image, please, could you just tell us the date?

A.   It was taken and uploaded on November 17th, 2020.

Q.    And if we can now go to Exhibit 402.1503.  It's four pages. They're all separate exhibits, unfortunately, but they go together.  So if we could look at 1503, please -- I'm sorry, 15013 and 15014, 15015, and 15016.

In general terms, can you please tell the jury what this letter appears to be?

A.    This appears to be a letter that was written to several leaders in Congress from a number of Congresspeople alleging fraud or irregularities with the 2020 election.

Q.    If we can zoom in on the bottom text for the date, please.

When did the defendant post this?

A.    December 18th, 2020.

Q.    And now let's go to Exhibit 402.3788, please.

First, can you read the text in the image?

A.    "We concede nothing.  #riggedelection."

Q.    And if we can zoom in on the text at the bottom of the screen, please.

What is the posted date here?

A.    December 21st, 2020.

Q.    Can you please read the text of the status?

A.    "Congressional vote on January 6 might be plan B.  Plan A could be to just ignore the fraudulent electors.  Vice President Mike Pence counts the legitimate ones only.  Ensures a Donald J. Trump victory.  Seven battleground states sent separate slates of electors.  On January 6, VP Pence could throw out the

fraudulent electors and count the electoral votes of the legit electors.  Actually, he must throw out fraudulent electors lest he be complicit in fraud.  Trump wins."

Q.   Could we please zoom out again for the full image or full page.

Special Agent Brown, based on your knowledge of search warrant returns from Facebook, images like this one, what are they commonly referred to as, if you know?

A.   I don't.

Q.   Have you ever heard the term "memes"?

MR. ROOTS:  Leading.

THE COURT:  Overruled.

BY MS. MILLER:

Q.   Do you know sitting here today whether the defendant himself fashioned what's in that image, created it himself?

A.   I don't know.

Q.   But the status that you read, do you know whether he posted that himself, would have written that himself?

A.   I do not know whether he wrote it himself, but if it was posted to his account, it was either himself or somebody else that had access.

Q.   Let's go to 402.3733.

What is the text of this image?

A.   "He has had our back.  Do you have his?"  Underneath, "1/6/2021, Washington, D.C."

Q.   If you could zoom in on the text below the image, please, for the date.

A.   The time of this one was January 1st, 2021.

Q.   Actually, could you take a look at what was above that?

A.   Excuse me.  I was looking at the comment there.  It was posted December 27, 2020, a few days before.

Q.   Just so the jury understands, what does it appear to be above that next to user Robert Campbell?

A.   That seems to be a response.  Sometimes when you post images or media, people can respond to it.  It seems like this user Robert Campbell did so here.

Q.   Now let's go to Exhibit 402.16941, please.

     What is the text in this image?

A.   "D.C. or bust, midnight ride."

Q.   Do you need to zoom in, or can you see the date there?

A.   I can see the date.  It says December 28th, 2020.

Q.   And then could we go to 402.16942, please.

     And what is the text of that image?

A.   "January 6th, answer the president 's call."

Q.   Could you tell us the date for that post, please?

A.   December 28th, 2020.

Q.   Could we go to 402.5522, and could we flip through the pages here of this exhibit quickly.  Thank you.  That's probably fine.  Please go to the first page again.  If you could zoom in on the top-half text, please.

Please read the text next to "summary" at the top of the page.

A.    "The U.S. Electoral College will meet during three rare sky events."

Q.    And what's the date of that post?

A.    December 29th, 2020.

Q.    And if we could zoom out, please, what do we see in the image on this page?

A.    We see a map with stops outlined in red.

Q.    And just underneath the image in the all caps, can you read that line, or do you need it to be zoomed in?

A.    "Alabama Midnight Riders caravan route."

Q.    If we could go to page 2, please, this looks similar to the last one.

Could you please tell the jury what's different?

A.    This is a different route in and a different part of the United States.  It says "Tenn," which I assume means Tennessee, "Midnight Riders caravan route."

Q.    If we could go to page 3 again.

This looks similar, but again, what's different?

A.    A different part of the United States, and the caption is "Boston Midnight Riders caravan route."

THE COURT:  Counsel, I think we're getting a little tired.

Ladies and gentlemen, I was hoping we could finish this

witness today, but I know it's getting late.  Would you all like to break now or continue a little bit longer?

How much longer do you have, Ms. Miller?

MS. MILLER:  I think it probably is going to be about an hour.

THE COURT:  All right, ladies and gentlemen.  We will take a break and have you come back tomorrow at 9:15, and we will continue with the special agent's testimony.

We will start at 9:15.  Just a reminder not to read about this case or do any research about this case or talk to anyone about it.

Thank you.

(Jury exited courtroom.)

THE COURT:  All right.  You can have a seat.

You're temporarily excused.

A couple of issues I want to raise.  One, if the defense wants any additional curative instruction on the assault reference -- you recall it was referenced earlier in the trial when the agent referred to assault on federal officers.  So I was assuming she was going to refer to the term in the colloquial way rather than try to give a legal definition there.  So -- but if you all would want as a part of the instructions some instruction making clear to the jurors that the Court's definition of assault governs and they should disregard anything they heard, an additional one, I will give that.

Also, Ms. Miller, I was not expecting the whole Three Percenters to come out.  I thought that you were going to refer to the pi on the tricorn hat, but not the Three Percenters.

Does the government believe that Mr. Thomas is a member of the Three Percenters?

MS. MILLER:  He certainly posts imagery about it.

THE COURT:  That's not my question.  Do you think he's a member of the Three Percenters?  I'm just asking the question, because I don't want to leave the jury with that impression if you know he's not.

If you don't know whether he is or isn't, then fine.

MS. MILLER:  I mean, I'm not aware of whether there is like an official membership of the Three Percenters, but is it an ideology he associates himself with?  Yes.

THE COURT:  There are -- I've tried people who are members of the Three Percenters.  So it is a group, at least in certain states, that has a well-formed membership.

It's okay what's come in, but I think we shouldn't leave the jury with the impression that he's a part of a formed group of Three Percenters unless he is.  If you don't know either way, then the defense can bring it out.  But if you know for a fact that he's not and that symbol is just on the hat, then I think you should bring that out.

MS. MILLER:  I don't think we know either way.  I wasn't going to have her talk anything more other than what he's

shown in his posts.

THE COURT:  Mr. Roots, your objections were for lack of foundation, lack of relevance.  It was a part of the video.  So it seemed relevant to me.  The foundation was laid.  If you had objected on 403 grounds, I would have clued into where she might be going.

I just wasn't focused on anything other than when you said this is pi, his symbol.  That's what I was thinking you were bringing out there.

If the government doesn't know one way or the other, presumably, that's something you all can bring out if he's not a member of the Three Percenters.  But I didn't want the government to know for a fact he's not and leave the jury with that impression that he could be.  I think enough people might know about it, given the press reports relating to January 6, that I would want you to not leave them with the wrong impression.

If you don't know one way or the other, then you don't.  That's why I'm asking.

MS. MILLER:  Yeah, we don't know one way or the other, Your Honor.

THE COURT:  Anything else we need to address before we end today?

MR. PIERCE:  We're starting at 9:15, Your Honor?

THE COURT:  Here's the situation.  I have a 9:00 a.m.

that's literally a five- or 10-minute conference call.  It really is.  So to the extent there are issues that we need to address before we start tomorrow, I want you all here at 8:30, 8:45.  I will let you all talk and see if there's anything like that, and if there's not, you can come at 9:00.

So someone is raising his hand.  You all -- I don't know if he's a part of the defense team, but can you talk to him?

MR. ROOTS:  (Nodded head.)

THE COURT:  Okay.  We're not going to get into anything that's not a part of the defense team here.

Is that individual?  No?  Okay.

All right.  So you all confer.  If there's a need to address anything preliminarily, if it's a really short matter, we can come at 8:45.  If it's not, 8:30 so that I can do the 9:00 call and we can start at 9:15 sharp.  I think we ought to be able to conclude the evidence in this case tomorrow.  I don't know if we'll get to closings, probably not, because we need a charging conference on the jury instructions.

So my goal, and I think it's reasonable, is to try to complete the evidence tomorrow and then discuss jury instructions and come back on Monday and instruct the jury and then have closing arguments.

Does that seem doable to both sides?

MS. MILLER:  It certainly does to the government, although we haven't seen the extent of the video they're

intending to present with Mr. Hill.

THE COURT:  I'm just asking about your case.

MS. MILLER:  Our case, absolutely.

THE COURT:  And I think you can speed things up with her.  I think you're losing some of the jury for sure.  It's a little monotonous to go through each clip.

What about the defense?

MR. ROOTS:  Tonight, we will have more -- we were a little crushed for witnesses, but we will have them tomorrow.  So we will be ready for our --

MS. MILLER:  Could we get the order of their witnesses, please, Your Honor?

THE COURT:  To the extent you know it.  Mr. Hill is starting?

MR. ROOTS:  Actually, we were planning on putting potentially Mr. Thomas on the stand first.

THE COURT:  All right.  And then Mr. Hill or Mr. Evans and Mister -- the other eyewitness?

MR. ROOTS:  There's Dave Sumrall.  My understanding is the judge has more or less ruled out John Moseley.

THE COURT:  Yes, because I -- well, how did I leave that?  This is the individual who could -- you could get in the information from the mayor's office.  I think it's an official Web page.

MR. ROOTS:  That's right.

THE COURT:  You could put him on the stand to say he didn't come into D.C., I guess.

MR. ROOTS:  He was on the east side, and he can rebut some claims that were made by Captain Baboulis about --

MS. MILLER:  We were going to stipulate --

THE COURT:  He doesn't have to stipulate.  Are you really calling him to say I didn't come out because of the mayor's --

MR. ROOTS:  Well, no.  His experience is not that he didn't come out.  He was all over D.C. on January 6 driving around and went to several things, and there were businesses shut down.  He couldn't even find a bathroom.  So he can testify to that.

It was a shut-down city, and it was not by rioters.  It was before rioters even started.  It was shut down by the government with these urgings to close your doors to Trump people coming into town.

MR. MCCAULEY:  Your Honor --

THE COURT:  How are you going to link that up without someone from the mayor's office?

MR. ROOTS:  Let's put it this way:  It's as authenticated and as foundational as the Safeway data is.

MS. MILLER:  We have a certificate.

THE COURT:  Ms. Miller, Mr. McCauley is up there ready to address.  You don't have to say anything from your seat.

Mr. McCauley?

MR. MCCAULEY:  Correct me if I'm wrong, Your Honor, but I believe Your Honor did this morning preclude Mr. Moseley's testimony based on the representation --

THE COURT:  I honestly can't remember.  I'm so tired.

MR. MCCAULEY:  My understanding was that this morning before the jury was first brought in, there were three quick orders of the Court that were read, the final of which was after a brief colloquy between the parties Mr. Moseley was precluded based on, one, the representation that the government made that we are willing to stipulate to a video that shows the east front that will allegedly impeach Captain Baboulis, so long as we can see it beforehand.

And otherwise, Mr. Moseley has no testimony that's of relevance to this case, especially considering what Your Honor has indicated toward the issue of the 231.

THE COURT:  Is he going to testify that the Safeways were closed?

MR. ROOTS:  I cannot believe that Count 1 turns on whether Safeways remained open.

THE COURT:  So far, I haven't looked -- I have to look at this legal issue.  So is this all briefed up for me on the net effect versus --

MR. MCCAULEY:  The government's response is due at 8:00 p.m. tonight --

MS. MILLER:  8:00 a.m. tomorrow morning.

THE COURT:  I'm going to have to hold on -- what I rule on that, I think, could impact this decision.  So do not assume that he's testifying.  I need to resolve this.

MR. MCCAULEY:  The government has a draft response.

THE COURT:  You have until tomorrow.

Mr. Roots, this isn't someone you're flying in.  So have him on call, and I will make a decision after I finally rule on that.

MR. ROOTS:  Okay.

THE COURT:  But as it stands now, I think the evidence you put on about commerce has to undermine what they're saying created a negative effect on commerce.  And if Safeway is closed and they can establish that Safeway is closed because of the curfew, how does Mr. Moseley's testimony about what was happening before the curfew impact that effect on commerce?

MR. ROOTS:  Well, let's put it this way:  It completely rebuts the claim that it was the civil disorder that caused the loss in profits by Safeway.

THE COURT:  Say that again.

MR. ROOTS:  The profits that were lost by Safeway on that day were not due to the Capitol demonstrators or Mr. Thomas.

THE COURT:  Because Safeway was closed before the Capitol events and before the mayor's curfew?

MR. ROOTS:  No.  Safeway, I believe, was open until about 6:00 that day.  But they were ordered closed by the government.  So there was an intervening factor.  This was not a case of rioters, civil disorderers who burned and looted.

THE COURT:  But the mayor's order herself ties the curfew imposed, which closed the Safeway, to the riots.  And unless you have someone from the mayor's office saying differently, that that was pretext for some other reason, I don't see the relevance of businesses being closed before unless they include the Safeway.

That's my tentative position on this, but I'm going to look at your briefs and see if I'm wrong on the net effect --

MR. ROOTS:  I'm told we actually do have a subpoena out to the mayor's office right now.

THE COURT:  All right.  So it's late, Mr. McCauley.  I would love to resolve this right now, but I'm too tired.

MR. MCCAULEY:  Understood.

The one other thing that I will put the Court and counsel on notice of is that Corporal Ainsworth has effectively no availability tomorrow.  So we will -- and we will need, as he is not local to D.C. --

THE COURT:  Mr. Roots, you need to tell me now why you need to call him to impeach him on something in the 302.  I didn't see it reviewing the 302, but if you can tell me -- not to put on videos you could have and should have played for him

earlier.  This would be to deal with the 302 issue.

Nothing prevents you from trying to subpoena him to appear in your case, but this is related to the discovery, the late discovery issue.

MR. MCCAULEY:  Yes.  To comply with the Court's ruling on this, we want to make --

THE COURT:  Him available to address anything they didn't know because they didn't have the 302 in a timely fashion.

MR. MCCAULEY:  Yes.

If I may just make a point.  I understand it's late, Your Honor, and I will make this point as succinctly as I can.

To bring up a point that Your Honor raised earlier, insofar as this agent who is currently on the stand is the author of this report --

THE COURT:  Yes, he can --

MR. MCCAULEY:  -- and was present for that, perhaps this is a question that is best asked of the agent rather than Corporal Ainsworth.

THE COURT:  I tend to agree.  I'm just wondering if there's some nugget in there that would be hearsay for her to testify to that he would need to testify.  I didn't see it in the 302.  Something that they learned that they didn't know before that they would want to question him about it, I don't see it myself.

But Mr. Roots, you need to tell me --

MR. ROOTS:  We were prepared to cross-examine him on some points but not what actually was said on the stand.  On the stand, he literally altered what was our understanding of his story and said well, not only was his falling down or being pushed down that day a major thing, but it was Mr. Thomas who absolutely did that, and that is not what we were prepared for.

And it turns out that that was in a secret 302 that we didn't have.

THE COURT:  What was in a secret 302 that you didn't know?

MR. ROOTS:  That they had pulled that out of him in secret meetings that they didn't tell us about and that it contradicted or at least it had a lot of new little -- a little -- some tricks to his story.

THE COURT:  So they didn't know until they got the 302 that the corporal was going to testify that Mr. Thomas knocked him down?

MR. MCCAULEY:  Okay, no.

THE COURT:  Was there anything in discovery that suggested --

MR. MCCAULEY:  Yes, there was, specifically the videos, the open source videos which show the strikes, show what appears to -- certainly to my and the government's eyes Mr. Thomas knocking down Corporal Ainsworth.

Moreover, there was an earlier 302 from January of this year where Corporal Ainsworth developed upon his story from or his narrative from January 6 or from his interview in February of 2021, that initial interview.

So they have had this information.  It is -- as we were approaching trial, it developed, of course, as you seek to extrapolate every fact.

But insofar as what they had, they had this information. They had numerous open source videos, the video of him falling, his 302.  They had their client's own ability to say -- to narrate the scene.  There were a number of different opportunities for them to get this information.

This is not secret information that the government obtained by improper means.  This was information that was confirmatory of video and information that we already had, the defense already had --

THE COURT:  You mean that the defense could figure out that he was knocked down by Thomas?

MR. MCCAULEY:  Certainly.

THE COURT:  I have to say to you, it's not entirely clear to me right now who knocked him down.  It's really not. But they were right there next to each other, so it's --

MR. MCCAULEY:  What I'm saying is, in terms of the chaotic scene, in terms of seeing Corporal Ainsworth fall, in terms of seeing Corporal Ainsworth -- the 302 describing

Ainsworth's description from earlier this year after his initial interview, this information was available to them.  This is not new information.

The only thing that we are --

THE COURT:  You were worried about the *Jencks* violation.

MR. MCCAULEY:  With the potential for the quotations in there.  And we turned them over in an abundance of caution for these witnesses -- for the witnesses who testified yesterday, certainly for this witness.  And the cross-examination about this is very likely better directed towards this witness about, perhaps, questions that she asked to develop this information.

THE COURT:  All right.  And you're going to make -- particularly with respect to him, he seems to be the most critical from the defense's perspective, we need on the record the discovery that they had about him before and after.

MR. MCCAULEY:  Of course.  And we have already sent that up the chain in our office, and we will be taking care of that.

THE COURT:  All right.

MR. ROOTS:  I will just say what we had was videos, body-cam videos of officers around which do not show what he now says, and he has changed his story.  He has added information to make it a crime.  Whereas, the videos don't show a crime.

So they've had meetings with the prosecution team in which they got Ainsworth to add a claim that he was pushed down by Thomas.

THE COURT: And you can question the agent about that and cross-examine her about that. She's the witness to cross-examine about that.

MR. ROOTS: We would like him to be available without a subpoena. They said he won't be available tomorrow, but we would like him available.

THE COURT: He does have a job. I don't know what to say about that.

MR. MCCAULEY: The government can make him available first thing Monday morning if this is a point that the defense wants to continue hammering. Again, this agent is almost certainly the best witness to direct this cross-examination towards.

THE COURT: Yes, I think that's right.

All right. We will have him on standby for Monday morning. I really want to get this case done tomorrow.

MR. MCCAULEY: We understand, Your Honor. We will have him standing by.

THE COURT: Am I clear you all are going to confer? If there's a need to meet ahead of my 9:00, you're going to send an e-mail to chambers so we will know, and I would be here.

Otherwise, I will be here at 9:05, and the jury will come

in at 9:15.

All right?

(Proceedings adjourned at 5:17 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.



/s/ Sara A. Wick                    August 5, 2023
SIGNATURE OF COURT REPORTER         DATE

**#**

**#172** [1] - 1:18

**/**

**/s** [1] - 235:8

**1**

**1** [9] - 19:21, 46:20, 65:22, 86:22, 98:20, 155:2, 159:25, 193:7, 226:19
**1/6/2021** [1] - 217:25
**10** [6] - 24:7, 52:10, 160:13, 161:23, 171:15, 171:24
**10-minute** [1] - 223:1
**100** [9] - 14:10, 19:10, 57:22, 63:16, 123:4, 127:20, 128:18, 181:11, 181:23
**100,000** [1] - 181:6
**101** [1] - 2:15
**103** [1] - 2:15
**1033** [5] - 90:1, 90:2, 90:6, 90:8, 90:10
**105** [1] - 2:7
**106** [2] - 189:14, 189:15
**108** [1] - 2:16
**109** [2] - 2:16, 2:17
**10:19** [1] - 172:1
**10:21** [1] - 171:25
**10:24** [1] - 57:3
**10:39** [1] - 57:3
**11** [4] - 162:5, 164:21, 193:6, 201:10
**11-second** [1] - 164:4
**111** [6] - 2:7, 2:22, 188:3, 189:2, 189:20, 190:4
**112** [4] - 2:22, 188:3, 189:2, 189:20
**113** [5] - 2:22, 188:3, 189:2, 189:20, 191:10
**11337** [1] - 144:10
**114** [6] - 2:8, 2:22, 188:4, 189:2, 189:20, 189:24
**119** [3] - 40:5, 40:16, 91:10
**11:00** [1] - 179:21
**11:30** [1] - 180:17
**11:46** [1] - 98:4
**12** [3] - 50:23, 193:6, 203:6
**121** [6] - 188:4, 189:2,

189:13, 189:15, 189:20, 191:21
**121**................. [1] - 2:22
**129** [1] - 2:9
**12:00** [1] - 98:4
**12:30** [1] - 60:23
**12:36** [1] - 119:5
**13** [7] - 50:19, 50:21, 203:4, 206:9, 208:11, 208:12, 208:14
**14** [9] - 52:4, 52:18, 162:5, 172:8, 172:9, 172:11, 173:4, 173:5, 209:8
**140** [1] - 2:17
**144** [1] - 2:18
**146** [1] - 2:18
**14877** [2] - 209:8, 209:11
**14:48:18** [1] - 190:8
**14:50** [1] - 211:22
**15** [7] - 47:23, 53:7, 53:15, 143:17, 178:23, 200:23, 205:20
**15-minute** [1] - 175:2
**150** [1] - 2:19
**15013** [1] - 216:4
**15014** [1] - 216:4
**15015** [1] - 216:4
**15016** [4] - 2:23, 209:15, 210:14, 216:4
**1503** [1] - 216:3
**1512** [1] - 14:24
**153** [1] - 2:19
**154** [1] - 2:20
**156** [1] - 2:20
**158** [1] - 2:21
**15:30** [1] - 197:6
**16** [4] - 168:17, 168:19, 173:10, 174:1
**163** [1] - 2:21
**16:25:59** [1] - 49:13
**16:26:53** [1] - 49:8
**16:28** [2] - 103:15, 106:3
**16:34** [1] - 214:2
**17** [3] - 173:11, 174:2, 186:21
**17th** [1] - 215:25
**18** [6] - 1:6, 25:20, 186:23, 187:2, 194:8, 194:9
**183** [8] - 64:18, 64:19, 65:5, 65:6, 66:25, 67:13, 67:18

**183**............................
................ [1] - 2:14
**189** [1] - 2:22
**18th** [1] - 216:12
**19** [2] - 46:20, 211:22
**1:00** [2] - 87:25, 111:25
**1:45** [3] - 87:25, 116:25, 119:4
**1:47** [1] - 119:5
**1:50:50** [2] - 66:25, 67:14
**1:50:58** [1] - 68:19
**1:51:00** [1] - 70:15
**1st** [1] - 218:3

**2**

**2** [14] - 19:22, 24:2, 86:15, 87:7, 88:7, 89:2, 91:14, 140:12, 164:21, 165:17, 193:7, 205:19, 219:13
**20** [4] - 83:10, 135:16, 147:20, 180:22
**20-second** [1] - 55:3
**20001** [1] - 1:22
**2014** [2] - 130:10, 130:18
**202-354-3284** [1] - 1:23
**2020** [12] - 160:11, 193:13, 215:6, 215:16, 215:25, 216:9, 216:12, 218:16, 218:21, 219:6
**2021** [30] - 35:15, 36:8, 46:11, 47:11, 48:15, 49:21, 56:13, 87:17, 88:23, 95:3, 112:7, 130:25, 131:5, 132:18, 151:15, 151:16, 153:24, 153:25, 157:7, 188:19, 190:8, 191:25, 192:15, 193:12, 193:15, 193:16, 211:15, 211:23, 218:3, 231:4
**2023** [2] - 1:6, 235:8
**205** [1] - 2:22
**20579** [1] - 1:15
**21** [6] - 98:9, 160:14, 171:15, 171:24, 194:13
**21-552** [1] - 3:4
**21-cr-552** [1] - 1:3

**210** [1] - 2:24
**214** [4] - 132:22, 133:5, 144:14, 145:13
**21550** [1] - 1:17
**21st** [1] - 216:19
**22** [3] - 47:20, 151:8, 194:21
**231** [3] - 22:16, 25:20, 226:16
**23508** [1] - 209:12
**25** [2] - 169:4, 200:14
**26** [4] - 101:12, 135:21, 135:23, 159:25
**27** [5] - 136:15, 161:9, 200:2, 200:5, 218:6
**28** [2] - 160:1, 195:10
**28th** [2] - 218:16, 218:21
**29** [2] - 124:10, 195:11
**292** [1] - 13:4
**29th** [1] - 219:6
**2:00** [2] - 111:25, 187:24
**2:30** [1] - 90:21
**2:48** [1] - 190:9
**2:50** [1] - 211:23

**3**

**3** [15] - 40:16, 47:19, 86:22, 157:8, 160:1, 165:18, 165:22, 166:5, 166:12, 166:13, 206:6, 206:14, 206:18, 219:19
**3-D** [5] - 40:13, 41:8, 43:25, 91:11, 95:17
**30** [7] - 21:24, 51:5, 165:18, 178:5, 180:22, 182:17
**30,000** [1] - 141:12
**30,000-page** [1] - 141:19
**302** [34] - 29:11, 29:15, 30:13, 121:23, 121:25, 122:2, 127:11, 127:12, 127:13, 127:15, 128:1, 128:4, 128:13, 129:1, 175:11, 175:21, 175:22, 176:16, 178:8, 178:9, 178:11, 178:17, 228:23, 228:24, 229:1, 229:8, 229:23, 230:8,

230:10, 230:16, 231:1, 231:10, 231:25
**302s** [31] - 28:21, 29:4, 29:7, 29:22, 30:3, 30:5, 30:8, 30:16, 30:18, 31:19, 119:20, 120:7, 120:8, 120:10, 121:9, 121:11, 122:9, 122:18, 123:12, 128:20, 128:24, 175:14, 176:5, 176:11, 176:18, 177:3, 177:23, 177:24, 178:12, 178:16
**303** [2] - 45:25, 46:18
**303**............................
............ [1] - 2:12
**303.1** [1] - 55:2
**303.X** [1] - 55:2
**305** [3] - 49:9, 49:25, 50:4
**305**............................
............ [1] - 2:12
**305.1** [4] - 55:24, 56:16, 56:19, 201:19
**305.1**............................
............. [1] - 2:13
**305.X** [1] - 55:24
**306** [3] - 100:2, 101:5, 101:10
**306**............................
............ [1] - 2:15
**306.1** [2] - 101:23, 102:2
**308** [4] - 2:15, 102:12, 103:6, 103:7
**308.1** [3] - 103:4, 103:6, 103:7
**308.1**............................
..... [1] - 2:15
**308.X** [1] - 103:4
**31** [2] - 161:12, 165:22
**33** [1] - 195:21
**333** [1] - 1:21
**34** [7] - 2:4, 50:16, 50:17, 195:20, 195:21, 196:1
**343** [1] - 178:6
**35** [3] - 50:16, 50:19, 166:12
**352** [1] - 178:6
**353** [1] - 178:7
**36** [7] - 149:18, 151:8, 173:5, 198:22, 199:3, 199:4
**360** [1] - 178:6
**37** [2] - 195:10, 199:13

**38** [3] - 169:13, 169:23, 199:14
**3:00** [1] - 191:6
**3:15** [1] - 90:21
**3:24** [1] - 179:6
**3:25** [1] - 165:22
**3:30** [3] - 175:3, 197:22, 197:24
**3:31** [1] - 165:22
**3:36** [1] - 179:6
**3:40** [1] - 47:24
**3rd** [2] - 57:13, 215:16

**4**

**4** [9] - 1:9, 92:21, 155:15, 156:1, 157:14, 157:21, 160:13, 168:8, 172:11
**40** [5] - 53:19, 161:23, 173:4, 194:22, 200:15
**400** [3] - 143:25, 147:9, 147:18
**401** [3] - 139:18, 140:6, 140:10
**401.............................**
**............** [1] - 2:17
**402** [6] - 142:5, 142:6, 143:15, 144:9, 209:8, 209:12
**402.1008** [3] - 2:24, 209:17, 210:15
**402.11337** [2] - 144:20, 144:25
**402.11337.................**
**.................** [1] - 2:18
**402.14877** [3] - 2:23, 210:13, 210:18
**402.15013** [3] - 2:23, 209:14, 210:14
**402.1503** [1] - 216:1
**402.15465** [4] - 2:23, 209:14, 210:13, 215:7
**402.15773** [4] - 2:23, 209:13, 210:13, 214:19
**402.16941** [4] - 2:23, 209:16, 210:15, 218:12
**402.16942** [4] - 2:24, 209:16, 210:15, 218:17
**402.16943** [3] - 2:24, 209:16, 210:15
**402.23508** [2] - 213:8, 213:17
**402.3717** [2] - 209:17,

210:16
**402.3717...................**
**............** [1] - 2:24
**402.3733** [4] - 2:23, 209:16, 210:14, 217:22
**402.3788** [4] - 2:23, 209:16, 210:14, 216:13
**402.5522** [7] - 2:24, 209:16, 209:17, 210:15, 218:22
**402.8825** [4] - 2:23, 209:14, 210:14, 215:17
**402.9901** [3] - 2:24, 209:17, 210:16
**403** [2] - 9:4, 222:5
**41** [4] - 194:10, 199:20, 200:1, 200:5
**42** [3] - 200:14, 200:15, 205:19
**43** [2] - 194:8, 195:11
**433** [1] - 178:5
**44** [5] - 169:14, 169:23, 186:23, 187:2, 200:23
**446** [2] - 107:17, 108:3
**446.............................**
**............** [1] - 2:16
**447** [2] - 108:21, 109:4
**447.............................**
**............** [1] - 2:16
**448** [2] - 109:15, 109:18
**448.............................**
**............** [1] - 2:17
**45** [12] - 50:21, 50:23, 50:24, 51:5, 166:5, 166:13, 168:8, 201:6, 201:10, 202:21
**45:20** [1] - 51:6
**45:46** [1] - 52:12
**45:50** [1] - 51:6
**46** [4] - 2:12, 52:3, 52:18, 156:1
**4704-B** [1] - 1:22
**48** [2] - 46:2, 174:1
**49** [3] - 53:7, 53:14, 196:1
**4:00** [1] - 87:19
**4:21** [1] - 101:2
**4:22** [1] - 46:11
**4:22:10** [1] - 124:13
**4:22:15** [1] - 124:14
**4:25** [3] - 49:14, 49:21, 56:13
**4:26** [2] - 49:8, 49:22
**4:28** [3] - 103:16,

104:14, 106:4
**4:30** [1] - 87:20

**5**

**5** [17] - 48:19, 57:13, 86:22, 94:25, 98:20, 157:14, 160:14, 161:9, 161:12, 168:9, 172:8, 172:9, 192:9, 205:20, 211:22, 214:9, 235:8
**50** [7] - 2:12, 50:24, 65:22, 151:2, 155:2, 186:18, 199:4
**50-second** [1] - 159:3
**500** [1] - 147:9
**504** [7] - 50:14, 50:23, 81:12, 170:4, 171:4, 194:7, 202:20
**505** [4] - 204:4, 204:6, 205:3, 205:10
**505.............................**
**............** [1] - 2:22
**507** [3] - 154:6, 154:22, 154:25
**507.............................**
**............** [1] - 2:20
**510** [3] - 158:13, 158:22, 159:1
**510.............................**
**............** [1] - 2:21
**511** [3] - 163:14, 163:22, 164:2
**511.............................**
**............** [1] - 2:21
**512** [4] - 146:12, 146:24, 147:3, 158:9
**512.............................**
**............** [1] - 2:18
**513** [5] - 2:19, 149:20, 150:8, 150:12, 150:17
**514** [4] - 2:19, 149:20, 150:12, 151:17
**515** [4] - 2:19, 149:20, 150:12, 151:21
**516** [4] - 149:20, 150:8, 150:12, 152:8
**516.....................** [1] - 2:19
**517** [3] - 152:24, 153:9, 153:13
**517.............................**
**............** [1] - 2:19
**518** [3] - 156:11, 156:23, 157:3
**518.............................**
**............** [1] - 2:20
**53** [2] - 203:4, 203:5

**54** [5] - 2:13, 174:2, 186:21, 203:6, 206:9
**56** [1] - 2:13
**57** [2] - 199:13, 203:15
**58** [1] - 165:18
**5:17** [1] - 234:3
**5:21** [1] - 161:4
**5th** [1] - 27:23

**6**

**6** [91] - 6:25, 7:25, 8:11, 9:8, 11:24, 12:20, 22:12, 24:20, 24:22, 25:1, 25:5, 25:7, 26:1, 26:3, 26:6, 26:8, 26:12, 26:15, 26:18, 26:24, 27:16, 28:7, 33:13, 36:8, 37:5, 45:21, 46:11, 47:11, 48:15, 49:21, 54:3, 54:8, 56:13, 57:6, 61:16, 67:9, 87:17, 88:23, 91:17, 95:3, 101:3, 102:7, 103:16, 103:24, 106:9, 109:8, 114:11, 114:25, 115:9, 115:12, 115:17, 116:1, 130:15, 130:25, 131:5, 131:21, 157:14, 160:5, 160:18, 160:23, 162:24, 163:5, 167:12, 170:25, 179:14, 181:18, 188:1, 188:19, 190:8, 190:24, 191:25, 192:15, 193:12, 193:15, 197:12, 199:24, 204:22, 208:5, 209:2, 209:6, 211:15, 213:10, 214:2, 214:17, 214:19, 216:21, 216:25, 222:15, 225:10, 231:3
**601** [1] - 1:14
**6039B9WG** [1] - 202:10
**6039BCMP** [1] - 202:19
**607** [1] - 35:4
**61** [4] - 2:4, 35:20, 36:7, 36:12
**62** [2] - 86:13, 87:19
**64** [1] - 87:3
**651** [1] - 178:5

**67** [1] - 2:14
**6:00** [5] - 190:24, 190:25, 193:14, 193:15, 228:2
**6D** [4] - 86:6, 86:14, 86:23, 89:7
**6D2** [1] - 86:23
**6th** [11] - 26:22, 27:3, 132:3, 138:4, 138:8, 139:3, 151:16, 153:25, 180:17, 188:1, 218:19

**7**

**7** [15] - 48:19, 112:7, 155:15, 168:17, 168:19, 169:4, 169:13, 169:14, 169:23, 188:2, 188:16, 190:25, 193:13, 193:16
**701** [2] - 166:20, 167:3
**711** [5] - 53:17, 54:11, 54:15, 61:13, 135:13
**711.............................**
**............** [1] - 2:13
**712** [3] - 77:4, 77:13, 96:16
**712.............................**
**............** [1] - 2:14
**75** [1] - 178:5
**77** [1] - 2:14
**7:00** [1] - 191:8
**7th** [3] - 157:7, 188:2, 211:23

**8**

**8** [5] - 24:7, 32:6, 97:16, 201:20, 201:24
**82** [1] - 2:5
**84** [1] - 2:5
**85** [1] - 2:6
**8:00** [2] - 226:25, 227:1
**8:30** [3] - 112:1, 223:3, 223:14
**8:45** [3] - 1:6, 223:4, 223:14
**8th** [2] - 151:15, 153:24

**9**

**9** [6] - 24:7, 32:6, 95:13, 168:9, 199:20, 215:6
**91367** [1] - 1:18

**93** [1] - 178:4
**9:00** [8] - 111:21, 112:1, 113:20, 131:19, 222:25, 223:5, 223:15, 233:23
**9:05** [1] - 233:25
**9:15** [5] - 220:7, 220:9, 222:24, 223:15, 234:1

## A

**a.m** [11] - 1:6, 57:3, 98:4, 179:21, 180:17, 188:2, 190:25, 193:15, 222:25, 227:1
**ability** [3] - 123:19, 124:2, 231:10
**able** [26] - 14:4, 15:1, 22:13, 33:10, 39:9, 47:5, 60:6, 60:8, 68:15, 113:21, 125:6, 133:10, 134:13, 134:17, 134:21, 135:1, 135:7, 135:9, 137:24, 138:12, 139:11, 139:13, 173:24, 179:10, 202:11, 223:16
**above-entitled** [1] - 235:5
**abruptly** [2] - 159:18, 161:16
**absent** [1] - 121:3
**absolutely** [8] - 23:10, 88:8, 124:17, 125:19, 127:21, 147:14, 224:3, 230:7
**abstract** [1] - 8:9
**abundance** [2] - 120:5, 232:8
**abusive** [1] - 41:13
**academy** [2] - 114:3, 130:18
**acceptable** [3] - 182:24, 183:22, 185:13
**access** [3] - 95:7, 138:13, 217:21
**account** [24] - 139:12, 140:16, 140:19, 141:7, 141:22, 143:5, 145:12, 146:9, 148:7, 148:25, 152:2, 153:4, 156:7, 157:15, 157:17,

170:12, 170:18, 170:22, 171:9, 191:12, 204:11, 207:1, 214:7, 217:20
**accountholder** [1] - 146:18
**accounts** [5] - 146:4, 170:14, 170:15, 171:5, 208:24
**accurate** [8] - 120:2, 121:3, 146:20, 153:5, 154:18, 163:19, 204:14, 209:25
**accurately** [6] - 15:9, 46:10, 49:20, 54:7, 56:12, 101:1
**acronym** [1] - 34:19
**act** [3] - 112:19, 112:25, 113:14
**Act** [1] - 126:16
**acting** [1] - 48:7
**Action** [1] - 3:4
**action** [3] - 18:13, 108:6, 108:15
**activation** [1] - 88:3
**active** [2] - 75:9, 75:10
**activist** [2] - 7:25, 21:6
**activists** [1] - 21:7
**activities** [1] - 88:5
**actors** [1] - 132:25
**actual** [6] - 38:9, 76:7, 154:13, 154:14, 174:10, 191:19
**add** [5] - 7:23, 17:4, 17:13, 182:7, 233:2
**added** [1] - 232:24
**addition** [3] - 36:19, 45:7, 72:22
**additional** [10] - 13:18, 23:6, 36:23, 39:18, 39:22, 55:20, 57:19, 145:24, 220:17, 220:25
**additionally** [1] - 75:2
**address** [14] - 11:19, 15:1, 23:2, 35:13, 121:7, 122:4, 122:16, 125:21, 145:21, 222:22, 223:3, 223:13, 225:25, 229:7
**addressed** [2] - 156:17, 156:18
**addresses** [1] - 141:3
**adequate** [1] - 181:2
**adjourned** [1] - 234:3
**administrative** [1] - 74:25
**admission** [5] - 24:17,

57:12, 67:13, 107:24, 109:1
**admit** [4] - 21:6, 32:3, 205:2, 210:3
**admitted** [35] - 32:7, 46:17, 49:10, 50:3, 50:15, 53:19, 54:14, 55:3, 55:25, 56:18, 67:17, 77:12, 101:9, 102:1, 103:6, 108:2, 109:3, 109:17, 140:9, 143:12, 143:18, 144:24, 147:2, 150:11, 153:12, 154:24, 157:2, 158:25, 164:1, 201:19, 201:21, 204:5, 205:6, 205:9, 210:12
**adopt** [2] - 120:1, 175:17
**adopted** [2] - 120:21, 121:1
**adrenaline** [2] - 90:10, 90:12
**advance** [10] - 25:5, 25:7, 26:25, 33:6, 45:19, 54:19, 83:14, 91:12, 99:22
**adverse** [2] - 5:6, 22:17
**advertisements** [1] - 41:4
**advise** [1] - 16:15
**advised** [2] - 5:4, 212:7
**affected** [3] - 28:7, 104:2, 115:16
**affects** [2] - 25:20, 25:21
**AFO** [7] - 132:22, 132:23, 133:5, 133:10, 144:14, 145:13, 145:19
**AFOs** [1] - 133:1
**afternoon** [9] - 3:15, 38:1, 87:20, 129:8, 129:16, 129:17, 131:9, 190:9
**afterwards** [1] - 145:19
**age** [1] - 84:8
**agencies** [2] - 62:14, 100:14
**Agency** [1] - 187:21
**agency** [3] - 190:3, 192:4, 197:17
**Agent** [53] - 129:12, 129:16, 135:22, 136:23, 140:16,

144:11, 145:2, 149:21, 150:19, 153:15, 154:2, 155:5, 155:19, 156:6, 157:6, 159:6, 160:5, 160:17, 161:25, 162:9, 164:8, 165:25, 166:8, 168:18, 169:8, 170:6, 172:12, 173:14, 174:5, 186:18, 189:25, 190:6, 191:11, 193:6, 194:14, 194:25, 195:15, 196:24, 199:8, 199:21, 200:19, 201:11, 202:1, 202:24, 203:9, 203:18, 204:6, 206:10, 208:22, 209:21, 210:20, 214:10, 217:6
**agent** [42] - 14:1, 20:3, 20:5, 20:8, 20:10, 20:16, 20:18, 20:20, 28:24, 30:2, 30:16, 32:8, 118:22, 119:21, 120:17, 120:22, 121:13, 121:23, 122:1, 122:2, 122:5, 122:10, 122:11, 122:23, 123:24, 129:1, 129:2, 130:3, 130:4, 130:5, 130:7, 130:12, 130:17, 132:7, 178:16, 182:22, 197:14, 220:19, 229:14, 229:18, 233:4, 233:14
**agent's** [2] - 122:13, 220:8
**agents** [5] - 4:13, 20:6, 120:19, 131:11, 131:24
**ages** [1] - 214:15
**aggressive** [4] - 41:21, 47:16, 81:2, 181:21
**agitated** [1] - 41:22
**ago** [10] - 26:8, 65:3, 84:10, 86:14, 95:1, 107:1, 116:10, 122:3, 170:23, 214:15
**agree** [21] - 6:8, 9:21, 9:22, 12:4, 22:5,

32:7, 63:11, 64:14, 70:18, 70:25, 71:6, 75:10, 76:16, 78:21, 80:5, 83:17, 110:18, 172:4, 182:16, 191:14, 229:20
**agreed** [2] - 83:15, 184:19
**agreement** [3] - 19:23, 19:25, 20:2
**ahead** [33] - 31:25, 41:25, 43:2, 50:16, 50:18, 51:12, 67:20, 68:2, 84:17, 92:19, 94:24, 95:24, 129:1, 144:6, 148:9, 159:16, 161:1, 168:8, 168:17, 169:13, 171:15, 172:8, 173:4, 174:1, 194:13, 195:20, 198:22, 199:20, 200:14, 200:23, 201:24, 203:4, 233:23
**aid** [1] - 51:20
**aided** [1] - 1:25
**aiding** [1] - 212:13
**Ainsworth** [24] - 61:19, 61:20, 121:19, 124:14, 124:16, 127:10, 134:22, 135:6, 135:12, 135:23, 137:1, 137:5, 176:5, 176:11, 178:10, 178:22, 179:19, 228:19, 229:19, 230:25, 231:2, 231:24, 231:25, 233:2
**Ainsworth's** [2] - 137:8, 232:1
**air** [5] - 91:2, 91:5, 91:7, 93:16, 93:17
**akin** [1] - 170:10
**Alabama** [1] - 219:12
**alarms** [2] - 17:6, 17:12
**Alberts** [3] - 11:21, 17:17, 17:19
**alert** [9] - 12:1, 187:19, 187:24, 188:17, 190:7, 190:21, 191:4, 191:6, 191:14
**alerted** [1] - 180:1
**alerts** [2] - 133:15, 188:16
**Alexis** [1] - 129:12

**ALEXIS** [2] - 2:9, 129:13
**all-hands** [1] - 131:9
**alleged** [2] - 13:15, 181:24
**allegedly** [1] - 226:12
**alleging** [1] - 216:8
**allow** [5] - 4:12, 8:24, 20:7, 167:19, 167:20
**allowed** [3] - 18:1, 23:2, 32:16
**allusions** [1] - 163:9
**almost** [10] - 23:9, 23:20, 24:25, 41:9, 109:10, 121:11, 130:8, 171:13, 189:9, 233:14
**altercation** [2] - 49:6, 202:25
**altered** [1] - 230:4
**AM** [1] - 58:6
**Amendment** [1] - 88:4
**AMERICA** [1] - 1:3
**America** [2] - 3:4, 212:20
**American** [1] - 206:7
**amount** [3] - 38:17, 76:6, 114:16
**analysis** [1] - 25:23
**analyzing** [1] - 29:20
**Anderson** [1] - 199:9
**anger** [1] - 59:13
**angle** [8] - 14:21, 65:14, 92:15, 95:16, 137:2, 137:3, 155:21, 195:4
**angles** [2] - 14:21, 171:2
**angry** [3] - 58:7, 58:14, 58:17
**announcements** [7] - 9:1, 9:10, 9:15, 9:18, 76:10, 76:14
**answer** [12] - 35:13, 68:14, 79:1, 79:2, 79:16, 104:8, 105:5, 123:4, 167:1, 167:7, 179:10, 218:19
**answered** [4] - 63:18, 78:16, 78:23, 78:24
**answering** [1] - 79:8
**answers** [1] - 123:9
**anticipate** [3] - 4:7, 9:13, 9:14
**anticipating** [1] - 147:8
**anxieties** [1] - 41:23
**anyway** [1] - 8:5
**apologize** [2] - 28:25, 47:23

**apology** [1] - 48:9
**appeal** [3] - 176:20, 177:6, 177:8
**Appeals** [1] - 177:9
**appear** [19] - 70:25, 111:19, 150:25, 151:12, 152:5, 171:12, 172:22, 173:6, 173:24, 187:13, 191:18, 195:7, 199:8, 200:8, 203:12, 214:21, 215:8, 218:7, 229:2
**APPEARANCES** [1] - 1:12
**appeared** [12] - 41:1, 41:2, 48:3, 69:22, 80:18, 132:21, 138:25, 153:21, 154:10, 165:4, 165:12, 173:2
**appearing** [1] - 215:20
**appellate** [1] - 176:24
**apply** [1] - 132:11
**appreciable** [1] - 160:22
**appreciably** [1] - 194:16
**approach** [3] - 3:5, 35:14, 93:20
**approaches** [1] - 197:25
**approaching** [2] - 168:25, 231:6
**appropriate** [7] - 8:3, 9:16, 10:17, 11:25, 18:21, 123:23, 183:15
**approve** [1] - 20:22
**approximate** [1] - 43:17
**Area** [1] - 164:17
**area** [39] - 9:1, 10:5, 10:13, 23:14, 40:20, 41:8, 42:6, 42:12, 44:6, 44:13, 49:21, 69:10, 69:11, 70:4, 70:15, 70:16, 77:23, 91:25, 92:1, 92:7, 92:10, 92:23, 94:5, 94:8, 94:11, 95:21, 95:23, 113:16, 113:22, 113:24, 114:15, 134:10, 165:5, 186:20, 187:25, 190:18, 190:19, 199:25
**areas** [7] - 23:12, 23:13, 23:14, 23:22, 24:7, 31:4, 32:16

**argue** [5] - 9:11, 22:20, 24:18, 127:23, 128:14
**argued** [1] - 26:14
**arguing** [2] - 26:3, 124:23
**arguments** [1] - 223:22
**arm** [6] - 68:6, 68:7, 68:8, 71:22, 73:19, 87:10
**armed** [2] - 203:22, 204:1
**arms** [2] - 49:2, 83:13
**arrest** [1] - 3:22
**arrive** [1] - 91:25
**arrived** [5] - 8:16, 39:12, 41:8, 90:18, 90:24
**arriving** [1] - 17:3
**arrow** [2] - 44:5, 44:12
**arrowhead** [1] - 92:9
**aspect** [1] - 120:25
**assault** [24] - 65:25, 66:7, 75:21, 124:11, 132:24, 133:10, 134:22, 137:6, 179:17, 181:17, 181:24, 197:15, 198:5, 198:6, 198:9, 198:12, 198:13, 198:17, 198:20, 199:1, 212:12, 220:17, 220:19, 220:24
**assault's** [1] - 134:10
**assaulted** [1] - 124:16
**assaulting** [1] - 133:21
**assaultive** [2] - 39:19, 198:15
**assaults** [7] - 132:21, 133:1, 133:3, 197:6, 197:17, 197:22
**assembled** [1] - 212:14
**assign** [3] - 36:6, 158:7, 211:7
**assigned** [3] - 35:18, 35:19, 158:10
**assignment** [4] - 34:25, 35:1, 36:11, 86:9
**assignments** [1] - 35:13
**assist** [1] - 90:4
**assistance** [3] - 37:11, 42:9, 131:25
**associated** [2] - 157:17, 170:18

**associates** [1] - 221:14
**assume** [2] - 219:17, 227:4
**assuming** [4] - 105:23, 178:13, 178:15, 220:20
**assure** [1] - 5:3
**assured** [1] - 127:21
**attached** [4] - 87:9, 141:25, 142:2, 207:3
**attachment** [4] - 157:22, 157:23, 158:1, 158:2
**Attachment** [1] - 158:3
**attempt** [2] - 24:21, 118:19
**attention** [10] - 35:15, 36:8, 62:20, 63:23, 71:15, 87:17, 88:23, 89:11, 169:24, 185:1
**attire** [1] - 152:15
**Attorney's** [1] - 1:14
**audio** [3] - 9:23, 9:24, 17:10
**August** [1] - 235:8
**AUSA** [2] - 1:13, 1:13
**authenticate** [2] - 64:24, 188:14
**authenticated** [1] - 225:22
**Authenticity** [2] - 139:23, 157:10
**authenticity** [3] - 140:3, 156:15, 190:1
**author** [1] - 229:14
**authority** [2] - 120:17, 193:8
**authorized** [1] - 21:23
**availability** [1] - 228:20
**available** [17] - 15:17, 15:19, 90:3, 120:14, 122:15, 135:3, 139:6, 139:10, 170:22, 188:23, 229:7, 232:2, 233:7, 233:8, 233:9, 233:12
**Avenue** [4] - 1:21, 91:4, 165:5, 165:7
**avoid** [4] - 9:12, 126:18, 171:14, 182:8
**avoided** [1] - 57:19
**awarded** [1] - 115:4
**awards** [1] - 115:17
**aware** [5] - 26:13, 26:17, 123:18, 181:19, 221:12

**awkward** [1] - 21:4

**B**

**B-r-o-w-n** [1] - 129:20
**Baboulis** [6] - 23:8, 23:12, 24:12, 174:9, 225:4, 226:12
**background** [8] - 21:14, 72:8, 107:3, 153:18, 168:20, 187:8, 200:19, 201:4
**backup** [1] - 37:19
**backward** [1] - 71:19
**badge** [1] - 83:7
**balance** [1] - 64:12
**ballistic** [5] - 36:19, 36:23, 39:23, 72:13, 75:3
**banister** [1] - 174:17
**banner** [1] - 145:9
**bar** [1] - 148:5
**barricades** [2] - 192:11, 192:20
**barriers** [2] - 23:10, 32:15
**base** [1] - 52:24
**based** [34] - 21:23, 28:14, 42:17, 118:18, 127:23, 128:13, 135:22, 135:24, 149:4, 152:20, 160:5, 160:17, 162:18, 163:7, 165:2, 167:3, 167:4, 168:22, 170:11, 172:15, 172:20, 172:21, 182:23, 183:25, 198:8, 199:23, 202:24, 205:23, 207:14, 208:5, 212:24, 217:6, 226:4, 226:10
**basing** [1] - 181:1
**basis** [3] - 166:25, 174:21, 191:5
**batch** [2] - 132:18, 176:8
**batches** [1] - 132:9
**bathroom** [7] - 27:6, 27:7, 113:13, 113:18, 113:22, 115:23, 225:12
**baton** [15] - 19:2, 36:23, 36:25, 37:2, 37:3, 37:4, 39:24, 44:23, 45:9, 47:4, 49:1, 72:22, 75:23, 85:3, 87:2

**batten** [3] - 87:1, 87:6, 87:12
**battleground** [1] - 216:24
**bears** [1] - 123:24
**beat** [1] - 19:20
**beating** [1] - 182:11
**became** [4] - 99:20, 132:5, 132:22, 212:15
**becomes** [3] - 8:5, 32:20, 120:18
**BEFORE** [2] - 1:1, 1:9
**beforehand** [3] - 32:20, 32:22, 226:13
**began** [7] - 25:6, 36:13, 36:15, 100:20, 123:22, 130:18, 174:8
**begged** [1] - 25:7
**begging** [1] - 26:18
**begin** [2] - 94:19, 119:8
**beginning** [18] - 50:6, 55:16, 65:19, 66:25, 67:13, 97:1, 98:8, 101:11, 111:23, 155:2, 159:3, 164:4, 164:25, 171:17, 188:1, 192:9, 204:17, 212:4
**begins** [1] - 190:22
**begun** [1] - 27:8
**behalf** [2] - 3:8, 3:13
**behavior** [1] - 39:19
**behind** [10] - 22:24, 43:4, 45:1, 93:4, 113:18, 162:20, 194:18, 200:21, 208:10
**bell** [1] - 159:9
**belonged** [1] - 202:16
**belonging** [7] - 141:15, 146:8, 146:16, 149:13, 150:1, 157:17, 214:9
**below** [7] - 141:3, 141:21, 151:16, 173:8, 213:11, 215:23, 218:1
**belt** [1] - 75:2
**Bench** [10] - 65:2, 81:19, 104:6, 106:17, 142:10, 147:6, 166:24, 189:4, 196:8, 206:13
**bench** [10] - 66:23, 82:4, 104:11, 107:13, 144:7, 147:24, 167:22,

189:18, 196:22, 207:11
**benefits** [2] - 115:6, 115:13
**best** [3] - 91:6, 229:18, 233:15
**better** [9] - 11:5, 17:8, 18:3, 18:12, 19:4, 39:20, 122:9, 123:25, 232:11
**between** [15] - 32:15, 76:6, 87:25, 97:11, 100:20, 110:13, 111:25, 112:1, 137:4, 176:23, 179:11, 180:6, 201:13, 203:1, 226:9
**beyond** [6] - 76:12, 81:18, 85:5, 112:4, 128:23, 139:5
**bias** [3] - 6:21, 6:24, 7:1
**biased** [2] - 7:24, 21:7
**bicycle** [1] - 192:23
**big** [5] - 58:24, 60:1, 113:5, 121:20, 134:6
**bike** [4] - 23:10, 87:3, 87:4, 164:12
**bit** [20] - 8:18, 11:6, 38:20, 39:8, 52:6, 64:12, 68:20, 71:24, 86:21, 89:17, 90:20, 117:17, 130:11, 130:16, 133:23, 141:3, 145:24, 148:20, 155:6, 220:2
**bits** [1] - 47:12
**Black** [5] - 140:20, 146:11, 146:17, 148:4, 214:9
**black** [1] - 187:11
**blacklion_jester@ yahoo.com** [1] - 141:5
**blacklionjester@ gmail.com** [2] - 141:6, 157:18
**blind** [1] - 143:19
**blind-sided** [1] - 143:19
**blocks** [3] - 38:9, 38:10, 130:1
**blue** [18] - 55:11, 63:24, 64:5, 64:6, 65:15, 65:17, 68:3, 69:3, 69:14, 69:16, 69:17, 69:19, 71:18, 71:21, 128:10, 128:12, 137:16
**blurry** [2] - 97:3,

164:14
**body** [46] - 18:14, 32:9, 45:9, 45:19, 45:21, 46:9, 49:19, 55:8, 56:11, 63:10, 65:10, 67:7, 81:7, 99:21, 99:24, 99:25, 100:22, 100:25, 102:7, 102:9, 102:14, 102:17, 117:16, 117:18, 134:3, 134:9, 134:20, 134:24, 134:25, 135:2, 135:7, 135:25, 171:1, 172:20, 172:24, 187:15, 197:12, 197:21, 197:23, 197:24, 202:4, 202:5, 202:9, 202:12, 202:17, 232:23
**body-cam** [3] - 134:9, 135:25, 232:23
**body-worn** [37] - 32:9, 45:19, 45:21, 46:9, 56:11, 63:10, 65:10, 67:7, 81:7, 99:21, 99:24, 99:25, 100:22, 100:25, 102:7, 102:9, 117:16, 117:18, 134:3, 134:20, 134:24, 134:25, 135:2, 135:7, 171:1, 172:20, 172:24, 187:15, 197:12, 197:21, 197:23, 197:24, 202:4, 202:5, 202:9, 202:12, 202:17
**boisterous** [1] - 5:12
**BOLO** [11] - 133:11, 133:12, 133:14, 133:15, 137:18, 137:20, 137:25, 144:14, 144:15, 145:15, 145:17
**BOLOs** [1] - 145:19
**bomb** [1] - 193:1
**bombs** [1] - 192:22
**books** [1] - 112:21
**boost** [1] - 115:10
**booted** [1] - 127:18
**Boston** [1] - 219:22
**bottles** [1] - 192:23
**bottom** [26] - 51:25, 56:10, 96:12, 97:23, 98:25, 99:2, 113:9, 136:15, 136:17,

137:9, 137:11, 137:14, 140:23, 154:12, 164:18, 190:5, 191:14, 193:5, 193:19, 202:12, 211:24, 212:19, 213:23, 215:14, 216:10, 216:16
**bought** [1] - 51:21
**Bowser** [2] - 190:23, 193:20
**Boys** [5] - 18:25, 19:23, 20:3, 22:3, 184:11
**Brady** [6] - 24:25, 25:4, 25:9, 25:13, 25:16, 29:21
**breached** [2] - 37:14, 39:20
**break** [14] - 57:1, 98:2, 112:18, 113:6, 113:10, 113:19, 113:23, 116:23, 116:25, 174:23, 175:1, 175:2, 220:2, 220:7
**breaking** [1] - 60:24
**breaks** [3] - 43:19, 113:13, 115:23
**breathe** [2] - 40:4, 44:20
**breather** [2] - 112:19, 113:14
**breathing** [1] - 93:18
**bricks** [1] - 192:23
**brief** [3] - 22:16, 98:2, 226:9
**briefed** [1] - 226:22
**briefly** [5] - 82:10, 82:11, 91:14, 147:5, 180:5
**briefs** [2] - 22:18, 228:12
**bring** [18] - 7:3, 27:14, 28:16, 57:5, 64:18, 77:4, 81:11, 104:22, 107:16, 108:21, 109:15, 120:12, 142:25, 180:4, 221:21, 221:23, 222:11, 229:13
**bringing** [2] - 196:16, 222:9
**brings** [1] - 198:10
**brought** [2] - 192:22, 226:7
**BROWN** [2] - 2:9, 129:13
**Brown** [52] - 129:12,

129:16, 135:22, 136:23, 140:16, 145:2, 149:21, 150:20, 153:15, 154:2, 155:5, 155:19, 156:6, 157:6, 159:6, 160:5, 160:17, 161:25, 162:9, 164:8, 165:25, 166:8, 168:18, 169:8, 170:6, 172:12, 173:14, 174:5, 186:18, 189:25, 190:6, 191:11, 193:6, 194:14, 194:25, 195:15, 196:24, 199:8, 199:21, 200:19, 201:11, 202:1, 202:24, 203:9, 203:18, 204:6, 206:10, 208:22, 209:21, 210:20, 214:10, 217:6
**brown** [10] - 44:21, 47:8, 47:12, 62:4, 71:19, 79:15, 99:1, 100:19, 129:20, 152:17
**build** [1] - 14:24
**building** [15] - 23:20, 23:21, 40:14, 90:24, 92:16, 106:6, 131:14, 150:22, 174:10, 194:20, 200:22, 201:5, 203:13, 212:20, 215:19
**buildings** [1] - 194:19
**bullet** [1] - 19:2
**bullets** [1] - 19:1
**bullhorn** [2] - 79:19, 79:20
**bullhorns** [1] - 79:18
**bunch** [3] - 18:21, 83:13, 209:10
**burned** [1] - 228:4
**buses** [1] - 90:25
**business** [2] - 60:12, 209:23
**businesses** [14] - 22:25, 25:7, 26:19, 27:1, 27:3, 27:7, 27:10, 27:15, 28:3, 28:5, 58:22, 59:20, 225:11, 228:9
**bust** [1] - 218:14
**BWC** [2] - 100:23, 100:24

**BY** [143] - 34:8, 37:23, 42:5, 43:13, 44:10, 46:5, 46:22, 48:1, 48:21, 50:8, 51:2, 51:11, 52:9, 52:16, 52:20, 53:10, 53:21, 54:18, 55:19, 56:5, 61:6, 61:15, 62:7, 62:23, 63:2, 63:22, 64:1, 64:9, 64:23, 67:3, 67:22, 68:5, 68:22, 69:5, 69:9, 70:17, 72:1, 72:7, 76:15, 76:25, 77:17, 78:14, 78:18, 79:6, 79:14, 80:23, 81:10, 82:15, 84:2, 84:19, 85:8, 86:1, 91:23, 92:20, 93:13, 94:14, 95:14, 96:7, 96:15, 96:20, 97:2, 97:18, 98:11, 98:23, 99:9, 100:6, 101:14, 102:6, 102:21, 103:10, 104:12, 105:7, 105:14, 107:15, 108:5, 109:5, 109:21, 111:17, 112:16, 114:22, 129:15, 135:20, 136:13, 136:21, 140:15, 144:8, 145:1, 148:2, 148:16, 150:18, 153:14, 155:4, 155:18, 156:5, 157:5, 159:5, 160:4, 160:16, 161:3, 161:11, 162:8, 163:13, 164:7, 164:24, 165:24, 166:7, 166:17, 167:24, 168:11, 169:7, 169:16, 170:1, 173:13, 174:4, 186:17, 187:1, 189:22, 190:15, 194:6, 194:24, 195:14, 196:3, 196:23, 197:10, 198:19, 199:7, 199:16, 200:4, 200:18, 201:9, 201:25, 203:8, 203:17, 204:3, 205:11, 205:22, 207:13, 208:4, 208:21, 209:20, 210:19, 213:18, 217:13

**C**

**California** [1] - 1:18
**cam** [6] - 18:14, 102:14, 102:17, 134:9, 135:25, 232:23
**camera** [55] - 32:9, 45:19, 45:21, 46:9, 49:19, 55:8, 56:11, 63:10, 65:10, 67:7, 81:6, 81:8, 99:21, 99:24, 99:25, 100:22, 100:25, 102:7, 102:9, 104:20, 113:9, 116:7, 116:8, 117:16, 117:19, 134:4, 134:20, 134:24, 134:25, 135:3, 135:7, 138:7, 152:7, 152:21, 162:16, 165:15, 168:24, 171:1, 171:22, 172:21, 172:24, 187:7, 187:15, 195:4, 197:12, 197:21, 197:23, 197:25, 199:19, 202:4, 202:6, 202:9, 202:12, 202:17, 204:19
**camouflage** [3] - 99:1, 152:16, 152:17
**camouflage-looking** [1] - 152:17
**Campanale** [8] - 172:23, 173:2, 187:16, 196:16, 196:18, 196:19, 203:23, 203:25
**Campanale's** [2] - 172:20, 195:6
**Campbell** [2] - 218:8, 218:11
**candidate** [1] - 41:3
**cannot** [2] - 181:17, 226:19
**capable** [1] - 66:11
**capacity** [1] - 8:2
**Capitol** [92] - 5:14, 8:15, 11:1, 17:7, 23:20, 32:16, 37:15, 38:5, 38:9, 38:10, 39:4, 39:8, 39:10, 39:12, 39:20, 40:14, 40:18, 41:17, 41:20, 43:23, 44:3, 44:7, 65:20, 89:7, 89:10, 90:19, 90:24, 91:12, 91:17, 91:22, 92:16, 92:23, 93:21, 94:18, 95:21, 99:18, 106:6, 107:3, 113:18, 114:1, 114:3, 114:4, 114:5, 114:10, 130:15, 131:8, 131:14, 132:25, 135:4, 138:4, 138:8, 150:22, 153:18, 159:15, 165:10, 166:3, 168:4, 168:7, 168:21, 168:25, 169:12, 170:3, 174:7, 174:8, 174:10, 181:21, 187:8, 192:11, 192:12, 192:20, 192:21, 192:25, 193:2, 194:15, 194:20, 195:7, 200:22, 200:25, 201:5, 203:10, 208:22, 212:6, 212:20, 212:22, 213:4, 213:10, 213:22, 215:19, 227:22, 227:25
**capitol** [1] - 138:24
**Capitol)** [2] - 151:11, 153:20
**capitolbuilding** [1] - 138:24
**caps** [1] - 219:10
**Captain** [4] - 24:12, 174:9, 225:4, 226:12
**caption** [3] - 151:15, 153:24, 219:21
**capture** [2] - 113:2, 113:5
**captured** [1] - 152:6
**captures** [1] - 202:25
**car** [4] - 74:8, 89:4, 91:4, 155:22
**caravan** [3] - 219:12, 219:18, 219:22
**card** [1] - 20:23
**care** [3] - 51:19, 191:1, 232:19
**career** [2] - 21:8, 21:17
**careful** [4] - 6:13, 81:21, 81:24, 169:24
**carefully** [1] - 122:25
**Carolyn** [1] - 162:10
**carried** [1] - 173:19
**carry** [2] - 74:7, 75:8
**cars** [3] - 65:19, 90:25, 91:1

**Case** [1] - 1:3
**case** [60] - 4:13, 9:3, 12:13, 14:13, 14:14, 14:24, 15:16, 16:21, 18:11, 19:6, 19:9, 20:3, 20:4, 20:5, 20:8, 20:10, 20:12, 20:16, 20:18, 20:20, 20:21, 21:1, 21:22, 32:4, 32:25, 39:14, 75:8, 75:10, 116:21, 117:5, 118:22, 120:24, 125:21, 126:15, 126:17, 127:1, 127:7, 132:14, 139:16, 149:1, 175:13, 175:25, 177:16, 178:4, 179:2, 181:9, 186:3, 197:14, 198:10, 198:13, 220:10, 223:16, 224:2, 224:3, 226:15, 228:4, 229:3, 233:19
**case-in-chief** [1] - 177:16
**cases** [8] - 24:22, 25:1, 131:24, 160:6, 160:18, 178:2, 178:6, 208:5
**catch** [12] - 37:2, 53:11, 53:12, 98:12, 103:11, 159:14, 161:13, 165:6, 165:8, 165:25, 166:8, 173:15
**categorically** [1] - 14:12
**caught** [3] - 69:3, 71:19, 183:16
**caused** [6] - 21:22, 25:2, 26:2, 58:20, 83:19, 227:19
**caution** [2] - 120:5, 232:8
**caving** [1] - 44:19
**CCTV** [1] - 135:4
**CDU** [22] - 35:19, 35:21, 36:2, 36:4, 36:5, 36:6, 36:7, 36:12, 36:20, 36:21, 74:10, 75:11, 75:23, 86:20, 86:22, 86:25, 87:18, 87:19, 88:3, 88:20
**cell** [6] - 55:9, 55:10, 80:18, 80:25, 81:1, 187:25
**center** [4] - 44:6,

94:11, 95:10, 96:3
**certain** [11] - 27:22, 37:2, 63:20, 76:19, 112:9, 127:20, 133:16, 145:4, 149:6, 189:9, 221:17
**certainly** [17] - 9:11, 16:15, 23:21, 26:9, 32:9, 120:23, 127:23, 141:16, 176:14, 177:3, 181:14, 221:6, 223:24, 230:24, 231:19, 232:10, 233:15
**certainty** [3] - 63:16, 123:5, 128:19
**Certificate** [2] - 139:23, 157:10
**CERTIFICATE** [1] - 235:1
**certificate** [3] - 156:15, 190:1, 225:23
**certification** [2] - 140:3, 156:19
**certified** [1] - 130:24
**certify** [1] - 235:3
**certifying** [1] - 160:24
**cetera** [1] - 180:9
**chain** [1] - 232:19
**chair** [1] - 85:24
**challenge** [2] - 60:6, 60:8
**chambers** [1] - 233:24
**chance** [3] - 65:7, 123:16, 180:19
**change** [3] - 81:24, 121:8, 207:22
**changed** [4] - 41:19, 128:16, 169:20, 232:24
**changes** [1] - 211:18
**channel** [2] - 146:7, 146:16
**channel's** [1] - 158:17
**channels** [1] - 134:19
**chant** [4] - 79:24, 187:3, 187:5, 194:11
**chanting** [1] - 98:15
**chaos** [5] - 16:9, 18:12, 81:15, 89:15, 89:17
**chaotic** [4] - 71:2, 72:3, 83:16, 231:24
**character** [2] - 3:23, 4:1
**charging** [1] - 223:18
**check** [3] - 88:14, 89:1, 184:22

**checked** [2] - 137:12, 170:23
**checked-looking** [1] - 137:12
**chest** [2] - 115:2, 200:12
**chief** [1] - 177:16
**child** [1] - 163:4
**chitchat** [1] - 185:16
**chose** [2] - 38:12, 48:8
**CHSs** [2] - 20:6, 20:13
**cigarette** [3] - 195:24, 197:2, 198:1
**circle** [6] - 43:2, 62:11, 68:7, 97:3, 148:10, 190:6
**circled** [7] - 43:8, 69:12, 94:11, 97:7, 97:23, 108:10, 190:11
**circles** [1] - 23:18
**circling** [1] - 69:10
**Circuit** [1] - 178:4
**circuit** [1] - 179:2
**circular** [2] - 148:17, 207:23
**circulated** [1] - 160:10
**circumstance** [1] - 95:17
**circumstances** [1] - 177:21
**cite** [1] - 178:2
**cited** [1] - 178:6
**citizens** [1] - 35:13
**city** [6] - 24:21, 27:12, 58:2, 114:15, 115:11, 225:14
**Citywide** [1] - 190:17
**citywide** [2] - 190:23, 192:2
**Civil** [5] - 35:23, 35:24, 74:12, 74:13, 86:13
**civil** [3] - 111:10, 227:18, 228:4
**civilians** [1] - 203:20
**claim** [4] - 115:13, 115:14, 227:18, 233:2
**claims** [2] - 108:12, 225:4
**clarify** [5] - 19:22, 77:8, 79:19, 143:2, 167:4
**clarifying** [1] - 143:15
**classes** [1] - 188:8
**clear** [32] - 12:15, 25:21, 43:11, 43:23, 44:1, 44:2, 45:14, 46:1, 62:19, 68:20,

71:24, 89:22, 92:19, 94:24, 95:12, 97:14, 106:18, 113:15, 143:4, 149:20, 176:3, 177:9, 178:22, 183:4, 184:1, 190:14, 193:24, 198:2, 207:9, 220:23, 231:21, 233:22
**clearing** [1] - 142:20
**clearly** [6] - 8:11, 18:15, 29:13, 52:7, 52:13, 66:20
**clears** [1] - 164:15
**clicking** [1] - 134:12
**client** [1] - 17:15
**client's** [1] - 231:10
**climb** [1] - 100:19
**climbing** [1] - 99:2
**clip** [2] - 103:18, 224:6
**close** [11] - 26:19, 50:12, 50:13, 71:2, 107:6, 113:25, 114:2, 114:7, 139:3, 185:12, 225:16
**closed** [9] - 28:10, 199:25, 226:18, 227:13, 227:14, 227:24, 228:2, 228:6, 228:9
**closer** [6] - 30:11, 39:12, 111:20, 194:16, 195:7, 195:9
**closest** [1] - 21:5
**closing** [5] - 22:24, 28:4, 33:8, 60:11, 223:22
**closings** [1] - 223:17
**clothing** [5] - 74:17, 74:19, 138:7, 214:23, 215:11
**clued** [1] - 222:5
**co** [1] - 3:14
**co-counsel** [1] - 3:14
**coach** [2] - 30:8, 30:9
**coached** [1] - 127:16
**coaching** [1] - 30:25
**coat** [1] - 99:1
**Code** [1] - 211:12
**collar** [2] - 130:14, 130:22
**colleagues** [1] - 135:10
**collectively** [1] - 66:15
**College** [3] - 160:24, 167:18, 219:3
**colloquial** [1] - 220:21
**colloquy** [3] - 4:25, 6:11, 226:9

**colonial** [1] - 214:23
**colonial-looking** [1] - 214:23
**colonies** [1] - 208:14
**color** [3] - 69:18, 70:1, 137:15
**Columbia** [4] - 139:17, 190:19, 193:11, 194:1
**COLUMBIA** [1] - 1:1
**coming** [11] - 22:18, 24:6, 61:11, 65:12, 76:7, 82:7, 144:3, 147:18, 160:20, 215:22, 225:16
**command** [1] - 45:16
**commands** [5] - 40:1, 45:3, 45:4, 45:7, 45:8
**commencing** [1] - 193:14
**commendations** [2] - 114:24, 115:4
**comment** [4] - 78:10, 107:4, 112:5, 218:5
**commentary** [1] - 6:3
**commentate** [1] - 13:24
**commenting** [1] - 108:18
**commerce** [15] - 22:15, 22:17, 22:20, 24:21, 25:8, 25:20, 25:21, 26:2, 26:23, 28:7, 58:25, 185:17, 227:12, 227:13, 227:16
**commit** [1] - 127:3
**committed** [3] - 132:21, 133:1, 139:14
**committing** [2] - 75:21, 133:3
**common** [5] - 34:19, 77:1, 77:3, 111:8, 205:24
**commonly** [2] - 110:12, 217:8
**communications** [1] - 184:21
**company** [2] - 60:4, 156:16
**compare** [1] - 99:11
**comparison** [1] - 176:23
**compilation** [4] - 141:14, 141:18, 202:5, 207:6
**complaining** [1] - 119:12

**complaints** [1] - 132:4
**complete** [1] - 223:20
**completely** [2] - 191:8, 227:18
**completeness** [1] - 189:16
**complicit** [1] - 217:3
**complied** [3] - 96:1, 96:10, 97:5
**comply** [1] - 229:5
**computer** [3] - 1:25, 125:8, 212:2
**computer-aided** [1] - 1:25
**concede** [1] - 216:15
**concern** [1] - 180:13
**concerned** [6] - 18:20, 21:12, 22:8, 177:6, 179:11, 180:6
**concerning** [1] - 18:6
**concerns** [5] - 4:24, 12:23, 13:2, 29:18, 182:8
**concise** [1] - 45:15
**conclude** [1] - 223:16
**conclusion** [11] - 15:6, 31:3, 122:14, 124:23, 126:17, 129:3, 147:21, 197:7, 198:4, 198:13, 198:23
**concrete** [2] - 70:5, 70:15
**concurrence** [1] - 133:9
**condone** [1] - 212:8
**conduct** [2] - 198:15, 198:20
**confer** [2] - 223:12, 233:22
**conference** [22] - 65:2, 66:23, 81:19, 82:4, 104:6, 104:11, 106:17, 107:13, 142:10, 144:7, 147:6, 147:24, 166:24, 167:22, 189:4, 189:18, 196:8, 196:22, 206:13, 207:11, 223:1, 223:18
**confident** [1] - 179:1
**confirm** [1] - 5:1
**confirmation** [1] - 178:18
**confirmatory** [1] - 231:14
**confirmed** [1] - 178:18
**conflict** [4] - 4:24, 5:1, 5:2, 5:4

**confused** [9] - 78:3, 78:5, 78:6, 78:7, 78:15, 78:19, 78:22, 84:20, 84:24
**confusing** [6] - 11:3, 48:6, 59:25, 78:20, 82:25, 83:4
**confusion** [3] - 82:22, 82:23, 84:20
**Congress** [3] - 159:13, 168:13, 216:8
**Congressional** [2] - 115:20, 167:18
**congressional** [1] - 216:21
**Congresspeople** [1] - 216:8
**conjunction** [3] - 45:8, 45:10, 45:15
**connection** [1] - 6:25
**considered** [1] - 26:10
**considering** [1] - 226:15
**consist** [1] - 188:7
**consisted** [1] - 188:15
**consistent** [5] - 30:5, 31:15, 69:21, 74:16, 80:19
**consistently** [2] - 43:20, 43:22
**Constitution** [2] - 1:21, 165:7
**contact** [8] - 69:22, 74:14, 74:20, 75:13, 75:15, 75:20, 126:20
**contain** [1] - 100:13
**contained** [4] - 171:3, 188:17, 213:20, 213:21
**contains** [2] - 172:4, 191:15
**content** [7] - 138:12, 139:11, 158:4, 185:5, 190:21, 191:15, 213:2
**context** [1] - 167:11
**continually** [1] - 118:13
**continuance** [1] - 182:9
**continuation** [1] - 124:3
**continue** [12] - 47:19, 91:24, 127:5, 136:9, 136:19, 161:8, 192:17, 192:18, 192:19, 220:2, 220:8, 233:14
**continued** [1] - 113:6

**continues** [3] - 4:17, 124:2, 158:1
**continuing** [1] - 193:12
**contract** [1] - 115:11
**contradicted** [1] - 230:14
**contrary** [1] - 183:19
**control** [7] - 35:25, 45:11, 47:6, 72:9, 74:9, 75:11, 86:12
**conversation** [3] - 57:11, 59:15, 117:1
**convinced** [2] - 27:15, 58:3
**Cooper** [2] - 17:23, 22:2
**cop** [1] - 77:3
**copies** [3] - 150:3, 188:21, 209:25
**copy** [10] - 128:25, 140:2, 144:14, 144:15, 144:17, 154:16, 156:19, 158:18, 163:19, 204:14
**corner** [23] - 40:9, 49:12, 49:13, 91:15, 91:21, 92:3, 92:11, 92:15, 92:16, 92:23, 98:25, 100:16, 113:9, 136:15, 136:18, 137:11, 148:13, 155:23, 164:16, 190:11, 202:5, 202:13, 203:12
**corporal** [8] - 14:9, 15:25, 19:16, 19:18, 122:12, 122:25, 126:19, 230:17
**Corporal** [19] - 61:19, 124:14, 124:16, 127:10, 134:22, 135:6, 135:12, 135:23, 136:25, 137:5, 137:8, 176:5, 178:22, 228:19, 229:19, 230:25, 231:2, 231:24, 231:25
**corporate** [1] - 121:15
**corporation** [1] - 60:4
**correct** [26] - 4:2, 4:3, 8:17, 66:1, 72:17, 73:13, 74:5, 78:19, 79:24, 106:10, 115:6, 124:4, 140:2, 144:17, 150:3, 150:6, 156:19,

158:18, 159:24, 169:10, 178:14, 178:19, 188:21, 196:25, 226:2, 235:4
**correctly** [1] - 81:7
**cost** [2] - 17:15
**counsel** [5] - 3:5, 3:14, 119:7, 219:23, 228:18
**Count** [1] - 226:19
**count** [4] - 14:25, 82:17, 160:25, 217:1
**counterterrorism** [1] - 130:22
**countless** [1] - 205:23
**counts** [3] - 124:11, 124:17, 216:23
**County** [5] - 14:9, 62:17, 134:23, 135:2, 135:11
**couple** [15] - 38:10, 51:4, 51:18, 81:11, 84:16, 94:25, 130:1, 132:19, 135:10, 141:5, 151:19, 171:20, 188:8, 210:20, 220:16
**course** [11] - 5:6, 7:21, 8:6, 38:21, 74:4, 82:13, 181:5, 181:16, 186:15, 231:6, 232:18
**COURT** [404] - 1:1, 3:9, 3:11, 3:15, 3:18, 4:1, 4:4, 4:11, 6:4, 6:9, 6:11, 6:17, 7:9, 7:15, 7:21, 8:1, 8:7, 8:11, 8:20, 8:24, 9:19, 10:2, 10:7, 11:14, 11:17, 11:25, 12:4, 12:7, 12:10, 12:15, 12:23, 12:25, 13:5, 13:17, 13:23, 14:15, 15:5, 15:13, 15:19, 15:23, 16:4, 16:10, 16:12, 16:15, 16:22, 16:25, 17:4, 17:19, 17:22, 18:6, 18:15, 19:6, 19:15, 19:19, 20:10, 20:15, 20:19, 20:24, 21:12, 22:5, 23:17, 23:23, 24:3, 24:10, 24:15, 25:12, 25:16, 25:24, 26:21, 27:1, 27:9, 27:13, 27:18, 27:24, 28:2, 28:12, 29:2, 29:6, 29:10, 29:22, 30:2, 30:10, 30:13, 30:16, 31:2, 31:17,

31:22, 31:25, 32:11, 32:15, 32:23, 33:5, 33:9, 33:15, 33:18, 33:20, 34:5, 37:22, 42:3, 43:10, 44:8, 46:15, 46:17, 48:17, 50:1, 50:3, 54:12, 54:14, 56:1, 56:4, 56:18, 56:25, 57:5, 57:14, 57:20, 57:24, 58:10, 58:13, 58:17, 58:21, 59:17, 59:20, 60:7, 60:18, 60:23, 61:1, 61:4, 63:19, 64:21, 65:7, 65:12, 65:18, 65:24, 66:6, 66:11, 66:18, 66:20, 67:15, 67:17, 68:14, 76:14, 76:24, 77:8, 77:12, 78:12, 78:17, 79:1, 79:10, 79:12, 80:22, 81:20, 82:3, 82:9, 82:13, 84:1, 84:12, 84:15, 84:17, 85:6, 85:12, 85:14, 85:17, 85:21, 85:23, 92:17, 93:11, 94:13, 95:11, 96:5, 96:14, 97:9, 97:13, 97:25, 98:2, 98:7, 101:7, 101:9, 101:24, 102:1, 102:17, 102:19, 103:6, 104:7, 104:25, 105:12, 106:19, 106:21, 106:25, 107:11, 107:14, 107:25, 108:2, 109:3, 109:17, 111:14, 112:13, 112:15, 114:20, 116:15, 116:17, 116:19, 116:22, 117:4, 117:8, 117:13, 117:20, 118:5, 118:8, 118:12, 118:15, 118:24, 119:3, 119:7, 119:9, 119:12, 119:16, 119:25, 120:7, 120:11, 120:16, 121:1, 121:13, 121:23, 122:1, 122:4, 122:11, 122:13, 122:20, 123:6, 124:1, 124:5, 124:19, 124:22, 125:10, 125:15, 125:20, 125:24, 126:4, 126:7,

126:14, 126:19, 126:23, 127:4, 127:12, 127:23, 128:6, 128:13, 128:20, 128:25, 129:6, 129:8, 140:7, 140:9, 142:7, 142:9, 142:11, 142:13, 142:19, 143:2, 143:10, 143:16, 143:22, 144:4, 144:22, 144:24, 146:25, 147:2, 147:4, 147:7, 147:17, 148:14, 150:9, 150:11, 150:15, 153:10, 153:12, 154:24, 156:25, 157:2, 158:23, 158:25, 163:12, 163:24, 164:1, 166:23, 166:25, 167:6, 167:10, 167:15, 167:19, 167:23, 174:25, 175:7, 175:10, 176:10, 176:13, 177:2, 177:13, 177:20, 178:15, 178:20, 178:24, 179:8, 181:5, 181:10, 181:12, 181:15, 182:2, 182:7, 182:16, 183:4, 183:13, 184:1, 184:7, 184:9, 184:19, 184:22, 185:5, 185:11, 185:14, 185:18, 185:22, 186:8, 186:11, 186:15, 189:5, 189:11, 189:17, 189:19, 190:13, 194:4, 196:7, 196:9, 196:15, 196:19, 196:21, 197:8, 198:2, 198:6, 198:11, 198:16, 198:24, 204:2, 205:4, 205:9, 206:14, 206:17, 206:23, 206:25, 207:3, 207:8, 207:12, 208:3, 209:19, 210:5, 210:8, 210:11, 217:12, 219:23, 220:6, 220:14, 221:7, 221:15,

222:2, 222:22, 222:25, 223:9, 224:2, 224:4, 224:13, 224:17, 224:21, 225:1, 225:6, 225:19, 225:24, 226:5, 226:17, 226:21, 227:2, 227:6, 227:11, 227:20, 227:24, 228:5, 228:15, 228:22, 229:7, 229:16, 229:20, 230:10, 230:16, 230:20, 231:17, 231:20, 232:5, 232:14, 232:21, 233:4, 233:10, 233:17, 233:22, 235:1, 235:9
**Court** [18] - 1:21, 5:3, 6:14, 12:1, 13:18, 19:13, 22:1, 29:1, 34:13, 59:4, 59:25, 119:18, 143:23, 177:9, 179:2, 179:11, 226:8, 228:18
**court** [7] - 22:4, 82:16, 82:18, 82:20, 139:16, 209:2
**Court's** [8] - 45:23, 47:22, 50:20, 81:9, 177:16, 209:18, 220:23, 229:5
**court's** [1] - 72:5
**COURTROOM** [5] - 3:3, 64:22, 148:1, 201:21, 213:15
**courtroom** [12] - 18:18, 33:19, 57:2, 61:3, 98:3, 98:5, 117:3, 125:22, 129:7, 175:4, 186:13, 220:13
**coverall** [1] - 87:12
**coveralls** [1] - 86:16
**covered** [1] - 204:25
**coworkers** [1] - 42:9
**craft** [1] - 123:20
**crazy** [1] - 108:6
**create** [1] - 94:4
**created** [4] - 197:18, 207:6, 217:15, 227:13
**crime** [6] - 94:3, 130:22, 139:13, 232:25
**crimes** [3] - 130:6, 130:13, 198:9

**Criminal** [1] - 3:3
**criminal** [1] - 3:21
**crisis** [1] - 130:24
**critical** [1] - 232:16
**CROSS** [2] - 61:5, 105:13
**cross** [36] - 5:8, 5:18, 6:20, 8:1, 30:15, 30:18, 31:19, 60:16, 65:4, 84:5, 107:5, 117:22, 117:25, 118:5, 120:9, 121:16, 121:17, 123:16, 123:22, 124:3, 126:13, 127:11, 127:14, 127:15, 128:20, 175:22, 180:20, 181:13, 183:19, 184:9, 189:12, 230:2, 232:11, 233:5, 233:6, 233:15
**Cross** [2] - 2:4, 2:7
**cross-examination** [5] - 6:20, 31:19, 123:22, 232:11, 233:15
**CROSS-EXAMINATION** [2] - 61:5, 105:13
**Cross-Examination.. .............** [2] - 2:4, 2:7
**cross-examine** [9] - 30:18, 60:16, 118:5, 120:9, 183:19, 189:12, 230:2, 233:5, 233:6
**cross-examined** [1] - 117:22
**cross-examining** [1] - 128:20
**crossed** [8] - 29:19, 31:5, 33:8, 122:10, 122:11, 122:12, 123:15, 176:16
**crossing** [1] - 123:17
**crowd** [31] - 5:11, 5:12, 5:20, 8:16, 9:1, 11:8, 16:9, 18:4, 18:12, 35:25, 38:6, 38:8, 41:19, 45:6, 47:4, 48:25, 49:2, 71:2, 71:3, 72:9, 74:9, 75:11, 76:8, 76:19, 77:22, 78:3, 78:21, 79:23, 94:7, 173:19, 173:23
**CRR** [1] - 1:21
**cruiser** [1] - 35:12
**crushed** [1] - 224:9

**CS** [2] - 91:6, 93:16
**cue** [2] - 45:15, 45:16
**cumulative** [3] - 13:10, 22:7, 59:12
**curative** [1] - 220:17
**curb** [2] - 70:8, 70:19
**curbing** [1] - 70:8
**curfew** [15] - 26:1, 26:7, 26:14, 26:16, 60:11, 188:1, 190:23, 192:3, 193:8, 193:11, 193:14, 227:15, 227:16, 227:25, 228:6
**Curfew** [1] - 190:17
**curious** [1] - 119:12
**current** [4] - 34:25, 35:1, 86:9, 170:25
**custodian** [2] - 139:24, 188:14
**Custodian** [1] - 190:2
**cut** [16] - 4:17, 30:22, 30:23, 31:3, 31:5, 31:7, 31:9, 31:14, 31:15, 66:9, 155:5, 159:17, 161:16, 168:16, 195:2
**cuts** [2] - 155:11, 159:20
**cutting** [4] - 31:6, 65:19, 186:11, 195:1
**cyber** [1] - 130:22

## D

**D.C** [26] - 1:5, 1:15, 1:22, 57:17, 58:22, 59:19, 86:11, 89:8, 90:16, 131:10, 153:20, 178:4, 187:21, 187:23, 187:25, 188:14, 190:3, 190:20, 190:23, 193:20, 212:22, 217:25, 218:14, 225:2, 225:10, 228:21
**dab** [1] - 97:7
**DABNEY** [1] - 1:9
**damage** [1] - 27:12
**Dan** [1] - 34:3
**DAN** [2] - 2:4, 34:1
**dark** [4] - 107:11, 131:19, 191:8, 191:9
**data** [3] - 134:6, 141:15, 225:22
**DATE** [1] - 235:9
**date** [20] - 139:2, 141:17, 151:12,

151:14, 153:23, 157:6, 191:24, 211:12, 214:1, 215:2, 215:14, 215:24, 216:10, 216:18, 218:2, 218:15, 218:16, 218:20, 219:5
**Dave** [1] - 224:19
**days** [4] - 26:18, 27:20, 112:8, 218:6
**daytime** [1] - 107:10
**DC** [1] - 191:13
**dead** [2] - 19:20, 182:11
**deal** [5] - 33:21, 58:25, 121:21, 123:3, 229:1
**dealing** [2] - 99:14, 185:2
**dealt** [1] - 24:22
**debate** [2] - 60:1, 167:18
**debating** [3] - 166:8, 166:15, 167:20
**December** [6] - 216:12, 216:19, 218:6, 218:16, 218:21, 219:6
**decent** [1] - 76:6
**decided** [1] - 26:7
**decision** [2] - 227:3, 227:8
**declaration** [4] - 188:13, 188:19, 192:2, 193:22
**Declaration** [1] - 190:2
**declared** [1] - 193:10
**decrees** [2] - 25:5, 28:9
**defendant** [46] - 3:13, 83:9, 84:4, 132:14, 133:20, 137:5, 137:19, 137:25, 138:6, 152:13, 155:24, 162:15, 162:19, 162:22, 163:3, 163:8, 168:12, 169:18, 170:19, 171:18, 172:17, 172:18, 174:6, 174:12, 182:12, 186:19, 187:15, 191:6, 194:14, 195:15, 196:5, 197:3, 197:12, 197:25, 199:19, 200:9, 201:11, 202:11, 203:1, 203:18,

203:22, 204:19, 206:5, 213:3, 216:11, 217:14
**Defendant** [3] - 1:7, 1:16, 109:4
**defendant's** [16] - 3:19, 153:4, 162:13, 162:14, 163:4, 165:12, 169:9, 170:8, 170:11, 171:4, 172:23, 187:6, 187:19, 204:10, 205:24, 208:23
**defending** [1] - 212:12
**Defense** [11] - 2:14, 2:16, 2:16, 2:17, 64:19, 67:18, 107:16, 108:3, 108:21, 109:15, 109:18
**defense** [52] - 4:1, 4:21, 6:23, 9:8, 13:7, 13:21, 16:8, 16:17, 22:9, 22:19, 22:24, 23:1, 28:20, 28:23, 29:18, 32:2, 32:25, 59:5, 59:16, 59:22, 64:19, 66:25, 67:13, 107:1, 116:20, 118:24, 120:6, 123:22, 126:23, 126:25, 127:7, 175:20, 176:15, 177:9, 177:10, 177:20, 178:24, 179:13, 183:7, 186:3, 186:11, 220:16, 221:21, 223:7, 223:10, 224:7, 231:15, 231:17, 233:13
**defense's** [4] - 4:11, 8:13, 22:16, 232:16
**defensive** [2] - 130:20, 130:21
**defines** [1] - 199:1
**definition** [3] - 25:6, 220:21, 220:24
**Defund** [1] - 84:8
**delay** [3] - 33:1, 33:21, 82:5
**delays** [1] - 32:25
**demeanor** [1] - 47:16
**demonstrations** [1] - 111:7
**demonstratively** [1] - 124:17
**demonstrator** [2] - 68:10, 71:16

**demonstrators** [8] - 71:13, 73:12, 92:10, 106:7, 110:8, 110:23, 113:23, 227:22
**demonstrators'** [2] - 71:6, 71:7
**demonstrators/ protestors** [1] - 105:19
**denied** [1] - 27:6
**Department** [6] - 34:4, 34:17, 34:18, 61:17, 86:6, 192:25
**department** [2] - 51:22, 115:21
**department-issued** [1] - 51:22
**depict** [1] - 170:25
**depicted** [6] - 133:11, 134:10, 137:25, 155:10, 165:4, 173:2
**depiction** [3] - 146:20, 153:5, 154:18
**depicts** [2] - 151:19, 215:10
**deploy** [1] - 131:10
**deployed** [2] - 131:18, 192:22
**deploying** [1] - 89:9
**deployments** [1] - 88:3
**DEPUTY** [5] - 3:3, 64:22, 148:1, 201:21, 213:15
**describe** [30] - 40:25, 41:7, 41:18, 42:23, 44:15, 46:23, 47:14, 48:2, 48:22, 52:11, 55:6, 86:16, 86:19, 88:2, 89:17, 90:23, 91:6, 95:15, 98:24, 103:23, 105:8, 112:11, 137:10, 141:9, 152:14, 157:25, 173:18, 198:16, 213:11, 215:18
**described** [6] - 19:7, 52:8, 99:11, 195:5, 201:1, 211:6
**describing** [5] - 43:8, 95:1, 96:9, 201:3, 231:25
**description** [3] - 15:2, 148:22, 232:1
**deserve** [1] - 83:7
**designated** [1] - 134:15
**desktop** [1] - 212:2

**desperation** [1] - 37:13
**despite** [1] - 212:12
**destruction** [2] - 212:5, 212:8
**determine** [2] - 145:7, 202:12
**determined** [2] - 131:23, 197:14
**develop** [1] - 232:13
**developed** [2] - 231:2, 231:6
**device** [3] - 9:23, 9:24, 152:5
**Dew** [1] - 186:9
**diagnosed** [1] - 104:1
**diagonal** [2] - 42:1, 91:21
**diagonally** [2] - 44:5, 45:9
**diametrically** [1] - 83:8
**Diet** [1] - 186:9
**differ** [1] - 151:22
**difference** [1] - 14:1
**different** [41] - 5:3, 13:12, 14:6, 27:22, 31:4, 36:21, 37:12, 54:20, 55:6, 56:8, 80:1, 86:19, 101:18, 102:22, 105:21, 110:13, 111:1, 125:11, 137:2, 143:11, 151:18, 151:19, 152:10, 162:1, 162:3, 165:5, 171:2, 173:1, 180:24, 188:8, 194:15, 199:9, 199:11, 206:3, 209:10, 219:15, 219:16, 219:20, 219:21, 231:11
**differentiated** [1] - 132:25
**differently** [3] - 122:10, 122:12, 228:8
**difficult** [6] - 40:3, 40:4, 118:17, 118:20, 159:9, 200:13
**difficulty** [1] - 125:4
**diminished** [1] - 5:6
**DIRECT** [3] - 34:7, 85:25, 129:14
**direct** [9] - 18:18, 18:19, 56:2, 62:1, 82:23, 104:9, 140:25, 185:18,

233:15
**Direct** [3] - 2:4, 2:6, 2:9
**directed** [3] - 47:3, 206:1, 232:11
**direction** [5] - 42:16, 42:19, 49:3, 165:13, 168:3
**directions** [2] - 45:15, 47:18
**directly** [4] - 11:11, 21:18, 94:1, 95:22
**dirt** [2] - 70:11, 70:20
**disclose** [1] - 177:2
**disclosed** [3] - 119:19, 119:22, 122:3
**disclosure** [1] - 176:5
**discover** [1] - 146:6
**discovery** [7] - 65:9, 65:11, 179:16, 229:3, 229:4, 230:20, 232:17
**discretion** [1] - 212:7
**discuss** [4] - 127:2, 180:5, 203:18, 223:20
**discussed** [3] - 183:23, 214:11, 214:13
**discussing** [2] - 10:16, 168:5
**discussion** [1] - 125:2
**disobedience** [1] - 111:11
**disorder** [2] - 110:3, 227:18
**disorderers** [1] - 228:4
**disregard** [2] - 79:12, 220:24
**disrupting** [2] - 192:12, 192:21
**distinction** [1] - 183:2
**distinctly** [1] - 47:12
**distinguish** [1] - 158:5
**distress** [1] - 90:3
**district** [1] - 86:23
**District** [11] - 27:16, 28:7, 34:17, 35:4, 35:12, 59:8, 139:17, 190:19, 193:10, 193:11, 193:25
**DISTRICT** [3] - 1:1, 1:1, 1:10
**Disturbance** [5] - 35:23, 35:24, 74:12, 74:13, 86:13
**disturbing** [1] - 212:7
**divider** [1] - 201:13

**doable** [1] - 223:23
**document** [6] - 57:24, 59:5, 140:12, 185:17, 191:24, 192:7
**documents** [2] - 57:6, 188:24
**dollar** [2] - 17:16, 17:17
**don** [3] - 38:13, 39:22, 75:12
**Donald** [2] - 160:11, 216:23
**Donato** [1] - 178:4
**done** [7] - 7:20, 24:12, 28:21, 60:5, 88:13, 177:17, 233:19
**donned** [6] - 39:3, 39:13, 39:15, 39:16, 39:18, 39:23
**donning** [1] - 40:1
**dons** [1] - 174:20
**door** [4] - 3:23, 3:25, 4:5, 112:12
**doors** [4] - 25:8, 26:19, 26:20, 225:16
**down** [65] - 14:18, 15:25, 24:21, 25:8, 27:1, 27:2, 27:10, 27:16, 27:25, 39:4, 44:5, 47:1, 61:23, 66:10, 66:15, 67:24, 68:12, 68:23, 69:23, 70:25, 71:9, 71:15, 71:16, 87:11, 89:4, 89:6, 89:7, 89:13, 92:2, 98:14, 100:12, 101:2, 108:9, 113:9, 114:5, 114:8, 121:21, 123:2, 124:12, 124:14, 124:16, 130:18, 131:10, 136:17, 137:17, 148:20, 154:1, 157:22, 179:19, 186:12, 187:4, 191:23, 194:11, 225:12, 225:14, 225:15, 230:5, 230:6, 230:18, 230:25, 231:18, 231:21, 233:2
**download** [1] - 142:1
**downloaded** [3] - 154:17, 204:15, 205:16
**downtown** [1] - 59:20
**downward** [1] - 25:3
**dozens** [1] - 159:8

**draft** [1] - 227:5
**drafted** [1] - 178:13
**drama** [1] - 166:3
**draw** [6] - 42:15, 91:14, 91:16, 93:2, 95:24
**drawing** [2] - 70:5, 91:24
**drawn** [5] - 92:15, 94:10, 96:3, 96:12
**dream** [1] - 114:13
**dreams** [1] - 114:13
**dress** [1] - 88:8
**dressed** [2] - 86:24, 87:4
**drew** [2] - 31:2, 96:13
**driving** [2] - 130:21, 225:10
**due** [3] - 26:15, 226:24, 227:22
**dump** [1] - 134:6
**during** [12] - 32:25, 33:8, 81:14, 81:15, 83:20, 104:14, 106:9, 107:10, 117:25, 211:18, 219:3
**duties** [4] - 35:10, 72:11, 72:12, 130:11
**duty** [4] - 75:2, 75:12, 88:24, 177:17

# E

**e-mail** [4] - 129:4, 141:3, 145:21, 233:24
**e-mails** [2] - 107:1, 184:20
**early** [10] - 11:6, 33:12, 87:23, 87:24, 88:10, 88:25, 89:3, 89:4, 138:24, 214:17
**ears** [2] - 76:5, 76:7
**ease** [1] - 142:3
**easier** [1] - 140:14
**easiest** [1] - 86:16
**easily** [1] - 125:6
**east** [16] - 22:13, 23:12, 23:15, 24:1, 24:6, 32:5, 32:10, 32:12, 165:15, 165:16, 169:2, 169:3, 173:22, 225:3, 226:11
**Eastern** [3] - 211:14, 211:18, 211:20
**economy** [2] - 27:12, 58:20
**effect** [14] - 10:20,

22:15, 22:17, 26:2, 26:14, 58:7, 180:16, 193:21, 193:23, 226:23, 227:13, 227:16, 228:12
**effective** [1] - 60:15
**effectively** [5] - 123:16, 124:3, 180:19, 183:18, 228:19
**efficiency** [1] - 142:4
**egg** [1] - 23:18
**eight** [2] - 17:2, 97:23
**either** [24] - 4:16, 7:24, 12:25, 64:10, 65:16, 66:9, 67:24, 68:12, 69:22, 70:22, 71:9, 75:17, 111:20, 134:14, 141:13, 141:20, 152:11, 158:8, 182:3, 188:22, 211:16, 217:20, 221:20, 221:24
**elbow** [2] - 73:19, 75:5
**election** [2] - 160:11, 216:9
**electoral** [2] - 160:10, 217:1
**Electoral** [3] - 160:24, 167:18, 219:3
**electors** [5] - 216:22, 216:25, 217:1, 217:2
**element** [1] - 59:2
**elicit** [5] - 4:14, 12:17, 17:11, 179:24, 180:15
**emergencies** [1] - 88:20
**Emergency** [2] - 187:21, 187:22
**emergency** [6] - 37:17, 51:19, 88:21, 188:20, 192:2, 193:10
**emotions** [1] - 48:5
**empowers** [1] - 130:5
**encourage** [1] - 183:24
**encouraged** [3] - 26:10, 27:2, 75:8
**End** [9] - 66:23, 82:4, 107:13, 144:7, 147:24, 167:22, 189:18, 196:22, 207:11
**end** [21] - 23:11, 49:5, 99:6, 103:11, 104:11, 111:23, 122:16, 123:11,

125:21, 134:12, 155:12, 156:3, 173:15, 195:24, 199:1, 203:15, 207:5, 207:8, 207:16, 208:19, 222:23

**ended** [4] - 47:5, 92:22, 93:5, 106:3

**ending** [2] - 93:1, 193:15

**energy** [2] - 59:3, 112:3

**enforcement** [37] - 21:8, 21:9, 21:14, 21:17, 21:25, 40:22, 40:24, 41:15, 41:16, 47:15, 71:5, 71:8, 71:12, 84:10, 86:7, 92:11, 99:16, 100:14, 100:21, 104:17, 110:21, 113:24, 151:20, 151:24, 172:19, 174:18, 174:19, 176:4, 180:8, 183:14, 184:15, 187:13, 192:24, 194:17, 194:18, 197:15, 197:18

**enforcement's** [1] - 203:19

**engaged** [1] - 150:21

**ensures** [1] - 216:23

**Enter** [1] - 164:19

**entered** [10] - 33:19, 61:3, 91:19, 98:5, 106:7, 129:7, 139:19, 186:13, 192:12, 192:21

**entertain** [1] - 176:14

**entire** [10] - 28:7, 39:8, 43:18, 95:23, 113:19, 139:11, 142:16, 143:5, 163:5, 172:15

**entirely** [2] - 181:25, 231:20

**entitled** [1] - 235:5

**entrance** [1] - 95:20

**entry** [2] - 94:18, 158:8

**episodes** [2] - 181:24, 181:25

**equipment** [5] - 36:24, 38:12, 38:13, 39:3, 52:7

**error** [2] - 28:19, 28:23

**especially** [1] - 226:15

**ESQ** [2] - 1:16, 1:16

**essential** [1] - 190:25

**essentially** [11] - 3:22, 8:21, 35:25, 43:6, 87:7, 114:4, 132:1, 134:6, 141:14, 193:24, 206:7

**establish** [2] - 42:8, 227:14

**established** [4] - 31:8, 31:9, 31:10, 45:2

**estimate** [1] - 131:19

**et** [1] - 180:9

**evaluate** [1] - 132:10

**Evans** [12] - 4:20, 4:25, 5:2, 5:3, 5:7, 8:12, 8:14, 8:22, 12:9, 12:11, 12:15, 224:17

**evening** [2] - 107:3, 107:10

**event** [2] - 120:8, 120:14

**events** [12] - 15:15, 26:8, 103:24, 130:14, 131:4, 131:8, 131:23, 132:2, 170:25, 219:4, 227:25

**eventually** [2] - 100:11, 134:13

**everywhere** [3] - 90:25, 91:1

**evidence** [68] - 3:20, 13:19, 15:1, 19:17, 22:19, 22:21, 25:2, 25:4, 26:9, 30:21, 31:12, 40:6, 45:25, 46:14, 46:18, 49:25, 50:4, 50:15, 54:15, 56:16, 56:19, 60:8, 60:9, 67:18, 77:5, 77:6, 77:13, 91:11, 101:6, 101:10, 101:23, 102:2, 103:7, 108:3, 109:4, 109:18, 117:14, 127:24, 135:14, 139:19, 140:6, 140:10, 144:21, 144:25, 146:24, 147:3, 150:8, 150:13, 153:9, 153:13, 154:25, 157:3, 159:1, 163:23, 164:2, 170:5, 183:6, 183:7, 189:2, 189:21, 202:24, 205:10, 210:16, 212:25, 214:19, 223:16,

223:20, 227:11

**evolving** [1] - 83:17

**exact** [3] - 66:15, 138:7

**exactly** [6] - 15:4, 28:3, 28:14, 31:14, 48:6, 122:7

**EXAMINATION** [9] - 34:7, 61:5, 82:14, 84:18, 85:25, 105:13, 111:16, 114:21, 129:14

**examination** [5] - 6:20, 31:19, 123:22, 232:11, 233:15

**Examination............** [2] - 2:5, 2:7

**Examination............** [2] - 2:5, 2:8

**Examination............** . [3] - 2:4, 2:6, 2:9

**Examination............** .. [2] - 2:4, 2:7

**examine** [9] - 30:18, 60:16, 118:5, 120:9, 183:19, 189:12, 230:2, 233:5, 233:6

**examined** [2] - 14:20, 117:22

**examining** [1] - 128:20

**example** [9] - 6:5, 60:12, 74:22, 179:18, 180:15, 183:12, 211:11, 211:20, 213:6

**except** [1] - 4:5

**exception** [1] - 58:12

**excessive** [1] - 180:8

**excited** [2] - 90:9, 90:12

**exclude** [2] - 20:24, 23:5

**excluded** [3] - 17:23, 21:25, 181:22

**excluding** [2] - 22:10, 28:15

**excuse** [3] - 119:21, 140:20, 218:5

**excused** [7] - 84:15, 85:12, 116:15, 118:15, 118:18, 176:1, 220:15

**exempt** [1] - 191:1

**exercise** [1] - 193:8

**exhausted** [3] - 112:2, 112:4, 115:23

**exhausting** [1] - 186:7

**exhaustion** [1] - 112:18

**Exhibit** [76] - 13:4, 40:5, 45:25, 46:18, 49:9, 49:25, 50:4, 50:14, 50:23, 53:17, 54:15, 55:2, 56:16, 56:19, 61:13, 67:18, 77:13, 81:12, 91:10, 96:16, 100:2, 101:5, 101:10, 101:23, 102:2, 103:4, 107:16, 108:3, 108:21, 109:4, 109:18, 135:13, 139:18, 140:6, 140:10, 142:5, 144:9, 144:25, 146:12, 146:24, 147:3, 152:8, 152:24, 153:9, 153:13, 154:6, 154:22, 154:25, 156:11, 156:23, 157:3, 158:13, 158:22, 159:1, 163:14, 163:22, 164:2, 170:4, 171:4, 186:18, 189:24, 191:10, 191:21, 194:7, 201:19, 202:20, 204:4, 204:6, 205:3, 205:10, 209:8, 209:12, 215:17, 216:1, 216:13, 218:12

**exhibit** [32] - 13:21, 16:2, 46:6, 49:15, 50:24, 55:21, 61:12, 67:13, 92:21, 94:25, 95:13, 100:8, 100:13, 102:23, 106:24, 142:5, 143:25, 145:10, 148:3, 152:25, 157:23, 163:15, 172:5, 190:12, 191:2, 191:16, 202:13, 203:14, 209:10, 209:13, 211:2, 218:23

**exhibit's** [1] - 108:2

**exhibits** [29] - 9:13, 9:15, 9:18, 13:21, 16:15, 27:21, 107:2, 125:5, 143:3, 143:20, 143:22, 143:23, 144:5, 147:19, 149:21, 181:1, 181:9, 183:6, 185:7, 186:12, 188:5, 188:7, 188:9,

188:21, 209:21, 210:4, 210:21, 216:2

**Exhibits** [8] - 103:7, 149:20, 150:8, 150:12, 188:3, 189:2, 189:20, 210:13

**EXHIBITS** [1] - 2:11

**existed** [1] - 95:2

**exists** [2] - 32:18, 32:19

**exited** [5] - 57:2, 98:3, 117:3, 175:4, 220:13

**exiting** [1] - 173:21

**expand** [1] - 44:20

**expandable** [1] - 87:2

**expanding** [1] - 128:22

**expect** [1] - 184:3

**expectation** [3] - 74:14, 74:15, 75:12

**expected** [1] - 118:19

**expecting** [2] - 74:20, 221:1

**experience** [15] - 21:24, 48:11, 72:9, 75:17, 80:19, 80:24, 86:12, 111:7, 114:10, 114:24, 123:2, 180:8, 183:14, 183:25, 225:9

**experienced** [3] - 12:20, 48:14, 60:12

**expert** [25] - 4:15, 13:7, 14:15, 15:2, 15:3, 17:23, 18:1, 19:21, 19:24, 21:13, 21:15, 21:19, 21:20, 21:25, 22:1, 22:9, 125:25, 135:15, 179:11, 180:7, 182:14, 182:20, 183:13, 183:14, 183:24

**expert-type** [1] - 22:9

**expertise** [2] - 14:17, 21:14

**explain** [6] - 18:23, 35:21, 39:14, 123:9, 134:25, 211:5

**explained** [3] - 22:15, 115:22, 163:3

**expressed** [2] - 158:7, 182:8

**extensive** [4] - 28:2, 28:13, 167:8, 197:11

**extent** [10] - 4:5, 32:2, 32:17, 32:19, 79:1, 128:11, 176:22,

223:2, 223:25, 224:13
**extra** [1] - 73:4
**extrapolate** [1] - 231:7
**extremely** [1] - 41:9
**extrinsic** [1] - 117:14
**eye** [1] - 42:24
**eyes** [2] - 93:18, 230:24
**eyewitness** [1] - 224:18

## F

**F.3d** [2] - 178:4, 178:5
**face** [4] - 87:6, 152:12, 215:8
**Facebook** [48] - 106:10, 106:12, 108:24, 109:13, 111:18, 112:17, 115:22, 115:24, 138:5, 138:6, 138:9, 138:10, 138:14, 139:5, 139:6, 139:12, 140:1, 140:3, 140:18, 141:9, 141:10, 142:16, 143:3, 143:5, 143:6, 143:23, 144:16, 144:18, 145:2, 145:8, 145:23, 145:25, 147:14, 147:20, 156:7, 163:1, 171:10, 171:11, 208:25, 209:1, 209:23, 209:24, 210:1, 211:4, 211:7, 213:13, 217:7
**faced** [2] - 111:12, 133:6
**facing** [8] - 44:5, 95:19, 113:9, 133:17, 138:9, 152:21, 194:12, 199:19
**fact** [22] - 6:21, 6:25, 8:25, 12:13, 12:16, 25:3, 26:14, 28:4, 29:12, 30:22, 58:17, 58:21, 117:23, 121:16, 122:6, 124:20, 128:9, 206:20, 221:21, 222:13, 231:7
**factor** [1] - 228:3
**fair** [24] - 3:19, 5:18, 6:22, 6:24, 8:1, 9:8,

37:17, 58:2, 88:19, 107:5, 107:7, 121:13, 121:16, 121:17, 122:20, 123:12, 124:1, 146:20, 153:5, 154:18, 163:19, 177:22, 204:14, 209:25
**fairly** [10] - 15:9, 46:10, 49:20, 54:7, 56:12, 63:20, 101:1, 134:4, 215:9, 215:11
**fall** [4] - 64:10, 83:19, 184:18, 231:24
**falling** [8] - 14:18, 70:25, 71:9, 71:16, 121:21, 123:2, 230:5, 231:9
**falls** [1] - 148:21
**false** [4] - 23:16, 24:13, 124:17, 124:18
**falsely** [4] - 30:21, 30:25, 31:1, 31:11
**falsify** [1] - 30:25
**familiar** [4] - 67:11, 107:20, 210:22, 211:16
**famous** [1] - 215:9
**far** [10] - 12:19, 18:12, 28:15, 42:20, 42:24, 50:12, 66:12, 106:6, 113:19, 226:21
**fashion** [1] - 229:9
**fashioned** [2] - 215:11, 217:15
**fault** [1] - 177:18
**FBI** [18] - 29:9, 30:7, 119:20, 121:20, 121:25, 122:2, 123:1, 128:17, 129:25, 130:2, 130:3, 130:14, 131:11, 131:25, 133:15, 155:5, 197:20, 204:14
**FBI's** [1] - 208:7
**fear** [1] - 105:10
**featured** [3] - 52:22, 151:24, 197:2
**February** [1] - 231:4
**federal** [14] - 59:1, 82:18, 82:20, 130:5, 130:13, 132:24, 133:1, 133:3, 133:10, 137:6, 139:13, 197:15, 220:19
**feelings** [2] - 76:22,

90:5
**feet** [1] - 81:17
**fell** [1] - 65:16
**felling** [1] - 105:9
**fellow** [1] - 45:3
**felony** [1] - 6:22
**felt** [7] - 37:12, 44:19, 48:2, 104:14, 112:5, 112:6
**fencing** [5] - 23:10, 23:21, 164:10, 164:11, 187:8
**few** [4] - 33:22, 38:9, 143:14, 218:6
**Field** [3] - 129:25, 131:11, 131:23
**fight** [5] - 44:25, 80:20, 81:2, 104:19, 104:21
**fighting** [1] - 161:13
**fights** [1] - 80:24
**figure** [4] - 72:5, 92:4, 133:24, 231:17
**file** [10] - 65:4, 65:6, 133:10, 135:15, 141:24, 141:25, 142:1, 158:18, 163:19, 176:21
**filed** [2] - 144:5, 177:7
**files** [10] - 132:19, 132:20, 133:5, 133:8, 133:18, 134:6, 141:22, 141:25, 142:1, 158:3
**filings** [1] - 3:18
**filming** [5] - 81:4, 84:4, 84:6, 84:9, 189:7
**final** [3] - 87:14, 202:25, 226:8
**finalize** [1] - 126:8
**finally** [7] - 112:18, 112:19, 113:11, 113:20, 113:22, 203:14, 227:8
**fine** [14] - 57:11, 57:14, 59:7, 59:9, 103:16, 119:16, 140:24, 157:24, 173:5, 194:9, 203:5, 214:3, 218:24, 221:11
**finer** [1] - 119:18
**finger** [2] - 37:13, 215:10
**finish** [4] - 61:1, 181:13, 185:22, 219:25
**fire** [1] - 87:12
**firearms** [1] - 130:21

**fired** [1] - 193:2
**firm** [1] - 125:25
**First** [1] - 88:4
**first** [37] - 46:2, 51:20, 53:1, 53:19, 63:3, 74:11, 77:9, 81:25, 82:20, 86:23, 96:17, 101:12, 104:2, 113:18, 117:5, 122:5, 123:8, 127:13, 127:18, 128:17, 140:18, 141:2, 141:12, 142:20, 154:15, 158:8, 171:20, 174:5, 188:9, 192:14, 209:15, 215:23, 216:14, 218:24, 224:16, 226:7, 233:13
**firsthand** [2] - 22:7, 22:14
**fit** [1] - 85:24
**five** [10] - 56:3, 65:3, 86:14, 113:12, 114:4, 124:11, 124:17, 165:21, 211:17, 223:1
**five-mile** [1] - 114:4
**flag** [2] - 162:4, 173:8
**flags** [2] - 41:5, 41:6
**flannel** [5] - 69:16, 69:18, 69:19, 69:21
**flat** [1] - 19:15
**flat-out** [1] - 19:15
**flip** [1] - 218:22
**flipped** [1] - 152:21
**Floor** [1] - 1:18
**flown** [1] - 17:14
**flying** [2] - 17:24, 227:7
**focus** [2] - 29:6, 41:10
**focused** [7] - 71:14, 84:25, 127:19, 130:14, 130:19, 187:7, 222:7
**focuses** [1] - 130:20
**focusing** [2] - 214:21, 215:23
**folks** [5] - 84:6, 132:1, 132:25, 149:6, 160:22
**follow** [4] - 25:25, 45:17, 111:5, 199:2
**followed** [4] - 4:21, 8:14, 8:20, 48:10
**following** [4] - 126:2, 131:20, 142:19, 145:25
**follows** [1] - 143:1

**footage** [30] - 52:24, 54:3, 55:8, 55:9, 55:10, 56:11, 63:10, 67:7, 79:17, 116:7, 116:8, 117:16, 134:1, 134:4, 134:9, 134:20, 134:24, 135:1, 135:3, 135:4, 135:25, 162:18, 170:25, 171:3, 171:23, 197:25, 199:23, 204:22, 212:7, 213:21
**FOR** [4] - 1:1, 34:1, 85:20, 129:13
**force** [4] - 21:22, 21:23, 180:9, 183:12
**forced** [1] - 49:2
**forcible** [1] - 198:21
**foregoing** [1] - 235:3
**foreground** [6] - 150:21, 153:17, 164:8, 187:9, 195:22, 201:3
**form** [7] - 42:11, 145:18, 152:9, 159:22, 161:20, 188:14, 205:16
**format** [6] - 141:9, 155:19, 168:14, 169:19, 199:17
**formation** [4] - 38:13, 38:22, 39:1, 39:2
**formed** [6] - 43:14, 94:2, 95:20, 99:19, 221:17, 221:19
**forming** [2] - 42:11, 94:5
**forth** [1] - 22:19
**forward** [16] - 7:19, 42:7, 44:24, 51:15, 94:22, 100:3, 100:15, 110:22, 122:13, 134:8, 164:14, 164:20, 165:17, 195:3, 206:9
**fought** [1] - 206:18
**foundation** [6] - 189:3, 197:8, 208:2, 210:10, 222:3, 222:4
**foundational** [1] - 225:22
**four** [7] - 86:14, 87:3, 89:3, 149:21, 173:23, 188:9, 216:1
**fourth** [1] - 193:18
**fracas** [1] - 81:15
**frame** [32] - 47:8, 50:10, 51:15, 51:16, 51:25, 54:8, 63:21,

83:20, 96:22, 97:19, 103:11, 103:14, 135:17, 135:23, 136:10, 136:11, 136:19, 154:15, 161:1, 168:18, 172:9, 172:10, 187:7, 187:9, 201:4
**frames** [4] - 51:14, 136:10, 137:8
**frankly** [3] - 20:12, 125:1, 143:19
**fraud** [3] - 160:10, 216:9, 217:3
**fraudulent** [3] - 216:22, 217:1, 217:2
**free** [2] - 52:13, 140:13
**freedom** [1] - 80:11
**freeze** [12] - 47:8, 96:21, 97:19, 103:11, 135:23, 136:10, 168:18, 172:9, 187:7, 201:4
**FRIEDRICH** [1] - 1:9
**friends** [2] - 58:1, 138:13
**frog** [1] - 215:7
**front** [10] - 42:23, 44:6, 48:3, 94:1, 100:19, 104:16, 118:10, 134:15, 150:22, 226:11
**frozen** [7] - 151:3, 154:14, 161:4, 172:11, 186:21, 187:2, 200:5
**frustrated** [1] - 48:9
**frustrations** [1] - 48:8
**fuck** [2] - 48:10, 83:6
**full** [15] - 36:4, 43:6, 54:16, 55:17, 56:20, 88:3, 152:3, 152:20, 155:8, 155:10, 191:2, 204:12, 209:13, 217:4
**full-time** [1] - 36:4
**fully** [4] - 33:3, 99:17, 131:19, 203:13
**fulsome** [3] - 123:9, 135:4, 175:15
**fun** [1] - 108:12
**function** [3] - 59:1, 152:7, 152:12

## G

**Gab** [3] - 148:24, 148:25, 149:5
**gaining** [1] - 94:18
**game** [1] - 20:23

**gas** [16] - 39:23, 40:1, 72:21, 76:5, 87:2, 87:6, 87:11, 88:12, 92:4, 92:13, 93:5, 93:7, 93:14, 93:16, 93:19, 212:15
**gassed** [2] - 88:11, 88:12
**gather** [2] - 38:13, 39:9
**gathered** [2] - 38:4, 41:2
**gear** [27] - 36:20, 36:21, 36:22, 39:13, 39:18, 39:22, 72:13, 72:20, 72:22, 73:1, 73:8, 73:10, 73:13, 74:13, 74:25, 75:12, 75:25, 76:3, 76:4, 86:15, 86:20, 87:7, 87:14, 88:5, 88:9, 89:1, 90:21
**general** [9] - 44:3, 49:21, 73:11, 91:17, 138:25, 145:16, 168:22, 204:17, 216:5
**generally** [11] - 39:6, 39:25, 40:25, 47:16, 84:4, 110:15, 119:20, 131:20, 188:7, 213:20, 213:21
**generated** [3] - 30:7, 184:17
**gentleman** [1] - 99:1
**gentlemen** [10] - 33:20, 79:12, 105:1, 116:24, 129:9, 174:25, 198:11, 198:25, 219:25, 220:6
**geographically** [3] - 130:25, 165:13, 168:23
**George's** [8] - 14:9, 61:20, 62:16, 69:23, 73:7, 134:23, 135:2, 135:10
**gesturing** [2] - 45:6, 200:11
**giant** [1] - 53:13
**girl** [1] - 104:19
**given** [15] - 5:7, 8:4, 11:14, 18:21, 94:21, 107:4, 115:10, 115:17, 115:21, 123:11, 132:10, 143:23, 151:9, 153:19, 222:15

**glad** [1] - 175:7
**glasses** [1] - 152:18
**glimmer** [1] - 51:23
**global** [1] - 65:11
**glove** [1] - 87:1
**gloves** [2] - 86:25, 87:11
**goal** [1] - 223:19
**Google** [4] - 156:15, 156:20, 158:5, 158:6
**Google's** [1] - 158:4
**GOVERNMENT** [3] - 34:1, 85:20, 129:13
**Government** [39] - 2:12, 2:12, 2:13, 2:13, 2:14, 2:15, 2:15, 2:17, 2:18, 2:18, 2:19, 2:20, 2:20, 2:21, 2:21, 2:22, 2:22, 2:23, 46:18, 50:4, 54:15, 56:19, 77:13, 101:10, 102:2, 103:7, 140:10, 144:25, 147:3, 150:12, 153:13, 154:25, 157:3, 159:1, 164:2, 188:3, 189:20, 205:10, 210:13
**government** [59] - 2:19, 4:14, 5:17, 5:19, 5:24, 6:13, 6:18, 9:5, 20:4, 20:13, 20:22, 23:7, 25:1, 25:9, 26:25, 31:22, 32:3, 33:1, 33:23, 57:9, 57:17, 58:25, 59:2, 59:6, 59:24, 60:3, 60:10, 60:20, 65:7, 85:18, 118:22, 118:25, 120:5, 122:15, 123:15, 124:23, 125:24, 126:9, 129:11, 176:21, 179:15, 179:24, 180:18, 181:1, 181:3, 182:7, 185:13, 185:25, 221:4, 222:10, 222:13, 223:24, 225:15, 226:10, 227:5, 228:3, 231:13, 233:12
**Government's** [1] - 61:13
**government's** [18] - 9:7, 14:23, 24:16, 25:14, 77:4, 123:17,

125:21, 126:17, 129:9, 143:22, 175:24, 177:16, 179:2, 181:8, 183:5, 183:16, 226:24, 230:24
**governs** [1] - 220:24
**grabbed** [1] - 44:24
**graduation** [1] - 114:8
**grainy** [2] - 70:1, 70:2
**grandstands** [6] - 93:4, 93:23, 187:12, 187:14, 194:12, 195:5
**grant** [2] - 29:25, 30:4
**granted** [1] - 4:5
**graphic** [1] - 212:6
**gray** [1] - 173:3
**great** [7] - 12:12, 14:21, 18:2, 33:15, 40:11, 125:4, 186:9
**greatly** [1] - 19:13
**green** [2] - 145:9, 174:20
**ground** [12] - 44:25, 47:5, 64:11, 64:13, 68:1, 68:24, 71:10, 199:21, 212:12
**grounds** [22] - 8:15, 17:7, 23:9, 41:18, 43:23, 44:3, 78:11, 90:19, 91:8, 91:17, 91:22, 93:21, 93:24, 99:18, 174:7, 174:8, 174:10, 189:16, 194:15, 200:25, 203:10, 222:5
**group** [7] - 49:6, 99:14, 131:13, 206:14, 208:9, 221:16, 221:19
**groups** [1] - 110:13
**grueling** [1] - 114:6
**guard** [1] - 183:16
**Guard** [1] - 113:11
**guards** [3] - 87:8, 87:9, 87:10
**guess** [17] - 6:13, 7:2, 14:25, 20:25, 48:13, 58:23, 60:1, 70:6, 79:16, 82:17, 86:20, 95:21, 122:18, 123:14, 186:10, 202:16, 225:2
**guessing** [2] - 70:3, 122:14
**guilt** [1] - 59:14
**guy** [5] - 73:7, 128:10, 128:11, 184:14

## H

**hair** [1] - 62:3
**half** [12] - 8:18, 86:14, 107:1, 140:23, 164:18, 174:16, 174:24, 190:5, 191:14, 191:22, 211:1, 218:25
**halfway** [1] - 212:10
**hallway** [2] - 116:11, 117:10
**halt** [1] - 83:13
**hammering** [1] - 233:14
**hand** [17] - 49:12, 68:8, 68:16, 70:2, 80:25, 82:17, 83:5, 83:6, 91:21, 136:17, 137:7, 172:14, 172:23, 183:11, 195:23, 203:24, 223:6
**handcuff** [1] - 51:23
**handful** [1] - 82:17
**handling** [1] - 131:24
**hands** [6] - 60:14, 64:13, 68:12, 80:15, 131:9
**hanging** [1] - 60:10
**hangs** [1] - 60:3
**happy** [2] - 33:4, 33:8
**hard** [13] - 25:25, 40:1, 41:11, 44:19, 76:1, 76:4, 76:16, 79:16, 86:16, 87:5, 125:19, 173:14
**hardened** [1] - 87:8
**harkening** [1] - 206:7
**harm** [2] - 58:20, 60:4
**hash** [4] - 158:3, 158:7, 158:9, 158:10
**hashtags** [6] - 138:19, 138:23, 138:24, 139:1, 212:19, 212:20
**hat** [7] - 60:3, 60:10, 152:16, 206:11, 207:23, 221:3, 221:22
**hate** [1] - 16:19
**haystack** [1] - 134:1
**hazard** [1] - 70:22
**HBO** [1] - 104:2
**head** [7] - 8:23, 73:5, 78:4, 86:15, 87:7, 171:7, 223:8
**head-to-toe** [1] - 87:7
**headed** [1] - 38:5
**heading** [1] - 165:15

**headline** [2] - 190:16, 190:17
**heads** [1] - 79:5
**headset** [1] - 147:5
**health** [1] - 190:25
**hear** [39] - 8:25, 9:10, 9:16, 9:17, 9:18, 27:13, 29:18, 37:5, 41:11, 76:1, 76:4, 76:7, 76:11, 76:16, 76:17, 77:25, 78:2, 89:20, 90:1, 90:8, 98:15, 98:18, 99:3, 103:18, 104:18, 111:9, 121:5, 129:22, 155:12, 159:9, 162:15, 166:9, 168:12, 168:13, 169:8, 169:11, 173:14, 195:15, 200:13
**heard** [30] - 17:6, 17:12, 28:15, 37:8, 37:10, 37:14, 40:1, 40:2, 40:3, 48:25, 76:18, 79:23, 80:1, 88:1, 89:15, 90:6, 98:14, 110:10, 117:11, 167:13, 187:3, 187:18, 194:11, 196:4, 202:1, 202:4, 203:18, 217:10, 220:25
**hearing** [9] - 5:21, 27:5, 37:17, 37:24, 38:2, 38:19, 58:6, 80:10, 110:8
**hearsay** [6] - 4:15, 37:21, 58:12, 104:23, 210:9, 229:21
**held** [1] - 79:20
**helmet** [12] - 36:23, 39:23, 55:11, 72:21, 75:7, 76:6, 76:7, 87:2, 87:4, 87:5, 87:11, 135:8
**helmets** [2] - 73:15, 134:15
**help** [6] - 19:13, 37:10, 37:17, 71:17, 120:16, 180:25
**helped** [2] - 42:14, 45:1
**helpful** [4] - 101:20, 102:25, 167:3, 215:4
**helping** [1] - 71:14
**hereby** [1] - 193:14
**heroes** [1] - 212:17

**herself** [1] - 228:5
**hidden** [1] - 20:14
**hiding** [1] - 142:22
**highlight** [1] - 11:21
**Hill** [41] - 9:25, 13:6, 13:14, 13:24, 14:2, 14:11, 14:16, 14:20, 15:5, 15:11, 16:7, 16:19, 17:5, 17:11, 17:14, 18:12, 19:4, 19:10, 20:7, 21:5, 21:8, 21:13, 22:6, 81:22, 125:3, 125:12, 125:16, 125:22, 126:5, 179:10, 179:14, 180:5, 181:17, 184:2, 184:7, 185:3, 224:1, 224:13, 224:17
**Hill's** [3] - 13:9, 14:18, 181:23
**Hills** [1] - 1:18
**himself** [15] - 3:24, 5:19, 7:18, 11:4, 47:5, 97:7, 97:23, 169:21, 217:15, 217:18, 217:19, 217:20, 221:14
**history** [4] - 3:21, 112:21, 142:16, 143:7
**hit** [1] - 92:11
**hockey** [1] - 87:7
**hold** [13] - 47:4, 75:22, 81:16, 83:10, 110:9, 110:16, 110:17, 110:22, 110:23, 110:25, 111:9, 215:13, 227:2
**holding** [6] - 75:21, 80:17, 80:25, 81:1, 104:19, 189:7
**home** [1] - 112:1
**Homeland** [1] - 187:22
**hone** [1] - 41:10
**honed** [1] - 25:19
**honest** [3] - 28:25, 69:25, 71:14
**honestly** [2] - 118:18, 226:5
**honor** [1] - 161:7
**Honor** [101] - 3:3, 3:7, 3:12, 3:24, 6:1, 6:16, 7:13, 7:23, 10:10, 12:24, 21:19, 23:6, 24:5, 25:18, 27:21, 28:17, 31:21, 31:24, 33:3, 33:25, 34:6, 46:13, 49:24, 54:10,

56:15, 57:10, 60:22, 64:22, 64:25, 66:14, 67:12, 67:16, 82:10, 82:12, 85:13, 85:15, 85:16, 92:18, 98:1, 98:6, 101:22, 103:3, 104:4, 104:23, 106:15, 106:18, 106:20, 107:12, 111:15, 112:11, 116:16, 118:9, 118:23, 119:17, 120:23, 123:18, 123:19, 123:23, 125:2, 127:8, 129:4, 129:11, 140:5, 142:3, 142:18, 143:14, 146:23, 150:7, 150:16, 154:21, 156:24, 158:22, 166:20, 174:22, 175:5, 176:12, 177:1, 177:12, 178:14, 178:19, 182:10, 183:1, 185:1, 186:14, 189:1, 194:2, 196:13, 196:20, 207:10, 210:3, 210:17, 222:21, 222:24, 224:12, 225:18, 226:2, 226:3, 226:15, 229:12, 229:13, 233:20
**Honor's** [1] - 6:2
**HONORABLE** [1] - 1:9
**honoring** [1] - 206:1
**hope** [2] - 32:7, 60:18
**hopefully** [3] - 59:16, 82:11, 209:9
**hoping** [2] - 44:1, 219:25
**Hopkins** [1] - 147:25
**horizontal** [1] - 96:13
**horse** [3] - 19:20, 182:11, 215:11
**hostile** [1] - 21:9
**hot** [1] - 179:8
**hour** [11] - 8:19, 26:6, 65:22, 90:20, 107:1, 171:13, 171:14, 174:23, 187:24, 188:17, 220:5
**hour-long** [1] - 171:14
**hours** [16] - 21:18, 87:24, 112:7, 112:8, 112:18, 113:3, 113:13, 134:1, 134:7, 134:12,

160:20, 162:18, 199:23, 205:23, 211:17
**House** [2] - 159:13, 160:23
**house** [4] - 112:10, 195:16, 195:17, 195:18
**HSEMA** [6] - 187:22, 188:14, 188:22, 190:3, 190:20, 191:13
**huge** [4] - 9:23, 24:14, 123:3, 128:18
**human** [1] - 112:24
**hundreds** [6] - 21:17, 179:14, 179:17, 180:1, 180:14, 180:16
**hung** [1] - 215:9
**hurt** [2] - 39:5, 76:21
**hypothetically** [1] - 179:22

**I**

**ID** [1] - 211:5
**idea** [4] - 20:21, 24:13, 83:24, 206:8
**ideal** [1] - 61:1
**identical** [1] - 121:11
**identification** [1] - 134:18
**identified** [9] - 55:14, 56:11, 127:11, 132:22, 136:25, 137:5, 149:1, 157:18, 197:17
**identifier** [3] - 158:12, 202:8, 202:18
**identifiers** [4] - 134:18, 157:18, 211:8, 213:13
**identifies** [1] - 198:9
**identify** [13] - 49:11, 77:9, 132:4, 133:19, 134:9, 134:13, 134:21, 135:1, 135:7, 135:9, 137:6, 137:24, 209:11
**identifying** [1] - 206:15
**ideology** [1] - 221:14
**IDs** [1] - 213:11
**ignore** [1] - 216:22
**illicit** [1] - 3:21
**image** [24] - 42:15, 141:20, 148:17, 206:16, 208:16, 210:21, 214:21,

214:24, 215:8, 215:12, 215:18, 215:19, 215:21, 215:24, 216:14, 217:4, 217:15, 217:23, 218:1, 218:13, 218:18, 219:8, 219:10
**imagery** [1] - 221:6
**images** [4] - 208:22, 208:23, 217:7, 218:10
**imagine** [1] - 131:25
**immediate** [1] - 133:6
**immediately** [3] - 15:17, 91:8, 133:22
**immovable** [1] - 24:14
**impact** [3] - 194:3, 227:3, 227:16
**impacted** [7] - 26:24, 26:25, 103:24, 104:8, 105:3, 176:4
**impeach** [14] - 5:20, 6:6, 6:24, 23:15, 24:11, 29:15, 123:14, 124:2, 127:25, 128:1, 177:21, 226:12, 228:23
**impeached** [2] - 5:15, 29:11
**impeaching** [3] - 24:3, 121:9, 121:10
**impeachment** [4] - 5:18, 7:5, 29:13
**impermissible** [1] - 184:4
**implemented** [1] - 21:22
**implied** [1] - 5:17
**imply** [1] - 25:22
**important** [1] - 18:10
**impose** [1] - 193:8
**imposed** [3] - 26:1, 26:7, 228:6
**impression** [5] - 10:25, 221:9, 221:19, 222:14, 222:17
**improper** [4] - 4:14, 5:23, 182:14, 231:14
**inaccurate** [2] - 118:3, 120:22
**inappropriate** [2] - 17:5, 127:14
**inauguration** [3] - 11:2, 95:8, 186:20
**inch** [2] - 19:12
**incident** [3] - 102:14, 102:17, 181:18

**inclined** [3] - 4:12, 20:24, 22:5
**include** [3] - 119:23, 170:17, 228:10
**included** [6] - 132:8, 134:11, 154:3, 174:10, 207:5, 207:20
**includes** [2] - 4:13, 73:19
**including** [6] - 62:16, 156:6, 172:15, 190:25, 191:22, 192:24
**inconceivable** [1] - 5:10
**inconsistent** [1] - 7:18
**incorrectly** [1] - 123:6
**increased** [1] - 115:8
**Independence** [1] - 91:4
**indicate** [2] - 58:5, 212:1
**indicated** [8] - 78:5, 78:15, 78:19, 78:20, 123:24, 143:6, 145:13, 226:16
**indicates** [1] - 78:21
**indicating** [1] - 195:3
**indicating)** [1] - 97:20
**individual** [20] - 47:7, 47:15, 63:23, 64:5, 64:6, 69:2, 71:19, 71:21, 132:21, 133:7, 133:11, 137:12, 137:24, 141:22, 146:3, 172:14, 215:11, 223:11, 224:22
**individuals** [14] - 5:13, 48:4, 69:11, 83:13, 99:14, 103:21, 132:4, 133:16, 153:17, 168:3, 168:20, 173:23, 187:10, 206:18
**indulgence** [6] - 45:23, 47:22, 50:20, 72:5, 81:9, 209:18
**inform** [1] - 136:24
**information** [16] - 25:10, 123:21, 127:13, 211:4, 224:23, 231:5, 231:8, 231:12, 231:13, 231:14, 231:15, 232:2, 232:3, 232:13, 232:24
**informed** [1] - 106:25

**informing** [1] - 120:5
**initial** [10] - 121:20, 121:23, 122:25, 133:5, 133:18, 137:3, 145:25, 231:4, 232:1
**initiate** [1] - 187:3
**initiated** [1] - 187:5
**injured** [2] - 193:1, 212:13
**innocence** [1] - 59:14
**innocent/vulnerable** [1] - 212:13
**inquire** [1] - 143:20
**insane** [1] - 113:1
**inside** [2] - 95:21, 99:19
**insofar** [5] - 120:23, 123:20, 184:16, 229:13, 231:8
**instance** [2] - 119:22, 130:14
**instantly** [1] - 16:2
**instead** [3] - 61:23, 125:15, 173:22
**instruct** [1] - 223:21
**instructing** [1] - 17:6
**instruction** [2] - 220:17, 220:23
**instructions** [4] - 199:1, 220:22, 223:18, 223:21
**intend** [1] - 181:4
**intending** [3] - 12:5, 12:6, 224:1
**intends** [1] - 118:22
**intent** [4] - 75:15, 192:12, 192:21, 209:7
**intentions** [1] - 212:17
**interaction** [5] - 137:4, 196:17, 203:22, 203:24, 206:3
**interactions** [2] - 44:12, 84:9
**interest** [1] - 4:24
**interests** [1] - 5:5
**interference** [1] - 59:1
**interior** [1] - 70:10
**internally** [1] - 127:3
**Internet** [1] - 146:3
**internet** [1] - 207:7
**interpret** [3] - 14:2, 15:20, 198:12
**interpretation** [2] - 21:21, 83:9
**interpreting** [1] - 15:22
**interrupt** [1] - 178:25
**intervening** [1] - 228:3

**interview** [7] - 123:8, 175:15, 178:9, 231:3, 231:4, 232:2
**interviewed** [1] - 119:24
**interviewing** [1] - 130:20
**intrigued** [1] - 105:17
**intro** [1] - 172:16
**introduce** [11] - 9:14, 9:17, 10:11, 18:16, 21:1, 32:12, 107:5, 107:7, 143:24, 147:21, 186:1
**inundated** [1] - 132:3
**investigate** [2] - 130:5, 130:13
**investigating** [2] - 160:17, 198:8
**investigation** [16] - 131:22, 135:22, 145:4, 146:21, 147:16, 149:4, 150:4, 162:10, 168:22, 170:11, 197:11, 197:19, 202:11, 208:5, 208:7, 208:8
**investigative** [4] - 130:19, 132:11, 133:4, 139:10
**inviting** [1] - 58:8
**involved** [5] - 18:14, 64:14, 65:17, 112:20, 188:12
**involvement** [1] - 131:4
**involves** [1] - 20:12
**involving** [3] - 13:15, 130:13, 181:18
**iPatriot** [2] - 149:12, 149:13
**irregularities** [1] - 216:9
**irrelevant** [6] - 10:23, 23:25, 48:16, 59:14, 181:22, 210:9
**irritants** [2] - 93:17, 212:15
**issue** [21] - 9:4, 11:19, 22:11, 24:21, 33:10, 36:24, 57:5, 58:25, 119:18, 120:15, 126:13, 126:18, 126:24, 133:14, 177:8, 180:24, 182:11, 226:16, 226:22, 229:1, 229:4
**issued** [17] - 25:5, 51:22, 73:20, 73:21,

73:25, 74:1, 74:3, 75:14, 75:23, 137:18, 139:4, 144:14, 156:21, 157:16, 187:24, 188:16, 188:19
**issues** [7] - 20:12, 35:13, 73:10, 139:15, 190:23, 220:16, 223:2
**item** [1] - 211:9
**itself** [3] - 24:18, 69:25, 174:11

### J

**jacket** [7] - 44:21, 47:8, 47:13, 62:4, 71:20, 152:17, 174:20
**jacket/camouflage** [1] - 100:19
**jackets** [1] - 79:15
**January** [106] - 6:25, 7:25, 8:11, 9:8, 11:24, 12:20, 22:12, 24:20, 24:22, 25:1, 25:5, 25:7, 26:1, 26:3, 26:6, 26:8, 26:12, 26:15, 26:18, 26:24, 27:16, 28:7, 33:13, 35:15, 36:8, 37:5, 45:21, 46:11, 47:11, 48:15, 49:21, 54:3, 54:8, 56:13, 57:6, 57:13, 61:16, 67:9, 87:17, 88:23, 91:17, 95:3, 101:3, 102:7, 103:24, 106:9, 109:8, 112:7, 114:11, 114:25, 115:9, 115:12, 115:17, 116:1, 130:15, 130:25, 131:5, 131:21, 132:18, 151:15, 151:16, 153:24, 153:25, 160:5, 160:18, 160:23, 162:24, 163:5, 167:12, 170:25, 179:14, 181:18, 188:19, 190:8, 190:24, 190:25, 191:8, 191:25, 192:15, 193:12, 193:13, 193:15, 193:16, 197:12, 199:24, 204:22, 208:5, 209:2, 209:6, 211:15, 211:18,

211:23, 213:10, 214:2, 214:17, 214:19, 216:21, 216:25, 218:3, 218:19, 222:15, 225:10, 231:1, 231:3
**Jencks** [29] - 29:2, 29:7, 29:16, 29:17, 29:21, 29:22, 30:17, 30:18, 119:20, 120:17, 120:18, 123:19, 126:13, 126:16, 175:12, 175:13, 175:16, 175:19, 175:25, 176:13, 177:15, 177:17, 178:20, 179:1, 179:3, 184:6, 184:7, 184:23, 232:5
**Jester** [5] - 140:20, 146:11, 146:17, 148:4, 214:9
**job** [4] - 36:4, 132:9, 134:8, 233:10
**Joe** [1] - 141:2
**JOHN** [1] - 1:16
**John** [3] - 1:17, 3:12, 224:20
**joined** [2] - 94:5, 94:15
**joint** [1] - 185:24
**joking** [2] - 117:17, 117:19
**Joseph** [6] - 3:13, 146:19, 148:19, 150:1, 153:22, 156:8
**JOSEPH** [1] - 1:6
**judge** [4] - 5:17, 143:20, 212:16, 224:20
**JUDGE** [1] - 1:10
**Judge** [3] - 17:23, 22:1, 22:2
**July** [1] - 157:7
**jumping** [1] - 155:6
**juror** [1] - 124:22
**jurors** [2] - 124:21, 220:23
**Jury** [13] - 3:2, 33:19, 57:2, 57:4, 61:3, 98:3, 98:5, 117:3, 129:7, 175:4, 179:7, 186:13, 220:13
**jury** [113] - 5:25, 14:3, 14:16, 19:13, 21:2, 24:18, 27:13, 28:16, 28:18, 31:17, 34:11, 35:21, 37:8, 38:25, 39:14, 40:6, 41:18, 42:23, 44:15, 46:19,

48:2, 50:5, 50:22, 52:11, 55:5, 56:21, 57:5, 64:21, 66:17, 67:19, 73:6, 77:10, 77:15, 81:21, 81:23, 83:3, 83:23, 86:18, 88:2, 90:23, 92:25, 95:2, 95:16, 97:4, 101:20, 102:4, 102:13, 102:25, 103:23, 104:14, 105:8, 108:4, 109:6, 109:20, 112:12, 118:10, 118:18, 118:20, 119:6, 124:24, 126:7, 128:14, 130:11, 130:16, 133:12, 133:23, 139:8, 140:11, 141:9, 145:16, 148:3, 148:24, 149:2, 149:11, 151:6, 151:9, 157:15, 157:25, 159:10, 161:5, 165:1, 170:9, 171:19, 174:5, 179:9, 180:4, 185:4, 186:2, 186:19, 189:23, 190:16, 193:21, 200:24, 201:15, 202:8, 202:23, 203:21, 204:24, 211:3, 213:12, 213:19, 216:5, 218:7, 219:15, 221:9, 221:19, 222:13, 223:18, 223:20, 223:21, 224:5, 226:7, 233:25
**JURY** [1] - 1:9
**justice** [1] - 215:22
**justifies** [1] - 117:24

## K

**K.V** [1] - 55:14
**keep** [19] - 17:24, 20:13, 41:17, 47:23, 48:18, 51:24, 52:17, 53:14, 63:24, 68:25, 74:8, 83:21, 94:18, 99:6, 116:20, 118:1, 125:25, 155:25, 166:4
**keeping** [2] - 27:13, 31:17
**Kelly** [1] - 22:1
**Kenneth** [3] - 3:4, 3:13

**KENNETH** [1] - 1:6
**kept** [1] - 52:2
**Kevin** [1] - 202:16
**Kevlar** [3] - 72:21, 75:7, 76:6
**keys** [4] - 51:24, 88:15, 88:16, 89:1
**kill** [2] - 104:18, 104:19
**kind** [28] - 8:5, 9:7, 16:3, 17:11, 20:13, 20:23, 27:18, 37:8, 38:7, 45:9, 48:5, 48:7, 48:11, 52:7, 52:25, 64:12, 70:8, 70:11, 71:22, 81:3, 83:8, 115:10, 152:5, 180:2, 180:15, 181:20, 185:21
**kinds** [4] - 18:5, 19:3, 19:4, 20:6
**kit** [2] - 51:18, 51:19
**knee** [2] - 73:24, 74:2
**knife** [3] - 172:22, 173:2, 203:24
**knives** [4] - 172:14, 172:17, 172:18, 172:22
**knocked** [4] - 15:25, 230:17, 231:18, 231:21
**knocking** [2] - 179:19, 230:25
**knowing** [3] - 18:4, 18:13, 167:1
**knowledge** [13] - 11:5, 12:12, 14:22, 15:12, 15:14, 22:14, 22:22, 24:24, 167:5, 170:21, 209:6, 217:6
**known** [7] - 23:14, 128:2, 149:14, 164:12, 175:23, 177:23, 208:9
**knows** [3] - 19:4, 28:14, 197:8

## L

**L-e-a-n-o** [1] - 34:14
**labeled** [1] - 65:6
**lack** [6] - 32:15, 115:22, 123:21, 222:2, 222:3
**ladies** [10] - 33:20, 79:12, 105:1, 116:24, 129:8, 174:25, 198:11, 198:25, 219:25, 220:6

**laid** [1] - 222:4
**Lambert** [29] - 3:14, 4:12, 4:19, 8:12, 13:11, 14:4, 14:17, 14:21, 15:19, 16:5, 16:16, 16:18, 16:25, 17:1, 17:8, 18:10, 21:7, 22:4, 24:7, 65:3, 66:11, 81:23, 118:24, 119:2, 125:3, 125:4, 125:16, 125:19, 126:3
**landed** [5] - 19:1, 19:2, 19:3, 40:19, 92:7
**language** [5] - 41:14, 145:18, 206:1, 212:7, 212:14
**large** [1] - 70:16
**larger** [3] - 25:17, 25:18, 87:2
**last** [33] - 14:8, 14:9, 14:11, 19:8, 28:19, 28:21, 28:23, 30:5, 34:12, 35:8, 56:8, 88:22, 99:3, 103:14, 106:3, 122:19, 123:4, 129:18, 141:2, 144:5, 151:18, 157:21, 159:17, 170:23, 176:9, 191:15, 195:8, 200:10, 203:2, 203:10, 210:25, 219:14
**lasting** [1] - 188:1
**late** [6] - 125:14, 176:5, 220:1, 228:15, 229:3, 229:11
**launch** [1] - 80:24
**law** [43] - 4:6, 21:8, 21:9, 21:13, 21:17, 21:24, 40:22, 40:24, 41:15, 41:16, 47:15, 71:5, 71:7, 71:12, 84:9, 86:7, 92:11, 99:16, 100:14, 100:21, 104:17, 110:21, 113:24, 120:24, 139:16, 151:20, 151:24, 172:19, 174:18, 174:19, 175:13, 176:3, 179:2, 180:8, 183:14, 184:15, 187:13, 192:24, 194:16, 194:18, 197:15, 197:17,

203:19
**Law** [1] - 1:17
**lawns** [1] - 131:16
**lawyer** [1] - 5:3
**lawyers** [1] - 198:10
**lay** [12] - 9:7, 9:9, 166:20, 167:2, 179:11, 179:23, 180:7, 180:10, 182:18, 182:24, 183:10, 197:8
**lead** [2] - 133:19, 134:10
**leaders** [1] - 216:8
**leading** [3] - 84:11, 93:10, 217:11
**leads** [1] - 132:8
**Leano** [29] - 34:4, 34:9, 34:12, 34:14, 34:15, 35:15, 38:18, 40:7, 44:11, 45:18, 46:6, 46:23, 47:7, 48:2, 48:22, 50:9, 51:3, 52:12, 52:21, 53:22, 54:19, 55:20, 56:6, 56:23, 61:10, 61:11, 82:16, 201:23, 202:1
**LEANO** [2] - 2:4, 34:1
**learn** [1] - 162:22
**learned** [2] - 136:25, 229:23
**least** [6] - 5:11, 57:15, 125:7, 131:12, 221:16, 230:14
**leave** [8] - 17:6, 88:7, 179:4, 221:9, 221:18, 222:13, 222:16, 224:21
**left** [27] - 29:12, 40:21, 42:15, 42:25, 43:9, 44:6, 51:13, 55:10, 94:11, 96:3, 97:23, 98:25, 109:22, 136:15, 136:17, 137:9, 137:11, 148:13, 155:23, 164:13, 164:16, 168:21, 168:25, 173:21, 174:15, 190:11
**left-hand** [1] - 136:17
**left-side** [1] - 174:15
**leg** [1] - 74:2
**legal** [9] - 33:22, 197:7, 198:4, 198:7, 198:12, 198:23, 198:25, 220:21, 226:22
**legit** [1] - 217:1

**legitimate** [1] - 216:23
**legs** [1] - 73:24
**length** [1] - 150:25
**lengthy** [1] - 205:14
**lens** [1] - 81:6
**less** [4] - 84:9, 94:2, 212:15, 224:20
**lest** [1] - 217:2
**letter** [5] - 140:2, 156:19, 157:6, 216:6, 216:7
**letters** [1] - 157:19
**letting** [1] - 195:18
**levels** [1] - 86:19
**liar** [1] - 7:7
**lieutenant** [2] - 88:25, 94:6
**lieutenants** [1] - 93:25
**lightning** [1] - 215:20
**likely** [5] - 32:12, 68:11, 124:24, 189:9, 232:11
**limine** [2] - 3:20, 4:4
**limited** [2] - 12:2, 28:11
**limits** [1] - 184:2
**line** [62] - 31:14, 31:15, 42:1, 42:9, 42:12, 42:14, 42:15, 43:9, 43:14, 43:16, 45:2, 47:1, 48:3, 70:5, 73:12, 83:10, 91:22, 92:15, 93:2, 94:2, 94:3, 94:4, 94:5, 94:6, 94:8, 94:10, 94:16, 94:19, 95:10, 95:19, 95:22, 95:24, 96:4, 96:12, 96:13, 99:19, 100:14, 110:9, 110:16, 110:17, 110:23, 110:25, 111:9, 125:25, 145:21, 145:22, 157:20, 173:21, 178:8, 179:11, 180:6, 186:22, 192:1, 192:14, 199:8, 199:12, 200:12, 215:13, 219:11
**lines** [5] - 4:7, 37:15, 92:17, 110:13, 208:10
**link** [6] - 28:4, 83:13, 149:8, 149:13, 214:7, 225:19
**linked** [1] - 49:2
**links** [2] - 138:5, 138:18

**Lion** [5] - 140:20, 146:11, 146:17, 148:4, 214:9
**list** [5] - 13:22, 106:24, 142:5, 144:1, 170:2
**listed** [9] - 140:16, 140:19, 140:25, 141:3, 142:5, 146:18, 148:24, 149:11, 213:11
**listen** [3] - 105:5, 161:14, 173:17
**listener** [2] - 10:20, 58:7
**literally** [5] - 35:7, 78:7, 180:1, 223:1, 230:4
**living** [1] - 104:3
**local** [3] - 27:5, 27:6, 228:21
**location** [6] - 31:16, 39:9, 39:11, 52:2, 67:5, 194:16
**lodged** [1] - 210:6
**long-range** [1] - 9:24
**long-sleeved** [1] - 69:17
**look** [37] - 6:12, 7:11, 11:18, 43:4, 57:24, 65:5, 67:9, 68:3, 68:10, 69:16, 70:2, 70:4, 70:21, 73:6, 73:9, 79:7, 81:4, 107:20, 120:2, 129:2, 130:4, 141:8, 148:20, 152:9, 154:12, 173:1, 181:20, 190:4, 204:4, 210:21, 214:18, 214:19, 215:1, 216:3, 218:4, 226:21, 228:11
**looked** [10] - 112:21, 122:25, 132:18, 175:11, 175:13, 179:16, 180:21, 191:19, 211:16, 226:21
**looking** [18] - 7:9, 7:10, 16:9, 27:6, 40:17, 63:12, 63:13, 93:24, 94:1, 133:7, 137:12, 148:17, 148:23, 152:17, 185:3, 188:18, 214:23, 218:5
**lookout** [3] - 133:13, 133:16, 137:18
**looks** [14] - 52:25, 57:16, 67:23, 69:19,

70:8, 70:10, 70:11, 70:19, 112:23, 141:11, 187:11, 211:4, 219:13, 219:20
**loop** [1] - 185:12
**looted** [1] - 228:4
**losing** [1] - 224:5
**loss** [2] - 60:13, 227:19
**lost** [1] - 227:21
**loud** [6] - 41:9, 41:12, 76:8, 129:21, 187:18
**love** [2] - 185:20, 228:16
**lower** [5] - 43:9, 108:9, 109:22, 124:12, 201:13
**LRAD** [1] - 9:24
**lunch** [5] - 31:18, 33:17, 59:16, 116:24, 118:21
**lungs** [1] - 44:19
**luxury** [1] - 137:2

# M

**mad** [2] - 58:8, 58:11
**mail** [4] - 129:4, 141:3, 145:21, 233:24
**mails** [2] - 107:1, 184:20
**main** [1] - 75:24
**major** [2] - 59:11, 230:6
**male** [4] - 152:16, 169:8, 173:15, 206:11
**Mall** [1] - 165:4
**man** [9] - 62:3, 63:5, 65:15, 65:16, 68:3, 69:14, 71:18, 214:23
**manage** [1] - 125:8
**management** [1] - 133:9
**Management** [2] - 187:21, 187:22
**Manassas** [1] - 131:3
**manner** [1] - 37:11
**manpower** [1] - 132:6
**map** [1] - 219:9
**March** [2] - 151:11, 153:20
**march** [4] - 159:14, 159:15, 212:21, 214:4
**marchfortrump** [1] - 214:6
**marching** [3] - 165:10, 165:14, 168:3

**marginal** [2] - 7:4, 9:2
**marginally** [1] - 58:23
**mark** [19] - 16:3, 18:13, 40:11, 55:3, 62:18, 64:20, 65:23, 68:18, 70:15, 92:25, 95:2, 96:8, 97:12, 107:17, 148:9, 159:3, 164:5, 164:21
**marked** [9] - 41:8, 42:1, 42:16, 43:14, 44:5, 44:11, 91:21, 95:10, 144:9
**marking** [2] - 112:21, 207:23
**marks** [1] - 120:20
**Maryland** [2] - 61:20, 62:16
**mash** [2] - 56:9, 56:12
**mash-up** [2] - 56:9, 56:12
**mashup** [1] - 55:21
**mashup-type** [1] - 55:21
**mask** [11] - 39:23, 40:1, 72:21, 76:5, 87:2, 87:6, 87:11, 93:5, 93:7, 93:14, 93:19
**masks** [3] - 91:9, 92:4, 92:13
**mass** [3] - 40:21, 40:22, 42:20
**match** [1] - 68:16
**matched** [2] - 54:20, 54:24
**material** [1] - 209:5
**materially** [1] - 5:6
**materials** [6] - 28:20, 119:19, 119:22, 135:5, 139:5, 209:2
**matter** [12] - 24:20, 58:10, 58:17, 94:4, 105:3, 112:25, 119:8, 141:17, 182:13, 185:24, 223:13, 235:5
**matters** [1] - 33:22
**mayor** [13] - 25:5, 25:7, 26:1, 26:18, 27:1, 27:11, 28:10, 57:6, 58:8, 59:14, 188:24, 193:20
**Mayor** [2] - 190:23, 192:5
**mayor's** [17] - 22:23, 22:24, 23:1, 24:20, 26:4, 26:11, 26:15, 28:13, 60:11, 188:18, 224:23,

225:8, 225:20, 227:25, 228:5, 228:7, 228:14
**MCCAULEY** [73] - 1:13, 7:13, 7:16, 7:22, 8:6, 8:8, 11:20, 12:1, 12:24, 15:2, 21:19, 23:24, 24:4, 25:13, 25:18, 30:15, 31:21, 32:9, 32:14, 32:19, 33:3, 33:6, 33:16, 57:10, 106:15, 106:18, 106:20, 119:8, 119:10, 119:14, 119:17, 120:4, 120:8, 120:13, 120:23, 122:2, 123:18, 124:4, 124:20, 126:12, 126:16, 126:20, 128:22, 176:7, 177:1, 177:19, 178:14, 178:19, 178:22, 182:10, 183:1, 183:5, 183:21, 184:16, 185:10, 185:12, 225:18, 226:2, 226:6, 226:24, 227:5, 228:17, 229:5, 229:10, 229:17, 230:19, 230:22, 231:19, 231:23, 232:7, 232:18, 233:12, 233:20
**McCauley** [11] - 3:10, 8:4, 12:23, 23:23, 25:12, 32:5, 124:19, 177:15, 225:24, 226:1, 228:15
**MD5** [2] - 158:8, 158:9
**mean** [28] - 8:7, 35:3, 35:7, 38:11, 42:23, 42:25, 71:8, 76:14, 79:19, 83:23, 88:2, 89:6, 90:15, 110:15, 119:14, 126:3, 132:23, 133:14, 160:9, 175:20, 181:6, 185:24, 189:11, 198:6, 207:5, 211:25, 221:12, 231:17
**meaning** [3] - 145:13, 146:2, 209:23
**means** [16] - 39:15, 39:16, 42:10, 88:9, 94:23, 110:16,

110:17, 110:22, 115:7, 133:2, 133:15, 160:7, 207:25, 211:17, 219:17, 231:14
**meant** [8] - 83:11, 83:12, 84:22, 110:25, 111:1, 132:7, 160:20, 182:22
**medal** [2] - 115:20, 115:21
**medals** [2] - 115:2, 115:4
**media** [25] - 14:23, 132:19, 132:20, 133:5, 133:7, 133:16, 134:1, 138:18, 141:20, 141:22, 141:25, 142:1, 143:12, 146:4, 149:6, 149:10, 171:5, 184:13, 184:14, 191:1, 206:22, 208:24, 211:8, 211:9, 218:10
**meet** [2] - 219:3, 233:23
**meeting** [2] - 128:4, 168:6
**meetings** [2] - 230:13, 233:1
**meets** [1] - 128:6
**megaphone** [1] - 79:20
**megaphones** [1] - 79:20
**member** [4] - 149:13, 221:4, 221:8, 222:12
**members** [8] - 5:11, 34:11, 38:25, 148:23, 149:11, 159:12, 161:5, 221:16
**membership** [2] - 221:13, 221:17
**memes** [1] - 217:10
**memorabilia** [1] - 41:4
**memorialized** [1] - 158:9
**memories** [5] - 44:12, 44:15, 47:10, 47:14, 93:21
**memory** [8] - 46:24, 90:5, 91:17, 93:8, 93:14, 116:6, 138:22, 138:25
**men's** [1] - 214:5
**mention** [2] - 123:2,

168:4
**mentioned** [1] - 190:3
**mentions** [1] - 212:24
**message** [1] - 45:14
**messages** [1] - 79:23
**messaging** [3] - 84:21, 84:24, 84:25
**met** [2] - 131:10, 131:12
**metal** [1] - 173:3
**methodology** [1] - 130:19
**Metro** [3] - 61:17, 62:13, 72:11
**Metropolitan** [5] - 34:4, 34:17, 34:18, 86:6, 192:25
**mic** [1] - 38:20
**mid** [1] - 132:18
**mid-January** [1] - 132:18
**middle** [13] - 42:2, 44:24, 47:8, 51:25, 91:1, 91:3, 94:10, 95:10, 96:13, 97:7, 140:23, 140:25, 187:9
**midnight** [5] - 111:20, 113:20, 155:14, 214:25, 218:14
**Midnight** [4] - 214:11, 219:12, 219:18, 219:22
**midnightride** [1] - 214:6
**might** [22] - 5:22, 9:14, 27:2, 28:6, 65:4, 70:21, 74:23, 75:13, 81:4, 81:21, 98:19, 116:20, 123:9, 128:10, 131:25, 132:2, 146:3, 163:7, 216:21, 222:6, 222:14
**Mike** [1] - 216:23
**mile** [1] - 114:4
**Miller** [21] - 3:8, 7:2, 7:14, 16:12, 19:19, 33:24, 56:1, 66:8, 77:8, 104:7, 126:10, 147:4, 166:25, 167:16, 182:22, 196:7, 196:10, 201:21, 220:3, 221:1, 225:24
**MILLER** [349] - 1:13, 3:7, 3:10, 3:24, 6:1, 6:5, 6:10, 6:16, 7:6, 7:12, 9:12, 10:10, 10:22, 11:10, 13:2,

15:4, 16:11, 16:14, 19:20, 24:11, 27:21, 28:1, 28:17, 29:4, 29:9, 31:24, 33:14, 33:17, 33:25, 34:2, 34:8, 37:23, 41:25, 42:4, 42:5, 43:7, 43:11, 43:13, 44:4, 44:9, 44:10, 45:23, 46:5, 46:13, 46:19, 46:22, 47:22, 48:1, 48:18, 48:21, 49:24, 50:5, 50:8, 50:14, 51:2, 51:11, 52:9, 52:16, 52:20, 53:7, 53:10, 53:17, 53:21, 54:10, 54:16, 54:18, 55:16, 55:19, 56:3, 56:5, 56:15, 56:20, 56:23, 57:18, 59:15, 60:22, 60:25, 63:18, 64:25, 65:3, 65:10, 66:2, 66:9, 66:14, 66:19, 67:16, 68:13, 76:12, 76:23, 77:6, 77:11, 78:9, 78:16, 78:23, 79:9, 80:21, 82:10, 82:15, 84:2, 84:14, 85:5, 85:13, 85:16, 85:18, 86:1, 91:20, 91:23, 92:14, 92:18, 92:20, 93:12, 93:13, 94:9, 94:14, 95:9, 95:12, 95:14, 96:2, 96:6, 96:7, 96:11, 96:15, 96:20, 97:2, 97:6, 97:10, 97:14, 97:18, 97:22, 98:1, 98:6, 98:8, 98:11, 98:20, 98:23, 99:6, 99:9, 100:6, 101:5, 101:11, 101:14, 101:22, 102:3, 102:6, 102:12, 102:16, 102:18, 102:21, 103:3, 103:8, 103:10, 104:10, 104:12, 105:7, 105:11, 106:22, 107:9, 107:12, 108:1, 109:2, 109:16, 111:15, 111:17, 112:11, 112:16, 114:18, 116:16, 118:9, 118:13, 118:23, 121:24, 126:1, 126:11, 127:2, 127:8, 129:4, 129:11, 129:15,

135:13, 135:20, 136:9, 136:13, 136:21, 140:5, 140:11, 140:15, 142:3, 142:12, 142:18, 143:14, 143:25, 144:8, 144:20, 145:1, 146:23, 147:14, 147:23, 147:25, 148:2, 148:12, 148:15, 148:16, 150:7, 150:14, 150:16, 150:18, 153:8, 153:14, 154:21, 155:1, 155:4, 155:15, 155:18, 155:25, 156:3, 156:5, 156:23, 157:4, 157:5, 158:21, 159:2, 159:5, 159:25, 160:4, 160:13, 160:16, 161:1, 161:3, 161:8, 161:11, 162:5, 162:8, 163:13, 163:22, 164:3, 164:7, 164:20, 164:24, 165:17, 165:21, 165:24, 166:4, 166:7, 166:17, 166:20, 167:2, 167:8, 167:11, 167:17, 167:24, 168:8, 168:11, 169:7, 169:13, 169:16, 170:1, 173:10, 173:13, 174:1, 174:4, 174:22, 175:5, 175:9, 176:8, 176:12, 176:25, 177:12, 184:5, 184:13, 184:20, 184:25, 185:20, 186:4, 186:9, 186:14, 186:16, 186:17, 187:1, 189:1, 189:22, 190:10, 190:14, 190:15, 194:6, 194:21, 194:24, 195:10, 195:14, 196:1, 196:3, 196:12, 196:17, 196:20, 196:23, 197:10, 198:8, 198:15, 198:18, 198:19, 199:3, 199:7, 199:13,

199:16, 200:1, 200:4, 200:14, 200:18, 201:6, 201:9, 201:18, 201:22, 201:25, 203:4, 203:8, 203:14, 203:17, 204:3, 205:2, 205:7, 205:11, 205:19, 205:22, 206:15, 206:20, 207:1, 207:5, 207:10, 207:13, 208:4, 208:18, 208:21, 209:20, 210:3, 210:17, 210:19, 213:17, 213:18, 217:13, 220:4, 221:6, 221:12, 221:24, 222:20, 223:24, 224:3, 224:11, 225:5, 225:23, 227:1
**Miller's** [1] - 119:14
**mind** [5] - 38:19, 48:13, 58:16, 85:1, 121:9
**mini** [1] - 59:2
**mint** [1] - 37:9
**minus** [2] - 211:22, 215:7
**minute** [18] - 16:3, 18:13, 46:20, 57:1, 64:20, 65:22, 68:18, 70:15, 83:20, 98:2, 98:20, 100:3, 101:12, 113:15, 151:23, 155:2, 159:25, 164:21
**minutes** [89] - 47:19, 48:19, 50:16, 50:17, 50:19, 50:21, 50:23, 50:24, 51:5, 52:3, 52:18, 53:7, 53:14, 56:3, 65:3, 151:2, 151:8, 151:19, 155:15, 156:1, 160:1, 160:13, 160:14, 161:9, 161:12, 161:23, 162:5, 164:21, 165:18, 165:22, 166:5, 166:12, 166:13, 168:8, 168:9, 168:17, 168:19, 169:4, 169:13, 169:14, 169:23, 171:15, 171:20, 171:24, 172:8, 172:9,

172:11, 173:4, 173:5, 173:11, 174:1, 174:2, 178:23, 186:21, 186:23, 187:2, 194:8, 194:10, 194:13, 194:22, 195:10, 195:11, 195:20, 195:21, 196:1, 198:22, 199:3, 199:4, 199:13, 199:14, 199:20, 200:2, 200:5, 200:14, 200:15, 200:23, 201:6, 201:10, 202:21, 203:4, 203:5, 203:6, 203:15, 205:19, 205:20, 206:9, 210:20
**misleading** [2] - 143:9, 210:9
**misplace** [1] - 88:16
**mispronouncing** [1] - 34:15
**missed** [1] - 3:15
**mission** [8] - 42:7, 94:15, 99:11, 99:12, 99:13, 99:17, 105:18, 105:20
**missions** [1] - 105:22
**misspoke** [1] - 188:12
**mistake** [2] - 28:25, 50:19
**Mister** [2] - 124:16, 224:18
**misunderstood** [1] - 198:3
**mixed** [2] - 48:5, 99:14
**mixture** [2] - 83:4, 100:14
**mobile** [4] - 211:24, 212:1, 212:2, 212:3
**modifications** [1] - 155:7
**modified** [1] - 207:17
**mom** [3] - 162:16, 162:23, 162:24
**moment** [18] - 45:23, 71:16, 72:3, 72:6, 77:21, 81:14, 98:1, 113:1, 113:2, 113:5, 124:14, 137:9, 151:4, 151:24, 153:15, 174:6, 201:18, 209:18
**moments** [1] - 95:1
**Monday** [3] - 223:21, 233:13, 233:18

| | | | | |
|---|---|---|---|---|
| **moniker** [1] - 206:21<br>**monotonous** [1] - 224:6<br>**months** [3] - 113:3, 134:8, 211:19<br>**monuments** [1] - 114:5<br>**Moore** [1] - 178:5<br>**mooted** [1] - 3:22<br>**moreover** [1] - 231:1<br>**morning** [31] - 3:7, 3:9, 3:11, 3:12, 33:13, 33:20, 33:21, 34:5, 34:6, 34:9, 34:10, 34:11, 36:15, 61:7, 61:8, 85:21, 85:22, 86:2, 105:15, 105:16, 111:21, 111:22, 112:1, 119:18, 193:12, 214:17, 226:3, 226:6, 227:1, 233:13, 233:18<br>**Moseley** [18] - 22:11, 22:22, 23:4, 23:7, 23:15, 24:19, 24:23, 25:10, 27:4, 27:9, 28:14, 57:21, 58:5, 58:10, 59:7, 224:20, 226:9, 226:14<br>**Moseley's** [3] - 26:17, 226:3, 227:15<br>**most** [13] - 15:11, 30:21, 68:11, 117:19, 130:23, 131:10, 135:4, 145:5, 145:18, 184:15, 212:11, 213:22, 232:15<br>**mostly** [2] - 130:13, 181:8<br>**motion** [3] - 3:19, 4:4, 124:10<br>**mount** [1] - 214:25<br>**Mountain** [1] - 186:9<br>**mounted** [1] - 155:14<br>**mouth** [2] - 195:25, 198:1<br>**move** [42] - 30:11, 43:18, 45:4, 45:6, 46:14, 49:24, 54:10, 56:15, 67:12, 78:9, 79:9, 79:10, 88:12, 94:22, 94:25, 101:5, 101:23, 102:16, 103:3, 103:18, 103:19, 107:24, 109:1, 110:22, 111:2, 111:6, 140:5, 142:4, 144:20, | 146:23, 150:7, 153:8, 154:22, 156:23, 158:21, 161:15, 163:22, 189:1, 201:11, 205:2, 210:3<br>**moved** [4] - 94:22, 194:14, 201:13, 203:10<br>**movement** [2] - 41:17, 195:3<br>**moving** [12] - 43:20, 43:21, 73:12, 94:17, 94:19, 98:14, 100:14, 129:1, 169:1, 169:3, 173:22, 201:1<br>**MPD** [21] - 34:19, 34:21, 34:23, 35:24, 42:10, 53:6, 61:18, 61:19, 72:12, 73:10, 77:21, 85:19, 86:6, 93:25, 134:3, 134:18, 134:24, 134:25, 135:3, 135:7, 174:20<br>**MPD's** [1] - 83:14<br>**MR** [309] - 3:12, 3:17, 4:3, 4:10, 7:13, 7:16, 7:22, 7:23, 8:6, 8:8, 8:18, 8:23, 9:22, 10:3, 10:9, 10:19, 10:24, 11:11, 11:16, 11:20, 12:1, 12:6, 12:8, 12:11, 12:22, 12:24, 13:4, 13:14, 13:20, 14:8, 14:20, 15:2, 15:11, 15:16, 15:22, 16:1, 16:6, 16:19, 16:24, 17:1, 17:13, 17:21, 17:25, 18:8, 18:24, 19:8, 19:17, 20:1, 20:11, 20:17, 20:20, 21:4, 21:16, 21:19, 23:6, 23:19, 23:24, 24:4, 24:13, 24:20, 25:13, 25:18, 26:13, 26:23, 27:4, 27:11, 27:17, 28:9, 29:20, 29:24, 30:4, 30:11, 30:15, 30:20, 31:14, 31:21, 32:9, 32:14, 32:19, 33:3, 33:6, 33:12, 33:16, 37:21, 46:16, 48:16, 50:2, 54:13, 56:17, 57:10, 57:22, 58:5, 58:12, 58:15, 58:19, 59:19, 60:3, 60:17, 61:6, 61:15, | 62:7, 62:23, 63:2, 63:22, 64:1, 64:9, 64:17, 64:23, 65:14, 65:21, 66:1, 66:4, 66:22, 66:24, 67:3, 67:12, 67:19, 67:22, 68:5, 68:18, 68:22, 69:2, 69:5, 69:9, 70:14, 70:17, 72:1, 72:5, 72:7, 76:15, 76:25, 77:14, 77:17, 78:11, 78:14, 78:18, 78:24, 79:6, 79:11, 79:14, 80:23, 81:9, 81:10, 82:1, 82:5, 84:11, 84:16, 84:19, 85:8, 85:11, 93:10, 101:8, 101:25, 102:14, 103:5, 104:4, 104:23, 105:14, 106:15, 106:18, 106:20, 107:15, 107:24, 108:4, 108:5, 109:5, 109:19, 109:21, 111:13, 112:14, 114:22, 116:14, 116:18, 116:20, 117:7, 117:9, 117:15, 118:3, 118:7, 119:1, 119:8, 119:10, 119:14, 119:17, 120:4, 120:8, 120:13, 120:23, 121:10, 121:19, 121:25, 122:2, 122:8, 122:12, 122:19, 122:24, 123:18, 124:4, 124:8, 124:20, 124:25, 125:12, 125:18, 125:23, 126:5, 126:12, 126:16, 126:20, 127:17, 128:4, 128:8, 128:16, 128:22, 140:8, 142:8, 142:14, 142:24, 143:6, 143:19, 144:2, 144:23, 147:1, 150:10, 153:11, 154:23, 157:1, 158:24, 163:10, 163:25, 166:19, 166:22, 167:13, 176:7, 177:1, 177:19, 178:14, 178:19, 178:22, 181:3, 181:8, 181:11, | 181:14, 181:23, 182:6, 182:10, 183:1, 183:5, 183:21, 184:8, 184:11, 184:14, 184:16, 185:10, 185:12, 185:15, 186:6, 189:3, 189:6, 189:13, 194:2, 196:6, 197:7, 198:5, 198:23, 204:1, 205:5, 205:8, 206:12, 206:24, 208:2, 210:6, 210:9, 217:11, 222:24, 223:8, 224:8, 224:15, 224:19, 224:25, 225:3, 225:9, 225:18, 225:21, 226:2, 226:6, 226:19, 226:24, 227:5, 227:10, 227:17, 227:21, 228:1, 228:13, 228:17, 229:5, 229:10, 229:17, 230:2, 230:12, 230:19, 230:22, 231:19, 231:23, 232:7, 232:18, 232:22, 233:7, 233:12, 233:20<br>**MS** [348] - 3:7, 3:10, 3:24, 6:1, 6:5, 6:10, 6:16, 7:6, 7:12, 9:12, 10:10, 10:22, 11:10, 13:2, 15:4, 16:11, 16:14, 19:20, 24:11, 27:21, 28:1, 28:17, 29:4, 29:9, 31:24, 33:14, 33:17, 33:25, 34:2, 34:8, 37:23, 41:25, 42:4, 42:5, 43:7, 43:11, 43:13, 44:4, 44:9, 44:10, 45:23, 46:5, 46:13, 46:19, 46:22, 47:22, 48:1, 48:18, 48:21, 49:24, 50:5, 50:8, 50:14, 51:2, 51:11, 52:9, 52:16, 52:20, 53:7, 53:10, 53:17, 53:21, 54:10, 54:16, 54:18, 55:19, 56:3, 56:5, 56:15, 56:20, 56:23, 57:18, 59:15, 60:22, 60:25, 63:18, 64:7, 64:25, 65:3, 65:10, 66:2, 66:9, 66:14, 66:19, 67:16, | 68:13, 76:12, 76:23, 77:6, 77:11, 78:9, 78:16, 78:23, 79:9, 80:21, 82:10, 82:15, 84:2, 84:14, 85:5, 85:13, 85:16, 85:18, 86:1, 91:20, 91:23, 92:14, 92:18, 92:20, 93:12, 93:13, 94:9, 94:14, 95:9, 95:12, 95:14, 96:2, 96:6, 96:7, 96:11, 96:15, 96:20, 97:2, 97:6, 97:10, 97:14, 97:18, 97:22, 98:1, 98:6, 98:8, 98:11, 98:20, 98:23, 99:6, 99:9, 100:6, 101:5, 101:11, 101:14, 101:22, 102:3, 102:6, 102:12, 102:16, 102:18, 102:21, 103:3, 103:8, 103:10, 104:10, 104:12, 105:7, 105:11, 106:22, 107:9, 107:12, 108:1, 109:2, 109:16, 111:15, 111:17, 112:11, 112:16, 114:18, 116:16, 118:9, 118:13, 118:23, 121:24, 126:1, 126:11, 127:2, 127:8, 129:4, 129:11, 129:15, 135:13, 135:20, 136:9, 136:13, 136:21, 140:5, 140:11, 140:15, 142:3, 142:12, 142:18, 143:14, 143:25, 144:8, 144:20, 145:1, 146:23, 147:14, 147:23, 147:25, 148:2, 148:12, 148:15, 148:16, 150:7, 150:14, 150:16, 150:18, 153:8, 153:14, 154:21, 155:1, 155:4, 155:15, 155:18, 155:25, 156:3, 156:5, 156:23, 157:4, 157:5, 158:21, 159:2, 159:5, 159:25, 160:4, 160:13, 160:16, |

161:1, 161:3, 161:8, 161:11, 162:5, 162:8, 163:13, 163:22, 164:3, 164:7, 164:20, 164:24, 165:17, 165:21, 165:24, 166:4, 166:7, 166:17, 166:20, 167:2, 167:8, 167:11, 167:17, 167:24, 168:8, 168:11, 169:7, 169:13, 169:16, 170:1, 173:10, 173:13, 174:1, 174:4, 174:22, 175:5, 175:9, 176:8, 176:12, 176:25, 177:12, 184:5, 184:13, 184:20, 184:25, 185:20, 186:4, 186:9, 186:14, 186:16, 186:17, 187:1, 189:1, 189:22, 190:10, 190:14, 190:15, 194:6, 194:21, 194:24, 195:10, 195:14, 196:1, 196:3, 196:12, 196:17, 196:20, 196:23, 197:10, 198:8, 198:15, 198:18, 198:19, 199:3, 199:7, 199:13, 199:16, 200:1, 200:4, 200:14, 200:18, 201:6, 201:9, 201:18, 201:22, 201:25, 203:4, 203:8, 203:14, 203:17, 204:3, 205:2, 205:7, 205:11, 205:19, 205:22, 206:15, 206:20, 207:1, 207:5, 207:10, 207:13, 208:4, 208:18, 208:21, 209:20, 210:3, 210:17, 210:19, 213:17, 213:18, 217:13, 220:4, 221:6, 221:12, 221:24, 222:20, 223:24, 224:3, 224:11, 225:5, 225:23, 227:1
**multiple** [7] - 49:1,

54:20, 79:16, 132:21, 161:17, 205:13, 212:15
**Muriel** [1] - 193:20
**must** [2] - 193:8, 217:2

**N**

**N-i-e-w-e-n-h-o-u-s** [1] - 86:4
**name** [25] - 34:13, 52:21, 52:23, 53:1, 55:14, 86:3, 129:18, 134:14, 140:19, 140:25, 141:2, 146:9, 146:18, 148:18, 153:19, 153:25, 162:13, 182:15, 191:11, 206:22, 209:13, 214:8
**named** [2] - 23:8, 61:19
**names** [3] - 3:6, 125:3, 170:14
**narrate** [1] - 231:11
**narrative** [3] - 18:17, 18:21, 231:3
**National** [2] - 113:11, 165:4
**natural** [1] - 60:24
**nature** [1] - 13:12
**near** [5] - 22:12, 71:22, 93:23, 99:25, 186:19
**necessarily** [2] - 126:21, 198:7
**necessary** [3] - 118:11, 125:4, 140:13
**need** [54] - 4:14, 4:25, 5:16, 5:24, 13:24, 14:4, 15:18, 20:22, 20:25, 24:19, 26:4, 26:10, 27:18, 28:12, 28:13, 28:16, 32:6, 37:15, 51:20, 74:15, 77:8, 87:5, 88:11, 88:16, 98:1, 121:8, 122:17, 127:2, 140:24, 175:24, 177:4, 178:12, 181:7, 182:8, 183:18, 184:9, 184:23, 185:8, 197:18, 215:3, 218:15, 219:11, 222:22, 223:2, 223:12, 223:17,

227:4, 228:20, 228:22, 228:23, 229:22, 230:1, 232:16, 233:23
**needed** [7] - 88:6, 88:8, 88:11, 89:13, 92:5, 125:19, 126:6
**needles** [1] - 133:25
**needs** [7] - 6:13, 15:10, 20:22, 81:23, 177:7, 177:9, 177:15
**negative** [4] - 114:11, 114:12, 114:23, 227:13
**negotiator** [1] - 130:24
**nervous** [1] - 90:9
**net** [4] - 22:17, 25:22, 226:23, 228:12
**networking** [1] - 149:10
**neutral** [1] - 21:6
**never** [6] - 4:6, 74:3, 99:17, 104:1, 115:15, 121:17
**new** [11] - 24:21, 29:21, 30:7, 121:10, 122:8, 127:11, 127:12, 177:23, 196:11, 230:14, 232:3
**news** [9] - 27:5, 58:6, 89:11, 117:5, 154:3, 156:6, 214:14, 214:16
**next** [21] - 24:4, 31:23, 33:22, 38:3, 52:1, 60:20, 61:2, 109:15, 111:21, 112:1, 129:9, 133:4, 133:6, 140:25, 148:17, 151:21, 211:11, 218:8, 219:1, 231:22
**Nickerson** [1] - 199:10
**NIEWENHOUS** [2] - 2:6, 85:20
**Niewenhous** [18] - 85:19, 86:2, 86:4, 86:5, 92:22, 95:15, 96:21, 98:12, 98:24, 99:10, 99:21, 101:15, 104:13, 105:8, 111:18, 113:25, 114:18, 203:1
**Niewenhous's** [1] - 201:2
**night** [15] - 14:8, 14:11, 19:8, 28:19, 28:23, 30:5, 35:5,

35:6, 35:8, 35:11, 113:7, 122:19, 193:12, 208:23, 214:16
**nighttime** [1] - 111:20
**nine** [1] - 130:8
**nobody** [2] - 114:12, 186:7
**noise** [4] - 41:7, 53:11, 159:10, 187:19
**none** [5] - 125:5, 178:15, 179:19, 183:14, 184:23
**nook** [1] - 95:21
**normal** [8] - 73:4, 74:17, 74:19, 75:4, 89:20, 112:19, 112:25, 113:14
**normally** [3] - 72:23, 74:5, 74:20
**north** [6] - 93:20, 94:18, 99:13, 201:1, 203:12, 203:13
**northbound** [1] - 94:23
**northeast** [1] - 89:7
**northern** [2] - 94:7, 95:18
**Northwest** [4] - 1:14, 1:21, 65:20, 131:16
**northwest** [1] - 92:23
**note** [5] - 38:18, 58:15, 81:22, 184:25, 185:3
**noted** [1] - 185:1
**notes** [1] - 16:11
**nothing** [13] - 23:20, 58:3, 74:6, 113:13, 115:9, 115:11, 116:14, 128:17, 167:13, 183:13, 184:3, 216:15, 229:2
**notice** [6] - 131:8, 175:6, 179:24, 181:2, 181:6, 228:19
**notified** [1] - 180:18
**November** [2] - 215:16, 215:25
**nugget** [1] - 229:21
**number** [29] - 11:17, 16:2, 19:21, 19:22, 21:1, 83:15, 86:23, 117:2, 132:8, 133:2, 134:15, 134:20, 135:8, 135:9, 135:12, 145:19, 149:16, 158:10, 168:20, 174:18, 183:6, 187:9, 200:20, 202:9,

202:18, 211:5, 213:15, 216:8, 231:11
**Number** [1] - 1:3
**numbers** [4] - 92:7, 135:11, 135:24, 157:19
**numerous** [1] - 231:9
**nutshell** [1] - 87:15

**O**

**oath** [3] - 23:13, 30:22, 206:1
**obey** [1] - 111:1
**object** [10] - 66:12, 78:9, 80:15, 104:4, 126:23, 142:21, 144:2, 182:15, 189:15, 194:2
**objected** [1] - 222:5
**objecting** [2] - 126:25, 147:17
**objection** [80] - 29:10, 37:21, 46:15, 46:16, 48:16, 50:1, 50:2, 54:12, 54:13, 56:17, 63:18, 67:15, 68:13, 76:12, 76:23, 77:7, 78:16, 78:23, 79:9, 80:21, 84:11, 85:5, 93:10, 101:7, 101:8, 101:24, 101:25, 102:13, 102:15, 103:5, 106:21, 107:25, 108:1, 109:2, 109:16, 112:13, 112:14, 112:15, 125:25, 126:1, 140:7, 140:8, 142:7, 142:9, 142:15, 142:24, 143:4, 144:22, 144:23, 146:25, 147:1, 150:9, 150:10, 153:10, 153:11, 154:23, 156:25, 157:1, 158:23, 158:24, 163:24, 163:25, 166:19, 189:14, 189:19, 194:5, 196:9, 197:7, 198:3, 198:23, 198:24, 204:1, 205:4, 205:8, 206:12, 207:12, 208:2, 210:5, 210:6
**objections** [3] - 4:17, 194:4, 222:2
**observed** [4] - 135:6,

136:24, 154:3, 172:3
**obstruct** [1] - 76:5
**obstructing** [1] - 8:16
**obstruction** [1] - 14:25
**obtain** [2] - 139:5, 154:16
**obtained** [1] - 231:13
**obvious** [3] - 107:11, 132:5, 167:19
**obviously** [9] - 27:24, 81:2, 141:24, 143:7, 179:10, 180:6, 184:23, 185:7, 189:8
**OC** [2] - 91:7, 93:16
**occasionally** [1] - 112:25
**occurred** [2] - 198:13, 209:5
**occurring** [1] - 197:6
**October** [1] - 215:6
**odd** [1] - 121:12
**OF** [5] - 1:1, 1:3, 1:9, 235:1, 235:9
**offer** [2] - 22:14, 183:7
**offered** [3] - 105:2, 182:20, 183:6
**offering** [2] - 21:21, 182:14
**Office** [5] - 1:14, 129:25, 131:12, 131:24, 192:5
**office** [10] - 22:23, 23:2, 26:4, 26:11, 28:13, 224:23, 225:20, 228:7, 228:14, 232:19
**officer** [63] - 14:1, 18:14, 19:1, 19:9, 29:7, 29:8, 29:11, 29:15, 30:12, 30:13, 30:21, 31:9, 31:15, 34:22, 35:4, 35:10, 35:17, 48:3, 50:9, 52:21, 55:11, 55:13, 60:16, 60:18, 61:9, 61:19, 61:22, 62:8, 62:11, 62:20, 64:10, 64:12, 65:16, 67:7, 67:23, 68:1, 68:12, 68:14, 68:23, 68:24, 69:23, 70:2, 71:17, 73:7, 73:9, 82:5, 83:19, 90:2, 90:3, 98:12, 98:19, 107:2, 117:5, 117:7, 118:1, 118:14, 132:24, 133:10, 134:15, 134:20, 137:6, 203:2
**Officer** [56] - 34:3,

34:5, 34:9, 34:12, 34:15, 35:15, 38:18, 40:7, 44:11, 45:18, 46:6, 46:23, 47:7, 48:2, 48:22, 50:9, 51:3, 52:12, 52:21, 53:22, 54:19, 55:20, 56:6, 56:23, 82:16, 85:14, 86:2, 86:4, 86:5, 92:22, 95:15, 96:21, 98:12, 98:24, 99:10, 99:21, 101:15, 104:13, 105:4, 105:8, 105:15, 111:18, 113:25, 114:18, 172:20, 172:23, 187:16, 195:5, 199:9, 201:2, 201:22, 202:1, 202:16, 203:1, 203:23, 203:25
**officer's** [6] - 29:8, 30:6, 31:3, 49:19, 56:10, 117:16
**officers** [55] - 8:16, 9:23, 14:6, 14:7, 29:23, 29:24, 31:19, 37:10, 38:22, 45:1, 45:3, 61:24, 67:8, 70:24, 71:15, 73:11, 77:22, 79:18, 79:21, 89:2, 94:2, 94:4, 94:6, 94:16, 94:19, 98:15, 99:3, 99:25, 133:1, 133:3, 133:20, 133:24, 134:5, 134:13, 150:21, 151:20, 174:18, 186:22, 187:13, 192:24, 192:25, 194:17, 194:18, 197:15, 197:18, 197:23, 197:25, 199:8, 200:20, 200:21, 201:5, 206:2, 206:4, 220:19, 232:23
**OFFICIAL** [1] - 235:1
**official** [8] - 57:7, 57:15, 57:24, 59:5, 76:10, 134:19, 221:13, 224:23
**Official** [1] - 1:21
**often** [1] - 120:19
**old** [2] - 51:18, 215:11
**old-fashioned** [1] - 215:11
**Olmstead** [1] - 23:13
**OMB** [1] - 1:18

**once** [24] - 7:2, 38:2, 38:25, 39:2, 39:7, 40:12, 40:17, 43:14, 61:12, 91:8, 91:24, 92:11, 99:19, 118:25, 133:4, 133:25, 147:11, 147:12, 152:20, 159:2, 164:3, 209:11
**one** [92] - 7:7, 7:13, 10:14, 11:20, 14:11, 15:11, 16:1, 17:13, 18:3, 23:24, 28:17, 45:23, 47:3, 48:9, 51:14, 51:18, 51:23, 52:15, 55:13, 55:20, 57:5, 57:6, 60:4, 65:1, 69:7, 72:16, 74:7, 76:20, 80:15, 83:5, 97:12, 100:3, 103:21, 104:18, 105:17, 109:15, 110:17, 110:24, 111:4, 111:11, 113:8, 113:14, 114:12, 115:19, 119:8, 119:13, 120:10, 123:24, 124:10, 124:16, 125:1, 127:3, 134:21, 135:25, 136:14, 141:6, 143:12, 147:10, 151:3, 151:18, 151:21, 151:22, 152:1, 158:6, 159:18, 161:14, 165:3, 166:10, 168:14, 169:22, 170:18, 178:5, 183:19, 188:16, 188:18, 195:2, 199:9, 203:24, 209:18, 213:15, 214:5, 217:7, 218:3, 219:14, 220:16, 220:25, 222:10, 222:18, 222:20, 226:10, 228:18
**one's** [1] - 206:1
**one-second** [1] - 97:12
**ones** [4] - 187:14, 188:22, 213:5, 216:23
**open** [14] - 16:20, 22:17, 26:20, 97:10, 100:22, 133:9, 146:2, 146:4, 150:4, 179:16, 226:20,

228:1, 230:23, 231:9
**open-source** [3] - 97:10, 100:22, 146:2
**opened** [1] - 112:12
**opens** [5] - 3:23, 3:24, 4:5, 15:16, 18:11
**operate** [1] - 35:12
**opine** [1] - 17:7
**opined** [1] - 185:8
**opinion** [10] - 10:21, 19:21, 95:6, 166:18, 166:20, 167:2, 182:20, 183:14, 191:6, 198:9
**opportunities** [1] - 231:12
**opportunity** [7] - 45:18, 49:15, 65:5, 117:20, 118:5, 123:7, 181:2
**opposed** [2] - 7:10, 83:8
**opposite** [1] - 49:3
**order** [10] - 22:24, 26:16, 38:8, 94:22, 141:15, 188:18, 193:9, 193:10, 224:11, 228:5
**ordered** [4] - 28:10, 193:11, 193:14, 228:2
**ordering** [1] - 28:9
**orders** [5] - 42:13, 75:16, 111:2, 111:6, 226:8
**organized** [2] - 141:16, 141:17
**orient** [1] - 174:5
**original** [1] - 208:14
**originally** [1] - 30:12
**originating** [1] - 192:4
**otherwise** [4] - 58:22, 107:5, 226:14, 233:25
**ought** [2] - 187:17, 223:15
**ourselves** [3] - 57:11, 74:15, 182:12
**outline** [1] - 101:19
**outlined** [1] - 219:9
**outside** [5] - 5:25, 114:7, 131:15, 191:9, 204:17
**outweigh** [1] - 143:8
**overall** [2] - 12:18, 131:21
**overblown** [1] - 108:18
**overkill** [3] - 8:5, 8:7, 59:4

**overrule** [2] - 104:25, 194:5
**overruled** [16] - 37:22, 63:19, 68:14, 76:13, 78:17, 79:3, 80:22, 84:12, 85:6, 167:23, 189:19, 204:2, 207:12, 208:3, 210:11, 217:12
**overview** [7] - 12:12, 14:5, 18:23, 18:25, 59:11, 125:2, 166:22
**OWEN** [1] - 1:6
**own** [10] - 15:13, 15:14, 46:23, 48:22, 58:15, 75:14, 173:24, 181:8, 192:22, 231:10
**Oxnard** [1] - 1:17

## P

**p-i-A-n-o-n** [1] - 149:3
**P.C** [1] - 1:17
**P.G** [1] - 62:17
**p.m** [23] - 46:11, 49:8, 49:14, 49:22, 56:13, 98:4, 101:2, 103:16, 104:15, 106:4, 119:5, 131:19, 179:6, 187:24, 188:1, 188:16, 190:24, 191:8, 193:14, 226:25, 234:3
**pace** [1] - 39:7
**padded** [2] - 86:17, 86:25
**padding** [2] - 73:4, 73:17
**pads** [7] - 73:19, 73:24, 74:2, 75:5, 86:16, 87:9
**page** [56] - 40:16, 91:14, 92:21, 94:25, 95:13, 105:24, 138:5, 138:6, 138:9, 138:10, 138:12, 138:16, 138:20, 139:6, 140:12, 140:18, 140:23, 141:1, 141:19, 144:10, 146:7, 146:10, 146:21, 147:10, 148:5, 149:17, 150:1, 150:5, 153:6, 154:3, 154:11, 154:17, 154:19, 157:8, 157:9, 158:17,

185:11, 190:5, 191:22, 192:6, 193:3, 193:18, 193:19, 209:8, 209:12, 209:13, 210:21, 213:23, 217:5, 218:24, 219:2, 219:8, 219:13, 219:19, 224:24
**pages** [9] - 133:16, 141:12, 142:5, 145:3, 145:4, 158:1, 209:10, 216:1, 218:23
**paid** [1] - 89:11
**pain** [1] - 186:8
**painting** [1] - 215:10
**Palermo** [1] - 178:6
**palette** [2] - 40:8, 91:16
**panic** [1] - 37:13
**panicked** [1] - 37:11
**pants** [1] - 75:1
**paragraph** [4] - 157:21, 192:9, 193:7, 212:10
**paragraphs** [3] - 157:14, 192:8, 193:6
**parent** [1] - 156:16
**parents'** [2] - 104:3, 112:10
**parked** [3] - 65:19, 91:1, 91:3
**parking** [2] - 28:10
**part** [30] - 25:9, 36:2, 36:4, 52:1, 72:11, 72:12, 86:13, 89:8, 117:5, 126:14, 142:11, 143:3, 143:18, 146:21, 147:22, 175:24, 178:17, 179:14, 196:13, 197:11, 201:13, 201:14, 219:16, 219:21, 220:22, 221:19, 222:3, 223:7, 223:10
**participation** [1] - 172:21
**particular** [10] - 42:12, 63:11, 64:20, 103:25, 117:7, 120:25, 145:8, 148:25, 151:4, 208:15
**particularly** [3] - 14:4, 141:13, 232:15
**parties** [3] - 19:23, 19:25, 226:9

**pass** [1] - 56:24
**past** [1] - 119:23
**path** [6] - 4:22, 8:14, 8:21, 12:16, 91:17, 92:2
**paths** [1] - 169:1
**Patrick** [1] - 34:4
**Patriots** [1] - 170:2
**patriots** [1] - 214:6
**patrol** [14] - 35:1, 35:2, 35:4, 35:12, 36:18, 72:23, 74:5, 74:8, 74:17, 74:19, 75:4, 75:8, 86:11
**pause** [3] - 97:1, 136:14, 201:18
**paused** [4] - 106:9, 194:8, 201:10, 202:20
**pauses** [1] - 43:19
**pay** [5] - 62:20, 63:23, 115:8, 115:10, 169:24
**paying** [2] - 71:15, 185:1
**PD** [2] - 61:17, 62:13
**pdf** [2] - 141:19, 141:25
**pdfs** [1] - 141:12
**peace** [1] - 80:11
**peaceful** [1] - 192:15
**peacefully** [1] - 212:14
**Pence** [2] - 216:23, 216:25
**pencil** [1] - 148:10
**pending** [1] - 104:9
**Pennsylvania** [1] - 165:5
**people** [61] - 9:10, 10:4, 10:23, 10:24, 11:1, 11:3, 38:4, 38:15, 39:5, 40:21, 40:22, 40:25, 41:2, 41:13, 42:20, 42:22, 43:3, 43:5, 43:24, 44:17, 47:1, 47:3, 70:24, 71:2, 71:9, 72:2, 74:14, 74:20, 79:15, 79:24, 80:24, 84:9, 88:16, 90:25, 91:1, 92:7, 99:15, 99:19, 104:16, 104:21, 105:18, 110:24, 113:2, 116:12, 132:4, 145:22, 162:4, 173:8, 173:21, 193:23, 206:6, 212:11, 214:4, 218:10, 221:15,

222:14, 225:16
**people's** [2] - 212:9, 212:11
**pepper** [1] - 192:23
**Percent** [1] - 206:14
**percent** [12] - 14:10, 19:10, 57:22, 63:16, 123:4, 127:20, 128:18, 181:11, 181:23, 206:6, 206:18
**Percenters** [9] - 208:9, 221:2, 221:3, 221:5, 221:8, 221:13, 221:16, 221:20, 222:12
**perception** [3] - 11:8, 11:22, 167:3
**perceptions** [1] - 11:13
**percipient** [2] - 15:14, 17:9
**perhaps** [6] - 18:3, 118:17, 135:17, 174:22, 229:17, 232:12
**perimeter** [1] - 131:13
**period** [3] - 53:1, 67:4, 104:14
**permissible** [1] - 183:10
**permission** [2] - 114:3, 150:14
**permit** [2] - 22:6, 22:19
**permits** [1] - 32:16
**permitted** [3] - 22:2, 23:12, 23:22
**permittees** [1] - 11:7
**perpetrated** [1] - 160:11
**person** [19] - 15:8, 16:1, 21:9, 23:2, 23:4, 47:10, 68:11, 68:17, 98:13, 111:3, 135:9, 136:25, 137:10, 137:19, 138:3, 152:12, 155:12, 155:21, 166:2
**personal** [4] - 22:22, 36:24, 75:14, 131:4
**personally** [1] - 75:6
**personnel** [2] - 172:19, 191:1
**persons** [4] - 192:11, 192:20, 192:24, 193:9
**perspective** [4] - 10:5, 65:24, 66:7, 232:16

**phone** [17] - 55:9, 55:10, 80:18, 80:25, 81:1, 81:7, 145:11, 152:7, 152:12, 166:23, 187:19, 189:6, 189:7, 189:12, 191:7, 196:7, 212:2
**phones** [4] - 64:25, 106:15, 187:25, 205:7
**photo** [2] - 211:5, 213:9
**photos** [3] - 138:16, 138:19, 139:1
**phrase** [3] - 110:10, 110:12, 160:7
**physical** [3] - 45:16, 74:20, 75:13
**physically** [2] - 49:2, 152:11
**pi** [5] - 206:21, 208:10, 208:17, 221:3, 222:8
**Pi** [1] - 206:22
**PI_Anon** [1] - 149:8
**PiAnon** [3] - 149:1, 149:14, 170:17
**pic** [2] - 108:6, 108:15
**pick** [2] - 166:23, 196:7
**picked** [1] - 39:7
**picture** [6] - 108:9, 108:17, 114:8, 148:17, 207:4, 213:10
**picture-looking** [1] - 148:17
**pictures** [3] - 107:11, 111:19, 134:2
**piece** [2] - 55:11, 59:23
**pieces** [1] - 47:12
**PIERCE** [4] - 1:16, 3:12, 3:17, 222:24
**Pierce** [5] - 1:17, 3:12, 18:24, 179:4, 179:8
**pin** [3] - 115:18, 115:19, 115:20
**pinch** [1] - 21:10
**pinging** [1] - 187:25
**place** [8] - 110:17, 110:24, 111:4, 111:11, 134:11, 159:18, 182:12, 194:15
**placed** [1] - 135:11
**places** [2] - 145:20, 165:2
**Plaintiff** [1] - 1:4
**plan** [2] - 216:21

**plane** [2] - 17:16, 17:17
**planned** [1] - 90:16
**planning** [3] - 66:2, 209:7, 224:15
**planter** [2] - 70:11, 70:16
**plastic** [1] - 87:8
**plates** [1] - 134:14
**platoon** [4] - 35:19, 86:16, 87:4, 89:2
**Platoon** [1] - 35:20
**platoons** [4] - 86:22, 87:3, 87:7, 88:7
**play** [60] - 46:2, 46:19, 50:24, 51:6, 52:3, 52:18, 53:7, 53:18, 54:16, 55:5, 55:17, 56:20, 66:3, 67:1, 67:20, 68:2, 68:20, 77:15, 96:17, 97:16, 98:8, 98:20, 101:12, 102:3, 155:1, 155:15, 156:3, 159:2, 160:1, 160:14, 161:25, 162:5, 164:3, 164:21, 165:18, 165:22, 166:12, 168:9, 169:4, 169:14, 169:22, 171:19, 173:10, 174:2, 186:23, 194:21, 195:11, 195:21, 196:1, 199:4, 199:14, 200:1, 200:15, 200:24, 201:6, 203:5, 203:6, 203:15, 205:19, 208:18
**play/pause** [3] - 134:11, 134:12
**played** [88] - 46:4, 46:21, 47:21, 47:25, 48:20, 50:7, 51:1, 51:7, 51:9, 52:5, 52:14, 52:19, 53:9, 53:16, 53:20, 54:17, 55:18, 56:22, 61:13, 61:14, 62:6, 62:22, 63:1, 63:25, 64:8, 64:16, 67:2, 67:21, 68:4, 68:21, 69:1, 69:4, 69:8, 71:25, 77:16, 78:8, 96:19, 96:24, 97:17, 98:10, 98:22, 99:8, 100:5, 101:13, 102:5, 102:20, 103:9,

135:19, 136:12, 136:20, 155:3, 155:17, 156:2, 156:4, 159:4, 160:3, 160:15, 161:2, 161:10, 162:7, 164:6, 164:23, 165:20, 165:23, 166:6, 166:14, 168:10, 169:6, 169:15, 169:25, 173:12, 174:3, 186:25, 194:23, 195:13, 196:2, 199:6, 199:15, 200:3, 200:10, 200:17, 201:8, 203:7, 203:16, 205:21, 208:20, 210:25, 228:25
**playing** [12] - 47:19, 47:23, 48:18, 53:14, 99:6, 135:16, 155:25, 161:8, 166:4, 171:14, 187:19, 202:23
**plays** [1] - 122:22
**Plaza** [1] - 65:20
**plenty** [1] - 13:2
**plus** [1] - 183:6
**podium** [1] - 3:5
**point** [52] - 8:4, 9:5, 16:16, 24:2, 24:4, 24:19, 25:16, 25:17, 25:18, 25:22, 25:25, 29:6, 29:25, 30:4, 31:11, 38:5, 42:8, 43:17, 58:19, 60:24, 84:21, 89:11, 92:3, 92:12, 92:22, 93:5, 93:18, 94:22, 96:8, 98:15, 104:7, 111:12, 112:2, 113:8, 113:12, 119:18, 121:13, 134:17, 145:12, 148:3, 177:14, 177:22, 185:13, 200:25, 201:16, 203:24, 206:5, 229:11, 229:12, 229:13, 233:13
**pointed** [2] - 24:23, 168:24
**pointing** [4] - 70:14, 165:15, 169:19, 169:21
**points** [6] - 23:24, 82:2, 82:6, 208:11, 208:12, 230:3

**poker** [1] - 20:23
**Police** [11] - 34:4, 34:17, 34:18, 61:17, 61:20, 84:8, 86:6, 114:3, 135:4, 192:25
**police** [29] - 8:16, 18:5, 29:7, 29:10, 29:14, 29:22, 29:24, 31:8, 35:12, 37:5, 42:8, 75:20, 80:4, 80:5, 89:22, 90:25, 94:3, 95:19, 95:22, 95:24, 181:21, 186:22, 187:3, 194:11, 200:20, 200:21, 206:1, 212:12
**politically** [1] - 58:8
**poor** [3] - 17:10, 17:13, 17:14
**popped** [1] - 81:21
**popular** [1] - 149:6
**portion** [22] - 48:23, 48:24, 64:15, 66:10, 81:6, 97:23, 99:3, 156:7, 162:1, 172:16, 173:16, 187:18, 190:11, 195:8, 195:16, 200:10, 201:12, 203:10, 204:17, 205:25
**portions** [4] - 24:8, 161:17, 204:24, 205:13
**position** [9] - 6:14, 38:12, 51:24, 60:5, 60:7, 121:5, 124:12, 182:13, 228:11
**positioned** [1] - 111:11
**positive** [2] - 114:11, 114:23
**positively** [2] - 134:17, 137:24
**possession** [3] - 3:21, 25:14, 177:24
**possible** [7] - 88:4, 89:14, 96:17, 126:21, 147:9, 174:24, 185:16
**possibly** [2] - 105:25, 180:3
**post** [17] - 106:9, 106:12, 107:22, 108:24, 110:1, 110:3, 115:24, 143:12, 145:8, 211:21, 212:4, 212:24, 215:2,

216:11, 218:9, 218:20, 219:5
**post-traumatic** [1] - 110:3
**posted** [27] - 108:24, 139:1, 151:12, 151:15, 153:3, 153:21, 153:22, 153:23, 153:24, 158:17, 162:25, 171:4, 180:17, 204:10, 206:25, 207:6, 208:23, 211:8, 211:11, 214:1, 214:2, 215:6, 215:16, 216:18, 217:17, 217:20, 218:6
**posting** [4] - 109:7, 109:13, 109:24, 141:20
**posts** [6] - 112:17, 115:22, 138:20, 141:8, 221:6, 222:1
**potential** [7] - 5:1, 11:21, 123:19, 126:18, 133:20, 137:6, 232:7
**potentially** [6] - 116:21, 125:13, 133:21, 164:14, 207:21, 224:16
**pouch** [1] - 51:21
**powerful** [1] - 20:18
**practical** [2] - 193:21, 194:3
**practically** [1] - 132:7
**practiced** [1] - 76:3
**pre** [1] - 24:20
**pre-January** [1] - 24:20
**precisely** [2] - 24:4, 31:15
**preclude** [5] - 3:20, 9:5, 180:2, 180:20, 226:3
**precluded** [4] - 12:2, 13:6, 19:24, 226:9
**predated** [2] - 209:2, 214:19
**prejudicial** [1] - 143:8
**preliminarily** [1] - 223:13
**preliminary** [1] - 119:8
**premises** [1] - 173:22
**preordained** [1] - 26:6
**prep** [1] - 28:22
**preparation** [4] - 40:14, 53:24, 55:21, 125:7

**prepare** [4] - 38:12, 39:21, 114:14, 117:20
**prepared** [4] - 16:20, 31:22, 230:2, 230:7
**prepped** [1] - 176:9
**prepping** [1] - 28:24
**presence** [1] - 5:25
**present** [8] - 3:2, 22:4, 57:4, 119:6, 179:7, 197:24, 224:1, 229:17
**presentation** [1] - 19:11
**presented** [1] - 5:12
**preset** [1] - 36:7
**president** [2] - 160:12, 218:19
**President** [1] - 216:22
**presidential** [1] - 41:3
**press** [1] - 222:15
**pressed** [2] - 44:19, 137:7
**presumably** [3] - 6:18, 207:20, 222:11
**presume** [2] - 188:10, 193:13
**presuming** [1] - 126:12
**pretext** [1] - 228:8
**pretty** [8] - 7:4, 43:20, 50:13, 93:8, 157:19, 167:19, 201:2, 209:9
**prevent** [1] - 94:17
**prevents** [1] - 229:2
**previous** [3] - 100:18, 135:24, 137:8
**previously** [10] - 19:12, 43:9, 43:14, 96:13, 106:7, 189:14, 196:14, 201:19, 206:4, 210:6
**Prince** [8] - 14:9, 61:20, 62:16, 69:23, 73:7, 134:22, 135:2, 135:10
**principal** [1] - 197:14
**principally** [1] - 22:13
**prison** [1] - 23:9
**prison-like** [1] - 23:9
**pro** [1] - 8:11
**pro-January** [1] - 8:11
**probable** [1] - 139:13
**probative** [1] - 143:8
**probe** [1] - 128:16
**problem** [8] - 32:20, 121:3, 125:1, 125:18, 126:24, 133:6, 142:13, 189:3
**procedural** [1] -

126:24
**proceed** [7] - 82:12, 85:16, 98:6, 107:14, 120:14, 129:9, 186:14
**proceeding** [1] - 39:3
**Proceedings** [2] - 1:24, 234:3
**proceedings** [3] - 192:12, 192:21, 235:4
**process** [1] - 209:2
**produced** [2] - 1:25, 134:4
**production** [5] - 134:3, 140:18, 141:20, 144:16, 158:3
**productions** [1] - 188:15
**profession** [1] - 114:13
**proffer** [4] - 8:13, 28:3, 28:14, 65:12
**proffering** [1] - 17:25
**proffers** [1] - 4:21
**profile** [2] - 146:1, 148:17
**profit/loss** [1] - 26:15
**profits** [3] - 25:3, 227:19, 227:21
**proper** [1] - 182:18
**property** [2] - 5:13, 193:9
**proposal** [1] - 33:14
**propose** [2] - 19:15, 125:16
**proposed** [1] - 4:11
**proposing** [1] - 125:12
**proposition** [1] - 111:3
**prosecuted** [2] - 6:25, 10:8
**prosecution** [5] - 30:7, 30:24, 79:8, 128:5, 233:1
**protect** [4] - 74:15, 93:18, 99:18, 193:9
**protected** [1] - 87:10
**protection** [3] - 73:24, 74:2, 75:14
**protective** [9] - 36:24, 38:13, 39:3, 73:1, 73:8, 73:10, 73:13, 73:22, 75:12
**protest** [1] - 212:21
**protestor** [2] - 68:10, 81:17
**protestors** [9] - 69:11,

92:10, 94:17, 100:20, 110:20, 111:10, 113:23, 181:18, 192:22
**protests** [3] - 75:18, 111:7, 192:15
**Proud** [5] - 18:25, 19:23, 20:3, 22:2, 184:11
**prove** [6] - 58:25, 59:3, 59:24, 117:13, 128:15, 198:10
**proves** [1] - 58:19
**provide** [4] - 25:4, 27:19, 177:4, 183:8
**provided** [6] - 28:22, 30:5, 65:9, 134:24, 138:5, 179:15
**providing** [2] - 25:1, 131:13
**PSA** [1] - 35:4
**psychic** [1] - 79:5
**PTSD** [12] - 104:1, 107:4, 107:7, 109:10, 110:2, 112:6, 115:13, 115:14, 115:15, 117:18, 117:23
**public** [23] - 7:20, 25:14, 27:10, 57:8, 75:13, 75:15, 77:1, 132:1, 138:9, 138:17, 145:25, 150:2, 153:6, 154:3, 154:19, 156:7, 170:12, 188:19, 188:23, 192:2, 193:10, 193:25
**public-facing** [1] - 138:9
**publicly** [5] - 133:17, 139:6, 170:22, 188:22, 188:23
**publicly-facing** [1] - 133:17
**publish** [12] - 46:19, 50:5, 50:22, 77:9, 102:3, 102:13, 102:16, 140:11, 150:14, 157:4, 189:23, 210:18
**published** [9] - 40:6, 64:21, 81:23, 133:15, 147:25, 156:7, 159:2, 164:3, 188:9
**pull** [9] - 40:5, 45:25, 50:14, 53:17, 92:4, 106:14, 135:13, 170:4, 209:12

**pulled** [3] - 91:3, 132:9, 230:12
**pulling** [1] - 81:24
**pulls** [1] - 143:11
**pure** [1] - 112:18
**purely** [1] - 183:5
**purpose** [7] - 15:6, 70:19, 117:6, 118:1, 145:4, 176:1, 190:3
**purposes** [5] - 6:24, 162:24, 176:20, 176:24, 211:15
**pursuant** [1] - 210:1
**push** [5] - 19:16, 44:18, 49:3, 73:12, 99:13
**pushed** [17] - 14:10, 19:10, 19:18, 43:16, 44:24, 47:1, 64:11, 65:16, 67:24, 68:12, 71:9, 121:21, 123:2, 124:16, 128:11, 230:6, 233:2
**pushing** [7] - 44:17, 45:10, 47:17, 62:24, 69:22, 77:22, 113:10
**put** [40] - 6:14, 7:19, 9:7, 13:18, 14:24, 18:8, 20:21, 21:10, 21:16, 22:19, 23:7, 37:13, 39:16, 60:5, 60:8, 88:5, 88:9, 91:8, 92:12, 93:7, 93:18, 119:17, 121:14, 122:7, 125:6, 125:7, 125:13, 127:6, 127:17, 131:25, 141:25, 181:9, 182:13, 215:10, 225:1, 225:21, 227:12, 227:17, 228:18, 228:25
**puts** [4] - 21:4, 21:10, 90:2, 120:17
**putting** [6] - 25:2, 59:3, 60:7, 93:14, 125:2, 224:15

## Q

**quality** [1] - 17:10
**Quantico** [1] - 130:18
**quasi** [1] - 21:13
**quasi-expert** [1] - 21:13
**questioning** [1] - 5:22
**questions** [17] - 5:16, 20:6, 56:24, 72:8, 78:13, 81:11, 84:14,

84:16, 85:11, 98:13, 105:11, 111:13, 114:19, 117:24, 143:15, 183:23, 232:12
**quick** [4] - 57:5, 64:24, 169:22, 226:7
**quickly** [6] - 85:2, 106:16, 132:5, 175:11, 209:9, 218:23
**quite** [3] - 8:18, 10:19, 16:7
**quotation** [2] - 128:23, 128:24
**quotations** [4] - 119:23, 120:9, 120:22, 232:7
**quote** [6] - 25:21, 120:2, 120:20, 138:13, 178:17, 203:19
**quotes** [7] - 120:1, 120:18, 121:14, 122:7, 175:14, 175:15, 178:11

## R

**racks** [3] - 23:10, 164:12, 192:24
**radio** [15] - 27:6, 33:12, 35:13, 37:5, 37:6, 41:10, 58:6, 89:14, 89:19, 89:20, 89:22, 89:25, 90:7, 185:17
**radios** [1] - 27:5
**railing** [2] - 174:17
**raise** [4] - 28:18, 124:8, 179:9, 220:16
**raised** [6] - 119:18, 136:1, 136:5, 175:7, 177:8, 229:13
**raising** [1] - 223:6
**rallies** [1] - 90:16
**Rally** [1] - 153:20
**ramp** [12] - 93:6, 95:1, 95:2, 95:4, 95:6, 95:7, 96:8, 99:2, 100:11, 100:19, 101:2, 201:2
**ran** [2] - 39:10, 40:18
**random** [1] - 132:9
**range** [1] - 9:24
**rank** [2] - 34:21, 35:16
**rare** [1] - 219:3
**rather** [6] - 7:14, 16:18, 30:12, 105:3, 220:21, 229:18

**rationally** [1] - 167:3
**raw** [3] - 134:4, 141:14, 141:18
**re** [1] - 45:2
**re-established** [1] - 45:2
**reach** [2] - 124:23, 166:2
**reached** [2] - 19:25, 20:2
**reaction** [1] - 18:5
**read** [28] - 22:16, 26:5, 161:5, 178:16, 189:10, 190:6, 190:16, 190:21, 191:11, 191:15, 191:24, 192:9, 193:6, 202:8, 202:17, 211:5, 212:4, 212:9, 212:19, 214:3, 215:2, 216:14, 216:20, 217:17, 219:1, 219:10, 220:9, 226:8
**reads** [1] - 190:17
**ready** [15] - 17:17, 33:22, 60:16, 60:20, 87:23, 88:1, 88:18, 89:2, 118:25, 119:7, 175:9, 175:10, 215:22, 224:10, 225:24
**real** [5] - 22:23, 64:24, 76:11, 125:18, 141:15
**realize** [5] - 112:6, 112:9, 112:20, 113:4, 115:15
**realized** [4] - 28:19, 28:22, 28:23, 115:14
**really** [28] - 9:4, 18:20, 37:12, 41:10, 42:20, 48:5, 48:6, 48:12, 48:13, 63:15, 68:16, 69:18, 71:15, 75:16, 75:22, 79:4, 89:12, 89:15, 104:9, 135:3, 143:16, 158:6, 223:2, 223:13, 225:7, 231:21, 233:19
**realtime** [1] - 32:21
**reason** [10] - 10:20, 20:15, 20:25, 22:23, 57:8, 113:21, 126:6, 147:19, 206:24, 228:8
**reasonable** [2] - 124:22, 223:19

**reassure** [1] - 180:25
**rebut** [2] - 60:9, 225:3
**rebuts** [1] - 227:18
**receive** [5] - 115:13, 132:8, 137:20, 141:23, 141:24
**received** [52] - 42:13, 46:18, 50:4, 54:15, 56:19, 57:21, 59:7, 59:8, 67:18, 77:13, 101:10, 102:2, 103:7, 106:25, 108:3, 109:4, 109:18, 115:6, 130:23, 131:8, 132:13, 132:17, 132:18, 133:18, 134:3, 140:3, 140:10, 141:10, 144:17, 144:25, 147:3, 150:12, 153:13, 154:25, 156:20, 157:3, 157:11, 158:19, 159:1, 159:22, 161:21, 163:20, 164:2, 184:5, 188:22, 189:6, 189:20, 191:7, 191:19, 205:10, 210:1, 210:16
**RECEIVED** [1] - 2:11
**receiving** [1] - 133:9
**recent** [2] - 3:18, 121:11
**recently** [1] - 130:24
**Recess** [4] - 57:3, 98:4, 119:5, 179:6
**recital** [1] - 178:9
**recognition** [1] - 145:13
**recognize** [29] - 18:1, 46:6, 53:3, 53:22, 56:6, 63:5, 67:1, 67:4, 67:6, 77:18, 77:21, 100:8, 108:22, 110:4, 139:20, 144:11, 146:13, 149:21, 149:23, 149:25, 152:25, 154:7, 156:12, 158:14, 163:15, 188:5, 204:7, 205:24
**recognizes** [1] - 30:20
**recollection** [4] - 24:23, 116:9, 116:12, 117:11
**recommend** [1] - 141:13

**record** [47] - 3:6, 7:8, 19:22, 34:2, 34:3, 41:25, 42:3, 43:7, 43:10, 44:4, 44:8, 49:5, 57:8, 66:20, 68:19, 70:14, 85:9, 86:3, 91:20, 92:14, 92:17, 94:9, 94:13, 95:9, 95:11, 96:2, 96:5, 96:11, 96:14, 97:6, 97:22, 97:25, 129:19, 148:12, 148:14, 152:14, 176:3, 176:20, 176:23, 177:6, 177:7, 178:2, 184:25, 190:10, 232:16, 235:4
**recorded** [1] - 1:24
**recording** [3] - 104:20, 104:21, 119:25
**Records** [2] - 139:24, 190:2
**records** [4] - 139:24, 188:14, 209:23, 209:25
**Recross** [2] - 2:5, 2:8
**RECROSS** [2] - 84:18, 114:21
**recross** [3] - 120:14, 126:13, 127:9
**RECROSS-EXAMINATION** [2] - 84:18, 114:21
**Recross-Examination........... ..** [2] - 2:5, 2:8
**red** [4] - 164:15, 164:17, 199:22, 219:9
**redact** [1] - 177:3
**redacted** [1] - 176:21
**REDIRECT** [2] - 82:14, 111:16
**Redirect** [2] - 2:5, 2:7
**redirect** [3] - 38:7, 82:9, 111:14
**reel** [2] - 154:4, 156:6
**reestablish** [1] - 46:25
**refer** [6] - 34:18, 145:19, 187:21, 213:13, 220:20, 221:2
**reference** [4] - 3:20, 198:12, 206:5, 220:18
**referenced** [2] - 212:25, 220:18
**references** [1] -

157:21
**referred** [7] - 117:23, 162:23, 174:13, 197:22, 213:2, 217:8, 220:19
**referring** [11] - 10:10, 10:14, 143:2, 159:11, 159:12, 160:19, 166:18, 167:17, 168:1, 186:20, 198:14
**reflect** [27] - 41:25, 42:3, 43:7, 43:10, 44:4, 44:8, 46:10, 54:7, 56:12, 91:20, 92:14, 92:17, 94:9, 94:13, 95:9, 95:11, 96:2, 96:5, 96:11, 96:14, 97:6, 97:22, 97:25, 114:10, 148:12, 148:14, 190:10
**reflected** [1] - 190:13
**reflection** [2] - 200:6, 200:8
**refrains** [1] - 205:24
**regard** [11] - 4:24, 5:8, 13:10, 15:1, 18:4, 29:24, 79:23, 124:10, 185:16, 189:13, 210:7
**regarding** [1] - 13:8
**regardless** [1] - 11:18
**register** [1] - 48:13
**registered** [1] - 141:6
**regular** [5] - 36:18, 36:22, 86:22, 86:24, 174:20
**reinforce** [1] - 42:14
**relate** [1] - 26:1
**related** [3] - 185:7, 209:6, 229:3
**relates** [1] - 206:18
**relating** [4] - 176:18, 179:17, 197:12, 222:15
**relation** [1] - 50:10
**relaying** [1] - 7:14
**relevance** [9] - 9:2, 9:19, 28:6, 76:23, 104:4, 206:12, 222:3, 226:15, 228:9
**relevant** [14] - 4:21, 10:17, 10:19, 11:8, 32:4, 58:3, 58:13, 58:23, 145:5, 145:7, 206:17, 206:23, 206:24, 222:4
**reluctant** [1] - 12:18
**relying** [3] - 5:21,

167:6, 179:25
**remainder** [1] - 202:23
**remained** [2] - 163:4, 226:20
**remedied** [1] - 177:15
**remedy** [2] - 123:20, 123:23
**remember** [48] - 19:9, 36:13, 36:16, 37:24, 40:13, 40:17, 40:20, 41:3, 41:7, 44:16, 44:18, 44:21, 44:22, 47:12, 47:17, 53:24, 55:20, 59:11, 62:17, 71:16, 74:3, 79:22, 80:9, 80:10, 81:7, 82:23, 82:25, 84:5, 84:6, 85:1, 89:24, 90:23, 91:11, 92:1, 92:6, 93:1, 131:17, 138:19, 138:22, 167:25, 170:19, 171:7, 173:1, 197:2, 214:15, 226:5
**remembered** [1] - 58:15
**remembering** [1] - 123:6
**remind** [4] - 83:3, 118:12, 181:16, 203:21
**reminded** [2] - 18:24, 117:15
**reminder** [3] - 116:25, 117:2, 220:9
**rendering** [4] - 41:8, 43:25, 51:20, 95:17
**renderings** [2] - 40:13, 91:11
**rental** [1] - 88:5
**repeat** [4] - 37:1, 45:5, 151:5, 161:17
**repeatedly** [1] - 25:19
**repeats** [1] - 205:13
**rephrase** [3] - 54:23, 93:11, 197:16
**replacement** [1] - 20:8
**replica** [1] - 115:20
**replicate** [1] - 136:24
**report** [14] - 29:12, 29:13, 29:14, 29:16, 121:2, 121:18, 121:20, 122:5, 122:6, 123:1, 128:17, 214:14, 214:16, 229:15
**reported** [2] - 36:17, 138:3
**Reporter** [1] - 1:21
**REPORTER** [2] -

235:1, 235:9
**reporting** [1] - 132:20
**reports** [4] - 120:2, 120:19, 184:16, 222:15
**represent** [2] - 49:20, 101:1
**representation** [2] - 226:4, 226:10
**Representatives** [1] - 160:24
**representatives** [1] - 168:6
**represented** [2] - 5:2, 32:11
**representing** [1] - 184:22
**represents** [4] - 7:18, 13:7, 15:9, 208:13
**republic** [1] - 212:17
**request** [3] - 134:19, 158:4, 209:1
**requested** [2] - 188:13, 209:5
**require** [1] - 22:17
**required** [1] - 59:23
**research** [4] - 117:1, 146:2, 179:1, 220:10
**reserve** [1] - 124:24
**resident** [1] - 59:19
**resolve** [2] - 227:4, 228:16
**resort** [1] - 88:22
**respect** [10] - 13:6, 22:11, 160:24, 174:6, 177:5, 195:16, 197:3, 203:22, 209:1, 232:15
**respond** [5] - 35:25, 36:7, 118:16, 142:18, 218:10
**response** [8] - 27:11, 156:20, 157:11, 158:4, 163:20, 218:9, 226:24, 227:5
**responses** [2] - 137:20, 137:22
**rest** [10] - 38:4, 38:12, 42:9, 43:5, 113:6, 118:22, 126:10, 185:23, 189:15, 208:18
**restrained** [2] - 212:10, 212:16
**restricted** [8] - 9:1, 10:5, 23:14, 24:14, 94:5, 174:7, 174:8, 199:25
**Restricted** [1] - 164:17

**restroom** [1] - 174:23
**rests** [3] - 118:25, 126:9, 185:25
**result** [2] - 28:8, 59:18
**retain** [2] - 45:1, 47:6
**retardant** [1] - 87:12
**retreat** [1] - 111:4
**return** [17] - 142:11, 143:3, 143:18, 144:18, 145:2, 145:23, 147:22, 158:19, 163:1, 163:18, 163:20, 208:25, 209:1, 209:24, 211:4, 211:7, 213:1
**returned** [1] - 172:18
**returns** [1] - 217:7
**revelations** [1] - 26:17
**reverse** [1] - 184:5
**review** [37] - 14:13, 33:7, 45:18, 49:15, 52:24, 65:8, 99:21, 99:24, 101:15, 102:9, 102:22, 117:18, 123:8, 134:9, 135:25, 137:3, 137:22, 145:25, 152:2, 152:20, 162:18, 162:25, 167:8, 172:15, 172:20, 175:18, 178:3, 180:3, 180:19, 181:2, 181:7, 181:13, 183:8, 197:11, 199:23, 202:24, 212:24
**reviewed** [27] - 3:18, 5:9, 13:9, 13:14, 21:14, 54:21, 133:5, 133:18, 138:6, 147:19, 153:6, 159:7, 159:17, 178:9, 179:14, 179:25, 180:11, 180:12, 180:13, 180:16, 182:17, 182:19, 182:23, 183:16, 183:18, 189:14, 197:21
**reviewing** [15] - 21:20, 40:13, 53:24, 54:5, 54:19, 54:25, 55:20, 91:11, 116:7, 116:8, 132:20, 162:2, 186:18, 194:8, 228:24
**Revolution** [2] - 206:7, 206:19

**rewind** [3] - 51:4, 64:3, 64:4
**Ride** [1] - 214:12
**ride** [1] - 218:14
**Riders** [4] - 155:14, 219:12, 219:18, 219:22
**riders** [1] - 214:25
**riggedelection** [1] - 216:15
**right-hand** [2] - 49:12, 91:21
**rigor** [1] - 132:11
**ringing** [1] - 159:10
**riot** [19] - 25:2, 25:6, 27:8, 27:12, 28:8, 35:25, 36:23, 37:3, 37:4, 39:23, 45:11, 72:16, 72:19, 72:20, 72:21, 73:11, 75:23, 86:12
**rioter** [1] - 68:11
**rioters** [12] - 10:12, 10:15, 26:24, 44:13, 58:20, 83:1, 98:18, 99:4, 181:18, 225:14, 225:15, 228:4
**riots** [3] - 75:17, 84:6, 228:6
**riser** [1] - 195:5
**risers** [8] - 40:20, 42:25, 43:3, 43:4, 43:6, 43:8, 174:14, 174:15
**risk** [3] - 5:6, 5:13, 182:11
**road** [1] - 91:1
**Robert** [4] - 85:18, 86:4, 218:8, 218:11
**ROBERT** [3] - 2:6, 85:20, 86:4
**robots** [1] - 112:23
**ROGER** [1] - 1:16
**Roger** [1] - 3:14
**role** [4] - 8:10, 14:19, 22:9, 131:21
**roll** [4] - 64:7, 71:23, 87:19, 88:13
**rolling** [1] - 68:25
**roof** [1] - 90:11
**room** [1] - 104:3
**Room** [1] - 1:22
**root's** [1] - 78:9
**Roots** [49] - 3:14, 4:9, 9:20, 12:4, 18:20, 24:15, 29:15, 31:2, 32:23, 56:25, 59:10, 61:4, 65:12, 66:6, 66:21, 78:12, 79:10,

81:20, 82:22, 83:15, 83:22, 84:5, 105:12, 107:14, 112:5, 116:17, 117:4, 118:10, 118:20, 121:5, 121:7, 122:4, 127:10, 127:14, 142:19, 143:17, 143:25, 147:13, 147:17, 167:10, 177:13, 179:13, 180:4, 189:5, 222:2, 227:7, 228:22, 230:1
**ROOTS** [237] - 1:16, 4:3, 4:10, 7:23, 8:18, 8:23, 9:22, 10:3, 10:9, 10:19, 10:24, 11:11, 11:16, 12:6, 12:8, 12:11, 12:22, 13:4, 13:14, 13:20, 14:8, 14:20, 15:11, 15:16, 15:22, 16:1, 16:6, 16:19, 16:24, 17:1, 17:13, 17:21, 17:25, 18:8, 18:24, 19:8, 19:17, 20:1, 20:11, 20:17, 20:20, 21:4, 21:16, 23:6, 23:19, 24:13, 24:20, 26:13, 26:23, 27:4, 27:11, 27:17, 28:9, 29:20, 29:24, 30:4, 30:11, 30:20, 31:14, 33:12, 37:21, 46:16, 48:16, 50:2, 54:13, 56:17, 57:22, 58:5, 58:12, 58:15, 58:19, 59:19, 60:3, 60:17, 61:6, 61:15, 62:7, 62:23, 63:2, 63:22, 64:1, 64:7, 64:9, 64:17, 64:23, 65:14, 65:21, 66:1, 66:4, 66:22, 66:24, 67:3, 67:12, 67:19, 67:22, 68:5, 68:18, 68:22, 69:2, 69:5, 69:9, 70:14, 70:17, 72:1, 72:5, 72:7, 76:15, 76:25, 77:14, 77:17, 78:11, 78:14, 78:18, 78:24, 79:6, 79:11, 79:14, 80:23, 81:9, 81:10, 82:1, 82:5, 84:11, 84:16, 84:19, 85:8, 85:11, 93:10, 101:8, 101:25, 102:14, 103:5, 104:4, 104:23, 105:14, 107:15, 107:24, 108:4,

108:5, 109:1, 109:5, 109:19, 109:21, 111:13, 112:14, 114:22, 116:14, 116:18, 116:20, 117:7, 117:9, 117:15, 118:3, 118:7, 119:1, 121:10, 121:19, 121:25, 122:8, 122:12, 122:19, 122:24, 124:8, 124:25, 125:12, 125:18, 125:23, 126:5, 127:17, 128:4, 128:8, 128:16, 140:8, 142:8, 142:14, 142:24, 143:6, 143:19, 144:2, 144:23, 147:1, 150:10, 153:11, 154:23, 157:1, 158:24, 163:10, 163:25, 166:19, 166:22, 167:13, 181:3, 181:8, 181:11, 181:14, 181:23, 182:6, 184:8, 184:11, 184:14, 185:15, 186:6, 189:3, 189:6, 189:13, 194:2, 196:6, 197:7, 198:5, 198:23, 204:1, 205:5, 205:8, 206:12, 206:24, 208:2, 210:6, 210:9, 217:11, 223:8, 224:8, 224:15, 224:19, 224:25, 225:3, 225:9, 225:21, 226:19, 227:10, 227:17, 227:21, 228:1, 228:13, 230:2, 230:12, 232:22, 233:7
**rose** [2] - 41:23
**roster** [2] - 36:6, 36:7
**roughly** [1] - 185:19
**rounded** [1] - 203:12
**route** [5] - 39:4, 219:12, 219:16, 219:18, 219:22
**RPR** [1] - 1:21
**rubber** [2] - 19:1, 19:2
**rule** [3] - 184:9, 227:3, 227:8
**Rule** [3] - 124:10,

166:20, 167:3
**ruled** [1] - 224:20
**ruling** [2] - 178:1, 229:5
**Rumble** [9] - 170:8, 170:9, 170:11, 170:15, 204:10, 204:15, 207:1, 207:21, 213:6
**Rummens** [2] - 3:10, 140:13
**run** [2] - 114:4, 114:5
**running** [2] - 39:8, 91:2

**S**

**safe** [4] - 79:16, 92:12, 105:21, 105:24
**safety** [2] - 5:13, 193:9
**Safeway** [18] - 22:21, 25:3, 26:15, 27:19, 27:21, 27:24, 60:4, 60:9, 60:11, 225:22, 227:13, 227:14, 227:19, 227:21, 227:24, 228:1, 228:6, 228:10
**Safeways** [2] - 226:17, 226:20
**sales** [1] - 28:1
**SAMANTHA** [1] - 1:13
**Samantha** [1] - 3:7
**sanction** [1] - 123:20
**sanctions** [1] - 123:19
**Sara** [2] - 235:3, 235:8
**SARA** [1] - 1:21
**saw** [43] - 6:17, 7:17, 12:14, 42:20, 42:22, 43:3, 43:6, 46:24, 46:25, 48:12, 48:23, 51:18, 64:12, 65:19, 71:9, 80:14, 83:13, 94:1, 98:25, 99:12, 100:18, 114:16, 121:2, 121:17, 132:20, 146:7, 146:20, 153:5, 165:3, 169:18, 172:23, 173:18, 173:20, 174:12, 178:16, 182:3, 182:4, 182:21, 183:15, 185:4, 185:5, 187:15, 203:21
**scared** [1] - 90:13
**scene** [27] - 9:7, 9:9, 12:18, 32:6, 61:25, 65:15, 65:18, 67:23,

73:6, 83:16, 83:17, 90:24, 91:3, 93:22, 94:3, 101:2, 151:20, 162:3, 165:3, 168:5, 174:9, 174:12, 195:2, 196:15, 196:19, 231:11, 231:24
**scheduled** [1] - 87:19
**scientific** [1] - 167:4
**scope** [3] - 76:12, 85:5, 128:23
**scramble** [1] - 72:2
**scrambles** [1] - 124:13
**scrambling** [1] - 125:1
**screaming** [1] - 104:16
**screen** [39] - 40:7, 40:9, 42:2, 42:16, 43:2, 43:9, 43:12, 44:6, 46:1, 62:9, 62:10, 62:19, 63:11, 63:13, 63:17, 91:15, 92:19, 94:10, 94:12, 94:24, 95:12, 96:3, 96:4, 96:12, 97:8, 97:15, 97:24, 107:18, 110:7, 137:11, 137:15, 148:9, 149:20, 164:16, 173:21, 174:16, 190:14, 216:17
**screenshot** [19] - 57:16, 145:10, 145:16, 148:4, 148:13, 148:23, 149:16, 150:19, 150:23, 151:3, 151:6, 151:7, 151:18, 152:15, 153:3, 154:10, 154:12, 172:3, 191:18
**screenshots** [4] - 147:15, 149:23, 149:24, 152:10
**screenshotted** [1] - 150:3
**scrimmage** [1] - 73:12
**scroll** [5] - 50:16, 148:5, 157:22, 194:13, 201:24
**scrum** [4] - 71:2, 83:22, 83:23, 83:24
**scuffle** [1] - 100:20
**SEAN** [1] - 1:13
**search** [15] - 139:4, 139:8, 139:10,

139:15, 141:10, 144:18, 147:11, 147:22, 156:20, 157:12, 157:16, 158:19, 209:24, 211:6, 217:6
**searchable** [1] - 141:13
**seat** [3] - 179:8, 220:14, 225:25
**second** [22] - 16:2, 48:9, 52:15, 60:1, 65:1, 68:2, 69:7, 92:15, 96:17, 96:23, 97:11, 97:12, 108:9, 122:6, 123:9, 128:17, 136:14, 191:4, 192:2, 192:6, 192:10, 193:10
**second-guess** [1] - 60:1
**secondly** [1] - 121:7
**seconds** [97] - 46:2, 46:20, 47:20, 47:23, 48:19, 50:16, 50:19, 50:21, 50:23, 50:25, 51:4, 51:5, 52:4, 52:10, 52:18, 53:8, 53:15, 53:19, 97:16, 97:23, 98:9, 98:20, 101:12, 135:16, 135:21, 135:23, 136:15, 151:8, 155:2, 155:16, 156:1, 160:1, 160:2, 160:13, 160:14, 161:9, 161:12, 161:23, 162:6, 164:22, 165:18, 165:19, 165:21, 165:22, 166:5, 166:12, 166:13, 168:9, 168:17, 168:19, 169:5, 169:13, 169:14, 169:23, 171:15, 171:24, 172:8, 172:9, 172:11, 173:4, 173:5, 173:11, 174:2, 186:21, 186:23, 187:2, 194:9, 194:10, 194:13, 194:22, 195:11, 195:12, 195:20, 195:21, 196:1, 199:3, 199:5, 199:13, 199:20, 200:2, 200:5, 200:14, 200:16,

200:23, 201:7, 201:10, 201:20, 201:24, 202:21, 203:5, 203:6, 205:20, 206:9
**secret** [5] - 26:14, 230:8, 230:10, 230:13, 231:13
**section** [3] - 114:14, 190:22, 195:5
**Section** [2] - 22:16, 193:7
**sectioning** [1] - 134:5
**secured** [2] - 113:22, 113:24
**security** [2] - 23:9, 131:14
**Security** [1] - 187:22
**see** [180] - 4:23, 5:16, 6:5, 6:7, 9:19, 11:3, 11:25, 12:15, 13:9, 14:1, 14:3, 15:5, 16:16, 17:7, 20:25, 22:22, 24:18, 28:6, 40:8, 42:16, 42:19, 42:21, 42:24, 43:4, 47:7, 51:3, 51:23, 52:6, 52:13, 55:10, 62:8, 62:10, 62:18, 62:24, 63:15, 63:21, 64:2, 64:5, 64:6, 64:10, 64:15, 66:8, 67:23, 67:24, 68:1, 68:6, 68:7, 68:23, 68:24, 69:10, 69:11, 69:14, 70:5, 70:12, 70:24, 71:18, 71:20, 71:21, 72:2, 73:6, 73:7, 79:20, 81:6, 81:18, 84:8, 88:21, 92:2, 96:21, 97:19, 100:3, 101:20, 102:25, 103:13, 104:7, 107:18, 108:6, 116:25, 119:3, 126:20, 132:11, 136:15, 136:17, 136:23, 137:9, 137:14, 139:5, 140:14, 142:4, 145:9, 146:3, 146:16, 148:3, 148:5, 148:6, 148:18, 148:19, 149:8, 150:19, 150:21, 151:16, 152:15, 152:16, 153:15, 153:17, 153:18, 155:6, 155:10, 155:19,

157:25, 158:2, 158:8, 158:11, 162:3, 164:8, 168:14, 168:18, 168:20, 169:17, 171:16, 171:18, 172:2, 172:3, 173:18, 173:20, 174:9, 174:12, 174:17, 174:18, 178:12, 181:15, 181:19, 182:18, 183:8, 185:5, 188:10, 189:9, 193:19, 193:20, 194:16, 194:25, 195:22, 197:24, 199:17, 199:21, 199:22, 200:6, 200:10, 200:19, 200:20, 201:2, 201:4, 201:5, 201:11, 206:3, 206:10, 206:11, 207:23, 208:10, 208:15, 208:17, 208:23, 213:9, 213:10, 213:23, 218:15, 218:16, 219:7, 219:9, 223:4, 226:13, 228:9, 228:12, 228:24, 229:22, 229:25
**seeing** [22] - 28:4, 31:6, 40:21, 41:3, 55:6, 62:17, 79:22, 95:16, 100:16, 145:15, 148:4, 151:24, 164:10, 165:2, 172:13, 172:14, 172:21, 207:15, 215:18, 215:19, 231:24, 231:25
**seek** [2] - 179:24, 231:6
**seeking** [1] - 77:22
**seem** [6] - 55:9, 67:11, 78:3, 81:1, 81:15, 223:23
**sees** [1] - 147:13
**segment** [3] - 64:7, 66:5, 77:19
**select** [3] - 40:9, 91:16, 178:11
**selfie** [4] - 109:7, 109:24, 113:8, 113:21
**selfies** [6] - 106:9, 106:12, 107:2,

109:7, 109:13, 113:17
**Senate** [6] - 131:16, 159:13, 160:23, 169:1, 203:13, 215:20
**senators** [1] - 168:6
**send** [2] - 90:3, 233:23
**sender** [1] - 190:20
**sense** [10] - 43:25, 50:9, 60:25, 124:6, 145:16, 168:22, 177:25, 179:13, 198:7
**senses** [1] - 91:4
**sensitive** [2] - 176:22, 177:3
**sent** [3] - 190:8, 216:24, 232:18
**sentence** [4] - 83:25, 157:21, 192:10, 192:13
**sentenced** [1] - 5:7
**sentencing** [7] - 5:9, 5:21, 6:7, 6:9, 6:12, 7:4, 7:20
**separate** [5] - 23:21, 119:11, 141:24, 216:2, 216:24
**separates** [1] - 23:20
**sergeant** [1] - 121:15
**seriatim** [1] - 147:13
**series** [5] - 143:25, 147:9, 147:18, 157:19
**serves** [1] - 190:2
**set** [5] - 11:2, 42:25, 124:9, 133:4, 215:23
**setting** [1] - 23:9
**settle** [1] - 126:12
**seven** [2] - 38:16, 216:24
**several** [4] - 16:8, 134:8, 216:7, 225:11
**SHA512** [1] - 158:9
**shape** [2] - 30:8
**share** [1] - 16:11
**shared** [3] - 13:2, 18:16, 28:20
**sharing** [1] - 170:10
**sharp** [1] - 223:15
**shield** [6] - 75:21, 75:22, 75:23, 87:6, 137:8, 200:6
**shields** [4] - 74:4, 74:6, 199:11
**shift** [5] - 35:11, 36:13, 87:22, 111:23, 113:19
**shifted** [1] - 195:2

**shifts** [1] - 35:5
**shin** [1] - 87:8
**shirt** [15] - 64:5, 64:6, 65:15, 68:3, 69:14, 69:16, 69:17, 69:19, 69:20, 75:1, 128:12, 137:13, 137:14, 137:16
**shirts** [2] - 93:24, 93:25
**shocked** [1] - 127:19
**shooter** [2] - 75:9, 75:10
**shooting** [1] - 18:25
**short** [2] - 4:18, 223:13
**shorthand** [1] - 1:24
**shot** [1] - 195:9
**shots** [2] - 193:1, 212:15
**shoulder** [1] - 87:9
**shout** [1] - 80:7
**shoving** [1] - 62:24
**show** [57] - 5:19, 7:7, 9:15, 14:13, 14:18, 15:7, 17:8, 19:17, 22:8, 24:8, 24:16, 32:13, 32:17, 49:9, 55:2, 55:24, 64:4, 66:4, 66:10, 67:19, 70:14, 77:14, 86:24, 87:21, 91:10, 96:16, 100:2, 102:12, 102:25, 108:4, 109:6, 109:19, 124:11, 139:13, 139:18, 144:9, 146:12, 149:16, 149:19, 152:24, 154:6, 156:11, 158:13, 163:14, 176:19, 179:19, 179:20, 188:3, 189:23, 204:18, 209:8, 209:9, 209:15, 230:23, 232:23, 232:25
**showed** [8] - 36:22, 61:25, 113:12, 127:18, 138:6, 149:22, 188:5, 209:22
**showing** [12] - 13:19, 66:7, 66:16, 70:1, 70:15, 81:25, 107:1, 125:5, 125:8, 128:8, 188:9, 204:6
**shown** [5] - 62:1, 81:12, 106:23, 155:23, 222:1

**shows** [13] - 10:20, 24:7, 24:9, 32:5, 32:10, 65:15, 128:9, 137:7, 167:13, 187:8, 204:19, 226:11
**shut** [11] - 25:8, 27:2, 27:7, 27:10, 27:16, 27:19, 27:24, 225:12, 225:14, 225:15
**shut-down** [1] - 225:14
**shutdown** [2] - 26:10, 26:11
**shutting** [1] - 27:1
**side** [41] - 4:16, 21:8, 22:13, 23:12, 23:15, 23:25, 24:1, 24:6, 32:5, 32:10, 32:12, 44:7, 55:10, 62:8, 62:10, 70:22, 71:5, 71:6, 71:7, 71:8, 71:16, 80:7, 80:8, 81:22, 93:25, 94:7, 94:18, 95:18, 99:13, 131:16, 168:21, 168:25, 169:1, 173:21, 174:15, 193:19, 203:12, 203:13, 215:20, 225:3
**sided** [1] - 143:19
**sides** [5] - 4:13, 32:2, 58:24, 71:12, 223:23
**sign** [7] - 161:6, 164:15, 164:17, 199:22, 199:24, 206:21
**signage** [1] - 179:18
**signaling** [1] - 49:1
**signature** [2] - 193:18, 193:20
**SIGNATURE** [1] - 235:9
**signs** [8] - 4:23, 8:15, 8:21, 12:16, 41:4, 41:6, 179:20, 180:17
**silent** [2] - 46:3, 53:18
**silver** [1] - 164:11
**similar** [8] - 19:6, 74:6, 161:16, 173:6, 176:11, 213:5, 219:13, 219:20
**similarly** [1] - 178:13
**simple** [1] - 45:16
**simply** [1] - 120:19
**single** [2] - 60:4, 142:15
**sit** [4] - 33:7, 88:6,

124:21, 170:21
**site** [6] - 149:6, 149:10, 149:14, 158:7, 170:8, 170:10
**sitting** [6] - 25:4, 104:3, 113:9, 162:19, 170:24, 217:14
**situate** [1] - 200:24
**situated** [1] - 203:9
**situation** [12] - 11:3, 19:14, 21:4, 72:19, 76:1, 78:20, 90:8, 90:15, 112:9, 112:12, 113:2, 222:25
**situations** [2] - 72:16, 104:1
**six** [4] - 34:24, 38:16, 84:10, 113:13
**sixth** [1] - 86:8
**Sixth** [2] - 34:17, 35:4
**skip** [20] - 55:3, 159:16, 159:25, 160:13, 161:23, 165:17, 168:8, 168:17, 169:13, 171:14, 171:24, 172:8, 174:1, 198:22, 199:3, 199:20, 201:19, 203:4, 203:15, 206:9
**skipping** [5] - 173:4, 195:20, 199:13, 200:14, 200:23
**sky** [1] - 219:3
**slash** [1] - 68:11
**slates** [1] - 216:24
**sleep** [1] - 60:18
**sleeping** [1] - 53:13
**sleeve** [1] - 69:22
**sleeved** [1] - 69:17
**slide** [2] - 100:3, 164:20
**slightly** [3] - 11:5, 30:11, 118:3
**slips** [1] - 184:2
**slower** [1] - 135:17
**smack** [1] - 97:7
**smacks** [1] - 30:24
**smiling** [1] - 107:3
**smoke** [1] - 91:2
**smoke's** [1] - 91:5
**social** [11] - 14:23, 133:16, 143:11, 146:4, 149:6, 149:10, 171:4, 184:13, 184:14, 206:22, 208:24
**soil** [1] - 70:11

**solicit** [1] - 7:19
**someone** [23] - 10:7, 11:23, 14:18, 26:4, 26:11, 28:12, 33:7, 39:20, 40:23, 40:24, 44:21, 44:22, 80:19, 85:2, 105:2, 125:8, 162:23, 168:24, 187:3, 223:6, 225:20, 227:7, 228:7
**sometimes** [6] - 81:1, 81:7, 88:8, 134:7, 134:14, 218:9
**somewhat** [1] - 82:11
**somewhere** [5] - 65:23, 90:21, 135:8, 141:21, 186:19
**soon** [1] - 89:14
**sorry** [35] - 11:12, 16:14, 19:20, 33:21, 34:15, 36:25, 37:9, 45:5, 50:17, 50:18, 50:20, 52:22, 66:14, 69:23, 81:12, 82:5, 83:25, 89:5, 100:16, 136:10, 138:7, 140:19, 140:22, 151:1, 151:5, 155:9, 165:7, 165:21, 171:16, 175:5, 178:24, 186:5, 192:13, 212:14, 216:3
**sort** [41] - 14:5, 30:8, 39:12, 40:18, 40:25, 41:8, 42:1, 42:7, 45:6, 49:6, 55:21, 56:8, 58:8, 61:23, 65:14, 69:3, 70:15, 71:18, 72:2, 86:19, 88:20, 91:21, 95:16, 99:10, 105:17, 108:12, 124:13, 127:2, 132:6, 132:9, 140:25, 141:10, 159:18, 174:16, 179:23, 182:24, 183:24, 185:2, 187:19, 207:15, 208:22
**sorts** [2] - 43:3, 130:6
**sought** [1] - 189:14
**souls** [1] - 214:5
**sound** [6] - 46:20, 54:16, 56:21, 101:12, 155:2, 164:4
**sounded** [1] - 159:12
**sounds** [8] - 21:15, 28:5, 86:19, 93:7, 142:8, 142:14,

142:25
**source** [6] - 97:10, 100:22, 146:2, 179:16, 230:23, 231:9
**south** [2] - 93:20, 94:17
**southeast** [1] - 86:11
**southwest** [1] - 92:16
**space** [2] - 76:6, 81:16
**spaces** [1] - 193:25
**spare** [1] - 51:23
**speaker** [4] - 159:11, 160:19, 161:13
**speaking** [15] - 11:11, 11:12, 38:20, 39:25, 48:4, 62:12, 98:18, 99:4, 119:20, 129:21, 142:9, 152:21, 171:22, 188:7, 194:4
**Special** [48] - 129:11, 135:22, 136:23, 144:11, 145:2, 149:21, 150:19, 153:15, 154:2, 155:5, 156:6, 157:6, 159:6, 160:5, 160:17, 161:25, 162:9, 164:8, 165:25, 166:8, 168:18, 169:8, 170:6, 172:12, 173:14, 186:18, 189:25, 190:6, 191:11, 193:6, 194:14, 194:25, 195:15, 196:24, 199:8, 199:21, 200:19, 201:11, 202:1, 202:24, 203:9, 203:18, 204:6, 208:22, 209:21, 210:20, 214:10, 217:6
**special** [15] - 14:17, 28:24, 74:9, 104:3, 130:3, 130:4, 130:5, 130:7, 130:12, 130:16, 130:17, 130:20, 131:11, 174:5, 220:8
**specialized** [4] - 72:19, 73:1, 167:5, 182:19
**specialty** [1] - 130:21
**specific** [12] - 5:14, 5:18, 19:8, 44:12, 44:15, 47:10, 76:18, 80:6, 89:24, 90:5,

141:8, 142:5
**specifically** [13] - 13:14, 13:16, 63:9, 68:17, 73:20, 80:9, 90:1, 104:13, 116:1, 116:6, 134:19, 135:12, 230:22
**speculate** [1] - 163:11
**speculation** [4] - 68:13, 80:21, 163:10, 166:19
**speed** [3] - 135:17, 144:6, 224:4
**spell** [4] - 34:12, 86:3, 129:18, 149:2
**spending** [1] - 59:22
**spicy** [1] - 91:6
**spliced** [1] - 214:13
**splitting** [2] - 38:7, 38:8
**spokesperson** [1] - 7:25
**spot** [1] - 92:12
**spray** [2] - 93:16, 192:23
**sprayed** [1] - 192:23
**springs** [1] - 81:3
**squad** [2] - 39:8, 131:15
**stage** [3] - 10:25, 174:14, 186:20
**staged** [2] - 38:10, 38:11
**staging** [2] - 10:13, 10:16
**staircase** [4] - 93:6, 95:4, 95:10, 95:20
**stamp** [11] - 18:19, 49:7, 49:11, 49:13, 67:6, 97:9, 97:11, 103:12, 141:21, 190:7, 211:12
**stamps** [2] - 66:16, 124:11
**stand** [24] - 4:8, 7:17, 18:17, 20:3, 20:5, 20:8, 24:12, 63:4, 74:10, 74:23, 76:19, 110:24, 116:3, 121:22, 123:3, 124:1, 187:3, 194:11, 212:11, 224:16, 225:1, 229:14, 230:3, 230:4
**standard** [2] - 176:19, 198:25
**Standard** [3] - 211:14, 211:18, 211:21
**standby** [1] - 233:18
**standing** [8] - 42:17,

50:10, 50:11, 93:24, 94:1, 114:8, 206:6, 233:21

**stands** [7] - 7:16, 35:22, 111:3, 133:12, 133:13, 208:8, 227:11

**start** [13] - 56:25, 64:24, 77:22, 91:4, 94:21, 128:8, 130:9, 135:16, 180:23, 186:3, 220:9, 223:3, 223:15

**started** [7] - 37:24, 38:2, 39:3, 39:7, 39:8, 92:4, 225:15

**starting** [7] - 3:6, 53:1, 171:23, 190:24, 192:14, 222:24, 224:14

**startling** [1] - 30:21

**starts** [1] - 18:13

**state** [10] - 3:5, 30:25, 34:12, 66:20, 86:2, 109:10, 110:2, 111:10, 129:18, 134:4

**statement** [6] - 8:8, 25:15, 31:20, 105:1, 128:21, 178:16

**statements** [10] - 7:20, 24:14, 29:8, 29:9, 76:17, 76:18, 80:6, 83:4, 118:10, 184:10

**STATES** [3] - 1:1, 1:3, 1:10

**states** [3] - 14:12, 216:24, 221:17

**States** [9] - 1:13, 1:14, 3:4, 3:6, 3:8, 114:1, 178:6, 219:17, 219:21

**stationary** [2] - 94:20, 94:21

**stationed** [1] - 131:15

**status** [4] - 213:23, 214:3, 216:20, 217:17

**statute** [2] - 25:19, 25:22

**stay** [5] - 10:2, 110:17, 111:4, 111:10, 215:22

**steady** [1] - 215:22

**steal** [3] - 44:23, 160:7, 212:21

**steeped** [1] - 16:7

**stenotype** [1] - 1:24

**step** [8] - 39:25, 70:6, 70:16, 86:18,

131:20, 145:23, 147:4, 175:6

**Stephen** [4] - 125:3, 125:12, 126:5, 185:3

**steps** [5] - 43:6, 98:14, 114:5, 133:4, 145:24

**stick** [1] - 175:12

**still** [14] - 22:19, 28:4, 29:20, 36:2, 76:7, 99:17, 105:19, 112:2, 119:25, 120:22, 151:20, 170:22, 175:11, 207:1

**stink** [1] - 192:22

**stipulate** [9] - 24:6, 32:13, 32:22, 33:8, 57:18, 59:6, 225:5, 225:6, 226:11

**stipulated** [1] - 20:7

**stipulating** [3] - 24:17, 57:12, 59:16

**stipulations** [4] - 32:25, 185:16, 185:23, 185:24

**stone** [1] - 23:13

**stop** [19] - 43:17, 52:13, 52:15, 63:3, 64:10, 66:12, 68:6, 69:6, 77:18, 104:20, 135:21, 136:22, 157:23, 160:7, 166:23, 193:17, 212:18, 212:21

**stops** [1] - 219:9

**stored** [1] - 51:21

**stores** [3] - 27:19, 27:22, 27:24

**storm** [1] - 170:3

**stormed** [2] - 192:11, 192:20

**storming** [1] - 169:12

**story** [6] - 27:22, 121:20, 230:5, 230:15, 231:2, 232:24

**straight** [3] - 51:12, 95:22, 113:13

**strategically** [1] - 6:17

**strategy** [1] - 60:2

**stray** [1] - 12:19

**Street** [3] - 1:14, 1:17, 114:9

**street** [4] - 39:4, 75:1, 87:1, 88:14

**streets** [3] - 28:10, 193:23, 193:25

**stress** [1] - 110:3

**strictly** [1] - 92:11

**strike** [7] - 19:2,

21:22, 78:9, 79:9, 79:10, 163:3, 184:4

**strikes** [1] - 230:23

**struggling** [1] - 47:18

**studied** [2] - 9:25, 15:24

**stuff** [9] - 12:13, 14:23, 16:7, 36:1, 51:20, 114:16, 148:21, 185:7, 205:5

**subject** [5] - 120:10, 141:17, 184:17, 184:20, 192:1

**submit** [2] - 133:10, 145:20

**submitted** [1] - 134:2

**submitting** [1] - 145:20

**subpoena** [4] - 188:12, 228:13, 229:2, 233:8

**subpoenaed** [1] - 187:21

**subscriber's** [1] - 153:25

**subscribers** [1] - 149:16

**subset** [2] - 180:22, 205:5

**substances** [1] - 3:21

**substantially** [3] - 178:8, 178:10, 213:5

**substantively** [1] - 185:7

**substitute** [1] - 126:5

**succinctly** [1] - 229:12

**suggest** [1] - 147:7

**suggested** [3] - 5:16, 180:13, 230:21

**suggesting** [2] - 31:13, 85:9

**suggests** [2] - 22:24, 26:5

**suit** [4] - 87:15, 87:16, 88:9, 88:20

**summary** [14] - 4:12, 4:14, 4:19, 13:8, 13:12, 14:5, 16:17, 20:25, 22:3, 125:11, 125:16, 180:6, 183:9, 219:1

**summer** [2] - 211:19, 214:6

**Sumrall** [13] - 8:13, 10:2, 10:3, 10:21, 11:4, 11:5, 11:13, 11:18, 12:8, 12:15, 12:24, 224:19

**Sumrall's** [3] - 10:11, 10:14, 11:21

**superimposed** [4] - 206:16, 206:21, 208:15, 215:7

**supersedes** [1] - 114:15

**support** [3] - 41:2, 41:6, 83:5

**supported** [3] - 62:13, 62:14, 206:7

**supporters** [4] - 10:13, 26:19, 26:20, 28:5

**supporting** [1] - 173:23

**supposed** [1] - 43:24

**Supreme** [1] - 179:2

**surely** [1] - 133:13

**surprise** [1] - 117:24

**surprised** [1] - 117:17

**surreal** [1] - 48:11

**surrounded** [3] - 10:24, 67:7, 208:10

**suspected** [1] - 133:2

**sustain** [4] - 4:16, 112:15, 196:9, 198:24

**sustained** [3] - 48:17, 76:24, 163:12

**sweatshirt** [1] - 152:17

**switch** [1] - 168:14

**switched** [2] - 155:21, 162:3

**SWORN** [3] - 34:1, 85:20, 129:13

**symbol** [5] - 208:8, 208:10, 208:17, 221:22, 222:8

**symbolizes** [1] - 208:6

## T

**T-shirt** [7] - 64:5, 64:6, 68:3, 69:14, 69:17, 69:20, 128:12

**table** [2] - 79:8, 127:21

**tactical** [1] - 51:19

**tactics** [2] - 130:20, 181:21

**tag** [3] - 52:21, 52:23, 55:14

**tamp** [2] - 24:21, 25:8

**tape** [2] - 55:11, 94:4

**tarp** [11] - 30:22, 30:23, 31:3, 31:4, 31:5, 31:6, 31:7, 31:9, 31:10, 31:14

**team** [8] - 16:8, 30:24, 120:6, 128:5, 130:24, 223:7,

223:10, 233:1

**teams** [1] - 16:8

**tear** [1] - 212:14

**tech** [1] - 51:18

**technical** [2] - 125:6, 167:5

**Telegram** [4] - 149:7, 149:8, 149:9, 149:10

**telephone** [2] - 145:22, 191:19

**temporarily** [1] - 220:15

**temporary** [1] - 174:14

**ten** [5] - 57:1, 58:1, 83:20, 98:2, 114:6

**ten-minute** [3] - 57:1, 83:20, 98:2

**tend** [2] - 12:4, 229:20

**Tenn** [1] - 219:17

**Tennessee** [1] - 219:18

**tenor** [1] - 47:14

**tensions** [1] - 41:23

**tentative** [1] - 228:11

**term** [4] - 39:12, 39:16, 217:10, 220:20

**terms** [27] - 55:6, 84:4, 86:9, 86:20, 92:7, 95:16, 139:1, 149:16, 152:9, 152:15, 155:19, 164:25, 168:14, 169:19, 173:19, 193:21, 194:18, 194:25, 195:23, 198:20, 199:17, 204:17, 210:8, 216:5, 231:23, 231:24, 231:25

**terrace** [5] - 91:25, 92:23, 100:11, 113:17, 201:14

**Terrace** [2] - 67:10, 131:16

**testified** [22] - 11:22, 19:23, 23:8, 23:12, 29:3, 29:5, 30:2, 30:22, 31:11, 76:8, 78:7, 82:16, 82:18, 85:2, 120:11, 122:7, 122:11, 123:7, 174:9, 176:10, 203:1, 232:9

**testifies** [1] - 118:14

**testify** [41] - 4:12, 4:19, 4:20, 4:22, 4:23, 6:9, 8:15, 8:24, 9:17, 10:22, 11:19, 13:8, 17:5, 17:19,

18:24, 19:15, 22:2, 22:4, 23:3, 23:19, 27:10, 30:25, 75:25, 78:12, 121:16, 125:17, 126:3, 126:4, 136:5, 180:7, 180:10, 180:21, 182:4, 185:6, 202:1, 202:4, 225:12, 226:17, 229:22, 230:17

**testifying** [10] - 13:7, 19:24, 21:23, 82:20, 82:23, 129:2, 182:21, 183:20, 198:4, 227:4

**TESTIMONY** [1] - 2:3

**testimony** [79] - 4:14, 4:15, 4:18, 4:20, 6:7, 7:19, 11:21, 12:3, 12:19, 13:9, 13:13, 14:5, 15:3, 17:11, 17:23, 19:25, 21:15, 21:20, 21:25, 22:6, 23:5, 23:11, 23:16, 24:8, 27:18, 30:6, 30:9, 30:11, 31:3, 40:14, 45:19, 49:16, 53:25, 54:20, 55:22, 59:13, 91:12, 99:22, 102:9, 117:21, 118:4, 121:11, 122:14, 125:25, 128:7, 129:3, 136:2, 166:21, 172:22, 176:4, 178:25, 179:12, 179:23, 180:2, 180:7, 180:15, 180:23, 181:1, 181:24, 182:14, 182:18, 182:24, 183:10, 183:13, 183:25, 184:3, 184:4, 184:18, 184:21, 195:6, 196:11, 201:2, 214:11, 220:8, 226:4, 226:14, 227:15

**text** [21] - 145:15, 188:17, 191:23, 192:8, 193:4, 214:24, 215:12, 215:14, 215:21, 215:23, 216:10, 216:14, 216:16, 216:20, 217:23, 218:1, 218:13, 218:18, 218:25, 219:1

**THE** [425] - 1:1, 1:1, 1:9, 3:9, 3:11, 3:15, 3:18, 4:1, 4:4, 4:11, 6:4, 6:9, 6:11, 6:17, 7:9, 7:15, 7:21, 8:1, 8:7, 8:11, 8:20, 8:24, 9:19, 10:2, 10:7, 11:14, 11:17, 11:25, 12:4, 12:7, 12:10, 12:15, 12:23, 12:25, 13:5, 13:17, 13:23, 14:15, 15:5, 15:13, 15:19, 15:23, 16:4, 16:10, 16:12, 16:15, 16:22, 16:25, 17:4, 17:19, 17:22, 18:6, 18:15, 19:6, 19:15, 19:19, 20:10, 20:15, 20:19, 20:24, 21:12, 22:5, 23:17, 23:23, 24:3, 24:10, 24:15, 25:12, 25:16, 25:24, 26:21, 27:1, 27:9, 27:13, 27:18, 27:24, 28:2, 28:12, 29:2, 29:6, 29:10, 29:22, 30:2, 30:10, 30:13, 30:16, 31:2, 31:17, 31:22, 31:25, 32:11, 32:15, 32:23, 33:5, 33:9, 33:15, 33:18, 33:20, 34:1, 34:5, 34:6, 37:22, 42:3, 43:10, 44:8, 46:15, 46:17, 48:17, 50:1, 50:3, 51:8, 51:10, 52:6, 52:15, 54:12, 54:14, 56:1, 56:4, 56:18, 56:25, 57:5, 57:14, 57:20, 57:24, 58:10, 58:13, 58:17, 58:21, 59:17, 59:20, 60:7, 60:18, 60:23, 61:1, 61:4, 63:19, 63:20, 64:21, 65:7, 65:12, 65:18, 65:24, 66:6, 66:11, 66:18, 66:20, 67:15, 67:17, 68:14, 68:16, 76:13, 76:14, 76:24, 77:8, 77:12, 78:12, 78:17, 79:1, 79:4, 79:10, 79:12, 80:22, 81:20, 82:3, 82:8, 82:9, 82:13, 84:1, 84:12, 84:13, 84:15, 84:17, 85:6, 85:7, 85:12, 85:14, 85:15, 85:17, 85:20, 85:21, 85:22, 85:23, 85:24, 92:17, 93:11, 94:13, 95:11,

96:5, 96:14, 96:25, 97:9, 97:13, 97:25, 98:2, 98:7, 101:7, 101:9, 101:24, 102:1, 102:17, 102:19, 103:6, 104:7, 104:25, 105:6, 105:12, 106:19, 106:21, 106:25, 107:11, 107:14, 107:25, 108:2, 109:3, 109:17, 111:14, 112:13, 112:15, 114:20, 116:15, 116:17, 116:19, 116:22, 117:4, 117:8, 117:13, 117:20, 118:5, 118:8, 118:12, 118:15, 118:24, 119:3, 119:7, 119:9, 119:12, 119:16, 119:25, 120:7, 120:11, 120:16, 121:1, 121:13, 121:23, 122:1, 122:4, 122:11, 122:13, 122:20, 123:6, 124:1, 124:5, 124:19, 124:22, 125:10, 125:15, 125:20, 125:24, 126:4, 126:7, 126:14, 126:19, 126:23, 127:4, 127:12, 127:23, 128:6, 128:13, 128:20, 128:25, 129:6, 129:8, 129:13, 140:7, 140:9, 142:7, 142:9, 142:11, 142:13, 142:19, 143:2, 143:10, 143:16, 143:22, 144:4, 144:22, 144:24, 146:25, 147:2, 147:4, 147:7, 147:17, 148:14, 150:9, 150:11, 150:15, 153:10, 153:12, 154:24, 156:25, 157:2, 158:23, 158:25, 163:12, 163:24, 164:1, 166:15, 166:23, 166:25, 167:6, 167:10, 167:15, 167:19, 167:23, 174:25,

175:7, 175:10, 176:10, 176:13, 177:2, 177:13, 177:20, 178:15, 178:20, 178:24, 179:8, 181:5, 181:10, 181:12, 181:15, 182:2, 182:7, 182:16, 183:4, 183:13, 184:1, 184:7, 184:9, 184:19, 184:22, 185:5, 185:11, 185:14, 185:18, 185:22, 186:8, 186:11, 186:15, 189:5, 189:11, 189:17, 189:19, 190:13, 194:4, 196:7, 196:9, 196:15, 196:19, 196:21, 197:8, 198:2, 198:6, 198:11, 198:16, 198:24, 204:2, 205:4, 205:9, 206:14, 206:17, 206:23, 206:25, 207:3, 207:8, 207:12, 208:3, 209:19, 210:5, 210:8, 210:11, 217:12, 219:23, 220:6, 220:14, 221:7, 221:15, 222:2, 222:22, 222:25, 223:9, 224:2, 224:4, 224:13, 224:17, 224:21, 225:1, 225:6, 225:19, 225:24, 226:5, 226:17, 226:21, 227:2, 227:6, 227:11, 227:20, 227:24, 228:5, 228:15, 228:22, 229:7, 229:16, 229:20, 230:10, 230:16, 230:20, 231:17, 231:20, 232:5, 232:14, 232:21, 233:4, 233:10, 233:17, 233:22

**theme** [1] - 206:21

**themselves** [7] - 13:23, 15:7, 21:2, 21:3, 27:22, 49:2, 187:22

**theory** [2] - 128:14,

160:10

**therefore** [1] - 26:2

**they've** [9] - 25:2, 25:3, 37:14, 39:20, 143:23, 143:24, 181:5, 181:9, 233:1

**thick** [1] - 38:6

**thigh** [1] - 87:8

**thinking** [5] - 44:2, 110:5, 121:19, 125:18, 222:8

**thinks** [1] - 6:18

**third** [2] - 192:13, 193:3

**Third** [2] - 1:18, 114:9

**Thomas** [73] - 3:4, 3:13, 4:5, 4:22, 4:25, 8:14, 8:17, 9:6, 10:6, 10:18, 11:9, 11:12, 12:17, 13:9, 13:19, 14:10, 15:25, 16:24, 17:5, 17:11, 19:10, 19:16, 19:17, 21:10, 22:12, 23:25, 30:22, 31:6, 63:4, 64:14, 65:17, 69:3, 80:1, 80:7, 80:14, 81:15, 85:9, 116:2, 116:3, 116:12, 117:12, 123:5, 124:12, 124:15, 125:13, 127:20, 128:18, 136:17, 138:3, 138:4, 138:13, 141:2, 146:8, 146:19, 148:19, 150:1, 153:22, 156:8, 167:13, 181:19, 182:1, 182:2, 221:4, 224:16, 227:23, 230:6, 230:17, 230:25, 231:18, 233:3

**THOMAS** [1] - 1:6

**Thomas's** [12] - 3:20, 9:2, 13:15, 59:14, 117:10, 137:7, 138:5, 142:16, 145:12, 145:25, 154:11, 189:6

**thousand** [1] - 17:16

**thousands** [9] - 17:17, 132:3, 134:1, 134:2, 145:3, 180:14, 180:16

**threat** [1] - 20:17

**threatening** [1] - 20:2

**threats** [1] - 193:1

**Three** [9] - 208:9,

221:1, 221:3, 221:5, 221:8, 221:13, 221:16, 221:20, 222:12
**three** [10] - 22:1, 24:11, 26:18, 27:20, 55:6, 59:2, 87:24, 208:10, 219:3, 226:7
**threw** [1] - 192:23
**throughout** [7] - 41:19, 43:5, 163:5, 171:1, 173:20, 178:11, 206:22
**throw** [2] - 216:25, 217:2
**thunderous** [1] - 214:5
**Thursday** [2] - 190:24, 193:15
**tickets** [2] - 17:16, 17:18
**tie** [3] - 60:14, 182:4, 208:3
**tied** [1] - 147:11
**tier** [3] - 87:14, 88:19, 88:20
**ties** [1] - 228:5
**timely** [1] - 229:8
**timing** [3] - 54:21, 54:24, 207:15
**tip** [11] - 44:11, 132:10, 132:12, 132:13, 132:16, 132:19, 145:20, 145:21
**tips** [3] - 132:4, 132:8, 132:17
**tired** [3] - 219:24, 226:5, 228:16
**title** [4] - 130:2, 151:9, 158:2, 191:22
**titled** [1] - 151:11
**today** [35] - 14:24, 15:16, 15:19, 16:20, 16:21, 16:23, 18:11, 22:4, 34:25, 35:1, 49:16, 53:25, 82:7, 99:22, 102:10, 122:15, 122:16, 122:18, 123:24, 125:13, 125:17, 126:19, 126:21, 127:18, 159:15, 170:21, 180:23, 185:22, 185:23, 186:3, 202:2, 203:2, 217:14, 220:1, 222:23
**today's** [1] - 124:7
**toe** [2] - 86:15, 87:7

**toes** [1] - 175:6
**together** [5] - 32:6, 38:4, 88:14, 214:13, 216:3
**tomorrow** [16] - 122:16, 177:14, 180:3, 180:22, 181:14, 186:3, 220:7, 223:3, 223:16, 223:20, 224:9, 227:1, 227:6, 228:20, 233:8, 233:19
**tone** [2] - 41:18, 47:14
**tonight** [4] - 17:3, 181:12, 224:8, 226:25
**took** [13] - 10:15, 12:17, 43:19, 47:4, 107:2, 113:21, 123:3, 134:10, 145:24, 147:15, 151:7, 178:25, 210:20
**tool** [2] - 75:24, 139:10
**top** [37] - 40:9, 49:11, 49:13, 55:8, 67:6, 91:15, 92:1, 92:3, 93:4, 93:6, 94:10, 94:11, 100:16, 137:14, 140:17, 140:19, 141:21, 145:10, 146:17, 148:5, 148:13, 157:9, 158:2, 164:13, 171:7, 174:16, 186:22, 187:11, 190:11, 191:22, 194:12, 202:5, 202:9, 211:1, 218:25, 219:1
**top-half** [1] - 218:25
**topic** [1] - 16:20
**topics** [2] - 16:20, 130:21
**total** [2] - 111:23, 171:12
**totally** [1] - 119:11
**touch** [2] - 40:7, 135:11
**touched** [2] - 64:13, 200:12
**touching** [1] - 198:21
**tough** [1] - 114:15
**tourniquet** [1] - 52:1
**toward** [9] - 39:8, 47:17, 95:19, 99:20, 100:20, 155:21, 168:3, 169:21,

226:16
**towards** [11] - 21:7, 38:5, 39:3, 44:6, 47:15, 91:22, 94:10, 96:4, 96:12, 232:12, 233:16
**town** [1] - 225:17
**track** [1] - 83:21
**traffic** [2] - 38:7, 38:8
**trained** [1] - 45:11
**training** [4] - 125:7, 130:17, 130:19, 183:25
**trainings** [1] - 130:23
**traitor** [2] - 76:20, 83:7
**traitors** [1] - 39:5
**trama** [1] - 51:19
**trampled** [1] - 212:13
**TRANSCRIPT** [1] - 1:9
**transcript** [4] - 5:9, 5:21, 184:11, 235:4
**Transcript** [1] - 1:25
**transcription** [1] - 1:25
**transform** [1] - 75:11
**transformed** [1] - 192:15
**translate** [1] - 211:13
**translates** [1] - 211:14
**translation** [2] - 196:4, 196:6
**transmissions** [1] - 41:11
**trap** [1] - 142:14
**trauma** [3] - 109:11, 110:2, 110:4
**traumatic** [1] - 110:3
**treated** [6] - 101:16, 101:20, 102:23, 103:1, 115:15, 132:17
**treatment** [1] - 203:19
**Treniss** [2] - 12:8, 12:11
**trial** [24] - 6:15, 11:22, 17:17, 17:20, 18:25, 19:23, 20:3, 22:3, 58:18, 59:2, 119:15, 136:2, 143:24, 170:24, 171:1, 172:21, 184:12, 186:7, 196:24, 197:3, 204:25, 220:18, 231:6
**TRIAL** [1] - 1:9
**trials** [2] - 17:16, 23:8
**tricks** [1] - 230:15
**tricorn** [2] - 206:11, 221:3
**tried** [4] - 17:16, 47:4,

85:2, 221:15
**triggers** [1] - 126:16
**tripped** [1] - 128:11
**tripping** [3] - 67:24, 70:22, 70:25
**trouble** [2] - 38:19, 171:25
**truck** [1] - 36:20
**true** [15] - 6:19, 66:6, 71:5, 120:23, 127:16, 127:22, 140:2, 144:17, 150:3, 156:19, 158:18, 175:18, 188:21, 211:24, 212:1
**truest** [1] - 212:17
**truly** [1] - 104:2
**Trump** [13] - 10:13, 26:19, 26:20, 28:5, 41:6, 58:9, 151:11, 153:20, 160:11, 212:21, 216:24, 217:3, 225:16
**trump** [1] - 20:23
**truth** [1] - 105:2
**truthfulness** [1] - 132:11
**try** [15] - 9:14, 10:14, 71:24, 83:13, 105:5, 110:17, 111:10, 112:25, 126:22, 180:14, 186:2, 198:10, 214:5, 220:21, 223:19
**trying** [20] - 9:15, 14:24, 18:20, 44:18, 44:23, 46:25, 47:1, 48:24, 49:3, 60:1, 71:17, 85:24, 110:24, 113:15, 118:16, 118:17, 133:24, 182:8, 212:11, 229:2
**Tuesday** [1] - 27:23
**turn** [6] - 19:9, 40:16, 152:11, 157:8, 185:8, 193:18
**turned** [7] - 28:24, 89:14, 152:11, 181:5, 184:23, 232:8
**turning** [7] - 28:5, 35:15, 36:8, 87:17, 88:23, 91:14, 92:21
**turns** [2] - 226:19, 230:8
**turtle** [6] - 86:15, 87:14, 87:15, 87:16, 88:9, 88:20
**tweet** [3] - 57:12,

57:13
**tweets** [5] - 57:20, 57:21, 59:7, 59:16
**Twitter** [3] - 188:23, 191:12, 214:7
**two** [17] - 16:17, 17:16, 20:25, 23:24, 28:21, 31:4, 32:16, 51:14, 55:9, 68:3, 74:7, 89:2, 94:6, 116:10, 119:23, 176:9, 188:16
**type** [7] - 22:9, 36:25, 37:2, 55:21, 95:6, 109:10, 113:2
**typical** [5] - 35:10, 74:24, 84:6, 87:1, 143:1
**typically** [6] - 74:24, 87:23, 88:7, 88:10, 177:20, 211:4
**typo** [1] - 193:13

## U

**U.S** [5] - 135:3, 178:4, 178:5, 178:6, 219:3
**U.S.C** [1] - 25:20
**ultimately** [1] - 17:15
**unarmed** [1] - 203:19
**unauthorized** [1] - 183:12
**uncertain** [1] - 31:5
**uncommon** [1] - 112:23
**under** [16] - 10:24, 23:13, 30:22, 69:17, 123:19, 148:21, 148:24, 149:7, 149:11, 162:4, 167:2, 191:23, 195:4, 195:5, 211:3, 211:4
**undercover** [1] - 20:6
**underlining** [1] - 148:11
**underlying** [1] - 148:13
**undermine** [1] - 227:12
**undermines** [1] - 22:21
**underneath** [7] - 69:19, 87:9, 99:1, 153:25, 187:15, 217:24, 219:10
**understood** [12] - 6:2, 6:10, 12:22, 15:13, 25:24, 31:21, 33:3, 118:7, 181:20,

182:10, 183:1,
228:17
**unduly** [1] - 22:7
**unfamiliar** [1] - 211:13
**unfortunate** [1] -
142:20
**unfortunately** [3] -
120:24, 176:9, 216:2
**unidentified** [2] -
137:12, 166:2
**uniform** [8] - 36:17,
36:18, 53:3, 53:5,
75:1, 86:24, 187:11
**unique** [7] - 51:22,
158:10, 158:12,
202:8, 202:17,
211:7, 213:13
**unit** [3] - 86:15, 86:17,
212:3
**Unit** [5] - 35:23, 35:24,
74:12, 74:13, 86:13
**UNITED** [3] - 1:1, 1:3,
1:10
**United** [9] - 1:13, 1:14,
3:4, 3:6, 3:8, 114:1,
178:6, 219:17,
219:21
**units** [2] - 74:10,
86:24
**Universal** [2] - 211:12,
214:2
**universe** [3] - 183:2,
183:17, 183:22
**unless** [6] - 3:23, 3:24,
88:7, 221:20, 228:7,
228:9
**unquote** [2] - 138:13,
203:19
**unreasonably** [1] -
143:8
**up** [115] - 7:16, 11:2,
18:9, 18:17, 28:1,
31:18, 33:16, 36:22,
38:20, 39:7, 40:5,
40:18, 42:25, 45:2,
45:25, 47:5, 48:10,
50:14, 53:17, 54:20,
54:24, 56:9, 56:12,
58:19, 61:23, 62:8,
62:10, 62:21, 63:4,
64:18, 68:16, 70:6,
70:16, 71:17, 77:4,
79:15, 80:14, 81:3,
81:12, 81:15, 81:21,
81:24, 86:24, 87:21,
88:9, 88:11, 88:12,
89:1, 89:7, 91:3,
91:8, 91:25, 92:1,
92:3, 92:22, 93:1,
93:5, 95:4, 95:10,

95:20, 98:15,
100:16, 106:14,
107:16, 108:21,
109:15, 111:12,
113:3, 113:12,
113:17, 114:5,
116:3, 116:22,
117:13, 123:11,
124:9, 124:13,
127:19, 128:15,
129:3, 131:10,
135:13, 137:7,
141:21, 143:11,
146:16, 148:7,
150:2, 155:14,
158:5, 164:15,
166:10, 166:23,
169:1, 170:4,
174:14, 179:4,
179:20, 182:5,
182:13, 185:22,
196:7, 201:13,
206:6, 208:3,
209:12, 212:20,
214:25, 215:9,
224:4, 225:19,
225:24, 226:22,
229:13, 232:19
**uploaded** [4] - 145:12,
212:1, 213:14,
215:25
**Upper** [1] - 67:9
**upper** [3] - 91:21,
201:14
**upward** [1] - 44:5
**upwards** [1] - 145:3
**urge** [1] - 110:24
**urgings** [1] - 225:16
**URL** [3] - 148:6,
148:13, 148:25
**user** [10] - 141:15,
146:17, 148:25,
149:1, 157:17,
157:20, 170:14,
214:8, 218:8, 218:11
**user's** [1] - 139:12
**usual** [2] - 38:17,
72:22
**UTC** [1] - 211:13

**V**

**value** [4] - 132:11,
143:8, 158:7, 158:9
**values** [1] - 158:3
**van** [6] - 38:4, 38:6,
38:14, 38:15, 38:17,
38:23
**vans** [6] - 87:23, 88:1,
88:5, 88:7, 88:11,

88:15
**vantage** [1] - 96:8
**variety** [1] - 70:24
**vast** [2] - 12:12, 143:6
**Veizaj** [2] - 52:25,
202:16
**verbal** [3] - 45:4, 45:7,
45:8
**verbatim** [5] - 120:19,
175:14, 178:9,
178:10, 178:12
**verdict** [1] - 124:24
**version** [9] - 56:8,
56:10, 101:15,
101:16, 101:20,
102:22, 102:23,
103:1, 208:16
**versus** [4] - 3:4, 42:24,
165:1, 226:23
**vest** [7] - 36:19, 51:21,
52:2, 72:14, 73:22,
75:3, 87:9
**via** [1] - 134:19
**vice** [1] - 216:22
**vicinity** [1] - 138:8
**victims** [1] - 134:22
**victory** [1] - 216:24
**Video** [79] - 46:4,
46:21, 47:21, 47:25,
48:20, 50:7, 51:1,
51:7, 51:9, 52:5,
52:14, 52:19, 53:9,
53:16, 53:20, 54:17,
55:18, 56:22, 61:14,
62:6, 62:22, 63:1,
63:25, 64:8, 64:16,
67:2, 67:21, 68:4,
68:21, 69:1, 69:4,
69:8, 71:25, 77:16,
78:8, 96:19, 96:24,
97:17, 98:10, 98:22,
99:8, 100:5, 101:13,
102:5, 102:20,
103:9, 135:19,
136:12, 136:20,
155:3, 155:17,
156:2, 156:4,
160:15, 161:2,
162:7, 164:6,
164:23, 165:20,
165:23, 166:6,
166:14, 168:10,
169:6, 169:15,
169:25, 173:12,
174:3, 186:25,
194:23, 196:2,
199:6, 199:15,
200:3, 200:17,
201:8, 203:7,
203:16, 205:21

**video** [198] - 10:1,
10:11, 10:23, 11:14,
11:18, 11:19, 13:24,
14:3, 14:16, 14:17,
15:8, 18:13, 18:18,
18:23, 18:25, 24:6,
24:15, 24:17, 32:5,
32:12, 32:18, 32:19,
33:6, 46:24, 46:25,
47:19, 48:18, 48:23,
48:24, 50:16, 51:3,
51:17, 53:12, 53:22,
53:24, 54:3, 54:16,
54:20, 55:8, 55:17,
56:20, 64:15, 64:18,
65:21, 66:2, 69:25,
70:1, 81:13, 81:21,
96:18, 97:7, 97:10,
97:11, 98:9, 98:25,
99:7, 99:12, 100:22,
101:16, 106:3,
123:8, 123:10,
124:12, 128:15,
134:6, 136:16,
136:23, 137:7,
150:23, 150:25,
151:1, 151:4, 151:7,
151:10, 151:12,
151:16, 151:25,
152:3, 152:5, 152:9,
152:20, 152:21,
152:22, 153:6,
153:16, 153:19,
154:3, 154:7,
154:10, 154:13,
154:14, 154:16,
154:18, 155:1,
155:6, 155:12,
155:20, 155:21,
155:23, 156:6,
158:6, 158:10,
158:11, 158:17,
158:18, 159:4,
159:7, 159:17,
159:22, 160:3,
161:10, 161:18,
161:23, 162:1,
163:18, 163:19,
164:4, 164:9,
164:21, 164:25,
165:2, 165:9, 166:1,
166:4, 167:8,
168:12, 169:19,
170:6, 170:10,
170:22, 170:25,
171:3, 171:12,
171:14, 171:17,
171:21, 172:4,
172:5, 172:11,
172:15, 172:17,
173:2, 173:6,

173:16, 173:20,
183:8, 183:9,
187:18, 191:9,
194:7, 194:8,
194:15, 195:1,
195:8, 195:11,
195:13, 195:16,
195:22, 196:10,
196:13, 199:17,
200:10, 201:12,
201:15, 201:16,
202:5, 202:23,
202:25, 203:11,
204:10, 204:12,
204:14, 204:20,
204:22, 204:24,
204:25, 205:13,
205:14, 205:25,
207:6, 207:8,
207:14, 207:17,
207:20, 208:19,
208:20, 210:25,
212:6, 213:11,
214:13, 222:3,
223:25, 226:11,
231:9, 231:15
**video-sharing** [1] -
170:10
**videoing** [1] - 189:7
**videos** [95] - 5:19,
10:15, 11:23, 13:8,
13:15, 13:17, 13:18,
13:23, 14:7, 14:13,
14:20, 14:22, 15:7,
15:12, 15:20, 15:22,
15:24, 17:8, 17:10,
18:3, 18:4, 18:7,
18:16, 19:11, 21:2,
21:11, 21:15, 21:18,
21:21, 22:8, 24:16,
32:3, 32:4, 32:7,
32:23, 54:4, 54:20,
54:24, 55:7, 81:24,
104:18, 125:5,
125:9, 127:17,
128:9, 134:12,
141:23, 153:3,
158:5, 161:16,
161:17, 162:25,
176:16, 179:15,
179:19, 179:25,
180:11, 180:12,
180:14, 180:16,
180:19, 180:22,
181:6, 181:25,
182:3, 182:17,
182:20, 183:2,
183:15, 183:17,
183:19, 183:22,
184:17, 205:12,
205:24, 212:24,

212:25, 213:2, 213:3, 213:14, 213:20, 213:21, 228:25, 230:23, 231:9, 232:22, 232:23, 232:25

**view** [5] - 126:14, 128:21, 141:16, 175:12, 198:20

**viewed** [2] - 19:11, 21:17

**viewer** [1] - 212:7

**views** [2] - 12:19, 198:16

**violated** [2] - 4:6, 179:3

**violation** [8] - 24:25, 25:9, 25:13, 175:13, 175:25, 177:15, 177:17, 232:6

**violations** [2] - 29:21, 176:14

**violence** [10] - 5:10, 6:6, 6:7, 6:18, 7:17, 13:16, 18:4, 104:22, 192:16, 212:8

**violent** [8] - 5:12, 13:15, 18:12, 99:14, 99:20, 108:13, 114:16, 192:16

**Virginia** [3] - 131:1, 131:2, 131:3

**visible** [1] - 135:24

**visit** [1] - 58:22

**visor** [6] - 61:23, 62:8, 62:10, 62:21, 136:1, 136:5

**visual** [2] - 40:17, 45:15

**vivid** [1] - 93:8

**voice** [6] - 162:19, 165:11, 169:8, 173:15, 187:6, 214:5

**voices** [2] - 77:25, 78:2

**volition** [1] - 173:25

**VOLUME** [1] - 1:9

**volume** [2] - 135:18, 159:3

**vote** [3] - 161:7, 167:18, 216:21

**votes** [1] - 217:1

**voting** [2] - 160:20, 160:22

**VP** [1] - 216:25

**vs** [1] - 1:5

---

**W**

**Wait** [1] - 166:2

---

**wait** [3] - 57:21, 88:6, 142:19

**waited** [1] - 118:17

**waiting** [5] - 22:16, 27:14, 31:17, 116:11, 126:8

**waive** [1] - 5:2

**wake** [1] - 212:20

**walk** [2] - 173:24, 211:3

**walking** [3] - 27:4, 39:7, 101:2

**Wall** [1] - 23:13

**wall** [4] - 23:13, 95:4, 99:2, 100:19

**walls** [3] - 23:18, 23:21, 24:14

**wants** [12] - 5:19, 10:11, 20:13, 32:3, 59:5, 59:6, 59:17, 127:11, 178:24, 183:7, 220:17, 233:14

**warn** [1] - 184:2

**warnings** [1] - 17:6

**warrant** [16] - 139:4, 139:8, 139:10, 139:15, 141:10, 144:18, 147:12, 147:22, 156:20, 157:12, 157:16, 158:19, 209:24, 210:1, 211:6, 217:7

**Washington** [8] - 1:5, 1:15, 1:22, 129:25, 131:11, 131:23, 212:22, 217:25

**wasting** [1] - 9:12

**watch** [4] - 11:15, 14:3, 14:16, 21:2

**watched** [4] - 103:25, 204:12, 205:23, 205:25

**watching** [2] - 66:7, 196:24

**ways** [2] - 59:2, 128:15

**WEA** [1] - 190:22

**wear** [7] - 72:13, 72:23, 74:24, 83:7, 87:1, 87:8, 134:14

**wearing** [20] - 36:17, 36:18, 45:21, 62:4, 69:14, 69:16, 72:19, 72:21, 73:2, 73:8, 73:13, 74:2, 74:22, 102:7, 115:2, 137:10, 138:6, 152:18, 174:20

**Web** [1] - 224:24

---

**website** [5] - 57:7, 57:9, 57:15, 57:16, 57:25

**websites** [1] - 133:17

**Wednesday** [3] - 190:24, 193:12, 193:15

**wee** [1] - 112:7

**week** [2] - 144:5, 170:23

**weeks** [4] - 28:21, 117:21, 119:23, 176:9

**welcome** [2] - 3:16, 33:21

**well-formed** [1] - 221:17

**west** [8] - 23:25, 44:7, 93:24, 95:18, 169:2, 169:3, 173:22

**West** [1] - 67:10

**whatnot** [1] - 58:7

**whatsoever** [1] - 10:18

**wheelchair** [1] - 95:7

**whereas** [2] - 165:4, 232:25

**white** [10] - 52:1, 93:23, 93:25, 130:13, 130:22, 152:16, 161:6, 164:15, 164:17, 199:22

**whole** [10] - 18:21, 84:21, 88:9, 123:1, 174:7, 175:15, 176:8, 196:10, 196:24, 221:1

**Wick** [2] - 235:3, 235:8

**WICK** [1] - 1:21

**wider** [1] - 208:7

**wife** [5] - 117:10, 162:13, 162:14, 162:23, 163:4

**wild** [1] - 212:21

**wildest** [1] - 114:13

**willing** [2] - 57:18, 226:11

**wins** [1] - 217:3

**wise** [3] - 54:21, 54:24, 207:15

**wish** [1] - 176:17

**WITNESS** [21] - 34:1, 34:6, 51:8, 51:10, 52:6, 52:15, 63:20, 68:16, 76:13, 79:4, 82:8, 84:13, 85:7, 85:15, 85:20, 85:22, 85:24, 96:25, 105:6, 129:13, 166:15

---

**Witness** [3] - 96:1, 96:10, 97:5

**witness** [108] - 4:13, 4:19, 6:14, 10:3, 12:12, 12:13, 13:8, 14:8, 15:9, 15:11, 15:14, 16:22, 17:9, 18:1, 18:2, 18:3, 18:25, 21:9, 22:3, 22:7, 23:1, 23:7, 28:22, 31:23, 32:1, 33:1, 33:11, 33:23, 42:1, 43:8, 44:5, 46:3, 53:18, 56:24, 57:19, 59:11, 60:20, 61:2, 66:24, 77:9, 78:13, 81:25, 82:2, 82:6, 84:15, 85:12, 91:20, 92:15, 94:9, 95:9, 96:2, 96:12, 97:6, 97:22, 100:3, 102:12, 106:19, 106:23, 116:15, 117:9, 117:21, 118:25, 119:9, 119:10, 120:18, 120:21, 121:2, 122:6, 123:14, 123:17, 123:25, 125:3, 125:11, 125:16, 126:10, 127:5, 127:6, 127:18, 128:6, 129:10, 148:12, 149:19, 163:10, 166:22, 175:17, 176:1, 176:4, 177:5, 177:21, 178:17, 180:6, 180:10, 182:13, 182:18, 182:25, 185:15, 186:3, 189:23, 190:10, 194:2, 203:2, 220:1, 232:10, 232:12, 233:5, 233:15

**witness's** [4] - 23:16, 129:3, 167:4, 198:12

**witnesses** [25] - 3:23, 4:2, 4:11, 9:7, 12:16, 16:17, 21:1, 29:5, 30:25, 119:24, 120:1, 120:10, 121:2, 122:15, 122:18, 122:22, 124:6, 124:7, 176:9, 178:16, 178:21, 224:9, 224:12, 232:9

**witnesses'** [1] - 4:17

**woman** [2] - 173:19,

---

173:24

**wonder** [1] - 59:22

**wondering** [2] - 7:2, 229:20

**wonky** [1] - 135:15

**Woodland** [1] - 1:18

**word** [11] - 15:3, 21:20, 38:11, 83:23, 140:16, 148:22, 148:24, 198:7, 204:1, 212:5, 212:10

**words** [3] - 46:23, 48:22, 108:17

**wore** [2] - 99:24, 99:25

**workers** [1] - 190:25

**works** [1] - 11:23

**worn** [37] - 32:9, 45:19, 45:21, 46:9, 56:11, 63:10, 65:10, 67:7, 81:7, 99:21, 99:24, 99:25, 100:22, 100:25, 102:7, 102:9, 117:16, 117:18, 134:3, 134:20, 134:24, 134:25, 135:2, 135:7, 171:1, 172:20, 172:24, 187:15, 197:12, 197:21, 197:23, 197:24, 202:4, 202:5, 202:9, 202:12, 202:17

**worried** [2] - 25:16, 232:5

**worry** [1] - 142:21

**worse** [2] - 89:13, 122:24

**wow** [1] - 113:1

**wrestle** [1] - 44:25

**wrist** [1] - 87:11

**writ** [1] - 119:21

**write** [3] - 29:16, 120:19, 134:18

**written** [4] - 119:23, 135:8, 216:7, 217:18

**wrote** [5] - 30:13, 30:16, 30:17, 119:21, 217:19

---

**Y**

**Yahoo** [1] - 141:7

**year** [3] - 86:8, 231:2, 232:1

**years** [6] - 21:24, 34:24, 84:10, 86:14, 116:10, 130:8

**yell** [1] - 77:1

**yelled** [2] - 83:10,

89:25
**yelling** [16] - 39:5,
39:6, 41:13, 41:14,
44:16, 44:17, 76:4,
80:1, 89:19, 89:20,
90:6, 90:7, 104:17,
104:18, 104:20
**yellowish** [1] - 173:3
**yesterday** [23] - 3:15,
22:15, 23:7, 29:5,
29:7, 30:6, 33:10,
116:11, 117:10,
119:19, 119:22,
122:18, 122:21,
122:22, 123:12,
123:15, 124:3,
128:15, 176:2,
176:6, 176:11,
212:6, 232:10
**yesterday's** [1] - 124:6
**yourself** [14] - 51:3,
52:13, 77:18, 78:15,
83:6, 96:21, 97:3,
97:19, 106:12,
107:22, 108:16,
109:7, 109:24, 155:5
**YouTube** [33] -
139:12, 146:7,
146:9, 146:16,
146:21, 147:14,
148:7, 149:17,
150:5, 151:13,
152:2, 153:4, 153:6,
153:19, 154:3,
154:11, 154:17,
154:19, 156:9,
156:10, 156:16,
157:15, 157:18,
158:6, 158:17,
158:19, 159:23,
162:25, 163:18,
170:10, 171:9, 211:6
**YouTube.com** [1] -
146:17
**youtube.com\user\
blacklionjester** [1] -
148:7

## Z

**zero** [2] - 62:18, 97:11
**zero-second** [1] -
97:11
**zeroing** [1] - 14:12
**zip** [2] - 141:24, 142:1
**zoom** [27] - 140:13,
140:22, 140:24,
148:21, 149:15,
157:14, 157:22,
190:5, 191:2,

191:22, 192:6,
192:7, 193:3, 193:4,
211:1, 212:23,
213:25, 215:3,
215:4, 215:14,
216:10, 216:16,
217:4, 218:1,
218:15, 218:24,
219:7
**zoom-in** [1] - 212:23
**zoomed** [2] - 190:11,
219:11
**zoomed-in** [1] -
190:11
**zooming** [1] - 212:23