<pre>
 1                BEFORE THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,          .
                                        .  Case Number 21-cr-552
 4           Plaintiff,                 .
                                        .
 5        vs.                           .
                                        .  Washington, D.C.
 6   KENNETH JOSEPH OWEN THOMAS,        .  May 22, 2023
                                        .  8:50 a.m.
 7           Defendant.                 .
     - - - - - - - - - - - - - - - - -

 8

 9                TRANSCRIPT OF JURY TRIAL, VOLUME 6
               BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                  UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:     SAMANTHA MILLER, AUSA
                                SEAN MCCAULEY, AUSA
14                              United States Attorney's Office
                                601 D Street Northwest
15                              Washington, D.C. 20579

16   For the Defendant:         JOHN PIERCE, ESQ.
                                ROGER ROOTS, ESQ.
17                              John Pierce Law P.C.
                                21550 Oxnard Street
18                              Third Floor, OMB #172
                                Woodland Hills, California 91367

19

20

21   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                333 Constitution Avenue Northwest
22                              Room 4704-B
                                Washington, D.C. 20001
23                              202-354-3284

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
</pre>

1

C O N T E N T S

2

TESTIMONY

3

KENNETH THOMAS           Direct Examination (Continued).. 21
4                        Cross-Examination............... 35
                         Redirect Examination........... 65
5
DAVID SUMRALL            Direct Examination............. 87
6                        Cross-Examination.............. 108
                         Redirect Examination........... 111
7                        Recross-Examination............ 113

8

9  Jury Instructions..................................... 177

10 Government Closing Statement.......................... 206

11 Defense Closing Statement............................. 231

12 Government Rebuttal Closing Statement................. 247

13

14

EXHIBITS RECEIVED

15 Defense 434.3......................................... 23
   Defense 295.......................................... 98
16 Defense 292.......................................... 105
   Defense 451.......................................... 115

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2          (Call to order of the court.)
 3          (Jury not present.)
 4          COURTROOM DEPUTY:  Your Honor, we are in Criminal
 5   Action 21-552, United States of America versus Kenneth Thomas.
 6          If I can have counsel please approach the podium and state
 7   your names for the record, starting with the United States.
 8          MS. MILLER:  Good morning, Your Honor.  I'm Samantha
 9   Miller on behalf of the United States.  I'm joined by
10   co-counsel, Sean McCauley, our paralegal, Brianna Rummens, and
11   our FBI case agent, Alexis Brown.
12          MR. PIERCE:  Good morning, Your Honor.  John Pierce on
13   behalf of the defendant, Kenneth Joseph Thomas, along with our
14   co-counsel, Roger Roots, and our paralegal, Emily Lambert.
15          THE COURT:  Good morning.  Let me make you aware that
16   juror number 3 has had a family emergency.  If you would like
17   more particulars, I will tell you more on the phone.  It's
18   clearly a family emergency, and I think we're going to have to
19   excuse him, because a close family member is in the hospital.
20          So that would mean it is the first alternate -- I won't
21   identify the seat, but you all know the first alternate -- would
22   now become one of the 12 jurors.  That leaves us with one
23   remaining alternate.
24          Any objection to excusing that juror number 3?
25          MS. MILLER:  No, Your Honor.
```

```
 1              MR. ROOTS:  Can we just have a scrum?  We just want to

 2     discuss.  I forget who that juror is.

 3              THE COURT:  Sure.

 4          (Defense conferred.)

 5              MR. ROOTS:  Well, this family emergency --

 6              THE COURT:  Why don't we get on the phone, and I will

 7     share details.

 8          (Bench conference.)

 9              THE COURT:  So juror number 3's wife has had a stroke,

10     and he informed Mr. Hopkins that he is unavailable.

11          Given the nature of the medical emergency, I can't imagine

12     that we could adjourn for the morning and he would be back in

13     the afternoon.  So I'm inclined to excuse him for cause.

14          Any objection?

15              MS. MILLER:  No, not from the government, Your Honor.

16              MR. ROOTS:  I guess we will not object.

17              THE COURT:  So juror number 3 is excused for the

18     remainder of the trial, and you all know juror number 1 is the

19     first alternate.  So that leaves number 5 as the only remaining

20     alternate.

21          (End of bench conference.)

22              THE COURT:  All right.  Before we bring the jury in,

23     just a couple of minor matters.

24          Mr. Pierce, Mr. Roots, I was confused.  There was a lot of

25     activity on the docket this morning, including a proffer from
```

Mr. Sumrall and the 615 issue.  The only day I was asking for
written proffers was the day, Mr. Roots, you couldn't tell me
what your witnesses were going to testify to.

I thought we covered Sumrall, and he's allowed to testify.
For what it's worth, I do agree with the government that his
testimony about the five officers who took no action at least an
hour before Mr. Thomas came up the same general area is not
relevant here, because it's that inaction that Mr. Thomas isn't
aware of.

So I would not allow Sumrall to testify about that, but I
was just confused why you're filing the witness proffer and the
615 motion that I've already ruled on.

MR. ROOTS:  Okay.  Understood, Your Honor.  I guess we
were just -- oh, that's right.  We had initially -- we filed a
document under John's name with my signature on it or something
like that.

THE COURT:  So the clerk rejected it?  I see.  I was
just confused.  I thought we had addressed all that.

Okay.  So that's cleared up.  And I went back and I looked
at the videos for each of the five charged assaults.
Particularly with Ainsworth, I'm confused.  As I understand it
now, the conduct that's charged -- the conduct that's behind
Count 5, the charge relating to Ainsworth, is not the instance
where it's hard to tell who knocked him down; is that right?
It's something that occurred later around 16:22:40, reflected in

1    Exhibit 710 and 711.

2        MS. MILLER:  Yes, Your Honor.  That has always been

3    our position.  It's been in a number of our filings.  The

4    defense decided to introduce an exhibit with Corporal Ainsworth

5    that we did not introduce with him.  It led to confusion.

6        THE COURT:  It definitely confused the Court.

7        Mr. McCauley, when I was saying it's not even clear to me

8    he committed the assault, that's what I was focused on.

9        So that's not even the charged assault?

10        MS. MILLER:  Well, I don't think we have to specify a

11    specific time frame.  It may be possible that he assaulted him

12    twice.  But the one we have been focused on all along was a

13    little bit later.  And Your Honor knows we've had those freeze

14    frames in a number of our filings with respect to this case

15    throughout.

16        THE COURT:  I think for purposes of the trial, we need

17    to know what the government's going to argue the assault was.

18        MS. MILLER:  Right, and it's the one we --

19        THE COURT:  We can't have three jurors finding the

20    first was an assault and five finding the second was an assault.

21    I think in closing, you've got to make very clear what conduct

22    applies to each charge, each count.  I mean, you could charge

23    two assaults; right?  But can you rely on -- can 12 jurors

24    together rely on different evidence to prove one assault against

25    Ainsworth?  And if so, I need some briefing on that.  You may be

1    right, but it's just -- I was confused by the presentation of

2    the evidence, and I suspect the jury is, and I just wanted to

3    confirm what the government's position is with respect to

4    Count 5.

5        What is the charged conduct?

6        MS. MILLER:  It's the freeze frames and the time frame

7    identified in a number of filings, including the most recent

8    jury instruction filing.

9        So, yes, Your Honor, you're correct.  The defense, for

10    whatever reason, has focused on something that occurred --

11    whether it involves Ainsworth or not is unclear -- that happened

12    like maybe 20 seconds before that.

13        THE COURT:  So the blue jacket guy versus Thomas

14    pushing Ainsworth down on the ground, that's not the conduct

15    that forms the basis of Count 5?

16        MS. MILLER:  Correct; not for our purposes, yes.

17        MR. ROOTS:  Your Honor, Corporal Ainsworth testified

18    with 100 percent certainty that Joe Thomas pushed him down.

19        THE COURT:  All right, fine.  You may have

20    successfully impeached him on that, but you understand that's

21    not the conduct that forms the basis of Count 5?

22        MR. ROOTS:  I will admit to being confused, and I

23    followed this action fairly closely.  We are confused about

24    which contact is alleged and which is which number assault.  We

25    are confused about this.

```
 1              THE COURT:  All right.  They've clarified that it's
 2    not Ainsworth falling down; it's the conduct, I don't know, 20
 3    seconds later when it appears that Mr. Thomas pushed Ainsworth.
 4              MR. MCCAULEY:  Your Honor, just for purposes of
 5    clarity, we are talking about the assault where Mr. Thomas is
 6    yelling "let him up" repeatedly.  That's the conduct.
 7              THE COURT:  But he's also -- as he does that, he's
 8    pushing.
 9              MR. MCCAULEY:  Yes, Your Honor is correct.  That's
10    the --
11              THE COURT:  That was confusing for me and apparently
12    the defense and perhaps the jury.  So I just want to make sure
13    we're clear on that before closings what the government's theory
14    is with Ainsworth.
15              MS. MILLER:  Absolutely.  That has always been our
16    theory.  I think the confusion was introduced by the defense.
17              THE COURT:  Okay.
18              MR. ROOTS:  With 100 percent certainty he said Thomas
19    pushed him over.  So it wasn't confusion introduced by the
20    defense.
21              THE COURT:  No, but do you understand the point,
22    Mr. Roots?  You may have successfully impeached him on that, but
23    that's not the charged assault.
24              MR. ROOTS:  Until this second, I wasn't actually aware
25    of that.  So now we're learning a new --
```

1          THE COURT:  I assume you were -- the government turned
2     over the video that shows both instances to you.
3          MR. ROOTS:  They've turned over a lot of videos, and
4     we've reviewed a lot of videos.
5          THE COURT:  Did you have Exhibit 710 and 711, that
6     reflect --
7          MR. ROOTS:  Yes.
8          THE COURT:  Well, that's -- to be clear, that's the
9     conduct they are relying on to prove Count 5, not the instance
10    that you say Ainsworth testified incorrectly about with whether
11    the guy in the blue jacket or whether Mr. Thomas knocked down
12    Ainsworth.  That's irrelevant for Count 5 other than your
13    impeachment of him.
14         MR. ROOTS:  All of us were trying to go over
15    preparation for closing this morning.  And we all sat around
16    saying we are all confused about what's Count -- the specific
17    contact.  We would like the government to maybe circle the
18    contacts they say Mr. Thomas had, because it's confusing for us.
19         THE COURT:  For each count or for Count 5?  I followed
20    it on the other counts.
21         But while I have you all here, I want to take one more
22    minute.  Let me just confirm that the Court's understanding of
23    the various assaults is correct.
24         So with respect to Counts 3 and 4, and these are the
25    close-in-time assaults, alleged assaults of Anderson and

1    Nickerson.  This is around 15:30-ish.  With respect to Anderson,

2    I think Mr. Thomas has testified he was going after pipe man,

3    the guy in the red jacket, but there's a push of Officer

4    Anderson.

5        And with respect to Nickerson, similar push up against him,

6    and then Mr. Thomas falls down.

7        Is that correct?

8            MS. MILLER:  I'm not sure if Mr. Thomas fell down, but

9    the officers were trying to prevent the surge.  So he turned

10   around and ended up kind of sitting on the steps.

11           THE COURT:  That's around 15:30-ish in time?

12           MS. MILLER:  Yes.  They're right after each other,

13   those two assaults, within seconds.

14           THE COURT:  Okay.  And then we've talked about

15   Ainsworth.

16       And then with Count 6, Veizaj, around 16:26, this shows

17   Mr. Thomas sort of pushing into the officers with other

18   protestors?

19           MR. MCCAULEY:  Yes, and we've been referring to that

20   colloquially as the "hold the line" assault.

21           MS. MILLER:  Right, because he's saying "hold the

22   line" over and over again as he does it.

23           MR. MCCAULEY:  For those who find phrases rather than

24   time stamps --

25           THE COURT:  And with Niewenhous, Count 7, around

1    16:29, Mr. Thomas slams into Niewenhous.

2              MS. MILLER:  Into his shield, yes, Your Honor.

3              THE COURT:  And he what?

4              MS. MILLER:  Into his shield, Your Honor.

5              THE COURT:  Into his shield?

6              MS. MILLER:  Yes.

7              THE COURT:  So it is just very confusing to the Court

8    again and apparently to the defense and I suspect the jury what

9    conduct relates to what count.  So I appreciate you all clearing

10   it up.

11             MR. ROOTS:  And I just want to say that as the Court

12   is aware, the Court has ruled already a little bit on this.  A

13   rival case accused other individuals, we believe, although it's

14   not clear, of committing at least overlapping assaults which

15   overlap the facts, the same discovery overlapped, the same

16   exhibits overlapped in that trial, the trial of Wren and Smith.

17             And we went and looked at their indictment.  The indictment

18   is not clear, does not name victims.  There are three assaults

19   in that indictment, without naming the victims or giving them

20   abbreviations.  So we believe after consultation that other

21   people have already been convicted of at least one of the

22   assaults.

23             THE COURT:  Mr. Roots, I read the government's

24   response to that.  It was pretty clear to me that while it's

25   close in time, that was a different assault.  It might have been

1    on the same officer.  I don't recall.  But it's different

2    conduct.  It's not what Mr. Thomas is charged with.

3        Am I reading the response correctly from the government?

4            MS. MILLER:  Yes, Your Honor.  And I think part of the

5    issue here is the defense's misunderstanding all along about

6    which assault on Ainsworth, if there were multiple, we have been

7    trying to present to the jury.  Because what he's referring to

8    is when the long-haired gentleman with curly long hair is seen

9    in the video pushing him.

10       That's not the one -- the Ainsworth assault we've been

11   focusing on at all.

12            THE COURT:  All right.

13            MR. ROOTS:  Smith is more accused of, I believe, the

14   same assault as Thomas.  The scrum where Ainsworth went over,

15   again, we focused on that because it was so, I would say,

16   prejudicial to us.  Knocking a cop over is pretty prejudicial to

17   us.

18            THE COURT:  But that's not what's charged.  They

19   probably don't know who did that for sure.

20            MR. ROOTS:  I'm learning this the first time here,

21   that that's not what's charged.

22            THE COURT:  The defense had the videos.  To the extent

23   there was confusion, I would hope the parties would talk before

24   trial, during discovery, about what the assault conduct is.  I'm

25   hearing all this for the first time and trying to piece it

together.  But you all have had these exhibits for a long time
and certainly could ask the government questions to clarify
which conduct is charged as an assault.

MR. ROOTS:  Well, we've asked the government a lot of
questions.

THE COURT:  Are you saying you asked about what
constituted this alleged assault on Ainsworth and they wouldn't
answer that question?

MR. ROOTS:  This weekend, they stopped speaking to us.
So I would say --

THE COURT:  Well, no, before trial started, I would
hope that you all would go to trial clear about what conduct is
behind each charged assault.

Prior to trial, did you ask them that question and they
refused to answer?

MR. ROOTS:  I don't honestly recall.

I do want to say for the record that we did not receive any
302s from Campanale.  And I think the Court -- we may have
miscommunicated.  The Court ruled that we had --

THE COURT:  302s from Campanale?  You mean from the
special agent relating to interviews of Campanale?

MR. ROOTS:  Yes.  We had none of that.

THE COURT:  And when did you -- there are Campanale
302s?

MR. ROOTS:  Yes.

 1              THE COURT:  And you have them now?

 2              MR. ROOTS:  We have them now.  And what's interesting

 3    is, Campanale in those says that he's testified in, plural,

 4    January 6 trials, not one.  So we still -- the government has

 5    not answered us.  How many has he testified in?  We just don't

 6    know.

 7              THE COURT:  All right.  The government, if it hasn't

 8    answered that question, needs to find out all the trials that

 9    Campanale has testified in.

10              MR. MCCAULEY:  One, Your Honor.

11              THE COURT:  He did testify, I thought, in trial that

12    there were multiple, but maybe multiple are coming?

13              MS. MILLER:  I'm not sure whether he's going to be

14    testifying in any upcoming --

15              THE COURT:  Okay.  But for a fact, he's only testified

16    in one, and you've made him aware that's the Wren case; right?

17              MS. MILLER:  As far as we know, yes.

18              THE COURT:  Well, the government should know.  So

19    double-check with your peeps on whether there are others.

20         Mr. Roots, as far as your filing, I denied the motion, but

21    I really was looking for you to point out specific lines in the

22    302s that were inconsistent with the testimony of the officers,

23    and I didn't get that kind of detailed analysis that I was

24    expecting.

25         And I reviewed the 302s multiple times, and I personally

1    saw nothing in there that was inconsistent with what they

2    testified to at trial, and I saw nothing in there exculpatory.

3        Do you disagree?

4        MR. ROOTS:  Well, it's not just a *Brady* violation;

5    it's a *Jencks* violation.

6        THE COURT:  But I've ruled multiple times it's not

7    *Jencks* for the police officer; it's *Jencks* for the Special

8    Agent.  You had it before the Special Agent testified.  I'm not

9    going to continue to retread rulings I've made.

10        With respect to the footnote motion you made to report R.N.

11    to the police department for not telling the police department

12    he had a career-ending medical diagnosis, my recollection is he

13    made clear on the stand on cross-examination he did not have a

14    diagnosis and he has PTSD symptoms.  There's no basis to report

15    him to the police department for that.  People use PTSD

16    colloquially, and I think it's clear to the jury now there is no

17    formal diagnosis.

18        MR. ROOTS:  This officer in his 302 says he blacks out

19    on the job.  I think the citizens of D.C. need to be aware

20    there's a cop on patrol that blacks out.

21        THE COURT:  Well, I assume that people are aware of

22    that.  I have no reason to think they're not.

23        MS. MILLER:  Your Honor, how is that relevant to this

24    case?

25        THE COURT:  It's not relevant to this case.  I guess

1    he's protecting the wider public.

2            MR. ROOTS:  It is relevant to the case because it's a

3    violation of his own policies and OSHA policies not to report to

4    his supervisor an injury.  He's claiming an injury, and he's not

5    reporting this.  This is a violation, and it's misconduct.

6            THE COURT:  Ms. Miller?

7            MS. MILLER:  Your Honor, I wasn't intending to raise

8    this this morning because Your Honor ruled yesterday, but given

9    Mr. Roots is again raising sort of defamatory issues relating to

10   this victim and witness in our case, I feel like I have to say

11   that although we didn't state it explicitly in our motion, we

12   feel as though these filings have really crossed an ethical

13   line, and --

14           THE COURT:  Well, they should not have been filed on

15   the public record, that's for sure.

16           MS. MILLER:  And we would again ask Your Honor to

17   strike anything with respect to Niewenhous, because they had the

18   302s, and they --

19           THE COURT:  What do you mean "strike anything"?

20           MS. MILLER:  Strike anything in their motion about his

21   testimony at all, because the whole argument revolves around not

22   having had his 302s, but they did.

23       So that -- and smearing his good name would never -- if

24   they had understood or taken a moment to realize what day he

25   testified on, they would have realized that that entire part of

```
 1    their motion was based on a misstatement of the facts of this

 2    trial.

 3              THE COURT:  What's the basis for including Niewenhous

 4    in that if you had the 302 before he testified?

 5              MR. ROOTS:  Well, I will just say, we may have had the

 6    302 at 7:30 in the evening the day before he testified.

 7              THE COURT:  And?

 8              MR. ROOTS:  And frankly --

 9              THE COURT:  You didn't read it?

10              MR. ROOTS:  I didn't read it.  I believe someone on

11    our team read it.  It was shocking, at least to me.  Here's an

12    officer who takes the stand, says he has undiagnosed PTSD, and

13    he says he blacks out, and he's afraid of crowds.

14        This officer needs to be --

15              THE COURT:  This is so tangential, Mr. Roots.  This

16    has nothing to do with the motion to dismiss for failure to turn

17    over 302s.  So it is --

18              MR. ROOTS:  And she mentioned ethical.  Can I mention

19    an ethical issue?

20              THE COURT:  No, I'm not going to hear any more of this

21    bickering back and forth.  We've got a jury waiting.  I'm going

22    to bring them in.  We're going to resume Mr. Thomas's testimony.

23        Is there anything beyond this issue that we need to discuss

24    now before I bring them in.

25              MS. MILLER:  The only other thing I wanted to note to
```

1    Your Honor and to defense counsel just on the record is one of

2    the many filings where we identified the specific assaults for

3    all of the officers, including Ainsworth by screenshots with

4    time stamps in them, is ECF No. 75, which I believe is just one

5    of many, but it has the exact screenshots that we've been

6    focusing on and the time frame.

7             THE COURT:  And that was filed well before trial?

8             MS. MILLER:  Yes, Your Honor.  That was filed on

9    March 9, 2023.

10            THE COURT:  All right.  Well, it's just -- there are a

11   lot of facts.  There are a lot of videos.  I think I was paying

12   attention.  I've certainly read all those filings.  I just

13   wanted to clarify for my own sake that the conduct involving the

14   man in the blue jacket really is irrelevant for purposes of

15   Count 5 other than maybe impeachment on -- perhaps on Ainsworth.

16   Correct?

17            MS. MILLER:  I agree, Your Honor, yes.

18            THE COURT:  Okay.  Can we bring in the jury.

19            COURTROOM DEPUTY:  We cannot.  We're still missing

20   two.

21            THE COURT:  Can you contact them?

22            COURTROOM DEPUTY:  Yeah, I shall.

23            THE COURT:  Mr. Roots?

24            MR. ROOTS:  I just want to say, we just filed a motion

25   in limine to probe witnesses, put on some evidence about that

1  other trial and that other indictment, because the jury, I

2  think, is confused.  And when -- I think maybe we could recall

3  the case agent and ask her some questions about the Wren case

4  and the Smith case.

5            THE COURT:  I don't understand the relevance here.

6  The government has made clear that's a different time frame.

7  Just because it's the same general area with the same agents, I

8  don't see the overlap.  You're going to have to give me a better

9  proffer on how that case is essential to this one.  I think it's

10  a different time frame based on what the government has

11  proffered.

12            MR. ROOTS:  We spoke with the attorney for Wren and

13  Smith.  We asked him, well, what officers did Wren and Smith get

14  convicted of assaulting.  He believes Ainsworth is in that

15  group.

16            THE COURT:  It may be, but it can be a half hour

17  earlier or five minutes earlier.  These officers were assaulted

18  multiple times by multiple individuals.  It's not surprising

19  that there's another trial involving an assault on Ainsworth in

20  the same general area.  It doesn't mean it's the same assault

21  that Mr. Thomas is charged with.

22        So you're going to have to proffer more specifics about the

23  time frame.  Get me the video.  Get me the time stamp.

24        The government has proffered that there's a gap of what

25  amount of time?

 1          MS. MILLER:  Approximately 20 seconds or so.

 2          THE COURT:  Okay.  Well, that's closer than I

 3   remembered, but you're clear that it's not the same assault?

 4          MS. MILLER:  Yes.  In one specific body-worn camera, I

 5   believe it's 303, it has the entire period.  We did what we

 6   called the treatment version to identify Ainsworth assault where

 7   we matched up multiple videos that just shows a shorter period.

 8   But if you look at just the longer video, you can see the time

 9   frame that they're talking about but then also the time frame

10   that we've been focusing on.

11          THE COURT:  Why don't we do this:  I'm going to have

12   to take a break because we don't have two jurors.  During this

13   break, why don't you all pull up the video and show the defense

14   what the assault is for Wren and what the assault is for Thomas.

15          MS. MILLER:  Sure.

16          THE COURT:  So we have one of the missing jurors, and

17   the other one is on Seventh Street.  Mr. Hopkins is going to go

18   down and get her to the front of the line.  So we should be able

19   to start in ten minutes.  So I'm going to take a brief break.

20      Mr. Roots, was there something else you wanted to say?

21          MR. ROOTS:  I think that's it.

22          THE COURT:  All right.  You all use this time to pull

23   up that video and review for the defense the distinction between

24   the Wren trial and this trial.

25          MS. MILLER:  Yes, Your Honor.

1          (Recess taken from 9:16 a.m. to 9:30 a.m.)

2          (Jury not present.)

3              THE COURT:  All right.  Are we ready to bring the jury

4     in?

5              COURTROOM DEPUTY:  We are, Your Honor.

6          (Jury entered courtroom.)

7              THE COURT:  Good morning, ladies and gentlemen.

8     Welcome back.  I hope you had a nice weekend.

9          We will resume this morning with Mr. Thomas's testimony.

10              MR. PIERCE:  Thank you very much, Your Honor.

11      KENNETH JOSEPH THOMAS, WITNESS FOR THE DEFENSE, RESUMED STAND

12                    DIRECT EXAMINATION (Continued)

13              BY MR. PIERCE:

14     Q.   Good morning, Mr. Thomas.

15     A.   Good morning.

16     Q.   So we're going to go over another few videos, maybe clear a

17     couple things up from some scenes we've looked at before, and

18     then look at one or two additional scenes, and then go to some

19     other questions.

20          Ms. Lambert, can you bring up Government's Exhibit 303X,

21     please.  It's already in evidence.

22          (Video played.)

23              BY MR. PIERCE:

24     Q.   Mr. Thomas, did you see right there in that video, you had

25     some contact with an officer there?

1    A.    Yes, I did.

2    Q.    Okay.  Can you please just in detail kind of walk us

3    through what occurred right there, from your standpoint?

4    A.    Yes.  The police line and the protestors sort of merged

5    towards each other, and there was a group of gentlemen that were

6    down on the ground being hit by the Capitol Police or Metro

7    Police, whichever they were.

8         And so sort of in defense of those that were vulnerable, I

9    stepped in between them and put my arm up in a defensive fashion

10   and pushed against that officer's shield, screaming "let him up"

11   multiple times until they could get up and out of the area to be

12   safe.

13        And then I followed through what essentially could be

14   considered a gap between the protestors and the police to try to

15   separate -- separate them from each other.

16   Q.    And in that situation, were you intending to hurt that

17   officer in any fashion?

18   A.    No, not at all.  I was just trying to help keep people

19   safe.

20   Q.    Were you intending to obstruct or impede that officer from,

21   in -- from your standpoint, doing his job?

22   A.    No.

23   Q.    Okay.  Now, Ms. Lambert, if we could take a look at

24   Exhibit 434.3, please.  I don't think this in evidence yet.

25        Do you see that scene right there, Mr. Thomas?

1    A.    Yes, I do.

2    Q.    And do you see yourself in that video?

3    A.    I do.

4    Q.    And from your recollection and understanding, is that a

5    fair and accurate representation of events that occurred at the

6    Capitol on January 6?

7    A.    Yes.

8              MR. PIERCE:  Move to admit this, Your Honor.

9              MR. MCCAULEY:  No objection.

10             THE COURT:  All right.  It's admitted.  You can

11   publish to the jury.

12        (Defense Exhibit 434.3 received into evidence.)

13        (Video played.)

14             BY MR. PIERCE:

15   Q.    Okay.  Go ahead and stop right there.

16        Mr. Thomas, did you see yourself in that video?

17   A.    Yes, I did, at the very beginning.

18   Q.    Okay.  Can you please walk the jury through in detail what

19   occurred there, from your standpoint.

20   A.    Sure.  So this is right after a previous scrum where the

21   protestors had the countdown, and they kind of rushed towards

22   the police line.  A lot of people got knocked over.  At the very

23   beginning of that, you see that I'm kind of helping an elderly

24   gentleman up off the ground.  He was laying at the base of the

25   stairs.

1    And then the protestor that I referred to as the pipe guy

2    had a flag pole, and he ran up and swung that flag pole, hitting

3    myself and some officers, to which I turned around and then put

4    my arm up to deflect his second swing, which then he threw the

5    flag pole over the police line.

6    I then made sure the gentleman I was helping up could get

7    out of that area, and then I walked away.

8    Q.    And in that instance, were you intending to cause any harm

9    or hurt any police officers?

10   A.    No, no.  Actually, quite the contrary, I took a flag pole

11   for them.

12   Q.    And in that incident, were you attempting to obstruct or

13   impede or prevent officers from doing their jobs?

14   A.    No, just again trying to keep people safe and, I mean, help

15   the guy up off the ground.  There was a lot of people that got

16   knocked over.

17   Q.    In that incident, were you attempting to prevent Congress

18   from doing any of its duties?

19   A.    No.  I will reiterate the fact the reason I was there was

20   to give Congress the voice to continue with the process.

21   Q.    Okay.  Thanks.  And can now we take a look at Exhibit 709,

22   government.  I believe that's in evidence.

23   (Video played.)

24   BY MR. PIERCE:

25   Q.    Okay.  Go ahead and stop right there.

1    Mr. Thomas, did you see yourself in that video?

2  A.   Yes, I did, at the end of the flower planter at the base of

3  the stairs.

4  Q.   Okay.  And again, can you please just walk the jury through

5  in detail what occurred there, from your standpoint.

6  A.   This is the same scene that you had just previously

7  watched, but just from a different angle.  From that vantage

8  point, you can see the crowd clashing with one another, and the

9  older gentleman with the cane was at the base of the planter --

10  or excuse me, at the end of the planter but at the base of the

11  stairs.  It just shows me going and helping him up.

12  Q.   And how many police officers did you see there in that

13  video?

14  A.   I can't count.  There's a lot, but several rows of them.

15  The entire Upper West Terrace is pretty much covered in police.

16  Q.   Did you believe that you had the ability to break through

17  that line?

18  A.   No, and there's really no point.  The Capitol's not a weird

19  game of capture the flag.

20  Q.   Can we go to Exhibit 308, please.  I think it's

21  Government's Exhibit 308.

22    (Video played.)

23    BY MR. PIERCE:

24  Q.   Stop right there for one second.

25    Do you see in that video it looks like you motioned to your

face or wiped your face?

A.    Yes.

Q.    And why was that?  What was occurring there?

A.    A few things.  I believe that I was wiping away some OC spray, because it irritates the skin and the eyes.  And I had also been hit numerous times in the face.  So I was, obviously, touching it to either wipe away some spray or to feel if my face is swelling up.

Q.    And what were you hit with?

A.    Night sticks, batons, whatever you want to call them, riot shields.  At one point during the day, I was also shot with a PepperBall and some other projectiles, but I don't know for sure what they were, but definitely a lot of OC spray and several baton hits to the face and head.

Q.    And the PepperBall round you're referring to, was that to the face or head?

A.    No.  That was to the thigh.

Q.    Okay.  Go ahead and keep playing.

      (Video played.)

          BY MR. PIERCE:

Q.    Go ahead and stop again.

      Also, do you see in that video you seem to be sort of breathing heavy or agitated to some extent?  Do you see that?

A.    Yes.

Q.    And if you recall, why was that?

1    A.    Quite frankly, getting hit and beaten for just exercising

2    what I perceived as my First Amendment right, my emotions become

3    heightened.  Adrenalin begins to rush.  It's a natural response

4    to be -- in a situation like that to breathe more heavily and

5    to, you know, speak more loudly.

6    Q.    Okay.  Go ahead and keep playing that, Ms. Lambert.

7         (Video played.)

8            BY MR. PIERCE:

9    Q.    Okay.  And Mr. Thomas, you saw yourself in that video?

10   A.    Yes, I did.

11   Q.    And again, can you please just walk the jury through in

12   some detail what occurred there from your standpoint.

13   A.    Sure.  So I walked down to the bottom of the stairs.  The

14   police officers had a line formed, and they were pushing their

15   shields forward and pushing the crowd out.

16        I decided to do like a peaceful resistance, so just kind of

17   stand there, but I put up my hood in anticipation of being

18   sprayed in the face again and just kind of braced my shoulder

19   down to brace for the impact of them to push me away.

20        What I mean by "peaceful resistance," it was just to make

21   them remove me from where I fully believed that I was allowed to

22   express my First Amendment right of freedom of speech, to

23   peaceably assemble, and redress my grievances to the government.

24        My idea of them pushing us out of there was a violation of

25   our rights, and I am not the type of person to just passively

1  accept that.  I wanted to show just the most minimal amount of

2  resistance, but without attacking anybody or causing any damage

3  like we had seen in times past.

4      So I just stood there and expected them to hit me, but just

5  make them remove me.

6  Q.   And you used the phrase "hold the line" there?  Did you

7  hear yourself use that?

8  A.   Yes.

9  Q.   Who were you addressing that to?

10 A.   My recollection is that I was actually talking to the

11 Capitol Police, because hold the line is a term that they use to

12 tell themselves to stop advancing.  And so I was yelling at them

13 to just say stop advancing, please don't push me out of an area

14 that I have a right to be.

15 Q.   Okay.  You can take that down, Ms. Lambert.

16 A.   Can I add something to that video?

17 Q.   Sure.

18 A.   At the very end of that, you see that I step towards the

19 planter, and then I jerk my face away and then turn around and

20 walk away from that area.

21     I witnessed the Capitol Police pushing a gentleman off of

22 that planter by his feet.  So his head was going to go down off

23 the planter onto the concrete.  I stepped towards him to just

24 offer some aid so he didn't get hurt.  And then I was sprayed

25 with pepper spray directly in the face for that, and then I had

1    to retreat.  I couldn't see.  It hurts.

2    Q.   Mr. Thomas, we've taken a look at a lot of videos with you

3    on the stand and with others on the stand.

4         Is there anything else that you want to tell the jury about

5    your interactions with the officers in these videos?

6    A.   Yes.  As Americans, we all have the right to redress our

7    grievances to the government.  I did not do anything that I

8    thought was unlawful.  I did not intend on harming anybody.

9    Quite the contrary, I did everything I could to try to keep

10   people safe and peaceful the whole day.

11        The whole day, I kept calling for no violence, no violence,

12   no violence.  Even when protestors would yell at me, What do you

13   mean no violence, how do you expect to get your country back, my

14   response was always, The constitutional process, buddy, the same

15   way we always do.

16        Left, right is irrelevant.  We as Americans all have the

17   right to redress our grievances and to use our voice.  The

18   people's voice is the most powerful tool that we all have, and

19   that includes the voice of the officers.  That includes the

20   protestors.  That includes everybody in this nation.  Whether we

21   agree politically or ideologically, it's irrelevant.  We're

22   Americans.  And quite frankly, we all love to bitch about our

23   government.  It's just kind of what we do, you know, vote for a

24   president, complain about him for four years, and then vote for

25   him again and complain about him for the next four.

1    That doesn't mean that it's criminal.  It's protected.  The

2    scenes that are being alleged as violence, quite the contrary.

3    It was me trying to help keep people safe, including the

4    officers, picking up the things that I would perceive as trip

5    hazards, like a thermos that was on the ground and I pick it up

6    and move it out of the way, removing objects from the stairs so

7    that people don't fall on them and get hurt.

8    I'm not perfect.  I messed up quite a bit my entire life.

9    I wasn't perfect at the Capitol.  But none of my actions were

10   intended to be malicious, harmful, or in any way stop the

11   process in which I hold great pride in of the Constitution.

12   Q.   Okay.  Thank you, Mr. Thomas.

13   Now, moving sort of post the situation at the Capitol, did

14   you realize at a certain point that you were wanted by the FBI?

15   A.   Yes.

16   Q.   And how did you come to know that?

17   A.   My wife had noticed a picture on Facebook that was referred

18   to by the case agent as a BOLO, and she had called me up and

19   said hey, you're on the FBI's list on Facebook.  And I pulled it

20   up, and I looked at it, and I made a joke.  I said I always

21   thought it would feel nice to be wanted, but she didn't like

22   that too much.

23   Q.   Did you -- upon learning that you were wanted by the FBI in

24   connection with January 6, did you go and voluntarily

25   affirmatively turn yourself in?

A.   That was my original intention, but I reached out to a
friend who was an attorney, and I asked him for some advice.  I
did not hire him as counsel.  I just said hey, what do you think
I should do.

Q.   Don't go into the exact communications, but just tell us
what was the result of those discussions.

A.   Okay.  Following that conversation, I made the choice to
just let them find me organically, you know, not run, don't do
anything crazy like that.  But I have a family to provide for.
I was working currently at that time.  And so to be able to
still maintain my lifestyle for my family and feed my kids and
work, I just went about my life.  I knew they were going to come
and get me eventually.  And that was it.  I just accepted that.

Q.   Ms. Lambert, can we bring up Government's Exhibit 508.
This is already in evidence.

     Can you take a look at that exhibit, Mr. Thomas, and read
that to yourself.  I'll just read it.  It says, "The Sedition
Hunters" -- strike that.

     Is this something that you posted, Mr. Thomas?

A.   Yes.

Q.   Okay.  And it says, "The Sedition Hunters are a leftist
antipatriot group dedicated to turning in peaceful Americans to
the FBI as insurrectionists.  While they were scouring the
Internet in an attempt to identify me, they gave me the code
name #tanoncamo.  I think I'm going to get it as a tattoo," a

smiley face emoji, "along with my number on the FBI most wanted

list, AFO No. 214."

    Do you see that?

A.   Yes, I do.

Q.   And why did you post that?

A.   Well, I apparently think I'm funny.  But the reason that I

posted that, it was a reply to another member of the chat room

that I operate pointing out that the Sedition Hunters had posted

a post online about me, and saying that I wanted to get

#tanoncamo and AFO 214 tattooed on me was kind of a way to mock

their idea that I was a criminal, kind of to snub it in their

face.

    I wanted to get it in the shape of a cross, AFO 214 and

#tanoncamo, because I'm a man of faith, and I believe that God

goes before me, and that I am innocent.  I did not do what I'm

being accused of.  I'm not an insurrectionist.  I'm not a

terrorist.  I'm not any of these things.  I'm just a regular

American that used my First Amendment right.

    And as kind of a way to stick my chest out and flex, I made

the suggestion that I would get it as a tattoo, which for the

record I did not actually get the tattoo.

Q.   Okay.  We've seen some references, I believe, in trial to

the phrase "3 percent."

    Do you recall that?

A.   Yes, I recall that.

Q.   And based on your understanding, what is that a reference
to?

A.   My understanding is the Three Percenters is like a malitia
group, which I'm not affiliated with them whatsoever.  I don't
agree with any of the -- many of their ideologies.

     Are you going to show the picture that was referenced with
that?

Q.   No.  I just wanted to cover that.

     And is there anything else about your social media posts
after January 6 that you want to share with the jury?

A.   Sure.  So I -- I always try to educate people about the
tenets of liberty and freedom.  All of us Americans stand under
the same banner of freedom, the red, white, and blue.  And I
have started a couple campaigns to try to help bring awareness
to what is going on with January 6, and I have posted on
numerous occasions that nobody is above the law and that if
somebody broke a window at the Capitol or if they, you know, hit
a cop with a flag pole, whatever, then they need to be held
accountable.  That is -- fair, true, and blind justice is all
I've ever called for after January 6, that due process rights
should be recognized, because part of what I have pushed out is
the idea that many January 6 defendants have been sitting in
jail for over two years without trial, and that, to me, is a
violation of rights.

     And I'm not making a mockery of the court, but I do not see

1    how it is fair for a system to be treating its citizens the way

2    that it has.

3         And so I've done a few things to help educate the people

4    about that, because the media is silent.  They keep repeating

5    the same seven, eight, ten videos, however many, on repeat.

6         And one of the things that I have done was ask Americans to

7    sing the National Anthem every single night.  It's a peaceful

8    way to tell those that are persecuting, in my opinion, that we

9    will not comply, that we don't stand for it, and I call it

10   #singforfreedom.  It's a way to show the families that are going

11   through this that we stand with them and pray for them, but also

12   to give strength to those that are suffering through it.

13        Now, if they're innocent or guilty, I don't know, and

14   that's not my point.  My point is that all Americans deserve due

15   process and true, fair, and blind justice.

16   Q.   Last couple of questions, Mr. Thomas.  In the course of

17   what occurred that day on January 6, what you did, the videos

18   we've looked at, do you believe that you committed any crimes?

19   A.   I do not, none of the ones that I'm being accused of at

20   least.

21   Q.   Do you take -- are you willing to take responsibility for

22   your actions that day?

23   A.   Yes.

24             MR. PIERCE:  Okay.  Thank you.  No further questions.

25             MR. MCCAULEY:  May I proceed, Your Honor?

```
 1              THE COURT:  Yes, you may.
 2                        CROSS-EXAMINATION
 3              BY MR. MCCAULEY:
 4    Q.    Good morning, sir.
 5    A.    Good morning.
 6    Q.    Sir, you've made many public statements about January 6;
 7    correct?
 8    A.    Yes.
 9    Q.    And those statements are all over the Internet; correct?
10    A.    Yes.
11    Q.    And in those statements, you say that you engaged in no
12    violence on January 6?
13    A.    Correct.
14    Q.    Correct?  And you took weapons away from people?
15    A.    Yes.
16    Q.    And that was essentially your testimony here today;
17    correct?
18    A.    Yes.
19    Q.    And Friday.  Excuse me.  Today and Friday.
20    A.    In a nutshell, yes.
21    Q.    And you testified at the very beginning of your testimony
22    on Friday that you have a passion for the truth; correct?
23    A.    Yes.
24    Q.    And that means telling the whole truth?
25    A.    Of course.
```

1    Q.   And nothing but the truth?

2    A.   I swore to that, yes.

3    Q.   And that was, in fact, the oath that you took before you

4    got on the stand today; correct?

5    A.   Yes.

6    Q.   I want to go way back.  You testified that from the Navy

7    you received a general discharge under honorable conditions;

8    correct?

9    A.   Yes.

10   Q.   And you're familiar with Navy discharge levels; correct?

11   A.   Yes.  General under honorable.

12   Q.   And you spoke at length about your status as a veteran;

13   correct?

14   A.   Yes.

15   Q.   And your service in the Navy; correct?

16   A.   Yes.

17   Q.   And you're proud of your two and a half years in the Navy;

18   correct?

19   A.   I mean, I'm proud to have served.  I didn't say I was

20   perfect.

21   Q.   Now, the highest level of discharge in the Navy is an

22   honorable discharge; correct?

23   A.   Yes.

24   Q.   And you did not receive one; correct?

25   A.   Correct.  I received general under honorable.

1    Q.   And that's because you didn't leave the Navy under your own

2    terms; correct?

3    A.   Correct.

4    Q.   You were in fact dismissed from the Navy for misconduct;

5    correct?

6    A.   Discharged, yes.

7    Q.   And you didn't tell the jury that?

8    A.   I stated that I had a general under honorable discharge.

9    Q.   But you talked at length about your status as a veteran and

10   how you were proud of your Navy service and how it informed what

11   you did on January 6.

12         And so you agree with me that telling the whole truth about

13   your service in the Navy would have included the terms that it

14   came to in the end?

15              MR. PIERCE:  Objection.

16              THE COURT:  Overruled.

17              BY MR. MCCAULEY:

18   Q.   Correct?

19   A.   I disagree with your characterization.

20   Q.   But you agree with me, you left that part out?

21   A.   I did not mention the dissertation of my discharge.

22              MR. PIERCE:  Objection; asked and answered.

23              THE COURT:  Overruled.

24              BY MR. MCCAULEY:

25   Q.   Now let's jump way forward.  This phrase, "storm the

1    Capitol," you testified that that's the one phrase you regret

2    using that day?

3    A.    Yes, because I did not understand the implications of it.

4    Q.    But it was your testimony that you understood that "storm"

5    generally meant many people getting together in one location at

6    the same time suddenly; correct?

7    A.    That's not what I stated.

8    Q.    But you did compare it to a swarm of bees; correct?

9    A.    I did.

10   Q.    Would you like to be at the center of a swarm of bees?

11   A.    I have numerous times.

12   Q.    Did you like it?

13   A.    Actually, I'm indifferent.

14   Q.    You're married; correct?

15   A.    Repeat the question.

16   Q.    You are married; correct?

17   A.    Yes.

18   Q.    In fact, last week was your wedding anniversary?  We heard

19   that in opening statements.

20   A.    Yes.

21   Q.    14 years?

22   A.    Yes.

23   Q.    Did you get married in a courthouse or in a church?

24   A.    In a church.

25   Q.    Would you like it if 3,000 people suddenly showed up

```
 1    outside of your wedding shouting "fuck these fucking assholes"?

 2              MR. PIERCE:  Objection; relevance.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  Did I ever say that at the Capitol?

 5              BY MR. MCCAULEY:

 6    Q.   You're a pastor; correct?

 7    A.   I am.

 8    Q.   Independent minister?

 9    A.   Independent minister, yes.

10    Q.   And you've given sermons?

11    A.   I have.

12    Q.   And some of those are in fact on the Internet, aren't they?

13    A.   Yes.

14    Q.   Now, would you like it if 3,000 people stormed into your

15    church in the middle of one of you are sermons and

16    yelled "Pastor, stand down"?

17              MR. PIERCE:  Objection; relevance.

18              THE COURT:  Sustained.  It's cumulative.  Let's move

19    on.

20              BY MR. MCCAULEY:

21    Q.   Sir, it wouldn't be okay if these people stormed your

22    wedding or stormed one of your sermons, because it is fair to

23    say that doing so would disrupt the proceedings; correct?

24              MR. PIERCE:  Same objection.

25              THE COURT:  Overruled.
```

1        BY MR. MCCAULEY:

2   Q.   Please answer.

3   A.   So I'll be real honest.  If nobody -- or excuse me.  If a

4   bunch of people showed up at where I was at and was expressing

5   their freedom of speech, that wouldn't bother me.  If they

6   became violent, like harming my family, of course that would

7   bother me.

8   Q.   Would it make it more difficult to speak to someone in

9   front of a church, everyone yelling "fuck these people"?

10  A.   I've actually preached in front of a group of bikers that

11  were screaming slurs at me the entire time and then converted

12  one of those gentlemen to want to get baptized.

13       So I have no problem standing in the face of adversity,

14  especially when it comes to my faith, sir.

15  Q.   And now, we've seen a number of your posts about the

16  lead-up to January 6; correct?

17  A.   I don't know what you've seen.

18  Q.   Some of your Internet posts; correct?  The jury has seen

19  many of these posts; correct?

20  A.   Yes.

21  Q.   And in these posts, you consistently reference the American

22  Revolution; correct?

23  A.   I referenced the American Revolution in one or two

24  marketing posts for the Midnight Ride caravan, which is actually

25  from another person's Internet promotion.

1    Q.   But we saw images of minutemen, colonial soldiers from your

2    Facebook; correct?

3    A.   Yes.

4    Q.   And we saw images of George Washington mounted on a

5    horseback holding his sword out; correct?

6    A.   With a Pepe the Frog face, but yes.

7    Q.   And we saw images of Paul Revere; correct?

8    A.   I do believe that was Paul Revere in the mount-up picture,

9    yes.

10   Q.   And in fact, you reference January 6 as the Second American

11   Revolution; correct?

12   A.   Again, that was another Internet personality's promotional

13   tag.

14   Q.   Sir, Paul Revere's ride from Boston to Lexington-Concord

15   was to warn of a battle; correct?

16   A.   To warn of incoming soldiers, yes.

17   Q.   One if by land, two if by sea; correct?

18   A.   Yes.

19   Q.   And it was to warn the people, the militia at Lexington and

20   Concord, to get ready to fight; correct?

21            MR. PIERCE:  Objection; calls for speculation from

22   200-plus years ago.

23            THE COURT:  Overruled.

24            THE WITNESS:  I mean, I believe so.  I'm not a history

25   major, sir.

1          BY MR. MCCAULEY:

2    Q.    And the soldiers, the minutemen who you shared on the

3    Internet, those were soldiers who were prepared to do violence;

4    correct?

5    A.    But it was also just a marketing flyer.  I made no calls

6    for violence, sir.

7    Q.    But you agree with me that the American Revolution was a

8    violent instance; correct?

9    A.    The American Revolution is a standpoint in our history

10   where we gained independence from tyranny.  The American

11   Revolution is something that we all look back and respect and

12   revere, like George Washington.  He's on the dollar bill for a

13   reason.  He's a historically prevalent and well-respected

14   president and leader of this nation that also championed the

15   peaceful transfer of power.

16        The whole truth, that's something that you're leaving out

17   as well, sir.

18   Q.    Do you agree with me that during the course of the American

19   Revolution people fought and died?  We call it, in fact, the

20   Revolutionary War?

21   A.    And the red stripes on our flag symbolize the sacrifices of

22   those brave men and women that were willing to sacrifice to give

23   us the freedom that we stand today.

24        That has nothing to do with my actions in the Capitol,

25   because one, I wasn't violent, and two, I wasn't trying to cause

1    a revolution, sir.

2    Q.   So it's your testimony that these images and references to

3    a war were in fact a call for peaceful resistance?

4    A.   Technically, the American flag is a symbol for peaceful

5    resistance as well.

6    Q.   And it's your testimony that you felt you were permitted to

7    enter the Capitol grounds that day?

8    A.   Yes.

9    Q.   And you said that you went there because of your military

10   training?  That inspired you to go towards the danger; correct?

11   A.   I see your question as two-tiered.  Can you please rephrase

12   that?

13   Q.   You testified that you went to the Capitol to provide

14   assistance; correct?

15   A.   Yes.

16   Q.   And you said that you went there to help the injured;

17   correct?

18   A.   Yes.  Potentially injured, both Capitol Police and

19   protestors.

20   Q.   Yet as soon as you got to the Capitol, on your own video,

21   you saw an injured woman being carried away; correct?

22   A.   Yes.

23   Q.   And you did nothing to assist her?

24   A.   Actually, I had asked if she was all right, and the person

25   in front nodded to me.

1    Q.    That's not on your video.

2    A.    My face isn't in the video at all.

3    Q.    And so you expect us to believe that as you walked past

4    this woman who is injured and do nothing, the one recognition of

5    her is conveniently not captured by the video?

6    A.    I can't explain, you know --

7    Q.    A nod to a person in a crowd was enough for you?

8    A.    Given the situation, yes.

9    Q.    And you had no idea who that person was?

10   A.    None.

11   Q.    You had no idea if they had seen the woman get injured?

12   A.    There is nonverbal communication.  That is a thing.

13   Q.    You had no idea if they had any idea what was happening

14   there?

15   A.    I can't answer for them.

16   Q.    And yet, even after you see this woman who is injured and

17   don't offer your assistance, the next thing we see in your video

18   is you going up the steps of the Capitol saying "We have a whole

19   list of patriots here who are going to storm the Capitol."

20   A.    I don't remember if that's chronologically accurate, but

21   okay.

22   Q.    But you agree it happened after; correct?

23   A.    I just said I don't remember if it's chronologically

24   accurate, but okay.

25   Q.    And so you climbed those stairs; correct?

```
 1    A.   Yes.

 2    Q.   And those stairs, you now know, lead to the Upper West

 3    Terrace; correct?

 4    A.   Yes.

 5    Q.   And you thought that you were permitted to be up there;

 6    correct?

 7    A.   Yes.

 8    Q.   Because this was a lawful and peaceful protest; correct?

 9              MR. PIERCE:  Objection; misstates the evidence.

10              BY MR. MCCAULEY:

11    Q.   Your testimony is that --

12              THE COURT:  Wait.

13              MR. MCCAULEY:  Excuse me.

14              THE COURT:  Rephrase the question.

15              BY MR. MCCAULEY:

16    Q.   It was your testimony that you believed at this moment, at

17    about 2:15 p.m., slightly thereafter, that you believed that

18    this was a lawful and peaceful protest?

19    A.   Yes.

20    Q.   Yet, this jury saw images -- excuse me.

21         And you thought that you were permitted to be there;

22    correct?

23    A.   Yes.

24    Q.   You thought that this was an open area; correct?

25    A.   Yes.
```

1   Q.   You felt that you had every right and authority to be in

2   that location?

3   A.   Correct.

4   Q.   Yet, this jury saw images of you standing underneath

5   grandstands; correct?

6   A.   There was an opening at the bottom, which everybody had

7   went through.  So I followed the crowd and went under those

8   grandstands to where there was an opening for us to see through.

9   Q.   Sir, have you been to many sporting events in your life?

10  A.   A few.

11  Q.   We saw a video of you saying that one of the reasons you

12  went to the Capitol was because you just wanted to take your kid

13  to a ball game again; correct?

14  A.   Yes.

15  Q.   At how many of those ball games were you permitted to hang

16  out underneath the grandstands?

17  A.   I don't think I've seen grandstands at sports --

18  Q.   Underneath the bleachers, then?

19  A.   Several, actually.

20  Q.   And underneath there, you were permitted to take knives and

21  try to cut zip ties?

22  A.   No, of course not.

23  Q.   You respect law enforcement; right?

24  A.   I do.

25  Q.   You back the blue?

1    A.    I do.

2    Q.    You believe in the thin blue line?

3    A.    I don't know what the thin blue line is.

4    Q.    Withdrawn.

5          Yet, when you enter the Capitol, the Capitol grounds on the

6    Upper West Terrace and you saw the line of police, you started

7    chanting "police stand down"; correct?

8    A.    Yes.

9    Q.    And you did that because you knew that they were in their

10   way -- your way; correct?

11   A.    I believed that they were preventing us from -- what's the

12   word I'm looking for?  They were preventing us from utilizing

13   our First Amendment.

14   Q.    And they were doing that, it's your testimony, because they

15   were standing in the way of you going to the Capitol to knock on

16   the door; correct?

17   A.    The knock on the door part was a joke, as I testified

18   previously.  But yes, I also asked them to stand down later on

19   because they were injuring people.

20   Q.    And when you were underneath the bleachers, there was an --

21   excuse me.

22         When you had just gotten out from underneath the bleachers,

23   we saw an officer come and say, "Please don't cross here, just

24   stand here"; correct?

25   A.    Yes, and I complied.

1    Q.    When officers tell you not to cross a line, that is an

2    indication not to cross the line; correct?

3    A.    Yes.

4    Q.    And if you respect law enforcement, one should not cross

5    that line; correct?

6    A.    Correct.

7    Q.    And I want to go back.  The jury heard an alert -- about an

8    alert that you received at 2:48 p.m.; correct?

9    A.    Yes.

10   Q.    And it's your testimony that you were unaware of that

11   alert?

12   A.    I heard the alert.  On my phone, as I record, I'm not able

13   to see what the alert is.  Shortly after, I stopped my

14   recording, and there was no notification that I saw on my phone

15   and, quite frankly, didn't care enough to look because it didn't

16   seem to be anything that important.

17   Q.    You had no idea what that alert might even be about?

18   A.    No, not until much later.

19   Q.    And that was even though you were walking around in an area

20   with a giant crowd; correct?

21   A.    I don't understand what that has to do with it, but okay.

22   Q.    You did not understand what that alert was, even though you

23   were in an area where there was pepper spray hanging in the air;

24   correct?

25   A.    Correct.

1    Q.   And you did not know what that alert was about, even though

2    you had seen a woman being carried away injured moments before?

3    A.   I don't think they would send out an ECF -- or excuse me,

4    an emergency message because a woman had to be carried away from

5    a massive crowd.  People pass out.  People get dehydrated.  It's

6    not an emergency of that matter.

7    Q.   And so nothing about this situation indicated to you maybe

8    I shouldn't be here?

9    A.   So your characterization, I think, is flawed, sir.  I

10   believe that the police were trying to push people out, but I

11   also believe that it was our First Amendment right to be there

12   and that they were unlawful by pushing people away and harming

13   unarmed citizens.

14        I complied with all the orders given to by police.  I

15   showed no violence.  I attacked nobody.  I was there to exercise

16   a constitutional right that every American has.

17   Q.   I want to focus on a phrase.  The police were there to

18   "push people out."

19        That's what you just testified to?

20   A.   In my understanding, it would have been unlawful, yes.

21   Q.   At no point in your life have you ever had a moment where

22   police are pushing someone out and you think maybe I shouldn't

23   be here?

24             MR. PIERCE:  Objection; relevance.

25             THE COURT:  Overruled.

```
 1              THE WITNESS:  Yeah, I can't really speculate at that,
 2     because I've never been in a situation where police were pushing
 3     people out.  So I don't even understand your question.
 4              BY MR. MCCAULEY:
 5     Q.   But you would agree with me that in such a situation that
 6     is an indication that you're not permitted to be there; correct?
 7     A.   When I was in the military, I swore an oath to the
 8     Constitution and to follow all lawful orders.  That would have
 9     been an unlawful order, sir.
10     Q.   We saw an image of your wife holding two, they looked like,
11     metal folding knives; correct?
12     A.   Yes.
13     Q.   And it's your testimony that those were two knives that you
14     found in Washington, D.C., that day?
15     A.   My wife found them and gave them to me, yes.
16     Q.   That your wife found.  I stand corrected.
17              And it's your testimony that with those knives you turned
18     them in to the Capitol Police or the Metropolitan Police
19     Department?
20     A.   Secret Service.
21              MR. PIERCE:  Objection -- withdrawn.
22              THE WITNESS:  Secret Service.
23              BY MR. MCCAULEY:
24     Q.   And you turned them in because you knew that anybody with a
25     knife that day was up to no good; correct?
```

1    A.    I knew that the knife was a potential for harm.  I can't

2    speculate as to somebody else's actions or intent.

3    Q.    But the presence of a knife indicated to you that there

4    were perhaps bad-faith actors in there, correct, in the crowd?

5    A.    Yes.

6    Q.    People who had brought knives with the intention of doing

7    harm; correct?

8    A.    Correct.  That's why I did not bring a knife to the

9    Capitol.

10    Q.    To damage property?

11    A.    I see where you're going with this, but okay.

12    Q.    To harm people, potentially?

13    A.    There's potential in a knife, yes.

14    Q.    But you were there to peacefully protest; correct?

15    A.    Yes.

16    Q.    Which is why you turned those knives in to some law

17    enforcement authority; correct?

18    A.    Yes.

19    Q.    If this jury saw a video of a knife in your hand, and you

20    didn't turn that knife in to the police, did you?

21    A.    And again, like I testified previously, I don't deny having

22    the knife in my hand.  It was handed to me, and I fell into like

23    a herd mentality.  When he said go ahead and cut this, my

24    response was yeah.  Campanale motioned to me to stop, and then

25    my brain kind of snapped back to reality, and I said what the

1    hell am I doing, and I handed the knife back to the guy.

2         I don't understand why I did not hand it over to Campanale,

3    which is I understand what you're asking, but again, it was a

4    decision that I made, and I own it.

5    Q.   You don't deny that you had the opportunity to hand Officer

6    Campanale that knife; correct?

7    A.   Correct.

8    Q.   And you had the opportunity to indicate to the person who

9    you said handed you that knife and say he got a knife, he gave

10   it to me?

11   A.   Yes, but I was also kind of distracted by the mental idea

12   that I just had done something wrong and the implications that I

13   could be in trouble for that as well, and therefore, I might not

14   have made the best judgment, but I handed the knife back to the

15   gentleman that gave it to me, and then I complied with all the

16   other orders that Campanale had given.

17   Q.   So it's your testimony that you were so stunned at that

18   moment by the whole crowd around you that you just reverted back

19   to handing it back; correct?

20   A.   Yes.

21   Q.   But you had the forethought to then lean over to Officer

22   Campanale and go, "Let us in, I'm asking you"?

23   A.   It was sort of the mantra of the day, but okay.

24   Q.   So you agree with the -- would you agree with the statement

25   that after "I'm asking" comes "I'm telling"?

```
1          I'm asking you to let me in; correct?

2               MR. PIERCE:  Objection; vague.

3               THE COURT:  Sustained.

4               BY MR. MCCAULEY:

5    Q.   Sir, it's your testimony that you did not engage in any

6    violence that day; correct?

7    A.   Correct.  I didn't go to harm anyone.

8    Q.   You did not go to harm anyone?

9    A.   Was that a question?

10   Q.   Yes.

11   A.   No, I did not intend to harm anybody.

12   Q.   And you didn't go to assault anyone; correct?

13   A.   Correct.

14   Q.   You only acted in self-defense and the defense of others;

15   correct?

16   A.   Yes.

17             MR. MCCAULEY:  Ms. Rummens, can we please call up

18   307.1 and play it in its entirety.

19        (Video played.)

20             MR. MCCAULEY:  Ms. Rummens, if we could now have 707,

21   just the first 30 seconds.

22        (Video played.)

23             BY MR. MCCAULEY:

24   Q.   It's your testimony that this is you not engaging in

25   violence; correct?
```

1    A.    Correct.  And I'd be happy to walk you through it step by

2    step --

3    Q.    It's your testimony that you never laid hands on any law

4    enforcement officers in this instance?

5    A.    That is --

6              MR. PIERCE:  Objection.  That misstates the record.

7              THE COURT:  Overruled.

8              MR. MCCAULEY:  I will withdraw it.

9              BY MR. MCCAULEY:

10   Q.    It's your testimony that you never heard or saw anyone

11   giving the 10 count; correct?

12   A.    No, I never said that at all.

13             MR. PIERCE:  Objection.  That misstates the testimony.

14             THE COURT:  Overruled.

15             BY MR. MCCAULEY:

16   Q.    So it's pure coincidence that you charge with the crowd at

17   the exact conclusion of that 10 count?

18   A.    No.

19   Q.    It's not pure coincidence?

20   A.    No.  I saw the pipe guy, as I've labeled him, rushing up

21   towards the line.  I followed him.  I lost him in the crowd, ran

22   into the guy in the red shirt that got pushed by the police.  I

23   then saw the older gentleman fall to the ground, and I reached

24   over to try to grab him.

25             I was not targeting the police.  The only person that I,

1    quote unquote, targeted was the pipe guy, because he had been a

2    bane to my existence while I was there.

3        I went to -- after I had fallen -- because I got pushed by

4    the officer.  As you showed in the previous video, his hand

5    pushed me.  I didn't actually touch him.  You highlighted that

6    yourself.  And then when I fell down, I stood back up, took a

7    step or two forward to kind of gain my composure, and then the

8    gentleman with the blue flannel shirt shoved me up the rest of

9    the stairs into the police line, where I then fell to the

10   ground, covered so that I did not get hurt, and then left the

11   area, which I testified to this already.

12        MS. MCCAULEY:  Ms. Rummens, can we please replay the

13   first 30 seconds of Exhibit 707.

14        (Video played.)

15        BY MR. MCCAULEY:

16   Q.   The gentleman that you were going to help -- excuse me.

17        You focused on the gentleman with the cane; correct?

18   A.   When I was at the top of the stairs, I saw the gentleman in

19   the black jacket holding a cane get knocked over.  So I reached

20   to try to grab him to prevent him from falling, yes.  I've said

21   this.

22   Q.   And then you made the first run up.  You reach for the

23   gentleman with the cane.  You get pushed back.

24        That's your testimony; correct?

25   A.   Yes.

1    Q.   And you agree with me that the gentleman with the cane is

2    to your left; correct?

3    A.   Yes.

4    Q.   Then why, sir, does 707 show you running to the right when

5    you go back up the stairs, not in the direction of the gentleman

6    with the cane?

7    A.   Because like I stated numerous times, sir, I lost my

8    balance.  Those are stairs.  They're steep.  And there's a very

9    culminated crowd, a lot of jostling, a lot of moving.  It's

10   called falling.

11        MR. MCCAULEY:  Ms. Rummens, please replay it.

12        (Video played.)

13        BY MR. MCCAULEY:

14   Q.   So it's your testimony that 707 shows you falling up the

15   stairs into an officer and not in the direction of the gentleman

16   with the cane; correct?

17   A.   Yes.

18   Q.   And it's your testimony that you charged up these stairs

19   once, missed, went back a second time; correct?

20   A.   I don't agree with the characterization of "charged."  But

21   again, I went initially after the pipe guy, saw the -- I ran

22   into the gentleman in the red because he got pushed into me.

23   The one officer was trying to push me away as I went to reach

24   for the other guy getting knocked down.  I failed, fell down the

25   stairs, stood up, took like a step or two forward to gain my

composure, and then got shoved forward, to which I then fell.
And if you notice, I actually fell against the police and then
turned away and then covered myself so that I didn't get hurt.

Q.   So it's your testimony that in 707 we see you falling?

A.   At the very end of it, yes.

     Have you ever fallen up the stairs, sir?

     THE COURT:  Sir, you can't ask the questions.  Just
answer the questions.

     THE WITNESS:  Yes, Your Honor.  Thank you.

     BY MR. MCCAULEY:

Q.   Sir, when you fell up these stairs, you went directly into
an officer's chest; correct?

A.   Yes.  He was standing there.

Q.   And then you fell; correct?

A.   The word "and then," I think, is trying to lay something
chronologically that I don't agree with.  But yes, I fell.

Q.   Do you agree you fell a second time during this incident?
Correct?

A.   I fell backwards the first time when I got shoved down the
stairs.  I fell forward the second time when I got shoved up the
stairs.

Q.   And then you turned around, and rather than helping the
gentleman with the cane, who you are now further away from, you
jammed your back into Sergeant Nickerson's legs; correct?

A.   No.  Actually, he kicked me, which the video would also

1    show from the other angle.

2            MR. MCCAULEY:  Ms. Rummens, please replay 307.1.

3        (Video played.)

4            BY MR. MCCAULEY:

5    Q.   Both times you went up these stairs, you did so knowing

6    there were officers at the top of the stairs; correct?

7    A.   Yes.  You can see them.

8    Q.   And you had just spent approximately 20 minutes standing at

9    the base of the stairs looking at this line of officers;

10   correct?

11   A.   I don't know the time frame, but okay.

12   Q.   You were in the courtroom when Corporal Ainsworth

13   testified; correct?

14   A.   Who was that again?

15   Q.   Corporal Ainsworth.

16   A.   Yes.

17   Q.   You remember how Corporal Ainsworth was able to identify

18   himself by the fact that his face shield was up?

19   A.   Yes.

20           MR. MCCAULEY:  Ms. Rummens, please play 303.1 in its

21   entirety.

22       (Video played.)

23           BY MR. MCCAULEY:

24   Q.   It's your testimony that in this instance you were only

25   intervening to help the individuals who had fallen; correct?

1   A.   Correct, and then the other person that I had seen that had

2   fallen that was being beaten by the police as well.

3   Q.   Yet, when we play 303.1, we can see you pushing an officer

4   with his face shield up well after those individuals are off the

5   ground; correct?

6   A.   No, that's not what I see, sir.

7        MR. MCCAULEY:  Ms. Rummens, could you please replay

8   between 45 seconds and 1 minute and 10 seconds.

9        (Video played.)

10        BY MR. MCCAULEY:

11   Q.   I assume you disagree with me that after this incident the

12   person with the face shield falls; correct -- with his face

13   shield up falls; correct?

14   A.   I didn't see anybody fall.  I kept a gap between the

15   protestors and the police, or at least attempted to, and also

16   initially put up my arm in defense to the person with the

17   shield, because they were hitting protestors.  There were

18   several that were hitting protestors with overhead strikes with

19   batons.

20   Q.   But you don't deny you kept pushing this officer well after

21   the people who you claim to be defending were up; correct?

22   A.   I do deny that.  I was pushing a gap into the crowd.  I

23   didn't target a specific officer.  If you see, I went straight

24   in between the two of them, between both groups.

25   Q.   But you targeted the officers in the form of this specific

```
1    officer because you knew that they were trying to clear the
2    terrace; correct?
3    A.   No, that's not why, and I also did not target the officers.
4    But your characterization is incorrect.  If you notice, I also
5    push away a protestor.
6              MR. MCCAULEY:  Ms. Rummens, can we please play Exhibit
7    305.1 in its entirety.
8         (Video played.)
9              BY MR. MCCAULEY:
10   Q.   Sir, what does "hold the line" mean to you?
11   A.   For people to stop advancing.
12   Q.   It doesn't mean prevent the officers from clearing the
13   terrace?  That's your testimony?
14   A.   I was asking both sides to stay where they were.
15   Q.   It's not a signal -- actually, withdrawn.
16        It's not a signal, in your mind, for everyone around you to
17   turn around, lock arms with you, and push back against the line
18   of officers?
19   A.   That's not what I was meaning by "hold the line," but it is
20   a common practice to turn your back to the police.
21   Q.   But that is exactly what happens in this video; correct?
22   A.   What exactly happens?
23   Q.   You turn around, you lock arms with your fellow rioters,
24   and you push back against the police?
25   A.   I disagree with your characterization of fellow rioter.
```

1    Q.   Please answer the question, sir.

2    A.   I did turn my back to the police, yes.

3    Q.   And you locked arms with the people around you?

4    A.   I don't recall that, but okay.

5    Q.   But it's in the video; correct?

6    A.   I didn't see it, but that's fine.  I believe you.

7             MR. MCCAULEY:  Ms. Rummens, please play 308.1.

8        (Video played.)

9             BY MR. MCCAULEY:

10   Q.   Sir, do you deny that's you?

11   A.   Do I deny what?

12   Q.   The person in the video, do you deny that that's you?

13   A.   No, that's me.

14   Q.   You testified on direct that you're not the type of person

15   who does passive resistance; correct?

16   A.   I did not say that.  I did not say that I don't do passive

17   resistance.  I actually just testified that peaceful resistance

18   is -- it's a right.

19   Q.   So based on your participation in January 6, you've become

20   a recognized figure in the community of people who have been

21   charged in connection with their activities at the Capitol that

22   day; correct?

23   A.   Not very well recognized, but yes, I have people that

24   follow my posts and my Internet videos, et cetera.

25   Q.   And you've, in fact, started a podcast about your

1  experience as a January 6 defendant; correct?

2  A.   That's not its purpose, but yes.

3  Q.   And you've interviewed many people on that podcast;

4  correct?

5  A.   Absolutely.

6  Q.   And you've used that podcast to raise funds; correct?

7  A.   For others, yes.

8  Q.   And for yourself; correct?

9  A.   Well, I have a sponsorship through Spotify, but I have not

10  actually received any funding from them.

11  Q.   And you've received advertisers; correct?

12  A.   I don't know what you mean by I've received advertisers.

13  Q.   Sir, are you supported -- is your podcast supported by

14  makehoneygreatagain.com?

15  A.   Yes.

16  Q.   And one of the reasons that this podcast is successful is

17  because you put forward alternative theories about what happened

18  on January 6?

19  A.   I put out my opinion, which is protected speech, and I also

20  allow my guests to share their side of the story, which is

21  something that many audiences will not be able to hear from

22  mainstream media or other avenues.  So I do feel that my podcast

23  is a unique way to put out a raw and unfiltered side of

24  January 6, both from defendants, family members, and also other

25  organizations that are involved in helping them and to bring

1    awareness to what's going on on all sides.

2    Q.   And some of the people whom you've interviewed on that

3    podcast have been present for largely this entire trial;

4    correct?

5    A.   Can you say that again?  I didn't hear part of it.

6    Q.   Some of the people whom you've interviewed on this podcast

7    have been present for this trial; correct?

8    A.   Yes.

9    Q.   And so do you disagree with me that you have a reason to

10   keep this narrative going?

11   A.   Which narrative?

12            MR. PIERCE:  Objection as to what narrative he's

13   referring to.

14            THE COURT:  Restate the question.

15            BY MR. MCCAULEY:

16   Q.   Sir, it's true that you have a reason as you sit on the

17   stand today to keep an alternative story about what happened on

18   January 6 going?

19            MR. PIERCE:  Objection; vague as to "alternative."

20            THE COURT:  Overruled.

21            THE WITNESS:  So I'm not pushing a narrative, as you

22   say.  I'm allowing people to tell their side of the story and to

23   express their views, and then I express my views.  And I also in

24   my podcast, which I'm sure you've listened to, tell my listeners

25   that they don't have to believe what we're saying, for them to

1    look into the facts of the cases themselves and for people to

2    make their own opinions, that I am not the bastion of truth and

3    neither is the government or the mainstream media, that each

4    individual is sovereign to their own actions and their own

5    ideologies, and they are able to be critical thinkers.

6        I don't push, as you say, a narrative.  I give the opinion

7    of one side as well as others and tell people that it would be

8    in their best interest to look into things themselves, because I

9    feel as though they're being misguided and lied to by other

10   mainstream media sources that they tend to rely on.

11   Q.   But among this community, you have a reputation; correct?

12   A.   Some good, some bad.

13   Q.   And you have used your reputation to acquire money;

14   correct?

15   A.   No.

16   Q.   But you have every reason to get up on the stand today and

17   say whatever needs to be said to keep your theory going;

18   correct?

19   A.   No, because I'm not up here for fame, clicks, or glory.

20   I'm up here because I did not do what I'm being accused of, and

21   I have a wife and four kids that I need to worry about.  I don't

22   care about my podcast.  I don't care about followers.  I could

23   not care about following through with any of that stuff, because

24   it's my life that is on the line and my family.  That's what

25   comes first.

1    Q.    And you have this podcast because you have a passion for

2    truth?

3    A.    That is one avenue that I've used to express my opinion,

4    and having a podcast is not illegal.

5                    MR. MCCAULEY:  Nothing further, Your Honor.

6                    THE COURT:  All right.  Mr. Pierce?

7                    MR. PIERCE:  Thank you very much, Your Honor.

8                         REDIRECT EXAMINATION

9                    BY MR. PIERCE:

10   Q.    Mr. Thomas, were you perfect in the Navy?

11   A.    No, not at all.

12   Q.    Have you been perfect in life?

13   A.    Not even close.

14   Q.    Were you perfect on January 6?

15   A.    No.

16   Q.    Is it illegal to post pictures of George Washington, so far

17   as you know?

18   A.    No.

19   Q.    Is it illegal to post pictures of Paul Revere, so far as

20   you know?

21   A.    No.

22   Q.    Is the American Revolution considered a bad thing in

23   history?

24   A.    No.  We revere and respect the fact that people were

25   willing to sacrifice their lives for the tenets of liberty.

1    Q.   Did you cut that tarp under the grandstand?

2    A.   No.

3    Q.   Have you seen anything in this trial about who cut any tarp

4    that day?

5    A.   Yes.  It was the police.

6    Q.   When you were underneath the bleachers, did you comply with

7    everything the police asked you to do?

8    A.   Yes.

9    Q.   Did Mister -- did Officer Campanale demand that you hand

10   the knife over to him specifically?

11   A.   He did not.

12   Q.   Did he reach out to take the knife from you?

13   A.   He did not.

14   Q.   You said that you looked on your phone after you heard an

15   alert when you had a chance.

16        Do you recall that?

17   A.   Yes.

18   Q.   But you didn't see anything at that time?

19   A.   No.

20   Q.   Were there lots of other things going on at that time?

21   A.   Yes.

22   Q.   Is anything that Mr. McCauley asked you -- did anything

23   that Mr. McCauley ask you about these videos change your

24   testimony that you've given about these videos in this trial?

25   A.   No.

1    Q.    You heard Mr. McCauley focus on the concept of falling up

2    stairs.

3          Do you recall that?

4    A.    Yes.

5    Q.    Have you ever seen the current President of the United

6    States fall up any stairs?

7              MR. MCCAULEY:  Objection.

8              THE COURT:  Overruled.

9              THE WITNESS:  I have.

10             BY MR. PIERCE:

11   Q.    Three times in a row?

12   A.    I believe that was how many, yes.

13   Q.    Are the things that you've said on the podcasts after

14   January 6 accurate, so far as you know?

15   A.    As far as I understand, specifically when I'm pointing out

16   the injustices that I perceived from the Department of Justice

17   because of January 6, destroying the lives of other families.

18   Q.    Are you trying to inform people about the truth, so far as

19   you see it?

20   A.    Yes.

21   Q.    Do you have some grand overarching theory or narrative or

22   alternative reality that you're trying to push about January 6?

23   A.    No, quite the opposite.  I tell everybody that comes on to

24   the podcast that I'm basically just going to let them speak.

25   It's an open, honest platform for their voice.  There's been a

few people that have come on to my podcast that I don't agree

with their narrative, but I still allow them to share that

voice, because that's the great thing about being Americans.  We

don't have to agree.

Q.   Why do you think the people that support you on your

podcast or that have been here watching you in this trial

support you?

A.   Because I'm an honest and likeable person.  I try to be

positive.  I can get into, you know, debates of political and

religious whatever topic.  It doesn't matter.  Like, we can talk

and have a friendly discourse.  And I like to see things from

multiple perspectives.  I give people respect.  I mean, I was

raised with manners.

     And so why do I think they came here to support me is

because they know that for the last two years the government has

made my life a living hell, and I have had enough resolve to

stand up and say I trust that God goes with me into this battle.

And I call it a battle of ideologies for words, the hearts and

minds of people, because that's what this is truly about, being

in my opinion fed a false narrative from one side.

     So I wanted to be able to allow those that are in the

middle of all this to share their side.  And quite frankly, they

understand that they're probably implicating themselves against

their own cases because every word will be used against them,

and I understood that as well as I did my podcast, that I have

1  no remorse for the things that I had said in my podcast, because

2  I was just trying to speak truth to give my opinion.

3      And I certainly do appreciate the federal government for

4  listening.  I always appreciate my audience.

5  Q.   Is it unusual -- to the extent you know, is it unusual for

6  January 6 defendants to have a lot of support?

7  A.   No.  There's an entire nation that stands behind them.  I

8  get hundreds of messages on a regular basis.  People send in

9  videos of them singing the National Anthem from all over the

10  country, and even former President Trump created the Justice for

11  All song and music video to stand with the January 6 defendants,

12  families, and inmates.

13  Q.   Have you made so much money off your podcast that you're

14  living the high life, VIP, four stars?

15  A.   Not even close.

16          MR. PIERCE:  Okay.  No further questions.

17          THE COURT:  All right.  I'm thinking it makes sense

18  now to take a break, about a 20-minute break.

19      So, Mr. Thomas, you can step down.  I'll excuse the jury

20  and have you come back at 5 after 11:00.

21      (Jury exited courtroom.)

22          THE COURT:  All right.  Who does the defense intend to

23  call next?

24          MR. PIERCE:  Mr. David Sumrall, Your Honor.

25          THE COURT:  And he's here and outside?

1          MR. PIERCE:  Yes, Your Honor.

2          THE COURT:  All right.  So I do want to advise him up

3     front about his potential exposure.  I'm going to take a break

4     now, and I will come back and do that.  That's why I gave the

5     jury a little bit longer break.

6          How long do you expect his testimony to be?  Fairly brief?

7          MR. ROOTS:  It probably won't be much more than 20

8     minutes.

9          THE COURT:  Okay.  So I'm just wondering whether I

10    should deal with -- maybe we should do his testimony and then --

11    that's going to be kind of an early lunch.  Should we try to get

12    to Evans as well?  And if so, should I take time on this break

13    now to go through what he needs to hear as well?

14         MR. ROOTS:  We want to say we believe Evans is not

15    going to make it.  Evans is not in town, and as of right now, we

16    believe he's not going to make it in time.

17         THE COURT:  Okay.  So Mr. Sumrall will testify.  And

18    then is the defense planning on resting?

19         MR. ROOTS:  I believe so.  Now, we do -- there are

20    those couple issues where we wanted to put the case agent back

21    on the stand and ask her about that other case a little bit.

22         THE COURT:  About what case?

23         MR. ROOTS:  The Wren and the Smith case.

24         THE COURT:  All right.  Is there anything about what

25    you all shared that should change my view of what I've said,

1    that these are two separate incidents?

2         MR. ROOTS:  Well, I think there is some jury confusion

3    about these things.

4         THE COURT:  That's not my question.  Are there, in

5    fact, two separate incidents, one involving Mr. Wren and one

6    involving Mr. Thomas?  And if so, why is the incident involving

7    Mr. Wren at all relevant to the incident involving Mr. Thomas?

8         MR. ROOTS:  Well, now that the government has told us

9    that the push over of Ainsworth is not Count 5, which was a

10   shock to us this morning --

11        THE COURT:  Did they ever tell you that was the basis

12   for the charge for Count 5, or did you just assume that?

13        MR. ROOTS:  Well, when Ainsworth took the stand and

14   made such a huge deal about it, with the direct examination, we

15   were led to believe that was one of the major accusations in

16   this trial.

17        THE COURT:  Presumably, you read ECF 75 where they

18   laid out the various actions that form the basis for each

19   assault charge.  Or Mr. Pierce did, rather.

20        MR. ROOTS:  We are awash in stuff.  Yeah, we read

21   those things and looked at videos.  So when that was presented

22   in this trial, we were under the understanding that that was the

23   Ainsworth assault.

24        THE COURT:  All right.  Well, I think you were on

25   notice that it wasn't, and I don't see the point of calling back

1    the agent to clarify something you should have known in advance.

2        MR. MCCAULEY:  I will also say for the record, this

3    agent knows nothing about the Wren and Smith case.  It was

4    investigated by an entirely different agent.  So insofar as

5    there could be any examination of her, it would be her

6    repeatedly saying, "I don't have any information."

7        THE COURT:  All right.

8        MR. MCCAULEY:  Final point, Your Honor, to see the

9    totality -- not the totality, but the close-in-time assault that

10   Mr. Wren did and has been convicted of to that of Mr. Thomas,

11   it's Exhibit 710, 711, and 712 show that cumulative interaction.

12     They are close in time, but they are distinct and separate

13   assaults.

14       THE COURT:  And those are reflected on the portions of

15   the video that are going back to the jury as exhibits?

16       MR. MCCAULEY:  Mr. Wren is not identified, but it will

17   be left to them to --

18       THE COURT:  Is he the individual with the ponytail and

19   the other brown jacket?

20       MR. MCCAULEY:  Yes, he has the brown jacket with the

21   embroidery on the black and the long hair.  They are clearly

22   different people.

23       THE COURT:  The Court has not been confused by the

24   distinction between Mr. Wren and Mr. Thomas and those two

25   assaults.  So I know the defense has focused on that, but it's

1    clear to the Court that that's not the assault that's charged,

2    and I don't see the relevance of calling -- certainly any agent

3    to discuss the Wren assault, but certainly not this agent, given

4    that she knows nothing about that investigation and that case.

5        So apart from that, are there any other witnesses that the

6    defense might consider?

7            MR. ROOTS:  Prior to the Court's order yesterday, we

8    had thought about putting Ainsworth back on, but apparently,

9    that's foreclosed.  So we will rest after --

10           THE COURT:  All right.  And I understand the

11   government still has time to consider whether it puts on a

12   rebuttal case.  But at this point, does the government

13   anticipate calling a rebuttal witness?  I'm not going to hold

14   you to it depending on what Sumrall says, but have you all had a

15   chance to talk about that?

16           MR. MCCAULEY:  We have had very tentative discussions.

17   Depending on what Mr. Sumrall says, we would like the

18   opportunity to revisit that.  But at this time, no, we do not

19   plan --

20           THE COURT:  All right.  But if you were to call the

21   second agent, it would be discrete, related to something Sumrall

22   testifies to perhaps, or more broad?  I'm not -- I'm just trying

23   to figure out timing.  That's all.

24           MR. MCCAULEY:  It could potentially be more broad.

25           THE COURT:  Not a lengthy witness?

1          MR. MCCAULEY:  Yes.

2          THE COURT:  So we will come back.  I will advise

3     Sumrall.  Then we will call the jury back in.  We will put him

4     on the stand.  And then once his testimony is concluded, the

5     defense presumably will rest unless something else comes to

6     mind.  And then if you're not going to call a rebuttal

7     witness -- if you are, I want to go ahead and move straight into

8     that.

9          If not, I'm going to give the jury a longer break, because

10     we do need to deal with the jury instruction issues, and that

11     could take a little bit of time, and we certainly want to ensure

12     that any changes the Court makes to the jury instructions, each

13     side has had an adequate time to review, and we're not giving

14     instructions to the jury that have errors in them.

15          So if we're not going to have a rebuttal witness for the

16     government, we probably need at least a couple of hours, you all

17     agree, for us to talk about the jury instructions and make sure

18     we're all on the same page with the final version?

19          MR. MCCAULEY:  Yes.  I'm sorry, Your Honor.  I think I

20     got confused.  I just want to make sure I understand the

21     timeline.

22          So it would be Mr. Sumrall direct, Mr. Sumrall cross,

23     potential redirect, then --

24          THE COURT:  If the defense should rest.

25          MR. MCCAULEY:  If the defense should rest,

1     government's case in rebuttal, then break for lunch --

2          THE COURT:  And do jury instructions.  I want to wrap

3     jury instructions in with the lunch break.  And it's probably

4     going to mean giving them at least a two-hour break for lunch so

5     that we can get those squared away.  And I would start by

6     instructing the jury and followed by the two closing

7     arguments -- well, three closing arguments.

8          I was anticipating 45 minutes a side.  Is that not adequate

9     time?

10         Let me ask the defense first.  Do you need more than 45

11    minutes?

12         MR. PIERCE:  I would think that's a good estimate,

13    Your Honor.

14         THE COURT:  All right.  The government?

15         MS. MILLER:  Your Honor, I would rather ask for more

16    and do less than ask for less and go longer.

17         THE COURT:  Well, how much more do you think you need?

18         MS. MILLER:  An hour is probably fine.

19         THE COURT:  For both.

20         MS. MILLER:  Is that an order or a question?

21         THE COURT:  I'm just saying.  Each side gets the same

22    amount of time.  The government has to divide it between its two

23    arguments.

24         MS. MILLER:  There are 12 counts in this case, which

25    is a lot.  So I would request an hour and then an additional 10,

1    15 minutes for rebuttal.

2            THE COURT:  Are you going to play every video that

3    relates to every assault?

4            MS. MILLER:  No, absolutely not.

5            THE COURT:  All right.  Mr. McCauley very efficiently

6    went through the videos for each assault, and I don't think --

7            MS. MILLER:  I think I have three short clips, and

8    they're not even all of the assaults.

9            THE COURT:  All right.  Let's plan on an hour for both

10   sides.  I will give you a warning, but I won't cut you off right

11   at an hour, but I really want you to aim for an hour.  All

12   right?  I think you're going to lose the jury, both sides, if

13   you try to talk to them more than an hour.

14       So are we clear on the order?  I'm going to take a brief

15   break.  Yes?

16           MR. ROOTS:  There's the little matter of the east --

17   the video of the east.  I don't know.  Have we --

18           THE COURT:  You all were going to stipulate to some

19   video that they could then --

20           MR. MCCAULEY:  We still haven't seen what this video

21   is.

22           THE COURT:  You all do that.  So we may need to give

23   the jury another ten minutes now for them to do that.  If the

24   defense is going to rest, you need to introduce that before you

25   rest.

```
 1              MR. ROOTS:  And maybe we stipulate on a sentence or
 2    two for the jury to understand the context.  So this video is
 3    designed to fill in what Captain Baboulis said.
 4              THE COURT:  About the walls around the eggs, all
 5    right.  Well, you all should be able to, I hope, work that out,
 6    but I don't want a lengthy video of this.  If it's for the
 7    purpose of showing -- I'm wondering whether photographs would do
 8    the same.
 9         You all decide.  You think an extra ten minutes will -- do
10    you think coming back at 11:15 gives you adequate time?
11              MR. MCCAULEY:  Provided that this clip is less than
12    that, yes.
13              THE COURT:  Okay.  Well, we don't need a 15-minute
14    clip.
15         Agreed, Mr. Roots?
16              MR. ROOTS:  I don't even think it's more than two
17    minutes.
18              MR. MCCAULEY:  That's fine.
19              THE COURT:  All right.  If you all need another five
20    minutes, let us know.  Mr. Hopkins, if you can let the jurors
21    know they have an extra ten minutes.
22         Thank you.  I will come back at 11:15 to do the Sumrall
23    piece.
24         (Recess taken from 10:56 a.m. to 11:22 a.m..)
25         (Jury not present.)
```

```
 1              THE COURT:  All right.  Now, with respect to

 2    Mr. Sumrall, just a reminder, I've made clear that Mr. Sumrall

 3    can testify generally about January 6.  He can testify about the

 4    signs that were down roughly an hour or so before Mr. Thomas

 5    took the same path.

 6         As far as specific instances of inaction or violence, he

 7    can't testify about those unless Mr. Thomas is aware of them,

 8    and I don't recall anything from Mr. Thomas's testimony that

 9    would suggest he was.

10         So I just want to make sure the defense understands the

11    parameters.

12         Has Mr. Sumrall consulted with counsel about his exposure?

13              MR. ROOTS:  That's a very good question.  I know he

14    did, but he's represented by Norm Pattis.

15              THE COURT:  Is that attorney here today?

16              MR. ROOTS:  Well, I don't -- we tried to contact that

17    attorney yesterday.  We haven't heard back from him.  So I don't

18    honestly -- Mr. Sumrall -- I don't know if he's been in touch

19    with his attorney.  So that is an open question, because we have

20    not heard back from that attorney.

21              THE COURT:  All right.  But I think it's important

22    that he has consulted with an attorney before he takes the

23    stand, given his exposure.  The government has charged

24    individuals who are on the grounds rather than inside the

25    Capitol.  I know in factual circumstances, that might not be
```

1    analogous to Sumrall's, but he does have exposure, and I would

2    for his own benefit expect and hope that he's gotten some legal

3    advice about that.

4            MR. ROOTS:  I know he has been -- he has waived his

5    Fifth Amendment in the Alberts trial specifically.

6            THE COURT:  All right.  I will inquire of him.  Is he

7    subpoenaed here, or is he appearing voluntarily?

8            MR. ROOTS:  I think he's here voluntarily.  Oh, I take

9    that back.  My understanding is he was subpoenaed.  Ms. Lambert

10   just said he was.

11           MS. LAMBERT:  Yes, he was subpoenaed at his request.

12           THE COURT:  At his request?  Okay.  I will talk to him

13   about whether he's spoken with an attorney.

14       Anything the government would like to raise before he comes

15   in?

16           MS. MILLER:  No, Your Honor.

17           THE COURT:  All right.  Go ahead and bring Mr. Sumrall

18   in.

19           MR. ROOTS:  They're going to have a colloquy or just a

20   little bit of a discussion about your --

21           THE COURT:  Mr. Sumrall, if you could come up to the

22   podium, sir.

23           MR. SUMRALL:  Good morning.

24           THE COURT:  I suspect you went through something like

25   this with Judge Cooper.  I understand you testified before him;

 1    correct?

 2             MR. SUMRALL:  Yes, ma'am.

 3             THE COURT:  I just want to make sure that you have

 4    consulted with counsel other than Mr. Pierce or Mr. Roots about

 5    testifying here today.

 6             MR. SUMRALL:  I did last time, yes.  I figure it's

 7    kind of the same thing.

 8             THE COURT:  Would you like additional time to talk to

 9    your attorney about this?

10             MR. SUMRALL:  No, I'm fine.

11             THE COURT:  You do understand that some folks who were

12    just on the grounds of the Capitol on January 6 rather than

13    inside the Capitol were prosecuted?  You understand that?

14             MR. SUMRALL:  I guess so.  I'm not sure who exactly

15    has been prosecuted just for being on the grass.  I mean, I went

16    over this with the FBI at my house several times.  They know

17    where I was.  I've never been charged.

18             THE COURT:  So you've already shared this with the

19    FBI?

20             MR. SUMRALL:  Oh, they've been in my home, yeah, yeah.

21    And they said I'm not a person of interest.  So I don't see why

22    it would change just --

23             THE COURT:  Correct me if I'm wrong, government

24    attorneys, but I don't think there's any guarantee that you

25    won't be prosecuted in the future?

1              MR. SUMRALL:  No, I understand.

2              THE COURT:  So we just need to make sure that you

3    understand you do have some exposure criminally from

4    prosecution.

5              MR. SUMRALL:  Yes, ma'am.

6              THE COURT:  Under The Fifth Amendment, of course, you

7    have the right not to incriminate yourself.

8              MR. SUMRALL:  Yes, ma'am.

9              THE COURT:  So I want to make sure that you understand

10   you have that right --

11             MR. SUMRALL:  I do.

12             THE COURT:  -- and you can assert that right now or on

13   the stand.

14             MR. SUMRALL:  I would rather not assert that Fifth

15   Amendment right.  I would rather testify.

16             THE COURT:  All right.  And you're comfortable, based

17   on the conversations you've had with your counsel, that you're

18   knowingly waiving this right?

19             MR. SUMRALL:  Yes, ma'am.

20             THE COURT:  And you're appearing pursuant to a

21   subpoena which compels you to be here, but you understand that

22   if you have concerns about testifying today, you could assert

23   the right now --

24             MR. SUMRALL:  Yes, ma'am.

25             THE COURT:  -- and you would not have to testify.

1          Do you understand?

2               MR. SUMRALL:  Yes, ma'am.

3               THE COURT:  Okay.  You want to proceed today?

4               MR. SUMRALL:  Yes, ma'am.

5               THE COURT:  All right.  Anything else either side

6     wants to put on the record here?

7               MR. ROOTS:  One thing.  When Mr. Sumrall was on the

8     stand in the Alberts trial, the government --

9               THE COURT:  Wait.  If we're getting into the content

10    of his testimony, I'm going to ask him to step out.

11         But, Mr. Sumrall, the other thing is, individuals who

12    testify and might want to invoke their right against

13    self-incrimination often have attorneys in the courtroom with

14    whom they can consult while they're testifying.

15         I understand you don't have an attorney here.  Would you --

16    are you willing to go forward without an attorney here?

17               MR. SUMRALL:  I'm willing, yes.

18               THE COURT:  All right, sir.  Thank you.  I'm going to

19    have you step outside so we can talk a little bit about the

20    Alberts trial.  Thank you, sir.

21               MR. SUMRALL:  Thank you.

22               THE COURT:  All right.  Mr. Roots.

23               MR. ROOTS:  This is just a minor matter.  When

24    Mr. Sumrall was on the stand in that other trial, the government

25    tried to elicit from him names of people that he knows that were

1    at the Capitol on January 6, which was irrelevant in my opinion,

2    but they said they wanted to do that to show his bias.

3         Now, Mr. Sumrall does not claim to be unbiased.

4         So I just want to --

5              THE COURT:  And is the government planning on doing

6    that today?  I don't understand why you can't elicit his bias in

7    other ways.

8              MR. MCCAULEY:  We're not planning on doing that.

9              THE COURT:  Okay.

10             MR. MCCAULEY:  Unless he truly goes off -- this is his

11   testimony in the Alberts trial.  Unless he truly goes off from

12   this, we do not intend to cross-examine him --

13             THE COURT:  Well, even so, before you ask any such

14   question, let's talk on the phone about it, because I'm not sure

15   how he would open the door to the government asking him about

16   individual people.  If he testifies about John Smith, that's a

17   fair cross, but if he's -- I find it hard to anticipate how he

18   might open the door to the government going through all these

19   other names that he doesn't discuss on direct.

20             MR. MCCAULEY:  Understood, Your Honor.  Before we get

21   into any of that, we'll -- we'll talk on the phones before we

22   get into anything.

23             THE COURT:  All right.  Any reason not to bring in the

24   jury now?

25        Just a reminder, we will do Mr. Sumrall.  Have we reached a

stipulation on the video?

MR. MCCAULEY:  We have.  I sent it to the Court -- I
sent the stipulation to the Court.  Ms. Lambert has the video.

THE COURT:  And Mr. Roots or Mr. Pierce, whoever is
handling Mr. Sumrall, are you going to move to introduce this at
the conclusion of Mr. Sumrall's testimony?

MR. ROOTS:  Yes.

THE COURT:  Is that integrated into his testimony?

MR. ROOTS:  Yes, and we were thinking that you, the
judge, could just read the sentence saying --

THE COURT:  So you want me to read that "the parties
agree that Exhibit 451 depicts the east front of the United
States Capitol in and around the area known as the egg on the
afternoon of January 6, 2021."

MR. ROOTS:  Yeah.

THE COURT:  Okay.

MR. MCCAULEY:  The one thing I will raise for Your
Honor just so we don't confuse the jury is all of the
information that the government has about what Mr. Sumrall saw
and witnessed on January 6 is that he was on the east front --
or excuse me, on the west front.

We understand that that will also be the substance of his
testimony today.  That's what makes it relevant.

THE COURT:  I thought -- and maybe I'm confusing
witnesses, but I thought that Mr. Roots said last week that he

```
 1    walked around to the east side at some point.

 2              MR. ROOTS:  My understanding is he did not.

 3              THE COURT:  Oh, okay.  That was Moseley, I guess.  All

 4    right.

 5              MR. MCCAULEY:  Yes, I believe that was Mr. Moseley.

 6              THE COURT:  Is that fair, Mr. Roots?  He's talking

 7    about the west side?

 8              MR. ROOTS:  Yes.

 9              THE COURT:  How are you getting -- why are you

10    introducing this with him on the stand rather than after he

11    steps down?

12              MR. ROOTS:  I don't believe we need him on the stand

13    at the time.  It just rebuts, in my opinion, Baboulis's

14    testimony.

15              THE COURT:  Of course, you can get it in, just not

16    through this witness; right?

17          So he'll be done, and then he'll step down.  And then I'll

18    ask is there any more evidence, and you will ask to introduce

19    this exhibit, and at that time, I will read the stipulation and

20    admit that exhibit.

21          Are you going to want to show that or just have it before

22    the jury and argue in closing that it reflects X, Y, and Z?

23              MR. ROOTS:  I think we do want to show it.  It's about

24    two minutes.

25              THE COURT:  All right.  You can show that video.  And
```

```
 1    then you plan to rest?

 2              MR. ROOTS:  Yes.

 3              THE COURT:  So after they rest, I'll turn to the

 4    government.

 5          Why are you -- you look very concerned.

 6              MR. MCCAULEY:  I am just thinking about how this will

 7    play out in my mind, and Your Honor's plan sounds perfect to the

 8    government.

 9              THE COURT:  All right.  So I will turn to you to see

10    if you're going to put on a rebuttal witness, and my

11    understanding is unless he says something that concerns you,

12    you're probably not going to.  You can change your mind, but you

13    probably won't.

14              MR. MCCAULEY:  Yes.  At this time, we are probably not

15    going to call a rebuttal witness.

16              THE COURT:  All right.  Okay.  Let's go ahead and

17    bring in the jury.

18          (Jury entered courtroom.)

19              THE COURT:  Welcome back, ladies and gentlemen.  We

20    will now proceed with the defendant's next witness.

21              MR. ROOTS:  Your Honor, the defense next calls David

22    Sumrall.

23              DAVID SUMRALL, WITNESS FOR THE DEFENSE, SWORN

24              THE COURT:  Good morning, sir.

25              THE WITNESS:  Good morning.
```

DIRECT EXAMINATION

BY MR. ROOTS:

Q.   Thank you, sir.  Would you state and spell your name for the court reporter.

A.   David Sumrall, D-a-v-i-d S-u-m-r-a-l-l.

Q.   And where are you from, Mr. Sumrall?

A.   Texas, right outside of Dallas, Rockwell.

Q.   And what do you do there?

A.   I'm a carpenter.

Q.   Carpenter.  How long have you been a carpenter?

A.   25-plus years, outdoor stuff.

Q.   And do you have an avocation in addition to your vocation?

A.   Yes, Stop Hate Awareness Program.  It's kind of a ministry or a hobby, I guess.

Q.   And would you just tell the jury a little bit about the history of that.

A.   I started the Stop Hate Awareness Program back in 1992 during the L.A. riots.  We saw what the media did with the little piece of film and how they created basically a race war, and we wanted --

         MR. MCCAULEY:  Objection.

         THE COURT:  Overruled.

         THE WITNESS:  And we wanted to try to help prevent the next occurrence with communication and education and find a place that we could communicate again and not fall for those

 1    lies.

 2            BY MR. ROOTS:

 3    Q.   And do you have websites, podcasts, anything like that?

 4    A.   I do have stophate.com.  I do.  And social media as well.

 5    Q.   And have you received any kind of news, media attention?

 6    A.   Yes, I have, a lot, from January 6.  We've focused mainly

 7    on January 6 for the last two and a half years.  I was actually

 8    there, and I've had many opportunities to speak with media and

 9    get our side of the story out with video and testimony.

10    Q.   Have you been on national television, for example?

11    A.   I have.  I was on Tucker Carlson a couple -- I guess a

12    month or a little more ago before he got his show canceled.

13    Q.   What's your objective with regard to focusing on January 6?

14    A.   Just the truth, you know.  I believe these people deserve

15    justice.  I don't think everybody did the things that they're

16    being said that they do.  We can prove a lot of that with video.

17            And it's been my mission to actually work with attorneys as

18    a video investigator.  So I do have access to the government

19    data, as well as the public data.  So I'm able to compare the

20    two and take a story from someone and see if it backs up from

21    the government's data or not.  And the comparison is what's

22    really important, I believe.

23    Q.   Just to be clear, do you hold yourself out as being

24    100 percent neutral?

25    A.   No, no.  I was there.  So I understand what the media says

1    and I understand what people experienced is two different

2    things.  So my bias is toward the innocent victims that were

3    there on January 6 as opposed to the narrative, I believe,

4    because like I said, on my video I captured, it tells a totally

5    different story than what the government shows from their

6    database a lot of times.

7    Q.    Okay.  So let's go right to that event, January 6, maybe

8    even January 5.

9          What was your experience arriving in D.C.?

10   A.    So we drove, got there on the 5th.  We knew there was

11   already a rally at Freedom Plaza.  People had said come to it,

12   but we wanted to get settled in, and we stayed north of town,

13   and we rode the train.

14         When we came to town the morning of the 6th, we were going

15   to meet a lot of people at the Washington Monument.  We were

16   there before 8:00, but as it turned out, the crowd was so big,

17   we never found any of those people to meet.  I think I saw two

18   people I knew all day long, and I knew hundreds of people that

19   were there.  Very big crowd.

20   Q.    And did you attend the Trump speech at The Ellipse, for

21   example?

22   A.    We did, but from where we could -- from where we were, we

23   couldn't see it, and hearing it over the intercoms was

24   difficult.  We were trying to watch it on YouTube, you know,

25   while we were standing off to the side, but we couldn't get a

1    good signal.

2         So we decided to go on down to the Capitol before everyone,

3    because I wanted to film the crowd size as it walked down.  So

4    we went down to the Capitol a little after 12:00, I guess.

5    Q.   A little after 12:00?

6    A.   Started the trip down there, yeah.

7    Q.   Would you just estimate the crowd size?

8    A.   Oh, man.  Over -- safely over a million, probably over

9    2 million as far as The Ellipse.  I don't know how many then

10   made it to the Capitol, but I would imagine it was probably half

11   of them.

12   Q.   Now, with regard -- so you would move toward the Capitol

13   from The Ellipse area?

14   A.   Yes.

15   Q.   And did you -- was it your understanding that there were

16   events there?

17   A.   Yes, absolutely.  I helped organize the Texas Stop the

18   Steal Rallies.  So I knew the organizers of the event, Ali

19   Alexander, Scott Presler, General Flynn.  There were supposed to

20   be multiple speakers on the premises of the Capitol that day.

21        I mean, we had seen the flyers and brochures, I guess, for

22   lack of a better word.  But yeah, there were scheduled events

23   there on the property.

24   Q.   Had you actually seen websites that said there were these

25   events?

```
1    A.    Yes.

2    Q.    And to be clear, you understood these events were at the

3    Capitol?

4    A.    Yes, absolutely.

5    Q.    On the grounds of the Capitol or in the area?

6    A.    On the grounds.  Permits.

7    Q.    Did you know precisely where?

8    A.    No, huh-uh.  I don't personally.  I think that's -- when we

9    got there, that's what we were trying to figure out.

10           MR. ROOTS:  Your Honor, we would like to pull up

11   Defense Exhibit 301.3.

12           THE COURT:  That's already in evidence?

13           MR. ROOTS:  I think 301.2 is in evidence.

14           THE COURT:  So just for the witness?

15           MR. ROOTS:  Just for the witness.

16           BY MR. ROOTS:

17   Q.    Do you see this on your screen, Mr. Sumrall?

18   A.    I see paperwork.

19   Q.    Do you recognize this kind of paperwork?

20   A.    I do.

21   Q.    And what do you recognize it as?

22   A.    Just a timeline of events, it looks like.

23   Q.    If we could scroll up toward the top.

24         And what does this look like as far as you can tell?

25   A.    It looks like the paperwork, police paperwork.  Is it
```

1    permits possibly?

2    Q.   And is this consistent with what you know about --

3    A.   Yes, this would be.

4         MR. ROOTS:  Your Honor, we move for admission of

5    301.3.

6         THE COURT:  Any objection?

7         MR. MCCAULEY:  Objection to foundation, Your Honor.

8         THE COURT:  Mr. Roots?

9    (Bench conference.)

10        THE COURT:  Mr. Roots, presumably, you're introducing

11   these for the truth.

12        MR. ROOTS:  Well, or just for the fact that there were

13   permits and he was aware there were permitted events there.

14        THE COURT:  Well, you've already elicited that.

15        MR. ROOTS:  I believe this is the specific permit for

16   one of the events he was intending on attending.

17        THE COURT:  But again, is this -- are these public

18   records?  What's the hearsay exception?

19        MR. ROOTS:  They are business records, public records,

20   yes.

21        THE COURT:  Mr. McCauley or Ms. --

22        MR. MCCAULEY:  Your Honor, I'm looking at this, and

23   this appears to be an amalgamated exhibit of potentially a

24   number of different agencies and groups.

25        THE COURT:  All right.  Well, that seems problematic,

1    Mr. Roots, to introduce all of this through this witness.  It's

2    clear that you've elicited that he was aware of a permit

3    relating to his event -- or the event he was familiar with, and

4    I'm not going to let you get into this through this witness.

5            MR. ROOTS:  Understood.  We can just ask him what

6    speakers and organizations he was aware of that were putting

7    these on maybe.

8            MR. MCCAULEY:  Your Honor, just for the record, it

9    appears that these exhibits pertain to the exact -- or in fact,

10   some of the permits that Captain Baboulis testified to on 8 and

11   9.  So this evidence is already before the jury --

12           THE COURT:  So it's already -- why don't you rely on

13   the -- you're saying, Mr. McCauley, that some of these exhibits

14   are already in evidence?

15           MR. MCCAULEY:  One moment, Your Honor.  Let me confer

16   with my counsel to make sure I'm thinking of the correct thing.

17       (Government counsel conferred.)

18           THE COURT:  Mr. McCauley, I think that's a different

19   permit.

20           MR. MCCAULEY:  I believe it is also a different

21   permit.  The objection is to both foundation and hearsay.  If he

22   can't testify to what this is, if he can't say what this is and

23   he doesn't know it and it appears to be an amalgamated record,

24   we're in a bind here.

25       And this evidence is already before -- or this testimony is

1   already before the jury.

2           THE COURT:  Okay.  Well, I don't think it's

3   problematic that he was aware there were permits, but I think

4   introducing this based on the foundation and the fact that it's

5   hearsay right now, I don't think the defense has gotten over

6   those hurdles.

7           MR. ROOTS:  Okay.  We can just ask him about speakers

8   that were promoted.

9           THE COURT:  All right.  Any objection, Mr. McCauley?

10          MR. MCCAULEY:  No, that's fine, Your Honor.

11          THE COURT:  All right.

12      (End of bench conference.)

13          THE COURT:  All right.  The objection is sustained.

14          BY MR. ROOTS:

15  Q.   Without going into the specifics of the permit, what

16  organizations did you understand were putting on events?

17  A.   There was the "stop the steal" group from Ali Alexander.

18  There was some political organizations.  I know that Simone

19  Gold, several other speakers were scheduled, like I said, Scott

20  Presler, Brandon Straka.  There were a lot of -- I mean, that's

21  why everybody went down there, for the permitted events, I

22  guess.

23  Q.   And was there the expectation that actual members of

24  Congress might speak?

25  A.   Absolutely.  There were several on the list, congressmen,

1    senators, absolutely.  Trump even said he was going down there,

2    but he didn't make it.

3    Q.    Had you ever seen the Capitol grounds before?

4    A.    When I was in junior high, I believe, or whenever you take

5    that big school trip.  I hadn't been in years before that.

6    Q.    Okay.  Let's pull up Defense Exhibit 295.

7         Do you see this on the screen?

8    A.    Yes.

9    Q.    Do you recognize this?

10    A.    Yes.

11    Q.    Is this video that you took yourself?

12    A.    It looks like it.

13         MR. ROOTS:  Your Honor, we move for admission of

14    Defense 295.

15         THE COURT:  Any objection?

16         MR. MCCAULEY:  Your Honor, we would -- can we go to

17    the phones very quickly?

18    (Bench conference.)

19         THE COURT:  Has the government had a chance to review

20    this?

21         MS. MILLER:  Your Honor, it's listed as, quote

22    unquote, open-source video on the exhibit list.  So we have no

23    idea whose videos and what open source this came from.

24         So that's a long --

25         THE COURT:  Have you seen this video?

```
 1            MS. MILLER:  No.

 2            MR. ROOTS:  This has been available to the government.

 3    This was also shown in the Alberts trial, the same video.

 4            THE COURT:  Okay.  Does the government want a moment

 5    to watch this video?

 6            MR. MCCAULEY:  One moment, Your Honor.

 7        (Government counsel conferred.)

 8            MR. MCCAULEY:  I mean, Your Honor, the other -- yes,

 9    we would like a moment to watch it without sound, but we would

10    like to hear the sound eventually, but we would also like the

11    defendant -- or excuse me, the witness to testify to where this

12    video is from, when it's from, approximately what time he took

13    this video.  That foundation has not yet been laid.

14            THE COURT:  You're going to lay that foundation before

15    this is admitted, Mr. Roots?

16            MR. ROOTS:  I could do that with that monument right

17    there in the background on that screen there.

18            MR. MCCAULEY:  We will also need time, Your Honor.

19    What time was this video?

20            THE COURT:  And is this going to show, Mr. Roots,

21    incidents involving use of force or inaction by officers that

22    Mr. Thomas knows nothing about?

23            MR. ROOTS:  Not at all.  We're putting this in to show

24    the situation as the first, I don't know, couple 300 went past

25    this area.
```

```
 1              THE COURT:  All right.  So from the Court's
 2    perspective, if this witness can testify that this looked like
 3    what he recalls in the moments he was there, then it can come
 4    in, if it fairly and accurately reflects what he saw that day.
 5    But you're going to have to lay that foundation to get it in.
 6       Can you do that?
 7              MR. ROOTS:  Yes.  I can ask him what time.  I can have
 8    him look at that monument, which I believe is the Peace
 9    Monument.
10              THE COURT:  But he doesn't know what time of day this
11    was taken, does he?
12              MR. ROOTS:  I'm sure Sumrall would know.  I don't
13    know.
14              THE COURT:  He actually took the video?
15              MR. ROOTS:  Yes.
16              THE COURT:  Okay.  All right.
17              MR. MCCAULEY:  With that foundation, we won't object,
18    if it is his video.
19              THE COURT:  But you do want a moment to review the
20    video?
21              MR. MCCAULEY:  It's 43 seconds long.  So if we could
22    take a true few moments to review it.
23              THE COURT:  Okay.
24       (End of bench conference.)
25              THE COURT:  Ladies and gentlemen, we're just giving
```

1    the government a chance to review this video before we proceed.

2         (Pause.)

3              MR. MCCAULEY:  The government is ready, Your Honor.

4              THE COURT:  All right.  You may proceed, Mr. Roots.

5              BY MR. ROOTS:

6    Q.   Okay.  Mr. Sumrall, you said you took this video?

7    A.   Yes.

8    Q.   Do you recognize any particular monument in the screen

9    you're seeing?

10   A.   The freedom statue there?  Is that what they call that?

11   The monument?

12   Q.   You recognize it?

13   A.   Yes.

14   Q.   Do you recognize what time of day this might have been?

15   A.   That's right around 1:00.

16              MR. ROOTS:  Okay.  We move for admission of 295,

17   Defense 295.

18              MR. MCCAULEY:  No objection.

19              THE COURT:  All right.  It's admitted.

20         (Defense Exhibit 295 received into evidence.)

21              MR. ROOTS:  And I would like to show it to the jury.

22         (Video played.)

23              BY MR. ROOTS:

24   Q.   Okay.  Did that look like the scene as you recall it that

25   day?

1    A.    Yes, sir.

2    Q.    And you said that was around 1:00?

3    A.    I'd say so, yes, sir.

4    Q.    Just to orient the jury, about where -- what's the location

5    here?

6    A.    That is the place of the initial gate breach, I guess what

7    they call it, the west side at the sidewalk.

8    Q.    And you said the "gate breach." Let me ask, what do you

9    mean by that?

10    A.    That's where the protestors first got onto the property.

11    Q.    And by "the property," what do you mean?

12    A.    The grass section. There was the outside outline, and

13    everything inside the grass area is what they -- when they pass

14    that first barrier, that they all went in the grass there all

15    over the complex.

16    Q.    And to be clear, were you a part of that initial breach?

17    A.    No.

18    Q.    You came -- how many people back would you say you came at

19    that time?

20    A.    We probably let several hundred people go through before we

21    went through. I told my team to stay back, because we didn't

22    know what was going to happen. We couldn't hear the

23    conversations with the police from where we were. We couldn't

24    see the altercation from where we were.

25    Q.    Let me stop you there.

```
1    A.    Okay.

2    Q.    You used the word "altercation."

3    A.    Uh-huh.

4              MR. MCCAULEY:  Objection.

5              THE COURT:  Mr. Roots.

6         (Bench conference.)

7              THE COURT:  I'm just concerned you may be going into

8    an area that's specifically excluded.

9              MR. ROOTS:  I did not expect that answer.  My

10   understanding is he witnessed no altercations.  He's talking

11   about things that he has become familiar with after reviewing --

12             THE COURT:  I know.  And why is this relevant to

13   Mr. Thomas's state of mind?

14             MR. ROOTS:  I did not expect that -- I want him to --

15   I think Mr. Sumrall will say there was no violence, it was

16   festive.

17             THE COURT:  Again, why is this relevant to Mr. Thomas?

18   He wasn't there.

19             MR. ROOTS:  This shows the conditions as Mr. Sumrall

20   came through, which were very unrestricted.

21             THE COURT:  But we've talked about what those

22   conditions are that you can elicit from him, and those are

23   things like signs being down and that sort of thing, not

24   specific, you know, conversations with police that he might have

25   been aware of that Mr. Thomas wasn't, not violence, not
```

1    inaction.

2        So let's move on from this, and let's talk about the

3    signage that's clearly appropriate.

4        (End of bench conference.)

5            THE COURT:  All right.  The objection is sustained.

6            BY MR. ROOTS:

7    Q.   Okay.  You said -- I think you said there were 600 or so

8    that might have gone through before you got there?

9    A.   At least, yeah.

10   Q.   So at the time you got there, did you see any barriers

11   there?

12   A.   When I first got to the circle, yes, I did.

13   Q.   You did see?

14   A.   Yes.

15   Q.   And what was going on there?

16   A.   There were a couple of dozen people standing up against the

17   barriers.  There were five policemen at the next set of barriers

18   on the sidewalk.  There were a couple of cops in the grass.  And

19   there was a long fence all the way across the property.  It

20   looked like a divider line.

21   Q.   Did you see any signs?

22   A.   Yes, I did, but you couldn't read them from there.  They

23   were all the way across the property from where we were

24   standing.

25   Q.   Did you hear any announcements of any kind?

1    A.    No, no.

2    Q.    Now, what happened after that?

3    A.    As far as the people going onto the property?

4    Q.    As far as whether or not the crowd moved or not in any

5    direction?

6    A.    They moved onto the property after they went through the

7    first -- so the first barricades had no police, zero police in

8    front of it.  The second barricade is the one that had the five

9    police.  So when everybody went past the first barricade, they

10   went up to the five police, and that's where we couldn't see

11   anything through the crowd.  I mean, everybody was stacked in

12   that sidewalk area.  We couldn't see exactly what was going on

13   there.  We didn't know until later.

14       So that's where that comment about an altercation.  We all

15   learned about that later.

16            MR. MCCAULEY:  Objection.

17            THE COURT:  Sustained.

18            BY MR. ROOTS:

19   Q.    Okay.  So you, with your video, what was the scene like?

20   A.    Festive, patriotic.

21   Q.    Did you see any anger or any kind of tension there?

22   A.    No.

23   Q.    What was your understanding about what had happened before

24   up in front?

25   A.    That day?

```
1    Q.    As you approached there.

2            MR. MCCAULEY:  Objection.

3            THE COURT:  Sustained.

4            BY MR. ROOTS:

5    Q.    What did you perceive was -- had happened?

6            MR. MCCAULEY:  Objection.

7            THE COURT:  Sustained.

8            BY MR. ROOTS:

9    Q.    You did say the crowd moved into the grounds area?

10   A.    Yes.

11   Q.    Did that seem to be against any kind of orders?

12   A.    No.

13   Q.    Did that seem to be some act of -- in violation of

14   anything?

15   A.    No.

16            MR. MCCAULEY:  Objection.

17            THE COURT:  Sustained.

18         Ladies and gentlemen, you should strike the last comment by

19   the witness.

20         Mr. Roots, let's move on to the signs.

21            BY MR. ROOTS:

22   Q.    With regard to the signs -- actually, let's move to

23   Exhibit 292, Defense 292.  This is not in evidence.

24         Do you recognize this video?

25   A.    I do.
```

```
1   Q.   And is this video that you yourself took?

2   A.   No.  My teammate did.

3   Q.   Were you near this area?

4   A.   Yes.

5   Q.   Do you recognize the scene and the setting there?

6   A.   Yes, I do.

7   Q.   And does this look like an accurate depiction of that

8   scene?

9   A.   Yes, it does.

10            MR. ROOTS:  We do move for admission of Defense 292.

11            MR. MCCAULEY:  Objection; foundation.

12            THE COURT:  Sustained.

13            MR. ROOTS:  Can I build some more foundation?

14            THE COURT:  You may.

15            BY MR. ROOTS:

16   Q.   So when you say you were near there, did you know any of

17   the participants, or experience any of these participants?

18   A.   Yes.

19   Q.   And did you interact with them?

20   A.   No, I did not, not at that point.

21   Q.   And where were you filming?  Where were you?

22   A.   From behind him, and we went to the left into the grass.

23   This is just before where we split up to film different areas.

24            MR. ROOTS:  Okay.  With that, I move to admit.

25            THE COURT:  Sir, did this fairly and accurately depict
```

1    what you saw that day?

2              THE WITNESS:  Yes, it does.

3              THE COURT:  All right.  Any objection?

4              MR. MCCAULEY:  No objection, Your Honor.

5              THE COURT:  Have you had an opportunity to review

6    this?

7              MR. MCCAULEY:  We're doing it right now.

8              THE COURT:  Let's wait a moment.

9         (Pause.)

10             MR. MCCAULEY:  No objection.

11             THE COURT:  Mr. Roots, can you clarify the time of

12   day?

13             BY MR. ROOTS:

14   Q.   Mr. Sumrall, what time of the day was this?

15   A.   I would say this is just after 1:00 as well.

16   Q.   Would this have been after that previous video?

17   A.   Yes.

18             MR. ROOTS:  Okay.  Let's go ahead and roll this for

19   the jury.

20             THE COURT:  It's admitted.

21        (Defense Exhibit 292 received into evidence.)

22        (Video played.)

23             BY MR. ROOTS:

24   Q.   Let me stop right there.

25        Did you hear any voice in the video there?

1    A.    Yes, I did.

2    Q.    And what did you hear?

3    A.    "This was set up for us.  They set this up for us."

4    Q.    And what was your understanding of that?

5    A.    We thought that it could have been the staging areas for

6    those permitted events.  We were trying to find out where to go

7    and who was speaking where.

8    Q.    Did it seem like there was a lot of direction about where

9    to go?

10    A.    There was no direction as where to go.  Nobody was there

11    directing, saying yes, no, come, go, anything.  We just wandered

12    around looking for that direction that we didn't get.

13    Q.    So do you now, as you've reviewed more information about

14    this --

15            MR. MCCAULEY:  Objection.

16            THE COURT:  Sustained.

17            MR. ROOTS:  Can I ask what he knows about the staging

18    now?

19            THE COURT:  No.

20            MR. ROOTS:  Okay.

21            BY MR. ROOTS:

22    Q.    So the people around you thought the staging that you saw

23    there in that video was --

24            MR. MCCAULEY:  Objection.

25            THE COURT:  Sustained.

 1          BY MR. ROOTS:

 2     Q.   With regard to signs, was it well -- were there signs that

 3     said "restricted area"?

 4     A.   Not that I ever saw.

 5     Q.   What about "area closed"?

 6     A.   Not that I ever saw.

 7     Q.   "No trespassing"?

 8     A.   Not that I ever saw.

 9     Q.   Did you see any signs that looked like -- that directed you

10     to any information about that?

11     A.   No.  There were signs, like I said, halfway up the yard.

12     You couldn't read them from there.  So I have no idea what they

13     said.

14     Q.   And did any law enforcement tell you anything about

15     their -- the situation there?

16     A.   Zero input from any law enforcement.  I don't think I was

17     from here to the --

18               MR. MCCAULEY:  Objection.

19               THE COURT:  Sustained.

20          Ladies and gentlemen, you should disregard that comment by

21     the witness.

22               BY MR. ROOTS:

23     Q.   Well, let me ask, you just said this video was a little bit

24     after the other one?

25     A.   Yes.

1    Q.   Was it still festive at this time?

2    A.   Yes, absolutely.

3    Q.   People there, would you say, were they happy, or were they

4    angry?

5    A.   They were happy.  You can hear it in their voices.

6    Q.   I'll have Mr. Thomas stand up, if you could.

7         Do you know this man?

8    A.   I do now.

9    Q.   When did you first meet him?

10   A.   In person, yesterday.

11   Q.   So you had never met him before yesterday?

12   A.   No, sir.

13   Q.   As far as you know, is the path you went in that area the

14   same path that he took?

15   A.   Yes, it is.

16              MR. MCCAULEY:  Objection.

17              THE COURT:  Sustained.

18        Ladies and gentlemen, disregard the statement by the

19   witness.

20              MR. ROOTS:  No further questions.  Thank you.

21              THE WITNESS:  Thank you.

22                         CROSS-EXAMINATION

23              BY MR. MCCAULEY:

24   Q.   Good afternoon, sir.  I want to pick up at the conclusion

25   of your direct testimony.

1    You testified that you never knew Mr. Thomas before

2  yesterday; correct?

3  A.    Personally, yes.  Like met him in person, no, until

4  yesterday.

5  Q.    And on January 6, you didn't know him from any other

6  person; correct?

7  A.    No.

8  Q.    You had never spoken with him before January 6; is that

9  correct?

10  A.    That's correct.

11  Q.    And you had never told him about these permits that you say

12  you knew about; correct?

13  A.    That's correct.  I had never spoken with him before, that's

14  correct.

15  Q.    And you never discussed what was going to happen on

16  January 6 with him; correct?

17  A.    I never spoke to him.

18          MR. ROOTS:  Asked and answered.

19          THE WITNESS:  That's correct.  I've ever spoken to him

20  before then.

21          MR. MCCAULEY:  I will rephrase, Your Honor.

22          THE COURT:  All right.

23          BY MR. MCCAULEY:

24  Q.    You never told him about any of the speakers that you say

25  you knew about at the Capitol on January 6?

1    A.    You realize we never spoke before January 6.  So I couldn't

2    have told him any of those things, yeah.

3    Q.    And it was your testimony on direct that you got to the

4    Capitol -- what you refer to as that first breach point?

5    A.    Yes.

6    Q.    At around 1:00 p.m.; correct?

7    A.    Yes.

8    Q.    And you agree with me that 1:00 p.m. is an hour and 15

9    minutes before 2:15 p.m.; correct?

10   A.    Sounds about right.

11   Q.    And it's two and a half hours before 3:30 p.m.?

12   A.    Would be.

13   Q.    And it's three and a half hours before 4:30 p.m.; correct?

14   A.    Okay, yeah.

15   Q.    And on January 6, you have no memory of seeing the

16   defendant; correct?

17   A.    No, none.  I would have to go through my footage to see if

18   we crossed paths.  I have not.

19   Q.    And in this 40-second clip, I believe it was 292, where you

20   said there was no direction, you would agree all you see -- or

21   excuse me.  You would agree that you don't see any law

22   enforcement; correct?

23   A.    That's correct.

24   Q.    You don't see much else at all, do you?

25   A.    That's right.

1  Q.   But before that, you testified that you saw two lines of

2  fences; correct?

3  A.   Yes.

4  Q.   And one of those lines of fences had police officers behind

5  it; correct?

6  A.   Five.

7  Q.   And in one of your videos, isn't it true that you see a

8  police barricade that's been pushed to the side?

9  A.   Which video?

10        MR. MCCAULEY:  We can replay the first defense

11  exhibit, I believe it's 295, and pause at 31 seconds.

12        (Video played.)

13        BY MR. MCCAULEY:

14  Q.   Sir, what's this in the background?

15  A.   That looks like a barrier.

16  Q.   And would you agree with me that it looks like it's been

17  pushed?

18  A.   I would not know the difference.  How does a barrier look

19  pushed?

20        MR. MCCAULEY:  Nothing further, Your Honor.

21        THE COURT:  All right.  Any redirect?

22                  REDIRECT EXAMINATION

23        BY MR. ROOTS:

24  Q.   You said you saw what looked like a bicycle rack or

25  something.  Did that appear to be erect, or was it knocked over?

1    A.   It was standing, it looked like.

2    Q.   And you had no way of knowing if it had been moved?

3    A.   No.

4    Q.   Now, you said you went through at 1:00, and the prosecutor

5    just asked you, well, you don't know what it was like at 2:15?

6    A.   Right.

7    Q.   To your knowledge, did it get more or less --

8              MR. MCCAULEY:  Objection.

9              THE COURT:  Grounds for the objection?

10             MR. MCCAULEY:  Beyond the scope, also precluded.

11             THE COURT:  Overruled.

12             MR. ROOTS:  Beyond the scope?

13             BY MR. ROOTS:

14   Q.   You can answer the question.  To your knowledge, did it get

15   more or less restricted after you went through?

16   A.   It stayed about the same.  We moved to the left and watched

17   hundreds and hundreds of more people come in just the same way

18   for the next hour and a half or so as they did from the very

19   beginning.  Just kept pouring in, pouring in, good mood,

20   festive.  Everybody's having -- there's even a guy playing a

21   guitar.  I mean, it was kind of a party atmosphere.

22   Q.   And to your knowledge, did any -- did it seem like after

23   you went through there were efforts to rebolster or put signs up

24   or post anything?

25   A.   No, not at all.  There were already barricades stacked

before we got there, other extra barricades.  So it's hard to
tell apart what was stacked beforehand and what was placed.
There were extra, I guess, barriers staged around.  I guess they
wanted to put them up or take them down.  I'm not sure.  But
just to see barriers somewhere was not an obvious oh, those
barriers have been moved.  To us, we didn't know the difference
between anything.

Q.   So after you went through, it did not get any more posted?

A.   No.

          MR. ROOTS:  No further questions.  Thank you.

          THE COURT:  Any redirect?  There was a new area.

                    RECROSS-EXAMINATION

          BY MR. MCCAULEY:

Q.   You testified on redirect that you went to the side,
correct, of the --

A.   Of the path of the grass, yes.

Q.   And approximately where were you?

A.   I could show you on a map.  Inside that first sidewalk, 30
yards maybe to the left, out into the grass maybe 20 yards.

Q.   So it's fair to say on what would perhaps be known as the
Capitol lawn; correct?

A.   Yes, absolutely.

Q.   And you have no idea what happened on the Upper West
Terrace at 3:30; correct?

A.   That day, I did not.

1    Q.   And you have no idea and you had no idea that day what was

2    happening on the Upper West Terrace at 4:30; correct?

3    A.   Other than what I filmed with my phone.  So I was a witness

4    to that from where I was, you know, phone with the zoom and

5    everything.  I was watching them go up the stairs.  I was

6    watching them go across the top.  I did have a pretty good view

7    for that stuff.

8    Q.   But you were not there in person to witness directly the

9    interactions that law enforcement officers were having with the

10   people who you say are protestors?

11   A.   That's right.

12              MR. ROOTS:  Objection.  It assumes facts not in

13   evidence.

14              THE COURT:  Overruled.

15              MR. MCCAULEY:  Nothing further.

16              THE COURT:  All right.  May this witness be excused?

17              MR. ROOTS:  Yes.

18              THE COURT:  Thank you, sir.

19              THE WITNESS:  Thank you.

20              THE COURT:  All right.  Does the defense have any

21   additional witnesses?

22              MR. ROOTS:  We do not.

23              THE COURT:  Any additional evidence?

24              MR. ROOTS:  We have that stipulated video.

25              THE COURT:  All right.  So again, ladies and

gentlemen, the parties have reached an agreement that you can

consider as evidence and the parties agree that Defense Exhibit

451 depicts the east front of the United States Capitol in and

around the area known as the egg on the afternoon of January 6,

2021.

Mr. Roots, would you like to play that video that the Court

will accept as evidence in this case?

MR. ROOTS:  Let's go ahead and just play that.

(Defense Exhibit 451 received into evidence.)

(Video played.)

MR. ROOTS:  I won't comment or ask any questions about

it.

THE COURT:  Any further evidence?

MR. PIERCE:  No, Your Honor.  With that, the defense

rests.

THE COURT:  Okay.  Thank you.

Any rebuttal evidence by the government?

MR. MCCAULEY:  No, Your Honor.

THE COURT:  All right.  So ladies and gentlemen, that

ends the conclusion of the evidence portion of the trial.  So

I'm now going to excuse you for a longer lunch than normal

because I need to address some legal issues with the parties

before we come back and I instruct you on the law, and then you

will here closing arguments from both sides.

So I'm going to excuse you until 2:30.  I think we

1    anticipate finishing the trial today.

2         Again, a reminder, no discussions about the case, no

3    research.

4         Enjoy your lunch.

5         (Jury exited courtroom.)

6             THE COURT:  All right.  Is there a renewed motion from

7    the defense?

8             MR. ROOTS:  We will renew the Rule 29.  We don't

9    believe the government has proven its case, especially with

10   regard to the 1512.  There's been no evidence offered about

11   intent to -- any corrupt intent to obstruct an official

12   proceeding.

13        The civil disorder count, Count 1, is a little bit more

14   nuanced.  We believe the commerce component of that was not

15   shown.  So without the commerce thing proven, they would have to

16   go to those other prongs, including the federal function.  We

17   don't believe they put on any evidence of that to speak of.

18        So we move for acquittal on Counts 1 and 2.

19        Of the five assault counts, two of them at least, the

20   victims did not show up, so the victims did not appear.  So we

21   would say without that testimony, at least two of the five --

22   and that would be, I believe, Nickerson, who never testified.

23   The other one was named Veizaj, never testified.

24        So there is no evidence of any fear, any intent to injure

25   other than some body cam that's almost tangential.  So we don't

1    have those officers saying that there was any assault on them.

2        And then there's Anderson, by the way, the 6-foot-4

3    300-pound officer who admitted on the stand he felt no fear, he

4    didn't even remember Mr. Thomas, and detected Mr. Thomas had no

5    intent to harm him in any way. So the Anderson assault has to

6    go away.

7        That leaves us with the Ainsworth and the -- what was the

8    other one? The Niewenhous. We don't believe those have been

9    shown. Niewenhous did say he was in fear, but it's not clear

10    from the evidence that came in as to what the basis of that was

11    and if it pertained to Mr. Thomas at all.

12        And from here, we have lots of -- well, they haven't shown

13    the restricted area counts, and several of the counts depend on

14    as a predicate the restricted area being proven, and that was

15    not -- all they showed was there was a sign hours earlier at a

16    location a mile away, The Ellipse. And then they show it on the

17    ground where Mr. Thomas was. There was a half a sign that was

18    torn apart laying on the ground.

19        So on that basis, there was no evidence that he perceived

20    he was in a restricted area. So all those counts that require

21    as a predicate a restricted area, all those counts have to be

22    dismissed.

23        THE COURT: All right. Would the government like to

24    respond?

25        MR. MCCAULEY: Very briefly, Your Honor.

1    As to the five assaults, the defendant seems to be

2    injecting again an element into the case that he must have acted

3    with the intent to injure.  That is simply not in the law.  The

4    law says "assault, resist, impede, or otherwise interfere with

5    law enforcement officers engaging in a federally protected

6    function."

7    These officers were engaging in a federally protected

8    function.  It is very much established that they were guarding

9    the Capitol to prevent people from entering that day.  It is

10   further established they were trying -- that they were doing so

11   by trying to keep the riot line back, and multiple times, the

12   defendant charged and made contact with them.

13   THE COURT:  Understood.  I think the confusion here is

14   the statute itself is called assault, and one way to commit an

15   assault is to assault, but there are four or five other ways to

16   commit assault.  But assault itself is defined as an intentional

17   attempt or threat to inflict injury upon someone else when

18   coupled with apparent present ability to do so.

19   So that does create some confusion when you all throw

20   around assault generally.  And this makes me think of a question

21   that I had generally about whether the Court should include any

22   additional curative instructions with respect to words like

23   "assault."  There was another one with "affecting interstate

24   commerce."  There have been some objections about stating the

25   law.  So we can talk about that in a moment, but I think is a

part of confusion.

So he's right that assault is defined to include these other pieces --

MR. MCCAULEY:  Understood, Your Honor.

THE COURT:  -- but somewhere, someone needs to explain all of that to the jury.

But I agree with what you're saying with regard to resist, oppose, impede, intimidate, or interfere, that that's not required.

MR. MCCAULEY:  If I may just touch on one additional point on that, the evidence speaks for itself that there was a threatening intent here in terms of an assault, if not an --

THE COURT:  An actual fear by the officer is not, even as to assault, a requirement.

MR. MCCAULEY:  Yes, Your Honor.

THE COURT:  Subjective fear by the officer is not an element the government need to prove even to prove the assault prong of the assault statute; correct?

MR. MCCAULEY:  Yes, Your Honor.

As to the 1512, it is clearly established that Mr. Thomas knew what was happening in the Capitol that day.  It is clearly established that he -- the Facebook evidence clearly shows and his own testimony shows that he went to the Capitol to stop that process.  And then the evidence that has been developed throughout this trial of him repeatedly trying to get past the

police lines so that he could go knock on the door of the

Capitol is clear evidence of his corrupt intent with regards to

that official proceeding.

As to the 231, there is clearly a civil disorder in which

Mr. Thomas was participating and in which he engaged in these

actions with these five law enforcement officers.

Moreover, Agent Brown's testimony establishes that that

civil disorder and the curfew that it caused to be declared had

an effect on interstate commerce -- or on commerce, which is all

that the government needs to prove.

And with respect to the various --

THE COURT:  Is that the government's sole theory, or

is the government also going to argue that there was

interference with a federal function and --

MR. MCCAULEY:  We believe that we've established both.

THE COURT:  All right.  I wasn't sure if that's what

you were saying there.  You are not just relying solely on the

commerce element?

MR. MCCAULEY:  No, we are not relying solely on

commerce.  We believe that we have satisfied both of the aspects

of 231.

THE COURT:  Maybe all three?  There's the movement as

well.

MR. MCCAULEY:  Yes, Your Honor.

THE COURT:  All right.

1          MR. MCCAULEY:  And then finally, with respect to the

2     trespassing statutes, Mr. Thomas testified that he didn't see

3     any signs that said this area is restricted.

4          Captain Baboulis's testimony clearly established that the

5     area was restricted.  There were ample signs that the government

6     has developed throughout this case that the defendant knew he

7     was not supposed to be there, not the least of which pepper

8     spray in the air, the police line that he tried repeatedly to

9     cross, the emergency alert that came through to his phone as he

10     was breaching the line.

11          Although certainly none of his videos show him panning over

12     a restricted area sign, it is clearly established that he should

13     not have been in that area, and any reasonable person would have

14     known that.

15          THE COURT:  And how does the emergency alert prove

16     that he's knowingly in a restricted area?

17          MR. MCCAULEY:  Well, it goes to the larger

18     circumstances.  I mean, obviously, the emergency alert in this

19     case and the evidence shows that it doesn't say you have entered

20     a restricted area, leave.  But what it does demonstrate is that

21     there was an active emergency situation around him that if he

22     hears it, if he had taken a moment to inspect his surroundings,

23     see that alert, and leave.

24          And it certainly was ordering a curfew, which is an

25     indication that there is a problem that needs to be dealt with

1    rapidly.

2        And so admittedly, Your Honor, it's circumstantial

3    evidence, but it is evidence nonetheless of the fact that he was

4    not permitted to be there doing what he was doing.

5            THE COURT:  It's just surprising you're leaning on

6    that so much, given his firsthand observations.

7            MR. MCCAULEY:  Understood.  This is the point Your

8    Honor asked me to develop.  So I'm developing this one first.

9        But also, his firsthand observations are also plainly

10   apparent of his inability -- of his -- of the impermissive

11   nature of his conduct.  And moreover, Your Honor, we would note

12   that even if one were to assume that he had no idea when he

13   first passed through the Peace Circle, which seems to be what

14   Mr. Sumrall's testimony was, certainly by the time he gets to

15   the Upper West Terrace and was actively resisting a police line,

16   he knew.

17           THE COURT:  All right.  That's all of the counts?

18           MR. MCCAULEY:  Yes, Your Honor.

19           THE COURT:  All right.  So as I've said before, I am

20   going to reserve any decision on the Rule 29 motion until after

21   the jury verdict.

22       All right.  Now for the charging conference, the defense

23   had requested the self-defense instruction or defense of others

24   for Count 1, the civil disorder count, and Counts 3 through 7,

25   the five charged assaults.

1    Is that still the case, Mr. Pierce, Mr. Roots, that it is

2    for those offenses for which you're seeking this instruction?

3         MR. ROOTS:  Yes.

4         THE COURT:  All right.  If I could have you come up to

5    the podium, Mr. Roots.  If you can just walk through your

6    position with respect to each assault, because at least as to

7    some of these assaults, it seemed to me that Mr. Thomas was

8    arguing that -- well, as to all except Ainsworth, that he didn't

9    intend to touch the officers, not that he was acting in

10   self-defense.

11    So help me understand the theory as for the counts other

12   than 5.  Are these alternative theories or --

13        MR. ROOTS:  Mr. Thomas has -- for each one, each one

14   is slightly different.  In, I believe, the first assault

15   accusation and maybe the second --

16        THE COURT:  Let's be clear.  Are we talking about

17   Count 3?

18        MR. ROOTS:  Anderson and, I believe, Nickerson.  That

19   was the stairs, where he was going up the stairs.

20        THE COURT:  Is that 3 and 4?

21        MR. MCCAULEY:  That's 3 and 4, Your Honor.

22        THE COURT:  Okay.  So for Counts 3 and 4 --

23        MR. ROOTS:  We would argue self-defense.  We recognize

24   the self-defense argument there is weaker, and we would argue

25   defense of others.  It's weaker there, those two counts.

1          We will say the real defense there with those two is not an

2     intent to assault officers.

3               THE COURT:  So you're arguing alternative theories

4     there?  In your closing, you're going to be arguing both?

5               MR. ROOTS:  Yes.  We believe the defense of others

6     defense mostly applies to the "let him up, let him up, let him

7     up" counts.

8               THE COURT:  And that is not both of these, though?

9               MR. ROOTS:  No.  The two on the steps, the defense is

10    sort of -- it's that he did not even intend to contact officers.

11    If anything, the evidence indicates his intent was to either

12    protect another person or get around -- or maybe get around the

13    situation, not to touch officers.

14              THE COURT:  So the "let him up" applies to the second

15    alleged assault?

16              MR. ROOTS:  That would be the third.

17              THE COURT:  Oh, I thought he was saying "let him up"

18    on 3 or 4 and 5.  But he didn't -- that's not --

19              MR. MCCAULEY:  Your Honor, I'm sorry.  So Counts 3 and

20    4 happened at 3:30 p.m.  They are assaults against Sergeant

21    Matthew Nickerson and Detective --

22              MS. MILLER:  3 is Anderson; 4 is Nickerson.

23              MR. MCCAULEY:  The other way around.  3 is Anderson; 4

24    is Nickerson.  5 is the one against Corporal Ainsworth.

25              THE COURT:  No, I understood that.  I just thought he

1    was suggesting -- you jumped from 3 and 4 to 5 on me.  And the

2    "let him up" --

3            MR. MCCAULEY:  That's Count 5.

4            THE COURT:  Okay.  I thought you were saying that he

5    also said "let him up" with Counts 3 and 4, but no, you were

6    moving on to 5.

7        Okay.  That's clear to me.  I understand the theory there.

8            MR. ROOTS:  So counts 5, 6, and 7 all occurred under

9    circumstances where, number 1, there had been excessive

10   violence.  There had been police officers swinging batons at

11   heads, which is excessive force by definition.  It violates

12   policy.  Mr. Thomas witnessed this, and there was protection of

13   others with regard to, I believe, all three of those.

14           THE COURT:  But how attenuated do those have to be?

15       If he saw baton hits, can he, you know, later, removed from

16   that area, assert defense of others, or does it have to be tied

17   to the officer who used the baton or some other officer in the

18   area where the baton was used to protect the other?

19       Can you just sort of globally assert the defense based on

20   something Mr. Thomas saw 10 yards away that resolved itself?

21   Does that give him the right to charge the officers?

22           MR. ROOTS:  Well, we actually briefed this very

23   question in the Proud Boy trial.  So Pezzola, who I was

24   representing or corepresenting, was around a situation where

25   people around him were being hit in the face with rubber bullets

1    and projectiles.  He was not hit in the head with rubber

2    bullets, and the officer he was accused of assaulting and

3    robbing a police shield from was not shooting any projectiles.

4    Nonetheless, we argued and won.

5        I believe we've briefed that pretty well.

6        THE COURT:  Wasn't it very close in location and at

7    the same time -- I mean immediately before?

8        MR. ROOTS:  Yeah, and it's similar in some ways

9    because the people around Pezzola were being hit and the people

10   around Thomas were being hit with baton blows to the head.  And

11   I believe Mr. Thomas himself testified that he was hit in the

12   head with at least one baton strike.

13       THE COURT:  With respect to which assault was that?

14       MR. ROOTS:  That actually might have been the first

15   two.  Counts 5 and 6, he says.  He was hit in the head with a

16   baton, and I think the evidence is clear that he said that at

17   the time.  This is not a newly created --

18       THE COURT:  And that's with respect to 5 and 6?

19       MR. ROOTS:  Yeah.

20       MS. MILLER:  Your Honor, if I may.

21       THE COURT:  Yes.

22       MS. MILLER:  I think the evidence actually contradicts

23   what was just said.  There is a video that we went through with

24   the FBI agent, and it shows him with a cigarette in his hand.

25   And in that video, after you see the cigarette, because it's his

1    own video, I believe, you hear him say, "I just got hit with a

2    night stick" or some term -- "hit in the dome with a" something

3    "stick," meaning a baton, and that is after the first set of

4    assaults.

5          As we all know, in the videos --

6          THE COURT:  "After the first," you mean 3 and 4?

7          MS. MILLER:  Right, because he has a cigarette in his

8    mouth in those assaults.  You can see it in the body-worn

9    camera.  I believe also Mr. Hill testified extensively about the

10   cigarette smoking time frame, you know.  He was talking about

11   how -- so I think that Mr. Roots is perhaps mistaken.  I think

12   that the baton -- the evidence -- the evidence itself shows that

13   if -- I don't know if he was or wasn't, but he talks about it in

14   his video at the 3:30 time frame, not the 4:30 time frame.

15         MR. MCCAULEY:  And just to be crystal clear, Your

16   Honor, we are talking about Exhibit 504.  After he goes -- after

17   the assaults, about a minute later, when he goes back up the

18   stairs -- and this is in the defense exhibits as well, I believe

19   Defense 483 or 438 -- he goes up, treats the gentleman from the

20   stairs, and after that says, "I took a night stick to the dome."

21         So insofar as there's any interaction -- he was not

22   reacting to baton strikes at that time when he goes back up

23   there.  That's the issue.

24         And then giving the jury this instruction for these

25   assaults in particular confuses the issues, because it is

1    clearly contradictory to the evidence that would be -- the video

2    evidence.

3         THE COURT:  Well, wait.  Count 5, you think that

4    that's -- putting aside the issue Mr. Roots has just raised

5    about him being hit in the head, the individual clearly falls

6    down before the assault in Count 5.

7    I know the government's theory is it doesn't apply because

8    he continued to push afterward.  But you don't -- looking at the

9    case law, it seems where a defendant testifies and testifies

10   that they were acting in self-defense, a court has to be careful

11   to restrict that defense and say that's not credible and become

12   a fact finder, comparing that testimony with the videos.

13   So unless it's very clear, and I'd be -- wait.

14   Mr. McCauley has got this, Ms. Miller.  I would be reluctant to

15   foreclose the defense in those circumstances, even if it's a

16   weak defense.

17        MR. MCCAULEY:  Well, Your Honor, at that point, it

18   does -- then it starts -- the question of how self-defense

19   interacts with 18 U.S.C. 111 becomes an issue, because -- which

20   is what we have briefed repeatedly.  I believe it's ECF 92.  We

21   have briefed that repeatedly in response to the notice of

22   affirmative defenses in our motion to strike where we cite

23   *United States* -- excuse me, *Fersner v. United States*, 482 A.2d

24   387; *U.S. v. Mumuni/Saleh*, 946 F.3d 97; *U.S. v. Acosta-Sierra*,

25   690 F.3d 1111.

And these statutes make it clear that when the person who -- or excuse me. When, we will call them, the distressed individual or the individual who the defendant claims is in need of self-defense is themselves committing a violation, whether that be a separate 111 or trespass or 1512, this defense does not apply.

In support of this, that's *U.S. v. Branch*, 191 F.3d 699, and *U.S. v. Drapeau*, 644 F.3d 646.

THE COURT: But what's the other offense? The trespass? And if that's contested, what is the other offense that's not contested?

MR. MCCAULEY: Well, the other offense would be an independent -- it could be an independent assault. It could be a trespass.

THE COURT: But you're asking the Court to find that he committed an independent assault?

MR. MCCAULEY: What we would be asking the Court to find is that the officer was acting within the lawful scope of his duty, because the defendant cannot put forward a self-defense argument to assist someone else who is already committing a crime.

So it's not a finding as to Mr. Thomas. It's a finding as to that other person.

MR. ROOTS: I've just been reminded, there were more than one people down on the ground when Mr. Thomas said "let him

up, let him up, let him up."  There was more than one on the

ground.  And I believe the evidence could reasonably be

interpreted as Mr. Thomas wanting to let him up, let him up with

regard to at least one officer who was on the ground.

THE COURT:  Mr. McCauley, I understand the

government's argument, and the evidence -- you know, many jurors

may not buy the argument.  It's just the Court's concerned about

making in effect factual findings on what those other

individuals were doing versus just giving the instruction and

making clear what the elements must show, and the government can

argue they haven't met it.

I just think foreclosing the defense altogether in

circumstances where he's taken the stand and argued he was

acting in self-defense is unwise.

MR. MCCAULEY:  Your Honor, we would ask certainly that

it be limited to the one or two -- if the Court is inclined to

make that determination, then the government would ask that it

be limited to the assaults that even support that.

THE COURT:  Well, that's what I'm trying to do now,

and I'm trying to get the defense to help me understand why it

applies to those beyond number 5.

MR. ROOTS:  We think it clearly applies to 5, 6, and

7.

THE COURT:  6 and 7 are the two where he's backing up

into the officers?

1          MR. ROOTS:  Yeah.  At that time -- it was later, after

2     there had been lots of violence.  At that point, there had been

3     baton strikes.  Officers had kicked people; people had kicked

4     officers.

5          And so at that time, Mr. Thomas was in a state of being

6     aware of lots of excessive force at that time in the day, and he

7     had seen lots of it himself.

8          THE COURT:  But that's the point I was making earlier.

9     Does that give an individual carte blanche because there's

10    been -- viewing the evidence in the light most favorable to you,

11    let's say I accept, which I'm not, but let's just say for a

12    moment that I'm accepting your perspective that excessive force

13    was used.  Even if I were to assume that, isn't there an

14    attenuation argument at some point?

15         You can't simply say, "Oh, over there ten minutes ago, I

16    saw this officer use excessive force, and therefore, I'm

17    justified in charging the officer to defend others who aren't in

18    imminent risk of harm."

19         Doesn't it need to be tied to an incident right in the

20    moment, in the general vicinity that a defendant's actions are

21    protecting as opposed to just some general, you know, save

22    everyone from continued force?  That does not seem like that's

23    what the law permits.

24         MR. ROOTS:  I think the video speaks for itself that

25    Mr. Thomas was actually, first of all, not using a whole lot of

force.  So --

THE COURT:  Well, that's a different issue.

MR. ROOTS:  Self-defense is sort of tied up with how much --

THE COURT:  That's not enough.  Simply because you nudge the officer and don't hit him very hard, that doesn't give you the right to have a self-defense instruction.

So what about those incidents justified his action based upon defense of self or others?  I don't think -- you would agree with me it's not defense of self when he's basically charging toward the officers?  That's not defending himself.  At that point, they haven't done anything to him in that period of time in that area.

MR. ROOTS:  Yeah, there's a lot of -- a long line of cases that stand for the proposition that the aggressor cannot argue self-defense.

THE COURT:  So who is the aggressor there, that's my question, in your view?

MR. ROOTS:  In 3 and 4 where --

THE COURT:  No, no, I want to talk about 6 and 7.  In 6 and 7, who is the aggressor?

MR. ROOTS:  I asked a question of one of the officers. It's very clear the officers were the aggressor.  They were pushing --

THE COURT:  Did anyone agree with that?

1          MR. ROOTS:  The officers did not, and I wouldn't

2     expect them to.  But I asked the question --

3          THE COURT:  Do you think the video shows that?

4          MR. ROOTS:  The video clearly shows it in the moments

5     preceding that moment where the cops were moving rapidly.

6          THE COURT:  I mean 6 and 7, not when they're going

7     across the Northwest Plaza.  But right in front of 6 and 7, the

8     video clips that I've seen, are the officers moving forward?

9          MR. ROOTS:  Well, the question of who is the

10    aggressor, as the prosecution pointed out, it's sort of tied

11    into who has a right to be where they are.

12         Now, this, of course, is tied in with some of our other

13    defenses.  The government argues that Mr. Thomas had no right

14    even to be there.  We argue that's not the case.  And so we

15    argue that, and the fact that --

16         THE COURT:  Let's stick with self-defense and defense

17    of others.

18         MR. ROOTS:  Well, it's tied in with this idea of who

19    was the aggressor, who had a right to be there and who didn't.

20         THE COURT:  Clearly, if I have to instruct the jury on

21    who had a right to be there, I would say the officers had a

22    lawful right to be where they were that day.

23         I'm not going to accept --

24         MR. ROOTS:  I wouldn't disagree with that.

25         THE COURT:  That's not -- I don't even know that

1    that's a proper defense for you to make in closing argument,

2    that the officers had no legal right to be there.  I'm not

3    necessarily going to give that instruction, but if you argue

4    that, that can be -- I'm just warning you, that can be

5    problematic.

6         Do you agree?

7              MR. ROOTS:  Yes, but --

8              THE COURT:  So you're not going to argue that the

9    officers had no legal right to be where they were?

10              MR. ROOTS:  No, I wouldn't argue that.

11              THE COURT:  Because that's what Mr. Thomas said on the

12    stand.

13              MR. ROOTS:  He argued that he felt he had a right to

14    be there.

15              THE COURT:  And he also said he had a right to

16    disregard the orders because the officers had no legal right to

17    be there and so it was an unlawful order.

18         You're not going to make any argument like that in your

19    closing, are you, or Mr. Pierce?

20              MR. ROOTS:  I think Mr. Thomas said he thought in his

21    mind he had a right not to be pushed off.

22              THE COURT:  Understood, what he thought in his own

23    mind, but you aren't going to categorically say the officers

24    didn't have a lawful right to be there?

25              MR. ROOTS:  I wouldn't say that.  Then it's an open

1    question about whether the officers had a right to push him off

2    and how much force they could use.  Then we get to civil

3    disobedience and all these other questions.

4        I just want to say that Mr. Thomas is seen in these videos

5    trying to create space.  So he is trying to separate the

6    protestors from the officers and get space so the people can get

7    up, and he says, "Let him up.  Let him up.  Let him up."

8             THE COURT:  You're conflating all these.  Let's go

9    back to 6 and 7.  Help me understand your self-defense theory

10   there.

11       Is it simply that he's seen a lot of stuff that day, and

12   therefore, he's going to push the officers back, or is it the

13   officers were coming at him, and he was in danger, so he went

14   forward towards them?

15       What is your theory of self-defense there?  I'm not clear

16   on what it is.

17             MR. ROOTS:  We disagree with the prosecution about the

18   gentleman who was down on the ground.  We believe --

19             THE COURT:  No, no, it's 6 and 7 right now.

20             MR. ROOTS:  Yeah, we believe officers were beating him

21   with sticks.

22             THE COURT:  Wait.  That's 5, isn't it?  I'm talking

23   about 6 and 7 when they're backing up -- when he's backing up

24   toward the officers.

25       What is your theory?  What are you arguing in closing for

1    self-defense?  Help me understand the theory.  I'm just not

2    tracking what you're saying.

3              MR. ROOTS:  Well, our theory there is, number 1,

4    there's very slight force, but the force such as it was would

5    open up space.

6              THE COURT:  But that's different.  Slight force does

7    not justify a self-defense exception.  That's a "I didn't mean

8    to do it."

9              MR. ROOTS:  It goes to weight rather than --

10             THE COURT:  No, it goes to his intent.  He didn't mean

11   to interfere or assault or resist or anything; he just brushed

12   up against them.  But that's separate than he was acting in

13   self-defense of himself or someone else.

14        So help he understand what your theory is to support the

15   self-defense or defense of others instruction as to Count 6

16   and 7?

17             MR. ROOTS:  I'm reminded that self-defense is wrapped

18   up in the question of how much force is reasonable.

19             THE COURT:  It might be wrapped up, but you still need

20   something else to justify the defense; right?  It's not just

21   light force; then light force is self-defense.

22             MR. ROOTS:  The officers were aggressively pushing the

23   protestors off the stairs at that moment, and that's after the

24   Ainsworth so-called assault.

25        The Indiana guy, the guy that says "I'm from Indiana," at

1    that moment, there was still excessive force.  At least officers

2    were pushing people who weren't prepared even at that point.

3    That would have been, I believe, the last --

4            THE COURT:  I guess I just didn't see any of this in

5    the videos that were shown relating to 6 and 7.  You're relying

6    on earlier videos for other assaults to say that the risk to

7    others continued?

8            MR. ROOTS:  Well, yes, and --

9            THE COURT:  But how many seconds intervening do we

10   have there?

11           MR. ROOTS:  It certainly was under one minute.  I

12   would say under 30 seconds.

13           THE COURT:  All right.  So you're saying -- well,

14   Mr. McCauley is frowning.  What is the gap between the videos

15   before that he's relying on when folks were knocked down and the

16   videos that the government introduced in support of the Counts 6

17   and 7?

18           MR. MCCAULEY:  We are no longer talking about seconds.

19   We are talking about minutes.  So the assaults for Counts 5, 6,

20   and 7 occur at 4:22:40, and then 4:25 into 4:26, and then at, I

21   believe, 4:28 to 4:29, yes.

22           THE COURT:  So these are the three assaults that

23   you're listing?

24           MR. MCCAULEY:  These are the three assaults that

25   occur, respectively Ainsworth, Veisaj, and then Niewenhous.

1    THE COURT:  Okay.  So we've got two and a half minutes

2    roughly between 5 and 6.  And you're saying that that fall --

3    the fact that one protestor fell down two and a half minutes

4    earlier justified -- is justification for self-defense or

5    defense of others instruction for Count 6 that happened two and

6    a half minutes later?  Is that your argument?

7    MR. ROOTS:  I would argue that's just one component.

8    There were also -- there was a lot of batons being thrown in

9    that melee period right there.

10    THE COURT:  But what came out at trial to support

11    that?

12    MR. ROOTS:  Specifically, I'm thinking of the video

13    that we introduced that shows Brock.  It got really violent.

14    The most violent aspects of all these videos was at that time,

15    right before the time when Mr. Thomas sort of turned his back

16    and was doing a little bit of pushing to create space.

17    710, that might actually be the most violent-appearing

18    video with the most people swinging.

19    THE COURT:  Video 710 shows -- what's the time stamp

20    for that?

21    MR. MCCAULEY:  Your Honor, I can actually offer some

22    information on this.  710 doesn't have a time stamp.  It's an

23    open-source video that shows a different angle of the assault on

24    Corporal Ainsworth.

25    THE COURT:  So that was two and a half minutes

1    earlier, roughly?

2           MR. MCCAULEY:  That was two and a half minutes earlier

3    before the incidents in Counts 6 and 7.  There is no --

4    unfortunately, there is no sync-up of that video with other

5    assaults or other treatments of this video.  But looking at that

6    video, 710, relative to 711, 712, and 303X or 303.1, it clearly

7    shows that that is the Ainsworth assault.

8        Whatever melee Mr. Roots is referencing --

9           THE COURT:  Okay.

10          MR. MCCAULEY:  -- happened --

11          THE COURT:  All right.  So to be clear, I'm going to

12   give it on 5, because I'm concerned about the Court becoming

13   some sort of fact finder there.  I think it's justified on

14   Count 5.  The defense hasn't given me anything yet on 6 and 7

15   other than the Ainsworth-related conduct that I think is too

16   attenuated to cover 6 and 7.

17       If there's something else specific, I will entertain it,

18   but you need to tie it to something that suggests an imminent

19   threat to self or someone else, not something two and a half

20   minutes earlier, I think.

21          MR. ROOTS:  Could we, when we get a break, review

22   videos?  There are a lot of baton --

23          THE COURT:  I will come back briefly, but understand,

24   we have to make changes to the jury instructions and circulate

25   it for all of us to proof.

1    So I know everyone needs to get food.  Do you want to get

2    food and look at this and come back at -- it's pretty fast, but

3    1:30 to talk about this, because we just need to make edits to

4    jury instructions and print them out, and then you will have

5    more time to eat until 2:30.  But I'm reluctant to wait too long

6    to get this cleared up.

7    So I'm looking for 3 and 4 and 6 and 7 for evidence that's

8    not too attenuated to the alleged assault that justifies the

9    self-defense or defense of others instruction.  I think you have

10    it for 5.  So I will give it at least with respect to 5, and I

11    remain open for the others.

12    Given that I'm giving it for 5, I'm interested in the

13    government's perspective.  Doesn't it automatically follow that

14    I should give it for 1, because if the jury doesn't buy the

15    evidence for anything but 5 and that's the basis for his civil

16    disorder, that the instruction appropriately applies to 1 as

17    well?  If I give it to any assault, it should also be given for

18    the civil disorder count?

19    MR. MCCAULEY:  Your Honor, before --

20    THE COURT:  Didn't another judge do this the same way

21    for another January 6 offender?  Once it was given for the

22    assault, it was given for the civil disorder?

23    MR. MCCAULEY:  Well, I believe Your Honor is referring

24    to the Webster case?

25    THE COURT:  Yes.

1          MR. MCCAULEY:  So that case was different in --

2          THE COURT:  There's one assault.

3          MR. MCCAULEY:  -- in character from this assault.

4          THE COURT:  But I can't sit here and say if the jury

5     is going to find him guilty of civil disorder, it's based on

6     Counts 3, 4, 7, or 8.  That's not my decision to make.  The jury

7     gets to decide what forms the basis of its civil disorder.

8          MR. MCCAULEY:  May we have a brief break to --

9          THE COURT:  So I will come back and address these.

10         Now, for the First Amendment, before we get too far,

11    because maybe we can resolve this, Mr. Roots, I've looked at the

12    First Amendment language that's used in other cases, and I would

13    be open to including, as Judge Kelly did, some First Amendment

14    language in 1512(c) instruction, but I don't see its relevance

15    to the other counts.

16         MR. ROOTS:  Well, we did brief that in what we call

17    the trial brief.  We did brief some law that says that it is a

18    defense to trespassing in some circumstances, and I think the

19    Capitol is that circumstance.

20         THE COURT:  Yeah, I've rejected that.

21         MR. ROOTS:  Okay.  I understand why the First

22    Amendment would not necessarily apply to the assault counts.

23    But this civil disorder thing, I mean, it becomes a little bit

24    of a --

25         THE COURT:  But the basis for the civil disorder

1   charge is clearly relying on his assaults.

2        Is that correct?  That's how the government will argue it?

3            MR. MCCAULEY:  Yes, Your Honor.

4            THE COURT:  So I think those fall together.

5        And the trespass, I don't think those cases apply in the

6   circumstances of this case, the cases you cited in your trial

7   brief.  I think they're very different.

8            MR. ROOTS:  We just thought of this morning about we

9   would ask for missing witness instructions with regard to

10  Nickerson and that other officer named Veizaj who are the

11  victims of two of the assaults.  The victims never testified.

12           THE COURT:  You could have subpoenaed them.

13           MR. ROOTS:  Well, I didn't know we had a burden to

14  subpoena them.

15           THE COURT:  Well, it became clear when the government

16  gave you its list who was and was not going to testify.  You

17  could have called them as witnesses.

18           MR. ROOTS:  Well, we do believe -- Nickerson was in

19  the hallway, we believe, ready to testify.

20           THE COURT:  Well, they gave us the list.

21       Was Nickerson on your list?

22           MR. MCCAULEY:  I'm sorry, Your Honor?

23           THE COURT:  I understood from the outset that you

24  weren't calling two of those officers.

25       Am I incorrect?

1          MR. MCCAULEY:  You are not incorrect.

2          THE COURT:  All right.  So I think you were on notice

3     that they weren't going to call those officers, and you could

4     have subpoenaed them and called them.

5          MR. ROOTS:  Well, I think the missing witness

6     instruction, which is used in some circuits, is that the jury is

7     free to draw whatever -- to draw inferences against the

8     prosecution for failing to put on an obviously material witness

9     that is so material to the count.  And that would apply to

10    Nickerson and Veizaj.  Obviously, the government didn't put them

11    on for a reason.

12         THE COURT:  You're going to need to give me a case on

13    that.  It doesn't seem to me that this is the sort of missing

14    witness problem that that instruction is intended for, but if

15    you have a D.C. Circuit case or outside circuit case law

16    suggesting that I'm wrong about that, I will certainly read the

17    cases.

18         MS. MILLER:  I'm sorry.  I may have missed this, Your

19    Honor.  Was this the subject of any defense briefing, this

20    missing witness instruction?

21         THE COURT:  Not that I recall.

22         MR. ROOTS:  No, but I'm hearing Your Honor say that we

23    had a burden to put them on.  I don't believe we ever had a

24    burden to put them on.  It was the government's burden.

25         THE COURT:  I don't think the government has a burden

to call every victim of assault when they have video evidence and other individuals who witnessed assaults of these other officers.  I don't know that there's any rule that says you must call the victim in an assault case.  You have to put on evidence and prove beyond a reasonable doubt that they were assaulted.

But again, if you've got any case law that suggests otherwise, I will read the case.

Mr. McCauley, with respect to Webster, I'm informed that that judge gave the self-defense instruction for acts of physical violence on restricted grounds, Count 2.  So I'm wondering whether I should do so here for the same reason that we're talking about with respect to civil disorder.  The one count that -- I think there's one in the last four counts that relies on physical violence.

So again, we don't know now if the jury were to convict on that count whether they're doing so based on -- which of the five assaults.  And hypothetically, they could convict based on assault number 5, and the self-defense instruction would apply there.

But I guess you're going to say that would be impossible, because if they find self-defense, then they would know they can't use 5 for the predicate for the civil disorder or the other charge, the 1752 charge.

MR. MCCAULEY:  Yes, Your Honor, yes.  I mean, the --

THE COURT:  But does the jury at a minimum need some

instruction to guarantee that they're relying on an assault

that's not one that's based on self --

MS. MILLER:  I'm sorry to jump in here.  Perhaps I'm

misunderstanding, but my understanding of both the physical

violence on Capitol grounds and the 231 is that it doesn't have

to be a charged act of violence, nor does, for the purposes of a

231, an act to obstruct, impede, or interfere with law

enforcement doesn't have to be charged.

So for example, in this case, say we didn't have any of the

assault charges.  We could still prove the 231 by the fact that

he impeded with Campanale with a knife and he was going to cut

property, impeding Campanale from doing his job because, you

know, he was distracted for that moment.

So I don't think they have to be charged acts --

THE COURT:  Regardless whether they're charged or not,

would the jury ever rely on a count that it found the defendant

acted in self-defense?  I guess the answer would be no, but do

they need any instruction to make clear that they're not doing

that?

MS. MILLER:  Yeah, I mean, I think they can rely on

whatever evidence they want.

THE COURT:  But we don't want them relying on a charge

they acquit of self-defense to then be the predicate for the

civil disorder or the -- we don't know, you're right.  There's

500 things maybe they could rely on.

1    But my point is, we don't know, if they come back with a

2    verdict, what they relied on, and do they at least need to be

3    told something about if he's acting in self-defense.

4    Are you saying, Ms. Miller, that he can act in

5    self-defense, not be convicted of Count 5, but for that same

6    conduct be convicted of Count 1 for that action that was done in

7    self-defense?

8    MS. MILLER:  No, but I think the jury can find that he

9    acted violently, whether it was charged or not.

10    THE COURT:  Agreed.  And no one's saying that.  I was

11    just using the other counts as examples.  My point is, we don't

12    want them getting confused and acquitting him of Count 5 but

13    then using that conduct to -- I know it's highly unlikely; I'm

14    just being theoretical here -- using that conduct to convict him

15    of one of these other counts where they found self-defense.

16    That's then not an act of violence that should form the

17    basis of those offenses; right?  And this is very theoretical --

18    MR. MCCAULEY:  I think that the --

19    THE COURT:  That this would never happen?

20    MR. MCCAULEY:  Never say never.

21    But, Your Honor, what I would ask for is, can we take the

22    break so we can look at some law, speak with some people, and

23    make --

24    THE COURT:  Absolutely.  I recognize this is highly

25    theoretical.  I just don't want to have an argument on appeal

1    that you don't know why the jury convicted.  And if they acquit

2    him of Count 5 --

3            MR. MCCAULEY:  Understood.

4            THE COURT:  -- is that tainting any conviction that

5    might come on these other counts?  And if so, why wouldn't the

6    government, in an abundance of caution, want the Court to give

7    it?

8        It's not that it applies.  It's that -- I will say the

9    defense argues that it applies, not that the Court deems it

10   applicable here.  It's the defense argues self-defense; in order

11   to find self-defense, you must find A, B, C, D.  So I'm not

12   blessing the theory.  I'm just informing the jury that -- you

13   understand?

14           MR. MCCAULEY:  I understand, Your Honor.  I don't want

15   to speak out of turn or be coming up with something on the fly

16   here without an opportunity to look at some law.

17           THE COURT:  Understood.  Does the government have any

18   objection to the Court using the same language that Judge Kelly

19   used with respect to the 1512(c)?  Are you familiar with that?

20           MS. MILLER:  I mean, I think we would request that we

21   not include any First Amendment additional language.  I believe

22   that was agreed to by the parties.  I think that ultimately

23   there was a lot of back and forth, and the parties reached an

24   agreement as to that instruction.

25           THE COURT:  Clearly, they're not bound for all time.

1    They're asking now for First Amendment instruction.  I'm not

2    inclined to give a global one, but I would, consistent with what

3    Judge Kelly did --

4            MR. ROOTS:  Can I answer that?

5            THE COURT:  -- consider including it under the

6    1512(c)(2).

7            MS. MILLER:  And, Your Honor, related to the

8    1512(c)(2) instruction, if you are inclined to do that or even

9    if you're not inclined to do that, I just wanted to remind Your

10   Honor that we did request an additional bit of language in our

11   ECF No. 109, Footnote 1, which you mentioned -- I'm losing track

12   of time -- I think it was last week at some time that you would

13   consider the sole purpose, it doesn't have to be the sole

14   purpose.

15           THE COURT:  Oh, right.  But what is the other purpose

16   here?  What's the evidence that shows some other purposes?  The

17   First Amendment?

18           MS. MILLER:  Right.

19           THE COURT:  I see.  But that's -- okay.  Fair enough.

20   I would be inclined to give that additional instruction,

21   particularly if the defense is pressing for this.

22       But to be clear, the language I'm considering including is

23   Judge Kelly's instruction.  "In addition, the First Amendment to

24   the United States Constitution affords people the right to

25   speak, assemble, and petition the government for grievances.

1    Accordingly, an individual who does no more than lawfully

2    exercise those rights does not act corruptly."

3        And then we would also include the additional language the

4    government wants, the dual purpose instruction.

5        Mr. Roots?

6            MR. ROOTS:  Counts 9 and 11 --

7            THE COURT:  First of all, before -- hold that thought.

8    But any objection from the defense for adding the language Judge

9    Kelly added and adding the additional instruction the government

10   is seeking?

11           MR. ROOTS:  Okay.  We certainly have no objection to a

12   First Amendment instruction on 1512.

13           THE COURT:  The one I just read?

14           MR. ROOTS:  The one you just read is weak.  I don't

15   know why Judge Kelly gave such a weak instruction.  I think the

16   First Amendment protection is much stronger than that in the

17   law.  I don't believe that people who come from out of state and

18   say "stop the steal" and get close to the legislators -- if all

19   they're wanting is to influence policymakers in the building,

20   they cannot be convicted of --

21           THE COURT:  That's a fact issue the jury has to

22   decide, but I don't see anything incorrect about his description

23   of what the First Amendment provides.  Do you?

24           MR. ROOTS:  I think it's very clear in this case.

25   This case is a quintessential case where the evidence, from

1    Mr. Thomas's perspective, is he came to persuade policymakers.

2    That's First Amendment protected.

3        The government argues that all the same evidence shows an

4    intent to, you know, obstruct and attack.

5            THE COURT:  No, we've gone through this.  They

6    separate the statements from the actions.  And he may well have

7    come to the Capitol with that intent.  At some point, he took

8    actions that crossed -- they allege he took actions that cross a

9    line, and those are two different things.

10            MR. ROOTS:  We've been over this.  If you go to a

11    baseball game and then you end up getting into a fistfight over

12    the popcorn, are you guilty of obstructing the baseball game?

13            THE COURT:  You might be guilty of assault.  I don't

14    know that obstruction of a baseball game is a crime.

15            MR. ROOTS:  Mr. Moseley just pointed out that Counts 9

16    and 11 have a persuasive intent element.  These are

17    misdemeanors.  The defendant had the intent to impede or

18    disrupt, disorderly conduct with the intent to disrupt orderly

19    conduct of government, and whatnot.  Counts 9 and 11 should also

20    have a First Amendment defense.

21            THE COURT:  What's the government's position on that?

22            MR. MCCAULEY:  Your Honor, we have extensively briefed

23    the First Amendment issues in this case.

24            THE COURT:  Did those counts exist in the Proud Boys

25    case?

1          MR. ROOTS:  No, no misdemeanors in that case.

2          THE COURT:  Okay.  I will take a look at that.

3      Again, that's Counts 8 and 9?  9 and 11, okay.

4          MS. MILLER:  But we are not aware of any cases where

5  that instruction has been given for the misdemeanors so far.

6          THE COURT:  I'm just wondering if it's given for

7  1512(c).  Is it the same logic that would warrant it, or is

8  there a distinction in some way?

9          MS. MILLER:  I think it's the "corruptly" difference.

10  There's no "corruptly" in the misdemeanor charges.

11          MR. MCCAULEY:  Yes.  And certainly with respect to the

12  misdemeanor trespass charges, the government has done very

13  fulsome briefing on those issues specifically that is clearly

14  contradictory to --

15          THE COURT:  All right.

16          MR. MCCAULEY:  The law and the facts are clearly

17  contradictory to what Mr. Roots is saying about the First

18  Amendment interplay with those charges.

19          THE COURT:  So let's come back at 1:45, and we will

20  discuss anything.  If you all have any cases that you can put

21  your fingers on now that you can e-mail -- Mr. Roots, you've

22  raised some issues about missing witness.  I don't think you're

23  right on the law, but if you want me to review something, let me

24  know those cases.

25      Otherwise, I'll see you all back at 1:45.

1        (Recess taken from 1:08 p.m. to 1:56 p.m.)

2        (Jury not present.)

3        THE COURT:  All right.  Before we get to the jury

4    instructions, let's take up the easy one first, the missing

5    witness instruction.

6        Mr. Roots, that seems applicable in a case where a witness

7    is uniquely available to the government.  I don't think you can

8    argue that's the case here.

9        MR. ROOTS:  Well, certainly, those two witnesses are

10   not available to us as easily, and they were on the government's

11   witness list.  So it's sort of mysterious why they didn't put

12   them on.  They are fairly material to these counts.

13       THE COURT:  The list that the government provided at

14   the outset was not -- or maybe even the day before did not

15   include either of those witnesses.

16       Am I correct?

17       MR. MCCAULEY:  The Joint Pretrial Statement did not

18   include it.

19       THE COURT:  Okay.  So that's your notice right there,

20   Mr. Roots.

21       MR. MCCAULEY:  And, Your Honor, I just want to -- this

22   is from *U.S. v. Tarantino*, which is a D.C. Circuit opinion,

23   846 F.2d 284.  This is at between -- at 418.  It clearly states

24   that if the evidence would then become unduly cumulative by

25   calling these witnesses, a missing witness instruction also is

1    inappropriate.

2         So in addition to the witness not being uniquely available

3    to the government, in this case, it could also have been unduly

4    cumulative, considering the video evidence and the testimony

5    that was already offered.

6              THE COURT:  All right.  Well, there's no evidence, is

7    there, Mr. Roots, that the government -- that you asked the

8    government to have the witness here and they didn't comply with

9    your request to have the witness here to be able to testify for

10   the defense?

11             MR. ROOTS:  We have no burden.  There's no burden on

12   the defense.

13             THE COURT:  I'm not saying you have the burden to

14   prove anything.  What I'm saying is, if you wanted to call an

15   agent in your case and they somehow obstructed your ability to

16   do that, I might look at this differently.

17        But I don't think that you ever made this point until now

18   when you want to have a missing witness instruction, and I don't

19   think that instruction is intended for factual circumstances

20   like this when the defense has made no effort to subpoena them,

21   to make a request of the government, to -- there's been no

22   blocking the government to call this witness.  The witness, in

23   fact, you pointed out, was out in the hallway.  You could have

24   subpoenaed them there or let the prosecutors know you wanted to

25   call that witness, and you didn't.

1    And now you want a missing witness instruction to leave the
2    jury with the impression that the government did something
3    wrong, and I don't think that that's the case here, or that the
4    witness made himself unavailable in some way that you couldn't
5    get them.

6    And I don't think that that's fair, and the additional
7    argument the government made that it's unduly cumulative, I
8    think, would apply.

9    But the stronger argument is you could have called them.
10   There was no one stopping you from calling them.  Until now,
11   this is the first we've heard that you wanted to call either of
12   these witnesses, at the charging conference.

13        MR. ROOTS:  Well, this also goes to the right to
14   confront accusers.

15        THE COURT:  And you had the right to confront them.
16   You don't wait until the charging conference to say I wanted to
17   call these people and I couldn't and I made no effort to do so.
18   That's not a missing witness.  That's a failure of the defense
19   to call someone they wanted to hear from.

20   There's no obligation for the government to put on every
21   agent.  There are other police officers who were not called.
22   You certainly had notice that they were streamlining their case
23   to include those officers who testified at trial, and you knew
24   that days before trial.  And you knew the witness was outside,
25   and you could have said we want him to stay so we can call him.

1          You did none of those things.  So I'm not giving that

2     instruction.

3          All right.  So turning to the self-defense instruction, I

4     did check.  It is true that Mehta's case only involved one

5     assault, but he did give it just globally to other offenses that

6     are similar to other offenses charged here, Mr. McCauley.

7               MR. MCCAULEY:  Your Honor, I spoke with one of the

8     supervisors over the break, and if Your Honor is inclined to

9     give a limiting instruction, we would ask that it be if the jury

10    finds the defendant not guilty of Count 5 by reason of

11    self-defense or defense of others, that they may not use that

12    offense as the predicate offense for the 231.

13         We do not think that is required by law, but if Your Honor

14    is inclined to do it, we can find at this time nothing that says

15    that that is contrary to law.

16              THE COURT:  All right.  Anything else you want to add

17    on self-defense generally and the other counts that I've not

18    decided whether or not to give the instruction for?

19              MR. MCCAULEY:  Well, Your Honor, I would say that for

20    Counts 3 and 4 -- excuse me.  Let me focus on Counts 6 and 7,

21    because Counts 3 and 4, I believe, are abundantly clear based on

22    the defendant's actions.

23         But Counts 6 and 7 show the defendant with -- and the

24    evidence in support of Counts 6 and 7 show the defendant with a

25    substantial gap between him, the police line, and the rioters

behind him.  He is in the center of that gap repeatedly confronting the officers.  There is no evidence that supports the defendant's interpretation or the defendant's assertion that in that moment -- I don't even think this was necessarily his testimony, but in that moment that he was acting in the defense of anyone.

For 6 and 7, these were instances where he advanced back up to the line, rallied others to help him -- rallied others to prevent the police line from advancing and clearing the terrace. And finally, Count 7 is him running up to an officer who is at the head of that line with no one behind him and body checking them.

It is, under the case law that the government has cited, it is abundantly clear that these officers were engaged, at least for Counts 6 and 7 -- all of them but certainly for Counts 6 and 7, the officers were engaged in a lawful duty, the defendant was the aggressor, and he was acting in furtherance of an unlawful -- and he was acting in furtherance of an unlawful goal, that being to obstruct the officers.  Self-defense is not appropriate for 6 and 7.

It is also not appropriate for Counts 3 and Counts 4, because again, the evidence is that the defendant is charging up the stairs, colliding with the officers, and then coming back down and doing it multiple times.

THE COURT:  What about -- so correct me if I'm wrong,

but I don't recall any testimony from the defendant with respect
to Count 6 or 7 that he was acting in self-defense or in defense
of others.

MR. MCCAULEY:  I do not recall any testimony from the
defendant to that effect.

THE COURT:  But rather, he didn't mean to touch the
officers, didn't mean to hit or hurt or -- I forget the exact
language he used, but it was unintentional.

MR. MCCAULEY:  I think that was actually for Counts 3
and 4, that was his contention about his purported contacts with
the officers.

For Counts 6 and 7, it was that he felt that he had a
lawful right to be there, and he was trying to prevent them from
moving beyond.

THE COURT:  But wasn't there testimony that he thought
that they were moving toward him?

MR. MCCAULEY:  For Counts 6 and 7?

THE COURT:  Uh-huh.

MR. MCCAULEY:  Yes, there was testimony that he
thought they were moving toward them, but then that gets to the
point Your Honor raised earlier about attenuation.

THE COURT:  No, no.  Just before he checks them, I
thought that the testimony was that they were beginning to move
toward -- the jury may disagree, but I thought his testimony was
they were coming toward him.

MR. MCCAULEY:  I believe that is his testimony, but that is precisely the situation that is considered by these cases where a law enforcement officer is trying to perform a lawful duty and someone intervenes -- and someone intervenes to prevent, impair, or impede that duty by assaulting the officer.

So it doesn't matter if he thought the officers were coming towards him or not, because to use a particular term he had the opportunity to retreat.  He had the opportunity to go back. Instead, he chose again to come to the danger and charge into this officer and to act as the aggressor in that instance.

And that's in violation of *Walters v. Lockett*, 896 F.3d 559.

THE COURT:  Sorry.  Say that again.

MR. MCCAULEY:  That particular instance -- excuse me. *Waters v. Lockett*, 896 F.3d 559.  And that's you cannot bring about the harm or instigate the fight and also claim self-defense.

So yes, the officers were advancing, as they were lawfully permitted to do, to protect this terrace and to clear the rioters from it.  The defendant then does not have the right to say that he was going to further this violent conduct against the officers, to further the interests of the riot by preventing them from doing that job and to claim self-defense or defense of others.

THE COURT:  Okay.  And with 3 and 4?

1              MR. MCCAULEY:  3 and 4 is a similar situation, Your

2    Honor, where the defendant sees the 10 count, he charges

3    forward, and does so twice into the officers both times.

4         Yes, his claim is that he was doing so -- I think his claim

5    is somewhat unclear because he says he has the dual intent to

6    both protect the gentleman with the cane --

7              THE COURT:  And he fell in.  And you can make hay of

8    that in closing arguments.  But one of his defenses there was I

9    was helping this individual who fell down, and you

10   cross-examined him on that, why did you go right instead of

11   left, but that was his testimony, that someone went down and he

12   was trying to help that person.

13             MR. MCCAULEY:  That was his testimony, yes.

14             THE COURT:  So I just am not going to get into

15   deciding that.

16             MR. MCCAULEY:  Into decisions of fact-finding, Your

17   Honor?

18             THE COURT:  Uh-huh.

19             MR. MCCAULEY:  Understood.  And Your Honor has already

20   made its decision as to Count 5.

21             THE COURT:  Yes.  So as to 3, 4, and 5, I'm inclined

22   to give it.

23        And at that point, I just wonder, Mr. McCauley, whether

24   it's -- by giving the instruction, again, I'm not saying that

25   the Court is blessing this defense.  It's just the defense is

1    arguing self-defense and defense of others.  And then I go on to

2    list the elements.

3        Is it cleaner just to give this defense globally and let

4    you all argue this?

5        I just think it's potentially very confusing to the jury to

6    start teasing out two.  You can easily knock it down for all the

7    reasons you've stated, but is that -- are we overcomplicating

8    things by carving out 7 and 8 --

9            MR. MCCAULEY:  6 and 7?

10           THE COURT:  I'm sorry, 6 and 7.

11           MR. MCCAULEY:  I'm having difficulty keeping them --

12           THE COURT:  I'm not looking for you to say you agree

13   with me, but do you see the --

14           MR. MCCAULEY:  I mean --

15           THE COURT:  -- trade-off in terms of just complexity

16   and confusion to a jury on what all this means with respect to 7

17   and 8 and how I have to instruct them that if they acquit on 7

18   and 8, then you cannot use that for these others?

19       Is it cleaner just to give it, and then you argue all of

20   this?

21           MR. MCCAULEY:  What I worry in that situation, Your

22   Honor, is that the jury may then interpret that self-defense is

23   itself a defense to 231 rather than the underlying offenses.

24   That is my concern in this.

25       And perhaps it does -- although admittedly it is, I guess

1    one could say, linguistically more complicated to have to parse

2    it out like that --

3              THE COURT:  Well, can we include language in the 231

4    that makes it clear that it doesn't have to be a charged

5    offense, the act of violence?

6              MR. MCCAULEY:  I suppose we could, but at that

7    point --

8              THE COURT:  This is a lengthy indictment with a lot of

9    charges, and I'm just trying to keep things --

10             MR. MCCAULEY:  I understand, Your Honor.

11             THE COURT:  I think you make good arguments on why it

12   doesn't apply, and I think jurors will track those arguments.  I

13   just -- I'm a little concerned about teasing out all of these

14   different exceptions to certain counts.

15             MR. MCCAULEY:  Would Your Honor then be inclined to

16   give an instruction that remedies the concern that I just put

17   forth?

18             THE COURT:  That's what I --

19             MR. MCCAULEY:  That self-defense is not itself a

20   defense to 231 but is a defense to the --

21             THE COURT:  I guess it could be if they're relying on

22   one of these offenses; right?

23             MR. MCCAULEY:  I understand.  I think that's --

24             THE COURT:  I would think that you all could come up

25   with some language there.

1    Mr. Roots, Mr. Pierce, you're following what he says, that

2 it's not necessary that the jury rely on one of the counts in

3 the indictment as the predicate for the civil disorder?

4    Right?  Isn't that the point you're making?  In other

5 words, the knife alone could be enough --

6         MR. MCCAULEY:  Yes.

7         THE COURT:  -- or some other instance.

8    I would be open to some language that you all propose to

9 cover that.  It does seem to be a correct statement of law.

10    Mr. Roots, Mr. Pierce, do you disagree?

11         MR. ROOTS:  Well, the plain language of that statute

12 says something like anyone who opposes, resists, obstructs

13 during a civil disorder.  So yeah, that would stand alone, I

14 think, and if it stands alone, then a self-defense claim would

15 also stand alone in that count, Count 1.

16         MR. MCCAULEY:  Then, Your Honor, I would say we're

17 back to the --

18         THE COURT:  But is his point just for any, you know --

19 let's say you argue even the knife, that that -- will you be

20 arguing that in doing that, he intended to obstruct, impede, or

21 interfere with one or more law enforcement officers?

22    For any act, there potentially could be a self-defense for

23 that act, even if it's charged or not charged; right?  I mean,

24 it could.  We don't know what the jury will be relying on.

25         MR. MCCAULEY:  Yes.  And my concern again, Your Honor,

is that for people who are not trained to legally parse out

every single step of a statute like this, that hearing that

self-defense is a defense -- that they will hear self-defense is

a defense to 18 U.S.C. 231.  And that is why I think it would

potentially be, although a lengthier exercise certainly, a

necessary one to in fact tease out the charges like that.

THE COURT:  So you think that -- you're not saying,

are you, that someone could be acquitted of one of these

offenses and still use that conduct as a predicate to --

MR. MCCAULEY:  I am not; I am not saying that.

THE COURT:  So if you're not saying that, then why

couldn't almost any act potentially also have a self-defense

defense to it, whether it's charged or not?

MR. ROOTS:  And by the way, Your Honor, there is

another count way down, I think it's doing an act of violence on

either a restricted area or Capitol grounds.  I believe

self-defense might even apply to that because it's an accusation

of violence.

THE COURT:  Well, that's my point, Mr. Roots.

Is it just easier to just have self-defense generally?  I'm

asking Mr. McCauley.  I know what your view is.

Mr. McCauley, the government's going to have to explain why

this is a nonissue for all the counts.

MR. MCCAULEY:  If Your Honor is inclined to go in that

direction, the government will argue accordingly.

1          THE COURT:  And I would not sustain an objection when

2     you're explaining that -- tell me what you would say and what

3     might the Court say to aid in that understanding of the jury.

4          Let's just be real clear about what it is, because maybe we

5     can put it in an instruction.

6          MR. MCCAULEY:  The argument, as I understand it, is if

7     you, the jury, find the defendant not guilty by reason of

8     self-defense to any one of these charges, it may not be used as

9     the predicate or underlying charge for the 231.

10          THE COURT:  All right.  But let's just say the jury is

11     relying on some other contact with law enforcement that you

12     didn't charge.  Maybe the jury thinks that he actually did knock

13     down Officer Ainsworth, even though -- I don't know if you're

14     trying to prove that or not.  You don't need to for Count 5.

15     But let's say the jury is convinced that he did knock down

16     Ainsworth, and the jury also thinks it was justified because

17     someone was falling down in front of Ainsworth.

18          And similarly, in that situation, the jury shouldn't rely

19     on that act to convict the defendant of civil disorder, should

20     it?

21          MR. MCCAULEY:  Agreed.

22          THE COURT:  So that's why I worry about limiting it in

23     the way you're suggesting, because there could be other violent

24     actions of the defendant that also have a self-defense defense,

25     legitimate self-defense, too, and the jury could find he did

this act but it was justified in self-defense, so they shouldn't
rely on that for the civil disorder.

It seems to me, Mr. McCauley, you will argue that for 231,
you'll say, you know, "You have to find the defendant knowingly
committed an act or attempted to commit an act.  Here, you've
heard about five assaults.  You've also heard about X, Y, and
Z," whatever else you want to highlight for them.  "In none of
these instances was he acting in self-defense."

MR. MCCAULEY:  The government can argue that, Your
Honor.  That is within our power and within the evidence to
argue.

THE COURT:  Okay.  And I know these are close calls.
I'm just shying on the side of not being a fact finder here,
because I think so long as the instruction is phrased in a way
that the government -- the defendant is arguing this, you know,
self-defense, not the Court is -- says it applies here, but the
defendant argues that the offenses were justified based on
self-defense.  In order to find self-defense, you must find
these things.

I really think it's more like this is the defendant 's
theory of the case, and in order to support that theory, you're
going to have to find these elements.

I just think it's a safer course for appellate purposes
than trying to tease things out.

MR. MCCAULEY:  And the government understands Your

1    Honor's reasoning.  We have our own reasoning, but we understand

2    yours.

3                THE COURT:  I think it's not compelling, but I don't

4    know that it's -- I worry about deciding things that the jury

5    should be deciding.

6                MR. MCCAULEY:  Understood, Your Honor.

7                THE COURT:  So as it's phrased here, I say "the

8    defendant has offered evidence."

9                MR. MCCAULEY:  Which instruction?

10               THE COURT:  Instruction 29.  I think it should be

11   changed to "argued," and you all can both argue about whether or

12   not he's offered evidence that supports that.

13           So it would read, "The defendant has argued" or "has

14   suggested" or -- because argument will not happen before I

15   advise them, but "the defendant's position is that he acted in

16   self-defense," "the defendant's position with respect to some

17   counts," something like that?

18               MR. MCCAULEY:  I think that makes sense, Your Honor.

19               THE COURT:  Any objection to that, "the defendant's

20   position with respect to some counts," because as to some you've

21   argued that he didn't touch them or mean to touch them.

22               MR. ROOTS:  How about just saying, "The defendant

23   argues justified use of force with regard to all the violence

24   accusations," "all the alleged acts of violence"?

25               THE COURT:  Well, why wouldn't we just itemize the

1    counts, then?

2         MR. ROOTS:  Well, again, there's that misdemeanor at

3    the bottom that says "act of violence in a Capitol grounds," and

4    then there's Count 1, which is this opposing law enforcement.

5         THE COURT:  You want what language?  "The defendant

6    argues unlawful use of force"?

7         MR. ROOTS:  "Is a defense to all accusations of

8    violence."

9         THE COURT:  "Defendant argues self-defense or defense

10    of others"?

11         MR. ROOTS:  "Justified use of force," yeah.

12         THE COURT:  No, I'm not going to use that.  But

13    "defendant argues that he acted in self-defense and/or defense

14    of others."

15    So I'll think about whether I'm going to list counts, but I

16    think it's cleaner to say "the defendant argues he acted in

17    self-defense and defense of others" and leave it to you all to

18    explain what that means.

19         MR. MCCAULEY:  Understood, Your Honor.

20         THE COURT:  All right.

21         MR. ROOTS:  The defense likes that.

22         THE COURT:  Okay.  Mr. Roots, you prefer "the

23    defendant argues," because he hasn't argued yet, rather

24    than "the defendant's position is that he acted in

25    self-defense"?

 1            MR. ROOTS:  Yeah.

 2            THE COURT:  You want "argues"?

 3            MR. ROOTS:  No, I don't like "argues."

 4            THE COURT:  Okay.  "The defendant's position is that

 5    he acted in self-defense and/or defense of another."  Okay.  All

 6    right.  That's the self-defense.

 7        On the language in the 1512(c)(2) instruction, are both

 8    sides okay with that, understanding the defendant wanted a

 9    broader First Amendment instruction that the Court has rejected?

10            MR. ROOTS:  Which instruction is that?

11            THE COURT:  This is instruction number 21, and it's --

12            MR. ROOTS:  And the First Amendment language is -- I'm

13    trying to find it here.

14            THE COURT:  So this adds both the language from the

15    Proud Boys trial with respect to the First Amendment.  This

16    Court did have some of this language in here already, in

17    contrast.  I think that came from my instructions, I think, in

18    *Reffitt*.  But the "while the defendant must act with intent to

19    obstruct an official proceeding, this need not be the sole

20    purpose."  This is the government's request that I am going to

21    give here as well.

22            MR. MCCAULEY:  The government is fine with these

23    modifications.

24            THE COURT:  And understanding that your objections are

25    preserved, Mr. Roots, do you have any objection with the way

1    this is worded in terms of incorporating the language from the

2    Proud Boys trial?

3            MR. ROOTS:  Okay.  We like that, you know, preserving

4    our other arguments about 1512, obviously.

5            THE COURT:  All right.  So I think that's it.

6    Anything else?  And I want to give you all a few moments to read

7    through this to check any typos.

8        Apparently, the numbering is off because the government

9    left space for like 20 through 29, but the way the Court's

10   instructions are, there's not a need for as many numbers.

11       Okay.  Now there is because we added self-defense.  So the

12   numbers have moved around.  I just want to make sure that you

13   all understand that compared to what you've seen before.  All

14   right?

15       But I do want to give you sufficient time to read these,

16   and I would like to review them one more time before I give

17   them.

18       So we will tell the jury that we will be out at -- does

19   2:45 give you adequate time to let us know and just let

20   Mr. Hopkins know if there's an issue so he can call back and

21   alert us?

22           MR. MCCAULEY:  That's adequate time for the

23   government.

24           THE COURT:  Does that work, Mr. Roots?

25           MR. ROOTS:  Okay.

1      THE COURT:  Okay.  We will take a brief recess until

2  2:45, and then I will come out and instruct the jury.

3      The government already rested in terms of a rebuttal case;

4  right?

5      MR. MCCAULEY:  We did, Your Honor.  We have released

6  our witness.

7      THE COURT:  I couldn't remember if you needed to do

8  that in front of the jury.  So I told the jury we would come

9  back and do instructions.  So we are all on the same page.

10     So I will come back.  I'll instruct.  We will do a very

11  brief break, like five minutes for them to stand up and go to

12  the bathroom, if need be, and then we will come back for the

13  government's opening closing.

14     Which one of you will be doing that?

15     MR. MCCAULEY:  Ms. Miller.

16     THE COURT:  All right.  And is it Mr. Roots or

17  Mr. Pierce?

18     MR. PIERCE:  I will, Your Honor.

19     THE COURT:  And then who is doing the government's

20  rebuttal?

21     MR. MCCAULEY:  Me, Your Honor.

22     THE COURT:  All right.

23     MS. MILLER:  Your Honor, I just want to make sure that

24  we don't get into a situation where the government does their

25  closing and then the defense has overnight and does their

1    closing tomorrow.

2            THE COURT:  No, we're going to finish today.

3            MR. MCCAULEY:  Understood, Your Honor.

4        (Recess taken from 2:26 p.m. to 2:53 p.m.)

5        (Jury not present.)

6            THE COURT:  All right.  A couple of issues.  I know my

7    law clerk mentioned some of these to you, but just for the

8    record, I want to review.

9        We're striking what was instruction 18 about the right of

10   the defendant not to testify.  We're striking what was

11   instruction 19 about the transcripts of the recordings.  Neither

12   of those apply.

13       With regard to the attempt instruction, rather than

14   repeating it in the obstruction of an official proceeding

15   instructions, I'm going to just say, "To determine whether the

16   defendant is guilty of attempt to commit obstruction of an

17   official proceeding, you should apply the definition the Court

18   provided earlier," rather than read the whole attempt again.  So

19   I will first have the attempt instruction when talking about

20   civil disorder.

21       Everyone okay with that?

22           MR. MCCAULEY:  Fine with the government, Your Honor.

23           MR. ROOTS:  Yes.

24           THE COURT:  Is that all right?

25           MR. ROOTS:  Yes.

1          THE COURT:  Okay.  Just again, to put on the record

2    for the self-defense, which you all have seen and I understand

3    you've signed off on, the beginning of the self-defense or

4    defense of others instruction will say, "The defendant's

5    position is that in some instances he acted in self-defense

6    and/or defense of another.  The use of force is justified when a

7    person reasonably believes that force is necessary for the

8    defense of one's self or another against the immediate use of

9    unlawful force.  To find," et cetera, et cetera.

10         And then the second-to-last paragraph will say, "To the

11   extent that you find the defendant committed an act in

12   self-defense or defense of others, the defendant cannot be

13   convicted on a charge on the basis of that act.  However, if

14   other acts not taken in self-defense or defense of others

15   support that charge, you may convict the defendant on the basis

16   of those acts."

17         Everybody's okay with that, I understood.

18              MR. ROOTS:  Yes.

19              MR. MCCAULEY:  Yes, Your Honor.

20         THE COURT:  Okay.  All right.  So I will read all the

21   way through -- I'm keeping redacted exhibits, because I know

22   that some videos are cut short.

23         Does that make sense to both sides?

24              MR. MCCAULEY:  Yes, Your Honor.

25              THE COURT:  They aren't technically redacted, but they

1    are shortened.

2              MR. MCCAULEY:  We also do have redacted exhibits.

3              THE COURT:  That's right.  Okay.

4         And then I will stop there on the -- no, I think I will

5    stop with the multiple counts -- no, I think I will read all

6    those, and then after closings are done, just the final

7    instructions will begin with the selection of a foreperson.

8              MR. MCCAULEY:  So substantive before and then --

9              THE COURT:  Substantive, and then the question is

10   whether I read the multiple accounts and exhibits during

11   deliberation, redacted exhibits before or after the closings.

12             MR. MCCAULEY:  I think after.

13             THE COURT:  After?  Okay.  So I will stop with the

14   substantive count.  The last instruction I read now will be the

15   self-defense instruction.

16        Is everyone in agreement on that?

17             MR. ROOTS:  Sounds good.

18             MS. MILLER:  It especially makes sense because they're

19   not going to start deliberating tonight with the exhibits.

20             THE COURT:  Right.  We have right now being printed

21   the final versions for you all so you can follow along as I

22   read.  If at any point -- don't be coy about interrupting me if

23   I've goofed.  All right?  I hope I won't, but I would rather be

24   interrupted than you all let me read something that's incorrect.

25   All right?  So definitely raise -- interrupt me if you think

1  that I'm reading something incorrectly.

2      And I'm just thinking ahead.  I think I will bring them in.

3  I will tell them that we anticipate finishing today but we may

4  go slightly past 5:30, and make sure that no one has a problem

5  staying a little bit later than 5:30 this evening, perhaps up to

6  6:00.

7          MR. MCCAULEY:  Fine with the government.

8          MR. ROOTS:  Sounds good.

9          THE COURT:  Okay.  Anything else that you think we

10 ought to do before I begin with instructing them?  Any -- have I

11 forgotten anything?

12         MR. ROOTS:  Nothing we can think of.

13         THE COURT:  Okay.

14         MR. MCCAULEY:  Nor us.

15         THE COURT:  So hard to know how long this is going to

16 take, but I think it's a long time for the jury to sit through

17 the government's entire closing and then the defense closing and

18 then the rebuttal.

19     So rather than stop after every instance, Ms. Miller, I'm

20 wondering whether if the instructions don't take me that long to

21 read, and I haven't read them out loud, so I don't know, if

22 they're 45 minutes or less, I'm inclined just to have you do

23 your opening and then take a very brief break before the

24 defendant's closing and then proceed directly from that to the

25 government's rebuttal.

1          Does that make sense to everyone?  I just think it's a long

2     time for them to sit through government's closing, defense

3     closing, and rebuttal without a break.

4          Does that make sense?

5               MS. MILLER:  Yes.  If we're going to do it that way,

6     could I use the restroom just one more time before we start?

7               THE COURT:  Yes.  If it takes a long time, then I will

8     take a break.

9               MS. MILLER:  Just in case.  Thank you.

10         (Pause.)

11              THE COURT:  At the end, of course, I will discharge

12    the one juror who remains an alternate before -- well, actually,

13    I'm not going to do that until they come back.  I hate to have

14    them come back, but given COVID and everything else, I think I

15    have to have them come back and -- although do we really have to

16    have them come back, or this juror can just be on call to come

17    in?  That's a lot to ask.

18              COURTROOM DEPUTY:  I think it depends on what time you

19    want to have them start.

20              THE COURT:  I think have them come back in and start

21    at 9:00 with deliberations, and that juror can be on call.  It

22    seems like a lot to bring the one juror.

23         Any of you, perspective?

24              MR. MCCAULEY:  The government would be fine with that

25    if we make it all the way through the instructions today.  So

1    the instructions, government's closing, defense closing,

2    rebuttal --

3            THE COURT:  Of course.  If not, no, we're not going to

4    excuse.  But I don't want to have someone come in just to be

5    excused.

6            MR. MCCAULEY:  That does seem --

7            THE COURT:  But I will make it very clear to that

8    juror, you need to be by your phone.

9            MR. MCCAULEY:  Understood, Your Honor.  That's

10   acceptable.

11           THE COURT:  You all are both okay with the proposed

12   verdict form?

13           MR. MCCAULEY:  Yes, Your Honor.

14           MR. ROOTS:  I believe so.

15           THE COURT:  She's back.  We should go ahead and get

16   the jury.

17       In the version you just received, we inadvertently omitted

18   the language at the beginning of attempt in the second offense.

19   So it should say, "In Count 2, the defendant is also charged

20   with intent to commit the crime of obstruction of an official

21   proceeding, and as I've instructed you, an attempt to commit

22   obstruction of official proceeding is a crime even if the

23   defendant did not actually complete the crime of obstruction of

24   an official proceeding.  To determine whether the defendant is

25   guilty, you should apply the definition I gave you."

1          Do you understand?  That's in the obstruction charge.

2               MR. MCCAULEY:  Understood, Your Honor.

3               MR. ROOTS:  Okay.

4          (Jury entered courtroom.)

5               THE COURT:  All right.  Welcome back, ladies and

6     gentlemen.  Sorry for the delay.  We had to deal with some legal

7     issues.  We are now prepared to move forward with the

8     instructions.  So I'm prepared to instruct you now on the

9     offenses and the related instructions.  And after that, we would

10    move directly to the government's closing argument, and after

11    that, the defendant's, and then any rebuttal by the government.

12    Both sides are anticipating that they each will take

13    approximately one hour to give their arguments.

14         And so I don't know exactly how long my reading of the

15    instructions will take, but I think this means that we could

16    complete the trial today -- not begin the deliberations but

17    complete the trial, but it might go a little bit past 5:30.

18         So I wanted to raise this with all of you to see if anyone

19    would have a problem staying a little bit beyond 5:30.  My guess

20    would be we would be done by 6:00 at the latest.  That's the

21    hope.

22         Is that a problem for anyone?  All right.  Okay.  I will

23    proceed with the instructions.

24         Ladies and gentlemen, you've now heard all of the evidence

25    in the case.  Before you begin your deliberations, I am going to

1    instruct you on the law.  I will start with some general rules

2    of law and then talk about the specific charges alleged here and

3    some of the specific issues in this case.  Some of these rules

4    will repeat what I told you in my preliminary instructions.

5        I will provide you with a copy of my instructions.  During

6    your deliberations, you may if you want refer to these

7    instructions.  While you may refer to any particular portion of

8    the instructions, you are to consider the instructions as a

9    whole, and you may not follow some and ignore others.  If you

10   have any questions about the instructions, you should feel free

11   to send me a note.  Please return your instructions to me when

12   your verdict is rendered.

13       As I explained at the beginning of the trial, my function

14   is to conduct this trial in an orderly, fair, and efficient

15   manner, to rule on questions of law, and to instruct you on the

16   law that applies in this case.  It is your duty to accept the

17   law as I instruct you.  Again, you should consider all of the

18   instructions as a whole.  You may not ignore or refuse to follow

19   any of the instructions.

20       Your function as a jury is to determine what the facts are

21   in this case.  You are the sole judges of the facts.  While it

22   was my responsibility to decide what was admitted as evidence

23   during the trial, you alone decide what weight, if any, to give

24   to that evidence.  You alone decide the credibility or

25   believability of the witnesses.  You should determine the facts

without prejudice, fear, sympathy, or favoritism.  You should

not be improperly influenced by anyone's race, ethnic origin, or

gender.  Decide the case solely based on a fair consideration of

the evidence.

You may not take anything I may have said or done as

indicating how I think you should decide this case.  If you

believe that I have expressed or indicated any such opinion, you

should ignore it.  The verdict in this case is your sole and

exclusive responsibility.

If any reference by me or the attorneys to the evidence is

different from your own memory of the evidence, it is your

memory that should control during your deliberations.

During the trial, I have permitted those jurors who wanted

to do so to take notes.  You may take your notebooks with you

into the jury room and use them during your deliberations if you

wish.  As I told you at the beginning of trial, your notes are

only to be an aid to your memory.  They are not evidence in the

case, and they should not replace your own memory of the

evidence.  Those jurors who have not taken notes should rely on

their own memory of the evidence.  The notes are intended to be

for the notetaker's own personal use.

During your deliberations, you may consider only the

evidence properly admitted in this trial.  The evidence in this

case consists of the sworn testimony of the witnesses, the

exhibits that were admitted into evidence, and the facts

stipulated to by the parties.  During the trial, you were told
that the parties had stipulated, that is, agreed to certain
facts.  You should consider any stipulation of fact to be
undisputed evidence.

When you consider the evidence, you are permitted to draw
from the facts that you find have been proven such reasonable
inferences as you feel are justified in light of your
experience.  You should give any evidence such weight that in
your judgment it is fairly entitled to receive.

The statements and arguments of the lawyers are not
evidence.  They are only intended to assist you in understanding
the evidence.  Similarly, the questions of the lawyers are not
evidence.

The indictment is merely the formal way of accusing a
person of a crime.  You must not consider the indictment as
evidence of any kind.  You may not consider it as any evidence
of the defendant's guilt or draw any inference of guilt from it.

Every defendant in a criminal case is presumed to be
innocent.  This presumption of innocence remains with the
defendant throughout the trial unless and until the government
has proven he is guilty beyond a reasonable doubt.  This burden
never shifts throughout the trial.  The law does not require the
defendant to prove his innocence or to produce any evidence at
all.

If you find that the government has proven beyond a

1    reasonable doubt every element of the offenses with which the

2    defendant is charged, it is your duty to find him guilty of

3    those offenses.

4        On the other hand, if you find that the government has

5    failed to prove any element of a particular offense beyond a

6    reasonable doubt, it is your duty to find the defendant not

7    guilty of that offense.

8        As I've explained, the government has the burden of proving

9    the defendant guilty beyond a reasonable doubt.  In civil cases,

10   it is only necessary to prove that a fact is more likely true

11   than not or in some cases that its truth is highly probable.

12   But in criminal cases, such as this one, the government's proof

13   must be more powerful than that.  It must be beyond a reasonable

14   doubt.  Reasonable doubt, as the name implies, is a doubt based

15   on reason, a doubt for which you have a reason based upon the

16   evidence or lack of evidence in the case.

17       If, after careful, honest, and impartial consideration of

18   all the evidence you cannot say that you're firmly convinced of

19   the defendant's guilt, then you have a reasonable doubt.

20       Reasonable doubt is the kind of doubt that would cause a

21   reasonable person, after careful and thoughtful reflection, to

22   hesitate to act in the graver or more important matters in life.

23       However, it is not an imaginary doubt, nor a doubt based on

24   speculation or guesswork.  It is a doubt based on reason.

25       The government is not required to prove guilt beyond all

doubt or to a mathematical or scientific certainty.  Its burden
is to prove guilt beyond a reasonable doubt.

There are two types of evidence from which you may
determine what the facts are in this case:  Direct evidence and
circumstantial evidence.  When a witness, such as an eyewitness,
asserts actual knowledge of a fact, that witness's testimony is
direct evidence.  On the other hand, evidence of facts and
circumstances from which reasonable inferences may be drawn is
circumstantial evidence.

Let me give you an example.  Assume that a person looked
out of a window and saw that snow was falling.  If he later
testified in court about what he had seen, his testimony would
be direct evidence that snow was falling at the time he saw it
happen.

Assume, however, that he looked out of a window and saw no
snow on the ground and then went to sleep and saw snow on the
ground after he woke up.  His testimony about what he had seen
would be circumstantial evidence that it showed while he was
asleep.

The law says that both direct and circumstantial evidence
are acceptable as means of proving a fact.  The law does not
favor one form of evidence over another.  It is for you to
decide how much weight to give any particular evidence, whether
it is direct or circumstantial.  You are permitted to give equal
weight to both.  Circumstantial evidence does not require a

greater degree of certainty than direct evidence.  In reaching a verdict in this case, you should consider all of the evidence presented, both direct and circumstantial.

You must not allow the nature of a charge to affect your verdict.  You must consider only the evidence that has been presented in this case in reaching a fair and impartial verdict.

The weight of the evidence is not necessarily determined by the number of witnesses testifying for each side.  Rather, you should consider all of the facts and circumstances and evidence to determine which of the witnesses you believe.  You might find that the testimony of a smaller number of witnesses on one side is more believable than the testimony of a greater number of witnesses on the other side, or you might find the opposite.

The lawyers in this case sometimes objected when the other side asked a question, made an argument, or offered evidence that the objecting lawyer believed was not proper.  You must not hold such objections against the lawyer who made them or the party he or she represents.  It is the lawyer's responsibility to object to evidence that he or she believes is not admissible.

If during the course of the trial I sustained an objection to a lawyer's question, you should ignore the question, and you must not speculate as to what the answer would have been.

In determining whether the government has proved the charges against the defendant beyond a reasonable doubt, you must consider the testimony of all of the witnesses who have

testified.  As I've said already, you are the sole judges of the

credibility of the witnesses.  You alone determine whether to

believe any witness and the extent to which a witness should be

believed.

Judging a witness's credibility means evaluating whether

the witness has testified truthfully and also whether the

witness accurately observed, recalled, and described the matters

about which the witness testified.

You may consider anything that in your judgment affects the

credibility of any witness.  For example, you may consider the

demeanor and the behavior of the witness on the witness stand,

the witness's manner of testifying, whether the witness

impresses you as a truthful person, whether the witness

impresses you as having an accurate memory and recollection,

whether the witness has any motive for not telling the truth,

whether the witness has had a full opportunity to observe the

matters about which he or she has testified, whether the witness

has any interest in the outcome of this case or friendship or

hostility toward other people concerned with this case.

In evaluating the accuracy of a witness's memory, you may

consider the circumstances surrounding the event, including any

circumstances that would impair or improve the witness's ability

to remember the event, the time that elapsed between the event

and any later recollections of the event, and the circumstances

under which the witness was asked to recall details of the

1    event.

2        You may consider whether there are any inconsistencies or

3    discrepancies between what the witness says now and what the

4    witness may have previously said.  You may also consider any

5    inconsistencies between the witness's testimony and any other

6    evidence that you credit, such as the testimony of another

7    witness.  You should consider whether any inconsistencies are

8    the result of different individuals seeing, hearing, or

9    recollecting things differently, whether they are the result of

10   actual forgetfulness or are the result of innocent mistakes or

11   the result of intentional falsehood.

12       You may consider the reasonableness or unreasonableness,

13   the probability or improbability of the testimony of a witness

14   in determining whether to accept it as true and as accurate.

15   You may consider whether the witness has been contradicted or

16   supported by other evidence you credit.

17       If you believe that any witness has shown him or herself to

18   be biased or prejudicial for or against either side in this

19   trial, you may consider and determine whether such bias or

20   prejudice has colored the testimony of the witness so as to

21   affect the desire and capability of that witness to tell the

22   truth.  You should give the testimony of each witness such

23   weight as in your judgment it is fairly entitled to receive.

24       In this case, you have heard testimony from a number of law

25   enforcement officers.  A police officer's testimony should be

1   evaluated by you just as any other evidence in this case.  In

2   evaluating the officer's credibility, you should use the same

3   guidelines that you apply to the testimony of any witness.  In

4   no event should you give either greater or lesser weight to the

5   testimony of any witness merely because he or she is a law

6   enforcement officer.

7       Count 1 of the indictment charges the defendant with

8   committing or attempting to commit an act to obstruct, impede,

9   or interfere with law enforcement officers lawfully carrying out

10  their official duties incident to a civil disorder, which is a

11  violation of federal law.

12      The Court will first explain the elements of the

13  substantive offense, along with its associated definitions.

14  Then the Court will explain how to determine whether the

15  defendant attempted to commit the offense.

16      In order to find the defendant guilty of obstructing

17  officers during a civil disorder, you must find the following

18  four elements beyond a reasonable doubt.

19      First, the defendant knowingly committed an act or

20  attempted to commit an act; second, in committing or attempting

21  to commit that act, the defendant intended to obstruct, impede,

22  or interfere with one or more law enforcement officers; third,

23  at the time of the defendant's actual or attempted act, the law

24  enforcement officer or officers were engaged in the lawful

25  performance of their official duties incident to and during a

civil disorder; fourth, the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct and does not act through ignorance, mistake, or accident.

In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.

The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons which, A, causes an immediate danger of injury to another individual; B, causes an immediate danger of damage to another individual's property; C, results in injury to another individual; or D, results in damage to another individual's property.

The term "commerce" means commerce or travel between one state, including the District of Columbia, and any other state, including the District of Columbia.  It also means commerce wholly within the District of Columbia.

The term "federally protected function" means any function, operation, or action carried out under the laws of the United States by any department, agency, or instrumentality of the United States or by an officer or employee thereof.

The term "department" includes executive departments.  The Department of Homeland Security, which includes the United States Secret Service, is an executive department.

The term "agency" includes any department, independent establishment, commission, administration, authority, board, or bureau of the United States.

The term "law enforcement officer" means any officer or employee of the United States, any state, or the District of Columbia while engaged in the enforcement or prosecution of any criminal laws of the United States, a state, or the District of Columbia.

In Count 1, the defendant is also charged with attempt to commit the crime of obstructing officers during a civil disorder.  An attempt to obstruct officers during a civil disorder is a federal crime even if the defendant did not actually complete the crime of obstructing officers during a civil disorder.

In order to find the defendant guilty of attempt to commit the crime of obstructing officers during a civil disorder, you must find that the government prove beyond a reasonable doubt each of the following two elements:  First, that the defendant intended to commit the crime of obstructing officers during a civil disorder as I have defined that offense above; second, that the defendant took a substantial step toward committing the crime of obstructing officers during a civil disorder, which

strongly corroborates or confirms that the defendant intended to commit that crime.

With respect to the first element of attempt, you may not find the defendant guilty of attempt to commit obstruction during a civil disorder merely because he thought about it. You must find that the evidence proved beyond a reasonable doubt that the defendant's mental state passed beyond the stage of thinking about the crime to actually intending to commit it.

With respect to the substantial step element, you may not find the defendant guilty of attempt to commit obstruction during a civil disorder merely because he made some plans or some preparation for committing that crime. Instead, you must find that the defendant took some firm, clear, undeniable action to accomplish his intent to commit obstruction during a civil disorder.

However, the substantial step element does not require the government to prove that the defendant did everything except the last act necessary to complete the crime.

Count 2 of the indictment charges the defendant with corruptly obstructing an official proceeding, which is a violation of law. Count 2 also charges the defendant with attempt to obstruct or impede an official proceeding and aiding and abetting others to commit that offense.

The Court will first explain the elements of the substantive offense, along with its associated definitions.

1    Then the Court will explain how to determine whether the

2    defendant attempted the offense and whether the defendant aided

3    and abetted the offense.

4        In order to find the defendant guilty of corruptly

5    obstructing an official proceeding, you must find that the

6    government proved each of the following four elements beyond a

7    reasonable doubt:

8        First, the defendant attempted to or did obstruct or impede

9    an official proceeding; second, the defendant acted with the

10   intent to obstruct or impede the official proceeding; third, the

11   defendant acted knowingly with awareness that the natural and

12   probable effect of his conduct would be to obstruct or impede

13   the official proceeding; fourth, the defendant acted corruptly.

14       The term "official proceeding" includes a proceeding before

15   the Congress.  The official proceeding need not be pending or

16   about to be instituted at the time of the offense.  If the

17   official proceeding was not pending or about to be initiated --

18   instituted, sorry, the government must prove beyond a reasonable

19   doubt that the official proceeding was reasonably foreseeable to

20   the defendant.

21       As used in Count 2, the term "official proceeding" means

22   Congress's joint session to certify the Electoral College vote.

23       A person acts knowingly if he realizes what he is doing and

24   is aware of the nature of his conduct and does not act through

25   ignorance, mistake, or accident.

1        In deciding whether the defendant acted knowingly, you may

2    consider all of the evidence, including what the defendant did

3    or said.

4        To act corruptly, the defendant must use unlawful means or

5    act with an unlawful purpose, or both.  The defendant must also

6    act with consciousness of wrongdoing.  Consciousness of

7    wrongdoing means with an understanding or awareness that what

8    the person is doing is wrong.  Not all attempts to obstruct or

9    impede an official proceeding involve acting corruptly.

10       For example, a witness in a court proceeding may refuse to

11   testify by invoking his Constitutional privilege against

12   self-incrimination, thereby obstructing or impeding the

13   proceeding, but he does not act corruptly.

14       In addition, the First Amendment to the United States

15   Constitution affords people the right to speak, assemble, and

16   petition the government for grievances.  Accordingly, an

17   individual who does no more than lawfully exercise those rights

18   does not act corruptly.

19       In contrast, an individual who obstructs or impedes a court

20   proceeding by engaging in conduct such as offering illegal

21   bribes, engaging in violence, committing fraud, or through other

22   independently unlawful conduct does not act corruptly.

23       Oh, let me read that again.

24       All right.  I read, in contrast, an individual who

25   obstructs or impedes a court proceeding by engaging in conduct

1    such as offering illegal bribes, engaging in violence,

2    committing fraud, or through other independently unlawful

3    conduct does act corruptly.  Often, acting corruptly involves

4    acting with the intent to secure an unlawful advantage or

5    benefit either for oneself or for another person.

6        While the defendant must act with the intent to obstruct

7    the official proceeding, this need not be his sole purpose.  A

8    defendant's unlawful intent to obstruct an official proceeding

9    is not negated by the simultaneous presence of another purpose

10    for his conduct.

11        However, the fact that the defendant's mere presence may

12    have had the unintended effect of obstructing or impeding a

13    proceeding does not establish that the defendant acted with the

14    intent to obstruct or impede that proceeding.

15        In Count 2, the defendant is charged with the attempt -- is

16    also charged with the attempt to commit a crime of obstruction

17    of an official proceeding.

18        As I've explained, an attempt to commit obstruction of an

19    official proceeding is a crime even if the defendant did not

20    actually complete the crime of obstruction of an official

21    proceeding.  To determine whether the defendant is guilty of

22    attempt to commit the crime of obstruction of an official

23    proceeding, you should apply the definition that I gave you

24    earlier for "attempt."

25        In this case, the government further alleges that the

1  defendant aided and abetted others in committing obstruction of

2  an official proceeding, as charged in Count 2.  A person may be

3  guilty of an offense if he aided and abetted another person in

4  committing that offense.  A person who has aided and abetted

5  another in committing an offense is often called an accomplice.

6  The person whom the accomplice aids and abets is known as the

7  principal.

8      It is not necessary that all of the people who committed

9  the crime be caught or identified.  It is sufficient if you find

10  beyond a reasonable doubt that the crime was committed by

11  someone and that the defendant knowingly and intentionally aided

12  and abetted that person in committing the crime.

13      In order to find the defendant guilty of obstruction of an

14  official proceeding because he aided and abetted others in

15  committing this offense, you must find that the government prove

16  beyond a reasonable doubt the following five requirements:

17      First, that others committed obstruction of an official

18  proceeding by committing each of the elements of the offense

19  charged as I've explained above; second, that the defendant knew

20  that obstruction of an official proceeding was going to be

21  committed or was being committed by others; third, that the

22  defendant performed an act or acts in furtherance of the

23  offense; fourth, that the defendant knowingly performed that act

24  or acts for the purpose of aiding, assisting, soliciting,

25  facilitating, or encouraging others in committing the offense of

obstruction of an official proceeding; fifth, that the defendant did that act or acts with the intent that others commit the offense of obstruction of an official proceeding.

To show that the defendant performed an act or acts in furtherance of the offense charged, the government needs to show some affirmative participation by the defendant which at least encouraged others to commit the offense. That is, you must find that the defendant's act or acts did in some way aid, assist, facilitate, or encourage others to commit the offense.

The defendant's act or acts need not further aid, assist, facilitate, or encourage every part or phase of the offense charged. It is enough if the defendant's act or acts further aid, assist, facilitate, or encourage only one or some parts or phases of the offense. Also, the defendant's acts need not themselves be against the law.

In deciding whether the defendant had the required knowledge and intent to satisfy the fourth requirement for adding and abetting, you may consider both direct and circumstantial evidence, including the defendant's words and actions and other facts and circumstances.

However, evidence that the defendant merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator during the commission of the offense is not enough for you to find the defendant guilty as an aider and abettor.

1    If the evidence shows that the defendant knew that the

2    offense was being committed or was about to be committed but

3    does not also prove beyond a reasonable doubt that it was the

4    defendant's intent and purpose to aid, assist, encourage,

5    facilitate, or otherwise associate himself with the offense, you

6    may not find the defendant guilty of the obstruction of an

7    official proceeding as an aider and abettor.

8    The government must prove beyond a reasonable doubt that

9    the defendant in some way participated in the offense committed

10   by others as something the defendant wished to bring about and

11   make succeed.

12   Counts 3, 4, 5, 6, and 7 each charge the defendant with

13   forcibly assaulting, resisting, opposing, impeding,

14   intimidating, or interfering with officers of the United States

15   or any persons assisting such officers who were engaged in the

16   performance of official duties while making physical contact

17   with the person or acting with the intent to commit another

18   felony, which is a violation of federal law.

19   In order to find the defendant guilty of Count 3, you must

20   find that the government proved each of the following five

21   elements beyond a reasonable doubt with respect to Officer R.A.

22   In order to find the defendant guilty of Count 4, you must

23   find the government proved each of the five elements beyond a

24   reasonable doubt with respect to Officer M.N.

25   In order to find the defendant guilty of Count 5, you must

1    find that the government proved each of the five elements beyond

2    a reasonable doubt with respect to Officer S.A.

3    In order to find the defendant guilty of Count 6, you must

4    find that the government proved each of the five elements beyond

5    a reasonable doubt with respect to Officer K.V.

6    And in order to find the defendant guilty of Count 7, you

7    must find that the government proved each of the five elements

8    beyond a reasonable doubt with respect to Officer R.N.

9    First, the defendant assaulted, resisted, opposed, impeded,

10    intimidated, or interfered with an officer of the United States

11    or any person assisting such an officer; second, the defendant

12    did such acts forcibly; third, the defendant did such acts

13    voluntarily and intentionally; fourth, the officer was then

14    engaged in the performance of official duties or the person was

15    assisting such an officer while such officer was engaged in the

16    performance of such official duties; fifth, the defendant made

17    physical contact with the victim or acted with the intent to

18    commit another felony.

19    For purposes of this element, "another felony" refers to

20    the offense charged in Count 1, civil disorder, or Count 2,

21    obstruction of an official proceeding and aiding and abetting.

22    The term "forcibly" means that the defendant used force,

23    attempted to use force, or threatened to use force against the

24    officer.  A threat to use force at some unspecified time in the

25    future is not sufficient to establish that the defendant acted

1    forcibly.

2        The term "assault" means any intentional attempt or threat

3    to inflict injury upon someone else when coupled with an

4    apparent present ability to do so.

5        A finding that one used force or attempted or threatened to

6    use it isn't the same as a finding that he attempted or

7    threatened to inflict injury.  In order to find that the

8    defendant committed an assault, you must find beyond a

9    reasonable doubt that the defendant acted forcibly and that the

10   defendant intended to inflict or intended to threaten injury.

11       The terms "resist, oppose, impede, intimidate, and

12   interfere with" carry their everyday ordinary meanings.

13       The term "intentionally" means that the defendant

14   knowingly, consciously, and voluntarily committed an act which

15   the law makes a crime.  This general intent may be inferred from

16   the doing of the act.

17       "Knowingly" has the same meaning I gave you previously.

18       The government does not have to prove that the defendant

19   knew that the victim was a federal officer or a person assisting

20   a federal officer in the performance of official duties.

21       It is not necessary to show that the defendant knew the

22   person being forcibly assaulted, resisted, opposed, impeded,

23   intimidated, or interfered with was at that time carrying out an

24   official duty, so long as it is established beyond a reasonable

25   doubt that the person was in fact carrying out an official duty

and that the defendant intentionally forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with the officer.

Count 8 of the indictment charges the defendant with entering or remaining in a restricted building or grounds, which is a violation of federal law.  In order to find the defendant guilty of this offense, you must find that the government proved each of the following two elements beyond a reasonable doubt: First, that the defendant entered or remained in a restricted building or grounds without lawful authority to do so; second, that the defendant knew that the building or grounds was restricted and he knew that he lacked the lawful authority to enter or remain there.

The term "restricted building or grounds" means any posted, cordoned-off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is temporarily visiting.

The term "person protected by the Secret Service" includes the vice president and the immediate family of the vice president.

The term "knowingly" has the same meaning I gave you previously.

Count 5 of the indictment charges the defendant with disorderly or disruptive conduct in a restricted building or grounds.  In order to find the defendant guilty of this offense,

you must find that the government proved each of the following

three elements beyond a reasonable doubt:  First, that the

defendant knowingly engaged in disorderly or disruptive conduct

in or in proximity to any restricted building or grounds;

second, that the defendant did so with the intent to impede or

disrupt the orderly conduct of government business or official

functions; third, that the defendant's conduct in fact impeded

or disrupted the orderly conduct of the government's business or

official function.

Sorry.  At the beginning, I said Count 5.  This was

actually Count 9 is the count that deals with disorderly or

disruptive conduct in a restricted area or grounds.

Disorderly conduct occurs when a person acts in such a

manner as to cause another person to be in reasonable fear that

a person or property in a person's immediate possession is

likely to be harmed or taken, uses words likely to produce

violence on the part of others, is unreasonably loud and

disruptive under the circumstances, or interferes with another

person by jostling against or unnecessarily crowding that

person.

Disruptive conduct is a disturbance that interrupts an

event, activity, or the normal course of a process.

The terms "restricted buildings or grounds" and "knowingly"

have the same meaning I gave you previously.

Count 10, engaging in physical violence in a restricted

building or grounds.  Count 6 of the document charges the
defendant with physical violence in a restricted building or
grounds.

In order to find the defendant guilty of this offense, you
must find that the government proved each of the following two
elements beyond a reasonable doubt:  First, that the defendant
engaged in any act of physical violence against a person or
property in a restricted building or grounds; second, that the
defendant knew the building or grounds was restricted and that
he lacked authority to remain there.

The term "act of physical violence" means any act involving
an assault or other infliction of death or bodily harm on an
individual or damage to or destruction of real or personal
property.

The terms "knowingly" and "restricted building or grounds"
have the same meanings I gave you previously.

Count 11 of the indictment charges the defendant with
engaging in disorderly and disruptive conduct within the United
States Capitol grounds, which is a violation of federal law.

In order to find the defendant guilty of this offense, you
must find that the government proved each of the following three
elements beyond a reasonable doubt:  First, that the defendant
engaged in disorderly or disruptive conduct in the United States
Capitol grounds; second, that the defendant did so with the
intent to impede, disrupt, or disturb the orderly conduct of a

session of Congress or either house of Congress or the orderly
conduct of a hearing before or any deliberation of a committee
of Congress or either house of Congress; third, that the
defendant acted willfully and knowingly.

The term "United States Capitol grounds" includes the
United States Capitol located at First Street Southeast in
Washington, D.C., and its grounds, which includes all squares,
reservations, streets, roadways, walks, and other areas as
defined on a map entitled "Map Showing Areas Comprising United
States Capitol Grounds," dated June 25th, 1946, approved by the
Architect of the Capitol and recorded in the Office of the
Surveyor of the District of Columbia.

A person acts willfully if he acts with the intent to do
something the law forbids; that is, to disobey or disregard the
law.  Willfully does not, however, require proof that the
defendant be aware of the specific law or rule that his conduct
may be violating.

The terms "knowingly," "disruptive conduct,"
and "disorderly conduct" have the same meanings I gave you
previously.

Count 12 of the indictment charges the defendant with
engaging in an act of physical violence in the United States
Capitol grounds or any of the Capitol buildings, which is a
violation of federal law.

In order to find the defendant guilty of this offense, you

must find that the government proved each of the following two elements beyond a reasonable doubt:  First, that the defendant engaged in an act of physical violence in the United States Capitol grounds; second, that the defendant acted willfully and knowingly.

The term "act of physical violence" means any act involving an assault or other infliction or threat of infliction of death or bodily harm on an individual or damage to or destruction of real or personal property.

The terms "knowingly," "willfully, and "United States Capitol grounds" have the meanings I gave you previously.

Someone's intent or knowledge ordinarily cannot be proved directly because there is no way of knowing what a person is actually thinking.  But you may infer someone's intent or knowledge from the surrounding circumstances.  You may consider any statement made or acts done by the defendant and other all facts and circumstances received in evidence which indicate his intent or knowledge.  You may infer but are not required to infer that a person intends the natural and probable consequences of acts he intentionally did or intentionally did not do.

It is entirely up to you, however, to decide what facts to find from the evidence received during the trial.  You should consider all of the circumstances in evidence that you think are relevant in determining whether the government has proved beyond

a reasonable doubt that the defendant acted with the necessary state of mind.

The defendant's position is that in some instances he acted in self-defense and/or the defense of another.  The use of force is justified when a person reasonably believes that force is necessary for the defense of oneself or another against the immediate use of unlawful force.

To find that the defendant was justified in using force against law enforcement officers, you must first find that the existence of force by law enforcement was unlawful because it was excessive.  If you so find, you may consider whether the defendant reasonably defended himself or another from that unlawful exercise of force.

A person may use a reasonable amount of force in self-defense or defense of another.  A person may use an amount of force which at the time of the incident he actually and reasonably believes is necessary to protect himself or another from imminent bodily harm.  The question is not whether, looking back on the incident, you believe that the use of force is necessary.  The question is whether the defendant, under the circumstances as they appeared to him at the time of the incident, actually believed he or another was in imminent danger of bodily harm and could reasonably hold that belief.

If you find that the defendant provoked imminent danger of bodily harm upon himself or another, he cannot rely upon the

right of self-defense or defense of another to justify his use
of force.  One who knowingly and unnecessarily places himself in
a position in conscious disregard of the substantial risk that
his presence will provoke a violent confrontation cannot claim
self-defense or defense of another.

To the extent that you find that the defendant committed an
act of self-defense or defense of others, the defendant cannot
be convicted on a charge on the basis of that act.  However, if
other acts not taken in self-defense or defense of others
support that charge, you may convict on the basis of those acts.

The defendant is not required to prove that he acted in
self-defense.  Where evidence of self-defense or defense of
another is present, the government must prove beyond a
reasonable doubt that the defendant did not act in self-defense
or defense of another.  If the government has failed to do so,
you must find the defendant not guilty.

All right, ladies and gentlemen.  Those complete the
initial instructions that the Court will give at this time.
We're prepared to move on with the government's opening closing
argument, but if anyone needs a break right now, we will take a
very short break.

All right.  So we will take literally a five-minute break
and be back with the closing argument of the government.

(Jury exited courtroom.)

THE COURT:  All right.  Other than the one I

1    corrected, did the parties hear any mistakes in the reading of

2    the instructions?

3              MR. PIERCE:  I think you used the word "existence"

4    instead of "exercise" on the self-defense instruction, Your

5    Honor.  I'm not sure it's a big deal.

6              THE COURT:  Do you want me to correct it?  I'm happy

7    to do so before the government begins.

8              MR. PIERCE:  Yeah, I think so, Your Honor.  It's just

9    one word.

10             THE COURT:  So tell me --

11             MR. PIERCE:  Instruction number 27, the second

12   paragraph and the first sentence, I think you used the

13   word "existence" --

14             THE COURT:  Okay.

15             MR. PIERCE:  -- instead of "exercise."

16             THE COURT:  I'm fighting the reading glasses.

17        All right.  So I will read -- that whole paragraph?

18             MR. PIERCE:  Yeah, I think that's fine, Your Honor.

19             MR. MCCAULEY:  I think that's a fine remedy, Your

20   Honor.

21             THE COURT:  All right.

22        (Recess taken from 3:52 p.m. to 3:59 p.m.)

23        (Jury entered courtroom.)

24             THE COURT:  All right.  Ladies and gentlemen, just one

25   small correction to what I read in the instructions.

1        Apparently, I said the word "existence" instead of

2   "exercise" in one area.  So I'm going to reread the sentence

3   that I made the -- in which I made the error and the next

4   sentence.  I am fighting reading glasses and perhaps need to

5   resign that I need them.

6        So this is the relevant portion, and this is in the

7   self-defense or defense of others instructions:  "To find that

8   the defendant was justified in using force against law

9   enforcement officers, you must first find that the exercise of

10  force by law enforcement was unlawful because it was excessive.

11  If you so find, you may consider whether the defendant

12  reasonably defended himself or another from that unlawful

13  exercise of force."

14       All right.  With that, Ms. Miller will proceed with the

15  government's initial closing argument.

16            MS. MILLER:  Thank you, Your Honor.

17       May it please the Court.  On January 6, 2021, an angry mob

18  of Americans descended on the United States Capitol.  The

19  defendant, sitting right here behind me today, was a part of

20  that mob.  The mob blew through barriers and through drastically

21  outnumbered lines of police officers who, as the day wore on,

22  began donning increasing amounts of protective gear.  As you

23  heard from our officer witnesses, they donned larger and larger

24  police shields, additional protective armor, gas masks,

25  ballistic helmets.  All of this was done so that they could

protect themselves and the building, defend themselves and the building from the rioters' relentless violent attacks.

The mob rushed the steps of the Capitol's west side.  Then the rioters quickly found their way up to the upper west -- I'm sorry, Lower West Plaza and onto a staging area, steps, and grandstands that were being set up for the inauguration.

The mob had and continued to go over, under, and through barriers and police lines at every turn, ignoring officers' attempts to keep them back, to keep them away from the Capitol building, from the vice president, and from the congressmen and women who were doing their constitutionally mandated duties inside.

The mob of rioters overcame the sting of chemical irritants in the air.  They ignored the flash bangs and other less-than-lethal devices that were being intermittently deployed by law enforcement to attempt to tame the angry crowd.  But the crowd wasn't deterred.  The defendant wasn't deterred.  Why? Because the mob and this defendant had become laser focused on their goal, storming the United States Capitol.

As my co-counsel told you in opening, for the first time since the Civil War, this angry mob of rioters was determined at all costs to prevent the peaceful transfer of power from one president to the next.  This mob knew that the Electoral College vote was going on inside the Capitol building on that day, and they knew their only chance at preventing Congress from

fulfilling its duties on January 6 was to, in the defendant's own words, "gather a list of patriots and storm the Capitol."

Think about that for a second. Here we are in the 21st Century, as one of the oldest democracies in the world, and yet, we have a mob of thousands of our own citizens who have decided to take the law into their own hands, a group of citizens who, in their desperation to keep their preferred candidate in office, had decided the answer was to attempt to violently overthrow the government and grind to a halt a democratic process that had been operating smoothly for the last 170 years, the Electoral College vote count.

And who was among them often at the front of the line chanting "police stand down" and "hold the line"?  The defendant.  Who was among them repeatedly and relentlessly getting up in officers' faces ordering them to uphold their oath?  The defendant.  Who was among them making his goal to prevent the peaceful transfer of power, crystal-clear at every turn?  The defendant.

"Just let us in."  "We're not backing down."  "I just want to knock on the door."  "We behind you."  "Whose house?  Our house."

And the only thing that would stop him was what did stop him:  The arrival of police reinforcements from the MPD and Prince George's County PD, who were summoned to the Capitol to assist with the ongoing emergency there.

And that's why we're here today, ladies and gentlemen.  The defendant at all costs assaulted five officers in his efforts to prevent those officers from carrying out their mission of removing rioters from the Capitol's restricted perimeter.

He remained on restricted Capitol grounds and the Upper West Terrace for hours, ignoring officers and resisting their orders to exit.  Over and over again, after losing ground, he went on the offensive, violently pushing up against and attacking lines of officers.

And because of the defendant and the other rioters he was encouraging, the Electoral College vote count could not and did not recommence until after 8:00 p.m. on January 6th.

At all costs, the defendant was going to storm the Capitol with his fellow patriots, and he did.

Now, some legal principles, some of which the judge just went over with you, are that proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty.  The government is not required to prove guilt beyond all possible doubt.  The evidence in this case can and does include acts, facts, statements, omissions, circumstances, and inferences.  And remember, circumstantial evidence carries the same weight as direct evidence.

Here is the list of charges and counts.  I'm not going to read all 12 to you, but notice that they're color-coded.  That's because there's similarities and there's overlap in both the

charges themselves and the evidence that proves them beyond a
reasonable doubt.

Here's how we've grouped them:  Count 2 stands by itself,
obstruction of an official proceeding.  Counts 1, 3, 4, 5, 6,
and 7 constitute civil disorder and, quote unquote, assault,
which I will explain later.  Counts 8, 9, 10, 11, and 12 revolve
around restricted grounds, otherwise sometimes known as
trespass.

Now, starting with Count 2, obstruction of an official
proceeding, generally speaking, what do you need to think about?
The what question, obstruction of the official proceeding.  The
how question, corruptly.  And the why question, to stop the
certification.

The elements that the judge just read to you, number 1,
that the defendant attempted to or did obstruct or impede an
official proceeding; number 2, the defendant intended to do so;
number 3, the defendant acted knowingly; and number 4, he acted
corruptly.

Let me break that down a little bit more.  Element 1,
attempted to or -- I'm sorry, attempted to obstruct or impede or
did so.  Was the official proceeding obstructed or impeded?
Let's think about the evidence.

Exhibit 103, the video that Captain Baboulis presented to
you, showed that the proceedings started at 1:05, but at
2:13 p.m., a staffer went up to this senator and said,

"Protestors are in the building."  So Congress is forced to recess.  Coincidentally, that was just when this defendant was mounting the steps to come up to the Capitol saying he was going to storm it.

How do we know the defendant attempted to obstruct or did obstruct?  Well, "Just let us in."  "I just want to go knock on the door."  "Let us in."  "This is our house."  "Police, stand down."  "This is our house."  "We're not backing down."

And remember this moment in his video that he took himself, ladies and gentlemen:  You see his reflection in the police shield of the line of officers, and what does he say to them?  "We behind you."

And you saw in the same video, Exhibit 103, that Congress did not resume until 8:06 p.m. that night, and actually, the vote count didn't complete until almost 4:00 a.m. on January 7th.

Elements 2 and 3, the defendant intended to obstruct and he acted knowingly.  Defendant's intent is ordinarily not proved directly, because you can't get inside someone's head, but you can infer intent from the surrounding circumstances, and it's the natural and probable consequences of their actions.

Keep in mind, it's not a plan.  Intent can be developed very quickly.  And also, as the judge told you, obstruction need not be the defendant's sole purpose in being there.

How do you know about defendant's knowledge?  Well, it's

the awareness that the natural and probable effect of his actions would be to obstruct.  In other words, his common sense, just like you're going to use your common sense.

Now, if he's creating a dangerous situation on Capitol grounds, he has to know that Congress can't resume.

Knowledge can be based on inferences from the evidence or what a person saw, did, observed, said, and understood.  Again, what does that mean?  The context.

Here's some of the context.  So leading up to January 6, we see a number of Facebook posts from the defendant.  One of them features an image of the Capitol building with a lightning bolt striking it that say "justice is coming.  Get ready.  Stay steady."

He also posts about a rigged election and specifically discusses in the text of the post that on January 6 there will be an Electoral College vote count.  He also posts the text of the 12th Amendment itself which governs the Electoral Vote count.

Now, how do we know that he intended to obstruct and acted knowingly?  Well, just look at what he did on January 6.  He videos himself walking up Constitution Avenue towards the Capitol building, and you hear him say, "You hear that, Congress," when everyone starts chanting "USA."  Then once he gets to the bottom of the steps, he turns his video towards his face and says, "Right now, we got a whole list of patriots going

1  and are going to storm the Capitol."

2        And you heard him, ladies and gentlemen.  That's the only

3  thing he regrets for the whole day, using the word "storm."

4  Why?  Because it's so incriminating.

5        He also posted later in the day and was still on Capitol

6  grounds as it was getting dark.  And again, he was still up in

7  police face saying, "You know it was farmers that stood up

8  against tyranny?  Three percent of society said we had enough.

9  We are today's 3 percent."

10       Now, remember, that's a little different than what he said

11  on the stand today.  You remember?  He said he wasn't associated

12  with the Three Percenters.  But he said so in his own video that

13  he took of himself.

14       He also said, "You swore to follow all lawful orders.

15  These are not lawful orders," to the police.  Last time I

16  checked, it's the police that makes the orders, not the

17  defendant.

18       He intended to obstruct and act knowingly by what he posted

19  the next day on January 7.  He proudly posted to Facebook a

20  video from the Capitol and said, "This is a video from the

21  Capitol yesterday.  Graphic language.  Disturbing footage.  I

22  became a little less restrained."

23       What are the hash tags to that post?  #Capitolbuilding,

24  #wildprotest, #stopthesteal, Washington, D.C., Capitol.

25       Then there's element 4, that he acted corruptly.  The judge

read to you what "corruptly" means.  It's either consciousness of wrongdoing or unlawful means or an unlawful purpose.  We submit that we've proved all three.

How do we know he was conscious that what he was doing was wrong?  Well, here's a good example.  He turns his camera off for the interaction with Campanale.  Officer Campanale sees he has a knife, walks over to him, points at him, and says, "Put that away."  But mysteriously, that wasn't in his own video.  He turned his camera off.  Why else would he do that if he didn't know what he was doing was illegal?

Unlawful means, well, I will cover these in more detail later, but let's just note the assaults on Anderson, on Nickerson, on Ainsworth, on Veisaj, and on Niewenhous.

An unlawful purpose, well, again, he's taking the law into his own hands.  "You swore to follow all lawful orders" to the police.  "These are not lawful orders," according to the defendant.

Also, just go back to his Facebook post.  He specifically is saying that what is lawful with the Electoral College vote count should be discarded.  "Plan A could be to just ignore the fraudulent electors."

Have we proved Count 2, obstruction of an official proceeding?  Yes, we have, beyond a reasonable doubt.

Moving on to the second group of counts, civil disorder and, quote unquote, assault.

1    For civil disorder, the judge read you, has four elements:

2    That the defendant knowingly committed an act or attempted to

3    commit an act; that he intended to obstruct, impede, or

4    interfere with a law enforcement officer; that the officers were

5    engaged in their lawful performance of duties, no question here;

6    and number 4, that the civil disorder obstructed, delayed, or

7    adversely affected either, one, commerce or, two, the movement

8    of goods or, three, the performance of any federally protected

9    function.  Again, we submit we proved all three.

10    How did the defendant obstruct, impede, or interfere with

11    officers?  Well, not only do we have the assaults on uniformed

12    officers protecting the Capitol, but again, just remember what

13    he said to all the officers all day long.

14    "Just let us in."  "Police stand down."  "This is our

15    house."  "We behind you."  "I just want to go knock on the

16    door."  "Let us in."

17    And don't forget about this.  We focus in on the assaults,

18    right, because they're disturbing, but his video covers a lot of

19    other acts to obstruct, impede, and interfere with officers

20    during a civil disorder, like this.

21    (Video played.)

22    MS. MILLER:  Ladies and gentlemen, he starts a "police

23    stand down" chant, and he focuses his camera directly on who?

24    The line of police officers, like Campanale, who had lined up at

25    the top of the grandstands and were ready to keep rioters from

getting closer to the Capitol building.

Also -- we will come back to it in a little bit, but you heard the alert noise on his phone that he completely ignored. Remember that that alert was telling him that the mayor was declaring an emergency.  Why?  Because of what was going on at the Capitol.

Again, even just this episode, he's keeping Officer Campanale from doing his job because Officer Campanale had to focus on telling him to put away a knife before he was cutting the zip ties for the tarp.  Yet, there's plenty of thousands of other people that Officer Campanale could have been worrying about.

And finally, lest we forget, as the sky is starting to dim and he's turned around on the Upper West Terrace facing north, Exhibit 504 at the very end, what does he say again?  "You see that, sons of bitches?  Fuck these assholes.  Hold the line," to police.

How do we know the civil disorder affected commerce or the movement of goods?  Remember Special Agent Brown's testimony about Safeway?  First, the mayor declared an emergency order and curfew, like I said, that alert noise.

In the order, the mayor said in Exhibit 121, "On January 6, 2021, protests transformed from peaceful to violent.  Barricades at the Capitol were stormed, and persons have entered the Capitol with the intent of disrupting proceedings.  Both Capitol

Police and Metropolitan Police Department officers have been injured.  A curfew is being set."

Exhibit 113 is the alert that the defendant received that we just heard on that video.

What's the result of the emergency that was declared? Well, Safeway sales at the stores in D.C. go into the red, and the number of shipments from Pennsylvania to D.C. on January 6 plummets.  Remember, Special Agent Brown told you, on January 5, there were over a thousand shipments for this one store we're looking at, 923.  Look how many there are on January 6.  Two total shipments.

But even if we hadn't proved that commerce was affected or goods were affected, we could also just prove this with that the civil disorder impeded a federally protected function.

Again here, we have multiple different federally protected functions, the official proceeding itself or also just the officers trying to do their duty.  And what does the defendant say to those officers?  "We behind you."

So have we proven Count 2, obstructing officers during a civil disorder?  Yes, beyond a reasonable doubt.

Now we come to the, quote unquote, assaults.  The reason why I keep calling them quote unquote is because the actual statute as the judge just read to you revolves around both assault or resisting, impeding, intimidating, or interfering with.  So it doesn't have to be -- it could be all of those, but

1    it could be any of those by themselves.

2        So even if you don't think of it as being an assault in the

3    traditional sense, as long as you find that this defendant

4    resisted, opposed, impeded, or intimidated with force any

5    officer, that's enough to find him guilty.

6        So we have to find he did that, that he used force, that he

7    did so voluntarily and intentionally, that they were doing their

8    official duties, no question there, and that he made physical

9    contact with the victim, true, and/or that he acted with the

10    intent to commit other felony.

11        Here, we just proved the other two felonies, Counts 1 and

12    2.  So there's no question of that.  Also, as you've seen

13    relentlessly in this trial, all the videos show that he touched

14    the five officers that are the victims of his assaults.

15        So the question you have to ask when you review this

16    evidence is, did the defendant assault, resist, oppose, impede,

17    or intimidate or interfere with the officers.  Remember, the law

18    does not require there to be punching, kicking, hitting or any

19    severe assault, as the defense referenced.

20        Also, even if it's an assault, the officer doesn't have to

21    be in fear.  Just because he's a big guy and he is maybe bigger

22    than the defendant and stronger, fear has nothing to do with the

23    law on assault.

24        So now we come to the assault on Officer Anderson.  I'm not

25    going to spend too much time on this one, because video --

1    Exhibit 307.1 shows pretty clearly that the defendant ran up a

2    short set of stairs directly into his body-worn camera on his

3    chest, and then because Officer Anderson was a big guy, he was

4    able to keep him back.  He didn't break through the line.

5        But what does he do next?  You see in the top photo here,

6    we have a freeze frame of him being down again at the bottom of

7    the steps.  Does he give up then?  No.  He runs up again, and

8    this time, he hits Officer Nickerson, who is just to Anderson's

9    left, which is why we have both body-worn cameras next to each

10   other in Exhibit 307.1, because you can look at one or the other

11   or both.  You can see the assault on both officers in both of

12   their body-worn cameras.

13       So again, Nickerson, ask yourself, did the defendant use

14   force to assault, resist, impede, oppose, intimidate, or

15   interfere with him?  Yes.

16       But even if you don't think the body-worn camera is enough,

17   take a look at Exhibit 707 that we covered here I think multiple

18   times today.  It's the same assault but from the other

19   direction.  You can see from the back.  I don't think I have to

20   tell you jurors that it's pretty clear he's not helping any

21   downtrodden elder individual here.  He's running up and

22   attacking the officers and found a convenient explanation after

23   the fact for why he was doing it.

24       Count 5 is Officer Ainsworth.  This one I want to spend a

25   little time with because I think the evidence got a little

1    confused during the trial.

2         Officer Ainsworth testified that the defendant knocked him

3    down.  That is what he remembers after reviewing video, and that

4    may be true.  The defense introduced an exhibit to him that he

5    had never seen before of an officer on the ground.  It was very

6    unclear who that officer was, whether it was Ainsworth, but

7    that's not the interaction that we have been focusing on for the

8    purposes of Count 5.

9         What you should focus on for Count 5 is Exhibit 303.1 at

10   around the 50-second mark.  You will see Officer Ainsworth with

11   his face shield up.  Remember, that's how he identified himself.

12   And then you will see the defendant, who claims that he was

13   doing it to help these two other men who had been pushed down by

14   the police.

15        But the problem with his story, ladies and gentlemen, is

16   that at 54 seconds, he engages with Officer Ainsworth.  At 57

17   seconds, you see those two individuals are up, circled in

18   yellow, and are moving away from any danger.  But still, the

19   defendant yells, "Let him up, let him up, let him up" for how

20   much longer?  At least another ten seconds.

21        So whether he initially started pushing against Officer

22   Ainsworth because of those other two gentlemen changed at some

23   point, because you don't need to push for 25 seconds or 30

24   seconds when the two guys you're trying to save are well away

25   and out of the camera's focus.

1          Let's watch that one together.

2          (Video played.)

3          MS. MILLER:  Ladies and gentlemen, we just saw one of

4    the two men he was purportedly saving, the guy in the blue

5    sweatshirt with the tan hat.  He was so okay by the time that

6    the defendant finishes saying "let him up" that he was going in

7    for more or going back in to grab someone.

8          So obviously, the story is a nice after-the-fact recount of

9    why he would have been assaulting Officer Ainsworth.  And again,

10   it's assaulting, impeding, obstructing, or interfering with, any

11   of the above.

12         So even if you don't find it's an assault, did the

13   defendant use force to resist, impede, oppose, intimidate, or

14   interfere with Officer Ainsworth?  Yes.

15         Then there's Officer Veisaj.  Now, he didn't testify, but

16   Officer Leano testified, because he was standing right next to

17   him, so he got in both his own body-worn camera and Officer

18   Veisaj's body-worn camera.  The thing to remember about who he

19   is when you go back and review this evidence is that he has the

20   blue tape on his -- on the top of his helmet.  And you might

21   remember that Officer Leano testified that he could even read

22   his name tag in the video, K. Veisaj.

23         Again here, I'm not going to play the video for you, but

24   it's pretty clear that at some point when the defendant starts

25   doing his "hold the line" chant, you see him and Officer Leano

1    on the top, you see him to the right, turning around, linking

2    arms with other rioters, and starting to push.

3         And Officer Veisaj's body-worn camera is on the bottom

4    here.  That's why you see the defendant's jacket, which is

5    sitting right here before you, pushing up against the officer.

6         And just remember, if you are taking notes, you may want to

7    note the body-worn camera number for Officer Veisaj.  It's down

8    there in the bottom of the screen.

9         So again, ask yourself, did the defendant use force to

10   assault, resist, impede, impose, intimidate, or interfere with

11   Officer Veizaj?  Yes.

12        Finally, ladies and gentlemen, Count 7, Officer Niewenhous,

13   again, I don't think this one needs a lot of explanation.  The

14   video speaks for itself.  The defendant walked down a set of

15   stairs, saw and heard, which you can clearly here in the video

16   in the body-worn camera, the line of officers saying "move,

17   move, move," and rather than listen to them, instead, he lines

18   up and takes a run at Officer Niewenhous.  He doesn't just do it

19   once either.  He does it multiple times.  And what does he say?

20   His usual chant, "hold the fucking line."

21        Did the defendant use force to assault, resist, impede,

22   oppose, intimidate, or interfere with Officer Niewenhous?  Yes.

23        So we've come to the end of the second group of counts, 3,

24   4, 5, 6, 7.  Have we proved those beyond a reasonable doubt?

25   Yes, we have.

1    Finally, the restricted grounds or trespass counts, Counts

2    8, 9, 10, 11, and 12.  I've listed them here again for you

3    because I want to note one thing.  The names of the counts are

4    very similar, but they're not the same, because they rely on

5    different statutes.  So the numbered statutes are different.

6    There's a red line separating 8, 9, and 10 from 11 and 12

7    because 8, 9, and 10 are pursuant to the statute that's the

8    number 1752.  Whereas, 11 and 12 are based on the statute 5104.

9    Before I talk about all those counts, I just want to remind

10    you again, not only do the counts overlap to some degree, but

11    the evidence, especially for this group of counts, overlaps a

12    lot.  So I'm going to go through the evidence with you, but I'm

13    not going to repeat it to every single one of the counts because

14    it applies to many of these counts.

15    So first, what is the Capitol grounds or the restricted

16    perimeter?  You heard Officer Baboulis testify and get into

17    Government Exhibit 105, the red line, which is where they set up

18    the barricades and the signs and the snow fencing and the bike

19    racks on January 6.  The legal definition of a restricted

20    perimeter is "any posted, cordoned-off, or otherwise restricted

21    area of a building or grounds where a person protected by the

22    U.S. Secret Service is or will be temporarily visiting."

23    That includes the vice president and his or her immediate

24    family.  Take a look again at Exhibit 201 and 204.  There is no

25    question that Vice President Pence was -- planned to, which is

201, visit on January 6, and then, of course, was there and was evacuated in 204, along with his family.

As a reminder, we're talking here about the Upper West Terrace and these two areas of the West Terrace in particular. The yellow circle is where the interactions with Officer Campanale and Officer Anderson and Officer Nickerson primarily took place.  You see the risers and then the short set of stairs to the left in this image.

The blue circle is where we see the 4:30 time frame assaults.  Those involved Officer Ainsworth, Officer Veisaj, and then Officer Niewenhous.

What did Captain Baboulis say about the entire Upper West Terrace, whether we're talking about the area where the grandstands are or the lower level of the Upper West Terrace? Well, it had been closed to the public ever since she had been with U.S. Capitol Police, for 26-plus years.

Ladies and gentlemen, also keep in mind that a mass trespass is still a trespass.  Just because everyone else around you is doing something illegal doesn't make what your illegal activity is any less illegal.

Count 8, entering or remaining on restricted grounds, the two elements here are that the defendant entered restricted grounds without the lawful authority and that he knew the grounds were restricted and knew that it was unlawful.

There has been a lot of discussion throughout this trial

1    about signs.  I submit to you that there are a lot of kind of

2    signs.  There's not just literal signs, which there is evidence

3    that he saw because in his own video, both Exhibit 511 and

4    Exhibit 504, it shows him videoing these signs.  One of them is

5    on a bike rack, and it says "restricted area, do not enter."

6    Another one is on the ground near him when he's up in the face

7    of cops yelling for them to, you know, follow their duty,

8    remember their oath.  And it pretty clearly shows "area closed."

9    Yes, it's folded, but I can read it there.  I assume you can,

10   too.

11       But there are other kinds of signs than just physical signs

12   and literal signs.  The ones that he chose to ignore, well, law

13   enforcement everywhere, police lines everywhere, verbal commands

14   to move and leave.  Again, you will hear that on the body-worn

15   camera.  You heard Officer Ainsworth point himself out in the

16   surveillance video because he's a tall guy, and he was directing

17   people to move.  Right?

18       And then you have as a side note Mayor Bowser's emergency

19   text alert noting to the defendant, as captured on his own

20   video, that there was an emergency situation.  I don't know

21   anyone who would go running towards an emergency.

22       What was defendant's response to the signs?  Well, there's

23   a lot of examples of this, but let's just take a look at this

24   one.

25       (Video played.)

1          MS. MILLER:  He's up in the face of the line of

2     officers.  They're preventing him getting to his goal of

3     knocking on the door of the Capitol building.  And what does he

4     do?  He joins a chant calling them traitors.

5          Count 9, pretty similar.  The elements are disorderly or

6     disruptive conduct on a restricted grounds knowingly with the

7     intent to impede or disrupt government business -- well, we've

8     already shown you that with the obstruction count, Count 2 --

9     and then that conduct, in fact, impeded or disrupted government

10    business.

11         Disorderly conduct, as the judge told you, is conduct that

12    causes another person to fear that their person or property is

13    likely to be harmed.  It uses words "likely to produce violence

14    on the part of others," "is unreasonably loud and disruptive

15    under the circumstances," or "interferes with another person by

16    jostling."

17         We have proven all of these.  As you can see, top right

18    picture is the property issue.  Was he going to cut zip ties and

19    further destroy property?

20         As just one example of many, many, yelling "hold the line"

21    5 million times, that's loud and disruptive.

22         And then jostling, well, there's no question about that.

23    You have at least the five assaults to look at, one of which is

24    shown here with Officer Veisaj.

25         And then you could also -- even if you don't find

disorderly conduct, you can find disruptive conduct, which is a
disturbance that interrupts an event, activity, or the normal
course of a process.  Many of those have been proven already
throughout the evidence, whether it's the official proceeding or
the officers doing their duty.  He was disruptive.

Again, how do we know about the defendant's intent?  Well,
it's the same throughout here.  "I just want to go knock on the
door."  "This is our house."  "We're not backing down."  "Police
stand down."

And please, I ask you, go back to 504, because we didn't
spend a ton of time on the end of that video, but you hear him
for hours, ladies and gentlemen -- I think that exhibit is about
an hour long -- throughout the entire thing, you hear him up in
the face of officers, pushing against the lines, yelling things
like, "You see that, you sons of bitches?  Fuck these assholes.
Hold the line."

Count 10, physical violence on restricted grounds, we need
to prove that he engaged in physical violence on restricted
grounds and that he did so knowingly with the intent to impede
or disrupt government business.  Again, I refer you to the
assault counts, Counts 3, 4, 5, 6, and 7, for this.

Count 11, disorderly or disruptive conduct on Capitol
grounds with the intent to impede, disrupt, or disturb Congress,
the one difference here is that he has to have acted willfully
or knowingly, which we haven't talked about yet.  A person acts

willfully if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law.

However, remember, ladies and gentlemen, willfully does not require proof that the defendant be aware of the specific law or rule that his conduct may be violating.

Well, I don't need to remind you of all the specific evidence here.  He was relentlessly disobeying officers all day long on January 6, for example by chanting "police stand down."

And finally, Count 12, physical violence on Capitol grounds, we've proven to you this evidence already, that he engaged in physical violence, any of the assault charges, and that he acted willfully and knowingly, like we just went over.

So that's a typo in terms of the count numbers, sorry, but all the restricted grounds and trespass charges we proved beyond a reasonable doubt.

Very quickly, I want to talk for a moment about the defense's arguments that have been infused throughout this trial.  The defendant sat up on the stand and told you a number of different times about a number of different comments where he was just joking around.  Was he, though?  Because he spent the entire day there saying over and over again -- I mean, it's painful to listen to.  Spend some time with his own videos.  I don't think he was kidding.

Acting in self-defense or defense of others, well, again, the videos speak for themselves and show that he was the

aggressor.  Even if there was a moment here or there where there was someone nearby that he may or may not have been helping, pay close attention, because he might have helped them for a second, but for the next 30 seconds, he's just aggressive with the police, assaulting, impeding, interfering, et cetera.

They may talk about how he arrived after Congress had already recessed.  Well, that may be true.  He was entering Capitol grounds right about when Congress recessed.  But you heard Captain Baboulis say that they could not resume their official duties until every single rioter was off Capitol grounds.  That's why someone like Special Agent Brown had to go to the Capitol later in the evening, to ensure that the rioters let the Congress people get back to work.  That happened around 8:00 p.m.

What about assaults weren't severe assaults?  Well, that's not required under the law.

And storming, the term "storming," he didn't mean what we're saying he means by that, he was just storming the grass.  And again, pay attention to what he said about his regret.  The only thing he regrets about January 6 is using the term "storm."  Why?  Because it's so damning to him.

He didn't see the signs.  Well, we covered that already, but let me just remark that his -- Mr. Hill's testimony, who was interpreting the videos for you, somehow, even though he wasn't there on January 6, was able to interpret and see the sign on

the ground that said "Stop the Steal."  Remember that testimony?
So somehow, the guy who wasn't there who reviewed the videos can
see the sign and read it, but when the defendant himself videos
a sign that says "area closed," somehow the defense says that he
can't see that sign, not to mention all the other signs that
aren't literal, physical signs.

Finally, you heard a lot of questions about whether this is
just persuasive speech.  If it had just been persuasive speech,
we might not have been here.  But first of all, I don't think it
was very persuasive, and second of all, it was accompanied by
violence.  You heard the judge tell you, where violence begins,
the First Amendment ends.  Please remember that as you review
the evidence.

Also remember that proof beyond a reasonable doubt is just
proof that leaves you firmly convinced that the defendant is
guilty.  It is not proof beyond all possible doubt.

And I ask you, ladies and gentlemen, do not forget your
common sense.  This case revolves around common sense, both to
interpret what the defendant claims about his common sense on
January 6 and what your own common sense tells you otherwise.

Therefore, we submit that based on this evidence and based
on the evidence you're going to continue reviewing in your
deliberations, we have proven each and every one of these 12
counts beyond a reasonable doubt and would ask you to return a
verdict of guilty on all counts.

1      Thank you.

2          THE COURT:  All right.  Thank you, Ms. Miller.

3      Ladies and gentlemen, just as a reminder, as I've stated a

4  couple of times, you should follow the instructions that the

5  Court gives you.

6      And just to clarify, to act corruptly, the defendant must

7  use unlawful means or act with an unlawful purpose or both.  The

8  defendant must also act with consciousness of wrongdoing.

9      All right.  Mr. Pierce?

10         MR. PIERCE:  Thank you very much, Your Honor.

11     Ladies and gentlemen of the jury, thank you very much for

12  your time and attention this week.

13     Mr. Joseph Thomas did not act perfectly on January 6.

14  Thank goodness that is not something that's required in America,

15  and that does not make anything that he did illegal.  What he is

16  being charged with are very serious allegations that the

17  evidence simply does not support.

18     We do not ask you to resolve this case based on sympathy to

19  Mr. Thomas.  We simply ask that you look at the evidence, the

20  evidence, the judge's instructions, and reach a fair verdict.

21  And if you do that, you are going to find, we submit, that he's

22  not guilty on all charges.

23     And remember, the government must prove every element

24  beyond a reasonable doubt.  That's extremely important as you go

25  through your deliberations.

1          To sum up, as you heard during this trial multiple times,

2     Mr. Thomas went to D.C. that day to have his voice heard,

3     period, full stop.  Mr. Thomas actually wanted Congress to do

4     its duty.  That's what he wanted to have happen.  He wanted --

5     did he vote for Trump?  Absolutely.  He said that.  But he

6     wanted Congress to do its duty in allowing Congress to consider

7     and hear objections pursuant to the 12th Amendment.  And we

8     agree completely that you should not check your common sense at

9     the door.

10          And when you do that and you look at the evidence, you're

11     going to see that every single thing that Joe Thomas did that

12     day falls into one of three buckets of conduct.

13          Number 1, he was there to have his voice be heard and

14     petition his government for redress of grievances and exercise

15     his right to assemble.  Number 2, he was there to -- number 2,

16     in connection with various things that happened, he was trying

17     to protect himself.  Or number 3, he was trying to protect other

18     people.

19          So we're going to move right into these counts.  Count 1 is

20     civil disorder, and it requires a couple things.  Number 1 that

21     it absolutely requires, and this is the key here, is intent,

22     intent to obstruct, impede, or interfere with a law enforcement

23     officer.

24          All of the evidence in this case with respect to

25     Mr. Thomas's intent is that he went there to have his voice

heard.  He went there to support.  He went there -- as a matter
of fact, if you recall, he initially went to D.C. in order to go
see speeches at The Ellipse, and as you saw in his speech at the
truck stop, he actually planned to go to a picnic at the
Infinity statue after that.

Him and his wife and his daughter started to -- after the
speeches, started to walk down to the Capitol.  While they were
walking down there, if you recall, they came across some knives;
his wife actually came across some knives.  And they actually
turned those in to the Secret Service, because Mr. Thomas felt
that that was the right thing to do.

Mr. Thomas did not come to D.C. with any weapons.  He did
not go there to do anything except to have his voice be heard
and to go to have a picnic with his wife and his daughter.

Also I want you to focus on commerce with respect to this
count.  The government provided some evidence related to one
Safeway store, but there is no evidence that what happened at
the Capitol that day actually impacted the sales at that
particular Safeway store.

MS. MILLER:  Objection, Your Honor; misstates the
evidence.

THE COURT:  Sustained.

Ladies and gentlemen, it's your recollection of the
evidence that controls.  If any reference by the attorneys to
the evidence is different from your own memory of the evidence,

it is your memory that should control during your deliberations.

MR. PIERCE:  And also, in fact, as you -- in the evidence, there was a warning issued by Mayor Bowser on January 3rd to actually stay away from Washington, D.C., during the January 6 protest.  And in that news release, she announced that with respect to First Amendment demonstrations that day that the city was preparing for.  So if anything, what happened with respect to commerce on January 6 was the result of the mayor's announcement and those actions that were taken.

Another few remarks that were made about this count were the comment, "police stand down."  Mr. Thomas did say "police stand down," because he felt, as he testified, that he had a right to be there, and he believed that himself and other protestors had the right to give their speech at the Capitol with respect to what was occurring.

They also testified -- I'm sorry.  They also raised the issue of the alert, that Mr. Thomas -- that came through the phone that you heard that Mr. Thomas, he heard the alert, but he was filming, and so he did not see it.  And then whenever he went to look at his phone when he had a chance, that alert was not there anymore.  But as he testified, there were lots of things going on, and he did not have time to see what that alert actually was.

Also, with respect to the knife incident when he was under the risers, everything that he did under those grandstands with

respect to whenever the police told him to do something, Officer

Campanale told him to do something, he complied with.  When

Officer Campanale told him to back up, he backed up.  When

Officer Campanale told him to get rid of the knife, he handed

the knife back to the person who had handed it to him.  Officer

Campanale did not instruct him to give Officer Campanale the

knife.  He did not reach out and try to take the knife back from

Officer Campanale.  He was complying with those orders.

And so with respect to Count 1, there's simply no intent

demonstrated to impede, resist, or obstruct officers or law

enforcement.

With respect to Count 2, this honestly, I will submit to

you, should be relatively easy.  There is no evidence whatsoever

that Mr. Thomas came to D.C. to obstruct an official proceeding

of Congress.

To the contrary, it is exactly the opposite.  Mr. Thomas

wanted Congress to consider the objections that started to be

raised that day so that the process in the 12th Amendment could

actually occur.

And if you think about this for a second, one of the things

that the government uses against Mr. Thomas is that he posted

the text of the 12th Amendment to the Constitution on social

media.  The text of the 12th Amendment is exactly what is

supposed to occur.  Mr. Thomas posted that because that's

exactly what he wanted to occur.  He did not post something that

said, you know, to heck with the 12th Amendment, we don't want that to happen.

Mr. Thomas believes in the Constitution. He loves the Constitution. And he posted the 12th Amendment because that's what he wanted to occur.

So not only is there -- so there's no intent whatsoever to obstruct an official proceeding of Congress, and there's certainly no corrupt intent to obstruct an official proceeding of Congress. He did nothing with, I think the phrase is, consciousness of wrongdoing. He testified consistently that he believed that everything that he was doing that day was lawful and that he was allowed to be doing. He certainly didn't receive any kind of benefit or anything like that from a personal standpoint in terms of bribes or anything like that. He simply went there to have his voice be heard.

And as the judge instructed, there is a First Amendment aspect to this count with respect to conduct that is expressive and that folks want to make under the First Amendment.

He simply -- it's the absolute opposite of intending to, wanting to obstruct an official proceeding. He wanted that particular official proceeding to proceed.

And also, if you think about it, organizing a caravan or being a part of a caravan to go to the District of Columbia is something that millions and millions of Americans have done over time in our history, and really, it's the quintessential and

it's the classic First Amendment activity.

He wanted Congress to do its job, and he had no intent to stop that, and he certainly had no corrupt intent.  If he did, he would not have come there with no weapons.  He would not have come there and started walking down to the Capitol with his wife and 16-year-old daughter.

Now, whenever he was walking down there with his wife and his at the time 16-year-old daughter, you recall at a certain point he testified that he started to smell OC gas or tear gas.  And at that point, he said to his wife, Hey, get my daughter out of here.  And then he did proceed to go down to the Capitol.

I believe Ms. Miller said that she can't imagine anybody who would move toward an emergency.  Mr. Thomas is somebody who would move toward an emergency.  That's what he testified to.  He is simply not the kind of person that is going to move in the other direction when he believes that people are in distress, whether that's protestors or whether that's law enforcement.

In addition, Congress was -- the official proceeding was halted before Mr. Thomas got there.  And so there was nothing about the halting of the certification process that Mr. Thomas himself had anything to do with, because he got there after that had been halted.

Now, you heard the testimony of Officer Baboulis with respect to needing to make sure that every single protestor was cleared out before they could resume the certification and that

they really could not start that security sweep to ensure that
until everyone had left.  But there is no evidence whatsoever
that Mr. Thomas himself delayed the start of that security sweep
by even one second.

And then the other thing I want to say about this is,
Mr. Thomas did mention in one of his social media posts the
concept of 3 percent.  The 3 percent refers to -- in the
American Revolution, there were apparently 3 percent of the
folks who fought against tyranny.  That's a common concept in
history.  Mr. Thomas is absolutely not a part of that group, and
he's a part of no sort of group such as that.

So with respect to Count 2, we do not believe those
elements have been met.  And frankly, that's, I argue, a very
easy decision for you, not guilty on that front.  Certainly,
they do not reach their burden of beyond a reasonable doubt.

Now let's move to the alleged assaults, and these are
Counts 3 through 7.  And in this charge, the government has to
show multiple things.  The first two are that the defendant
assaulted, resisted, opposed, impeded, intimidated, or
interfered with an officer of the United States or any person
assisting such an officer and, second, that the defendant did
such acts forcibly.  And then a definition of assault -- and the
definition's in the jury instructions.  The term "assault" means
any intentional attempt or threat to inflict injury upon someone
else when coupled with an apparent present ability to do so.

1     Now, we're going to go through quickly the key videos here.

2   I know you've seen them a lot.  But please, when you go back to

3   that jury room, please look at every single moment, every single

4   aspect of those videos, all the context, everything that was

5   happening, and everything that was said.

6     And I believe you will see, or the evidence will show that

7   there was never any intentional attempt or threat to inflict

8   injury upon someone else.  To the extent that there was contact

9   in these circumstances, it was either the officers moving

10  towards him or it was in the effort to defend himself or defend

11  other individuals.

12    So let's go to Count 3.  This is with respect to

13  Mr. Anderson.  Why don't you go ahead and play that.

14    (Video played.)

15        MR. PIERCE:  Again, when you go back and look at these

16  videos, look at them very, very carefully, and remember the

17  testimony of all the witnesses.

18    On Count 3 and on Count 4, really what happened here is

19  that Mr. Thomas had noticed an individual that he had an

20  altercation with, words with previously.  Let me back up.

21    With respect to the countdown that you hear in Counts 3 and

22  4, Mr. Thomas testified that he was not a part of that

23  countdown.  He was not somebody who was participating in that

24  countdown.  And whenever the crowd began to move forward, he had

25  noticed an individual that he had these words with, thought was

perhaps trouble, and he actually began to move toward that
individual to prevent further problems.

And then as he got close to that line, he saw that there
was a gentleman that was falling down, and he attempted to reach
for that individual to help them.  He was -- he was actually
unsuccessful in doing that, and he fell, was pushed by officers.
He started flailing with his hands.  It was kind of a confused
scene, but there was no intent to threaten or to inflict injury
by Mr. Thomas.

Also, with respect to Mr. Anderson, he testified on
cross-examination that he didn't believe there was any intent by
Mr. Thomas to injure him and that he was not afraid.  Of course,
Mr. Anderson is a larger individual.  He was not afraid.  He was
also asked to identify Mr. Thomas, and he said that he did not
recognize Mr. Thomas.

So with respect to Count 3, that was trying to help that
individual falling down and having incidental contact with those
officers.

And with respect to Count 4, go ahead and play Count 4.

(Video played.)

MR. PIERCE:  So here, it's the same scene.  This is an
individual named Officer Nickerson.  You will recall that
Officer Nickerson did not testify.  And so we do not know
exactly what Officer Nickerson would have said.

But again, it's the same scene.  You see that Mr. Thomas is

1    hit on the back with a flag pole, and you see a confused scene

2    where he's reaching for an individual to try to help.  He falls,

3    and he is contacted by the officers.

4        So with respect to that alleged count, he was acting in

5    defense of others, and any contact that he had with those

6    officers was incidental.  He was not attacking them.  He did not

7    act with any intent to threaten or to inflict bodily injury.

8        Let's move to Count 5.  This is Officer Ainsworth.

9        (Video played.)

10        MR. PIERCE:  And what you can see in this video really

11    sums up I think in a very good way Mr. Thomas's actions and

12    intent that day.

13        Mr. Thomas saw that -- Mr. Thomas -- first of all, he saw

14    individuals being struck with overhand strikes with batons.  He

15    himself actually, Mr. Thomas, was struck on January 6 with

16    strikes to the head with batons.

17        Again, Mr. Thomas, whether it's just who he is, it's his

18    training or whatnot, he is not somebody who is going to shy away

19    from that situation.  He was trying to help that individual.  It

20    was a confused scene.  There were multiple individuals on the

21    ground, and he was trying to -- he said, "Let him up, let him

22    up, let him up," and he was clearly trying to assist that

23    individual who was on the ground.

24        And he testified also that he was not only trying to assist

25    other protestors who were in danger that day or being attacked,

1    he was also attempting to assist law enforcement on that day.

2        Also with respect to Officer Ainsworth, he testified that

3    he was 100 percent certain that it was defendant Thomas who

4    pushed him to the ground.  As the evidence showed, the person

5    that actually pushed Officer Ainsworth to the ground slightly

6    before that was not defendant Thomas.  And we think that you

7    should take that into account when evaluating credibility of

8    Officer Ainsworth's testimony.

9        So Count 5, clearly defense of others.

10       Count 6, let's go ahead and play that.

11       (Video played.)

12           MR. PIERCE:  So this is Officer Veizaj.  Again, that

13   officer did not testify.  We don't know what he would have said.

14       In Count 6, defendant Thomas was attempting to essentially

15   prevent a clash between officers and protestors and trying to

16   allow others to get up and to retreat.  He simply -- he turned

17   his back, essentially, to the officers in that effort to create

18   space between those two groups.

19       And so in that circumstance, again, that was the officers

20   that were pushing forward towards him, and any contact also

21   related to defense of others and of self really to try to create

22   space and to try to prevent those two groups of individuals from

23   coming together.

24       Also, the defendant testified that his repeated use of

25   "hold the line" was -- it was actually directed to both groups

1    of individuals that day.  It was essentially taking the position

2    that the protestors had a right to be there and that they should

3    hold the line because they had a right to be there, in his view,

4    and to exercise, you know, their right to say what they wanted

5    to say.  And it was also to the police, indicating to them that

6    they should just stay on line so that there was not additional

7    violence and the two groups of people did not get in any further

8    altercations with each other.

9        So that is Count 6.  And go ahead to Count 7.

10       (Video played.)

11           MR. PIERCE:  And so with respect to Count 7, I'm not

12   sure we saw the contact there, but that was also a situation

13   where the officers -- the line of officers was moving toward --

14   in the direction of defendant Thomas and the protestors.  He

15   actually -- he said he lowered his shoulder, covered his face,

16   and he was essentially in a state of sort of peaceful or passive

17   resistance of just standing there in the belief that he had a

18   right to be there and to say the things that he was saying.

19       But there was certainly not any -- there was certainly not

20   any intent to threaten or to injure any law enforcement officers

21   with that action.

22       Now, moving to --

23       (Video played.)

24           MR. PIERCE:  So that's what we were referring to just

25   there, and you saw that defendant Thomas was experiencing

effects of the tear gas or the pepper spray.  You also saw that

he was repeating the line that he used repeatedly throughout the

day, "We want freedom.  We want peace."  And he was essentially

attempting to stand there and to be in a position where he felt

he could be to exercise his rights.

And now moving on to 8, 9 -- 8 and 9 and 10, these -- so

Count 8 is entering or remaining in a restricted building or

grounds.  We think this one is pretty straightforward as well.

There is no evidence whatsoever that Mr. Thomas saw any

signs or indications or announcements that he was not allowed to

be in the area that he was there, that it was restricted.  He

did see a sign earlier on when he was up by The Ellipse that

indicated it was restricted.  He complied with that.

And then there was a half-broken sign that was laying on

the ground down by the Capitol.  But he was very clear that he

did not see anything indicating that he should not be there.  He

believed that he was allowed to be there.  And you heard the

testimony of David Sumrall that indicated that similar

experience at the Capitol.

So Count 8, he did not have any intent to be on any

restricted grounds or know that he was on any restricted

grounds.

That also applies to Count 9.  Count 9 refers to alleged

disorderly or disruptive conduct in a restricted building or

grounds.  The same argument applies there with respect to, it

1    was not -- he did not know or believe that he was on restricted

2    grounds.

3          That also requires the intent to impede or disrupt the

4    orderly conduct of government business or official functions,

5    and the same things we've indicated before apply there.

6          He did not have any intent to do that whatsoever, and

7    anything that he did with respect to the knife incident,

8    somebody handed it to him, he handed it back, and he complied

9    with the officers.

10          And with respect to the alleged assaults, all those were

11    self-defense or defense of others, or was conduct that was

12    either incidental or the police were making the contact.

13          Count 10, also similar points, was not restricted

14    grounds -- he did not believe he was on restricted grounds.  He

15    was on no notice that they were on restricted grounds, and also,

16    to the extent that there's any argument that he engaged in

17    physical violence, again, that would be something that was

18    self-defense or defense of others.

19          Count 11, disorderly conduct in a Capitol building or

20    grounds, that requires that the defendant engage in disorderly

21    or disruptive conduct in the United States Capitol or grounds

22    and that he did so with the intent to impede, disrupt, or

23    disturb the orderly conduct of a session of Congress or either

24    house of Congress.

25          And again, he did not go there -- he had no intent to

disrupt any or disturb any proceeding of Congress.  He wanted
Congress to proceed with its duties.  And again, any activity he
engaged in that involved contact with officers was self-defense,
defense of others, or incidental contact, or was initiated by
the officers.

     And then finally, Count 12, act of physical violence in the
Capitol grounds or building, basically, the same points as the
other last few counts.

     There was -- anything that he did with respect to alleged
physical violence was something that was in his own defense or
defense of others.  And so we believe that that count as well
should be not guilty.

     So to sum things up, it is the quintessential American
thing to do to get in a caravan and go to D.C. and to have your
voice be heard.  That is what Mr. Thomas set out to do that day.
Everything he did that day was either that or it was in defense
of other people or defense of himself.

     And when you go back there and you review the evidence,
please remember that every single element must be proven beyond
a reasonable doubt.  And so what I will leave you with is
Mr. Thomas's speech at the truck stop, which indicates very
clearly what he set out to do and was intending to do in D.C.
that day.

     (Video played.)

          MR. PIERCE:  Mr. Thomas did not go to D.C. to hurt

anyone.  He did not go to D.C. to obstruct any official

proceeding of Congress.  And he did not do so.  So we would ask

you to return a verdict of not guilty on all counts.

Thank you very much.

THE COURT:  Thank you, Mr. Pierce.

Mr. McCauley?

MR. MCCAULEY:  Yes, Your Honor.

Good afternoon, everyone.  I just want to offer a couple

quick points on what you just heard.

Mr. Pierce talked a lot about what Mr. Thomas knew about

the restricted perimeter around the Capitol.  Ladies and

gentlemen, I submit to you that even if he did not know the

perimeter was restricted when he passed through the Peace

Circle, any reasonable person would know it was restricted by

the time he got to the Upper West Terrace.

We saw a video very briefly in the defendant's closing

argument.  It was of the east front of the Capitol.  That is the

area where Captain Baboulis testified that there were permits.

The west front is not the east front.  The east front is not the

west front.  The defendant was never on the east front.  He made

his approach through the west front.

Mr. Pierce talked a lot about self-defense, and he asked

you, watch the videos closely.  We are also asking you to watch

them closely, because each and every second of them refute the

narrative that the defendant put forward about them.

For Counts 3 and 4, he says that he was assisting the older gentleman with the cane.  Yet, the video shows him clearly bounding up the steps in the opposite direction of the people with the cane.

For Count 5, the assault against Corporal Ainsworth, it shows him pushing an officer with his face shield up well after the people behind him had gotten up.

Count 6 and Count 7 speak for themselves.  There was a gap that the defendant chose to enter, chose to brace himself against the officers, chose to turn and yell "hold the line."

And finally, for Count 7, it also speaks for itself.  Again, you can see that there's a space.  You can see there's a gap.  And you can see the defendant turn and check his entire body into Officer Niewenhous's shield as he is making an approach, yelling "move back, move back, move back."  You can hear it in the video.

And that video that you saw, it's also from the time period around when Counts 3 and 4 occurred, in the defendant's closing, that is not the assaultive conduct.  That is from immediately after, after the defendant had failed to get through the line, after he had failed in his two charges up the steps, after he had bounded the opposite way of the gentleman who had fallen.

Only when he failed did he go back to try and help that person.  That is not self-defense or defense of others.

You heard a lot about the First Amendment.  The First

1    Amendment protects many sacred rights.  But the right to engage

2    in violence is not among them.  As Ms. Miller said, where

3    violence begins, the First Amendment ends.

4          The defendant chose, when his words did not succeed, to

5    engage in violence, and he chose it repeatedly, five times over

6    the course of an hour.

7          The evidence is clear.  Find the defendant guilty of all of

8    the charges before you.

9          Thank you.

10              THE COURT:  All right.  Ladies and gentlemen, I have

11   about ten minutes more of brief instructions before I excuse you

12   for the day.

13         Does anyone need a break, or can you sit through these

14   instructions?  All right.  Okay.

15         Each count of the indictment charges a separate offense.

16   You should consider each offense and the evidence which applies

17   to it separately, and you should return separate verdicts as to

18   each count unless I instruct you to do otherwise.

19         The fact that you may find the defendant guilty or not

20   guilty on any one count of the indictment should not influence

21   your verdict with respect to any other count of the indictment.

22         At any time during your deliberations, you may return your

23   verdict of guilty or not guilty with respect to any count.

24         I will be sending into the jury room with you the exhibits

25   that have been admitted into evidence.  You may examine any or

all of them as you consider your verdicts.  Please keep in mind that exhibits that were only marked for identification but were not admitted into evidence will not be given to you to examine or to consider in reaching your verdict.

During this trial, a number of exhibits were admitted into evidence.  Sometimes, only parts of an exhibit that are relevant to your deliberations were admitted.  Where this has occurred, I have required the irrelevant parts to be blocked out or deleted.  Thus, as you examine the exhibits and you see or hear a statement where there appear to be omissions, you should consider only the portions that were admitted.  You should not guess as to what has been taken out.

When you return to the jury room, you should first select a foreperson to preside over your deliberations and to be your spokesperson here in court.  There are no specific rules regarding how you should select a foreperson.  That is up to you.

However, as you go about the task, be mindful of your mission to reach a fair and just verdict based on the evidence. Consider selecting a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, who will encourage civility and mutual respect among all of you, who will invite each juror to speak up regarding his or her views about the evidence, and who will promote a full and fair consideration of the evidence.

1          As I have mentioned repeatedly throughout the trial, there

2    could be reports in the newspapers or on the radio, Internet, or

3    television about this case.  You may be tempted to read, listen

4    to, or watch media coverage.  But as I've explained, you must

5    not read, listen to, or watch such reports, because you must

6    decide this case solely on the evidence presented in the

7    courtroom.  As I've mentioned, if you receive automatic alerts

8    from any source, you may need to change your push notifications,

9    news subscriptions, or RSS or Twitter feeds.

10         If any publicity about this trial inadvertently comes to

11   your attention, do not discuss it with other jurors or with

12   anyone else.  Just let me or my clerk know as soon after as it

13   happens as you can, and I will briefly discuss it with you.

14         As you retire to the jury room to deliberate, I also wish

15   to remind you of another instruction that I've given you on

16   multiple occasions throughout the trial.  I've told you not to

17   communicate with anyone about this case.  Now during your

18   deliberations, you may not communicate with anyone who is not on

19   the jury about this case.  This includes any electronic

20   communications such as e-mail or text or any blogging about the

21   case.

22         In addition, you may not conduct any independent

23   investigation during deliberations.  This means you may not

24   conduct any research in person or electronically via the

25   Internet or in another way.

You may speak to your fellow jurors about the case, but only in the jury room.

If it becomes necessary during your deliberations to communicate with me, you may send a note by the clerk or marshal, signed by your foreperson or by one or more members of the jury. No member of the jury should try to communicate with me except by such a signed note, and I will never communicate with any member of the jury on any matter concerning the merits of this case except in writing or orally here in open court.

Bear in mind also that you are never under any circumstances to reveal to any person, not the clerk, not the marshal, or me, how jurors are voting until after you have reached a unanimous verdict.

This means that you should never tell me in writing or in open court how the jury is divided on any matter. For example, you should not say 6-6 or 7-5 or 11-1 or any other fashion, whether the vote is for conviction or acquittal or on any other issue in this case.

The punishment provided by law for this crime is for the Court to decide. You may not consider punishment in deciding whether the government have proved its case against the defendant beyond a reasonable doubt.

A verdict must represent the considered judgment of each juror, and in order to return a verdict, each juror must agree on the verdict. In other words, your verdict must be unanimous.

1    When you have reached your verdict, just send me a note

2    informing me of this fact and have your foreperson sign the

3    note.  Again, do not tell me what your verdict is.  The

4    foreperson should fill out and sign the verdict form that will

5    be provided.  I will then call you into the courtroom and ask

6    your foreperson to read your verdict in open court.

7    You will be provided with a verdict form for use when you

8    have concluded your deliberations.  The form is not evidence in

9    this case, and nothing on it should be taken to suggest or

10   convey any opinions by me as to what the verdict should be.

11   Nothing on the form replaces the instructions of law that I

12   have already given you, and nothing on it replaces or modifies

13   the instructions about the elements which the government must

14   prove beyond a reasonable doubt.  The form is meant only to

15   assist you in recording your verdict.

16   So the last thing I must do before you begin your

17   deliberations is to excuse the alternate juror.  As I told you

18   before, the selection of alternates was an entirely random

19   process.  We selected two seats to be the alternate seats before

20   any of you entered the courtroom.

21   As you know, one juror has been excused for good cause.  So

22   we now have only one remaining alternate.  Because the rest of

23   you have remained healthy and attentive, I can now excuse the

24   juror in seat number 5.

25   Hold on just a moment.  Before you leave, I am going to ask

you that you tear out a page of your notebook and that you give
your name and your number to the clerk.  I do this because it's
possible, though very unlikely, that we will need to summon you
back to rejoin the jury if something happens to a regular juror.

Since that possibility exists, I am also going to instruct
you not to discuss this case with anyone until we call you.  My
earlier instruction on the use of the Internet still applies.
Do not research this case or communicate about it on the
Internet or in person.

In all likelihood, we will be calling you to tell you there
has been a verdict and you are now free to discuss the case.
There is, however, the small chance that we will need to bring
you back on the jury.

Thank you very much for your service.  We are extremely
grateful for your time and attention in this case.  Again,
before you leave, please be in touch with Mr. Hopkins with your
number and name.

All right.  Ladies and gentlemen, rather than sending you
into the jury room to deliberate, it's been a long day.  I'm
going to excuse you for the day and have you come back tomorrow
at 9:30 to begin your deliberations.

So again, the reminders continue about discussing the case
and doing any research.

Thank you for your attention.

(Jury exited courtroom.)

1          THE COURT:  All right, Counsel.  So I did catch

2    another typo with regard to the firearm and ammunition in one of

3    the instructions that I read.  I do want you all to review again

4    the instructions that I gave you, as well as the verdict form,

5    to make sure that there are not any other errors that I could

6    fix before the jury begins deliberations.

7          I also want you to review with the courtroom deputy the

8    exhibits and what's been admitted and what's not been admitted,

9    and that you all state on the record that you're in agreement

10   about what's been admitted, and we do that on the record.

11         So we can do that now, or we can bring you back at

12   9:00 a.m. and go over any errors in the instructions and make

13   sure the exhibits are all accurate, whatever is going back, the

14   verdict form, et cetera.

15         The courtroom deputy clerk will obtain your signatures

16   acknowledging the list of exhibits that are going back to the

17   jury.

18         So I'll start with Mr. Pierce, Mr. Roots.  Do you want to

19   come back tomorrow at 9:00 a.m. or stay and do this now?

20         MR. ROOTS:  9:00 a.m. sounds good to me.

21         THE COURT:  All right.  Does that work for the

22   government?

23         MS. MILLER:  Yes, Your Honor.  Is it possible to get a

24   copy of these in electronic form that we could look at as well?

25         THE COURT:  Sure.  Absolutely.

1          And the law clerk will incorporate the edits we made today

2     and send that, and if you can incorporate that, just redline so

3     they know.

4          What else?  But do let us know -- if you review it tonight

5     and you find errors, let us know as soon as possible.

6     Otherwise, you can let us know tomorrow at 9:00.  But we do need

7     to copy sets for each juror.  So that will take some time.  If

8     you end up having any edits to make before then, let us know.

9          Is there anything else we need to cover this evening?

10               MR. MCCAULEY:  Not from the government, Your Honor.

11               THE COURT:  From the defense?

12               MR. ROOTS:  Not from the defense.

13          There's one thing, which is just that matter of that

14     transcript from that other trial.  I would like to just make

15     sure that we do get it, if it ever appears.

16               MS. MILLER:  We actually just got it today.

17               MR. MCCAULEY:  Sorry, Your Honor.  We did start to

18     receive parts of the transcript today, but from my very quick

19     review, and I could be wrong about this, I don't believe Officer

20     Campanale's testimony is in there.  It appears to be the opening

21     and the closing arguments of the case.

22               THE COURT:  Have the parties ordered that?

23               MR. MCCAULEY:  We have.  Our colleagues who tried that

24     case are keeping us informed as the minutes are being developed,

25     but --

1          THE COURT:  So you expect to have it tonight?

2          MR. MCCAULEY:  Tomorrow.  If I'm optimistic, tomorrow;

3    if I'm realistic, mid-week.

4          THE COURT:  All right.  Well, Mr. Roots, based on our

5    discussion here, I don't see how this becomes relevant in this

6    case.

7          MR. ROOTS:  You've already ruled, but in the event

8    that the transcript shows more of possible direct involvement of

9    the cross-fertilization of Campanale's testimony, then I

10   think --

11         THE COURT:  The appropriate motion can be filed, of

12   course.

13         MR. ROOTS:  It could be a habeas corpus issue or

14   something, motion for new trial.

15         THE COURT:  Understood.  It would be helpful to get

16   this.

17         MR. MCCAULEY:  We will follow up with our colleagues

18   who tried that case and see if maybe we can't hurry things

19   along.

20         MR. ROOTS:  We recognize the evidence is in, and

21   there's no altering that.

22         THE COURT:  All right.  We will be back at 9:00 a.m.

23       (Proceedings adjourned at 5:32 p.m.)

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Sara A. Wick_____          July 11, 2023_____

SIGNATURE OF COURT REPORTER          DATE

**#**

**#172** [1] - 1:18

**/**

**/s** [1] - 258:8

**1**

**1** [24] - 4:18, 59:8, 116:13, 116:18, 122:24, 125:9, 136:3, 140:14, 140:16, 146:6, 148:11, 162:15, 167:4, 186:7, 188:12, 196:20, 210:4, 210:14, 210:19, 218:11, 232:13, 232:19, 232:20, 235:9
**10** [14] - 54:11, 54:17, 59:8, 75:25, 125:20, 159:2, 199:25, 210:6, 223:2, 223:6, 223:7, 227:17, 244:6, 245:13
**100** [4] - 7:18, 8:18, 88:24, 242:3
**103** [2] - 210:23, 211:13
**105** [2] - 2:16, 223:17
**108** [1] - 2:6
**109** [1] - 148:11
**10:56** [1] - 77:24
**11** [12] - 149:6, 150:16, 150:19, 151:3, 200:17, 210:6, 223:2, 223:6, 223:8, 227:22, 245:19, 258:8
**11-1** [1] - 252:16
**111** [3] - 2:6, 128:19, 129:5
**1111** [1] - 128:25
**113** [2] - 2:7, 217:3
**115** [1] - 2:16
**11:00** [1] - 69:20
**11:15** [2] - 77:10, 77:22
**11:22** [1] - 77:24
**12** [12] - 3:22, 6:23, 75:24, 201:21, 209:24, 210:6, 223:2, 223:6, 223:8, 228:9, 230:23, 246:6
**121** [1] - 216:22
**12:00** [2] - 90:4, 90:5
**12th** [7] - 212:17,

232:7, 235:18, 235:22, 235:23, 236:1, 236:4
**14** [1] - 38:21
**15** [2] - 76:1, 110:8
**15-minute** [1] - 77:13
**1512** [5] - 116:10, 119:20, 129:5, 149:12, 169:4
**1512(c** [2] - 141:14, 147:19
**1512(c)** [1] - 151:7
**1512(c)(2** [2] - 148:8, 168:7
**1512(c)(2)** [1] - 148:6
**15:30-ish** [2] - 10:1, 10:11
**16-year-old** [1] - 237:6, 237:8
**16:22:40** [1] - 5:25
**16:26** [1] - 10:16
**16:29** [1] - 11:1
**170** [1] - 208:10
**1752** [2] - 144:23, 223:8
**177** [1] - 2:9
**18** [3] - 128:19, 163:4, 171:9
**19** [1] - 171:11
**191** [1] - 129:7
**1946** [1] - 201:10
**1992** [1] - 87:17
**1:00** [6] - 98:15, 99:2, 105:15, 110:6, 110:8, 112:4
**1:05** [1] - 210:24
**1:08** [1] - 152:1
**1:30** [1] - 140:3
**1:45** [2] - 151:19, 151:25
**1:56** [1] - 152:1

**2**

**2** [22] - 90:9, 116:18, 144:10, 176:19, 189:19, 189:21, 190:21, 192:15, 193:2, 196:20, 210:3, 210:9, 210:16, 211:17, 214:22, 217:19, 218:12, 226:8, 232:15, 235:12, 238:12
**20** [7] - 7:12, 8:2, 20:1, 58:8, 70:7, 113:19, 169:9
**20-minute** [1] - 69:18
**200-plus** [1] - 41:22

**20001** [1] - 1:22
**201** [2] - 223:24, 224:1
**202-354-3284** [1] - 1:23
**2021** [4] - 84:14, 115:5, 206:17, 216:23
**2023** [3] - 1:6, 18:9, 258:8
**204** [2] - 223:24, 224:2
**20579** [1] - 1:15
**206** [1] - 2:10
**21** [2] - 2:3, 168:11
**21-552** [1] - 3:5
**21-cr-552** [1] - 1:3
**214** [3] - 32:2, 32:10, 32:13
**21550** [1] - 1:17
**21st** [1] - 208:3
**22** [1] - 1:6
**23** [1] - 2:15
**231** [13] - 2:11, 120:4, 120:21, 145:5, 145:7, 145:10, 155:12, 160:23, 161:3, 161:20, 163:4, 164:9, 165:3
**247** [1] - 2:12
**25** [1] - 220:23
**25-plus** [1] - 87:11
**25th** [1] - 201:10
**26-plus** [1] - 224:16
**27** [1] - 205:11
**284** [1] - 152:23
**29** [4] - 116:8, 122:20, 166:10, 169:9
**292** [5] - 103:23, 104:10, 105:21, 110:19
**292.............................
............. [1] - 2:16
**295** [6] - 95:6, 95:14, 98:16, 98:17, 98:20, 111:11
**295.............................
............. [1] - 2:15
**2:13** [1] - 210:25
**2:15** [3] - 45:17, 110:9, 112:5
**2:26** [1] - 171:4
**2:30** [2] - 115:25, 140:5
**2:45** [2] - 169:19, 170:2
**2:48** [1] - 48:8
**2:53** [1] - 171:4

**3**

**3** [46] - 3:16, 3:24,

4:17, 9:24, 32:23, 122:24, 123:17, 123:20, 123:21, 123:22, 124:18, 124:19, 124:22, 124:23, 125:1, 125:5, 127:6, 132:19, 140:7, 141:6, 155:20, 155:21, 156:21, 157:9, 158:25, 159:1, 159:21, 195:12, 195:19, 210:4, 210:17, 211:17, 213:9, 222:23, 227:21, 232:17, 238:7, 238:8, 238:17, 239:12, 239:18, 239:21, 240:16, 248:1, 248:18
**3's** [1] - 4:9
**3,000** [2] - 38:25, 39:14
**30** [6] - 53:21, 55:13, 113:18, 137:12, 220:23, 229:4
**300** [1] - 96:24
**300-pound** [1] - 117:3
**301.2** [1] - 91:13
**301.3** [2] - 91:11, 92:5
**302** [3] - 15:18, 17:4, 17:6
**302s** [8] - 13:18, 13:20, 13:24, 14:22, 14:25, 16:18, 16:22, 17:17
**303** [1] - 20:5
**303.1** [4] - 58:20, 59:3, 139:6, 220:9
**303X** [2] - 21:20, 139:6
**305.1** [1] - 60:7
**307.1** [4] - 53:18, 58:2, 219:1, 219:10
**308** [2] - 25:20, 25:21
**308.1** [1] - 61:7
**31** [1] - 111:11
**333** [1] - 1:21
**35** [1] - 2:4
**387** [1] - 128:24
**3:30** [4] - 110:11, 113:24, 124:20, 127:14
**3:52** [1] - 205:22
**3:59** [1] - 205:22
**3rd** [1] - 234:4

**4**

**4** [35] - 9:24, 123:20,

123:21, 123:22, 124:18, 124:20, 124:22, 124:23, 125:1, 125:5, 127:6, 132:19, 140:7, 141:6, 155:20, 155:21, 156:21, 157:10, 158:25, 159:1, 159:21, 195:12, 195:22, 210:4, 210:17, 213:25, 215:6, 222:24, 227:21, 239:18, 239:22, 240:19, 248:1, 248:18
**40-second** [1] - 110:19
**418** [1] - 152:23
**43** [1] - 97:21
**434.3** [2] - 22:24, 23:12
**434.3.........................
............. [1] - 2:15
**438** [1] - 127:19
**45** [4] - 59:8, 75:8, 75:10, 174:22
**451** [3] - 84:12, 115:3, 115:9
**451.............................
............. [1] - 2:16
**4704-B** [1] - 1:22
**482** [1] - 128:23
**483** [1] - 127:19
**4:00** [1] - 211:15
**4:22:40** [1] - 137:20
**4:25** [1] - 137:20
**4:26** [1] - 137:20
**4:28** [1] - 137:21
**4:29** [1] - 137:21
**4:30** [4] - 110:13, 114:2, 127:14, 224:9

**5**

**5** [60] - 4:19, 5:23, 7:4, 7:15, 7:21, 9:9, 9:12, 9:19, 18:15, 69:20, 71:9, 71:12, 89:8, 123:12, 124:18, 124:24, 125:1, 125:3, 125:6, 125:8, 126:15, 126:18, 128:3, 128:6, 130:21, 130:22, 135:22, 137:19, 138:2, 139:12, 139:14, 140:10, 140:12, 140:15, 144:18, 144:22,

146:5, 146:12, 147:2, 155:10, 159:20, 159:21, 164:14, 195:12, 195:25, 198:23, 199:10, 210:4, 217:8, 219:24, 220:8, 220:9, 222:24, 226:21, 227:21, 241:8, 242:9, 248:5, 253:24
**50-second** [1] - 220:10
**500** [1] - 145:25
**504** [4] - 127:16, 216:15, 225:4, 227:10
**508** [1] - 31:14
**5104** [1] - 223:8
**511** [1] - 225:3
**54** [1] - 220:16
**559** [2] - 158:12, 158:15
**57** [1] - 220:16
**5:30** [4] - 174:4, 174:5, 177:17, 177:19
**5:32** [1] - 257:23
**5th** [1] - 89:10

### 6

**6** [106] - 1:9, 10:16, 14:4, 23:6, 30:24, 33:10, 33:15, 33:20, 33:22, 34:17, 35:6, 35:12, 37:11, 40:16, 41:10, 61:19, 62:1, 62:18, 62:24, 63:18, 65:14, 67:14, 67:17, 67:22, 69:6, 69:11, 78:3, 80:12, 83:1, 84:14, 84:20, 88:6, 88:7, 88:13, 89:3, 89:7, 109:5, 109:8, 109:16, 109:25, 110:1, 110:15, 115:4, 125:8, 126:15, 126:18, 130:22, 130:24, 132:20, 132:21, 133:6, 133:7, 135:9, 135:19, 135:23, 136:15, 137:5, 137:16, 137:19, 138:2, 138:5, 139:3, 139:14, 139:16, 140:7, 140:21, 155:20, 155:23, 155:24, 156:7, 156:15, 156:20,

157:2, 157:12, 157:17, 160:9, 160:10, 195:12, 196:3, 200:1, 206:17, 208:1, 210:4, 212:9, 212:15, 212:20, 216:22, 217:7, 217:10, 222:24, 223:19, 224:1, 227:21, 228:8, 229:20, 229:25, 230:20, 231:13, 234:5, 234:8, 241:15, 242:10, 242:14, 243:9, 248:8
**6-6** [1] - 252:16
**6-foot-4** [1] - 117:2
**600** [1] - 101:7
**601** [1] - 1:14
**615** [2] - 5:1, 5:12
**644** [1] - 129:8
**646** [1] - 129:8
**65** [1] - 2:4
**690** [1] - 128:25
**699** [1] - 129:7
**6:00** [2] - 174:6, 177:20
**6th** [2] - 89:14, 209:12

### 7

**7** [49] - 10:25, 122:24, 125:8, 130:23, 130:24, 132:20, 132:21, 133:6, 133:7, 135:9, 135:19, 135:23, 136:16, 137:5, 137:17, 137:20, 139:3, 139:14, 139:16, 140:7, 141:6, 155:20, 155:23, 155:24, 156:7, 156:10, 156:15, 156:16, 156:20, 157:2, 157:12, 157:17, 160:8, 160:9, 160:10, 160:16, 160:17, 195:12, 196:6, 210:5, 213:19, 222:12, 222:24, 227:21, 238:17, 243:9, 243:11, 248:8, 248:11
**7-5** [1] - 252:16
**707** [6] - 53:20, 55:13, 56:4, 56:14, 57:4,

219:17
**709** [1] - 24:21
**710** [7] - 6:1, 9:5, 72:11, 138:17, 138:19, 138:22, 139:6
**711** [4] - 6:1, 9:5, 72:11, 139:6
**712** [2] - 72:11, 139:6
**75** [2] - 18:4, 71:17
**7:30** [1] - 17:6
**7th** [1] - 211:16

### 8

**8** [16] - 93:10, 141:6, 151:3, 160:8, 160:17, 160:18, 198:4, 210:6, 223:2, 223:6, 223:7, 224:21, 244:6, 244:7, 244:20
**846** [1] - 152:23
**87** [1] - 2:5
**896** [2] - 158:11, 158:15
**8:00** [3] - 89:16, 209:12, 229:14
**8:06** [1] - 211:14
**8:50** [1] - 1:6

### 9

**9** [17] - 18:9, 93:11, 149:6, 150:15, 150:19, 151:3, 199:11, 210:6, 223:2, 223:6, 223:7, 226:5, 244:6, 244:23
**91367** [1] - 1:18
**92** [1] - 128:20
**923** [1] - 217:10
**946** [1] - 128:24
**97** [1] - 128:24
**98** [1] - 2:15
**9:00** [6] - 175:21, 255:12, 255:19, 255:20, 256:6, 257:22
**9:16** [1] - 21:1
**9:30** [2] - 21:1, 254:21

### A

**A.2d** [1] - 128:23
**a.m** [9] - 1:6, 21:1, 77:24, 211:15, 255:12, 255:19, 255:20, 257:22
**a.m.** [1] - 77:24

**abbreviations** [1] - 11:20
**abets** [1] - 193:6
**abetted** [6] - 190:3, 193:1, 193:3, 193:4, 193:12, 193:14
**abetting** [3] - 189:23, 194:18, 196:21
**abettor** [2] - 194:25, 195:7
**ability** [6] - 25:16, 118:18, 153:15, 184:22, 197:4, 238:25
**able** [13] - 20:18, 31:10, 48:12, 58:17, 62:21, 64:5, 68:21, 77:5, 88:19, 153:9, 219:4, 229:25, 250:20
**above-entitled** [1] - 258:5
**absolute** [1] - 236:19
**absolutely** [14] - 8:15, 62:5, 76:4, 90:17, 91:4, 94:25, 95:1, 108:2, 113:22, 146:24, 232:5, 232:21, 238:10, 255:25
**abundance** [1] - 147:6
**abundantly** [2] - 155:21, 156:14
**accept** [6] - 28:1, 115:7, 131:11, 133:23, 178:16, 185:14
**acceptable** [2] - 176:10, 182:21
**accepted** [1] - 31:13
**accepting** [1] - 131:12
**access** [1] - 88:18
**accident** [2] - 187:7, 190:25
**accompanied** [1] - 230:10
**accomplice** [2] - 193:5, 193:6
**accomplish** [1] - 189:14
**according** [1] - 214:16
**accordingly** [3] - 149:1, 163:25, 191:16
**account** [1] - 242:7
**accountable** [1] - 33:19
**accounts** [1] - 173:10
**accuracy** [1] - 184:20
**accurate** [8] - 23:5,

44:20, 44:24, 67:14, 104:7, 184:14, 185:14, 255:13
**accurately** [3] - 97:4, 104:25, 184:7
**accusation** [2] - 123:15, 163:17
**accusations** [3] - 71:15, 166:24, 167:7
**accused** [6] - 11:13, 12:13, 32:16, 34:19, 64:20, 126:2
**accusers** [1] - 154:14
**accusing** [1] - 180:14
**acknowledging** [1] - 255:16
**Acosta** [1] - 128:24
**Acosta-Sierra** [1] - 128:24
**acquire** [1] - 64:13
**acquit** [3] - 145:23, 147:1, 160:17
**acquittal** [2] - 116:18, 252:17
**acquitted** [1] - 163:8
**acquitting** [1] - 146:12
**act** [65] - 103:13, 145:6, 145:7, 146:4, 146:16, 149:2, 158:10, 161:5, 162:22, 162:23, 163:12, 163:15, 164:19, 165:1, 165:5, 167:3, 168:18, 172:11, 172:13, 181:22, 186:8, 186:19, 186:20, 186:21, 186:23, 187:6, 189:18, 190:24, 191:4, 191:5, 191:6, 191:13, 191:18, 191:22, 192:3, 192:6, 193:22, 193:23, 194:2, 194:4, 194:8, 194:10, 194:12, 197:14, 197:16, 200:7, 200:11, 201:22, 202:3, 202:6, 204:7, 204:8, 204:14, 213:18, 215:2, 215:3, 231:6, 231:7, 231:8, 231:13, 241:7, 246:6
**acted** [32] - 53:14, 118:2, 145:17, 146:9, 166:15, 167:13, 167:16, 167:24, 168:5,

172:5, 187:8, 190:9, 190:11, 190:13, 191:1, 192:13, 196:17, 196:25, 197:9, 201:4, 202:4, 203:1, 203:3, 204:11, 210:17, 211:18, 212:19, 213:25, 218:9, 227:24, 228:12

**acting** [17] - 123:9, 128:10, 129:18, 130:14, 136:12, 146:3, 156:5, 156:17, 156:18, 157:2, 165:8, 191:9, 192:3, 192:4, 195:17, 228:24, 241:4

**Action** [1] - 3:5

**actions** [18] - 30:9, 34:22, 42:24, 51:2, 64:4, 71:18, 120:6, 131:20, 150:6, 150:8, 155:22, 164:24, 194:20, 211:21, 212:2, 234:9, 241:11

**active** [1] - 121:21

**actively** [1] - 122:15

**activities** [1] - 61:21

**activity** [6] - 4:25, 199:22, 224:20, 227:2, 237:1, 246:2

**actors** [1] - 51:4

**acts** [30] - 144:9, 145:14, 166:24, 172:14, 172:16, 187:5, 187:12, 190:23, 193:22, 193:24, 194:2, 194:4, 194:8, 194:10, 194:12, 194:14, 196:12, 199:13, 201:13, 202:16, 202:20, 204:9, 204:10, 209:20, 215:19, 227:25, 228:1, 238:22

**actual** [6] - 94:23, 119:13, 182:6, 185:10, 186:23, 217:22

**add** [2] - 28:16, 155:16

**added** [2] - 149:9,

169:11

**adding** [3] - 149:8, 149:9, 194:18

**addition** [6] - 87:12, 148:23, 153:2, 191:14, 237:18, 251:22

**additional** [15] - 21:18, 75:25, 80:8, 114:21, 114:23, 118:22, 119:10, 147:21, 148:10, 148:20, 149:3, 149:9, 154:6, 206:24, 243:6

**address** [2] - 115:22, 141:9

**addressed** [1] - 5:18

**addressing** [1] - 28:9

**adds** [1] - 168:14

**adequate** [5] - 74:13, 75:8, 77:10, 169:19, 169:22

**adjourn** [1] - 4:12

**adjourned** [1] - 257:23

**administration** [1] - 188:5

**admissible** [1] - 183:19

**admission** [4] - 92:4, 95:13, 98:16, 104:10

**admit** [4] - 7:22, 23:8, 85:20, 104:24

**admitted** [16] - 23:10, 96:15, 98:19, 105:20, 117:3, 178:22, 179:23, 179:25, 249:25, 250:3, 250:5, 250:7, 250:11, 255:8, 255:10

**admittedly** [1] - 122:2, 160:25

**adrenalin** [1] - 27:3

**advance** [1] - 72:1

**advanced** [1] - 156:7

**advancing** [5] - 28:12, 28:13, 60:11, 156:9, 158:18

**advantage** [1] - 192:4

**adversely** [2] - 187:2, 215:7

**adversity** [1] - 40:13

**advertisers** [2] - 62:11, 62:12

**advice** [2] - 31:2, 79:3

**advise** [3] - 70:2, 74:2, 166:15, 141:9

**affect** [2] - 183:4, 185:21

**affected** [5] - 187:2, 215:7, 216:18, 217:12, 217:13

**affecting** [1] - 118:23

**affects** [1] - 184:9

**affiliated** [1] - 33:4

**affirmatively** [1] - 30:25

**affords** [2] - 148:24, 191:15

**AFO** [3] - 32:2, 32:10, 32:13

**afraid** [3] - 17:13, 240:12, 240:13

**after-the-fact** [1] - 221:8

**afternoon** [5] - 4:13, 84:14, 108:24, 115:4, 247:8

**agencies** [1] - 92:24

**agency** [2] - 187:24, 188:4

**Agent** [6] - 15:8, 120:7, 216:19, 217:8, 229:11

**agent** [14] - 3:11, 13:21, 19:3, 30:18, 70:20, 72:11, 72:3, 72:4, 73:2, 73:3, 73:21, 126:24, 153:15, 154:21

**agents** [1] - 19:7

**aggressive** [1] - 229:4

**aggressively** [1] - 136:22

**aggressor** [9] - 132:15, 132:17, 132:21, 132:23, 133:10, 133:19, 156:17, 158:10, 229:1

**agitated** [1] - 26:23

**ago** [3] - 41:22, 88:12, 131:15

**agree** [32] - 5:5, 18:17, 29:21, 33:5, 37:12, 37:20, 42:7, 42:18, 44:22, 50:5, 52:24, 56:1, 56:20, 57:16, 57:17, 68:1, 68:4, 74:17, 84:12, 110:8, 110:20, 110:21, 111:16, 115:2, 119:7, 132:10, 132:25, 134:6, 160:12, 232:8, 252:24

**agreed** [5] - 77:15, 146:10, 147:22, 164:21, 180:2

**agreement** [4] - 115:1, 147:24, 173:16, 255:9

**ahead** [17] - 23:15, 24:25, 26:18, 26:21, 27:6, 51:23, 74:7, 79:17, 86:16, 105:18, 115:8, 174:2, 176:15, 239:13, 240:19, 242:10, 243:9

**aid** [7] - 28:24, 164:3, 179:17, 194:8, 194:10, 194:13, 195:4

**aided** [7] - 1:25, 190:2, 193:1, 193:3, 193:4, 193:11, 193:14

**aider** [2] - 194:25, 195:7

**aiding** [3] - 189:22, 193:24, 196:21

**aids** [1] - 193:6

**aim** [1] - 76:11

**Ainsworth** [55] - 5:21, 5:23, 6:4, 6:25, 7:11, 7:14, 7:17, 8:2, 8:3, 8:14, 9:10, 9:12, 10:15, 12:6, 12:10, 12:14, 13:7, 18:3, 18:15, 19:14, 19:19, 20:6, 58:12, 58:15, 58:17, 71:9, 71:13, 71:23, 73:8, 117:7, 123:8, 124:24, 136:24, 137:25, 138:24, 139:7, 139:15, 164:13, 164:16, 164:17, 214:13, 219:24, 220:2, 220:6, 220:10, 220:16, 220:22, 221:9, 221:14, 224:10, 225:15, 241:8, 242:2, 242:5, 248:5

**Ainsworth's** [1] - 242:8

**Ainsworth-related** [1] - 139:15

**air** [3] - 48:23, 121:8, 207:14

**Alberts** [5] - 79:5, 82:8, 82:20, 83:11, 96:3

**alert** [23] - 48:7, 48:8, 48:11, 48:12, 48:13, 48:17, 48:22, 49:1, 66:15, 121:9, 121:15, 121:18,

121:23, 169:21, 216:3, 216:4, 216:21, 217:3, 225:19, 234:17, 234:18, 234:20, 234:22

**alerts** [1] - 251:7

**Alexander** [2] - 90:19, 94:17

**Alexis** [1] - 3:11

**Ali** [2] - 90:18, 94:17

**allegations** [1] - 231:16

**allege** [1] - 150:8

**alleged** [13] - 7:24, 9:25, 13:7, 30:2, 124:15, 140:8, 166:24, 178:2, 238:16, 241:4, 244:23, 245:10, 246:9

**alleges** [1] - 192:25

**allow** [6] - 5:10, 62:20, 68:2, 68:21, 183:4, 242:16

**allowed** [5] - 5:4, 27:21, 236:12, 244:10, 244:17

**allowing** [2] - 63:22, 232:6

**almost** [3] - 116:25, 163:12, 211:15

**alone** [7] - 162:5, 162:13, 162:14, 162:15, 178:23, 178:24, 184:2

**altercation** [4] - 99:24, 100:2, 102:14, 239:20

**altercations** [2] - 100:10, 243:8

**altering** [1] - 257:21

**alternate** [9] - 3:20, 3:21, 3:23, 4:19, 4:20, 175:12, 253:17, 253:19, 253:22

**alternates** [1] - 253:18

**alternative** [6] - 62:17, 63:17, 63:19, 67:22, 123:12, 124:3

**altogether** [1] - 130:12

**amalgamated** [2] - 92:23, 93:23

**Amendment** [42] - 27:2, 27:22, 32:18, 47:13, 49:11, 79:5, 81:6, 81:15, 141:10, 141:12, 141:13, 141:22, 147:21,

148:1, 148:17,
148:23, 149:12,
149:16, 149:23,
150:2, 150:20,
150:23, 151:18,
168:9, 168:12,
168:15, 191:14,
212:17, 230:12,
232:7, 234:6,
235:18, 235:22,
235:23, 236:1,
236:4, 236:16,
236:18, 237:1,
248:25, 249:1, 249:3
**AMERICA** [1] - 1:3
**America** [2] - 3:5,
231:14
**American** [13] - 32:18,
40:21, 40:23, 41:10,
42:7, 42:9, 42:10,
42:18, 43:4, 49:16,
65:22, 238:8, 246:13
**Americans** [10] - 29:6,
29:16, 29:22, 31:22,
33:12, 34:6, 34:14,
68:3, 206:18, 236:24
**ammunition** [1] -
255:2
**amount** [5] - 19:25,
28:1, 75:22, 203:14,
203:15
**amounts** [1] - 206:22
**ample** [1] - 121:5
**analogous** [1] - 79:1
**analysis** [1] - 14:23
**Anderson** [15] - 9:25,
10:1, 10:4, 117:2,
117:5, 123:18,
124:22, 124:23,
214:12, 218:24,
219:3, 224:6,
239:13, 240:10,
240:13
**Anderson's** [1] - 219:8
**anger** [1] - 102:21
**angle** [3] - 25:7, 58:1,
138:23
**angry** [4] - 108:4,
206:17, 207:16,
207:21
**anniversary** [1] -
38:18
**announced** [1] - 234:5
**announcement** [1] -
234:9
**announcements** [2] -
101:25, 244:10
**answer** [12] - 13:8,
13:15, 40:2, 44:15,
57:8, 61:1, 100:9,

112:14, 145:17,
148:4, 183:22, 208:8
**answered** [4] - 14:5,
14:8, 37:22, 109:18
**Anthem** [2] - 34:7,
69:9
**anticipate** [4] - 73:13,
83:17, 116:1, 174:3
**anticipating** [2] - 75:8,
177:12
**anticipation** [1] -
27:17
**antipatriot** [1] - 31:22
**apart** [3] - 73:5, 113:2,
117:18
**apparent** [4] - 118:18,
122:10, 197:4,
238:25
**appeal** [1] - 146:25
**appear** [3] - 111:25,
116:20, 250:10
**APPEARANCES** [1] -
1:12
**appeared** [1] - 203:21
**appearing** [3] - 79:7,
81:20, 138:17
**appellate** [1] - 165:23
**applicable** [2] -
147:10, 152:6
**applies** [15] - 6:22,
124:6, 124:14,
130:21, 130:22,
140:16, 147:8,
147:9, 165:16,
178:16, 223:14,
244:23, 244:25,
249:16, 254:7
**apply** [15] - 128:7,
129:6, 141:22,
142:5, 143:9,
144:18, 154:8,
161:12, 163:17,
171:12, 171:17,
176:25, 186:3,
192:23, 245:5
**appreciate** [3] - 11:9,
69:3, 69:4
**approach** [3] - 3:6,
247:21, 248:15
**approached** [1] -
103:1
**appropriate** [4] -
101:3, 156:20,
156:21, 257:11
**appropriately** [1] -
140:16
**approved** [1] - 201:10
**Architect** [1] - 201:11
**area** [50] - 5:7, 19:7,
19:20, 22:11, 24:7,

28:13, 28:20, 45:24,
48:19, 48:23, 55:11,
84:13, 90:13, 91:5,
96:25, 99:13, 100:8,
102:12, 103:9,
104:3, 107:3, 107:5,
108:13, 113:11,
115:4, 117:13,
117:14, 117:20,
117:21, 121:3,
121:5, 121:12,
121:13, 121:16,
121:20, 125:16,
125:18, 132:13,
163:16, 198:15,
199:12, 206:2,
207:5, 223:21,
224:13, 225:5,
225:8, 230:4,
244:11, 247:18
**areas** [4] - 104:23,
106:5, 201:8, 224:4
**Areas** [1] - 201:9
**argue** [24] - 6:17,
85:22, 120:13,
123:23, 123:24,
130:11, 132:16,
133:14, 133:15,
134:3, 134:8,
134:10, 138:7,
142:2, 152:8, 160:4,
160:19, 162:19,
163:25, 165:3,
165:9, 165:11,
166:11, 238:13
**argued** [7] - 126:4,
130:13, 134:13,
166:11, 166:13,
166:21, 167:23
**argues** [13] - 133:13,
147:9, 147:10,
150:3, 165:17,
166:23, 167:6,
167:9, 167:13,
167:16, 167:23,
168:2, 168:3
**arguing** [7] - 123:8,
124:3, 124:4,
135:25, 160:1,
162:20, 165:15
**argument** [22] - 16:21,
123:24, 129:20,
130:6, 130:7,
131:14, 134:1,
134:18, 138:6,
146:25, 154:7,
154:9, 164:6,
166:14, 177:10,
183:15, 204:20,
204:23, 206:15,

244:25, 245:16,
247:17
**arguments** [12] - 75:7,
75:23, 115:24,
159:8, 161:11,
161:12, 169:4,
177:13, 180:10,
228:17, 256:21
**arm** [3] - 22:9, 24:4,
59:16
**armor** [1] - 206:24
**arms** [4] - 60:17,
60:23, 61:3, 222:2
**arrival** [1] - 208:23
**arrived** [1] - 229:6
**arriving** [1] - 89:9
**article** [1] - 187:3
**aside** [1] - 128:4
**asleep** [1] - 182:19
**aspect** [2] - 236:17,
239:4
**aspects** [2] - 120:20,
138:14
**assault** [97] - 6:8, 6:9,
6:17, 6:20, 6:24,
7:24, 8:5, 8:23,
10:20, 11:25, 12:6,
12:10, 12:14, 12:24,
13:3, 13:7, 13:13,
19:19, 19:20, 20:3,
20:6, 20:14, 53:12,
71:19, 71:23, 72:9,
73:1, 73:3, 76:3,
76:6, 116:19, 117:1,
117:5, 118:4,
118:14, 118:15,
118:16, 118:20,
118:23, 119:2,
119:12, 119:14,
119:17, 119:18,
123:6, 123:14,
124:2, 124:15,
126:13, 128:6,
129:13, 129:16,
136:11, 136:24,
138:23, 139:7,
140:8, 140:17,
140:22, 141:2,
141:3, 141:22,
144:1, 144:4,
144:18, 145:1,
145:10, 150:13,
155:5, 197:2, 197:8,
200:12, 202:7,
210:5, 214:25,
217:24, 218:2,
218:16, 218:19,
218:20, 218:23,
218:24, 219:11,
219:14, 219:18,

221:12, 222:10,
222:21, 227:21,
228:11, 238:22,
238:23, 248:5
**assaulted** [8] - 6:11,
19:17, 144:5, 196:9,
197:22, 198:1,
209:2, 238:19
**assaulting** [7] - 19:14,
126:2, 158:5,
195:13, 221:9,
221:10, 229:5
**assaultive** [1] - 248:19
**assaults** [43] - 5:20,
6:23, 9:23, 9:25,
10:13, 11:14, 11:18,
11:22, 18:2, 72:13,
72:25, 76:8, 118:1,
122:25, 123:7,
124:20, 127:4,
127:8, 127:17,
127:25, 130:18,
137:6, 137:19,
137:22, 137:24,
139:5, 142:1,
142:11, 144:2,
144:17, 165:6,
214:12, 215:11,
215:17, 217:21,
218:14, 224:10,
226:23, 229:15,
238:16, 245:10
**assemble** [4] - 27:23,
148:25, 191:15,
232:15
**assert** [5] - 81:12,
81:14, 81:22,
125:16, 125:19
**assertion** [1] - 156:3
**asserts** [1] - 182:6
**assholes** [3] - 39:1,
216:16, 227:15
**assist** [12] - 43:23,
129:20, 180:11,
194:8, 194:10,
194:13, 195:4,
208:25, 241:22,
241:24, 242:1,
253:15
**assistance** [2] - 43:14,
44:17
**assisting** [7] - 193:24,
195:15, 196:11,
196:15, 197:19,
238:21, 248:1
**associate** [1] - 195:5
**associated** [4] -
186:13, 189:25,
194:21, 213:11
**assume** [9] - 9:1,

15:21, 59:11, 71:12, 122:12, 131:13, 182:10, 182:15, 225:9
**assumes** [1] - 114:12
**atmosphere** [1] - 112:21
**attack** [1] - 150:4
**attacked** [2] - 49:15, 241:25
**attacking** [4] - 28:2, 209:9, 219:22, 241:6
**attacks** [1] - 207:2
**attempt** [25] - 31:24, 118:17, 171:13, 171:16, 171:18, 171:19, 176:18, 176:21, 188:12, 188:14, 188:18, 189:3, 189:4, 189:10, 189:22, 192:15, 192:16, 192:18, 192:22, 192:24, 197:2, 207:16, 208:8, 238:24, 239:7
**attempted** [16] - 59:15, 165:5, 186:15, 186:20, 186:23, 190:2, 190:8, 196:23, 197:5, 197:6, 210:15, 210:20, 211:5, 215:2, 240:4
**attempting** [7] - 24:12, 24:17, 186:8, 186:20, 242:1, 242:14, 244:4
**attempts** [2] - 191:8, 207:9
**attend** [1] - 89:20
**attending** [1] - 92:16
**attention** [8] - 18:12, 88:5, 229:3, 229:19, 231:12, 251:11, 254:15, 254:24
**attentive** [1] - 253:23
**attenuated** [3] - 125:14, 139:16, 140:8
**attenuation** [2] - 131:14, 157:21
**attorney** [11] - 19:12, 31:2, 78:15, 78:17, 78:19, 78:20, 78:22, 79:13, 80:9, 82:15, 82:16
**Attorney's** [1] - 1:14
**attorneys** [5] - 80:24, 82:13, 88:17,

179:10, 233:24
**audience** [1] - 69:4
**audiences** [1] - 62:21
**AUSA** [2] - 1:13, 1:13
**authority** [7] - 46:1, 51:17, 188:5, 198:10, 198:12, 200:10, 224:23
**automatic** [1] - 251:7
**automatically** [1] - 140:13
**available** [4] - 96:2, 152:7, 152:10, 153:2
**Avenue** [1] - 1:21, 212:21
**avenue** [1] - 65:3
**avenues** [1] - 62:22
**avocation** [1] - 87:12
**aware** [19] - 3:15, 5:9, 8:24, 11:12, 14:16, 15:19, 15:21, 78:7, 92:13, 93:2, 93:6, 94:3, 100:25, 131:6, 151:4, 187:6, 190:24, 201:16, 228:4
**awareness** [5] - 33:14, 63:1, 190:11, 191:7, 212:1
**Awareness** [2] - 87:13, 87:17
**awash** [1] - 71:20

# B

**Baboulis** [8] - 77:3, 93:10, 210:23, 223:16, 224:12, 229:9, 237:23, 247:18
**Baboulis's** [2] - 85:13, 121:4
**backed** [1] - 235:3
**background** [2] - 96:17, 111:14
**backing** [6] - 130:24, 135:23, 208:19, 211:8, 227:8
**backs** [1] - 88:20
**backwards** [1] - 57:19
**bad** [3] - 51:4, 64:12, 65:22
**bad-faith** [1] - 51:4
**balance** [1] - 56:8
**ball** [2] - 46:13, 46:15
**ballistic** [1] - 206:25
**bane** [1] - 55:2
**bangs** [1] - 207:14
**banner** [1] - 33:13
**baptized** [1] - 40:12

**barricade** [3] - 102:8, 102:9, 111:8
**barricades** [5] - 102:7, 112:25, 113:1, 216:23, 223:18
**barrier** [3] - 99:14, 111:15, 111:18
**barriers** [8] - 101:10, 101:17, 113:3, 113:5, 113:6, 206:20, 207:8
**base** [5] - 23:24, 25:2, 25:9, 25:10, 58:9
**baseball** [3] - 150:11, 150:12, 150:14
**based** [26] - 17:1, 19:10, 33:1, 61:19, 81:16, 94:4, 125:19, 132:8, 141:5, 144:16, 144:17, 145:2, 155:21, 165:17, 179:3, 181:14, 181:15, 181:23, 181:24, 212:6, 223:8, 230:21, 231:18, 250:19, 257:4
**basis** [17] - 7:15, 7:21, 15:14, 17:3, 69:8, 71:11, 71:18, 117:10, 117:19, 140:15, 141:7, 141:25, 146:17, 172:13, 172:15, 204:8, 204:10
**bastion** [1] - 64:2
**bathroom** [1] - 170:12
**baton** [12] - 26:14, 125:15, 125:17, 125:18, 126:10, 126:12, 126:16, 127:3, 127:12, 127:22, 131:3, 139:22
**batons** [6] - 26:10, 59:19, 125:10, 138:8, 241:14, 241:16
**battle** [3] - 41:15, 68:17, 68:18
**bear** [1] - 252:10
**beaten** [2] - 27:1, 59:2
**beating** [1] - 135:20
**became** [3] - 40:6, 142:15, 213:22
**become** [7] - 3:22, 27:2, 61:19, 100:11, 128:11, 152:24, 207:18
**becomes** [4] - 128:19,

141:23, 252:3, 257:5
**becoming** [1] - 139:12
**bees** [2] - 38:8, 38:10
**BEFORE** [2] - 1:1, 1:9
**beforehand** [1] - 113:2
**began** [3] - 206:22, 239:24, 240:1
**begin** [6] - 173:7, 174:10, 177:16, 177:25, 253:16, 254:21
**beginning** [10] - 23:17, 23:23, 35:21, 112:19, 157:23, 172:3, 176:18, 178:13, 179:16, 199:10
**begins** [5] - 27:3, 205:7, 230:11, 249:3, 255:6
**behalf** [2] - 3:9, 3:13
**behavior** [1] - 184:11
**behind** [13] - 5:22, 13:13, 69:7, 104:22, 111:4, 156:1, 156:11, 206:19, 208:20, 211:12, 215:15, 217:18, 248:7
**belief** [2] - 203:23, 243:17
**believability** [1] - 178:25
**believable** [1] - 183:12
**believes** [7] - 19:14, 172:7, 183:19, 203:5, 203:17, 236:3, 237:16
**Bench** [4] - 4:8, 92:9, 95:18, 100:6
**bench** [4] - 4:21, 94:12, 97:24, 101:4
**benefit** [3] - 79:2, 192:5, 236:13
**best** [2] - 52:14, 64:8
**better** [2] - 19:8, 90:22
**between** [20] - 20:23, 22:9, 22:14, 59:8, 59:14, 59:24, 72:24, 75:22, 113:7, 137:14, 138:2, 152:23, 155:25, 184:23, 185:3, 185:5, 187:18, 242:15, 242:18
**beyond** [54] - 17:23, 112:10, 112:12, 130:21, 144:5, 157:14, 177:19,

180:21, 180:25, 181:5, 181:9, 181:13, 181:25, 182:2, 183:24, 186:18, 188:20, 189:6, 189:7, 190:6, 190:18, 193:10, 193:16, 195:3, 195:8, 195:21, 195:23, 196:1, 196:4, 196:8, 197:8, 197:24, 198:8, 199:2, 200:6, 200:22, 202:2, 202:25, 204:13, 209:16, 209:18, 210:1, 214:23, 217:20, 222:24, 228:14, 230:14, 230:16, 230:24, 231:24, 238:15, 246:19, 252:22, 253:14
**bias** [4] - 83:2, 83:6, 89:2, 185:19
**biased** [1] - 185:18
**bickering** [1] - 17:21
**bicycle** [1] - 111:24
**big** [6] - 89:16, 89:19, 95:5, 205:5, 218:21, 219:3
**bigger** [1] - 218:21
**bike** [2] - 223:18, 225:5
**bikers** [1] - 40:10
**bill** [1] - 42:12
**bind** [1] - 93:24
**bit** [19] - 6:13, 11:12, 30:8, 70:5, 70:21, 74:11, 79:20, 82:19, 87:15, 107:23, 116:13, 138:16, 141:23, 148:10, 174:5, 177:17, 177:19, 210:19, 216:2
**bitch** [1] - 29:22
**bitches** [2] - 216:16, 227:15
**black** [2] - 55:19, 72:21
**blacks** [3] - 15:18, 15:20, 17:13
**blanche** [1] - 131:9
**bleachers** [4] - 46:18, 47:20, 47:22, 66:6
**blessing** [2] - 147:12, 159:25
**blew** [1] - 206:20
**blind** [2] - 33:19,

34:15
**blocked** [1] - 250:8
**blocking** [1] - 153:22
**blogging** [1] - 251:20
**blows** [1] - 126:10
**blue** [11] - 7:13, 9:11,
18:14, 33:13, 46:25,
47:2, 47:3, 55:8,
221:4, 221:20, 224:9
**board** [1] - 188:5
**bodily** [6] - 200:12,
202:8, 203:18,
203:23, 203:25,
241:7
**body** [15] - 20:4,
116:25, 127:8,
156:11, 219:2,
219:9, 219:12,
219:16, 221:17,
221:18, 222:3,
222:7, 222:16,
225:14, 248:14
**body-worn** [12] - 20:4,
127:8, 219:2, 219:9,
219:12, 219:16,
221:17, 221:18,
222:3, 222:7,
222:16, 225:14
**BOLO** [1] - 30:18
**bolt** [1] - 212:11
**Boston** [1] - 41:14
**bother** [2] - 40:5, 40:7
**bottom** [7] - 27:13,
46:6, 167:3, 212:24,
219:6, 222:3, 222:8
**bound** [1] - 147:25
**bounded** [1] - 248:22
**bounding** [1] - 248:3
**Bowser** [1] - 234:3
**Bowser's** [1] - 225:18
**Boy** [1] - 125:23
**Boys** [3] - 150:24,
168:15, 169:2
**brace** [2] - 27:19,
248:9
**braced** [1] - 27:18
**Brady** [1] - 15:4
**brain** [1] - 51:25
**branch** [1] - 129:7
**Brandon** [1] - 94:20
**brave** [1] - 42:22
**breach** [4] - 99:6,
99:8, 99:16, 110:4
**breaching** [1] - 121:10
**break** [28] - 20:12,
20:13, 20:19, 25:16,
69:18, 70:3, 70:5,
70:12, 74:9, 75:1,
75:3, 75:4, 76:15,
139:21, 141:8,

146:22, 155:8,
170:11, 174:23,
175:3, 175:8,
204:20, 204:21,
204:22, 210:19,
219:4, 249:13
**breathe** [1] - 27:4
**breathing** [1] - 26:23
**Brianna** [1] - 3:10
**bribes** [3] - 191:21,
192:1, 236:14
**brief** [12] - 20:19, 70:6,
76:14, 141:8,
141:16, 141:17,
142:7, 170:1,
170:11, 174:23,
249:11
**briefed** [5] - 125:22,
126:5, 128:20,
128:21, 150:22
**briefing** [3] - 6:25,
143:19, 151:13
**briefly** [4] - 117:25,
139:23, 247:16,
251:13
**bring** [19] - 4:22,
17:22, 17:24, 18:18,
21:3, 21:20, 31:14,
33:14, 51:8, 62:25,
79:17, 83:23, 86:17,
158:15, 174:2,
175:22, 195:10,
254:12, 255:11
**broad** [2] - 73:22,
73:24
**broader** [1] - 168:9
**brochures** [1] - 90:21
**Brock** [1] - 138:13
**broke** [1] - 33:17
**broken** [1] - 244:14
**brought** [1] - 51:6
**brown** [2] - 72:19,
72:20
**Brown** [3] - 3:11,
217:8, 229:11
**Brown's** [2] - 120:7,
216:19
**brushed** [1] - 136:11
**buckets** [1] - 232:12
**buddy** [1] - 29:14
**build** [1] - 104:13
**building** [27] - 149:19,
198:5, 198:10,
198:11, 198:14,
198:15, 198:24,
199:4, 200:1, 200:2,
200:8, 200:9,
200:15, 207:1,
207:2, 207:10,
207:24, 211:1,

212:11, 212:22,
216:1, 223:21,
226:3, 244:7,
244:24, 245:19,
246:7
**buildings** [2] - 199:23,
201:23
**bullets** [2] - 125:25,
126:2
**bunch** [1] - 40:4
**burden** [12] - 142:13,
143:23, 143:24,
143:25, 153:11,
153:13, 180:21,
181:8, 182:1, 238:15
**bureau** [1] - 188:6
**business** [7] - 92:19,
199:6, 199:8, 226:7,
226:10, 227:20,
245:4
**buy** [2] - 130:7, 140:14
**BY** [56] - 21:13, 21:23,
23:14, 24:24, 25:23,
26:20, 27:8, 35:3,
37:17, 37:24, 39:5,
39:20, 40:1, 42:1,
45:10, 45:15, 50:4,
50:23, 53:4, 53:23,
54:9, 54:15, 55:15,
56:13, 57:10, 58:4,
58:23, 59:10, 60:9,
61:9, 63:15, 65:9,
67:10, 87:2, 88:2,
91:16, 94:14, 98:5,
98:23, 101:6,
102:18, 103:4,
103:8, 103:21,
104:15, 105:13,
105:23, 106:21,
107:1, 107:22,
108:23, 109:23,
111:13, 111:23,
112:13, 113:13

**C**

**California** [1] - 1:18
**cam** [1] - 116:25
**camera** [13] - 20:4,
127:9, 214:5, 214:9,
215:23, 219:2,
219:16, 221:17,
221:18, 222:3,
222:7, 222:16,
225:15
**camera's** [1] - 220:25
**cameras** [2] - 219:9,
219:12
**campaigns** [1] - 33:14
**Campanale** [27] -

13:18, 13:20, 13:21,
13:23, 14:3, 14:9,
51:24, 52:2, 52:6,
52:16, 52:22, 66:9,
145:11, 145:12,
214:6, 215:24,
216:8, 216:11,
224:6, 235:2, 235:3,
235:4, 235:6, 235:8
**Campanale's** [2] -
256:20, 257:9
**canceled** [1] - 88:12
**candidate** [1] - 208:7
**cane** [11] - 25:9,
55:17, 55:19, 55:23,
56:1, 56:6, 56:16,
57:23, 159:6, 248:2,
248:4
**cannot** [12] - 18:19,
129:19, 132:15,
149:20, 158:15,
160:18, 172:12,
181:18, 202:12,
203:25, 204:4, 204:7
**capability** [1] - 185:21
**Capitol** [102] - 22:6,
23:6, 28:11, 28:21,
30:9, 30:13, 33:17,
38:1, 39:4, 42:24,
43:7, 43:13, 43:18,
43:20, 44:18, 44:19,
46:12, 47:5, 47:15,
50:18, 51:9, 61:21,
78:25, 80:12, 80:13,
83:1, 84:13, 90:2,
90:4, 90:10, 90:12,
90:20, 91:3, 91:5,
95:3, 109:25, 110:4,
113:21, 115:3,
118:9, 119:21,
119:23, 120:2,
141:19, 145:5,
150:7, 163:16,
167:3, 200:19,
200:24, 201:5,
201:6, 201:10,
201:11, 201:23,
202:4, 202:11,
206:18, 207:9,
207:19, 207:24,
208:2, 208:24,
209:5, 209:13,
211:3, 212:4,
212:11, 212:22,
213:1, 213:5,
213:20, 213:21,
213:24, 215:12,
216:1, 216:6,
216:24, 216:25,
223:15, 224:16,

226:3, 227:22,
228:9, 229:8,
229:10, 229:12,
233:7, 233:18,
234:14, 237:5,
237:11, 244:15,
244:19, 245:19,
245:21, 246:7,
247:11, 247:17
**Capitol's** [3] - 25:18,
207:3, 209:4
**Capitolbuilding** [1] -
213:23
**Captain** [7] - 77:3,
93:10, 121:4,
210:23, 224:12,
229:9, 247:18
**capture** [1] - 25:19
**captured** [3] - 44:5,
89:4, 225:19
**caravan** [4] - 40:24,
236:22, 236:23,
246:14
**care** [4] - 48:15, 64:22,
64:23
**career** [1] - 15:12
**career-ending** [1] -
15:12
**careful** [3] - 128:10,
181:17, 181:21
**carefully** [1] - 239:16
**Carlson** [1] - 88:11
**carpenter** [3] - 87:9,
87:10
**carried** [4] - 43:21,
49:2, 49:4, 187:23
**carries** [1] - 209:21
**carry** [1] - 197:12
**carrying** [4] - 186:9,
197:23, 197:25,
209:3
**carte** [1] - 131:9
**carving** [1] - 160:8
**Case** [1] - 1:3
**case** [101] - 3:11, 6:14,
11:13, 14:16, 15:24,
15:25, 16:2, 16:10,
19:3, 19:4, 19:9,
30:18, 70:20, 70:21,
70:22, 70:23, 72:3,
73:4, 73:12, 75:1,
75:24, 115:7, 116:2,
116:9, 118:2, 121:6,
121:19, 123:1,
128:9, 133:14,
140:24, 141:1,
142:6, 143:12,
143:15, 144:4,
144:6, 144:7, 145:9,
149:24, 149:25,

150:23, 150:25,
151:1, 152:6, 152:8,
153:3, 153:15,
154:3, 154:22,
155:4, 156:13,
165:21, 170:3,
175:9, 177:25,
178:3, 178:16,
178:21, 179:3,
179:6, 179:8,
179:18, 179:24,
180:18, 181:16,
182:4, 183:2, 183:6,
183:14, 184:18,
184:19, 185:24,
186:1, 192:25,
209:19, 230:18,
231:18, 232:24,
251:3, 251:6,
251:17, 251:19,
251:21, 252:1,
252:9, 252:18,
252:21, 253:9,
254:6, 254:8,
254:11, 254:15,
254:22, 256:21,
256:24, 257:6,
257:18
**cases** [14] - 64:1,
68:24, 132:15,
141:12, 142:5,
142:6, 143:17,
151:4, 151:20,
151:24, 158:3,
181:9, 181:11,
181:12
**catch** [1] - 255:1
**categorically** [1] -
134:23
**caught** [1] - 193:9
**caused** [1] - 120:8
**causes** [3] - 187:13,
187:14, 226:12
**causing** [1] - 28:2
**caution** [1] - 147:6
**center** [2] - 38:10,
156:1
**Century** [1] - 208:4
**certain** [5] - 30:14,
161:14, 180:2,
237:8, 242:3
**certainly** [24] - 13:2,
18:12, 69:3, 73:2,
73:3, 74:11, 121:11,
121:24, 122:14,
130:15, 137:11,
143:16, 149:11,
151:11, 152:9,
154:22, 156:15,
163:5, 236:8,

236:12, 237:3,
238:14, 243:19
**certainty** [4] - 7:18,
8:18, 182:1, 183:1
**CERTIFICATE** [1] -
258:1
**certification** [3] -
210:13, 237:20,
237:25
**certify** [2] - 190:22,
258:3
**cetera** [5] - 61:24,
172:9, 229:5, 255:14
**championed** [1] -
42:14
**chance** [7] - 66:15,
73:15, 95:19, 98:1,
207:25, 234:20,
254:12
**change** [5] - 66:23,
70:25, 80:22, 86:12,
251:8
**changed** [2] - 166:11,
220:22
**changes** [2] - 74:12,
139:24
**chant** [4] - 215:23,
221:25, 222:20,
226:4
**chanting** [4] - 47:7,
208:13, 212:23,
228:8
**character** [1] - 141:3
**characterization** [5] -
37:19, 49:9, 56:20,
60:4, 60:25
**charge** [22] - 5:23,
6:22, 54:16, 71:12,
71:19, 125:21,
142:1, 144:23,
145:22, 158:9,
164:9, 164:12,
172:13, 172:15,
177:1, 183:4,
195:12, 204:8,
204:10, 238:17
**charged** [40] - 5:20,
5:22, 6:9, 7:5, 8:23,
12:2, 12:18, 12:21,
13:3, 13:13, 19:21,
56:18, 56:20, 61:21,
73:1, 78:23, 80:17,
118:12, 122:25,
145:6, 145:8,
145:14, 145:15,
146:9, 155:6, 161:4,
162:23, 163:13,
176:19, 181:2,
188:12, 192:15,
192:16, 193:2,

193:19, 194:5,
194:12, 196:20,
231:16
**charges** [26] - 145:10,
151:10, 151:12,
151:18, 159:2,
161:9, 163:6, 164:8,
178:2, 183:24,
186:7, 189:19,
189:21, 198:4,
198:23, 200:1,
200:17, 201:21,
209:23, 210:1,
228:11, 228:14,
231:22, 248:21,
249:8, 249:15
**charging** [6] - 122:22,
131:17, 132:11,
154:12, 154:16,
156:22
**chat** [1] - 32:7
**check** [5] - 14:19,
155:4, 169:7, 232:8,
248:13
**checked** [1] - 213:16
**checking** [1] - 156:11
**checks** [1] - 157:22
**chemical** [1] - 207:13
**chest** [3] - 32:19,
57:12, 219:3
**choice** [1] - 31:7
**chose** [7] - 158:9,
225:12, 248:9,
248:10, 249:4, 249:5
**chronologically** [1] -
44:20, 44:23, 57:16
**church** [4] - 38:23,
38:24, 39:15, 40:9
**cigarette** [4] - 126:24,
126:25, 127:7,
127:10
**circle** [4] - 9:17,
101:12, 224:5, 224:9
**Circle** [2] - 122:13,
247:14
**circled** [1] - 220:17
**Circuit** [2] - 143:15,
152:22
**circuit** [1] - 143:15
**circuits** [1] - 143:6
**circulate** [1] - 139:24
**circumstance** [2] -
141:19, 242:19
**circumstances** [24] -
78:25, 121:18,
125:9, 128:15,
130:13, 141:18,
142:6, 153:19,
182:8, 183:9,
184:21, 184:22,

184:24, 194:20,
199:18, 202:15,
202:17, 202:24,
203:21, 209:20,
211:20, 226:15,
239:9, 252:11
**circumstantial** [10] -
122:2, 182:5, 182:9,
182:18, 182:20,
182:24, 182:25,
183:3, 194:19,
209:21
**cite** [1] - 128:22
**cited** [2] - 142:6,
156:13
**citizens** [5] - 15:19,
34:1, 49:13, 208:5,
208:6
**city** [1] - 234:7
**Civil** [1] - 207:21
**civil** [45] - 116:13,
120:4, 120:8,
122:24, 135:2,
140:15, 140:18,
140:22, 141:5,
141:7, 141:23,
141:25, 144:12,
144:22, 145:24,
162:3, 162:13,
164:19, 165:2,
171:20, 181:9,
186:10, 186:17,
187:1, 187:11,
188:13, 188:14,
188:17, 188:19,
188:23, 188:25,
189:5, 189:11,
189:14, 196:20,
210:5, 214:24,
215:1, 215:6,
215:20, 216:18,
217:14, 217:20,
232:20
**civility** [1] - 250:22
**claim** [8] - 59:21, 83:3,
158:16, 158:23,
159:4, 162:14, 204:4
**claiming** [1] - 16:4
**claims** [3] - 129:3,
220:12, 230:19
**clarified** [1] - 8:1
**clarify** [5] - 13:2,
18:13, 72:1, 105:11,
231:6
**clarity** [1] - 8:5
**clash** [1] - 242:15
**clashing** [1] - 25:8
**classic** [1] - 237:1
**cleaner** [3] - 160:3,
160:19, 167:16

**clear** [49] - 6:7, 6:21,
8:13, 9:8, 11:14,
11:18, 11:24, 13:12,
15:13, 15:16, 19:6,
20:3, 21:16, 60:1,
73:1, 76:14, 78:2,
88:23, 91:2, 93:2,
99:16, 117:9, 120:2,
123:16, 125:7,
126:16, 127:15,
128:13, 129:1,
130:10, 132:23,
135:15, 139:11,
142:15, 145:18,
148:22, 149:24,
155:21, 156:14,
158:19, 161:4,
164:4, 176:7,
189:13, 208:17,
219:20, 221:24,
244:15, 249:7
**cleared** [3] - 5:19,
140:6, 237:25
**clearing** [3] - 11:9,
60:12, 156:9
**clearly** [27] - 3:18,
72:21, 101:3,
119:20, 119:21,
119:22, 120:4,
121:4, 121:12,
128:1, 128:5,
130:22, 133:4,
133:20, 139:6,
142:1, 147:25,
151:13, 151:16,
152:23, 219:1,
222:15, 225:8,
241:22, 242:9,
246:22, 248:2
**clerk** [8] - 5:17, 171:7,
251:12, 252:4,
252:11, 254:2,
255:15, 256:1
**clicks** [1] - 64:19
**climbed** [1] - 44:25
**clip** [3] - 77:11, 77:14,
110:19
**clips** [2] - 76:7, 133:8
**close** [12] - 3:19, 9:25,
11:25, 65:13, 69:15,
72:9, 72:12, 126:6,
149:18, 165:12,
229:3, 240:3
**close-in-time** [2] -
9:25, 72:9
**closed** [4] - 107:5,
224:15, 225:8, 230:4
**closely** [3] - 7:23,
247:23, 247:24
**closer** [2] - 20:2,

216:1
**Closing** [3] - 2:10, 2:11, 2:12
**closing** [28] - 6:21, 9:15, 75:6, 75:7, 85:22, 115:24, 124:4, 134:1, 134:19, 135:25, 159:8, 170:13, 170:25, 171:1, 174:17, 174:24, 175:2, 175:3, 176:1, 177:10, 204:19, 204:23, 206:15, 247:16, 248:18, 256:21
**closings** [3] - 8:13, 173:6, 173:11
**co** [3] - 3:10, 3:14, 207:20
**co-counsel** [3] - 3:10, 3:14, 207:20
**code** [1] - 31:24
**coded** [1] - 209:24
**coincidence** [2] - 54:16, 54:19
**coincidentally** [1] - 211:2
**colleagues** [2] - 256:23, 257:17
**College** [6] - 190:22, 207:23, 208:11, 209:11, 212:16, 214:19
**colliding** [1] - 156:23
**colloquially** [2] - 10:20, 15:16
**colloquy** [1] - 79:19
**colonial** [1] - 41:1
**color** [1] - 209:24
**color-coded** [1] - 209:24
**colored** [1] - 185:20
**COLUMBIA** [1] - 1:1
**Columbia** [7] - 187:19, 187:20, 187:21, 188:9, 188:11, 201:12, 236:23
**comfortable** [1] - 81:16
**coming** [9] - 14:12, 77:10, 135:13, 147:15, 156:23, 157:25, 158:6, 212:12, 242:23
**commands** [1] - 225:13
**comment** [5] - 102:14, 103:18, 107:20, 115:11, 234:11

**comments** [1] - 228:19
**commerce** [17] - 116:14, 116:15, 118:24, 120:9, 120:18, 120:20, 187:2, 187:3, 187:18, 187:20, 215:7, 216:18, 217:12, 233:15, 234:8
**commission** [2] - 188:5, 194:23
**commit** [29] - 118:14, 118:16, 165:5, 171:16, 176:20, 176:21, 186:8, 186:15, 186:20, 186:21, 188:13, 188:18, 188:22, 189:2, 189:4, 189:8, 189:10, 189:14, 189:23, 192:16, 192:18, 192:22, 194:2, 194:7, 194:9, 195:17, 196:18, 215:3, 218:10
**committed** [18] - 6:8, 34:18, 129:16, 165:5, 172:11, 186:19, 193:8, 193:10, 193:17, 193:21, 195:2, 195:9, 197:8, 197:14, 204:6, 215:2
**committee** [1] - 201:2
**committing** [16] - 11:14, 129:4, 129:21, 186:8, 186:20, 188:24, 189:12, 191:21, 192:2, 193:1, 193:4, 193:5, 193:12, 193:15, 193:18, 193:25
**commodity** [1] - 187:3
**common** [9] - 60:20, 212:2, 212:3, 230:18, 230:19, 230:20, 232:8, 238:9
**communicate** [7] - 87:25, 251:17, 251:18, 252:4, 252:6, 252:7, 254:8
**communication** [2] - 44:12, 87:24
**communications** [2] - 31:5, 251:20
**community** [2] - 61:20, 64:11

**compare** [2] - 38:8, 88:19
**compared** [2] - 169:13
**comparing** [1] - 128:12
**comparison** [1] - 88:21
**compelling** [1] - 166:3
**compels** [1] - 81:21
**complain** [2] - 29:24, 29:25
**complete** [8] - 176:23, 177:16, 177:17, 188:16, 189:18, 192:20, 204:17, 211:15
**completely** [2] - 216:3, 232:8
**complex** [1] - 99:15
**complexity** [1] - 160:15
**complicated** [1] - 161:1
**complied** [6] - 47:25, 49:14, 52:15, 235:2, 244:13, 245:8
**comply** [3] - 34:9, 66:6, 153:8
**complying** [1] - 235:8
**component** [2] - 116:14, 138:7
**composure** [2] - 55:7, 57:1
**Comprising** [1] - 201:9
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concept** [3] - 67:1, 238:7, 238:9
**concern** [3] - 160:24, 161:16, 162:25
**concerned** [6] - 86:5, 100:7, 130:7, 139:12, 161:13, 184:19
**concerning** [1] - 252:8
**concerns** [2] - 81:22, 86:11
**concluded** [2] - 74:4, 253:8
**conclusion** [4] - 54:17, 84:6, 108:24, 115:20
**Concord** [2] - 41:14, 41:20
**concrete** [1] - 28:23
**conditions** [3] - 36:7, 100:19, 100:22
**conduct** [68] - 5:22,

6:21, 7:5, 7:14, 7:21, 8:2, 8:6, 9:9, 11:9, 12:2, 12:24, 13:3, 13:12, 18:13, 122:11, 139:15, 146:6, 146:13, 146:14, 150:18, 150:19, 158:21, 163:9, 178:14, 187:4, 187:6, 190:12, 190:24, 191:20, 191:22, 191:25, 192:3, 192:10, 198:24, 199:3, 199:6, 199:7, 199:8, 199:12, 199:13, 199:21, 200:18, 200:23, 200:25, 201:2, 201:16, 201:18, 201:19, 226:6, 226:9, 226:11, 227:1, 227:22, 228:5, 232:12, 236:17, 244:24, 245:4, 245:11, 245:19, 245:21, 245:23, 248:19, 251:22, 251:24
**confer** [1] - 93:15
**conference** [11] - 4:8, 4:21, 92:9, 94:12, 95:18, 97:24, 100:6, 101:4, 122:22, 154:12, 154:16
**conferred** [3] - 4:4, 93:17, 96:7
**confirm** [2] - 7:3, 9:22
**confirms** [1] - 189:1
**conflating** [1] - 135:8
**confront** [2] - 154:14, 154:15
**confrontation** [1] - 204:4
**confronting** [1] - 156:2
**confuse** [1] - 84:18
**confused** [18] - 4:24, 5:11, 5:18, 5:21, 6:6, 7:1, 7:22, 7:23, 7:25, 9:16, 19:2, 72:23, 74:20, 146:12, 220:1, 240:7, 241:1, 241:20
**confuses** [1] - 127:25
**confusing** [5] - 8:11, 9:18, 11:7, 84:24, 160:5
**confusion** [9] - 6:5, 8:16, 8:19, 12:23,

71:2, 118:13, 118:19, 119:1, 160:16
**Congress** [31] - 24:17, 24:20, 94:24, 190:15, 201:1, 201:3, 207:25, 211:1, 211:13, 212:5, 212:23, 227:23, 229:6, 229:8, 229:13, 232:3, 232:6, 235:15, 235:17, 236:7, 236:9, 237:2, 237:18, 245:23, 245:24, 246:1, 246:2, 247:2
**Congress's** [1] - 190:22
**congressmen** [2] - 94:25, 207:10
**connection** [3] - 30:24, 61:21, 232:16
**conscious** [2] - 204:3, 214:4
**consciously** [1] - 197:14
**consciousness** [5] - 191:6, 214:1, 231:8, 236:10
**consequences** [2] - 202:20, 211:21
**consider** [40] - 73:6, 73:11, 115:2, 148:5, 148:13, 178:8, 178:17, 179:22, 180:3, 180:5, 180:15, 180:16, 183:2, 183:5, 183:9, 183:25, 184:9, 184:10, 184:21, 185:2, 185:4, 185:7, 185:12, 185:15, 185:19, 187:9, 191:2, 194:18, 202:15, 202:24, 203:11, 206:11, 232:6, 235:17, 249:16, 250:1, 250:4, 250:11, 250:20, 252:20
**consideration** [3] - 179:3, 181:17, 250:25
**considered** [4] - 22:14, 65:22, 158:2, 252:23
**considering** [2] - 148:22, 153:4
**consistent** [2] - 92:2,

148:2
**consistently** [2] - 40:21, 236:10
**consists** [1] - 179:24
**constitute** [1] - 210:5
**constituted** [1] - 13:7
**Constitution** [8] - 1:21, 50:8, 148:24, 191:15, 212:21, 235:22, 236:3, 236:4
**constitution** [1] - 30:11
**Constitutional** [1] - 191:11
**constitutional** [2] - 29:14, 49:16
**constitutionally** [1] - 207:11
**consult** [1] - 82:14
**consultation** [1] - 11:20
**consulted** [3] - 78:12, 78:22, 80:4
**contact** [19] - 7:24, 9:17, 18:21, 21:25, 78:16, 118:12, 124:10, 164:11, 195:16, 196:17, 218:9, 239:8, 240:17, 241:5, 242:20, 243:12, 245:12, 246:3, 246:4
**contacted** [1] - 241:3
**contacts** [2] - 9:18, 157:10
**content** [1] - 82:9
**contention** [1] - 157:10
**contested** [2] - 129:10, 129:11
**context** [4] - 77:2, 212:8, 212:9, 239:4
**continue** [4] - 15:9, 24:20, 230:22, 254:22
**Continued** [1] - 21:12
**continued** [4] - 128:8, 131:22, 137:7, 207:7
**Continued).** [1] - 2:3
**contradicted** [1] - 185:15
**contradictory** [3] - 128:1, 151:14, 151:17
**contradicts** [1] - 126:22
**contrary** [5] - 24:10, 29:9, 30:2, 155:15, 235:16
**contrast** [3] - 168:17,

191:19, 191:24
**control** [2] - 179:12, 234:1
**controls** [1] - 233:24
**convenient** [1] - 219:22
**conveniently** [1] - 44:5
**conversation** [1] - 31:7
**conversations** [3] - 81:17, 99:23, 100:24
**converted** [1] - 40:11
**convey** [1] - 253:10
**convict** [6] - 144:15, 144:17, 146:14, 164:19, 172:15, 204:10
**convicted** [9] - 11:21, 19:14, 72:10, 146:5, 146:6, 147:1, 149:20, 172:13, 204:8
**conviction** [2] - 147:4, 252:17
**convinced** [4] - 164:15, 181:18, 209:17, 230:15
**Cooper** [1] - 79:25
**cop** [3] - 12:16, 15:20, 33:18
**cops** [3] - 101:18, 133:5, 225:7
**copy** [3] - 178:5, 255:24, 256:7
**cordoned** [2] - 198:15, 223:20
**cordoned-off** [2] - 198:15, 223:20
**corepresenting** [1] - 125:24
**Corporal** [8] - 6:4, 7:17, 58:12, 58:15, 58:17, 124:24, 138:24, 248:5
**corpus** [1] - 257:13
**correct** [153] - 7:9, 7:16, 8:9, 9:23, 10:7, 18:16, 35:7, 35:9, 35:13, 35:14, 35:17, 35:22, 36:4, 36:8, 36:10, 36:13, 36:15, 36:18, 36:22, 36:24, 36:25, 37:2, 37:3, 37:5, 37:18, 38:6, 38:8, 38:14, 38:16, 39:6, 39:23, 40:16, 40:18, 40:19, 40:22, 41:2, 41:5, 41:7, 41:11, 41:15, 41:17,

41:20, 42:4, 42:8, 43:10, 43:14, 43:17, 43:21, 44:22, 44:25, 45:3, 45:6, 45:8, 45:22, 45:24, 46:3, 46:5, 46:13, 47:7, 47:10, 47:16, 47:24, 48:2, 48:5, 48:6, 48:8, 48:20, 48:24, 48:25, 50:6, 50:11, 50:25, 51:4, 51:7, 51:8, 51:14, 51:17, 52:6, 52:7, 52:19, 53:1, 53:6, 53:7, 53:12, 53:13, 53:15, 53:25, 54:1, 54:11, 55:17, 55:24, 56:2, 56:16, 56:19, 57:12, 57:14, 57:18, 57:24, 58:6, 58:10, 58:13, 58:25, 59:1, 59:5, 59:12, 59:13, 59:21, 60:2, 60:21, 61:5, 61:15, 61:22, 62:1, 62:4, 62:6, 62:8, 62:11, 63:4, 63:7, 64:11, 64:14, 64:18, 80:1, 80:23, 93:16, 109:2, 109:6, 109:9, 109:10, 109:12, 109:13, 109:14, 109:16, 109:19, 110:6, 110:9, 110:13, 110:16, 110:22, 110:23, 111:2, 111:5, 113:15, 113:21, 113:24, 114:2, 119:18, 142:2, 152:16, 156:25, 162:9, 205:6, 258:4
**corrected** [2] - 50:16, 205:1
**correction** [1] - 205:25
**correctly** [1] - 12:3
**corroborates** [1] - 189:1
**corrupt** [4] - 116:11, 120:2, 236:8, 237:3
**corruptly** [18] - 149:2, 151:9, 151:10, 189:20, 190:4, 190:13, 191:4, 191:9, 191:13, 191:18, 191:22, 192:3, 210:12, 210:18, 213:25, 214:1, 231:6
**costs** [3] - 207:22, 209:2, 209:13

**Counsel** [1] - 255:1
**counsel** [12] - 3:6, 3:10, 3:14, 18:1, 31:3, 78:12, 80:4, 81:17, 93:16, 93:17, 96:7, 207:20
**Count** [98] - 5:23, 7:4, 7:15, 7:21, 9:9, 9:12, 9:16, 9:19, 10:16, 10:25, 18:15, 71:9, 71:12, 116:13, 122:24, 123:17, 125:3, 128:3, 128:6, 136:15, 138:5, 139:14, 144:10, 146:5, 146:6, 146:12, 147:2, 155:10, 156:10, 157:2, 159:20, 162:15, 164:14, 167:4, 176:19, 186:7, 188:12, 189:19, 189:21, 190:21, 192:15, 193:2, 195:19, 195:22, 195:25, 196:3, 196:6, 196:20, 198:4, 198:23, 199:10, 199:11, 199:25, 200:1, 200:17, 201:21, 210:3, 210:9, 214:22, 217:19, 220:8, 220:9, 222:12, 224:21, 226:5, 226:8, 227:17, 227:22, 228:9, 232:19, 235:9, 235:12, 238:12, 239:12, 239:18, 240:16, 240:19, 241:8, 242:9, 242:10, 242:14, 243:9, 243:11, 244:7, 244:20, 244:23, 245:13, 245:19, 246:6, 248:5, 248:8, 248:11
**count** [37] - 6:22, 9:19, 11:9, 25:14, 54:11, 54:17, 116:13, 122:24, 140:18, 143:9, 144:13, 144:16, 145:16, 159:2, 162:15, 163:15, 173:14, 199:11, 208:11, 209:11, 211:15, 212:16, 212:18, 214:20, 219:24,

226:8, 228:13, 233:16, 234:10, 236:17, 241:4, 246:11, 249:15, 249:18, 249:20, 249:21, 249:23
**countdown** [4] - 23:21, 239:21, 239:23, 239:24
**country** [2] - 29:13, 69:10
**counts** [48] - 9:20, 75:24, 116:19, 117:13, 117:20, 117:21, 122:17, 123:11, 123:25, 124:7, 125:8, 126:15, 141:15, 141:22, 144:13, 146:11, 146:15, 147:5, 149:6, 150:19, 150:24, 152:12, 155:17, 161:14, 162:2, 163:23, 166:17, 166:20, 167:1, 167:15, 173:5, 209:23, 214:24, 222:23, 223:1, 223:3, 223:9, 223:10, 223:11, 223:13, 223:14, 227:21, 230:24, 230:25, 232:19, 246:8, 247:3
**Counts** [34] - 9:24, 116:18, 122:24, 123:22, 124:19, 125:5, 137:16, 137:19, 139:3, 141:6, 150:15, 151:3, 155:20, 155:21, 155:23, 155:24, 156:15, 156:21, 157:9, 157:12, 157:17, 195:12, 210:4, 210:6, 218:11, 223:1, 227:21, 238:17, 239:21, 248:1, 248:18
**County** [1] - 208:24
**couple** [14] - 4:23, 21:17, 33:14, 34:16, 70:20, 74:16, 88:11, 96:24, 101:16, 101:18, 171:6, 231:4, 232:20, 247:8
**coupled** [3] - 118:18, 197:3, 238:25

**course** [18] - 34:16, 35:25, 40:6, 42:18, 46:22, 81:6, 85:15, 133:12, 165:23, 175:11, 176:3, 183:20, 199:22, 224:1, 227:3, 240:12, 249:6, 257:12

**COURT** [439] - 1:1, 3:15, 4:3, 4:6, 4:9, 4:17, 4:22, 5:17, 6:6, 6:16, 6:19, 7:13, 7:19, 8:1, 8:7, 8:11, 8:17, 8:21, 9:1, 9:5, 9:8, 9:19, 10:11, 10:14, 10:25, 11:3, 11:5, 11:7, 11:23, 12:12, 12:18, 12:22, 13:6, 13:11, 13:20, 13:23, 14:1, 14:7, 14:11, 14:15, 14:18, 15:6, 15:21, 15:25, 16:6, 16:14, 16:19, 17:3, 17:7, 17:9, 17:15, 17:20, 18:7, 18:10, 18:18, 18:21, 18:23, 19:5, 19:16, 20:2, 20:11, 20:16, 20:22, 21:3, 21:7, 23:10, 35:1, 37:16, 37:23, 39:3, 39:18, 39:25, 41:23, 45:12, 45:14, 49:25, 53:3, 54:7, 54:14, 57:7, 63:14, 63:20, 65:6, 67:8, 69:17, 69:22, 69:25, 70:2, 70:9, 70:17, 70:22, 70:24, 71:4, 71:11, 71:17, 71:24, 72:7, 72:14, 72:18, 72:23, 73:10, 73:20, 73:25, 74:2, 74:24, 75:2, 75:14, 75:17, 75:19, 75:21, 76:2, 76:5, 76:9, 76:18, 76:22, 77:4, 77:13, 77:19, 78:1, 78:15, 78:21, 79:6, 79:12, 79:17, 79:21, 79:24, 80:3, 80:8, 80:11, 80:18, 80:23, 81:2, 81:6, 81:9, 81:12, 81:16, 81:20, 81:25, 82:3, 82:5, 82:9, 82:18, 82:22, 83:5, 83:9, 83:13, 83:23, 84:4, 84:8, 84:11, 84:16, 84:24, 85:3, 85:6, 85:9, 85:15, 85:25, 86:3,

86:9, 86:16, 86:19, 86:24, 87:22, 91:12, 91:14, 92:6, 92:8, 92:10, 92:14, 92:17, 92:21, 92:25, 93:12, 93:18, 94:2, 94:9, 94:11, 94:13, 95:15, 95:19, 95:25, 96:4, 96:14, 96:20, 97:1, 97:10, 97:14, 97:16, 97:19, 97:23, 97:25, 98:4, 98:19, 100:5, 100:7, 100:12, 100:17, 100:21, 101:5, 102:17, 103:3, 103:7, 103:17, 104:12, 104:14, 104:25, 105:3, 105:5, 105:8, 105:11, 105:20, 106:16, 106:19, 106:25, 107:19, 108:17, 109:22, 111:21, 112:9, 112:11, 113:11, 114:14, 114:16, 114:18, 114:20, 114:23, 114:25, 115:13, 115:16, 115:19, 116:6, 117:23, 118:13, 119:5, 119:13, 119:16, 120:12, 120:16, 120:22, 120:25, 121:15, 122:5, 122:17, 122:19, 123:4, 123:16, 123:20, 123:22, 124:3, 124:8, 124:14, 124:17, 124:25, 125:4, 125:14, 126:6, 126:13, 126:18, 126:21, 127:6, 128:3, 129:9, 129:15, 130:5, 130:19, 130:24, 131:8, 132:2, 132:5, 132:17, 132:20, 132:25, 133:3, 133:6, 133:16, 133:20, 133:25, 134:8, 134:11, 134:15, 134:22, 135:8, 135:19, 135:22, 136:6, 136:10, 136:19, 137:4, 137:9, 137:13, 137:22, 138:1, 138:10, 138:19, 138:25,

139:9, 139:11, 139:23, 140:20, 140:25, 141:2, 141:4, 141:9, 141:20, 141:25, 142:4, 142:12, 142:15, 142:20, 142:23, 143:2, 143:12, 143:21, 143:25, 144:25, 145:15, 145:22, 146:10, 146:19, 146:24, 147:4, 147:17, 147:25, 148:5, 148:15, 148:19, 149:7, 149:13, 149:21, 150:5, 150:13, 150:21, 150:24, 151:2, 151:6, 151:15, 151:19, 152:3, 152:13, 152:19, 153:6, 153:13, 154:15, 155:16, 156:25, 157:6, 157:15, 157:18, 157:22, 158:13, 158:25, 159:7, 159:14, 159:18, 159:21, 160:10, 160:12, 160:15, 161:3, 161:8, 161:11, 161:18, 161:21, 161:24, 162:7, 162:18, 163:7, 163:11, 163:19, 164:1, 164:10, 164:22, 165:12, 166:3, 166:7, 166:10, 166:19, 166:25, 167:5, 167:9, 167:12, 167:20, 167:22, 168:2, 168:4, 168:11, 168:14, 168:24, 169:5, 169:24, 170:1, 170:7, 170:16, 170:19, 170:22, 171:2, 171:6, 171:24, 172:1, 172:20, 172:25, 173:3, 173:9, 173:13, 173:20, 174:9, 174:13, 174:15, 175:7, 175:11, 175:20, 176:3, 176:7, 176:11, 176:15, 177:5, 204:25,

205:6, 205:10, 205:14, 205:16, 205:21, 205:24, 231:2, 233:22, 247:5, 249:10, 255:1, 255:21, 255:25, 256:11, 256:22, 257:1, 257:4, 257:11, 257:15, 257:22, 258:1, 258:9

**Court** [35] - 1:21, 6:6, 11:7, 11:11, 11:12, 13:18, 13:19, 72:23, 73:1, 74:12, 84:2, 84:3, 115:6, 118:21, 129:15, 129:17, 130:16, 139:12, 147:6, 147:9, 147:18, 159:25, 164:3, 165:16, 168:9, 168:16, 171:17, 186:12, 186:14, 189:24, 190:1, 204:18, 206:17, 231:5, 252:20

**court** [12] - 3:2, 33:25, 87:4, 128:10, 182:12, 191:10, 191:19, 191:25, 250:15, 252:9, 252:15, 253:6

**Court's** [5] - 9:22, 73:7, 97:1, 130:7, 169:9

**courthouse** [1] - 38:23

**courtroom** [15] - 21:6, 58:12, 69:21, 82:13, 86:18, 116:5, 177:4, 204:24, 205:23, 251:7, 253:5, 253:20, 254:25, 255:7, 255:15

**COURTROOM** [5] - 3:4, 18:19, 18:22, 21:5, 175:18

**cover** [5] - 33:8, 139:16, 162:9, 214:11, 256:9

**coverage** [1] - 251:4

**covered** [7] - 5:4, 25:15, 55:10, 57:3, 219:17, 229:22, 243:15

**covers** [1] - 215:18

**COVID** [1] - 175:14

**coy** [1] - 173:22

**crazy** [1] - 31:9

**create** [5] - 118:19, 135:5, 138:16, 242:17, 242:21

**created** [3] - 69:10, 87:19, 126:17

**creating** [1] - 212:4

**credibility** [6] - 178:24, 184:2, 184:5, 184:10, 186:2, 242:7

**credible** [1] - 128:11

**credit** [2] - 185:6, 185:16

**crime** [25] - 129:21, 150:14, 176:20, 176:22, 176:23, 180:15, 188:13, 188:15, 188:16, 188:19, 188:22, 188:25, 189:2, 189:8, 189:12, 189:18, 192:16, 192:19, 192:20, 192:22, 193:9, 193:10, 193:12, 197:15, 252:19

**crimes** [1] - 34:18

**Criminal** [1] - 3:4

**criminal** [6] - 30:1, 32:11, 180:18, 181:12, 188:10, 194:22

**criminally** [1] - 81:3

**critical** [1] - 64:5

**cross** [14] - 15:13, 32:13, 47:23, 48:1, 48:2, 48:4, 74:22, 83:12, 83:17, 121:9, 150:8, 159:10, 240:11, 257:9

**CROSS** [2] - 35:2, 108:22

**Cross** [2] - 2:4, 2:6

**cross-examination** [2] - 15:13, 240:11

**CROSS-EXAMINATION** [2] - 35:2, 108:22

**Cross-Examination..**
**...........** [2] - 2:4, 2:6

**cross-examine** [1] - 83:12

**cross-examined** [1] - 159:10

**cross-fertilization** [1] - 257:9

**crossed** [3] - 16:12, 110:18, 150:8

**crowd** [22] - 25:8, 27:15, 44:7, 46:7,

48:20, 49:5, 51:4, 52:18, 54:16, 54:21, 56:9, 59:22, 89:16, 89:19, 90:3, 90:7, 102:4, 102:11, 103:9, 207:16, 207:17, 239:24
**crowding** [1] - 199:19
**crowds** [1] - 17:13
**CRR** [1] - 1:21
**crystal** [2] - 127:15, 208:17
**crystal-clear** [1] - 208:17
**culminated** [1] - 56:9
**cumulative** [5] - 39:18, 72:11, 152:24, 153:4, 154:7
**curative** [1] - 118:22
**curfew** [4] - 120:8, 121:24, 216:21, 217:2
**curly** [1] - 12:8
**current** [1] - 67:5
**cut** [8] - 46:21, 51:23, 66:1, 66:3, 76:10, 145:11, 172:22, 226:18
**cutting** [1] - 216:9

# D

**D.C** [21] - 1:5, 1:15, 1:22, 15:19, 50:14, 89:9, 143:15, 152:22, 201:7, 213:24, 217:6, 217:7, 232:2, 233:2, 233:12, 234:4, 235:14, 246:14, 246:22, 246:25, 247:1
**DABNEY** [1] - 1:9
**Dallas** [1] - 87:7
**damage** [6] - 28:2, 51:10, 187:14, 187:16, 200:13, 202:8
**damning** [1] - 229:21
**danger** [9] - 43:10, 135:13, 158:9, 187:13, 187:14, 203:22, 203:24, 220:18, 241:25
**dangerous** [1] - 212:4
**dark** [1] - 213:6
**data** [3] - 88:19, 88:21
**database** [1] - 89:6
**DATE** [1] - 258:9
**dated** [1] - 201:10

**daughter** [5] - 233:6, 233:14, 237:6, 237:8, 237:10
**David** [4] - 69:24, 86:21, 87:5, 244:18
**DAVID** [3] - 2:5, 86:23, 87:5
**days** [1] - 154:24
**deal** [5] - 70:10, 71:14, 74:10, 177:6, 205:5
**deals** [1] - 199:11
**dealt** [1] - 121:25
**death** [2] - 200:12, 202:7
**debates** [1] - 68:9
**decide** [12] - 77:9, 141:7, 149:22, 178:22, 178:23, 178:24, 179:3, 179:6, 182:23, 202:22, 251:6, 252:20
**decided** [6] - 6:4, 27:16, 90:2, 155:18, 208:5, 208:8
**deciding** [7] - 159:15, 166:4, 166:5, 187:8, 191:1, 194:16, 252:20
**decision** [5] - 52:4, 122:20, 141:6, 159:20, 238:14
**decisions** [1] - 159:16
**declared** [3] - 120:8, 216:20, 217:5
**declaring** [1] - 216:5
**dedicated** [1] - 31:22
**deems** [1] - 147:9
**defamatory** [1] - 16:9
**defend** [4] - 131:17, 207:1, 239:10
**defendant** [223] - 3:13, 62:1, 96:11, 110:16, 118:1, 118:12, 121:6, 128:9, 129:3, 129:19, 145:16, 150:17, 155:10, 155:23, 155:24, 156:16, 156:22, 157:1, 157:5, 158:20, 159:2, 164:7, 164:19, 164:24, 165:4, 165:15, 165:17, 165:20, 166:8, 166:13, 166:22, 167:5, 167:9, 167:13, 167:16, 167:23, 168:8, 168:18, 171:10,

171:16, 172:11, 172:12, 172:15, 176:19, 176:23, 176:24, 180:18, 180:20, 180:23, 181:2, 181:6, 181:9, 183:24, 186:7, 186:15, 186:16, 186:19, 186:21, 187:8, 187:9, 188:12, 188:15, 188:18, 188:21, 188:24, 189:1, 189:4, 189:10, 189:13, 189:17, 189:19, 189:21, 190:2, 190:4, 190:8, 190:9, 190:11, 190:13, 190:20, 191:1, 191:2, 191:4, 191:5, 192:6, 192:13, 192:15, 192:19, 192:21, 193:1, 193:11, 193:13, 193:19, 193:22, 193:23, 194:1, 194:4, 194:6, 194:16, 194:21, 194:24, 195:1, 195:6, 195:9, 195:10, 195:12, 195:19, 195:22, 195:25, 196:3, 196:6, 196:9, 196:11, 196:12, 196:16, 196:22, 196:25, 197:8, 197:9, 197:10, 197:13, 197:18, 197:21, 198:1, 198:4, 198:6, 198:9, 198:11, 198:23, 198:25, 199:3, 199:5, 200:2, 200:4, 200:6, 200:9, 200:17, 200:20, 200:22, 200:24, 201:4, 201:16, 201:21, 201:25, 202:2, 202:4, 202:16, 203:1, 203:8, 203:12, 203:20, 203:24, 204:6, 204:7, 204:11, 204:14, 204:16, 206:8, 206:11, 206:19, 207:17, 207:18, 208:14, 208:16, 208:18, 209:2, 209:10, 209:13,

209:17, 210:15, 210:16, 210:17, 211:2, 211:5, 211:17, 212:10, 213:17, 214:17, 215:2, 215:10, 217:3, 217:17, 218:3, 218:16, 218:22, 219:1, 219:13, 220:2, 220:12, 220:19, 221:6, 221:13, 221:24, 222:9, 222:14, 222:21, 224:22, 225:19, 228:4, 228:18, 230:3, 230:15, 230:19, 231:6, 231:8, 238:18, 238:21, 242:3, 242:6, 242:14, 242:24, 243:14, 243:25, 245:20, 247:20, 247:25, 248:9, 248:13, 248:20, 249:4, 249:7, 249:19, 252:22
**Defendant** [2] - 1:7, 1:16
**defendant's** [36] - 86:20, 131:20, 155:22, 156:3, 166:15, 166:16, 166:19, 167:24, 168:4, 172:4, 174:24, 177:11, 180:17, 181:19, 186:23, 189:7, 192:8, 192:11, 194:8, 194:10, 194:12, 194:14, 194:19, 195:4, 199:7, 203:3, 208:1, 211:18, 211:24, 211:25, 222:4, 225:22, 227:6, 247:16, 248:18
**defendants** [4] - 33:22, 62:24, 69:6, 69:11
**defended** [2] - 203:12, 206:12
**defending** [2] - 59:21, 132:11
**Defense** [17] - 2:11, 2:15, 2:15, 2:16, 2:16, 23:12, 91:11, 95:6, 95:14, 98:17, 98:20, 103:23,

104:10, 105:21, 115:2, 115:9, 127:19
**defense** [214] - 4:4, 6:4, 7:9, 8:12, 8:16, 8:20, 11:8, 12:22, 18:1, 20:13, 20:23, 22:8, 53:14, 59:16, 69:22, 70:18, 72:25, 73:6, 74:5, 74:24, 74:25, 75:10, 76:24, 78:10, 86:21, 94:5, 111:10, 114:20, 115:14, 116:7, 122:22, 122:23, 123:10, 123:23, 123:24, 123:25, 124:1, 124:5, 124:6, 124:9, 125:16, 125:19, 127:18, 128:10, 128:11, 128:15, 128:16, 128:18, 129:4, 129:5, 129:20, 130:12, 130:14, 130:20, 132:3, 132:7, 132:9, 132:10, 132:16, 133:16, 134:1, 135:9, 135:15, 136:1, 136:7, 136:13, 136:15, 136:17, 136:20, 136:21, 138:4, 138:5, 139:14, 140:9, 141:18, 143:19, 144:9, 144:18, 144:21, 145:17, 145:23, 146:3, 146:5, 146:7, 146:15, 147:9, 147:10, 147:11, 148:21, 149:8, 150:20, 153:10, 153:12, 153:20, 154:18, 155:3, 155:11, 155:17, 156:5, 156:19, 157:2, 158:17, 158:23, 159:25, 160:1, 160:3, 160:22, 160:23, 161:19, 161:20, 162:14, 162:22, 163:3, 163:4, 163:12, 163:13, 163:17, 163:20, 164:8, 164:24, 164:25, 165:1, 165:8, 165:16, 165:18, 166:16, 167:7, 167:9,

167:13, 167:17, 167:21, 167:25, 168:5, 168:6, 169:11, 170:25, 172:2, 172:3, 172:4, 172:5, 172:6, 172:8, 172:12, 172:14, 173:15, 174:17, 175:2, 176:1, 203:4, 203:6, 203:15, 204:1, 204:5, 204:7, 204:9, 204:12, 204:14, 204:15, 205:4, 206:7, 218:19, 220:4, 228:24, 230:4, 241:5, 242:9, 242:21, 245:11, 245:18, 246:3, 246:4, 246:10, 246:11, 246:16, 246:17, 247:22, 248:24, 256:11, 256:12

**DEFENSE** [2] - 21:11, 86:23

**defense's** [2] - 12:5, 228:17

**defenses** [3] - 128:22, 133:13, 159:8

**defensive** [1] - 22:9

**defined** [4] - 118:16, 119:2, 188:23, 201:9

**definitely** [3] - 6:6, 26:13, 173:25

**definition** [6] - 125:11, 171:17, 176:25, 192:23, 223:19, 238:22

**definition's** [1] - 238:23

**definitions** [2] - 186:13, 189:25

**deflect** [1] - 24:4

**degree** [3] - 183:1, 187:1, 223:10

**dehydrated** [1] - 49:5

**delay** [1] - 177:6

**delayed** [3] - 187:2, 215:6, 238:3

**deleted** [1] - 250:8

**deliberate** [2] - 251:14, 254:19

**deliberating** [1] - 173:19

**deliberation** [2] - 173:11, 201:2

**deliberations** [20] - 175:21, 177:16, 177:25, 178:6,

179:12, 179:15, 179:22, 230:23, 231:25, 234:1, 249:22, 250:7, 250:14, 251:18, 251:23, 252:3, 253:8, 253:17, 254:21, 255:6

**demand** [1] - 66:9

**demeanor** [1] - 184:11

**democracies** [1] - 208:4

**democratic** [1] - 208:9

**demonstrate** [1] - 121:20

**demonstrated** [1] - 235:10

**demonstrations** [1] - 234:6

**denied** [1] - 14:20

**deny** [7] - 51:21, 52:5, 59:20, 59:22, 61:10, 61:11, 61:12

**department** [7] - 15:11, 15:15, 187:24, 188:1, 188:3, 188:4

**Department** [4] - 50:19, 67:16, 188:2, 217:1

**departments** [1] - 188:1

**depict** [1] - 104:25

**depiction** [1] - 104:7

**depicts** [2] - 84:12, 115:3

**deployed** [1] - 207:15

**deputy** [2] - 255:7, 255:15

**DEPUTY** [5] - 3:4, 18:19, 18:22, 21:5, 175:18

**descended** [1] - 206:18

**described** [1] - 184:7

**description** [1] - 149:22

**deserve** [2] - 34:14, 88:14

**designed** [1] - 77:3

**desire** [1] - 185:21

**desperation** [1] - 208:7

**destroy** [1] - 226:19

**destroying** [1] - 67:17

**destruction** [2] - 200:13, 202:8

**detail** [5] - 22:2, 23:18, 25:5, 27:12, 214:11

**detailed** [1] - 14:23

**details** [2] - 4:7, 184:25

**detected** [1] - 117:4

**Detective** [1] - 124:21

**determination** [1] - 130:17

**determine** [11] - 171:15, 176:24, 178:20, 178:25, 182:4, 183:10, 184:2, 185:19, 186:14, 190:1, 192:21

**determined** [2] - 183:7, 207:21

**determining** [3] - 183:23, 185:14, 202:25

**deterred** [2] - 207:17

**develop** [1] - 122:8

**developed** [4] - 119:24, 121:6, 211:22, 256:24

**developing** [1] - 122:8

**devices** [1] - 207:15

**diagnosis** [3] - 15:12, 15:14, 15:17

**died** [1] - 42:19

**difference** [4] - 111:18, 113:6, 151:9, 227:24

**different** [31] - 6:24, 11:25, 12:1, 19:6, 19:10, 25:7, 72:4, 72:22, 89:1, 89:5, 92:24, 93:18, 93:20, 104:23, 123:14, 132:2, 136:6, 138:23, 141:1, 142:7, 150:9, 161:14, 179:11, 185:8, 213:10, 217:15, 223:5, 228:19, 233:25

**differently** [2] - 153:16, 185:9

**difficult** [2] - 40:8, 89:24

**difficulty** [1] - 160:11

**dim** [1] - 216:13

**Direct** [2] - 2:3, 2:5

**DIRECT** [2] - 21:12, 87:1

**direct** [16] - 61:14, 71:14, 74:22, 83:19, 108:25, 110:3, 182:4, 182:7, 182:13, 182:20, 182:24, 183:1, 183:3, 194:18,

209:22, 257:8

**directed** [2] - 107:9, 242:25

**directing** [2] - 106:11, 225:16

**direction** [12] - 56:5, 56:15, 102:5, 106:8, 106:10, 106:12, 110:20, 163:25, 219:19, 237:16, 243:14, 248:3

**directly** [9] - 28:25, 57:11, 114:8, 174:24, 177:10, 202:13, 211:19, 215:23, 219:2

**disagree** [9] - 15:3, 37:19, 59:11, 60:25, 63:9, 133:24, 135:17, 157:24, 162:10

**discarded** [1] - 214:20

**discharge** [7] - 36:7, 36:10, 36:21, 36:22, 37:8, 37:21, 175:11

**discharged** [1] - 37:6

**discourse** [1] - 68:11

**discovery** [2] - 11:15, 12:24

**discrepancies** [1] - 185:3

**discrete** [1] - 73:21

**discuss** [9] - 4:2, 17:23, 73:3, 83:19, 151:20, 251:11, 251:13, 254:6, 254:11

**discussed** [1] - 109:15

**discusses** [1] - 212:15

**discussing** [1] - 254:22

**discussion** [3] - 79:20, 224:25, 257:5

**discussions** [4] - 31:6, 73:16, 116:2, 250:21

**dismiss** [1] - 17:16

**dismissed** [2] - 37:4, 117:22

**disobedience** [1] - 135:3

**disobey** [2] - 201:14, 228:2

**disobeying** [1] - 228:7

**disorder** [43] - 116:13, 120:4, 120:8, 122:24, 140:16, 140:18, 140:22, 141:5, 141:7,

141:23, 141:25, 144:12, 144:22, 145:24, 162:3, 162:13, 164:19, 165:2, 171:20, 186:10, 186:17, 187:1, 187:11, 188:14, 188:15, 188:17, 188:19, 188:23, 188:25, 189:5, 189:11, 189:15, 196:20, 210:5, 214:24, 215:1, 215:6, 215:20, 216:18, 217:14, 217:20, 232:20

**disorderly** [15] - 150:18, 198:24, 199:3, 199:11, 199:13, 200:18, 200:23, 201:19, 226:5, 226:11, 227:1, 227:22, 244:24, 245:19, 245:20

**disregard** [6] - 107:20, 108:18, 134:16, 201:14, 204:3, 228:2

**disrupt** [11] - 39:23, 150:18, 199:6, 200:25, 226:7, 227:20, 227:23, 245:3, 245:22, 246:1

**disrupted** [2] - 199:8, 226:9

**disrupting** [1] - 216:25

**disruptive** [16] - 198:24, 199:3, 199:12, 199:18, 199:21, 200:18, 200:23, 201:18, 226:6, 226:14, 226:21, 227:1, 227:5, 227:22, 244:24, 245:21

**dissertation** [1] - 37:21

**distinct** [1] - 72:12

**distinction** [3] - 20:23, 72:24, 151:8

**distracted** [2] - 52:11, 145:13

**distress** [1] - 237:16

**distressed** [1] - 129:2

**District** [7] - 187:19, 187:20, 187:21, 188:8, 188:10, 201:12, 236:23

**DISTRICT** [3] - 1:1, 1:1, 1:10
**disturb** [4] - 200:25, 227:23, 245:23, 246:1
**disturbance** [3] - 187:11, 199:21, 227:2
**disturbing** [2] - 213:21, 215:18
**divide** [1] - 75:22
**divided** [1] - 252:15
**divider** [1] - 101:20
**docket** [1] - 4:25
**document** [2] - 5:15, 200:1
**dollar** [1] - 42:12
**dome** [2] - 127:2, 127:20
**done** [13] - 34:3, 34:6, 52:12, 85:17, 132:12, 146:6, 151:12, 173:6, 177:20, 179:5, 202:16, 206:25, 236:24
**donned** [1] - 206:23
**donning** [1] - 206:22
**door** [11] - 47:16, 47:17, 83:15, 83:18, 120:1, 208:20, 211:7, 215:16, 226:3, 227:8, 232:9
**double** [1] - 14:19
**double-check** [1] - 14:19
**doubt** [56] - 144:5, 180:21, 181:1, 181:6, 181:9, 181:14, 181:15, 181:19, 181:20, 181:23, 181:24, 182:1, 182:2, 183:24, 186:18, 188:20, 189:6, 190:7, 190:19, 193:10, 193:16, 195:3, 195:8, 195:21, 195:24, 196:2, 196:5, 196:8, 197:9, 197:25, 198:8, 199:2, 200:6, 200:22, 202:2, 203:1, 204:14, 209:16, 209:19, 210:2, 214:23, 217:20, 222:24, 228:15, 230:14, 230:16, 230:24, 231:24, 238:15,

246:20, 252:22, 253:14
**down** [70] - 5:24, 7:14, 7:18, 8:2, 9:11, 10:6, 10:8, 20:18, 22:6, 27:13, 27:19, 28:15, 28:22, 39:16, 47:7, 47:18, 55:6, 56:24, 57:19, 69:19, 78:4, 85:11, 85:17, 90:2, 90:3, 90:4, 90:6, 94:21, 95:1, 100:23, 113:4, 128:6, 129:25, 135:18, 137:15, 138:3, 156:24, 159:9, 159:11, 160:6, 163:15, 164:13, 164:15, 164:17, 208:13, 208:19, 210:19, 211:8, 215:14, 215:23, 219:6, 220:3, 220:13, 222:7, 222:14, 227:8, 227:9, 228:8, 233:7, 233:8, 234:11, 234:12, 237:5, 237:7, 237:11, 240:4, 240:17, 244:15
**downtrodden** [1] - 219:21
**dozen** [1] - 101:16
**Drapeau** [1] - 129:8
**drastically** [1] - 206:20
**draw** [4] - 143:7, 180:5, 180:17
**drawn** [1] - 182:8
**drove** [1] - 89:10
**dual** [2] - 149:4, 159:5
**due** [2] - 33:20, 34:14
**during** [40] - 12:24, 20:12, 26:11, 42:18, 57:17, 87:18, 162:13, 173:10, 178:5, 178:23, 179:12, 179:13, 179:15, 179:22, 180:1, 183:20, 186:17, 186:25, 188:13, 188:14, 188:16, 188:19, 188:22, 188:25, 189:5, 189:11, 189:14, 194:23, 202:23, 215:20, 217:19, 220:1, 232:1, 234:1, 234:4,

249:22, 250:5, 251:17, 251:23, 252:3
**duties** [13] - 24:18, 186:10, 186:25, 195:16, 196:14, 196:16, 197:20, 207:11, 208:1, 215:5, 218:8, 229:10, 246:2
**duty** [14] - 129:19, 156:16, 158:4, 158:5, 178:16, 181:2, 181:6, 197:24, 197:25, 217:17, 225:7, 227:5, 232:4, 232:6

## E

**e-mail** [2] - 151:21, 251:20
**early** [1] - 70:11
**easier** [1] - 163:20
**easily** [2] - 152:10, 160:6
**east** [10] - 76:16, 76:17, 84:12, 84:20, 85:1, 115:3, 247:17, 247:19, 247:20
**easy** [3] - 152:4, 235:13, 238:14
**eat** [1] - 140:5
**ECF** [5] - 18:4, 49:3, 71:17, 128:20, 148:11
**edits** [3] - 140:3, 256:1, 256:8
**educate** [2] - 33:11, 34:3
**education** [1] - 87:24
**effect** [6] - 120:9, 130:8, 157:5, 190:12, 192:12, 212:1
**effects** [1] - 244:1
**efficient** [1] - 178:14
**efficiently** [1] - 76:5
**effort** [4] - 153:20, 154:17, 239:10, 242:17
**efforts** [2] - 112:23, 209:2
**egg** [2] - 84:13, 115:4
**eggs** [1] - 77:4
**eight** [1] - 34:5
**either** [19] - 26:7, 82:5, 124:11, 152:15, 154:11, 163:16, 185:18, 186:4,

187:2, 192:5, 201:1, 201:3, 214:1, 215:7, 222:19, 239:9, 245:12, 245:23, 246:16
**elapsed** [1] - 184:23
**elder** [1] - 219:21
**elderly** [1] - 23:23
**election** [1] - 212:14
**Electoral** [7] - 190:22, 207:23, 208:11, 209:11, 212:16, 212:17, 214:19
**electors** [1] - 214:21
**electronic** [2] - 251:19, 255:24
**electronically** [1] - 251:24
**element** [14] - 118:2, 119:17, 120:18, 150:16, 181:1, 181:5, 189:3, 189:9, 189:16, 196:19, 210:19, 213:25, 231:23, 246:19
**elements** [26] - 130:10, 160:2, 165:22, 186:12, 186:18, 188:21, 189:24, 190:6, 193:18, 195:21, 195:23, 196:1, 196:4, 196:7, 198:8, 199:2, 200:6, 200:22, 202:2, 210:14, 211:17, 215:1, 224:22, 226:5, 238:13, 253:13
**elicit** [3] - 82:25, 83:6, 100:22
**elicited** [2] - 92:14, 93:2
**Ellipse** [6] - 89:20, 90:9, 90:13, 117:16, 233:3, 244:12
**embroidery** [1] - 72:21
**emergency** [19] - 3:16, 3:18, 4:5, 4:11, 49:4, 49:6, 121:9, 121:15, 121:18, 121:21, 208:25, 216:5, 216:20, 217:5, 225:18, 225:20, 225:21, 237:13, 237:14
**Emily** [1] - 3:14
**emoji** [1] - 32:1
**emotions** [1] - 27:2
**employee** [2] - 187:25,

188:8
**encourage** [5] - 194:9, 194:11, 194:13, 195:4, 250:22
**encouraged** [1] - 194:7
**encouraging** [2] - 193:25, 209:11
**End** [4] - 4:21, 94:12, 97:24, 101:4
**end** [11] - 25:2, 25:10, 28:18, 37:14, 57:5, 150:11, 175:11, 216:15, 222:23, 227:11, 256:8
**ended** [1] - 10:10
**ending** [1] - 15:12
**ends** [3] - 115:20, 230:12, 249:3
**enforcement** [34] - 46:23, 48:4, 51:17, 54:4, 107:14, 107:16, 110:22, 114:9, 118:5, 120:6, 145:8, 158:3, 162:21, 164:11, 167:4, 185:25, 186:6, 186:9, 186:22, 186:24, 188:7, 188:9, 203:9, 203:10, 206:9, 206:10, 207:16, 215:4, 225:13, 232:22, 235:11, 237:17, 242:1, 243:20
**engage** [4] - 53:5, 245:20, 249:1, 249:5
**engaged** [18] - 35:11, 120:5, 156:14, 156:16, 186:24, 188:9, 195:15, 196:14, 196:15, 199:3, 200:7, 200:23, 202:3, 215:5, 227:18, 228:11, 245:16, 246:3
**engages** [1] - 220:16
**engaging** [10] - 53:24, 118:5, 118:7, 191:20, 191:21, 191:25, 192:1, 199:25, 200:18, 201:22
**enjoy** [1] - 116:4
**ensure** [3] - 74:11, 229:12, 238:1
**enter** [5] - 43:7, 47:5, 198:13, 225:5, 248:9

**entered** [9] - 21:6, 86:18, 121:19, 177:4, 198:9, 205:23, 216:24, 224:22, 253:20
**entering** [5] - 118:9, 198:5, 224:21, 229:7, 244:7
**entertain** [1] - 139:17
**entire** [12] - 16:25, 20:5, 25:15, 30:8, 40:11, 63:3, 69:7, 174:17, 224:12, 227:13, 228:21, 248:13
**entirely** [3] - 72:4, 202:22, 253:18
**entirety** [3] - 53:18, 58:21, 60:7
**entitled** [4] - 180:9, 185:23, 201:9, 258:5
**episode** [1] - 216:7
**equal** [1] - 182:24
**erect** [1] - 111:25
**error** [1] - 206:3
**errors** [4] - 74:14, 255:5, 255:12, 256:5
**especially** [4] - 40:14, 116:9, 173:18, 223:11
**ESQ** [2] - 1:16, 1:16
**essential** [1] - 19:9
**essentially** [7] - 22:13, 35:16, 242:14, 242:17, 243:1, 243:16, 244:3
**establish** [2] - 192:13, 196:25
**established** [8] - 118:8, 118:10, 119:20, 119:22, 120:15, 121:4, 121:12, 197:24
**establishes** [1] - 120:7
**establishment** [1] - 188:5
**estimate** [2] - 75:12, 90:7
**et** [5] - 61:24, 172:9, 229:5, 255:14
**ethical** [3] - 16:12, 17:18, 17:19
**ethnic** [1] - 179:2
**evacuated** [1] - 224:2
**evaluated** [1] - 186:1
**evaluating** [4] - 184:5, 184:20, 186:2, 242:7
**Evans** [3] - 70:12, 70:14, 70:15

**evening** [4] - 17:6, 174:5, 229:12, 256:9
**event** [13] - 89:7, 90:18, 93:3, 184:21, 184:23, 184:24, 185:1, 186:4, 199:22, 227:2, 257:7
**events** [12] - 23:5, 46:9, 90:16, 90:22, 90:25, 91:2, 91:22, 92:13, 92:16, 94:16, 94:21, 106:6
**eventually** [2] - 31:13, 96:10
**everyday** [1] - 197:12
**everywhere** [2] - 225:13
**evidence** [169] - 6:24, 7:2, 18:25, 21:21, 22:24, 23:12, 24:22, 31:15, 45:9, 85:18, 91:12, 91:13, 93:11, 93:14, 93:25, 98:20, 103:23, 105:21, 114:13, 114:23, 115:2, 115:7, 115:9, 115:13, 115:17, 115:20, 116:10, 116:17, 116:24, 117:10, 117:19, 119:11, 119:22, 119:24, 120:2, 121:19, 122:3, 124:11, 126:16, 126:22, 127:12, 128:1, 128:2, 130:2, 130:6, 131:10, 140:7, 140:15, 144:1, 144:4, 145:21, 148:16, 149:25, 150:3, 152:24, 153:4, 153:6, 155:24, 156:2, 156:22, 165:10, 166:8, 166:12, 177:24, 178:22, 178:24, 179:4, 179:10, 179:11, 179:17, 179:19, 179:20, 179:23, 179:25, 180:4, 180:5, 180:8, 180:11, 180:12, 180:13, 180:16, 180:23, 181:16, 181:18, 182:3, 182:4, 182:5, 182:7, 182:9, 182:13, 182:18, 182:20, 182:22, 182:23,

182:25, 183:1, 183:2, 183:5, 183:7, 183:9, 183:15, 183:19, 185:6, 185:16, 186:1, 187:9, 189:6, 191:2, 194:19, 194:21, 195:1, 202:17, 202:23, 202:24, 204:12, 209:19, 209:21, 209:22, 210:1, 210:22, 212:6, 218:16, 219:25, 221:19, 223:11, 223:12, 225:2, 227:4, 228:7, 228:10, 230:13, 230:21, 230:22, 231:17, 231:19, 231:20, 232:10, 232:24, 233:16, 233:17, 233:21, 233:24, 233:25, 234:3, 235:13, 238:2, 239:6, 242:4, 244:9, 246:18, 249:7, 249:16, 249:25, 250:3, 250:6, 250:19, 250:21, 250:24, 250:25, 251:6, 253:8, 257:20
**exact** [5] - 18:5, 31:5, 54:17, 93:9, 157:7
**exactly** [9] - 60:21, 60:22, 80:14, 102:12, 177:14, 235:16, 235:23, 235:25, 240:24
**examination** [4] - 15:13, 71:14, 72:5, 240:11
**EXAMINATION** [7] - 21:12, 35:2, 65:8, 87:1, 108:22, 111:22, 113:12
**Examination** [1] - 2:3
**Examination...........** [2] - 2:4, 2:6
**Examination...........** [1] - 2:7
**Examination.............** [1] - 2:5
**Examination.............** [2] - 2:4, 2:6
**examine** [4] - 83:12, 249:25, 250:3, 250:9
**examined** [1] - 159:10
**example** [10] - 88:10, 89:21, 145:9,

182:10, 184:10, 191:10, 214:5, 226:20, 228:8, 252:15
**examples** [2] - 146:11, 225:23
**except** [5] - 123:8, 189:17, 233:13, 252:7, 252:9
**exception** [2] - 92:18, 136:7
**exceptions** [1] - 161:14
**excessive** [8] - 125:9, 125:11, 131:6, 131:12, 131:16, 137:1, 203:11, 206:10
**excluded** [1] - 100:8
**exclusive** [1] - 179:9
**exculpatory** [1] - 15:2
**excuse** [25] - 3:19, 4:13, 25:10, 35:19, 40:3, 45:13, 45:20, 47:21, 49:3, 55:16, 69:19, 84:21, 96:11, 110:21, 115:21, 115:25, 128:23, 129:2, 155:20, 158:14, 176:4, 249:11, 253:17, 253:23, 254:20
**excused** [4] - 4:17, 114:16, 176:5, 253:21
**excusing** [1] - 3:24
**executive** [2] - 188:1, 188:3
**exercise** [13] - 49:15, 149:2, 163:5, 191:17, 203:13, 205:4, 205:15, 206:2, 206:9, 206:13, 232:14, 243:4, 244:5
**exercising** [1] - 27:1
**Exhibit** [33] - 6:1, 9:5, 21:20, 22:24, 23:12, 24:21, 25:20, 25:21, 31:14, 55:13, 60:6, 72:11, 84:12, 91:11, 95:6, 98:20, 103:23, 105:21, 115:2, 115:9, 127:16, 210:23, 211:13, 216:15, 216:22, 219:1, 219:10, 219:17, 220:9, 223:17, 223:24, 225:3, 225:4

**exhibit** [11] - 6:4, 31:16, 85:19, 85:20, 92:23, 95:22, 111:11, 217:3, 220:4, 227:12, 250:6
**exhibits** [19] - 11:16, 13:1, 72:15, 93:9, 93:13, 127:18, 172:21, 173:2, 173:10, 173:11, 173:19, 179:25, 249:24, 250:2, 250:5, 250:9, 255:8, 255:13, 255:16
**EXHIBITS** [1] - 2:14
**exist** [1] - 150:24
**existence** [5] - 55:2, 203:10, 205:3, 205:13, 206:1
**exists** [1] - 254:5
**exit** [1] - 209:7
**exited** [4] - 69:21, 116:5, 204:24, 254:25
**expect** [8] - 29:13, 44:3, 70:6, 79:2, 100:9, 100:14, 133:2, 257:1
**expectation** [1] - 94:23
**expected** [1] - 28:4
**expecting** [1] - 14:24
**experience** [5] - 62:1, 89:9, 104:17, 180:8, 244:19
**experienced** [1] - 89:1
**experiencing** [1] - 243:25
**explain** [9] - 44:6, 119:5, 163:22, 167:18, 186:12, 186:14, 189:24, 190:1, 210:6
**explained** [5] - 178:13, 181:8, 192:18, 193:19, 251:4
**explaining** [1] - 164:2
**explanation** [2] - 219:22, 222:13
**explicitly** [1] - 16:11
**exposure** [5] - 70:3, 78:12, 78:23, 79:1, 81:3
**express** [4] - 27:22, 63:23, 65:3
**expressed** [1] - 179:7
**expressing** [1] - 40:4
**expressive** [1] - 236:17

**extensively** [2] - 127:9, 150:22
**extent** [8] - 12:22, 26:23, 69:5, 172:11, 184:3, 204:6, 239:8, 245:16
**extra** [4] - 77:9, 77:21, 113:1, 113:3
**extremely** [2] - 231:24, 254:14
**eyes** [1] - 26:5
**eyewitness** [1] - 182:5

## F

**F.2d** [1] - 152:23
**F.3d** [6] - 128:24, 128:25, 129:7, 129:8, 158:11, 158:15
**face** [27] - 26:1, 26:6, 26:7, 26:14, 26:16, 27:18, 28:19, 28:25, 32:1, 32:12, 40:13, 41:6, 44:2, 58:18, 59:4, 59:12, 125:25, 212:25, 213:7, 220:11, 225:6, 226:1, 227:14, 243:15, 248:6
**Facebook** [7] - 30:17, 30:19, 41:2, 119:22, 212:10, 213:19, 214:18
**faces** [1] - 208:15
**facilitate** [5] - 194:9, 194:11, 194:13, 195:5, 250:20
**facilitating** [1] - 193:25
**facing** [1] - 216:14
**fact** [41] - 14:15, 24:19, 36:3, 37:4, 38:18, 39:12, 41:10, 42:19, 43:3, 58:18, 61:25, 65:24, 71:5, 92:12, 93:9, 94:4, 122:3, 128:12, 133:15, 138:3, 139:13, 145:10, 149:21, 153:23, 159:16, 163:6, 165:13, 180:3, 181:10, 182:6, 182:21, 192:11, 197:25, 199:7, 219:23, 221:8, 226:9, 233:2, 234:2, 249:19, 253:2
**fact-finding** [1] -

159:16
**facts** [19] - 11:15, 17:1, 18:11, 64:1, 114:12, 151:16, 178:20, 178:21, 178:25, 179:25, 180:3, 180:6, 182:4, 182:7, 183:9, 194:20, 202:17, 202:22, 209:20
**factual** [3] - 78:25, 130:8, 153:19
**failed** [6] - 56:24, 181:5, 204:15, 248:20, 248:21, 248:23
**failing** [1] - 143:8
**failure** [2] - 17:16, 154:18
**fair** [16] - 23:5, 33:19, 34:1, 34:15, 39:22, 83:17, 85:6, 113:20, 148:19, 154:6, 178:14, 179:3, 183:6, 231:20, 250:19, 250:24
**fairly** [7] - 7:23, 70:6, 97:4, 104:25, 152:12, 180:9, 185:23
**faith** [3] - 32:14, 40:14, 51:4
**fall** [7] - 30:7, 54:23, 59:14, 67:6, 87:25, 138:2, 142:4
**fallen** [5] - 55:3, 57:6, 58:25, 59:2, 248:22
**falling** [1] - 8:2, 55:20, 56:10, 56:14, 57:4, 67:1, 164:17, 182:11, 182:13, 240:4, 240:17
**falls** [6] - 10:6, 59:12, 59:13, 128:5, 232:12, 241:2
**false** [1] - 68:20
**falsehood** [1] - 185:11
**fame** [1] - 64:19
**familiar** [4] - 36:10, 93:3, 100:11, 147:19
**families** [3] - 34:10, 67:17, 69:12
**family** [12] - 3:16, 3:18, 3:19, 4:5, 31:9, 31:11, 40:6, 62:24, 64:24, 198:19, 223:24, 224:2
**far** [15] - 14:17, 14:20, 65:16, 65:19, 67:14, 67:15, 67:18, 78:6,

90:9, 91:24, 102:3, 102:4, 108:13, 141:10, 151:5
**farmers** [1] - 213:7
**fashion** [3] - 22:9, 22:17, 252:16
**fast** [1] - 140:2
**favor** [1] - 182:22
**favorable** [1] - 131:10
**favoritism** [1] - 179:1
**FBI** [8] - 3:11, 30:14, 30:23, 31:23, 32:1, 80:16, 80:19, 126:24
**FBI's** [1] - 30:19
**fear** [10] - 116:24, 117:3, 117:9, 119:13, 119:16, 179:1, 199:14, 218:21, 218:22, 226:12
**features** [1] - 212:11
**fed** [1] - 68:20
**federal** [11] - 69:3, 116:16, 120:14, 186:11, 188:15, 195:18, 197:19, 197:20, 198:6, 200:19, 201:24
**federally** [7] - 118:5, 118:7, 187:4, 187:22, 215:8, 217:14, 217:15
**feed** [1] - 31:11
**feeds** [1] - 251:9
**feet** [1] - 28:22
**fell** [17] - 10:8, 51:22, 55:6, 55:9, 56:24, 57:1, 57:2, 57:11, 57:14, 57:16, 57:17, 57:19, 57:20, 138:3, 159:7, 159:9, 240:6
**fellow** [4] - 60:23, 60:25, 209:14, 252:1
**felonies** [1] - 218:11
**felony** [4] - 195:18, 196:18, 196:19, 218:10
**felt** [8] - 43:6, 46:1, 117:3, 134:13, 157:12, 233:10, 234:12, 244:4
**fence** [1] - 101:19
**fences** [2] - 111:2, 111:4
**fencing** [1] - 223:18
**Fersner** [1] - 128:23
**fertilization** [1] - 257:9
**festive** [4] - 100:16, 102:20, 108:1, 112:20

**few** [9] - 21:16, 26:4, 34:3, 46:10, 68:1, 97:22, 169:6, 234:10, 246:8
**Fifth** [3] - 79:5, 81:6, 81:14
**fifth** [2] - 194:1, 196:16
**fight** [2] - 41:20, 158:16
**fighting** [2] - 205:16, 206:4
**figure** [4] - 61:20, 73:23, 80:6, 91:9
**filed** [6] - 5:14, 16:14, 18:7, 18:8, 18:24, 257:11
**filing** [3] - 5:11, 7:8, 14:20
**filings** [6] - 6:3, 6:14, 7:7, 16:12, 18:2, 18:12
**fill** [2] - 77:3, 253:4
**film** [3] - 87:19, 90:3, 104:23
**filmed** [1] - 114:3
**filming** [2] - 104:21, 234:19
**final** [4] - 72:8, 74:18, 173:6, 173:21
**finally** [9] - 121:1, 156:10, 216:13, 222:12, 223:1, 228:9, 230:7, 246:6, 248:11
**finder** [2] - 128:12, 139:13, 165:13
**findings** [1] - 130:8
**fine** [12] - 7:19, 61:6, 75:18, 77:18, 80:10, 94:10, 168:22, 171:22, 174:7, 175:24, 205:18, 205:19
**fingers** [1] - 151:21
**finish** [1] - 171:2
**finishes** [1] - 221:6
**finishing** [2] - 116:1, 174:3
**firearm** [1] - 255:2
**firm** [1] - 189:13
**firmly** [3] - 181:18, 209:17, 230:15
**First** [33] - 27:2, 27:22, 32:18, 47:13, 49:11, 141:10, 141:12, 141:13, 141:21, 147:21, 148:1, 148:17, 148:23, 149:12, 149:16,

149:23, 150:2, 150:20, 150:23, 151:17, 168:9, 168:12, 168:15, 191:14, 201:6, 230:12, 234:6, 236:16, 236:18, 237:1, 248:25, 249:3
**first** [57] - 3:20, 3:21, 4:19, 6:20, 12:20, 12:25, 53:21, 55:13, 55:22, 57:19, 64:25, 75:10, 96:24, 99:10, 99:14, 101:12, 102:7, 102:9, 108:9, 110:4, 111:10, 113:18, 122:8, 122:13, 123:14, 126:14, 127:3, 127:6, 131:25, 149:7, 152:4, 154:11, 171:19, 186:12, 186:19, 188:21, 189:3, 189:24, 190:8, 193:17, 196:9, 198:9, 199:2, 200:6, 200:22, 202:2, 203:9, 205:12, 206:9, 207:20, 216:20, 223:15, 230:9, 238:18, 241:13, 250:13
**firsthand** [2] - 122:6, 122:9
**fistfight** [1] - 150:11
**five** [29] - 5:6, 5:20, 6:20, 19:17, 77:19, 101:17, 102:8, 102:10, 111:6, 116:19, 116:21, 118:1, 118:15, 120:6, 122:25, 144:17, 165:6, 170:11, 193:16, 195:20, 195:23, 196:1, 196:4, 196:7, 204:22, 209:2, 218:14, 226:23, 249:5
**five-minute** [1] - 204:22
**fix** [1] - 255:6
**flag** [9] - 24:2, 24:5, 24:10, 25:19, 33:18, 42:21, 43:4, 241:1
**flailing** [1] - 240:7
**flannel** [1] - 55:8
**flash** [1] - 207:14
**flawed** [1] - 49:9

**flex** [1] - 32:19
**Floor** [1] - 1:18
**flower** [1] - 25:2
**fly** [1] - 147:15
**flyer** [1] - 42:5
**flyers** [1] - 90:21
**Flynn** [1] - 90:19
**focus** [8] - 49:17, 67:1, 155:20, 215:17, 216:9, 220:9, 220:25, 233:15
**focused** [8] - 6:8, 6:12, 7:10, 12:15, 55:17, 72:25, 88:6, 207:18
**focuses** [1] - 215:23
**focusing** [5] - 12:11, 18:6, 20:10, 88:13, 220:7
**folded** [1] - 225:9
**folding** [1] - 50:11
**folks** [4] - 80:11, 137:15, 236:18, 238:9
**follow** [11] - 50:8, 61:24, 140:13, 173:21, 178:9, 178:18, 213:14, 214:15, 225:7, 231:4, 257:17
**followed** [6] - 7:23, 9:19, 22:13, 46:7, 54:21, 75:6
**followers** [1] - 64:22
**following** [13] - 31:7, 64:23, 162:1, 186:17, 188:21, 190:6, 193:16, 195:20, 198:8, 199:1, 200:5, 200:21, 202:1
**food** [2] - 140:1, 140:2
**footage** [2] - 110:17, 213:21
**Footnote** [1] - 148:11
**footnote** [1] - 15:10
**FOR** [3] - 1:1, 21:11, 86:23
**forbids** [2] - 201:14, 228:2
**force** [45] - 96:21, 125:11, 131:6, 131:12, 131:16, 131:22, 132:1, 135:2, 136:4, 136:6, 136:18, 136:21, 137:1, 166:23, 167:6, 167:11, 172:6, 172:7, 172:9,

196:22, 196:23, 196:24, 197:5, 203:4, 203:5, 203:7, 203:8, 203:10, 203:13, 203:14, 203:16, 203:19, 204:2, 206:8, 206:10, 206:13, 218:4, 218:6, 219:14, 221:13, 222:9, 222:21
**forced** [1] - 211:1
**forcibly** [8] - 195:13, 196:12, 196:22, 197:1, 197:9, 197:22, 198:1, 238:22
**foreclose** [1] - 128:15
**foreclosed** [1] - 73:9
**foreclosing** [1] - 130:12
**foregoing** [1] - 258:3
**foreperson** [8] - 173:7, 250:14, 250:16, 250:20, 252:5, 253:2, 253:4, 253:6
**foreseeable** [1] - 190:19
**forethought** [1] - 52:21
**forget** [5] - 4:2, 157:7, 215:17, 216:13, 230:17
**forgetfulness** [1] - 185:10
**forgotten** [1] - 174:11
**form** [16] - 59:25, 71:18, 146:16, 176:12, 182:22, 253:4, 253:7, 253:8, 253:11, 253:14, 255:4, 255:14, 255:24
**formal** [2] - 15:17, 180:14
**formed** [1] - 27:14
**former** [1] - 69:10
**forms** [3] - 7:15, 7:21, 141:7
**forth** [3] - 17:21, 147:23, 161:17
**forward** [16] - 27:15, 37:25, 55:7, 56:25, 57:1, 57:20, 62:17, 82:16, 129:19, 133:8, 135:14, 159:3, 177:7, 239:24, 242:20, 247:25

**fought** [2] - 42:19, 238:9
**foundation** [9] - 92:7, 93:21, 94:4, 96:13, 96:14, 97:5, 97:17, 104:11, 104:13
**four** [9] - 29:24, 29:25, 64:21, 69:14, 118:15, 144:13, 186:18, 190:6, 215:1
**fourth** [5] - 187:1, 190:13, 193:23, 194:17, 196:13
**frame** [14] - 6:11, 7:6, 18:6, 19:6, 19:10, 19:23, 20:9, 58:11, 127:10, 127:14, 219:6, 224:9
**frames** [2] - 6:14, 7:6
**frankly** [6] - 17:8, 27:1, 29:22, 48:15, 68:22, 238:13
**fraud** [2] - 191:21, 192:2
**fraudulent** [1] - 214:21
**free** [3] - 143:7, 178:10, 254:11
**freedom** [7] - 27:22, 33:12, 33:13, 40:5, 42:23, 98:10, 244:3
**Freedom** [1] - 89:11
**freeze** [3] - 6:13, 7:6, 219:6
**Friday** [3] - 35:19, 35:22
**FRIEDRICH** [1] - 1:9
**friend** [1] - 31:2
**friendly** [1] - 68:11
**friendship** [1] - 184:18
**Frog** [1] - 41:6
**front** [23] - 20:18, 40:9, 40:10, 43:25, 70:3, 84:12, 84:20, 84:21, 102:8, 102:24, 115:3, 133:7, 164:17, 170:8, 208:12, 238:14, 247:17, 247:19, 247:20, 247:21
**frowning** [1] - 137:14
**fuck** [4] - 39:1, 40:9, 216:16, 227:15
**fucking** [2] - 39:1, 222:20
**fulfilling** [1] - 208:1
**full** [3] - 184:16, 232:3, 250:24
**fully** [1] - 27:21

**fulsome** [1] - 151:13
**function** [12] - 116:16, 118:6, 118:8, 120:14, 178:13, 178:20, 187:4, 187:22, 199:9, 215:9, 217:14
**functions** [3] - 199:7, 217:16, 245:4
**funding** [1] - 62:10
**funds** [1] - 62:6
**funny** [1] - 32:6
**furtherance** [4] - 156:17, 156:18, 193:22, 194:5
**future** [2] - 80:25, 196:25

### G

**gain** [2] - 55:7, 56:25
**gained** [1] - 42:10
**game** [5] - 25:19, 46:13, 150:11, 150:12, 150:14
**games** [1] - 46:15
**gap** [9] - 19:24, 22:14, 59:14, 59:22, 137:14, 155:25, 156:1, 248:8, 248:13
**gas** [4] - 206:24, 237:9, 244:1
**gate** [2] - 99:6, 99:8
**gather** [1] - 208:2
**gear** [1] - 206:22
**gender** [1] - 179:3
**general** [11] - 5:7, 19:7, 19:20, 36:7, 36:11, 36:25, 37:8, 131:20, 131:21, 178:1, 197:15
**General** [1] - 90:19
**generally** [7] - 38:5, 78:3, 118:20, 118:21, 155:17, 163:20, 210:10
**gentleman** [23] - 12:8, 23:24, 24:6, 25:9, 28:21, 52:15, 54:23, 55:8, 55:16, 55:17, 55:18, 55:23, 56:1, 56:5, 56:15, 56:22, 57:23, 127:19, 135:18, 159:6, 240:4, 248:2, 248:22
**gentlemen** [32] - 21:7, 22:5, 40:12, 86:19, 97:25, 103:18, 107:20, 108:18, 115:1, 115:19,

177:6, 177:24, 204:17, 205:24, 209:1, 211:10, 213:2, 215:22, 220:15, 220:22, 221:3, 222:12, 224:17, 227:12, 228:3, 230:17, 231:3, 231:11, 233:23, 247:12, 249:10, 254:18
**George** [3] - 41:4, 42:12, 65:16
**George's** [1] - 208:24
**giant** [1] - 48:20
**given** [21] - 4:11, 16:8, 39:10, 44:8, 49:14, 52:16, 66:24, 73:3, 78:23, 122:6, 139:14, 140:12, 140:17, 140:21, 140:22, 151:5, 151:6, 175:14, 250:3, 251:15, 253:12
**glasses** [2] - 205:16, 206:4
**global** [1] - 148:2
**globally** [3] - 125:19, 155:5, 160:3
**glory** [1] - 64:19
**goal** [4] - 156:19, 207:19, 208:16, 226:2
**God** [2] - 32:14, 68:17
**Gold** [1] - 94:19
**goodness** [1] - 231:14
**goods** [3] - 215:8, 216:19, 217:13
**goofed** [1] - 173:23
**government** [138] - 4:15, 5:5, 9:1, 9:17, 12:3, 13:2, 13:4, 14:4, 14:7, 14:18, 19:6, 19:10, 19:24, 24:22, 27:23, 29:7, 29:23, 64:3, 68:15, 69:3, 71:8, 73:11, 73:12, 74:16, 75:14, 75:22, 78:23, 79:14, 80:23, 82:8, 82:24, 83:5, 83:15, 83:18, 84:19, 86:4, 86:8, 88:18, 89:5, 95:19, 96:2, 96:4, 98:1, 98:3, 115:17, 116:9, 117:23, 119:17, 120:10, 120:13, 121:5, 130:10, 130:17, 133:13,

137:16, 142:2,
142:15, 143:10,
143:25, 147:6,
147:17, 148:25,
149:4, 149:9, 150:3,
150:19, 151:12,
152:7, 152:13,
153:3, 153:7, 153:8,
153:21, 153:22,
154:2, 154:7,
154:20, 156:13,
163:25, 165:9,
165:15, 165:25,
168:22, 169:8,
169:23, 170:3,
170:24, 171:22,
174:7, 175:24,
177:11, 180:20,
180:25, 181:4,
181:8, 181:25,
183:23, 188:20,
189:17, 190:6,
190:18, 191:16,
192:25, 193:15,
194:5, 195:8,
195:20, 195:23,
196:1, 196:4, 196:7,
197:18, 198:7,
199:1, 199:6, 200:5,
200:21, 202:1,
202:25, 204:13,
204:15, 204:23,
205:7, 208:9,
209:18, 226:7,
226:9, 227:20,
231:23, 232:14,
233:16, 235:21,
238:17, 245:4,
252:21, 253:13,
255:22, 256:10
**Government** [5] -
2:10, 2:12, 93:17,
96:7, 223:17
**Government's** [3] -
21:20, 25:21, 31:14
**government's** [26] -
6:17, 7:3, 8:13,
11:23, 75:1, 88:21,
120:12, 128:7,
130:6, 140:13,
143:24, 150:21,
152:10, 163:22,
168:20, 170:13,
170:19, 174:17,
174:25, 175:2,
176:1, 177:10,
181:12, 199:8,
204:19, 206:15
**governs** [1] - 212:17
**grab** [3] - 54:24,

55:20, 221:7
**grand** [1] - 67:21
**grandstand** [1] - 66:1
**grandstands** [8] -
46:5, 46:8, 46:16,
46:17, 207:6,
215:25, 224:14,
234:25
**graphic** [1] - 213:21
**grass** [9] - 80:15,
99:12, 99:13, 99:14,
101:18, 104:22,
113:16, 113:19,
229:18
**grateful** [1] - 254:15
**graver** [1] - 181:22
**great** [2] - 30:11, 68:3
**greater** [3] - 183:1,
183:12, 186:4
**grievances** [6] -
27:23, 29:7, 29:17,
148:25, 191:16,
232:14
**grind** [1] - 208:9
**ground** [25] - 7:14,
22:6, 23:24, 24:15,
30:5, 54:23, 55:10,
59:5, 117:17,
117:18, 129:25,
130:2, 130:4,
135:18, 182:16,
182:17, 209:7,
220:5, 225:6, 230:1,
241:21, 241:23,
242:4, 242:5, 244:15
**Grounds** [1] - 201:10
**grounds** [63] - 43:7,
47:5, 78:24, 80:12,
91:5, 91:6, 95:3,
103:9, 112:9,
144:10, 145:5,
163:16, 167:3,
198:5, 198:10,
198:11, 198:14,
198:16, 198:25,
199:4, 199:12,
199:23, 200:1,
200:3, 200:8, 200:9,
200:15, 200:19,
200:24, 201:5,
201:7, 201:23,
202:4, 202:11,
209:5, 210:7, 212:5,
213:6, 223:1,
223:15, 223:21,
224:21, 224:23,
224:24, 226:6,
227:17, 227:19,
227:23, 228:10,
228:14, 229:8,

229:11, 244:8,
244:21, 244:22,
244:25, 245:2,
245:14, 245:15,
245:20, 245:21,
246:7
**group** [12] - 19:15,
22:5, 31:22, 33:4,
40:10, 94:17, 208:6,
214:24, 222:23,
223:11, 238:10,
238:11
**grouped** [1] - 210:3
**groups** [7] - 59:24,
92:24, 187:12,
242:18, 242:22,
242:25, 243:7
**guarantee** [2] - 80:24,
145:1
**guarding** [1] - 118:8
**guess** [20] - 4:16,
5:13, 15:25, 80:14,
85:3, 87:14, 88:11,
90:4, 90:21, 94:22,
99:6, 113:3, 137:4,
144:20, 145:17,
160:25, 161:21,
177:19, 250:12
**guesswork** [1] -
181:24
**guests** [1] - 62:20
**guidelines** [1] - 186:3
**guilt** [6] - 180:17,
181:19, 181:25,
182:2, 209:18
**guilty** [46] - 34:13,
141:5, 150:12,
150:13, 155:10,
164:7, 171:16,
176:25, 180:21,
181:2, 181:7, 181:9,
186:16, 188:18,
189:4, 189:10,
190:4, 192:21,
193:3, 193:13,
194:24, 195:6,
195:19, 195:22,
195:25, 196:3,
196:6, 198:7,
198:25, 200:4,
200:20, 201:25,
204:16, 209:18,
218:5, 230:16,
230:25, 231:22,
238:14, 246:12,
247:3, 249:7,
249:19, 249:20,
249:23
**guitar** [1] - 112:21
**guy** [19] - 7:13, 9:11,

10:3, 24:1, 24:15,
52:1, 54:20, 54:22,
55:1, 56:21, 56:24,
112:20, 136:25,
218:21, 219:3,
221:4, 225:16, 230:2
**guys** [1] - 220:24

# H

**habeas** [1] - 257:13
**hair** [2] - 12:8, 72:21
**haired** [1] - 12:8
**half** [15] - 19:16,
36:17, 88:7, 90:10,
110:11, 110:13,
112:18, 117:17,
138:1, 138:3, 138:6,
138:25, 139:2,
139:19, 244:14
**half-broken** [1] -
244:14
**halfway** [1] - 107:11
**hallway** [2] - 142:19,
153:23
**halt** [1] - 208:9
**halted** [2] - 237:19,
237:22
**halting** [1] - 237:20
**hand** [9] - 51:19,
51:22, 52:2, 52:5,
55:4, 66:9, 126:24,
181:4, 182:7
**handed** [8] - 51:22,
52:1, 52:9, 52:14,
235:4, 235:5, 245:8
**handing** [1] - 52:19
**handling** [1] - 84:5
**hands** [4] - 54:3,
208:6, 214:15, 240:7
**hang** [1] - 46:15
**hanging** [1] - 48:23
**happy** [4] - 54:1,
108:3, 108:5, 205:6
**hard** [5] - 5:24, 83:17,
113:1, 132:6, 174:15
**harm** [15] - 24:8, 51:1,
51:7, 51:12, 53:7,
53:8, 53:11, 117:5,
131:18, 158:16,
200:12, 202:8,
203:18, 203:23,
203:25
**harmed** [2] - 199:16,
226:13
**harmful** [1] - 30:10
**harming** [3] - 29:8,
40:6, 49:12
**hash** [1] - 213:23
**hat** [1] - 221:5

**hate** [1] - 175:13
**Hate** [2] - 87:13, 87:17
**hay** [1] - 159:7
**hazards** [1] - 30:5
**head** [11] - 26:14,
26:16, 28:22, 126:1,
126:10, 126:12,
126:15, 128:5,
156:11, 211:19,
241:16
**heads** [1] - 125:11
**healthy** [1] - 253:23
**hear** [24] - 17:20, 28:7,
62:21, 63:5, 70:13,
96:10, 99:22,
101:25, 105:25,
106:2, 108:5, 127:1,
154:19, 163:3,
205:1, 212:22,
225:14, 227:11,
227:13, 232:7,
239:21, 248:16,
250:9
**heard** [36] - 38:18,
48:7, 48:12, 54:10,
66:14, 67:1, 78:17,
78:20, 154:11,
165:6, 177:24,
185:24, 206:23,
213:2, 216:3, 217:4,
222:15, 223:16,
225:15, 229:9,
230:7, 230:11,
232:1, 232:2,
232:13, 233:1,
233:13, 234:18,
236:15, 237:23,
244:17, 246:15,
247:9, 248:25
**hearing** [6] - 12:25,
89:23, 143:22,
163:2, 185:8, 201:2
**hears** [1] - 121:22
**hearsay** [3] - 92:18,
93:21, 94:5
**hearts** [1] - 68:18
**heavily** [1] - 27:4
**heavy** [1] - 26:23
**heck** [1] - 236:1
**heightened** [1] - 27:3
**held** [1] - 33:18
**hell** [2] - 52:1, 68:16
**helmet** [1] - 221:20
**helmets** [1] - 206:25
**help** [23] - 22:18,
24:14, 30:3, 33:14,
34:3, 43:16, 55:16,
58:25, 87:23,
123:11, 130:20,
135:9, 136:1,

136:14, 156:8, 159:12, 220:13, 240:5, 240:16, 241:2, 241:19, 248:23, 250:21
**helped** [2] - 90:17, 229:3
**helpful** [1] - 257:15
**helping** [8] - 23:23, 24:6, 25:11, 57:22, 62:25, 159:9, 219:20, 229:2
**herd** [1] - 51:23
**herself** [1] - 185:17
**hesitate** [1] - 181:22
**high** [2] - 69:14, 95:4
**highest** [1] - 36:21
**highlight** [1] - 165:7
**highlighted** [1] - 55:5
**highly** [3] - 146:13, 146:24, 181:11
**Hill** [1] - 127:9
**Hill's** [1] - 229:23
**Hills** [1] - 1:18
**himself** [26] - 58:18, 126:11, 131:7, 132:11, 136:13, 154:4, 195:5, 203:12, 203:17, 203:25, 204:2, 206:12, 211:9, 212:21, 213:13, 220:11, 225:15, 230:3, 232:17, 234:13, 237:21, 238:3, 239:10, 241:15, 246:17, 248:9
**hire** [1] - 31:3
**historically** [1] - 42:13
**history** [6] - 41:24, 42:9, 65:23, 87:16, 236:25, 238:10
**hit** [18] - 22:6, 26:6, 26:9, 27:1, 28:4, 33:17, 125:25, 126:1, 126:9, 126:10, 126:11, 126:15, 127:1, 127:2, 128:5, 132:6, 157:7, 241:1
**hits** [3] - 26:14, 125:15, 219:8
**hitting** [4] - 24:2, 59:17, 59:18, 218:18
**hobby** [1] - 87:14
**hold** [22] - 10:20, 10:21, 28:6, 28:11, 30:11, 60:10, 60:19, 73:13, 88:23, 149:7,

183:17, 203:23, 208:13, 216:16, 221:25, 222:20, 226:20, 227:16, 242:25, 243:3, 248:10, 253:25
**holding** [3] - 41:5, 50:10, 55:19
**home** [1] - 80:20
**Homeland** [1] - 188:2
**honest** [4] - 40:3, 67:25, 68:8, 181:17
**honestly** [3] - 13:16, 78:18, 235:12
**Honor** [130] - 3:4, 3:8, 3:12, 3:25, 4:15, 5:13, 6:2, 6:13, 7:9, 7:17, 8:4, 8:9, 11:2, 11:4, 12:4, 14:10, 15:23, 16:7, 16:8, 16:16, 18:1, 18:8, 18:17, 20:25, 21:5, 21:10, 23:8, 34:25, 57:9, 65:5, 65:7, 69:24, 70:1, 72:8, 74:19, 75:13, 75:15, 79:16, 83:20, 84:18, 86:21, 91:10, 92:4, 92:7, 92:22, 93:8, 93:15, 94:10, 95:13, 95:16, 95:21, 96:6, 96:8, 96:18, 98:3, 105:4, 109:21, 111:20, 115:14, 115:18, 117:25, 119:4, 119:15, 119:19, 120:24, 122:2, 122:8, 122:11, 122:18, 123:21, 124:19, 126:20, 127:16, 128:17, 130:15, 138:21, 140:19, 140:23, 142:3, 142:22, 143:19, 143:22, 144:24, 146:21, 147:14, 148:7, 148:10, 150:22, 152:21, 155:7, 155:8, 155:13, 155:19, 157:21, 159:2, 159:17, 159:19, 160:22, 161:10, 161:15, 162:16, 162:25, 163:14, 163:24, 165:10, 166:6, 166:18, 167:19, 170:5, 170:18, 170:21,

170:23, 171:3, 171:22, 172:19, 172:24, 176:9, 176:13, 177:2, 205:5, 205:8, 205:18, 205:20, 206:16, 231:10, 233:20, 247:7, 255:23, 256:10, 256:17
**Honor's** [2] - 86:7, 166:1
**HONORABLE** [1] - 1:9
**honorable** [5] - 36:7, 36:11, 36:22, 36:25, 37:8
**hood** [1] - 27:17
**hope** [7] - 12:23, 13:12, 21:8, 77:5, 79:2, 173:23, 177:21
**Hopkins** [5] - 4:10, 20:17, 77:20, 169:20, 254:16
**horseback** [1] - 41:5
**hospital** [1] - 3:19
**hostility** [1] - 184:19
**hour** [15] - 5:7, 19:16, 75:4, 75:18, 75:25, 76:9, 76:11, 76:13, 78:4, 110:8, 112:18, 177:13, 227:13, 249:6
**hours** [6] - 74:16, 110:11, 110:13, 117:15, 209:6, 227:12
**house** [10] - 80:16, 201:1, 201:3, 208:20, 208:21, 211:7, 211:8, 215:15, 227:8, 245:24
**huge** [1] - 71:14
**hundred** [1] - 99:20
**hundreds** [4] - 69:8, 89:18, 112:17
**Hunters** [3] - 31:18, 31:21, 32:8
**hurdles** [1] - 94:6
**hurry** [1] - 257:18
**hurt** [8] - 22:16, 24:9, 28:24, 30:7, 55:10, 57:3, 57:7, 246:25
**hurts** [1] - 29:1
**hypothetically** [1] - 144:17

**I**

**idea** [16] - 27:24,

32:11, 33:22, 44:9, 44:11, 44:13, 48:17, 52:11, 95:23, 107:12, 113:23, 114:1, 122:12, 133:18
**identification** [1] - 250:2
**identified** [5] - 7:7, 18:2, 72:16, 193:9, 220:11
**identify** [5] - 3:21, 20:6, 31:24, 58:17, 240:14
**ideologically** [1] - 29:21
**ideologies** [3] - 33:5, 64:5, 68:18
**ignorance** [2] - 187:7, 190:25
**ignore** [6] - 178:9, 178:18, 179:8, 183:21, 214:20, 225:12
**ignored** [2] - 207:14, 216:3
**ignoring** [2] - 207:8, 209:6
**illegal** [10] - 65:4, 65:16, 65:19, 191:20, 192:1, 214:10, 224:19, 224:20, 231:15
**image** [3] - 50:10, 212:11, 224:8
**images** [6] - 41:1, 41:4, 41:7, 43:2, 45:20, 46:4
**imaginary** [1] - 181:23
**imagine** [4] - 4:11, 90:10, 237:12
**immediate** [7] - 172:8, 187:13, 187:14, 198:19, 199:15, 203:7, 223:23
**immediately** [2] - 126:7, 248:19
**imminent** [5] - 131:18, 139:18, 203:18, 203:22, 203:24
**impact** [1] - 27:19
**impacted** [1] - 233:18
**impair** [2] - 158:5, 184:22
**impartial** [2] - 181:17, 183:6
**impeached** [2] - 7:20, 8:22
**impeachment** [2] - 9:13, 18:15

**impede** [36] - 22:20, 24:13, 118:4, 119:8, 145:7, 150:17, 158:5, 162:20, 186:8, 186:21, 189:22, 190:8, 190:10, 190:12, 191:9, 192:14, 197:11, 199:5, 200:25, 210:15, 210:20, 215:3, 215:10, 215:19, 218:16, 219:14, 221:13, 222:10, 222:21, 226:7, 227:19, 227:23, 232:22, 235:10, 245:3, 245:22
**impeded** [10] - 145:11, 196:9, 197:22, 198:2, 199:7, 210:21, 217:14, 218:4, 226:9, 238:19
**impedes** [2] - 191:19, 191:25
**impeding** [7] - 145:12, 191:12, 192:12, 195:13, 217:24, 221:10, 229:5
**impermissive** [1] - 122:10
**implicating** [1] - 68:23
**implications** [2] - 38:3, 52:12
**implies** [1] - 181:14
**important** [5] - 48:16, 78:21, 88:22, 181:22, 231:24
**impose** [1] - 222:10
**impossible** [1] - 144:20
**impresses** [2] - 184:13, 184:14
**impression** [1] - 154:2
**improbability** [1] - 185:13
**improperly** [1] - 179:2
**improve** [1] - 184:22
**inability** [1] - 122:10
**inaction** [4] - 5:8, 78:6, 96:21, 101:1
**inadvertently** [2] - 176:17, 251:10
**inappropriate** [1] - 153:1
**inauguration** [1] - 207:6
**incident** [14] - 24:12, 24:17, 57:17, 59:11, 71:6, 71:7, 131:19,

186:10, 186:25,
203:16, 203:19,
203:22, 234:24,
245:7
**incidental** [4] -
240:17, 241:6,
245:12, 246:4
**incidents** [5] - 71:1,
71:5, 96:21, 132:8,
139:3
**inclined** [12] - 4:13,
130:16, 148:2,
148:8, 148:9,
148:20, 155:8,
155:14, 159:21,
161:15, 163:24,
174:22
**include** [9] - 118:21,
119:2, 147:21,
149:3, 152:15,
152:18, 154:23,
161:3, 209:20
**included** [1] - 37:13
**includes** [12] - 29:19,
29:20, 188:1, 188:2,
188:4, 190:14,
198:18, 201:5,
201:7, 223:23,
251:19
**including** [15] - 4:25,
7:7, 17:3, 18:3, 30:3,
116:16, 141:13,
148:5, 148:22,
184:21, 187:9,
187:19, 187:20,
191:2, 194:19
**incoming** [1] - 41:16
**inconsistencies** [3] -
185:2, 185:5, 185:7
**inconsistent** [2] -
14:22, 15:1
**incorporate** [2] -
256:1, 256:2
**incorporating** [1] -
169:1
**incorrect** [5] - 60:4,
142:25, 143:1,
149:22, 173:24
**incorrectly** [2] - 9:10,
174:1
**increasing** [1] -
206:22
**incriminate** [1] - 81:7
**incriminating** [1] -
213:4
**incrimination** [2] -
82:13, 191:12
**independence** [1] -
42:10
**independent** [7] -

39:8, 39:9, 129:13,
129:16, 188:4,
251:22
**independently** [2] -
191:22, 192:2
**Indiana** [2] - 136:25
**indicate** [2] - 52:8,
202:17
**indicated** [6] - 49:7,
51:3, 179:7, 244:13,
244:18, 245:5
**indicates** [2] - 124:11,
246:21
**indicating** [3] - 179:6,
243:5, 244:16
**indication** [3] - 48:2,
50:6, 121:25
**indications** [1] -
244:10
**indictment** [17] -
11:17, 11:19, 19:1,
161:8, 162:3,
180:14, 180:15,
186:7, 189:19,
198:4, 198:23,
200:17, 201:21,
249:15, 249:20,
249:21
**indifferent** [1] - 38:13
**individual** [27] - 64:4,
72:18, 83:16, 128:5,
129:3, 131:9, 149:1,
159:9, 187:14,
187:16, 191:17,
191:19, 191:24,
200:13, 202:8,
219:21, 239:19,
239:25, 240:2,
240:5, 240:13,
240:17, 240:22,
241:2, 241:19,
241:23
**individual's** [2] -
187:15, 187:16
**individuals** [15] -
11:13, 19:18, 58:25,
59:4, 78:24, 82:11,
130:9, 144:2, 185:8,
220:17, 239:11,
241:14, 241:20,
242:22, 243:1
**infer** [4] - 202:14,
202:18, 202:19,
211:20
**inference** [1] - 180:17
**inferences** [5] - 143:7,
180:7, 182:8,
209:21, 212:6
**inferred** [1] - 197:15
**Infinity** [1] - 233:5

**inflict** [8] - 118:17,
197:3, 197:7,
197:10, 238:24,
239:7, 240:8, 241:7
**infliction** [3] - 200:12,
202:7
**influence** [1] - 149:19,
249:20
**influenced** [1] - 179:2
**inform** [1] - 67:18
**information** [5] - 72:6,
84:19, 106:13,
107:10, 138:22
**informed** [4] - 4:10,
37:10, 144:8, 256:24
**informing** [1] -
147:12, 253:2
**infused** [1] - 228:17
**initial** [4] - 99:6, 99:16,
204:18, 206:15
**initiated** [2] - 190:17,
246:4
**injecting** [1] - 118:2
**injure** [4] - 116:24,
118:3, 240:12,
243:20
**injured** [8] - 43:16,
43:18, 43:21, 44:4,
44:11, 44:16, 49:2,
217:2
**injuring** [1] - 47:19
**injury** [12] - 16:4,
118:17, 187:13,
187:15, 197:3,
197:7, 197:10,
238:24, 239:8,
240:8, 241:7
**injustices** [1] - 67:16
**inmates** [1] - 69:12
**innocence** [2] -
180:19, 180:23
**innocent** [5] - 32:15,
34:13, 89:2, 180:19,
185:10
**input** [1] - 107:16
**inquire** [1] - 79:6
**inside** [7] - 78:24,
80:13, 99:13,
113:18, 207:12,
207:24, 211:19
**insofar** [2] - 72:4,
127:21
**inspect** [1] - 121:22
**inspired** [1] - 43:10
**instance** [10] - 5:23,
9:9, 24:8, 42:8, 54:4,
58:24, 158:10,
158:14, 162:7,
174:19
**instances** [6] - 9:2,

78:6, 156:7, 165:8,
172:5, 203:3
**instead** [7] - 158:9,
159:10, 189:12,
205:4, 205:15,
206:1, 222:17
**instigate** [1] - 158:16
**instituted** [2] - 190:16,
190:18
**instruct** [12] - 115:23,
133:20, 160:17,
170:2, 170:10,
177:8, 178:1,
178:15, 178:17,
235:6, 249:18, 254:5
**instructed** [2] -
176:21, 236:16
**instructing** [2] - 75:6,
174:10
**instruction** [60] - 7:8,
74:10, 122:23,
123:2, 127:24,
130:9, 132:7, 134:3,
136:15, 138:5,
140:9, 140:16,
141:14, 143:6,
143:14, 143:20,
144:9, 144:18,
145:1, 145:18,
147:24, 148:1,
148:8, 148:20,
148:23, 149:4,
149:9, 149:12,
149:15, 151:5,
152:5, 152:25,
153:18, 153:19,
154:1, 155:2, 155:3,
155:9, 155:18,
159:24, 161:16,
164:5, 165:14,
166:9, 166:10,
168:7, 168:9,
168:10, 168:11,
171:9, 171:11,
171:13, 171:19,
172:4, 173:14,
173:15, 205:4,
205:11, 251:15,
254:7
**instructions** [45] -
74:12, 74:14, 74:17,
75:2, 75:3, 118:22,
139:24, 140:4,
142:9, 152:4,
168:17, 169:10,
170:9, 171:15,
173:7, 174:20,
175:25, 176:1,
177:8, 177:9,
177:15, 177:23,

178:4, 178:5, 178:7,
178:8, 178:10,
178:11, 178:18,
178:19, 204:18,
205:2, 205:25,
206:7, 231:4,
231:20, 238:23,
249:11, 249:14,
253:11, 253:13,
255:3, 255:4, 255:12
**Instructions..............
.....................** [1] -
2:9
**instrumentality** [1] -
187:24
**insurrectionist** [1] -
32:16
**insurrectionists** [1] -
31:23
**integrated** [1] - 84:8
**intend** [6] - 29:8,
53:11, 69:22, 83:12,
123:9, 124:10
**intended** [16] - 30:10,
143:14, 153:19,
162:20, 179:20,
180:11, 186:21,
188:22, 189:1,
197:10, 210:16,
211:17, 212:19,
213:18, 215:3
**intending** [8] - 16:7,
22:16, 22:20, 24:8,
92:16, 189:8,
236:19, 246:22
**intends** [1] - 202:19
**intent** [65] - 51:2,
116:11, 116:24,
117:5, 118:3,
119:12, 120:2,
124:2, 124:11,
136:10, 150:4,
150:7, 150:16,
150:17, 150:18,
159:5, 168:18,
176:20, 189:14,
190:10, 192:4,
192:6, 192:8,
192:14, 194:2,
194:17, 195:4,
195:17, 196:17,
197:15, 199:5,
200:25, 201:13,
202:12, 202:14,
202:18, 211:18,
211:20, 211:22,
216:25, 218:10,
226:7, 227:6,
227:19, 227:23,
228:1, 232:21,

232:22, 232:25,
235:9, 236:6, 236:8,
237:2, 237:3, 240:8,
240:11, 241:7,
241:12, 243:20,
244:20, 245:3,
245:6, 245:22,
245:25
**intention** [2] - 31:1,
51:6
**intentional** [5] -
118:16, 185:11,
197:2, 238:24, 239:7
**intentionally** [7] -
193:11, 196:13,
197:13, 198:1,
202:20, 218:7
**interact** [1] - 104:19
**interaction** [4] - 72:11,
127:21, 214:6, 220:7
**interactions** [3] - 29:5,
114:9, 224:5
**interacts** [1] - 128:19
**intercoms** [1] - 89:23
**interest** [3] - 64:8,
80:21, 184:18
**interested** [1] - 140:12
**interesting** [1] - 14:2
**interests** [1] - 158:22
**interfere** [17] - 118:4,
119:8, 136:11,
145:7, 162:21,
186:9, 186:22,
197:12, 215:4,
215:10, 215:19,
218:17, 219:15,
221:14, 222:10,
222:22, 232:22
**interfered** [4] - 196:10,
197:23, 198:2,
238:20
**interference** [1] -
120:14
**interferes** [2] - 199:18,
226:15
**interfering** [4] -
195:14, 217:24,
221:10, 229:5
**intermittently** [1] -
207:15
**Internet** [12] - 31:24,
35:9, 39:12, 40:18,
40:25, 41:12, 42:3,
61:24, 251:2,
251:25, 254:7, 254:9
**interplay** [1] - 151:18
**interpret** [3] - 160:22,
229:25, 230:19
**interpretation** [1] -
156:3

**interpreted** [1] - 130:3
**interpreting** [1] -
229:24
**interrupt** [1] - 173:25
**interrupted** [1] -
173:24
**interrupting** [1] -
173:22
**interrupts** [2] -
199:21, 227:2
**interstate** [2] - 118:23,
120:9
**intervenes** [1] - 158:4
**intervening** [2] -
58:25, 137:9
**interviewed** [3] - 62:3,
63:2, 63:6
**interviews** [1] - 13:21
**intimidate** [7] - 119:8,
197:11, 218:17,
219:14, 221:13,
222:10, 222:22
**intimidated** [5] -
196:10, 197:23,
198:2, 218:4, 238:19
**intimidating** [2] -
195:14, 217:24
**introduce** [6] - 6:4,
6:5, 76:24, 84:5,
85:18, 93:1
**introduced** [5] - 8:16,
8:19, 137:16,
138:13, 220:4
**introducing** [3] -
85:10, 92:10, 94:4
**investigated** [1] - 72:4
**investigation** [2] -
73:4, 251:23
**investigator** [1] -
88:18
**invite** [1] - 250:23
**invoke** [1] - 82:12
**invoking** [1] - 191:11
**involve** [1] - 191:9
**involved** [5] - 62:25,
155:4, 194:22,
224:10, 246:3
**involvement** [1] -
257:8
**involves** [2] - 7:11,
192:3
**involving** [10] - 18:13,
19:19, 71:5, 71:6,
71:7, 96:21, 187:12,
200:11, 202:6
**irrelevant** [6] - 9:12,
18:14, 29:16, 29:21,
83:1, 250:8
**irritants** [1] - 207:13
**irritates** [1] - 26:5

**issue** [14] - 5:1, 12:5,
17:19, 17:23,
127:23, 128:4,
128:19, 132:2,
149:21, 169:20,
226:18, 234:17,
252:18, 257:13
**issued** [1] - 234:3
**issues** [11] - 16:9,
70:20, 74:10,
115:22, 127:25,
150:23, 151:13,
151:22, 171:6,
177:7, 178:3
**itemize** [1] - 166:25
**itself** [13] - 118:14,
118:16, 119:11,
125:20, 127:12,
131:24, 160:23,
161:19, 210:3,
212:17, 217:16,
222:14, 248:11

## J

**jacket** [8] - 7:13, 9:11,
10:3, 18:14, 55:19,
72:19, 72:20, 222:4
**jail** [1] - 33:23
**jammed** [1] - 57:24
**January** [66] - 14:4,
23:6, 30:24, 33:10,
33:15, 33:20, 33:22,
34:17, 35:6, 35:12,
37:11, 40:16, 41:10,
61:19, 62:1, 62:18,
62:24, 63:18, 65:14,
67:14, 67:17, 67:22,
69:6, 69:11, 78:3,
80:12, 83:1, 84:14,
84:20, 88:6, 88:7,
88:13, 89:3, 89:7,
89:8, 109:5, 109:8,
109:16, 109:25,
110:1, 110:15,
115:4, 140:21,
206:17, 208:1,
209:12, 211:16,
212:9, 212:15,
212:20, 213:19,
216:22, 217:7,
217:8, 217:10,
223:19, 224:1,
228:8, 229:20,
229:25, 230:20,
231:13, 234:4,
234:5, 234:8, 241:15
**Jencks** [3] - 15:5, 15:7
**jerk** [1] - 28:19
**job** [6] - 15:19, 22:21,

145:12, 158:23,
216:8, 237:2
**jobs** [1] - 24:13
**Joe** [2] - 7:18, 232:11
**JOHN** [1] - 1:16
**John** [3] - 1:17, 3:12,
83:16
**John's** [1] - 5:15
**joined** [1] - 3:9
**joins** [1] - 226:4
**Joint** [1] - 152:17
**joint** [1] - 190:22
**joke** [2] - 30:20, 47:17
**joking** [1] - 228:20
**JOSEPH** [2] - 1:6,
21:11
**Joseph** [2] - 3:13,
231:13
**jostling** [4] - 56:9,
199:19, 226:16,
226:22
**judge** [12] - 84:10,
140:20, 144:9,
209:15, 210:14,
211:23, 213:25,
215:1, 217:23,
226:11, 230:11,
236:16
**Judge** [7] - 79:25,
141:13, 147:18,
148:3, 148:23,
149:8, 149:15
**JUDGE** [1] - 1:10
**judge's** [1] - 231:20
**judges** [2] - 178:21,
184:1
**judging** [1] - 184:5
**judgment** [5] - 52:14,
180:9, 184:9,
185:23, 252:23
**July** [1] - 258:8
**jump** [2] - 37:25,
145:3
**jumped** [1] - 125:1
**June** [1] - 201:10
**junior** [1] - 95:4
**juror** [19] - 3:16, 3:24,
4:2, 4:9, 4:17, 4:18,
175:12, 175:16,
175:21, 175:22,
176:8, 250:23,
252:24, 253:17,
253:21, 253:24,
254:4, 256:7
**jurors** [14] - 3:22,
6:19, 6:23, 20:12,
20:16, 77:20, 130:6,
161:12, 179:13,
179:19, 219:20,
251:11, 252:1,

252:12
**JURY** [1] - 1:9
**Jury** [14] - 2:9, 3:3,
21:2, 21:6, 69:21,
77:25, 86:18, 116:5,
152:2, 171:5, 177:4,
204:24, 205:23,
254:25
**jury** [109] - 4:22, 7:2,
7:8, 8:12, 11:8, 12:7,
15:16, 17:21, 18:18,
19:1, 21:3, 23:11,
23:18, 25:4, 27:11,
29:4, 33:10, 37:7,
40:18, 45:20, 46:4,
48:7, 51:19, 69:19,
70:5, 71:2, 72:15,
74:3, 74:9, 74:10,
74:12, 74:14, 74:17,
75:2, 75:3, 75:6,
76:12, 76:23, 77:2,
83:24, 84:18, 85:22,
86:17, 87:15, 93:11,
94:1, 98:21, 99:4,
105:19, 119:6,
122:21, 127:24,
133:20, 139:24,
140:4, 140:14,
141:4, 141:6, 143:6,
144:15, 144:25,
145:16, 146:8,
147:1, 147:12,
149:21, 152:3,
154:2, 155:9,
157:24, 160:5,
160:16, 160:22,
162:2, 162:24,
164:3, 164:7,
164:10, 164:12,
164:15, 164:16,
164:18, 164:25,
166:4, 169:18,
170:2, 170:8,
174:16, 176:16,
178:20, 179:15,
231:11, 238:23,
239:3, 249:24,
250:13, 251:14,
251:19, 252:2,
252:6, 252:8,
252:15, 254:4,
254:13, 254:19,
255:6, 255:17
**Justice** [2] - 67:16,
69:10
**justice** [4] - 33:19,
34:15, 88:15, 212:12
**justification** [1] -
138:4
**justified** [14] - 131:17,

132:8, 138:4,
139:13, 164:16,
165:1, 165:17,
166:23, 167:11,
172:6, 180:7, 203:5,
203:8, 206:8
**justifies** [1] - 140:8
**justify** [3] - 136:7,
136:20, 204:1

# K

**K.V** [1] - 196:5
**keep** [21] - 22:18,
24:14, 26:18, 27:6,
29:9, 30:3, 34:4,
63:10, 63:17, 64:17,
118:11, 161:9,
207:9, 208:7,
211:22, 215:25,
217:22, 219:4,
224:17, 250:1
**keeping** [4] - 160:11,
172:21, 216:7,
256:24
**Kelly** [5] - 141:13,
147:18, 148:3,
149:9, 149:15
**Kelly's** [1] - 148:23
**KENNETH** [3] - 1:6,
2:3, 21:11
**Kenneth** [2] - 3:5, 3:13
**kept** [4] - 29:11, 59:14,
59:20, 112:19
**key** [2] - 232:21, 239:1
**kicked** [3] - 57:25,
131:3
**kicking** [1] - 218:18
**kid** [1] - 46:12
**kidding** [1] - 228:23
**kids** [2] - 31:11, 64:21
**kind** [29] - 10:10,
14:23, 22:2, 23:21,
23:23, 27:16, 27:18,
29:23, 32:10, 32:11,
32:19, 51:25, 52:11,
55:7, 70:11, 80:7,
87:13, 88:5, 91:19,
101:25, 102:21,
103:11, 112:21,
180:16, 181:20,
225:1, 236:13,
237:15, 240:7
**kinds** [1] - 225:11
**knife** [26] - 50:25,
51:1, 51:3, 51:8,
51:13, 51:19, 51:20,
51:22, 52:1, 52:6,
52:9, 52:14, 66:10,
66:12, 145:11,

162:5, 162:19,
214:7, 216:9,
234:24, 235:4,
235:5, 235:7, 245:7
**knives** [8] - 46:20,
50:11, 50:13, 50:17,
51:6, 51:16, 233:8,
233:9
**knock** [10] - 47:15,
47:17, 120:1, 160:6,
164:12, 164:15,
208:20, 211:6,
215:15, 227:7
**knocked** [9] - 5:24,
9:11, 23:22, 24:16,
55:19, 56:24,
111:25, 137:15,
220:2
**knocking** [2] - 12:16,
226:3
**knowing** [4] - 58:5,
112:2, 194:23,
202:13
**knowingly** [31] -
81:18, 121:16,
165:4, 186:19,
187:5, 187:8,
190:11, 190:23,
191:1, 193:11,
193:23, 197:14,
197:17, 198:21,
199:3, 199:23,
200:15, 201:4,
201:18, 202:5,
202:10, 204:2,
210:17, 211:18,
212:20, 213:18,
215:2, 226:6,
227:19, 227:25,
228:12
**knowledge** [10] -
112:7, 112:14,
112:22, 182:6,
194:17, 202:12,
202:15, 202:18,
211:25, 212:6
**known** [7] - 72:1,
84:13, 113:20,
115:4, 121:14,
193:6, 210:7
**knows** [6] - 6:13, 72:3,
73:4, 82:25, 96:22,
106:17

# L

**L.A** [1] - 87:18
**labeled** [1] - 54:20
**lack** [2] - 90:22,
181:16

**lacked** [2] - 198:12,
200:10
**ladies** [29] - 21:7,
86:19, 97:25,
103:18, 107:20,
108:18, 114:25,
115:19, 177:5,
177:24, 204:17,
205:24, 209:1,
211:10, 213:2,
215:22, 220:15,
221:3, 222:12,
224:17, 227:12,
228:3, 230:17,
231:3, 231:11,
233:23, 247:11,
249:10, 254:18
**laid** [3] - 54:3, 71:18,
96:13
**LAMBERT** [1] - 79:11
**Lambert** [8] - 3:14,
21:20, 22:23, 27:6,
28:15, 31:14, 79:9,
84:3
**land** [1] - 41:17
**language** [21] -
141:12, 141:14,
147:18, 147:21,
148:10, 148:22,
149:3, 149:8, 157:8,
161:3, 161:25,
162:8, 162:11,
167:5, 168:7,
168:12, 168:14,
168:16, 169:1,
176:18, 213:21
**largely** [1] - 63:3
**larger** [4] - 121:17,
206:23, 240:13
**laser** [1] - 207:18
**last** [17] - 34:16,
38:18, 68:15, 80:6,
84:25, 88:7, 103:18,
137:3, 144:13,
148:12, 172:10,
173:14, 189:18,
208:10, 213:15,
246:8, 253:16
**latest** [1] - 177:20
**law** [83] - 33:16, 46:23,
48:4, 51:16, 54:3,
107:14, 107:16,
110:21, 114:9,
115:23, 118:3,
118:4, 118:5,
118:25, 120:6,
128:9, 131:23,
141:17, 143:15,
144:6, 145:7,
146:22, 147:16,

149:17, 151:16,
151:23, 155:13,
155:15, 156:13,
158:3, 162:9,
162:21, 164:11,
167:4, 171:7, 178:1,
178:2, 178:15,
178:16, 178:17,
180:22, 182:20,
182:21, 185:24,
186:5, 186:9,
186:11, 186:22,
186:23, 188:7,
189:21, 194:15,
195:18, 197:15,
198:6, 200:19,
201:14, 201:15,
201:16, 201:24,
203:9, 203:10,
206:8, 206:10,
207:16, 208:6,
214:14, 215:4,
218:17, 218:23,
225:12, 228:2,
228:4, 229:16,
232:22, 235:10,
237:17, 242:1,
243:20, 252:19,
253:11, 256:1
**Law** [1] - 1:17
**lawful** [20] - 45:8,
45:18, 50:8, 129:18,
133:22, 134:24,
156:16, 157:13,
158:4, 186:24,
198:10, 198:12,
213:14, 213:15,
214:15, 214:16,
214:19, 215:5,
224:23, 236:11
**lawfully** [4] - 149:1,
158:18, 186:9,
191:17
**lawn** [1] - 113:21
**laws** [2] - 187:23,
188:10
**lawyer** [2] - 183:16,
183:17
**lawyer's** [2] - 183:18,
183:21
**lawyers** [3] - 180:10,
180:12, 183:14
**lay** [3] - 57:15, 96:14,
97:5
**laying** [3] - 23:24,
117:18, 244:14
**lead** [2] - 40:16, 45:2
**lead-up** [1] - 40:16
**leader** [1] - 42:14
**leading** [1] - 212:9

**lean** [1] - 52:21
**leaning** [1] - 122:5
**Leano** [3] - 221:16,
221:21, 221:25
**learned** [1] - 102:15
**learning** [3] - 8:25,
12:20, 30:23
**least** [22] - 5:6, 11:14,
11:21, 17:11, 34:20,
59:15, 74:16, 75:4,
101:9, 116:19,
116:21, 121:7,
123:6, 126:12,
130:4, 137:1,
140:10, 146:2,
156:14, 194:6,
220:20, 226:23
**leave** [6] - 37:1,
121:20, 121:23,
154:1, 167:17,
225:14, 246:20,
253:25, 254:16
**leaves** [5] - 3:22, 4:19,
117:7, 209:17,
230:15
**leaving** [1] - 42:16
**led** [2] - 6:5, 71:15
**left** [13] - 29:16, 37:20,
55:10, 56:2, 72:17,
104:22, 112:16,
113:19, 159:11,
169:9, 219:9, 224:8,
238:2
**leftist** [1] - 31:21
**legal** [8] - 79:2,
115:22, 134:2,
134:9, 134:16,
177:6, 209:15,
223:19
**legally** [1] - 163:1
**legislators** [1] -
149:18
**legitimate** [1] - 164:25
**legs** [1] - 57:24
**length** [2] - 36:12,
37:9
**lengthier** [1] - 163:5
**lengthy** [3] - 73:25,
77:6, 161:8
**less** [9] - 75:16, 77:11,
112:7, 112:15,
174:22, 207:15,
213:22, 224:20
**less-than-lethal** [1] -
207:15
**lesser** [1] - 186:4
**lest** [1] - 216:13
**lethal** [1] - 207:15
**level** [2] - 36:21,
224:14

**levels** [1] - 36:10
**Lexington** [2] - 41:14, 41:19
**Lexington-Concord** [1] - 41:14
**liberty** [2] - 33:12, 65:25
**lied** [1] - 64:9
**lies** [1] - 88:1
**life** [9] - 30:8, 31:12, 46:9, 49:21, 64:24, 65:12, 68:16, 69:14, 181:22
**lifestyle** [1] - 31:11
**light** [4] - 131:10, 136:21, 180:7
**lightning** [1] - 212:11
**likeable** [1] - 68:8
**likelihood** [1] - 254:10
**likely** [5] - 181:10, 199:16, 226:13
**limine** [1] - 18:25
**limited** [2] - 130:16, 130:18
**limiting** [2] - 155:9, 164:22
**line** [57] - 10:20, 10:22, 16:13, 20:18, 22:4, 23:22, 24:5, 25:17, 27:14, 28:6, 28:11, 47:2, 47:3, 47:6, 48:1, 48:2, 48:5, 54:21, 55:9, 58:9, 60:10, 60:17, 60:19, 64:24, 101:20, 118:11, 121:8, 121:10, 122:15, 132:14, 150:9, 155:25, 156:8, 156:9, 156:11, 208:12, 208:13, 211:11, 215:24, 216:16, 219:4, 221:25, 222:16, 222:20, 223:6, 223:17, 226:1, 226:20, 227:16, 240:3, 242:25, 243:3, 243:6, 243:13, 244:2, 248:10, 248:20
**lined** [1] - 215:24
**lines** [10] - 14:21, 111:1, 111:4, 120:1, 206:21, 207:8, 209:9, 222:17, 225:13, 227:14
**linguistically** [1] - 161:1

**linking** [1] - 222:1
**list** [16] - 30:19, 32:2, 44:19, 94:25, 95:22, 142:16, 142:20, 142:21, 152:11, 152:13, 160:2, 167:15, 208:2, 209:23, 212:25, 255:16
**listed** [2] - 95:21, 223:2
**listen** [1] - 222:17, 228:22, 251:3, 251:5
**listened** [1] - 63:24
**listeners** [1] - 63:24
**listening** [1] - 69:4
**listing** [1] - 137:23
**literal** [3] - 225:2, 225:12, 230:6
**literally** [1] - 204:22
**lives** [2] - 65:25, 67:17
**living** [2] - 68:16, 69:14
**located** [1] - 201:6
**location** [5] - 38:5, 46:2, 99:4, 117:16, 126:6
**lock** [2] - 60:17, 60:23
**locked** [1] - 61:3
**lockett** [2] - 158:11, 158:15
**logic** [1] - 151:7
**long-haired** [1] - 12:8
**look** [35] - 20:8, 21:18, 22:23, 24:21, 29:2, 31:16, 42:11, 48:15, 64:1, 64:8, 86:5, 91:24, 97:8, 98:24, 104:7, 111:18, 140:2, 146:22, 147:16, 151:2, 153:16, 212:20, 217:10, 219:10, 219:17, 223:24, 225:23, 226:23, 231:19, 232:10, 234:20, 239:3, 239:15, 239:16, 255:24
**looked** [16] - 5:19, 11:17, 21:17, 30:20, 34:18, 50:10, 66:14, 71:21, 97:2, 101:20, 107:9, 111:24, 112:1, 141:11, 182:10, 182:15
**looking** [11] - 14:21, 47:12, 58:9, 92:22, 106:12, 128:8, 139:5, 140:7,

160:12, 203:18, 217:10
**looks** [6] - 25:25, 91:22, 91:25, 95:12, 111:15, 111:16
**lose** [1] - 76:12
**losing** [2] - 148:11, 209:7
**lost** [2] - 54:21, 56:7
**loud** [4] - 174:21, 199:17, 226:14, 226:21
**loudly** [1] - 27:5
**love** [1] - 29:22
**loves** [1] - 236:3
**lower** [1] - 224:14
**Lower** [1] - 207:5
**lowered** [1] - 243:15
**lunch** [6] - 70:11, 75:1, 75:3, 75:4, 115:21, 116:4

# M

**M.N** [1] - 195:24
**ma'am** [7] - 80:2, 81:5, 81:8, 81:19, 81:24, 82:2, 82:4
**mail** [2] - 151:21, 251:20
**mainstream** [3] - 62:22, 64:3, 64:10
**maintain** [1] - 31:11
**major** [2] - 41:25, 71:15
**makehoneygreataga in.com** [1] - 62:14
**malicious** [1] - 30:10
**militia** [1] - 33:3
**man** [5] - 10:2, 18:14, 32:14, 90:8, 108:7
**mandated** [1] - 207:11
**manner** [3] - 178:15, 184:12, 199:14
**manners** [1] - 68:13
**mantra** [1] - 52:23
**map** [2] - 113:18, 201:9
**Map** [1] - 201:9
**March** [1] - 18:9
**mark** [1] - 220:10
**marked** [1] - 250:2
**marketing** [2] - 40:24, 42:5
**married** [3] - 38:14, 38:16, 38:23
**marshal** [2] - 252:5, 252:12
**masks** [1] - 206:24
**mass** [1] - 224:17

**massive** [1] - 49:5
**matched** [1] - 20:7
**material** [3] - 143:8, 143:9, 152:12
**mathematical** [1] - 182:1
**matter** [10] - 49:6, 68:10, 76:16, 82:23, 158:6, 233:1, 252:8, 252:15, 256:13, 258:5
**matters** [4] - 4:23, 181:22, 184:7, 184:17
**Matthew** [1] - 124:21
**Mayor** [2] - 225:18, 234:3
**mayor** [3] - 216:4, 216:20, 216:22
**mayor's** [1] - 234:9
**MCCAULEY** [208] - 1:13, 8:4, 8:9, 10:19, 10:23, 14:10, 23:9, 34:25, 35:3, 37:17, 37:24, 39:5, 39:20, 40:1, 42:1, 45:10, 45:13, 45:15, 50:4, 50:23, 53:4, 53:17, 53:20, 53:23, 54:8, 54:9, 54:15, 55:12, 55:15, 56:11, 56:13, 57:10, 58:2, 58:4, 58:20, 58:23, 59:7, 59:10, 60:6, 60:9, 61:7, 61:9, 63:15, 65:5, 67:7, 72:2, 72:8, 72:16, 72:20, 73:16, 73:24, 74:1, 74:19, 74:25, 76:20, 77:11, 77:18, 83:8, 83:10, 83:20, 84:2, 84:17, 85:5, 86:6, 86:14, 87:21, 92:7, 92:22, 93:8, 93:15, 93:20, 94:10, 95:16, 96:6, 96:8, 96:18, 97:17, 97:21, 98:3, 98:18, 100:4, 102:16, 103:2, 103:6, 103:16, 104:11, 105:4, 105:7, 105:10, 106:15, 106:24, 107:18, 108:16, 108:23, 109:21, 109:23, 111:10, 111:13, 111:20, 112:8, 112:10, 113:13, 114:15, 115:18, 117:25,

119:4, 119:10, 119:15, 119:19, 120:15, 120:19, 120:24, 121:1, 121:17, 122:7, 122:18, 123:21, 124:19, 124:23, 125:3, 127:15, 128:17, 129:12, 129:17, 130:15, 137:18, 137:24, 138:21, 139:2, 139:10, 140:19, 140:23, 141:1, 141:3, 141:8, 142:3, 142:22, 143:1, 144:24, 146:18, 146:20, 147:3, 147:14, 150:22, 151:11, 151:16, 152:17, 152:21, 155:7, 155:19, 157:4, 157:9, 157:17, 157:19, 158:1, 158:14, 159:1, 159:13, 159:16, 159:19, 160:9, 160:11, 160:14, 160:21, 161:6, 161:10, 161:15, 161:19, 161:23, 162:6, 162:16, 162:25, 163:10, 163:24, 164:6, 164:21, 165:9, 165:25, 166:6, 166:9, 166:18, 167:19, 168:22, 169:22, 170:5, 170:15, 170:21, 171:3, 171:22, 172:19, 172:24, 173:2, 173:8, 173:12, 174:7, 174:14, 175:24, 176:6, 176:9, 176:13, 177:2, 205:19, 247:7, 256:10, 256:17, 256:23, 257:2, 257:17
**McCauley** [20] - 3:10, 6:7, 66:22, 66:23, 67:1, 76:5, 92:21, 93:13, 93:18, 94:9, 128:14, 130:5, 137:14, 144:8, 155:6, 159:23, 163:21, 163:22, 165:3, 247:6
**mean** [42] - 3:20, 6:22,

13:20, 16:19, 19:20, 24:14, 27:20, 29:13, 30:1, 36:19, 41:24, 60:10, 60:12, 62:12, 68:12, 75:4, 80:15, 90:21, 94:20, 96:8, 99:9, 99:11, 102:11, 112:21, 121:18, 126:7, 127:6, 133:6, 136:7, 136:10, 141:23, 144:24, 145:20, 147:20, 157:6, 157:7, 160:14, 162:23, 166:21, 212:8, 228:21, 229:17

**meaning** [5] - 60:19, 127:3, 197:17, 198:21, 199:24

**meanings** [4] - 197:12, 200:16, 201:19, 202:11

**means** [28] - 35:24, 160:16, 167:18, 177:15, 182:21, 184:5, 187:11, 187:18, 187:20, 187:22, 188:7, 190:21, 191:4, 191:7, 196:22, 197:2, 197:13, 198:14, 200:11, 202:6, 214:1, 214:2, 214:11, 229:18, 231:7, 238:23, 251:23, 252:14

**meant** [2] - 38:5, 253:14

**media** [13] - 33:9, 34:4, 62:22, 64:3, 64:10, 87:18, 88:4, 88:5, 88:8, 88:25, 235:23, 238:6, 251:4

**medical** [2] - 4:11, 15:12

**meet** [3] - 89:15, 89:17, 108:9

**Mehta's** [1] - 155:4

**melee** [2] - 138:9, 139:8

**member** [4] - 3:19, 32:7, 252:6, 252:8

**members** [3] - 62:24, 94:23, 252:5

**memory** [10] - 110:15, 179:11, 179:12, 179:17, 179:18, 179:20, 184:14, 184:20, 233:25, 234:1

**men** [3] - 42:22, 220:13, 221:4

**mental** [2] - 52:11, 189:7

**mentality** [1] - 51:23

**mention** [4] - 17:18, 37:21, 230:5, 238:6

**mentioned** [5] - 17:18, 148:11, 171:7, 251:1, 251:7

**mere** [1] - 192:11

**merely** [7] - 180:14, 186:5, 189:5, 189:11, 194:21, 194:22, 194:23

**merged** [1] - 22:4

**merits** [1] - 252:8

**message** [1] - 49:4

**messages** [1] - 69:8

**messed** [1] - 30:8

**met** [4] - 108:11, 109:3, 130:11, 238:13

**metal** [1] - 50:11

**Metro** [1] - 22:6

**Metropolitan** [2] - 50:18, 217:1

**mid** [1] - 257:3

**mid-week** [1] - 257:3

**middle** [2] - 39:15, 68:22

**Midnight** [1] - 40:24

**might** [25] - 11:25, 48:17, 52:13, 73:6, 78:25, 82:12, 83:18, 94:24, 98:14, 100:24, 101:8, 126:14, 136:19, 138:17, 147:5, 150:13, 153:16, 163:17, 164:3, 177:17, 183:10, 183:13, 221:20, 229:3, 230:9

**mile** [1] - 117:16

**military** [2] - 43:9, 50:7

**militia** [1] - 41:19

**Miller** [10] - 3:9, 16:6, 128:14, 146:4, 170:15, 174:19, 206:14, 231:2, 237:12, 249:2

**MILLER** [63] - 1:13, 3:8, 3:25, 4:15, 6:2, 6:10, 6:18, 7:6, 7:16, 8:15, 10:8, 10:12, 10:21, 11:2, 11:4, 11:6, 12:4, 14:13, 14:17, 15:23, 16:7,

16:16, 16:20, 17:25, 18:8, 18:17, 20:1, 20:4, 20:15, 20:25, 75:15, 75:18, 75:20, 75:24, 76:4, 76:7, 79:16, 95:21, 96:1, 124:22, 126:20, 126:22, 127:7, 143:18, 145:3, 145:20, 146:8, 147:20, 148:7, 148:18, 151:4, 151:9, 170:23, 173:18, 175:5, 175:9, 206:16, 215:22, 221:3, 226:1, 233:20, 255:23, 256:16

**million** [3] - 90:8, 90:9, 226:21

**millions** [2] - 236:24

**mind** [12] - 60:16, 74:6, 86:7, 86:12, 100:13, 134:21, 134:23, 203:2, 211:22, 224:17, 250:1, 252:10

**mindful** [1] - 250:18

**minds** [1] - 68:19

**minimal** [1] - 28:1

**minimum** [1] - 144:25

**minister** [2] - 39:8, 39:9

**ministry** [1] - 87:13

**minor** [2] - 4:23, 82:23

**minute** [5] - 9:22, 59:8, 127:17, 137:11, 204:22

**minutemen** [2] - 41:1, 42:2

**minutes** [26] - 19:17, 20:19, 58:8, 70:8, 75:8, 75:11, 76:1, 76:23, 77:9, 77:17, 77:20, 77:21, 85:24, 110:9, 131:15, 137:19, 138:1, 138:3, 138:6, 138:25, 139:2, 139:20, 170:11, 174:22, 249:11, 256:24

**miscommunicated** [1] - 13:19

**misconduct** [2] - 16:5, 37:4

**misdemeanor** [3] - 151:10, 151:12, 167:2

**misdemeanors** [3] -

**150:17, 151:1, 151:5

**misguided** [1] - 64:9

**missed** [2] - 56:19, 143:18

**missing** [12] - 18:19, 20:16, 142:9, 143:5, 143:13, 143:20, 151:22, 152:4, 152:25, 153:18, 154:1, 154:18

**mission** [3] - 88:17, 209:3, 250:19

**misstatement** [1] - 17:1

**misstates** [4] - 45:9, 54:6, 54:13, 233:20

**mistake** [2] - 187:7, 190:25

**mistaken** [1] - 127:11

**mistakes** [2] - 185:10, 205:1

**Mister** [1] - 66:9

**misunderstanding** [2] - 12:5, 145:4

**mob** [10] - 206:17, 206:20, 207:3, 207:7, 207:13, 207:18, 207:21, 207:23, 208:5

**mock** [1] - 32:10

**mockery** [1] - 33:25

**modifications** [1] - 168:23

**modifies** [1] - 253:12

**moment** [25] - 16:24, 45:16, 49:21, 52:18, 93:15, 96:4, 96:6, 96:9, 97:19, 105:8, 118:25, 121:22, 131:12, 131:20, 133:5, 136:23, 137:1, 145:13, 156:4, 156:5, 211:9, 228:16, 229:1, 239:3, 253:25

**moments** [5] - 49:2, 97:3, 97:22, 133:4, 169:6

**money** [2] - 64:13, 69:13

**month** [1] - 88:12

**monument** [4] - 96:16, 97:8, 98:8, 98:11

**Monument** [2] - 89:15, 97:9

**mood** [1] - 112:19

**moreover** [2] - 120:7, 122:11

**morning** [19] - 3:8, 3:12, 3:15, 4:12,

150:17, 151:1, 151:5

**Moseley** [2] - 85:3, 85:5, 150:15

**most** [8] - 7:7, 28:1, 29:18, 32:1, 131:10, 138:14, 138:17, 138:18

**mostly** [1] - 124:6

**motion** [13] - 5:12, 14:20, 15:10, 16:11, 16:20, 17:1, 17:16, 18:24, 116:6, 122:20, 128:22, 257:11, 257:14

**motioned** [2] - 25:25, 51:24

**motive** [1] - 184:15

**mount** [1] - 41:8

**mount-up** [1] - 41:8

**mounted** [1] - 41:4

**mounting** [1] - 211:3

**mouth** [1] - 127:8

**move** [35] - 23:8, 30:6, 39:18, 74:7, 84:5, 90:12, 92:4, 95:13, 98:16, 101:2, 103:20, 103:22, 104:10, 104:24, 116:18, 157:23, 177:7, 177:10, 204:19, 222:16, 222:17, 225:14, 225:17, 232:19, 237:13, 237:14, 237:15, 238:16, 239:24, 240:1, 241:8, 248:15

**moved** [7] - 102:4, 102:6, 103:9, 112:2, 112:16, 113:6, 169:12

**movement** [4] - 120:22, 187:3, 215:7, 216:19

**moving** [14] - 30:13, 56:9, 125:6, 133:5, 133:8, 157:14, 157:16, 157:20, 214:24, 220:18, 239:9, 243:13, 243:22, 244:6

**MPD** [1] - 208:23

**MR** [471] - 3:12, 4:1, 4:5, 4:16, 5:13, 7:17, 7:22, 8:4, 8:9, 8:18, 8:24, 9:3, 9:7, 9:14,

10:19, 10:23, 11:11, 12:13, 12:20, 13:4, 13:9, 13:16, 13:22, 13:25, 14:2, 14:10, 15:4, 15:18, 16:2, 17:5, 17:8, 17:10, 17:18, 18:24, 19:12, 20:21, 21:10, 21:13, 21:23, 23:8, 23:9, 23:14, 24:24, 25:23, 26:20, 27:8, 34:24, 34:25, 35:3, 37:15, 37:17, 37:22, 37:24, 39:2, 39:5, 39:17, 39:20, 39:24, 40:1, 41:21, 42:1, 45:9, 45:10, 45:13, 45:15, 49:24, 50:4, 50:21, 50:23, 53:2, 53:4, 53:17, 53:20, 53:23, 54:6, 54:8, 54:9, 54:13, 54:15, 55:15, 56:11, 56:13, 57:10, 58:2, 58:4, 58:20, 58:23, 59:7, 59:10, 60:6, 60:9, 61:7, 61:9, 63:12, 63:15, 63:19, 65:5, 65:7, 65:9, 67:7, 67:10, 69:16, 69:24, 70:1, 70:7, 70:14, 70:19, 70:23, 71:2, 71:8, 71:13, 71:20, 72:2, 72:8, 72:16, 72:20, 73:7, 73:16, 73:24, 74:1, 74:19, 74:25, 75:12, 76:16, 76:20, 77:1, 77:11, 77:16, 77:18, 78:13, 78:16, 79:4, 79:8, 79:19, 79:23, 80:2, 80:6, 80:10, 80:14, 80:20, 81:1, 81:5, 81:8, 81:11, 81:14, 81:19, 81:24, 82:2, 82:4, 82:7, 82:17, 82:21, 82:23, 83:8, 83:10, 83:20, 84:2, 84:7, 84:9, 84:15, 84:17, 85:2, 85:5, 85:8, 85:12, 85:23, 86:2, 86:6, 86:14, 86:21, 87:2, 87:21, 88:2, 91:10, 91:13, 91:15, 91:16, 92:4, 92:7, 92:12, 92:15, 92:19, 92:22, 93:5, 93:8, 93:15, 93:20, 94:7, 94:10, 94:14, 95:13, 95:16, 96:2, 96:6, 96:8, 96:16, 96:18,

96:23, 97:7, 97:12, 97:15, 97:17, 97:21, 98:3, 98:5, 98:16, 98:18, 98:21, 98:23, 100:4, 100:9, 100:14, 100:19, 101:6, 102:16, 102:18, 103:2, 103:4, 103:6, 103:8, 103:16, 103:21, 104:10, 104:11, 104:13, 104:15, 104:24, 105:4, 105:7, 105:10, 105:13, 105:18, 105:23, 106:15, 106:17, 106:20, 106:21, 106:24, 107:1, 107:18, 107:22, 108:16, 108:20, 108:23, 109:18, 109:21, 109:23, 111:10, 111:13, 111:20, 111:23, 112:8, 112:10, 112:12, 112:13, 113:10, 113:13, 114:12, 114:15, 114:17, 114:22, 114:24, 115:8, 115:11, 115:14, 115:18, 116:8, 117:25, 119:4, 119:10, 119:15, 119:19, 120:15, 120:19, 120:24, 121:1, 121:17, 122:7, 122:18, 123:3, 123:13, 123:18, 123:21, 123:23, 124:5, 124:9, 124:16, 124:19, 124:23, 125:3, 125:8, 125:22, 126:8, 126:14, 126:19, 127:15, 128:17, 129:12, 129:17, 129:24, 130:15, 130:22, 131:1, 131:24, 132:3, 132:14, 132:19, 132:22, 133:1, 133:4, 133:9, 133:18, 133:24, 134:7, 134:10, 134:13, 134:20, 134:25, 135:17, 135:20, 136:3, 136:9, 136:17, 136:22, 137:8,

137:11, 137:18, 137:24, 138:7, 138:12, 138:21, 139:2, 139:10, 139:21, 140:19, 140:23, 141:1, 141:3, 141:8, 141:16, 141:21, 142:3, 142:8, 142:13, 142:18, 142:22, 143:1, 143:5, 143:22, 144:24, 146:18, 146:20, 147:3, 147:14, 148:4, 149:6, 149:11, 149:14, 149:24, 150:10, 150:15, 150:22, 151:1, 151:11, 151:16, 152:9, 152:17, 152:21, 153:11, 154:13, 155:7, 155:19, 157:4, 157:9, 157:17, 157:19, 158:1, 158:14, 159:1, 159:13, 159:16, 159:19, 160:9, 160:11, 160:14, 160:21, 161:6, 161:10, 161:15, 161:19, 161:23, 162:6, 162:11, 162:16, 162:25, 163:10, 163:14, 163:24, 164:6, 164:21, 165:9, 165:25, 166:6, 166:9, 166:18, 166:22, 167:2, 167:7, 167:11, 167:19, 167:21, 168:1, 168:3, 168:10, 168:12, 168:22, 169:3, 169:22, 169:25, 170:5, 170:15, 170:18, 170:21, 171:3, 171:22, 171:23, 171:25, 172:18, 172:19, 172:24, 173:2, 173:8, 173:12, 173:17, 174:7, 174:8, 174:12, 174:14, 175:24, 176:6, 176:9, 176:13, 176:14, 177:2, 177:3, 205:3, 205:8, 205:11,

205:15, 205:18, 205:19, 231:10, 234:2, 239:15, 240:21, 241:10, 242:12, 243:11, 243:24, 246:25, 247:7, 255:20, 256:10, 256:12, 256:17, 256:23, 257:2, 257:7, 257:13, 257:17, 257:20

**MS** [64] - 3:8, 3:25, 4:15, 6:2, 6:10, 6:18, 7:6, 7:16, 8:15, 10:8, 10:12, 10:21, 11:2, 11:4, 11:6, 12:4, 14:13, 14:17, 15:23, 16:7, 16:16, 16:20, 17:25, 18:8, 18:17, 20:1, 20:4, 20:15, 20:25, 55:12, 75:15, 75:18, 75:20, 75:24, 76:4, 76:7, 79:11, 79:16, 95:21, 96:1, 124:22, 126:20, 126:22, 127:7, 143:18, 145:3, 145:20, 146:8, 147:20, 148:7, 148:18, 151:4, 151:9, 170:23, 173:18, 175:5, 175:9, 206:16, 215:22, 221:3, 226:1, 233:20, 255:23, 256:16
**multiple** [22] - 12:6, 14:12, 14:25, 15:6, 19:18, 20:7, 22:11, 68:12, 90:20, 118:11, 156:24, 173:5, 173:10, 217:15, 219:17, 222:19, 232:1, 238:18, 241:20, 251:16
**Mumuni/Saleh** [1] - 128:24
**music** [1] - 69:11
**must** [52] - 118:2, 130:10, 144:3, 147:11, 165:18, 168:18, 180:15, 181:13, 183:4, 183:5, 183:16, 183:22, 183:25, 186:17, 188:20, 189:6, 189:12, 190:5, 190:18,

191:4, 191:5, 192:6, 193:15, 194:7, 195:8, 195:19, 195:22, 195:25, 196:3, 196:7, 197:8, 198:7, 199:1, 200:5, 200:21, 202:1, 203:9, 204:13, 204:16, 206:9, 231:6, 231:8, 231:23, 246:19, 251:4, 251:5, 252:23, 252:24, 252:25, 253:13, 253:16
**mutual** [1] - 250:22
**mysterious** [1] - 152:11
**mysteriously** [1] - 214:8

# N

**name** [9] - 5:15, 11:18, 16:23, 31:25, 87:3, 181:14, 221:22, 254:2, 254:17
**named** [3] - 116:23, 142:10, 240:22
**names** [4] - 3:7, 82:25, 83:19, 223:3
**naming** [1] - 11:19
**narrative** [10] - 63:10, 63:11, 63:12, 63:21, 64:6, 67:21, 68:2, 68:20, 89:3, 247:25
**nation** [3] - 29:20, 42:14, 69:7
**national** [1] - 88:10
**National** [2] - 34:7, 69:9
**natural** [5] - 27:3, 190:11, 202:19, 211:21, 212:1
**nature** [5] - 4:11, 122:11, 183:4, 187:6, 190:24
**Navy** [10] - 36:6, 36:10, 36:15, 36:17, 36:21, 37:1, 37:4, 37:10, 37:13, 65:10
**near** [3] - 104:3, 104:16, 225:6
**nearby** [1] - 229:2
**necessarily** [4] - 134:3, 141:22, 156:4, 183:7
**necessary** [12] - 162:2, 163:6, 172:7, 181:10, 189:18,

193:8, 197:21, 203:1, 203:6, 203:17, 203:20, 252:3
**need** [50] - 6:16, 6:25, 15:19, 17:23, 33:18, 64:21, 74:10, 74:16, 75:10, 75:17, 76:22, 76:24, 77:13, 77:19, 81:2, 85:12, 96:18, 115:22, 119:17, 129:3, 131:19, 136:19, 139:18, 140:3, 143:12, 144:25, 145:18, 146:2, 164:14, 168:19, 169:10, 170:12, 176:8, 190:15, 192:7, 194:10, 194:14, 206:4, 206:5, 210:10, 211:23, 220:23, 227:17, 228:6, 249:13, 251:8, 254:3, 254:12, 256:6, 256:9
**needed** [1] - 170:7
**needing** [1] - 237:24
**needs** [11] - 14:8, 17:14, 64:17, 70:13, 119:5, 120:10, 121:25, 140:1, 194:5, 204:20, 222:13
**negated** [1] - 192:9
**neutral** [1] - 88:24
**never** [29] - 16:23, 50:2, 54:3, 54:10, 54:12, 80:17, 89:17, 108:11, 109:1, 109:8, 109:11, 109:13, 109:15, 109:17, 109:24, 110:1, 116:22, 116:23, 142:11, 146:19, 146:20, 180:22, 220:5, 239:7, 247:20, 252:7, 252:10, 252:14
**new** [3] - 8:25, 113:11, 257:14
**newly** [1] - 126:17
**news** [3] - 88:5, 234:5, 251:9
**newspapers** [1] - 251:2
**next** [15] - 29:25, 44:17, 69:23, 86:20, 86:21, 87:24,

101:17, 112:18, 206:3, 207:23, 213:19, 219:5, 219:9, 221:16, 229:4
**nice** [3] - 21:8, 30:21, 221:8
**Nickerson** [18] - 10:1, 10:5, 116:22, 123:18, 124:21, 124:22, 124:24, 142:10, 142:18, 142:21, 143:10, 214:13, 219:8, 219:13, 224:6, 240:22, 240:23, 240:24
**Nickerson's** [1] - 57:24
**Niewenhous** [12] - 10:25, 11:1, 16:17, 17:3, 117:8, 117:9, 137:25, 214:13, 222:12, 222:18, 222:22, 224:11
**Niewenhous's** [1] - 248:14
**night** [5] - 26:10, 34:7, 127:2, 127:20, 211:14
**nobody** [4] - 33:16, 40:3, 49:15, 106:10
**noise** [2] - 216:3, 216:21
**none** [8] - 13:22, 30:9, 34:19, 44:10, 110:17, 121:11, 155:1, 165:7
**nonetheless** [2] - 122:3, 126:4
**nonissue** [1] - 163:23
**nonverbal** [1] - 44:12
**Norm** [1] - 78:14
**normal** [3] - 115:21, 199:22, 227:2
**north** [2] - 89:12, 216:14
**Northwest** [3] - 1:14, 1:21, 133:7
**note** [11] - 17:25, 122:11, 178:11, 214:12, 222:7, 223:3, 225:18, 252:4, 252:7, 253:1, 253:3
**notebook** [1] - 254:1
**notebooks** [1] - 179:14
**notes** [5] - 179:14, 179:16, 179:19, 179:20, 222:6

**notetaker's** [1] - 179:21
**nothing** [22] - 15:1, 15:2, 17:16, 36:1, 42:24, 43:23, 44:4, 49:7, 65:5, 72:3, 73:4, 96:22, 111:20, 114:15, 155:14, 174:12, 218:22, 236:9, 237:19, 253:9, 253:11, 253:12
**notice** [9] - 57:2, 60:4, 71:25, 128:21, 143:2, 152:19, 154:22, 209:24, 245:15
**noticed** [3] - 30:17, 239:19, 239:25
**notification** [1] - 48:14
**notifications** [1] - 251:8
**noting** [1] - 225:19
**nuanced** [1] - 116:14
**nudge** [1] - 132:6
**Number** [1] - 1:3
**number** [43] - 3:16, 3:24, 4:9, 4:17, 4:18, 4:19, 6:3, 6:14, 7:7, 7:24, 32:1, 40:15, 92:24, 125:9, 130:21, 136:3, 144:18, 168:11, 183:8, 183:11, 183:12, 185:24, 205:11, 210:14, 210:16, 210:17, 212:10, 215:6, 217:7, 222:7, 223:8, 228:18, 228:19, 232:13, 232:15, 232:17, 232:20, 250:5, 253:24, 254:2, 254:17
**numbered** [1] - 223:5
**numbering** [1] - 169:8
**numbers** [3] - 169:10, 169:12, 228:13
**numerous** [4] - 26:6, 33:16, 38:11, 56:7
**nutshell** [1] - 35:20

### O

**oath** [4] - 36:3, 50:7, 208:16, 225:8
**object** [3] - 4:16, 97:17, 183:19
**objected** [1] - 183:14
**objecting** [1] - 183:16

**objection** [51] - 3:24, 4:14, 23:9, 37:15, 37:22, 39:2, 39:17, 39:24, 41:21, 45:9, 49:24, 50:21, 53:2, 54:6, 54:13, 63:12, 63:19, 67:7, 87:21, 92:6, 92:7, 93:21, 94:9, 94:13, 95:15, 98:18, 100:4, 101:5, 102:16, 103:2, 103:6, 103:16, 104:11, 105:3, 105:4, 105:10, 106:15, 106:24, 107:18, 108:16, 112:8, 112:9, 114:12, 147:18, 149:8, 149:11, 164:1, 166:19, 168:25, 183:20, 233:20
**objections** [5] - 118:24, 168:24, 183:17, 232:7, 235:17
**objective** [1] - 88:13
**objects** [1] - 30:6
**obligation** [1] - 154:20
**observations** [2] - 122:6, 122:9
**observe** [1] - 184:16
**observed** [2] - 184:7, 212:7
**obstruct** [37] - 22:20, 24:12, 116:11, 145:7, 150:4, 156:19, 162:20, 168:19, 186:8, 186:21, 188:14, 189:22, 190:8, 190:10, 190:12, 191:8, 192:6, 192:8, 192:14, 210:15, 210:20, 211:5, 211:6, 211:17, 212:2, 212:19, 213:18, 215:3, 215:10, 215:19, 232:22, 235:10, 235:14, 236:7, 236:8, 236:20, 247:1
**obstructed** [4] - 153:15, 187:2, 210:21, 215:6
**obstructing** [13] - 150:12, 186:16, 188:13, 188:16, 188:19, 188:22, 188:25, 189:20,

190:5, 191:12, 192:12, 217:19, 221:10
**obstruction** [28] - 150:14, 171:14, 171:16, 176:20, 176:22, 176:23, 177:1, 189:4, 189:10, 189:14, 192:16, 192:18, 192:20, 192:22, 193:1, 193:13, 193:17, 193:20, 194:1, 194:3, 195:6, 196:21, 210:4, 210:9, 210:11, 211:23, 214:22, 226:8
**obstructs** [3] - 162:12, 191:19, 191:25
**obtain** [1] - 255:15
**obvious** [1] - 113:5
**obviously** [6] - 26:6, 121:18, 143:8, 143:10, 169:4, 221:8
**OC** [3] - 26:4, 26:13, 237:9
**occasions** [2] - 33:16, 251:16
**occur** [6] - 137:20, 137:25, 235:19, 235:24, 235:25, 236:5
**occurred** [11] - 5:25, 7:10, 22:3, 23:5, 23:19, 25:5, 27:12, 34:17, 125:8, 248:18, 250:7
**occurrence** [1] - 87:24
**occurring** [2] - 26:3, 234:15
**occurs** [1] - 199:13
**OF** [5] - 1:1, 1:3, 1:9, 258:1, 258:9
**offender** [1] - 140:21
**offense** [42] - 129:9, 129:10, 129:12, 155:12, 161:5, 176:18, 181:5, 181:7, 186:13, 186:15, 188:23, 189:23, 189:25, 190:2, 190:3, 190:16, 193:3, 193:4, 193:5, 193:15, 193:18, 193:23, 193:25, 194:3, 194:5, 194:7, 194:9, 194:11, 194:14, 194:24,

195:2, 195:5, 195:9, 196:20, 198:7, 198:25, 200:4, 200:20, 201:25, 249:15, 249:16
**offenses** [11] - 123:2, 146:17, 155:5, 155:6, 160:23, 161:22, 163:9, 165:17, 177:9, 181:1, 181:3
**offensive** [1] - 209:8
**offer** [4] - 28:24, 44:17, 138:21, 247:8
**offered** [5] - 116:10, 153:5, 166:8, 166:12, 183:15
**offering** [2] - 191:20, 192:1
**Office** [2] - 1:14, 201:11
**office** [1] - 208:8
**officer** [58] - 12:1, 15:7, 15:18, 17:12, 17:14, 21:25, 22:17, 22:20, 47:23, 55:4, 56:15, 56:23, 59:3, 59:20, 59:23, 60:1, 117:3, 119:13, 119:16, 125:17, 126:2, 129:18, 130:4, 131:16, 131:17, 132:6, 142:10, 156:10, 158:3, 158:5, 158:10, 186:6, 186:24, 187:25, 188:7, 196:10, 196:11, 196:13, 196:15, 196:24, 197:19, 197:20, 198:3, 206:23, 215:4, 218:5, 218:20, 220:5, 220:6, 222:5, 232:23, 238:20, 238:21, 242:13, 248:6
**Officer** [61] - 10:3, 52:5, 52:21, 66:9, 164:13, 195:21, 195:24, 196:2, 196:5, 196:8, 214:6, 216:7, 216:8, 216:11, 218:24, 219:3, 219:8, 219:24, 220:2, 220:10, 220:16, 220:21, 221:9, 221:14, 221:15,

221:16, 221:17, 221:21, 221:25, 222:3, 222:7, 222:11, 222:12, 222:18, 222:22, 223:16, 224:5, 224:6, 224:10, 224:11, 225:15, 226:24, 235:1, 235:3, 235:4, 235:5, 235:6, 235:8, 237:23, 240:22, 240:23, 240:24, 241:8, 242:2, 242:5, 242:8, 242:12, 248:14, 256:19
**officer's** [4] - 22:10, 57:12, 185:25, 186:2
**officers** [130] - 5:6, 10:9, 10:17, 14:22, 18:3, 19:13, 19:17, 24:3, 24:9, 24:13, 25:12, 27:14, 29:5, 29:19, 30:4, 48:1, 54:4, 58:6, 58:9, 59:25, 60:3, 60:12, 60:18, 96:21, 111:4, 114:9, 117:1, 118:5, 118:7, 120:6, 123:9, 124:2, 124:10, 124:13, 125:10, 125:21, 130:25, 131:3, 131:4, 132:11, 132:22, 132:23, 133:1, 133:8, 133:21, 134:2, 134:9, 134:16, 134:23, 135:1, 135:6, 135:12, 135:13, 135:20, 135:24, 136:22, 137:1, 142:24, 143:3, 144:3, 154:21, 154:23, 156:2, 156:14, 156:16, 156:19, 156:23, 157:7, 157:11, 158:6, 158:18, 158:22, 159:3, 162:21, 185:25, 186:9, 186:17, 186:22, 186:24, 188:13, 188:14, 188:16, 188:19, 188:22, 188:25, 195:14, 195:15, 203:9, 206:9, 206:21, 209:2, 209:3, 209:6, 209:9, 211:11, 215:4,

215:11, 215:12, 215:13, 215:19, 215:24, 217:1, 217:17, 217:18, 217:19, 218:14, 218:17, 219:11, 219:22, 222:16, 226:2, 227:5, 227:14, 228:7, 235:10, 239:9, 240:6, 240:18, 241:3, 241:6, 242:15, 242:17, 242:19, 243:13, 243:20, 245:9, 246:3, 246:5, 248:10
**officers'** [2] - 207:8, 208:15
**Official** [1] - 1:21
**OFFICIAL** [1] - 258:1
**official** [62] - 116:11, 120:3, 168:19, 171:14, 171:17, 176:20, 176:22, 176:24, 186:10, 186:25, 189:20, 189:22, 190:5, 190:9, 190:10, 190:13, 190:14, 190:15, 190:17, 190:19, 190:21, 191:9, 192:7, 192:8, 192:17, 192:19, 192:20, 192:22, 193:2, 193:14, 193:17, 193:20, 194:1, 194:3, 195:7, 195:16, 196:14, 196:16, 196:21, 197:20, 197:24, 197:25, 199:6, 199:9, 210:4, 210:9, 210:11, 210:16, 210:21, 214:22, 217:16, 218:8, 227:4, 229:10, 235:14, 236:7, 236:8, 236:20, 236:21, 237:18, 245:4, 247:1
**often** [4] - 82:13, 192:3, 193:5, 208:12
**older** [3] - 25:9, 54:23, 248:1
**oldest** [1] - 208:4
**OMB** [1] - 1:18
**omissions** [2] - 209:20, 250:10
**omitted** [1] - 176:17
**once** [5] - 56:19, 74:4,

140:21, 212:23, 222:19
**one** [142] - 3:22, 6:12, 6:18, 6:24, 9:21, 11:21, 12:10, 14:4, 14:10, 14:16, 18:1, 18:4, 19:9, 20:4, 20:16, 20:17, 21:18, 25:8, 25:24, 26:11, 34:6, 36:24, 38:1, 38:5, 39:15, 39:22, 40:12, 40:23, 41:17, 42:25, 44:4, 46:11, 48:4, 56:23, 62:16, 64:7, 65:3, 68:20, 71:5, 71:15, 82:7, 84:17, 92:16, 93:15, 96:6, 102:8, 107:24, 111:4, 111:7, 116:23, 117:8, 118:14, 118:23, 119:10, 122:8, 122:12, 123:13, 124:24, 126:12, 129:25, 130:1, 130:4, 130:16, 132:22, 137:11, 138:3, 138:7, 141:2, 144:12, 144:13, 145:2, 146:15, 148:2, 149:13, 149:14, 152:4, 154:10, 155:4, 155:7, 156:11, 159:8, 161:1, 161:22, 162:2, 162:21, 163:6, 163:8, 164:8, 169:16, 170:14, 174:4, 175:6, 175:12, 175:22, 177:13, 181:12, 182:22, 183:11, 186:22, 187:18, 194:13, 197:5, 204:2, 204:25, 205:9, 205:24, 206:2, 207:22, 208:4, 212:10, 215:7, 217:9, 218:25, 219:10, 219:24, 221:1, 221:3, 222:13, 223:3, 223:13, 225:4, 225:6, 225:24, 226:20, 226:23, 227:24, 230:23, 232:12, 233:16, 235:20, 238:4, 238:6, 244:8, 249:20, 252:5,

253:21, 253:22, 255:2, 256:13
**one's** [2] - 146:10, 172:8
**ones** [2] - 34:19, 225:12
**oneself** [2] - 192:5, 203:6
**ongoing** [1] - 208:25
**online** [1] - 32:9
**open** [16] - 45:24, 67:25, 78:19, 83:15, 83:18, 95:22, 95:23, 134:25, 136:5, 138:23, 140:11, 141:13, 162:8, 252:9, 252:15, 253:6
**open-source** [2] - 95:22, 138:23
**opening** [8] - 38:19, 46:6, 46:8, 170:13, 174:23, 204:19, 207:20, 256:20
**operate** [1] - 32:8
**operating** [1] - 208:10
**operation** [1] - 187:23
**opinion** [10] - 34:8, 62:19, 64:6, 65:3, 68:20, 69:2, 83:1, 85:13, 152:22, 179:7
**opinions** [2] - 64:2, 253:10
**opportunities** [1] - 88:8
**opportunity** [8] - 52:5, 52:8, 73:18, 105:5, 147:16, 158:8, 184:16
**oppose** [6] - 119:8, 197:11, 218:16, 219:14, 221:13, 222:22
**opposed** [7] - 89:3, 131:21, 196:9, 197:22, 198:2, 218:4, 238:19
**opposes** [1] - 162:12
**opposing** [2] - 167:4, 195:13
**opposite** [6] - 67:23, 183:13, 235:16, 236:19, 248:3, 248:22
**optimistic** [1] - 257:2
**orally** [1] - 252:9
**order** [28] - 3:2, 50:9, 73:7, 75:20, 76:14, 134:17, 147:10, 165:18, 165:21, 186:16, 188:18,

190:4, 193:13,
195:19, 195:22,
195:25, 196:3,
196:6, 197:7, 198:6,
198:25, 200:4,
200:20, 201:25,
216:20, 216:22,
233:2, 252:24
**ordered** [1] - 256:22
**ordering** [2] - 121:24,
208:15
**orderly** [8] - 150:18,
178:14, 199:6,
199:8, 200:25,
201:1, 245:4, 245:23
**orders** [12] - 49:14,
50:8, 52:16, 103:11,
134:16, 209:7,
213:14, 213:15,
213:16, 214:15,
214:16, 235:8
**ordinarily** [2] - 202:12,
211:18
**ordinary** [1] - 197:12
**organically** [1] - 31:8
**organizations** [4] -
62:25, 93:6, 94:16,
94:18
**organize** [2] - 90:17,
250:21
**organizers** [1] - 90:18
**organizing** [1] -
236:22
**orient** [1] - 99:4
**origin** [1] - 179:2
**original** [1] - 31:1
**OSHA** [1] - 16:3
**otherwise** [10] - 118:4,
144:7, 151:25,
195:5, 198:15,
210:7, 223:20,
230:20, 249:18,
256:6
**ought** [1] - 174:10
**outcome** [1] - 184:18
**outdoor** [1] - 87:11
**outline** [1] - 99:12
**outnumbered** [1] -
206:21
**outset** [2] - 142:23,
152:14
**outside** [7] - 39:1,
69:25, 82:19, 87:7,
99:12, 143:15,
154:24
**overarching** [1] -
67:21
**overcame** [1] - 207:13
**overcomplicating** [1]
- 160:7

**overhand** [1] - 241:14
**overhead** [1] - 59:18
**overlap** [4] - 11:15,
19:8, 209:25, 223:10
**overlapped** [2] -
11:15, 11:16
**overlapping** [1] -
11:14
**overlaps** [1] - 223:11
**overnight** [1] - 170:25
**overruled** [13] - 37:16,
37:23, 39:3, 39:25,
41:23, 49:25, 54:7,
54:14, 63:20, 67:8,
87:22, 112:11,
114:14
**overthrow** [1] - 208:9
**OWEN** [1] - 1:6
**own** [31] - 16:3, 18:13,
37:1, 43:20, 52:4,
64:2, 64:4, 68:24,
79:2, 119:23, 127:1,
134:22, 166:1,
179:11, 179:18,
179:20, 179:21,
208:2, 208:5, 208:6,
213:12, 214:8,
214:15, 221:17,
225:3, 225:19,
228:22, 230:20,
233:25, 246:10
**Oxnard** [1] - 1:17

# P

**P.C** [1] - 1:17
**p.m** [19] - 45:17, 48:8,
110:6, 110:8, 110:9,
110:11, 110:13,
124:20, 152:1,
171:4, 205:22,
209:12, 210:25,
211:14, 229:14,
257:23
**page** [3] - 74:18,
170:9, 254:1
**painful** [1] - 228:22
**panning** [1] - 121:11
**paperwork** [4] - 91:18,
91:19, 91:25
**paragraph** [3] -
172:10, 205:12,
205:17
**paralegal** [2] - 3:10,
3:14
**parameters** [1] - 78:11
**parse** [2] - 161:1,
163:1
**part** [16] - 12:4, 16:25,
33:21, 37:20, 47:17,

63:5, 99:16, 119:1,
194:11, 199:17,
206:19, 226:14,
236:23, 238:10,
238:11, 239:22
**participants** [2] -
104:17
**participated** [1] -
195:9
**participating** [2] -
120:5, 239:23
**participation** [2] -
61:19, 194:6
**particular** [10] - 98:8,
127:25, 158:7,
158:14, 178:7,
181:5, 182:23,
224:4, 233:19,
236:21
**particularly** [2] - 5:21,
148:21
**particulars** [1] - 3:17
**parties** [11] - 12:23,
84:11, 115:1, 115:2,
115:22, 147:22,
147:23, 180:1,
180:2, 205:1, 256:22
**parts** [4] - 194:13,
250:6, 250:8, 256:18
**party** [2] - 112:21,
183:18
**pass** [2] - 49:5, 99:13
**passed** [3] - 122:13,
189:7, 247:13
**passion** [2] - 35:22,
65:1
**passive** [3] - 61:15,
61:16, 243:16
**passively** [1] - 27:25
**past** [7] - 28:3, 44:3,
96:24, 102:9,
119:25, 174:4,
177:17
**pastor** [1] - 39:6
**Pastor** [1] - 39:16
**path** [4] - 78:5,
108:13, 108:14,
113:16
**paths** [1] - 110:18
**patriotic** [1] - 102:20
**patriots** [4] - 44:19,
208:2, 209:14,
212:25
**patrol** [1] - 15:20
**Pattis** [1] - 78:14
**Paul** [4] - 41:7, 41:8,
41:14, 65:19
**Pause** [3] - 98:2,
105:9, 175:10
**pause** [1] - 111:11

**pay** [2] - 229:2, 229:19
**paying** [1] - 18:11
**PD** [1] - 208:24
**peace** [1] - 244:3
**Peace** [3] - 97:8,
122:13, 247:13
**peaceably** [1] - 27:23
**peaceful** [15] - 27:16,
27:20, 29:10, 31:22,
34:7, 42:15, 43:3,
43:4, 45:8, 45:18,
61:17, 207:22,
208:17, 216:23,
243:16
**peacefully** [1] - 51:14
**peeps** [1] - 14:19
**Pence** [1] - 223:25
**pending** [2] - 190:15,
190:17
**Pennsylvania** [1] -
217:7
**people** [93] - 11:21,
15:15, 15:21, 22:18,
23:22, 24:14, 24:15,
29:10, 30:3, 30:7,
33:11, 34:3, 35:14,
38:5, 38:25, 39:14,
39:21, 40:4, 40:9,
41:19, 42:19, 47:19,
49:5, 49:10, 49:12,
49:18, 50:3, 51:6,
51:12, 59:21, 60:11,
61:3, 61:20, 61:23,
62:3, 63:2, 63:6,
63:22, 64:1, 64:7,
65:24, 67:18, 68:1,
68:5, 68:12, 68:19,
69:8, 72:22, 82:25,
83:16, 88:14, 89:1,
89:11, 89:15, 89:17,
89:18, 99:18, 99:20,
101:16, 102:3,
106:22, 108:3,
112:17, 114:10,
118:9, 125:25,
126:9, 129:25,
131:3, 135:6, 137:2,
138:18, 146:22,
148:24, 149:17,
154:17, 163:1,
184:19, 191:15,
193:8, 216:11,
225:17, 229:13,
232:18, 237:16,
243:7, 246:17,
248:3, 248:7
**people's** [1] - 29:18
**Pepe** [1] - 41:6
**pepper** [4] - 28:25,
48:23, 121:7, 244:1

**PepperBall** [2] -
26:12, 26:15
**perceive** [2] - 30:4,
103:5
**perceived** [3] - 27:2,
67:16, 117:19
**percent** [10] - 7:18,
8:18, 32:23, 88:24,
213:8, 213:9, 238:7,
238:8, 242:3
**Percenters** [2] - 33:3,
213:12
**perfect** [7] - 30:8,
30:9, 36:20, 65:10,
65:12, 65:14, 86:7
**perfectly** [1] - 231:13
**perform** [1] - 158:3
**performance** [8] -
186:25, 187:4,
195:16, 196:14,
196:16, 197:20,
215:5, 215:8
**performed** [3] -
193:22, 193:23,
194:4
**perhaps** [11] - 8:12,
18:15, 51:4, 73:22,
113:20, 127:11,
145:3, 160:25,
174:5, 206:4, 240:1
**perimeter** [5] - 209:4,
223:16, 223:20,
247:11, 247:13
**period** [6] - 20:5, 20:7,
132:12, 138:9,
232:3, 248:17
**permit** [5] - 92:15,
93:2, 93:19, 93:21,
94:15
**permits** [8] - 91:6,
92:1, 92:13, 93:10,
94:3, 109:11,
131:23, 247:18
**permitted** [14] - 43:6,
45:5, 45:21, 46:15,
46:20, 50:6, 92:13,
94:21, 106:6, 122:4,
158:19, 179:13,
180:5, 182:24
**persecuting** [1] - 34:8
**person** [71] - 27:25,
43:24, 44:7, 44:9,
52:8, 54:25, 59:1,
59:12, 59:16, 61:12,
61:14, 68:8, 80:21,
108:10, 109:3,
109:6, 114:8,
121:13, 124:12,
129:1, 129:23,
159:12, 172:7,

180:15, 181:21,
182:10, 184:13,
187:5, 190:23,
191:8, 192:5, 193:2,
193:3, 193:4, 193:6,
193:12, 195:17,
196:11, 196:14,
197:19, 197:22,
197:25, 198:16,
198:18, 199:13,
199:14, 199:15,
199:19, 199:20,
200:7, 201:13,
202:13, 202:19,
203:5, 203:14,
203:15, 212:7,
223:21, 226:12,
226:15, 227:25,
235:5, 237:15,
238:20, 242:4,
247:14, 248:24,
251:24, 252:11,
254:9
**person's** [2] - 40:25,
199:15
**personal** [4] - 179:21,
200:13, 202:9,
236:14
**personality's** [1] -
41:12
**personally** [3] - 14:25,
91:8, 109:3
**persons** [4] - 187:12,
194:22, 195:15,
216:24
**perspective** [5] - 97:2,
131:12, 140:13,
150:1, 175:23
**perspectives** [1] -
68:12
**persuade** [1] - 150:1
**persuasive** [4] -
150:16, 230:8,
230:10
**pertain** [1] - 93:9
**pertained** [1] - 117:11
**petition** [3] - 148:25,
191:16, 232:14
**Pezzola** [2] - 125:23,
126:9
**phase** [1] - 194:11
**phases** [1] - 194:14
**phone** [13] - 3:17, 4:6,
48:12, 48:14, 66:14,
83:14, 114:3, 114:4,
121:9, 176:8, 216:3,
234:18, 234:20
**phones** [2] - 83:21,
95:17
**photo** [1] - 219:5

**photographs** [1] -
77:7
**phrase** [6] - 28:6,
32:23, 37:25, 38:1,
49:17, 236:9
**phrased** [2] - 165:14,
166:7
**phrases** [1] - 10:23
**physical** [22] - 144:10,
144:14, 145:4,
195:16, 196:17,
199:25, 200:2,
200:7, 200:11,
201:22, 202:3,
202:6, 218:8,
225:11, 227:17,
227:18, 228:9,
228:11, 230:6,
245:17, 246:6,
246:10
**pick** [2] - 30:5, 108:24
**picking** [1] - 30:4
**picnic** [2] - 233:4,
233:14
**picture** [4] - 30:17,
33:6, 41:8, 226:18
**pictures** [2] - 65:16,
65:19
**piece** [3] - 12:25,
77:23, 87:19
**pieces** [1] - 119:3
**PIERCE** [49] - 1:16,
3:12, 21:10, 21:13,
21:23, 23:8, 23:14,
24:24, 25:23, 26:20,
27:8, 34:24, 37:15,
37:22, 39:2, 39:17,
39:24, 41:21, 45:9,
49:24, 50:21, 53:2,
54:6, 54:13, 63:12,
63:19, 65:7, 65:9,
67:10, 69:16, 69:24,
70:1, 75:12, 115:14,
170:18, 205:3,
205:8, 205:11,
205:15, 205:18,
231:10, 234:2,
239:15, 240:21,
241:10, 242:12,
243:11, 243:24,
246:25
**Pierce** [17] - 1:17,
3:12, 4:24, 65:6,
71:19, 80:4, 84:4,
123:1, 134:19,
162:1, 162:10,
170:17, 231:9,
247:5, 247:10,
247:22, 255:18
**pipe** [5] - 10:2, 24:1,

54:20, 55:1, 56:21
**place** [3] - 87:25, 99:6,
224:7
**placed** [1] - 113:2
**places** [1] - 204:2
**plain** [1] - 162:11
**plainly** [1] - 122:9
**Plaintiff** [1] - 1:4
**plan** [6] - 73:19, 76:9,
86:1, 86:7, 211:22,
214:20
**planned** [2] - 223:25,
233:4
**planning** [3] - 70:18,
83:5, 83:8
**plans** [1] - 189:11
**planter** [6] - 25:2,
25:9, 25:10, 28:19,
28:22, 28:23
**platform** [1] - 67:25
**play** [13] - 53:18,
58:20, 59:3, 60:6,
61:7, 76:2, 86:7,
115:6, 115:8,
221:23, 239:13,
240:19, 242:10
**played** [29] - 21:22,
23:13, 24:23, 25:22,
26:19, 27:7, 53:19,
53:22, 55:14, 56:12,
58:3, 58:22, 59:9,
60:8, 61:8, 98:22,
105:22, 111:12,
115:10, 215:21,
221:2, 225:25,
239:14, 240:20,
241:9, 242:11,
243:10, 243:23,
246:24
**playing** [3] - 26:18,
27:6, 112:20
**Plaza** [3] - 89:11,
133:7, 207:5
**plenty** [1] - 216:10
**plummets** [1] - 217:8
**plural** [1] - 14:3
**podcast** [18] - 61:25,
62:3, 62:6, 62:13,
62:16, 62:22, 63:3,
63:6, 63:24, 64:22,
65:1, 65:4, 67:24,
68:1, 68:6, 68:25,
69:1, 69:13
**podcasts** [2] - 67:13,
88:3
**podium** [3] - 3:6,
79:22, 123:5
**point** [39] - 8:21,
14:21, 25:8, 25:18,
26:11, 30:14, 34:14,

49:21, 71:25, 72:8,
73:12, 85:1, 104:20,
110:4, 119:11,
122:7, 128:17,
131:2, 131:8,
131:14, 132:12,
137:2, 146:1,
146:11, 150:7,
153:17, 157:21,
159:23, 161:7,
162:4, 162:18,
163:19, 173:22,
220:23, 221:24,
225:15, 237:9,
237:10
**pointed** [3] - 133:10,
150:15, 153:23
**pointing** [2] - 32:8,
67:15
**points** [4] - 214:7,
245:13, 246:7, 247:9
**pole** [6] - 24:2, 24:5,
24:10, 33:18, 241:1
**Police** [10] - 22:6,
22:7, 28:11, 28:21,
43:18, 50:18, 217:1,
224:16
**police** [74] - 15:7,
15:11, 15:15, 22:4,
22:14, 23:22, 24:5,
24:9, 25:12, 25:15,
27:14, 47:6, 47:7,
49:10, 49:14, 49:17,
49:22, 50:2, 51:20,
54:22, 54:25, 55:9,
57:2, 59:2, 59:15,
60:20, 60:24, 61:2,
66:5, 66:7, 91:25,
99:23, 100:24,
102:7, 102:9,
102:10, 111:4,
111:8, 120:1, 121:8,
122:15, 125:10,
126:3, 154:21,
155:25, 156:9,
185:25, 206:21,
206:24, 207:8,
208:13, 208:23,
211:7, 211:10,
213:7, 213:15,
213:16, 214:16,
215:14, 215:22,
215:24, 216:17,
220:14, 225:13,
227:8, 228:8, 229:5,
234:11, 235:1,
243:5, 245:12
**policemen** [1] -
101:17
**policies** [2] - 16:3

**policy** [1] - 125:12
**policymakers** [2] -
149:19, 150:1
**political** [2] - 68:9,
94:18
**politically** [1] - 29:21
**ponytail** [1] - 72:18
**popcorn** [1] - 150:12
**portion** [3] - 115:20,
178:7, 206:6
**portions** [2] - 72:14,
250:11
**position** [14] - 6:3,
7:3, 123:6, 150:21,
166:15, 166:16,
166:20, 167:24,
168:4, 172:5, 203:3,
204:3, 243:1, 244:4
**positive** [1] - 68:9
**possession** [1] -
199:15
**possibility** [1] - 254:5
**possible** [7] - 6:11,
209:19, 230:16,
254:3, 255:23,
256:5, 257:8
**possibly** [1] - 92:1
**post** [10] - 30:13, 32:5,
32:9, 65:16, 65:19,
112:24, 212:15,
213:23, 214:18,
235:25
**posted** [1] - 31:19,
32:7, 32:8, 33:15,
113:8, 198:14,
213:5, 213:18,
213:19, 223:20,
235:21, 235:24,
236:4
**posts** [11] - 33:9,
40:15, 40:18, 40:19,
40:21, 40:24, 61:24,
212:10, 212:14,
212:16, 238:6
**potential** [4] - 51:1,
51:13, 70:3, 74:23
**potentially** [8] - 43:18,
51:12, 73:24, 92:23,
160:5, 162:22,
163:5, 163:12
**pouring** [2] - 112:19
**power** [4] - 42:15,
165:10, 207:22,
208:17
**powerful** [2] - 29:18,
181:13
**practice** [1] - 60:20
**pray** [1] - 34:11
**preached** [1] - 40:10
**preceding** [1] - 133:5

**precisely** [2] - 91:7,
158:2
**precluded** [1] - 112:10
**predicate** [8] - 117:14,
117:21, 144:22,
145:23, 155:12,
162:3, 163:9, 164:9
**prefer** [1] - 167:22
**preferred** [1] - 208:7
**prejudice** [2] - 179:1,
185:20
**prejudicial** [3] - 12:16,
185:18
**preliminary** [1] - 178:4
**premises** [1] - 90:20
**preparation** [2] - 9:15,
189:12
**prepared** [5] - 42:3,
137:2, 177:7, 177:8,
204:19
**preparing** [1] - 234:7
**presence** [4] - 51:3,
192:9, 192:11, 204:4
**present** [13] - 3:3,
12:7, 21:2, 63:3,
63:7, 77:25, 118:18,
152:2, 171:5,
194:22, 197:4,
204:13, 238:25
**presentation** [1] - 7:1
**presented** [5] - 71:21,
183:3, 183:6,
210:23, 251:6
**preserved** [1] - 168:25
**preserving** [1] - 169:3
**preside** [1] - 250:14
**President** [3] - 67:5,
69:10, 223:25
**president** [7] - 29:24,
42:14, 198:19,
198:20, 207:10,
207:23, 223:23
**Presler** [2] - 90:19,
94:20
**pressing** [1] - 148:21
**presumably** [3] -
71:17, 74:5, 92:10
**presumed** [1] - 180:18
**presumption** [1] -
180:19
**Pretrial** [1] - 152:17
**pretty** [12] - 11:24,
12:16, 25:15, 114:6,
126:5, 140:2, 219:1,
219:20, 221:24,
225:8, 226:5, 244:8
**prevalent** [1] - 42:13
**prevent** [16] - 10:9,
24:13, 24:17, 55:20,
60:12, 87:23, 118:9,

156:9, 157:13,
158:5, 207:22,
208:17, 209:3,
240:2, 242:15,
242:22
**preventing** [5] - 47:11,
47:12, 158:22,
207:25, 226:2
**previous** [3] - 23:20,
55:4, 105:16
**previously** [11] - 25:6,
47:18, 51:21, 185:4,
197:17, 198:22,
199:24, 200:16,
201:20, 202:11,
239:20
**pride** [1] - 30:11
**primarily** [1] - 224:6
**Prince** [1] - 208:24
**principal** [1] - 193:7
**principles** [1] - 209:15
**print** [1] - 140:4
**printed** [1] - 173:20
**privilege** [1] - 191:11
**probability** [1] -
185:13
**probable** [5] - 181:11,
190:12, 202:19,
211:21, 212:1
**probe** [1] - 18:25
**problem** [7] - 40:13,
121:25, 143:14,
174:4, 177:19,
177:22, 220:15
**problematic** [3] -
92:25, 94:3, 134:5
**problems** [1] - 240:2
**proceed** [11] - 34:25,
82:3, 86:20, 98:1,
98:4, 174:24,
177:23, 206:14,
236:21, 237:11,
246:2
**proceeding** [57] -
116:12, 120:3,
168:19, 171:14,
171:17, 176:21,
176:22, 176:24,
189:20, 189:22,
190:5, 190:9,
190:10, 190:13,
190:14, 190:15,
190:17, 190:19,
190:21, 191:9,
191:10, 191:13,
191:20, 191:25,
192:7, 192:8,
192:13, 192:14,
192:17, 192:19,
192:21, 192:23,

193:2, 193:14,
193:18, 193:20,
194:1, 194:3, 195:7,
196:21, 210:4,
210:10, 210:11,
210:16, 210:21,
214:23, 217:16,
227:4, 235:14,
236:7, 236:8,
236:20, 236:21,
237:18, 246:1, 247:2
**proceedings** [4] -
39:23, 210:24,
216:25, 258:4
**Proceedings** [2] -
1:24, 257:23
**process** [12] - 24:20,
29:14, 30:11, 33:20,
34:15, 119:24,
199:22, 208:10,
227:3, 235:18,
237:20, 253:19
**produce** [3] - 180:23,
199:16, 226:13
**produced** [1] - 1:25
**proffer** [4] - 4:25,
5:11, 19:9, 19:22
**proffered** [2] - 19:11,
19:24
**proffers** [1] - 5:2
**Program** [2] - 87:13,
87:17
**projectiles** [3] - 26:12,
126:1, 126:3
**promote** [1] - 250:24
**promoted** [1] - 94:8
**promotion** [1] - 40:25
**promotional** [1] -
41:12
**prong** [1] - 119:18
**prongs** [1] - 116:16
**proof** [9] - 139:25,
181:12, 201:15,
209:16, 209:17,
228:4, 230:14,
230:15, 230:16
**proper** [2] - 134:1,
183:16
**properly** [1] - 179:23
**property** [18] - 51:10,
90:23, 99:10, 99:11,
101:19, 101:23,
102:3, 102:6,
145:12, 187:15,
187:17, 199:15,
200:8, 200:14,
202:9, 226:12,
226:18, 226:19
**propose** [1] - 162:8
**proposed** [1] - 176:11

**proposition** [1] -
132:15
**prosecuted** [3] -
80:13, 80:15, 80:25
**prosecution** [5] -
81:4, 133:10,
135:17, 143:8, 188:9
**prosecutor** [1] - 112:4
**prosecutors** [1] -
153:24
**protect** [8] - 124:12,
125:18, 158:19,
159:6, 203:17,
207:1, 232:17
**protected** [13] - 30:1,
62:19, 118:5, 118:7,
150:2, 187:4,
187:22, 198:16,
198:18, 215:8,
217:14, 217:15,
223:21
**protecting** [3] - 16:1,
131:21, 215:12
**protection** [2] -
125:12, 149:16
**protective** [2] -
206:22, 206:24
**protects** [1] - 249:1
**protest** [4] - 45:8,
45:18, 51:14, 234:5
**protestor** [4] - 24:1,
60:5, 138:3, 237:24
**Protestors** [1] - 211:1
**protestors** [20] -
10:18, 22:4, 22:14,
23:21, 29:12, 29:20,
43:19, 59:15, 59:17,
59:18, 99:10,
114:10, 135:6,
136:23, 234:14,
237:17, 241:25,
242:15, 243:2,
243:14
**protests** [1] - 216:23
**proud** [3] - 36:17,
36:19, 37:10
**Proud** [4] - 125:23,
150:24, 168:15,
169:2
**proudly** [1] - 213:19
**prove** [30] - 6:24, 9:9,
88:16, 119:17,
120:10, 121:15,
144:5, 145:10,
153:14, 164:14,
180:23, 181:5,
181:10, 181:25,
182:2, 188:20,
189:17, 190:18,
193:15, 195:3,

195:8, 197:18,
204:11, 204:13,
209:18, 217:13,
227:18, 231:23,
253:14
**proved** [24] - 183:23,
189:6, 190:6,
195:20, 195:23,
196:1, 196:4, 196:7,
198:7, 199:1, 200:5,
200:21, 202:1,
202:12, 202:25,
211:18, 214:3,
214:22, 215:9,
217:12, 218:11,
222:24, 228:14,
252:21
**proven** [12] - 116:9,
116:15, 117:14,
180:6, 180:21,
180:25, 217:19,
226:17, 227:3,
228:10, 230:23,
246:19
**proves** [1] - 210:1
**provide** [3] - 31:9,
43:13, 178:5
**provided** [7] - 77:11,
152:13, 171:18,
233:16, 252:19,
253:5, 253:7
**provides** [1] - 149:23
**proving** [2] - 181:8,
182:21
**provoke** [1] - 204:4
**provoked** [1] - 203:24
**proximity** [1] - 199:4
**PTSD** [3] - 15:14,
15:15, 17:12
**public** [8] - 16:1,
16:15, 35:6, 88:19,
92:17, 92:19,
187:11, 224:15
**publicity** [1] - 251:10
**publish** [1] - 23:11
**pull** [4] - 20:13, 20:22,
91:10, 95:6
**pulled** [1] - 30:19
**punching** [1] - 218:18
**punishment** [2] -
252:19, 252:20
**pure** [2] - 54:16, 54:19
**purported** [1] - 157:10
**purportedly** [1] -
221:4
**purpose** [16] - 62:2,
77:7, 148:13,
148:14, 148:15,
149:4, 168:20,
191:5, 192:7, 192:9,

193:24, 195:4, 211:24, 214:2, 214:14, 231:7

**purposes** [9] - 6:16, 7:16, 8:4, 18:14, 145:6, 148:16, 165:23, 196:19, 220:8

**pursuant** [3] - 81:20, 223:7, 232:7

**push** [19] - 10:3, 10:5, 27:19, 28:13, 49:10, 49:18, 56:23, 60:5, 60:17, 60:24, 64:6, 67:22, 71:9, 128:8, 135:1, 135:12, 220:23, 222:2, 251:8

**pushed** [18] - 7:18, 8:3, 8:19, 22:10, 33:21, 54:22, 55:3, 55:5, 55:23, 56:22, 111:8, 111:17, 111:19, 134:21, 220:13, 240:6, 242:4, 242:5

**pushing** [25] - 7:14, 8:8, 10:17, 12:9, 27:14, 27:15, 27:24, 28:21, 49:12, 49:22, 50:2, 59:3, 59:20, 59:22, 63:21, 132:24, 136:22, 137:2, 138:16, 209:8, 220:21, 222:5, 227:14, 242:20, 248:6

**Put** [1] - 214:7

**put** [29] - 18:25, 22:9, 24:3, 27:17, 59:16, 62:17, 62:19, 62:23, 70:20, 74:3, 82:6, 86:10, 112:23, 113:4, 116:17, 129:19, 143:8, 143:10, 143:23, 143:24, 144:4, 151:20, 152:11, 154:20, 161:16, 164:5, 172:1, 216:9, 247:25

**puts** [1] - 73:11

**putting** [5] - 73:8, 93:6, 94:16, 96:23, 128:4

### Q

**questions** [17] - 13:2, 13:5, 19:3, 21:19, 34:16, 34:24, 57:7,

57:8, 69:16, 108:20, 113:10, 115:11, 135:3, 178:10, 178:15, 180:12, 230:7

**quick** [2] - 247:9, 256:18

**quickly** [5] - 95:17, 207:4, 211:23, 228:16, 239:1

**quintessential** [3] - 149:25, 236:25, 246:13

**quite** [9] - 24:10, 27:1, 29:9, 29:22, 30:2, 30:8, 48:15, 67:23, 68:22

**quote** [6] - 55:1, 95:21, 210:5, 214:25, 217:21, 217:22

### R

**R.A** [1] - 195:21

**R.N** [2] - 15:10, 196:8

**race** [2] - 87:19, 179:2

**rack** [2] - 111:24, 225:5

**racks** [1] - 223:19

**radio** [1] - 251:2

**raise** [6] - 16:7, 62:6, 79:14, 84:17, 173:25, 177:18

**raised** [6] - 68:13, 128:4, 151:22, 157:21, 234:16, 235:18

**raising** [1] - 16:9

**rallied** [2] - 156:8

**Rallies** [1] - 90:18

**rally** [1] - 89:11

**ran** [4] - 24:2, 54:21, 56:21, 219:1

**random** [1] - 253:18

**rapidly** [2] - 122:1, 133:5

**rather** [20] - 10:23, 57:22, 71:19, 75:15, 78:24, 80:12, 81:14, 81:15, 85:10, 136:9, 157:6, 160:23, 167:23, 171:13, 171:18, 173:23, 174:19, 183:8, 222:17, 254:18

**raw** [1] - 62:23

**reach** [8] - 55:22, 56:23, 66:12, 231:20, 235:7,

238:15, 240:4, 250:19

**reached** [8] - 31:1, 54:23, 55:19, 83:25, 115:1, 147:23, 252:13, 253:1

**reaching** [4] - 183:1, 183:6, 241:2, 250:4

**reacting** [1] - 127:22

**read** [46] - 11:23, 17:9, 17:10, 17:11, 18:12, 31:16, 31:17, 71:17, 71:20, 84:10, 84:11, 85:19, 101:22, 107:12, 143:16, 144:7, 149:13, 149:14, 166:13, 169:6, 169:15, 171:18, 172:20, 173:5, 173:10, 173:14, 173:22, 173:24, 174:21, 191:23, 191:24, 205:17, 205:25, 209:24, 210:14, 214:1, 215:1, 217:23, 221:21, 225:9, 230:3, 251:3, 251:5, 253:6, 255:3

**reading** [6] - 12:3, 174:1, 177:14, 205:1, 205:16, 206:4

**ready** [6] - 21:3, 41:20, 98:3, 142:19, 212:12, 215:25

**real** [5] - 40:3, 124:1, 164:4, 200:13, 202:9

**realistic** [1] - 257:3

**reality** [2] - 51:25, 67:22

**realize** [3] - 16:24, 30:14, 110:1

**realized** [1] - 16:25

**realizes** [2] - 187:5, 190:23

**really** [15] - 14:21, 16:12, 18:14, 25:18, 50:1, 76:11, 88:22, 138:13, 165:20, 175:15, 236:25, 238:1, 239:18, 241:10, 242:21

**reason** [17] - 7:10, 15:22, 24:19, 32:6, 42:13, 63:9, 63:16, 64:16, 83:23, 143:11, 144:11, 155:10, 164:7, 181:15, 181:24, 217:21

**reasonable** [55] - 121:13, 136:18, 144:5, 180:6, 180:21, 181:1, 181:6, 181:9, 181:13, 181:14, 181:19, 181:20, 181:21, 182:2, 182:8, 183:24, 186:18, 188:20, 189:6, 190:7, 190:18, 193:10, 193:16, 195:3, 195:8, 195:21, 195:24, 196:2, 196:5, 196:8, 197:9, 197:24, 198:8, 199:2, 199:14, 200:6, 200:22, 202:2, 203:1, 203:14, 204:14, 209:16, 210:2, 214:23, 217:20, 222:24, 228:15, 230:14, 230:24, 231:24, 238:15, 246:20, 247:14, 252:22, 253:14

**reasonableness** [1] - 185:12

**reasonably** [8] - 130:2, 172:7, 190:19, 203:5, 203:12, 203:17, 203:23, 206:12

**reasoning** [2] - 166:1

**reasons** [3] - 46:11, 62:16, 160:7

**rebolster** [1] - 112:23

**rebuts** [1] - 85:13

**Rebuttal** [1] - 2:12

**rebuttal** [16] - 73:12, 73:13, 74:6, 74:15, 75:1, 76:1, 86:10, 86:15, 115:17, 170:3, 170:20, 174:18, 174:25, 175:3, 176:2, 177:11

**recalled** [1] - 184:7

**receive** [7] - 13:17, 36:24, 180:9, 185:23, 236:13, 251:7, 256:18

**received** [15] - 23:12, 36:7, 36:25, 48:8, 62:10, 62:11, 62:12, 88:5, 98:20, 105:21, 115:9, 176:17, 202:17, 202:23, 217:3

**reasonable** [55] -

**RECEIVED** [1] - 2:14

**recent** [1] - 7:7

**Recess** [5] - 21:1, 77:24, 152:1, 171:4, 205:22

**recess** [2] - 170:1, 211:2

**recessed** [2] - 229:7, 229:8

**recognition** [1] - 44:4

**recognize** [9] - 91:19, 91:21, 95:9, 98:8, 98:12, 98:14, 103:24, 104:5, 123:23, 146:24, 240:15, 257:20

**recognized** [3] - 33:21, 61:20, 61:23

**recollecting** [1] - 185:9

**recollection** [5] - 15:12, 23:4, 28:10, 184:14, 233:23

**recollections** [1] - 184:24

**recommence** [1] - 209:12

**record** [16] - 3:7, 13:17, 16:15, 18:1, 32:21, 48:12, 54:6, 72:2, 82:6, 93:8, 93:23, 171:8, 172:1, 255:9, 255:10, 258:4

**recorded** [2] - 1:24, 201:11

**recording** [2] - 48:14, 253:15

**recordings** [1] - 171:11

**records** [3] - 92:18, 92:19

**recount** [1] - 221:8

**recross** [1] - 2:7

**RECROSS** [1] - 113:12

**RECROSS-EXAMINATION** [1] - 113:12

**recross-Examination**...........  . [1] - 2:7

**red** [8] - 10:3, 33:13, 42:21, 54:22, 56:22, 217:6, 223:6, 223:17

**redacted** [4] - 172:21, 172:25, 173:2, 173:11

**redirect** [4] - 74:23, 111:21, 113:11, 113:14

**Redirect** [2] - 2:4, 2:6
**REDIRECT** [2] - 65:8,
111:22
**redline** [1] - 256:2
**redress** [4] - 27:23,
29:6, 29:17, 232:14
**refer** [4] - 110:4,
178:6, 178:7, 227:20
**reference** [5] - 33:1,
40:21, 41:10,
179:10, 233:24
**referenced** [3] - 33:6,
40:23, 218:19
**references** [2] - 32:22,
43:2
**referencing** [1] - 139:8
**referred** [2] - 24:1,
30:17
**referring** [6] - 10:19,
12:7, 26:15, 63:13,
140:23, 243:24
**refers** [3] - 196:19,
238:7, 244:23
**Reffitt** [1] - 168:18
**reflect** [1] - 9:6
**reflected** [2] - 5:25,
72:14
**reflection** [2] - 181:21,
211:10
**reflects** [2] - 85:22,
97:4
**refuse** [2] - 178:18,
191:10
**refused** [1] - 13:15
**refute** [1] - 247:24
**regard** [12] - 88:13,
90:12, 103:22,
107:2, 116:10,
119:7, 125:13,
130:4, 142:9,
166:23, 171:13,
255:2
**regarding** [2] -
250:16, 250:23
**regardless** [1] -
145:15
**regards** [1] - 120:2
**regret** [2] - 38:1,
229:19
**regrets** [2] - 213:3,
229:20
**regular** [3] - 32:17,
69:8, 254:4
**reinforcements** [1] -
208:23
**reiterate** [1] - 24:19
**rejected** [3] - 5:17,
141:20, 168:9
**rejoin** [1] - 254:4
**related** [6] - 73:21,

139:15, 148:7,
177:9, 233:16,
242:21
**relates** [2] - 11:9, 76:3
**relating** [5] - 5:23,
13:21, 16:9, 93:3,
137:5
**relative** [1] - 139:6
**relatively** [1] - 235:13
**release** [1] - 234:5
**released** [1] - 170:5
**relentless** [1] - 207:2
**relentlessly** [3] -
208:14, 218:13,
228:7
**relevance** [6] - 19:5,
39:2, 39:17, 49:24,
73:2, 141:14
**relevant** [12] - 5:8,
15:23, 15:25, 16:2,
71:7, 84:23, 100:12,
100:17, 202:25,
206:6, 250:6, 257:5
**relied** [1] - 146:2
**relies** [1] - 144:14
**religious** [1] - 68:10
**reluctant** [2] - 128:14,
140:5
**rely** [13] - 6:23, 6:24,
64:10, 93:12,
145:16, 145:20,
145:25, 162:2,
164:18, 165:2,
179:19, 203:25,
223:4
**relying** [11] - 9:9,
120:17, 120:19,
137:5, 137:15,
142:1, 145:1,
145:22, 161:21,
162:24, 164:11
**remain** [3] - 140:11,
198:13, 200:10
**remainder** [1] - 4:18
**remained** [3] - 198:9,
209:5, 253:23
**remaining** [6] - 3:23,
4:19, 198:5, 224:21,
244:7, 253:22
**remains** [2] - 175:12,
180:19
**remark** [1] - 229:23
**remarks** [1] - 234:10
**remedies** [1] - 161:16
**remedy** [1] - 205:19
**remember** [27] -
44:20, 44:23, 58:17,
117:4, 170:7,
184:23, 209:21,
211:9, 213:10,

213:11, 215:12,
216:4, 216:19,
217:8, 218:17,
220:11, 221:18,
221:21, 222:6,
225:8, 228:3, 230:1,
230:12, 230:14,
231:23, 239:16,
246:19
**remembered** [1] - 20:3
**remembers** [1] - 220:3
**remind** [4] - 148:9,
223:9, 228:6, 251:15
**reminded** [2] - 129:24,
136:17
**reminder** [5] - 78:2,
83:25, 116:2, 224:3,
231:3
**reminders** [1] - 254:22
**remorse** [1] - 69:1
**remove** [2] - 27:21,
28:5
**removed** [1] - 125:15
**removing** [2] - 30:6,
209:4
**rendered** [1] - 178:12
**renew** [1] - 116:8
**renewed** [1] - 116:6
**repeat** [4] - 34:5,
38:15, 178:4, 223:13
**repeated** [1] - 242:24
**repeatedly** [11] - 8:6,
72:6, 119:25, 121:8,
128:20, 128:21,
156:1, 208:14,
244:2, 249:5, 251:1
**repeating** [3] - 34:4,
171:14, 244:2
**rephrase** [3] - 43:11,
45:14, 109:21
**replace** [1] - 179:18
**replaces** [2] - 253:11,
253:12
**replay** [5] - 55:12,
56:11, 58:2, 59:7,
111:10
**reply** [1] - 32:7
**report** [3] - 15:10,
15:14, 16:3
**Reporter** [1] - 1:21
**REPORTER** [2] -
258:1, 258:9
**reporter** [1] - 87:4
**reporting** [1] - 16:5
**reports** [2] - 251:2,
251:5
**represent** [1] - 252:23
**representation** [1] -
23:5
**represented** [1] -

78:14
**representing** [1] -
125:24
**represents** [1] -
183:18
**reputation** [2] - 64:11,
64:13
**request** [8] - 75:25,
79:11, 79:12,
147:20, 148:10,
153:9, 153:21,
168:20
**requested** [1] - 122:23
**require** [7] - 117:20,
180:22, 182:25,
189:16, 201:15,
218:18, 228:4
**required** [10] - 119:9,
155:13, 181:25,
194:16, 202:18,
204:11, 209:18,
229:16, 231:14,
250:8
**requirement** [2] -
119:14, 194:17
**requirements** [1] -
193:16
**requires** [4] - 232:20,
232:21, 245:3,
245:20
**reread** [1] - 206:2
**research** [4] - 116:3,
251:24, 254:8,
254:23
**reservations** [1] -
201:8
**reserve** [1] - 122:20
**resign** [1] - 206:5
**resist** [10] - 118:4,
119:7, 136:11,
197:11, 218:16,
219:14, 221:13,
222:10, 222:21,
235:10
**resistance** [9] - 27:16,
27:20, 28:2, 43:3,
43:5, 61:15, 61:17,
243:17
**resisted** [5] - 196:9,
197:22, 198:2,
218:4, 238:19
**resisting** [4] - 122:15,
195:13, 209:6,
217:24
**resists** [1] - 162:12
**resolve** [3] - 68:16,
141:11, 231:18
**resolved** [1] - 125:20
**respect** [63] - 6:14,
7:3, 9:24, 10:1, 10:5,

15:10, 16:17, 42:11,
46:23, 48:4, 65:24,
68:12, 78:1, 118:22,
120:11, 121:1,
123:6, 126:13,
126:18, 140:10,
144:8, 144:12,
147:19, 151:11,
157:1, 160:16,
166:16, 166:20,
168:15, 189:3,
189:9, 195:21,
195:24, 196:2,
196:5, 196:8,
232:24, 233:15,
234:6, 234:8,
234:15, 234:24,
235:1, 235:9,
235:12, 236:17,
237:24, 238:12,
239:12, 239:21,
240:10, 240:16,
240:19, 241:4,
242:2, 243:11,
244:25, 245:7,
245:10, 246:9,
249:21, 249:23,
250:22
**respected** [1] - 42:13
**respectively** [1] -
137:25
**respond** [1] - 117:24
**response** [7] - 11:24,
12:3, 27:3, 29:14,
51:24, 128:21,
225:22
**responsibility** [4] -
34:21, 178:22,
179:9, 183:18
**rest** [10] - 55:8, 73:9,
74:5, 74:24, 74:25,
76:24, 76:25, 86:1,
86:3, 253:22
**restate** [1] - 63:14
**rested** [1] - 170:3
**resting** [1] - 70:18
**restrained** [1] - 213:22
**restrict** [1] - 128:11
**restricted** [55] - 107:3,
112:15, 117:13,
117:14, 117:20,
117:21, 121:3,
121:5, 121:12,
121:16, 121:20,
144:10, 163:16,
198:5, 198:9,
198:12, 198:14,
198:15, 198:24,
199:4, 199:12,
199:23, 199:25,

200:2, 200:8, 200:9, 200:15, 209:4, 209:5, 210:7, 223:1, 223:15, 223:19, 223:20, 224:21, 224:22, 224:24, 225:5, 226:6, 227:17, 227:18, 228:14, 244:7, 244:11, 244:13, 244:21, 244:24, 245:1, 245:13, 245:14, 245:15, 247:11, 247:13, 247:14
**restroom** [1] - 175:6
**rests** [1] - 115:15
**result** [7] - 31:6, 185:8, 185:9, 185:10, 185:11, 217:5, 234:8
**results** [2] - 187:15, 187:16
**resume** [6] - 17:22, 21:9, 211:14, 212:5, 229:9, 237:25
**RESUMED** [1] - 21:11
**retire** [1] - 251:14
**retread** [1] - 15:9
**retreat** [3] - 29:1, 158:8, 242:16
**return** [7] - 178:11, 230:24, 247:3, 249:17, 249:22, 250:13, 252:24
**reveal** [1] - 252:11
**Revere** [3] - 41:7, 41:8, 65:19
**revere** [2] - 42:12, 65:24
**Revere's** [1] - 41:14
**reverted** [1] - 52:18
**review** [19] - 20:23, 74:13, 95:19, 97:19, 97:22, 98:1, 105:5, 139:21, 151:23, 169:16, 171:8, 218:15, 221:19, 230:12, 246:18, 255:3, 255:7, 256:4, 256:19
**reviewed** [4] - 9:4, 14:25, 106:13, 230:2
**reviewing** [3] - 100:11, 220:3, 230:22
**revisit** [1] - 73:18
**revolution** [1] - 43:1
**Revolution** [9] - 40:22, 40:23, 41:11,

42:7, 42:9, 42:11, 42:19, 65:22, 238:8
**Revolutionary** [1] - 42:20
**revolve** [1] - 210:6
**revolves** [3] - 16:21, 217:23, 230:18
**rid** [1] - 235:4
**Ride** [1] - 40:24
**ride** [1] - 41:14
**rigged** [1] - 212:14
**rights** [7] - 27:25, 33:20, 33:24, 149:2, 191:17, 244:5, 249:1
**riot** [3] - 26:10, 118:11, 158:22
**rioter** [2] - 60:25, 229:10
**rioters** [11] - 60:23, 155:25, 158:20, 207:4, 207:13, 207:21, 209:4, 209:10, 215:25, 222:2, 229:12
**rioters'** [1] - 207:2
**riots** [1] - 87:18
**risers** [2] - 224:7, 234:25
**risk** [3] - 131:18, 137:6, 204:3
**rival** [1] - 11:13
**roadways** [1] - 201:8
**robbing** [1] - 126:3
**Rockwell** [1] - 87:7
**rode** [1] - 89:13
**Roger** [1] - 3:14
**ROGER** [1] - 1:16
**roll** [1] - 105:18
**room** [8] - 32:7, 179:15, 239:3, 249:24, 250:13, 251:14, 252:2, 254:19
**Room** [1] - 1:22
**roots** [1] - 96:15
**Roots** [46] - 3:14, 4:24, 5:2, 8:22, 11:23, 14:20, 16:9, 17:15, 18:23, 20:20, 77:15, 80:4, 82:22, 84:4, 84:25, 85:6, 92:8, 92:10, 93:1, 96:20, 98:4, 100:5, 103:20, 105:11, 115:6, 123:1, 123:5, 127:11, 128:4, 139:8, 141:11, 149:5, 151:17, 151:21, 152:6, 152:20, 153:7,

162:1, 162:10, 163:19, 167:22, 168:25, 169:24, 170:16, 255:18, 257:4
**ROOTS** [201] - 1:16, 4:1, 4:5, 4:16, 5:13, 7:17, 7:22, 8:18, 8:24, 9:3, 9:7, 9:14, 11:11, 12:13, 12:20, 13:4, 13:9, 13:16, 13:22, 13:25, 14:2, 15:4, 15:18, 16:2, 17:5, 17:8, 17:10, 17:18, 18:24, 19:12, 20:21, 70:7, 70:14, 70:19, 70:23, 71:2, 71:8, 71:13, 71:20, 73:7, 76:16, 77:1, 77:16, 78:13, 78:16, 79:4, 79:8, 79:19, 82:7, 82:23, 84:7, 84:9, 84:15, 85:2, 85:8, 85:12, 85:23, 86:2, 86:21, 87:2, 88:2, 91:10, 91:13, 91:15, 91:16, 92:4, 92:12, 92:15, 92:19, 93:5, 94:7, 94:14, 95:13, 96:2, 96:16, 96:23, 97:7, 97:12, 97:15, 98:5, 98:16, 98:21, 98:23, 100:9, 100:14, 100:19, 101:6, 102:18, 103:4, 103:8, 103:21, 104:10, 104:13, 104:15, 104:24, 105:13, 105:18, 105:23, 106:17, 106:20, 106:21, 107:1, 107:22, 108:20, 109:18, 111:23, 112:12, 112:13, 113:10, 114:12, 114:17, 114:22, 114:24, 115:8, 115:11, 116:8, 123:3, 123:13, 123:18, 123:23, 124:5, 124:9, 124:16, 125:8, 125:22, 126:8, 126:14, 126:19, 129:24, 130:22, 131:1, 131:24, 132:3, 132:14, 132:19, 132:22, 133:1, 133:4, 133:9, 133:18, 133:24,

134:7, 134:10, 134:13, 134:20, 134:25, 135:17, 135:20, 136:3, 136:9, 136:17, 136:22, 137:8, 137:11, 138:7, 138:12, 139:21, 141:16, 141:21, 142:8, 142:13, 142:18, 143:5, 143:22, 148:4, 149:6, 149:11, 149:14, 149:24, 150:10, 150:15, 151:1, 152:9, 153:11, 154:13, 162:11, 163:14, 166:22, 167:2, 167:7, 167:11, 167:21, 168:1, 168:3, 168:10, 168:12, 169:3, 169:25, 171:23, 171:25, 172:18, 173:17, 174:8, 174:12, 176:14, 177:3, 255:20, 256:12, 257:7, 257:13, 257:20
**roughly** [3] - 78:4, 138:2, 139:1
**round** [1] - 26:15
**row** [1] - 67:11
**rows** [1] - 25:14
**RPR** [1] - 1:21
**RSS** [1] - 251:9
**rubber** [2] - 125:25, 126:1
**rule** [4] - 144:3, 178:15, 201:16, 228:5
**Rule** [2] - 116:8, 122:20
**ruled** [6] - 5:12, 11:12, 13:19, 15:6, 16:8, 257:7
**rules** [3] - 178:1, 178:3, 250:15
**rulings** [1] - 15:9
**Rummens** [10] - 3:10, 53:17, 53:20, 55:12, 56:11, 58:2, 58:20, 59:7, 60:6, 61:7
**run** [2] - 31:8, 55:22, 222:18
**running** [4] - 56:4, 156:10, 219:21, 225:21
**runs** [1] - 219:7

**rush** [1] - 27:3
**rushed** [2] - 23:21, 207:3
**rushing** [1] - 54:20

## S

**S-u-m-r-a-l-l** [1] - 87:5
**S.A** [1] - 196:2
**sacred** [1] - 249:1
**sacrifice** [2] - 42:22, 65:25
**sacrifices** [1] - 42:21
**safe** [5] - 22:12, 22:19, 24:14, 29:10, 30:3
**safely** [1] - 90:8
**safer** [1] - 165:23
**Safeway** [4] - 216:20, 217:6, 233:17, 233:19
**sake** [1] - 18:13
**sales** [2] - 217:6, 233:18
**Samantha** [1] - 3:8
**SAMANTHA** [1] - 1:13
**SARA** [1] - 1:21
**Sara** [2] - 258:3, 258:8
**sat** [2] - 9:15, 228:18
**satisfied** [1] - 120:20
**satisfy** [1] - 194:17
**save** [2] - 131:21, 220:24
**saving** [1] - 221:4
**saw** [53] - 15:1, 15:2, 27:9, 41:1, 41:4, 41:7, 43:21, 45:20, 46:4, 46:11, 47:6, 47:23, 48:14, 50:10, 51:19, 54:10, 54:20, 54:23, 55:18, 56:21, 84:19, 87:18, 89:17, 97:4, 105:1, 106:22, 107:4, 107:6, 107:8, 111:1, 111:24, 125:15, 125:20, 131:16, 182:11, 182:13, 182:15, 182:16, 211:13, 212:7, 221:3, 222:15, 225:3, 233:3, 240:3, 241:13, 243:12, 243:25, 244:1, 244:9, 247:16, 248:17
**scene** [11] - 22:25, 25:6, 98:24, 102:19, 104:5, 104:8, 240:8, 240:21, 240:25, 241:1, 241:20

**scenes** [3] - 21:17, 21:18, 30:2
**scheduled** [2] - 90:22, 94:19
**school** [1] - 95:5
**scientific** [1] - 182:1
**scope** [3] - 112:10, 112:12, 129:18
**Scott** [2] - 90:19, 94:19
**scouring** [1] - 31:23
**screaming** [2] - 22:10, 40:11
**screen** [5] - 91:17, 95:7, 96:17, 98:8, 222:8
**screenshots** [2] - 18:3, 18:5
**scroll** [1] - 91:23
**scrum** [3] - 4:1, 12:14, 23:20
**sea** [1] - 41:17
**SEAN** [1] - 1:13
**Sean** [1] - 3:10
**seat** [2] - 3:21, 253:24
**seats** [2] - 253:19
**Second** [1] - 41:10
**second** [33] - 6:20, 8:24, 24:4, 25:24, 56:19, 57:17, 57:20, 73:21, 102:8, 123:15, 124:14, 172:10, 176:18, 186:20, 188:23, 190:9, 193:19, 196:11, 198:10, 199:5, 200:8, 200:24, 202:4, 205:11, 208:3, 214:24, 222:23, 229:3, 230:10, 235:20, 238:4, 238:21, 247:24
**second-to-last** [1] - 172:10
**seconds** [19] - 7:12, 8:3, 10:13, 20:1, 53:21, 55:13, 59:8, 97:21, 111:11, 137:9, 137:12, 137:18, 220:16, 220:17, 220:20, 220:23, 220:24, 229:4
**Secret** [7] - 50:20, 50:22, 188:3, 198:16, 198:18, 223:22, 233:10
**section** [1] - 99:12
**secure** [1] - 192:4

**security** [2] - 238:1, 238:3
**Security** [1] - 188:2
**Sedition** [3] - 31:17, 31:21, 32:8
**see** [105] - 5:17, 19:8, 20:8, 21:24, 22:25, 23:2, 23:16, 23:23, 25:1, 25:8, 25:12, 25:25, 26:22, 26:23, 28:18, 29:1, 32:3, 33:25, 43:11, 44:16, 44:17, 46:8, 48:13, 51:11, 57:4, 58:7, 59:3, 59:6, 59:14, 59:23, 61:6, 66:18, 67:19, 68:11, 71:25, 72:8, 73:2, 80:21, 86:9, 88:20, 89:23, 91:17, 91:18, 95:7, 99:24, 101:10, 101:13, 101:21, 102:10, 102:12, 102:21, 107:9, 110:17, 110:20, 110:21, 110:24, 111:7, 113:5, 121:2, 121:23, 126:25, 127:8, 137:4, 141:14, 148:19, 149:22, 151:25, 160:13, 177:18, 211:10, 212:10, 216:15, 219:5, 219:11, 219:19, 220:10, 220:12, 220:17, 221:25, 222:1, 222:4, 224:7, 224:9, 226:17, 227:15, 229:22, 229:25, 230:3, 230:5, 232:11, 233:3, 234:19, 234:22, 239:6, 240:25, 241:1, 241:10, 244:12, 244:16, 248:12, 248:13, 250:9, 257:5, 257:18
**seeing** [3] - 98:9, 110:15, 185:8
**seeking** [2] - 123:2, 149:10
**seem** [10] - 26:22, 48:16, 103:11, 103:13, 106:8, 112:22, 131:22, 143:13, 162:9, 176:6
**sees** [2] - 159:2, 214:6
**select** [2] - 250:13,

250:16
**selected** [1] - 253:19
**selecting** [1] - 250:20
**selection** [2] - 173:7, 253:18
**self** [99] - 53:14, 82:13, 122:23, 123:10, 123:23, 123:24, 128:10, 128:18, 129:4, 129:19, 130:14, 132:3, 132:7, 132:9, 132:10, 132:16, 133:16, 135:9, 135:15, 136:1, 136:7, 136:13, 136:15, 136:17, 136:21, 138:4, 139:19, 140:9, 144:9, 144:18, 144:21, 145:2, 145:17, 145:23, 146:3, 146:5, 146:7, 146:15, 147:10, 147:11, 155:3, 155:11, 155:17, 156:19, 157:2, 158:17, 158:23, 160:1, 160:22, 161:19, 162:14, 162:22, 163:3, 163:12, 163:17, 163:20, 164:8, 164:24, 164:25, 165:1, 165:8, 165:16, 165:18, 166:16, 167:9, 167:13, 167:17, 167:25, 168:5, 168:6, 169:11, 172:2, 172:3, 172:5, 172:12, 172:14, 173:15, 203:4, 203:15, 204:1, 204:5, 204:7, 204:9, 204:12, 204:14, 205:4, 206:7, 228:24, 245:11, 245:18, 246:3, 247:22, 248:24
**self-incrimination** [2] - 82:13, 191:12
**senator** [1] - 210:25
**senators** [1] - 95:1
**send** [6] - 49:3, 69:8, 178:11, 252:4, 253:1, 256:2
**sending** [2] - 249:24, 254:18
**sense** [14] - 69:17, 166:18, 172:23, 173:18, 175:1, 175:4, 212:2, 212:3, 218:3, 230:18, 230:19, 230:20, 232:8
**sent** [2] - 84:2, 84:3
**sentence** [5] - 77:1, 84:10, 205:12, 206:2, 206:4
**separate** [11] - 22:15, 71:1, 71:5, 72:12, 129:5, 135:5, 136:12, 150:6, 249:15, 249:17

135:15, 136:1, 136:7, 136:13, 136:15, 136:17, 136:21, 138:4, 140:9, 144:9, 144:18, 144:21, 145:17, 145:23, 146:3, 146:5, 146:7, 146:15, 147:10, 147:11, 155:3, 155:11, 155:17, 156:19, 157:2, 158:17, 158:23, 160:1, 160:22, 161:19, 162:14, 162:22, 163:3, 163:12, 163:17, 163:20, 164:8, 164:24, 164:25, 165:1, 165:8, 165:16, 165:18, 166:16, 167:9, 167:13, 167:17, 167:25, 168:5, 168:6, 169:11, 172:2, 172:3, 172:5, 172:12, 172:14, 173:15, 203:4, 203:15, 204:1, 204:5, 204:7, 204:9, 204:12, 204:14, 205:4, 206:7, 228:24, 245:11, 245:18, 246:3, 247:22, 248:24
**self-incrimination** [2] - 82:13, 191:12
**senator** [1] - 210:25
**senators** [1] - 95:1
**send** [6] - 49:3, 69:8, 178:11, 252:4, 253:1, 256:2
**sending** [2] - 249:24, 254:18
**sense** [14] - 69:17, 166:18, 172:23, 173:18, 175:1, 175:4, 212:2, 212:3, 218:3, 230:18, 230:19, 230:20, 232:8
**sent** [2] - 84:2, 84:3
**sentence** [5] - 77:1, 84:10, 205:12, 206:2, 206:4
**separate** [11] - 22:15, 71:1, 71:5, 72:12, 129:5, 135:5, 136:12, 150:6, 249:15, 249:17

**separately** [1] - 249:17
**separating** [1] - 223:6
**Sergeant** [2] - 57:24, 124:20
**serious** [1] - 231:16
**sermons** [3] - 39:10, 39:15, 39:22
**served** [1] - 36:19
**Service** [7] - 50:20, 50:22, 188:3, 198:16, 198:18, 223:22, 233:10
**service** [4] - 36:15, 37:10, 37:13, 254:14
**session** [3] - 190:22, 201:1, 245:23
**set** [12] - 101:17, 106:3, 127:3, 207:6, 217:2, 219:2, 222:14, 223:17, 224:7, 246:15, 246:22
**sets** [1] - 256:7
**setting** [1] - 104:5
**settled** [1] - 89:12
**seven** [1] - 34:5
**Seventh** [1] - 20:17
**several** [9] - 25:14, 26:13, 46:19, 59:18, 80:16, 94:19, 94:25, 99:20, 117:13
**severe** [2] - 218:19, 229:15
**shall** [1] - 18:22
**shape** [1] - 32:13
**share** [5] - 4:7, 33:10, 62:20, 68:2, 68:22
**shared** [3] - 42:2, 70:25, 80:18
**shield** [14] - 11:2, 11:4, 11:5, 22:10, 58:18, 59:4, 59:12, 59:13, 59:17, 126:3, 211:11, 220:11, 248:6, 248:14
**shields** [3] - 26:11, 27:15, 206:24
**shifts** [1] - 180:22
**shipments** [3] - 217:7, 217:9, 217:11
**shirt** [2] - 54:22, 55:8
**shock** [1] - 71:10
**shocking** [1] - 17:11
**shooting** [1] - 126:3
**short** [5] - 76:7, 172:22, 204:21, 219:2, 224:7
**shortened** [1] - 173:1
**shorter** [1] - 20:7

**shorthand** [1] - 1:24
**shortly** [1] - 48:13
**shot** [1] - 26:11
**shoulder** [2] - 27:18, 243:15
**shouting** [1] - 39:1
**shoved** [4] - 55:8, 57:1, 57:19, 57:20
**show** [29] - 20:13, 28:1, 33:6, 34:10, 56:4, 58:1, 72:11, 83:2, 85:21, 85:23, 85:25, 88:12, 96:20, 96:23, 98:21, 113:18, 116:20, 117:16, 121:11, 130:10, 155:23, 155:24, 194:4, 194:5, 197:21, 218:13, 228:25, 238:18, 239:6
**showed** [8] - 38:25, 40:4, 49:15, 55:4, 117:15, 182:18, 210:24, 242:4
**showing** [1] - 77:7
**Showing** [1] - 201:9
**shown** [8] - 96:3, 116:15, 117:9, 117:12, 137:5, 185:17, 226:8, 226:24
**shows** [27] - 9:2, 10:16, 20:7, 25:11, 56:14, 89:5, 100:19, 119:22, 119:23, 121:19, 126:24, 127:12, 133:3, 133:4, 138:13, 138:19, 138:23, 139:7, 148:16, 150:3, 195:1, 219:1, 225:4, 225:8, 248:2, 248:6, 257:8
**shy** [1] - 241:18
**shying** [1] - 165:13
**side** [25] - 62:20, 62:23, 63:22, 64:7, 68:20, 68:22, 74:13, 75:8, 75:21, 82:5, 85:1, 85:7, 88:9, 89:25, 99:7, 111:8, 113:14, 165:13, 183:8, 183:11, 183:13, 183:15, 185:18, 207:3, 225:18
**sides** [8] - 60:14, 63:1, 76:10, 76:12, 115:24, 168:8,

172:23, 177:12
**sidewalk** [4] - 99:7, 101:18, 102:12, 113:18
**Sierra** [1] - 128:24
**sign** [11] - 117:15, 117:17, 121:12, 229:25, 230:3, 230:4, 230:5, 244:12, 244:14, 253:2, 253:4
**signage** [1] - 101:3
**signal** [3] - 60:15, 60:16, 90:1
**SIGNATURE** [1] - 258:9
**signature** [1] - 5:15
**signatures** [1] - 255:15
**signed** [3] - 172:3, 252:5, 252:7
**signs** [25] - 78:4, 100:23, 101:21, 103:20, 103:22, 107:2, 107:9, 107:11, 112:23, 121:3, 121:5, 223:18, 225:1, 225:2, 225:4, 225:11, 225:12, 225:22, 229:22, 230:5, 230:6, 244:10
**silent** [1] - 34:4
**similar** [8] - 10:5, 126:8, 155:6, 159:1, 223:4, 226:5, 244:18, 245:13
**similarities** [1] - 209:25
**similarly** [2] - 164:18, 180:12
**Simone** [1] - 94:18
**simply** [11] - 118:3, 131:15, 132:5, 135:11, 231:17, 231:19, 235:9, 236:15, 236:19, 237:15, 242:16
**simultaneous** [1] - 192:9
**sing** [1] - 34:7
**singforfreedom** [1] - 34:10
**singing** [1] - 69:9
**single** [9] - 34:7, 163:2, 223:13, 229:10, 232:11, 237:24, 239:3, 246:19
**sit** [5] - 63:16, 141:4,

174:16, 175:2, 249:13
**sitting** [4] - 10:10, 33:22, 206:19, 222:5
**situation** [21] - 22:16, 27:4, 30:13, 44:8, 49:7, 50:2, 50:5, 96:24, 107:15, 121:21, 124:13, 125:24, 158:2, 159:1, 160:21, 164:18, 170:24, 212:4, 225:20, 241:19, 243:12
**size** [2] - 90:3, 90:7
**skin** [1] - 26:5
**sky** [1] - 216:13
**slams** [1] - 11:1
**sleep** [1] - 182:16
**slight** [2] - 136:4, 136:6
**slightly** [4] - 45:17, 123:14, 174:4, 242:5
**slurs** [1] - 40:11
**small** [2] - 205:25, 254:12
**smaller** [1] - 183:11
**smearing** [1] - 16:23
**smell** [1] - 237:9
**smiley** [1] - 32:1
**Smith** [8] - 11:16, 12:13, 19:4, 19:13, 70:23, 72:3, 83:16
**smoking** [1] - 127:10
**smoothly** [1] - 208:10
**snapped** [1] - 51:25
**snow** [5] - 182:11, 182:13, 182:16, 223:18
**snub** [1] - 32:11
**so-called** [1] - 136:24
**social** [4] - 33:9, 88:4, 235:22, 238:6
**society** [1] - 213:8
**soldiers** [4] - 41:1, 41:16, 42:2, 42:3
**sole** [9] - 120:12, 148:13, 168:19, 178:21, 179:8, 184:1, 192:7, 211:24
**solely** [4] - 120:17, 120:19, 179:3, 251:6
**soliciting** [1] - 193:24
**someone** [23] - 17:10, 40:8, 49:22, 88:20, 118:17, 119:5, 129:20, 136:13, 139:19, 154:19, 158:4, 159:11, 163:8, 164:17,

176:4, 193:11, 197:3, 221:7, 229:2, 229:11, 238:24, 239:8
**sometimes** [3] - 183:14, 210:7, 250:6
**somewhat** [1] - 159:5
**somewhere** [2] - 113:5, 119:5
**song** [1] - 69:11
**sons** [2] - 216:16, 227:15
**soon** [3] - 43:20, 251:12, 256:5
**sorry** [15] - 74:19, 124:19, 142:22, 143:18, 145:3, 158:13, 160:10, 177:6, 190:18, 199:10, 207:5, 210:20, 228:13, 234:16, 256:17
**sort** [18] - 10:17, 16:9, 22:4, 22:8, 26:22, 30:13, 52:23, 100:23, 124:10, 125:19, 132:3, 133:10, 138:15, 139:13, 143:13, 152:11, 238:11, 243:16
**sound** [2] - 96:9, 96:10
**sounds** [5] - 86:7, 110:10, 173:17, 174:8, 255:20
**source** [4] - 95:22, 95:23, 138:23, 251:8
**sources** [1] - 64:10
**Southeast** [1] - 201:6
**sovereign** [1] - 64:4
**space** [8] - 135:5, 135:6, 136:5, 138:16, 169:9, 242:18, 242:22, 248:12
**speakers** [5] - 90:20, 93:6, 94:7, 94:19, 109:24
**speaking** [3] - 13:9, 106:7, 210:10
**speaks** [4] - 119:11, 131:24, 222:14, 248:11
**special** [1] - 13:21
**Special** [5] - 15:7, 15:8, 216:19, 217:8, 229:11
**specific** [17] - 6:11, 9:16, 14:21, 18:2,

20:4, 59:23, 59:25, 78:6, 92:15, 100:24, 139:17, 178:2, 178:3, 201:16, 228:4, 228:6, 250:15
**specifically** [8] - 66:10, 67:15, 79:5, 100:8, 138:12, 151:13, 212:14, 214:18
**specifics** [2] - 19:22, 94:15
**specify** [1] - 6:10
**spectator** [1] - 194:23
**speculate** [3] - 50:1, 51:2, 183:22
**speculation** [2] - 41:21, 181:24
**speech** [9] - 27:22, 40:5, 62:19, 89:20, 230:8, 233:3, 234:14, 246:21
**speeches** [2] - 233:3, 233:7
**spell** [1] - 87:3
**spend** [4] - 218:25, 219:24, 227:11, 228:22
**spent** [2] - 58:8, 228:20
**split** [1] - 104:23
**spoken** [4] - 79:13, 109:8, 109:13, 109:19
**spokesperson** [1] - 250:15
**sponsorship** [1] - 62:9
**sporting** [1] - 46:9
**sports** [1] - 46:17
**Spotify** [1] - 62:9
**spray** [7] - 26:5, 26:7, 26:13, 28:25, 48:23, 121:8, 244:1
**sprayed** [2] - 27:18, 28:24
**squared** [1] - 75:5
**squares** [1] - 201:7
**stacked** [3] - 102:11, 112:25, 113:2
**staffer** [1] - 210:25
**stage** [1] - 189:7
**staged** [1] - 113:3
**staging** [4] - 106:5, 106:17, 106:22, 207:5
**stairs** [33] - 23:25, 25:3, 25:11, 27:13, 30:6, 44:25, 45:2, 55:9, 55:18, 56:5,

56:8, 56:15, 56:18, 56:25, 57:6, 57:11, 57:20, 57:21, 58:5, 58:6, 58:9, 67:2, 67:6, 114:5, 123:19, 127:18, 127:20, 136:23, 156:23, 219:2, 222:15, 224:7
**stamp** [3] - 19:23, 138:19, 138:22
**stamps** [2] - 10:24, 18:4
**STAND** [1] - 21:11
**stand** [48] - 15:13, 17:12, 27:17, 29:3, 33:12, 34:9, 34:11, 36:4, 39:16, 42:23, 47:7, 47:18, 47:24, 50:16, 63:17, 64:16, 68:17, 69:11, 70:21, 71:13, 74:4, 78:23, 81:13, 82:8, 82:24, 85:10, 85:12, 108:6, 117:3, 130:13, 132:15, 134:12, 162:13, 162:15, 170:11, 184:11, 208:13, 211:7, 213:11, 215:14, 215:23, 227:9, 228:8, 228:18, 234:11, 234:12, 244:4
**standing** [11] - 40:13, 46:4, 47:15, 57:13, 58:8, 89:25, 101:16, 101:24, 112:1, 221:16, 243:17
**standpoint** [7] - 22:3, 22:21, 23:19, 25:5, 27:12, 42:9, 236:14
**stands** [3] - 69:7, 162:14, 210:3
**stars** [1] - 69:14
**start** [12] - 20:19, 75:5, 160:6, 173:19, 175:6, 175:19, 175:20, 178:1, 238:1, 238:3, 255:18, 256:17
**started** [14] - 13:11, 33:14, 47:6, 61:25, 87:17, 90:6, 210:24, 220:21, 233:6, 233:7, 235:17, 237:5, 237:9, 240:7
**starting** [4] - 3:7, 210:9, 216:13, 222:2
**starts** [4] - 128:18, 212:23, 215:22,

221:24
**state** [14] - 3:6, 16:11, 87:3, 100:13, 131:5, 149:17, 187:19, 188:8, 188:10, 189:7, 203:2, 243:16, 255:9
**Statement** [1] - 152:17
**statement** [5] - 52:24, 108:18, 162:9, 202:16, 250:10
**Statement.................** [1] - 2:12
**Statement.................** ......... [1] - 2:10
**Statement.................** ............ [1] - 2:11
**statements** [7] - 35:6, 35:9, 35:11, 38:19, 150:6, 180:10, 209:20
**STATES** [3] - 1:1, 1:3, 1:10
**states** [1] - 152:23
**States** [32] - 1:13, 1:14, 3:5, 3:7, 3:9, 67:6, 84:13, 115:3, 128:23, 148:24, 187:24, 187:25, 188:3, 188:6, 188:8, 188:10, 191:14, 195:14, 196:10, 200:19, 200:23, 201:5, 201:6, 201:10, 201:22, 202:3, 202:10, 206:18, 207:19, 238:20, 245:21
**stating** [1] - 118:24
**statue** [2] - 98:10, 233:5
**status** [2] - 36:12, 37:9
**statute** [7] - 118:14, 119:18, 162:11, 163:2, 217:23, 223:7, 223:8
**statutes** [4] - 121:2, 129:1, 223:5
**stay** [7] - 60:14, 99:21, 154:25, 212:12, 234:4, 243:6, 255:19
**stayed** [2] - 89:12, 112:16
**staying** [2] - 174:5, 177:19
**steady** [1] - 212:13
**Steal** [2] - 90:18, 230:1
**steal** [2] - 94:17,

149:18
**steep** [1] - 56:8
**stenotype** [1] - 1:24
**step** [13] - 28:18, 54:1, 54:2, 55:7, 56:25, 69:19, 82:10, 82:19, 85:17, 163:2, 188:24, 189:9, 189:16
**stepped** [2] - 22:9, 28:23
**steps** [11] - 10:10, 44:18, 85:11, 124:9, 207:3, 207:5, 211:3, 212:24, 219:7, 248:3, 248:21
**stick** [5] - 32:19, 127:2, 127:3, 127:20, 133:16
**sticks** [2] - 26:10, 135:21
**still** [17] - 14:4, 18:19, 31:11, 68:2, 73:11, 76:20, 108:1, 123:1, 136:19, 137:1, 145:10, 163:9, 213:5, 213:6, 220:18, 224:18, 254:7
**sting** [1] - 207:13
**stipulate** [2] - 76:18, 77:1
**stipulated** [3] - 114:24, 180:1, 180:2
**stipulation** [4] - 84:1, 84:3, 85:19, 180:3
**stood** [4] - 28:4, 55:6, 56:25, 213:7
**stop** [25] - 23:15, 24:25, 25:24, 26:21, 28:12, 28:13, 30:10, 51:24, 60:11, 94:17, 99:25, 105:24, 119:23, 149:18, 173:4, 173:5, 173:13, 174:19, 208:22, 210:12, 232:3, 233:4, 237:3, 246:21
**Stop** [4] - 87:13, 87:17, 90:17, 230:1
**stophate.com** [1] - 88:4
**stopped** [2] - 13:9, 48:13
**stopping** [1] - 154:10
**stopthesteal** [1] - 213:24
**store** [3] - 217:9, 233:17, 233:19

**stores** [1] - 217:6
**storm** [9] - 37:25, 38:4, 44:19, 208:2, 209:13, 211:4, 213:1, 213:3, 229:20
**stormed** [4] - 39:14, 39:21, 39:22, 216:24
**storming** [4] - 207:19, 229:17, 229:18
**story** [8] - 62:20, 63:17, 63:22, 88:9, 88:20, 89:5, 220:15, 221:8
**straight** [2] - 59:23, 74:7
**straightforward** [1] - 244:8
**Straka** [1] - 94:20
**streamlining** [1] - 154:22
**Street** [4] - 1:14, 1:17, 20:17, 201:6
**streets** [1] - 201:8
**strength** [1] - 34:12
**strike** [7] - 16:17, 16:19, 16:20, 31:18, 103:18, 126:12, 128:22
**strikes** [5] - 59:18, 127:22, 131:3, 241:14, 241:16
**striking** [3] - 171:9, 171:10, 212:12
**stripes** [1] - 42:21
**stroke** [1] - 4:9
**stronger** [3] - 149:16, 154:9, 218:22
**strongly** [1] - 189:1
**struck** [2] - 241:14, 241:15
**stuff** [5] - 64:23, 71:20, 87:11, 114:7, 135:11
**stunned** [1] - 52:17
**subject** [1] - 143:19
**subjective** [1] - 119:16
**submit** [7] - 214:3, 215:9, 225:1, 230:21, 231:21, 235:12, 247:12
**subpoena** [3] - 81:21, 142:14, 153:20
**subpoenaed** [6] - 79:7, 79:9, 79:11, 142:12, 143:4, 153:24
**subscriptions** [1] - 251:9
**substance** [1] - 84:22
**substantial** [5] -

155:25, 188:24, 189:9, 189:16, 204:3
**substantive** [5] - 173:8, 173:9, 173:14, 186:13, 189:25
**succeed** [2] - 195:11, 249:4
**successful** [1] - 62:16
**successfully** [2] - 7:20, 8:22
**suddenly** [2] - 38:6, 38:25
**suffering** [1] - 34:12
**sufficient** [3] - 169:15, 193:9, 196:25
**suggest** [2] - 78:9, 253:9
**suggested** [1] - 166:14
**suggesting** [3] - 125:1, 143:16, 164:23
**suggestion** [1] - 32:20
**suggests** [2] - 139:18, 144:6
**sum** [2] - 232:1, 246:13
**summon** [1] - 254:3
**summoned** [1] - 208:24
**SUMRALL** [19] - 2:5, 79:23, 80:2, 80:6, 80:10, 80:14, 80:20, 81:1, 81:5, 81:8, 81:11, 81:14, 81:19, 81:24, 82:2, 82:4, 82:17, 82:21, 86:23
**Sumrall** [35] - 5:1, 5:4, 5:10, 69:24, 70:17, 73:14, 73:17, 73:21, 74:3, 74:22, 77:22, 78:2, 78:12, 78:18, 79:17, 79:21, 82:7, 82:11, 82:24, 83:3, 83:25, 84:5, 84:19, 86:22, 87:5, 87:6, 91:17, 97:12, 98:6, 100:15, 100:19, 105:14, 244:18
**Sumrall's** [3] - 79:1, 84:6, 122:14
**sums** [1] - 241:11
**supervisor** [1] - 16:4
**supervisors** [1] - 155:8
**support** [15] - 68:5, 68:7, 68:14, 69:6, 129:7, 130:18, 136:14, 137:16,

138:10, 155:24, 165:21, 172:15, 204:10, 231:17, 233:1
**supported** [3] - 62:13, 185:16
**supports** [2] - 156:2, 166:12
**suppose** [1] - 161:6
**supposed** [3] - 90:19, 121:7, 235:24
**surge** [1] - 10:9
**surprising** [2] - 19:18, 122:5
**surrounding** [3] - 184:21, 202:15, 211:20
**surroundings** [1] - 121:22
**surveillance** [1] - 225:16
**Surveyor** [1] - 201:12
**suspect** [3] - 7:2, 11:8, 79:24
**sustain** [1] - 164:1
**sustained** [15] - 39:18, 53:3, 94:13, 101:5, 102:17, 103:3, 103:7, 103:17, 104:12, 106:16, 106:25, 107:19, 108:17, 183:20, 233:22
**swarm** [2] - 38:8, 38:10
**sweatshirt** [1] - 221:5
**sweep** [2] - 238:1, 238:3
**swelling** [1] - 26:8
**swing** [1] - 24:4
**swinging** [2] - 125:10, 138:18
**sword** [1] - 41:5
**swore** [4] - 36:2, 50:7, 213:14, 214:15
**sworn** [1] - 179:24
**SWORN** [1] - 86:23
**swung** [1] - 24:2
**symbol** [1] - 43:4
**symbolize** [1] - 42:21
**sympathy** [2] - 179:1, 231:18
**symptoms** [1] - 15:14
**sync** [1] - 139:4
**sync-up** [1] - 139:4
**system** [1] - 34:1

---

**T**

---

**tag** [2] - 41:13, 221:22

**tags** [1] - 213:23
**tainting** [1] - 147:4
**talks** [1] - 127:13
**tall** [1] - 225:16
**tame** [1] - 207:16
**tan** [1] - 221:5
**tangential** [2] - 17:15, 116:25
**tanoncamo** [3] - 31:25, 32:10, 32:14
**tape** [1] - 221:20
**Tarantino** [1] - 152:22
**target** [2] - 59:23, 60:3
**targeted** [2] - 55:1, 59:25
**targeting** [1] - 54:25
**tarp** [3] - 66:1, 66:3, 216:10
**task** [1] - 250:18
**tattoo** [3] - 31:25, 32:20, 32:21
**tattooed** [1] - 32:10
**team** [2] - 17:11, 99:21
**teammate** [1] - 104:2
**tear** [3] - 237:9, 244:1, 254:1
**tease** [2] - 163:6, 165:24
**teasing** [2] - 160:6, 161:13
**technically** [2] - 43:4, 172:25
**television** [2] - 88:10, 251:3
**temporarily** [2] - 198:17, 223:22
**tempted** [1] - 251:3
**ten** [8] - 20:19, 34:5, 76:23, 77:9, 77:21, 131:15, 220:20, 249:11
**tend** [1] - 64:10
**tenets** [2] - 33:12, 65:25
**tension** [1] - 102:21
**tentative** [1] - 73:16
**term** [23] - 28:11, 127:2, 158:7, 187:11, 187:18, 187:22, 188:1, 188:4, 188:7, 190:14, 190:21, 196:22, 197:2, 197:13, 198:14, 198:18, 198:21, 200:11, 201:5, 202:6, 229:17, 229:20, 238:23
**terms** [13] - 37:2, 37:13, 119:12,

160:15, 169:1, 170:3, 197:11, 199:23, 200:15, 201:18, 202:10, 228:13, 236:14
**terrace** [4] - 60:2, 60:13, 156:9, 158:19
**Terrace** [13] - 25:15, 45:3, 47:6, 113:24, 114:2, 122:15, 209:6, 216:14, 224:4, 224:13, 224:14, 247:15
**terrorist** [1] - 32:17
**testified** [55] - 7:17, 9:10, 10:2, 14:3, 14:5, 14:9, 14:15, 15:2, 15:8, 16:25, 17:4, 17:6, 35:21, 36:6, 38:1, 43:13, 47:17, 49:19, 51:21, 55:11, 58:13, 61:14, 61:17, 79:25, 93:10, 109:1, 111:1, 113:14, 116:22, 116:23, 121:2, 126:11, 127:9, 142:11, 154:23, 182:12, 184:1, 184:6, 184:8, 184:17, 220:2, 221:16, 221:21, 234:12, 234:16, 234:21, 236:10, 237:9, 237:14, 239:22, 240:10, 241:24, 242:2, 242:24, 247:18
**testifies** [4] - 73:22, 83:16, 128:9
**testify** [23] - 5:3, 5:4, 5:10, 14:11, 70:17, 78:3, 78:7, 81:15, 81:25, 82:12, 93:22, 96:11, 97:2, 142:16, 142:19, 153:9, 171:10, 191:11, 221:15, 223:16, 240:23, 242:13
**testifying** [6] - 14:14, 80:5, 81:22, 82:14, 183:8, 184:12
**TESTIMONY** [1] - 2:2
**testimony** [85] - 5:6, 14:22, 16:21, 17:22, 21:9, 35:16, 35:21, 38:4, 43:2, 43:6, 45:11, 45:16, 47:14, 48:10, 50:13, 50:17, 52:17, 53:5, 53:24,

54:3, 54:10, 54:13, 55:24, 56:14, 56:18, 57:4, 58:24, 60:13, 66:24, 70:6, 70:10, 74:4, 78:8, 82:10, 83:11, 84:6, 84:8, 84:23, 85:14, 88:9, 93:25, 108:25, 110:3, 116:21, 119:23, 120:7, 121:4, 122:14, 128:12, 153:4, 156:5, 157:1, 157:4, 157:15, 157:19, 157:23, 157:24, 158:1, 159:11, 159:13, 179:24, 182:6, 182:12, 182:17, 183:11, 183:12, 183:25, 185:5, 185:6, 185:13, 185:20, 185:22, 185:24, 185:25, 186:3, 186:5, 216:19, 229:23, 230:1, 237:23, 239:17, 242:8, 244:18, 256:20, 257:9
**Texas** [2] - 87:7, 90:17
**text** [6] - 212:15, 212:16, 225:19, 235:22, 235:23, 251:20
**THE** [454] - 1:1, 1:1, 1:9, 3:15, 4:3, 4:6, 4:9, 4:17, 4:22, 5:17, 6:6, 6:16, 6:19, 7:13, 7:19, 8:1, 8:7, 8:11, 8:17, 8:21, 9:1, 9:5, 9:8, 9:19, 10:11, 10:14, 10:25, 11:3, 11:5, 11:7, 11:23, 12:12, 12:18, 12:22, 13:6, 13:11, 13:20, 13:23, 14:1, 14:7, 14:11, 14:15, 14:18, 15:6, 15:21, 15:25, 16:6, 16:14, 16:19, 17:3, 17:7, 17:9, 17:15, 17:20, 18:7, 18:10, 18:18, 18:21, 18:23, 19:5, 19:16, 20:2, 20:11, 20:16, 20:22, 21:3, 21:7, 21:11, 23:10, 35:1, 37:16, 37:23, 39:3, 39:4, 39:18, 39:25, 41:23, 41:24, 45:12, 45:14, 49:25, 50:1, 50:22, 53:3, 54:7,

54:14, 57:7, 57:9, 63:14, 63:20, 63:21, 65:6, 67:8, 67:9, 69:17, 69:22, 69:25, 70:2, 70:9, 70:17, 70:22, 70:24, 71:4, 71:11, 71:17, 71:24, 72:7, 72:14, 72:18, 72:23, 73:10, 73:20, 73:25, 74:2, 74:24, 75:2, 75:14, 75:17, 75:19, 75:21, 76:2, 76:5, 76:9, 76:18, 76:22, 77:4, 77:13, 77:19, 78:1, 78:15, 78:21, 79:6, 79:12, 79:17, 79:21, 79:24, 80:3, 80:8, 80:11, 80:18, 80:23, 81:2, 81:6, 81:9, 81:12, 81:16, 81:20, 81:25, 82:3, 82:5, 82:9, 82:18, 82:22, 83:5, 83:9, 83:13, 83:23, 84:4, 84:8, 84:11, 84:16, 84:24, 85:3, 85:6, 85:9, 85:15, 85:25, 86:3, 86:9, 86:16, 86:19, 86:23, 86:24, 86:25, 87:22, 87:23, 91:12, 91:14, 92:6, 92:8, 92:10, 92:14, 92:17, 92:21, 92:25, 93:12, 93:18, 94:2, 94:9, 94:11, 94:13, 95:15, 95:19, 95:25, 96:4, 96:14, 96:20, 97:1, 97:10, 97:14, 97:16, 97:19, 97:23, 97:25, 98:4, 98:19, 100:5, 100:7, 100:12, 100:17, 100:21, 101:5, 102:17, 103:3, 103:7, 103:17, 104:12, 104:14, 104:25, 105:2, 105:3, 105:5, 105:8, 105:11, 105:20, 106:16, 106:19, 106:25, 107:19, 108:17, 108:21, 109:19, 109:22, 111:21, 112:9, 112:11, 113:11, 114:14, 114:16, 114:18, 114:19, 114:20, 114:23, 114:25, 115:13, 115:16, 115:19, 116:6, 117:23,

118:13, 119:5,
119:13, 119:16,
120:12, 120:16,
120:22, 120:25,
121:15, 122:5,
122:17, 122:19,
123:4, 123:16,
123:20, 123:22,
124:3, 124:8,
124:14, 124:17,
124:25, 125:4,
125:14, 126:6,
126:13, 126:18,
126:21, 127:6,
128:3, 129:9,
129:15, 130:5,
130:19, 130:24,
131:8, 132:2, 132:5,
132:17, 132:20,
132:25, 133:3,
133:6, 133:16,
133:20, 133:25,
134:8, 134:11,
134:15, 134:22,
135:8, 135:19,
135:22, 136:6,
136:10, 136:19,
137:4, 137:9,
137:13, 137:22,
138:1, 138:10,
138:19, 138:25,
139:9, 139:11,
139:23, 140:20,
140:25, 141:2,
141:4, 141:9,
141:20, 141:25,
142:4, 142:12,
142:15, 142:20,
142:23, 143:2,
143:12, 143:21,
143:25, 144:25,
145:15, 145:22,
146:10, 146:19,
146:24, 147:4,
147:17, 147:25,
148:5, 148:15,
148:19, 149:7,
149:13, 149:21,
150:5, 150:13,
150:21, 150:24,
151:2, 151:6,
151:15, 151:19,
152:3, 152:13,
152:19, 153:6,
153:13, 154:15,
155:16, 156:25,
157:6, 157:15,
157:18, 157:22,
158:13, 158:25,
159:7, 159:14,
159:18, 159:21,

160:10, 160:12,
160:15, 161:3,
161:8, 161:11,
161:18, 161:21,
161:24, 162:7,
162:18, 163:7,
163:11, 163:19,
164:1, 164:10,
164:22, 165:12,
166:3, 166:7,
166:10, 166:19,
166:25, 167:5,
167:9, 167:12,
167:20, 167:22,
168:2, 168:4,
168:11, 168:14,
168:24, 169:5,
169:24, 170:1,
170:7, 170:16,
170:19, 170:22,
171:2, 171:6,
171:24, 172:1,
172:20, 172:25,
173:3, 173:9,
173:13, 173:20,
174:9, 174:13,
174:15, 175:7,
175:11, 175:20,
176:3, 176:7,
176:11, 176:15,
177:5, 204:25,
205:6, 205:10,
205:14, 205:16,
205:21, 205:24,
231:2, 233:22,
247:5, 249:10,
255:1, 255:21,
255:25, 256:11,
256:22, 257:1,
257:4, 257:11,
257:15, 257:22
**themselves** [12] -
28:12, 64:1, 64:8,
68:23, 129:4,
194:15, 207:1,
210:1, 218:1,
228:25, 248:8
**theoretical** [3] -
146:14, 146:17,
146:25
**theories** [3] - 62:17,
123:12, 124:3
**theory** [17] - 8:13,
8:16, 64:17, 67:21,
120:12, 123:11,
125:7, 128:7, 135:9,
135:15, 135:25,
136:1, 136:3,
136:14, 147:12,
165:21

**thereafter** [1] - 45:17
**thereby** [1] - 191:12
**therefore** [4] - 52:13,
131:16, 135:12,
230:21
**thereof** [1] - 187:25
**thermos** [1] - 30:5
**they've** [3] - 8:1, 9:3,
80:20
**thigh** [1] - 26:17
**thin** [2] - 47:2, 47:3
**thinkers** [1] - 64:5
**thinking** [8] - 69:17,
84:9, 86:6, 93:16,
138:12, 174:2,
189:8, 202:14
**thinks** [2] - 164:12,
164:16
**Third** [1] - 1:18
**third** [7] - 124:16,
186:22, 190:10,
193:21, 196:12,
199:7, 201:3
**Thomas** [108] - 3:5,
3:13, 5:7, 5:8, 7:13,
7:18, 8:3, 8:5, 8:18,
9:11, 9:18, 10:2,
10:6, 10:8, 10:17,
11:1, 12:2, 12:14,
19:21, 20:14, 21:14,
21:24, 22:25, 23:16,
25:1, 27:9, 29:2,
30:12, 31:16, 31:19,
34:16, 65:10, 69:19,
71:6, 71:7, 72:10,
72:24, 78:4, 78:7,
96:22, 100:17,
100:25, 108:6,
109:1, 117:4,
117:11, 117:17,
119:20, 120:5,
121:2, 123:7,
123:13, 125:12,
125:20, 126:10,
126:11, 129:22,
129:25, 130:3,
131:5, 131:25,
133:13, 134:11,
134:20, 135:4,
138:15, 231:13,
231:19, 232:2,
232:3, 232:11,
233:10, 233:12,
234:11, 234:17,
234:18, 235:14,
235:16, 235:21,
235:24, 236:3,
237:13, 237:19,
237:20, 238:3,
238:6, 238:10,

239:19, 239:22,
240:9, 240:12,
240:14, 240:15,
240:25, 241:13,
241:15, 241:17,
242:3, 242:6,
242:14, 243:14,
243:25, 244:9,
246:15, 246:25,
247:10
**THOMAS** [3] - 1:6, 2:3,
21:11
**Thomas's** [8] - 17:22,
21:9, 78:8, 100:13,
150:1, 232:25,
241:11, 246:21
**thoughtful** [1] -
181:21
**thousand** [1] - 217:9
**thousands** [2] - 208:5,
216:10
**threat** [7] - 118:17,
139:19, 196:24,
197:2, 202:7,
238:24, 239:7
**threaten** [4] - 197:10,
240:8, 241:7, 243:20
**threatened** [3] -
196:23, 197:5, 197:7
**threatening** [1] -
119:12
**three** [18] - 6:19,
11:18, 67:11, 75:7,
76:7, 110:13,
120:22, 125:13,
137:22, 137:24,
187:12, 199:2,
200:21, 213:8,
214:3, 215:8, 215:9,
232:12
**Three** [2] - 33:3,
213:12
**threw** [1] - 24:4
**throughout** [13] -
6:15, 119:25, 121:6,
180:20, 180:22,
224:25, 227:4,
227:7, 227:13,
228:17, 244:2,
251:1, 251:16
**throw** [1] - 118:19
**thrown** [1] - 138:8
**tie** [1] - 139:18
**tied** [6] - 125:16,
131:19, 132:3,
133:10, 133:12,
133:18
**tiered** [1] - 43:11
**ties** [3] - 46:21,
216:10, 226:18

**timeline** [2] - 74:21,
91:22
**timing** [1] - 73:23
**today** [24] - 35:16,
35:19, 36:4, 42:23,
63:17, 64:16, 78:15,
80:5, 81:22, 82:3,
83:6, 84:23, 116:1,
171:2, 174:3,
175:25, 177:16,
206:19, 209:1,
213:11, 219:18,
256:1, 256:16,
256:18
**today's** [1] - 213:9
**together** [6] - 6:24,
13:1, 38:5, 142:4,
221:1, 242:23
**tomorrow** [6] - 171:1,
254:20, 255:19,
256:6, 257:2
**ton** [1] - 227:11
**tonight** [3] - 173:19,
256:4, 257:1
**took** [22] - 5:6, 24:10,
35:14, 36:3, 55:6,
56:25, 71:13, 78:5,
95:11, 96:12, 97:14,
98:6, 104:1, 108:14,
127:20, 150:7,
150:8, 188:24,
189:13, 211:9,
213:13, 224:7
**tool** [1] - 29:18
**top** [9] - 55:18, 58:6,
91:23, 114:6,
215:25, 219:5,
221:20, 222:1,
226:17
**topic** [1] - 68:10
**torn** [1] - 117:18
**total** [1] - 217:11
**totality** [2] - 72:9
**totally** [1] - 89:4
**touch** [9] - 55:5,
78:18, 119:10,
123:9, 124:13,
157:6, 166:21,
254:16
**touched** [1] - 218:13
**touching** [1] - 26:7
**toward** [15] - 89:2,
90:12, 91:23,
132:11, 135:24,
157:16, 157:20,
157:24, 157:25,
184:19, 188:24,
237:13, 237:14,
240:1, 243:13
**towards** [13] - 22:5,

23:21, 28:18, 28:23, 43:10, 54:21, 135:14, 158:7, 212:21, 212:24, 225:21, 239:10, 242:20

**town** [3] - 70:15, 89:12, 89:14
**track** [2] - 148:11, 161:12
**tracking** [1] - 136:2
**trade** [1] - 160:15
**trade-off** [1] - 160:15
**traditional** [1] - 218:3
**train** [1] - 89:13
**trained** [1] - 163:1
**training** [2] - 43:10, 241:18
**traitors** [1] - 226:4
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 1:25
**transcript** [4] - 256:14, 256:18, 257:8, 258:4
**transcription** [1] - 1:25
**transcripts** [1] - 171:11
**transfer** [3] - 42:15, 207:22, 208:17
**transformed** [1] - 216:23
**travel** [1] - 187:18
**treating** [1] - 34:1
**treatment** [1] - 20:6
**treatments** [1] - 139:5
**treats** [1] - 127:19
**trespass** [10] - 129:5, 129:10, 129:14, 142:5, 151:12, 210:8, 223:1, 224:18, 228:14
**trespassing** [3] - 107:7, 121:2, 141:18
**trial** [67] - 4:18, 6:16, 11:16, 12:24, 13:11, 13:12, 13:14, 14:11, 15:2, 17:2, 18:7, 19:1, 19:19, 20:24, 32:22, 33:23, 63:3, 63:7, 66:3, 66:24, 68:6, 71:16, 71:22, 79:5, 82:8, 82:20, 82:24, 83:11, 96:3, 115:20, 116:1, 119:25, 125:23, 138:10, 141:17, 142:6, 154:23, 154:24, 168:15, 169:2, 177:16, 177:17, 178:13,

178:14, 178:23, 179:13, 179:16, 179:23, 180:1, 180:20, 180:22, 183:20, 185:19, 202:23, 218:13, 220:1, 224:25, 228:18, 232:1, 250:5, 251:1, 251:10, 251:16, 256:14, 257:14
**TRIAL** [1] - 1:9
**trials** [2] - 14:4, 14:8
**tried** [5] - 78:16, 82:25, 121:8, 256:23, 257:18
**trip** [3] - 30:4, 90:6, 95:5
**trouble** [2] - 52:13, 240:1
**truck** [2] - 233:4, 246:21
**true** [11] - 33:19, 34:15, 63:16, 97:22, 111:7, 155:4, 181:10, 185:14, 218:9, 220:4, 229:7
**truly** [3] - 68:19, 83:10, 83:11
**Trump** [4] - 69:10, 89:20, 95:1, 232:5
**trust** [1] - 68:17
**truth** [14] - 35:22, 35:24, 36:1, 37:12, 42:16, 64:2, 65:2, 67:18, 69:2, 88:14, 92:11, 181:11, 184:15, 185:22
**truthful** [1] - 184:13
**truthfully** [1] - 184:6
**try** [17] - 22:14, 29:9, 33:11, 33:14, 46:21, 54:24, 55:20, 68:8, 70:11, 76:13, 87:23, 235:7, 241:2, 242:21, 242:22, 248:23, 252:6
**trying** [43] - 9:14, 10:9, 12:7, 12:25, 22:18, 24:14, 30:3, 42:25, 49:10, 56:23, 57:15, 60:1, 67:18, 67:22, 69:2, 73:22, 89:24, 91:9, 106:6, 118:10, 118:11, 119:25, 130:19, 130:20, 135:5, 157:13, 158:3, 159:12, 161:9, 164:14, 165:24, 168:13,

217:17, 220:24, 232:16, 232:17, 240:16, 241:19, 241:21, 241:22, 241:24, 242:15
**Tucker** [1] - 88:11
**turn** [15] - 17:16, 28:19, 30:25, 51:20, 60:17, 60:20, 60:23, 61:2, 86:3, 86:9, 147:15, 207:8, 208:18, 248:10, 248:13
**turned** [15] - 9:1, 9:3, 10:9, 24:3, 50:17, 50:24, 51:16, 57:3, 57:22, 89:16, 138:15, 214:9, 216:14, 233:10, 242:16
**turning** [3] - 31:22, 155:3, 222:1
**turns** [2] - 212:24, 214:5
**twice** [2] - 6:12, 159:3
**Twitter** [1] - 251:9
**two** [72] - 6:23, 10:13, 18:20, 20:12, 21:18, 33:23, 36:17, 40:23, 41:17, 42:25, 43:11, 50:10, 50:13, 55:7, 56:25, 59:24, 68:15, 71:1, 71:5, 72:24, 75:4, 75:6, 75:22, 77:2, 77:16, 85:24, 88:7, 88:20, 89:1, 89:17, 110:11, 111:1, 116:19, 116:21, 123:25, 124:1, 124:9, 126:15, 130:16, 130:24, 138:1, 138:3, 138:5, 138:25, 139:2, 139:19, 142:11, 142:24, 150:9, 152:9, 160:6, 182:3, 188:21, 198:8, 200:5, 202:1, 215:7, 217:10, 218:11, 220:13, 220:17, 220:22, 220:24, 221:4, 224:4, 224:22, 238:18, 242:18, 242:22, 243:7, 248:21, 253:19
**two-hour** [1] - 75:4
**two-tiered** [1] - 43:11
**type** [2] - 27:25, 61:14

**types** [1] - 182:3
**typo** [2] - 228:13, 255:2
**typos** [1] - 169:7
**tyranny** [3] - 42:10, 213:8, 238:9

# U

**U.S** [7] - 128:24, 129:7, 129:8, 152:22, 223:22, 224:16
**U.S.C** [2] - 128:19, 163:4
**ultimately** [1] - 147:22
**unanimous** [2] - 252:13, 252:25
**unarmed** [1] - 49:13
**unavailable** [2] - 4:10, 154:4
**unaware** [1] - 48:10
**unbiased** [1] - 83:3
**unclear** [3] - 7:11, 159:5, 220:6
**undeniable** [1] - 189:13
**under** [27] - 5:15, 33:12, 36:7, 36:11, 36:25, 37:1, 37:8, 46:7, 66:1, 71:22, 81:6, 125:8, 137:11, 137:12, 148:5, 156:13, 184:25, 187:23, 199:18, 203:20, 207:7, 226:15, 229:16, 234:24, 234:25, 236:18, 252:10
**underlying** [2] - 160:23, 164:9
**underneath** [7] - 46:4, 46:16, 46:18, 46:20, 47:20, 47:22, 66:6
**understood** [22] - 5:13, 16:24, 38:4, 68:25, 83:20, 91:2, 93:5, 118:13, 122:7, 124:25, 134:22, 142:23, 147:3, 147:17, 159:19, 166:6, 167:19, 171:3, 172:17, 176:9, 212:7, 257:15
**Understood** [2] - 119:4, 177:2
**undiagnosed** [1] - 17:12
**undisputed** [1] - 180:4
**unduly** [3] - 152:24,

153:3, 154:7
**unfiltered** [1] - 62:23
**unfortunately** [1] - 139:4
**uniformed** [1] - 215:11
**unintended** [1] - 192:12
**unintentional** [1] - 157:8
**unique** [1] - 62:23
**uniquely** [2] - 152:7, 153:2
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [32] - 1:13, 1:14, 3:5, 3:7, 3:9, 67:5, 84:12, 115:3, 128:23, 148:24, 187:23, 187:25, 188:2, 188:6, 188:8, 188:10, 191:14, 195:14, 196:10, 200:18, 200:23, 201:5, 201:6, 201:9, 201:22, 202:3, 202:10, 206:18, 207:19, 238:20, 245:21
**unlawful** [27] - 29:8, 49:12, 49:20, 50:9, 134:17, 156:18, 167:6, 172:9, 191:4, 191:5, 191:22, 192:2, 192:4, 192:8, 203:7, 203:10, 203:13, 206:10, 206:12, 214:2, 214:11, 214:14, 224:24, 231:7
**unless** [8] - 74:5, 78:7, 83:10, 83:11, 86:11, 128:13, 180:20, 249:18
**unlikely** [2] - 146:13, 254:3
**unnecessarily** [2] - 199:19, 204:2
**unquote** [6] - 55:1, 95:22, 210:5, 214:25, 217:21, 217:22
**unreasonableness** [1] - 185:12
**unreasonably** [2] - 199:17, 226:14
**unrestricted** [1] - 100:20
**unspecified** [1] - 196:24

228:18, 232:1,
235:3, 239:20,
241:11, 241:21,
241:22, 242:16,
244:12, 246:13,
248:3, 248:6, 248:7,
248:21, 250:16,
250:23, 256:8,
257:17
**upcoming** [1] - 14:14
**uphold** [1] - 208:15
**Upper** [12] - 25:15,
45:2, 47:6, 113:23,
114:2, 122:15,
209:5, 216:14,
224:3, 224:12,
224:14, 247:15
**upper** [1] - 207:4
**USA** [1] - 212:23
**uses** [3] - 199:16,
226:13, 235:21
**usual** [1] - 222:20
**utilizing** [1] - 47:12

## V

**vague** [2] - 53:2, 63:19
**vantage** [1] - 25:7
**various** [4] - 9:23,
71:18, 120:11,
232:16
**Veisaj** [7] - 137:25,
214:13, 221:15,
221:22, 222:7,
224:10, 226:24
**Veisaj's** [2] - 221:18,
222:3
**Veizaj** [6] - 10:16,
116:23, 142:10,
143:10, 222:11,
242:12
**venture** [1] - 194:22
**verbal** [1] - 225:13
**verdict** [30] - 122:21,
146:2, 176:12,
178:12, 179:8,
183:2, 183:5, 183:6,
230:25, 231:20,
247:3, 249:21,
249:23, 250:4,
250:19, 252:13,
252:23, 252:24,
252:25, 253:1,
253:3, 253:4, 253:6,
253:7, 253:10,
253:15, 254:11,
255:4, 255:14
**verdicts** [2] - 249:17,
250:1
**version** [3] - 20:6,

74:18, 176:17
**versions** [1] - 173:21
**versus** [3] - 3:5, 7:13,
130:9
**veteran** [2] - 36:12,
37:9
**via** [1] - 251:24
**vice** [4] - 198:19,
207:10, 223:23
**Vice** [1] - 223:25
**vicinity** [1] - 131:20
**victim** [6] - 16:10,
144:1, 144:4,
196:17, 197:19,
218:9
**victims** [8] - 11:18,
11:19, 89:2, 116:20,
142:11, 218:14
**Video** [27] - 21:22,
23:13, 25:22, 26:19,
27:7, 53:19, 53:22,
55:14, 56:12, 58:3,
58:22, 60:8, 61:8,
98:22, 105:22,
111:12, 115:10,
215:21, 221:2,
225:25, 239:14,
240:20, 241:9,
242:11, 243:10,
243:23, 246:24
**video** [110] - 9:2, 12:9,
19:23, 20:8, 20:13,
20:23, 21:24, 23:2,
23:16, 24:23, 25:1,
25:13, 25:25, 26:22,
27:9, 28:16, 43:20,
44:1, 44:2, 44:5,
44:17, 46:11, 51:19,
55:4, 57:25, 59:9,
60:21, 61:5, 61:12,
69:11, 72:15, 76:2,
76:17, 76:19, 76:20,
77:2, 77:6, 84:1,
84:3, 85:25, 88:9,
88:16, 88:18, 89:4,
95:11, 95:22, 95:25,
96:3, 96:5, 96:12,
96:13, 96:19, 97:14,
97:18, 97:20, 98:1,
98:6, 102:19,
103:24, 104:1,
105:16, 105:25,
106:23, 107:23,
111:9, 114:24,
115:6, 126:23,
126:25, 127:1,
127:14, 128:1,
131:24, 133:3,
133:4, 133:8,
138:12, 138:18,

138:19, 138:23,
139:4, 139:5, 139:6,
144:1, 153:4,
210:23, 211:9,
211:13, 212:24,
213:12, 213:20,
214:8, 215:18,
217:4, 218:25,
220:3, 221:22,
221:23, 222:14,
222:15, 225:3,
225:16, 225:20,
227:11, 241:10,
247:16, 248:2,
248:16, 248:17
**videoing** [1] - 225:4
**videos** [41] - 5:20, 9:3,
9:4, 12:22, 18:11,
20:7, 21:16, 29:2,
29:5, 34:5, 34:17,
61:24, 66:23, 66:24,
69:9, 71:21, 76:6,
95:23, 111:7,
121:11, 127:5,
128:12, 135:4,
137:5, 137:6,
137:14, 137:16,
138:14, 139:22,
172:22, 212:21,
218:13, 228:22,
228:25, 229:24,
230:2, 230:3, 239:1,
239:4, 239:16,
247:23
**view** [5] - 70:25,
114:6, 132:18,
163:21, 243:3
**viewing** [1] - 131:10
**views** [3] - 63:23,
250:23
**violates** [1] - 125:11
**violating** [2] - 201:17,
228:5
**violation** [15] - 15:4,
15:5, 16:3, 16:5,
27:24, 33:24,
103:13, 129:4,
158:11, 186:11,
189:21, 195:18,
198:6, 200:19,
201:24
**violence** [53] - 29:11,
29:12, 29:13, 30:2,
35:12, 42:3, 42:6,
49:15, 53:6, 53:25,
78:6, 100:15,
100:25, 125:10,
131:2, 144:10,
144:14, 145:5,
145:6, 146:16,

161:5, 163:15,
163:18, 166:23,
166:24, 167:3,
167:8, 187:12,
191:21, 192:1,
199:17, 199:25,
200:2, 200:7,
200:11, 201:22,
202:3, 202:6,
226:13, 227:17,
227:18, 228:9,
228:11, 230:11,
243:7, 245:17,
246:6, 246:10,
249:2, 249:3, 249:5
**violent** [11] - 40:6,
42:8, 42:25, 138:13,
138:14, 138:17,
158:21, 164:23,
204:4, 207:2, 216:23
**violent-appearing** [1]
- 138:17
**violently** [3] - 146:9,
208:8, 209:8
**VIP** [1] - 69:14
**visit** [1] - 224:1
**visiting** [2] - 198:17,
223:22
**vocation** [1] - 87:12
**voice** [13] - 24:20,
29:17, 29:18, 29:19,
67:25, 68:3, 105:25,
232:2, 232:13,
232:25, 233:13,
236:15, 246:15
**voices** [1] - 108:5
**VOLUME** [1] - 1:9
**voluntarily** [6] - 30:24,
79:7, 79:8, 196:13,
197:14, 218:7
**vote** [11] - 29:23,
29:24, 190:22,
207:24, 208:11,
209:11, 211:15,
212:16, 214:19,
232:5, 252:17
**Vote** [1] - 212:17
**voting** [1] - 252:12
**vs** [1] - 1:5
**vulnerable** [1] - 22:8

## W

**wait** [8] - 45:12, 82:9,
105:8, 128:3,
128:13, 135:22,
140:5, 154:16
**waiting** [1] - 17:21
**waived** [1] - 79:4
**waiving** [1] - 81:18

**walk** [8] - 22:2, 23:18, 25:4, 27:11, 28:20, 54:1, 123:5, 233:7
**walked** [6] - 24:7, 27:13, 44:3, 85:1, 90:3, 222:14
**walking** [5] - 48:19, 212:21, 233:8, 237:5, 237:7
**walks** [2] - 201:8, 214:7
**walls** [1] - 77:4
**Walters** [1] - 158:11
**wandered** [1] - 106:11
**wants** [2] - 82:6, 149:4
**War** [2] - 42:20, 207:21
**war** [2] - 43:3, 87:19
**warn** [3] - 41:15, 41:16, 41:19
**warning** [3] - 76:10, 134:4, 234:3
**warrant** [1] - 151:7
**Washington** [11] - 1:5, 1:15, 1:22, 41:4, 42:12, 50:14, 65:16, 89:15, 201:7, 213:24, 234:4
**watch** [8] - 89:24, 96:5, 96:9, 221:1, 247:23, 251:4, 251:5
**watched** [2] - 25:7, 112:16
**watching** [3] - 68:6, 114:5, 114:6
**Waters** [1] - 158:12
**ways** [3] - 83:7, 118:15, 126:8
**weak** [3] - 128:16, 149:14, 149:15
**weaker** [2] - 123:24, 123:25
**weapons** [3] - 35:14, 233:12, 237:4
**websites** [2] - 88:3, 90:24
**Webster** [2] - 140:24, 144:8
**wedding** [3] - 38:18, 39:1, 39:22
**week** [5] - 38:18, 84:25, 148:12, 231:12, 257:3
**weekend** [2] - 13:9, 21:8
**weight** [9] - 136:9, 178:23, 180:8, 182:23, 182:25, 183:7, 185:23, 186:4, 209:22

**weird** [1] - 25:18
**welcome** [3] - 21:8, 86:19, 177:5
**well-respected** [1] - 42:13
**West** [14] - 25:15, 45:2, 47:6, 113:23, 114:2, 122:15, 207:5, 209:6, 216:14, 224:3, 224:4, 224:12, 224:14, 247:15
**west** [8] - 84:21, 85:7, 99:7, 207:3, 207:4, 247:19, 247:20, 247:21
**whatnot** [2] - 150:19, 241:18
**whatsoever** [6] - 33:4, 235:13, 236:6, 238:2, 244:9, 245:6
**whereas** [1] - 223:8
**whichever** [1] - 22:7
**white** [1] - 33:13
**whole** [15] - 16:21, 29:10, 29:11, 35:24, 37:12, 42:16, 44:18, 52:18, 131:25, 171:18, 178:9, 178:18, 205:17, 212:25, 213:3
**wholly** [1] - 187:21
**WICK** [1] - 1:21
**Wick** [2] - 258:3, 258:8
**wider** [1] - 16:1
**wife** [12] - 4:9, 30:17, 50:10, 50:15, 50:16, 64:21, 233:6, 233:9, 233:14, 237:5, 237:7, 237:10
**wildprotest** [1] - 213:24
**willfully** [9] - 201:4, 201:13, 201:15, 202:4, 202:10, 227:24, 228:1, 228:3, 228:12
**willing** [5] - 34:21, 42:22, 65:25, 82:16, 82:17
**window** [3] - 33:17, 182:11, 182:15
**wipe** [1] - 26:7
**wiped** [1] - 26:1
**wiping** [1] - 26:4
**wish** [2] - 179:16, 251:14
**wished** [1] - 195:10
**withdraw** [1] - 54:8
**withdrawn** [3] - 47:4,

50:21, 60:15
**witness** [71] - 5:11, 16:10, 73:13, 73:25, 74:7, 74:15, 85:16, 86:10, 86:15, 86:20, 91:14, 91:15, 93:1, 93:4, 96:11, 97:2, 103:19, 107:21, 108:19, 114:3, 114:8, 114:16, 142:9, 143:5, 143:8, 143:14, 143:20, 151:22, 152:5, 152:6, 152:11, 152:25, 153:2, 153:8, 153:9, 153:18, 153:22, 153:25, 154:1, 154:4, 154:18, 154:24, 170:6, 182:5, 184:3, 184:6, 184:7, 184:8, 184:10, 184:11, 184:12, 184:13, 184:15, 184:16, 184:17, 184:25, 185:3, 185:4, 185:7, 185:13, 185:15, 185:17, 185:20, 185:21, 185:22, 186:3, 186:5, 191:10
**WITNESS** [15] - 21:11, 39:4, 41:24, 50:1, 50:22, 57:9, 63:21, 67:9, 86:23, 86:25, 87:23, 105:2, 108:21, 109:19, 114:19
**witness's** [6] - 182:6, 184:5, 184:12, 184:20, 184:22, 185:5
**witnessed** [5] - 28:21, 84:20, 100:10, 125:12, 144:2
**witnesses** [20] - 5:3, 18:25, 73:5, 84:25, 114:21, 142:17, 152:9, 152:15, 152:25, 154:12, 178:25, 179:24, 183:8, 183:10, 183:11, 183:13, 183:25, 184:2, 206:23, 239:17
**woke** [1] - 182:17
**woman** [6] - 43:21, 44:4, 44:11, 44:16, 49:2, 49:4
**women** [2] - 42:22,

207:11
**won** [1] - 126:4
**wonder** [1] - 159:23
**wondering** [5] - 70:9, 77:7, 144:11, 151:6, 174:20
**Woodland** [1] - 1:18
**word** [10] - 47:12, 57:15, 68:24, 90:22, 100:2, 205:3, 205:9, 205:13, 206:1, 213:3
**worded** [1] - 169:1
**words** [6] - 68:18, 118:22, 162:5, 194:19, 199:16, 208:2, 212:2, 226:13, 239:20, 239:25, 249:4, 252:25
**wore** [1] - 206:21
**world** [1] - 208:4
**worn** [12] - 20:4, 127:8, 219:2, 219:9, 219:12, 219:16, 221:17, 221:18, 222:3, 222:7, 222:16, 225:14
**worry** [4] - 64:21, 160:21, 164:22, 166:4
**worrying** [1] - 216:11
**worth** [1] - 5:5
**wrap** [1] - 75:2
**wrapped** [2] - 136:17, 136:19
**Wren** [15] - 11:16, 14:16, 19:3, 19:12, 19:13, 20:14, 20:24, 70:23, 71:5, 71:7, 72:3, 72:10, 72:16, 72:24, 73:3
**writing** [2] - 252:9, 252:14
**written** [1] - 5:2
**wrongdoing** [5] - 191:6, 191:7, 214:2, 231:8, 236:10

**Y**

**yard** [1] - 107:11
**yards** [3] - 113:19, 125:20
**years** [11] - 29:24, 33:23, 36:17, 38:21, 41:22, 68:15, 87:11, 88:7, 95:5, 208:10, 224:16
**yell** [2] - 29:12, 248:10
**yelled** [1] - 39:16

**yelling** [7] - 8:6, 28:12, 40:9, 225:7, 226:20, 227:14, 248:15
**yellow** [2] - 220:18, 224:5
**yells** [1] - 220:19
**yesterday** [8] - 16:8, 73:7, 78:17, 108:10, 108:11, 109:2, 109:4, 213:21
**yourself** [15] - 23:2, 23:16, 25:1, 27:9, 28:7, 30:25, 31:17, 55:6, 62:8, 81:7, 88:23, 95:11, 104:1, 219:13, 222:9
**YouTube** [1] - 89:24

**Z**

**zero** [2] - 102:7, 107:16
**zip** [3] - 46:21, 216:10, 226:18
**zoom** [1] - 114:4