**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-00552 (DLF)** |
| **v.** | : | |
| | : | |
| **KENNETH JOSEPH OWEN THOMAS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response to the Defendant's Sentencing Memorandum (ECF No. 202). In addition, the government addresses certain questions the Court has recently raised in other January 6-related sentencings.

The government's requested sentence—109 months of incarceration, 36 months of supervised release, restitution of $2,000, a fine of $77,607, and mandatory assessments totaling $525—continues to be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Not only did Thomas "voluntarily and intentionally" and "forcibly" assault, resist, or impede at least four officer-victims on January 6, he also led the charge during an hours-long crusade of civil unrest on the Capitol's Upper West Terrace, where he physically pushed back against officers' attempts to clear the Terrace while belligerently calling them "sons of bitches" and yelling "fuck these assholes" at them. Thomas was not repentant in the face of the jury's guilty verdict on seven counts. To the contrary, Thomas dedicated himself to prodigiously proliferating misinformation and lies about January 6, trumpeting and celebrating his

actions as patriotic, heroic, and honorable, and blaming the very individuals he victimized – the officers who have suffered, among other things, extreme mental anguish as a result of Thomas's and his fellow rioters' assault on the Capitol Building. For these reasons, the government's requested sentence is warranted and appropriate.

## **RESPONSE**

### I.   **The Defendant's Guidelines Analysis is Wrong.**

On June 1, 2023, Thomas was convicted of seven federal crimes, including five felonies. Despite this, he asks the Court to sentence him to 12 months' home confinement, a sentence entirely inconsistent with the United States Sentencing Guidelines and the sentencing factors set forth under 18 U.S.C. § 3553(a). Such a request ignores not only the Guidelines, but the gravity of Thomas's offenses, the need for general deterrence–to ensure that another January 6 never happens again–the rule of law, the defendant's total remorselessness, and, most importantly, the heroic work done by the officers Thomas victimized on January 6, 2021. Some of those officers will provide a victim impact statement at Thomas's sentencing, where they will share details regarding the extreme mental anguish they have suffered at the hands of this Defendant.[1]

---

[1] Thomas' Sentencing Memorandum is replete with flippant remarks and asides that show that Thomas does not take his convictions seriously and that he has no respect for this Court and this process, including, for example, the following: "The PSR's 'aggravated assault' enhancement (for 'resisting officers' with the intent to 'resist officers' during a civil disorder;) and 'official victim' enhancements ('resisting officers performing official duties'—because they are performing 'official duties'; **LOL**) are equally preposterous and evidence-free." ECF No. 202 at 5 (emphasis added). Assaulting multiple officers is not a laughing matter.

A. Thomas Misapplies the Guidelines with Respect to his Convictions Under 18 U.S.C. §§ 111(a) and 231(a)(3).

While Thomas does not provide a calculation that substantiates his preferred offense level of 13, he appears to dispute the calculation of his base offense level under 2A2.2. *See* ECF 202 at 5 (stating that the aggravated assault "enhancement" is "preposterous and evidence free"). Probation and the government have correctly calculated Thomas's offense level for each Section 111 violation using U.S.S.G. § 2A2.2. In the last week alone, the Court twice applied this guideline based on physical contact and/or the intent to commit another felony – including in one case, *United States v. Sargent,* 21-cr-639 (DLF), where the offense of conviction was not an assault, but a violation of Section 231.

The cross reference to U.S.S.G. § 2A2.2 applies here because Thomas committed a "felonious assault…with the intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.  This Court has routinely applied the U.S.S.G. § 2A2.2 cross reference to January 6 defendants convicted of violations of 18 U.S.C. § 111 where they were also convicted of, or charged with, violating 18 U.S.C. § 231. *See, e.g., United States v. Sargent,* 21-cr-639 (DLF) (though sentencing was continued, Court indicated it would apply § 2A2.2 to Sargent's Section 231 conviction); *United States v. Rodriguez,* 21-cr-483 (DLF); *United States v. Creek*, 21-cr-645 (DLF). The cross reference applies where the defendant commits a "felonious assault" in certain circumstances. As this Court recently noted during the sentencing hearing in *Sargent*, a "felonious assault" includes a felony violation of 18 U.S.C. § 111(a), that is, where a defendant "assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer," "forcibly," "voluntarily and intentionally," and where "the defendant made physical contact with the victim, or acted with the intent to commit

another felony." *See* ECF No. 190 (Revised Jury Instructions) at 28-29. That is what Thomas was convicted of here.

As the Court found in *United States v. Rodriguez,* a defendant can receive the cross-reference to U.S.S.G. § 2A2.2 even if the Section 231 conduct overlaps with the Section 111 conduct:  it is reasonable to punish more harshly a defendant who assaults an officer during a civil disorder than one who does not. *See* 21-cr-483 (DLF). In addition to Section 231, the Court could also apply U.S.S.G. § 2A2.2 by finding that Thomas violated Section 111(a) with the intent to obstruct an official proceeding.

While the Court's analysis can stop with the fact that Thomas violated Section 111, the Court can also find that Thomas's conduct included an "assault." U.S.S.G. § 2A2.4(c) instructs that § 2A2.2 be applied "[i]f the conduct constituted aggravated assault." In that phrase, "conduct" refers to *all* relevant conduct, not simply the conduct underlying the crimes for which Thomas was convicted. *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997). Thomas's conduct included an assault. Thomas, twice, charged up the steps towards the officers at full speed, pumping his arms and raising his hands as he ran directly into Officers M.N.'s and R.A.'s chests. He jumped a short wall and began pushing with his hands and body into the line of officers' riot shields, including Corporal S.A.'s, then yelled, "YOU HAVE WOKEN A SLEEPING GIANT!" Thomas then joined other rioters who used their backs to forcefully push against the moving line of officers, including Officers K.V. and D.P.L., who said his chest was "pressed so hard it felt like my lungs [were] caving in. It felt like they couldn't expand. I couldn't breathe." (5/18/23 Trial Tr. 15-20). Thomas then body-checked, multiple times, Officer R.N. as he and other officers attempted to clear the mob from the Upper West Terrace. Finally, as the mob was pushed around the corner

4

of the Terrace, Thomas continued pushing and yelling, "You see that sons of bitches!"  "Hold the line, hold the line, fuck these assholes, hold the line!"  Courts have found that spitting on an officer can be a felony assault under Section 111. *United States v. Lehi*, 466 F. App'x 96, 100 (10th Cir. 2011) ("Mr. Lehi spit directly into the face and eyes of a federal officer who was engaged in his official duties. By doing so, Mr. Lehi committed a forcible assault involving physical contact in violation of 18 U.S.C. § 111(a)."); *Beran v. United States*, No. CIV. A. 88-0603 (RCL), 1992 WL 182261, at *6 (D.D.C. July 13, 1992), *aff'd*, No. 92-5388, 1993 WL 185254 (D.C. Cir. May 20, 1993) ("[E]ven shoving or spitting on a federal officer may rise to the level of an assault under 18 U.S.C. § 111.").  Thomas's conduct easily clears that bar – and it was felonious because it involved physical contact *and* the intent to commit another felony.

Except for misstating the trial evidence to falsely suggest that his contact with the officers was somehow incidental to his attempts to aid others, Thomas does not dispute that he made physical contact with each officer-victim. *See* U.S.S.G. §2A.2.4(b)(1) (Physical Contact Adjustment). Thomas also does not dispute that he was convicted of another felony, 18 U.S.C. § 231(a)(3). Accordingly, the Court should calculate his offense level for the Section 111 violations using the aggravated assault guideline, a base offense level of 14.

The Court should also reject Thomas's challenge to the application of a six-point official victim enhancement under U.S.S.G. § 3A1.2(a)-(b). The government is unaware of any January 6 conviction where a court applied U.S.S.G. § 2A2.2 and did not apply an official-victim enhancement. Thomas argues that this enhancement is "duplicative of the base offense among other problems."  ECF 202 at 5. This is incorrect. The base offense level is for all aggravated assaults; the official victim enhancement rightly increases the guidelines for the subcategory of

aggravated assaults committed against official victims – and not simply *all* assaults against official victims, but only those assaults against official victims where the defendant was *motivated* by the victim's status as an officer. U.S.S.G. § 3A1.2(a). It would exclude, for example, an aggravated assault against an on-duty plainclothes federal agent if the defendant did not know his victim was an agent and did not attack him on account of his role. *See, e.g., United States v. Morales*, 807 F. App'x 654, 655 (9th Cir. 2020) (defendant was convicted under Section 111 for throwing a chisel at the window of a car driven by a DEA agent, but no official victim enhancement was applied because no evidence suggested the defendant knew and was motivated by the fact that the car's driver was a federal employee). For the same reason, contrary to Thomas's contention, not all violations of Section 111(a) trigger the official victim enhancement.[2]

Thomas also calls the claim that he deleted video footage "evidence-less" and not a "significant" obstruction. ECF 202 at 4. But Thomas does not dispute that he provided materially false testimony under oath. That is the basis for the obstruction enhancement here. *See* U.S.S.G. § 3C1.1 n.4(B) (Obstruction Adjustment).

Since the filing of the government's sentencing memorandum, U.S.S.G. § 4C1.1 went into effect. Thomas is not entitled to any downward adjustment under this section because he has a criminal history point. U.S.S.G. § 4C1.1(a)(1). Moreover, Thomas used violence or threats of violence in connection with the offense. U.S.S.G. § 4C1.1(a)(3). Therefore, the Court should adopt

---

[2] For the same reason, there is no impermissible double-counting where a court applies U.S.S.G. § 2A2.2 and the official victim enhancement. Impermissible double counting does not occur if the enhancement does not duplicate an essential element of the offense. *Valdez-Torres,* 108 F.3d at 338.

Probation's and the government's guidelines calculations and set the offense level for each violation of Section 111 at 22.

Thomas' Sentencing Memorandum also fails to account for any grouping, and does not refute the government's analysis. He thus does not appear to dispute that, U.S.S.G. § 3D1.2, although the Section 231(a)(3) conviction groups with <u>one</u> of Thomas' four assaults (victim is R.A.), the remaining <u>three</u> assault convictions (victims are M.N., K.V., and R.N.) and the <u>trespass</u> conviction (victim is Congress) must therefore be separated, resulting in five separate groups.

Thomas also offers no response to the government's argument that the Court can – and should – consider the evidence of Thomas's obstructive conduct when sentencing him for his seven crimes of conviction, even though Thomas was acquitted of Count Two (the violation of 18 U.S.C. § 1512(c)(2)). As noted in the government's original memorandum, the law is clear that acquitted conduct may be considered in connection with sentencing when proven by a preponderance of the evidence. In fact, as Judge Hogan correctly stated in *United States v. Gatling*, which the D.C. Circuit then affirmed, "[t]o the degree that [a defendant] suggests that a court may not consider acquitted conduct in determining a sentence, he is wrong." 639 F. Supp. 2d 4, 8 n.5 (D.D.C. 2009), *aff'd*, 687 F.3d 382 (D.C. Cir. 2012). In that case, Judge Hogan considered whether, like here, application of a cross-reference based on acquitted conduct was appropriate, and held it was. *Id.* at 8-9. "[A] defendant receiving an enhanced sentence based on acquitted conduct is not being punished for the acquitted conduct as an offense distinct from the convicted offense." *United States v. Edwards*, 427 F. Supp. 2d 17, 23 (D.D.C. 2006), *aff'd*, 198 F. App'x. 4 (D.C. Cir. 2006) (citing *United States v. Watts*, 519 U.S. 148 (1997)). That is because "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of reasonable doubt as to

7

his guilt." *Watts*, 519 U.S. at 155 (quoting *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984)). Thus, a jury verdict of acquittal does not preclude the government from relitigating an issue related to the acquitted conduct at sentencing, where a lower standard of proof applies and a broader range of evidence is admissible. *See id.* at 156.

Thus, this Court can and should find that, by at least a preponderance of the evidence, Thomas committed Count 8 (the Section 1752(a)(1) trespass crime) with an intent to obstruct the certification proceeding on January 6, 2021, and apply the guidelines accordingly: apply a cross reference under U.S.S.G. § 2B2.3(c)(1) and calculate the offense level for Count Eight using the guideline for obstruction of an official proceeding, U.S.S.G. §2J1.2. For these additional reasons, the Court should adopt the government's and Probation's guidelines calculations.

B.   Thomas Has Failed to Accept Responsibility.

While calling the government's calculation "preposterous," ECF No. 202 at 3, 5, Thomas incredibly claims he "should be awarded" a "2-point downward adjustment for acceptance of responsibility[.]" *Id.* at 3.

The U.S.S.G. § 3E1.1 adjustment is applied where "the defendant clearly demonstrates acceptance of responsibility for his offense[.]" The Application Notes counsel that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, cmt. N.2.

At trial, Thomas did just that, vigorously contesting his guilt.  Rather than admitting he illegally entered restricted Capitol grounds to "storm the Capitol," as he stated in real time in one of his videos from January 6, at trial, Thomas testified that he trespassed and remained on Capitol

grounds, physically pushing back against the police for hours, because he believed others needed his help, because he was lawfully exercising his first Amendment rights, and because he simply wanted to participate in the official proceeding, not interrupt it.  He so testified despite sending a text message on January 6 stating "we're just trying to push through [the cops'] line," despite repeatedly calling officers assholes, sons of bitches, and traitors as they attempted to clear rioters from the grounds on January 6, and despite that it was obvious that his actions, into nightfall, were successfully delaying the official proceeding that was supposed to be taking place inside the Capitol building.

Even following his conviction, he *still* has not admitted his guilt for his egregious conduct, nor has he expressed even an iota of remorse or contrition. Instead, Thomas revels in his crimes and has used them to bring himself notoriety and fame among those who propound alternative, dishonest narratives about January 6. With that fame, he has sought to fundraise and enrich himself by capitalizing on his crimes, as discussed in the government's original memorandum and further below. Most egregiously, Thomas has ridiculed the very individuals he victimized, such as when he announced, "Let's give them PTSD by singing the National Anthem" in a podcast on the same day he was convicted. *See* ECF No. 203 at 38. Thus, Thomas has done anything but accept responsibility, as his sentence should so reflect.

**II.  Thomas's 3553(a) Arguments are Unavailing.**

   A.  Thomas's Family Circumstances Do Not Warrant a Downward Variance.

Thomas' memorandum states that his family circumstances are "extraordinary" because his children suffer from various conditions requiring special diets and monitoring. *See* ECF No. 202 at 8. He also notes that he, too, receives treatment for certain conditions at the local VA

hospital. *See id.* However, the circumstances raised by Thomas are no different than countless individuals convicted of federal felonies and sentenced to significant prison terms and do not justify the drastic sentencing reduction he seeks. Thomas' own memorandum and the final presentence report by the U.S. Probation Office indicate the following: (1) both Thomas and his wife "have meticulously monitored and carefully isolated foods in their family diets so as to treat and care for themselves and their children," *id.;* ECF No. 206 (PSR) ¶ 110 *;* (2) Thomas "reported his wife is healthy and does not require any medication," PSR ¶ 109; and, (3) Thomas "currently resides with his wife and children at his father-in-law's residence," *id.* ¶ 111. Thus, although the government sympathizes with Thomas' and his children's medical conditions, they do not qualify as the kind of "extraordinary" circumstances warranting departure. As noted by Thomas, it appears that the BTM condition is treatable through diet. In addition, Thomas's back strain and hearing-related issues also are manageable and not extraordinary; indeed, they did not stop him from traveling to Washington, D.C. on January 6 and engaging in physical altercations with police for many hours.

Moreover, Thomas cites no case law in support his position. However, a cursory review of applicable case law shows why Thomas' circumstances do not fall into the "rare" extraordinary category. *See, e.g., United States v. Dyce*, 91 F.3d 1462, 1466 (D.C. Cir. 1996) ("[W]e underscore what is implicit in the word 'extraordinary' and explicit in the Guidelines themselves: departures on such a basis [extraordinary family ties/responsibilities] should be rare.").

For example, the D.C. Circuit in *United States v. Dyce*, while affording the district court "considerable respect on appeal," reversed its finding that "a single mother with three children under the age of four years old, one of whom is three months old and is being breast fed by the

Defendant" constituted an extraordinary family circumstance. *Id.* at 1467. Among other things, the D.C. Circuit placed emphasis on the fact that the defendant was "was not living alone. To the contrary, . . . Dyce was living not only with the father of her children but also with her parents and sister, who were employed." *Id.* The D.C. Circuit also emphasized that the defendant did not "shoulder[] the financial burden of raising her children" and that "the children could and would be cared for by members of [the defendant's] family." *Id.* The same is true here with respect to Thomas and his family: although we do not know whether Thomas' wife is employed,[3] the whole family lives at Thomas' father-in-law's home, where Thomas' children are provided and cared for by both he and his wife, despite that Thomas' only income since May 2023 is profiteering from January 6. *See* ECF No. 202 at 8; PSR ¶¶ 109-11, 121, 136-37.

The D.C. Circuit in *Dyce* then held as follows: "In sum, we can find nothing to suggest that Dyce's family circumstances were in any degree 'extraordinary.' To the contrary, hers were demonstrably better than those of many defendants who have been denied departures for extraordinary family responsibilities." *Dyce*, 91 F.3d at 1467–68.[4] "In Dyce's case, there is no

---

[3] Whether Thomas' wife is gainfully employed is not clear, given Thomas failed to provide her contact information to Probation. *See* PSR at 38 ("The defendant claims he provided contact information for his wife and mother. Probation Office Response: The defendant did not include the contact information in the questionnaire forms. After reviewing the initial draft of the presentence report, neither the defendant nor defense counsel contacted the US Probation Office to provide the contact information. The US Probation Office emailed defense counsel with a request for the information, but there was no response.").

[4] Collecting cases as follows: *See, e.g., United States v. Webb,* 49 F.3d 636, 638 (10th Cir.) (defendant was sole caretaker and "loving and conscientious" parent of a son who had been on his school's honor roll before defendant's incarceration but had problems thereafter), *cert. denied,* 516 U.S. 839 (1995); *United States v. Brown,* 29 F.3d 953, 961 (5th Cir. 1994) (defendant had two children under the age of five with undefined medical problems who would have to live with great-grandmother); *United States v. (John) Goff,* 20 F.3d 918, 921 (8th Cir. 1994) (defendant, whose wife was disabled by depression and panic attacks, provided sole support

evidence that her children will not receive adequate care." *Id.* "The unfortunate fact is that some mothers are criminals; and, like it or not, incarceration is our criminal justice system's principal method of punishment. A term in jail will *always* separate a mother from her children." *Id.*

The same is true here: though his circumstances are unfortunate, Thomas has not shown they are sufficiently extraordinary to support a downward variance.

B.  This Court and Many Courts in this District Have Already Rejected False Comparisons Between the January 6 Riots and the 2020 Protests in Portland, Oregon.

Thomas dedicates nearly ten pages of his twenty-one page memorandum to a rhetorical argument equating his own crimes of conviction with the conduct of protestors in Portland, Oregon during the summer of 2020. Entirely ignoring sentences imposed in this District for the same crimes of which he was convicted in connection the January 6, 2021 riots, Thomas bemoans his alleged mistreatment, concentrating on purported "Severe sentencing Disparities between 'Left Wing' and 'Right Wing' Rioters Have Emerged—Which are Anathema to the Rule of Law and the Legitimacy of the Federal Courts." *See* ECF No. 202 at 9-18. Thomas then again falsely asserts "it is the government's own conduct regarding American political protest which has caused the greatest disparities of all[.]" ECF No. 202 at 9-18. Thomas then goes on to copy and paste five pages from a different January 6 defendant's briefing discussing whether and the extent to which

---

for three young sons); *United States v. Chestna,* 962 F.2d 103, 107 (1st Cir.1992) (defendant was single mother of four young children, one of whom was born after sentencing); *United States v. Cacho,* 951 F.2d 308, 310 (11th Cir. 1992) (defendant was mother of four young children).

individuals were prosecuted following the Black Lives Matter protests in Portland, Oregon. *See id.* at 11-18.

As Judge Cooper, responding to similar arguments, has explained to January 6 defendant Christopher Alberts, "You had plenty of ways to make your voice heard. . . . But in this country you can't make your voice heard by helping a mob storm the Capitol by overrunning police . . . That's mob rule, all right, which is exactly the opposite of what the Founding Fathers envisioned when they wrote that Constitution that you say you care so much about." ECF No. 186 (July 19, 2023 Sent. Tr.), 69:7-70:7, *United States v. Alberts*, 21-cr-00026 (CRC).

This Court has similarly rejected Thomas's First Amendment-related motions, *see generally* ECF No. 197 (Govt. Resp. to Mot. for New Trial (reciting the Court's many rejections of these and similar arguments)), as well as nearly identical Portland-related comparisons in connection with claims of selective prosecution. *See* March 21, 2023 Minute Entry (denying selective prosecution motion).

Thomas also argues that he should be compared to the Portland protestors, rather than his fellow rioters, for purposes of 18 U.S.C. § 3553(a)(6).  He should not. Section 3553 directs courts in imposing a sentence to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who *have been found guilty of similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added). Thomas identifies no such defendants, and provides no persuasive reason that the Court should compare him to the protestors in Portland in 2020, rather than his fellow rioters at the Capitol on January 6, 2021.

As other district judges have explained, "the mob on January 6th ... 'endangered hundreds of federal officials in the Capitol complex,' including Members of Congress and their staffs, Vice

13

President Pence, and the United States Capitol Police." *United States v. Brock,* 628 F. Supp. 3d 85, 102 (D.D.C. 2022), *aff'd,* No. 23-3045, 2023 WL 3671002 (D.C. Cir. May 25, 2023) (quoting *United States v. Judd,* 579 F.Supp.3d 1, 8 (D.D.C. 2021)). "In contrast, the Portland protests happened at night, when no federal employees were in the buildings to be endangered." *Id.; accord United States v. Rhodes,* No. 22-cr-15 (APM), 2022 WL 3042200, at *5 (D.D.C. Aug. 2, 2022) (Portland protestors were not alleged to have "engaged in comparable conduct" since defendant did not identify an "official proceeding" they obstructed").

In *Alberts*, as here, the defendant and his counsel argued that he should be compared to the Portland protestors, rather than his fellow rioters, for purposes of 18 U.S.C. § 3553(a)(6). Judge Cooper rejected a comparison between an individual who was convicted of assault under 18 U.S.C. § 111(a)(1) and civil disorder under 18 U.S.C. § 231(a)(3) with those who committed crimes in connection with the George Floyd protests in Portland. He explained as follows:

> We've heard a lot about Antifa and BLM and other political protests. The protests in 2020 in response to the George Floyd murder and police treatment of people of color occurred all over the country and took many forms. By all accounts, most were peaceful and within the bounds of legitimate political discourse, but some, if not many, people went too far, all right. . . . according to Department of Justice statements, at least 300 federal prosecutions resulted as well, including for some of the same crimes that were implicated in January 6th: arson, illegal gun possession, civil disorder.

> . . . as many of my colleagues have observed, January 6th was not just another political protest, all right, be it from the left or the right. And we see political protests from all sides in Washington, D.C., virtually every week.

> Never before has a violent mob stormed the Capitol in an attempt to overturn the results of a democratic election without any evidence or findings that the election was fraudulent. And you can rest assured that if any BLM members or Antifa members had done that and come before me, they would be treated exactly the same way as I've treated all of my January 6th defendants who I have sentenced to probation and up to multiple years.

14

ECF No. 186 (July 19, 2023 Sent. Tr.), 72:6-73:10, *United States v. Alberts*, 21-cr-26 (CRC).

Comparing his conduct to others convicted in the January 6 riot, Judge Cooper sentenced Alberts

to 84 months in prison.

Judge Cooper's reasoning in *Alberts*, and the reasoning in the cases cited above, apply with

equal force here: Thomas' conduct on January 6 was not simply "political protest" that is protected

by the First Amendment, and his crimes should be compared to his fellow January 6 rioters rather

than those in Portland, Oregon. Thomas was thrilled to be a part of the mob that endangered

hundreds of federal officials in the Capitol complex. And his ultimate purpose was to obstruct the

certification of the Electoral College vote by force, which is why, pre-January 6, he posted on

Facebook about the Electoral College Vote Act, that "Justice is Coming," and memes about the

"2nd American Revolution." *See* ECF No. 203 at 4. These facts make his case different from the

ones in Portland, Oregon.[5]

### III.    Additional Evidence of Thomas' Disrespect for the Rule of Law and Total Lack of Remorse.

Since August 2023, when the government filed its sentencing memorandum, Thomas has

continued to prodigiously post his views on social media. While he is entitled to make these posts,

they illustrate Thomas's ongoing evasion of responsibility for his conduct and his lack of any

remorse. While only a small selection of these postings are reproduced below, they represent the

---

[5] Indeed, many of the Portland defendants whom he cites had their cases dismissed, and thus fall outside the bounds of 18 U.S.C. § 3553(a)(6), which directs courts to look at disparities among sentenced defendants. By Thomas's logic, he should also be sentenced more leniently because some individuals somewhere might have been acquitted of Section 111. That is not the law.

character and mindset Thomas has broadcast to the public and his thousands of followers as he prepares for sentencing.[6] The posts below are listed from newest to oldest:

On or about November 4, 2023, Thomas posted the following on his TruthSocial account, where he continued to refer to January 6 defendants as "prisoners of war" and suggested incorrectly that they ae being prosecuted for mere "presence" at the Capitol:[7]



On or about September 9, 2023, Thomas posted to his Telegram account a link to an article entitled, "The Alternate Reality of a J6 Defendant as Told by Biden's DOJ," wherein he is quoted extensively discussing his trial, including as follows: "My judge . . . was extremely hostile at first. She actually threatened to throw my attorneys in jail because they filed a motion saying that I could use the First Amendment as part of my defense. And that enraged her . . . [but eventually] I think

---

[6] A curated list of Thomas's social media accounts can be found here: https://libertylinks.io/PiAnon.

[7] https://truthsocial.com/@PiAnon/posts/111349376575996290.

she saw, you know, 'This kid has a case.'"[8] The article further stated that "Thomas told UncoverDC the government is 'really good at backpedaling and wiggling their way around. At one point, my attorney caught the government tampering with witnesses out in the hallway.'"



In addition, under the subsection, "Some Capitol Police Officers Were Violent with Protestors," Thomas is further quoted as follows:

> I didn't know I was in a restricted area. There were no signs, no announcements, no indication were [sic] weren't allowed to be there . . . And I was trying to keep the peace, but that didn't stop them from beating me. And as soon as they beat me, I would stand up dust myself off.

---

[8]   https://uncoverdc.com/2023/09/08/the-alternate-reality-of-a-j6-defendant-as-told-by-bidens-doj/.

*Id.*

On or about September 6, 2023, Thomas posted to one of his four Rumble video accounts, "Freedom Unchained," a video entitled "Ep 15 | Coffee & Pi w/ Special Guest Daniel Goodwyn (J6er)." [9] His "guest," Daniel Goodwyn, is a January 6 defendant who pleaded guilty on January 31, 2023 to a violation of 18 U.S.C. § 1752(a)(1). In the video, Thomas introduced Goodwyn as follows: "a true friend that I've screamed from the rooftops [about] . . . his innocence for the last two and a half years . . .!" In Thomas's interview of Goodwyn, Goodwyn states that "the DOJ hasn't stopped, the FBI hasn't stopped . . . and D.C. district courts are showing no signs of mercy . . .." Among other things, Thomas then goes on to discuss how additional footage should be released to reveal the "foreign operatives" and other "people in the crowd who were instigating violence…"

As these social media posts make clear, the deterrence-related concerns set forth in the government's prior sentencing recommendation persist.

**IV.   $2,000 in Restitution is Warranted and Appropriate.**

As of June 2023, restitution has been ordered in over 500 January 6-related cases, including in multiple cases before this Court. Thomas' case should fair no differently, particularly as he does not appear to object to the government's requested $2,000 restitution amount.

---

[9] In the introduction to this video and to the hundreds of hours of videos Thomas has created and posted since his convictions in this case, Thomas overlays his own videos from January 6, where he is seen and heard screaming at police, with his promotional messaging surrounding the January 6 "POW" "campaign" he created, "Sing4Freedom," with audio files and imagery from various historical war campaigns involving totalitarian states. *See* https://rumble.com/v3fbdt2-ep-15-coffee-and-pi-w-special-guest-daniel-goodwyn-j6er.html?mref=nb1hk&mc=5w6ms.

The rationale this Court applied at sentencing in *United States v. Ramey,* 22-cr-184, is instructive. There, as here, the Defendant was convicted assaulting two officers with pepper spray under 18 U.S.C. § 111 and of civil disorder under 18 U.S.C. § 231. At sentencing, this Court recognized that it "was inclined" to impose the requested $2,000 in restitution because "Mr. Ramey was certainly responsible, the Court believes, for the additional need of reinforcements, given his actions against the officers." *Id.,* July 7, 2023 Sent. Tr. 3:20-4:6. The same is true here.

Just like Ramey, Thomas was a part of a group of rioters that pushed through lines of officers who were attempting to keep the mob from gaining access to the Capitol. In his 3:30 p.m. assaults, Thomas intentionally and forcefully threw his body and hands directly into the officers' chests in an effort to get through the police line and closer to the Capitol building. Even after his first assaults, Thomas's conduct continued to tax the police. About an hour later, around 4:30 p.m., after a fresh set of officers, including those from Prince George's County, began attempting to clear the Upper West Terrace, Thomas exclaimed, "YOU HAVE WOKEN A SLEEPING GIANT!," and then began again physically pushing back against those officers. Even after body-checking MPD Officer R.N. in his riot shield, while again chanting, "HOLD THE LINE, HOLD THE FUCKING LINE," Thomas did not stop. After the police line had forced the mob around the corner to the northernmost part of the Upper West Terrace, Thomas continued to physically push back against the moving police line with other rioters, screaming, "You see that sons of bitches! Hold the line, hold the line, fuck these assholes, hold the line!" As his own videos show, Thomas remained on the Capitol grounds until nightfall, thus requiring additional reinforcements to deploy,

such as FBI Special Agent Alexis Brown, who testified that she was summoned to the Capitol at approximately 9 p.m. on the evening of January 6.[10]

As the above shows, this Court's restitution analysis in *Ramey*, albeit brief, applies equally to Thomas. When thousands of people stormed the United States Capitol Building on January 6, 2021, they overwhelmed the severely outnumbered USCP officers, thinning their ranks as they tried to hold back the mob, forcing them to call in reinforcements from nearby law enforcement agencies, including the MPD, the PG County Police Department, and the FBI. Thomas, for many hours, joined the riotous attack, and his offenses of conviction contributed to the harm inflicted upon the officers and required the reinforced police response. In addition, Thomas damaged property, including to Congress and the Architect of the Capitol, given Thomas' attacks on the police officers was for the purpose of getting the mob inside the Capitol in order to stop the certification vote – that constitutes a crime against property because his conduct was intended to deprive the Architect and Congress of their rights to use the building as it was intended: to perform the business of Congress (similar to a trespassing crime that ousts the legitimate occupier of the property from possession, which is worse than merely trespassing, which does not have that effect). Therefore, like Ramey, Thomas should be ordered to pay $2,000 in restitution for his crimes.

---

[10] "We received notice of the events happening at the Capitol later in the afternoon. We were told that it was an all-hands call to deploy down to D.C., where I met up with probably most of the other special agents of the FBI from the Washington Field Office. We met, and we were told that we were to -- at least my group was told that we were going to be providing perimeter security around the Capitol building. I was stationed myself with my squad right outside of the Northwest Terrace on the Senate side on the lawns. . . . It was fully dark. I'd estimate around 9:00 p.m." (5/28/23 Trial Tr. 131:8-19).

The government is aware that the Court has recently raised certain questions regarding restitution in January 6 cases. It therefore provides additional support for its restitution request below.

A. Background

The government's current calculation of losses arising from the riot include the following:[11]

**Damages to the Capitol Building and Grounds**

| | |
|---|---|
| Architect of the Capital | $1,177,254.03 |
| House Chief Administrative Officer | $547,411.27 |
| Secretary of the Senate | $32,075.00 |
| Senate Sergeant at Arms | $79,490.05 |
| Total | $1,836,230.35 |

**Damages Incurred by the United States Capitol Police Department**

| | |
|---|---|
| Continuation of Pay (COP)/Workers Comp and Medical Treatment | $1,045,129.80 |
| Lost and Damaged Property | 41,719.90 |
| Total | $1,086,849.70 |

**Total[12]**

| | |
|---|---|
| Total for both groups | $2,923,080.05 |

Restitution is warranted even though Thomas did not personally damage or steal property, or personally require any of his officer-victims to seek medical treatment. Those who actually damaged property and injured police officers likely could not have done so without the weight of the mob behind them, and, as FBI Special Agent Brown testified, the building could not be secured until every last rioter was removed. Moreover, attacks from individuals like Thomas required

---

[11] Supporting materials underlying these figures attached as Exhibit One.

[12] In around March 2023, MPD submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as discussed in this memorandum.

officers' attention and made them less able to help defend their fellow officers against simultaneous attacks from other rioters. Amid the violent Capitol attack, Thomas reasonably anticipated and proximately caused damage to the Capitol building and injuries to the police officers who were guarding it that day. Therefore, he is liable for restitution under either or both the Victim Witness Protection Act (WWPA), 18 U.S.C. § 3663, and the Mandatory Victim Protection Act (MVPA), § 3663A. Finding otherwise would effectively render the victims of January 6 incapable of being made whole.

Because many actors with divergent roles in the riot converged to cause victims' injuries, all convicted January 6 defendants are liable for restitution amounts that reflect their relative role in causing the victims' losses. The way the January 6 defendants caused losses to the victims may be unique in many respects, but the need to provide restitution to victims, indeed the Congressional mandate to do so in many cases, is clear. Case law resoundingly reflects the overarching principle that analytical difficulties in defining causation or apportioning damages should not prevent courts from making victims whole. So, to reflect the incremental damage all January 6 defendants proximately caused, the government has requested, defendants have agreed, and courts have imposed (in hundreds of cases) $2,000 in restitution for felony defendants and $500 for misdemeanor defendants, plus any sums from damage each defendant personally caused.

Thomas, therefore, should be ordered to pay some amount in restitution for his role in contributing to the riot:  both to persons, including the broader police force victims, whose damages, such as in overtime costs, were substantial, but whose costs cannot be attributed to a single or even a discrete group of January 6 rioters, as well to property, including to Congress and the Architect of the Capitol, given Thomas' attacks on the police officers for the purpose of getting

the mob inside the Capitol, thereby depriving Congress of its rights to use the building as it was intended.

As discussed further below, for most defendants, the government submits that the standard $2,000 is a reasonable and appropriate amount. These numbers are based on an estimate of the damage to the Capitol and compensable expenses to injured officers divided by the estimated number of felony and misdemeanor defendants prosecuted for the January 6 events.

B. Restitution under the VWPA and MVRA Is Appropriate to Compensate the Victims[13] for Harm January 6 Defendants Have Caused.

Under both the VWPA and MVRA, Congress has given the courts broad discretion to craft restitution orders that fully compensate crime victims while recognizing defendants' varying degrees of culpability. Because the January 6 cases involve the related criminal conduct of hundreds of defendants, all of whom proximately caused loss to the victims, the courts can allocate restitution based on incremental culpability and, in the conspiracy cases, impose joint and several liability. Critically, most, if not all, January 6 defendants proximately caused harm to the victims in this case, including Congress. Therefore, restitution ought to be imposed regardless of whether a defendant personally injured a police officer or damaged property.

---

[13] The victims here are the Architect of the Capitol, the federal agency charged with operating and maintaining the physical and esthetic integrity of the Capitol Building and Grounds, the House Chief Administrative Officer, the Secretary of the Senate, the Senate Sargent at Arms, and the United States Capitol Police Department, several hundred of whose officers were guarding the Capitol Building and Grounds on January 6 when they suffered physical and/or emotional injuries as a direct result of the riot. *See* 18 U.S.C.§ 3664(i) (authorizing restitution to federal agencies).

>  1. *The VWPA Permits Restitution for Title 18 Offenses, and the MVRA Requires Restitution for Some Offenses that are Crimes of Violence or Property Offenses.*

Restitution seeks to provide recompense for harm that convicted criminals have inflicted upon victims and put them in the place, at least financially, where they stood before they were victimized. *See Paroline v. United States*, 572 U.S. 434, 456 (2014) ("The primary goal of restitution is remedial or compensatory."); *Dolan v. United States*, 560 U.S. 605, 612 (2010) (the MVRA "seeks primarily to ensure that victims of a crime receive full restitution"). But a federal court possesses no "inherent authority to order restitution," and can impose restitution only when authorized by statute. *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012).  The government's sentencing memorandum describes the two general restitution statutes, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291, § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663) and the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A). *See* ECF No. 203 at 45-46.

To determine whether a criminal defendant bears responsibility for the harm the offense caused, the relevant inquiry is the scope of the defendant's offense conduct and the harm the victim suffered as a result. *See Hughey,* 495 U.S. at 413 (Congress "authorize[d] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction"). Broader restitution is permitted where the offense of conviction contains as an element a scheme, conspiracy, or pattern of criminal activity, 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2) (MVRA), or if a plea agreement allows for a greater amount. *United States v. Thomas*, 862 F. Supp. 2d 19, 21 (D.D.C. 2012).

Significantly for the January 6 cases, a "reasonable estimate" or reasonable approximation

24

of loss is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *see also Paroline*, 572 U.S. at 459 (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry"). "The determination of an appropriate restitution amount is by nature an inexact science." *United States v. Brewer*, 983 F.2d 181, 185 (10th Cir. 1993). "[W]here the precise amount [of restitution] owed is difficult to determine, 18 U.S.C. § 3664 authorizes the court to reach an expeditious, reasonable determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim." *Id*. (citing S. Rep. No. 532, 97th Cong., 2d Sess. 31, reprinted in 1982 U.S. Code Cong. & Admin. News 2515, 2537) (cleaned up).

> ### 2. *Thomas' Offenses Warrant Restitution Because He Proximately Caused the Victims' Harm.*

Thomas is convicted of crimes that, at a minimum, are covered by the VWPA if not also by the MVRA. All offenses charged in the January 6 cases, save for those under 40 U.S.C. § 5104 (unlawful activities in the Capitol and grounds), are Title 18 offenses that fall under the discretionary restitution provisions in the VWPA. A subset of these crimes also falls under the mandatory restitution provisions in the MVRA, which applies to crimes of violence and property offenses. Unlike the categorical approach that applies to crimes of violence, in determining

whether an offense is against property, "courts may consider the facts and circumstances of the crime that was committed." *United States v. Razzouk*, 984 F.3d 181, 186 (2d Cir. 2020). *See United States v. Collins*, 854 F.3d 1324, 1334 (11th Cir. 2017) (rejecting "a categorical approach" to property offenses); *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017) (same); *United States v. Turner*, 718 F.3d 226, 235 (3d Cir. 2013) (same). In the context of the January 6 Capitol riot, property offenses may include 18 U.S.C. § 1752(a)(1)-(3) (entering or remaining in restricted buildings or grounds and obstructive conduct inside), 18 U.S.C. § 641 (theft of public money or property), 18 U.S.C. § 1361 (destruction of government property). Both restitution statutes require that the offense *proximately* cause the victim's harm. *See* 18 U.S.C. § 3663(a)(2) (VWPA defines "victim" as one who is "directly and proximately harmed as a result of the commission of an offense"); 18 U.S.C. § 3663A(a)(2) (MVRA's same language).

The January 6 cases present a relatively common restitution question about proximate causation—how to recompense victims for their losses where multiple defendants' actions have caused harm. *See United States v. Simon*, 12 F.4th 1, 65 (1st Cir. 2021) (cleaned up) ("Every loss that factors into the restitutionary amount must have an adequate causal link to the defendant[s'] criminal conduct."). Although the absence of a particular defendant, or even dozens of defendants, from the mob of rioters may have made little difference to the damages caused by the riot, that does not mean that any particular rioter may avoid restitution liability because his personal contribution to the aggregate loss is *de minimis*. If that were so, most rioters would escape restitution altogether, and the victims would not be made whole. Given the broad compensatory goals of the restitution statutes, Congress could not possibly have intended that a massive, unprecedented riot causing millions of dollars of loss would not trigger *any* restitution from nearly

all of those who criminally participated.

The Supreme Court confronted an analogous issue in *Paroline*. The defendant was one of many, perhaps thousands, of individuals who possessed the child victim's pornographic images, and the victim sought restitution from the defendant in the full amount of her damages. *Id.* at 449. Interpreting a restitution statute for child pornography offenses that shares the same causation language as the VWPA and MVRA, the Supreme Court held that restitution is available "only to the extent the defendant's offense proximately caused a victim's losses." *Paroline*, 572 U.S. at 448 (interpreting restitution under 18 U.S.C. § 2259). Proximate cause, the Court explained, is "a flexible concept that generally refers to the basic requirement that there must be 'some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 444 (cleaned up). "A requirement of proximate cause thus serves, *inter alia,* to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* at 445.

The Court then addressed the "difficult question" of how to determine what losses a defendant had caused. *Id.* at 449. The Court recognized that strict but-for causation—the traditional causal requirement—could not be established when a victim's images are widely distributed across the internet: "Even without [the defendant's] offense, thousands would have viewed and would in the future view the victim's images, so it cannot be shown that her trauma and attendant losses would have been any different but for [the defendant's] offense." *Id.* at 450. Yet the Court refused to deny restitution on that ground, explaining that "there can be no doubt Congress wanted victims to receive restitution for harms like this." *Id.* at 457. "While it is not possible to identify a discrete, readily definable incremental loss [the defendant] caused, it is indisputable that he was a part of

the overall phenomenon that caused [the victim's] general losses." *Id*.

The Supreme Court elaborated that while "[e]very event has many causes, . . . only some of them are proximate, as the law uses that term." *Id*. at 444. Proximate cause requires that an event be both "an actual cause or cause in fact" and "that there must be some direct relation between the injury asserted and the injurious conduct alleged." *Id*. (cleaned up). "Proximate cause is often explicated in terms of *foreseeability or the scope of the risk created by the predicate conduct*." *Id*. at 445 (emphasis added).

Requiring strict "but for" causation in Paroline's case inadequately captured his responsibility for the victim's harm. The victim's losses (as here) were caused by the aggregate criminal conduct of an unknowable number of offenders, and the government was generally unable to demonstrate that any individual defendant's offense conduct was a cause in fact of the victim's loss. To address the statutory command that a defendant whose criminal conduct contributed to the loss must pay restitution, the *Paroline* Court addressed "aggregate causation theories," which hold that "when the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event." 572 U.S. at 451 (cleaned up). The theory posits that "a wrongdoer's conduct, though alone insufficient to cause the plaintiff's harm, is, when combined with conduct by other persons, more than sufficient to cause the harm." *Id*. at 452. Such "aggregate causation theories … are []relevant to determining the proper outcome in cases like this." *Id.* at 456. So where a defendant's criminal conduct contributes, even minimally, to "the victim's general losses," he proximately caused that loss even if "it is not possible to identify a discrete, readily definable incremental loss he caused."

28

*Id*. at 456-57. "[W]here it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court … should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Id*. at 458.

The *Paroline* Court recognized that "[t]his approach is not without its difficulties," "involv[ing] discretion and estimation." *Id*. at 462. But the Court emphasized that "[d]istrict courts routinely exercise wide discretion both in sentencing as a general matter and more specifically in fashioning restitution orders," and recognized that courts "can only do their best to apply the statute as written in a workable manner." *Id*. As a result, the Court explained, there can be no "precise algorithm" for computing individual restitution awards. *Id*. at 459-60.

The same principles apply here. As in *Paroline*, it is impossible to trace a particular amount of losses to Thomas' offense conduct by recourse to a more traditional causal inquiry, but his offenses still proximately contributed to the losses the victims suffered. When properly aggregated, each January 6 defendant's conduct was a proximate cause of the losses sustained during the Capitol breach. Whether any one defendant personally hit an officer or broke a window, they were part of a collective whole that overran the outnumbered officers stationed at the Capitol, dissipating their lines, and giving others the opening to hit and break throughout the building. This is true even for rioters such as Thomas who stayed outside the building: they drew officers who could have been defending the interior of the Capitol outside, and contributed to officer injuries and required a substantial police response there. Whereas an individual trespasser, acting alone or in a small group, might not reasonably foresee that his trespass would lead to destruction and injury, it was reasonably foreseeable for such trespass in the context of the January 6 riot to result in the damages

29

that occurred. The police officers sought to protect the Capitol not from a single trespasser, not from several, and not even dozens, but from thousands, all of whom contributed incrementally to the harm which, in the aggregate, harmed multiple victims. Each defendant's own conduct played a part in the causal process, and each defendant is responsible for the foreseeable "consequences and gravity" of that conduct. *Paroline*, 572 U.S. at 462. Even if any one defendant's role in the overall causal process may be relatively small, that fact does not prohibit restitution outright—it just means that their share should be relatively smaller.

Many judges of this Court have properly embraced this legal liability in the context of deciding various other motions, utilizing the same type of analysis authorized by the Supreme Court in the context of restitution. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK, ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions); *id*. ("Indeed, even the presence of one unauthorized person in the Capitol is reason to suspend Congressional proceedings"); *id*. at 12 ("the law permits the factfinder to infer that a person intends the natural and probable consequences of their actions . . . As Captain Mendoza aptly explained, the probable and natural consequence of breaking into the United States

30

Capitol is the disruption of Congressional business and proceedings.").[14]

All in all, *Paroline*'s proximate cause analysis recognizes aggregate causation where many defendants incrementally and foreseeably cause harm. *Paroline* involved a group of temporally and physically distinct criminal actors, each of whom harmed the victim in a reasonably foreseeable way. The January 6 defendants are criminal actors who were *not* temporally or physically remote from each other, but instead acted in concert as a mob to cause disruption, which reasonably foreseeably led to harm and damage. Providing compensation to the victims harmed by their concerted action is in keeping with *Paroline's* pragmatic view of proximate cause. And, to be clear, in cases where individual defendants caused a direct harm—like breaking a window or medically incapacitating a law enforcement officer—the government appropriately seeks a larger amount of restitution from such persons. Nevertheless, on a macro level, imposing restitution in every case is recognition that the offenses perpetrated by individual defendants caused at least an incremental amount of harm.

### C.   The *Paroline* Reasoning Applies to January 6 Defendants.

Just as the *Paroline* Court concluded that individual defendants should be responsible for a share of the victim's total loses, the January 6 defendants are responsible for their fair share of restitution. And just as the *Paroline* Court approved "rough guideposts" for trial courts to follow in determining a perpetrator's "relative causal role" in a victim's injury, 572 U.S. at 460, so too

---

[14] *See also, e.g., United States v. Chan*, No. 21-cr-00668 (TNM), Tr. Jan. 24, 2023, pp. 15-16 ("Of course, part of the danger of mobs is the sheer volume of people. Had [the defendant] or any one of his fellow rioters been in the Capitol alone, they could have quickly been dealt with by the police. [The defendant] by his presence and actions was also acting to protect and insulate the other rioters from arrest.");.

31

should the court here.

The D.C. Circuit considered how to apply those guideposts in *United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019). *Monzel*, like *Paroline*, involved restitution for the victim of child pornography under § 2259. *Id*. The D.C. Circuit affirmed the district court's award of $7,500 in restitution toward more than $3 million total loss, by a single defendant who possessed a single pornographic image of the victim. *Id*. And, like *Paroline*, the *Monzel* Court approved restitution even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm." *Id*. at 477. In setting the restitution amount, the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment." *Id*. at 485. Ultimately, the restitution award was permissible because it "reflect[ed] a reasonable exercise of discretion guided by *Paroline* guideposts." *Id*.

Here, the United States has sought $2,000 in restitution from felony defendants and $500 from misdemeanor defendants whether or not they actually injured a police officer or damaged property, because, regardless, they proximately contributed to the damages the victims in this case suffered. These numbers are based on damages to the Capitol and compensable expenses to injured officers divided by the early estimated number of misdemeanor and felony defendants responsible for the losses caused by the riot. *See Monzel*, 930 F.3d at 478 (explaining that where a defendant was not substantially more involved in causing compensable loss than most others "his relative share of restitution should not be severe, but neither should it be token or nominal. Instead, it should be reasonable and circumscribed") (cleaned up).

This restitution approach is a reasonable estimate based on the total loss to the U.S. Capitol

and its protecting agencies and the number of defendants the government anticipated it may charge based on the projected numbers of those who illegally trespassed. Realistically, and perhaps importantly, the $2,000/$500 restitution paradigm will not currently exceed the total losses.

Courts across this District have imposed restitution in this way in hundreds of misdemeanor and felony cases to date, totaling at least $471,000 in over 500 individual cases. And in many of these cases, courts have explicitly recognized that a single defendant's offense conduct contributed to the mob's success. Below is a sampling of comments from judges emphasizing the collective action of January 6 defendants and also their liability for restitution even if they were not directly responsible for property damage or personal injury:

1.   *United States v. Rubenacker*, (1:21-cr-193) Tr. 05/26/2022 at 146-47 (J. Howell) (convicted after open plea, restitution uncontested):

> Where, as here, the case involves the related criminal conduct of multiple defendants, the procedures for awarding restitution under both the MVPA and the VWPA allow the Court discretion to hold the defendants jointly and severally liable for the full amount of restitution or apportion restitution and hold the defendant responsible only for his own individual contribution to the victim's loss.

2.   *United States v. Griffin*, (1:21-cr-0092) Tr. 06/17/2022 at 41 (J. McFadden) (convicted at trial, restitution uncontested):

> While there's no evidence that you damaged property yourself and you did not even enter the Capitol Building, I do believe that the combined actions from you and others caused significant damage to the inauguration stage itself, and I do believe the actions of the rioters complicated law enforcement's efforts to prevent damage to the Capitol Building itself.

3.   *United States v. Webster*, (1:21-cr-208) Tr. 09/01/2022 at 23-25 (J. Mehta) (convicted at trial, restitution uncontested):

> You know, given the nature of the overall conduct, you can't have any particular person responsible for all $2 million, but it's certainly safe to say that the $2 million in damage could not have happened but for the collective action of each individual person who was there on January the 6th. And so everybody who was there in a

sense, whether they directly destroyed property or not, certainly contributed and caused it, and so I think the amount of $2,000 that's been requested is fair in terms of a restitution amount, for a total amount of $2,060 as restitution in this case.

4.   *United States v. Wood*, (1:21-cr-223) Tr. 11/28/2022 at 42 (J. Mehta) (convicted after open plea, restitution amount contested):

And while Mr. Wood did not do so directly—he didn't break anything. He didn't destroy anything—certainly his presence there aided and abetted, particularly given how close he was to some of the windows that were shattered, in that conduct, in assisting and aiding and abetting that conduct. I do think the $2,000 is appropriate as restitution as that is consistent with the felony amounts that have been—with felonies, as has been the case across these January 6th proceedings.

5.   *United States v. Council*, (1:21-cr-207) Tr. 12/12/2022 at 61 (J. McFadden) (convicted at trial, restitution uncontested):

I note that the Government is seeking restitution, not for the officer, but for the damage done to Congress, to the Capitol Building. And even though there's no evidence that the Defendant specifically sought to destroy property, his actions were part of the harms being done against Congress here.

6.   *United States v. Sargent*, (1:21-cr-258) Tr. 12/12/2022 at 61-63 (J. Hogan) (convicted after open plea, restitution contested):

My finding is that you participated in the riot with the attempt to assault the police officer and you were intending to do that to cause further damages and riot and delay or obstruct in the—by your civil actions to Count 1, the civil unrest that you contributed to, resulting in the delaying of the Electoral College vote. And so you should be responsible for some type of restitution. You saw the damage being done. You were on the tower. You saw the people going through the barricades, the police being attacked, the tear gas being expended, officers fleeing. You were all part of that in the midst of that. In fact, you forced your way to the front of the line to join in that. So I think it's appropriate that you be assessed restitution under the law.[15]

---

[15] The court reduced the restitution from $2,000 to $500 in this case based on the defendant's poverty. *Id.*

As this Court did in *Ramey*, it can and should again order restitution to the victims harmed on January 6 in an amount that reflects each defendant's relative role in the causal process underlying the victims' losses.

## V.   Thomas is Liable to Pay Mandatory Restitution under the MVRA regardless of His Financial Circumstances.

Although Thomas failed to provide USPO with the IRS consent form or the requested verification of his reported financial information, it is worth reiterating that the USPO found "[b]ased on the defendant's financial status, it appears he has the ability to pay a fine in addition to restitution in this case." PSR ¶¶ 129, 134-38. Particularly given that he has used his January 6-related fame for profit, any argument about an inability to pay should be discarded. Furthermore, restitution is mandatory under the MVRA, particularly where, as here, Thomas admitted at trial that he threatened and attempted property damage when he bent down to use a jackknife to cut the zip-ties that were holding the white tarp to the grandstands. Moreover, similar to a trespassing crime that ousts the legitimate occupier of the property from possession, Thomas' attacks on the police officers for the purpose of getting the mob inside the Capitol in order to stop the certification vote was a crime against property because it was intended to deprive the Architect and Congress of their rights to use the building as it was intended: to perform the business of Congress. Because Thomas proximately caused property damage, at most, his financial circumstances are relevant only to a payment schedule under § 3664(f)(3).

A.   The MVRA mandates restitution where, looking at the facts and circumstances of the offense, the defendant has committed the offense in a way that constitutes an "offense against property."

The MVRA mandates restitution for a subset of offenses covered in the VWPA, including

"offense[s] against property" and "crime[s] of violence":

> (c)(1) This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense--
>> (A) that is--
>>> (i) a crime of violence, as defined in section 16;
>>> (ii) an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit; [and]
>> * * *
>> (B) in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

18 U.S.C. § 3663A(c)(1).

The MVRA does not define "offense against property," but Circuit courts invariably have held that "courts may consider the facts and circumstances of the crime that was committed to determine if it is an 'offense against property' within the meaning of the MVRA." *United States v. Razzouk*, 984 F.3d 181, 186 (2d Cir. 2020). Although the D.C. Circuit has not yet weighed in, so far, every Circuit to have considered the issue has rejected a categorical approach.  Rejecting a categorical approach and instead looking at how the crime was committed, courts have held that the following crimes were "offense[s] against property": *Razzouk*, 984 F.3d at 186 (accepting bribes in violation of 18 U.S.C. § 666(a)(1)(B)); *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017) (making a false statement in a mortgage fraud case, in violation of 18 U.S.C. § 1001(a)(2)); *United States v. Hagen*, 60 F.4th 932, 953 (5th Cir. 2023) (conspiracy to defraud the United States and to commit money laundering in a health care fraud case, in violation of 18 U.S.C. §§ 371, 1956(a)(2)(A), (h)); *United States v. Collins*, 854 F.3d 1324, 1334 (11th Cir. 2017) (conspiracy to accept gratuities in connection with a bank transaction, in violation of 18 U.S.C. §§ 215, 371). *See also United States v. Sukhtipyaroge*, 394 F. Supp. 3d 951, 95-60 (D. Minn. 2019),

*aff'd on other grounds*, 1 F.4th 603 (8th Cir. 2021) (visa fraud, in violation of 18 U.S.C. §§ 1546, was an "offense against property" because it caused the immigrant victim to lose entitled earnings).

This means that an "offense against property" is not categorically limited to those crimes that have an *element* that "implicates" property. *Id.*; *see id.* at 188 ("We see no reason to limit arbitrarily victims' compensation for property loss to those crimes—Hobbs Act robbery, for example—in which some action involving 'property' is ordinarily referred to as an element"). Rather, courts apply a "circumstance-specific" approach, looking at "the specific way in which an offender committed the crime on a specific occasion." *Nijhawan v. Holder*, 557 U.S. 29, 34 (2009) (contrasting categorial and circumstance specific approaches in the context of an immigration case).

This fact-based approach is consistent with the "plain text of the statute . . . [which] suggests that the way the crime is carried out is relevant to its application." *Razzouk*, 984 F.3d at 187. "[T]he MVRA's description of 'offenses against property' makes no mention of the elements of any generic crime and provides no other signal that examination of such elements serves its purpose." *Id.* This reading is also supported by use of the word, "committed" in the phrase "committed by fraud or deceit," which points to how the crime was carried out, rather than how it is defined. *Id.* By contrast, a "crime of violence," to which MVRA also applies, § 3663A(c)(1)(A)(i), is governed by 18 U.S.C. § 16's definition of "crime of violence" that turns upon the elements of the offense. *Id.*

**CONCLUSION**

Based on the foregoing and the bases set forth the government's prior sentencing recommendation, the government recommends that the Court impose a sentence of 109 months of incarceration, at the midpoint of the applicable range, 36 months of supervised release, restitution of $2,000, a fine of $77,607, and mandatory assessments totaling $525.

Respectfully submitted,

MATTHEW M. GRAVES

United States Attorney
DC Bar No. 481052

*/s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

# EXHIBIT ONE
# (FILED UNDER SEAL)